Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-19 Filed 02/25/2385 Page 1 of 1539    PageID 17239

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 84 of 84    PageID 98077

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.


SIDNEY A. FITZWATER
SENIOR JUDGE

# EXHIBIT 20

Case 19-34054-sgj11    Doc 3596-20    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 28 Filed 02/29/23    Page 3 of 1539    PageID 17241
Exhibit 20    Page 2 of 5

Case: 19-10847    Document: 00515903826    Page: 1    Date Filed: 06/17/2021

# United States Court of Appeals
# for the Fifth Circuit

_____

No. 19-10847

_____

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

IN THE MATTER OF: ACIS CAPITAL MANAGEMENT, L.P.,

*Debtor*,

----------------------------

NEUTRA LIMITED;

*Appellant*,

*versus*

ROBIN E. PHELAN, CHAPTER 11 TRUSTEE,

*Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-291

_____

No. 19-10847

Before Sᴍɪᴛʜ, Hᴏ, and Oʟᴅʜᴀᴍ, *Circuit Judges*.

Pᴇʀ Cᴜʀɪᴀᴍ:*

Having thoroughly reviewed the parties' briefs and arguments, we conclude the district court's judgment affirming the bankruptcy court's order confirming the Chapter 11 plan must be AFFIRMED. We further conclude the appeal of the district court's plan injunction is moot and must be DISMISSED.

---

* Pursuant to 5ᴛʜ Cɪʀᴄᴜɪᴛ Rᴜʟᴇ 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᴛʜ Cɪʀᴄᴜɪᴛ Rᴜʟᴇ 47.5.4.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

                No. 19-10847    Neutra v. Phelan
                                USDC No. 3:19-CV-291

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
<u>certiorari</u> in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

Case: 19-10847    Document: 00515903827    Page: 2    Date Filed: 06/17/2021

The judgment entered provides that appellant pay to appellee the
costs on appeal.  A bill of cost form is available on the court's
website www.ca5.uscourts.gov.

                         Sincerely,

                         LYLE W. CAYCE, Clerk

                         *Charles Whitney*

                         By: _____
                         Charles B. Whitney, Deputy Clerk

Enclosure(s)

Ms. Annmarie Antoniette Chiarello
Mr. Phillip Lewis Lamberson
Mr. Jeffrey Scott Levinger
Mrs. Rakhee V. Patel

# EXHIBIT 21

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Hearing Date: TBD** |
| | ) **Objection Deadline: TBD** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

The official committee of unsecured creditors (the "<u>Committee</u>") of Highland Capital Management, L.P. (the "<u>Debtor</u>"), hereby submits this motion (this "<u>Motion</u>") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed Order</u>"), pursuant to 28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>"), transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas.

## PRELIMINARY STATEMENT

1.      Although a debtor's choice of venue generally warrants deference, this case presents unique facts that make a change in venue appropriate.  The Debtor has only one location in the United States—its Dallas, Texas headquarters, which houses the Debtor's management and key personnel.  In fact, the Debtor's headquarters sit less than two miles from the United States Bankruptcy Court for the Northern District of Texas (the "<u>Dallas Bankruptcy Court</u>"), making the venue clearly more convenient for the Debtor and its management than Delaware.  Additionally,

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

although the Debtor's creditors span the nation, a substantial number of the Debtor's creditors (including several of the top twenty unsecured creditors and Committee members) are concentrated in Texas, or the Midwest more broadly.  Likewise, nearly all of the professionals active in this case are concentrated in Texas, Chicago, or Los Angeles.  The Dallas Bankruptcy Court is more centrally located and easily accessible to the key parties in this case, along with their advisors.  Transferring venue from Wilmington, Delaware to Dallas, Texas would result in greater efficiencies and significant cost savings for the Debtor's estate.

2.      Moreover, the Dallas Bankruptcy Court is already intimately familiar with the Debtor's principals and complex organizational structure—the involuntary chapter 11 cases of the Debtor's former affiliates and current Committee members, Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (collectively, "Acis") are pending in the Dallas Bankruptcy Court.  Specifically, the Dallas Bankruptcy Court has (a) heard multiple days' worth of material testimony from the Debtor's principal owner (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general counsel, at least two assistant general counsels, and numerous other employees of the Debtor and other witnesses; and (b) issued at least six published opinions to date, many of which have been affirmed on appeal to the United States District Court for the Northern District of Texas (the "Dallas District Court") in subsequent published opinions.  The Dallas Bankruptcy Court is still presiding over an adversary proceeding commenced by the Debtor and its affiliates, and the Debtor's appeal of Acis's confirmed chapter 11 plan is still pending before the Fifth Circuit.  As evidenced by the published opinions, the Dallas Bankruptcy Court and the Dallas District Court are intimately familiar with the Debtor's business, principal owner, and key executives.  For these reasons, the Dallas Bankruptcy Court is uniquely positioned to oversee this chapter 11 case.

ACTIVE 250501748

3.    The Committee respectfully submits that, for the reasons set forth above and discussed more fully below, based on the unique facts of this case, both the interests of justice and convenience of the parties justify an exception to the general deference granted to a debtor's choice of venue and warrant the transfer of venue to the Dallas Bankruptcy Court.

**JURISDICTION**

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.    The statutory and other bases for the relief requested herein are 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Local Rule 1014-1.

**BACKGROUND**

6.    On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Committee was appointed by the United States Trustee on October 29, 2019 [Docket No. 65].

**I.    The Debtor's Connections to Dallas.**

7.    As noted in the Voluntary Petition [Docket No. 1], the Debtor's principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201, which also serves as the Debtor's

international headquarters, and, in fact, its only office in the United States.  *See Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 9] (the "First Day Declaration"), ¶ 7.  Although it is unclear how many of the Debtor's 76 employees are based in the Debtor's international offices, presumably those employees based in the U.S. live in or around the Debtor's headquarters in Dallas, Texas.  Furthermore, all but one of the Debtor's equity holders are also located in Dallas, Texas.  *See* Voluntary Petition [Docket No. 1], at pg. 14.  In sum, Dallas, Texas is the epicenter of the Debtor's operations.

## II.    The Dallas Bankruptcy Court's Familiarity with the Debtor.

8.      Prior to the commencement of this chapter 11 case, the Debtor was (and currently remains) actively involved in the involuntary chapter 11 case of Acis, its then-affiliate and current Committee member, captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the "Acis Bankruptcy").  Until 2019, Acis was the "structured credit arm of Highland."  *In re Acis Capital Mgmt., L.P.*, Nos. 18-30264 (SGJ), 2019 Bankr. LEXIS 292, at *17 n. 21 (Bankr. N.D. Tex. Jan. 31, 2019) (the "Acis Confirmation Opinion"), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).[2] Acis did not have any of its own employees and, instead, contracted with the Debtor to perform all day-to-day functions, meaning that all Acis corporate representatives and witnesses in the Acis Bankruptcy were employees of the Debtor.  *Id.* at *9.  Moreover, there was complete overlap between Acis and the Debtor at the executive level, with the Debtor's CEO James Dondero serving as President of Acis and the Debtor's CFO, and first day declarant, Frank Waterhouse serving as Treasurer.

9.      The Acis Bankruptcy commenced on January 30, 2018, when Joshua N. Terry filed involuntary petitions against Acis to commence chapter 7 cases in the Dallas Bankruptcy Court.

---

[2] The Acis Confirmation Opinion is attached hereto as **Exhibit B**.

In connection with a hotly-contested trial on the involuntary petitions, the Dallas Bankruptcy Court heard seven days of testimony and argument, entered orders for relief and issued a written opinion, which is attached hereto as **Exhibit C** (the "Acis Involuntary Opinion").  Testimony included that of the Debtor's co-founder and CEO, James Dondero, the Debtor's co-founder and then-Chief Investment Officer, Mark Okada, the Debtor's General Counsel, Scott Ellington, the Debtor's Controller, David Klos, and the Debtor's Assistant General Counsel, Isaac Leventon.

10.     In May 2018, the Acis bankruptcy cases were converted from Chapter 7 to Chapter 11, and a Chapter 11 Trustee was appointed "due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management."  *See* Acis Confirmation Op. at *15.

11.     The Debtor and its affiliates were, and remain, exceptionally active throughout the Acis Bankruptcy, objecting to virtually every action proposed by the Chapter 11 Trustee throughout the case.  *See In re Acis Capital Mgmt., L.P.*, 603 B.R. 300, 302 (Bankr. N.D. Tex. 2019).  As a result, the Dallas Bankruptcy Court was forced to conduct many evidentiary hearings, during which the Debtor's executives and employees were often called to testify.  Overall, between the Acis Bankruptcy and related adversary proceedings, the Dallas Bankruptcy Court has to date reviewed approximately 700 exhibits, heard more than thirty days of testimony and oral argument, and issued six opinions.  The Dallas District Court has also ruled on three appeals related to the Acis Bankruptcy, all of which were filed by the Debtor and/or its affiliates.  The Debtor's appeal of the Acis confirmation order is now pending before the Fifth Circuit.[3]

12.     The Dallas Bankruptcy Court is also currently adjudicating a number of fraudulent transfer causes of action that Acis has brought against the Debtor and certain of its non-debtor

---

[3]     *See generally Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 69] and

affiliates in a consolidated adversary case (the "Acis Adversary Proceeding").  Distilled to its

essence, the Acis Adversary Proceeding concerns actions taken by the Debtor and its affiliates to

denude the Acis debtors' estates of their value and frustrate an imminent, substantial judgment

against Acis.  *See Acis Capital Mgmt., GP, LLC v. Highland Capital Mgmt., L.P. (In re Acis*

*Capital Mgmt., L.P.)*, 600 B.R. 541, 549 (Bankr. N.D. Tex. 2019) (the "Acis Arbitration

Opinion").[4]

13.    In sum, the Dallas Bankruptcy Court and the Dallas District Court are already

intimately familiar with the Debtor's complex structure, its management, and key personnel, and

are well-versed in the contentious relationship between the Debtor and several of its largest

creditors, including members of the Committee.  Accordingly, the Dallas Bankruptcy Court is

uniquely situated to oversee this chapter 11 case.

### RELIEF REQUESTED

14.    By this Motion, the Committee requests entry of the Proposed Order, substantially

in the form attached hereto as **Exhibit A**, transferring the venue of this chapter 11 case to the

Dallas Bankruptcy Court.

### BASIS FOR RELIEF

### III.    The Dallas Bankruptcy Court is an Appropriate Venue Under 28 U.S.C. § 1408.

15.    Section 1408 of title 28 of the United States Code provides that bankruptcy cases

may be commenced in the district court for the district "in which the domicile, residence, principal

place of business in the United States, or principal assets in the United States" of the debtor is

---

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as*
*Special Texas Litigation Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 70] (describing the Debtor's
ongoing litigation and involvement with the Acis Bankruptcy).

[4] A copy of the Acis Arbitration Opinion is attached hereto as **Exhibit D**.

ACTIVE 250501748

located or the district "in which there is a pending case under title 11 concerning such person's affiliate."

16.     The Debtor's headquarters, and indeed its only office in the United States, is located in Dallas, Texas.  Moreover, had this chapter 11 case commenced mere months ago, the Acis Bankruptcy would be a "pending case under title 11 concerning" the Debtor's affiliate.[5]  The Dallas Bankruptcy Court easily satisfies the statutory venue requirements under 28 U.S.C. § 1408.

**IV.     The Court Should Exercise its Discretion to Transfer Venue to the Dallas Bankruptcy Court.**

17.     It is within a court's discretion to transfer a case to another venue if it is "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Courts have interpreted this statutory provision to create two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties.  *See In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012).  Movants for transfer of venue have the burden of showing that a transfer is warranted based on the preponderance of the evidence.[6]  *Id.* at *5.

**A.     Transferring Venue to the Dallas Bankruptcy Court Would Serve the Convenience of the Parties.**

18.     In determining whether a venue transfer would serve the convenience of the parties, courts generally examine the following six factors: "(a) proximity of the creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of the witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation."  *In re*

---

[5] The Debtor ceased to be an affiliate of Acis following confirmation of the Acis plan of reorganization in January 2019, when equity in reorganized Acis was distributed to Mr. Terry in exchange for a reduction of his allowed claim.

[6]  To meet its burden herein, the Committee is relying on the record of this case, including the First Day Declaration, and the established record of the Acis Bankruptcy.  The Committee therefore does not anticipate there being any need to hold an evidentiary hearing on this Motion.

*Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4, 2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)).  Under this analysis, the factor given the most weight is the economic and efficient administration of the estate.  *Id.*

### 1.    Proximity of Creditors of Every Kind to the Court.

19.    Of the Debtor's twenty largest unsecured creditors, at least seven[7] are listed as having Texas addresses:  Acis, Joshua and Jennifer Terry, McKool Smith, P.C., Foley Gardere, DLA Piper LLP (US), Lackey Hershman LLP, and Andrews Kurth LLP.  *See* Voluntary Petition [Docket No. 1].  Additionally, of the total known claims at this juncture, it appears that a significant number of the Debtor's creditors are located in Texas, and the rest of the creditors appear to be scattered across the United States.  No known creditors appear to be based in Delaware.  *See id.*

20.    Courts may also focus on the location of the debtor's and creditors' professionals in deciding whether to transfer venue.  *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 492529, at *6 (Bankr. D. Del. Feb. 2, 2015).  The Committee's proposed counsel is primarily located in Chicago, Illinois, but also maintains an office in Dallas, Texas (where its litigation team for this case is based).  If this case were to proceed before this Court, the Committee would have to retain Delaware co-counsel.[8]  Additionally, several of the Debtor's largest creditors are separately represented by counsel based in the Midwest: the Acis is represented by the Rogge Dunne Group and Winstead PC in Dallas [Docket No. 81], the Redeemer Committee of the Highland Crusader Fund is represented by Jenner & Block LLP primarily out of its Chicago office

---

[7] Additionally, although listed with a North Carolina address, CLO Holdco, Ltd. is an affiliate of and controlled by the Debtor, whose principal place of business is in the Northern District of Texas.  The Debtor also lists Reid Collins & Tsai's New York office, despite the fact that the firm is a Texas limited liability partnership based in Texas.

[8] Under Local Rule 9010-1(d), the Committee has until November 27, 2019, to obtain Delaware co-counsel, if necessary.

[Docket Nos. 1, 36], and USB Securities LLC and UBS AG London Branch is represented by Latham & Watkins LLP, which has an office in Houston [Docket No. 85].

21.     Considering the proximity of both the Debtor's creditors and their professionals to the Dallas Bankruptcy Court, this factor should weigh in favor of transfer. *See In re Rehoboth Hosp., LP*, No. 11-12798 (KG), 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011) (concluding that, on balance, this factor favored transfer to Texas when the overwhelming majority of creditors were located in Texas).

### 2.     Proximity of the Debtor to the Court.

22.     Courts have noted that this inquiry should focus primarily on the parties that must appear in court. *See Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6. The Debtor's headquarters, and only office located in the United States, is in Dallas, Texas. *See* First Day Decl., at ¶ 7. As a result, it is likely that any of the Debtor's personnel who would have to appear in court are located in Dallas, Texas. The Debtor has no connection to Delaware other than the fact that it was formed there.

23.     The Committee concedes that Debtor's counsel maintains an office in Delaware but does not have an office in Dallas. That said, Debtor's counsel represents itself as having a "national presence," including in the Fifth Circuit,[9] and its lead lawyers on this matter are based in Los Angeles. The Debtor's proposed financial advisor team is also predominantly based in Los Angeles with several members located in Chicago. No proposed advisor from Development Specialists, Inc. is located on the East Coast, let alone in Delaware. *See Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

---

[9] *See* http://www.pszjlaw.com/about-presence.html#circuit5.

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75], Ex. A. Accordingly, the Committee respectfully submits that this factor weighs in favor of transferring venue to the Dallas Bankruptcy Court.

### 3.    Proximity of the Witnesses Necessary to the Administration of the Estate.

24.    The Committee anticipates that the witnesses likely to be necessary in this chapter 11 case are the Debtor's management, who are all located in Dallas, Texas, or the Debtor's financial advisors, who are all located in either Chicago, Illinois, or Los Angeles, California. Dallas, Texas, is significantly closer to any potential witness than Wilmington, Delaware. Thus, the Committee respectfully submits that this factor also weighs in favor of transferring venue to the Dallas Bankruptcy Court.

### 4.    Location of the Assets.

25.    The location of the Debtor's assets is not as important as other factors where "the ultimate goal is rehabilitation rather than liquidation." *See In re Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6 (quoting *In re Enron Corp.*, 274 B.R. 327, 347 (Bankr. S.D.N.Y. 2002)). Although the Committee believes that the Debtor's U.S. assets would be located at the Debtor's headquarters in Dallas, Texas, the Committee does not believe this factor important to the Court's decision.

### 5.    Economic Administration of the Estate.

26.    As noted above, the most important factor is the economic and efficient administration of the Debtor's estate. *Id.* The Committee does not dispute the ability of this Court to administer this chapter 11 case in a just and efficient manner. That said, there are many factors that make the Dallas Bankruptcy Court the more economical venue. As discussed in more detail below as part of the "interests of justice" analysis: (1) there is a higher concentration of creditors

ACTIVE 250501748

and creditors' counsel in Texas and the Midwest than elsewhere in the country; (2) the Debtor and all of its U.S. personnel are in Dallas, Texas; (3) Dallas, Texas is more centrally located in the United States than Wilmington, Delaware and arguably easier and cheaper for parties to travel to; (4) most creditors would need to obtain Delaware co-counsel if venue remains before this Court; and (5) the Dallas Bankruptcy Court and the Dallas District Court has already expended great time and effort familiarizing itself with the Debtor, the Debtor's operations, and the disputes between the Debtor and some of its largest creditors. For these reasons and the reasons set forth below in Section II.B, this factor weighs heavily in favor of transferring venue to the Dallas Bankruptcy Court. *See In re Qualteq, Inc.* 2012 WL 527669, at *6 (noting that same considerations for this factor arise in applying the "interest of justice" prong).

### 6. Necessity for Ancillary Administration if Liquidation Should Result.

27. "Most cases do not consider liquidation because it is illogical to focus on liquidation contingencies when the goal of the bankruptcy is reorganization." *In re Dunmore Homes, Inc.*, 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008). However, should this case be converted to a liquidation, the Debtor's personal property would be predominantly located in Dallas, Texas. As a result, this factor also weighs in favor of transfer.

### B. Interests of Justice.

28. When determining whether a transfer would serve the interests of justice, courts consider whether such transfer "would promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *7 (quotations omitted). The interests of justice standard is a "broad and flexible standard which must be applied on a case-by-case basis." *In re Safety-Kleen Corp.*, Adv. Proc. No. 00-1984, 2001 Bankr. LEXIS 1296, at *6 (Bankr. D. Del. Aug. 27, 2001) (citing *Gulf States Expl. Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

### 1.    Judicial Economy.

29.    Judicial economy would be served by transferring this case to the Dallas Bankruptcy Court.  At the time of this filing, this Court has only held one hearing, granting interim relief for a handful of routine "first day" motions.  In contrast, the Dallas Bankruptcy Court has heard at least 30 days of testimony, including that of the Debtor's executives, and conducted countless hearings in the Acis Bankruptcy.  With the exception of the Debtor's proposed chief restructuring officer and Mr. Waterhouse, the Dallas Bankruptcy Court is familiar with nearly all of the Debtor's senior management.  As summarized above, the Dallas Bankruptcy Court and Dallas District Court have already devoted multiple days of court time to the Debtor.

30.    Additionally, Acis's claim against the Debtor (which is listed on the list of twenty largest unsecured creditors) and the Debtor's proof of claim and administrative claim against Acis (which is technically an asset of the Debtor's estate) are currently pending in the Dallas Bankruptcy Court.  Judicial economy would best be served by utilizing the time and resources already extended by the Dallas Bankruptcy Court in connection with these claims.  This factor weighs overwhelmingly in favor of transfer.  Indeed, it is hard to imagine a case where judicial economy would be better served by a transfer of venue under 28 U.S.C. § 1412.

31.    Courts in this district have historically placed a particular emphasis "on the "learning curve" that typically militates against a transfer.  *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016).  This case is unique in that the "learning curve" that typically militates against a transfer in the interests-of-justice basis is actually *inverted*.  That is, it is not the proposed transferee court that will have a "learning curve," but rather it is this Court that would.  Given that this Court has only considered first day relief, and on an interim basis, while the Dallas Bankruptcy Court and Dallas District Court both have

intimate familiarity with the parties and their businesses, transferring the venue would be in furtherance of judicial economy.

### 2.    Economic and Efficient Administration of the Bankruptcy Estate.

32.    As previously noted, there are economic efficiencies available in Dallas, Texas that are not available in Wilmington, Delaware.  Venue in Dallas would allow the Debtor's employees to easily attend hearings in this case and thus eliminate the need for air travel for most witnesses. The Debtor's headquarters are located in The Crescent in Dallas, Texas, approximately 1.2 miles from the Dallas Bankruptcy Court.  By contrast, this Court is located approximately 1,437 miles from the Debtor's headquarters.  Travel to this Court from the Debtor's headquarters requires, at a minimum, a 30-minute car ride to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and then a 30-minute car ride to Wilmington, Delaware.  The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington.  If this case remains in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on maximizing value for all creditors.

33.    Additionally, as the Debtor's professionals and proposed CRO are primarily located in Los Angeles, venue in Dallas would eliminate hours of travel time and the administrative expense associated with the same.  Dallas-Fort Worth International Airport, consistently the third-busiest airport in the country (behind Chicago O'Hare and Atlanta Hartsfield-Jackson), offers nearly 1,800 flights per day.  American Airlines alone offers approximately 14 non-stop flights per day from LAX to DFW.  According to FlightSphere.com, there are approximately 20 total flights per day from LAX to DFW and 7 flights per day from DAL to LAX.  By contrast, according to FlightSphere.com, there are approximately 10 flights per day from DFW to Philadelphia and approximately 8 flights per day from DAL to Philadelphia.  The flight from LAX to DFW is

approximately 3 hours, whereas the flight from LAX to Philadelphia is approximately 6 hours. *See In re Rehoboth Hosp., LP,* No. 11-1279 (KG), 2011 Bankr. LEXIS 3992, at *15 (Bankr. D. Del. October 19, 2011) (transferring venue of a single asset real estate case from Delaware to Texas because "the estate may incur significant travel costs to obtain the testimony of witnesses that are located in Texas").

34.      Additionally, Rule 45 of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 9016, mandates that contested non-party discovery disputes (potentially like those related to the Debtor's approximately 2,000 non-debtor affiliates) be heard in the place of compliance, which would most likely be in the Northern District of Texas.  The Committee is already aware of the Debtor's history of contesting discovery.  *See, e.g., Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, CV 6547-VCN, 2016 WL 61223, at *1 (Del. Ch. Feb. 2, 2016). It is therefore likely that the Dallas District Court and Dallas Bankruptcy Court will need to hear and resolve multiple discovery disputes.  In light of that inevitability, it would be sensible to transfer this case so that related disputes aren't being heard in multiple venues.

35.      There is no doubt that transferring venue to Dallas would promote the economic and efficient administration of this chapter 11 case.  This factor weighs in favor of transfer.

### 3.      Timeliness.

36.      As of the date of this Motion, this case has only been pending for 16 days.  The Committee is also seeking to have this Motion heard on an expedited basis, as set forth in the motion to shorten notice filed concurrently herewith.  *Cf. In re Jones*, 39 B.R. 1019, 1020 (Bankr. S.D.N.Y. 1984) ("[t]he debtor's motion to change venue is untimely given the fact that this case was commenced over one and one-half years ago").  The Court has only considered the Debtor's request for first day relief on an interim basis.  The next hearing is not scheduled until November 19, 2019.  The Motion is timely and this factor weighs in favor of transfer.

14

**4.    Fairness.**

37.    Transferring this chapter 11 case to a venue where employees, creditors, and numerous other parties-in-interest may more easily participate in the restructuring process would be manifestly fair.  To the extent the Debtor chose this forum in order to distance itself from largely unfavorable findings, fairness dictates that this case should be transferred.

*        *        *        *        *

38.    For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this chapter 11 case be transferred to the Dallas Bankruptcy Court.  The majority of the parties and professionals involved in this chapter 11 cases are more centrally located to Dallas, Texas than Wilmington, Delaware, which would create significant costs savings to the Debtor's estate compared to keeping the case in Delaware.  Moreover, the Dallas Bankruptcy Court and Dallas District Court are both well-versed in the facts and issues that will undoubtedly need to be addressed in this chapter 11 case.  As such, the Committee respectfully requests that this Court transfer venue of this case to the Dallas Bankruptcy Court.

## <u>NOTICE</u>

39.    Notice of this Motion will be provided to (i) the Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion.  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein

and such other and any further relief as the Court may deem just and proper.


Dated:  November 1, 2019                    SIDLEY AUSTIN LLP
        Wilmington, Delaware

                                            */s/ Bojan Guzina*
                                            ————————————————————————
                                             Bojan Guzina
                                             Matthew A. Clemente
                                            Alyssa Russell
                                            One South Dearborn Street
                                            Chicago, Illinois 60603
                                            Telephone:  (312) 853-7000
                                            Facsimile:  (312) 853-7036

                                                    -and-

                                            Jessica C. K. Boelter
                                            787 Seventh Avenue
                                            New York, New York 10019
                                            Telephone: (212) 839-5300
                                            Facsimile: (212) 839-5599

                                                    -and-

                                            Penny P. Reid
                                            Paige Holden Montgomery
                                            2021 McKinney Avenue
                                            Suite 2000
                                            Dallas, Texas 74201
                                            Telephone: (214) 981-3300
                                            Facsimile: (214) 981-3400

                                            PROPOSED ATTORNEYS FOR THE OFFICIAL
                                            COMMITTEE OF UNSECURED CREDITORS

ACTIVE 250501748

APPX. 102654

**Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
|  | ) |
| Debtor. | ) **Ref. Docket No.: ___** |

**ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES**
**BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS**

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this
"Order") transferring the venue of the above-captioned chapter 11 case to the United States
Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this
matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the
United States District Court for the District of Delaware, dated February 29, 2012; and this matter
being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper
pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing
on, the Motion having been given; and it appearing that no other or further notice need be provided;
and this Court having found that the relief requested in the Motion and provided for herein is in
the best interest of the Debtor, creditors of the Debtors, and other parties in interest; and this Court
having determined that the legal and factual bases set forth in the Motion establish just cause for
the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause
appearing therefor, it is HEREBY ORDERED THAT:

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

1.      Pursuant to Rule 1014(b), in the interest of justice and for the convenience of

parties, the above-captioned chapter 11 case shall proceed in the Dallas Bankruptcy Court.

Accordingly, the Court will transfer this case to the Dallas Bankruptcy Court pursuant to 28 U.S.C.

§ 1412.


Dated: _____, 2019
Wilmington, Delaware                          _____
                                              Honorable Christopher S. Sontchi
                                              United States Bankruptcy Judge

ACTIVE 250501748

## Exhibit B

### Acis Confirmation Opinion

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21 Filed 12/29/23 160 Page 28 of 1539   PageID 17266
Case 18-30264-sgj11   Doc 1283927-5 Filed 01/31/19   Entered 01/31/19 Page 12:04 48 Page 1 of 47



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-11** |
| | § | **(Chapter 11)** |
| | § | |
| Debtor. | § | |

### BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
### (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
### CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21   Filed 12/23/23   Page 29 of 1539   PageID 17267
Case 18-30264-sgj11   Doc 1392-3   Filed 01/31/19   Entered 01/31/19 13:04:48   Page 2 of 47

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors:  (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors").  The two chapter

11 cases have been administratively consolidated.[2]

The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing.  Based on the foregoing, the court ***overrules all objections***

and will confirm the Plan, including all proposed modifications to it.  The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3]  The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code.  Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769.  References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company.  As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law").  The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.*, 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.*, No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21 Filed 12/29/23 160   Page 30 of 1539    PageID 17268
Case 18-30264-sgj11    Doc 892-35   Filed 01/31/19    Entered 01/31/19 15:14:04   Page 3 of 47

Plan is determined to have complied with the applicable Bankruptcy Rules and due process. The court provides reasoning for its ruling below. The court directs the Chapter 11 Trustee to submit to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that were filed at DE # 814. This Bench Ruling supplements those Findings of Fact and Conclusions of Law and Order and, where appropriate, should be considered additional findings and conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

## I.    **Background.**[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending since January 30, 2018 and have been astonishingly contentious. The Chapter 11 Trustee has been in place since on or about May 14, 2018. The Plan (which is the fourth one proposed by the Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c) Neutra, Ltd. ("Neutra Cayman"). The Chapter 11 Trustee loosely refers to these three objectors (the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they are all, directly or indirectly, part of the Highland 2,000-member corporate organizational structure), but they also have been in "lockstep" with one another in objecting to virtually every position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5] These Objectors' parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Petitions, entered April 13, 2018. DE # 118. Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, **the Debtors** and Highland were affiliated and had a close relationship. Exhs. 17, 18, 22-27, 251, 619 & 649.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/25/03160Page 31 of 1539  PageID 17269
Case 18-3026 sgj11 Doc 1 29275 Filed 01/31/19   Entered 01/31/19 15:04:48 Page 4 of 47

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a

CLO portfolio manager. [6]  It manages hundreds of millions of dollars' worth of CLOs (which is

an acronym for "collateralized loan obligations").  Specifically, it provides fund management

services to various special purpose entities that hold CLOs.  The Debtor-Acis was providing

management services for five such special purpose entities (the "Acis CLOs") as of the time that

it and its general partner were put into the involuntary Bankruptcy Cases.  The parties have

informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-

Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are

structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of

senior debt owed by large corporations and, therefore, earn revenue from the variable interest

payments made by those corporations on such senior debt; and (b) on the liability side of their

balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest

rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are

mostly institutions and pension funds (these tranches of notes are usually rated anywhere from

Triple A to Single B, depending upon things such as their interest rate and perceived risk).  The

CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of

interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the

fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom

of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes,"

but these "notes" are genuinely equity).  As portfolio manager, the Debtor-Acis manages the

CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

APPX. 102562

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-21   Filed 12/26/23   Page 32 of 1539   PageID 17270
Case 18-30264-sgj11   Doc 3927-3   Filed 01/31/19   Entered 01/31/19 16:04:48   Page 5 of 47

portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy.  This has never been threatened or a concern.  Only the Debtor-Acis which *manages* the CLO business is in bankruptcy.  For the most part, the CLO SPEs have continued somewhat "business as usual" during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7] and baskets of loans have been bought and sold from time to time).  The CLO SPEs have retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-time on matters, and are not currently objecting to the Plan.  There is also an indenture trustee (U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy process—only making occasional statements aimed at ensuring that the indentures for the CLOs are not interfered with or disrespected.  The indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of its business and allowed it to function.  The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient funds to make distributions to the equity.  *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2) through p. 16 (line 18).  But it appears to this court that these missed distributions were due to actions of Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued an injunction to temporarily halt Highland's actions.  *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67 (line 14) through p. 68 (line 6).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 12/27/23    Page 33 of 1539    PageID 17271
Case 18-30264-sgj11    Doc 3927-55    Filed 01/31/19    Entered 01/31/19 15:17:04    Page 6 of 47

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by the Debtor-Acis.

### 1. The PMAs with the CLO SPEs.[8]

First, the Debtor-Acis has various portfolio management agreements (the "PMAs") *with the CLO SPEs*, pursuant to which the Debtor-Acis earns management fees. The PMAs have been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs are executory contracts pursuant to section 365 of the Bankruptcy Code). They are what generate revenue for the Debtor-Acis.

### 2. The Sub-Advisory Agreement with Highland.[9]

Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an insider, *Highland* (*i.e.,* one of the Objectors). Highland's "insider" status will be further explained below. Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the use of Highland front-office personnel/advisors to perform management services for the Debtor-Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs). The Debtor-Acis paid handsome fees to Highland pursuant to this agreement. This, too, was an executory contract pursuant to section 365 of the Bankruptcy Code. As explained below, this agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-21   Filed 12/23/03160   Page 34 of 1539   PageID 17272
Case 18-30264-sgj11   Doc 1392-35   Filed 01/31/19   Entered 01/31/19 15:18:04   Page 7 of 47

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment

of the Debtor-Acis's creditors.[11]

### 3. The Shared Services Agreement with Highland.[12]

Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with

Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's

back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs

under the PMAs). To be clear, the Debtor-Acis had no employees of its own—only a couple of

officers and members. The Debtor-Acis paid handsome fees to Highland for the personnel and

back-office services that Highland provided to the Debtor-Acis. This, too, was an executory

contract pursuant to section 365 of the Bankruptcy Code. As explained below, this agreement

was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court

approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

### 4. The Equity PMA.[13]

Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also

had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)

whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately

to the equity holder in the CLO SPEs. This portfolio management agreement with the equity

holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would

probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12)
through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21   Filed 12/29/23   Page 35 of 1539   PageID 17273
Case 18-30264-sgj11   Doc 892-55   Filed 01/31/19   Entered 01/31/19 21:04:48   Page 8 of 47

it as the "Equity/ALF PMA".[14]  The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures.[15]  In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF").[17]  Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF.[18]  The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 28-21    Filed 12/30/23    Page 36 of 1539    PageID 17274
Case 18-30264-sgj11    Doc 972    Filed 01/16/19    Entered 01/11/19    Page 100 of 48    Page 9 of 47

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases.  The court has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated by agents of Highland on the eve of bankruptcy.  The court has heard credible testimony that it is important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves, but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally redemptions, refinancings, and resets.  A redemption is essentially when the equity in the CLO, before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the tranches of notes, so that the CLO comes to an end.  A refinancing is when a lower interest rate can be accomplished in the market place on the tranches of debt of the CLO, but the maturity date and other terms remain in place (similar to a refinancing on a home mortgage).  This can happen typically after a two-year non-call period.  A reset is when the maturity date, the reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is considered the "controlling" class, and a majority of holders in this class can terminate the CLO manager (*i.e.,* the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/29/23 160 Page 37 of 1539   PageID 17275
Case 18-30264-sgj11-DDL38927SFiledDoc3612    Entered 01/31/19 Page 110f 49 Page 10 of 47

Highland (as further described below)—no doubt because they are earning their fixed income stream without a hitch.  And the bottom tranche of "notes" in the CLO SPEs (the equity) has voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of notes, starting at the top with the Triple A's.  But, by virtue of the Equity/ALF PMA, the Debtor-Acis was really acting for the equity.  It seems substantially likely to the court that this is why Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as mentioned above, was an agreement that the equity could have only terminated "for cause"—and it appears there would have been no "cause").

### III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors.  The non-insider creditors are, for the most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy petitions.  Mr. Terry was the human being who formerly, quite successfully served as the portfolio manager for the Debtor-Acis for many years.  Mr. Terry was terminated under contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero.  Mr. Terry was technically an employee of Highland itself (like all employees are, in the Highland family of companies—no matter which subsidiary or affiliate they work for).  After his employment termination, Highland sued Mr. Terry in September 2016.  Mr. Terry asserted claims back against Highland and both of the above-referenced Debtors.  The litigation was referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS," Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 02/29/23    Page 38 of 1539    PageID 17276
Case 18-30264-sgj11    Doc 2075    Filed 01/31/19    Entered 01/31/19 at 12:04    Page 11 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate.  A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was entered on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-Acis was being rendered insolvent and unable to pay creditors including himself, due to actions undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,* transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings.

## IV. The Objectors (all of which are "Insiders").

*There are no non-insider creditors objecting to the Plan*.  Mr. Terry supports the Plan. The CLO SPEs and Indenture Trustee do not oppose the Plan.  None of the vendors oppose the Plan.  The U.S. Trustee is not opposing the Plan.  As a technical matter, two impaired classes of creditors voted to accept the Plan.[20]  *So who are the Objectors to the Plan (which Plan will be further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c) Neutra Cayman.  As noted earlier, the Chapter 11 Trustee frequently refers to them collectively as "The Highlands"—but the Objectors do not like this conflation.  At one time Highland and

---

[20] Classes 2 and 3.  *See* Exh. 613.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 12/33/23    Page 39 of 1539    PageID 17277
Case 18-30264-sgj11    Doc 892-5    Filed 01/31/19    Entered 01/31/19    Page 12 of 47

HCLOF Guernsey had the same lawyers. They do not anymore. However, they frequently file joint pleadings and take the same positions. Highland and Neutra Cayman do still have the same lawyers.

    1.  Highland.

Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest. As mentioned earlier, Mr. Dondero is the chief executive of Highland. Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds. Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above). ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition.***[21] Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement. The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

In any event, Highland is a ***disputed insider creditor***. It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-21   Filed 12/34/23   Page 40 of 1539   PageID 17278
Case 18-30264-sgj11   Doc 2792-5   Filed 11/31/19   Entered 11/01/19   Page 13 of 47

Trustee take charge of the Debtor-Acis.  Highland does not seem to dispute that it is an insider.[22]
But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for
at least the following reasons:  (a) the same human being (Mr. Dondero) was president of the
Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott
Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the
Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement
and Shared Services Agreement.[24]

Additionally, the court believes that the Chapter 11 Trustee made a convincing argument
in connection with Plan confirmation (and his justification for the separate classification of
Highland's claim in the Plan from other general unsecured creditors) that Highland should also
be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund
management business and Highland's control over the Debtor-Acis has now been divested.
Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as
an officer of the debtor, affiliate, *etc.*  Further, the list of enumerated "insiders" is not exclusive or
exhaustive.  *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210
(5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized
as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.' The
conferral of that status often turns on whether the person's transactions with the debtor (or another of its
insiders) were at arm's length."  *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018).
The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have
focused on two factors in making that determination: (1) the closeness of the relationship between the
parties and (2) whether the transaction . . . [was] conducted at arm's length."  *Browning Interests v.
Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5).  The court notes that, although Highland has, from time to
time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible
evidence to support this contention.

13

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/25/03160   Page 41 of 1539   PageID 17279
Case 18-30264-sgj11   Doc 3892-55   Filed 01/31/19   Entered 01/31/19 15:11:54   Page 14 of 47

motivations in objecting to the Plan.  More importantly, it provides a sound legal and business justification for separately classifying its claim in the Plan.

    2.  <u>HCLOF Guernsey.</u>

The second Objector, HCLOF Guernsey, is an entity formed in the island nation of Guernsey.  It has two allegedly independent Directors from Guernsey who have provided testimony in connection with confirmation of the Plan.  It was enormously clear to the court (as will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland **entirely** to tell them what to do, what to say, and when.  In any event, HCLOF Guernsey is the owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to as the "subordinated notes" in the CLO SPEs).  According to HCLOF Guernsey's 2017 Annual Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be a Dallas bank that is an affiliate of Highland.[25]  HCLOF Guernsey was created in the year 2015 and was formerly known as "ALF."[26]  Its name was changed on October 30, 2017 (ten days after Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis.  The equity owner HCLOF Guernsey, in turn, has three equity owners:  (i) a 49% equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero**; (ii) 2% is owned by **Highland employees**; and (iii)  a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-21    Filed 12/30/23    Page 42 of 1539    PageID 17280
Case 18-30264-sgj11    Doc 3923-5    Filed 01/31/19    Entered 01/31/19 15:11:04    Page 15 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27]  Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable.  So how is HCLOF Guernsey a party-in-interest?  The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief.  At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29]  However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding.  But then, the Chapter 11 Trustee subsequently filed claims *against* HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey.  HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-21 Filed 02/20/23160 Page 43 of 1539    PageID 17281
Case 18-30264-sgj11  Doc 1387-3 Filed 01/31/19   Entered 01/31/19 15:11:04   Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to

terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of

its value.  Thus, HCLOF Guernsey may ultimately owe money to this estate.  But most

importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed

temporary injunction in the Plan that essentially would enjoin (for a finite, defined period)

HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs,

pending resolution of the Highland Entities Adversary Proceeding.  This temporary injunction in

the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

   3.   Neutra Cayman.

   Neutra Cayman is a Cayman island exempted company that is the equity owner **of the**

**Debtor-Acis itself** (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs).

Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry

Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy

Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously

owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the

Debtor-Acis).[30]  The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors:
Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC").
*See* note 2, *supra*.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC,
with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family
trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant
times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.
When Acis GP/LLC was formed (*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy
Investment Trust.  After Mr. Terry was terminated by Highland, his 25% limited partnership interest in
Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his
interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to
74.9%).  But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December
18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership
interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman.  The Dugaboy Investment Trust
also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21 Filed 12/29/23 160   Page 44 of 1539   PageID 17282
Case 18-30264-sgj11    Doc 3927-35 Filed 01/31/19   Entered 01/31/19 18:14:49   Page 17 of 47

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained further below.

## V.    **The Plan.**

The Plan is fairly simple, considering the complexity of the business and the relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue additional fund management contracts. Again, there is no objection by the CLO SPEs to the Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

17

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-21   Filed 02/39/23   Page 45 of 1539   PageID 17283
Case 18-30264-sgj11   Doc 2392-5   Filed 01/31/19   Entered 01/31/19   Page 18 of 47

be treated as an unsecured claim. Each unsecured creditor will receive on the Plan Effective Date an unsecured cash flow note in the full amount of its claim, which notes will mature three years after the Effective Date of the Plan, with equal quarterly payments of principal and interest, at 5% interest per annum. These cash flow notes are expected to yield payment in full (actually 102%) to the unsecured creditors.[34]

As for the sub-advisory and shared services agreements with Highland, as noted earlier, the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code. The Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the sub-advisory and shared services going forward, for a minimum two-year term (unless the Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35] Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured claim, and he thought it was justified by the circumstances of this case. While the Objectors have argued that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the Bankruptcy Code, section 547(b) is discretionary (e.g., a "trustee may avoid any transfer" that might be avoidable as a preference). The Chapter 11 Trustee credibly emphasized that this was negotiated treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else had wanted to propose something different. Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3) through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the Plan. To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will receive the same treatment as other general unsecured claims (cash flow notes). To the extent any of these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have been paid in full (they will have maturity dates to occur on the earlier of: (i) the date that is two years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective Date). The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the back-office shared services agreement type functions.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 04/03/24   Page 46 of 1539   PageID 17284
Case 18-30264-sgj11   Doc 2775   Filed 01/31/19   Entered 01/31/19   Page 19 of 47

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365.  However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA.  Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan.  With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,* the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017).  The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

19

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 2/19/63160   Page 47 of 1539   PageID 17285
Case 18-30264-sgj11   Doc 1389-2   Filed 01/31/19   Entered 01/31/19   Page 20 of 47

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the Debtor-Acis, and then rapidly unfolding after the Arbitration Award.  This was allegedly done to denude the Debtor-Acis of value and make the Debtors "judgment proof."  This was allegedly also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point.  Among other things, pursuant to amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level.  Then, in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate empire).  Numerous other transactions were undertaken through the Fall of 2017, removing assets and agreements away from the Debtor-Acis.  For example, a multi-million dollar note receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36]  Exh. 627.

[37]  On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement").  Exh. 225.  The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer").  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis.  The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it.  Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer.  Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement.  To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach.  The Debtor-

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 12/22/23    Page 48 of 1539    PageID 17286
Case 18-30264-sgj11    Doc 882-75    Filed 11/01/19    Entered 11/01/19 15:12:04    Page 21 of 47
Exhibit 21    Page 20 of 46    Doc 3612    Filed 11/01/19    Page 21 of 47

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four

days after the Arbitration Award). And then the Equity/ALF PMA was terminated so that the

Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio

manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the

Debtor-Acis out of business. Specifically, on October 27, 2017, just seven days after Mr. Terry's

Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights

under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management

rights—for no value—to Highland HCF, an affiliate of Highland. It appears that the only alleged

consideration for these transfers, to the extent there was any, was the satisfaction of purported

debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer. The primary
consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the
approximate amount of $7.5 million for participation fees, which was transferred to Highland
Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of
the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a
promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred. In any event, it
appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could
collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as
portfolio manager by the equity owner (now known as HCLOF Guernsey) ***"for cause"*** at § 14(a)-(e).
Exh. 11. Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least
ninety (90) days' notice, pursuant to § 13(a)-(c). Exh. 11. It would appear that these terms were wholly
ignored by the persons orchestrating the Equity/ALF PMA termination. It appears that the Debtor-Acis
was simply manipulated to consent and agree to its removal and replacement as portfolio manager of
HCLOF Guernsey. This transfer of the Debtor-Acis's portfolio management rights to the offshore entity
Highland HCF was accomplished by way of a new portfolio management agreement entered into by the
equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which
empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey
as was previously held by the Debtor-Acis LP under the Equity/ALF PMA. *See* Exh. 19, October 27,
2017 PMA §§ 1 & 5(a)-(q). This agreement appears to have been further solidified in a second portfolio
management agreement dated November 15, 2017. Exh. 215. The Debtor-Acis received no consideration
for this transfer.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-21   Filed 12/23/23   Page 49 of 1539   PageID 17287
Case 18-30264-sgj11   Doc 892-75   Filed 01/31/19   Entered 01/31/19   Page 22 of 47
Exhibit 21   Page 23 of 48   Page 1304

The Highland Defendants argue that the Equity/ALF PMA (its termination being arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding) did not have value. But the evidence convinces the court that it absolutely did. A witness, Mr. Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made decisions regarding the underlying financial instruments including seeking an optional redemption and negotiating a reset. Mr. Alpern also credibly testified about the importance, in the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an "evergreen fee stream."[39] Additionally, Mr. Terry also credibly testified that the portfolio manager (not the CLO equity interest holder) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.[40] The Chapter 11 Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control of an optional redemption.[41] Finally, a witness, Mr. Klein, credibly testified about the value of the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP.[42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11 Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous to suggest otherwise. However, not only does the Equity/ALF PMA appear to this court to have delegated the relevant power and authority **to the Debtor-Acis**, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78. *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 52-1    Filed 04/03/16    Page 50 of 1539    PageID 17288
Case 18-30264-sgj11    Doc 3892    Filed 01/31/19    Page 2 of 47    Page 23 of 47

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF

Guernsey as to whether to request an optional redemption of the Acis CLOs were not the

HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and

Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly

testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager

under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of

optional redemption for HCLOF Guernsey.[44]

      The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of

success on the merits with regard to his claims set forth in the Highland Entities Adversary

Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as

further explained below).  Of course, the nature and extent of the rights ultimately recovered by

the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as

HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas

under the terms of the Equity/ALF PMA.[45]

    2.   The Plan Injunction.

      The most controversial aspect of the Plan—the aspect of it that seems to be the primary

focus of the Objectors—is a ***portion*** of an injunction in the Plan (the "Temporary Injunction").

The Temporary Injunction would ***temporarily*** enjoin the following parties ***from effectuating an***

***optional redemption or liquidating the Acis CLOs*** and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140 (McGuffin).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 04/25/23    Page 51 of 1539    PageID 17289
Case 18-3026-sgj19-1283-93755 Filed 11/31/12    Entered 11/01/19 15:25:04    Page 24 of 47

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v) Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created entity that entered into a portfolio management agreement with a new Acis-CLO that was established in 2017); and (vii) any affiliates of Highland and their respective employees, agents, representatives, transferees, assigns, and successors.[46]  This Temporary Injunction is proposed to only last until the earlier of when:  (a) the creditors of the Debtors are paid in full; (b) resolution of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest. ***Fully consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner in the CLO SPEs, chooses to agree to resets***.  The basis for the Temporary Injunction is as follows:  The Chapter 11 Trustee has asserted numerous claims in the Highland Entities Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to recover the Debtor-Acis's rights under the Equity/ALF PMA.[47]  The Temporary Plan Injunction essentially provides for the continuation, after the Effective Date, of injunctive relief that the bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland Entities Adversary Proceeding.  The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.*, very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21 Filed 12/26/23 16 Page 52 of 1539    PageID 17290
Case 18-30264-sgj11    Doc 3827-3 Filed 01/31/19    Entered 01/31/19 15:12:04    Page 25 of 47

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming

the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a)

substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer

irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the

defendant; and (d) the injunction is in the public interest.[48]  Each element is present in these

cases.

*Immediate and Irreparable Harm.*  The court finds and concludes that the Temporary

Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable

harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean

hands, that would have no authority to effectuate a liquidation of the CLOs, absent the

prepetition wrongful termination of the Equity/ALF PMA).  Mr. Scott, a director of HCLOF

Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for

an optional redemption of the Acis CLOs.[49]  The testimony of Ms. Bestwick, the other director

of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would

redeem the Acis CLOs so that they could once again be managed by Highland.[50]  The Chapter 11

Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-

Acis to manage.[51]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-21 Filed 12/27/23 Page 53 of 1539    PageID 17291
Case 18-30264-sgj11    Doc 2275 Filed 01/31/19    Entered 01/31/19 Page 126 of 47    Page 26 of 47

is very important because it protects the revenues under the Acis PMAs, which is a source of

potential recovery to creditors under the Plan.[52]  Mr. Terry credibly testified that the Temporary

Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going

concern value without it.  In fact, without the Plan Injunction, Mr. Terry will be precluded from

reorganizing the business and paying creditors.[53]

      The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm

because he has an adequate remedy at law.  This argument misses the mark.  The destruction of

the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two

years, constitutes irreparable harm.  The fact that the estate possesses a number of avoidance

claims for damages against Highland and its affiliates, and could potentially obtain damages on

such claims, does not render the destruction of the Debtor-Acis's ongoing business any less

harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean
> that a remedy at law is 'adequate.' For example, some courts have found that a
> remedy at law is inadequate if legal redress may be obtained only by pursuing a
> multiplicity of actions.[54]

> *Likelihood of Success on the Merits.*  The Chapter 11 Trustee has also demonstrated a

likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934)
("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold
the remedy by injunction.")).

APPX. 102684

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21    Filed 12/48/23 16    Page 54 of 1539    PageID 17292
Case 18-30264-sgj11    Doc 2352-3    Filed 11/01/19    Entered 11/01/19 15:27:09    Page 27 of 47

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55]  The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors.  Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56]  However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57]  In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO.  Exh. 23, Transcript 2/7/18 at pp. 55-58.  Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred.  Exh. 23, Transcript 2/7/18 at pp. 203-204.  Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions.  Exh. 23, Transcript 2/7/18 at p. 226.  Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant.  Exh. 25, Transcript 3/23/18 at p. 53.  Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager.  Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/49/23160 Page 55 of 1539    PageID 17293
Case 18-30264-sgj11    Doc 3923-7 Filed 03/19    Entered 01/31/19 Page 1294 of 48    Page 28 of 47

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

  The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] *See* Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] *See* Ex. 25, Transcript 3/23/28 at pp. 143-44.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-21 Filed 12/29/23 Page 56 of 1539   PageID 17294
Case 18-30264-sgj11   Doc 3827-55   Filed 01/31/19   Page 29 of 47

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65]  While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

    *Balance of Harms.*  The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction.  The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding.  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67]  Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68]  Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69]  Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98.  Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors.  In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A). The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component.  Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/29/23 160    Page 57 of 1539    PageID 17295
Case 18-30264-sgj11-DC 2392755 Filed Doc 31612    Entered 01/31/19 Page 1104 of 47    Page 30 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

*Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy. Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and allows it to pay its creditors under a successful plan of reorganization.  The public interest is also furthered by maintaining the status quo through the Temporary Plan Injunction so that the avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public interest is not furthered by allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-21    Page 52 of 360    Page 58 of 1539    PageID 17296
Case 18-3026    Case 19-34054    Doc 3396-21    Filed 11/01/19    Page 31 of 47    Page 31 of 47

without sufficient resources to pursue and effectively litigate potentially valuable causes of action.

In sum, the court finds and concludes that the proposed Plan injunction (including the Temporary Injunction) is legally permissible and justified under all the circumstances. It is narrowly tailored to address the specific harm to which it is directed and comports with governing case and statutory authority and applicable rules of bankruptcy and civil procedure. The Plan Injunction is consistent with Fifth Circuit precedent.[74] Such an injunction would not violate section 524(e) of the Bankruptcy Code. That subsection provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[75] The Plan Injunction would not affect the liability of any entity, or the liability of any property. The injunction would only temporarily prohibit Highland and its Co-Defendants from exercising one form of economic recourse, thereby preserving the status quo while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought. *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze."). The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief. *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief."). *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 12/53/23160    Page 59 of 1539    PageID 17297
Case 18-3026-sgj19-1  Document 3755  Filed 01/3612    Entered 01/31/19  Page 330 of 49  Page 32 of 47

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

> 3.  Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and
> Brigade.

The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith),* 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction."  *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-21    Filed 12/24/23    Page 60 of 1539    PageID 17298
Case 18-30264-sgj11    Doc 1387    Filed 01/31/19    Entered 01/31/19 15:13:04    Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan.  He is well qualified to reorganize the Debtor-Acis.  Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81]  The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82]  The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83]  Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis.  Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86]  Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87]  Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/55/03160   Page 61 of 1539   PageID 17299
Case 18-3026-sgj11-1   Document 27-5   Filed 01/31/19   Page 34 of 47
Case 18-30264-sgj11   Doc 392-5   Filed 01/31/19   Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis points.[88]  Highland attempted to show with evidence and argument that Brigade had made some failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis, and that trades out of compliance with the applicable CLO tests occasionally happen, and Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is there no credible evidence of Brigade mismanagement but, to the contrary, it appears that Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 05/08/23   Page 62 of 1539   PageID 17300
Case 18-30264-sgj11   Doc 1389-2   Filed 01/31/19   Entered 01/31/19 15:13:04   Page 35 of 47

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs.  Meanwhile, Brigade has subsequently reduced that cash balance by $280 million to approximately $100 million.[92]  Mr. Worman also credibly testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93]  The Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders.[94]  Certain contradictory testimony of Hunter Covitz was not convincing that:  (a) there were very few conforming loans available to be purchased for the Acis CLOs in the approximately four months that elapsed between the entry of the Order for Relief and the time when Highland was terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the AAA notes rather than invest in new loans.[96]  The court found more convincing the testimony of Mr. Terry:  (a) that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-21 Filed 12/20/23 160    Page 63 of 1539    PageID 17301
Case 18-30264-sgj11    Doc 3892-73 Filed 01/31/19    Entered 01/31/19 15:13:04    Page 36 of 47

that, although there was no change in market conditions, Highland essentially stopped buying collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

4.    <u>Resets—Non-impairment of Anyone's Rights.</u>

The Plan only contemplates **consensual** resets of the Acis CLOs—in other words, only if HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-21    Filed 12/29/23    Page 64 of 1539    PageID 17302
Case 18-30264-sgj11    Doc 1238-2    Filed 01/31/19    Entered 01/31/19    Page 37 of 47

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November

15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided

that there may be a change in circumstances following the date of the Offering Memorandum

and that any forward-looking statements in the Offering Memorandum involved risks and

uncertainties "because they relate to events and depend on circumstances that may or may not

occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that

the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-

managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs

managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF

Guernsey directors' fiduciary duties require them to act independently and objectively in the best

interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]

HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all

testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is

confirmed.[109]

 Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of

the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset

of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] *See* Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] *See* Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] *See* Exh. 90, HCLOF Offering Memorandum, at p. 12**.**

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] *See* Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167
(Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-21   Filed 2/59/6316   Page 65 of 1539   PageID 17303
Case 18-30264-sgj11   Doc 1392735   Filed 01/31/19   Entered 01/31/19 15:13:04   Page 38 of 47

testified that the Reorganized Debtor will have cash flow from multiple potential sources—
including the revenues from the CLO PMAs with the Acis CLOs, potential new business
developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI.  General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of
the evidence, the credibility of witnesses and contradictions in their testimony naturally can be
significant.  Here, there were some noteworthy problems and contradictions with some of the
testimony provided by the Objectors' witnesses.  They are summarized below.

1.  Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and
the court was asked to consider his testimony again in connection with confirmation (he did not
attend the confirmation hearing).  He is the General Counsel, Chief Legal Officer, and a Partner
at Highland.  Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place
and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be
associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]  Mr.
Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings
of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of
refinancings and resets for this vintage of CLOs in the market place) and, in connection with
that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created
entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p.
53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21 Filed 12/09/23 160 Page 66 of 1539    PageID 17304
Case 18-30264-sgj11  Doc 398  Filed 01/31/19  Page 39 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new

Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated:

"The equity, you know, calls the tune, so to speak, in terms of the CLO . . . ."[115]  In summary, an

overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in

the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this

was the motivation for the prepetition transactions orchestrated by Highland prior to the

Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold.

First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact,

in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a

new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was

touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs

over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis

be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the

Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by

the Passive Investor.[117]

---

[113]  *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114] *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/29/23   Page 67 of 1539   PageID 17305
Case 18-30264-sgj11   Doc 1238-2   Filed 01/31/19   Entered 01/31/19   Page 40 of 47

2. <u>Michael Pugatch: The Passive Investor Made Into a Scapegoat.</u>

The reality is that Highland, indeed, started working on the concept of doing resets of some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016). Highland, in fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the portfolio manager for that reset in April 2017). As part of that process of implementing resets for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share of the equity tranche of the Acis CLOs. Highland finally obtained the commitment of the Passive Investor in November 2017, after starting initial discussions with them in the second quarter of 2017.[118] A representative for the Passive Investor referred to itself as "passive" in a deposition.[119] Concepts and documentation for the Passive Investor's investment in the Acis CLOs were discussed for a while during 2017. As recently as August 2017, the negotiations with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager for the CLOs.[120] Then the arbitration trial with Mr. Terry began in September 2017 and the Terry Arbitration Award was issued on October 20, 2017. Suddenly, it appears that the dismantling of the Debtor-Acis began with all deliberate speed. The court believes, based on the totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager going forward, so that Highland could keep reaping the benefits of the reset CLOs. Specifically, when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21 Filed 12/29/23160 Page 68 of 1539   PageID 17306
Case 18-30264-sgj11   Doc 38-23755 Filed 01/31/19   Entered 11/01/39/19 Page 1420 of 48 Page 41 of 47

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM, testified that [the Passive Investor] said with absolute certainty that they had no interest in doing business with Acis because the Acis brand was purportedly toxic and, consequently, nothing associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he had read that testimony and that the statement was not true.[122]  He further stated that "the ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told that it was a change in the brand or the name, as requested by Highland."[124]  And when asked "Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch answered:  "No. What I would say is, when the suggested name change did occur, there were commercial reasons given to us as to why that would be beneficial in terms of the ongoing management of those CLOs and the intended investment thesis around the investment that we had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/03/23 Page 69 of 1539    PageID 17307
Case 18-30264-sgj11 Doc 892-5 Filed 01/31/19    Entered 01/31/19 15:11:04 Page 42 of 47

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128]  When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied:  "The award itself, no.  I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130]  The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

### 3.   The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (i.e., its only directors):  Mr. William Scott[132] and Ms. Heather Bestwick.[133]  It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way.  Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not.  They are both

---

[128] Id. at p. 32 (lines 16-17); pp. 33-35.

[129] Id. at p. 43 (lines 3-9); p. 89.

[130] Id. at p. 68 (lines 11-13).

[131] Id. at p. 82, lines 9-24.

[132] See Exh. 721.

[133] See Exh. 719.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-21   Filed 02/24/23   Page 70 of 1539   PageID 17308
Case 18-30264-sgj11   Doc 2275   Filed 01/31/19   Page 43 of 47

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134] She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135] She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137] Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138] She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140] She reiterated that she only talks to Highland employees. She also was under the impression that terminating the Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141] She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 12/05/23    Page 71 of 1539    PageID 17309
Case 18-30264-sgj11    Doc 1392    Filed 01/31/19    Entered 01/31/19    Page 44 of 47

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to ask Highland"[143] why it did not inform her sooner.  Her testimony was clear that she defers to Highland on everything, stating that as directors they were "heavily reliant on our service providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15 Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF Guernsey, stating that board minutes and other documents would show that they took a great level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally, that it required participation in court hearings by a director of HCLOF Guernsey each time that HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-21 Filed 06/03/16    Page 72 of 1539    PageID 17310
Case 18-30264-sgj11  Doc 392-3  Filed 01/31/19    Entered 01/31/19 15:14:04    Page 45 of 47

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases and that he had never disagreed with Highland's advice.[150]  He confirmed that all investment decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service providers.[151]  Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152] But he had not talked to the Passive Investor.[153]  As if all this deference to Highland were not enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as security for its loans from NexBank.[154]  Also, interestingly, when asked about the adversary proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently a typical thing in the world of off-shore jurisdictions that are large financial centers.[155]  Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV."  The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 12/27/23    Page 73 of 1539    PageID 17311
Case 18-30264-sgj11    Doc 3927-35    Filed 10/31/19    Entered 11/01/19    Page 4704 of 49    Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

**VII.** **Conclusion**.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) ***the unique status of the Objectors*** (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) ***the appropriateness and legality of the proposed Plan Injunction*** that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21   Filed 12/28/23   Page 74 of 1539   PageID 17312
Case 18-30264-sgj11    Doc 1822   Filed 11/30/19    Entered 11/30/19   Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

### #### End of Bench Ruling and Memorandum Opinion ####

**Exhibit C**

**Acis Involuntary Opinion**

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21   Filed 12/29/23   Page 76 of 1539   PageID 17314
Case 18-30264-sgj11   Doc 391-8 Filed 04/13/18   Entered 04/13/18 16:32:58   Page 1 of 53



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed April 13, 2018

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| Alleged Debtor. | § | |

_____

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-7** |
| | § | |
| | § | |
| Alleged Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDERS FOR RELIEF ISSUED AFTER TRIAL ON CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

APPX. 017293

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21    Filed 12/29/23160    Page 77 of 1539    PageID 17315
Case 18-30264-sgj11    Doc 239-13    Filed 04/13/18    Entered 04/13/18 16:34:58    Page 2 of 53

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

**I.    FINDINGS OF FACT**

    **A.    Introduction.**

    1.      The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

    2.      Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the
Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets,
and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion
to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for
Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The
court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss.
Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it
heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court
has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C.
§ 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction,
pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and
Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court
has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute—
11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their
business headquarters in this district.

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.      Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.      Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.      Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.      The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.      Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 12/23/03160    Page 79 of 1539    PageID 17317
Case 18-30264-sgj11    Doc 391-3    Filed 04/13/18    Entered 04/13/18 18:35:58    Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.      In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.      There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.     A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award—$7,949,749.15.[6]

11.     Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-21 Filed 12/29/23 160 Page 80 of 1539    PageID 17318
Case 18-30264-sgj11   Doc 231-3 Filed 04/13/18   Entered 04/13/18 16:36:58 Page 5 of 53

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had, [8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

12.    Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

13.    Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

APPX. 017710

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21  Filed 12/25/23  Page 81 of 1539  PageID 17319
Case 18-30264-sgj11    Doc 39  Filed 04/13/18    Entered 04/13/18 16:34:58  Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12]  Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it.  Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.    On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13]  Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.    Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests.  On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15]  Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265.  Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

APP.1072

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-21    Filed 12/26/23    Page 82 of 1539    PageID 17320
Case 18-30264-sgj11    Doc 239    Filed 04/13/18    Entered 04/13/18 16:38:58    Page 7 of 53

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's

counsel that the Alleged Debtors were "judgment proof."[16]

16.    At approximately 11:57 p.m. on January 30, 2018 (on the evening before a

scheduled temporary injunction hearing in State Court 2—at which time State Court 2

presumably might have considered the Alleged Debtors' request to post the $495,070.50

supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary

Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.    For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute

that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section

303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the

Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to

liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the

Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three

or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to

Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to

Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their*

*debts as such debts become due* unless such debts are the subject of a bona fide dispute as to

liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests

in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as

an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with

the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and

also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 02/20/23160   Page 83 of 1539    PageID 17321
Case 18-30264-sgj11    Doc 3913-55  Filed 04/13618    Entered 04/13/18 Page 39:5854Page 8 of 53

nevertheless **abstain** in this matter, pursuant to Bankruptcy Code **section 305**, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.    The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a **"special circumstances"** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here **do not warrant section 305 abstention** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.    As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a **"special circumstances"** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.    Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g.*, *In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-21   Exhibit 21    Filed 12/29/23    Page 84 of 1539    PageID 17322
Case 18-30264-sgj11    Doc 1683-1    Filed 04/06/18    Entered 04/06/18    Page 34 of 54    Page 9 of 53

21.    Finally, the Alleged Debtors also have ***not shown facts here that warrant section***

***305 abstention*** because they have not shown that the interests of creditors and the Alleged

Debtors would be better served by dismissal.

> **B.    The CLO Business:  Understanding the Alleged Debtors' Business
> Operations, Structure, and What Creditors and Interest Holders They
> Actually Have.**

22.    Highland set up its first CLO in the year 1996.  Highland was one of the early

participants in the CLO industry.

23.    The Alleged Debtors were formed in 2011 to be the new "brand" or face of the

Highland CLO business, after Highland's name had suffered some negative publicity in the

marketplace.

24.    Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis

LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which

were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO

2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on

these CLOs (since the oldest one was established in the year 2013).

25.    The key "players" in and features with regard to the Highland CLOs, during the

time period relevant to the issues adjudicated at the Trial, have been:

(a)    <u>The CLO manager.</u>  As mentioned earlier, the CLO manager is the Alleged

Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter,

the "CLO Collateral Management Agreements") with the CLOs (which CLOs

were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7, set up in April 2017, as to which Acis LP's
contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/29/23   Page 85 of 1539   PageID 17323
Case 18-30264-sgj11   Doc 1341   Filed 11/04/19   Page 10 of 53

management fees[19] from the CLOs in exchange for managing the pool of assets

within the CLOs and communicating with investors in the CLOs.[20]  As mentioned

earlier, Mr. Terry was the human being that performed the management function

at Acis LP until Highland fired him on June 9, 2016 and also terminated his

limited partnership interest in Acis LP.  Mr. Terry, and all employees who have

ever provided services to the CLO manager, are Highland employees—which

were provided to Acis LP through shared and sub-advisory services agreements—

as further explained below.  Thus, to be clear, Acis LP has always essentially

subcontracted its CLO managerial function out to Highland.

(b)  <u>The pool of assets.</u> Within each CLO that the CLO manager manages is a basket

of loans that the CLO manager purchases.  The basket of loans typically consists

of approximately 200 loans-payable (or portions of loans payable), on which large

well-known companies typically are the makers/obligors (and which loans,

collectively, provide a variable rate of interest).[21]  The CLO manager can

typically decide to buy and sell different loans to go into the pool of assets, with

certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See*, as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3). Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-21    Filed 12/29/23    Page 86 of 1539    PageID 17324
Case 18-30264-sgj11    Doc 1389-5    Filed 04/13/18    Entered 04/13/18 Page 12 of 53    Page 11 of 53

(c)    <u>The CLO investors</u> (*i.e.,* CLO note holders).  These may be any number of persons or entities, including pension funds, life insurance companies, or others who decide to invest in the CLOs and contribute capital to fund the purchase of a CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on which can range anywhere from Triple-A to Single-B, depending upon the risk option the investor chooses.  There are typically five or six traunches of notes issued by the CLO (with the top AAA-rated traunche being the least risky and the bottom traunche being the most risky) and—to be clear—the CLO itself (again, in each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO manager receives income from the pool of loans in the CLO, he distributes that income to the CLO investors, in accordance with their note indentures,[22] starting with the top traunche of notes and then down to the other traunches.  The top traunche of notes (AAA-rated) is considered the "controlling" class and a majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for cause on 45 days' notice, although all parties seem to agree this would be a rare event.

(d)    <u>The CLO equity holder</u>.  The CLO equity holder actually is a holder of subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on which the CLO special purpose entity is obligated), and has voting rights and is itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/29/23   Page 87 of 1539   PageID 17325
Case 18-3026   Case 19-12239   Filed 04/18   Entered 11/04/19   Page 436 of 53   Page 12 of 53

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for example, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's).  Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island nation of Guernsey,[24] was the CLO equity holder.  To be clear, *ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP*.  Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs).  No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).  The complicated structure of the CLO business—all parties seemed to agree—has been developed, among other reasons, to comply with "risk-retention requirements" imposed by the U.S. Congress's massive Dodd-Frank financial reform legislation[25] enacted in year 2010, in response to the financial crisis and recession that first began in 2008.

---

[23] The top tranche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, *subsequent to December 2016*, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-21    Filed 12/22/23    Page 88 of 1539    PageID 17326
Case 18-3026-sgj11  Doc 239-3  Filed 04/13/18    Entered 04/13/18    Page 34 of 5Page 13 of 53

(e)    <u>The Equity Owners of ALF</u>.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF ***may*** be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could
be either all at the equity level or vertically, up and down the note traunches).  There are multiple ways to
accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or
doing it through a controlled subsidiary).  This particular rule was announced in ***December 2014*** and the SEC
thereafter issued a no action letter stating that ***if a CLO was issued prior to December 2014***, then any refinancing of
such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,*
changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk
retention in place.  ***Four of Acis LP's current CLOs were issued prior to December 2014.***  Thus, these four CLOs
are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-
middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on
October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra.*

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017
were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also*
Exh. 82, p. 162, lines 2-7.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-21   Filed 02/23/03160   Page 89 of 1539   PageID 17327
Case 18-30264-sgj11   Doc 339-13   Filed 04/13/18   Entered 04/13/18   Page 14 of 53   Page 14 of 53

(f)    <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is an underwriter for the CLO notes which solicits investors for the CLO notes (examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)    <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance of publicly traded notes, there is an indenture trustee (example given at the Trial:  U.S. Bank).[30]

26.    Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for Highland in 2005 until his employment was terminated on June 9, 2016.

27.    Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself.  Highland has approximately 150 employees in the United States.  Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared Services Agreement (herein so called),[31] which provides "back office" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/29/23   Page 90 of 1539   PageID 17328
Case 18-30264-sgj11   Doc 199-3   Filed 04/13/18   Entered 04/13/18   Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP

and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the

General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland

pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very

few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP

through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most

frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of

both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It

appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,

Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank

Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as

Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged

Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington

(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant

General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes

instructions will come to him from the compliance group headed up by Chief Compliance

Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21 Filed 12/25/23   Page 91 of 1539   PageID 17329
Case 18-30264-sgj11   Doc 13955   Filed 04/13/18   Entered 04/13/18 08:58:58   Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his assistant the authority to sign his name.  As set forth above, Mr. Ellington (who **did not** testify at the Trial)[36] and Mr. Leventon (who **did** testify at the Trial) are not officers, directors, or employees of the Alleged Debtors.  Mr. Leventon is designated to be the representative for the Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he explained that this representative-authority derives from the Shared Services Agreement.  Mr. Leventon testified that he takes his instructions generally through his direct supervisor, Mr. Ellington, although Highland partners can ask him to perform legal services for any of Highland's 2,000 entities.

## C.    Transfers and Transactions Involving the Alleged Debtors Since the Litigation with Mr. Terry Commenced—and Especially After the Arbitration Award.

31.    Below is a listing of some (but not necessarily all) of the transfers and transactions that the Alleged Debtors, Highland, and related parties undertook **after** the litigation with Mr. Terry commenced.

(a)    <u>Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow Stream.</u>  On October 7, 2016 (approximately one month after the litigation arose among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland a participation interest in its expected future cash flow from the CLO Collateral Management Agreements—specifically, it sold a portion of the cash flow it expected to earn from November 2016 to August 2019 (not the full life of the CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence. *See* Exh. 25.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-21   Filed 08/26/23   Page 92 of 1539   PageID 17330
Case 18-30264-sgj11   Doc 13-3   Filed 11/04/19   Entered 11/04/19   Page 17 of 53   Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland").  Mr.
Dondero signed the purchase and sale agreement for both purchaser and seller.[37]
Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued
interest at 3% per annum.  It appears that the $666,665 cash down payment was
actually paid, and a payment required on the Acis LP Note Receivable from
Highland of $3,370,694 on May 31, 2017, was actually made.  The Acis LP Note
Receivable from Highland was payable in three installments, with a $5,286,243
payment required on May 31, 2018, and a $4,677,690 payment required on May
31, 2019.  When viewed in complete isolation, this transaction does not
necessarily appear problematic.  Although there was evidence that Acis LP had
been managing the five CLOs for about $10 million per year of fees, some of the
recitals in the purchase and sale agreement suggest that there may have been a
sound business reason for the transaction and the arbitration panel,[38] viewing this
transaction in isolation, did not think it was necessarily problematic or actionable.
In any event, Highland is adamant it was a net neutral transaction.

(b)    Transfer of Acis LP's interest in ALF.  Recall that ALF was the entity that held
equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held
voting rights and was a capital provider to the overall risk retention structure
supporting the CLOs.  And Acis LP, in turn, held a 15% indirect interest in ALF.
On October 24, 2017 (***four days after the Arbitration Award***), Acis, LP entered
into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Exhibit 21    Page 2/27/23160    Page 93 of 1539    PageID 17331
Case 18-30264-sgj11    Doc 1313-3    Filed 04/13/18    Entered 04/13/18    Page 34 of 53    Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs, 19-22.

[41] *See* n.23 *supra*.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21 Filed 02/28/23 160    Page 94 of 1539    PageID 17332
Case 18-30264-sgj11    Doc 1385    Filed 04/13/18    Entered 04/13/18 14:23:40    Page 19 of 53

reported to him (including Mr. Terry before his termination), testified that he had no knowledge of this particular transaction. The document effectuating this transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis LP, acting by its general partner, Acis GP/LLC.[42]

(c)    <u>ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it with a new Highland Cayman Island Entity</u>. On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF.[43] This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.[44]

(d)    <u>The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet Another Highland Cayman Island Entity.</u> On November 3, 2017 (10 days after the Arbitration Award), Acis LP assigned and transferred its interests in the Acis LP Note Receivable from Highland—which at that point had a balance owing of over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 13-21   Filed 09/08/16   Page 95 of 1539   PageID 17333
Case 18-30264   Case 18-3391 3558 Doc 1361-3   Filed 11/04/19   Page 456 of 57   Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new collateral manager of the CLOs (in other words, the new Acis LP).[45]  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.[46]  The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis  LP will assign to it the Acis LP Note Receivable from Highland.   One more thing:  since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, **_Highland CLO Management Ltd._** agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)    <u>Various Additional Transactions that further Transitioned CLO Management and Fees Away from Acis LP to Highland Cayman Island Entity.</u>  On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] _Id._ at p.6.

[47] _Id._ at pp. 1 & 2.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21  Exhibit 21  Page 96 of 1539    Page 96 of 1539    PageID 17334
Case 18-3026  Case 19-12339155  Filed Doc 13613    Entered 01/13/18    Page 34 23 of 59    Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)     In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]    In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)     <u>Change of Equity Owners of the Alleged Debtors</u>.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners:  (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.  When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21    Filed 09/29/23    Page 97 of 1539    PageID 17335
Case 18-30264-sgj11    Doc 1283-13    Filed 04/13/18    Entered 04/13/18    Page 22 of 53    Page 22 of 53

(*i.e.*, the .1% owner of Acis LP), its sole member was the Dugaboy Investment

Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership

interest in Acis LP was forfeited and divided among the two remaining limited

partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy

Investment Trust (increasing its interest by 15% up to 74.9%).   But, more

importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.*, on

December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed

their entire limited partnership interests in Acis LP—25% and 74.9%,

respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands

exempted company.   Dugaboy Investment Trust also conveyed its 100%

membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he

did this on advice of counsel.  He also did not dispute that he had made millions

of dollars of equity dividends from his equity investment in Acis LP in recent

years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)     <u>The Intended Reset of Acis CLO 2014-3.</u>  With all of the above maneuverings

having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3

in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment

bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final

offering circular was issued in January 2018[53]—contemplating a reset of Acis

CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21 Filed 12/29/23   Page 98 of 1539   PageID 17336
Case 18-30264-sgj11   Doc 291-8 Filed 04/13/18   Entered 04/13/18   Page 24 of 54   Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP.  The act of implementing a reset on the CLO was not in itself suspect.  However, the reset would, of course, have the effect of depriving Acis LP from a valuable asset—an agreement that could realistically be expected to provide millions of dollars of future collateral management fees—coincidentally (or not) just after Mr. Terry obtained his large judgment.

**D.   Findings Regarding Credibility of Witnesses.**

32.   The court found the testimony of Mr. Terry to be very credible.  He was very familiar with the financial condition of the Alleged Debtors, since he presided over the business of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed publicly available information regarding the companies since his termination.  Mr. Terry credibly testified that the Alleged Debtors have never had a significant number of creditors, since most of the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement and Sub-Advisory Agreement.  Thus, Highland should at all times be the Alleged Debtors' main creditor.  The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only a handful of creditors (maybe four or so) besides him and Highland.  The court also finds that Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21 Filed 12/23/23160 Page 99 of 1539   PageID 17337
Case 18-30264-sgj11   Doc 1336   Filed 11/04/19   Entered 11/04/19 Page 24 of 53   Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the Arbitration Award (if not sooner).[54]

33.    The court found the testimony of almost all of the witnesses for the Alleged Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability.  For example, sometimes business decisions concerning the Alleged Debtors were said to have been made by a "collective," and other times the in-house Highland lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC) stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While Mr. Dondero is the chief executive of a multi-billion dollar international investment company, and naturally has widespread responsibilities and must delegate to and rely upon others including lawyers, this court simply does not believe that he never read the Arbitration Award.  The court perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr. Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr. Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on behalf of Mr. Terry.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-21   Filed 09/29/23   Page 100 of 1539   PageID 17338
Case 18-30264-sgj11   Doc 3391-1   Filed 03/13/18   Entered 11/04/19   Page 25 of 53   Page 25 of 53

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never even read the Arbitration Award.

34.     As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another Cayman Island entity, but the Highland Assistant General Counsel could not remember the names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr. Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor anyone else from the compliance group testified.

35.     Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know whom its officers were.  He could not testify as to the meaning of certain transactions in which Acis LP had engaged in during recent weeks and said that he signed certain documents on advice of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary Petitions.

36.     Again, there was a lot of plausible deniability at Trial as to the "whos" and "whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-21 Filed 09/25/23   Page 101 of 1539   PageID 17339
Case 18-30264-sgj11   Doc 1361   Filed 11/04/19   Page 26 of 53

since the Arbitration Award.  The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

### E.  Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.     The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact.  Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-21   Filed 06/26/23   Page 102 of 1539   PageID 17340
Case 18-30264-sgj11   Doc 318-1   Filed 04/13/18   Entered 04/13/18   Page 27 of 53
Exhibit 21 Page 26 of 160
Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims, which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61] This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5-15   Filed 09/29/23   Page 103 of 1539   PageID 17341
Case 18-3026   Case 19-12239 TS   Filed 04/13/18   Entered 11/04/19   Page 325 of 5   Page 28 of 53

39.     Additionally, there were certain creditors that filed sworn statements saying they were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 15-21    Filed 12/28/23    Page 104 of 1539    PageID 17342
Case 18-30264-sgj11    Doc 1339    Filed 11/04/19    Entered 11/04/19    Page 29 of 53

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.    Next, the court finds that there are certain creditors included in the "Law Firm

Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really

creditors of the individual law firms and/or Highland, and that these law firm vendor creditors

should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a

direct contractual obligation on the part of either the Alleged Debtors or Highland—although the

court certainly understands that, when the law firms would retain vendors, they would bill these

to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were

already eliminated with agreement of the Alleged Debtors but, from the remaining list of

creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear,

while the individual law firm creditors may ultimately have a right to reimbursement for these

vendor expenses from Highland (who may then potentially have a right to reimbursement from

the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not

find this vendor to have a claim ***directly*** against the Alleged Debtors for purposes of section

303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 6-15    Filed 29/20 160    Page 105 of 1539    PageID 17343
Case 18-3026-sgj11-1    Document 6-15    Filed 04/13/18    Entered 04/13/18    Page 30 of 53

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No. 13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 12/19/22    Page 106 of 1539    PageID 17344
Case 18-30264-sgj11    Doc 3918-55    Filed 04/13/18    Entered 04/13/18    Page 325 of 53    Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No**. **14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees.  The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21   Filed 10/12/22   Page 107 of 1539   PageID 17345
Exhibit 21   Page 106 of 167
Case 18-30264-sgj11   Doc 131   Filed 04/13/18   Entered 04/13/18   Page 32 of 53
Page 355 of 5

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42.   Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.,* Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.*, Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21 Filed 12/20/23 Page 108 of 1539   PageID 17346
Case 18-30264-sgj11   Doc 239-13 Filed 04/13/18   Entered 04/13/18 Page 33 of 53  Page 33 of 53

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group. Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence

strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and

Highland, in order to bolster an argument that having a sole petitioning creditor was legally

inadequate in this case.[75]  For example, the Klos Declaration and other information, that was

provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing to *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 85-21 Filed 12/09/22 Page 109 of 1539 PageID 17347
Case 18-30264-sgj11 Doc 1308-53 Filed 04/13/18 Entered 04/13/18 Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business. Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another. This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

> **F.**   **Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).**

44.      The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old. The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.      First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date). Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017. Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-1   Filed 12/09/24   Page 110 of 1539   PageID 17348
Case 18-30264-sgj11   Doc 339-1   Filed 04/13/18   Entered 04/13/18   Page 35 of 53

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's

invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In

any event, AKK represented that both the Alleged Debtors and Highland are jointly and

severally liable for the fees owed to it.[80] AKK also represented that, to its knowledge, the

amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it

has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The

court makes a logical inference that AKK expected timely payment of its invoices—the largest

of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally

not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its

$6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes

that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it

is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated

July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August

30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 09/29/23    Page 111 of 1539    PageID 17349
Case 18-30264-sgj11    Doc 391-5    Filed 04/13/18    Entered 04/13/18    Page 36 of 53    Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.     Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.     Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

_____

[84] Exh. 40M.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21 Filed 10/12/06 of 160 Page 112 of 1539   PageID 17350
Case 18-3026-ag Case 11-22311-CSS Filed 04/13/18   Entered 04/13/18 Page 3458 of 53 Page 37 of 53

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in accordance with its engagement letter and, thus, it has generally not been paid timely.

51.     Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed to it was for legal services provided to the Alleged Debtors and Highland in connection with the arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices for their services are all directed to Highland.[85]  The evidence reflected that three invoices had not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53; a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices (if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has generally not been paid timely.

52.     Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date" (five months before the Petition Date).[88]  Although requested in discovery, no engagement letter for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that, while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 685-21   Filed 12/20/26 of 160 Page 113 of 1539   PageID 17351
Case 18-30264-sgj11   Doc 391-85   Filed 04/13/18   Entered 04/13/18 Page 39 of 57 Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.     Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.     Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 5-21 Filed 12/08/23  Page 114 of 1539    PageID 17352
Case 18-3026   Case 19-1221918755  Doc 136 13    Filed 11/01/19 18  Page 34 of 57  Page 39 of 53

55.    In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.    Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

---

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors. *See, e.g., In re Moss,* 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.,* Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 12/09/26 Page 115 of 1539    PageID 17353
Case 18-30264-sgj11    Doc 1083-3    Filed 04/13/18    Entered 04/13/18 Page 40 of 53
Exhibit 121    Page 20926 of 160    Page 115 of 1539
Case 19-12239-CSS    Doc 136-13    Filed 04/13/18    Page 3450 of 54

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the Financial Statements of Acis LP submitted into evidence do not support the notion that the cash balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/29/23 of 160 Page 116 of 1539    PageID 17354
Case 18-30264-sgj11    Doc 1813-3 Filed 04/19/18    Entered 04/19/18 Page 342 of 57 Page 41 of 53

II.    **Conclusions of Law**

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21 Filed 12/29/26 Page 117 of 160    Page 117 of 1539    PageID 17355
Case 18-30264-sgj11    Doc 1913-13 Filed 04/13/18    Entered 04/13/18 Page 345 of 53    Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

### A.    *Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?*

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, ***at most***, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that ***Acis LP*** has—as opposed to the liability or amount that Highland or other insiders bear responsibility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors. *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-21   Filed 12/29/23   Page 118 of 1539   PageID 17356
Exhibit 21   Page 117 of 160
Case 18-30264-sgj11   Doc 339   Filed 04/13/18   Entered 04/13/18 14:58:57   Page 43 of 53

## B.   Are the Alleged Debtors Generally Paying Their Debts as They Become Due?

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[105] Again, the burden is on the Petitioning Creditor to prove this element by a preponderance of the evidence.[106] The determination is made as of the filing date of the Involuntary Petitions.[107] In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs.[108] No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[109] Courts typically hold that "generally not paying debts" includes regularly missing a significant number of payments **or** regularly missing payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21   Filed 12/29/26 of 16 Page 119 of 1539   PageID 17357
Case 18-30264-sgj11   Doc 113-3   Filed 04/13/18   Entered 04/13/18   Page 45 of 53 Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment). Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

### C. With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry. As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are: Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

APP.x.10739

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5-21   Filed 12/29/26 of 160   Page 120 of 1539   PageID 17358
Case 18-30264-sgj11   Doc 331   Filed 04/13/18   Entered 04/13/18   Page 45 of 53   Page 45 of 53

independent finding of "bad faith," the court need not ultimately decide the efficacy or

applicability of such authority, because the court does not believe that the evidence demonstrated

any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions.

Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out

of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets

and value and that a bankruptcy filing was the most effective and efficient way to preserve value

for the Acis LP creditors.  The court concludes that Mr. Terry was wholly justified in pursuing

the Involuntary Petitions.

### D.     Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or
> may suspend all proceedings in a case under this title, at any time if—
>      (1) the interests of creditors and the debtor would be better served by such
> dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a

properly filed bankruptcy case is an ***extraordinary remedy***.[114]  Moreover, granting an abstention

motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple

balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its

***creditors*** must be served by granting the request to abstain.[115]  The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing to *AMC Investors, LLC*, 406 B.R. at 488).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 12/29/23    Page 121 of 1539    PageID 17359
Case 18-30264-sgj11    Doc 913-3    Filed 11/01/18    Entered 11/01/18 23:57:59    Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or
> there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of
> assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-
> of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that
> it would be costly and time consuming to start afresh with the federal bankruptcy
> process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.    *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

APPX. 17352

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 52-1   Filed 02/09/26   Page 122 of 1539   PageID 17360
Case 18-30264-sgj11   Doc 139-1   Filed 04/13/18   Entered 04/13/18   Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code.  Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court.  The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland.  This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120]  Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee.  Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

      *ii.*    *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 5-21 Filed 29/26 of 160 Page 123 of 1539    PageID 17361
Case 18-3026-sgj11    Doc 191355 Filed Doc 1361B    Entered 04/13/18 Page 349 of 58 Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an ***equitable*** distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 18-21 Filed 12/19/26 of 160age 124 of 1539 PageID 17362
Case 18-30264-sgj11 Doc 391-5 Filed 04/13/18 Entered 04/13/18 Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124] Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands). The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125] Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court. Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case. Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry. This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade,* 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith,* 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 85-21 Filed 12/29/26 of 16 Page 125 of 1539 PageID 17363
Case 18-30264-sgj11 Doc 2391853 Filed Dc 136/13 Entered 04/19/18 Page 350 of 53 Page 50 of 53

distribution to **all creditors**, including Mr. Terry. Additionally, a federal bankruptcy court has

certain tools available to it that are not available to a state court such as the ability to invalidate

potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell

assets free and clear of liens, claims and encumbrances pursuant to section 363 of the

Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy

Code. These are all useful tools available to the Alleged Debtors in a bankruptcy case that would

be lost if this court were to ultimately abstain.

     Finally, there was more than enough evidence showing the acrimonious and bitter

relationship that exists between Mr. Terry and Mr. Dondero. Thus, the availability of an out-of-

court arrangement being obtained in this case is, in this court's mind, slim to none.

     In summation, the court finds that all of the factors above support this case staying with

the bankruptcy court.

          **iii.**    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been
Sought.*

     The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith

and as a litigation tactic to gain some sort of advantage in the state court proceedings. The court

has already found above that these cases were not filed in bad faith and that Mr. Terry has met

the necessary statutory requirements of section 303 of the Bankruptcy Code. Moreover, it is

worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition

is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a

fact-dependent determination.[126] Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary
bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's
motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would
not effectively be dealt with in another forum).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21    Filed 12/29/23    Page 126 of 1539    PageID 17364
Exhibit 21    Page 126 of 160
Case 18-30264-sgj11    Doc 239    Filed 04/13/18    Entered 04/13/18 16:25:58    Page 51 of 53
Case 18-30264-sgj11    Doc 239-1    Filed 04/13/18    Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions. Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court. This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there had been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors. Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy. If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors. Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 85-21 Filed 12/21/23 of 160 Page 127 of 1539 PageID 17365
Case 18-30264-sgj11 Doc 391-3 Filed 04/13/18 Entered 04/13/18 Page 35 of 57 Page 52 of 53

significant harm to the "equity" of the Alleged Debtors.  Specifically, the Alleged Debtors have

argued that, if this court were to enter orders for relief, the equity would be forced to "call" and

ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in

substantial losses to the equity on their investments.  First, to be clear, the current equity of the

Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only

became the equity of the Alleged Debtors on December 19, 2017.  But this is not the "equity"

being referred to by the Alleged Debtors in its argument.  Rather, the so-called "equity," about

which the Alleged Debtors seemed so concerned, is actually *certain parties that own the equity*

*of the entity that owns the equity in the CLOs*—which includes (a) an unnamed third-party

investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate

(49%), and (c) Highland employees (2%).  However, abstention under section 305 of the

Bankruptcy Code does not require this court to look at what is in the best interests of these third-

parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what

is in the best interests of the Alleged Debtors and the creditors.  Accordingly, the Alleged

Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating

abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who

the Alleged Debtors are really out to protect—Highland and Highland-affiliates.  Moreover, the

court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby

ending the Alleged Debtors' right to receive future management fees, there would still be

potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which

include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry
of orders for relief in these cases.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-1    Exhibit 21    Page 22 of 160    Page 128 of 1539    PageID 17366
Case 18-30264-sgj11    Doc 391    Filed 04/13/18    Entered 04/13/18    Page 53 of 53    Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland.  Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

## III.    CONCLUSION

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith.   This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above.  A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland.  A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have.  The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors.  This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

**Exhibit D**

**Acis Arbitration Opinion**

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-21 Filed 12/22/23 of 160   Page 130 of 1539   PageID 17368
Case 18-03078-sgj Doc 102 Filed 04/16/19   Entered 04/16/19 Page 1 of 30



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed April 16, 2019**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, GP, | § | CASE NO. 18-30265-SGJ-11 |
| LLC, | § | (Jointly Administered Under |
|    Debtors. | § | Case No. 18-30264-SGJ-11) |
| _____ | § | (Chapter 11) |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, | § | |
|    Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 18-03078-SGJ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND CLO FUNDING | § | |
| LTD, HIGHLAND HCF ADVISOR, LTD., | § | |
| HIGHLAND CLO MANAGEMENT, LTD., | § | |
| and HIGHLAND CLO HOLDINGS, LTD., | § | |
|    Defendants. | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL
## ARBITRATION [DE # 102]

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-21 Filed 12/22/26 Page 131 of 1539    PageID 17369
Case 18-03078-sgj    Doc 239    Filed 04/03/19    Entered 04/03/19 15:38:28    Page 2 of 30

# I.    Introduction.

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1]

requesting that the bankruptcy court send to arbitration only a ***sub-set*** of claims asserted in the

above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context

is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately

below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage

primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The

Arbitration Motion, as explained below, seeks arbitration of ***eight*** of the 35 claims (*i.e.,* Counts

1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P.

("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were

originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive

relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter

11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11

Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties

related to Highland as third-party defendants with regard to some of those 35 counterclaims).

Notably, these 35 counterclaims—***as directed toward Highland***—were also alleged to be

objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy

cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5 avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE # 84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-21 Filed 12/22/23 Page 132 of 1539   PageID 17370
Exhibit 21   Page 132 of 160
Case 18-03078-sgj Doc 123-6 Filed 04/16/19 Entered 04/16/19 Page 3 of 30   Page 3 of 30

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy

Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or

offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]  In fact, after

the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were

20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to

Highland's proofs of claim.[5]  The Chapter 11 Trustee also filed yet a separate adversary

proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been

consolidated with this Adversary Proceeding.[6]

The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11

plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new

ownership and management, were vested in that plan with the counterclaims in this Adversary

Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland

and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital
Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the
proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27*, filed in Case No. 18-
30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis
of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are
virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i)
section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against
the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii)
section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors
and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in
that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee
has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the
Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of
Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland
proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

APPX. 10762

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-21    Filed 12/29/23    Page 133 of 1539    PageID 17371
Case 18-03078-sgj    Doc 236    Filed 04/16/19    Entered 04/16/19    Page 4 of 30    Page 4 of 30

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7]  Thus,

Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and

proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original

"counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also

objections to Highland's proof of claim).  The separate adversary proceeding that was filed by

the Chapter 11 Trustee seeking injunctive relief  (Adv. Proc. No 18-03212) was consolidated into

this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect

that the Chapter 11 Trustee had become situated as plaintiff.[8]  But, to be clear, the Reorganized

Debtors are actually now plaintiffs in place of the Chapter 11 Trustee.  The Reorganized Debtors

are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis

GP"), and they oppose the Arbitration Motion.[9]

      Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq*., Highland argues

that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because:

(a) these eight counts revolve around the interpretation of certain prior versions of a Sub-

Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned

agreements contained binding arbitration clauses.  Highland also requests that the Adversary

Proceeding be stayed regarding counts 1-8, pending binding arbitration.  The Reorganized

Debtors dispute that there are binding arbitration clauses applicable to counts 1-8.  As explained

further below, the aforementioned agreements were amended many times and the arbitration

clauses were eventually eliminated in the last versions of the agreements.  The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21 Filed 12/22/23 Page 134 of 1539   PageID 17372
Case 18-03078-sgj   Doc 236   Filed 04/03/19   Entered 04/16/19 Page 5 of 30 Page 5 of 30

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should exercise discretion and decline to order arbitration, since core bankruptcy matters are involved and arbitration would conflict with the purposes of the Bankruptcy Code.  For the reasons set forth below, the Arbitration Motion is denied.  This means that Counts 1-26 & 33-35 will go forward and be adjudicated in this Adversary Proceeding.[10]  But as will be explained in a separate order that is being issued shortly following this order, there are certain counts complaining of **postpetition** state law torts and breaches of contract in this Adversary Proceeding (Counts 27-32) that this court believes should be separated out into a different adversary proceeding and consolidated with a contested matter involving a Highland request for allowance of a postpetition administrative expense claim [DE # 772].

## II.    Background Facts.

### A.    First, the Agreements Between the Parties.

As this court has noted on various occasions, Acis LP was formed in the year 2011, and is primarily a CLO portfolio manager.[11]  Specifically, Acis LP provides fund management services to various special purpose entities that hold CLOs (which is an acronym for "collateralized loan obligations").  Acis LP was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases").  The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter.  The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-21    Filed 12/29/23    Page 135 of 1539    PageID 17373
Case 18-03078-sgj    Doc 396    Filed 04/06/19    Entered 04/06/19 Page 6 of 30    Page 6 of 30

are structured as follows: (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds. The CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt. At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity). As portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO SPEs. The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy. Only Acis LP which ***manages*** the CLO business and its general partner, Acis GP, were put into bankruptcy.

Historically, Acis LP has had four main sets of contracts that were at the heart of its business and allowed it to function. They are described below. The second and third agreements set forth below are highly relevant to the Arbitration Motion before the court. The Chapter 11 Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21  Filed 12/29/26 of 16  Page 136 of 1539    PageID 17374
Case 18-03078-sgj  Doc 2396-7  Filed 04/03/94    Entered 11/04/16 19  Page 8 of 30  Page 7 of 30

1.    The PMAs with the CLO SPEs.

First, Acis LP has various portfolio management agreements ("PMAs") **_with the CLO_**
**_SPEs_**, pursuant to which Acis LP earns management fees.  The PMAs have been the primary
"assets" (loosely speaking) of Acis LP.  They are what generate revenue for Acis LP.

2.    The Sub-Advisory Agreement with Highland.

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with **_Highland_**.
Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-
office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP
could fulfill its obligations to the CLO SPEs under the PMAs).  Acis LP paid handsome fees to
Highland pursuant to this agreement.  This agreement was rejected (with bankruptcy court
approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee
credibly represented that he had not only found resources to provide these services at a much
lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth
efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

**_There were five iterations of the Sub-Advisory Agreement between the parties over_**
**_time_**:  (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an
arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement,
"made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at
section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered
into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

APPX. 10276

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 35-21 Filed 12/29/23 Page 137 of 1539 PageID 17375
Case 18-03078-sgj Doc 231 Filed 04/16/19 Page 8 of 30

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016,

"to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the

Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (*which*

*suddenly contained no arbitration clause, with no explanation*).[16]

    3.    <u>The Shared Services Agreement with Highland.</u>

Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland,

pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office

services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs).

To be clear, Acis LP had no employees of its own—only a couple of officers and members.  Acis

LP paid handsome fees to Highland for the personnel and back-office services that Highland

provided to Acis LP.  This agreement was also rejected by the Chapter 11 Trustee during the

Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory

Agreement with Highland was rejected.

    ***There were five iterations of the Shared Services Agreement between the parties over***

***time***:  (a) the initial Shared  Services Agreement "effective as of January 1, 2011" (which had an

arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21 Filed 12/23/26 of 160age 138 of 1539    PageID 17376
Case 18-03Case 19-0233CSEBed D4166-4    Entered 01/04/15/19Page3108 of 3Page 9 of 30

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and

Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an

arbitration clause at section 9.14;[20] and (e) a Fourth Amended and Restated Shared Services

Agreement "dated as of March 17, 2017" (*which suddenly contained no arbitration clause, with*

*no explanation*).[21]

        4.       The Equity/ALF-PMA.

        Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet

another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby

Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity

holder in the CLO SPEs.  This portfolio management agreement with the equity holder in the

CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be

easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the

"Equity/ALF PMA").  Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but

the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP

considered the agreement valuable and very important, because it essentially gave Acis LP the

ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to

make substantial decisions on behalf of the CLO SPEs' *equity*—distinct from making decisions

for the CLO SPEs themselves pursuant to the PMAs.  In any event, shortly before the

Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP:  (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 55-21   Filed 12/23/24   Page 139 of 1539   PageID 17377
Case 18-03078-sgj   Doc 396   Filed 04/03/19   Entered 04/16/19 Page 128 of 31   Page 10 of 30

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one of the Defendants in this Adversary Proceeding).

       5.       <u>Limited Partnership Agreement of Acis LP.</u>

There is actually a fifth agreement that should be mentioned.  Although not as integral as the previous four agreements, there was a certain Amended and Restated Agreement of Limited Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the "LPA"), entered into among the general partner and limited partners of Acis LP.  Reorganized Acis has argued in the Adversary Proceeding that this LPA limited in some respects the compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared Services Agreement.

## B.    Next, the 35 Counts Asserted Against Highland in this Adversary Proceeding.

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about certain activities of Highland and some of its affiliates and actors who controlled it, which activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against Acis LP.  Specifically, these activities of Highland began soon after:  (a) it terminated former Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8 million arbitration award against Acis LP in October 2017, which was confirmed by a judgment in December 2017.  The activities and counts revolve around:  (a) Highland's alleged overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21   Filed 12/29/23   Page 140 of 1539   PageID 17378
Case 18-03078-sgj   Doc 396   Filed 04/08/19   Entered 04/16/19 Page 12 of 31   Page 11 of 30

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer of a \$9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35).  There are also some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

    As mentioned earlier, Highland's Arbitration Motion only requests the court defer to arbitration Counts 1-8—that is the counts relating to:  (a) Highland's alleged overcharging of Acis LP  by more than \$7 million for fees/expenses under the Sub-Advisory and Shared Services Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory and Shared Services Agreements (Counts 5-8).  Highland argues that, ***since all of these counts pertain to the Sub-Advisory Agreement and Shared Services Agreement*** between Acis LP and Highland, the arbitration clauses in those agreements dictate that the counts be carved out from this Adversary Proceeding and sent to binding arbitration.  Highland acknowledges that these two agreements were amended and restated numerous times, and that the last time they were amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that, since all of the activity complained of in Counts 1-8 occurred ***prior*** to March 17, 2017, ***the older iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses, govern***.  Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21   Filed 12/23/26 of 160   Page 141 of 1539   PageID 17379
Case 18-03078-sgj   Doc 396   Filed 04/16/19   Entered 04/16/19 Page 123 of 31   Page 12 of 30

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17, 2017 iteration of the agreements).  And Counts 5-8, while articulated as fraudulent transfer claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions.  That includes the provisions directing arbitration.  And, they argue, it does not matter **when** the causes of action occurred/accrued or not.  What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.

**C.     The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.**

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version.  The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8521 Filed 02/23/26 of 16Page 142 of 1539    PageID 17380
Case 18-03078-sgj Doc 123896756d 04/06794    Entered 11/04116/19 25g8:28of 3age 13 of 30

As earlier mentioned, these two agreements were later amended and restated several times. The arbitration provisions remained identical until they were completely eliminated in March 2017. The Reorganized Debtor argues that this is a short analysis: there was no longer an operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or noncontractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as 'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory Agreement: "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they "amended, restated and replaced the existing agreements *in [their] entirety*."[27] The March 17, 2017 agreements also each provided that they "supersede[d] all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21 Filed 12/29/23 of 160 Page 143 of 1539   PageID 17381
Case 18-03078-sgj Doc 123 96-21 Filed 04/05/19   Entered 04/05/19 Page 14 of 30

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate.  "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP.  The court's inquiry can and should end there.  But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion *not* to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code.  Therefore, this is further reason why the Arbitration Motion should be denied.

**III.    Legal Analysis.**

**A.    The Federal Arbitration Act and Arbitration Clauses Generally.**

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30]  Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31]  The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 185-21 Filed 12/22/23   Page 144 of 1539   PageID 17382
Case 18-03078-sgj   Doc 139-3   Filed 04/11/19   Page 15 of 30

arbitrability of claims should be resolved in favor of arbitration."[32]  "There is a strong

presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement

bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two

threshold questions:  (1) whether an arbitration agreement is valid; and (2) whether the dispute

falls within the scope of the agreement.[34]  To evaluate the enforceability of an arbitration

agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the

scope of the agreement is a matter of federal substantive law.[36]

## B. Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]

With respect to the first element—whether a valid agreement to arbitrate exists—federal

courts "apply ordinary state-law principles that govern the formation of contracts."[38]  Here, the

choice of law provisions of the Highland-Acis Agreements state:  "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy.  Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21    Filed 12/29/23    Page 145 of 1539    PageID 17383
Case 18-03078-sgj    Doc 396-18    Filed 04/03/19    Page 16 of 30
Exhibit 21    Page 229 of 1639

governed by the laws of Texas. . . ."[39]  "Under the Texas rules, in those contract cases in which
the parties have agreed to an enforceable choice of law clause, the law of the chosen state must
be applied."[40]  Accordingly, Texas law governs whether the parties are subject to an enforceable
agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-
Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42]  And,
it would seem to be beyond peradventure that this was, at one time, enforceable between the
parties, with regard to any disputes that arose regarding the agreements.  The tricky conundrum
here is that those arbitration provisions were deleted in the most recent iterations of the
agreements—that is, the March 17, 2017 versions of the agreements.  Highland argues that, since
Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged
fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue
of modifications to the agreements that were made up to March 17, 2017), the pre-March 17,
2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the
arbitration provisions apply.  In other words, what matters is when causes of action *accrue* not
when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is
most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43]  In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion,
§ 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v.
Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 8-21   Filed 12/24/23   Page 146 of 1539   PageID 17384
Exhibit 21   Page 24 of 167
Case 18-03078-sgj   Doc 239-53   Filed 04/03/19   Entered 04/16/19   Page 17 of 30

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm

and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations

of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of

the Equal Pay Act.  The law firm filed a motion to compel arbitration with regard to all of these

claims.  The law firm's motion to compel was based upon various partnership agreements which

governed the law firm.  The original partnership agreement was first effective on August 26,

1986, and the plaintiff did not sign that agreement.  Subsequent to that time, however, the

original partnership agreement was amended and restated on several occasions.  The plaintiff

admitted that she signed four partnership agreement documents:  (1) a Restated Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994

Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law

Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment

No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated

January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998

("1998 Partnership Agreement").  The earlier two agreements—*i.e.,* the 1994 and 1996

Partnership Agreements—did **not** contain an arbitration clause. The 1996 Amendment No. 1 and

the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause

as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good
> faith effort to settle any dispute or claim arising under this partnership agreement.
> If the equity or non-equity partners fail to resolve a dispute or claim, such equity or
> non-equity partner shall submit the dispute or claim to binding arbitration under the
> rules of the American Arbitration Association then in effect. Judgment on
> arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-21    Filed 12/12/23    Page 147 of 1539    PageID 17385
Exhibit 21    Page 24 of 160
Case 18-03078-sgj    Doc 239-3    Filed 04/03/19    Entered 04/16/19    Page 18 of 30
Doc 1069-4    Filed 11/11/19    Page 18 of 31

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff **conceded** that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding: (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing). However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were: (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act. The district court granted in part and denied in part the motion to compel arbitration, holding that: (1) the plaintiff's contract claims arising under **earlier** partnership agreements, which **did not** contain arbitration clauses, were **not arbitrable**; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect. The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 685-21 Filed 12/24/26 of 160 Page 148 of 1539    PageID 17386
Case 18-03078-sgj    Doc 239-6    Filed 04/16/19    Entered 04/16/19 Page 23 of 31 Page 19 of 30

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation, failed to promote her, and deprived her of benefits from a tobacco case. The court noted that, if the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment No. 1 or the 1998 Partnership Agreement *because those agreements did not even exist at that time*. But, to the extent that the conduct Plaintiff complained of occurred when the 1996 Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be subject to arbitration.[47]

The court further noted that the arbitration clause should not be interpreted as covering the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain grammatical language of the arbitration clause gave no indication that it would apply retroactively. "To interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-21   Filed 12/14/23   Page 149 of 1539   PageID 17387
Case 18-03078-sgj   Doc 396-5   Filed 04/03/94   Entered 11/04/19 25:38:28   Page 20 of 30

Bottom line, the court in *Coffman* seemed to focus on **when each cause of action accrued** and looked to the **agreement that governed at such time**.  This court agrees with that reasoning and sees no reason why the result should be different in the case at bar, simply because the arbitration clauses in the case at bar were in **earlier** versions of the Sub-Advisory and Shared Services Agreements as opposed to being in the **later** versions of those agreements (in other words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a determination that there is no binding arbitration clause in the case at bar.  One is the case of *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49]  This case involved a motion to compel arbitration that was denied (which denial was affirmed by the Fifth Circuit).  Like the case at bar, it involved a situation where there had been a succession of agreements, with earlier agreements containing arbitration provisions and the last agreement containing no arbitration clause.  Specifically, in the *Goss-Reid* case, there were three agreements that were relevant.  First, a **Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI") and a party named Rittenhaus-Tate Organization ("RTO").  RTO was a business owned by Tracy Goss and Sheila Reid.  The Franchise Agreement, among other things, provided that RTO's owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use of certain of TTI's intellectual property.  During the term of the Franchise Agreement, Tracy Goss and Sheila Reid developed certain consulting services technology they called "The Winning Strategy" and it apparently was built off of TTI's intellectual property.  This first agreement contained a mandatory arbitration provision.  Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

APP.102739

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-1   Filed 12/14/23   Page 150 of 1539   PageID 17388
Case 18-03078-sgj   Doc 23   Filed 01/03/19   Entered 01/03/19 Page 22 of   Page 21 of 30

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"), on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same intellectual property covered by the Franchise Agreement." This second agreement also contained a mandatory arbitration agreement. Third, there was a **Transfer Agreement** that appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive right to use the intellectual property that was the subject of the prior agreements in exchange for a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration provision in this third agreement and the agreement did not adopt or refer to the arbitration provisions contained in the earlier agreements. The third agreement stated that it constituted "an amendment to the License Agreement . . . between you and this company ('TEKNIKO'), supersedes all prior agreements between you and TEKNIKO and, except as provided below, will terminate your rights and those of TEKNIKO under the License Agreement."

At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education Company. These Defendants (hereafter so called) asserted ownership themselves of "The Winning Strategy" based on the Franchise Agreement. The Defendants—citing to the arbitration clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel arbitration, which was denied at the district court level and also at the Fifth Circuit. The district court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New York law and apparently the parties agreed that New York law applied), and that the Transfer Agreement constituted a novation and extinguished the arbitration provisions of the previous

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21 Filed 12/14/26 of 160 Page 151 of 1539    PageID 17389
Case 18-03078-sgj Doc 236-3 Filed 04/03/19 Entered 04/11/19 Page 22 of 30    Page 22 of 30

agreements.  On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement.  Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas law.  Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52]  "This type of agreement clearly constitutes a novation under New York law."[53]  The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement.  The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.'  Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp. v. Teco Pipeline Co.*[55]  In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.,* 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21   Filed 12/26 of 16  Page 152 of 1539   PageID 17390
Case 18-03078-sgj   Doc 22-2   Filed 04/06/19   Entered 04/16/19   Page 23 of 30

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and

those various agreements were not amendments or restatements of one initial agreement.  Rather,

there was an Operating Agreement, there were documents that were alleged to create a joint

venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation

Agreement, and a couple of Settlement Agreements entered into later when various disputes

arose.  One of the key agreements, the so-called Operating Agreement, contained an arbitration

clause.  When party Teco Pipeline sued party Valero and other related parties, Valero moved to

compel arbitration, arguing that the litigation was subject to the arbitration clause in the

Operating Agreement.  The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating

Agreement that contained the arbitration clause but, even if they were, a later Settlement

Agreement essentially redefined the parties' relationship—essentially superseding the parties'

relationship that had been set forth in the numerous prior agreements—and it did not have an

arbitration clause.  Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding
> against any of them with respect to their obligations, liabilities, or any other matter
> under or arising out of or in connection with this Agreement may be brought in the
> United States District Court for the Western District of Texas, San Antonio
> Division, or in the courts of the State of Texas, and hereby irrevocably accepts and
> submits to the jurisdiction of each of the aforesaid court in personam, generally and
> unconditionally with respect to any such action, suit or proceeding for itself and in
> respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.*,

that the parties would go through judicial channels, not arbitration.  Teco also asserted that the

intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8-21 Filed 04/26/24    Page 153 of 1539    PageID 17391
Case 18-03078-sgj Doc 239-05 Filed 04/03/19    Entered 04/16/19 Page 23 of 31    Page 24 of 30

Settlement Agreement.  The appeals court disagreed with Teco's argument and determined arbitration was required.  First, the court determined that the provision regarding litigation applied only to disputes arising under the Settlement Agreement not the previously executed Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation Agreements.  There was nothing to indicate that all the terms of those previous agreements had been superseded by the Settlement Agreement.  In fact, it appeared that only select terms of the earlier agreements were being modified.  Significantly, the Settlement Agreement referred to an "Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the Settlement Agreement—suggesting that it remained in intact (except for the amendment attached).  Moreover, there was a post-Settlement Agreement letter submitted into evidence stating that the prior Operating Agreement and arbitration provision were still in effect.  The court addressed many other arguments made by Teco and, in the end, found nothing had superseded or otherwise revoked the prior arbitration clause.

This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive of the situation in the case at bar.  Those cases clearly dealt with a myriad of agreements—for example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding Settlement Agreement (with no arbitration clause) was determined not to have been intended to supersede or replace the agreement with the arbitration clause.  In *Goss-Reid*, there were also a myriad of agreements (*i.e.,* a franchise agreement, a license agreement and then a transfer agreement), and the last one containing no arbitration clause was held to have been a novation of the prior agreements.   In *Valero* and *Goss-Reid*, the various agreements were not amendments or restatements of one initial agreement.  The case at bar is more analogous to the *Coffman* case (involving amendments and restatements of an initial agreement) and the logic of that holding

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-21  Exhibit 21  Filed 12/24/26  Page 154 of 1539    PageID 17392
Case 18-03078-sgj  Doc 396-75  Filed 04/06/94    Filed 04/16/19  Page 28 of 31  Page 25 of 30

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017 version of the agreements that suggests that the agreement to submit disputes to litigation in Texas and the deletion of the arbitration clauses should be applied retroactively.  The court believes it should look at when a cause of action accrued and determine if there was a binding arbitration clause between the parties at that time in the governing version of the agreement.  Thus, the court determines that there were valid arbitration agreements that applied to all disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the extent that those disputes involved conduct prior to March 17, 2017.  Since Counts 1-8 involve conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements in the Sub-Advisory Agreement and Shared Series Agreement.

## C.    But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.

The analysis does not end here.  Yes, there is an otherwise valid, binding arbitration clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to March 17, 2017).  And, yes, Counts 1-8 involve conduct and disputes arising under these pre-March 17, 2017 agreements.  But what about the fact that these disputes arise in an adversary proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])?  And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21   Filed 12/29/22   Page 155 of 1539   PageID 17393
Exhibit 21   Page 24 of 160
Case 18-03078-sgj   Doc 236   Filed 04/03/19   Entered 04/11/19 15:38:22   Page 26 of 30

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services

Agreement who has asked for enforcement of the arbitration clauses in those agreements) has

filed proofs of claim?[62]  And what about the fact that Counts 1-8 (as with every count in the

Adversary Proceeding) are all urged to be ***offsets*** to Highland's proofs of claim?[63]  Highland's

proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared

Services Agreements (*i.e.,* the versions that have no arbitration clauses).  Highland has not

argued that its proofs of claim are subject to arbitration (likely because they are governed by the

post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements).  But,

again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors

argue that each of these counts present potential offsets to Highlands' proofs of claim.  As a

reminder, these counts are:

**COUNT 1**:   Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA (Highland allegedly overcharged expenses by $7M+ (*i.e.,* excessive fees) under the Sub-Advisory and Shared Services Agreements).

**COUNT 2**:   Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments (turnover the $7M+ overcharged).

**COUNT 3**:   Money Had and Received for Overcharges and Unauthorized Overpayments (again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory Agreement and Shared Services Agreement).

**COUNT 4**:   Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+ overcharged implicating the Sub-Advisory Agreement and Shared Services Agreement).

**COUNT 5**:   Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement (modifications to the Sub-Advisory Agreement in subsequent iterations were allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6852-1 Filed 12/22/26 of 16age 156 of 1539   PageID 17394
Case 18-03078-sgj  Doc 12396-51d  04/06/94   Entered 104106 19 Page 128 of  Page 27 of 30

**COUNT 6**:   Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:   Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:   Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, *five of the eight counts that Highland wants arbitrated* (Counts 2, and 5-8) clearly involve statutory core matters.[64]  Moreover, *all* of the counts in the Adversary Proceeding are asserted *defensively* to two proofs of claim—meaning *all eight counts that Highland wants arbitrated* (even Counts 1, 3, and 4) have transformed into statutory core matters.[65]  Does this matter?  This court believes yes.

The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66]  In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds:  (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C).  This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a *statutory* "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter.  However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.,* all 35 counts) are likely *inexplicably intertwined* with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them.  While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is *after* the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods.  For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers.  Thus, how does one evaluate the proofs of claim separately from this argument?  Additionally, Highland *has asserted unliquidated indemnification claims* in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims).  The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy),* 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.),* 118 F.3d 1056 (5th Cir. 1997).

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 8521 Filed 12/25/26 Page 157 of 1539    PageID 17395
Case 18-03078-sgj    Doc 396-58    Doc 694    Filed 11/01/19 Page 23 of 31 Page 28 of 30

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration provision would conflict with the purposes/goals of the Bankruptcy Code.[67]  Some purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation, and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here.  In *Gandy*, an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various business partners, asserting causes of action against them for making transfers out of a partnership affecting her ownership interests, and the causes of action included breach of contract, negligence, breach of fiduciary duty, fraud and constructive trust.  There was an arbitration clause in the applicable partnership agreement and the state court granted a motion to compel arbitration.  Then, the debtor filed a Chapter 11 case and removed the state court lawsuit to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and alter ego in a separate adversary proceeding, and requested substantive consolidation.  The bankruptcy court granted consolidation of the two actions and then the defendants filed a motion to compel arbitration.  The bankruptcy court denied the motion, after finding that the debtor was essentially seeking avoidance of fraudulent transfers.  The Fifth Circuit affirmed the bankruptcy court's refusal to enforce an arbitration clause contained in the underlying partnership agreement.  The court agreed with the bankruptcy court that the complaint essentially—more than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 13851    Filed 12/15/22    Page 158 of 1539    PageID 17396
Case 18-03078-sgj    Doc 2396-21    Doc 669-4    Filed 11/04/19    Page 338 of 31    Page 29 of 30

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were

state law tort claims and breach of contract also asserted) but also—in looking at whether

enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted

that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of

the assets of a debtor's estate.  The court thought the avoidance actions predominated over the

"peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal

bankruptcy forum provided by the Code is at its zenith."[69]  The court stated that "[s]ome of the

purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the

Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to

protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of

the bankruptcy court to enforce its own orders."[71]

     This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than

anything else—seeks avoidance of fraudulent transfers.  Such avoidance theories derive from the

Bankruptcy Code.  Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center,

as are the "strong arm" powers of section 544(a).  Enforcing the arbitration clause here would

conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company.  The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement.  The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code."  *Nat'l Gypsum Co.*, 118 F.3d at 1067.  Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court would not send the dispute to arbitration.

[71] *Gandy,* 299 F.3d at 500.

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-21   Filed 2/25/26 of 160   Page 159 of 1539   PageID 17397
Case 18-03078-sgj   Doc 296   Filed 04/16/19   Entered 04/16/19 Page 328 of 30   Page 30 of 30

expeditious and equitable distribution of the assets of a debtor's estate. The avoidance actions in this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith." Arbitrating Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral part of determining Highland's proofs of claim and the other core counts in the Adversary Proceeding. The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to provide a central forum for litigation, whenever feasible and jurisdictionally sound. Indeed, in *Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of the bankruptcy court has been invoked and the nature of estate claims becomes "different from [their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority to decline to order arbitration here.[73] It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

### #### END OF MEMORANDUM OPINION AND ORDER####

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding involving whether section 524 discharge was violated by credit card company whose agreement with debtor contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to the structure of the Code.").

## CERTIFICATE OF SERVICE

I, Elliot Bromagen, certify that I am not less than 18 years of age, and that service of the foregoing was caused to be made on November 1, 2019, in the manner indicated on the parties on the attached service list.

Date:  November 1, 2019

*/s/ Elliot Bromagen*
Elliot Bromagen

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-21 Filed 12/15/23    Page 161 of 1539    PageID 17399
Exhibit 21    Page 255 of 160

Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 2 of 7

**HAND DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)

**OVERNIGHT DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE 19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Jose F. Bibiloni, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Hunter Mountain Trust)
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE  19801

**OVERNIGHT DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**OVERNIGHT DELIVERY**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**OVERNIGHT DELIVERY**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**OVERNIGHT DELIVERY**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**OVERNIGHT DELIVERY**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**OVERNIGHT DELIVERY**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**OVERNIGHT DELIVERY**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**OVERNIGHT DELIVERY**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**OVERNIGHT DELIVERY**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**OVERNIGHT DELIVERY**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

**OVERNIGHT DELIVERY**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX 75206

**OVERNIGHT DELIVERY**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**OVERNIGHT DELIVERY**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**OVERNIGHT DELIVERY**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**OVERNIGHT DELIVERY**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Frontier State Bank
Attn: Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**OVERNIGHT DELIVERY**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**OVERNIGHT DELIVERY**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**OVERNIGHT DELIVERY**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

APPX. 017346

**OVERNIGHT DELIVERY**
(Counsel to California Public Employees'
Retirement System ("CalPERS"))
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**OVERNIGHT DELIVERY**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**OVERNIGHT DELIVERY**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**OVERNIGHT DELIVERY**
(Counsel to Jefferies)
Patrick Maxcy, Esq.
Dentons US LLP
233 South Wacker Drive Suite 5900
Chicago, Illinois 60606-6361

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Bojan Guzina, Esquire
Matthew Clemente, Esquire
Alyssa Russell, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Jessica Boelter, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Penny P. Reid, Esquire
Paige Holden Montgomery, Esquire
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201

APPX. 17473

# EXHIBIT 22

# In Re:

*HIGHLAND CAPITAL MANAGEMENT, L.P.*

*Case No. 19-12239(CSS)*

---

*December 2, 2019*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

To purchase copies of this transcript, please contact us by phone or email

Min-U-Script® with Word Index

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38   Exhibit 22   Filed 09/03/13   Page 29 of 139   Page 169 of 1539   PageID 17407

1

```
 1

 2   UNITED STATES BANKRUPTCY COURT

 3   DISTRICT OF DELAWARE

 4   - - - - - - - - - - - - - - - - - - - -x

 5   In the Matter of:

 6   HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

 7            Debtor.                        19-12239(CSS)

 8   - - - - - - - - - - - - - - - - - - - -x

 9

10

11               United States Bankruptcy Court

12               824 North Market Street

13               Wilmington, Delaware

14

15               December 2, 2019

16               10:07 AM

17

18

19   B E F O R E:

20   HON. CHRISTOPHER S. SONTCHI

21   CHIEF U.S. BANKRUPTCY JUDGE

22

23   ECR OPERATOR:  LESLIE MURIN

24

25
```

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-85   Filed 03/24/23   Page 170 of 1539   PageID 17408

Exhibit 22   Page 29 of 139

2

1

2  Motion for Entry of an Order (I) Authorizing Bradley D. Sharp

3  to Act as Foreign Representative Pursuant to 11 U.S.C. Section

4  1505 and (II) Granting Related Relief (Docket No. 68).

5

6  Motion of the Official Committee of Unsecured Creditors for

7  Entry of an Order Authorizing Filing Under Seal of the Omnibus

8  Objection of the Official Committee of Unsecured Creditors to

9  the Debtor's (1) Motion for Final Order Authorizing Continuance

10  of the Existing Cash Management System, (II) Motion to Employ

11  and Retain Development Specialists, Inc. to Provide a Chief

12  Restructuring Officer, and (III) Precautionary Motion for

13  Approval of Protocols for "Ordinary Course" Transactions

14  (Docket No. 123).

15

16  Motion of Debtor for Entry of Interim and Final Orders

17  Authorizing Debtor to File Under Seal Portions of Its Creditor

18  Matrix Containing Employee Address Information (Docket No. 8).

19

20  Debtor's Application for an Order Authorizing the Retention and

21  Employment of Foley Gardere, Foley & Lardner LLP as Special

22  Texas Counsel, Nunc Pro Tunc to the Petition Date (Docket No.

23  69).

24

25

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-22   Filed 03/23/23   Page 171 of 1539   PageID 17409
Exhibit 22   Page 29 of 139

3

1

2  Debtor's Application for an Order Authorizing the Retention and

3  Employment of Lynn Pinker Cox & Hurst LLP as Special Texas

4  Litigation Counsel, Nunc Pro Tunc to the Petition Date (Docket

5  No. 70).

6

7  Motion of Debtor for Entry of Interim and Final Orders

8  Authorizing (A) Continuance of Existing Cash Management System

9  and Brokerage Relationships, (B) Continued Use of the Prime

10  Account, (C) Limited Waiver of Section 345(b) Deposit and

11  Investment Requirements, and (D) Granting Related Relief

12  (Docket No. 5).

13

14  Motion Pursuant to 11 U.S.C. Sections 105(a) and 363(b) to

15  Employ and Retain Development Specialists, Inc. to Provide a

16  Chief Restructuring Officer, Additional Personnel, and

17  Financial Advisory and Restructuring-Related Services, Nunc Pro

18  Tunc as of the Petition Date (Docket No. 75).

19

20  Precautionary Motion of the Debtor for Order Approving

21  Protocols for the Debtor to Implement Certain Transactions in

22  the Ordinary Course of Business (Docket No. 77).

23

24

25

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-85   Filed 03/29/23   Page 172 of 1539   PageID 17410

Exhibit 22   Page 20 of 139

4

1

2  Motion of the Official Committee of Unsecured Creditors for an

3  Order Transferring Venue of This Case to the United States

4  Bankruptcy Court for the Northern District of Texas (Docket No.

5  86).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Clara Rubin

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-85   Filed 09/29/23   Page 173 of 1539   PageID 17411
Exhibit 22   Page 29 of 139

5

1

2  A P P E A R A N C E S :

3  PACHULSKI STANG ZIEHL & JONES LLP

4        Attorneys for Debtor

5  BY:   JAMES E. O'NEILL, ESQ.

6        GREGORY DEMO, ESQ.

7        IRA D. KHARASCH, ESQ.

8        MAXIM LITVAK, ESQ.

9        JOHN A. MORRIS, ESQ.

10       JEFFREY N. POMERANTZ, ESQ.

11

12

13  UNITED STATES DEPARTMENT OF JUSTICE

14        Office of the United States Trustee

15  BY:   JANE LEAMY, ESQ.

16

17

18  SIDLEY AUSTIN LLP

19        Proposed Counsel for Official Committee of Unsecured

20        Creditors

21  BY:   MATTHEW A. CLEMENTE, ESQ.

22        PENNY P. REID, ESQ.

23        DENNIS M. TWOMEY, ESQ.

24

25

APP. 102804

6

1

2  YOUNG CONAWAY STARGATT & TAYLOR, LLP

3       Attorneys for Official Committee of Unsecured Creditors

4  BY:   SEAN M. BEACH, ESQ.

5       KEVIN A. GUERKE, ESQ.

6       MICHAEL R. NESTOR, ESQ.

7

8

9  ASHBY & GEDDES, P.A.

10       Attorneys for Jefferies, LLC

11  BY:   WILLIAM P. BOWDEN, ESQ.

12

13

14  BLANK ROME LLP

15       Attorneys for Acis Capital Management GP, et al.

16  BY:   JOHN E. LUCIAN, ESQ.

17       JOSE F. BIBILONI, ESQ.

18

19

20  DENTONS US, LLP

21       Attorneys for Jefferies

22  BY:   LAUREN MACKSOUD, ESQ. (TELEPHONICALLY)

23       PATRICK C. MAXCY, ESQ. (TELEPHONICALLY)

24

25

APPX. 102805

Case 19-34054-sgj11  Doc 3596-22  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 31-85  Filed 08/29/23  Page 175 of 1539  PageID 17413
Exhibit 22  Page 29 of 139

7

1

2   GIBSON, DUNN & CRUTCHER LLP

3          Attorneys for Alvarez & Marsal

4   BY:   MICHAEL A. ROSENTHAL, ESQ.

5

6

7   JENNER & BLOCK

8          Attorneys for Redeemer Committee of Crusader Fund

9   BY:   MARC B. HANKIN, ESQ.

10          TERRI L. MASCHERIN, ESQ.

11

12

13   LATHAM & WATKINS, LLP

14          Attorneys for UBS Securities LLC and UBS London Bank

15   BY:   ASIF ATTARWALA, ESQ. (TELEPHONICALLY)

16          JEFF BJORK, ESQ. (TELEPHONICALLY)

17          ANDREW B. CLUBOK, ESQ. (TELEPHONICALLY)

18          KUAN HUANG, ESQ. (TELEPHONICALLY)

19          KIMBERLY A. POSIN, ESQ. (TELEPHONICALLY)

20

21

22   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

23          Attorneys for Redeemer Committee of Crusader Fund

24   BY:   CURTIS S. MILLER, ESQ.

25

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-22   Filed 10/20/23   Page 176 of 1539   PageID 17414
Exhibit 22   Page 10 of 139

8

```
 1
 2   POTTER ANDERSON & CORROON LLP
 3         Attorneys for Alvarez & Marsal
 4   BY:   JEREMY W. RYAN, ESQ.
 5
 6
 7   ROGGE DUNN GROUP, PC.
 8         Attorneys for Acis Capital Management GP, et al.
 9   BY:   BRIAN P. SHAW, ESQ.
10
11
12   SCHULTE ROTH & ZABEL LLP
13         Attorneys for CLO Entities, Intertrust Entities
14   BY:   JAMES T. BENTLEY, ESQ. (TELEPHONICALLY)
15
16
17   WINSTEAD, P.C.
18         Attorneys for Acis Capital Management GP, et al.
19   BY:   RAKHEE V. PATEL, ESQ.
20
21
22
23
24
25
```

APPX. 102806

9

```
 1

 2   ALSO PRESENT:

 3         ISAAC D. LEVENTON, ESQ., Asst. General Counsel, Highland

 4         Capital Management

 5         FRANK WATERHOUSE, Partner and CFO, Highland Capital

 6         Management

 7         BRADLEY SHARP, Pres. and CEO, Development Specialists,

 8         Inc.

 9         FRED CARUSO, COO, Development Specialists, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

APPX. 023807

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/22/23   Page 178 of 1539   PageID 17416
Exhibit 22   Page 19 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    10

 1                   P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            THE COURT:  Please be seated.

 4            MR. O'NEILL:  Good morning, Your Honor.

 5            THE COURT:  Good morning.

 6            MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl &

 7   Jones, here today on behalf of the debtor, Highland Capital

 8   Management.  With me, Your Honor, at counsel table is Jeff

 9   Pomerantz, Ira Kharasch, John Morris, Greg Demo, and Max

10   Litvak, representing the debtor.  Also in the courtroom with

11   us, from our client, Isaac Leventon and Frank Waterhouse and,

12   from DSI, Brad Sharp and Fred Caruso.

13            THE COURT:  Welcome.

14            MR. O'NEILL:  Your Honor, we have a number of matters

15   on the agenda today, but we are going to proceed with item

16   number 12 on the agenda, which is the committee's venue motion.

17   So I will yield the podium to them.

18            THE COURT:  Okay.

19            MR. CLEMENTE:  Good morning, Your Honor.

20            THE COURT:  Good morning.

21            MR. CLEMENTE:  Matthew Clemente from Sidley Austin,

22   proposed counsel to the official committee of unsecured

23   creditors.  With me here today, my colleagues Dennis Twomey and

24   Penny Reid, along with our co-counsel from Young Conaway, Mike

25   Nestor and Sean Beach.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/29/23   Page 179 of 1539   PageID 17417
Exhibit 22   Page 23 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    11

 1              Your Honor, we have filed our venue motion.  We

 2      believe that venue -- it's appropriate to transfer venue to the

 3      bankruptcy court in the District of Texas for the reasons that

 4      we laid out in the motion.  Based on Your Honor's --

 5      discussions with Your Honor this morning, we understand that we

 6      would proceed with what I believe would be a short proffer from

 7      the debtor, we would have an opportunity to cross, and then we

 8      would proceed to argument from there.  If that's acceptable to

 9      Your Honor, that's --

10              THE COURT:  That's fine.  Thank you.

11              MR. CLEMENTE:  -- that's the way we'd proceed.

12              THE COURT:  Yes.

13              MR. CLEMENTE:  Thank you, Your Honor.

14              MR. POMERANTZ:  Good morning, Your Honor.  Jeff

15      Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

16      debtor.  We'd also like at this time, Your Honor, to move into

17      evidence Exhibits A through U, except for Exhibit G.  Exhibit G

18      is one of those documents that we refer to in chambers as would

19      be subject to seal.  We don't need to refer to it in connection

20      with the venue motion.  But if Your Honor would like, I can

21      approach with a binder containing the --

22              THE COURT:  Yeah, I don't have those.

23              MR. POMERANTZ:  -- exhibits.  There have been no

24      objections to them.

25              MR. POMERANTZ:  Your Honor, if Mr. Sharp were called

 1  to testify, he would testify --

 2          THE COURT:  Hang --

 3          MR. POMERANTZ:  Oh, sorry.

 4          THE COURT:  Hang on.  Okay.

 5          MR. POMERANTZ:  Okay.

 6          THE COURT:  Look at the documents.  It's the first

 7  I've seen them.

 8      (Pause)

 9          THE COURT:  So you're moving A through U, except for

10  G?

11          MR. POMERANTZ:  Correct, Your Honor.

12          THE COURT:  Any objection?

13          MR. CLEMENTE:  Sorry, Your Honor, one --

14          THE COURT:  No; yeah, that's fine.

15          MR. CLEMENTE:  No objection, Your Honor.

16          THE COURT:  All right, they're admitted without

17  objection, other than G.  G is not admitted at this time.

18      (Debtors' Exhibits A through U, except for Exhibit G, were

19  hereby received into evidence, as of this date.)

20          THE COURT:  All right, you may proceed with the

21  proffer.

22          MR. POMERANTZ:  Thank you, Your Honor.

23          If Mr. Sharp were called to testify, he would testify

24  that he is the proposed chief restructuring officer of the

25  debtor; he's also the president of Development Specialists,

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 12/15/23   Page 181 of 1539   PageID 17419
Exhibit 22   Page 25 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    13

1  Inc., a financial advisory firm.  He would testify that he's

2  been a restructuring professional with over twenty-five years

3  of experience as a trustee, a chief restructuring officer, and

4  a financial advisor, in a myriad of industries.  He would

5  testify that he has been appointed as chief restructuring

6  officer in four cases in Delaware, including In re Variant

7  before Judge Shannon, In re Woodbridge before Judge Carey, In

8  re WL Homes before Judge Shannon, and In re Beverly Hills

9  Bancorp before Judge Carey.

10        He would testify that he has a national practice, he's

11  physically headquartered in Los Angeles, and it would be as

12  convenient for him to travel to this court in Delaware than it

13  would be for him to travel to Dallas.  He would testify that

14  the debtor's counsel, Pachulski Stang Ziehl & Jones, has

15  offices in Delaware and, if the case were transferred, the

16  debtor would need to retain local counsel in Dallas.

17        He would testify that he was initially engaged by the

18  debtor on October 7, 2019 and that, prior to his engagement as

19  a CRO, he had no prior involvement with Highland or any of its

20  senior management employees or principals.  He would testify

21  that he was introduced to Highland by Pachulski Stang Ziehl &

22  Jones.

23        He would testify that, since his engagement, he and

24  his colleague, Fred Caruso, who functions as an extension of

25  him in his role as chief restructuring officer, and other

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 02/16/23   Page 182 of 1539   PageID 17420

HIGHLAND CAPITAL MANAGEMENT, L.P.                    14

 1  employees of DSI have devoted themselves to learning about the

 2  debtor's business and financial affairs, knowledge that only

 3  increases as the days go by.  He would testify that he and

 4  others from DSI have spent hundreds of hours meeting with

 5  various employees of the debtor and reviewing and accessing the

 6  debtor's books and records.  He would testify that he's been

 7  given complete access to a wealth of information by the debtor,

 8  and nothing he or his team have requested from the debtor have

 9  been withheld by them.

10          He would testify that the debtor's a limited

11  partnership organized under the laws of Delaware and that the

12  debtor's general partner, Strand Advisors, is a corporation

13  organized under Delaware law as well, and Strand is the manager

14  of the debtor.  He would testify that over ninety-nine percent

15  of the debtor's limited partnerships are held by Delaware

16  entities.

17          He would testify that the debtor owns and manages a

18  sophisticated financial-advisory-services and money-management

19  business that has assets and interests all over the world; that

20  the debtor's assets under management, including its own

21  proprietary assets and those of its clients, through various

22  related parties, exist in the United States, Asia, South

23  America, and Europe.

24          He would testify that the debtor has over two-and-a-

25  half billion dollars of assets under management and receives

 1   management and advisory fees from a multitude of sources around

 2   the world.  He would also testify that the debtor provides

 3   shared services for approximately 7.5 billion of assets managed

 4   by a variety of affiliated and unaffiliated entities, including

 5   other affiliated registered investment advisors.

 6           He would testify that although the debtor is based in

 7   Dallas, the debtor's affiliates and related parties maintain

 8   offices or have personnel in many international locales,

 9   including Buenos Aires, Rio de Janeiro, Singapore, and Seoul.

10   He would testify that the debtor owns and manages targeted

11   funds in Korea, South America, and Singapore.

12           He would testify that the debtor's filed the motion

13   that's pending today to appoint him as foreign representative

14   in order to manage certain foreign interests, including those

15   proceedings pending in Bermuda and Cayman.  He would testify

16   that the principal assets in the United States consist of

17   custodial and noncustodial interests and investments located

18   all over the country, and that the debtor's prime brokerage

19   account that holds the bulk of the debtor's liquid assets is

20   located in New York City with Jefferies.

21           He would testify the debtor owes approximately 30

22   million dollars to Jefferies on account of margin obligations

23   that are secured by the securities in the prime account, and

24   that the debtor's other principal secured creditor, Frontier

25   State Bank, is based in Oklahoma City and is owed approximately

 1   5.2 million dollars as of the petition date.

 2          He would testify that one aspect of the debtor's

 3   business is management advisory services in connection with

 4   various investments and collateralized loan obligations, or

 5   "CLOs", and that the debtor previously provided submanager,

 6   subadvisory, and shared services to Acis CLOs pursuant to

 7   certain contractual agreements that were terminated during the

 8   course of Acis' bankruptcy in or around August 2018.  He would

 9   testify that he's informed and believes that the compensation

10   structure for subadvisory and shared-service agreements is

11   different for CLOs than with other types of private equity or

12   hedge funds that the debtor manages.

13          He will testify that a focus of DSI's efforts in this

14   case will be to evaluate the appropriateness and the economics

15   of the shared-service agreements and subadvisory agreements

16   that the debtor's a party to with both affiliated and

17   unaffiliated third parties, and he would determine what

18   modifications are appropriate given the facts and

19   circumstances.

20          He would testify that, since the petition date and, he

21   believes, since August 2018, the debtor has not had any direct

22   business dealings with respect to Acis or the CLO assets for

23   which Acis serves as CLO manager, and that the debtor no longer

24   advises or subadvises any active CLOs; the debtor only has CLOs

25   that are in liquidation and in the process of monetizing their

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/29/23   Page 185 of 1539   PageID 17423

HIGHLAND CAPITAL MANAGEMENT, L.P.                          17

1    underlying assets and paying off their remaining investors'
2    revenues that will decrease over time; and that the CLO portion
3    of the debtor's business provides just ten percent of the
4    debtor's revenue, which, again, will shrink over time.

5          He would testify that the debtor derives ninety
6    percent of its other revenue from managing asset classes that
7    have nothing to do with Acis, including private equity, hedge
8    fund, mutual funds, open-ended retail funds, and real-estate
9    funds.

10         He would testify that the debtors and Acis assert
11   various substantial disputed and unliquidated claims against
12   each other, and the debtor has outstanding claims against Acis
13   that total no less than eight million dollars for services
14   rendered.  He would testify that the debtor and Acis have been,
15   and continue to be, involved in highly contentious litigation,
16   including matters that are subject to multiple appeals from the
17   bankruptcy court and pending fraudulent-transfer claims brought
18   by Acis against the debtor, in Texas.  He would testify the
19   debtor is currently supporting two pending appeals of orders of
20   the Texas bankruptcy court, granting the involuntary petition
21   against Acis and confirming Acis' Chapter 11 plan that put Mr.
22   Terry in charge of Acis.

23         He would testify that, although he serves subject to
24   the debtor's ability to terminate him, he has full
25   responsibility with respect to analyzing and pursing insider

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/20/23   Page 186 of 1539   PageID 17424
Exhibit 22   Page 20 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                        18

1  transactions and is in charge of the debtor's restructuring

2  efforts, and that he has no prior relationship with either Acis

3  or the Texas bankruptcy court with respect to this matter.  He

4  would testify that his goal in this case is to maximize the

5  value of the debtor's estate for the benefit of all

6  constituents, and he intends to evaluate all available

7  strategic options for accomplishing the goal, and hopes to work

8  constructively with the committee in that regard.

9        He believes that the outcome of this case will not

10  turn on the day-to-day management of the debtor's assets but

11  instead will be driven by the debtor's ability to restructure

12  its balance sheet and maximize the value of its assets, many of

13  which are liquid.  He would testify that either he or Fred

14  Caruso would provide substantially all the testimony that would

15  be provided for the debtor in this case.

16        Lastly, he would testify that he's been on the job for

17  over a month-and-a-half, that the debtor has been following the

18  protocols set out in the motion for which approval is being

19  sought today.  He would testify the debtor's being transparent

20  with the creditors' committee, has met with and communicated

21  with FTI on many occasions, and shared a lot of information.

22  And he would testify that there have been no allegations made

23  by the committee or any other party, regarding any post-

24  petition impropriety by the debtor.

25        That concludes my proffer of Mr. Sharp's testimony.

Case 19-34054-sgj11  Doc 3596-22  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 16-22  Filed 12/29/23  Page 187 of 1539  PageID 17425

HIGHLAND CAPITAL MANAGEMENT, L.P.                    19

```
 1            THE COURT:  All right, thank you very much.

 2            Does anyone wish to cross-examine the witness?

 3            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

 4            THE COURT:  Yes?

 5            UNIDENTIFIED SPEAKER:  Yeah.

 6            THE COURT:  Okay.

 7            MS. REID:  Yes, Your Honor.

 8            THE COURT:  Mr. Sharp, would you please take the

 9    stand?  And remain standing for your affirmation.

10            THE CLERK:  Would you step up to the stand, please?

11    Raise your right hand.

12        (Witness affirmed)

13            THE CLERK:  Please state and spell your name for the

14    record.

15            THE WITNESS:  Bradley Sharp, B-R-A-D-L-E-Y; last name,

16    S-H-A-R-P.

17            THE CLERK:  Thank you.

18            THE COURT:  Very good.

19            MS. REID:  Good morning, Your Honor.  Penny Reid on

20    behalf of the creditors' committee.

21            THE COURT:  Good morning.

22            Mr. Sharp, just -- you look like a veteran, but if you

23    could stay close to the microphone, I'd appreciate it.

24            THE WITNESS:  Yes, sir.

25            THE COURT:  Thank you.
```

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 12/22/23   Page 188 of 1539   PageID 17426
Exhibit 22   Page 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                          20

 1   CROSS-EXAMINATION

 2   BY MS. REID:

 3   Q.   Mr. Sharp, you've only met Mr. Dondero once; correct?

 4   A.   That is correct.

 5   Q.   And that was in Dallas; correct?

 6   A.   That is correct.

 7   Q.   And your team has been at the debtor's offices; correct?

 8   A.   Yes.

 9   Q.   And worked over a hundred hours at the debtor's offices;

10   correct?

11   A.   Yes.

12   Q.   And that's all been in Dallas; correct?

13   A.   Yes.

14   Q.   Your team has not been to a New York office; has it?

15   A.   No.

16   Q.   Has your team -- your team has not been to Korea; has it?

17   A.   No.

18   Q.   Your team has not been to Singapore; has it?

19   A.   With respect to this engagement, no.

20   Q.   Okay.  And you haven't met any employees in the Singapore

21   office; have you?

22   A.   No.

23   Q.   And under this proposed engagement, you're going to report

24   to Mr. Dondero; correct?

25   A.   Yes.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 02/23/23   Page 189 of 1539   PageID 17427
Exhibit 22   Page 23 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                              21

 1            MS. REID:  We will reserve our rights to further

 2   question him on the other issues, non-venue issues.

 3            THE COURT:  Of course.

 4            MR. SHAW:  Good morning, Your Honor.  Brian Shaw on

 5   behalf of Acis Capital Management, a creditor.

 6            THE COURT:  Yes, Mr. Shaw, you may proceed.

 7   CROSS-EXAMINATION

 8   BY MR. SHAW:

 9   Q.  Mr. Sharp, you were hired nine days before the bankruptcy

10   petition was filed in this case; correct?

11   A.  Correct.

12   Q.  Other than the retention of DSI, are there any other new

13   managers at the debtor, that didn't exist prior to the

14   bankruptcy filing?

15            MR. MORRIS:  Objection.  Beyond the scope, Your Honor.

16   This should be a traditional cross.

17            THE COURT:  You're going to need to find a microphone

18   or talk into one that's in front of you.

19            MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

20   Jones, for the debtor.

21            This line of questioning is beyond the scope.  This

22   should be a traditional cross.  The moving parties have called

23   no witnesses, as Your Honor is aware.

24            THE COURT:  Well, they reserved the right to call

25   witnesses based on what you did in your direct.  So I'm not

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/29/23   Page 190 of 1539   PageID 17428

HIGHLAND CAPITAL MANAGEMENT, L.P.                                22

 1  going to hold them to technicalities.

 2          You may proceed.

 3          MR. SHAW:  Thank you, Judge.

 4          THE COURT:  Do you remember the question, Mr. Shaw?

 5          THE WITNESS:  I do.

 6  A.  Not that I'm aware of.

 7  Q.  Okay.  So other than -- so DSI is the only difference pre-

 8  petition and post-petition; is that right?

 9  A.  With respect to management.  Obviously, the company's now

10  operating in bankruptcy, which is significantly different.

11  Q.  You testified, in your proffer, regarding the provision of

12  shared services and subadvisory to Acis; do you remember that

13  proffer your counsel commented about?

14  A.  I do.

15  Q.  And one of the core parts of the debtor's business is the

16  provision of shared services and subadvisory services to

17  affiliates and nonaffiliates; right?

18  A.  Yes.

19  Q.  Okay.  And so that was true for Acis and it's true for

20  current affiliates of the debtor; right?

21  A.  Yes, except for, you know, Acis was primarily CLOs, which

22  is a reducing part of the debtor's business.

23  Q.  Do you have any reason to believe that the Northern

24  District of Texas cannot hear this case expeditiously and

25  fairly?

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 05/25/23   Page 191 of 1539   PageID 17429
Exhibit 22   Page 25 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                          23

 1   A.   No.

 2              MR. SHAW:  Pass the witness.

 3              THE COURT:  Any other cross-examination?

 4              Hearing none, any -- redirect; that's what it's

 5   called.  There we go.

 6              MR. MORRIS:  No, thank you, Your Honor.

 7              THE COURT:  All right.  Thank you, sir.  You may step

 8   down.

 9              THE WITNESS:  Thank you.

10              THE COURT:  Any further evidence by any party, in

11   connection with the venue motion only?

12              MR. CLEMENTE:  Your Honor, I believe we would like to

13   call Mr. Waterhouse to the stand to testify in connection with

14   the venue motion briefly.

15              THE COURT:  All right.  Mr. Waterhouse.  I thought

16   we -- there we go.  If you could please take the stand as well,

17   sir, and remain standing.

18              MR. GUERKE:  May it please the Court.  Good morning,

19   Your Honor.  Kevin Guerke on behalf of the creditors'

20   committee.

21              THE CLERK:  Please raise your right hand.

22         (Witness affirmed)

23              THE CLERK:  Please state and spell your name for the

24   record.

25              THE WITNESS:  Yes; it's Frank Waterhouse, F-R-A-N-K,

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 5522   Filed 22/26/23   Page 192 of 1539   PageID 17430

HIGHLAND CAPITAL MANAGEMENT, L.P.                        24

 1  W-A-T-E-R-H-O-U-S-E.

 2          THE CLERK:  Thank you.

 3          THE COURT:  Thank you.  Please be seated and try to

 4  remain close to the microphone, if you would, please.  It's a

 5  little awkward here.

 6          You may proceed.

 7  DIRECT EXAMINATION

 8  BY MR. GUERKE:

 9  Q.  Mr. Waterhouse, you've worked for the debtor, Highland

10  Capital Management, L.P., since 2006; correct?

11  A.  Yes.

12  Q.  You started there as a senior accountant; right?

13  A.  That is correct.

14  Q.  You were promoted to chief financial officer at the end of

15  2011; correct?

16  A.  Yes.

17  Q.  That's the title that you hold today; right?

18  A.  Yes.

19  Q.  You also currently hold the title of partner; right?

20  A.  Yes.

21  Q.  You were made partner three or four years ago; correct?

22  A.  Yes.  I mean, I don't remember the exact time but, yeah,

23  approximately three or four years ago.

24  Q.  You are an officer in Highland Affiliates; correct?

25  A.  Yes.

1   Q.  James Dondero is the president of Highland Capital

2   Management, L.P.; right?

3   A.  Yes.

4   Q.  Mr. Dondero owns and controls Highland's general partner,

5   Strand Advisors, Inc.; right?

6            MR. MORRIS:  Your Honor, I'm just going to object for

7   the record.  This is supposed to be a rebuttal witness.  This

8   isn't rebutting anything; it's just new facts --

9            THE COURT:  He's laying

10           MR. MORRIS:  -- that they're seeking --

11           THE COURT:  I'm sure he's laying foundation.

12           MR. GUERKE:  I am, Your Honor.  It's background, it's

13   foundation.  It has to go (sic) with the organizational

14   structure.

15           THE COURT:  That's fine.  Objection overruled.

16   Q.  Mr. Waterhouse, Mr. Dondero owns and control Highland's

17   general partner, Strand Advisors, Inc.; correct?

18   A.  I don't remember his exact title but, yes, he is

19   president.

20   Q.  He owns a hundred percent of the equity in Strand; right?

21   A.  Yes.

22   Q.  He also has a limited-partnership interest in Highland;

23   correct?

24   A.  That is correct.

25   Q.  Mr. Dondero's the portfolio manager of all Highland funds;

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 45-22   Filed 12/28/23   Page 194 of 1539   PageID 17432
Exhibit 22   Page 28 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                          26

 1   right?

 2           MR. MORRIS:  Objection to the form of the question.

 3           THE COURT:  Overruled.

 4           You can answer.

 5   A.  Yes, he -- he is the portfolio manager or the -- or a co-

 6   portfolio manager.  We have several funds.  I -- I -- I can't

 7   recall if he is the sole portfolio manager on every single fund

 8   or -- but he -- he -- but yes, he is -- he is a portfolio

 9   manager.

10   Q.  As the president of Highland, Mr. Dondero promoted you to

11   CFO back in 2011; right?

12   A.  Yes.  My -- my promotion was recommended by the -- the

13   former CFO and, as president, Mr. Dondero had to, you know,

14   obviously, approve that taking.

15   Q.  You report to Mr. Dondero; right?

16   A.  Yes.

17   Q.  He's your boss; correct?

18   A.  Yes.

19   Q.  And after the transition period from the old CFO to you,

20   you've reported only to Mr. Dondero; right?

21   A.  That is correct.

22   Q.  After the bankruptcy was filed, you still report to Mr.

23   Dondero; right?

24   A.  Yes.

25   Q.  And Mr. Dondero doesn't report to anyone; correct?

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 09/29/23   Page 195 of 1539   PageID 17433
Exhibit 22   Page 29 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    27

```
 1  A.  Yeah, not -- not to my knowledge.  Yeah, it's correct.
 2  Q.  Mr. Dondero has the ability to terminate you; right?
 3  A.  Again, I -- I assume so.  Again, I think I -- I testified
 4  earlier last week, I -- I -- I -- you know, again, I don't know
 5  through this process -- again, I'm not -- bankruptcy is not
 6  something that I -- I am, you know, a specialist.  I'm not a
 7  bankruptcy attorney.  But maybe the CRO can, or Jim, or
 8  something in -- in conjunction.  But I think, theoretically,
 9  yes.
10  Q.  Post-bankruptcy, you don't report to Bradley Sharp; right?
11          MR. MORRIS:  Objection, Your Honor.  Same objection:
12  beyond the scope.
13          THE COURT:  Overruled.
14  A.  I do not.
15  Q.  Post-bankruptcy, you don't report to Fred Caruso; correct?
16  A.  I do not.
17  Q.  Mr. Sharp doesn't have the power to terminate your
18  employment; right?
19  A.  Again, I'll --
20          THE COURT:  Actually, he already answered that
21  question; said he wasn't sure.
22  Q.  Mr. Waterhouse, there are six groups below Mr. Dondero in
23  Highland's organizational chart; correct?
24  A.  Give or -- give or take.
25  Q.  The heads of those groups are the executive-level
```

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/20/23   Page 196 of 1539   PageID 17434
Exhibit 22   Page 30 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                           28

 1  management employees that you describe in your declaration that

 2  was submitted in association with the first-day motions; right?

 3  A.  Yes.

 4  Q.  You manage one of those teams; correct?

 5  A.  Yes.

 6  Q.  Your team is made up of the corporate accounting folks,

 7  Funding Accounting, the tax group, Valuation, Operations,

 8  Retail Fund Operations, Human Resources, and IT; right?

 9  A.  That -- that is correct.

10  Q.  The other Highland teams are the legal-compliance team --

11  correct?

12  A.  Yes.

13  Q.  The credit-research team; right?

14  A.  Yes.

15  Q.  Public-relations team; correct?

16  A.  Yes.

17  Q.  Private-equity team; right?

18  A.  Yes.

19  Q.  And the trading team; true?

20  A.  Yes.

21  Q.  The heads of each one of those groups report up to Mr.

22  Dondero; isn't that true?

23  A.  Yes, and we -- we -- well, and we also -- and -- but we

24  have a risk-management team as well, at Highland.  That -- that

25  risk-management team reports up through the trading team.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 04/21/23   Page 197 of 1539   PageID 17435
Exhibit 22   Page 29 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    29

 1    Q.  As the CFO, your office is in Dallas, Texas; right?

 2    A.  Yes.  My -- yes, we office in -- or my office is in

 3    Dallas, Texas.

 4    Q.  That's been the location of your office since you joined

 5    Highland; correct?

 6    A.  My current location in Dallas, Texas, is not the same as

 7    it was when I joined Highland Capital in October of 2006.

 8    Q.  You started in 2006 and your office was in Dallas; right?

 9    A.  Well, my offices were in Dallas but it was not at the same

10    location as we are currently.

11    Q.  Your current offices are also in Dallas; right?

12    A.  Yes, their address is in Dallas, Texas.

13    Q.  Over seventy Highland employees work out of Highland's

14    Dallas office; right?

15    A.  Yes.

16    Q.  Dallas is the only location where Debtor Highland

17    employees work; correct?

18    A.  Yes.

19    Q.  Mr. Dondero's office is in Dallas; true?

20    A.  Yes.

21    Q.  Members of the legal team have offices in Dallas; right?

22    A.  Yes.

23    Q.  You meet with Mr. Dondero at a minimum of once a week;

24    correct?

25    A.  Yes, give or take.

 1  Q.  Usually those meetings are in his office in Dallas; right?

 2  A.  Yes.

 3  Q.  All the group heads that we just discussed all have

 4  offices in Dallas; right?

 5  A.  Yes.  We used to -- our -- our risk-management team used

 6  to be officed in New York.  But yes, we -- we -- yes.

 7  Q.  You mentioned New York.  There's a location in New York

 8  that we discussed at your deposition; do you remember that?

 9  A.  Yes.

10  Q.  That office in New York is not in Highland -- the debtor's

11  name; true?

12  A.  That is correct.

13  Q.  It's in another nondebtor-entity name; correct?

14  A.  Yes.

15  Q.  There are no Highland employees in that New York location;

16  correct?

17  A.  That is correct.

18  Q.  In the proffer that you just heard, and at your

19  deposition, there was some discussion about offices outside of

20  the United States.  Do you recall that?

21  A.  Yes.

22  Q.  The people who work in those locations are not employees

23  of the debtor, Highland Capital Management, L.P.; right?

24  A.  That's right.

25  Q.  The offices outside the U.S. are subsidiary offices with

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 12/22/23   Page 199 of 1539   PageID 17437
Exhibit 22   Page 33 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    31

 1  subsidiary employees; correct?

 2  A.  That is correct.

 3  Q.  You've never been to those offices; right?

 4  A.  I have not.

 5  Q.  You have members of team who include David Klos, Clifford

 6  Stoops, and some other folks; right?

 7  A.  Yes.

 8  Q.  You have standing weekly meetings with those folks --

 9          THE COURT:  All right --

10  Q.  -- right?

11          THE COURT:  -- I'm going to reprimand -- this is well

12  beyond -- I was giving you some leeway but, if this is what you

13  wanted to put on -- it's your motion, sir.  I mean, this is --

14  you're laying your foundation in your case-in-chief.  Why

15  didn't you put this on to begin with?

16          MR. GUERKE:  Your Honor, it's rebuttal to the proffer

17  that Mr. Sharp just offered.

18          THE COURT:  In what way?

19          MR. GUERKE:  Related to the organizational structure

20  and how decisions are made currently at the debtor.

21          MR. MORRIS:  Your Honor, if I may.  I don't believe

22  any aspect of the proffer went to the location of decision-

23  making.

24          THE COURT:  Would you like to reply to that?

25          MR. GUERKE:  Yes.  The proffer was made that decisions

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 04/24/23   Page 200 of 1539   PageID 17438

HIGHLAND CAPITAL MANAGEMENT, L.P.                           32

 1  are made in California and around the country, and around the

 2  world I believe.  And this evidence rebuts that; that the

 3  organizational structure and the day-to-day operations are

 4  still run in Dallas, Texas, as they were before bankruptcy.

 5          And, Your Honor, I have three questions, then I'll sit

 6  down.

 7          THE COURT:  Okay.  All right, I'll allow it.

 8  Q.  When you meet with people on your team that we just

 9  identified, you meet with them in Dallas; correct?

10  A.  That's correct.

11          MR. GUERKE:  Those are my only questions.  Thank you,

12  Mr. Waterhouse.

13          THE COURT:  All right.

14          THE WITNESS:  Thank you.

15          THE COURT:  That was direct.  Any further direct?

16          Yes, sir.

17          MR. SHAW:  Real briefly, Your Honor.

18  DIRECT EXAMINATION

19  BY MR. SHAW:

20  Q.  Mr. Waterhouse, as the CFO of the debtor, were you aware

21  that the debtor intended to file bankruptcy prior to the

22  filing?

23          MR. MORRIS:  Objection.  Beyond the scope.

24          MR. SHAW:  Judge, we designated any witness that they

25  designated, so I don't know that we necessarily have called --

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 12/25/23   Page 201 of 1539   PageID 17439

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    33

 1          THE COURT:  Well, yeah, but it's your motion --

 2          MR. SHAW:  Correct.

 3          THE COURT:  -- and you declined to put any evidence on

 4  in support of your motion.  They then put on evidence in

 5  opposition to your motion.  So you're limited, sir, to

 6  rebutting the evidence they put on.  You had your chance to

 7  make your case-in-chief; you decided not to do it.  It's not my

 8  fault.

 9          MR. SHAW:  My understanding was that we were -- that,

10  depending upon what the proffer was, which we -- we're not

11  aware of what the proffer was before today, that we reserved

12  the right to call Mr. Waterhouse, which I understood from our

13  chambers conference is what we exercised that right to do.  If

14  I misunderstood how procedurally we were going about it,

15  then --

16          THE COURT:  Well, I don't understand how -- that

17  doesn't make any sense to me.  You get a free shot to hear

18  their case first, and then you get to make your direct case?

19  Why would I allow that?  It's your motion.

20          MR. SHAW:  Understood.

21          THE COURT:  All right, so let's stick to rebutting

22  what they put on.

23          MR. SHAW:  Okay.

24          THE COURT:  I gave a lot of leeway to your colleague;

25  I'll give you leeway.  But I don't really want to sit through

 1  forty-five minutes of direct that you could have done in the

 2  first place.

 3          MR. SHAW:  And I promise you, I have a very few

 4  limited questions.

 5          THE COURT:  All right.

 6  BY MR. SHAW:

 7  Q.  With regard -- where is Mr. Dondero today?

 8  A.  I don't know.

 9  Q.  For the shared services and subadvisory services that the

10  debtor previously provided Acis -- are you aware of those?

11  A.  I'm aware of them generally.

12  Q.  All right.  Have you ever reviewed the shared-services and

13  subadvisory agreements between Acis and Highland?

14  A.  I'm sure I reviewed them at -- at some point, but I

15  honestly can't recall.

16  Q.  How are those agreements different than the shared-

17  services and subadvisory agreements currently between the

18  debtor and various affiliates?

19          MR. MORRIS:  Objection.  No foundation.

20          MR. SHAW:  It's directly relevant to -- the foundation

21  being he said he's aware of them.  I --

22          MR. MORRIS:  The witness just testified that he's not

23  familiar with them as he sits here --

24          THE COURT:  I can't hear you.

25          MR. MORRIS:  The witness just testified that he's not

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 115-22   Filed 09/27/23   Page 203 of 1539   PageID 17441

HIGHLAND CAPITAL MANAGEMENT, L.P.                              35

 1   familiar with them as he sits here today.  He may have seen

 2   them in some -- at some point in the past.

 3            THE COURT:  Well, he can qualify the answer further.

 4   Overruled.

 5            You can answer.

 6   A.  You know, again, I -- I don't -- I don't know.  I don't

 7   have the documents in front of me.  I -- I -- like I said, I'm

 8   generally aware of -- of the Acis agreements.  You know, I

 9   don't have these agreements memorized to any certain degree, so

10   I -- I -- I -- I don't know specifically.

11   Q.  As -- you're familiar with the -- as the CFO, with the

12   shared-services and subadvisory agreements that govern the

13   seven billion dollars in assets under management that the

14   debtor provides for affiliates and nonaffiliates; right?

15   A.  Yes, I'm generally aware of those agreements.

16   Q.  And are those agreements typical in form?  Do they differ

17   widely in their content?

18   A.  Again, I don't know -- I mean, they -- they can.  Again,

19   it -- it depends on the nature of the services.  And -- you

20   know, it -- there isn't a standard template, I would say, for

21   shared services.  Yes, they can differ.  As I said, I don't

22   have those agreements memorized, so I can't speak as to how

23   they are similar or how they are not.

24            MR. SHAW:  Pass the witness.

25            THE COURT:  Thank you.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 03/28/23   Page 204 of 1539   PageID 17442
Exhibit 22   Page 238 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    36

 1              I guess it'll be cross of your own witness.  Any
 2   cross?
 3              MR. MORRIS:  No, thank you, Your Honor.
 4              THE COURT:  All right, sir, thank you.  Mr.
 5   Waterhouse, you may step down.
 6              THE WITNESS:  Thank you.
 7              THE COURT:  You're welcome.
 8              Any further evidence?
 9              MS. PATEL:  Your Honor, as I referenced, we just have
10   some exhibits; I believe these to be the unobjected-to pieces
11   of it.  We -- Acis provided a witness-and-exhibit list.  These
12   are the unobjected-to exhibits, and we would just move them in.
13   And --
14              THE COURT:  Is this the ones I already have?
15              MS. PATEL:  No, Your Honor.  I believe you only have
16   the debtor's.
17              THE COURT:  Yeah.
18              MS. PATEL:  And I will apologize, Your Honor; we've
19   given debtors a copy of the exhibits.  Our -- there was
20   miscommunication.  They are not bound.
21              THE COURT:  That's fine.
22              MS. PATEL:  But they are numbered.
23              THE COURT:  All right.
24              MS. PATEL:  If I may approach?
25              THE COURT:  Yes.  Please don't hurt yourself.  It's a

 1 | bit of a mess there.

 2 |         MS. PATEL:  There's a little trash back here.

 3 |         THE COURT:  These are all not objected to; is that

 4 | correct?

 5 |         MS. PATEL:  (Indiscernible), Your Honor, but I go

 6 | through them.

 7 |         THE COURT:  Are they -- okay.

 8 |         MS. PATEL:  What I've handed the Court and to opposing

 9 | counsel are Exhibits 1 -- Acis Exhibits 1 through 18, with the

10 | exclusion of Exhibit 3 and Exhibit 9, which were objected to;

11 | and then also Exhibit Numbers 24 and 25, which were not

12 | objected to.  We do have one additional exhibit, Your Honor,

13 | that was objected to, that I would like to move in.

14 |         THE COURT:  All right.  Is there any objection to the

15 | admission of the documents that counsel has represented there's

16 | no objection to?

17 |         MR. MORRIS:  No, Your Honor.

18 |         THE COURT:  Okay.  They are admitted without

19 | objection.

20 |     (Acis' Exhibits 1 through 18, with the exception of Nos. 3

21 | and 9; and Exhibits 24 and 25, were hereby received into

22 | evidence, as of this date.)

23 |         MS. PATEL:  If I may approach, Your Honor?

24 |         THE COURT:  Yes.

25 |         Thank you.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 04/20/23   Page 206 of 1539   PageID 17444
Exhibit 22   Page 207 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                          38

1          MS. PATEL:  And, Your Honor, my co-counsel will handle

2    that -- will handle it since we -- this was a late objection

3    and he prepared with respect to this; I prepared with respect

4    to argument.

5          THE COURT:  Okay.

6          Yes, sir.

7          MR. CLEMENTE:  I believe there's a hearsay objection

8    regarding this.

9          MR. MORRIS:  Relevance and hearsay, Your Honor.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  Your Honor, I'll address hearsay first.

12    Federal Rule of Evidence 807 is a residual exception to the

13    hearsay rule; provides that a hearsay statement is admissible

14    if the statement is supported by sufficient guarantees of

15    trustworthiness, after considering the totality of the

16    circumstances under which it was made and evidence, if any,

17    corroborating the statement, and (2) it is more probative on

18    the point for which it is offered, than any other evidence that

19    the proponent can obtain through reasonable efforts.

20          This is an email exchange between counsel for Acis and

21    the courtroom deputy for Judge Jernigan, just requesting and

22    ask -- inquiring about the court's availability.  Everything

23    about that email supports the fact that it is -- that it is

24    authentic and that there's no question about whether or not it

25    is -- it's trustworthy.  How would we put on evidence of

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 04/23/24   Page 207 of 1539   PageID 17445
Exhibit 22   Page 49 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    39

 1   whether or not Judge Jernigan in the Northern District of Texas

 2   has sufficient time to hear these numerous motions that are

 3   set, other than by providing something like this?  I mean, we

 4   can't call or depose the courtroom deputy or the judge.  So

 5   based upon that, also -- there also is an exception, under the

 6   hearsay rule, to a public record.  I think this also falls

 7   within that exception to the rule.  So for that reason, we

 8   don't believe the hearsay objection is proper.

 9           As far as relevance, it goes to the argument about

10   transfer and whether or not the transferee court can

11   expeditiously hear the matter.  And that's one of the elements

12   and one of the core questions about judicial efficiency.

13           So for those reasons, we believe that the objections

14   are not well-founded and we offer this exhibit.  And it's

15   Exhibit 26.

16           THE COURT:  Reply?

17           MR. MORRIS:  Briefly, Your Honor.

18           THE COURT:  Yes.

19           MR. MORRIS:  I'm not aware of any case where a court

20   has ever considered, let alone decided, a venue motion on the

21   availability of another court's time.  So I don't think it's

22   relevant at all.  I do think it's an out-of-court statement

23   being offered for the truth of the matter asserted, and I do

24   believe it's hearsay.

25           MR. CLEMENTE:  It most certainly is hearsay, Judge;

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 02/22/23   Page 208 of 1539   PageID 17446

HIGHLAND CAPITAL MANAGEMENT, L.P.                    40

 1  just to respond.  But the question is not whether it's hearsay
 2  but whether it's admissible.  And of course the Court is well
 3  aware that hearsay can be admissible, and one of the exceptions
 4  is the exception that I outlined.

 5          THE COURT:  All right, I'll overrule the objection and
 6  admit the document.  It is hearsay but it clearly meets the
 7  reliability aspects for the exception to hearsay.  With regard
 8  to the relevance, I think its relevance is very -- well, let me
 9  put it this way; I think it's tangentially relevant.  I mean,
10  it certainly is relevant whether the Northern District of Texas
11  has the ability to handle the case were it transferred there.
12  To me that's -- I don't even think that's disputed, I mean,
13  it's obvious, it's a fantastic bankruptcy court.  They're more
14  than capable of handling it.  So I -- it's probably
15  duplicative, if nothing else.

16          Also, it's very carefully written so that you don't
17  actually identify what case you're talking about.  So whether
18  the courtroom deputy realized what you were saying or not
19  saying with regard to this specific motion is obviously
20  unclear.  But I will allow it for very limited purposes.

21      (Email exchange between Acis' counsel and Hon. Jernigan's
22  courtroom deputy was hereby received into evidence as Acis'
23  Exhibit 26, for the stated limited purposes, as of this date.)

24          MR. CLEMENTE:  Thank you, Your Honor.

25          THE COURT:  Any other evidence?

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-22   Filed 02/23/23   Page 209 of 1539   PageID 17447
Exhibit 22   Page 208 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                              41

 1           I'm going to -- all right, last chance.  I'm going to

 2    close the evidentiary record.

 3           All right, the evidentiary record's closed.  Let's

 4    take a short recess; then I'll hear argument.  We will start

 5    with the movants and their supporters, and then we'll turn it

 6    over to the debtor.  Okay?  We'll take a short recess.

 7           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

 8        (Recess at 10:48 a.m. until 11:05 a.m.)

 9           THE COURT:  Be seated.  Sorry about the delay.  We had

10    some computer difficulties.  But they're all ironed out.

11           You may proceed.

12           MR. CLEMENTE:  Thank you, Your Honor.  Again, Matthew

13    Clements from Sidley Austin, on behalf of the committee.

14           Your Honor, to begin, everything we rely on in our

15    venue argument is uncontested and uncontroverted and is in the

16    record that either the debtor's exhibits or the Asic's (sic)

17    exhibits or the record of this case, or published opinions of

18    the Dallas bankruptcy court, and which Your Honor can take

19    judicial notice of -- we believe that that record more than

20    amply carries our evidentiary burden with respect to the venue

21    motion.

22           With respect to the Sharp proffer, Your Honor, it

23    attempted to create the appearance of a debtor with operations

24    in far-flung jurisdictions, employees at nondebtor entities

25    that may be located in places other than Dallas, offices that

 1  may be in New York that aren't actually debtor offices.  And

 2  the testimony of Mr. Waterhouse rebutted that and made clear

 3  that the debtor has no employees other than in Dallas and that

 4  Mr. Dondero makes all of the decisions, and he is in Dallas.

 5  The nerve center of this debtor is in Dallas.  And we wanted to

 6  make that clear, Your Honor, after the proffer, the rebuttal,

 7  and the evidentiary record.  We believe that the evidentiary

 8  record is largely uncontroverted with respect to the arguments

 9  that we're going to be made (sic) in our venue motion, and that

10  Mr. Sharp's testimony has been effectively rebutted.

11          With that, Your Honor, we believe that this case is

12  atypical and presents a set of unique facts which we believe

13  are uncontroverted, that warrant transfer of venue to the

14  Dallas bankruptcy court.  And frankly, Your Honor, it does beg

15  the question as to why the debtor chose not to file in Dallas,

16  what we believe the most logical venue is, in the first

17  instance.  Let's talk about some of these unique facts here;

18  then we'll move into some of the arguments we made in our

19  motion, and then we'll talk about some of the things that the

20  debtor made (sic) in its reply.

21          First and perhaps most importantly, which is obvious

22  from the nature of this proceeding, not a single creditor or

23  party-in-interest has filed papers supporting the debtor's

24  venue in Delaware, other than, obviously, the debtor.  The

25  official committee has unanimously supported venue transfer to

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 04/25/23   Page 211 of 1539   PageID 17449
Exhibit 22   Page 245 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    43

 1  Dallas, Texas.  Acis, in its own capacity as creditor, has

 2  joined the transfer request.  It's not surprising to us, Your

 3  Honor, that no creditor has affirmatively come out in favor of

 4  venue in Delaware, because the debtor is in Dallas and, in

 5  fact, that is where its nerve center is.

 6          Your Honor, we do believe that it's particularly

 7  significant because in this case, although schedules and

 8  statements have not yet been filed, the creditors' committee

 9  makes up the vast majority of creditors in this case, in terms

10  of absolute dollar amounts.  There may be multiple creditors in

11  number, but the vast majority of dollar amount of creditors are

12  represented by the official committee of unsecured creditor

13  (sic).

14          There was reference to Jefferies.  They're owed thirty

15  million dollars.  There was reference to Frontier Bank.

16  They're owed five million dollars.  A single claim of one

17  committee member dwarfs that by multiples, Your Honor.  So we

18  believe the fact that no other creditor supports venue in

19  Delaware is a very significant fact, Your Honor, and is not

20  controverted.

21          Second, Your Honor, until a few months ago, the Acis

22  case, which is pending in the Dallas bankruptcy court, was an

23  affiliated case.  And again, this can be gleaned from the

24  published decisions and the record that's been put into

25  evidence.  Had this case been filed prior to confirmation of

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 06/26/23   Page 212 of 1539   PageID 17450
Exhibit 22   Page 46 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                           44

1   the Acis plan, under Rule 1014 the Dallas bankruptcy court

2   would be the appropriate court to determine venue.  And

3   although I would never suppose to predetermine how a judge

4   would rule, I think there would have been a high probability

5   that the Dallas court would have taken venue over the debtor's

6   case.

7          This is important, Your Honor, because the third point

8   I'd like to make is that Highland and the debtor, and as we

9   have described in our papers and related attachments, and as

10  Mr. Sharp referred to in his proper -- in his proffer, has

11  itself filed an appeal, seeking to overturn the confirmed Acis

12  plan of reorganization and return the equity that was

13  distributed to Mr. Terry under that confirmed plan, to an

14  entity called Nutro (ph.).

15         Second on Nutro, Your Honor.  Nutro's wholly owned by

16  Mr. Dondero and, therefore, if Acis were returned underneath

17  Nutro, it would become an affiliate of this debtor, and Acis

18  would once again be subject to, as an initial matter, a

19  venue -- excuse me, this debtor would be subject to, as an

20  initial matter, a venue determination by the Dallas bankruptcy

21  court.  If we have a successful appeal, we would have

22  affiliated cases with dueling jurisdictions, Your Honor, and

23  the Dallas bankruptcy court, as I mentioned, would determine

24  venue.

25         On that, Your Honor, the debtor must believe -- it's

 1  not just me speculating.  The debtor must believe that there is

 2  a material possibility of this occurrence, as it has been

 3  seeking to employ counsel -- and you'll hear about that

 4  shortly -- and expend estate resources on behalf of Nutro, a

 5  nondebtor affiliate, in an attempt to have the Acis

 6  confirmation order overturned, with, again, the result being

 7  Acis would, again, be a debtor affiliate.  Therefore, the

 8  debtor cannot argue that such possibility does not materially

 9  impact the venue decision or is remote, in particular where

10  they're trying to convince the committee and this Court to use

11  estate resources to achieve that very outcome.  The debtor's

12  effectively arguing for a ruling on appeal, but the debtor is

13  an affiliate of Acis, in which case the current Chapter 11

14  proceeding should be in Dallas, Texas.

15          Fourth, Your Honor --

16          THE COURT:  Well --

17          MR. CLEMENTE:  Yes, Your Honor.

18          THE COURT:  -- let me interrupt you for a moment,

19  because that hasn't happened.  As we sit here today --

20          MR. CLEMENTE:  That's correct, Your Honor.

21          THE COURT:  -- they're not affiliates.  There seems to

22  be an assumption that, were this case to be transferred to the

23  Northern District of Texas, it would be assigned to -- sorry,

24  I'm losing my notes --

25          MR. CLEMENTE:  Judge Jernigan, Your Honor.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 06/28/23   Page 214 of 1539   PageID 17452
Exhibit 22   Page 28 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    46

 1          THE COURT:  Jernigan, yes.  Thank you.  Sorry.  I know

 2   Judge Jernigan fairly well.

 3          But if they're not affiliates, isn't the case subject

 4   to random assignment under the normal procedures in the

 5   Northern District of Texas?  And if it's not assigned to Judge

 6   Jernigan, don't your arguments about judicial knowledge and

 7   experience in connection with this case fall away because

 8   nobody other than Judge Jernigan has that special knowledge in

 9   Texas?  And all -- what other colleagues would be able to do

10   there is simply walk down the hall and talk to her.  And of

11   course, I can pick up the phone and talk to her any time, as

12   well.

13          So I'm just teasing out this assumption that

14   definitely feels to be behind everybody's arguments, that she's

15   going to get this case.  Is there anything in the record that

16   would support that?  Is there some sort of rule I'm not aware

17   of in Texas or that I'm -- am I assuming something that's not

18   consistent with practice down there, which is that this case

19   would be randomly assigned?

20          MR. CLEMENTE:  Your Honor, I believe you are correct

21   in the sense that the case would be randomly assigned, but I

22   believe Your Honor could look at -- as I understand, there are

23   three judges located in the Dallas court district; one is

24   obviously Judge Houser.  I could be getting the name wrong.

25   But she's overseeing the Puerto Rican proceeding --

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 45-11522   Filed 29/28   Page 215 of 1539   PageID 17453

HIGHLAND CAPITAL MANAGEMENT, L.P.                    47

 1              THE COURT:  Um-hum.

 2              MR. CLEMENTE:  -- so her docket is clearly beyond --

 3              THE COURT:  She's also --

 4              MR. CLEMENTE:  -- full.

 5              THE COURT:  -- about to retire, so I don't even know

 6    if she's taking new cases.

 7              MR. CLEMENTE:  Correct.  So that leaves two judges,

 8    Your Honor.  And we understand -- perhaps Acis' counsel would

 9    be able to expand on that, given their familiarity with the

10    Dallas bankruptcy court, but that judge is not being assigned

11    new cases, given a circumstance with that particular judge.

12              But to answer your direct question, Your Honor, I

13    believe you are correct; it would be a random assignment.  But

14    we do believe that there is a high probability it would wind up

15    with Judge Jernigan.

16              THE COURT:  But it might be a pool of one; right?

17              MR. CLEMENTE:  That is correct, Your Honor.  And even

18    if it wasn't, I think, clearly, for all the reasons we'll

19    discuss, we would have a very strong case to make that it

20    should be transferred to Judge Jernigan, even if it initially

21    got somebody else on the --

22              THE COURT:  Well, you know, I mean, if a judge were a

23    lawyer, a judge couldn't have both these cases.  A judge (sic)

24    couldn't have a case with two warring former affiliates,

25    because it would create a conflict of interest.  Now, those

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 05/30/23   Page 216 of 1539   PageID 17454

HIGHLAND CAPITAL MANAGEMENT, L.P.                          48

 1   rules don't apply to judges.  We're assumed to be above all

 2   that.  But -- since we don't have clients.  But it does -- it

 3   might inform someone's decision about do I really feel

 4   comfortable having Acis and Highland, given the situation -- I

 5   mean, they wouldn't be jointly administered, certainly, of

 6   course.  They're --

 7              MR. CLEMENTE:  That's correct, Your Honor.

 8              THE COURT:  Again, they're not affiliates, at least as

 9   we stand here today; although the debtors are trying to change

10   that, purportedly.  It might create a situation where a judge

11   might take that into consideration in deciding whether to have

12   the case or not.  And I --

13         Now, we deal all the time with jointly administered

14   affiliated cases, right, because there's always intercompany

15   debt --

16              MR. CLEMENTE:  That's correct.

17              THE COURT:  -- and we all just assume it away (ph.).

18              MR. CLEMENTE:  That's correct, Your Honor.

19              THE COURT:  But this is a little different in that

20   they're not affiliates.

21              MR. CLEMENTE:  I do think, Your --

22              THE COURT:  Again, she would -- the judge wouldn't be

23   required -- Judge Jernigan wouldn't be required -- it's not a

24   recusal issue.  It's not a disqualification issue.  It's just

25   a -- sort of something to think about in making the decision.

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 15-22    Filed 05/31/23    Page 217 of 1539    PageID 17455

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    49

1         MR. CLEMENTE:  I don't disagree, Your Honor.  I do

2    think Your Honor hit on it, though.  Bankruptcy judges are

3    unique in that perspective that they're put in situations all

4    the time where a decision may impact one particular entity to

5    the detriment of another entity that's also before Your Honor

6    in connection with a particular bankruptcy proceeding.

7         THE COURT:  Yeah.

8         MR. CLEMENTE:  With that, Your Honor, I'll continue to

9    move forward.

10         THE COURT:  Yeah, please.

11         MR. CLEMENTE:  Fourth, and this gets back to the point

12    we were just discussing with Your Honor, we do not believe

13    there's any credible dispute that the Dallas court has already

14    upped the learning curve relative to this Court.  Again, not

15    that Your Honor wouldn't be able to come up to speed and that

16    Your Honor has tremendous capacity to do that, but the record

17    is clear, from our perspective, that the Dallas bankruptcy

18    court has already had to wrestle with issues involving the

19    debtor.  There has been extensive proceeding (sic) in the

20    Dallas bankruptcy court, not just the bankruptcy court but also

21    the district court, with respect to the Acis case.

22         There are several written opinions, again, that Your

23    Honor can take judicial notice of and which are also in the

24    record, that provide, after an extensive and developed factual

25    record, that Acis only operated through Debtor Highland -- the

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 03/22/23   Page 218 of 1539   PageID 17456

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    50

 1  debtor, Highland.  It is clear that the Dallas court had to

 2  develop an understanding of how the debtor's complex business

 3  worked.  It is the same business as the debtor engages in here,

 4  albeit a subset.

 5          That's consistent with Mr. Sharp's testimony.  Mr.

 6  Sharp didn't say that they no longer are in the CLO business.

 7  He characterized it in a certain fashion, but the debtor

 8  clearly still manages and advises CLOs.  That is a part of the

 9  debtor's business.  That is what was at issue in the Acis

10  proceeding. And also, as Mr. Waterhouse testified to quite

11  clearly in the rebuttal, and as Mr. Sharp testified to in the

12  cross, it's the same principal actors:  Mr. Dondero and others

13  on his management team.

14          Your Honor, this case, although the idea is to get a

15  fresh start, we believe will necessary require a backward-

16  looking review of the facts.  And the Dallas court has upped

17  the learning curve from that perspective.  The committee

18  recognizes that the Dallas court would take time and determine

19  issues as presented to it.  And depending on the issue, the

20  past experience of the court will have varying degrees of

21  relevance.  But that experience is nonetheless important to the

22  committee to ensure maximum efficiency, with an entity that has

23  demonstrated itself to be highly litigious, Your Honor.  One

24  needs only to review the top-twenty list of creditors, made up

25  largely of law firms and other professionals, to make the

 1   determination that the debtor is highly litigious, as well as

 2   the record in this proceeding.

 3           So Your Honor, those four facts, we believe, are

 4   unique, and we believe that they strike in favor of

 5   transferring venue to Dallas.  I do want to walk through some

 6   of the arguments we made in our papers, as well, but I wanted

 7   to highlight what we believe are truly distinguishing features

 8   of this particular situation.

 9           Your Honor, as we more fully lay out in our papers, we

10   do believe the convenience of the parties supports transfer of

11   venue.  The debtor's nerve center is in Dallas; Mr. Waterhouse

12   was clear on that.  Mr. Dondero is the portfolio manager for

13   all of the Highland funds, and he is the one-hundred-percent

14   owner of Strand.  Strand's the general partner of this debtor.

15   All decisions run through Mr. Dondero.  And it's clear that Mr.

16   Dondero and all of the other key personnel are located in

17   Dallas.

18           Your Honor, a large number of creditors are located in

19   Dallas; you need not look past the list of twenty largest

20   unsecured creditors to determine that.  There are almost a

21   majority of those creditors that are located in Texas.  While

22   the committee agrees that the overall organization with several

23   thousand affiliates is complex -- and you'll hear about that as

24   we go on this afternoon -- there's 2,000 affiliated entities

25   with Highland -- the debtor is only Highland.  And so the idea

 1   that there may be offices in far-flung jurisdictions, those are

 2   not debtor offices.

 3           Your Honor, the interests of justice also support the

 4   transfer of venue.  The Dallas bankruptcy court has clearly

 5   invested time and resources that are applicable to this debtor.

 6   In this context, the learning curve that is referred to in the

 7   cases clearly favors transfer of venue to Dallas.  Although

 8   this case has been pending for a while, Your Honor, there's

 9   only been a first-day hearing with very limited relief granted,

10   and one brief status conference.

11           There are also economic efficiencies in Dallas.

12   Dallas is convenient for all debtor employees.  Yes, people can

13   get on planes, but it's hard to argue that being a mile-and-a-

14   half away from the courthouse isn't more convenient.

15           THE COURT:  I don't know.  Parking's tough.

16           MR. CLEMENTE:  And perhaps an overnight trip is

17   helpful for the family life, Your Honor.  It depends.

18           Dallas is convenient for the professionals.  It's easy

19   to fly in and out of Dallas, as we point out in our papers,

20   Your Honor.  There's no real, I believe, disagreement that

21   Dallas would not be convenient.

22           Additionally, Your Honor, and we think that this is a

23   unique factor as well, if the long history of Highland's

24   litigious nature is any indicator here, there will be discovery

25   disputes.  And under Rule 45, contested nonparty discovery

 1    would likely occur in the Northern District in Texas, in

 2    Dallas.  Given the massive number of nondebtor affiliates --

 3    again, we only have 1 box here; there's, like, 2,000 others.

 4    It is highly likely that nonparty discovery will become an

 5    issue.

 6            The fact that -- I heard Mr. Sharp testify in his

 7    proffer that he believes he and Mr. Caruso will provide all of

 8    the testimony.  That's great and good and well for him to think

 9    that.  I think the committee's going to take a different view

10    of that, Your Honor.

11            Our own limited history in this case shows the

12    relevance of Dallas.  Two of the three depositions occurred in

13    Dallas.  I believe we informed Your Honor of that on the status

14    call that we had.  And the third didn't, only because we

15    believe Mr. Sharp was not able to travel to Dallas.

16            The justice that the debtor seeks in the Acis case,

17    Your Honor, yields a result that this places -- excuse me, Your

18    Honor.  The justice that we talked about in the appeal with

19    respect to the Acis confirmation order yields a result that

20    places this debtor in the Dallas bankruptcy court, which is

21    also in the interest of justice.

22            So, Your Honor, we believe there are several unique

23    factors.  We believe that the traditional factors, as we lay

24    out in our papers, support the transfer of venue.  And I wanted

25    to just briefly touch on some of the objections that the debtor

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 06/26/23   Page 222 of 1539   PageID 17460
Exhibit 22   Page 256 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                54

 1   raised to our venue motion.  First, the debtor thinks too

 2   little of the Dallas court, in asserting that we're trying to

 3   gain some type -- the committee is trying to gain some type of

 4   litigation advantage.  We have no doubt, as Your Honor has

 5   tremendous respect for the Dallas court, that the Dallas court

 6   will take each issue as it comes to it, without prejudice or

 7   predetermination.  History and experience doesn't mean

 8   prejudice or predetermination; it just means familiarity, Your

 9   Honor.  That's all it means.

10        Our point is simply that the Dallas court clearly had

11   to spend time wrestling with the debtor, how it operated, and

12   its opaque structure.  And let me spend a second on how.  As we

13   point out in our reply and, again, as the record is clear based

14   on the published opinions, Acis had no employees; it was a box.

15   And it subcontracted its management services to the debtor.

16   The Dallas court examined that contract, that subadvisory

17   agreement that Mr. Sharp and, I believe, Mr. Waterhouse

18   referred to, and had to become familiar with it.  That's clear

19   from the published opinions.  And the debtor has numerous other

20   similar contracts.

21        The Dallas court also made determinations -- and

22   these, again, are in published opinions -- whether certain of

23   the debtor's contracts with Acis were personal-services

24   contracts.  Again, they may differ, Your Honor, in terms of the

25   specifics, but these are clear examples of where the Dallas

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 09/29/23   Page 223 of 1539   PageID 17461

HIGHLAND CAPITAL MANAGEMENT, L.P.                                55

 1 | bankruptcy court had to wrestle with contracts of Highland, the
 2 | way Highland operated, and the way that it was managed.
 3 |      Additionally, Your Honor, on the point of litigation
 4 | advantage, as I thought about this, I think the debtor's, sort
 5 | of, arguments regarding a litigation advantage, frankly, worked
 6 | the other way.  If I may, here, for a second, Your Honor.  Mr.
 7 | Dondero is the sole controlling party, as the testimonies made
 8 | clear.  He's based in Dallas.  As we demonstrated in our
 9 | papers, Dallas is clearly the most efficient and convenient
10 | forum for the creditors.  And the creditors have sent this
11 | message loud and clear through this motion to transfer and the
12 | lack of any party affirmatively supporting the debtor and venue
13 | in Delaware.
14 |      Mr. Dondero, in our view, as he has shown in the past,
15 | consistently makes decisions that are in his best interest,
16 | potentially fleeing from a jurisdiction and not his creditors.
17 | And we believe that fleeing from the Dallas court, that is,
18 | steps away from his office -- and that is convenient for his
19 | creditors and, frankly, seems to be the most logical choice of
20 | venue -- again, understanding -- we don't dispute that the
21 | debtor is a Delaware limited partnership.  We're not disputing
22 | that.  But we're talking about what's logical.  That's the
23 | point that I would like to make here, Your Honor.
24 |      Again, back to --
25 |      THE COURT:  Well, I mean --

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 03/28/23   Page 224 of 1539   PageID 17462
Exhibit 22   Page 38 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                56

1          MR. CLEMENTE:  Yes, Your Honor.

2          THE COURT:  -- I mean, a cynic -- and after almost

3   fourteen years, maybe I'm becoming one; I don't know.  But a

4   cynic would say -- and not necessarily badly (ph.), that both

5   sides want -- are interested in forum-shopping; the debtor

6   fleeing, obviously, adverse rulings in Texas, and the creditors

7   fleeing Delaware to go back to the home of adverse rulings

8   against the debtor in Texas.  And it's six one, half dozen the

9   other.  However, at least the cases -- or some of the cases say

10  that the debtor is entitled to some deference in its forum-

11  shopping, as opposed to the creditor, in their opposition, in

12  their forum-shopping.  I'm not sure I buy that.  And as a

13  matter of fact, I've ruled previously that there is no

14  deference --

15         MR. CLEMENTE:  Correct.

16         THE COURT:  -- that should be afforded to the debtor,

17  in the EFH case.  But --

18         MR. CLEMENTE:  That's correct, Your Honor.

19         THE COURT:  -- I just throw that out there.

20         MR. CLEMENTE:  And I believe Your Honor also made a

21  point, in the EFH ruling, regarding the support of the various

22  parties for the venue.  And so I believe that is actually a

23  very strong factor that weighs in favor of transfer to --

24         THE COURT:  Well, and -- yeah, I mean --

25         MR. CLEMENTE:  -- Dallas.

1          THE COURT:  -- and that case had -- the government of

2     Texas or the committee, or both, supported venue.  That case

3     probably, thankfully, would have been sent to Texas, freed up

4     five years of my life, and twenty appeals and --

5          MR. CLEMENTE:  You're stronger for it, though --

6          THE COURT:  -- everything else.

7          MR. CLEMENTE:  -- Your Honor.

8          THE COURT:  Yeah -- I don't know about that.  I'm

9     heavier, that's for sure.

10          MR. CLEMENTE:  I wish I could blame that for my

11     weight, Your Honor, but I can't.

12          Your Honor, back -- very briefly, because we did touch

13     on it already.  We do believe that the Dallas court experience

14     is highly relevant, contrary to what the debtor remarks in

15     their objection.  The debtor again tries to cast the Acis

16     bankruptcy as being narrow and only involving CLOs.  Again, the

17     testimony, I believe, showed, in -- shows, in point of fact,

18     the debtor does manage a significant number of CLOs.  Even if

19     they are in liquidation, there are still decisions that are

20     being made.  And therefore, exposure to how the debtor operated

21     with respect to CLOs is highly relevant.

22          Your Honor, I already mentioned, so I won't repeat

23     myself, that Acis was a box and it had no employees, and

24     therefore, obviously, the court had to look through to what was

25     going on at Highland in terms of how the debtor was managed.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 6-22   Filed 07/30/23   Page 226 of 1539   PageID 17464
Exhibit 22   Page 80 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                         58

1           Your Honor, the CRO, unfortunately, I believe, for the

2   debtor, does not cleanse the venue choice.  The CRO was not

3   around.  The CRO didn't decide venue.  And as clear from the

4   testimony, the CRO reports to Mr. Dondero.  Nothing has

5   changed.  There has been no management changes.  I believe that

6   was also consistent with the testimony.  And everybody still

7   reports to Mr. Dondero, and he's located in Dallas, and Dallas

8   is the nerve center.

9           Additionally, as I mentioned, the cases will be very

10  much about the past, unfortunately, Your Honor, a time when the

11  CRO was not involved, and about transactions and conduct

12  engaged in by the debtor and Mr. Dondero in the run-up to this

13  bankruptcy.

14          In short, I believe the CRO issue is a red herring,

15  Your Honor; it doesn't erase the history the Dallas bankruptcy

16  court has with the debtor through the Acis proceeding, and it

17  doesn't erase the history of the decision-making process that

18  the debtor engaged in, in the past and currently engages in

19  today.

20          With that, Your Honor -- we already had a colloquy

21  about how we do not believe the Dallas bankruptcy court is

22  conflicted, so I won't spend any further time on that.  But I

23  would like to sum up.  Your Honor, let me be very clear.  We

24  have the utmost respect for you and for this Court, so I want

25  to make sure that Your Honor is very clear on that.  However,

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 15-22 Filed 09/29/23 Page 227 of 1539 PageID 17465

HIGHLAND CAPITAL MANAGEMENT, L.P.                    59

 1  the committee respectfully believes that this case presents the

 2  unique combination of facts which dictate that the transfer of

 3  venue to the Dallas bankruptcy court is appropriate.

 4          THE COURT:  You don't need to worry.  My ego assumes

 5  you have respect for me.

 6      (Laughter)

 7          MR. CLEMENTE:  Thank you for that, Your Honor.  Unless

 8  Your Honor has any questions, I'll sit.

 9          THE COURT:  I do not.  There may be others in support

10  who want to be heard.

11          Mr. Pomerantz (sic).

12          MR. LUCIAN:  Your Honor, for the record, John Lucian

13  of Blank Rome, local counsel for Acis.

14          Just during the break, we had a binder made for Your

15  Honor so that the exhibits that Ms. Patel had handed up that

16  were admitted -- I know Mr. Morris has no objection to us

17  handing that up, Your Honor.  It's the -- 1 through 26, with

18  the ones that were not admitted.  This will save you from --

19          THE COURT:  Is that these?

20          MR. LUCIAN:  Yeah.  That's the -- you got them in the

21  binder now.

22          THE COURT:  Okay.  Is this in there --

23          MR. LUCIAN:  Yeah.

24          THE COURT:  -- the email?

25          MR. LUCIAN:  Yes; 26, yes.  If you want to switch to

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 02/02/23   Page 228 of 1539   PageID 17466
Exhibit 22   Page 62 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                      60

 1 | that.  Perfect.

 2 |         MS. PATEL:  Thank you, Your Honor.  For the record,

 3 | Rakhee Patel on behalf of Acis Capital Management, L.P., who

 4 | joined in the committee's motion.  And I will make reference to

 5 | those -- certain of those documents.  I'm generally loathe to

 6 | hand up big binders or big stacks of documents without telling

 7 | the Court of what's been handed up.  So, very briefly, Your

 8 | Honor, I will say, Exhibits 1 and 2 (sic) in the binder are the

 9 | involun -- the issue -- I'm sorry, the opinion issued by the

10 | Dallas bankruptcy court, in connection with the involuntary

11 | trial, and Exhibit number 2 is the opinion that was issued in

12 | connection with confirmation of Acis' plan.  I would also point

13 | the Court to Exhibit Number 17, which is the actual

14 | confirmation order in Acis Capital Management.  And I'll make

15 | reference to one other exhibit as I go through my presen -- or

16 | a number of other exhibits, but -- one additional ruling by the

17 | court, as I go through my presentation.

18 |         THE COURT:  What was the date of -- oh, okay.  Never

19 | mind.  So the confirmation was late January?

20 |         MS. PATEL:  Yes, Your Honor.  January 31st, 2019.  And

21 | the plan went effective on February 15th of 2019.

22 |         THE COURT:  Okay.

23 |         MS. PATEL:  And the Highland bankruptcy, I believe,

24 | was just a little bit over eight months later.

25 |         And, Your Honor, I'll try not to duplicate necessarily

 1  what the committee did, and I will promise to keep this as

 2  brief as I can.  I'm happy to answer any questions, because

 3  standing here before you is the counsel -- at least the

 4  bankruptcy counsel that lived and breathed the Acis case from

 5  the date that they were filed on January 30th of 2018, through

 6  today.

 7          Now, Your Honor -- and along with my co-counsel, Mr.

 8  Shaw, who has been living and breathing, frankly, the issues

 9  longer than I have, even.

10          Your Honor, I will repeat something that was in our

11  moving papers.  And I know Your Honor and Your Honor's team has

12  probably read all the moving papers. but I think this bears

13  repeating, and that is that this case is unique.  It is, in my

14  mind, exceptionally unique.  These facts are so unique, Your

15  Honor, that I would venture to say I don't think that this is

16  necessarily a case that would even possibly or remotely or even

17  tangentially open any floodgates, because these facts are so

18  different from the typical motion to transfer venue.

19          Your Honor, touching quickly on the burden-of-proof

20  issue that Your Honor referenced in your colloquy with Mr.

21  Clemente.  Your Honor, Acis concedes, obviously, the burden of

22  proof is clear that it's the preponderance of the evidence.

23  And I won't go through ad nauseum all of the factors.  I know

24  the Court is exceptionally familiar with all the factors on

25  both the convenience-of-the-parties and interest-of-justice

 1  side.  But I would just note that, at least in the Court's

 2  prior rulings, you've said that the factors are not really a

 3  scorecard, that we're not counting three factors versus three

 4  factors, or four versus two.

 5          And I would just --

 6          THE COURT:  Well, that follows with my fundamental

 7  tenet, which is that any legal test with more than three

 8  factors is useless.  It's just a -- it's just a question of

 9  discussion.

10          MS. PATEL:  I think -- and I think this Court has wide

11  discretion with whether to transfer this case or not.

12          Your Honor, one final quick point that I'll call

13  the -- kind of the four corners or setting the table, for

14  purposes of go-forward, is back to the reference to the -- that

15  there's no real deference, necessarily, to the debtor's choice

16  of venue.  That's sort of subsumed in the burden of proof.  The

17  movant bears a burden of proof and, if they meet the

18  preponderance of the evidence, then the burden shifts.  And

19  that's really kind of where the debtor's choice of forum weighs

20  in.

21          Now, Your Honor, one other quick point is that there's

22  been a lot of discussion in the objections and the responses

23  and the replies, indicating that this whole issue is about Acis

24  as a creditor.  And what I'm here to say, Your Honor, is that

25  this, actually, the issue, the motion to transfer venue, is not

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 22   Filed 05/25/23   Page 231 of 1539   PageID 17469

HIGHLAND CAPITAL MANAGEMENT, L.P.                    63

 1   really about Acis as a creditor.  And I'm here representing

 2   Acis as a creditor.  This has been painted as there's one

 3   creditor that's driving this, and that's Acis.  That's just

 4   simply not the case, Your Honor.

 5        The reality is that you've got hundreds of millions of

 6   dollars or claims represented by the committee, as a fiduciary

 7   to those claims, that have made this motion.  This is not Acis'

 8   motion.  Yes, we did join with respect to it.  And really, it

 9   has -- that has more to do with the fact that we're the Texas

10   folks, we're the Texas creditor.  And we -- again, I and Mr.

11   Shaw lived and breathed the Texas cases.  And I'm here to stand

12   before the Court and answer any questions you may have with

13   respect to what happened, what transpired, but, more

14   importantly, what could happen on a go-forward basis.

15        Your Honor, it's important -- and I -- again, harking

16   back to this concept of this is unique.  As Your Honor noted in

17   EFH, had the committee signed on, had the Texas comptroller

18   signed on, perhaps that outcome would have been a little bit

19   different.  But here, Your Honor, we've got the committee

20   moving for transfer of venue.  And I think that's really

21   significant.  And I'll go through in a little bit sort of the

22   debt stack that we're dealing with here, and you'll see that,

23   hands down, the committee is the fulcrum debt here.  It is the

24   fulcrum debt, Your Honor.

25        Your Honor, one final quick note on forum-shopping.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 06/26/23   Page 232 of 1539   PageID 17470
Exhibit 22   Page 36 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    64

 1    And there's been conversation with respect to the committee's

 2    forum-shopping, the debtor's relationship.  Look, I've read

 3    Your Honor's prior opinions and I really do think the issue

 4    boils down to -- I think it's probably neutral with respect to

 5    both sides.  As Your Honor pointed out, the debtor has the

 6    ability to choose the state of its incorporation as its venue

 7    for filing of bankruptcy.  And also, the committee has the

 8    ability to move, to transfer, pursuant to 1412, to a place that

 9    is the interest of justice and the convenience of the parties.

10    I really view that as being the -- there should be no negatives

11    cast on, frankly, either side, with respect to forum-shopping,

12    because it's kind of invited by the structure of the statute.

13         So if the case isn't about Acis as a creditor, what is

14    this case about?  Well, I -- or what is this motion about?

15    Here I really do think that -- at its heart, that this

16    particular motion to transfer, and probably motions to transfer

17    in general, boil down to the bankruptcy case itself.  So here

18    that would be -- this is all about Highland's bankruptcy and

19    where it should be administered, what makes sense.

20         And, Your Honor, I want to go through a couple of

21    different subtopics on this.  First I want to talk about the

22    business lines that the debtor engages in.  What does it do?

23    And this is all from the -- what I'm going to refer the Court

24    to is all included in the first-day declaration of Mr.

25    Waterhouse, which is Debtor's Exhibit O.

1           And, Your Honor, in Mr. Waterhouse's declaration, he

2   goes through the three kind of general lines of the debtor's

3   business.  First is proprietary trading.  And that involves

4   sort of trading with the debtor's money or leveraged money in

5   certain brokerage accounts.  And I really think that

6   proprietary trading is probably that line of business -- when

7   we're thinking about which court is best suited to oversee that

8   line of business and what's going to happen with respect to it,

9   I think that's really neutral.  I think both Delaware and

10  Dallas could adequately handle that issue.

11          The issue really becomes a lot more focused, though,

12  when we look at the other two lines of business.  The next line

13  of business is investment management services.  And this is --

14  and a big piece of that is the debtor's operation of its CLOs

15  or collateralized loan obligations.

16          If the 2018 financials -- again, I believe they're

17  contained in debtor's exhibits -- if you take a look at those

18  you'll see that as a part of investment management fee revenue,

19  a lot of the revenue that was generated is related to the

20  debtor's operation of eighteen CLOs along with some managed

21  separate accounts, et cetera.

22          Your Honor, the CLO piece and the separate accounts

23  are issues that the Dallas court was faced with through Acis'

24  bankruptcy and Highland's management of it.  And I'll borrow

25  from Mr. Clemente his phrase:  Acis was effectively a box.  It

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 03/28/23   Page 234 of 1539   PageID 17472

HIGHLAND CAPITAL MANAGEMENT, L.P.                    66

 1  had no employees of its own.  It only had two officers, Mr.

 2  Dondero and Mr. Waterhouse, who was the treasurer of Acis,

 3  until their resignation shortly after the appointment of --

 4  shortly after the involuntary filings and the appointment of a

 5  trustee.

 6           Now, Your Honor, the other -- the last piece that's

 7  also involved is shared services.  So we've got investment

 8  management, and there's subpieces of it.  And I won't represent

 9  to the Court that is Judge Jernigan familiar with every aspect

10  of Highland's investment management services?  No, likely not.

11  But neither is this Court.  This Court is still, very much so,

12  on the learning curve with respect to that.

13           And I would submit, Your Honor, that Judge Jernigan is

14  frankly just further along that learning curve with respect to

15  the investment management services.

16           On shared services, Your Honor, as Mr. Clemente

17  referenced, the opinions are very clear -- again, Exhibits 1

18  and 2 -- with respect to there is -- it's clear that Judge

19  Jernigan had to evaluate shared services.  And I'll kind of

20  summarize what the structure of what Judge Jernigan had to

21  evaluate was.  Again, Acis is a box.  It was provided its

22  services by Highland, pursuant to two key agreements:  a

23  subadvisory agreement and a shared-services agreement.  And

24  that shared-services agreement is relatively generic.  And all

25  that is is the subadvisory -- I like to think of it as that's

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11-22   Filed 09/29/23   Page 235 of 1539   PageID 17473
Exhibit 22   Page 69 of 139

 1    the thinking brain stuff.  That's the investment advisory.

 2    Does this comply with SEC guidelines?  Should these trades be

 3    made?  What does the marketplace look like?

 4         Shared services, on the other hand, Your Honor, are

 5    all that middle- and back-office typical type stuff.  There's

 6    no real rocket science with respect to it.  It's just providing

 7    infrastructure:  accounting, legal, bookkeeping functions, all

 8    those things that any sort of generic business would provide.

 9         And again, that is something that Judge Jernigan is

10    just more familiar with.  She is familiar with Highland's

11    business modus operandi.

12         And, Your Honor, if you look sort of across the

13    Highland structure, you will see that Acis really was just a

14    little microcosm.  It's a little template, because it gets

15    repeated throughout the Highland empire.

16         And one of the exhibits -- and forgive me; I didn't

17    bring up the other exhibit list, but multiple parties have

18    designated it, and it's the entities list.  And there's 2,000

19    entities, approximately.  I didn't count them all up.  But

20    that's a number that's been thrown around:  2,000 entities

21    under this.  And they are all each little microcosms.

22    Certainly, Judge Jernigan is further along with respect to the

23    Acis microcosm, but also with respect to the template as well.

24         Your Honor, with respect to then, therefore, economy

25    or -- judicial economy or efficiency, again, Judge Jernigan,

APPX. 102866

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 09/30/23   Page 236 of 1539   PageID 17474
Exhibit 22   Page 270 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    68

 1  further along the learning curve.

 2          Your Honor, now turning then to the debt stack, as I

 3  had referenced earlier -- again, this is all set forth in the

 4  declaration of Mr. Waterhouse -- you've got two secured

 5  lenders, Jefferies and Frontier.  And no one's heard with

 6  respect to -- from them with respect to their position.  Your

 7  Honor, these are two creditors that are vastly oversecured, and

 8  so really they -- I'll put them as sort of neutral with respect

 9  to what's going to happen in this bankruptcy case.

10          Then the next item in the debt stack that Mr.

11  Waterhouse identifies is Highland CLO Management.  Well, Your

12  Honor, it's a note that was transferred -- Highland is the

13  obligor on the note.  It's about nine-and-a-half million

14  dollars.  And it was a note that was previously held by Acis

15  and that was transferred to an entity by the name of Highland

16  CLO Management, by Mr. Dondero.

17          Highland CLO Management, in turn -- Mr. Waterhouse

18  references that there's sort of -- Highland doesn't have a

19  beneficial interest with respect to it.  But if you look at the

20  retention applications that are set for hearing a little bit

21  later today, you'll see that actually the debtors (sic) are

22  claiming there is an interest in this, that the debtor has an

23  interest in making sure that Highland CLO Management has a

24  defense when it comes to the issue of was that transfer from

25  Acis to Highland CLO Management a fraudulent transfer.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1522 Filed 02/29/24   Page 237 of 1539   PageID 17475
Exhibit 22 Page 79 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    69

1             And again, these are issues that Judge Jernigan has

2    had to grapple with all throughout the bankruptcy case.  There

3    have been no -- there has been no adjudication that it was a

4    fraudulent transfer; but certainly she's had to evaluate it in

5    connection with four injunctions that were issued in connection

6    with the Acis case.

7             First there was a -- excuse me -- a sua sponte

8    injunction.  Second there came an ex parte injunction.  Third

9    there was a preliminary injunction.  And then fourth there was

10   a plan injunction.  And that plan injunction, Your Honor, is

11   embodied in Exhibit Number 17.  And again, all of these

12   transfers and transactions -- part of the debt stack of

13   Highland has been evaluated by Judge Jernigan.

14            Last in the debt stack, but certainly not least, Your

15   Honor, we have the general unsecureds.  And Mr. Waterhouse, in

16   his deposition that was held in Dallas, estimated that perhaps

17   the general unsecureds could be upwards of two billion dollars,

18   all told.

19            Now, just looking at the twenty largest, we're still

20   in the hundreds of millions, and we don't have the benefit of

21   schedules yet.  But this is -- this is the big dog.  This is

22   the big layer of debt.  This is who is really the fulcrum here.

23            And keep in mind, Your Honor, this is a free-fall

24   bankruptcy.  No one knows where this is going to go.  At the

25   first-day hearings, debtor's Counsel referenced that there

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 12/22/23   Page 238 of 1539   PageID 17476
Exhibit 22   Page 72 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    70

 1  could be sales of assets and divestiture of certain things,

 2  operational restructuring.  There's really no idea where this

 3  case is headed.  And I think that's significant, Your Honor,

 4  because this is an operational restructure or perhaps a

 5  liquidation.

 6          I hope not.  I hope that this is an operational

 7  restructure and that all creditors can be paid either in full

 8  or close to in full, but that's significant.  And the reason

 9  why it's significant here is because, Your Honor, you've got

10  the fiduciary for that fulcrum debt voting with their feet with

11  what could happen -- what should happen on a plan.

12          And they're saying we think this case should be

13  administered in Texas.  And I think, again, going back to what

14  makes this case so unique, I think that's what makes it so

15  unique is that there are -- just from a dollar perspective and

16  volume perspective, the significant creditors and the committee

17  with respect to who's a fiduciary telling you, Judge, we think

18  this case should be administered in Texas.  And those votes are

19  going to be important with respect to any exit that happens

20  here.

21          Your Honor, I'll hit sort of on another factor, the

22  sort of forum's interest or a local interest in the

23  controversy.  And I concede, clearly -- and I think Your Honor

24  has referenced in the past -- Delaware, when it -- when an

25  entity is organized under Delaware law, that the forum state

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 02/23/23   Page 239 of 1539   PageID 17477
Exhibit 22   Page 239 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.                         71

 1   has an interest in protecting its entities.  However, I will

 2   say, I think what's different here is --

 3              THE COURT:  Say that again?

 4              MS. PATEL:  I'm sorry, Your Honor.  I probably

 5   misstated that.  That the state of incorporation has an

 6   interest in entities that are --

 7              THE COURT:  Yeah, but --

 8              MS. PATEL:  -- formed under its state's law.

 9              THE COURT:  -- you're in the wrong court for that.

10   That's state court.  This is --

11              MS. PATEL:  I'm sorry?

12              THE COURT:  -- the --

13              MS. PATEL:  Oh, yeah.

14              THE COURT:  You're in the wrong court for that.  I

15   don't care about that.  This is --

16              MS. PATEL:  All right.

17              THE COURT:  -- this is federal court.

18              MS. PATEL:  Fair enough.  I'll take that one, then.

19              THE COURT:  This is federal court.  That's for the

20   chancery and the governor.

21              MS. PATEL:  Well, Your Honor, and going back just to

22   the issue of the unique factors here, usually, Your Honor, in a

23   motion to transfer venue, you have what I'll call relatively

24   similarly situated courts, certainly if you've got a transfer-

25   of-venue motion that was filed as early as the one that was

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 09/29/23   Page 240 of 1539   PageID 17478
Exhibit 22   Page 239 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    72

 1    filed in this case, within the first few weeks of the case, and

 2    within, I believe, two days of the committee's formation.

 3            That's just not the scenario here, Your Honor.  You

 4    have a bankruptcy court in Texas who is familiar with various

 5    aspects of the debtor's business.  Is it familiar with every

 6    aspect of the debtor's business?  No.  But that certainly can't

 7    be said as to the Delaware Court either, that you are familiar

 8    with every aspect of the debtor's business.

 9            Your Honor, in Texas there's not only a bankruptcy

10    court, there's a district court who is familiar with all of

11    the -- with aspects of the debtor's business, and that is the

12    Honorable Judge Fitzwater.

13            And what I will say -- Your Honor was asking questions

14    with respect to the judge -- the bankruptcy judge that it would

15    be assigned to.  I'm happy to address those from my

16    perspective.  But what I will note is that every appeal that

17    stemmed out of the Acis bankruptcy case -- and there were in

18    excess of ten -- every single one was transferred ultimately to

19    Judge Fitzwater for adjudication.

20            So even if -- even if we look just one layer up from

21    the bankruptcy court to the district court, Judge Fitzwater is

22    intimately familiar.  And now we've got three -- in connection

23    with the Acis cases -- three appeals that are pending before

24    the Fifth Circuit, two of which involve Highland or a Highland-

25    related entity.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-22   Filed 07/21/23   Page 241 of 1539   PageID 17479

HIGHLAND CAPITAL MANAGEMENT, L.P.                          73

1           Your Honor, I want to quickly touch on the --

2           THE COURT:  Is it the practice in the -- it's the

3   practice in our district court that once a district judge is

4   assigned an appeal in connection with a bankruptcy, any further

5   appeals in that bankruptcy go to that district judge.  Is that

6   the practice in Texas?

7           MS. PATEL:  It's the practice, Your Honor.  I don't

8   believe that there's a specific local rule that says that that

9   will happen, but that's functionally what happens.  And

10  sometimes you have to make a motion to transfer between two

11  courts, but invariably, it usually goes to sort of either the

12  first-filed court or kind of the first court to really get into

13  a substantive issue.

14          THE COURT:  Okay.

15          MS. PATEL:  Your Honor, I'll touch on a couple more

16  quick points.  It is offensive to me when I read through the

17  debtor's pleadings and that there is an implication that the

18  Dallas court is somehow biased.  I think of Judge Jernigan and

19  I think of this Court and I think of virtually every bankruptcy

20  court that I've ever had the privilege of appearing before as

21  being fair and impartial.  And this concept of bias, that's

22  only grounded in the fact that the debtors have -- or I'm

23  sorry -- the debtor has lost a few.

24          And I will say, just to kind of forestall that easy

25  conclusion based on the opinions, I would note, in Acis'

APPX. 102872

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 06/26/23   Page 242 of 1539   PageID 17480
Exhibit 22   Page 75 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    74

 1  exhibits, if you look at Exhibit Number 12, that is -- it's an

 2  email that the court sent in connection with Acis' first

 3  confirmation hearing.  And that was a confirmation hearing that

 4  occurred in August of 2018.  And the court ultimately denied

 5  confirmation of the first sort of plan.  And there were kind of

 6  three sub-plans.  But the court denied it.

 7          And so again, I'm offended that there would be even an

 8  implication that the court is somehow biased, because this

 9  isn't a scenario where there have been only adverse rulings to

10  Highland in connection with the Acis bankruptcy case.  Judge

11  Jernigan has called the balls and strikes as she sees them,

12  Your Honor.

13          Your Honor, I'll conclude with the following, which is

14  that I would venture to guess that if this Court were in sort

15  of -- if we reversed the scenario and this Court had expended

16  hundreds of hours, hundreds of pages of opinions, untold hours

17  of its courtroom staff's time, going through and poring through

18  an exceptionally voluminous record, over 100,000 pages, and

19  having expended over forty days of courtroom time, with that

20  significant of an interest in the case and that expenditure of

21  time, I would venture to guess that this Court would want this

22  case transferred back to Delaware, if it had been filed

23  anywhere else.

24          And so I would submit to Your Honor that this Court

25  should -- this case should be transferred to Dallas for all of

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22 Filed 09/29/23   Page 243 of 1539   PageID 17481

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    75

 1    the reasons proffered by the committee and as joined by Acis.

 2    Thank you, Your Honor.

 3              THE COURT:  You're welcome.

 4              Anyone else in favor of the motion?

 5              All right.  This time it will be short.  We're going

 6    to take a very short recess, and then I'll hear from the

 7    debtor.

 8         (Recess at 11:50 a.m. until 12:00 p.m.)

 9              THE CLERK:  All rise.

10              THE COURT:  Please be seated.  I apologize.  I know

11    it's getting warmer and warmer in here.  And we're trying to

12    contact -- we're trying to find someone in Maintenance who's

13    working today.

14              MR. POMERANTZ:  It's usually motivation to get the

15    hearings done quickly, in my experience.

16              THE COURT:  Yeah, it's -- if I take off my robe, don't

17    be offended.  I do have clothes on underneath.

18              MR. BOWDEN:  Thank you.

19              THE COURT:  I heard you, Mr. Bowden.

20              All right, go ahead.

21              MR. POMERANTZ:  Good afternoon, again, Your Honor.

22    Jeff Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

23    debtors-in-possession (sic).  Before I go on to my prepared

24    remarks, I just want to address a couple of the points that

25    were raised by Mr. Clemente and Acis' Counsel.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 09/29/23   Page 244 of 1539   PageID 17482

HIGHLAND CAPITAL MANAGEMENT, L.P.                    76

 1            First, we are not aware of any formal statement that

 2   Judge Hale, in the Northern District of Texas, is not taking

 3   cases.  So I think Your Honor's point was a good one.  There's

 4   no definite -- there's no requirement, and it may or may not be

 5   that this case gets transferred, if Your Honor were to transfer

 6   it.

 7            Second, Your Honor, Highland has -- there have been

 8   appeals made not only from confirmation of the plan but also

 9   from the involuntary itself.  If the involuntary appeal

10   succeeded, there wouldn't even be a bankruptcy case to be

11   related to.  And in any event, the case law says that events

12   that may or may not happen in the future are not really

13   relevant to the venue analysis.

14            Lastly, Your Honor, Mr. Clemente started by saying he

15   thinks the facts are largely in dispute, and you heard Counsel

16   then go through in detail, as did Acis' Counsel, about how

17   there's no dispute that Judge Jernigan has a learning curve.

18            Of course they need to say that because that is the

19   focus and the crux of their venue-transfer argument.  As I will

20   demonstrate in my comments and as the evidence is before the

21   Court, other than the opinions that were written and other than

22   the amount of time the court has spent, there is no real nexus

23   between what happened in that case and what happened in this

24   case.

25            We have no doubt that Judge Jernigan learned all about

 1  Acis, learned all about Acis' relationship to Highland.  But

 2  the real issue before Your Honor is what does that have to do

 3  with this debtor, this debtor's assets and liabilities, and

 4  this debtor's operations.  And as my comments will show, we

 5  think that's a significantly overblown argument.

 6          Your Honor, during their presentation, Counsel really

 7  strayed a little bit from what the motion and the joinders sort

 8  of said.  There they went through a painstaking analysis of the

 9  various factors supporting venue.  I know Your Honor said that

10  over three factors, you don't find that helpful, but the courts

11  have relied on a series of factors.

12          And I think the reason why they have strayed away from

13  that and focused on the committee being the one to support the

14  transfer-of-venue motion and the facts of the Acis case is

15  because when you pare it down, the actual factors demonstrate

16  that there is no way the committee can carry its burden to

17  demonstrate that venue should be transferred.

18          However -- Your Honor pointed to this at the

19  beginning, in mentioning comments about forum-shopping -- the

20  committee and Acis are really being disingenuous, and they have

21  not told you the real reason that they want the case before

22  Judge Jernigan.

23          At the first-day hearing, Your Honor, Acis said they

24  intended to file a motion for an appointed trustee.  The

25  committee has told the debtor it intends to file a motion to

Case 19-34054-sgj11  Doc 3596-22  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 15-22  Filed 08/30/23  Page 246 of 1539  PageID 17484
Exhibit 22  Page 30 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    78

1  appoint a trustee after this hearing.  The motion has not yet

2  been filed, Your Honor, because they want Judge Jernigan to

3  rule on that motion.  And it's not because she's familiar with

4  this debtor's business, this debtor's assets, or this debtor's

5  liabilities, because she generally is not.  It is because she

6  formed negative views regarding certain members of the debtor's

7  management that the committee and Acis hope will carry over to

8  this case.

9           The convenience of the parties and the interests of

10  justice and how this case is so unique are just a pretext.

11  They want a trustee to run the debtor, and they want Judge

12  Jernigan and not Your Honor to rule on that motion.  That, Your

13  Honor, is not a proper reason to transfer venue, but rather a

14  transparent litigation ploy.

15           Similarly, Acis also wants the case to proceed in its

16  home court where it has enjoyed success in litigating against

17  the debtor.  Your Honor mentioned the conflicts-of-interest

18  theories.  They're not just conflicts of interest between two

19  jointly administered debtors.  These go to the crux of what the

20  Acis case is about and significant claims against the debtor.

21           The Court may ask, appropriately -- and the Court

22  did -- why would the debtor file the case in Delaware?  Chapter

23  11 is all about a fresh start.  The debtor recognized concerns

24  that the creditors had with certain aspects of its pre-petition

25  conduct, and proactively appointed Brad Sharp as chief

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1522   Exhibit 22 Filed 08/31/23   Page 247 of 1539   PageID 17485

HIGHLAND CAPITAL MANAGEMENT, L.P.                         79

 1  restructuring officer with expanded powers, to oversee the

 2  debtor's operations.

 3          Mr. Sharp worked with the debtor and Counsel to craft

 4  a protocol for transactions that would be subject to increased

 5  transparency.  The debtor didn't have to do that.  As Your

 6  Honor mentioned at the first-day hearing, the debtor operates

 7  its business in the ordinary course.  But given the

 8  circumstances surrounding this case, given the history, we

 9  felt, and the CRO, importantly, felt it was important to get on

10  the table what the debtor, through the CRO, believed was

11  ordinary and what was not, so we could have a transparent

12  discussion, discussion that, while we've made headway with the

13  committee, we have not yet been able to come to an agreement.

14          The debtor filed the case in this district because it

15  wanted a judge to preside over this case that would look at

16  what's going on with this debtor, with this debtor's

17  management, this debtor's post-petition conduct, without the

18  baggage of what happened in a previous case, which contrary to

19  what Acis and the committee says, has very little to do with

20  this debtor.

21          These form insufficient grounds, Your Honor, to

22  overturn the debtor's choice of venue, and the motion should be

23  denied.

24          I would like to now walk through the statutory

25  analysis, something that Counsel avoided, because again, I

 1  think it highlights the weakness of their argument.

 2          It is clear that the Delaware venue is proper, and

 3  1408 says the places where a Chapter 11 debtor can file the

 4  case.  As the vast majority of debtors who file cases in this

 5  district, the debtor filed here because it was domiciled in

 6  Delaware.  It is a Delaware LP.  But it goes further than that.

 7  99.94 percent of its LP interests are owned by Delaware

 8  entities.  And the general partner, Strand Advisors, is a

 9  Delaware general partner.

10          While many cases, Your Honor, before this court, rely

11  on the domicile of one affiliate to bring other non-Delaware

12  related affiliates before the court, that's not the case here.

13  All you have, virtually, are Delaware entities, through the

14  ownership structure.

15          As I will also discuss in a few moments, Your Honor,

16  domicile is not the only connection that this debtor has to

17  this district, as significant litigation matters involving the

18  debtor, including those commenced by committee members, that

19  was the catalyst to the filing, are pending in Delaware.

20  Accordingly, the committee acknowledges, as they must, that

21  Delaware is, of course, a proper venue.

22          However, they rely on 1412 which sets forth the

23  standard -- test that the movant has to meet in order to

24  transfer venue, either for the convenience of the parties or

25  the interest of the justice.

1              And courts, including the written opinions in this

2    district by your colleagues, most often cite to the six factors

3    in the CORCO decision in the Fifth Circuit in 1979.  And as

4    Judge Gross, in his 2016 opinion in Restaurants Acquisition

5    makes clear, the movant bears the burden of demonstrating that

6    the factors strongly weigh in favor of a transfer.

7              Similarly, Judge Gross stated in that case -- and I

8    know Your Honor may not fully subscribe -- that courts

9    generally grant substantial deference to the debtor's choice of

10   forum.

11             And in the case here, where not only do you have the

12   debtor is a Delaware entity, but virtually all of its holdings

13   are well -- are Delaware entities as well, it is even more

14   appropriate to defer to the debtor's choice of forum.  As Judge

15   Walsh said in his 1998 opinion at PWS Holding, it is a

16   fundamental legal tenet that every citizen of a state is

17   entitled to take advantage of the state and federal judicial

18   process in that state.

19             So the question before Your Honor is whether the facts

20   in this case strongly weigh in favor of a venue transfer such

21   that the Court will disregard the debtor's reasoned business

22   judgment to commence the case in this district?

23             We submit, Your Honor, that the committee and Acis

24   have not come close to meeting that standard, and the CORCO

25   factors do not support a transfer.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 04/20/23   Page 250 of 1539   PageID 17488
Exhibit 22   Page 84 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    82

1          The first one is the proximity of creditors.  And the

2     committee is focused on the fact that the committee -- the

3     representative fiduciary of the estate -- has determined that

4     venue is appropriate.  But the factor not only looks at the

5     number of creditors, it looks at the dollar amount of the

6     creditors.  And if you analyze -- an analysis of either

7     demonstrates that convenience of the parties does not support a

8     transfer of venue in this case.

9          The debtor has two secured creditors.  Jefferies is

10    headquartered in New York City.  Frontier Bank is headquartered

11    in Oklahoma.  There was reference by Acis' Counsel to HCLOF.

12    Their secured claim is unrelated to the note that was at issue

13    in Acis, and there's nothing in the record to say that that

14    secured instrument has anything to do with the Acis case.

15    Neither of those creditors has weighed in on the motion to

16    transfer venue.

17         So let's look at the unsecured creditors.  Of the

18    twenty that were listed in the debtor's petition, seven have

19    Texas addresses.  Five of those are debtor's either current or

20    former law firms.  Two of them are in the courtroom today.  And

21    as Your Honor I'm sure appreciates, debtor professionals --

22    former debtor professionals are not usually active in

23    bankruptcy cases.  Indeed, none of them filed a notice of

24    appearance in this case.

25         The other two that have Texas addresses are the claims

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 22   Filed 08/25/23   Page 251 of 1539   PageID 17489

HIGHLAND CAPITAL MANAGEMENT, L.P.                    83

 1  related to Acis:  the Acis claim and the Josh Terry claim.

 2  There are no other unsophisticated creditors that the Court

 3  needs to worry about that would not be able to travel to

 4  Delaware, as needed.

 5          The two largest unsecured creditors in the top twenty

 6  are the Redeemer Committee and Patrick Daugherty, each of whom

 7  had pre-petition litigation pending against the debtor that

 8  they each commenced in the Delaware Chancery Court.  And the

 9  arbitration proceeding that preceded the Redeemer chancery

10  court litigation was pending in New York City.

11          UBS, a member of the committee, listed as number

12  nineteen with a disputed and unliquidated claim, will likely

13  claim it is the largest creditor of the estate.  It is based in

14  New York.  It has litigation pending against the debtor in New

15  York, and used Latham & Watkins' DC office for that litigation.

16          And lastly, the fifth largest creditor, Your Honor,

17  Meta-e Discovery, is also on the committee.  Where is their

18  address?  Stamford, Connecticut.

19          As Judge Gross reasoned in Restaurants Acquisition, in

20  order to overcome the strong presumption in favor of the venue

21  transfer, a transfer must substantially improve the

22  administrative feasibility with respect to the creditor body as

23  a whole.  So the committee sits out there and Acis sits out

24  there saying that it's convenient for the creditors, it's much

25  more convenient in Dallas.  Their actions belie their

 1  statements.  All this litigation was focused on either Delaware

 2  or the Northeast.  It is just simply disingenuous for them to

 3  argue otherwise.

 4          The next factor, Your Honor, is the proximity of the

 5  debtor.  And in applying this factor, the courts focus

 6  primarily on the parties who appear in court.  The debtor

 7  retained Brad Sharp, and he has demonstrated its intention --

 8  and the debtor has demonstrated its intention of having Mr.

 9  Sharp be the face of the reorganization efforts before the

10  Court.

11          Indeed, in cases where a CRO is reported, Your Honor,

12  the CRO is more apt to testify in court than any other debtor

13  representative.  And I believe Mr. Sharp's testimony, which was

14  uncontroverted, was that he expects that he and Mr. Caruso will

15  provide the bulk of the testimony required from debtor

16  representatives during this bankruptcy case; and that's because

17  the debtor has given Mr. Sharp broad authority to evaluate the

18  propriety of post-petition transactions and to pursue and

19  analyze insider claims.

20          And at today's hearing the debtor will offer the

21  testimony of Mr. Sharp and his colleague, Mr. Caruso, to

22  support the relief requested.  They have developed a

23  substantial amount of knowledge regarding the debtor's assets,

24  liabilities, and operations, in the six weeks they've been on

25  the job; and that knowledge will continue to grow.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 09/29/23   Page 253 of 1539   PageID 17491
Exhibit 22   Page 297 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    85

1          And Mr. Sharp has significant experience, as he

2    testified to, being a CRO in cases in this district; and he

3    could travel just as easily to Delaware as he can to Texas.

4          While the debtor acknowledges that other debtor

5    employees like Frank Waterhouse may be called to testify, as he

6    was today, the involvement of the debtor's personnel in this

7    court is likely to be immaterial.  And he was the only Texas

8    person called to testify in this case.  And if the committee

9    and Acis felt it was so important that representatives of the

10   debtor be -- it would be easier for them to travel to court,

11   they didn't call any witnesses in today, which is the most

12   important hearing in the case.

13         Also, Your Honor, our offices, as you know, are in

14   Delaware.  And while it's true that we practice all around the

15   country, we would need separate counsel if we were to -- if the

16   case was to be -- to move.

17         And similarly, the committee retained Young Conaway,

18   which took a significantly active role in the litigation

19   leading up to today.  That information and knowledge and

20   expertise would be lost if the case was transferred.

21         Next, Your Honor, related, is the proximity of

22   witnesses.  And a I said, the committee can't demonstrate that

23   witnesses in this case would find Texas a substantially more

24   convenient forum than this court.  And you would have expected

25   them to have subpoenaed Texas witnesses if that were so

 1 | important.

 2 |         Location of assets, Your Honor, is one of the CORCO

 3 | factors.  And the committee makes a big point that all the

 4 | decision-making is in Texas and all the people are in Texas and

 5 | the office is in Texas.  The courts that look at location of

 6 | assets as being critical typically involve cases that are

 7 | single-asset real-estate cases, or cases that are small local

 8 | businesses that have significant regional connections.

 9 |         But if you look at the debtor's assets here, it's not

10 | the case.  Their assets generally include financial instruments

11 | and investments in a wide variety of public stock; advisory

12 | contracts; shared services; and interests in nonpublic hedge

13 | funds and private equity funds.

14 |         The assets are located throughout the United States

15 | and in Latin America, Korea, and Singapore.  And the majority

16 | of the debtor's liquid assets are in New York.  We were not --

17 | we don't dispute the point that there aren't significant people

18 | in Dallas and that the offices are in Dallas and all the

19 | employees.  We don't dispute that.  But the assets are far-

20 | flung around the country, and the cases, again, that focus on

21 | the assets, focus on local expertise that the court will bring

22 | to bear, particularly in real-estate cases with respect to

23 | valuation.  You have nothing of that here.

24 |         The debtor intends to use its Chapter 11 to provide

25 | breathing room and to evaluate, hopefully in a constructive way

 1   with the committee, how best to maximize value for the debtor's

 2   assets through a consensual restructuring; and there's no

 3   reason to believe why Texas rather than this court, would be a

 4   more appropriate forum for this restructuring.

 5          The last factor, Your Honor, is the economic

 6   administration of the estate, which the courts generally point

 7   to as the most important factor.  And the committee points to

 8   five reasons, which is essentially retreads of its previous

 9   arguments.

10          Again, they argue a higher concentration of creditors

11   in Texas and Midwest.  That's not the case, as I mentioned.

12   They argue that there's a higher concentration of professionals

13   in Texas and Midwest.  And if you look at all the

14   professionals, they're all from national firms; they're all

15   metropolitan areas that practice routinely before this Court.

16   And the concept that the flights being different and the

17   mileage being different is in any way -- is in any way

18   important, is just not -- is just not the case.

19          People practice in a global, national world, these

20   days.  And if that argument succeeded, most of the -- your

21   brethren and yourself would not have much to do, because that

22   argument could support transfers in most cases.

23          THE COURT:  Well, I think really goes to why -- I

24   mean, I know this is the standards that are generally applied,

25   but it's a case from 1979.  It's really behind the times.  I

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 11-22   Filed 07/30/23   Page 256 of 1539   PageID 17494

HIGHLAND CAPITAL MANAGEMENT, L.P.                                88

 1  don't think the factors reflect corporate practice of

 2  bankruptcy reality of 2019.

 3          MR. POMERANTZ:  And that's exactly what Judge Gross

 4  said in the Caesar's opinion --

 5          THE COURT:  Right.

 6          MR. POMERANTZ:  -- which is cited in the material,

 7  that this argument, given technology, given frequency of air --

 8  ease of air travel, it's just not a relevant factor anymore.

 9          And the two pages that the movants spent in the brief

10  talking to you about how many direct flights there are from LA

11  to Delaware as opposed to LA to Dallas, that, Your Honor, I

12  think is just silly.

13          The committee also argues that most creditors would

14  need to retain local counsel if they were here.  Well, if you

15  look, the case has been pending a month-and-a-half, and other

16  than notices of appearance filed by committee members, there

17  have only been two notices of appearance that have been filed

18  that are unrelated to debtor entities.  And one of those is

19  Daugherty, who commenced litigation in chancery court.  So the

20  argument that is made typically in cases where they're filed in

21  jurisdictions far off from where the debtor's operating is, is

22  that it'll be burdensome on the mom-and-pop creditor, Your

23  Honor, we don't have mom-and-pop creditors here.  And there's

24  nobody out there with material claims against the estate that

25  will not have the ability and have trouble and demonstrated the

 1  willingness to hire Delaware Counsel.

 2          The last argument --

 3          THE COURT:  Even when you do have mom and -- again, to

 4  comment on reality, even when you do have mom-and-pop creditors

 5  in businesses that are very locally focused, general practice

 6  today is to make their claims irrelevant, in that to the extent

 7  they have avoidance claims, they're paid on the first day.

 8  Their real concern is whether the business will continue or

 9  not.

10          Now, it's certainly true that pension claims are

11  important, and proofs of claim are important.  But we have

12  many -- all courts have many procedures in place to ensure that

13  those types of creditors can participate without having to go

14  to the courthouse.

15          MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16  mentioned that in the Restaurants Acquisition case, which was a

17  Texas-based --

18          THE COURT:  He's a smart guy.

19          MR. POMERANTZ:  We'll be sorry to see him go, Your

20  Honor.

21          THE COURT:  Yeah, absolutely.

22          MR. POMERANTZ:  Which was a Texas-based restaurant

23  chain that had more of a local flair.  But he made the comments

24  Your Honor made.

25          The last argument the committee makes is that Texas is

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-22   Filed 02/22/23   Page 258 of 1539   PageID 17496
Exhibit 22   Page 22 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    90

 1 │ more convenient.  And this is really the crux, which I'll spend

 2 │ some time over the next few minutes.

 3 │         Texas is more convenient -- convenient -- because the

 4 │ Texas bankruptcy court, where Acis is pending has, in their

 5 │ words, already expended great time and effort familiarizing

 6 │ itself with the debtor and its operations.  You've heard

 7 │ statements like "learning curve".  You heard statements about

 8 │ everything that the debtor -- that Judge Jernigan has found out

 9 │ about this debtor, and how important and how helpful it is, and

10 │ how Your Honor will be behind the learning curve.  We just

11 │ don't buy that, Your Honor.

12 │         And aside from that argument, the arguments that the

13 │ committee makes for transfer are arguments that could be made

14 │ in any case before Your Honor.

15 │         THE COURT:  Yeah, I was going to say that's kind of an

16 │ interesting argument, because actually it assumes Judge

17 │ Jernigan's going to ignore the rules of evidence in making

18 │ factual findings, because you're limited to the record before

19 │ you on a specific motion.  And what fact you may have learned

20 │ with regard to something a person has done, maybe that goes

21 │ into questions of credibility on cross-examination or direct

22 │ testimony, but to actually base your decision on a fact that's

23 │ not in the record for the specific proceeding would be

24 │ improper.

25 │         MR. POMERANTZ:  Look, I agree, Your Honor.  And the

 1  familiarity with the type of business -- if I wasn't speaking

 2  to Your Honor or your brethren or many other judges around the

 3  country, I'd say well, maybe there are certain judges who

 4  haven't dealt with large financial services company, may not

 5  know what a CLO, may not know what a hedge fund is or private

 6  equity fund is.  I'm very confident that Your Honor has had

 7  many cases with sophisticated financial instruments, likely CLO

 8  obligations, so that Your Honor not only has a good base of

 9  knowledge that would give you the same base of knowledge that

10  Judge Jernigan has, but as we've also found, you are a fairly

11  quick study and that I have no doubt that you could come up-to-

12  speed without very little effort.

13          So their argument is a grossly overstated

14  interpretation of what the Acis case was about and that what

15  was learned in that case has any relevance.  As a part -- as a

16  result of the Acis plan confirmation, Acis is no longer part of

17  the debtor's organizational structure.  The debtor owns no

18  equity in Acis.  And the debtor no longer provides any advisory

19  services to Acis.

20          We admit that Judge Jernigan conducted many hearings,

21  and she issued several lengthy opinions, and she heard from a

22  variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23  has not -- Your Honor might read the opinions that she wrote

24  that are attached to the exhibits, the plan confirmation

25  opinion, the arbitration opinion, the involuntary opinion; and

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 15-22 Filed 04/24/23 Page 260 of 1539 PageID 17498

HIGHLAND CAPITAL MANAGEMENT, L.P. 92

1  you will conclude, I believe, as I have concluded, that ninety-

2  five percent of that stuff has nothing to do with this debtor.

3         It focused on the CLO obligations -- CLO business, the

4  relationship, the transfers of certain assets away from Acis

5  that basically Acis is claiming were fraudulent conveyances,

6  and that was the real focus; not on any of the debtor's

7  business operations.

8         Acis was the advisory arm through which the debtor

9  structured its collateral loan portfolio.  The fees -- the

10 uncontroverted evidence is the fees generated from the CLO

11 business represent approximately ten percent of the debtor's

12 revenue and that that will reduce over time, because since the

13 market crash in 2009 the debtor has not created any new CLO

14 funds.  So there's no active management and advisory services

15 going on for the CLOs.  They're just being liquidated in the

16 normal course.  Their importance will continue to decrease.

17 And even right now, it's only ten percent.

18        The debtor generates its revenues from trading public

19 securities; its equity positions in a variety of nonpublic,

20 private-equity, and hedge funds; and advisory and back-office

21 service provided to third parties.  It is the monetization of

22 those assets that will provide the basis for the restructuring

23 of this debtor.  And Judge Jernigan's prior experience with the

24 small sliver of what the debtor's business currently is, will

25 be only marginally relevant, at all.

 1        Acis didn't have any other balance-sheet assets.  They
 2   were basically an advisor of CLOs.
 3        For example, Judge Jernigan has no experience or
 4   knowledge surrounding the debtor's multi-strat. fund; its
 5   Korean, Latin American, or Singapore private-equity
 6   investments; its investments in the PetroCap funds; or the
 7   other myriad of assets that are on the debtor's balance sheet
 8   which Your Honor will likely will hear about in connection with
 9   the hearings that will go on later.

10        The committee and Acis make a big point of arguing
11   that Judge Jernigan is familiar with the shared-service and
12   management agreements between Acis and the debtor.  However,
13   there was a lot of testimony from the podium on that.  The only
14   testimony before Your Honor is that the contracts are
15   different.  Mr. Waterhouse wasn't even familiar with the
16   contracts, couldn't provide any testimony.  But Mr. Sharp
17   testified that the type of shared-service and advisory
18   agreements for CLOs are markedly different than the type of
19   services and advisory agreements for non-CLO entities.  While
20   Acis' Counsel stood up there and said there's a template and
21   they're pretty much the same, that was purely argument.  There
22   was no evidence in the record to reflect that.

23        And in fact, the only two agreements that involved
24   Highland in the Acis case were these two agreements.  But
25   again, they're like apples and oranges.

 1           In any event, Your Honor, one of the matters that Mr.

 2    Sharp is focusing on will be the appropriate economic

 3    arrangement between the debtor and its affiliates and

 4    nonaffiliates, through its shared-services and advisory

 5    agreements.  That has been a focus of DSI's analysis.  The

 6    committee has indicated that's something that they want to

 7    focus on.  And Mr. Sharp will come up with a recommendation as

 8    to what those should be, and it'll be that recommendation

 9    that'll be based on the market rate for these contracts in

10    these particular businesses that will be relevant for Your

11    Honor to consider, at some point.

12           They attached a post-confirmation opinion that Judge

13    Jernigan issued with respect to denial of a motion to seek

14    arbitration regarding provisions of those agreements.  But if

15    you read that opinion carefully, you will see that the primary

16    issues in that case were whether an arbitration provision

17    actually survived, given that the last version of the agreement

18    did not have them -- there were five different iterations in

19    each of the agreements.  And after concluding that the

20    arbitration provision did survive, she ultimately ruled that

21    that notwithstanding, she would not enforce arbitration because

22    the claims were too related to the other claims that were being

23    asserted.  Again, nothing to do with the debtor's business.

24           In fact, Your Honor, after today, I have no doubt that

25    Your Honor will be a lot more familiar -- if Your Honor is not

APPX. 102892

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-22   Filed 09/29/23   Page 263 of 1539   PageID 17501
Exhibit 22   Page 97 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                           95

 1    already -- with what the debtor does.  So Your Honor will hear

 2    testimony from Mr. Caruso; Your Honor will hear testimony from

 3    Mr. Sharp, about various aspects of the debtor's business, what

 4    it's doing, its management structure, how that structure is

 5    working.  All that you will hear, which will put you in an

 6    advanced state, compared to Judge Jernigan, as opposed to being

 7    behind.

 8           And there are other aspects of this case that are on

 9    the way that have nothing to do with Acis.  For example, we

10    just filed a motion to approve ordinary-course bonuses to

11    employees.  And we may also seek approval of a KERP and a KEIP.

12    Acis had their own employees, and Judge Jernigan had no special

13    knowledge of the debtor that would put her in a better position

14    to give her an advantage over this Court in determining an

15    appropriate compensation structure.

16           It isn't that difficult.  Your Honor hears it all the

17    time:  KEIPs, KERPs.  Judge Jernigan hears it all the time.  My

18    point is, Your Honor, there's nothing that would help her, from

19    her knowledge of Acis, that would justify a transfer of venue.

20           They also stress that -- in their papers, that Judge

21    Jernigan heard a lot of testimony from debtor's management.

22    But they really don't discuss what the content of that

23    testimony is or how it's, in any event, relevant to this case.

24    They just really want to rely on the sheer volume of

25    information that they have foisted on Your Honor, citing to the

1  entire record, by saying there's so much; there's been hundreds

2  of pages, dozens of hearings, and then that means Judge

3  Jernigan is in a much better position.

4         If they wanted to point to specific things in the

5  record where the judge had specific knowledge, they could have.

6  They shouldn't (sic) have.  And they're trying to do this on a

7  big holistic view, but when Your Honor looks at the record, I

8  think Your Honor will conclude otherwise.

9         In any event, it's not really -- they don't explain

10  why familiarity with the debtor's management is at all

11  relevant.  Look, they clearly want a trustee in this case and

12  believe that because Judge Jernigan found debtor's management

13  to not be credible, she'll be more apt to appoint a trustee

14  than this Court.  But that argument doesn't withstand scrutiny.

15         This case is different.  This case is being managed by

16  a CRO.  This case had the debtor file a motion it didn't have

17  to file for ordinary-course protocols.  This case has -- thus

18  far, you haven't heard anything about any discovery disputes,

19  you haven't heard anything -- although you heard a couple weeks

20  ago there might be issues with cooperation, we provided a

21  substantial amount of documents, produced witnesses, in a

22  significantly accelerated time frame.  You have heard nothing

23  about that.

24         So any un-cooperation or difficulty of any -- that

25  they may have encountered in the Acis case, there's no evidence

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-22   Filed 09/29/23   Page 265 of 1539   PageID 17503

HIGHLAND CAPITAL MANAGEMENT, L.P.                                      97

 1  that that's occurring here, for good reason; because Mr. Sharp

 2  is in charge.  And although he is still reporting to Mr.

 3  Dondero, as his corporate structure, Mr. Dondero can terminate

 4  him, and if he terminates him, he has to give notice.  That's

 5  appropriate.  That's one of the issues we address in connection

 6  with the U.S. Trustee's concerns with the CRO motion.  In order

 7  to file a corporate governance, he has to report.  But there

 8  are certain things, as you'll hear later, that he has been

 9  given primary responsibility for.

10          Your Honor, Chapter 11 is about giving a debtor a

11  fresh start, and this court is no -- this case is no exception.

12  This Court is fully capable of evaluating the veracity of the

13  debtor's witnesses; and transferring the case to Judge

14  Jernigan, when the real motivation is because of how she has

15  dealt with the prior case -- which they may not say it, but

16  that's clearly what's happening here -- would be unduly

17  prejudicial to the debtor.

18          We have nothing against Judge Jernigan.  She is a fine

19  jurist.  But in this case I think it's a challenge and there's

20  a reason why we decided to have the case filed here.

21          And then I'll also point to Your Honor the significant

22  adversity between the two estates.  Your Honor mentioned that.

23  Counsel said, well, it happens in all cases.  True.  We've been

24  involved in many, many cases with multi debtors, that they have

25  issues in intercompany claims.  That's a fact of modern

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-22   Filed 12/20/23   Page 266 of 1539   PageID 17504

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    98

 1    corporate life.

 2              But this is different.  The whole -- one of the -- the

 3    most significant asset of Acis are their claims against this

 4    debtor.  How those claims are prosecuted and when they succeed,

 5    may make or break the Acis case as to whether unsecured

 6    creditors get paid or not.

 7              In a case like this, this factor does not support a

 8    transfer of venue; we argue that it supports keeping the case

 9    before Your Honor so that it can maintain the separateness of

10    the estates.

11              In conclusion, Your Honor, we don't believe the

12    committee has come close to satisfying its burden that a change

13    of venue is appropriate under 1412.  And as I mentioned at the

14    beginning of my presentation, the committee's motive in

15    bringing the motion and Acis' motive in joining the motion is

16    clear.  Even though the debtor has installed a CRO with

17    expanded powers, with impeccable credentials to address

18    creditor concerns, the committee and Acis are focused on the

19    appointment of a Chapter 11 trustee and believe the transfer of

20    the case to Texas is the most likely to get that goal

21    accomplished.

22              But rather than filing the case -- or filing a trustee

23    motion here, they took their shot on a venue motion and hope

24    that Your Honor will give them a shot to do it in Texas.

25              Your Honor, for those reasons, we respectfully request

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-22   Filed 02/20/26   Page 267 of 1539   PageID 17505
Exhibit 22   Page 126 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    99

 1  that Your Honor deny the motion.

 2          THE COURT:  Thank you.

 3          MR. POMERANTZ:  Does Your Honor have any more

 4  questions?

 5          THE COURT:  No.

 6          MR. POMERANTZ:  Thank you, Your Honor.

 7          THE COURT:  Reply?

 8          MR. CLEMENTE:  Briefly, Your Honor.  I will be brief.

 9  It will be a little less organized, because I'll just run

10  through some points very quickly.

11          THE COURT:  Okay.

12          MR. CLEMENTE:  First of all, on Restaurant

13  Acquisitions, I believe in that opinion, Your Honor, there were

14  creditors that supported venue in Delaware.  We do not have a

15  single creditor on the record supporting Delaware -- excuse

16  me -- supporting venue in Delaware.

17          Regarding the litigation in New York and Delaware,

18  that's a red herring, Your Honor.  They're forced creditors.

19  They were forced to bring lawsuits to achieve their view of

20  justice.  It's not relevant to whether -- the location of

21  that -- those lawsuits being in Delaware and New York.  They

22  were forced to bring those lawsuits in order to get paid by Mr.

23  Dondero and the debtor.

24          Your Honor, we didn't call witnesses this morning,

25  because we believe -- as I mentioned in my argument -- that the

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-22   Filed 12/20/23   Page 268 of 1539   PageID 17506

HIGHLAND CAPITAL MANAGEMENT, L.P.                    100

 1    uncontroverted facts support our venue-transfer motion.  The

 2    other motions are their burden, Your Honor.  And so I wanted to

 3    remind Your Honor of that.

 4             Regarding Young Conaway, obviously, we shouldn't -- it

 5    shouldn't be held against us that we decided that the smart and

 6    prudent thing to do is to have able Co-Counsel advise us as we

 7    proceed in front of Your Honor.  So I believe that that's

 8    something that simply is of no moment.

 9             The location of the assets, Your Honor, these are

10    financial instruments.  They're interests in limited

11    partnerships.  They're documents.  They're things that are

12    created by documents.  And again, it's not controverted.

13    That's all located in Dallas, Your Honor.

14             So this idea of far-flung assets throughout the

15    country just simply isn't true.  These are documents.  They're

16    interests.  They're things that exist on paper.

17             Your Honor, we have not made this about the mom-and-

18    pop creditors.  We take Your Honor's comments to heart on that.

19    As Counsel for Acis suggested, this is about the large body of

20    unsecured creditors that are sitting at the bottom of this cap

21    structure with oversecured creditors on top of it.  And this

22    large body of unsecured creditors has said we believe that

23    venue is appropriate in Dallas.

24             Regarding the rules of evidence, of course Judge

25    Jernigan is not going to ignore the rules of evidence.  But

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-22   Filed 12/08/23   Page 269 of 1539   PageID 17507
Exhibit 22   Page 202 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    101

 1  we're talking about judicial efficiency.

 2          For example, when I need to look at an indenture, I

 3  know in article 2 it's going to have payment terms.  That's the

 4  type of thing that we're talking about, Your Honor; not that

 5  she's going to pre-judge or ignore the rules of evidence as she

 6  makes her determinations.

 7          Finally, Your Honor, two things that I would -- that I

 8  would like to say.  The testimony you may hear this afternoon,

 9  obviously that should not factor into what you're up the

10  learning curve today, right now, in terms of considering the

11  venue motion.  That would put the cart before the horse, I

12  think.

13          And, Your Honor, I'd be remiss if I didn't talk about

14  this ordinary-course motion that we keep hearing about.  If

15  they didn't need it, they shouldn't have filed it.  But

16  instead, what they're trying to do is create some type of

17  transparency and legitimacy around transactions that I think

18  we'll make clear, are not in the ordinary course.

19          And the final point that I would make there, Your

20  Honor; it's interesting Mr. Pomerantz referred to the multi-

21  strategy transaction.  That one is -- Your Honor, I will

22  call -- a doozy.  And you will hear more about it this

23  afternoon, to the extent Your Honor decides not (sic) to keep

24  venue.

25          With that, unless you have questions for me, I'll sit

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-22   Filed 02/20/24   Page 270 of 1539   PageID 17508
Exhibit 22   Page 270 of 539

HIGHLAND CAPITAL MANAGEMENT, L.P.                    102

 1  down.

 2          THE COURT:  No questions.

 3          MR. CLEMENTE:  Thank you.

 4          THE COURT:  Thank you.

 5          MS. PATEL:  Your Honor, I'll be brief, and I won't

 6  repeat anything that Mr. Clemente, on behalf of the committee,

 7  said.  But I did want to just address kind of the first point

 8  Mr. Pomerantz made with respect to Judge Hale, and he's not

 9  aware of any formal statement that Judge Hale is not taking

10  cases.  Your Honor, that's accurate.  I'm not aware of any

11  formal statement that Judge Hale is not taking cases either.

12          So to answer Your Honor's question, in terms of random

13  assignment, in the Northern District of Texas, where I have

14  practiced my entire career, and primarily practice before the

15  courts that are there -- and I'm a former law clerk to Judge

16  Hale also -- I will say that although there may be a random

17  assignment, it is not -- absolutely not unheard of that when

18  you've got the matter -- for example, if a case were assigned

19  to Judge Hale, but Judge Houser were to hear first-day matters

20  and other significant matters, that Judge Hale would then

21  transfer that case for judicial efficiency and economy within

22  the district, to Judge Houser for further proceedings.

23          In other words, the Northern District of Texas always

24  finds the easiest way in which to handle matters.  And I am

25  confident, Your Honor, that if this matter were transferred to

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 18-22   Filed 02/05/24   Page 271 of 1539   PageID 17509
Exhibit 22    Page 20526 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    103

1    the Northern District of Texas, that despite whoever it would

2    be assigned to, that everyone is well aware of the time that

3    Judge Jernigan has spent becoming familiar with Highland, these

4    issues, and the amount of court resources that have been

5    expended, such that this case would be transferred to Judge

6    Jernigan.

7         But perhaps that's just a question for Judge Jernigan

8    and her courtroom staff or the Northern District of Texas and

9    the courtroom -- I'm sorry -- the court clerk or the staff

10   that's there.

11        Your Honor, one last very quick point.  The comment

12   was made that -- with respect to CLOs that Highland hasn't had

13   a new CLO since 2009.  That, Your Honor, is because every new

14   CLO that was issued from 2009 going forward to 2017, every one

15   of those was issued in Acis.  Acis was the structured-credit

16   arm of Highland.  It is how it issued new CLOs.

17        Indeed, it issued seven CLOs under Acis, with over two

18   billion dollars in assets under management.  The fact that

19   there have been no new CLOs since then, simply means that they

20   haven't been able to get one off the ground.

21        But make no mistake, Your Honor, the CLO business is

22   valuable enough that it is now the subject of significant

23   litigation because of all of the attempts to transfer those CLO

24   assets away.  So in terms of the court's familiarity, I would

25   submit, again, that the bankruptcy court is clearly more

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-22   Filed 12/06/23   Page 272 of 1539   PageID 17510
Exhibit 22   Page 206 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    104

 1  familiar with a significant piece of Highland's business.

 2          One last thing, Your Honor, and somewhat similar to

 3  that, that Judge Jernigan was not familiar with the Korean

 4  entities, the Singapore entities, or the multi-strat.  I submit

 5  to Your Honor that this Court hasn't been exposed to those

 6  things as well, other than conclusory statements that well,

 7  we've got some Korean assets; oh, we've got some Singapore

 8  assets; and we've got multi-strat; and other than Mr.

 9  Waterhouse's, like, five-minute testimony at the first-day

10  hearing where I was questioning him with respect to the assets

11  which he didn't really quite know about what's inside a

12  multi-strat.

13          Other than that, this Court hasn't been exposed either

14  to those assets, so when we're looking at the broad playing

15  field rather than looking at specific assets, there is a

16  learning curve.  Judge Jernigan is further along it with

17  respect to certain things.  Otherwise both courts are similarly

18  situated or neutral to each other.  But it's those assets that

19  she is familiar with, the business model of Highland, and that

20  further along the learning curve that she is, that's what's

21  significant here, Your Honor.

22          And that will play into, clearly, what will ultimately

23  be how Highland is going to restructure.  Again, the creditors

24  here have voted with their feet in filing this transfer motion.

25  And these are the very same creditors, Your Honor, that will be

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-22 Filed 12/20/23   Page 273 of 1539   PageID 17511
Exhibit 22   Page 273 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.                    105

 1    necessary in order for this -- if it's going to be a successful

 2    restructure, they're the ones that are necessary to make it a

 3    successful restructure.  Thank you.

 4              THE COURT:  You're welcome.

 5              All right, let's break for lunch until 1:45.  And when

 6    I come back at 1:45 -- when we come back at 1:45, I am going to

 7    issue an oral decision on this motion.  All right.

 8         (Recess at 12:39 p.m. until 1:47 p.m.)

 9              THE CLERK:  All rise.

10              THE COURT:  Please be seated.

11              Okay, good afternoon.  Thank you for coming back.  I'm

12    now prepared to rule on the motion to transfer venue, which I'm

13    going to grant.

14              So I think, as I hinted at during argument, that the

15    case law that we're kind of clinging to on motions to transfer

16    venue, really do not reflect the modern reality of Chapter 11

17    practice in the U.S. and internationally.  And I think a lot of

18    the parts of the test really don't reflect what's going on

19    generally in Chapter 11 cases.

20              The thing I take greatest umbrage -- no, "umbrage"

21    isn't the right word -- but disagree with the most is the idea

22    that there's somehow a strong presumption of the debtor's

23    choice of forum.

24              Look, every debtor that files bankruptcy -- certainly

25    every sophisticated Chapter 11 debtor that files bankruptcy --

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-22   Filed 12/08/23   Page 274 of 1539   PageID 17512
Exhibit 22   Page 206 of 339

HIGHLAND CAPITAL MANAGEMENT, L.P.                    106

 1  is engaged in forum-shopping.  There is an element to that.

 2  Where you file will depend on a lot of things that are unique

 3  to the forum.

 4        I don't think you need to be ashamed of that.  I don't

 5  think that's bad.  As long as the venue you're choosing is

 6  appropriate under the law, certainly you're going to make

 7  decisions based on what the law is in that particular district,

 8  perhaps even a preference to individual judges or judge in that

 9  district.

10        To compound that with a strong presumption in favor of

11  the debtor is to really give a boost to the debtor's choice of

12  forum, which is made -- included in the decision-making process

13  is an element of forum-shopping, to a level that makes it very

14  difficult to overcome that presumption.

15        Of course, the creditors that file a motion to

16  transfer venue are engaged in forum-shopping themselves.

17  Otherwise, why would they be switching forums and going for a

18  different location.  Again, I don't think that the word "forum-

19  shopping" should have the negative connotation that it has come

20  to have in the law.  It is the reality of bankruptcy practice.

21        Now, if that's involved -- if that goes a step further

22  and somehow involves chicanery or something inappropriate just

23  from an ethical standpoint, of course that's problematic.  But

24  there's absolutely no indication here whatsoever that anyone,

25  on behalf of the debtor or the creditors or the Dallas court or

 1    the Delaware court, is doing anything other than acting

 2    appropriately.

 3           The question about a motion to transfer venue is

 4    whether the motion should be granted by a preponderance of the

 5    evidence.  If you add a strong presumption, you're turning it

 6    into a harder motion to be granted; and I don't think that's

 7    appropriate.

 8           However, I find the laundry list of factors that are

 9    generally discussed to be irrelevant or almost irrelevant to

10    the actual issues that are going on, particularly in a case

11    like this.  And I'll get to that in a second.

12           So six of the debtors are located in Texas; UBS is

13    located in New York.  UBS is located everywhere.  Wells Fargo

14    is located everywhere.  Certainly companies have executive

15    suites.  But whether or not that should be the decision about

16    where a case should file, to me, isn't particularly clear.  It

17    depends on the facts of the case.

18           I think a more general approach that would involve

19    looking at the facts and circumstances of a case and seeing

20    whether it points to a specific jurisdiction might be a more

21    helpful way of proceeding.  And that's what this case is really

22    about.

23           This is a unique case, I think.  It is a different

24    case than those that we usually run into.  And although maybe

25    not completely different from every case, but in any event,

Case 19-34054-sgj11  Doc 3596-22  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 68-22  Filed 12/11/23  Page 276 of 1539  PageID 17514
Exhibit 22  Page 276 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.                    108

 1  this case is very focused on responding to existing litigation.

 2  And that existing litigation of a former affiliate, as of a few

 3  months ago, and a pending appeal that could make it a current

 4  affiliate, is located in the Northern District of Texas.

 5          The judge in the Northern District of Texas has done a

 6  tremendous amount of work and has done -- issued a number of

 7  opinions, had a number of trials.  That work creates a

 8  familiarity with the facts, issues, and players in a case

 9  which, while it may not affect the actual decision based on

10  evidence on a motion-by-motion basis, certainly could color a

11  judge's approach to a case.

12          Judges are human.  Judges make judgments over time as

13  to the parties, as to the lawyers.  That's not inappropriate,

14  as long as you stick by the rules of evidence.  But it

15  certainly can color what credibility you might give to a

16  witness or to counsel.

17          I think here we have a situation where the real

18  gravitas of this case is in Dallas.  The two facts that really

19  come out to me are, in this case, the fact that the executive

20  suite is very focused and very Dallas-oriented.  It's a global

21  empire, but it's clearly focused in Dallas.  And the existing

22  litigation in the Acis bankruptcy that's been going on for some

23  time; those are the two predominant factors.

24          Everything else kind of falls away.  The creditors are

25  scattered.  The assets are scattered.  The economic

1  administration isn't being affected one way or the other.  I

2  mean, people can get on planes and you can go to Philly or you

3  can go to Dallas.  Either way, you're stuck on American

4  Airlines.  But so be it.

5          It can be done.  And as a result, I think that the

6  best solution here, to give the debtors a fair shot at

7  reorganization, but to balance the creditors' rights and the

8  creditors' desires, is to move the case to Texas.

9          And on that latter point, just to finish up.  As I

10 said with my previous decision in EFH, it was striking in that

11 case that only one creditor moved to transfer venue and that

12 none of the other creditors either actively opposed or simply

13 stayed silent with regard to that motion, including significant

14 creditors, like the official committee.

15         In this case, we have the opposite.  We have the

16 debtor defending its venue choice, of course.  But there's a

17 lot of silence, because there's no one else on that side.  I

18 thought it highly significant that Jefferies and -- is it

19 Fortress?

20         UNIDENTIFIED SPEAKER:  Frontier.

21         THE COURT:  Frontier, thank you.  That Jefferies and

22 Frontier did not take a position.  And no other creditors

23 opposed the committee's motion.  And the committee consists of

24 a series of very large creditors.

25         So I think that given these facts and circumstances,

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-22   Filed 09/29/23   Page 278 of 1539   PageID 17516
Exhibit 22   Page 279 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.                110

 1  particularly the unique nature of the ongoing litigation and

 2  the existing tie to Dallas, the executive suite and management,

 3  principal place of business, if you will, being focused in

 4  Dallas, and creditors -- as Counsel said -- voting with their

 5  feet to move the case to Dallas, and applying just a good old

 6  fashioned preponderance of the evidence standard, that the

 7  Court should grant the motion, which I will do.

 8          Now, I need an order.  And we will get the machinery

 9  in place, as soon as I get the order signed, to transfer the

10  file as quickly as possible.

11          I did call Judge Jernigan prior -- right before I came

12  out -- well, right before I went and got lunch and then came

13  out -- to inform her what I was going to do, so the Dallas

14  court is aware that this is -- that this is an issue that's

15  coming their way.

16          Is there anything -- I'm not going to create a lot of

17  law of the case for Judge Jernigan on matters that don't need

18  to be decided today.  Is there anything the parties actually

19  agree on that needs to go forward today or can go forward

20  today?  If not, I'd rather just save everything for Judge

21  Jernigan to have a fresh look at.  I know that she did mention

22  that she has availability on her calendar over the next several

23  weeks.  So you should be able to get on it rather quickly, once

24  the case gets transferred.

25          We used to send big boxes in the mail to do this, but

 1  now it's just hitting a couple buttons on a computer to take

 2  care of that.

 3            So is there anything we could -- we need to decide?

 4            Okay.  Just a question.  Obviously there are estate

 5  professionals -- Pachulski not really a problem, since you'll

 6  stay in the case, but I'm thinking of Young Conaway -- and I

 7  don't know if there are any other firms that are Delaware firms

 8  that might fall out of the case that would be subject to the

 9  Court.  But I'll leave that for Judge Jernigan to decide

10  whether to retain them for a limited period of time or to pay

11  them or not pay them.  Hopefully, of course, they've earned

12  their money; they should be paid.

13            Yes, sir.

14            MR. KHARASCH:  Your Honor, Ira Kharasch of Pachulski.

15  I think Your Honor, there is one vital matter that you should

16  hear today and rule on.  I would think it would be generally an

17  easy motion.  It is the application to employ the CRO.  That is

18  within the debtor's business judgment, given -- as we described

19  the reasons for that, considering the concerns raised by

20  creditors.

21            I think it's critical that the CRO be formally

22  engaged.  They've done a tremendous amount of work in the past

23  six weeks.  They've been at the company full time, for a team,

24  for a month.  They have done a lot of good stuff in this case.

25  They have a lot more things to do.

APPX. 102909

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-22   Filed 12/19/23   Page 280 of 1539   PageID 17518
Exhibit 22   Page 279 of 1339

HIGHLAND CAPITAL MANAGEMENT, L.P.                    112

 1          The CRO has been tasked under the modified -- under

 2     the protocols, with broadened authority to take all kinds of

 3     and accept all kinds of decision-making over key decisions of

 4     this case, involving insider transactions, ordinary-course

 5     transactions.  We've done a lot of work modifying the protocols

 6     that relate to that.

 7          This company is operating every day.  I think the CRO

 8     and his team deserve some comfort that they should get employed

 9     as of today, Your Honor.  I -- you know --

10          THE COURT:  Let me hear from the committee.

11          MR. CLEMENTE:  Thank you, Your Honor.  Matthew

12     Clemente on behalf of the committee.

13          Your Honor, we don't agree with that.  Again, it's not

14     about DSI being paid or not being paid.  As Your Honor

15     mentioned with Young Conaway, that isn't the issue.  But to the

16     extent Your Honor has any familiarity with the motions, they're

17     all intertwined.  The CRO is all part of the protocols that

18     they're advancing in the ordinary-course motion.

19          So this isn't about simply retaining a professional to

20     ensure that that professional gets paid.  It really is about

21     setting what I like to call concrete pillars in the ground in

22     terms of how the debtor views the case should be managed going

23     forward.  And I think based on Your Honor's ruling, that's

24     something that Judge Jernigan should be given the opportunity

25     to weigh in on.

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-22   Filed 02/29/26   Page 281 of 1539   PageID 17519
Exhibit 22   Page 1526 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.                          113

 1           So again, it's not about Mr. Sharp and his firm

 2    getting paid.  I don't believe that that is the issue.  They

 3    can continue doing what they've been doing, up to this point,

 4    just like we have, for example, at Sidley, and the rest of the

 5    professionals that haven't been retained.  And I don't see why

 6    that should cause a problem.

 7           But we do believe that that is integrated with the

 8    other suite of motions that would be before Your Honor; and we

 9    think it's appropriate for Judge Jernigan to make those

10    decisions.

11           THE COURT:  All right.  Well, I don't view a retention

12    application to be an emergent basis to hear a motion anyway.

13    But I'm certainly not going to agree to sign it over objection

14    of the committee, given how I just ruled.  So --

15           MR. CLEMENTE:  Thank you, Your Honor.

16           THE COURT:  -- I'd also say.  So I'd ask the committee

17    Counsel to circulate a form of order and submit it under

18    certification of counsel.  I think the simpler the better; just

19    for the reasons set forth on the record, and it's transferred.

20    Don't put a lot of findings in there.  That'll just cause

21    trouble.  That's my belief.  But you can negotiate what you

22    want to negotiate, and as soon as that's ready, upload it,

23    inform chambers, we'll get it signed, and we'll start the

24    machinery in place.

25           MR. CLEMENTE:  Great.  Thank you very much, Your

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-22   Filed 12/06/23   Page 282 of 1539   PageID 17520

HIGHLAND CAPITAL MANAGEMENT, L.P.                    114

1  Honor.  We appreciate it.

2            THE COURT:  All right.  We're adjourned.

3        (Whereupon these proceedings were concluded at 2:02 PM)

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-22   Filed 09/29/26   Page 283 of 1539   PageID 17521
Exhibit 22   Page 297 of 379

115

```
 1                        I N D E X

 2   WITNESS                  EXAMINATION BY          PAGE

 3   Bradley Sharp            Ms. Reid                 20

 4   Bradley Sharp            Mr. Shaw                 21

 5   Frank Waterhouse         Mr. Guekre               24

 6   Frank Waterhouse         Mr. Shaw                 32

 7

 8                        E X H I B I T S

 9   DEBTOR'S          DESCRIPTION                    PAGE

10   --          A thru U, except for G               12

11   ACIS'             DESCRIPTION                    PAGE

12   --          Exhibits 1 through 18, with          37

13               the exception of Nos. 3 and

14               9; and Exhibits 24 and 25

15   26          Email exchange between Acis'         40

16               counsel and Hon. Jernigan's

17               courtroom deputy

18

19                        RULINGS

20                                   Page     Line

21   Motion of the Official Committee of    105       13

22   Unsecured Creditors for an Order

23   Transferring Venue of this Case to the

24   United States Bankruptcy Court for the

25   Northern District of Texas, granted.
```

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-22 Filed 12/29/23   Page 284 of 1539   PageID 17522
Exhibit 22   Page 283 of 379

116

1

2                    C E R T I F I C A T I O N

3

4   I, Clara Rubin, certify that the foregoing transcript is a true

5   and accurate record of the proceedings.

6

7

8

9

10                                    December 3, 2019

11   _____        _____

12   CLARA RUBIN                       DATE

13

14   eScribers, LLC

15   352 Seventh Avenue, Suite #604

16   New York, NY 10001

17   (973) 406-2250

18   operations@escribers.net

19

20

21

22

23

24

25

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

# A

**ability (7)**
17:24;18:11;27:2;
40:11;64:6,8;88:25
**able (9)**
46:9;47:9;49:15;
53:15;79:13;83:3;
100:6;103:20;
110:23
**above (1)**
48:1
**absolute (1)**
43:10
**absolutely (3)**
89:21;102:17;
106:24
**accelerated (1)**
96:22
**accept (1)**
112:3
**acceptable (1)**
11:8
**access (1)**
14:7
**accessing (1)**
14:5
**accomplished (1)**
98:21
**accomplishing (1)**
18:7
**Accordingly (1)**
80:20
**account (3)**
15:19,22,23
**accountant (1)**
24:12
**accounting (3)**
28:6,7;67:7
**accounts (3)**
65:5,21,22
**accurate (1)**
102:10
**achieve (2)**
45:11;99:19
**Acis (106)**
6:15;8:8,18;16:6,
22,23;17:7,10,12,14,
18,21,22;18:2;21:5;
22:12,19,21;34:10,
13;35:8;36:11;37:9;
38:20;43:1,21;44:1,
11,16,17;45:5,7,13;
48:4;49:21,25;50:9;
53:16,19;54:14,23;
57:15,23;58:16;
59:13;60:3,14;61:4,
21;62:23;63:1,2,3;
64:13;65:25;66:2,
21;67:13,23;68:14,
25;69:6;72:17,23;
74:10;75:1;77:1,14,

20,23;78:7,15,20;
79:19;81:23;82:13,
14;83:1,1,23;85:9;
90:4;91:14,16,16,18,
19;92:4,5,8;93:1,10,
12,24;95:9,12,19;
96:25;98:3,5,18;
100:19;103:15,15,
17;108:22
**Acis' (17)**
16:8;17:21;37:20;
40:21,22;47:8;
60:12;63:7;65:23;
73:25;74:2;75:25;
76:16;77:1;82:11;
93:20;98:15
**acknowledges (2)**
80:20;85:4
**Acquisition (3)**
81:4;83:19;89:16
**Acquisitions (1)**
99:13
**across (1)**
67:12
**acting (1)**
107:1
**actions (1)**
83:25
**active (4)**
16:24;82:22;
85:18;92:14
**actively (1)**
109:12
**actors (1)**
50:12
**actual (4)**
60:13;77:15;
107:10;108:9
**Actually (10)**
27:20;40:17;42:1;
56:22;62:25;68:21;
90:16,22;94:17;
110:18
**ad (1)**
61:23
**add (1)**
107:5
**additional (2)**
37:12;60:16
**Additionally (3)**
52:22;55:3;58:9
**address (8)**
29:12;38:11;
72:15;75:24;83:18;
97:5;98:17;102:7
**addresses (2)**
82:19,25
**adequately (1)**
65:10
**adjourned (1)**
114:2
**adjudication (2)**
69:3;72:19

administered (6)
48:5,13;64:19;
70:13,18;78:19
administration (2)
87:6;109:1
administrative (1)
83:22
admissible (3)
38:13;40:2,3
admission (1)
37:15
admit (2)
40:6;91:20
admitted (5)
12:16,17;37:18;
59:16,18
advanced (1)
95:6
advancing (1)
112:18
advantage (5)
54:4;55:4,5;81:17;
95:14
adverse (3)
56:6,7;74:9
adversity (1)
97:22
advise (1)
100:6
advises (2)
16:24;50:8
advisor (2)
13:4;93:2
Advisors (5)
14:12;15:5;25:5,
17;80:8
advisory (12)
13:1;15:1;16:3;
67:1;86:11;91:18;
92:8,14,20;93:17,19;
94:4
affairs (1)
14:2
affect (1)
108:9
affected (1)
109:1
affiliate (7)
44:17;45:5,7,13;
80:11;108:2,4
affiliated (7)
15:4,5;16:16;
43:23;44:22;48:14;
51:24
affiliates (15)
15:7;22:17,20;
24:24;34:18;35:14;
45:21;46:3;47:24;
48:8,20;51:23;53:2;
80:12;94:3
affirmation (1)
19:9
affirmatively (2)

43:3;55:12
affirmed (2)
19:12;23:22
afforded (1)
56:16
afternoon (5)
51:24;75:21;
101:8,23;105:11
again (52)
17:4;27:3,3,4,5,19;
35:6,18,18;41:12;
43:23;44:18;45:6,7;
48:8,22;49:14,22;
53:3;54:13,22,24;
55:20,24;57:15,16;
63:10,15;65:16;
66:17,21;67:9,25;
68:3;69:1,11;70:13;
71:3;74:7;75:21;
79:25;86:20;87:10;
89:3;93:25;94:23;
100:12;103:25;
104:23;106:18;
112:13;113:1
against (13)
17:11,12,18,21;
56:8;78:16,20;83:7,
14;88:24;97:18;
98:3;100:5
agenda (2)
10:15,16
ago (5)
24:21,23;43:21;
96:20;108:3
agree (4)
90:25;110:19;
112:13;113:13
agreement (6)
54:17;66:23,23,
24;79:13;94:17
agreements (22)
16:7,10,15,15;
34:13,16,17;35:8,9,
12,15,16,22;66:22;
93:12,18,19,23,24;
94:5,14,19
agrees (1)
51:22
ahead (1)
75:20
air (2)
88:7,8
Aires (1)
15:9
Airlines (1)
109:4
al (3)
6:15;8:8,18
albeit (1)
50:4
allegations (1)
18:22
allow (3)

43:3;55:12
**affirmed (2)**
19:12;23:22
**32:7;33:19;40:20
almost (3)**
51:20;56:2;107:9
**alone (1)**
39:20
**along (8)**
10:24;61:7;65:20;
66:14;67:22;68:1;
104:16,20
**although (11)**
15:6;17:23;43:7;
44:3;48:9;50:14;
52:7;96:19;97:2;
102:16;107:24
**Alvarez (2)**
7:3;8:3
**always (2)**
48:14;102:23
**America (3)**
14:23;15:11;86:15
**American (2)**
93:5;109:3
**amount (8)**
43:11;76:22;82:5;
84:23;96:21;103:4;
108:6;111:22
**amounts (1)**
43:10
**amply (1)**
41:20
**analysis (5)**
76:13;77:8;79:25;
82:6;94:5
**analyze (2)**
82:6;84:19
**analyzing (1)**
17:25
**ANDERSON (1)**
8:2
**ANDREW (1)**
7:17
**Angeles (1)**
13:11
**answered (1)**
27:20
**anymore (1)**
88:8
**apologize (2)**
36:18;75:10
**appeal (8)**
44:11,21;45:12;
53:18;72:16;73:4;
76:9;108:3
**appeals (6)**
17:16,19;57:4;
72:23;73:5;76:8
**appear (1)**
84:6
**appearance (4)**
41:23;82:24;
88:16,17
**appearing (1)**
73:20

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22    Filed 12/22/23    Page 286 of 1539    PageID 17524
Exhibit 22 Page 22 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

apples (1)
93:25
applicable (1)
52:5
application (2)
111:17;113:12
applications (1)
68:20
applied (1)
87:24
apply (1)
48:1
applying (2)
84:5;110:5
appoint (3)
15:13;78:1;96:13
appointed (3)
13:5;77:24;78:25
appointment (3)
66:3,4;98:19
appreciate (2)
19:23;114:1
appreciates (1)
82:21
approach (5)
11:21;36:24;
37:23;107:18;
108:11
appropriate (15)
11:2;16:18;44:2;
59:3;81:14;82:4;
87:4;94:2;95:15;
97:5;98:13;100:23;
106:6;107:7;113:9
appropriately (2)
78:21;107:2
appropriateness (1)
16:14
approval (2)
18:18;95:11
approve (2)
26:14;95:10
approximately (6)
15:3,21,25;24:23;
67:19;92:11
apt (2)
84:12;96:13
arbitration (6)
83:9;91:25;94:14,
16,20,21
areas (1)
87:15
argue (6)
45:8;52:13;84:3;
87:10,12;98:8
argues (1)
88:13
arguing (2)
45:12;93:10
argument (21)
11:8;38:4;39:9;
41:4,15;76:19;77:5;
80:1;87:20,22;88:7,

20;89:2,25;90:12,16;
91:13;93:21;96:14;
99:25;105:14
arguments (9)
42:8,18;46:6,14;
51:6;55:5;87:9;
90:12,13
arm (2)
92:8;103:16
around (10)
15:1;16:8;32:1,1;
58:3;67:20;85:14;
86:20;91:2;101:17
arrangement (1)
94:3
ARSHT (1)
7:22
article (1)
101:3
ashamed (1)
106:4
ASHBY (1)
6:9
Asia (1)
14:22
Asic's (1)
41:16
aside (1)
90:12
ASIF (1)
7:15
aspect (5)
16:2;31:22;66:9;
72:6,8
aspects (6)
40:7;72:5,11;
78:24;95:3,8
assert (1)
17:10
asserted (2)
39:23;94:23
asserting (1)
54:2
asset (2)
17:6;98:3
assets (40)
14:19,20,21,25;
15:3,16,19;16:22;
17:1;18:10,12;
35:13;70:1;77:3;
78:4;84:23;86:2,6,9,
10,14,16,19,21;87:2;
92:4,22;93:1,7;
100:9,14;103:18,24;
104:7,8,10,14,15,18;
108:25
assigned (9)
45:23;46:5,19,21;
47:10;72:15;73:4;
102:18;103:2
assignment (4)
46:4;47:13;
102:13,17

association (1)
28:2
Asst (1)
9:3
assume (2)
27:3;48:17
assumed (1)
48:1
assumes (2)
59:4;90:16
assuming (1)
46:17
assumption (2)
45:22;46:13
attached (2)
91:24;94:12
attachments (1)
44:9
ATTARWALA (1)
7:15
attempt (1)
45:5
attempted (1)
41:23
attempts (1)
103:23
attorney (1)
27:7
Attorneys (12)
6:3,10,15,21;7:3,8,
14,23;8:3,8,13,18
atypical (1)
42:12
August (3)
16:8,21;74:4
Austin (2)
10:21;41:13
authentic (1)
38:24
authority (2)
84:17;112:2
availability (3)
38:22;39:21;
110:22
available (1)
18:6
avoidance (1)
89:7
avoided (1)
79:25
aware (17)
21:23;22:6;32:20;
33:11;34:10,11,21;
35:8,15;39:19;40:3;
46:16;76:1;102:9,
10;103:2;110:14
away (8)
46:7;48:17;52:14;
55:18;77:12;92:4;
103:24;108:24
awkward (1)
24:5

association (1)
28:2

| | B |
|---|---|

back (14)
26:11;37:2;49:11;
55:24;56:7;57:12;
62:14;63:16;70:13;
71:21;74:22;105:6,6,
11
background (1)
25:12
back-office (2)
67:5;92:20
backward- (1)
50:15
bad (1)
106:5
badly (1)
56:4
baggage (1)
79:18
balance (3)
18:12;93:7;109:7
balance-sheet (1)
93:1
balls (1)
74:11
Bancorp (1)
13:9
Bank (4)
7:14;15:25;43:15;
82:10
bankruptcy (63)
11:3;16:8;17:17,
20;18:3;21:9,14;
22:10;26:22;27:5,7;
32:4,21;40:13;
41:18;42:14;43:22;
44:1,20,23;47:10;
49:2,6,17,20,20;
52:4;53:20;55:1;
57:16;58:13,15,21;
59:3;60:10,23;61:4;
64:7,17,18;65:24;
68:9;69:2,24;72:4,9,
14,17,21;73:4,5,19;
74:10;76:10;82:23;
84:16;88:2;90:4;
103:25;105:24,25;
106:20;108:22
base (3)
90:22;91:8,9
Based (13)
11:4;15:6,25;
21:25;39:5;54:13;
55:8;73:25;83:13;
94:9;106:7;108:9;
112:23
basically (2)
92:5;93:2
basis (4)
63:14;92:22;
108:10;113:12

BEACH (2)
6:4;10:25
bear (1)
86:22
bears (3)
61:12;62:17;81:5
become (3)
44:17;53:4;54:18
becomes (1)
65:11
becoming (2)
56:3;103:3
beg (1)
42:14
begin (2)
31:15;41:14
beginning (2)
77:19;98:14
behalf (12)
10:7;11:15;19:20;
21:5;23:19;41:13;
45:4;60:3;75:22;
102:6;106:25;
112:12
behind (4)
46:14;87:25;
90:10;95:7
belie (1)
83:25
belief (1)
113:21
believes (5)
16:9,21;18:9;53:7;
59:1
below (1)
27:22
beneficial (1)
68:19
benefit (2)
18:5;69:20
BENTLEY (1)
8:14
Bermuda (1)
15:15
best (4)
55:15;65:7;87:1;
109:6
better (3)
95:13;96:3;113:18
Beverly (1)
13:8
Beyond (4)
21:15,21;27:12;
31:12;32:23;47:2
bias (1)
73:21
biased (2)
73:18;74:8
BIBILONI (1)
6:17
big (9)
60:6,6;65:14;
69:21,22;86:3;

APPX. 102913

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 68-22   Filed 12/12/23   Page 287 of 1539   PageID 17525
Exhibit 22   Page 286 of 189

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

93:10;96:7;110:25
**billion (5)**
    14:25;15:3;35:13;
    69:17;103:18
**binder (4)**
    11:21;59:14,21;
    60:8
**binders (1)**
    60:6
**bit (6)**
    37:1;60:24;63:18,
    21;68:20;77:7
**BJORK (1)**
    7:16
**blame (1)**
    57:10
**BLANK (2)**
    6:14;59:13
**BLOCK (1)**
    7:7
**body (3)**
    83:22;100:19,22
**boil (1)**
    64:17
**boils (1)**
    64:4
**bonuses (1)**
    95:10
**bookkeeping (1)**
    67:7
**books (1)**
    14:6
**boost (1)**
    106:11
**borrow (1)**
    65:24
**boss (1)**
    26:17
**both (8)**
    16:16;47:23;56:4;
    57:2;61:25;64:5;
    65:9;104:17
**bottom (1)**
    100:20
**bound (1)**
    36:20
**BOWDEN (3)**
    6:11;75:18,19
**box (5)**
    53:3;54:14;57:23;
    65:25;66:21
**boxes (1)**
    110:25
**Brad (3)**
    10:12;78:25;84:7
**BRADLEY (3)**
    9:7;19:15;27:10
**B-R-A-D-L-E-Y (1)**
    19:15
**brain (1)**
    67:1
**break (3)**
    59:14;98:5;105:5

**breathed (2)**
    61:4;63:11
**breathing (2)**
    61:8;86:25
**brethren (2)**
    87:21;91:2
**BRIAN (2)**
    8:9;21:4
**brief (5)**
    52:10;61:2;88:9;
    99:8;102:5
**briefly (7)**
    23:14;32:17;
    39:17;53:25;57:12;
    60:7;99:8
**bring (5)**
    67:17;80:11;
    86:21;99:19,22
**bringing (1)**
    98:15
**broad (2)**
    84:17;104:14
**broadened (1)**
    112:2
**brokerage (2)**
    15:18;65:5
**brought (1)**
    17:17
**Buenos (1)**
    15:9
**bulk (2)**
    15:19;84:15
**burden (9)**
    41:20;61:21;
    62:16,17,18;77:16;
    81:5;98:12;100:2
**burden-of-proof (1)**
    61:19
**burdensome (1)**
    88:22
**business (39)**
    14:2;19;16:3,22;
    17:3;22:15,22;50:2,
    3,6,9;64:22;65:3,6,8,
    12,13;67:8,11;72:5,
    6,8,11;78:4;79:7;
    81:21;89:8;91:1;
    92:3,7,11,24;94:23;
    95:3;103:21;104:1,
    19;110:3;111:18
**businesses (3)**
    86:8;89:5;94:10
**buttons (1)**
    111:1
**buy (2)**
    56:12;90:11

**C**

**Caesar's (1)**
    88:4
**calendar (1)**
    110:22

**California (1)**
    32:1
**call (12)**
    21:24;23:13;
    33:12;39:4;53:14;
    62:12;71:23;85:11;
    99:24;101:22;
    110:11;112:21
**called (9)**
    11:25;12:23;
    21:22;23:5;32:25;
    44:14;74:11;85:5,8
**came (3)**
    69:8;110:11,12
**can (31)**
    11:20;26:4;27:7;
    35:3,5,18,21;38:19;
    39:10;40:3;41:18;
    43:23;46:11;49:23;
    52:12;61:2;70:7;
    77:16;80:3;85:3;
    89:13;97:3;98:9;
    108:15;109:2,2,3,5;
    110:19;113:3,21
**cap (1)**
    100:20
**capable (2)**
    40:14;97:12
**capacity (2)**
    43:1;49:16
**Capital (13)**
    6:15;8:8,18;9:4,5;
    10:7;21:5;24:10;
    25:1;29:7;30:23;
    60:3,14
**care (2)**
    71:15;111:2
**career (1)**
    102:14
**carefully (2)**
    40:16;94:15
**Carey (2)**
    13:7,9
**carries (1)**
    41:20
**carry (2)**
    77:16;78:7
**cart (1)**
    101:11
**CARUSO (9)**
    9:9;10:12;13:24;
    18:14;27:15;53:7;
    84:14,21;95:2
**case (149)**
    13:15;16:14;18:4,
    9,15;21:10;22:24;
    33:18,18;39:19;
    40:11,17;41:17;
    42:11;43:7,9,22,23,
    25;44:6;45:13,22;
    46:3,7,15,18,21;
    47:19,24;48:12;
    49:21;50:14;52:8;

    53:11,16;56:17;57:1,
    2;59:1;61:4,13,16;
    62:11;63:4;64:13,14,
    17;68:9;69:2,6;70:3,
    12,14,18;72:1,1,17;
    74:10,20,22,25;76:5,
    10,11,23,24;77:14,
    21;78:8,10,15,20,22;
    79:8,14,15,18;80:4,
    12;81:7,11,20,22;
    82:8,14,24;84:16;
    85:8,12,16,20,23;
    86:10;87:11,18,25;
    88:15;89:16;90:14;
    91:14,15;93:24;
    94:16;95:8,23;96:11,
    15,15,16,17,25;
    97:11,13,15,19,20;
    98:5,7,8,20,22;
    102:18,21;103:5;
    105:15;107:10,16,
    17,19,21,23,24,25;
    108:1,8,11,18,19;
    109:8,11,15;110:5,
    17,24;111:6,8,24;
    112:4,22
**case-in-chief (2)**
    31:14;33:7
**cases (31)**
    13:6;44:22;47:6,
    11,23;48:14;52:7;
    56:9,9;58:9;63:11;
    72:23;76:3;80:4,10;
    82:23;84:11;85:2;
    86:6,7,7,20,22;
    87:22;88:20;91:7;
    97:23,24;102:10,11;
    105:19
**cast (2)**
    57:15;64:11
**catalyst (1)**
    80:19
**cause (2)**
    113:6,20
**Cayman (1)**
    15:15
**center (4)**
    42:5;43:5;51:11;
    58:8
**CEO (1)**
    9:7
**certain (14)**
    15:14;16:7;35:9;
    50:7;54:22;60:5;
    65:5;70:1;78:6,24;
    91:3;92:4;97:8;
    104:17
**certainly (15)**
    39:25;40:10;48:5;
    67:22;69:4,14;
    71:24;72:6;89:10;
    105:24;106:6;
    107:14;108:10,15;

    113:13
**certification (1)**
    113:18
**cetera (1)**
    65:21
**CFO (7)**
    9:5;26:11,13,19;
    29:1;32:20;35:11
**chain (1)**
    89:23
**challenge (1)**
    97:19
**chambers (3)**
    11:18;33:13;
    113:23
**chance (2)**
    33:6;41:1
**chancery (4)**
    71:20;83:8,9;
    88:19
**change (2)**
    48:9;98:12
**changed (1)**
    58:5
**changes (1)**
    58:5
**Chapter (10)**
    17:21;45:13;
    78:22;80:3;86:24;
    97:10;98:19;105:16,
    19,25
**characterized (1)**
    50:7
**charge (3)**
    17:22;18:1;97:2
**chart (1)**
    27:23
**chicanery (1)**
    106:22
**chief (6)**
    12:24;13:3,5,25;
    24:14;78:25
**choice (10)**
    55:19;58:2;62:15,
    19;79:22;81:9,14;
    105:23;106:11;
    109:16
**choose (1)**
    64:6
**choosing (1)**
    106:5
**chose (1)**
    42:15
**Circuit (2)**
    72:24;81:3
**circulate (1)**
    113:17
**circumstance (1)**
    47:11
**circumstances (5)**
    16:19;38:16;79:8;
    107:19;109:25
**cite (1)**

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-22    Filed 12/22/23    Page 288 of 1539    PageID 17526
Exhibit 22    Page 292 of 1739

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

81:2
**cited (1)**
88:6
**citing (1)**
95:25
**citizen (1)**
81:16
**City (4)**
15:20,25;82:10;
83:10
**claim (7)**
43:16;82:12;83:1,
1,12,13;89:11
**claiming (2)**
68:22;92:5
**claims (17)**
17:11,12,17;63:6,
7;78:20;82:25;
84:19;88:24;89:6,7,
10;94:22,22;97:25;
98:3,4
**classes (1)**
17:6
**cleanse (1)**
58:2
**clear (22)**
42:2,6;49:17;50:1;
51:12,15;54:13,18,
25;55:8,11;58:3,23,
25;61:22;66:17,18;
80:2;81:5;98:16;
101:18;107:16
**clearly (15)**
40:6;47:2,18;50:8,
11;52:4,7;54:10;
55:9;70:23;96:11;
97:16;103:25;
104:22;108:21
**CLEMENTE (51)**
10:19,21,21;11:11,
13;12:13,15;23:12;
38:7,11;39:25;
40:24;41:12;45:17,
20,25;46:20;47:2,4,
7,17;48:7,16,18,21;
49:1,8,11;52:16;
56:1,15,18,20,25;
57:5,7,10;59:7;
61:21;65:25;66:16;
75:25;76:14;99:8,
12;102:3,6;112:11,
12;113:15,25
**Clements (1)**
41:13
**CLERK (11)**
10:2;19:10,13,17;
23:21,23;24:2;75:9;
102:15;103:9;105:9
**client (1)**
10:11
**clients (2)**
14:21;48:2
**Clifford (1)**

31:5
**clinging (1)**
105:15
**CLO (21)**
8:13;16:22,23;
17:2;50:6;65:22;
68:11,16,17,23,25;
91:5,7;92:3,3,10,13;
103:13,14,21,23
**CLOs (19)**
16:5,6,11,24,24;
22:21;50:8;57:16,18,
21;65:14,20;92:15;
93:2,18;103:12,16,
17,19
**close (6)**
19:23;24:4;41:2;
70:8;81:24;98:12
**closed (1)**
41:3
**clothes (1)**
75:17
**CLUBOK (1)**
7:17
**co- (1)**
26:5
**co-counsel (4)**
10:24;38:1;61:7;
100:6
**collateral (1)**
92:9
**collateralized (2)**
16:4;65:15
**colleague (3)**
13:24;33:24;84:21
**colleagues (3)**
10:23;46:9;81:2
**colloquy (2)**
58:20;61:20
**color (2)**
108:10,15
**combination (1)**
59:2
**comfort (1)**
112:8
**comfortable (1)**
48:4
**coming (2)**
105:11;110:15
**commence (1)**
81:22
**commenced (3)**
80:18;83:8;88:19
**comment (2)**
89:4;103:11
**commented (1)**
22:13
**comments (5)**
76:20;77:4,19;
89:23;100:18
**Committee (66)**
6:3;7:8,23;10:22;
18:8,20,23;19:20;

23:20;41:13;42:25;
43:8,12,17;45:10;
50:17,22;51:22;
54:3;57:2;59:1;61:1;
63:6,17,19,23;64:7;
70:16;75:1;77:13,16,
20,25;78:7;79:13,19;
80:18,20;81:23;82:2,
2;83:6,11,17,23;
85:8,17,22;86:3;
87:1,7;88:13,16;
89:25;90:13;93:10;
94:6;98:12,18;
102:6;109:14,23;
112:10,12;113:14,16
**committee's (7)**
10:16;53:9;60:4;
64:1;72:2;98:14;
109:23
**communicated (1)**
18:20
**companies (1)**
107:14
**company (3)**
91:4;111:23;112:7
**company's (1)**
22:9
**compared (1)**
95:6
**compensation (2)**
16:9;95:15
**complete (1)**
14:7
**completely (1)**
107:25
**complex (2)**
50:2;51:23
**comply (1)**
67:2
**compound (1)**
106:10
**comptroller (1)**
63:17
**computer (2)**
41:10;111:1
**CONAWAY (6)**
6:2;10:24;85:17;
100:4;111:6;112:15
**concede (1)**
70:23
**concedes (1)**
61:21
**concentration (2)**
87:10,12
**concept (3)**
63:16;73:21;87:16
**concern (1)**
89:8
**concerns (4)**
78:23;97:6;98:18;
111:19
**conclude (3)**
74:13;92:1;96:8

**concluded (2)**
92:1;114:3
**concludes (1)**
18:25
**concluding (1)**
94:19
**conclusion (2)**
73:25;98:11
**conclusory (1)**
104:6
**concrete (1)**
112:21
**conduct (3)**
58:11;78:25;79:17
**conducted (1)**
91:20
**conference (2)**
33:13;52:10
**confident (2)**
91:6;102:25
**confirmation (12)**
43:25;45:6;53:19;
60:12,14,19;74:3,3,
5;76:8;91:16,24
**confirmed (2)**
44:11,13
**confirming (1)**
17:21
**conflict (1)**
47:25
**conflicted (1)**
58:22
**conflicts (1)**
78:18
**conflicts-of-interest (1)**
78:17
**conjunction (1)**
27:8
**Connecticut (1)**
83:18
**connection (17)**
11:19;16:3;23:11,
13;46:7;49:6;60:10,
12;69:5,5;72:22;
73:4;74:2,10;80:16;
93:8;97:5
**connections (1)**
86:8
**connotation (1)**
106:19
**consensual (1)**
87:2
**consider (1)**
94:11
**consideration (1)**
48:11
**considered (1)**
39:20
**considering (3)**
38:15;101:10;
111:19
**consist (1)**
15:16

**consistent (3)**
46:18;50:5;58:6
**consistently (1)**
55:15
**consists (1)**
109:23
**constituents (1)**
18:6
**constructive (1)**
86:25
**constructively (1)**
18:8
**contact (1)**
75:12
**contained (1)**
65:17
**containing (1)**
11:21
**content (2)**
35:17;95:22
**contentious (1)**
17:15
**contested (1)**
52:25
**context (1)**
52:6
**continue (6)**
17:15;49:8;84:25;
89:8;92:16;113:3
**contract (1)**
54:16
**contracts (8)**
54:20,23,24;55:1;
86:12;93:14,16;94:9
**contractual (1)**
16:7
**contrary (2)**
57:14;79:18
**control (1)**
25:16
**controlling (1)**
55:7
**controls (1)**
25:4
**controversy (1)**
70:23
**controverted (2)**
43:20;100:12
**convenience (5)**
51:10;64:9;78:9;
80:24;82:7
**convenience-of-the-parties (1)**
61:25
**convenient (13)**
13:12;52:12,14,18,
21;55:9,18;83:24,25;
85:24;90:1,3,3
**conversation (1)**
64:1
**conveyances (1)**
92:5
**convince (1)**
45:10

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-22 Filed 12/22/23   Page 289 of 1539   PageID 17527

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

**COO (1)**
9:9
**cooperation (1)**
96:20
**copy (1)**
36:19
**CORCO (3)**
81:3,24;86:2
**core (2)**
22:15;39:12
**corners (1)**
62:13
**corporate (5)**
28:6;88:1;97:3,7;
98:1
**corporation (1)**
14:12
**corroborating (1)**
38:17
**CORROON (1)**
8:2
**Counsel (33)**
9:3;10:8,22;13:14,
16;22:13;37:9,15;
38:20;40:21;45:3;
47:8;59:13;61:3,4;
69:25;75:25;76:15,
16;77:6;79:3,25;
82:11;85:15;88:14;
89:1;93:20;97:23;
100:19;108:16;
110:4;113:17,18
**count (1)**
67:19
**counting (1)**
62:3
**country (6)**
15:18;32:1;85:15;
86:20;91:3;100:15
**couple (5)**
64:20;73:15;
75:24;96:19;111:1
**course (15)**
16:8;21:3;40:2;
46:11;48:6;76:18;
79:7;80:21;92:16;
100:24;101:18;
106:15,23;109:16;
111:11
**COURT (260)**
10:3,5,13,18,20;
11:3,10,12,22;12:2,
4,6,9,12,14,16,20;
13:12;17:17,20;
18:3;19:1,4,6,8,18,
21,25;21:3,6,17,24;
22:4;23:3,7,10,15,
18;24:3;25:9,11,15;
26:3;27:13,20;31:9,
11,18,24;32:7,13,15;
33:1,3,16,21,24;
34:5,24;35:3,25;
36:4,7,14,17,21,23,

25;37:3,7,8,14,18,
24;38:5,10;39:10,16,
18,19;40:2,5,13,25;
41:9,18;42:14;
43:22;44:1,2,5,21,
23;45:10,16,18,21;
46:1,23;47:1,3,5,10,
16,22;48:8,17,19,22;
49:7,10,13,14,18,20,
20,21;50:1,16,18,20;
52:4,15;53:20;54:2,
5,5,10,16,21;55:1,17,
25;56:2,16,19,24;
57:1,6,8,13,24;
58:16,21,24;59:3,4,
9,19,22,24;60:7,10,
13,17,18,22;61:24;
62:6,10;63:12;
64:23;65:7,23;66:9,
11,11;71:3,7,9,9,10,
12,14,14,17,17,19,
19;72:4,7,10,10,21,
21;73:2,3,12,12,14,
18,19,20;74:2,4,6,8,
14,15,21,24;75:3,10,
16,19;76:21,22;
78:16,21,21;80:10,
12;81:21;83:2,8,10;
84:6,10,12;85:7,10,
24;86:21;87:3,15,23;
88:5,19;89:3,18,21;
90:4,15;95:14;
96:14;97:11,12;99:2,
5,7,11;102:2,4;
103:4,9,25;104:5,13;
105:4,10;106:25;
107:1;109:21;110:7,
14;111:9;112:10;
113:11,16;114:2
**courthouse (2)**
52:14;89:14
**courtroom (10)**
10:10;38:21;39:4;
40:18,22;74:17,19;
82:20;103:8,9
**courts (11)**
71:24;73:11;
77:10;81:1,8;84:5;
86:5;87:6;89:12;
102:15;104:17
**court's (4)**
38:22;39:21;62:1;
103:24
**craft (1)**
79:3
**crash (1)**
92:13
**create (5)**
41:23;47:25;
48:10;101:16;
110:16
**created (2)**
92:13;100:12

**creates (1)**
108:7
**credentials (1)**
98:17
**credibility (2)**
90:21;108:15
**credible (2)**
49:13;96:13
**creditor (21)**
15:24;21:5;42:22;
43:1,3,12,18;56:11;
62:24;63:1,2,3,10;
64:13;83:13,16,22;
88:22;98:18;99:15;
109:11
**Creditors (50)**
6:3;10:23;43:9,10,
11;50:24;51:18,20,
21;55:10,10,16,19;
56:6;68:7;70:7,16;
78:24;82:1,5,6,9,15,
17;83:2,5,24;87:10;
88:13,23;89:4,13;
98:6;99:14,18;
100:18,20,21,22;
104:23,25;106:15,
25;108:24;109:12,
14,22,24;110:4;
111:20
**creditors' (6)**
18:20;19:20;
23:19;43:8;109:7,8
**credit-research (1)**
28:13
**critical (2)**
86:6;111:21
**CRO (21)**
13:19;27:7;58:1,2,
3,4,11,14;79:9,10;
84:11,12;85:2;
96:16;97:6;98:16;
111:17,21;112:1,7,
17
**cross (6)**
11:7;21:16,22;
36:1,2;50:12
**CROSS-EXAMINATION (4)**
20:1;21:7;23:3;
90:21
**cross-examine (1)**
19:2
**Crusader (2)**
7:8,23
**CRUTCHER (1)**
7:2
**crux (3)**
76:19;78:19;90:1
**current (6)**
22:20;29:6,11;
45:13;82:19;108:3
**currently (7)**
17:19;24:19;
29:10;31:20;34:17;

58:18;92:24
**CURTIS (1)**
7:24
**curve (12)**
49:14;50:17;52:6;
66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**custodial (1)**
15:17
**cynic (2)**
56:2,4

**D**

**Dallas (96)**
13:13,16;15:7;
20:5,12;29:1,3,6,8,9,
11,12,14,16,19,21;
30:1,4;32:4,9;41:18,
25;42:3,4,5,14,15;
43:1,4,22;44:1,5,20,
23;45:14;46:23;
47:10;49:13,17,20;
50:1,16,18;51:5,11,
17,19;52:4,7,11,12;
18,19,21;53:2,12,13,
15,20;54:2,5,5,10,16,
21,25;55:8,9,17;
56:25;57:13;58:7,7,
15,21;59:3;60:10;
65:10,23;69:16;
73:18;74:25;83:25;
86:18,18;88:11;
100:13,23;106:25;
108:18,21;109:3;
110:2,4,5,13
**Dallas-oriented (1)**
108:20
**date (7)**
12:19;16:1,20;
37:22;40:23;60:18;
61:5
**Daugherty (2)**
83:6;88:19
**David (1)**
31:5
**day (2)**
89:7;112:7
**days (5)**
14:3;21:9;72:2;
74:19;87:20
**day-to-day (2)**
18:10;32:3
**DC (1)**
83:15
**de (1)**
15:9
**deal (1)**
48:13
**dealing (1)**
63:22
**dealings (1)**

16:22
**dealt (2)**
91:4;97:15
**debt (10)**
48:15;63:22,23,
24;68:2,10;69:12,14,
22;70:10
**debtor (159)**
10:7,10;11:7,16;
12:25;13:16,18;14:5,
7,8,14,17,24;15:2,6,
10,21;16:5,12,21,23,
24;17:5,12,14,18,19;
18:15,17,24;21:13,
20;22:20;24:9;
29:16;30:23;31:20;
32:20,21;34:10,18;
35:14;41:6,23;42:1,
3,5,15,20,24;43:4;
44:8,17,19,25;45:1,
7,8,12;49:19,25;
50:1,3,7;51:1,14,25;
52:2,5,12;53:16,20,
25;54:1,11,15,19;
55:12,21;56:5,8,10,
16;57:14,15,18,20,
25;58:2,12,16,18;
64:5,22;68:22;
73:23;75:7;77:3,25;
78:11,17,20,22,23;
79:3,5,6,10,14,16,20;
80:3,5,16,18;81:12;
82:9,21,22;83:7,14;
84:5,6,8,12,15,17,20;
85:4,4,10;86:24;
88:18;90:6,8,9;
91:17,18;92:2,8,13,
18,23;93:12;94:3;
95:1,13;96:16;97:10,
17;98:4,16;99:23;
105:24,25;106:11,
25;109:16;112:22
**debtors (30)**
17:10;36:19;48:9;
68:21;73:22;78:19;
80:4;97:24;107:12;
109:6
**Debtors' (1)**
12:18
**debtor's (88)**
13:14;14:2,6,10,
12,15,20;15:7,12,18,
19,24;16:2,16;17:3,
4,24;18:1,5,10,11,
19;20:7,9;22:15,22;
30:10;36:16;41:16;
42:23;44:5;45:11;
50:2,9;51:11;54:23;
55:4;62:15,19;64:2,
25;65:2,4,14,17,20;
69:25;72:5,6,8,11;
73:17;77:3,4;78:4,4,
4,6;79:2,16,17,22;

APPX. 102919

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22 Filed 12/22/26 Page 290 of 1539    PageID 17528
Exhibit 22 Page 224 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

81:9,14,21;82:18,19;
84:23;85:6;86:9,16;
87:1;88:21;91:17;
92:6,11,24;93:4,7;
94:23;95:3,21;96:10,
12;97:13;105:22;
106:11;111:18
**debtors-in-possession (1)**
75:23
**decide (3)**
58:3;111:3,9
**decided (5)**
33:7;39:20;97:20;
100:5;110:18
**decides (1)**
101:23
**deciding (1)**
48:11
**decision (10)**
45:9;48:3,25;49:4;
81:3;90:22;105:7;
107:15;108:9;
109:10
**decision- (1)**
31:22
**decision-making (4)**
58:17;86:4;
106:12;112:3
**decisions (10)**
31:20,25;42:4;
43:24;51:15;55:15;
57:19;106:7;112:3;
113:10
**declaration (4)**
28:1;64:24;65:1;
68:4
**declined (1)**
33:3
**decrease (2)**
17:2;92:16
**defending (1)**
109:16
**defense (1)**
68:24
**defer (1)**
81:14
**deference (4)**
56:10,14;62:15;
81:9
**definite (1)**
76:4
**definitely (1)**
46:14
**degree (1)**
35:9
**degrees (1)**
50:20
**Delaware (42)**
13:6,12,15;14:11,
13,15;42:24;43:4,19;
55:13,21;56:7;65:9;
70:24,25;72:7;
74:22;78:22;80:2,6,

6,7,9,13,19,21;81:12,
13;83:4,8;84:1;85:3,
14;88:11;89:1;
99:14,15,16,17,21;
107:1;111:7
**delay (1)**
41:9
**Demo (1)**
10:9
**demonstrate (4)**
76:20;77:15,17;
85:22
**demonstrated (5)**
50:23;55:8;84:7,8;
88:25
**demonstrates (1)**
82:7
**demonstrating (1)**
81:5
**denial (1)**
94:13
**denied (3)**
74:4,6;79:23
**Dennis (1)**
10:23
**DENTONS (1)**
6:20
**deny (1)**
99:1
**depend (1)**
106:2
**depending (2)**
33:10;50:19
**depends (3)**
35:19;52:17;
107:17
**depose (1)**
39:4
**deposition (3)**
30:8;19;69:16
**depositions (1)**
53:12
**deputy (4)**
38:21;39:4;40:18,
22
**derives (1)**
17:5
**describe (1)**
28:1
**described (2)**
44:9;111:18
**deserve (1)**
112:8
**designated (3)**
32:24,25;67:18
**desires (1)**
109:8
**despite (1)**
103:1
**detail (1)**
76:16
**determination (2)**
44:20;51:1

**determinations (2)**
54:21;101:6
**determine (5)**
16:17;44:2,23;
50:18;51:20
**determined (1)**
82:3
**determining (1)**
95:14
**detriment (1)**
49:5
**develop (1)**
50:2
**developed (2)**
49:24;84:22
**Development (3)**
9:7,9;12:25
**devoted (1)**
14:1
**dictate (1)**
59:2
**differ (3)**
35:16,21;54:24
**difference (1)**
22:7
**different (19)**
16:11;22:10;
34:16;48:19;53:9;
61:18;63:19;64:21;
71:2;87:16,17;93:15,
18;94:18;96:15;
98:2;106:18;107:23,
25
**difficult (2)**
95:16;106:14
**difficulties (1)**
41:10
**difficulty (1)**
96:24
**direct (11)**
16:21;21:25;24:7;
32:15,15,18;33:18;
34:1;47:12;88:10;
90:21
**directly (1)**
34:20
**disagree (2)**
49:1;105:21
**disagreement (1)**
52:20
**discovery (5)**
52:24,25;53:4;
83:17;96:18
**discretion (1)**
62:11
**discuss (3)**
47:19;80:15;95:22
**discussed (3)**
30:3,8;107:9
**discussing (1)**
49:12
**discussion (5)**
30:19;62:9,22;

79:12,12
**discussions (1)**
11:5
**disingenuous (2)**
77:20;84:2
**dispute (6)**
49:13;55:20;
76:15,17;86:17,19
**disputed (3)**
17:11;40:12;83:12
**disputes (2)**
52:25;96:18
**disputing (1)**
55:21
**disqualification (1)**
48:24
**disregard (1)**
81:21
**distinguishing (1)**
51:7
**distributed (1)**
44:13
**District (30)**
11:3;22:24;39:1;
40:10;45:23;46:5,
23;49:21;53:1;
72:10,21;73:3,3,5;
76:2;79:14;80:5,17;
81:2,2;85:2;102:13,
22,23;103:1,8;106:7,
9;108:4,5
**divestiture (1)**
70:1
**docket (1)**
47:2
**document (1)**
40:6
**documents (10)**
11:18;12:6;35:7;
37:15;60:5,6;96:21;
100:11,12,15
**dog (1)**
69:21
**dollar (4)**
43:10,11;70:15;
82:5
**dollars (11)**
14:25;15:22;16:1;
17:13;35:13;43:15,
16;63:6;68:14;
69:17;103:18
**domicile (2)**
80:11,16
**domiciled (1)**
80:5
**Dondero (32)**
20:3,24;25:1,4,16;
26:10,13,15,20,23,
25;27:2,22;28:22;
29:23;34:7;42:4;
44:16;50:12;51:12,
15,16;55:7,14;58:4,
7,12;66:2;68:16;

97:3,3;99:23
**Dondero's (2)**
25:25;29:19
**done (9)**
34:1;75:15;90:20;
108:5,6;109:5;
111:22,24;112:5
**doozy (1)**
101:22
**doubt (4)**
54:4;76:25;91:11;
94:24
**down (10)**
23:8;32:6;36:5;
46:10,18;63:23;64:4,
17;77:15;102:1
**dozen (1)**
56:8
**dozens (1)**
96:2
**driven (1)**
18:11
**driving (1)**
63:3
**DSI (6)**
10:12;14:1,4;
21:12;22:7;112:14
**DSI's (2)**
16:13;94:5
**dueling (1)**
44:22
**DUNN (2)**
7:2;8:7
**duplicate (1)**
60:25
**duplicative (1)**
40:15
**during (5)**
16:7;59:14;77:6;
84:16;105:14
**dwarfs (1)**
43:17

### E

**earlier (2)**
27:4;68:3
**early (1)**
71:25
**earned (1)**
111:11
**ease (1)**
88:8
**easier (1)**
85:10
**easiest (1)**
102:24
**easily (1)**
85:3
**easy (3)**
52:18;73:24;
111:17
**economic (4)**

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22    Filed 12/22/23    Page 291 of 1539    PageID 17529
Exhibit 22    Page 2 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

52:11;87:5;94:2;
108:25
**economics (1)**
16:14
**economy (3)**
67:24,25;102:21
**effective (1)**
60:21
**effectively (3)**
42:10;45:12;65:25
**efficiencies (1)**
52:11
**efficiency (5)**
39:12;50:22;
67:25;101:1;102:21
**efficient (1)**
55:9
**effort (2)**
90:5;91:12
**efforts (4)**
16:13;18:2;38:19;
84:9
**EFH (4)**
56:17,21;63:17;
109:10
**ego (1)**
59:4
**eight (2)**
17:13;60:24
**eighteen (1)**
65:20
**either (15)**
18:2,13;41:16;
64:11;70:7;72:7;
73:11;80:24;82:6,
19;84:1;102:11;
104:13;109:3,12
**element (2)**
106:1,13
**elements (1)**
39:11
**else (7)**
40:15;47:21;57:6;
74:23;75:4;108:24;
109:17
**email (5)**
38:20,23;40:21;
59:24;74:2
**embodied (1)**
69:11
**emergent (1)**
113:12
**empire (2)**
67:15;108:21
**employ (2)**
45:3;111:17
**employed (1)**
112:8
**employees (20)**
13:20;14:1,5;
20:20;28:1;29:13,
17;30:15,22;31:1;
41:24;42:3;52:12;

54:14;57:23;66:1;
85:5;86:19;95:11,12
**employment (1)**
27:18
**encountered (1)**
96:25
**end (1)**
24:14
**enforce (1)**
94:21
**engaged (6)**
13:17;58:12,18;
106:1,16;111:22
**engagement (4)**
13:18,23;20:19,23
**engages (3)**
50:3;58:18;64:22
**enjoyed (1)**
78:16
**enough (2)**
71:18;103:22
**ensure (3)**
50:22;89:12;
112:20
**entire (2)**
96:1;102:14
**Entities (18)**
8:13,13;14:16;
15:4;41:24;51:24;
67:18,19,20;71:1,6;
80:8,13;81:13;
88:18;93:19;104:4,4
**entitled (2)**
56:10;81:17
**entity (8)**
44:14;49:4,5;
50:22;68:15;70:25;
72:25;81:12
**equity (8)**
16:11;17:7;25:20;
44:12;86:13;91:6,
18;92:19
**erase (2)**
58:15,17
**ESQ (22)**
6:4,5,6,11,16,17,
22,23;7:4,9,10,15,16,
17,18,19,24;8:4,9,14,
19;9:3
**essentially (1)**
87:8
**estate (8)**
18:5;45:4,11;82:3;
83:13;87:6;88:24;
111:4
**estates (2)**
97:22;98:10
**estimated (1)**
69:16
**et (4)**
6:15;8:8,18;65:21
**ethical (1)**
106:23

**Europe (1)**
14:23
**evaluate (7)**
16:14;18:6;66:19,
21;69:4;84:17;86:25
**evaluated (1)**
69:13
**evaluating (1)**
97:12
**even (19)**
40:12;47:5,17,20;
57:18;61:9,16,16;
72:20,20;74:7;
76:10;81:13;89:3,4;
92:17;93:15;98:16;
106:8
**event (5)**
76:11;94:1;95:23;
96:9;107:25
**events (1)**
76:11
**everybody (1)**
58:6
**everybody's (1)**
46:14
**everyone (1)**
103:2
**everywhere (2)**
107:13,14
**evidence (30)**
11:17;12:19;
23:10;32:2;33:3,4,6;
36:8;37:22;38:12,16,
18,25;40:22,25;
43:25;61:22;62:18;
76:20;90:17;92:10;
93:22;96:25;100:24,
25;101:5;107:5;
108:10,14;110:6
**evidentiary (5)**
41:2,3,20;42:7,7
**ex (1)**
69:8
**exact (2)**
24:22;25:18
**exactly (1)**
88:3
**EXAMINATION (2)**
24:7;32:18
**examined (1)**
54:16
**example (5)**
93:3;95:9;101:2;
102:18;113:4
**examples (1)**
54:25
**except (4)**
11:17;12:9,18;
22:21
**exception (7)**
37:20;38:12;39:5,
7;40:4,7;97:11
**exceptionally (3)**

61:14,24;74:18
**exceptions (1)**
40:3
**excess (1)**
72:18
**exchange (2)**
38:20;40:21
**exclusion (1)**
37:10
**excuse (4)**
44:19;53:17;69:7;
99:15
**executive (3)**
107:14;108:19;
110:2
**executive-level (1)**
27:25
**exercised (1)**
33:13
**Exhibit (17)**
11:17,17;12:18;
37:10,10,11,12;
39:14,15;40:23;
60:11,13,15;64:25;
67:17;69:11;74:1
**Exhibits (20)**
11:17,23;12:18;
36:10,12,19;37:9,9,
20,21;41:16,17;
59:15;60:8,16;
65:17;66:17;67:16;
74:1;91:24
**exist (3)**
14:22;21:13;
100:16
**existing (4)**
108:1,2,21;110:2
**exit (1)**
70:19
**expand (1)**
47:9
**expanded (2)**
79:1;98:17
**expected (1)**
85:24
**expects (1)**
84:14
**expeditiously (2)**
22:24;39:11
**expend (1)**
45:4
**expended (4)**
74:15,19;90:5;
103:5
**expenditure (1)**
74:20
**experience (10)**
13:3;46:7;50:20,
21;54:7;57:13;
75:15;85:1;92:23;
93:3
**expertise (2)**
85:20;86:21

**explain (1)**
96:9
**exposed (2)**
104:5,13
**exposure (1)**
57:20
**extension (1)**
13:24
**extensive (2)**
49:19,24
**extent (3)**
89:6;101:23;
112:16

---

**F**

**face (1)**
84:9
**faced (1)**
65:23
**fact (17)**
38:23;43:5,18,19;
53:6;56:13;57:17;
63:9;73:22;82:2;
90:19,22;93:23;
94:24;97:25;103:18;
108:19
**factor (11)**
52:23;56:23;
70:21;82:4;84:4,5;
87:5,7;88:8;98:7;
101:9
**factors (20)**
53:23,23;61:23,
24;62:2,3,4,8;71:22;
77:9,10,11,15;81:2,
6,25;86:3;88:1;
107:8;108:23
**facts (18)**
16:18;25:8;42:12,
17;50:16;51:3;59:2;
61:14,17;76:15;
77:14;81:19;100:1;
107:17,19;108:8,18;
109:25
**factual (2)**
49:24;90:18
**Fair (3)**
71:18;73:21;109:6
**fairly (3)**
22:25;46:2;91:10
**fall (2)**
46:7;111:8
**falls (2)**
39:6;108:24
**familiar (21)**
34:23;35:1,11;
54:18;61:24;66:9;
67:10,10;72:4,5,7,
10,22;78:3;93:11,15;
94:25;103:3;104:1,3,
19
**familiarity (7)**

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-22 Filed 12/26/23   Page 292 of 1539   PageID 17530
Exhibit 22   Page 292 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

47:9;54:8;91:1;
96:10;103:24;108:8;
112:16
**familiarizing (1)**
90:5
**family (1)**
52:17
**fantastic (1)**
40:13
**far (3)**
39:9;88:21;96:18
**far- (1)**
86:19
**far-flung (3)**
41:24;52:1;100:14
**Fargo (1)**
107:13
**fashion (1)**
50:7
**fashioned (1)**
110:6
**fault (1)**
33:8
**favor (8)**
43:3;51:4;56:23;
75:4;81:6,20;83:20;
106:10
**favors (1)**
52:7
**feasibility (1)**
83:22
**features (1)**
51:7
**February (1)**
60:21
**Federal (4)**
38:12;71:17,19;
81:17
**fee (1)**
65:18
**feel (1)**
48:3
**feels (1)**
46:14
**fees (3)**
15:1;92:9,10
**feet (3)**
70:10;104:24;
110:5
**felt (3)**
79:9,9;85:9
**few (7)**
34:3;43:21;72:1;
73:23;80:15;90:2;
108:2
**fiduciary (4)**
63:6;70:10,17;
82:3
**field (1)**
104:15
**Fifth (3)**
72:24;81:3;83:16
**file (14)**

32:21;42:15;
77:24,25;78:22;80:3,
4;96:16,17;97:7;
106:2,15;107:16;
110:10
**filed (22)**
11:1;15:12;21:10;
26:22;42:23;43:8,
25;44:11;61:5;
71:25;72:1;74:22;
78:2;79:14;80:5;
82:23;88:16,17,20;
95:10;97:20;101:15
**files (2)**
105:24,25
**filing (7)**
21:14;32:22;64:7;
80:19;98:22,22;
104:24
**filings (1)**
66:4
**final (3)**
62:12;63:25;
101:19
**Finally (1)**
101:7
**financial (8)**
13:1,4;14:2;24:14;
86:10;91:4,7;100:10
**financial-advisory-services (1)**
14:18
**financials (1)**
65:16
**find (5)**
21:17;75:12;
77:10;85:23;107:8
**findings (2)**
90:18;113:20
**finds (1)**
102:24
**fine (5)**
11:10;12:14;
25:15;36:21;97:18
**finish (1)**
109:9
**firm (2)**
13:1;113:1
**firms (5)**
50:25;82:20;
87:14;111:7,7
**first (19)**
12:6;33:18;34:2;
38:11;42:16,21;
54:1;64:21;65:3;
69:7;72:1;73:12;
74:2,5;76:1;82:1;
89:7;99:12;102:7
**first-day (8)**
28:2;52:9;64:24;
69:25;77:23;79:6;
102:19;104:9
**first-filed (1)**
73:12

**Fitzwater (3)**
72:12,19,21
**five (6)**
43:16;57:4;82:19;
87:8;92:2;94:18
**five-minute (1)**
104:9
**flair (1)**
89:23
**fleeing (4)**
55:16,17;56:6,7
**flights (2)**
87:16;88:10
**floodgates (1)**
61:17
**flung (1)**
86:20
**fly (1)**
52:19
**focus (8)**
16:13;76:19;84:5;
86:20,21;92:6;94:5,7
**focused (11)**
65:11;77:13;82:2;
84:1;89:5;92:3;
98:18;108:1,20,21;
110:3
**focusing (1)**
94:2
**foisted (1)**
95:25
**folks (4)**
28:6;31:6,8;63:10
**following (2)**
18:17;74:13
**follows (1)**
62:6
**forced (3)**
99:18,19,22
**foreign (2)**
15:13,14
**forestall (1)**
73:24
**forgive (1)**
67:16
**form (4)**
26:2;35:16;79:21;
113:17
**formal (3)**
76:1;102:9,11
**formally (1)**
111:21
**formation (1)**
72:2
**formed (2)**
71:8;78:6
**former (5)**
26:13;47:24;
82:20,22;102:15;
108:2
**forth (3)**
68:3;80:22;113:19
**Fortress (1)**

109:19
**forty (1)**
74:19
**forty-five (1)**
34:1
**forum (10)**
55:10;62:19;
70:25;81:10,14;
85:24;87:4;105:23;
106:3,12
**forum- (2)**
56:10;106:18
**forums (1)**
106:17
**forum's (1)**
70:22
**forum-shopping (9)**
56:5,12;63:25;
64:2,11;77:19;106:1,
13,16
**forward (5)**
49:9;103:14;
110:19,19;112:23
**found (3)**
90:8;91:10;96:12
**foundation (5)**
25:11,13;31:14;
34:19,20
**four (7)**
13:6;24:21,23;
51:3;62:4,13;69:5
**fourteen (1)**
56:3
**Fourth (3)**
45:15;49:11;69:9
**frame (1)**
96:22
**FRANK (4)**
9:5;10:11;23:25;
85:5
**F-R-A-N-K (1)**
23:25
**frankly (6)**
42:14;55:5,19;
61:8;64:11;66:14
**fraudulent (3)**
68:25;69:4;92:5
**fraudulent-transfer (1)**
17:17
**FRED (5)**
9:9;10:12;13:24;
18:13;27:15
**free (1)**
33:17
**freed (1)**
57:3
**free-fall (1)**
69:23
**frequency (1)**
88:7
**fresh (4)**
50:15;78:23;
97:11;110:21

**front (3)**
21:18;35:7;100:7
**Frontier (7)**
15:24;43:15;68:5;
82:10;109:20,21,22
**FTI (1)**
18:21
**fulcrum (4)**
63:23,24;69:22;
70:10
**full (5)**
17:24;47:4;70:7,8;
111:23
**fully (3)**
51:9;81:8;97:12
**functionally (1)**
73:9
**functions (2)**
13:24;67:7
**Fund (8)**
7:8,23;17:8;26:7;
28:8;91:5,6;93:4
**fundamental (2)**
62:6;81:16
**Funding (1)**
28:7
**funds (13)**
15:11;16:12;17:8,
8,9;25:25;26:6;
51:13;86:13,13;
92:14,20;93:6
**further (15)**
21:1;23:10;32:15;
35:3;36:8;58:22;
66:14;67:22;68:1;
73:4;80:6;102:22;
104:16,20;106:21
**future (1)**
76:12

## G

**gain (2)**
54:3,3
**gave (1)**
33:24
**GEDDES (1)**
6:9
**General (13)**
9:3;14:12;25:4,17;
51:14;64:17;65:2;
69:15,17;80:8,9;
89:5;107:18
**generally (12)**
34:11;35:8,15;
60:5;78:5;81:9;
86:10;87:6,24;
105:19;107:9;
111:16
**generated (2)**
65:19;92:10
**generates (1)**
92:18

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(8) familiarizing - generates

APPX. 102923

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22 Filed 12/27/23    Page 293 of 1539    PageID 17531
Exhibit 22    Page 293 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

**generic (2)**
66:24;67:8
**gets (5)**
49:11;67:14;76:5;
110:24;112:20
**GIBSON (1)**
7:2
**given (18)**
14:7;16:18;36:19;
47:9,11;48:4;53:2;
79:7,8;84:17;88:7,7;
94:17;97:9;109:25;
111:18;112:24;
113:14
**giving (2)**
31:12;97:10
**gleaned (1)**
43:23
**global (2)**
87:19;108:20
**goal (3)**
18:4,7;98:20
**goes (7)**
39:9;65:2;73:11;
80:6;87:23;90:20;
106:21
**go-forward (2)**
62:14;63:14
**Good (18)**
10:4,5,19,20;
11:14;19:18,19,21;
21:4;23:18;53:8;
75:21;76:3;91:8;
97:1;105:11;110:5;
111:24
**govern (1)**
35:12
**governance (1)**
97:7
**government (1)**
57:1
**governor (1)**
71:20
**GP (3)**
6:15;8:8,18
**grant (3)**
81:9;105:13;110:7
**granted (3)**
52:9;107:4,6
**granting (1)**
17:20
**grapple (1)**
69:2
**gravitas (1)**
108:18
**great (3)**
53:8;90:5;113:25
**greatest (1)**
105:20
**Greg (1)**
10:9
**Gross (5)**
81:4,7;83:19;88:3;

89:15
**grossly (1)**
91:13
**ground (2)**
103:20;112:21
**grounded (1)**
73:22
**grounds (1)**
79:21
**GROUP (3)**
8:7;28:7;30:3
**groups (3)**
27:22,25;28:21
**grow (1)**
84:25
**guarantees (1)**
38:14
**GUERKE (9)**
6:5;23:18,19;24:8;
25:12;31:16,19,25;
32:11
**guess (3)**
36:1;74:14,21
**guidelines (1)**
67:2
**guy (1)**
89:18

# H

**Hale (7)**
76:2;102:8,9,11,
16,19,20
**half (3)**
14:25;52:14;56:8
**hall (1)**
46:10
**hand (4)**
19:11;23:21;60:6;
67:4
**handed (3)**
37:8;59:15;60:7
**handing (1)**
59:17
**handle (5)**
38:1,2;40:11;
65:10;102:24
**handling (1)**
40:14
**hands (1)**
63:23
**Hang (2)**
12:2,4
**HANKIN (1)**
7:9
**happen (7)**
63:14;65:8;68:9;
70:11,11;73:9;76:12
**happened (5)**
45:19;63:13;
76:23,23;79:18
**happening (1)**
97:16

**happens (3)**
70:19;73:9;97:23
**happy (2)**
61:2;72:15
**hard (1)**
52:13
**harder (1)**
107:6
**harking (1)**
63:15
**HCLOF (1)**
82:11
**headed (1)**
70:3
**headquartered (3)**
13:11;82:10,10
**heads (3)**
27:25;28:21;30:3
**headway (1)**
79:12
**hear (20)**
22:24;33:17;
34:24;39:2,11;41:4;
45:3;51:23;75:6;
93:8;95:1,2,5;97:8;
101:8,22;102:19;
111:16;112:10;
113:12
**heard (14)**
30:18;53:6;59:10;
68:5;75:19;76:15;
90:6,7;91:21;95:21;
96:18,19,19,22
**Hearing (12)**
23:4;52:9;68:20;
74:3,3;77:23;78:1;
79:6;84:20;85:12;
101:14;104:10
**hearings (5)**
69:25;75:15;
91:20;93:9;96:2
**hears (2)**
95:16,17
**hearsay (13)**
38:7,9,11,13,13;
39:6,8,24,25;40:1,3,
6,7
**heart (2)**
64:15;100:18
**heavier (1)**
57:9
**hedge (5)**
16:12;17:7;86:12;
91:5;92:20
**held (4)**
14:15;68:14;
69:16;100:5
**help (1)**
95:18
**helpful (4)**
52:17;77:10;90:9;
107:21
**hereby (3)**

12:19;37:21;40:22
**herring (2)**
58:14;99:18
**high (2)**
44:4;47:14
**higher (2)**
87:10,12
**Highland (53)**
9:3,5;10:7;13:19,
21;24:9,24;25:1,22,
25;26:10;28:10,24;
29:5,7,13,16;30:10,
15,23;34:13;44:8;
48:4;49:25;50:1;
51:13,25,25;55:1,2;
57:25;60:23;66:22;
67:13,15;68:11,12,
15,17,18,23,25;
69:13;72:24;74:10;
76:7;77:1;93:24;
103:3,12,16;104:19,
23
**Highland- (1)**
72:24
**Highland's (10)**
25:4,16;27:23;
29:13;52:23;64:18;
65:24;66:10;67:10;
104:1
**highlight (1)**
51:7
**highlights (1)**
80:1
**highly (7)**
17:15;50:23;51:1;
53:4;57:14,21;
109:18
**Hills (1)**
13:8
**hinted (1)**
105:14
**hire (1)**
89:1
**hired (1)**
21:9
**history (6)**
52:23;53:11;54:7;
58:15,17;79:8
**hit (2)**
49:2;70:21
**hitting (1)**
111:1
**hold (3)**
22:1;24:17,19
**Holding (1)**
81:15
**holdings (1)**
81:12
**holds (1)**
15:19
**holistic (1)**
96:7
**home (2)**

56:7;78:16
**Homes (1)**
13:8
**Hon (1)**
40:21
**honestly (1)**
34:15
**Honor (276)**
10:4,8,14,19;11:1,
5,9,13,14,16,20,25;
12:11,13,15,22;19:3,
7,19;21:4,15,23;
23:6,12,19;25:6,12;
27:11;31:16,21;32:5,
17;36:3,9,15,18;
37:5,12,17,23;38:1,
9,11;39:17;40:24;
41:7,12,14,18,22;
42:6,11,14;43:3,6,
17,19,21;44:7,15,22,
25;45:15,17,20,25;
46:20,22;47:8,12,17;
48:7,18;49:1,2,5,8,
12,15,16,23;50:14,
23;51:3,9,18;52:3,8,
17,20,22;53:10,13,
17,18,22;54:4,9,24;
55:3,6,23;56:1,18,
20;57:7,11,12,22;
58:1,10,15,20,23,25;
59:7,8,12,15,17;
60:2,8,20,25;61:7,
10,11,15,19,20,21;
62:12,21,24;63:4,15,
16,19,24,25;64:5,20;
65:1,22;66:6,13,16;
67:4,12,24;68:2,7,
12;69:10,15,23;70:3,
9,21,23;71:4,21,22;
72:3,9,13;73:1,7,15;
74:12,13,24;75:2,21;
76:5,7,14;77:2,6,9,
18,23;78:2,12,13,17;
79:6,21;80:10,15;
81:8,19,23;82:21;
83:16;84:4,11;85:13,
21;86:2;87:5;88:11,
23;89:15,20,24;
90:10,11,14,25;91:2,
6,8,22,22,23;93:8,
14;94:1,11,24,25,25;
95:1,2,16,18,25;
96:7,8;97:10,21,22;
98:9,11,24,25;99:1,
3,6,8,13,18,24;100:2,
3,7,9,13,17;101:4,7,
13,20,21,23;102:5,
10,25;103:11,13,21;
104:2,5,21,25;
111:14,15;112:9,11,
13,14,16;113:8,15;
114:1
**Honorable (1)**

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-2    Filed 12/28/23    Page 294 of 1539    PageID 17532
Exhibit 22    Page 293 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                           December 2, 2019

72:12
**Honor's (7)**
11:4;61:11;64:3;
76:3;100:18;102:12;
112:23
**hope (4)**
70:6,6;78:7;98:23
**hopefully (2)**
86:25;111:11
**hopes (1)**
18:7
**horse (1)**
101:11
**hours (4)**
14:4;20:9;74:16,
16
**Houser (3)**
46:24;102:19,22
**HUANG (1)**
7:18
**Human (2)**
28:8;108:12
**hundred (2)**
20:9;25:20
**hundreds (6)**
14:4;63:5;69:20;
74:16,16;96:1
**hurt (1)**
36:25

**I**

**idea (5)**
50:14;51:25;70:2;
100:14;105:21
**identified (1)**
32:9
**identifies (1)**
68:11
**identify (1)**
40:17
**ignore (3)**
90:17;100:25;
101:5
**immaterial (1)**
85:7
**impact (2)**
45:9;49:4
**impartial (1)**
73:21
**impeccable (1)**
98:17
**implication (2)**
73:17;74:8
**importance (1)**
92:16
**important (14)**
44:7;50:21;63:15;
70:19;79:9;85:9,12;
86:1;87:7,18;89:11,
11;90:9
**importantly (3)**
42:21;63:14;79:9

**improper (1)**
90:24
**impropriety (1)**
18:24
**improve (1)**
83:21
**inappropriate (2)**
106:22;108:13
**Inc (5)**
9:8,9;13:1;25:5,17
**include (2)**
31:5;86:10
**included (2)**
64:24;106:12
**including (10)**
13:6;14:20;15:4,9,
14;17:7,16;80:18;
81:1;109:13
**incorporation (2)**
64:6;71:5
**increased (1)**
79:4
**increases (1)**
14:3
**Indeed (3)**
82:23;84:11;
103:17
**indenture (1)**
101:2
**indicated (1)**
94:6
**indicating (1)**
62:23
**indication (1)**
106:24
**indicator (1)**
52:24
**Indiscernible (1)**
37:5
**individual (1)**
106:8
**industries (1)**
13:4
**inform (3)**
48:3;110:13;
113:23
**information (4)**
14:7;18:21;85:19;
95:25
**informed (2)**
16:9;53:13
**infrastructure (1)**
67:7
**initial (2)**
44:18,20
**initially (2)**
13:17;47:20
**injunction (5)**
69:8,8,9,10,10
**injunctions (1)**
69:5
**inquiring (1)**
38:22

**inside (1)**
104:11
**insider (3)**
17:25;84:19;112:4
**installed (1)**
98:16
**instance (1)**
42:17
**instead (2)**
18:11;101:16
**instrument (1)**
82:14
**instruments (3)**
86:10;91:7;100:10
**insufficient (1)**
79:21
**integrated (1)**
113:7
**intended (2)**
32:21;77:24
**intends (3)**
18:6;77:25;86:24
**intention (2)**
84:7,8
**intercompany (2)**
48:14;97:25
**interest (15)**
25:22;47:25;
53:21;55:15;64:9;
68:19,22,23;70:22,
22;71:1,6;74:20;
78:18;80:25
**interested (1)**
56:5
**interesting (2)**
90:16;101:20
**interest-of-justice (1)**
61:25
**interests (9)**
14:19;15:14,17;
52:3;78:9;80:7;
86:12;100:10,16
**international (1)**
15:8
**internationally (1)**
105:17
**interpretation (1)**
91:14
**interrupt (1)**
45:18
**Intertrust (1)**
8:13
**intertwined (1)**
112:17
**intimately (1)**
72:22
**into (14)**
11:16;12:19;
21:18;37:21;40:22;
42:18;43:24;48:11;
73:12;90:21;101:9;
104:22;107:6,24
**introduced (1)**

13:21
**invariably (1)**
73:11
**invested (1)**
52:5
**investment (7)**
15:5;65:13,18;
66:7,10,15;67:1
**investments (5)**
15:17;16:4;86:11;
93:6,6
**investors' (1)**
17:1
**invited (1)**
64:12
**involun (1)**
60:9
**involuntary (6)**
17:20;60:10;66:4;
76:9,9;91:25
**involve (3)**
72:24;86:6;107:18
**involved (6)**
17:15;58:11;66:7;
93:23;97:24;106:21
**involvement (2)**
13:19;85:6
**involves (2)**
65:3;106:22
**involving (4)**
49:18;57:16;
80:17;112:4
**Ira (2)**
10:9;111:14
**ironed (1)**
41:10
**irrelevant (3)**
89:6;107:9,9
**ISAAC (2)**
9:3;10:11
**issue (23)**
48:24,24;50:9,19;
53:5;54:6;58:14;
60:9;61:20;62:23,
25;64:3;65:10,11;
68:24;71:22;73:13;
77:2;82:12;105:7;
110:14;112:15;
113:2
**issued (10)**
60:9,11;69:5;
91:21;94:13;103:14,
15,16,17;108:6
**issues (14)**
21:2,2;49:18;
50:19;61:8;65:23;
69:1;94:16;96:20;
97:5,25;103:4;
107:10;108:8
**item (2)**
10:15;68:10
**iterations (1)**
94:18

**J**

**JAMES (3)**
8:14;10:6;25:1
**Janeiro (1)**
15:9
**January (3)**
60:19,20;61:5
**JEFF (3)**
7:16;10:8;11:14;
75:22
**Jefferies (9)**
6:10,21;15:20,22;
43:14;68:5;82:9;
109:18,21
**JENNER (1)**
7:7
**JEREMY (1)**
8:4
**Jernigan (52)**
38:21;39:1;45:25;
46:1,2,6,8;47:15,20;
48:23;66:9,13,19,20;
67:9,22,25;69:1,13;
73:18;74:11;76:17,
25;77:22;78:2,12;
90:8;91:10,20;93:3,
11;94:13;95:6,12,17,
21;96:3,12;97:14,18;
100:25;103:3,6,7;
104:3,16;110:11,17,
21;111:9;112:24;
113:9
**Jernigan's (3)**
40:21;90:17;92:23
**Jim (1)**
27:7
**job (2)**
18:16;84:25
**JOHN (4)**
6:16;10:9;21:19;
59:12
**join (1)**
63:8
**joinders (1)**
77:7
**joined (5)**
29:4,7;43:2;60:4;
75:1
**joining (1)**
98:15
**jointly (3)**
48:5,13;78:19
**Jones (6)**
10:7;11:15;13:14,
22;21:20;75:22
**JOSE (1)**
6:17
**Josh (1)**
83:1
**Judge (97)**
13:7,7,8,9;22:3;

32:24;38:21;39:1,4,
25;44:3;45:25;46:2,
5,8,24;47:10,11,15,
20,22,23,23;48:10,
22,23;66:9,13,18,20;
67:9,22,25;69:1,13;
70:17;72:12,14,14,
19,21;73:3,5,18;
74:10;76:2,17,25;
77:22;78:2,11;
79:15;81:4,7,14;
83:19;88:3;89:15;
90:8,16;91:10,20;
92:23;93:3,11;
94:12;95:6,12,17,20;
96:2,5,12;97:13,18;
100:24;102:8,9,11,
15,19,19,20,22;
103:3,5,7;104:3,16;
106:8;108:5;110:11,
17,20;111:9;112:24;
113:9
**judges (9)**
46:23;47:7;48:1;
49:2;91:2,3;106:8;
108:12,12
**judge's (1)**
108:11
**judgment (2)**
81:22;111:18
**judgments (1)**
108:12
**judicial (8)**
39:12;41:19;46:6;
49:23;67:25;81:17;
101:1;102:21
**jurisdiction (2)**
55:16;107:20
**jurisdictions (4)**
41:24;44:22;52:1;
88:21
**jurist (1)**
97:19
**justice (8)**
52:3;53:16,18,21;
64:9;78:10;80:25;
99:20
**justify (1)**
95:19

---

**K**

**keep (4)**
61:1;69:23;
101:14,23
**keeping (1)**
98:8
**KEIP (1)**
95:11
**KEIPs (1)**
95:17
**KERP (1)**
95:11

**KERPs (1)**
95:17
**KEVIN (2)**
6:5;23:19
**key (3)**
51:16;66:22;112:3
**Kharasch (3)**
10:9;111:14,14
**KIMBERLY (1)**
7:19
**kind (12)**
62:13,19;64:12;
65:2;66:19;73:12,
24;74:5;90:15;
102:7;105:15;
108:24
**kinds (2)**
112:2,3
**Klos (1)**
31:5
**knowledge (13)**
14:2;27:1;46:6,8;
84:23,25;85:19;91:9,
9;93:4;95:13,19;
96:5
**knows (1)**
69:24
**Korea (3)**
15:11;20:16;86:15
**Korean (3)**
93:5;104:3,7
**KUAN (1)**
7:18

---

**L**

**LA (2)**
88:10,11
**lack (1)**
55:12
**laid (1)**
11:4
**large (5)**
51:18;91:4;
100:19,22;109:24
**largely (3)**
42:8;50:25;76:15
**largest (5)**
51:19;69:19;83:5,
13,16
**last (11)**
19:15;27:4;41:1;
66:6;69:14;87:5;
89:2,25;94:17;
103:11;104:2
**Lastly (3)**
18:16;76:14;83:16
**late (2)**
38:2;60:19
**later (4)**
60:24;68:21;93:9;
97:8
**LATHAM (2)**

7:13;83:15
**Latin (2)**
86:15;93:5
**latter (1)**
109:9
**Laughter (1)**
59:6
**laundry (1)**
107:8
**LAUREN (1)**
6:22
**law (12)**
14:13;50:25;
70:25;71:8;76:11;
82:20;102:15;
105:15;106:6,7,20;
110:17
**laws (1)**
14:11
**lawsuits (3)**
99:19,21,22
**lawyer (1)**
47:23
**lawyers (1)**
108:13
**lay (2)**
51:9;53:23
**layer (2)**
69:22;72:20
**laying (3)**
25:9,11;31:14
**leading (1)**
85:19
**learned (4)**
76:25;77:1;90:19;
91:15
**learning (13)**
14:1;49:14;50:17;
52:6;66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**least (5)**
48:8;56:9;61:3;
62:1;69:14
**leave (1)**
111:9
**leaves (1)**
47:7
**leeway (3)**
31:12;33:24,25
**legal (4)**
29:21;62:7;67:7;
81:16
**legal-compliance (1)**
28:10
**legitimacy (1)**
101:17
**lenders (1)**
68:5
**lengthy (1)**
91:21
**less (2)**
17:13;99:9

**level (1)**
106:13
**LEVENTON (2)**
9:3;10:11
**leveraged (1)**
65:4
**liabilities (3)**
77:3;78:5;84:24
**life (3)**
52:17;57:4;98:1
**likely (8)**
53:1,4;66:10;
83:12;85:7;91:7;
93:8;98:20
**limited (12)**
14:10,15;33:5;
34:4;40:20,23;52:9;
53:11;55:21;90:18;
100:10;111:10
**limited-partnership (1)**
25:22
**line (4)**
21:21;65:6,8,12
**lines (3)**
64:22;65:2,12
**liquid (3)**
15:19;18:13;86:16
**liquidated (1)**
92:15
**liquidation (3)**
16:25;57:19;70:5
**list (6)**
36:11;50:24;
51:19;67:17,18;
107:8
**listed (2)**
82:18;83:11
**litigating (1)**
78:16
**litigation (19)**
17:15;54:4;55:3,5;
78:14;80:17;83:7,10,
14,15;84:1;85:18;
88:19;99:17;103:23;
108:1,2,22;110:1
**litigious (3)**
50:23;51:1;52:24
**little (15)**
24:5;37:2;48:19;
54:2;60:24;63:18,
21;67:14,14,21;
68:20;77:7;79:19;
91:12;99:9
**Litvak (1)**
10:10
**lived (2)**
61:4;63:11
**living (1)**
61:8
**LLC (2)**
6:10;7:14
**LLP (8)**
6:2,14,20;7:2,13,

22;8:2,12
**loan (3)**
16:4;65:15;92:9
**loathe (1)**
60:5
**local (8)**
13:16;59:13;
70:22;73:8;86:7,21;
88:14;89:23
**locales (1)**
15:8
**locally (1)**
89:5
**located (15)**
15:17,20;41:25;
46:23;51:16,18,21;
58:7;86:14;100:13;
107:12,13,13,14;
108:4
**location (12)**
29:4,6,10,16;30:7,
15;31:22;86:2,5;
99:20;100:9;106:18
**locations (1)**
30:22
**logical (3)**
42:16;55:19,22
**London (1)**
7:14
**long (3)**
52:23;106:5;
108:14
**longer (5)**
16:23;50:6;61:9;
91:16,18
**Look (24)**
12:6;19:22;46:22;
51:19;57:24;64:2;
65:12,17;67:3,12;
68:19;72:20;74:1;
79:15;82:17;86:5,9;
87:13;88:15;90:25;
96:11;101:2;105:24;
110:21
**looking (5)**
50:16;69:19;
104:14,15;107:19
**looks (3)**
82:4,5;96:7
**Los (1)**
13:11
**losing (1)**
45:24
**lost (2)**
73:23;85:20
**lot (16)**
18:21;33:24;
62:22;65:11,19;
93:13;94:25;95:21;
105:17;106:2;
109:17;110:16;
111:24,25;112:5;
113:20

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22 Filed 12/30/26 of 139 Page 296 of 1539    PageID 17534

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                              December 2, 2019

**loud (1)**
55:11
**LP (6)**
24:10;25:2;30:23;
60:3;80:6,7
**LUCIAN (6)**
6:16;59:12,12,20,
23,25
**lunch (2)**
105:5;110:12

**M**

**machinery (2)**
110:8;113:24
**MACKSOUD (1)**
6:22
**mail (1)**
110:25
**maintain (2)**
15:7;98:9
**Maintenance (1)**
75:12
**majority (5)**
43:9,11;51:21;
80:4;86:15
**makes (12)**
42:4;43:9;55:15;
64:19;70:14,14;
81:5;86:3;89:25;
90:13;101:6;106:13
**making (4)**
31:23;48:25;
68:23;90:17
**manage (3)**
15:14;28:4;57:18
**managed (6)**
15:3;55:2;57:25;
65:20;96:15;112:22
**Management (45)**
6:15;8:8,18;9:4,6;
10:8;13:20;14:20,
25;15:1;16:3;18:10;
21:5;22:9;24:10;
25:2;28:1;30:23;
35:13;50:13;54:15;
58:5;60:3,14;65:13,
18,24;66:8,10,15;
68:11,16,17,23,25;
78:7;79:17;92:14;
93:12;95:4,21;96:10,
12;103:18;110:2
**manager (8)**
14:13;16:23;
25:25;26:5,6,7,9;
51:12
**managers (1)**
21:13
**manages (4)**
14:17;15:10;
16:12;50:8
**managing (1)**
17:6

**many (12)**
15:8;18:12,21;
80:10;88:10;89:12,
12;91:2,7,20;97:24,
24
**MARC (1)**
7:9
**margin (1)**
15:22
**marginally (1)**
92:25
**markedly (1)**
93:18
**market (2)**
92:13;94:9
**marketplace (1)**
67:3
**Marsal (2)**
7:3;8:3
**MASCHERIN (1)**
7:10
**massive (1)**
53:2
**material (3)**
45:2;88:6,24
**materially (1)**
45:8
**matter (9)**
18:3;39:11,23;
44:18,20;56:13;
102:18,25;111:15
**matters (8)**
10:14;17:16;
80:17;94:1;102:19,
20,24;110:17
**Matthew (3)**
10:21;41:12;
112:11
**Max (1)**
10:9
**MAXCY (1)**
6:23
**maximize (3)**
18:4,12;87:1
**maximum (1)**
50:22
**may (38)**
12:20;21:6;22:2;
23:7,18;24:6;31:21;
35:1;36:5,24;37:23;
41:11,25;42:1;
43:10;49:4;52:1;
54:24;55:6;59:9;
63:12;76:4,4,12,12;
78:21;81:8;85:5;
90:19;91:4,5;95:11;
96:25;97:15;98:5;
101:8;102:16;108:9
**maybe (5)**
27:7;56:3;90:20;
91:3;107:24
**mean (14)**
24:22;31:13;

35:18;39:3;40:9,12;
47:22;48:5;54:7;
55:25;56:2,24;
87:24;109:2
**means (4)**
54:8;9:96:2;
103:19
**meet (5)**
29:23;32:8,9;
62:17;80:23
**meeting (2)**
14:4;81:24
**meetings (2)**
30:1;31:8
**meets (1)**
40:6
**member (2)**
43:17;83:11
**Members (5)**
29:21;31:5;78:6;
80:18;88:16
**memorized (2)**
35:9,22
**mention (1)**
110:21
**mentioned (12)**
30:7;44:23;57:22;
58:9;78:17;79:6;
87:11;89:16;97:22;
98:13;99:25;112:15
**mentioning (1)**
77:19
**mess (1)**
37:1
**message (1)**
55:11
**met (3)**
18:20;20:3,20
**Meta-e (1)**
83:17
**metropolitan (1)**
87:15
**MICHAEL (2)**
6:6;7:4
**microcosm (2)**
67:14,23
**microcosms (1)**
67:21
**microphone (3)**
19:23;21:17;24:4
**middle- (1)**
67:5
**Midwest (2)**
87:11,13
**might (9)**
47:16;48:3,10,11;
91:23;96:20;107:20;
108:15;111:8
**Mike (1)**
10:24
**mileage (1)**
87:17
**mile-and-a- (1)**

52:13
**MILLER (1)**
7:24
**million (6)**
15:22;16:1;17:13;
43:15,16;68:13
**millions (2)**
63:5;69:20
**mind (3)**
60:19;61:14;69:23
**minimum (1)**
29:23
**minutes (2)**
34:1;90:2
**miscommunication (1)**
36:20
**misstated (1)**
71:5
**mistake (1)**
103:21
**misunderstood (1)**
33:14
**model (1)**
104:19
**modern (2)**
97:25;105:16
**modifications (1)**
16:18
**modified (1)**
112:1
**modifying (1)**
112:5
**modus (1)**
67:11
**mom (1)**
89:3
**mom-and- (1)**
100:17
**mom-and-pop (3)**
88:22,23;89:4
**moment (2)**
45:18;100:8
**moments (1)**
80:15
**monetization (1)**
92:21
**monetizing (1)**
16:25
**money (3)**
65:4,4;111:12
**money-management (1)**
14:18
**month (1)**
111:24
**month-and-a-half (2)**
18:17;88:15
**months (3)**
43:21;60:24;108:3
**more (27)**
38:17;40:13;
41:19;51:9;52:14;
62:7;63:9,13;65:11;
67:10;73:15;81:13;

52:13
**83:25;84:12;85:23;**
87:4;89:23;90:1,3;
94:25;96:13;99:3;
101:22;103:25;
107:18,20;111:25
**morning (11)**
10:4,5,19,20;11:5,
14;19:19,21;21:4;
23:18;99:24
**MORRIS (21)**
7:22;10:9;21:15,
19,19;23:6;25:6,10;
26:2;27:11;31:21;
32:23;34:19,22,25;
36:3;37:17;38:9;
39:17,19;59:16
**most (14)**
39:25;42:16,21;
55:9,19;81:2;85:11;
87:7,20,22;88:13;
98:3,20;105:21
**motion (66)**
10:16;11:1,4,20;
15:12;18:18;23:11,
14;31:13;33:1,4,5,
19;39:20;40:19;
41:21;42:9,19;54:1;
55:11;60:4;61:18;
62:25;63:7,8;64:14,
16;71:23,25;73:10;
75:4;77:7,14,24,25;
78:1,3,12;79:22;
82:15;90:19;94:13;
95:10;96:16;97:6;
98:15,15,23,23;99:1;
100:1;101:11,14;
104:24;105:7,12;
106:15;107:3,4,6;
109:13,23;110:7;
111:17;112:18;
113:12
**motion-by-motion (1)**
108:10
**motions (7)**
28:2;39:2;64:16;
100:2;105:15;
112:16;113:8
**motivation (2)**
75:14;97:14
**motive (2)**
98:14,15
**movant (3)**
62:17;80:23;81:5
**movants (2)**
41:5;88:9
**move (9)**
11:16;36:12;
37:13;42:18;49:9;
64:8;85:16;109:8;
110:5
**moved (1)**
109:11
**moving (5)**

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22 Filed 02/23/26 Page 297 of 1539    PageID 17535
Exhibit 22 Page 296 of 189

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

12:9;21:22;61:11,
12;63:20
**much (9)**
19:1;58:10;66:11;
83:24;87:21;93:21;
96:1,3;113:25
**multi (1)**
97:24
**multi- (1)**
101:20
**multiple (3)**
17:16;43:10;67:17
**multiples (1)**
43:17
**multi-strat (4)**
93:4;104:4,8,12
**multitude (1)**
15:1
**must (4)**
44:25;45:1;80:20;
83:21
**mutual (1)**
17:8
**myriad (2)**
13:4;93:7
**myself (1)**
57:23

## N

**name (7)**
19:13,15;23:23;
30:11,13;46:24;
68:15
**narrow (1)**
57:16
**national (3)**
13:10;87:14,19
**nature (4)**
35:19;42:22;
52:24;110:1
**nauseum (1)**
61:23
**necessarily (5)**
32:25;56:4;60:25;
61:16;62:15
**necessary (3)**
50:15;105:1,2
**need (14)**
11:19;13:16;
21:17;51:19;59:4;
76:18;85:15;88:14;
101:2,15;106:4;
110:8,17;111:3
**needed (1)**
83:4
**needs (3)**
50:24;83:3;110:19
**negative (2)**
78:6;106:19
**negatives (1)**
64:10
**negotiate (2)**

113:21,22
**neither (2)**
66:11;82:15
**nerve (4)**
42:5;43:5;51:11;
58:8
**NESTOR (2)**
6:6;10:25
**neutral (4)**
64:4;65:9;68:8;
104:18
**New (25)**
15:20;20:14;
21:12;25:8;30:6,7,7,
10,15;42:1;47:6,11;
82:10;83:10,14,14;
86:16;92:13;99:17,
21;103:13,13,16,19;
107:13
**next (6)**
65:12;68:10;84:4;
85:21;90:2;110:22
**nexus (1)**
76:22
**NICHOLS (1)**
7:22
**nine (1)**
21:9
**nine-and-a-half (1)**
68:13
**nineteen (1)**
83:12
**ninety (1)**
17:5
**ninety- (1)**
92:1
**ninety-nine (1)**
14:14
**nobody (2)**
46:8;88:24
**nonaffiliates (3)**
22:17;35:14;94:4
**non-CLO (1)**
93:19
**noncustodial (1)**
15:17
**nondebtor (3)**
41:24;45:5;53:2
**nondebtor-entity (1)**
30:13
**non-Delaware (1)**
80:11
**none (3)**
23:4;82:23;109:12
**nonetheless (1)**
50:21
**nonparty (2)**
52:25;53:4
**nonpublic (2)**
86:12;92:19
**non-venue (1)**
21:2
**normal (2)**

46:4;92:16
**Northeast (1)**
84:2
**Northern (13)**
22:23;39:1;40:10;
45:23;46:5;53:1;
76:2;102:13,23;
103:1,8;108:4,5
**Nos (1)**
37:20
**note (8)**
62:1;63:25;68:12,
13,14;72:16;73:25;
82:12
**noted (1)**
63:16
**notes (1)**
45:24
**notice (4)**
41:19;49:23;
82:23;97:4
**notices (2)**
88:16,17
**notwithstanding (1)**
94:21
**number (16)**
10:14,16;43:11;
51:18;53:2;57:18;
60:11,13,16;67:20;
69:11;74:1;82:5;
83:11;108:6,7
**numbered (1)**
36:22
**Numbers (1)**
37:11
**numerous (2)**
39:2;54:19
**Nutro (4)**
44:14,15,17;45:4
**Nutro's (1)**
44:15

## O

**object (1)**
25:6
**objected (4)**
37:3,10,12,13
**objection (20)**
12:12,15,17;
21:15;25:15;26:2;
27:11,11;32:23;
34:19;37:14,16,19;
38:2,7;39:8;40:5;
57:15;59:16;113:13
**objections (4)**
11:24;39:13;
53:25;62:22
**obligations (5)**
15:22;16:4;65:15;
91:8;92:3
**obligor (1)**
68:13

**obtain (1)**
38:19
**obvious (2)**
40:13;42:21
**Obviously (11)**
22:9;26:14;40:19;
42:24;46:24;56:6;
57:24;61:21;100:4;
101:9;111:4
**occasions (1)**
18:21
**occur (1)**
53:1
**occurred (2)**
53:12;74:4
**occurrence (1)**
45:2
**occurring (1)**
97:1
**October (2)**
13:18;29:7
**off (4)**
17:1;75:16;88:21;
103:20
**offended (2)**
74:7;75:17
**offensive (1)**
73:16
**offer (2)**
39:14;84:20
**offered (3)**
31:17;38:18;39:23
**office (14)**
20:14,21;29:1,2,2,
4,8,14,19;30:1,10;
55:18;83:15;86:5
**officed (1)**
30:6
**officer (7)**
12:24;13:3,6,25;
24:14,24;79:1
**officers (1)**
66:1
**offices (18)**
13:15,15;8,20:7,9;
29:9,11,21;30:4,19,
25,25;31:3;41:25;
42:1;52:1,2;85:13;
86:18
**Official (5)**
6:3;10:22;42:25;
43:12;109:14
**often (1)**
81:2
**of-venue (1)**
71:25
**Oklahoma (2)**
15:25;82:11
**old (2)**
26:19;110:5
**once (5)**
20:3;29:23;44:18;
73:3;110:23

**one (49)**
11:18;12:13;16:2;
21:18;22:15;28:4,
21;37:12;39:11,12;
40:3;43:16;46:23;
47:16;49:4;50:23;
52:10;56:3,8;60:15,
16;62:12,21;63:2,25;
67:16;69:24;71:18,
25;72:18,20;76:3;
77:13;80:11;82:1;
86:2;88:18;94:1;
97:5;98:2;101:21;
103:11,14,20;104:2;
109:1,11,17;111:15
**one-hundred-percent (1)**
51:13
**O'NEILL (4)**
10:4,6,6,14
**ones (3)**
36:14;59:18;105:2
**one's (1)**
68:5
**ongoing (1)**
110:1
**only (32)**
14:2;16:24;20:3;
22:7;23:11;26:20;
29:16;32:11;36:15;
49:25;50:24;51:25;
52:9;53:3,14;57:16;
66:1;72:9;73:22;
74:9;76:8;80:16;
81:11;82:4;85:7;
88:17;91:8;92:17,
25;93:13,23;109:11
**opaque (1)**
54:12
**open (1)**
61:17
**open-ended (1)**
17:8
**operandi (1)**
67:11
**operated (4)**
49:25;54:11;55:2;
57:20
**operates (1)**
79:6
**operating (3)**
22:10;88:21;112:7
**operation (2)**
65:14,20
**operational (3)**
70:2,4,6
**Operations (9)**
28:7,8;32:3;41:23;
77:4;79:2;84:24;
90:6;92:7
**opinion (11)**
60:9,11;81:4,15;
88:4;91:25,25,25;
94:12,15;99:13

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

APPX. 102928

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

**opinions (14)**
41:17;49:22;
54:14,19,22;64:3;
66:17;73:25;74:16;
76:21;81:1;91:21,
23;108:7
**opportunity (2)**
11:7;112:24
**opposed (5)**
56:11;88:11;95:6;
109:12,23
**opposing (1)**
37:8
**opposite (1)**
109:15
**opposition (2)**
33:5;56:11
**options (1)**
18:7
**oral (1)**
105:7
**oranges (1)**
93:25
**order (12)**
15:14;45:6;53:19;
60:14;80:23;83:20;
97:6;99:22;105:1;
110:8,9;113:17
**orders (1)**
17:19
**ordinary (3)**
79:7,11;101:18
**ordinary-course (5)**
95:10;96:17;
101:14;112:4,18
**organization (1)**
51:22
**organizational (5)**
25:13;27:23;
31:19;32:3;91:17
**organized (4)**
14:11,13;70:25;
99:9
**others (4)**
14:4;50:12;53:3;
59:9
**otherwise (4)**
84:3;96:8;104:17;
106:17
**out (22)**
11:4;18:18;29:13;
41:10;43:3;46:13;
51:9;52:19,19;
53:24;54:13;56:19;
64:5;72:17;83:23,
23;88:24;90:8;
108:19;110:12,13;
111:8
**outcome (2)**
18:9;45:11;63:18
**outlined (1)**
40:4
**out-of-court (1)**

39:22
**outside (2)**
30:19,25
**outstanding (1)**
17:12
**over (26)**
13:2;14:14,19,24;
15:18;17:2,4;18:17;
20:9;29:13;41:6;
44:5;60:24;74:18,
19;77:10;78:7;
79:15;90:2;92:12;
95:14;103:17;
108:12;110:22;
112:3;113:13
**overall (1)**
51:22
**overblown (1)**
77:5
**overcome (1)**
83:20;106:14
**overnight (1)**
52:16
**overrule (1)**
40:5
**overruled (4)**
25:15;26:3;27:13;
35:4
**oversecured (2)**
68:7;100:21
**oversee (2)**
65:7;79:1
**overseeing (1)**
46:25
**overstated (1)**
91:13
**overturn (2)**
44:11;79:22
**overturned (1)**
45:6
**owed (3)**
15:25;43:14,16
**owes (1)**
15:21
**own (6)**
14:20;36:1;43:1;
53:11;66:1;95:12
**owned (2)**
44:15;80:7
**owner (1)**
51:14
**ownership (1)**
80:14
**owns (6)**
14:17;15:10;25:4,
16,20;91:17

**P**

**PA (1)**
6:9
**Pachulski (8)**
10:6;11:15;13:14,

21;21:19;75:22;
111:5,14
**pages (4)**
74:16,18;88:9;
96:2
**paid (9)**
70:7;89:7;98:6;
99:22;111:12;
112:14,14,20;113:2
**painstaking (1)**
77:8
**painted (1)**
63:2
**paper (1)**
100:16
**papers (10)**
42:23;44:9;51:6,9;
52:19;53:24;55:9;
61:11,12;95:20
**pare (1)**
77:15
**Parking's (1)**
52:15
**part (7)**
22:22;50:8;65:18;
69:12;91:15,16;
112:17
**parte (1)**
69:8
**participate (1)**
89:13
**particular (8)**
45:9;47:11;49:4,6;
51:8;64:16;94:10;
106:7
**particularly (5)**
43:6;86:22;
107:10,16;110:1
**parties (15)**
14:22;15:7;16:17;
21:22;51:10;56:22;
64:9;67:17;78:9;
80:24;82:7;84:6;
92:21;108:13;
110:18
**Partner (9)**
9:5;14:12;24:19,
21;25:4,17;51:14;
80:8,9
**partnership (2)**
14:11;55:21
**partnerships (2)**
14:15;100:11
**parts (2)**
22:15;105:18
**party (5)**
18:16;18:23;
23:10;55:7,12
**party-in-interest (1)**
42:23
**Pass (2)**
22:2;35:24
**past (8)**

35:2;50:20;51:19;
55:14;58:10,18;
70:24;111:22
**PATEL (27)**
8:19;36:9,15,18,
22,24;37:2,5,8,23;
38:1;59:15;60:2,3,
20,23;62:10;71:4,8,
11,13,16,18,21;73:7,
15;102:5
**PATRICK (2)**
6:23;83:6
**Pause (1)**
12:8
**pay (2)**
111:10,11
**paying (1)**
17:1
**payment (1)**
101:3
**PC (2)**
8:7,17
**pending (14)**
15:13,15;17:17,
19;43:22;52:8;
72:23;80:19;83:7,10,
14;88:15;90:4;108:3
**Penny (2)**
10:24;19:19
**pension (1)**
89:10
**people (7)**
30:22;32:8;52:12;
86:4,17;87:19;109:2
**percent (8)**
14:14;17:3,6;
25:20;80:7;92:2,11,
17
**Perfect (1)**
60:1
**perhaps (8)**
42:21;47:8;52:16;
63:18;69:16;70:4;
103:7;106:8
**period (2)**
26:19;111:10
**person (2)**
85:8;90:20
**personal-services (1)**
54:23
**personnel (3)**
15:8;51:16;85:6
**perspective (6)**
49:3,17;50:17;
70:15,16;72:16
**petition (7)**
16:1,20;17:20;
18:24;21:10;22:8;
82:18
**PetroCap (1)**
93:6
**ph (3)**
44:14;48:17;56:4

**Philly (1)**
109:2
**phone (1)**
46:11
**phrase (1)**
65:25
**physically (1)**
13:11
**pick (1)**
46:11
**piece (4)**
65:14,22;66:6;
104:1
**pieces (1)**
36:10
**pillars (1)**
112:21
**place (6)**
34:2;64:8;89:12;
110:3,9;113:24
**places (4)**
41:25;53:17,20;
80:3
**plan (13)**
17:21;44:1,12,13;
60:12,21;69:10,10;
70:11;74:5;76:8;
91:16,24
**planes (1)**
52:13;109:2
**play (1)**
104:22
**players (1)**
108:8
**playing (1)**
104:14
**pleadings (1)**
73:17
**Please (14)**
10:3;19:8,10,13;
23:16,18,21,23;24:3,
4;36:25;49:10;
75:10;105:10
**ploy (1)**
78:14
**pm (4)**
75:8;105:8,8;
114:3
**podium (2)**
10:17;93:13
**point (29)**
34:14;35:2;38:18;
44:7;49:11;52:19;
54:10,13;55:3,23;
56:21;57:17;60:12;
62:12,21;76:3;86:3,
17;87:6;93:10;
94:11;95:18;96:4;
97:21;101:19;102:7;
103:11;109:9;113:3
**pointed (2)**
64:5;77:18
**points (5)**

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-22 Filed 12/19/23 Page 299 of 1539 PageID 17537
Exhibit 22 Page 298 of 1539

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

73:16;75:24;87:7;
99:10;107:20
**Pomerantz (23)**
  10:9;11:14,15,23,
  25;12:3,5,11,22;
  59:11;75:14,21,22;
  88:3,6;89:15,19,22;
  90:25;99:3,6;
  101:20;102:8
**pool (1)**
  47:16
**pop (1)**
  100:18
**poring (1)**
  74:17
**portfolio (7)**
  25:25;26:5,6,7,8;
  51:12;92:9
**portion (1)**
  17:2
**POSIN (1)**
  7:19
**position (4)**
  68:6;95:13;96:3;
  109:22
**positions (1)**
  92:19
**possibility (2)**
  45:2,8
**possible (1)**
  110:10
**possibly (1)**
  61:16
**post- (1)**
  18:23
**Post-bankruptcy (2)**
  27:10,15
**post-confirmation (1)**
  94:12
**post-petition (2)**
  22:8;79:17;84:18
**potentially (1)**
  55:16
**POTTER (1)**
  8:2
**power (1)**
  27:17
**powers (2)**
  79:1;98:17
**practice (14)**
  13:10;46:18;73:2,
  3,6,7;85:14;87:15,
  19;88:1;89:5;
  102:14;105:17;
  106:20
**practiced (1)**
  102:14
**pre- (1)**
  22:7
**preceded (1)**
  83:9
**predetermination (2)**
  54:7,8

**predetermine (1)**
  44:3
**predominant (1)**
  108:23
**preference (1)**
  106:8
**pre-judge (1)**
  101:5
**prejudice (2)**
  54:6,8
**prejudicial (1)**
  97:17
**preliminary (1)**
  69:9
**prepared (4)**
  38:3,3;75:23;
  105:12
**pre-petition (2)**
  78:24;83:7
**preponderance (4)**
  61:22;62:18;
  107:4;110:6
**Pres (1)**
  9:7
**presen (1)**
  60:15
**PRESENT (1)**
  9:2
**presentation (3)**
  60:17;77:6;98:14
**presented (1)**
  50:19
**presents (2)**
  42:12;59:1
**preside (1)**
  79:15
**president (5)**
  12:25;25:1,19;
  26:10,13
**presumption (5)**
  83:20;105:22;
  106:10,14;107:5
**pretext (1)**
  78:10
**pretty (1)**
  93:21
**previous (3)**
  79:18;87:8;109:10
**previously (4)**
  16:5;34:10;56:13;
  68:14
**primarily (3)**
  22:21;84:6;102:14
**primary (2)**
  94:15;97:9
**prime (2)**
  15:18,23
**principal (4)**
  15:16,24;50:12;
  110:3
**principals (1)**
  13:20
**prior (11)**

13:18,19;18:2;
21:13;32:21;43:25;
62:2;64:3;92:23;
97:15;110:11
**private (4)**
  16:11;17:7;86:13;
  91:5
**Private-equity (3)**
  28:17;92:20;93:5
**privilege (1)**
  73:20
**proactively (1)**
  78:25
**probability (2)**
  44:4;47:14
**probably (7)**
  40:14;57:3;61:12;
  64:4,16;65:6;71:4
**probative (1)**
  38:17
**problem (2)**
  111:5;113:6
**problematic (1)**
  106:23
**procedurally (1)**
  33:14
**procedures (2)**
  46:4;89:12
**proceed (11)**
  10:15;11:6,8,11;
  12:20;21:6;22:2;
  24:6;41:11;78:15;
  100:7
**proceeding (11)**
  42:22;45:14;
  46:25;49:6,19;
  50:10;51:2;58:16;
  83:9;90:23;107:21
**proceedings (3)**
  15:15;102:22;
  114:3
**process (5)**
  16:25;27:5;58:17;
  81:18;106:12
**produced (1)**
  96:21
**professional (3)**
  13:2;112:19,20
**professionals (8)**
  50:25;52:18;
  82:21,22;87:12,14;
  111:5;113:5
**proffer (15)**
  11:6;12:21;18:25;
  22:11,13;30:18;
  31:16,22,25;33:10,
  11;41:22;42:6;
  44:10;53:7
**proffered (1)**
  75:1
**promise (2)**
  34:3;61:1
**promoted (2)**

24:14;26:10
**promotion (1)**
  26:12
**proof (3)**
  61:22;62:16,17
**proofs (1)**
  89:11
**proper (5)**
  39:8;44:10;78:13;
  80:2,21
**proponent (1)**
  38:19
**proposed (3)**
  10:22;12:24;20:23
**proprietary (3)**
  14:21;65:3,6
**propriety (1)**
  84:18
**prosecuted (1)**
  98:4
**protecting (1)**
  71:1
**protocol (1)**
  79:4
**protocols (5)**
  18:18;96:17;
  112:2,5,17
**provide (8)**
  18:14;49:24;53:7;
  67:8;84:15;86:24;
  92:22;93:16
**provided (7)**
  16:5;18:15;34:10;
  36:11;66:21;92:21;
  96:20
**provides (5)**
  15:2;17:3;35:14;
  38:13;91:18
**providing (2)**
  39:3;67:6
**provision (4)**
  22:11,16;94:16,20
**provisions (1)**
  94:14
**proximity (3)**
  82:1;84:4;85:21
**prudent (1)**
  100:6
**public (3)**
  39:6;86:11;92:18
**Public-relations (1)**
  28:15
**published (5)**
  41:17;43:24;
  54:14,19,22
**Puerto (1)**
  46:25
**purely (1)**
  93:21
**purportedly (1)**
  48:10
**purposes (3)**
  40:20,23;62:14

**pursing (1)**
  17:25
**pursuant (3)**
  16:6;64:8;66:22
**pursue (1)**
  84:18
**put (16)**
  17:21;31:13,15;
  33:3,4,6,22;38:25;
  40:9;43:24;49:3;
  68:8;95:5,13;
  101:11;113:20
**PWS (1)**
  81:15

---

### Q

**qualify (1)**
  35:3
**quick (6)**
  62:12,21;63:25;
  73:16;91:11;103:11
**quickly (6)**
  61:19;73:1;75:15;
  99:10;110:10,23
**quite (2)**
  50:10;104:11

---

### R

**Raise (2)**
  19:11;23:21
**raised (3)**
  54:1;75:25;111:19
**RAKHEE (2)**
  8:19;60:3
**random (4)**
  46:4;47:13;
  102:12,16
**randomly (2)**
  46:19,21
**rate (1)**
  94:9
**rather (6)**
  78:13;87:3;98:22;
  104:15;110:20,23
**re (4)**
  13:6,7,8,8
**read (5)**
  61:12;64:2;73:16;
  91:23;94:15
**ready (1)**
  113:22
**Real (11)**
  32:17;52:20;
  62:15;67:6;76:22;
  77:2,21;89:8;92:6;
  97:14;108:17
**real-estate (3)**
  17:8;86:7,22
**reality (5)**
  63:5;88:2;89:4;
  105:16;106:20

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

**realized (1)**
40:18
**really (35)**
33:25;48:3;62:2,
19;63:1,8,20;64:3,
10,15;65:5,9,11;
67:13;68:8;69:22;
70:2;73:12;76:12;
77:6,20;87:23,25;
90:1;95:22,24;96:9;
104:11;105:16,18;
106:11;107:21;
108:18;111:5;
112:20
**reason (9)**
22:23;39:7;70:8;
77:12,21;78:13;
87:3;97:1,20
**reasonable (1)**
38:19
**reasoned (2)**
81:21;83:19
**reasons (8)**
11:3;39:13;47:18;
75:1;87:8;98:25;
111:19;113:19
**rebuts (1)**
32:2
**rebuttal (4)**
25:7;31:16;42:6;
50:11
**rebutted (2)**
42:2,10
**rebutting (3)**
25:8;33:6,21
**recall (3)**
26:7;30:20;34:15
**received (3)**
12:19;37:21;40:22
**receives (1)**
14:25
**recess (6)**
41:4,6,8;75:6,8;
105:8
**recognized (1)**
78:23
**recognizes (1)**
50:18
**recommendation (2)**
94:7,8
**recommended (1)**
26:12
**record (29)**
19:14;23:24;25:7;
39:6;41:2,16,17,19;
42:7,8;43:24;46:15;
49:16,24,25;51:2;
54:13;59:12;60:2;
74:18;82:13;90:18,
23;93:22;96:1,5,7;
99:15;113:19
**records (1)**
14:6

**record's (1)**
41:3
**recusal (1)**
48:24
**red (2)**
58:14;99:18
**Redeemer (4)**
7:8,23;83:6,9
**redirect (1)**
23:4
**reduce (1)**
92:12
**reducing (1)**
22:22
**refer (3)**
11:18,19;64:23
**reference (6)**
43:14,15;60:4,15;
62:14;82:11
**referenced (6)**
36:9;61:20;66:17;
68:3;69:25;70:24
**references (1)**
68:18
**referred (4)**
44:10;52:6;54:18;
101:20
**reflect (4)**
88:1;93:22;
105:16,18
**regard (6)**
18:8;34:7;40:7,19;
90:20;109:13
**regarding (11)**
18:23;22:11;38:8;
55:5;56:21;78:6;
84:23;94:14;99:17;
100:4,24
**regional (1)**
86:8
**registered (1)**
15:5
**Reid (6)**
10:24;19:7,19,19;
20:2;21:1
**relate (1)**
112:6
**related (11)**
14:22;15:7;31:19;
44:9;65:19;72:25;
76:11;80:12;83:1;
85:21;94:22
**relationship (4)**
18:2;64:2;77:1;
92:4
**relative (1)**
49:14
**relatively (2)**
66:24;71:23
**Relevance (7)**
38:9;39:9;40:8,8;
50:21;53:12;91:15
**relevant (13)**

34:20;39:22;40:9,
10;57:14,21;76:13;
88:8;92:25;94:10;
95:23;96:11;99:20
**reliability (1)**
40:7
**relied (1)**
77:11
**relief (2)**
52:9;84:22
**rely (4)**
41:14;80:10,22;
95:24
**remain (3)**
19:9;23:17;24:4
**remaining (1)**
17:1
**remarks (2)**
57:14;75:24
**remember (5)**
22:4,12;24:22;
25:18;30:8
**remind (1)**
100:3
**remiss (1)**
101:13
**remote (1)**
45:9
**remotely (1)**
61:16
**rendered (1)**
17:14
**reorganization (3)**
44:12;84:9;109:7
**repeat (3)**
57:22;61:10;102:6
**repeated (1)**
67:15
**repeating (1)**
61:13
**replies (1)**
62:23
**reply (5)**
31:24;39:16;
42:20;54:13;99:7
**report (8)**
20:23;26:15,22,
25;27:10,15;28:21;
97:7
**reported (2)**
26:20;84:11
**reporting (1)**
97:2
**reports (3)**
28:25;58:4,7
**represent (2)**
66:8;92:11
**representative (3)**
15:13;82:3;84:13
**representatives (2)**
84:16;85:9
**represented (1)**
37:15;43:12;63:6

**representing (2)**
10:10;63:1
**reprimand (1)**
31:11
**request (2)**
43:2;98:25
**requested (2)**
14:8;84:22
**requesting (1)**
38:21
**require (1)**
50:15
**required (3)**
48:23,23;84:15
**requirement (1)**
76:4
**reserve (1)**
21:1
**reserved (2)**
21:24;33:11
**residual (1)**
38:12
**resignation (1)**
66:3
**Resources (5)**
28:8;45:4,11;52:5;
103:4
**respect (43)**
16:22;17:25;18:3;
20:19;22:9;38:3,3;
41:20,22;42:8;
49:21;53:19;54:5;
57:21;58:24;59:5;
63:8,13;64:1,4,11;
65:8;66:12,14,18;
67:6,2,23,24;68:6,
6,8,19;70:17,19;
72:14;83:22;86:22;
94:13;102:8;103:12;
104:10,17
**respectfully (2)**
59:1;98:25
**respond (1)**
40:1
**responding (1)**
108:1
**responses (1)**
62:22
**responsibility (2)**
17:25;97:9
**rest (1)**
113:4
**restaurant (2)**
89:22;99:12
**Restaurants (3)**
81:4;83:19;89:16
**restructure (6)**
18:11;70:4,7;
104:23;105:2,3
**restructuring (11)**
12:24;13:2,3,5,25;
18:1;70:2;79:1;87:2,
4;92:22

**result (5)**
45:6;53:17,19;
91:16;109:5
**retail (2)**
17:8;28:8
**retain (3)**
13:16;88:14;
111:10
**retained (3)**
84:7;85:17;113:5
**retaining (1)**
112:19
**retention (3)**
21:12;68:20;
113:11
**retire (1)**
47:5
**retreads (1)**
87:8
**return (1)**
44:12
**returned (1)**
44:16
**revenue (5)**
17:4,6;65:18,19;
92:12
**revenues (2)**
17:2;92:18
**reversed (1)**
74:15
**review (2)**
50:16,24
**reviewed (2)**
34:12,14
**reviewing (1)**
14:5
**Rican (1)**
46:25
**right (71)**
12:16,20;19:1,11;
21:24;22:8,17,20;
23:7,15,21;24:12,17,
19;25:2,5,20;26:1,
11,15,20,23;27:2,10,
18;28:2,8,13,17;
29:1,8,11,14,21;
30:1,4,23,24;31:3,6,
9,10;32:7,13;33:12,
13,21;34:5,12;35:14;
36:4,23;37:14;40:5;
41:1,3;47:16;48:14;
71:16;75:5,20;88:5;
92:17;101:10;105:5,
7,21;110:11,12;
113:11;114:2
**rights (2)**
21:1;109:7
**Rio (1)**
15:9
**rise (3)**
10:2;75:9;105:9
**risk-management (3)**
28:24,25;30:5

APPX. 02930

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 58-22 Filed 12/15/26 Page 301 of 1539 PageID 17539
Exhibit 22 Page 23 of 133

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

**robe (1)**
  75:16
**rocket (1)**
  67:6
**ROGGE (1)**
  8:7
**role (2)**
  13:25;85:18
**ROME (2)**
  6:14;59:13
**room (1)**
  86:25
**ROSENTHAL (1)**
  7:4
**ROTH (1)**
  8:12
**routinely (1)**
  87:15
**Rule (13)**
  38:12,13;39:6,7;
  44:1,4;46:16;52:25;
  73:8;78:3,12;
  105:12;111:16
**ruled (3)**
  56:13;94:20;
  113:14
**rules (6)**
  48:1;90:17;
  100:24,25;101:5;
  108:14
**ruling (4)**
  45:12;56:21;
  60:16;112:23
**rulings (4)**
  56:6,7;62:2;74:9
**run (5)**
  32:4;51:15;78:11;
  99:9;107:24
**run-up (1)**
  58:12
**RYAN (1)**
  8:4

**S**

**sales (1)**
  70:1
**Same (8)**
  27:11;29:6,9;50:3,
  12;91:9;93:21;
  104:25
**satisfying (1)**
  98:12
**save (2)**
  59:18;110:20
**saying (6)**
  40:18,19;70:12;
  76:14;83:24;96:1
**scattered (2)**
  108:25,25
**scenario (3)**
  72:3;74:9,15
**schedules (2)**

43:7;69:21
**SCHULTE (1)**
  8:12
**science (1)**
  67:6
**scope (4)**
  21:15,21;27:12;
  32:23
**scorecard (1)**
  62:3
**scrutiny (1)**
  96:14
**seal (1)**
  11:19
**SEAN (2)**
  6:4;10:25
**seated (5)**
  10:3;24:3;41:9;
  75:10;105:10
**SEC (1)**
  67:2
**Second (7)**
  43:21;44:15;
  54:12;55:6;69:8;
  76:7;107:11
**secured (6)**
  15:23,24;68:4;
  82:9,12,14
**Securities (3)**
  7:14;15:23;92:19
**seeing (1)**
  107:19
**seek (2)**
  94:13;95:11
**seeking (3)**
  25:10;44:11;45:3
**seeks (1)**
  53:16
**seems (2)**
  45:21;55:19
**sees (1)**
  74:11
**send (1)**
  110:25
**senior (2)**
  13:20;24:12
**sense (3)**
  33:17;46:21;64:19
**sent (3)**
  55:10;57:3;74:2
**Seoul (1)**
  15:9
**separate (3)**
  65:21,22;85:15
**separateness (1)**
  98:9
**series (2)**
  77:11;109:24
**serves (2)**
  16:23;17:23
**service (1)**
  92:21
**services (26)**

15:3;16:3,6;17:13;
  22:12,16,16;34:9,9,
  17;35:19,21;54:15;
  65:13;66:7,10,15,16,
  19,22;67:4;86:12;
  91:4,19;92:14;93:19
**set (6)**
  18:18;39:3;42:12;
  68:3,20;113:19
**sets (1)**
  80:22
**setting (2)**
  62:13;112:21
**seven (3)**
  35:13;82:18;
  103:17
**seventy (1)**
  29:13
**several (6)**
  26:6;49:22;51:22;
  53:22;91:21;110:22
**Shannon (2)**
  13:7,8
**shared (12)**
  15:3;16:6;18:21;
  22:12,16;34:9;
  35:21;66:7,16,19;
  67:4;86:12
**shared- (1)**
  34:16
**shared-service (2)**
  16:10,15;93:11,17
**shared-services (5)**
  34:12;35:12;
  66:23,24;94:4
**SHARP (32)**
  9:7;10:12;11:25;
  12:23;19:8,15,22;
  20:3;21:9;27:10,17;
  31:17;41:22;44:10;
  50:6,11;53:6,15;
  54:17;78:25;79:3;
  84:7,9,17,21;85:1;
  93:16;94:2,7;95:3;
  97:1;113:1
**S-H-A-R-P (1)**
  19:16
**Sharp's (4)**
  18:25;42:10;50:5;
  84:13
**SHAW (21)**
  8:9;21:4,4,6,8;
  22:3,4;23:2;32:17,
  19,24;33:2,9,20,23;
  34:3,6,20;35:24;
  61:8;63:11
**sheer (1)**
  95:24
**sheet (2)**
  18:12;93:7
**shifts (1)**
  62:18
**shopping (2)**

56:11;106:19
**short (6)**
  11:6;41:4,6;58:14;
  75:5,6
**shortly (3)**
  45:4;66:3,4
**shot (4)**
  33:17;98:23,24;
  109:6
**show (1)**
  77:4
**showed (1)**
  57:17
**shown (1)**
  55:14
**shows (2)**
  53:11;57:17
**shrink (1)**
  17:4
**sic (13)**
  25:13;41:16;42:9,
  20;43:13;47:23;
  49:19;59:11;60:8;
  68:21;75:23;96:6;
  101:23
**side (3)**
  62:1;64:11;109:17
**sides (2)**
  56:5;64:5
**Sidley (3)**
  10:21;41:13;113:4
**sign (1)**
  113:13
**signed (4)**
  63:17,18;110:9;
  113:23
**significant (22)**
  43:7,19;57:18;
  63:21;70:3,8,9,16;
  74:20;78:20;80:17;
  85:1;86:8,17;97:21;
  98:3;102:20;103:22;
  104:1,21;109:13,18
**significantly (4)**
  22:10;77:5;85:18;
  96:22
**silence (1)**
  109:17
**silent (1)**
  109:13
**silly (1)**
  88:12
**similar (3)**
  35:23;54:20;104:2
**similarly (5)**
  71:24;78:15;81:7;
  85:17;104:17
**simpler (1)**
  113:18
**simply (9)**
  46:10;54:10;63:4;
  84:2;100:8,15;
  103:19;109:12;

112:19
**Singapore (8)**
  15:9,11;20:18,20;
  86:15;93:5;104:4,7
**single (5)**
  26:7;42:22;43:16;
  72:18;99:15
**single-asset (1)**
  86:7
**sit (5)**
  32:5;33:25;45:19;
  59:8;101:25
**sits (4)**
  34:23;35:1;83:23,
  23
**sitting (1)**
  100:20
**situated (2)**
  71:24;104:18
**situation (4)**
  48:4,10;51:8;
  108:17
**situations (1)**
  49:3
**six (6)**
  27:22;56:8;81:2;
  84:24;107:12;
  111:23
**sliver (1)**
  92:24
**small (2)**
  86:7;92:24
**smart (2)**
  89:18;100:5
**sole (2)**
  26:7;55:7
**solution (1)**
  109:6
**somebody (1)**
  47:21
**somehow (4)**
  73:18;74:8;
  105:22;106:22
**someone (1)**
  75:12
**someone's (1)**
  48:3
**sometimes (1)**
  73:10
**somewhat (1)**
  104:2
**soon (2)**
  110:9;113:22
**sophisticated (3)**
  14:18;91:7;105:25
**sorry (11)**
  12:3,13;41:9;
  45:23;46:1;60:9;
  71:4,11;73:23;
  89:19;103:9
**sort (16)**
  46:16;48:25;55:4;
  62:16;63:21;65:4;

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-22 Filed 12/36/23 Page 302 of 1539 PageID 17540
Exhibit 22 Page 236 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                           December 2, 2019

67:8,12;68:8,18;
70:21,22;73:11;74:5,
14;77:7
**sought (1)**
18:19
**sources (1)**
15:1
**South (2)**
14:22;15:11
**speak (1)**
35:22
**SPEAKER (4)**
19:3,5;41:7;
109:20
**speaking (1)**
91:1
**special (2)**
46:8;95:12
**specialist (1)**
27:6
**Specialists (3)**
9:7,9;12:25
**specific (8)**
40:19;73:8;90:19,
23;96:4,5;104:15;
107:20
**specifically (1)**
35:10
**specifics (1)**
54:25
**speculating (1)**
45:1
**speed (2)**
49:15;91:12
**spell (2)**
19:13;23:23
**spend (4)**
54:11,12;58:22;
90:1
**spent (4)**
14:4;76:22;88:9;
103:3
**sponte (1)**
69:7
**stack (5)**
63:22;68:2,10;
69:12,14
**stacks (1)**
60:6
**staff (2)**
103:8,9
**staff's (1)**
74:17
**Stamford (1)**
83:18
**stand (6)**
19:9,10;23:13,16;
48:9;63:11
**standard (4)**
35:20;80:23;
81:24;110:6
**standards (1)**
87:24

**standing (4)**
19:9;23:17;31:8;
61:3
**standpoint (1)**
106:23
**Stang (6)**
10:6;11:15;13:14,
21;21:19;75:22
**STARGATT (1)**
6:2
**start (5)**
41:4;50:15;78:23;
97:11;113:23
**started (3)**
24:12;29:8;76:14
**State (11)**
15:25;19:13;
23:23;64:6;70:25;
71:5,10;81:16,17,18;
95:6
**stated (2)**
40:23;81:7
**statement (7)**
38:13,14,17;
39:22;76:1;102:9,11
**statements (5)**
43:8;84:1;90:7,7;
104:6
**States (4)**
14:22;15:16;
30:20;86:14
**state's (1)**
71:8
**status (2)**
52:10;53:13
**statute (1)**
64:12
**statutory (1)**
79:24
**stay (2)**
19:23;111:6
**stayed (1)**
109:13
**stemmed (1)**
72:17
**step (4)**
19:10;23:7;36:5;
106:21
**steps (1)**
55:18
**stick (2)**
33:21;108:14
**still (8)**
26:22;32:4;50:8;
57:19;58:6;66:11;
69:19;97:2
**stock (1)**
86:11
**stood (1)**
93:20
**Stoops (1)**
31:6
**Strand (7)**

14:12,13;25:5,17,
20;51:14;80:8
**Strand's (1)**
51:14
**strategic (1)**
18:7
**strategy (1)**
101:21
**strayed (2)**
77:7,12
**stress (1)**
95:20
**strike (1)**
51:4
**strikes (1)**
74:11
**striking (1)**
109:10
**strong (6)**
47:19;56:23;
83:20;105:22;
106:10;107:5
**stronger (1)**
57:5
**strongly (1)**
81:6,20
**structure (15)**
16:10;25:14;
31:19;32:3;54:12;
64:12;66:20;67:13;
80:14;91:17;95:4,4,
15;97:3;100:21
**structured (1)**
92:9
**structured-credit (1)**
103:15
**stuck (1)**
109:3
**study (1)**
91:11
**stuff (4)**
67:1,5;92:2;
111:24
**sua (1)**
69:7
**subadvises (1)**
16:24
**subadvisory (12)**
16:6,10,15;22:12,
16;34:9,13,17;35:12;
54:16;66:23,25
**subcontracted (1)**
54:15
**subject (9)**
11:19;17:16,23;
44:18,19;46:3;79:4;
103:22;111:8
**submanager (1)**
16:5
**submit (6)**
66:13;74:24;
81:23;103:25;104:4;
113:17

**submitted (1)**
28:2
**subpieces (1)**
66:8
**sub-plans (1)**
74:6
**subpoenaed (1)**
85:25
**subscribe (1)**
81:8
**subset (1)**
50:4
**subsidiary (2)**
30:25;31:1
**substantial (4)**
17:11;81:9;84:23;
96:21
**substantially (3)**
18:14;83:21;85:23
**substantive (1)**
73:13
**subsumed (1)**
62:16
**subtopics (1)**
64:21
**succeed (1)**
98:4
**succeeded (2)**
76:10;87:20
**success (1)**
78:16
**successful (3)**
44:21;105:1,3
**sufficient (2)**
38:14;39:2
**suggested (1)**
100:19
**suite (3)**
108:20;110:2;
113:8
**suited (1)**
65:7
**suites (1)**
107:15
**sum (1)**
58:23
**summarize (1)**
66:20
**support (13)**
33:4;46:16;52:3;
53:24;56:21;59:9;
77:13;81:25;82:7;
84:22;87:22;98:7;
100:1
**supported (4)**
38:14;42:25;57:2;
99:14
**supporters (1)**
41:5
**supporting (6)**
17:19;42:23;
55:12;77:9;99:15,16
**supports (4)**

38:23;43:18;
51:10;98:8
**suppose (1)**
44:3
**supposed (1)**
25:7
**sure (9)**
25:11;27:21;
34:14;56:12;57:9;
58:25;68:23;82:21;
91:22
**surprising (1)**
43:2
**surrounding (2)**
79:8;93:4
**survive (1)**
94:20
**survived (1)**
94:17
**switch (1)**
59:25
**switching (1)**
106:17

---

**T**

**table (3)**
10:8;62:13;79:10
**talk (7)**
21:18;42:17,19;
46:10,11;64:21;
101:13
**talked (1)**
53:18
**talking (5)**
40:17;55:22;
88:10;101:1,4
**tangentially (2)**
40:9;61:17
**targeted (1)**
15:10
**tasked (1)**
112:1
**tax (1)**
28:7
**TAYLOR (1)**
6:2
**team (23)**
14:8;20:7,14,16,
16,18;28:6,10,13,15,
17,19,24,25,25;
29:21;30:5;31:5;
32:8;50:13;61:11;
111:23;112:8
**teams (2)**
28:4,10
**teasing (1)**
46:13
**technicalities (1)**
22:1
**technology (1)**
88:7
**TELEPHONICALLY (8)**

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 68-22 Filed 12/27/23 Page 303 of 1539 PageID 17541
Exhibit 22 Page 29 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

6:22,23;7:15,16,
17,18,19;8:14
**telling (2)**
60:6;70:17
**template (4)**
35:20;67:14,23;
93:20
**ten (4)**
17:3;72:18;92:11,
17
**tenet (2)**
62:7;81:16
**terminate (4)**
17:24;27:2,17;
97:3
**terminated (1)**
16:7
**terminates (1)**
97:4
**terms (8)**
43:9;54:24;57:25;
101:3,10;102:12;
103:24;112:22
**TERRI (1)**
7:10
**Terry (3)**
17:22;44:13;83:1
**test (3)**
62:7;80:23;105:18
**testified (8)**
22:11;27:3;34:22,
25;50:10,11;85:2;
93:17
**testify (42)**
12:1,1,23,23;13:1,
5,10,13,17,20,23;
14:3,6,10,14,17,24;
15:2,6,10,12,15,21;
16:2,9,13,20;17:5,
10,14,18,23;18:4,13,
16,19,22;23:13;53:6;
84:12;85:5,8
**testimonies (1)**
55:7
**testimony (22)**
18:14,25;42:2,10;
50:5;53:8;57:17;
58:4,6;84:13,15,21;
90:22;93:13,14,16;
95:2,2,21,23;101:8;
104:9
**Texas (59)**
11:3;17:18,20;
18:3;22:24;29:1,3,6,
12;32:4;39:1;40:10;
43:1;45:14,23;46:5,
9,17;51:21;53:1;
56:6,8;57:2,3;63:9,
10,11,17;70:13,18;
72:4,9;73:6;76:2;
82:19,25;85:3,7,23,
25;86:4,4,5;87:3,11,
13;89:25;90:3,4;

98:20,24;102:13,23;
103:1,8;107:12;
108:4,5;109:8
**Texas-based (2)**
89:17,22
**thankfully (1)**
57:3
**that'll (2)**
94:9;113:20
**theoretically (1)**
27:8
**theories (1)**
78:18
**therefore (5)**
44:16;45:7;57:20,
24;67:24
**thinking (3)**
65:7;67:1;111:6
**third (5)**
16:17;44:7;53:14;
69:8;92:21
**thirty (1)**
43:14
**though (4)**
49:2;57:5;65:11;
98:16
**thought (3)**
23:15;55:4;109:18
**thousand (1)**
51:23
**three (13)**
24:21,23;32:5;
46:23;53:12;62:3,3,
7;65:2;72:22,23;
74:6;77:10
**throughout (4)**
67:15;69:2;86:14;
100:14
**throw (1)**
56:19
**thrown (1)**
67:20
**thus (1)**
96:17
**tie (1)**
110:2
**times (1)**
87:25
**title (3)**
24:17,19;25:18
**today (27)**
10:7,15,23;15:13;
18:19;24:17;33:11;
34:7;35:1;45:19;
48:9;58:19;61:6;
68:21;75:13;82:20;
85:6,11,19;89:6;
94:24;101:10;
108:18,19,20;
111:16;112:9
**today's (1)**
84:20
**told (3)**

69:18;77:21,25
**took (2)**
85:18;98:23
**top (2)**
83:5;100:21
**top-twenty (1)**
50:24
**total (1)**
17:13
**totality (1)**
38:15
**touch (4)**
53:25;57:12;73:1,
15
**touching (1)**
61:19
**tough (1)**
52:15
**trades (1)**
67:2
**trading (6)**
28:19,25;65:3,4,6;
92:18
**traditional (1)**
21:16,22;53:23
**transaction (1)**
101:21
**transactions (8)**
18:1;58:11;69:12;
79:4;84:18;101:17;
112:4,5
**transfer (47)**
11:2;39:10;42:13,
25;43:2;51:10;52:4,
7;53:24;55:11;
56:23;59:2;61:18;
62:11,25;63:20;64:8,
16,16;68:24;25;69:4;
71:23;73:10;76:5;
78:13;80:24;81:6,20,
25;82:8,16;83:21,21;
90:13;95:19;98:8,
19;102:21;103:23;
104:24;105:12,15;
106:16;107:3;
109:11;110:9
**transfer- (1)**
71:24
**transferee (1)**
39:10
**transfer-of-venue (1)**
77:14
**transferred (16)**
13:15;40:11;
45:22;47:20;68:12,
15;72:18;74:22,25;
76:5;77:15;85:20;
102:25;103:5;
110:24;113:19
**transferring (2)**
51:5;97:13
**transfers (2)**
69:12;87:22;92:4

**transition (1)**
26:19
**transparency (2)**
79:5;101:17
**transparent (3)**
18:19;78:14;79:11
**transpired (1)**
63:13
**trash (1)**
37:2
**travel (7)**
13:12,13;53:15;
83:3;85:3,10;88:8
**treasurer (1)**
66:2
**tremendous (4)**
49:16;54:5;108:6;
111:22
**trial (1)**
60:11
**trials (1)**
108:7
**tries (1)**
57:15
**trip (1)**
52:16
**trouble (2)**
88:25;113:21
**true (10)**
22:19,19;28:19,
22;29:19;30:11;
85:14;89:10;97:23;
100:15
**truly (1)**
51:7
**trustee (9)**
13:3;66:5;77:24;
78:1,11;96:11,13;
98:19,22
**Trustee's (1)**
97:6
**trustworthiness (1)**
38:15
**trustworthy (1)**
38:25
**truth (1)**
39:23
**try (2)**
24:3;60:25
**trying (8)**
45:10;48:9;54:2,3;
75:11,12;96:6;
101:16
**TUNNELL (1)**
7:22
**turn (3)**
18:10;41:5;68:17
**turning (2)**
68:2;107:5
**twenty (5)**
51:19;57:4;69:19;
82:18;83:5
**twenty-five (1)**

13:2
**two (28)**
17:19;47:7,24;
53:12;62:4;65:12;
66:1,22;68:4,7;
69:17;72:2,24;
73:10;78:18;82:9,20,
25;83:5;88:9,17;
93:23,24;97:22;
101:7;103:17;
108:18,23
**two-and-a- (1)**
14:24
**Twomey (1)**
10:23
**type (8)**
54:3,3;67:5;91:1;
93:17,18;101:4,16
**types (2)**
16:11;89:13
**typical (3)**
35:16;61:18;67:5
**typically (2)**
86:6;88:20

---

**U**

**UBS (5)**
7:14,14;83:11;
107:12,13
**ultimately (4)**
72:18;74:4;94:20;
104:22
**umbrage (2)**
105:20,20
**Um-hum (1)**
47:1
**unaffiliated (2)**
15:4;16:17
**unanimously (1)**
42:25
**unclear (1)**
40:20
**uncontested (1)**
41:15
**uncontroverted (6)**
41:15;42:8,13;
84:14;92:10;100:1
**un-cooperation (1)**
96:24
**under (22)**
14:11,13,20,25;
20:23;35:13;38:16;
39:5;44:1,13;46:4;
52:25;67:21;70:25;
71:8;98:13;103:17,
18;106:6;112:1,1;
113:17
**underlying (1)**
17:1
**underneath (2)**
44:16;75:17
**understood (2)**

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 68-22 Filed 02/28/26    Page 304 of 1539    PageID 17542
Exhibit 22 Page 236 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

33:12,20
**unduly (1)**
  97:16
**unfortunately (2)**
  58:1,10
**unheard (1)**
  102:17
**UNIDENTIFIED (4)**
  19:3,5;41:7;
  109:20
**unique (18)**
  42:12,17;49:3;
  51:4;52:23;53:22;
  59:2;61:13,14,14;
  63:16;70:14,15;
  71:22;78:10;106:2;
  107:23;110:1
**United (4)**
  14:22;15:16;
  30:20;86:14
**Unless (2)**
  59:7;101:25
**unliquidated (2)**
  17:11;83:12
**unobjected-to (2)**
  36:10,12
**unrelated (2)**
  82:12;88:18
**Unsecured (9)**
  6:3;10:22;43:12;
  51:20;82:17;83:5;
  98:5;100:20,22
**unsecureds (2)**
  69:15,17
**unsophisticated (1)**
  83:2
**untold (1)**
  74:16
**up (24)**
  19:10;28:6,21,25;
  43:9;46:11;47:14;
  49:15;50:24;57:3;
  58:23;59:15,17;60:6,
  7;67:17,19;72:20;
  85:19;93:20;94:7;
  101:9;109:9;113:3
**upload (1)**
  113:22
**upon (2)**
  33:10;39:5
**upped (2)**
  49:14;50:16
**up-to- (1)**
  91:11
**upwards (1)**
  69:17
**use (2)**
  45:10;86:24
**used (4)**
  30:5,5;83:15;
  110:25
**useless (1)**
  62:8

**Usually (6)**
  30:1;71:22;73:11;
  75:14;82:22;107:24
**utmost (1)**
  58:24

**V**

**valuable (1)**
  103:22
**Valuation (2)**
  28:7;86:23
**value (3)**
  18:5,12;87:1
**Variant (1)**
  13:6
**variety (4)**
  15:4;86:11;91:22;
  92:19
**various (9)**
  14:5,21;16:4;
  17:11;34:18;56:21;
  72:4;77:9;95:3
**varying (1)**
  50:20
**vast (3)**
  43:9,11;80:4
**vastly (1)**
  68:7
**venture (3)**
  61:15;74:14,21
**venue (71)**
  10:16;11:1,2,2,20;
  23:11,14;39:20;
  41:15,20;42:9,13,16,
  24,25;43:4,18;44:2,
  5,19,20,24;45:9;
  51:5,11;52:4,7;
  53:24;54:1;55:12,
  20;56:22;57:2;58:2,
  3;59:3;61:18;62:16,
  25;63:20;64:6;
  71:23;76:13;77:9,
  17;78:13;79:22;
  80:2,21,24;81:20;
  82:4,8,16;83:20;
  95:19;98:8,13,23;
  99:14,16;100:23;
  101:11,24;105:12,
  16;106:5,16;107:3;
  109:11,16
**venue-transfer (2)**
  76:19;100:1
**veracity (1)**
  97:12
**version (1)**
  94:17
**versus (2)**
  62:3,4
**veteran (1)**
  19:22
**view (6)**
  53:9;55:14;64:10;

96:7;99:19;113:11
**views (2)**
  78:6;112:22
**virtually (3)**
  73:19;80:13;81:12
**vital (1)**
  111:15
**volume (2)**
  70:16;95:24
**voluminous (1)**
  74:18
**voted (1)**
  104:24
**votes (1)**
  70:18
**voting (2)**
  70:10;110:4

**W**

**walk (3)**
  46:10;51:5;79:24
**Walsh (1)**
  81:15
**wants (1)**
  78:15
**warmer (2)**
  75:11,11
**warrant (1)**
  42:13
**warring (1)**
  47:24
**WATERHOUSE (24)**
  9:5;10:11;23:13,
  15,25;24:9;25:16;
  27:22;32:12,20;
  33:12;36:5;42:2;
  50:10;51:11;54:17;
  64:25;66:2;68:4,11,
  17;69:15;85:5;93:15
**W-A-T-E-R-H-O-U-S-E (1)**
  24:1
**Waterhouse's (2)**
  65:1;104:9
**WATKINS (1)**
  7:13
**Watkins' (1)**
  83:15
**way (16)**
  11:11;31:18;40:9;
  55:2,2,6;77:16;
  86:25;87:17,17;
  95:9;102:24;107:21;
  109:1,3;110:15
**weakness (1)**
  80:1
**wealth (1)**
  14:7
**week (2)**
  27:4;29:23
**weekly (1)**
  31:8
**weeks (5)**

72:1;84:24;96:19;
  110:23;111:23
**weigh (3)**
  81:6,20;112:25
**weighed (1)**
  82:15
**weighs (2)**
  56:23;62:19
**weight (1)**
  57:11
**Welcome (4)**
  10:13;36:7;75:3;
  105:4
**well-founded (1)**
  39:14
**Wells (1)**
  107:13
**what's (10)**
  55:22;60:7;65:8;
  68:9;71:2;79:16;
  97:16;104:11,20;
  105:18
**whatsoever (1)**
  106:24
**Whereupon (1)**
  114:3
**whole (3)**
  62:23;83:23;98:2
**wholly (1)**
  44:15
**who's (2)**
  70:17;75:12
**wide (2)**
  62:10;86:11
**widely (1)**
  35:17
**WILLIAM (1)**
  6:11
**willingness (1)**
  89:1
**wind (1)**
  47:14
**WINSTEAD (1)**
  8:17
**wish (2)**
  19:2;57:10
**withheld (1)**
  14:9
**within (5)**
  39:7;72:1,2;
  102:21;111:18
**without (7)**
  12:16;37:18;54:6;
  60:6;79:17;89:13;
  91:12
**withstand (1)**
  96:14
**witness (18)**
  19:2,12,15,24;
  22:5;23:2,9,22,25;
  25:7;32:14,24;34:22,
  25;35:24;36:1,6;
  108:16

**witness-and-exhibit (1)**
  36:11
**witnesses (10)**
  21:23,25;85:11,22,
  23,25;91:22;96:21;
  97:13;99:24
**WL (1)**
  13:8
**Woodbridge (1)**
  13:7
**word (2)**
  105:21;106:18
**words (2)**
  90:5;102:23
**work (8)**
  18:7;29:13,17;
  30:22;108:6,7;
  111:22;112:5
**worked (5)**
  20:9;24:9;50:3;
  55:5;79:3
**working (2)**
  75:13;95:5
**world (4)**
  14:19;15:2;32:2;
  87:19
**worry (2)**
  59:4;83:3
**wrestle (2)**
  49:18;55:1
**wrestling (1)**
  54:11
**written (4)**
  40:16;49:22;
  76:21;81:1
**wrong (3)**
  46:24;71:9,14
**wrote (1)**
  91:23

**Y**

**years (5)**
  13:2;24:21,23;
  56:3;57:4
**yield (1)**
  10:17
**yields (2)**
  53:17,19
**York (16)**
  15:20;20:14;30:6,
  7,7,10,15;42:1;
  82:10;83:10,14,15;
  86:16;99:17,21;
  107:13
**YOUNG (6)**
  6:2;10:24;85:17;
  100:4;111:6;112:15

**Z**

**ZABEL (1)**
  8:12

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**Ziehl (6)**
  10:6;11:15;13:14,
  21;21:19;75:22

---

**1**

---

**1 (7)**
  37:9,9,20;53:3;
  59:17;60:8;66:17
**1:45 (3)**
  105:5,6,6
**1:47 (1)**
  105:8
**10:48 (1)**
  41:8
**100,000 (1)**
  74:18
**1014 (1)**
  44:1
**11 (10)**
  17:21;45:13;
  78:23;80:3;86:24;
  97:10;98:19;105:16,
  19,25
**11:05 (1)**
  41:8
**11:50 (1)**
  75:8
**12 (2)**
  10:16;74:1
**12:00 (1)**
  75:8
**12:39 (1)**
  105:8
**1408 (1)**
  80:3
**1412 (3)**
  64:8;80:22;98:13
**15th (1)**
  60:21
**17 (2)**
  60:13;69:11
**18 (2)**
  37:9,20
**1979 (2)**
  81:3;87:25
**1998 (1)**
  81:15

---

**2**

---

**2 (5)**
  38:17;60:8,11;
  66:18;101:3
**2,000 (4)**
  51:24;53:3;67:18,
  20
**2:02 (1)**
  114:3
**2006 (3)**
  24:10;29:7,8
**2009 (3)**
  92:13;103:13,14

**2011 (2)**
  24:15;26:11
**2016 (1)**
  81:4
**2017 (1)**
  103:14
**2018 (5)**
  16:8,21;61:5;
  65:16;74:4
**2019 (4)**
  13:18;60:20,21;
  88:2
**24 (2)**
  37:11,21
**25 (2)**
  37:11,21
**26 (4)**
  39:15;40:23;
  59:17,25

---

**3**

---

**3 (2)**
  37:10,20
**30 (1)**
  15:21
**30th (1)**
  61:5
**31st (1)**
  60:20

---

**4**

---

**45 (1)**
  52:25

---

**5**

---

**5.2 (1)**
  16:1

---

**7**

---

**7 (1)**
  13:18
**7.5 (1)**
  15:3

---

**8**

---

**807 (1)**
  38:12

---

**9**

---

**9 (2)**
  37:10,21
**99.94 (1)**
  80:7

# EXHIBIT 23

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                              )   Case No. 19-34054-sgj-11
 3   In Re:                   )   Chapter 11
                              )
 4   HIGHLAND CAPITAL         )   Dallas, Texas
     MANAGEMENT, L.P.,        )   January 9, 2020
 5                            )   9:30 a.m. Docket
                              )
 6          Debtor.          )
                              )   DEBTOR'S MOTION TO COMPROMISE
 7                            )   CONTROVERSY WITH OFFICIAL
                              )   COMMITTEE OF UNSECURED
 8   _____)   CREDITORS [281]

 9                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Debtor:          Jeffrey N. Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
13                            10100 Santa Monica Blvd.,
                               13th Floor
14                            Los Angeles, CA  90067-4003
                              (310) 277-6910
15
     For the Debtors:         Ira D. Kharasch
16                            PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
17                             13th Floor
                              Los Angeles, CA  90067-4003
18                            (310) 277-6910

19   For the Debtor:          John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
20                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
21                            (212) 561-7700

22   For the Debtors:         Melissa S. Hayward
                              Zachery Z. Annable
23                            HAYWARD & ASSOCIATES, PLLC
                              10501 N. Central Expressway,
24                             Suite 106
                              Dallas, TX  75231
25                            (972) 755-7104
```

2

1    APPEARANCES, cont'd.

2    For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      Dennis M. Twomey
3                                 SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
4                                 Chicago, IL  60603
                                  (312) 853-7539
5
     For the Official Committee   Penny P. Reid
6    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
7                                 Dallas, TX  75201
                                  (214) 981-3413
8
     For the Issuer Group:        James T. Bentley
9    (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
                                  919 Third Avenue
10                                New York, NY  10022
                                  (212) 756-2000
11
     For the Issuer Group:        James E. Bain
12   (Telephonic)                 JONES WALKER, LLP
                                  811 Main Street, Suite 2900
13                                Houston, TX  77002
                                  (713) 437-1820
14
     For Acis Capital            Rakhee V. Patel
15   Management GP, LLC:         Annmarie Antoinette Chiarello
                                 WINSTEAD, P.C.
16                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
17                               (214) 745-5250

18   For Redeemer Committee of   Terri L. Mascherin
     the Highland Crusader       JENNER& BLOCK, LLP
19   Fund:                       353 N. Clark Street
     (Telephonic)                Chicago, IL  60654-3456
20                               (312) 923-2799

21   For Redeemer Committee of   Mark B. Hankin
     the Highland Crusader       JENNER & BLOCK, LLP
22   Fund:                       919 Third Avenue
     (Telephonic)                New York, NY  10022-3098
23                               (212) 891-1600

24

25

3

```
 1   APPEARANCES, cont'd.:

 2   For the U.S. Trustee:       Lisa L. Lambert
                                 Meredyth A. Kippes
 3                               OFFICE OF THE UNITED STATES
                                   TRUSTEE
 4                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242
 5                               (214) 767-8967

 6   For Jefferies, LLC:         Patrick C. Maxcy
     (Telephonic)                DENTONS US, LLP
 7                               233 South Wacker Drive, Suite 5900
                                 Chicago, IL  60606-6361
 8                               (312) 876-8000

 9   For Patrick Daugherty,      Patrick Daugherty
     Pro Se:
10
     Recorded by:                Hawaii S. Jeng
11                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
12                               Dallas, TX  75242
                                 (214) 753-2006
13
     Transcribed by:             Kathy Rehling
14                               311 Paradise Cove
                                 Shady Shores, TX  76208
15                               (972) 786-3063

16

17

18

19

20

21

22

23

24

25       Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.
```

4

1            DALLAS, TEXAS - JANUARY 9, 2020 - 9:56 A.M.

2            THE COURT:  All right.  Let's roll to Highland now.

3    Let's get appearances from lawyers in the courtroom, please.

4            MR. POMERANTZ:  Good morning, Your Honor.  Jeff

5    Pomerantz; Pachulski Stang Ziehl & Jones.  Happy New Year,

6    Your Honor.

7            THE COURT:  Happy New Year.

8            MR. POMERANTZ:  Here on behalf of the Debtor.

9            THE COURT:  Okay.  Thank you.

10            MS. HAYWARD:  Good morning, Your Honor.  Melissa

11    Hayward and Zachery Annable on behalf of the Debtor.

12            THE COURT:  Good morning.

13            MS. LAMBERT:  Lisa Lambert, and I think Ms. Kippes

14    will be joining me, representing William Neary, the United

15    States Trustee.

16            THE COURT:  Thank you.

17            MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

18    Chiarello and Rakhee Patel here on behalf of Acis Capital

19    Management, LP and Acis Capital Management GP, LLC.

20            THE COURT:  Thank you.

21            MR. CLEMENTE:  Good morning, Your Honor.  Matthew

22    Clemente from Sidley Austin on behalf of the Official

23    Committee of Unsecured Creditors.  With me today are my

24    partners Dennis Twomey and Penny Reid.

25            THE COURT:  Okay.  Good morning.  All right.  Is that

5

1   all of the courtroom appearances?

2       All right.  We have several people on the phone.  I think

3   most of them are just listening in.  If you're on the phone,

4   though, and you wish to appear, you may do so at this time.

5           MR. BENTLEY:  Good morning, Your Honor.  This is

6   James Bentley of Schulte Roth & Zabel.  Also on the line is my

7   co-counsel, Joseph Bain of Jones Walker.  We represent the

8   Issuers.

9           THE COURT:  Okay.  Good morning.

10          MS. MASCHERIN:  Good morning, Your Honor.  This is --

11          MR. MAXCY:  Good morning.  Patrick --

12          MS. MASCHERIN:  Good morning, Your Honor.  This is

13  Terri Mascherin of Jenner & Block.  Also on the line with me

14  is my partner, Mark Hankin.  We represent the Redeemer

15  Committee of the Highland Crusader Fund, which is one of the

16  members of the Unsecured Creditors' Committee.

17          THE COURT:  Okay.  Good morning.

18          MR. MAXCY:  Good morning, Your Honor.  This is

19  Patrick Maxcy from Dentons US, LLP on behalf of Jefferies,

20  LLC.

21          THE COURT:  Okay.  Thank you.  All right.  Well, I

22  guess that is it for the phone appearances.

23      Mr. Pomerantz, we're -- we have just one matter on the

24  calendar, the motion to compromise with the Committee.  I saw

25  two limited objections, and then a U.S. Trustee's broader

6

1   objection.  I'll start with, Do you have any of these

2   objections worked out?

3           MR. POMERANTZ:  Yes, we do.

4           THE COURT:  Okay.

5           MR. POMERANTZ:  We believe we have the Jefferies

6   objection worked out, as well as the objection of the Issuers.

7   And I'll, during the course of my presentation, alert Your

8   Honor to how that's worked out.

9           THE COURT:  Okay.

10          MR. POMERANTZ:  And then we'll have a revised order

11  that basically addresses each of their concerns, or at least

12  Jefferies' concerns, but the statements on the record for the

13  Issuers' concerns.

14          THE COURT:  Okay.  Very good.

15          MR. POMERANTZ:  Good morning again, Your Honor.  Jeff

16  Pomerantz; Pachulski, Stang, Ziehl & Jones.  I'm joined in the

17  courtroom by Ira Kharasch, Greg Demo, and John Morris from my

18  office.  I would also like to introduce the Court to the

19  proposed new members of the board of directors of Strand

20  Advisors, which is the Debtor's general partner.  They're all

21  sitting in the first row behind counsel's well.  And that's

22  Mr. James Seery, --

23          THE COURT:  Good morning.

24          MR. POMERANTZ:  -- Mr. John Dubel, --

25          THE COURT:  Good morning.

7

1          MR. POMERANTZ:  -- and the Honorable Russell Nelms.

2          THE COURT:  Yes.  I've met him before.

3          MR. POMERANTZ:  As have we.  We thought you would

4     remember him.

5          The resumes of Mr. Seery and Mr. Dubel were attached to

6     the motion filed on December 27th, and those two resumes and

7     the resume of the Honorable Judge Nelms were attached to the

8     reply that was filed last evening.  And while Mr. Seery and

9     Mr. Dubel may be new names to Your Honor, we know that you are

10    familiar with Judge Nelms, who sat with you in this district.

11         THE COURT:  Uh-huh.

12         MR. POMERANTZ:  Also in the courtroom, Your Honor, is

13    Brad Sharp, the Debtor's chief restructuring officer from DSI,

14    --

15         THE COURT:  Good morning.

16         MR. POMERANTZ:  -- and his colleague, Fred Caruso,

17    who spends most of his working hours at the Debtor's Dallas

18    headquarters.

19         THE COURT:  Good morning.

20         MR. POMERANTZ:  We have the declaration of Mr. Sharp

21    that we would move into evidence at this point in time.

22         THE COURT:  All right.  I've got a stack of paper.

23    If you have an extra copy for me to use, --

24         MS. HAYWARD:  Your Honor, may I approach with the --

25         THE COURT:  You may.

8

1         MS. HAYWARD:  Your Honor, it was filed, the

2   declaration was filed.  I'm not sure that we have a copy of --

3         MR. POMERANTZ:  Your Honor, we will also at the

4   appropriate time during my presentation, I'll bring up to Your

5   -- ask to bring up to Your Honor revisions to the term sheet

6   that was attached to the motion.

7         THE COURT:  Okay.

8         MR. POMERANTZ:  Copies have been given to Ms. Lambert

9   as well as the Committee.

10        THE COURT:  Okay.  Very good.  All right.  Well, what

11  was handed to me was the preliminary term sheet as well as the

12  CVs for the proposed new board members.  I don't see the

13  declaration --

14        MR. POMERANTZ:  Your Honor, if I may approach, I have

15  a copy.

16        THE COURT:  You may.  All right.  Very good.

17        MR. POMERANTZ:  So we would move that declaration

18  into evidence.

19        THE COURT:  All right.  The Court will admit this.

20  It was filed on the docket at 327, but I will additionally

21  admit it as Exhibit 1 today.

22     (Debtor's Exhibit 1 is received into evidence.)

23        THE COURT:  At some point in time, I want to give

24  parties the opportunity to cross-examine Mr. Sharp.  Do you

25  want to do that now, or shall we hear an opening statement?

9

1          MR. POMERANTZ:  However Your Honor prefers.  I mean,

2     maybe it's helpful to hear argument first, and then, before

3     the Trustee --

4          THE COURT:  I think I'd like to hear opening

5     statements and then we'll --

6          MR. POMERANTZ:  Thank you.

7          THE COURT:  -- make the opportunity available.  Okay.

8            OPENING STATEMENT ON BEHALF OF THE DEBTOR

9          MR. POMERANTZ:  Your Honor, by way of background, we

10    appeared before Your Honor on December 6th and December 19th.

11    And during each of those hearings, we described for the Court

12    negotiations that were underway between the Committee and the

13    Debtor which, if successful, would have -- would eliminate the

14    need for contested and uncertain and costly litigation

15    regarding the appointment of a Chapter 11 trustee and really

16    put this case in a position where the Debtor and the Committee

17    would be able to work together constructively towards

18    negotiation of a plan.

19       As a result of our hearing on December 19th, Your Honor

20    entered a scheduling order that set deadlines for either the

21    filing of a motion to approve a settlement, or alternatively,

22    the filing of one or more motions for the appointment of a

23    trustee.

24       As set forth and required by the scheduling order, we

25    filed our motion on December 27th, and in that motion we

Case 19-34054-sgj11 Doc 3596-23 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 185 Filed 29/12/26 2 Page 316 of 1539 PageID 17554

10

1     sought approval of a term sheet and ancillary documents

2     between the Debtor and the Committee, which I'll describe

3     shortly.

4         While a couple of items had not yet been agreed to at the

5     time the motion was filed, I'm pleased to report that over the

6     last couple of days we've been able to reach closure with the

7     Committee with respect to those items, and there would also be

8     some modifications to the term sheet, which I'll go through in

9     a few moments.

10        The motion, Your Honor, seeks approval of the term sheet,

11    which accomplishes a variety of things that, again, will allow

12    the Debtor and the Committee to put the acrimony that has

13    existed in this case for the first three months behind us and

14    allow us to focus on productive matters.  In the last 24

15    hours, as I mentioned, there have been a few changes to the

16    term sheet that I will describe.  And I would like to hand up

17    Your Honor a redline and a clean copy of the revised term

18    sheet and exhibits.  May I approach?

19            THE COURT:  All right.  You may.  Do you have an

20    extra for the law clerk?  Okay.  Thank you.

21        (Pause.)

22            MR. POMERANTZ:  Your Honor, the term sheet does a

23    number of things.  Would you like me to give Your Honor some

24    time to look through the redlines?

25            THE COURT:  No.  You may proceed.

1            MR. POMERANTZ:  Okay.  The term sheet does a number

2    of things.  The first thing the term sheet does is appointment

3    of an independent board at Strand Advisors.  Strand Advisors

4    is the GP of the Debtor.  The Debtor is an LP.  The Debtor

5    previously had filed a motion to approve the retention of Brad

6    Sharp as the chief restructuring officer, and that initial

7    agreement and motion contain details regarding the scope of

8    Mr. Sharp's authority and the scope of what the Debtor could

9    do without Mr. Sharp's prior consent.

10       The Committee raised concerns that the structure was not

11   sufficient to ensure that decisions were being made for the

12   Debtor only in their best interests and without any

13   inappropriate influence from Mr. Dondero.

14       To address the Committee's concerns, a focal point of the

15   settlement was the Debtor's agreement to appoint an

16   independent board of directors at Strand who would be

17   responsible for managing the operations of the Debtor.

18       Over the last few weeks, a principal aspect of the

19   negotiations between the Committee and the Debtor have been

20   discussing who should the independent directors be.

21   Conceptually, the Debtor and the Committee both agreed that

22   the board should include, first, a person with significant

23   industry experience in which the Debtor operates -- hedge

24   funds, money management; second, a person with deep

25   restructuring experience from the financial advisor side; and

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-15   Filed 05/22/23   Page 318 of 1539   PageID 17556
Exhibit 23   Page 2 of 92

12

1    third, a person with some sort of judicial or governmental

2    experience.

3         The Debtor originally provided the Committee with three

4    proposed candidates.  The Committee considered the Debtor's

5    request, but instead presented the Debtor with four different

6    candidates and asked the Debtor to choose from those four.

7    The Debtors interviewed each of those people and ultimately

8    agreed on Messrs. Dubel and Seery, who were each on the

9    original list.

10        As of the deadline to file the motion on December 27th,

11   the Committee and the Debtor had still not agreed on the

12   identity of the third board member, but the parties were

13   hopeful that an agreement could ultimately be reached and we

14   decided to go ahead and file the motion.  As I'm sure Your

15   Honor saw in the motion, it was contingent upon everyone

16   agreeing on the third board member.

17        Ultimately, the Debtor and the Committee both agreed that

18   Mr. Dubel and Mr. Seery could identify the third board member

19   out of a pool of four people:  Two of the people originally

20   requested by the Committee and two people identified by the

21   Debtor.  This week and over the weekend, Mr. Seery and Mr.

22   Dubel interviewed each of the four candidates, and ultimately

23   decided on the appointment of Judge Nelms as the third

24   independent board member.

25        The board, as it will be constituted going forward, in the

13

1    Debtor's opinion, consists of three exceptional individuals

2    who are independent of the Debtor, have a sterling reputation

3    in the community, and bring to the Debtor a variety of the

4    skills that we believe, and believe the Committee agrees,

5    gives the Debtor the best opportunity to achieve a consensual

6    restructuring and otherwise manage the affairs of the Debtor

7    in the best interests of the stakeholders.

8        It is contemplated that the Debtor will continue to retain

9    the services of DSI as the chief restructuring officer, and

10   ultimately the board will determine if it's important to

11   retain a CEO going forward.

12       The second thing that the term sheet does, Your Honor, was

13   the removal of Mr. Dondero as an officer and director of

14   Strand and eliminate all of his control over decision-making

15   of the Debtor.  The Debtor recognized early on in this case

16   that Mr. Dondero's continuing role with the Debtor in a

17   position of authority made the Committee extremely uneasy.

18   Accordingly, the term sheet provides for him removing himself

19   as an officer and director of Strand and that he would no

20   longer be in a position of control at the Debtor.

21       However, since the filing of the motion, over the last

22   several days, concerns have been raised about whether removing

23   Mr. Dondero from the business entirely would have unintended

24   consequences.  I believe I may have mentioned at prior

25   hearings that, because of his involvement as a portfolio

14

1    manager under various contracts with third parties, that there

2    could be adverse economic consequences to the Debtor if he

3    didn't stay in some role.

4        As a result of discussions over the last 24 hours, the

5    Committee has agreed and the Debtor agreed to modify the term

6    sheet to allow the new board to decide whether to retain Mr.

7    Dondero in his capacity as a portfolio manager, provided,

8    however, that he will not receive any compensation and he will

9    agree to resign if requested by the board.

10       In any event, he will have no decision-making control at

11   all and he will report to the independent board.

12       The corporate governance documents that create the new

13   independent board of Strand also provide that Mr. Dondero, as

14   the owner of the equity in Strand, may not replace the board

15   without the Committee consent or court order.

16       The third major aspect of the term sheet, Your Honor, was

17   the agreement on operating protocols, and it really relates to

18   the ground rules for the Debtor's operations going forward and

19   when notice to the Committee is required of certain

20   transactions that would otherwise be in the ordinary course of

21   business.

22       Importantly, Your Honor, we are not trying to modify the

23   Bankruptcy Code in any way.  Any transactions out of the

24   ordinary course of business would still be subject to Your

25   Honor's approval.

15

```
 1        However, in this case, as we indicated in the initial

 2    motion we filed when the case was in Delaware, whether or not

 3    something is ordinary is not straightforward in a case such as

 4    the Debtor's, given the nature of the Debtor's operations.  So

 5    we thought it was important to establish ground rules up

 6    front, and establishing those ground rules was one of the

 7    things we did initially in the case.  We had opposition from

 8    the Committee, and we've worked through the opposition and

 9    ultimately arrived at the operating protocols that are

10    attached to the term sheet.

11        They have been slightly modified in nonmaterial ways in

12    the documents I handed up to Your Honor.

13        They were subject to substantial negotiations between the

14    Debtor and the Committee, and we also expect them to be the

15    subject of future discussions with the Committee and the

16    independent board after the independent board takes -- takes

17    place.  Takes over.

18        Two parties in interest, Your Honor, Jefferies and a group

19    of Issuers, the CLOs, have filed comments to the term sheet,

20    which I'll describe in a few moments.

21              THE COURT:  Okay.

22              MR. POMERANTZ:  The next aspect, Your Honor, of the

23    term sheet was the provision of standing to the Creditors'

24    Committee to pursue certain insider claims.

25        During the negotiations, the Committee requested immediate
```

16

 1   standing to investigate and potentially prosecute claims

 2   against insiders to the extent those insiders were not

 3   employed by the Debtor.  Granting standing at this stage of

 4   the case was a difficult give by the Debtor.  However, the

 5   Committee impressed upon the Debtor the importance of them

 6   being able to control the filing of any actions against the

 7   insiders, and the Debtor decided to accede to the Committee's

 8   request.

 9       It still remains the Debtor's hope that, with the creation

10   of the independent board, that the Debtor, the Committee, and

11   any insiders who might be subject to any such claims will be

12   able to come together and negotiate a consensual resolution of

13   this case.  While all parties, I'm sure, can and know how to

14   litigate, hopefully they will agree that a negotiated outcome

15   is better than a litigated outcome.

16       The next aspect of the term sheet, Your Honor, was the

17   document preservation protocols, and it provides for certain

18   procedures to be put in place to address the Committee's

19   concerns about document preservation.  They are contained in

20   an exhibit to the term sheet.  Again, slight nonmaterial

21   modifications were made in what I handed up to Your Honor.

22   And essentially they provide also for the Committee's access

23   to privileged documents to aid in their investigation and

24   prosecution of claims to which they are granted standing, and

25   also sets forth a procedure to be followed to address concerns

17

1    if the information is subject to shared privileges by several

2    entities.

3        As I mentioned, Your Honor, three parties have filed

4    responses to the motion.  The first is Jefferies.  Jefferies

5    is a secured creditor of the Debtor with respect to its margin

6    account held at Jefferies, and also has a similar account held

7    by a non-debtor affiliate.  They have asked for clarification

8    that, one, nothing in the protocols or the motion affects its

9    rights under the underlying agreements or the safe harbor

10   provisions of the Bankruptcy Code entitling them to enforce

11   their remedies; and two, that the Debtors will not trade in

12   the prime account without Jefferies' consent, and if that

13   consent is sought and not obtained, only subject to court

14   order.

15       The Debtor has agreed to include language in the order to

16   address Jefferies' concern, and at the conclusion of my

17   presentation I'll submit to Your Honor an order and a redline

18   containing that language.

19           THE COURT:  Okay.

20           MR. POMERANTZ:  The second objection -- or not

21   objection, Your Honor -- the second statement was filed by a

22   group of Issuers of CLO obligations.

23           THE COURT:  Uh-huh.

24           MR. POMERANTZ:  And they were concerned that certain

25   aspects of the operating protocols which require notice to the

1    Committee prior to the Debtor being able to take certain

2    actions could conflict with the provisions of the underlying

3    agreements which might require the Debtor to take action on a

4    more expedited basis.

5         Neither the Issuers or the Debtor are aware of any

6    potential transactions that will arise prior to the next

7    hearing before Your Honor on January 21st.  We understand --

8    we were not party to these discussions between the Committee

9    and the Issuers yesterday, but we understand the way it's been

10   resolved is that the Issuers will withdraw their objection as

11   it relates to going forward today, subject to being able to

12   come back to the Court on the 21st and revisit the issue if

13   additional changes are not made acceptable to them to resolve

14   their issues and concerns.

15             THE COURT:  Okay.

16             MR. POMERANTZ:  But I think all parties acknowledge

17   that over the next 12 days this is a theoretical issue rather

18   than a practical issue.

19             THE COURT:  Okay.

20             MR. POMERANTZ:  This brings us, Your Honor, to the

21   United States Trustee's opposition, which is really the only

22   true objection to the motion that has been filed.  No creditor

23   has filed an objection, no investor has filed an objection,

24   and no governmental agency -- which the U.S. Trustee in its

25   objection purports to be pursuing their interests -- has filed

19

1    an objection, either.

2        As Your Honor probably recalls, at the December 19th

3    hearing the Trustee indicated its intent to oppose any

4    agreement between the Debtor and the Committee that would

5    involve corporate governance and to file its own motion for

6    the appointment of the trustee.  That motion is currently

7    scheduled for hearing on January 21st.  We had asked the U.S.

8    Trustee to reserve judgment on the Committee's and Debtor's

9    agreement until after we had come to an agreement and after we

10   had presented it to the Trustee, in hopes that it would

11   address their concerns.  However, as the Court told us -- as

12   the U.S. Trustee told us and Your Honor at the December 19th

13   hearing, there was nothing short of appointment of a trustee

14   that would satisfy the Trustee.

15       The comments really didn't make sense to us, and I believe

16   it perplexed Your Honor, but here we are.

17       At its core, Your Honor, the U.S. Trustee's objection is

18   really a request that the Court substitute its business

19   judgment for that of the Debtor and the Committee, the

20   Committee who represents the substantial majority of all

21   claims in this case, when both of them have decided that

22   agreeing to certain changes in corporate governance, among

23   other things, is preferable to the uncertain, costly, and

24   time-consuming litigation over a trustee, and also the

25   uncertainty, even if a trustee was appointed, on how the case

20

1    would be administered.

2         To the contrary, under the corporate governance proposal,

3    we have three highly-qualified individuals who are poised to

4    take over management of the Debtor, and each bring with them

5    various skills that one trustee would not have.

6         The Trustee has filed its motion for appointment of a

7    trustee, and I'm sure on the 21st will argue that the Code

8    requires it.  However, that's not the issue before Your Honor

9    today.  It's not whether a trustee is appropriate.  It's

10   whether the motion and the term sheet is a sound exercise of

11   the Debtor's business judgment under Section 363, and,

12   importantly, a reasonable compromise of the pending disputes

13   between the Debtor and the Committee.

14        The Trustee's objection raises three general points, none

15   of which have any merit.  First, the Trustee argues that there

16   is a lack of disclosure of significant matters.  The first

17   aspect that the Trustee raises to, or points to, is the

18   absence of identification of the third board member and the

19   absence of disclosure of the compensation that the board

20   members will receive, which will be backstopped by the Debtor.

21        As I described before, Your Honor, the identity of the

22   third member of the board was a fluid process which was only

23   resolved earlier this week, and the Debtor did not believe

24   that it was appropriate to reach agreement on director

25   compensation until all board members could provide input.

21

1   Last night, we filed a reply to the Trustee's objection in

2   which we disclosed the identity of the third board member, and

3   we'll also disclose the proposed compensation to be provided

4   to them, which essentially is as follows.  Each member of the

5   board will receive $60,000 a month for the first three months

6   of the case, $50,000 a month for the next three months of the

7   case, and the presumption thereafter would be $30,000 a month.

8   However, people recognize that this case will look a lot

9   differently six months from now, and while the presumption is

10  $30,000, the Debtor, the independent board members, and the

11  Committee will sit down, see how the case looks, and decide

12  whether any modifications are appropriate.

13      The amount of compensation, which at first blush may seem

14  significant, really reflects the significant amount of work

15  that the Debtor, the Committee, and the independent directors

16  anticipate will be required from them not only to get up to

17  speed about the case, but to effectively manage this complex

18  Debtor's business operations.  The directors have heard from

19  the Debtor and the Committee of all the issues, of all the

20  concerns, and this is not an enviable task that they are

21  undertaking.  The compensation they are being provided thus

22  far we believe is appropriate under the circumstances and

23  commensurate with the work that they are going to be expected

24  to complete.

25      If they are successful and they are able to achieve a

22

 1  consensual restructuring here, the million and a half or so

 2  that will be spent on them will be best million and a half

 3  dollars I think spent in this case.

 4      Your Honor, we also have updated corporate governance

 5  documents which --

 6      (Pause.)

 7          MR. POMERANTZ:  Your Honor, may I approach with the

 8  updated corporate governance documents?

 9          THE COURT:  You may.  Okay.

10          MR. POMERANTZ:  As I will discuss in a moment, Your

11  Honor, there is really no need for the Court to approve the

12  corporate governance documents, as they have been executed by

13  Strand, which is not a debtor before this Court.  However,

14  there are a couple of matters in those documents that I want

15  to bring to the Court's attention that do impact on the

16  Debtor.

17          THE COURT:  Okay.

18          MR. POMERANTZ:  First, as is typical for board

19  members, Strand has agreed to indemnify the independent

20  directors to the full extent permitted by law.  The

21  independent directors have requested that the Debtors backstop

22  Strand's agreement, and the Debtor and the Committee agree,

23  and the documents so provide.

24      Strand has also committed to obtain directors and officers

25  coverage for the independent directors.  It has been located,

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35-23   Filed 04/24/23   Page 329 of 1539   PageID 17567
Exhibit 23   Page 224 of 92

23

1  it's in the process of being finalized and bound, and the

2  Debtor will pay the cost of that coverage.

3      The independent directors have also asked for language in

4  the order approving the settlement that requires a party

5  seeking to assert a claim against the independent directors

6  relating to their role as an independent director to

7  demonstrate to this Court that a claim is colorable before

8  filing the claim and providing the Court with jurisdiction

9  over any such claim.  This is language that's similar in other

10  similar types of cases.

11          THE COURT:  Uh-huh.

12          MR. POMERANTZ:  That will be reflected in the order.

13      Next, the Trustee objects to the failure of the Debtor to

14  identify who the potential chief executive officer of the

15  Debtor will be.  And essentially, she's arguing that you have

16  to identify that CEO now; it has to be subject to court

17  approval.  However, there's no requirement that any company

18  retain a CEO.  It's not a corporate law requirement.  And the

19  fact that the board reserves the right to retain a CEO in the

20  future is consistent with corporate law and is not a basis to

21  deny the motion.  And in any event, normally, the retention of

22  a CEO is not a subject that is brought to the Court's

23  attention for Court approval.

24      So the lack of any clarity over the identity of the CEO is

25  a reflection of the fact that this independent board does not

24

 1  know if a CEO is required.  They will come in, they are going

 2  to interview all the employees, they're going to sit down with

 3  the CRO, they're going to sit down with counsel, they're going

 4  to sit down with the Committee, and ultimately they will

 5  decide if a CEO is to be retained.  And if a CEO is to be

 6  retained, they will go through the process of identifying who

 7  that CEO is.  But again, it's not a reason to deny the motion.

 8       The Trustee has also argued that because the Committee is

 9  not granted standing to pursue claims against current

10  employees, as opposed to former employees, that there might be

11  some statute of limitations concerns with respect to claims

12  against those employees.  The argument doesn't really make

13  sense to us.  In the standard case, the Debtor retains causes

14  of action.  And the Committee can investigate causes of

15  action.  And at some point during the case, a Committee could

16  come in and could demand that the Debtor prosecute them, and

17  if the Debtor unreasonably refuses, could seek standing before

18  the Court.

19       In this case, the Debtors agreed up front that the

20  Committee has the standing to prosecute certain claims against

21  insiders that are not employees of the Debtor, which obviates

22  the need for standing.  So we've gone one step more.  But the

23  Trustee is arguing that that leaves a void for the claims that

24  are not subject to the agreement on standing.

25       However, the term sheet provides that the board is going

25

 1   to make determinations on what employees should remain, what

 2   employees should not remain.  To the extent the board

 3   terminates any employees and there are claims against them,

 4   then basically the Committee will have the ability to bring

 5   those claims.

 6       To the extent that those people aren't terminated, we have

 7   no doubt that the Committee, in the course of its

 8   investigation, will determine whether claims should be brought

 9   against those people, and at some point in time may ask the

10   Debtor to prosecute those claims or ultimately seek standing.

11       In any event, these things are not being swept under the

12   rug.  There's no real legitimate concern that there's any

13   statute of limitations issue that will prevent those claims

14   from being prosecuted.

15       I am very much aware and have no doubt that the Committee

16   is going to be laser-focused on claims, and any concern that

17   statute of limitations is going to lapse I think is not well-

18   taken.

19       The Trustee next argues that the Court does not have the

20   jurisdiction to implement the corporate governance matters,

21   and for that reason the motion should be denied.  They -- she

22   argues that because Strand is not a debtor, that the Court has

23   no authority to appoint --

24           MS. LAMBERT:  Your Honor, I object.  The United

25   States Trustee is a he.  I am not the United States Trustee,

26

1  and the attacks *ad hominem* are inappropriate.

2          THE COURT:  All right.  Well, clarification, the U.S.

3  Trustee is the guy in Washington.  But anyway, you may

4  proceed.

5          MR. POMERANTZ:  I apologize to Ms. Lambert.

6          MS. LAMBERT:  Actually, he's downstairs right now.

7  Bill Neary.

8          MR. POMERANTZ:  I apologize to --

9          THE COURT:  Oh, well, I thought you meant the big guy

10 in Washington.  But anyway, you may proceed.

11         MR. POMERANTZ:  I apologize to Ms. Lambert and no

12 offense was meant.

13         THE COURT:  Okay.

14         MR. POMERANTZ:  So, the U.S. Trustee argues that

15 because Strand is not a debtor that the Court has no authority

16 to appointment the independent directors and limit Mr.

17 Dondero's right to remove the independent directors.  The

18 Debtor is not really seeking authority to appoint -- to have

19 court authority for the appointment of the directors at

20 Strand.  Again, as I mentioned before, that authority exists

21 outside of bankruptcy.  Strand is not a debtor.  Strand could

22 appoint anyone it wants to carry out its responsibility as the

23 general partner of the Debtor, and it's exercising its

24 corporate authority to do so by installing a board at Strand.

25     Nor is the Debtor seeking court authority for Strand to

27

1   enter into the corporate governance documents.  Other than the

2   couple of items I mentioned before, Your Honor, Strand can

3   enter into these documents without authority from this Court.

4   The only court authority that was required:  Debtor to

5   backstop the indemnification obligations, Debtor to pay

6   compensation to the board members, and Debtor to pay for the

7   D&O policy.

8        With respect to the Court's right to limit Mr. Dondero's

9   ability to terminate the independent directors, the term sheet

10   contemplates the Court approving a stipulation which limits

11   Mr. Dondero's ability to terminate the independent directors,

12   and if he does in fact seek to terminate the appointment of

13   the independent directors, he would be in violation of court

14   order.  But even more importantly, Your Honor, if he decided

15   to terminate the independent directors without the Committee's

16   consent and without the Debtor's consent, I wouldn't imagine

17   it would take anyone very long to come back before Your Honor

18   and ask Your Honor to very quickly appoint a trustee.

19        Accordingly, Your Honor, I think the argument of lack of

20   jurisdiction over Strand is a red herring and should be

21   denied.

22        Lastly, Your Honor, the Trustee makes a curious argument

23   that a trustee is needed to protect all investors and

24   governmental authorities.  The Trustee argues that this case

25   demands transparency which can only be accomplished by a

28

1   Chapter 11 trustee.

2        One thing I think the Debtor and the Committee and the

3   U.S. Trustee will agree on, this case does demand

4   transparency.  And we believe we've installed a corporate

5   governance structure, an operating protocol structure, a

6   document preservation structure, that does just that, provides

7   transparency that this Debtor has not been subject to and

8   which is quite different from the case that was before Your

9   Honor before.

10       So we believe that what the Debtor and the Committee have

11  done is not only in the interests of the Debtor, the

12  creditors, but investors and all governmental entities.

13       And no investor or governmental entity has had any

14  concerns or any problems with what is being done.  They

15  haven't filed any objection.  The U.S. Trustee apparently is

16  proceeding by proxy asserting those interests.

17       Second, nothing in the term sheet or any of the documents

18  limits the rights of investors or of governmental entities to

19  seek a trustee, to seek documents, or to do anything they

20  would -- that they would be entitled to do under the

21  Bankruptcy Code.

22       In any event, Your Honor, the fact that the Trustee

23  believes that a trustee is more appropriate, again, is an

24  argument that they can make at the January 21st hearing.  It's

25  not a basis for denial of this motion.

29

```
 1        In conclusion, Your Honor, the only economic stakeholders

 2   in this case believe that proceeding with the transactions

 3   contemplated by the term sheet is in the best interest of the

 4   estate, will maximize their ability to achieve a consensual

 5   restructuring, and move this case through the system as

 6   quickly and efficiently as possible.  The term sheet is a

 7   valid exercise of the Debtor's business judgment under 363 and

 8   an appropriate compromise of controversy, and the Trustee's

 9   objections are really nothing more than a rehash of its

10   request for an appointment of a trustee.

11        For all these reasons, Your Honor, we request that the

12   Court overrule the U.S. Trustee's objection and approve the

13   motion.

14             THE COURT:  All right.  Well, before I hear from our

15   objectors, is there any friendly commentary?  Mr. Clemente, I

16   figured you might want to address this.

17             MR. CLEMENTE:  I do, Your Honor.  And good morning.

18             THE COURT:  Good morning.

19       OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                        UNSECURED CREDITORS

21             MR. CLEMENTE:  For the record, Matthew Clemente from

22   Sidley Austin on behalf of the Official committee of Unsecured

23   Creditors.  I do have some comments that I would like to make,

24   Your Honor, some, so please bear with me.  I will try and be

25   brief.
```

30

1          THE COURT:  Okay.

2          MR. CLEMENTE:  I think as late as 1:00 o'clock in the

3     morning I wasn't sure that I would be in front of you with

4     this settlement fully in place in a manner that was

5     satisfactory to my Committee.  As I mentioned to you in my

6     prior appearances in front of you, every provision was

7     important to the Committee, and they all work together.  As

8     Your Honor can imagine, there was a lot of negotiation that

9     took place, including late in the day and early morning, to

10    come to that conclusion.

11         Some comments on our perspective as a committee, Your

12    Honor.  As an initial matter, we were absolutely not okay with

13    the governance structure that was in place when the petition

14    was filed.  As we detailed in our objections to the CRO motion

15    and the protocol motion back when the case was in Delaware,

16    the Committee has very real and identifiable concerns about

17    the Debtor's ability to dispatch its fiduciary duty.  And the

18    Committee very seriously contemplated moving for a Chapter 11

19    trustee daily.  That conversation is something that the

20    Committee continues to -- continued to engage in, Your Honor.

21    So it's something that they considered very, very carefully.

22         That was the lens through which the Committee was

23    approaching negotiations over the settlement agreement and the

24    independent director structure.  That's how they viewed it.

25    That's the backdrop against which they came to it.

1       The Committee had two primary goals that it had sought to

2   achieve with the settlement agreement.  The first was to

3   ensure that Mr. Dondero does not remain in a position of

4   management authority or control in any fashion with the

5   Debtor.  Goal number two was to ensure that the value of the

6   Debtor's estate is preserved and maximized.  Those two goals

7   needed to work together.

8       The Committee  believes that the carefully-crafted

9   settlement agreement achieves these objectives in a manner

10   that is more beneficial to the estate than a potential Chapter

11   11 trustee and a related fight over its appointment at this

12   time.

13       The lynchpin of the settlement, Your Honor, is the

14   appointment of the three independent directors.  And as Mr.

15   Pomerantz outlined for you, that was the subject of intense

16   discussion, negotiation, debate among the Committee and with

17   the Debtor.  But we believe that Mr. Seery, Mr. Dubel, and

18   Judge Nelms are fully independent, highly qualified, and bring

19   relevant and complementary skillsets to this board.  Mr.

20   Pomerantz referred to that, but we believe that the three

21   directors all bring unique talents and attributes that will

22   allow them to function effectively as a board and provide the

23   appropriate oversight and direction that we believe is

24   necessary here.

25       However, regardless of how independent or highly skilled

1   they may be, they would be of no use if they weren't bestowed

2   with the appropriate power.  So that was another point that

3   was very important to the Committee, and we believe that the

4   settlement does this.  The settlement makes clear that the

5   independent directors are granted exclusive control over the

6   Debtor, including over all employees.  That's absolutely

7   critical to the Committee.

8       The settlement also provides that the CRO and the Debtor's

9   professionals shall report and serve at the direction of the

10  independent directors.  That is also very important.

11      And let me be clear, Your Honor, because I think you may

12  have raised this at a prior hearing:  This is not a board that

13  we expect to work at 50,000 feet, as demonstrated by the

14  compensation structure that Mr. Pomerantz outlined for you.

15  This will be a board that's hands-on, members of which will be

16  on the ground, at the Debtor, with a strong presence and a

17  clear message of who is in charge.  That is critical for this

18  Committee.

19      Additionally, as Mr. Pomerantz mentioned, the new board,

20  in consultation with the Committee, is empowered to determine

21  whether a CEO should be retained.  It's possible that one of

22  the independent directors could be that CEO, Your Honor.  But

23  we wanted to make clear that that was an important part of the

24  structure, should the board determine that that was the way it

25  wanted to go.

33

     1      So, in sum, Your Honor, we believe that the independent

     2   board has the clear authority and the skillset that's

     3   necessary to take control and will be actively and

     4   aggressively doing so.

     5      But let me be clear, rest assured, Your Honor, this is not

     6   going to be a board that answers to the Committee in that

     7   sense.  I think that we will all be moving together

     8   directionally, but it's very possible that I will be in front

     9   of Your Honor arguing against a decision that this independent

    10   board made.  So I want to assure Your Honor that although the

    11   Committee was very active and in fact picked Mr. Seery and Mr.

    12   Dubel, and then Mr. Pomerantz detailed how the third director

    13   was picked, we understand who their duty -- what their duty is

    14   and we also understand that they're not a rubberstamp for the

    15   Committee, Your Honor.  And so I wanted to make that point to

    16   you to assure Your Honor that that's not the structure that's

    17   being set up here, nor are they the type of individuals that

    18   would allow that to happen.

    19      Additionally, Your Honor, the settlement grants the

    20   Committee standing to pursue estate causes of action against

    21   the related parties.  That was very important to us, Your

    22   Honor.

    23      And in addition to that, the settlement provides the

    24   Committee access to privileged documents and sets forth a

    25   discovery protocol that will assist the Committee in its

34

1   investigation.

2       The Committee strongly believes that Mr. Dondero's

3   repeated past behavior, that there are many questionable

4   transactions that will need to be thoroughly investigated and

5   pursued.  And so having those causes of action with the

6   economic party in interest related to those causes of action,

7   the Committee and its constituencies, we thought was very

8   important and very critical.

9       Granting standing, Your Honor, as I mentioned, avoids any

10  issues regarding who will be controlling those claims.

11      I'll touch on this in a moment, but Mr. Pomerantz talked

12  about Mr. Dondero remaining in name as an employee.  Let me

13  assure Your Honor that that is not a backdoor around the

14  Committee's ability to investigate and immediately pursue

15  claims against him should that be the course that we choose to

16  take.  So he's not part of that carve-out for current

17  employees.  That's not at all happening.  That would never be

18  something that my Committee would be comfortable with.  So I

19  wanted to make clear to Your Honor that that's not something

20  that's happening with sort of this late edition of Mr.

21  Dondero's continuing on in name as an employee.

22      Your Honor, the settlement also lays out a very detailed

23  set of operating protocols which we do believe are appropriate

24  and provides the Committee with transparency, which I've been

25  expressing to Your Honor we've needed since this case has

35

1   started.

2       Finally, as we point out in our reply and as would always

3   be the case, should new facts develop or the situation demand

4   it, the Committee reserves the right to seek a Chapter 11

5   trustee, as does any other party in interest, to the extent it

6   may be appropriate at that time.

7       In short, Your Honor, the Committee very carefully and

8   diligently weighed the independent director option versus the

9   Chapter 11 trustee option.  The Committee had very clear goals

10  in mind, as I expressed to you, and determined that those

11  goals could be achieved in a value-maximizing manner through

12  the independent director structure.

13      The negotiations were very intense, and it was only after

14  the Committee determined that each piece of the settlement was

15  to its satisfaction did it ultimately conclude that the

16  settlement maximizes value for all stakeholders while at the

17  same time protecting those stakeholders from exposure to

18  continuing insider dealing, breaches of duty, and

19  mismanagement.

20      Therefore, the Committee believes approving the settlement

21  is in the best interest of the estate, and therefore it

22  believes it should be approved.

23      I do want to offer a word about Mr. Dondero continuing as

24  an employee.  As Your Honor was aware, the term sheet as

25  originally filed provided that Mr. Dondero would, among other

36

 1  things, resign as an employee of the Debtor.  Mid to late
 2  afternoon yesterday, Mr. Ellington called me and said that the
 3  Debtor was now of the view that Mr. Dondero should remain on
 4  as an employee in that capacity for the benefit of the estate.
 5  The Committee was, very appropriately, very skeptical of this,
 6  as well as the sort of last-minute offer, last-minute, you
 7  know, addition, however you want to view it -- some might
 8  argue retrade -- that Mr. Dondero was to leave the Debtor,
 9  period.  That was our view.  That was the way that the term
10  sheet was initially structured.  And under no circumstances
11  was the Committee going to allow Mr. Dondero to have any
12  control over this Debtor.

13       Your Honor, the Committee doesn't know what, if any, the
14  consequences are of removing Mr. Dondero as an employee.  And
15  we're not conceding at all that there are any value lost by
16  removing Mr. Dondero as an employee.  Instead, what we're
17  doing is we're staying true to our structure with the
18  independent directors and we're empowering them to decide.
19  And so it's consistent with, you know, our goals of having the
20  independent director structure in place.  And under the
21  settlement as now constructed, even with this late addition or
22  adjustment, Mr. Dondero would remain as an employee in name
23  only, subject in all respects to the direction, oversight, and
24  removal by the independent board.  And importantly, should
25  they decide to do that, Mr. Dondero shall resign.  And he

37

 1 ‖ shall receive no compensation.

 2 ‖     So he will not be in control of this Debtor.  The

 3 ‖ independent directors are.  And he's not going to be empowered

 4 ‖ to make decisions on behalf of the Debtor.  Instead, we're

 5 ‖ empowering our independent directors to make those decisions

 6 ‖ and determinations on behalf of the Debtor.

 7 ‖     I wanted -- I thought it was important that I provide that

 8 ‖ perspective to Your Honor, as this is something that came in

 9 ‖ at a very, very late hour.

10 ‖     Overall, Your Honor, for the reasons I have stated and the

11 ‖ reasons in our reply, the Committee, as a fiduciary of all

12 ‖ creditors in this case, believes that the settlement is in the

13 ‖ best interests of the creditors and should be approved.  And

14 ‖ at this time, it's the better alternative than the cost,

15 ‖ delay, and uncertainty resulting from a Chapter 11 trustee

16 ‖ fight and the potential appointment of a Chapter 11 trustee.

17 ‖     It is time to put the governance issues behind us, Your

18 ‖ Honor, and to move forward to determine how to maximize value

19 ‖ for the creditors and how to get them paid.

20 ‖     Your Honor, just regarding the specific resolutions of

21 ‖ objections that Mr. Pomerantz put on the record, I agree with

22 ‖ how Mr. Pomerantz characterized those, and the Committee is

23 ‖ supportive of those resolutions as well.

24 ‖     Those are all my remarks, Your Honor, but I am happy to

25 ‖ answer any questions or address any concerns Your Honor may

38

1  have.

2         THE COURT:  Okay.  Two follow-up questions.  First, I

3  know I asked you this at a previous hearing and you told me,

4  but your Committee, as I recall, is very well constituted.

5  Just remind me of the members.

6         MR. CLEMENTE:  Yes.

7         THE COURT:  You have a representative from the

8  Redeemer Committee, --

9         MR. CLEMENTE:  Yes, Your Honor.

10        THE COURT:  -- which is a $140 million or so

11  arbitration award?

12        MR. CLEMENTE:  Yes, Your Honor.

13        THE COURT:  Okay.  And who else is on the Committee?

14  Is an Acis representative?

15        MR. CLEMENTE:  Acis is on the Committee, Your Honor.

16        THE COURT:  Uh-huh.

17        MR. CLEMENTE:  Meta-e Discovery, who is a trade

18  vendor of the Debtor, is on the Committee.  And UBS

19  Securities, who is also --

20        THE COURT:  Okay.

21        MR. CLEMENTE:  -- a litigation claimant, is on the

22  Committee.

23     It was the U.S. Trustee in Delaware's parting gift to me

24  to name a four-member committee, Your Honor.

25     (Laughter.)

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85   Filed 04/22/24   Page 345 of 1539   PageID 17583
Exhibit 23   Page 240 of 92

39

1          THE COURT:  Okay.  Makes it awkward at times.  And

2    then back to the Dondero subject.

3          MR. CLEMENTE:  Yes, Your Honor.

4          THE COURT:  I mean, again, both Mr. Pomerantz and you

5    clarified that the proposal now is the new board will decide

6    if he stays on, Mr. Pomerantz said as a portfolio manager.

7          MR. CLEMENTE:  That is correct, Your Honor.

8          THE COURT:  Am I -- I mean, I'm hearing that

9    correctly?

10          MR. CLEMENTE:  That is correct, Your Honor.

11          THE COURT:  So, right now, whatever officer positions

12    he has, he's technically not resigning?  Or --

13          MR. CLEMENTE:  He is resigning as an officer of the

14    company, Your Honor.

15          THE COURT:  Okay.  He's resigning?  So the board will

16    just decide, is he going to be a portfolio manager or some --

17    whatever the employee title is?

18          MR. CLEMENTE:  Or they could decide that he's not

19    necessary.

20          THE COURT:  Or not necessary?  In any event, no

21    compensation?

22          MR. CLEMENTE:  That is correct, Your Honor.

23          THE COURT:  Okay.

24          MR. CLEMENTE:  And as you can see, the term sheet

25    provides that Mr. Dondero shall not cause any related entity

40

1  to terminate any agreements with the Debtor as well.  That was

2  language that was added last night as well.

3          THE COURT:  All right.  So they're going to make the

4  decision, does he help preserve value by staying in some

5  capacity or not?

6          MR. CLEMENTE:  That is correct, Your Honor.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  That, cutting through it, that is the

9  way that ultimately the Committee views it.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  And if there's an opportunity -- and

12  I'm not conceding that there is.  I'm not conceding that he

13  preserves any value.

14          THE COURT:  Uh-huh.

15          MR. CLEMENTE:  But we wanted to give the option to

16  our independent directors to make that determination.  Because

17  if there's an opportunity to preserve value, that's what we're

18  trying to achieve.

19          THE COURT:  Okay.  And I don't even know if you've

20  thought through this.  Would there be some sort of notice

21  filed on record in the case if --

22          MR. CLEMENTE:  If --

23          THE COURT:  -- if the decision is made to --

24          MR. CLEMENTE:  To -- to --

25          THE COURT:  -- hire him or keep him as a portfolio

41

 1  manager?

 2          MR. CLEMENTE:  So, I think the default under the term

 3  sheet, as revised, is he stays in that capacity in terms of

 4  name.  The independent directors will -- they're subject to

 5  his control and direction, and they could decide to remove

 6  him.

 7          THE COURT:  Uh-huh.

 8          MR. CLEMENTE:  Perhaps if Your Honor --

 9          THE COURT:  Okay.

10          MR. CLEMENTE:  We could provide notice if they make

11  the determination to remove him, but I think the default is

12  that, you know, he's in that -- he's remaining as that

13  employee name currently.  So that's the current default.

14          THE COURT:  Okay.  All right.  Thank you.

15          MR. CLEMENTE:  Thank you very much, Your Honor.

16          THE COURT:  Well, Ms. Patel, you're getting up so

17  I'll hear -- I don't know who all has been in the loop over

18  this overnight development.

19      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

20          MS. PATEL:  Your Honor, Acis has been in the loop as

21  a member of the Committee.  And I will be very brief with

22  respect to Acis's individual comments.  And I just want to be

23  clear:  Obviously, I'm here as counsel for Acis, and so this

24  is Acis's individual position.  Mr. Clemente aptly and very

25  ably handled the Committee's overall position with respect to

42

1  this.

2      But Your Honor, I just want to, on behalf of Acis, make

3  sure that, because of these developments, that's really -- I

4  really had hoped to have zero role today, but I want to make

5  sure that we're -- Acis is on record with respect to our

6  position.  And obviously, given Your Honor's knowledge and

7  oversight of the long history of Acis's bankruptcy case and

8  seeing some of the events that transpired there, I'm sure that

9  this will all, against that backdrop, make an awful lot of

10  sense.

11      But, you know, it's this continued role for Mr. Dondero

12  that is of concern.  You know, this issue even being raised

13  within like the last 48 hours by Mr. Ellington, the timing of

14  it just creates an issue.  I mean, did this -- how could this

15  possibly have come out of left field when this is such a huge

16  part of what the Debtor does in its ordinary course of

17  business, is serve as a portfolio manager, and these are

18  contracts that have been negotiated, generally speaking,

19  internally by Highland.  So the fact that if Mr. Dondero were

20  to exit the structure and there would be some potential

21  ramifications to that, I've got to wonder how much of a

22  surprise could that really have been to Highland folks.

23      But I just wanted to highlight, in connection with the

24  term sheet -- this is the preliminary term sheet that was

25  handed up Your Honor, and I believe Your Honor has a redline

43

1   version of it as well --

2          THE COURT:  Uh-huh.

3          MS. PATEL:  -- on Page 2, with respect to the role of

4   Mr. James Dondero, there's various provisions in there.  And I

5   guess I would be remiss, Your Honor, if I didn't say, at least

6   out of the gate, Acis obviously supports the implementation of

7   this independent board of directors.  We believe all the

8   candidates are very capable and are -- we put our reliance

9   upon them.

10         Obviously, we don't concede any issues.  We'll see what

11  we're going to do.  But certainly, for the time being, we do

12  support the entry of this agreement of the settlement -- or,

13  I'm sorry, approval of the settlement agreement by the Court

14  that lets the independent board be put into place.

15         But what I'll focus the Court on, on Page 2 under the role

16  of Mr. James Dondero, it goes through various provisions as to

17  what he'll resign to -- positions he'll resign from and that

18  he will remain as an employee of the Debtor, including

19  maintaining his title as portfolio manager for all funds and

20  investment vehicles for which he currently holds that title.

21  And then it goes on to provide as to who he'll report to and

22  how he will be governed, which includes by the independent

23  board, he will receive no compensation, and that he will be

24  subject to at all times the supervision, direction, and

25  authority of the independent directors.

44

1      Again, we have faith that the independent directors will

2   oversee this and will govern his role accordingly.  However,

3   given Acis's history with how transactions have transpired at

4   Highland, we remain highly cautious with respect to what

5   happens next.

6      And to that end, Your Honor, the very last sentence there

7   on Page 2, "Mr. Dondero shall not cause any related entity to

8   terminate any agreements with the Debtor," is a key provision

9   of this that keeps Acis, as a Committee member, on board with

10  this agreement.  I wanted to highlight that and note that, in

11  the last less than 48 hours, in the last 12 hours, or maybe a

12  little bit more than that, call it 18 to be safe, that's where

13  -- that's a provision that's been -- that's where we've ended

14  up.  It's all of these issues have been going at lightning

15  speed, but I did want to just, for the record and so everybody

16  is clear, that is an important piece of this agreement to --

17  for Acis.

18      And as Your Honor knows, this Debtor, Highland, is wont to

19  try to terminate agreements and to try -- in an attempt to try

20  and transfer valuable contracts away and valuable revenue

21  stream away from an entity to an alternate entity.  And that's

22  really the heart of our concern, Your Honor.

23      So, with that, I just wanted to be clear and be on record

24  as to Acis's position.  Thank you.

25          THE COURT:  Thank you.  All right.

45

 1          MR. POMERANTZ:  Your Honor, if I briefly may respond

 2    to the issues with Mr. Dondero while they are fresh in Your

 3    Honor's mind?

 4          THE COURT:  Okay.  Okay.

 5          MR. POMERANTZ:  Your Honor, look, we appreciate the

 6    timing of this coming to the attention of the Committee as

 7    being less than optimal.  As Your Honor can appreciate, this

 8    case that's been filed three months ago, a lot of people are

 9    looking very carefully at what's happening to the Debtor.

10    Investors are looking.  There was a transfer of venue.  There

11    have been a lot of reports about potential trustee motions.

12    And we believe a lot of parties are waiting to see the outcome

13    of this hearing and the trustee hearing to determine whether

14    they will determine to continue to do business with the

15    Debtor.

16        It's not only an issue of contractual rights.  It's also

17    an issue of whether investors feel comfortable on who is

18    managing, who is managing their investments.

19        This issue of Mr. Dondero's continuing role has been

20    something that at the Debtor we've continued to grapple with

21    over the last several weeks.  It's always been our thought

22    that we should do nothing that would unduly harm the company

23    from an economic standpoint.  I think the Committee shares

24    that.  That if it's determined by an independent board -- and

25    don't take current Debtor professionals, don't take current

46

 1    Debtor employees' word for it -- but if they determine that

 2    there's an economic benefit by keeping him on to preserve

 3    material revenue stream, they should be able to make that

 4    determination.  I think that's really at the core here.  And I

 5    think the Committee got ultimately comfortable with it because

 6    it will be an independent board, the majority of the members

 7    identified and chosen by them and accepted by the Debtor.

 8        So, again, we apologize to the parties and the Court for

 9    bringing this on late.  It wasn't my intent to come here and

10    present modified versions of the term sheet that hadn't been

11    filed.  But that's where we are, and that's why it has come

12    up, and that's why it's an extremely important issue, because

13    preserving whatever revenue we can for the Debtor is

14    important.

15        Now, at the end of the day, the board may either decide

16    that he doesn't preserve the revenue, or the negatives from

17    keeping him involved with the company outweigh any benefits.

18    And that's a decision they will have to make, and it'll be

19    their province to make.  So I just wanted to give Your Honor

20    that perspective.

21            THE COURT:  Okay.

22            MR. DAUGHERTY:  Your Honor, may I approach?

23            THE COURT:  Mr. Daugherty?  You may.

24        OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

25            MR. DAUGHERTY:  I apologize.  I was not planning to

47

1   address the Court at all today.  I would have had my attorney

2   here for it.  But I just ask a little bit of indulgence to

3   represent myself *pro se* for this issue.

4       This is the first I've heard that Mr. Dondero would stay

5   with the company.  I think it's an awful idea.  There's a

6   litany of reasons for that.

7       By the way, I'm completely in support of this -- of this

8   board that's been chosen.  I have every confidence that

9   they'll be able to make good decisions eventually.  But

10  they're stepping into this thing new.  Obviously, I've been

11  through this in your court with *Acis* and other matters, and I

12  have deep, deep concerns about Mr. Dondero continuing in that

13  role, simply because of the influence it has on the rest of

14  the organization and the message that it sends, both

15  internally and externally, of where the company goes from

16  here.

17      So I just wanted to let you know my thoughts.  I wasn't

18  planning to make them.  I haven't filed anything.  But that's

19  where I stand.

20          THE COURT:  All right.  Thank you, Mr. Daugherty.

21      All right.  Before we hear from the U.S. Trustee, who I

22  know is going to have a lot to say, let me just circle back

23  briefly to Jefferies counsel and the CLO Issuers' counsel.

24  You heard the representations of Mr. Pomerantz earlier about,

25  well, first, in the case of Jefferies, that the Debtor has

1   agreed to language to address your concerns.  Do you want to

2   weigh in on that and confirm that you're content that you're

3   going to have language to work out your concerns?

4            OPENING STATEMENT ON BEHALF OF JEFFERIES, LLC

5            MR. MAXCY:  Thank you, Your Honor.  Patrick Maxcy for

6   Jefferies.

7        No, I don't have anything additional to add to what Mr.

8   Pomerantz said.  The language that we have worked out will

9   speak for itself and will be included in the order.

10           THE COURT:  All right.  Thank you.

11       And counsel for the CLO and CDO Issuers, do you confirm

12   that you would be in agreement to basically withdraw your

13   objections for now, but perhaps come back and make argument on

14   the 21st if you have not worked out language with the

15   Committee that you think works?

16           OPENING STATEMENT ON BEHALF OF THE ISSUER GROUP

17           MR. BENTLEY:  James Bentley from Schulte Roth for the

18   Issuers, Your Honor.

19        I believe the deal that Mr. Pomerantz and Mr. Clemente

20   and I have discussed was adjourning our objection to the 21st,

21   --

22           THE COURT:  Okay.

23           MR. BENTLEY:  -- rather than withdrawing it.

24           THE COURT:  Okay.

25           MR. BENTLEY:  We're -- we believe we will be able to

49

1    come up with language acceptable to the Issuers, but we would

2    like to reserve the right to come back to the Court on our

3    limited objection if we cannot, given that our issue is really

4    -- really only relates to the 25 Issuers we represent.

5              THE COURT:  Okay.  Thank you very much.

6          All right.  Ms. Lambert?

7        OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

8              MS. LAMBERT:  May it please the Court.  As the Debtor

9    acknowledges, the motion that they are settling, the issues

10   that they are settling, are the issues that the U.S. Trustee

11   has raised in his motion to appoint a Chapter 11 trustee.  As

12   a matter of statutory construction, Section 1104 does not

13   contemplate settlement of these issues.  1112, in contrast,

14   has a provision that if the Court finds and determines that

15   there is cause to convert a case, there are unusual

16   circumstances and the Court can find a reasonable

17   justification for the wrongdoing or the error that occurred

18   that led to cause -- for example, administrative defects in

19   1112, not filing monthly operating reports -- and that can be

20   cured.  The Court has to make a finding that those -- these

21   defects can be cured within a reasonable period of time.

22   Section 1104 contains no analog to his.

23       If the Court finds cause to direct the appointment of a

24   Chapter 11 trustee, then the Court is supposed to appoint a

25   Chapter 11 trustee.  And *Trailer Ferry* and *AWECO* both stand

50

1   for the proposition that, on today's day, we're supposed to

2   have evidence about what the management issues are that led to

3   this agreement.  There's been no evidence.  There's been no

4   allegations in the motion for settlement.  And so the U.S.

5   Trustee is prepared to put that evidence on.

6       And Your Honor, one aspect of this is that the arbitration

7   agreement has been sealed.  And there are people on the phone.

8   I don't know who's on the phone.  The U.S. Trustee has opposed

9   the sealing of the arbitration -- not arbitration agreement,

10  the arbitration judgment -- has opposed the sealing of that.

11  And then they referenced a confidentiality order as the basis

12  to seal it.  The U.S. Trustee also opposed that

13  confidentiality motion, which was filed subsequently to the

14  motion to seal.

15      There is no confidentiality order.  An interim order was

16  entered sealing the arbitration award, but -- and the U.S.

17  Trustee has honored that by redacting all of the pleadings

18  that we filed relating to that, but it's important today for

19  the U.S. Trustee to be able to discuss it in argument, and it

20  is here -- and we have it prepared to be admitted into an

21  exhibit.

22      So, to proceed with my argument, Your Honor, I need some

23  clarification about what I can say.

24          THE COURT:  You want clarification from me on what

25  you can say?

51

 1        MS. LAMBERT:  Well, I mean, either that or we need to

 2   clear the room.

 3        THE COURT:  I've read the arbitration award.

 4        MS. LAMBERT:  Right.

 5        THE COURT:  It's in my brain.

 6        MS. LAMBERT:  Right.  Okay.

 7        THE COURT:  Uh-huh.

 8        MS. LAMBERT:  And so one of the arguments here today

 9   is that the U.S. Trustee is representing the SEC and

10   representing other Government agencies and things.  No.

11   Obviously, that is not the U.S. Trustee --

12        THE COURT:  I didn't hear that.

13        MS. LAMBERT:  Okay.  The -- one of the positions has

14   been, in the papers, is, well, that we don't have standing to

15   raise their issues.  And that's true.

16        THE COURT:  Okay.

17        MS. LAMBERT:  But the problem is that the U.S.

18   Trustee has been constrained from discussing those issues with

19   the SEC.  The arbitration award is very relevant to the SEC's

20   oversight.  I anticipate the evidence today will be that the

21   SEC, after the financial crisis of 2008, imposed restrictions

22   on this Debtor on breach of fiduciary duty issues.  I

23   anticipate that the arbitration findings would be very

24   relevant to whether those issues are ongoing or not.

25        THE COURT:  Okay.  Let me weigh in.  I view the legal

52

1    standard that this Court has to weigh today as being:  Is the

2    Debtor proposing something that is reflective of sound

3    business judgment, reasonable business judgment?  And to the

4    extent this is a compromise of controversies with the

5    Committee, is this fair and equitable and in the best interest

6    of the estate?

7        And as Mr. Pomerantz has said, you know, a lot of this

8    maybe doesn't even need Court approval.  But to the extent

9    there are aspects of this that are appropriate to seek Court

10   approval on, you know, this is my task.  I have to look at

11   what's presented, and is this reflective of sound business

12   judgment?  Is this fair and equitable?  Is it in the best

13   interest?

14       So, assuming there are tons of bad facts here reflected in

15   the arbitration award, reflected in other evidence, bad facts

16   that might justify a trustee, a Chapter 11 trustee, is this

17   nevertheless, what's proposed today, a reasonable compromise

18   of, you know, the trustee arguments the Committee could make

19   or, you know, is this a reasonable framework for going

20   forward?  Okay?

21       So I guess what I'm saying is I'm confused about, you

22   know, do I need to look at the arbitration award?  Do we need

23   to have evidence of all of that?  I can assume that there are

24   terrible facts out there that might justify a trustee, but I'm

25   looking at what's proposed.  Is this a fair and equitable way

53

1    to resolve the disputes?  Is it sound business judgment?

2    Frankly, is it a pragmatic solution here to preserve value?

3    So that's the legal standard I have in my mind here.

4              MS. LAMBERT:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. LAMBERT:  The standard is whether it is fair and

7    equitable to resolve the issues in the Chapter 11 trustee

8    motion, and it is the U.S. Trustee's position that they are

9    not resolved by this.  And how are they not resolved?  Number

10   one, they're not resolved because the problems that led to the

11   breach of fiduciary duty issues and findings are more

12   pervasive, both based on this Court' finding in the *Acis* case

13   and in the arbitration court's finding in Mr. Dondero.  Other

14   officers are implicated.

15             THE COURT:  But how --

16             MS. LAMBERT:  Other employees are implicated.

17             THE COURT:  Okay.  I feel like maybe we're talking at

18   each other, not getting each other.  I've got a proposed

19   solution here to totally change the playing field, if you

20   will.  Bring in incredibly qualified people to --

21             MS. LAMBERT:  Those people --

22             THE COURT:  -- to change out the, you know, the

23   person that you say breached fiduciary duties, the, you know,

24   mismanagement, whatever bad labels we have here, but bring in

25   a clean slate.

54

1          MS. LAMBERT:  No, Your Honor, because employees

2     remain at the Debtor who are problematic.  The board that is

3     appointed owes a fiduciary duty to whom?  Strand.  Dondero.

4     He's still the board -- he is the sole stockholder.  Yes.  In

5     addition, --

6          THE COURT:  And they won't be taking directions from

7     him.

8          MS. LAMBERT:  In addition, --

9          THE COURT:  The term sheet is they won't be taking

10    directions from him.

11         MS. LAMBERT:  Your Honor, there is no evidence before

12    the Court today that Mr. Dondero has entered a stipulation.

13    This is part of the problem.  This continues --

14         THE COURT:  Well, if he doesn't, in five minutes the

15    Committee is going to be filing their trustee motion, right?

16         MS. LAMBERT:  Well, then we haven't saved any time or

17    any money.  This is the whole issue.  They have to put on

18    evidence that this is a resolution of issues.  We're going to

19    have the motion to appoint a Chapter 11 trustee either way.

20         THE COURT:  All right.  Well, we did have the

21    evidence of Mr. Sharp.  Would you like to cross-examine him at

22    this point?

23         MS. LAMBERT:  Your Honor, I would like to put the

24    U.S. Trustee's exhibits into evidence and then cross-examine

25    him.

55

1          THE COURT:  All right.  Your exhibits?

2          MR. POMERANTZ:  Your Honor, we would object to any

3    exhibits.  The Trustee has not filed an exhibit list.

4          MS. LAMBERT:  Your Honor, this matter was set on an

5    expedited basis and the Court does not require exhibit and

6    witnesses lists when a matter is filed on an expedited basis.

7    It's impossible, when a response is filed at 5:00 o'clock the

8    evening before and supplements are made in the morning of the

9    hearing, for the U.S. Trustee to put on a witness and exhibit

10   list.

11         MR. POMERANTZ:  Your Honor, we were here on the 19th.

12   We set out a briefing schedule.  And maybe it was a couple

13   days short of normal notice.  Ms. Lambert agreed to issue

14   discovery by a certain date, and she at no point said that

15   because there was 13 days' notice as opposed to longer period

16   that she couldn't comply and provide a witness list.

17      We provided with a witness list.  We provided an exhibit

18   list.  The Trustee's effort and attempt to now submit exhibits

19   and rely on maybe there were some changes this morning, that

20   just doesn't cut it, and that's not fair and that's not due

21   process.

22         THE COURT:  Okay.  I sustain the objection.  The

23   exhibits won't be admitted since there was no exhibit list.

24         MS. LAMBERT:  Your Honor, I do not have an exhibit

25   list from them.  And they --

56

```
 1              THE COURT:  Well, they haven't offered any.

 2              MS. LAMBERT:  They put on new exhibits this morning.

 3    The exhibits that the U.S. Trustee has are all things that

 4    they are familiar with.

 5              THE COURT:  Let me back up.  They didn't introduce

 6    any exhibits.  They --

 7              MS. LAMBERT:  But they introduced the declaration,

 8    they introduced the supplements to the agreement that were

 9    drafted this morning, they've introduced the new corporate

10    resolutions, all of which they handed me this morning.

11              THE COURT:  All right.  Well, the declaration of Mr.

12    Sharp, it's two pages long.  It is, I don't think, any kind of

13    surprise information.

14              MS. LAMBERT:  Your Honor, --

15              THE COURT:  I'll allow you to cross-examine him.

16              MS. LAMBERT:  -- the U.S. Trustee's exhibits are no

17    surprise, either.  The *Acis* opinion is no surprise to anybody

18    in this courtroom.

19              THE COURT:  Okay.  Well, what are your exhibits?

20              MS. LAMBERT:  The --

21              THE COURT:  I probably should have asked.

22              MS. LAMBERT:  The exhibits are the *Acis* opinion, the

23    arbitration awards or the determinations, both the partial and

24    the final, and the SEC's original judgment.  There are four

25    exhibits.
```

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 23-5 Exhibit 23 Filed 03/26/24   Page 258 of 92   Page 363 of 1539   PageID 17601

57

1        THE COURT:  All right.  Well, Mr. Pomerantz, what

2   would you like to say?  One of them I have obviously seen,

3   since I wrote it.

4        MR. POMERANTZ:  Yes, you've written it.  You wrote

5   it.

6      (Laughter.)

7        MR. POMERANTZ:  Your Honor, I think this is a tempest

8   in a teapot.  The Committee's brief that it filed in

9   opposition to the CRO retention, the ordinary course

10  protocols, and the cash management motion had a litany of

11  description of the Redeemer litigation, of the SEC litigation.

12  There are plenty of bad facts out here.  Okay?  We have an

13  interim order to seal.  There was no hearing set today for our

14  final hearing.

15     The Trustee has objected to that order, and I suspect that

16  will be heard on the 21st.  We don't think it's appropriate to

17  introduce the Redeemer award.  However, we have read the

18  redacted provisions or portion of the U.S. Trustee's brief,

19  and we have no problem if the U.S. Trustee limits its argument

20  to the redacted portion in presenting that to the Court.

21     In other words, we don't believe that the few sentences

22  that were redacted need to be redacted.

23     However, to the extent they intend to submit the

24  arbitration award, we don't think it's appropriate, we don't

25  think it's necessary, we think Your Honor hit it right, that

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 28-11   Filed 10/26/23   Page 364 of 1539   PageID 17602
Exhibit 23   Page 259 of 92

58

 1   the issues today are not whether there's mismanagement at the

 2   Debtor.  Okay?

 3       The U.S. Trustee's position is, notwithstanding this new

 4   structure, it doesn't work.  She has a trustee motion on.  She

 5   can argue on the 21st that it doesn't work.  Nobody is

 6   prejudicing her right to do so.

 7       We think it's prejudicial, it's unfair, it's procedurally

 8   improper to submit the Redeemer arbitration award and to allow

 9   the Trustee to do anything other than describe exactly what

10   she has in her pleading.

11           THE COURT:  Okay.  I sustain the objection to those

12   exhibits.  Again, I've read them.  They're in my brain.  I

13   wrote one of them.  But I will allow you to cross-examine Mr.

14   Sharp.  So, Mr. Sharp, would you please come to the witness

15   stand?  Please raise your right hand.

16           BRADLEY SHARP, DEBTOR'S WITNESS, SWORN

17           THE COURT:  All right.  Please be seated.

18           MS. LAMBERT:  To clarify, Your Honor, has the Court

19   considered the *Acis* opinion and the arbitration opinions based

20   on judicial notice?

21           THE COURT:  And we're doing a lot of hair-splitting

22   here.  I'm just letting you know I -- the facts are in my

23   brain.  You can't extract them from my brain.  Okay?

24           MS. LAMBERT:  Okay.

25           THE COURT:  I know there have been a lot of bad

Sharp - Cross                              59

1    things, arguably bad things.  But to me, the real issue here
2    today is whether this framework that has been heavily
3    negotiated with the Committee reflects reasonable business
4    judgment on the part of the Debtor, is a fair and equitable
5    resolution of the Committee's, you know, arguments in favor of
6    a trustee, and whether this makes, you know, sense going
7    forward to allow this Debtor to go forward without a trustee.
8    Okay?
9        So I really think that the evidence you want is not
10   terribly relevant.  We technically aren't here on a trustee
11   motion today.  We're here on whether a new board and the
12   terms, the protocols suggested, reflect reasonable business
13   judgment and reflect a fair compromise of arguments the
14   Committee has raised.  All right?  So I don't know how much
15   more clear I can make that.  I guess the technical answer is
16   I'm not taking judicial notice of those things for purposes of
17   today.
18       All right.  You may proceed.
19                      CROSS-EXAMINATION
20   BY MS. LAMBERT:
21   Q   Mr. Strand, can you state your name for --
22   A   Sorry.  Bradley Sharp, S-H-A-R-P.
23   Q   Sharp.  Mr. -- oh, sorry.
24   A   No relation to Strand.
25   Q   All right.  Strand is the general partner of the Debtor,

Sharp - Cross                                60

1  right?

2  A    That is correct.

3  Q    And there has been no change in the board of the Debtor

4  except Mr. Dondero's resignation; is that right?

5  A    Well, it's a little different, because the -- Strand is

6  the general partner of the Debtor.

7  Q    Yes.

8  A    So the new board will be acting and in control of the

9  Debtor.

10  Q    Yes.  And there is -- Strand is a non-debtor, correct?

11  A    That is correct.

12  Q    And the stock of the non-debtor, Strand, is owned by

13  Dondero?

14  A    Mr. Dondero owns Strand Advisors.

15  Q    In its entirety?

16  A    That is correct.

17  Q    So the board will owe a fiduciary duty to Mr. -- to Mr.

18  Dondero?

19  A    The board will have a fiduciary duty to the Debtor and to

20  Strand Advisors.

21  Q    All right.

22  A    Their duty is to the entity.

23  Q    The -- Strand, as the general partner, as an entity, owes

24  a fiduciary duty to the Debtor, right?

25          MR. MORRIS:  Objection to the extent it calls for a

Sharp - Cross                                      61

 1  legal conclusion.

 2          THE COURT:  Sustained.

 3  BY MS. LAMBERT:

 4  Q    Do you know?

 5  A    As a lay person.  I'm not an attorney.

 6  Q    Okay.  So you don't know what the fiduciary roles of the

 7  board will be; is that right?

 8  A    Well, the fiduciary board will be acting -- you know,

 9  looking at it from my perspective as the chief restructuring

10  officer, the new board will be acting as the Debtor-in-

11  Possession.  And, you know, they will be directing the Debtor-

12  in-Possession.  You know, the Debtor-in-Possession has duties

13  to all parties in interest, and they will be directing the

14  Debtor.  They will be directing me as CRO.

15  Q    And, in addition, there may be a CEO, right?

16  A    That is contemplated, correct.

17  Q    It is contemplated?  It --

18  A    It is -- it is an option that the board has if they think

19  a CEO is necessary.

20  Q    But you don't know whether a CEO is going to be appointed

21  or not?

22  A    That's up to the board.

23  Q    And you don't know what the compensation for that

24  individual might be, right?

25  A    Again, that's up to the board.

Sharp - Cross                           62

 1   Q    Mr. Dondero is going to be an employee of the Debtor,

 2   right?

 3   A    That's correct.

 4   Q    And Mr. Dondero started the Debtor, correct?

 5   A    I believe so.

 6   Q    And he also started Strand, right?

 7   A    I believe that's correct.

 8   Q    And he is also in control of a number of entities that the

 9   Debtor does business with; is that right?

10   A    That is correct.

11   Q    Mr. Ellington is going to remain on with the Debtor?

12   A    That -- Mr. Ellington is an employee.  All employees are

13   now subject to the board.

14   Q    Okay.  And Mr. Ellington's role with the Debtor is what?

15   A    He is general counsel with the Debtor.

16   Q    And there are other in-house attorneys with the Debtor,

17   right?

18   A    That's correct.

19   Q    And who else is there currently?

20   A    I don't have the list in front of me, you know, the

21   employee list.  As of now, because obviously this is still --

22   hasn't been effected, so the board has not made any decisions

23   with respect to any employees going forward.

24   Q    And the CFO remains the same?

25   A    Yeah, that is, again, as of now.  I don't know what the

Sharp - Cross                          63

1  board is going to do, if anything.

2  Q   Do you have any anticipation of what you would recommend

3  to the board regarding the CFO?

4  A   You know, I have many recommendations I have not made to

5  the board yet.  I just met them this morning.

6  Q   Are you aware that historically this Court has found that

7  the lawyers provided bad advice to the Debtor?

8         MR. MORRIS:  Objection to the form of the question.

9         THE COURT:  Sustained.

10  BY MS. LAMBERT:

11  Q   Do you have any knowledge about whether there have been

12  findings that the law firm gave erroneous advice to the

13  Debtor?  Or, I mean, the in-house counsel gave erroneous

14  advice.

15         MR. MORRIS:  Objection to the form of the question.

16         THE COURT:  Sustained.

17         MS. LAMBERT:  Your Honor, I'm asking for the

18  foundation.

19         THE COURT:  Rephrase.

20  BY MS. LAMBERT:

21  Q   Do you -- are you aware of any concerns about the in-house

22  counsel?

23  A   Yes.

24  Q   What is your knowledge?

25  A   I have read the rulings from this Court.

Sharp - Cross                                   64

 1   Q   And what is your understanding of those rulings?

 2   A   I don't recall specifically.  I read that early on when I

 3   was first employed.  But there have been concerns with respect

 4   to, you know, management of the Debtor.

 5   Q   As the CRO, have you made any recommendations to change

 6   employees to date?

 7   A   As of now, I don't have a -- the board.  You know, the

 8   board has just been employed.  We have not made

 9   recommendations up to this point.  We are still -- obviously,

10   have been evaluating our position and what needs to happen.  I

11   think it's important for the Debtor at this time, a little

12   stability would be a good thing for -- until we develop the

13   direction going forward.

14   Q   Are you familiar with the compensation terms for the

15   directors?

16   A   Yes.

17   Q   And the directors are employees of Strand but paid by the

18   Debtor; is that right?

19   A   Oh, I'm not sure they're employees of Strand, but they are

20   paid by the Debtor, their compensation.  That's correct.

21   Q   And yet the compensation is technically through Strand,

22   right?

23   A   They -- they are.  They have to act through the general

24   partner of the Debtor because of the corporate structure.

25   Q   One of the portions of the agreement is that the Committee

Sharp - Cross                                      65

 1   acquires litigation claims.  Are you familiar with that?

 2   A    I am.

 3   Q    Have you parsed out which litigation claims those might be

 4   at this point?

 5   A    I think the agreement says they have litigation claims

 6   against insiders and related parties.  So I don't know what

 7   those individual claims are.  I don't know what exists.

 8   Q    Are you aware that the Committee obtains the attorney-

 9   client privilege and work product privilege?

10   A    Yeah.  Subject to the terms of those agreements, correct.

11   Q    Have you gone through the documents and determined which

12   ones would fall on -- which attorney files would fall on which

13   side?

14   A    Not as of yet.

15   Q    Have you been taking direction from Mr. Dondero?

16   A    We've had -- I've had limited interaction with Mr. Dondero

17   since my retention.  You know, we have been complying with the

18   protocols that we had been negotiating with the Committee and

19   providing information to the Committee.  We have been, as a

20   result of those protocols, instructing management of the

21   company on compliance with those protocols.  So they have

22   brought to us transactions that they would like to do.  We

23   have reviewed those transactions and compared it to the

24   proposed protocols and have been enforcing those.  So if

25   management has asked to do a transaction that does not meet

Sharp - Cross                                      66

 1  within those protocols, we have been declining the
 2  transaction.  And that -- you know, the company has agreed
 3  with that decision and accepted that decision.
 4  Q    When you say management, who are you -- to whom are you
 5  referring?
 6  A    You know, the whole management team at the company.  In-
 7  house counsel.  The CFO.  You know, I've had limited
 8  interaction with Mr. Dondero.  One interaction was he did
 9  question one of my decisions that I made.  We discussed it and
10  he accepted my conclusion.
11  Q    You're at the Debtor every day?
12  A    My team is.
13  Q    You are not?
14  A    I have had some travel restrictions due to a medical
15  issue, but I have three of my team there every day.
16  Q    Is Mr. Dondero there every day?
17  A    I don't know.  I don't think so.  In the few days I'm
18  there, I've not seen him.
19  Q    Is Mr. Ellington there every day?
20  A    No.
21  Q    Who on the management team is there every day?
22  A    You know, our primary interaction is with Isaac Leventon,
23  Frank Waterhouse, the CFO.  You know, primary interaction, you
24  know, with David Klos, who is the controller, in dealing with
25  the financial issues.

Sharp - Cross                              67

1      Obviously, we spend a lot -- my team spends a lot of time

2  with the head of compliance.

3  Q   Were you surprised by this addition that Mr. Dondero would

4  remain as an employee?

5  A   I can't say I was surprised.  It is an issue that we

6  struggle with, given the nature of this company's business.

7  You know, I see the change in the language and, you know, as

8  CRO, I am comfortable with it.

9  Q   So, as CRO, if Mr. Dondero is necessary now, you recognize

10 that he was necessary three weeks ago?

11 A   I'm not saying that he's necessary.  I'm saying that it is

12 important for the board to be able to make that decision.

13 Q   And it wasn't important when the settlement was filed?

14 A   It was the -- it was a struggle at the time.  I was

15 concerned at the time it was filed the unintended consequences

16 of Mr. Dondero resigning completely and disappearing, because

17 there are a significant number of funds that the Debtor deals

18 with related parties that are controlled by Mr. Dondero, and I

19 was worried about the financial impact with it.  I knew this

20 issue was important to the Committee.  And if that's something

21 that the Debtor agreed to and the Committee agreed to, so be

22 it.

23      You know, I think the last-minute compromise is acceptable

24 and appropriate.  I think the language as negotiated is going

25 to be very helpful to the Debtor.  And I think, then, it's up

Sharp - Cross                          68

1   to the board to make the decision, with full knowledge on

2   what's the best avenue forward.

3   Q   And the language as negotiated was added because, in the

4   past, there have been problems with Mr. Dondero changing or

5   terminating agreements with related entities, right?

6   A   There was that -- I've seen that -- issues raised in the

7   *Acis* case.

8           MS. LAMBERT:  No further questions.

9           THE COURT:  All right.  Any redirect?

10          MR. POMERANTZ:  Not from the Debtor.

11          THE COURT:  Anyone have examination?  No?  All right.

12   Thank you, Mr. Sharp.  You're excused.

13          THE WITNESS:  Thank you.

14       (The witness steps down.)

15          THE COURT:  All right.  Are we going to have any

16   other, I guess, witnesses, evidence?

17              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18          MR. POMERANTZ:  No, Your Honor.  I just had a couple

19   points.  One, Ms. Lambert mentioned that she hadn't seen a

20   copy of the stipulation referred to, which was prohibiting Mr.

21   Dondero from terminating the board.  There's a good reason for

22   her not having seen it.  I hadn't provided it to her.  It just

23   came this morning, right before the hearing.  I have one

24   signed copy.  I have other copies that I could represent, even

25   though they're unsigned, are the same, so I would like to

69

 1    provide Your Honor.  I'll keep the signed copy but provide you

 2    with an unsigned copy, but it's the same, and also give one to

 3    the U.S. Trustee.

 4            THE COURT:  But you've got a signature of Mr. Dondero

 5    on that?

 6            MR. POMERANTZ:  Yes, I do.

 7            THE COURT:  Okay.

 8            MR. POMERANTZ:  May I approach?

 9            THE COURT:  You may.  Thank you.

10            MR. POMERANTZ:  Your Honor, maybe for the record it

11    would be appropriate for me to show Your Honor the signature,

12    so you could say that you've seen it?

13            THE COURT:  Yes.  Yes.

14            MR. POMERANTZ:  May I approach again?

15            THE COURT:  You may.  (Pause.)  Okay.  Thank you.

16    The record will reflect I've seen Mr. Dondero's signature.

17            MR. POMERANTZ:  Your Honor, one of the threads that

18    Ms. Lambert said to Your Honor is that there were employees

19    still remaining at the Debtor and that those employees may

20    have been involved in some wrongdoing.

21        I submit, Your Honor, if Your Honor appointed a Chapter 11

22    trustee today, what would a Chapter 11 trustee do?  A Chapter

23    11 trustee wouldn't terminate every employee at the Debtor.  A

24    Chapter 11 trustee, if he or she was doing what they should

25    do, would go down to the company, would interview members of

70

1    the company, senior management, and decide who should stay on

2    and who should not stay on.

3        That, I submit, Your Honor, is exactly what this board

4    will do.  So the concept of there being something different

5    done, if you have a board here or not, I don't think makes

6    sense.

7        And lastly, Your Honor, Ms. Lambert expressed the issue as

8    whether it's fair and equitable to resolve the U.S. Trustee

9    issues in this way.  I don't think that's the standard.  The

10   only fair and equitable I understand is in plan confirmation.

11   I think Your Honor said it straight, which is:  Is this a

12   valid exercise of the Debtor's business judgment and is it an

13   appropriate compromise of controversy?  That is the standard.

14   And, again, we have always acknowledged that, notwithstanding

15   how Your Honor rules today, the Trustee reserves the right to

16   come back to court and argue a trustee is appropriate on the

17   21st.

18       We believe, Your Honor, that many of the cases, in this

19   circuit and elsewhere, look to the continuing management of

20   the company and whether management issues have been addressed

21   as a significant factor in determining whether a trustee is

22   appointed.  And it'll come as no surprise, of course, if Your

23   Honor grants our motion today, this will be a lynchpin of our

24   opposition to the trustee motion.

25       But, again, those issues are for another day, and we

71

 1    believe that we have satisfied our standard, and we request

 2    that Your Honor approve the motion.

 3         THE COURT:  All right.  Other closing arguments?

 4    CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

 5         MS. LAMBERT:  Yes, Your Honor.  As the Debtor

 6    acknowledges, the Court has no jurisdiction over Strand.  This

 7    is a complicated structure.  A trustee avoids all of the

 8    complications involved in the Court exercising jurisdiction

 9    over an entity that it doesn't have jurisdiction over.

10         To enter a stock stipulation related to a non-debtor is

11    highly irregular, and Mr. Dondero is the person behind that.

12    It has happened in cases where people have been in these kinds

13    of structures, like that FSLIC used to put in these kinds of

14    structures -- there's published opinion, the *Goubert*

15    (phonetic) case -- where the person continued to exercise

16    control even though they had a stock trust.

17         The Court needs a person beholden to the Court.  The

18    evidence is that, historically, this Debtor has entered into

19    things that breached its fiduciary duty and resulted in self-

20    dealing and liability for the Debtor.  The evidence is that

21    these go beyond Mr. Dondero and the Court does not have

22    jurisdiction over his stock.  The Court does not have

23    jurisdiction over Strand.  The board members of Strand are not

24    employees of the Court, they're employees of Strand, a non-

25    debtor.  These members have a fiduciary duty to Strand.

1    Yes, Strand is the general partner of this Debtor and has

2    a fiduciary duty, but all these fiduciary duties intermix in

3    ways that result in conflicts for this case.  These conflicts

4    are unnecessary.  The Court could just appoint a trustee who

5    only owes a fiduciary duty to the members and creditors of

6    this case, as well as the next (inaudible).

7        There is no evidence that this is cheaper.  There is no

8    evidence that this is a total resolution, because issues are

9    left open, such as whether or not a CEO is going to be

10   appointed, how much that person is going to cost.

11       Finally, Your Honor, the sealing has constrained the

12   ability of some of the parties to understand what's going on

13   in this case.  And that is material to the argument about who

14   is here, because we don't know who -- that all the people who

15   would have participated in this discussion had an opportunity

16   to participate in it.

17       Yes, the creditors have a fiduciary duty, and I believe

18   that they represented to the best of their ability, but they

19   are not charged with the issues that others are charged with,

20   such as the SEC.

21       There is no evidence that the officers are disinterested.

22   Rather, the new officers are going to be conflicted by the

23   nature of their position.  There's no evidence that it's

24   cheaper.  And a trustee, if appointed, could be appointed on

25   an hourly basis.  This is a Chapter 11 trustee.

1      They argue that the trustee would not have the knowledge,

2   and yet they've been able to find three candidates to serve

3   for the board who are qualified.  So there's no evidence that

4   it would not be better to have a trustee for that reason as

5   well.

6      The evidence is that, historically, the Redeemer Committee

7   was set up to prevent these kinds of transactions and have

8   oversight.  Historically, the evidence is it did not work.

9   For this reason, the statute provides a solution, and the

10  Court should impose it.  The Court should deny this motion as

11  not being in the interest of the estate, as not being a sound

12  exercise of discretion, because it's really the discretion of

13  Strand, not the Debtor, and it will remain the discretion of

14  Strand, not the Debtor.

15     Thank you.

16         THE COURT:  All right.  Anyone else have comments?

17         MR. POMERANTZ:  Your Honor, just a couple of minor

18  points.

19         THE COURT:  Okay.

20         CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

21         MR. POMERANTZ:  Ms. Lambert started by saying the

22  Court doesn't have jurisdiction over Strand.  I know I just

23  handed her the stipulation, but the last paragraph of the

24  stipulation specifically says that the parties stipulate and

25  agree that the Court shall have exclusive jurisdiction over

74

 1   all matters arising from or related to the interpretation and

 2   implementation of this stipulation and the adjudication of any

 3   parties breaching the stipulation.

 4       So the Court does have jurisdiction now that the

 5   stipulation has been signed, assuming that the Court enters

 6   it, so I think that addresses that issue.

 7       Your Honor, the evidence of the disinterestedness of the

 8   members of the board, we've provided their *curriculum vitaes*.

 9   We've made representations that they have no connections with

10   the Debtor or any of the parties in interest.  We don't think

11   that, just because they become appointed and become a director

12   of Strand, that that renders them disinterested [sic], and we

13   think that the Trustee's arguments that being at a different

14   level creates different duties is just not -- is not accurate.

15   I don't think that the Committee would have had any appetite

16   for this type of structure had they believed that each of

17   these board members wouldn't feel that their fiduciary duty

18   was to the Debtor's estate.  And they all are seasoned

19   restructuring people from different aspects, all understand

20   their fiduciary duties well, and all are prepared to carry

21   them out.

22       Lastly, the Trustee points to the historic issues, and

23   specifically mentioned the Redeemer Committee and that

24   structure didn't work.  Well, I think it speaks volumes, Your

25   Honor, that not only the Redeemer Committee, are they on the

75

1   Committee and the Committee has supported this motion, but the

2   Redeemer Committee hasn't come to Your Honor and said that,

3   notwithstanding that structure that may or may not have been

4   effective, this structure is ineffective.

5       And at the end, Your Honor, the Trustee is trying to

6   replace the business judgment of the Debtor.  The Debtor is

7   entitled to deference of the judgment, again, focusing on the

8   correct standard.  And, again, the Trustee will have her day

9   in -- his day in court in connection with the ultimate trustee

10  motion on the 21st.

11      Thank you, Your Honor.

12          THE COURT:  Anyone else?

13      All right.  Well, the Court is going to note a few things

14  as part of its ruling, obviously.  The new proposed

15  independent board members for Strand, Strand obviously being

16  the general partner of the Debtor, Highland -- Mr. James

17  Seery, Mr. John Dubel, and retired Judge Russ Nelms -- are

18  highly-qualified individuals with respect to the industry.

19  Some of them with respect to restructuring.  Certainly, in the

20  case of retired Judge Nelms, with regard to fiduciary duties

21  and the Bankruptcy Code requirements.

22      These three individuals were chosen by the Creditors'

23  Committee, whose constituency is broad, whose constituency is

24  owed well over $100 million.  And they were chosen by the

25  Committee after literally months of negotiation.  Obviously,

76

1   this bankruptcy was filed in October, and it appears to this

2   Court, from the representations of counsel, that from the very

3   beginning of the case -- the Committee was, I guess, appointed

4   a week or two after the case was filed in October -- there's

5   been haggling over corporate governance of this Debtor.

6       So we have highly-qualified individuals.  We have

7   individuals who were chosen by the well-constituted Creditors'

8   Committee.  And what has been proposed to the Court is that it

9   is these independent directors that would have sole and

10  exclusive management and control of the Debtor.

11      An interesting jurisdictional argument has been made, and

12  it's one of those arguments that, frankly, you know, sounds

13  good when you first hear it, but when you really drill down

14  about the governance structure here, I mean, obviously, this

15  Debtor is a limited partnership and it acts through a general

16  partner.  It's the general partner that controls the Debtor

17  entity.  And while Strand Advisors, Inc., the general partner,

18  may not technically be in bankruptcy, it's the structure of

19  these entities such that it controls the Debtor.  So the

20  jurisdictional argument, when you drill down, feels a little

21  off.

22      Moreover, we have language in the stipulation where Strand

23  is stipulating and consenting, if you will, to this Court's

24  exercise of jurisdiction over it.

25      There are many things about the compromise here that have

77

 1  very compelling appeal.  Among them, certainly, the Committee

 2  that's negotiated this term sheet retains the right at any

 3  time to move for a Chapter 11 trustee if it believes there are

 4  grounds.  The Committee is granted standing to pursue estate

 5  claims, certain estate claims right off the bat, without

 6  having to come back and ask the Court, without having to rely

 7  on the Debtor to pursue that.  There are document production

 8  provisions, document preservation provisions, a shared

 9  privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13      I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23      Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

78

 1   business justification for proposing the independent slate of

 2   directors at the GP level for the Debtor, the protocols, the

 3   negotiation with the Committee, the document sharing, the

 4   standing given to them?  Does all of this reflect reasonable

 5   business judgment?  And I find, quite clearly, it does.  I

 6   find it to be a pragmatic solution to the Committee's concerns

 7   about existing management and control.

 8       And I think I used the words "fair and equitable," not

 9   just Ms. Lambert, because it is also presented to the Court as

10   a 9019 compromise of disputes with the Committee, and we

11   traditionally use a fair and equitable and best interest of

12   the estate analysis in this context.  So, to the extent that

13   applies, I do find this a fair and equitable way of resolving

14   the disputes with the Committee, and I find this to be in the

15   best interest of the estate.  So I do approve this.

16       And by approving this motion, I'm approving the term sheet

17   as it's been presented, the various terms therein, the

18   exhibits thereto.  I'm specifically approving the new

19   independent directors, the document management and

20   preservation process, the standing to the Committee over

21   certain of the estate claims, the reporting requirements, the

22   operating protocols, the whole bundle of provisions.

23       Now, there is one specific thing I want to say about the

24   role of Mr. Dondero.  When Ms. Patel got up and talked about

25   the newest language that has been added to the term sheet, she

1  highlighted in particular the very last sentence on Page 2 of

2  the term sheet, the sentence reading, "Mr. Dondero shall not

3  cause any related entity to terminate any agreements with the

4  Debtor."  Her statement that that was important, it really

5  resonated with me, because, you know, as I said earlier, I

6  can't extract what I learned during the *Acis* case, it's in my

7  brain, and we did have many moments during the *Acis* case where

8  the Chapter 11 trustee came in and credibly testified that,

9  whether it was Mr. Dondero personally or others at Highland,

10  they were surreptitiously liquidating funds, they were

11  changing agreements, assigning agreements to others.  They

12  were doing things behind the scenes that were impacting the

13  value of the Debtor in a bad way.

14      So not only do I think that language is very important,

15  but I am going to require that language to be put in the

16  order.  Okay?  So we're not just going to have an order

17  approving the term sheet that has that language.  I want

18  language specifically in the order.  You know, you can figure

19  out where the appropriate place to stick it in the order is,

20  but I want specific language in here regarding Mr. Dondero's

21  role.  I also -- the language in there that his role as an

22  employee of the Debtor will be subject at all times to the

23  supervision, direction, and authority of the Debtors, I want

24  that language in there as well.  Let's go ahead and put the

25  language in there that at any time, in any event, the

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-5   Filed 12/12/23   Page 386 of 1539   PageID 17624

80

1   independent directors can determine he's no longer going to be

2   retained.  I want that in the order.

3       And I'm sure most of you can read my mind why, but I want

4   it crystal clear that if he violates these terms, he's

5   violated a federal court order, and contempt will be one of

6   the tools available to the Court.  He needs to understand

7   that.  Mr. Ellington needs to understand that.  You know, if

8   there are any games behind the scene, not only do I expect the

9   Committee  is going to come in and highlight that to the Court

10  and file a motion for a trustee or whatever, but we're going

11  to have a contempt of court issue.

12      So, anybody want to respond to that?

13          MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14  Stang Ziehl & Jones.

15      We hear Your Honor.  What I thought I'd do now is I have a

16  clean redline of the order, of course not including the

17  provision you just requested, --

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  -- which we will go back and upload

20  and hope to get an order signed by Your Honor today, if you're

21  around.  But to go over the other changes, the changes to

22  Jefferies, the other language changes I discussed before.  I

23  gave a copy to Ms. Lambert and to the Committee.  May I

24  approach with a --

25          THE COURT:  You may.

 1            MR. POMERANTZ:  Thank you.

 2            THE COURT:  Okay.  All right.  (Pause.)  All right.

 3   The form of order looks fine to me.  Obviously, you'll add the

 4   Dondero-related language, and we may have further wording

 5   tweaks negotiated with the CLO Issuers.  But, again, I approve

 6   all of this.  I didn't say on the record the compensation, but

 7   certainly I am approving that as reasonable.  I expect these

 8   three directors are going to be working very, very hard.  And

 9   so, as you said, not 50,000-foot level monitoring, actually

10   rolling up sleeves on-site, so I think the compensation is

11   reasonable.

12            MR. POMERANTZ:  Thank you, Your Honor.  We will

13   submit an order shortly that includes Your Honor's language

14   requested.

15            THE COURT:  Okay.

16            MR. POMERANTZ:  Are you around this afternoon?

17            THE COURT:  I am around, --

18            MR. POMERANTZ:  Okay.

19            THE COURT:  -- so just pick up the phone or send an

20   email to Traci, my courtroom deputy, --

21            MR. POMERANTZ:  Yes.

22            THE COURT:  -- so she can tell me, "It's in your

23   queue to sign."

24            MR. POMERANTZ:  She has been extremely helpful and

25   responsive.

82

 1          THE COURT:  Good.  I'm glad to hear that.

 2          MR. POMERANTZ:  Yes.

 3          THE COURT:  Now, as far as future scheduling, I did

 4   have her sitting by, listening, in case we needed to discuss

 5   anything.  Obviously, we're going to have a kind of a

 6   carryover placeholder on the 21st as part of the trustee

 7   motion hearing for any remaining issues with the CLO Issuer.

 8   And, you know, that's just a placeholder if necessary to hear

 9   language controversies.

10      My courtroom deputy was concerned, because you have a lot

11   of pending motions that have just sort of sat there pending

12   because this was the big issue, right?  She wants to make sure

13   she sets anything you need a setting on.  And I don't know if

14   you want to discuss that today or go back as a group and --

15          MR. POMERANTZ:  We're happy to -- I think, you know,

16   I think that's appropriate to do.  We had the motion to

17   appoint the CRO.

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  That was pending.  That gets resolved

20   by this motion.  We will submit an order --

21          THE COURT:  Okay.

22          MR. POMERANTZ:  -- with the new agreement that was

23   attached to the term sheet.

24      We had the cash management order which Judge Sontchi had

25   issued an interim order.  We will have a final order with

83

 1   respect to that.

 2           THE COURT:  Okay.

 3           MR. POMERANTZ:  We will be withdrawing the motion to

 4   approve ordinary course protocols which was originally on for

 5   hearing.

 6           THE COURT:  Uh-huh.

 7           MR. POMERANTZ:  I think on the 21st we have currently

 8   set a motion to approve the retention or Mercer, which is the

 9   Debtor's compensation consultant, --

10           THE COURT:  Uh-huh.

11           MR. POMERANTZ:  -- and an analog motion that was

12   originally set for today with respect to insiders, non-

13   insiders, but is on for non-insiders and insiders on the 21st,

14   --

15           THE COURT:  Uh-huh.

16           MR. POMERANTZ:  -- which is the motion to approve

17   bonuses.

18           THE COURT:  Uh-huh.

19           MR. POMERANTZ:  Of course, the Debtor's new board is

20   going to be wanting to very carefully review that.  And we are

21   going back and today having our first new board meeting with

22   the board to start bringing them up to speed.  But we

23   presently intend, subject to, obviously, their direction, to

24   go forward on the 21st.

25       We also have the retention of Lynn Pinker and Foley

84

1    Gardere, which had been filed and was brought on for hearing

2    previously.  It had been delayed, again, for the board to look

3    at the issues.  We expect to have that on for the 21st.  And I

4    believe, I believe that would be it.

5           MS. LAMBERT:  No, Your Honor, the --

6           MR. POMERANTZ:  No?

7           MS. LAMBERT:  -- U.S. Trustee has objected to the

8    motion to seal, which was the second item on the Wilmington

9    Court's docket that got -- and it got transferred here.  The

10   U.S. Trustee has also objected to the motion for protective

11   order.  The issues overlap.  We request that they be set as

12   quickly as possible.

13          MR. POMERANTZ:  We're happy to set both of those for

14   the 21st as well.

15          THE COURT:  All right.  So I think what I'm going to

16   ask you to do is just get on the phone, one of you, with Traci

17   and just make sure she's clear on everything you need set on

18   the 21st, and then you can do a big notice of hearing, just

19   kind of listing all of these matters.

20          MR. POMERANTZ:  Your Honor, with respect to the CRO

21   motion -- order and the cash management order, I was wondering

22   if it would be helpful for my colleague Mr. Demo to go over

23   the amendments to those orders -- we would like those to be

24   entered today -- to see if Your Honor has any questions.

25          THE COURT:  All right.  That would be good.  Mr.

85

1   Clemente, did you have something first?

2          MR. CLEMENTE:  Just very quickly, Your Honor.  We had

3   filed our retention applications for the Committee

4   professionals and filed CNOs, and your office had indicated

5   you wanted to get through today, which I totally understand,

6   but I just wanted to make sure that Your Honor didn't lose

7   sight of those.  I don't believe there were any objections to

8   those, but I think your intent was probably to deal with them

9   after today, but I just wanted to --

10          THE COURT:  All right.  Yes, it was to get through

11   today.

12          MR. CLEMENTE:  Yes.

13          THE COURT:  So, since you've had plenty of time run

14   on those, you can submit orders and I'll get them signed in

15   chambers.

16          MR. CLEMENTE:  Thank you very much, Your Honor.

17   Appreciate it.

18          THE COURT:  Okay.  Thank you.  Counsel?

19          MR. DEMO:  Good afternoon, Your Honor.  Greg Demo,

20   Pachulski Stang, on behalf of the Debtor.  I'm happy to keep

21   this as brief as possible, but I think walking through the

22   cash management motion has the most changes.

23          THE COURT:  Okay.

24          MR. DEMO:  The biggest change there, and we had

25   discussed this with the United Stated Trustee in Delaware, is

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-25   Filed 02/28/24   Page 392 of 1539   PageID 17630

86

1    that in our initial motion we disclosed that the Debtor had

2    bank accounts at BBVA and then also at NexBank.  Those

3    accounts have been moved to East West Bank, --

4              THE COURT:  Okay.

5              MR. DEMO:  -- which is a party to a depository

6    agreement with the United Stated Trustee.

7              THE COURT:  Okay.

8              MR. DEMO:  The only exception to that is a

9    certificate of deposit that is at NexBank.  It's a relatively

10   small amount of money.  It's $135,000.  But it also is pledged

11   as collateral on a lease.  So that has been -- proven

12   problematic to move.  The Trustee for Delaware did say that

13   was okay.  I would hope that the Trustee for Texas would agree

14   with that.  We did disclose it in the initial debtor

15   interview.

16       But those are the bank accounts.  The bank accounts at

17   BBVA and NexBank, with the exception of that CD, were all

18   closed as of yesterday.

19             THE COURT:  Okay.

20             MR. DEMO:  So now we are going to be using East West

21   Bank for all operating accounts, all cash, going forward.

22       The other two accounts are the account at Jefferies, which

23   is the prime brokerage account.

24             THE COURT:  Uh-huh.

25             MR. DEMO:  That account, we are keeping open.

87

 1   Obviously, there have been conversations with Jefferies that
 2   are going to be reflected in the proposed order on the
 3   settlement, but we do propose to keep the Jefferies prime
 4   brokerage account open as well.
 5       And then we filed a supplement for another prime brokerage
 6   account that we have at a prime broker called Maxim Group.
 7   That account has $30 million in securities in it, give or
 8   take, and then literally like $100 in cash.  The Debtor
 9   considers that account more an investment than actual
10   operating account, but we would like to keep that account open
11   as well, just so it can continue holding those securities.
12       Jefferies and Maxim, neither of them are on the depository
13   list, so we are requesting a waiver of 345(b) for those two
14   accounts, and then also requesting a waiver of 345(b) with
15   respect to the certificate of deposit at NexBank.
16           THE COURT:  Okay.
17           MR. DEMO:  That's where we're at at cash management.
18   And I guess, sorry, one more thing.  In the original cash
19   management motion, we had a series of intercompany
20   transactions that we disclosed, and we had gotten interim
21   relief from the Delaware court to make those payments up to a
22   hundred -- or, $1.7 million.  We are below that account, and
23   on a go-forward basis, all of those intercompany transactions
24   are getting subsumed into the settlement motion and the
25   operating protocols and all of that.  But we are asking for

88

1  final relief on the intercompany transactions that we made

2  under the interim order.

3          THE COURT:  Okay.  All right.  Who wishes to be heard

4  on this?  I don't know how much discussion we've had outside

5  the courtroom on this.

6          MS. LAMBERT:  We haven't -- normally, a bond would be

7  appropriate for the Jefferies and the other small account.

8  The estate is at risk on the CD, but it's not that much money.

9  It's not worth bonding.  It'll be more expensive to bond it.

10         NexBank, as you know, Your Honor, is a bank where Mr.

11 Dondero is the CEO.  So that was part of the reason that

12 NexBank was carved out.  But the -- so I would like them to

13 bid bonds on the Jefferies and the other account.  And if we

14 -- let's carry it on those issues so that we can see how

15 expensive bonding it would be, and if it's cost-prohibitive,

16 maybe we reconsider.  But in the past, the bonds haven't been

17 very expensive, relatively.

18         MR. DEMO:  We're happy to discuss that with the U.S.

19 Trustee.  I mean, just for the record, the Jefferies account,

20 you know, does support a margin loan.  It's $80 million in

21 securities.  It's $30 million at Maxim.  They're SIPC.  I

22 mean, it's Jefferies and, you know, another large prime

23 broker.  Again, we're happy to discuss it with the Trustee.  I

24 don't know that it's necessary, but we will discuss it.

25         THE COURT:  Okay.  Well, you all can discuss it, and

89

```
 1   if you have an unopposed order, an agreed order, --

 2           MR. DEMO:  Uh-huh.

 3           THE COURT:  -- you can upload it and I'll sign it.

 4   Otherwise, if you need hearing time on the 21st, --

 5           MR. DEMO:  Okay.

 6           THE COURT:  -- we'll get it all figured out then and

 7   --

 8           MR. DEMO:  Okay.  All right.

 9           THE COURT:  -- resolve it then.

10           MR. DEMO:  Thank you, Your Honor.  And then I guess

11   the other motion is the CRO retention.  This one should

12   hopefully be pretty brief.  We are just filing a new proposed

13   order that attaches the engagement letter, as has been

14   modified by all of the settlement discussions.  I believe the

15   Committee is on board with that, and it's consistent.  It was

16   one of the attachments that you approved this morning in

17   connection with the settlement.

18           THE COURT:  All right.  Comments on that?

19           A VOICE:  None, Your Honor.

20           THE COURT:  Committee, you're good?

21           MS. LAMBERT:  The U.S. Trustee had also objected to

22   the CRO motion, but it's some of the same issues that the

23   Committee raised.  And the CRO, my understanding, is now not

24   an employee of the board but totally overseen by the board,

25   and with that, we can withdraw our objection.
```

90

1          THE COURT:  All right.  Very good.  I'll sign your

2   order on the CRO, then.

3          MR. DEMO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  Well, if there's nothing

5   else, I'll be on the lookout for your orders.  And, again, if

6   you could coordinate with Traci to make sure she's clear on

7   everything you need set on the 21st.

8          MR. POMERANTZ:  Thank you very much, Your Honor.

9          THE COURT:  All right.

10         MR. CLEMENTE:  Thank you, Your Honor.

11         MR. DEMO:  Thank you, Your Honor.

12         THE CLERK:  All rise.

13      (Proceedings concluded at 11:54 a.m.)

14                          --oOo--

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **12/10/2020**

24   _____     _____

    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

91

INDEX

PROCEEDINGS                                               4

OPENING STATEMENTS

By Mr. Pomerantz                                          9
By Mr. Clemente                                          29
By Ms. Patel                                             41
By Mr. Pomerantz                                         45
By Mr. Daugherty                                         46
By Mr. Maxcy                                             48
By Mr. Bentley                                           48
By Ms. Lambert                                           49

WITNESSES

Debtor's Witnesses

Bradley Sharp
- Direct Testimony by Declaration                         8
- Cross-Examination by Ms. Lambert                       59

EXHIBITS

Debtor's Exhibits                        Identified Received

1    Bradley Sharp Declaration                  8        8

CLOSING ARGUMENTS

By Mr. Pomerantz                                         68
By Mr. Clemente                                          71
By Mr. Pomerantz                                         73

RULINGS                                                  75

END OF PROCEEDINGS                                       90

INDEX                                                    91

# EXHIBIT 24

```
                     IN THE UNITED STATES BANKRUPTCY COURT
  1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
  2
                                  )   Case No. 19-34054-sgj-11
  3   In Re:                       )
                                  )
  4   HIGHLAND CAPITAL            )   Dallas, Texas
      MANAGEMENT, L.P.,           )   February 19, 2020
  5                               )   9:30 a.m.
                                  )
  6           Debtor.             )
                                  )   MOTIONS
  7   _____ )

                     TRANSCRIPT OF PROCEEDINGS
  8           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
  9
      APPEARANCES:
 10
      For the Debtor:              Greg Demo
 11                                John A. Morris
                                   PACHULSKI STANG ZIEHL & JONES, LLP
 12                                780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
 13                                (212) 561-7700

 14   For the Debtor:              Jeffrey N. Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
 15                                10100 Santa Monica Blvd., 13th
                                     Floor
 16                                Los Angeles, CA  90067
                                   (310) 277-6910
 17
      For the Debtor:              Melissa S. Hayward
 18                                Zachery Z. Annable
                                   HAYWARD & ASSOCIATES, PLLC
 19                                10501 N. Central Expressway,
                                     Suite 106
 20                                Dallas, TX  75231
                                   (972) 755-7104
 21
      For the Official Committee   Matthew A. Clemente
 22   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
 23                                Chicago, IL  60603
                                   (312) 853-7539
 24

 25
```

2

```
 1  APPEARANCES, cont'd.:

 2  For the Official Committee    Juliana Hoffman
    of Unsecured Creditors:       SIDLEY AUSTIN, LLP
 3                                2021 McKinney Avenue, Suite 2000
                                  Dallas, TX  75201
 4                                (214) 981-3413

 5  For Acis Capital             Rakhee V. Patel
    Management GP, LLC,          Annmarie Antoinette Chiarello
 6  et al.:                      Phillip L. Lamberson
                                 WINSTEAD, P.C.
 7                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
 8                               (214) 745-5250

 9  For Acis Capital             Brian Patrick Shaw
    Management GP, LLC,          ROGGE DUNN GROUP, P.C.
10  et al.:                      500 N. Akard Street, Suite 1900
                                 Dallas, TX  75201
11                               (214) 239-2707

12  For the Issuer Group:        Amy K. Anderson
                                 JONES WALKER, LLP
13                               811 Main Street, Suite 2900
                                 Houston, TX  77002
14                               (713) 437-1866

15  For the Issuer Group:        James T. Bentley
    (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
16                               919 Third Avenue
                                 New York, NY  10022
17                               (212) 756-2000

18  For Redeemer Committee of    Mark A. Platt
    the Highland Crusader        FROST BROWN TODD, LLC
19  Fund:                        100 Crescent Court, Suite 350
                                 Dallas, TX  75201
20                               (214) 580-5852

21  For Redeemer Committee of    Marc B. Hankin
    the Highland Crusader        JENNER & BLOCK, LLP
22  Fund:                        919 Third Avenue
    (Telephonic)                 New York, NY  10022-3098
23                               (212) 891-1600

24

25
```

3

APPEARANCES, cont'd.:

For the U.S. Trustee:        Lisa L. Lambert
                             OFFICE OF THE UNITED STATES
                               TRUSTEE
                             1100 Commerce Street, Room 976
                             Dallas, TX  75242
                             (214) 767-8967 Ext. 1080

Recorded by:                 Michael F. Edmond
                             UNITED STATES BANKRUPTCY COURT
                             1100 Commerce Street, 12th Floor
                             Dallas, TX  75242
                             (214) 753-2062

Transcribed by:              Kathy Rehling
                             311 Paradise Cove
                             Shady Shores, TX  76208
                             (972) 786-3063

                   Proceedings recorded by electronic sound recording;
                     transcript produced by transcription service.

4

1               <u>DALLAS, TEXAS - FEBRUARY 19, 2020 - 9:43 A.M.</u>

2               THE COURT:  All right.  Well, we have Highland

3     matters.  Let's get lawyer appearances, in the courtroom

4     first.

5               MR. DEMO:  Good morning, Your Honor.  Greg Demo;

6     Pachulski Stang Ziehl & Jones, on behalf of the Debtor.  With

7     me are Jeff Pomerantz and John Morris.

8               THE COURT:  Okay.  Good morning.

9               MR. POMERANTZ:  Good morning.

10              MR. CLEMENTE:  Good morning, Your Honor.  Matthew

11    Clemente and Juliana Hoffman from Sidley Austin on behalf of

12    the Official Committee of Unsecured Creditors.

13              THE COURT:  Good morning.

14              MS. HAYWARD:  Good morning, Your Honor.  Melissa

15    Hayward and Zachery Annable also on behalf of the Debtor.

16              THE COURT:  Good morning.

17              MS. LAMBERT:  Lisa Lambert with the U.S. Department

18    of Justice on behalf of the U.S. Trustee, William Neary.

19              THE COURT:  Good morning.

20              MS. PATEL:  Good morning, Your Honor.  Rakhee Patel,

21    Phil Lamberson, and Annemarie Chiarello of Winstead, P.C., and

22    also Brian Shaw of Rogge Dunn Group, on behalf of Acis Capital

23    Management, LP and Acis Capital Management, GP, LLC.

24              THE COURT:  Thank you.

25              MR. PLATT:  Good morning, Your Honor.  Mark Platt

5

1   from Frost Brown Todd on behalf of the Redeemer Committee of

2   the Highland Crusader Fund.  I believe that at least Marc

3   Hankin from Jenner & Block is on the line as well.

4            THE COURT:  Okay.  Thank you.

5            MS. ANDERSON:  Good morning, Your Honor.  Amy

6   Anderson with Jones Walker on behalf of the Issuers.  And I

7   believe Mr. James Bentley with Schulte Roth is also on the

8   phone.

9      And I apologize for interrupting the flow.  I would ask if

10  Mr. Bentley and I could be excused after the uncontested

11  matters are taken up this morning, just to avoid  --

12           THE COURT:  Okay.

13           MS. ANDERSON:  -- having us -- I don't want to re-

14  interrupt later, if that is all right with Your Honor.

15           THE COURT:  Okay.  That's fine.  Thank you.

16           MS. ANDERSON:  Okay.

17           THE COURT:  All right.  That looks like all the

18  courtroom appearances.  On the phone, we heard that James

19  Bentley is there.  Do you want to appear, Mr. Bentley?

20           MR. BENTLEY:  Yes, that's correct, Your Honor.  Good

21  morning.

22           THE COURT:  All right.

23           MR. BENTLEY:  Good morning, Your Honor.  James

24  Bentley; Schulte Roth & Zabel; for the Cayman Issuers.

25           THE COURT:  All right.  And someone else was there

6

1   for the Redeemer Fund.  I can't remember.  Was it Mr. Clubok

2   you said, or anyone else on the phone?

3           MR. HANKIN:  Marc Hankin from Jenner & Block, --

4           THE COURT:  Oh, okay.

5           MR. HANKIN:  -- Your Honor.

6           THE COURT:  All right.  Mr. Hankin.  Anyone else on

7   the phone who wants to appear may go ahead.

8       All right.  I guess we're good to go.  Well, I'll turn now

9   -- Mr. Demo, are you going to start us off today?

10          MR. DEMO:  Yes, Your Honor.

11          THE COURT:  Someone delivered a wonderful notebook

12   and an easy-to-follow agenda.  I appreciate whoever hard work

13   was behind that.  It really helps us get prepared back in

14   chambers.  So, thank you.

15          MR. DEMO:  And we're happy to do it, Your Honor,

16   because, honestly, it helps us, I think, as much as it helps

17   you.

18          THE COURT:  Okay.

19          MR. DEMO:  And we do have extra copies if anybody

20   needs a copy of the agenda.

21          THE COURT:  Okay.

22          MR. DEMO:  Generally speaking, we'd kind of like to

23   go in the order of the agenda, I think, with two exceptions.

24   I know that Ms. Adams and Mr. Bentley have to move, so I

25   thought maybe we could do their objection to the settlement

7

1   motion first.

2          THE COURT:  Okay.  So that's the carryover matter.

3          MR. DEMO:  Correct, Your Honor.

4          THE COURT:  We obviously have an order in place, but

5   we kept it open to accommodate their issues.

6          MR. DEMO:  Correct.

7          THE COURT:  Okay.

8          MR. DEMO:  And that's Item 7 on Page 7.

9          THE COURT:  All right.

10          MR. DEMO:  And I think this one -- and anybody can

11   correct if I'm wrong -- will go pretty easily.  We've come to

12   an agreement with the Objecting Parties.

13          THE COURT:  All right.

14          MR. DEMO:  We are planning on submitting, under a

15   notice, a revised copy of the operating protocols that were

16   approved by this Court in connection with the settlement that

17   addresses those Objectors' concerns.  And then once that is

18   filed, the Objecting Parties will withdraw their objection.

19          THE COURT:  All right.  Anyone wish to speak up on

20   this matter?

21      All right.  Well, as I recall, the concern had been that

22   they didn't want the agreed-upon operating protocols with the

23   Committee to somehow change contractual rights of the parties,

24   and so --

25          MR. DEMO:  That is correct, Your Honor.  And we took

8

 1  their language and we carved out a small universe of CLO

 2  Issuers, --

 3          THE COURT: Okay.

 4          MR. DEMO:  -- exactly as they asked for.

 5          THE COURT:  All right.  Well, again, I'll ask:  Does

 6  anyone have any comment about this revised process?

 7      All right.  Well, that sounds perfectly fine to me, so

 8  we'll look for the revised copy of the operational procedures.

 9          MR. DEMO:  Okay.  Great, Your Honor.

10      And then I guess the only other exception to the order of

11  the agenda --

12      (Garbled phone noises.)

13          THE COURT:  Is someone on the phone wishing to speak

14  up?  (no response)  All right.  I guess not.

15          MR. DEMO:  Yeah.  I guess the only other exception to

16  the order in the agenda is the Foley Gardere retention

17  application.

18          THE COURT:  Okay.

19          MR. DEMO:  We would like to do that last.  It is a

20  contested hearing and I think we are going to have some

21  evidence on that.

22          THE COURT:  All right.  All right.  Sounds fine.

23          MR. DEMO:  Then, I guess, just going through the

24  agenda in the order that it's written, the first one is the

25  Lynn Pinker retention application.  We had originally filed

9

1   that retention application back in October.  We recently

2   withdrew it.  We're not going to go forward on it.

3            THE COURT:  All right.

4            MR. DEMO:  The second matter, and I guess the second

5   two matters, hopefully, we can take at the same time.  These

6   are two uncontested matters.  Certificates of no objection

7   have been filed for both of them.  The first is the foreign

8   representative motion.

9            THE COURT:  Yeah, and I will tell you, I don't know

10  if it's shown up on PACER yet, --

11           MR. DEMO:  Okay.

12           THE COURT:  -- but I actually already signed an order

13  on that, --

14           MR. DEMO:  Okay.

15           THE COURT:  -- as well as exclusivity.

16           MR. DEMO:  Perfect.

17           THE COURT:  But, you know, I saw the certificates of

18  no objection, but perhaps we need to talk about it in case

19  anyone wants to comment in any way.

20           MR. DEMO:  If anybody does, I mean, if you've already

21  entered them -- I know PACER was down, so I don't think we've

22  seen it yet.

23           THE COURT:  Okay.

24           MR. DEMO:  But we're fine moving on if --

25           THE COURT:  Well, yeah.  The foreign representative

10

```
 1   motion looked like a no-brainer, if you will.

 2           MR. DEMO:  Uh-huh.

 3           THE COURT:  It was filed way back in October, right?

 4           MR. DEMO:  Correct.  Right.

 5           THE COURT:  And no one had ever objected.  It's just

 6   that there are some foreign proceedings out there; --

 7           MR. DEMO:  Right.  Right.

 8           THE COURT:  -- you wanted to make sure that there was

 9   a human being who had authority to act in those?

10           MR. DEMO:  Correct.

11           THE COURT:  All right.  So, if no one has any

12   comment, I did go ahead and sign the order approving that.

13           MR. DEMO:  Okay.

14           THE COURT:  Similarly, exclusivity.  I signed an

15   order on that yesterday.  In probably nine out of ten cases, I

16   would have had a hearing with evidence.

17           MR. DEMO:  Uh-huh.

18           THE COURT:  But, again, that one seemed like a no-

19   brainer.  We had no objections, and obviously you've been in

20   court a lot, with a lot of things happening.

21           MR. DEMO:  Yes.

22           THE COURT:  So it seemed like a no-brainer to give

23   more time on that.  So, does anyone have anything they wanted

24   to say about that?  (no response)  All right.

25           MR. DEMO:  Okay.
```

11

1          THE COURT:  So that is granted.  I can't remember,

2     off the top of my brain, what the extended time frame was.  Do

3     you want to say that on the record?  Because I've just blanked

4     out at the moment.

5          (Counsel confer.)

6          MR. DEMO:  It's -- we extended it for four months,

7     Your Honor.

8          THE COURT:  Okay.  All right.  So that was June, June

9     12th as the deadline for filing a plan, and then the

10    solicitation period would expire on August 11th, 2020.  That's

11    what I've approved.

12         MR. DEMO:  Yes.

13         THE COURT:  All right.

14         MR. DEMO:  Okay.  The next matter is the bar date

15    motion.  There was an automatic bar date set for April 8th --

16         THE COURT:  Uh-huh.

17         MR. DEMO:  -- in connection with the 341 notice.  We

18    just wanted to have procedures for filing claims approved by

19    this Court.

20         THE COURT:  Okay.

21         MR. DEMO:  You know, we filed the motion.  There are

22    no objections.  We did have some comments from the United

23    States Trustee, which we've incorporated into a redlined

24    order.

25        Something came up last night where, the way that it works

12

```
 1   because we have a lot of investors, is that a lot of people
 2   get notice through their custodians and through the different
 3   administrators.
 4            THE COURT:  Uh-huh.
 5            MR. DEMO:  And so we worked that into the motion.
 6   The United States Trustee has asked for an extension of 45
 7   days for those folks to file their claim.  We're okay with
 8   that.  We're going to work with her afterwards, and we will
 9   submit a revised form of order.
10            THE COURT:  Okay.  So, just to be clear, the proposed
11   deadlines, as revised, would be what?
12            MR. DEMO:  It depends on when the notice is actually
13   able to be sent out.
14            THE COURT:  Okay.
15            MR. DEMO:  We need to work through some technical
16   issues on that.
17            THE COURT:  Okay.  Ms. Lambert?
18            MS. LAMBERT:  So, Judge Jernigan, I think the Court
19   is familiar with this from when we solicit Equity Committees.
20   It's the same issue here.  You go to TD Ameritrade and then
21   they send the notice to the direct holders, but also asked
22   that they include correspondence to the TD Ameritrade or
23   Merrill Lynch equivalents saying -- instructing them to send
24   the notice of the bar date to their direct holders.
25        So we're going to agree on the phrasing of the letter.
```

13

1    I'm hopeful that we can attach that to the order so the Court

2    can see what it looks like.

3            THE COURT:  All right.

4            MR. DEMO:  Okay.  And we'll work through those

5    issues, Your Honor, and have something to you as soon as

6    possible.

7            THE COURT:  All right.  And you're also asking for

8    bar dates, really, bar date for 503(b)(9) claims as well?

9            MR. DEMO:  Yeah.  We don't think we're going to have

10   any.

11           THE COURT:  Okay.

12           MR. DEMO:  So it's really just out of an abundance of

13   caution.

14           THE COURT:  Okay.  All right.  Well, I'll look for

15   that form of order --

16           MR. DEMO:  Okay.

17           THE COURT:  -- and be happy to sign it as you all

18   have negotiated it.

19           MR. DEMO:  Okay.  And then skipping over Foley

20   Gardere, there is one still outstanding objection on that, so

21   we will hear that in due course.

22           THE COURT:  Okay.

23           MR. DEMO:  The next one is Item 6 on Page 6, and

24   that's the PensionDanmark motion to lift the stay.  We have an

25   agreement in principle with PensionDanmark that the Committee

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 65-24   Filed 12/15/23   Page 412 of 1539   PageID 17650
Exhibit 24   Page 29 of 189

14

1   has signed off on.  We're just going through and working

2   through the paperwork.  And so we would like to just push this

3   to the next hearing date, with the expectation that we would

4   get the paperwork filed in between then and we wouldn't have

5   to have it set.

6           THE COURT:  All right.  So we will carry this to our

7   next omnibus hearing date.  I don't know if we have one

8   automatically set at this point or --

9           MR DEMO:  It's March 13th.

10          THE COURT:  March--?

11          MR. DEMO:  12th.

12          MS. HAYWARD:  11th.

13          MR. DEMO:  11th.  I'm sorry.  I was in the ballpark.

14          THE COURT:  Okay.  So, carried to March 11th, as

15  necessary.

16          MR. DEMO:  Uh-huh.

17          THE COURT:  All right.

18          MR. DEMO:  And then I guess the next thing, skipping

19  over the CLO Issuers' objection, which we already addressed,

20  --

21          THE COURT:  Uh-huh.

22          MR. DEMO:  -- is the sealing conference motion.

23          THE COURT:  Okay.

24          MR. DEMO:  And I would turn this over to my

25  colleague, John Morris.

15

1          THE COURT:  All right.

2          MR. MORRIS:  Good morning, Your Honor.  John Morris,

3    Pachulski Stang Ziehl & Jones.

4          THE COURT:  Good morning.

5          MR. MORRIS:  I hope that this doesn't take too much

6    time.  But following the last hearing that we had, the Court

7    had rendered a ruling with respect to the Committee's sealing

8    motion.  And regrettably, the Debtor and the U.S. Trustee's

9    Office were unable to agree on a form of order.  And that led

10   to kind of a back-and-forth about the scope of the protective

11   order that had been entered.

12       So, because we couldn't come to an agreement, and because

13   the Debtor had concerns about the interpretation and the

14   position, frankly, that the U.S. Trustee was taking with

15   respect to the protective order, we filed our motion for the

16   entry of an order concerning the sealing motion and for a

17   conference.  And that was filed at Docket 397.

18       The Court subsequently entered the Debtor's proposed order

19   on the sealing motion, on the Committee's sealing motion.  So

20   that's moot.

21       The only issue, to the extent there is an issue, and I'm

22   not sure that there is, but to the extent that there is an

23   issue, it was just the Debtor's desire to make clear on the

24   record that the words of the protective order are clear and

25   unambiguous and that they apply to any party who receives

16

1    documents in this bankruptcy case, whether it's in connection

2    with a contested matter or an adversary proceeding, and that

3    order applies both to documents previously received and to

4    documents that will be received in the future.

5         We had asked the U.S. Trustee's Office to make -- just to

6    agree that they would abide by the protective order.  And I'm

7    not casting aspersions, I'm not saying, you know, they're bad

8    people or anything, but we never got the crystal-clear

9    response that we needed and expected, frankly, that the order

10   says what the order says and the U.S. Trustee's Office would,

11   you know, would abide by it.

12             THE COURT:  Okay.  So, --

13             MR. MORRIS:  So that's why we asked for this status

14   conference.

15             THE COURT:  So this is more than just the issue of

16   the Redeemer Committee arbitration award --

17             MR. MORRIS:  Correct.

18             THE COURT:  -- that was the attachment to the --

19             MS. LAMBERT:  No, Your Honor.

20             THE COURT:  Wait.  Oh, okay.  Well, what I was about

21   to say is I was understanding from your presentation that you

22   thought this was about more than just the arbitration award,

23   the Redeemer Committee arbitration award that had been

24   attached to that Committee objection and that was subject to

25   the motion to seal.

17

1      You think it is also about items marked Confidential that

2   the U.S. Trustee received before the entry of the protective

3   order?

4           MR. MORRIS:  As it explicitly provides for.  And I'll

5   just say that the concerns arise from the written

6   communications that we received, where the U.S. Trustee's

7   Office specifically said that they would file matters

8   unredacted and without seal.  And we asked them to simply

9   retract that statement, because the order says what the order

10  says.  And I think it's a fair concern that the Debtor has in

11  this regard, and it was really a very simple request.  Please,

12  please, I mean, you can't file documents unredacted and

13  without seal because there's a protective order in place.

14          THE COURT:  Okay.  Now, Ms. Lambert, you say -- what

15  were you about to say?

16          MS. LAMBERT:  First, Your Honor, I want to be clear

17  that the U.S. Trustee -- everyone in the U.S. Trustee's Office

18  intends to honor the Court's orders.  There are many things

19  that we debate hotly and that we feel animated about in terms

20  of legal advocacy, but we intend to honor both the office and

21  the individual that holds that office when the Court has made

22  a ruling.

23      The issue that is presented to the Court is what is the

24  effect of dismissing a motion to seal on the basis that it is

25  moot?  There's black-letter law that sealing should be for

18

1   limited time periods and things should be unsealed --

2          THE COURT:  Okay.  Can I stop you?  Are you saying

3   that you think the sole issue here is just the arbitration

4   award?

5          MS. LAMBERT:  Yes, Your Honor.

6          THE COURT:  Okay.  So, so --

7          MS. LAMBERT:  And this is how it springs back to the

8   protective order.

9          THE COURT:  Okay.  Let me --

10         MS. LAMBERT:  The U.S. --

11         THE COURT:  Let me stop you, because what about other

12  documents besides the arbitration award that the U.S. Trustee

13  might have received prior to the Court signing the protective

14  order?

15         MS. LAMBERT:  The U.S. Trustee did not receive any

16  other items that --

17         THE COURT:  Okay.  So we are just talking about the

18  arbitration?

19         MS. LAMBERT:  We have not to this date received any

20  other items than those items --

21         THE COURT:  Okay.

22         MS. LAMBERT:  -- that were subject to the motion to

23  seal.

24         THE COURT:  Okay.

25         MS. LAMBERT:  And this is the U.S. Trustee's

19

1   position.  The Court --

2          THE COURT:  I will say that one of the Debtor's

3   lawyers is shaking his head.  I want to see if there's a

4   disagreement about, did the U.S. Trustee receive more items?

5   Was that --

6          MR. MORRIS:  I would say, Your Honor, I don't know

7   exactly what was delivered, because I'm, --

8          THE COURT:  Okay.

9          MR. MORRIS:  -- right, I'm part of a team.  But I do

10  know that we gave, for example, information about bonus --

11  about, you know, personnel bonus motions that is confidential.

12         MS. LAMBERT:  But the issue about what was going to

13  be filed unsealed was related to the items in the motion to

14  seal and the U.S. Trustee's attendant motion for the

15  appointment of a Chapter 11 Trustee, which had been redacted.

16         THE COURT:  Okay.  Let me -- I'm going to take a shot

17  at making this go quicker.  What I meant when I ruled that,

18  well, the objection of the Committee is moot now because it

19  was resolved by other orders; therefore, I think the motion to

20  file under seal the arbitration award is moot because it was

21  connected to the Committee's objection; you know, that was a

22  quick, off-the-cuff comment.  What I was trying to say is I

23  didn't think this needed any more court time.  There was no

24  case in controversy anymore.  I didn't know why I needed to

25  resolve an objection to the motion to file under seal.

20

1        What I meant is it's going to be like it never even

2   happened, right?  And what I probably should have done is

3   said, Committee, you want to make an oral motion to withdraw

4   your objection and withdraw your motion to seal, you know,

5   orally, I'll grant it orally and just remove it from the

6   record, so to speak.

7        And I thought we were passing off to another day whether

8   that arbitration award, if someone wanted to file it and file

9   it publicly or disclose it, they could then file a motion

10  later.

11              MR. MORRIS:  Your Honor?

12              MS. LAMBERT:  Here's the -- here's the --

13              MR. MORRIS:  Your Honor, if I may?

14              THE COURT:  Uh-huh.

15              MR. MORRIS:  You've done exactly what you've said.

16              THE COURT:  Okay.

17              MR. MORRIS:  I don't think there is an issue now.

18              THE COURT:  Okay.

19              MR. MORRIS:  I've heard from the U.S. Trustee's

20  Office what I asked for probably three times in writing, that

21  they are going to abide by the terms of the protective order.

22  With respect to the sealing order, Your Honor has entered an

23  order.  It declared the Committee's motion to seal moot, and

24  it specifically provided that anybody who's received the

25  awards has to treat them in accordance with the protective

21

 1   order.

 2           THE COURT:  Yeah.

 3           MR. MORRIS:  Nobody's appealed that order.

 4           THE COURT:  Okay.

 5           MR. MORRIS:  It's now the -- it's -- whatever the

 6   U.S. Trustee's interpretation is of the law is kind of

 7   irrelevant at this point because the order has been entered

 8   and it hasn't been appealed.

 9           THE COURT:  Okay.

10           MS. LAMBERT:  Here's the thing, Your Honor.  The case

11   law, *Omni Video*, similar things.  There are two issues.

12   Number one is whether the mootness of the underlying issue

13   means that the pleadings should be unredacted, which is black

14   letter that at some point pleadings should be unredacted and

15   made available to the public.  And the Court's ruling is that

16   by replacing the management the Court has mooted anything that

17   might be scandalous about that or that might be problematic

18   about it, and therefore --

19           THE COURT:  What is the it?  I'm not following.

20           MS. LAMBERT:  -- the arbitration award and the

21   pleadings attendant were redacted, but the --

22           THE COURT:  I haven't said anything about -- I mean,

23   I denied a Chapter 11 trustee motion because I thought the new

24   management was a correct way to go forward in this case.

25           MS. LAMBERT:  Correct.

22

```
 1              THE COURT:  The arbitration award, what I meant was

 2    it's like it never happened now.  And if I --

 3              MS. LAMBERT:  Right.

 4              THE COURT:  -- need to do an amended order saying the

 5    Committee has permission to withdraw the objection and

 6    withdraw the motion to seal, I'll --

 7              MS. LAMBERT:  That's --

 8              THE COURT:  -- I'll do that, --

 9              MS. LAMBERT:  But --

10              THE COURT:  -- so there's nothing on the record to

11    make public.

12              MS. LAMBERT:  But withdrawing the motion, objection,

13    does not delete it from the record, Your Honor.

14              THE COURT:  Well, I'm going to make it so.  I'm going

15    to make it so.  And then if, one day, you or someone else --

16              MS. LAMBERT:  Your Honor, currently, --

17              THE COURT:  -- wants to be relieved from the

18    protective order and asks that it be publicly filed, I'll

19    consider --

20              MS. LAMBERT:  Your Honor?

21              THE COURT:  -- the merits of that.

22              MS. LAMBERT:  Your Honor, the thing is that the

23    Committee, when it filed its original objection, did not

24    redact.  So this information has been in the public domain for

25    months now.  And the arbitration --
```

23

1              THE COURT:  Wait.  Okay.  This all happened in

2    Delaware, so I don't know their procedure.  Are you saying it

3    was on the public PACER?

4              MS. LAMBERT:  They didn't redact.

5              MR. MORRIS:  No.  Your Honor, the Redeemer Award

6    (inaudible).  The order says what the order says.  It's been

7    entered.  I mean, this is the concern, is that we have this

8    never-ending debate.  I've heard -- the Debtor has heard what

9    it needed to hear, and that is the U.S. Trustee's Office will

10   abide by the terms of the protective order.

11       With respect to the Committee's motion to seal, we're done

12   with that.

13             MS. LAMBERT:  There is no --

14             MR. MORRIS:  An order has been entered.

15             MS. LAMBERT:  There is no motion to seal.  The normal

16   effect of -- the dismissal of a motion to seal on the basis

17   that it is moot is that everything attendant to that becomes

18   unredacted and unsealed.

19       In addition, there's a separate issue that the Debtor gets

20   to talk about what the amounts in the Redeemer awards were

21   unilaterally, without -- and the Committee gets to talk about

22   it unilaterally.  They've mentioned what the findings were in

23   four different spots in their objection that are not redacted.

24   And the U.S. Trustee is the only one that's held to the motion

25   to seal, which we have honored, but the --

24

```
 1            THE COURT:  I don't understand why we're having this
 2   discussion.  For now, I've made it a moot issue, a dead issue.
 3   The objection to which the arbitration award was attached as
 4   an exhibit became moot.  Maybe I'm not using the best legal
 5   description, but it was resolved.  And I didn't feel the need
 6   for us to have a dispute about whether that motion to seal,
 7   which related to the objection --
 8            MS. LAMBERT:  The motion to seal --
 9            THE COURT:  -- was meritorious or not.  If -- again,
10   --
11            MS. LAMBERT:  But the motion to --
12            THE COURT:  -- to me, there's an easy fix.  If you're
13   -- if you think it's necessary, I'll grant the --
14            MR. MORRIS:  Your Honor?
15            THE COURT:  This seems like wasted energy, --
16            MS. LAMBERT:  But --
17            THE COURT:  -- granting the Committee authority to
18   withdraw their objection and their motion to seal --
19            MS. LAMBERT:  But, Your Honor, --
20            THE COURT:  -- so that it's off the record.
21            MS. LAMBERT:  -- the interim sealing order didn't
22   impact just their objection.  It impacted the U.S. Trustee's
23   motion to dismiss.  It impacted the evidence.  The finding
24   that these issues are moot because they're resolved means that
25   the Court should unredact them because it's no longer
```

25

1    confidential.  It's no longer a problem.  If the evidence is

2    --

3            THE COURT:  Why are we having this discussion?  Why

4    is this important in this Chapter 11 case?  The arbitration

5    award may get in one day, and someone may ask me, and I may

6    say yes, I may say no.  It depends on what the legal arguments

7    are.

8            MS. LAMBERT:  It's --

9            THE COURT:  Why is this relevant right now?

10           MS. LAMBERT:  It's important to the public's

11   perception, and the U.S. Trustee is charged with making the

12   information about a case available to the public.

13           MR. MORRIS:  Your Honor, there is no motion --

14           MS. LAMBERT:  This -- these -- these arbitration --

15           MR. MORRIS:  There's no relief that's been sought.

16           MS. LAMBERT:  The arbitration awards have been

17   discussed in the press, Your Honor.  And the press --

18           THE COURT:  Well, let me just say this.  Okay?  This

19   was obviously -- there was an arbitration award.  It was never

20   confirmed with a judgment by a court.  And I am presuming -- I

21   don't need to decide today -- but I'm presuming that there is

22   some legal argument that someone feels can be made about why

23   that arbitration award is confidential.  You know, it

24   obviously --

25           MR. MORRIS:  The Committee made that argument in

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 115-24   Filed 12/29/23   Page 424 of 1539   PageID 17662

Exhibit 24    Page 29 of 189

26

1 | their motion.

2 | THE COURT:  Obviously, if there had been a judgment,

3 | it all would have been out in the world.  And I will say I

4 | cannot remember ever being in a situation where someone wanted

5 | to keep an arbitration award confidential in a bankruptcy

6 | case.  Maybe it happens.  I'm just -- I've never seen it.  So

7 | if there is a day where someone wants me to find this

8 | arbitration award can be made public, I may very well do it.

9 | I don't know.  I'll hear the legal arguments.  But I am just

10 | asking, why are we arguing about this today?

11 | MS. LAMBERT:  We're arguing about it today because it

12 | remains a point of interest and a point of information sharing

13 | to government creditors and other creditors that are involved

14 | in the case, as well as the public.

15 | THE COURT:  They're not in here, the SEC or whoever

16 | you're --

17 | MS. LAMBERT:  Well, how would they know to be in

18 | here?

19 | THE COURT:  Because maybe they've seen the press that

20 | you're talking about.  All right.  I don't know --

21 | MR. MORRIS:  Your Honor, we -- the Debtor's heard

22 | what --

23 | THE COURT:  The protective order governs.  And my

24 | prior order with regard to the sealing motion I think made

25 | clear, but if it didn't, I'm going to say right now:  As far

27

 1   as I'm concerned, the arbitration award, nothing gets unsealed

 2   on the Court's docket, and no one will file it or disclose it

 3   without bringing a motion, and we'll have a legal argument and

 4   evidence or whatever we need and I'll rule on the issue.

 5          MS. LAMBERT:  So, Your Honor, my understanding is

 6   that the Court is striking the objection to the CRO that the

 7   Committee filed and striking the U.S. Trustee's motion to

 8   dismiss, which was redacted, and striking the evidence, and

 9   those will not be on the docket available to the public at

10   all.

11          THE COURT:  That's not what I'm doing.  I don't -- I

12   don't even know -- I don't understand why you're saying that.

13          MS. LAMBERT:  Well, you can't just withdraw the

14   objection.  The objection had the exhibits attached to it.

15   The issue that the U.S. Trustee -- I'm sorry, but I'm always

16   charged with this issue -- is trying to unseal documents and

17   trying to determine the proper date for unsealing them.  They

18   attached to the arbitration award, like a motion for summary

19   judgment.  That's the practice in Delaware.  And so the issue

20   is, at what point will that become unsealed?  It's a higher

21   standard --

22          THE COURT:  The answer is no, without an order from

23   this Court.

24          MS. LAMBERT:  It is a higher standard than for

25   confidentiality.  And in addition, --

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 1-524   Filed 12/29/23   Page 426 of 1539   PageID 17664
Exhibit 524   Page 190 of 189

28

1          THE COURT:  All right.  If you want to file a motion

2     and we set it for hearing and we have briefing, we'll do that.

3     But, for now, there's -- there are two orders that I will tell

4     you on the record what they mean is, right now, the

5     arbitration award is not to be publicly disclosed.  Not by the

6     Court on the docket system.  Not by any person.

7        If someone wants to publicly disclose it, they can file a

8     motion and we'll talk about whether it's protected or not.

9          MR. MORRIS:  Thank you.

10          THE COURT:  Whether there are grounds, legal grounds,

11    to protect it.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  I've told you I'm skeptical.  I'm

14    skeptical.  But, you know, we'll see.  Okay?

15          MS. LAMBERT:  Okay.  Your Honor, the FJC publication

16    is very clear that the Court should be trying, when issues are

17    moot, to unseal items.  And this is why our advocacy is this

18    way.  And I will move to unseal it.

19          THE COURT:  All right.

20          MR. DEMO:  For the record, Your Honor, again, Greg

21    Demo; Pachulski Stang Ziehl & Jones; for the Debtor.

22        Before we move on to the Foley retention, two quick

23    housekeeping matters.

24          THE COURT:  Uh-huh.

25          MR. DEMO:  We would like to set the next omnibus

29

1   hearing date on April 22nd.  At that date, we would do the

2   quarterly fee applications and whatever else comes up onto the

3   docket.

4           THE COURT:  All right.  Have you run that by Traci

5   Ellison yet?

6           MR. DEMO:  We have not.

7           THE COURT:  Okay.

8           MR. DEMO:  We've talked to the Committee about it,

9   though.

10          THE COURT:  So I will call her right now.

11          MR. DEMO:  And then, I guess, Your Honor, before you

12  do that, we are actually asking for a hearing date on March

13  4th at 1:30 as well.  We're going to have an expedited motion

14  that we'll be filing, I think, this week.  So if you're going

15  to check with her, I guess it might make sense to check on

16  both of those dates.

17          THE COURT:  Okay.

18      (Court confers with Clerk telephonically.)

19          THE COURT:  Okay.  We can give you April 22nd, as you

20  requested, at 9:30.

21          MR. DEMO:  Okay.  Thank you.

22          THE COURT:  Okay.  So that's going to be an omnibus.

23      (Court confers with Clerk telephonically.)

24          THE COURT:  All right.  We can give you March 4th at

25  1:30.

30

1       How about a preview of what we're going to -- what are we

2   going to be seeing?

3           MR. DEMO:  And, Your Honor, I guess we had also

4   reserved March 2nd, and we can release that date.

5           THE COURT:  What?  I'm sorry.

6           MR. DEMO:  We had previously reserved March 2nd at

7   9:30 for the expedited motion, which I'll describe briefly in

8   a second.  We don't need the March 2nd date.

9           THE COURT:  So, okay.

10          MR. DEMO:  Yeah.

11          THE COURT:  All right.  So I'll tell Traci that one

12  --

13          MR. DEMO:  Yeah.  Okay.  Perfect.  Thank you.

14          THE COURT:  -- is off.  Okay.  What is this going to

15  be?

16          MR. DEMO:  The expedited motion, we obviously run a

17  series of investment funds.  From time to time, those funds,

18  either through liquidation or just through normal proceeds

19  generation, make distributions out to their investors.

20      Under the protocols, distributions out to what are

21  related, called related entities under the protocols, which

22  include Mr. Dondero, entities owned by Mr. Dondero, and

23  numerous other categories, those entities cannot receive their

24  distributions from those investment vehicles if the Committee

25  objects to those distributions unless we come to the Court and

31

1    we get Your Honor's approval.

2        That issue has come up.  We are hoping to make those

3    distributions to these related entities.  The Committee has

4    said that they will object, but they've also agreed to the

5    motion to expedite.

6             THE COURT:  All right.

7             MR. DEMO:  So that's the issue that's going to be in

8    front of Your Honor on March 4th.

9             THE COURT:  All right.  When are you going to file

10   the motion?

11            MR. DEMO:  We are hoping to file it, I think, by

12   Friday.

13            THE COURT:  Okay.  So that would be -- what are we at

14   now, the 19th?

15            MR. DEMO:  Yeah.

16            THE COURT:  Okay.  So that'd be --

17            MR. DEMO:  Yeah.  And obviously, --

18            THE COURT:  -- a couple weeks.

19            MR. DEMO:  -- yeah, we'll endeavor to get it filed as

20   soon as possible.

21            THE COURT:  Okay.

22            MR. DEMO:  And then I guess the last item, Your

23   Honor, is the Foley Gardere retention application.

24            THE COURT:  Okay.

25            MR. DEMO:  And, you know, this should be a relatively

32

1   simple retention application.  You know, we'll get into it a

2   little bit more.  There are two objections that were

3   originally filed, one by the Committee and one by Acis.

4   Yesterday morning, the Committee withdrew their objection, so

5   the only objection to the Foley Gardere retention application

6   is by Acis.

7       In the courtroom with me are Holland O'Neil with Foley

8   Gardere -- she's the partner in charge of that representation

9   -- and then also The Honorable Russell Nelms, who's a member

10  of the Independent Board of Directors of Strand Advisors, the

11  party that manages the Debtor.  And I should be remiss if I

12  didn't mention that the two other independent directors, James

13  Seery and John Dubel, are also in the courtroom, --

14          THE COURT:  Okay.

15          MR. DEMO:  -- as is the Debtor's chief restructuring

16  officer.

17      And as I said, Your Honor, really, the only thing, the

18  only substantive thing we're here this morning on is this

19  retention application.  The retention application is under

20  Section 327 of the Bankruptcy Code, and it's to represent the

21  Debtor in three matters related to the Acis bankruptcy and the

22  resulting litigation.

23      Judge Nelms is going to be testifying in support of the

24  Foley retention this afternoon.

25          THE COURT:  Okay.

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 55-24   Filed 12/29/23   Page 431 of 1539   PageID 17669
Exhibit 24   Page 24 of 189

33

1          MR. DEMO:  We filed the retention application on

2    October 29th, along with the retention application of Lynn

3    Pinker.  As I mentioned earlier, the Lynn Pinker retention

4    application was withdrawn.  Two objections were filed to the

5    Foley retention:  One by the Committee, one by Acis.

6        The Committee -- or, sorry, the Debtor addressed those two

7    objections in an omnibus reply that we filed on November 21st.

8    The primary response to those objections was providing

9    additional disclosure to this Court concerning the parties

10   being represented by Foley, the proceedings in which Foley was

11   going to represent those parties, and the allocation of fees,

12   of Foley's fees, across those parties.

13       The reply disclosed, and Judge Nelms will also testify,

14   that the Debtor had originally intended to engage Foley on

15   four matters, not three.  The first matters is general matters

16   just relating to the Acis bankruptcy, status conferences,

17   proof of claim issues.  The second matter is the appeal to the

18   Fifth Circuit of the confirmation order.  The third matter was

19   the appeal, again to the Fifth Circuit, of the entry of the

20   involuntary petition.  And then the fourth matter was the

21   appeal of Winstead's retention as counsel to both Mr. Terry,

22   who is a pre-petition creditor of Acis, and Robert [sic]

23   Phelan as the Chapter 11 trustee.

24       The two appeals, the appeal of the confirmation order and

25   the appeal of the involuntary petition, have been fully

34

 1   briefed to the Fifth Circuit, and some of that briefing was

 2   done, by necessity, post-petition, because of the drag in time

 3   between when we filed the retention and now.  And the Fifth

 4   Circuit has actually set both of those appeals for oral

 5   argument.  They've been consolidated for purposes of oral

 6   argument, and both of the appeals are set for March 30th, so

 7   about six weeks away.

 8       Now, it's an understatement to say a lot has happened in

 9   this case since we filed the reply on November 21st.  One of

10   the most major things in this case, as the Court knows, is the

11   appointment of the Board of Directors.  The Board of Directors

12   was appointed on January 9th and it oversees the management of

13   the Debtor.  Judge Nelms is in this courtroom and will be

14   testifying as to what the Board did to familiarize itself with

15   the Acis litigation and with Foley's retention.  And you'll

16   hear from Judge Nelms that the Board had extensive

17   conversation with the Debtor's employees, including the

18   Debtor's internal legal team, Ms. O'Neil with Foley Gardere,

19   attorneys from Pachulski regarding the status of the Acis

20   litigation and the bankruptcy and Foley's retention.

21       You'll also hear that Judge Nelms reached out directly to

22   Josh Terry, the major party in the Acis litigation, and that

23   Judge Nelms met with both Josh Terry and Ms. Patel to discuss

24   the status of the Acis litigation.

25       And then finally you'll hear, as part of that diligence,

35

1    that the Board analyzed the economic benefit of proceeding

2    with Foley's retention in all three of those matters that I

3    mentioned and also conducted their own diligence on the claims

4    that are being raised in those matters.

5        As a result of that diligence, and I'll discuss the

6    explicit reasons later, the Board determined that it is in the

7    best interest of the Debtor and its estate to proceed with

8    Foley's retention with respect to the three matters I

9    mentioned earlier:  the Acis general bankruptcy, the appeal of

10   the confirmation order, and the appeal of the involuntary

11   petition.

12       The Debtor has also asked for Foley's assistance on

13   certain ancillary matters, like including about disclosures of

14   the Acis litigation, including what needs to go on the

15   schedules and things like that.

16       As a result of this diligence, however, the Board decided

17   to drop the Winstead appeal.  So Acis -- I'm sorry, Foley is

18   not going to be retained to challenge Winstead's retention in

19   that proceeding.  And assuming that Foley is retained, Foley

20   will prepare the papers to withdraw that objection as soon as

21   possible.

22       As a quick aside, though, you know, Foley was directed by

23   the Debtor to continue with the Winstead matter post-petition.

24   Incurred about $25,000 of fees.  And we believe that Foley was

25   working in good faith on that.  So although we're not going to

36

1    proceed with the Winstead matter, we would still ask that

2    Foley be entitled to file a fee application for those fees.

3    The Committee has agreed with this, and we have a form of

4    proposed order with the Committee that contemplates Foley's

5    payment or Foley's receiving payment for the Winstead fees of

6    $25,000.

7            THE COURT:  Wait.  You're talking about, if I approve

8    their retention, rolling that into the retention order?

9            MR. DEMO:  We are, Your Honor.

10           THE COURT:  Okay.

11           MR. DEMO:  No?

12           THE COURT:  That's a no-go, I'll tell you right now.

13           MR. DEMO:  Okay.

14           THE COURT:  I mean, --

15           MR. DEMO:  And we can, we can deal with that.

16           THE COURT:  Yeah.

17           MR. DEMO:  But I --

18           THE COURT:  I'm not going to say yes or no to any

19    fees I haven't seen.

20           MR. DEMO:  Okay.  And -- well, I'm sorry.  What's

21    going to be rolled into the order is their ability to file for

22    those fees.  Everybody would still have the right to object to

23    those fees.  You would have the right to say yes or no on

24    those fees.  The only thing that we would be asking for is

25    that they would be able to apply for those fees and that the

```
 1    fact that they weren't retained on that matter specifically
 2    would not be a basis for an objection to those fees.  So it's
 3    a little bit different.
 4              THE COURT:  Okay.
 5              MR. DEMO:  We're not trying to cut off anybody's
 6    right to object to those fees.
 7              THE COURT:  Okay.  But I don't want to put some
 8    imprimatur on their ability to ask for them.
 9              MR. DEMO:  Okay.
10              THE COURT:  Okay?  So, you know, it's just another
11    day.
12              MR. DEMO:  Yeah.
13              THE COURT:  If they ask for that in a fee app -- if I
14    approve their retention and they ask for it in a fee app,
15    we'll --
16              MR. DEMO:  Okay.  Understood, Your Honor.
17              THE COURT:  -- decide whether it's meritorious or
18    not.
19              MR. DEMO:  Okay.
20              THE COURT:  Okay.
21              MR. DEMO:  And then I guess, just moving on, you
22    know, as you'll hear from Judge Nelms, all of the elements of
23    227(e), you know, have been met.  You know, first, Foley is
24    being retained for a special purpose.  Nobody has objected on
25    that basis.
```

1    Second, Foley is not being retained to conduct the

2  Debtor's bankruptcy case.  That's my firm, Pachulski Stang.

3  Again, nobody has objected on that basis.

4    Third, Foley represented the Debtor prior to the petition

5  date on these matters.  Again, nobody has objected on that

6  basis.

7    And, fourth, you know, as Judge Nelms will testify, the

8  retention of Foley and Foley's continued prosecution of the

9  Acis matters is in the best interest of the Debtor's estate.

10    And then fifth and finally, Foley has no adverse interest

11  with respect to the matters on which it is being retained.

12    Now, as I mentioned, there were two omnibus objections

13  that were filed.  There was the Committee's objection and then

14  there was Acis's objection.  Both of these objections really

15  had one common theme, which was that there was insufficient

16  disclosure as to how the fees were going to be allocated, and,

17  honestly, whether or not Mr. James Dondero would benefit from

18  Foley's retention without paying his share of those fees.

19    Now, we had a meeting with the Committee on Friday and we

20  walked through this issue.  And as a result of that, the

21  Committee withdrew its objection.

22    What we told to the Committee is that, prior to the Acis

23  bankruptcy -- and this goes primarily to the retention -- or,

24  the prosecution of the involuntary petition appeal.  In that

25  appeal, Foley is representing just Neutra.  Foley is not

39

1    representing the Debtor.  Now, the economic benefit to the

2    estate, though, in that appeal accrues almost solely to the

3    Debtor.  It does not accrue to Neutra or to Neutra's economic

4    interest owners, which, full disclosure, are Mr. James Dondero

5    and Mr. Mark Okada.

6        The reason why the Debtor -- and you'll hear, again, hear

7    this from Judge Nelms -- believes that it's in the economic

8    best interest of its estate to pay for Neutra's fees in that

9    appeal is that, if Neutra is successful in that appeal, the

10   involuntary petition obviously will be struck, the involuntary

11   will be unwound, and the economic interest and the economic

12   ownership of Acis will revert to Neutra.

13       Upon that reversion, Highland Capital Management will be

14   reinstated as the advisor to Neutra.

15       Now, if Neutra -- I'm sorry, if Acis then generates fees,

16   those fees are going to be paid about 85 percent to satisfy

17   the contractual obligations under that advisory agreement.

18       So, on a go-forward basis, again, if Neutra is successful,

19   85 percent of the revenue generated by Acis will go to Neutra.

20   That remaining 15 percent will be used to satisfy the claim

21   that Acis -- I'm sorry, that Highland Capital Management has

22   against Acis for the pre-, post-petition, and gap period

23   services that it provided to Acis under the advisory

24   agreements.  That claim is about $8 million.

25       So, 85 percent of the revenue on a go-forward basis is

1    going to be used to satisfy the obligations under the

2    management agreement.  The balance of that is going to be used

3    to satisfy that $8 million claim.

4        That means that, you know, if our math is right -- and

5    obviously, the numbers are not static -- that there's not

6    going to be any contributions or any distributions to the

7    upstream equity, to Mr. Dondero or Mr. Okada, for about four

8    years.  After that four years, 85 percent of the revenue is

9    still going to go to Highland Capital Management, the Debtor,

10   under those advisory agreements.

11       So for that reason, we do believe, and Judge Nelms will

12   testify, that the true economic beneficiary of the Neutra

13   appeal of the involuntary petition is actually Highland

14   Capital Management.

15            THE COURT:  I don't want to jump ahead too much, but

16   are we going to talk today about mootness as a potential issue

17   with both of these appeals?  I mean, you know, I have to say

18   it's very compelling to me that you tell me all the briefing

19   has been done --

20            MR. DEMO:  Uh-huh.

21            THE COURT:  -- and oral argument is set in March, so

22   -- but is mootness a --

23            MR. DEMO:  We don't --

24            THE COURT:  Was there ever a motion to dismiss for

25   mootness or --

41

```
 1            MR. DEMO:  Not that I'm aware of, Your Honor.

 2            THE COURT:  Okay.

 3            MR. DEMO:  And all the briefing has been done.

 4            THE COURT:  Okay.

 5            MR. DEMO:  Again, oral argument is set.  And as far

 6   as I know, nobody has raised that issue.

 7            THE COURT:  Okay.

 8            MR. DEMO:  So I think that we're still proceeding as

 9   to whether --

10            THE COURT:  And, again, I'm leaping ahead, but I'm

11   just -- you know, you went through the scenario --

12            MR. DEMO:  Uh-huh.

13            THE COURT:  -- to show that, you know, Dondero and --

14   if the involuntary was reversed, you know, no money would ever

15   get there.  But you're painting a picture, to me, that, again,

16   it feels a little farfetched.  But the evidence will either,

17   you know, bear it out or not.

18            MR. DEMO:  Again, the evidence, you know, I think,

19   will bear it out.

20       And I think what's important also is, when you're thinking

21   about this, is to think of the actual universe of post-

22   petition fees that Foley is going to incur for those services,

23   for the briefing of the two appeals and then for the

24   bankruptcy services, versus the actual economic gain that the

25   Debtor could and hopefully will get if those appeals are
```

42

1   successful.

2            THE COURT:  Okay.

3            MR. DEMO:  So, Foley --

4            THE COURT:  And hopefully the evidence will really go

5   to this.

6            MR. DEMO:  Yes.

7            THE COURT:  I'm trying to think of -- I'm trying to

8   decide what life looks like --

9            MR. DEMO:  Right.

10           THE COURT:  -- if there is a successful reversal.

11           MR. DEMO:  Right.

12           THE COURT:  And I'm not at all clear.  So the

13   evidence and argument will hopefully make me clear.

14           MR. DEMO:  Yes.  And, honestly, Your Honor knows the

15   facts and circumstances --

16           THE COURT:  Right.

17           MR. DEMO:  -- better than me and probably better than

18   anyone.

19           THE COURT:  Uh-huh.

20           MR. DEMO:  But I think what's --

21           THE COURT:  I mean, we've had -- we had terminated

22   contracts --

23           MR. DEMO:  Right.

24           THE COURT:  -- with Highland.  We have a Reorganized

25   Debtor now, which, you know, --

43

1           MR. DEMO:  Right.

2           THE COURT:  -- has new contractual arrangements.

3           MR. DEMO:  Right.

4           THE COURT:  I just, I'm not sure how that all goes

5   away if there's a reversal.  So I'm --

6           MR. DEMO:  Right.

7           THE COURT:  I'm really wanting to drill down on the

8   benefit --

9           MR. DEMO:  Okay.  And --

10          THE COURT:  -- to Highland.

11          MR. DEMO:  And we can do that.  But I think --

12          THE COURT:  Okay.

13          MR. DEMO:  -- it's helpful to talk about --

14          THE COURT:  Uh-huh.

15          MR. DEMO:  -- the universe of fees first and then

16   talk about the related benefit for that.

17      Foley Gardere has helpfully filed two post-petition fee

18   applications.  Those fee applications disclose that, on all

19   three of these matters, Foley has billed about $330,000.  We

20   believe that Foley was probably going to bill, up through the

21   end of oral argument, about $500,000.

22      And then, you know, again -- and not getting too deep into

23   it, because I do think this is something that's better for

24   testimony because I think it goes to, you know, what the Board

25   believes is the economic benefit to the estate -- but if the

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-24   Filed 12/29/23   Page 442 of 1539   PageID 17680
Exhibit 24   Page 45 of 189

44

 1  Neutra appeal is successful, if the confirmation order appeal

 2  is successful, then the post-petition fees that are going to

 3  accrue or we believe are going to accrue to Highland Capital

 4  Management under those contracts are tens of millions of

 5  dollars a year.

 6      The post-petition and gap period and pre-petition fees

 7  that we believe that Acis owes to Highland are $8 million a

 8  year.  And then there's the go-forward fees.

 9      So we believe that, for spending $500,000, the benefits to

10  the estate are actually going to be in the tens of millions of

11  dollars.  So, you know, even though, you know, reasonable

12  minds can differ as to the merits -- and, again, we'll put on

13  some testimony about that, although there's obviously

14  privilege issues and things like that -- the actual economic

15  benefit to the estate is $500,000 versus the possible benefit

16  of $50 million, possibly more dollars, plus the removal of a

17  substantial portion of Acis's proof of claim, which is -- I

18  think it says not less than $75 million.  So you're looking

19  at, if we're successful, fees into the estate --

20          THE COURT:  Well, that's a different issue, though.

21  Isn't that --

22          MR. DEMO:  It is, but it --

23          THE COURT:  Isn't that the Acis adversary proceeding

24  component?

25          MR. DEMO:  Yes.

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-24   Filed 06/20/23   Page 443 of 1539   PageID 17681
Exhibit 24   Page 26 of 189

45

1          THE COURT:  So, --

2          MR. DEMO:  But if the -- if the -- and, again, I

3     don't want to get too far into this --

4          THE COURT:  Uh-huh.

5          MR. DEMO:  -- because I don't want to get into, you

6     know, legal arguments that are going to be on appeal.

7          THE COURT:  Uh-huh.

8          MR. DEMO:  But what we believe is that, and what

9     Judge Nelms will testify to and what you'll hear, is that if

10    the confirmation order and the involuntary petition are

11    erased, especially the involuntary petition, and we go back to

12    status quo ante, the benefit to the estate is going to be in

13    the tens of millions of dollars, at a minimum, plus the

14    possible diminution, to a large extent, of a proof of claim

15    that is not less than $75 million, and we've heard numbers of

16    up to $300 million.

17       So you're looking to spend $500,000 on these two matters

18    for a benefit to the estate that's going to be astronomically

19    more than that.  So the benefit to the estate versus the money

20    that is going out of the estate, especially since everything

21    has been briefed and set for oral argument, I guess,

22    personally, I find it difficult to not see that benefit and

23    not to see that spending that half a million dollars to

24    possibly get back $50-plus million, I just don't see how

25    that's not a benefit to the estate and how that does not

46

 1   warrant the retention of Foley Gardere in the limited matters

 2   that we're honestly asking them to be retained for.

 3           THE COURT:  All right.

 4           MR. DEMO:  Okay.

 5           THE COURT:  I'll hear other opening statements on

 6   this.

 7           MR. LAMBERSON:  Good morning, Your Honor.  Phillip

 8   Lamberson on behalf of Acis Capital Management.

 9       First of all, let me start off with outlining exactly what

10   our limited objection relates to.  We are not objecting to the

11   Debtor retaining Foley Gardere to handle the litigation

12   matters for the Debtor.  So, for example, the Acis litigation,

13   anything related to the Acis bankruptcy, that's fine.  We

14   don't have any objection to that.

15           THE COURT:  So the mega-adversary proceeding against

16   Highland and affiliates that is stayed, --

17           MR. LAMBERSON:  Uh-huh.

18           THE COURT:  -- I have a giant Report and

19   Recommendation on my desk that was ready to go about the time

20   the Highland bankruptcy was filed -- but it's stayed:  You

21   would have no objection to Gardere defending Highland --

22           MR. LAMBERSON:  Correct.

23           THE COURT:  -- in that if ever a motion to lift stay

24   is filed and that goes forward?

25           MR. LAMBERSON:  Correct.

47

1          THE COURT:  Okay.

2          MR. LAMBERSON:  And, for example, I believe counsel

3    mentioned this:  To the extent that there's a status

4    conference in the Acis case or something like that, we don't

5    have any issue with Foley representing the Debtor as it

6    relates to that.

7        We don't have any objection to the representation of the

8    Debtor as it relates to the Debtor's appeal of the

9    confirmation order.  We don't have any objection to Neutra's

10   retention of Foley at all.  In fact, we don't have any basis

11   to object to Neutra's retention of Foley Gardere.  Neutra is

12   not a debtor.

13       We fully expect and anticipate that we'll be opposite

14   Foley Gardere in the appeal which is going to be argued at the

15   end of next month, as well as any matters in front of this

16   Court.

17       What we do object to is the Debtor agreeing -- frankly,

18   pre-agreeing -- to pay Foley Gardere for litigation costs

19   incurred by non-debtors, and, specifically, Neutra.  And as

20   counsel outlined, and the reply filed by the Debtors is very

21   clear on this point, Neutra is not a subsidiary of the Debtor.

22   Neutra is ultimately owned one hundred percent by Mr. Dondero

23   and Mr. Okada.

24       So why, why are we objecting?  There's a couple of

25   reasons.  Number one, this is obviously an extremely unusual

48

1   request.  It's not really a --

2          THE COURT:  Okay.  Let me just make sure I heard you

3   correct.  The only thing that Acis is objecting to is the

4   Debtor paying fees for Gardere -- Foley Gardere's

5   representation of Neutra?

6          MR. LAMBERSON:  Correct.

7          THE COURT:  Okay.  So, --

8          MR. LAMBERSON:  Right.  And let me --

9          THE COURT:  -- you don't have a problem with Foley

10  representing the Debtor in these appeal -- well, the Debtor

11  isn't an appellant in the involuntary appeal, right?  Or no?

12         MR. LAMBERSON:  It is -- no.  So, the Debtor is an

13  appellant in the --

14         THE COURT:  The confirmation order.

15         MR. LAMBERSON:  -- confirmation order appeal.

16         THE COURT:  Uh-huh.

17         MR. LAMBERSON:  It's one of two appellants.

18         THE COURT:  Uh-huh.

19         MR. LAMBERSON:  The other one is Neutra.

20         THE COURT:  Uh-huh.

21         MR. LAMBERSON:  Neutra is the only appellant in the

22  confirmation order -- I'm sorry, in the order for relief

23  appeal.

24         THE COURT:  Okay.  So you don't have any problem with

25  Foley's retention; it's just you don't want the Debtor to pay

49

 1   Neutra's legal fees?

 2           MR. LAMBERSON:  Correct.

 3           THE COURT:  And there needs to be some allocation in

 4   the confirmation appeal between Neutra and the Debtor, and it

 5   needs to all be paid by Neutra, --

 6           MR. LAMBERSON:  Correct.

 7           THE COURT:  -- not the Debtor?  Okay.

 8           MR. LAMBERSON:  Yeah.  That's exactly correct, Your

 9   Honor.

10           THE COURT:  Okay.  Just --

11           MR. LAMBERSON:  So I wanted to be clear on that, --

12           THE COURT:  Okay.

13           MR. LAMBERSON:  -- that we're not -- we understand

14   that they're --

15           THE COURT:  Okay.

16           MR. LAMBERSON:  -- going to be our opponents going

17   forward, and we're fine with that.

18           THE COURT:  Uh-huh.

19           MR. LAMBERSON:  I actually like Mrs. O'Neil.

20      So, why are we objecting?  So, there's a couple of

21   reasons.  One is procedural and one is really more

22   substantive.  So, this is obviously a strange request under

23   Section 327.  327 is to approve counsel for the Debtor, for

24   the estate.  And this request doesn't really fit.

25      So, for example, you engage Foley Gardere.  You agree that

50

1  the Debtor is going to pay fees under 330.  Okay.  Well, how

2  do we apply 330 in this situation, right?  What constitutes

3  reasonable and necessary as it relates to the Debtor when the

4  work wasn't done for the Debtor?  What constitutes a

5  determination of whether it was beneficial to the Debtor when,

6  again, the work wasn't done for the Debtor?

7      There's other issues, obviously.  Who controls Neutra?

8  It's not controlled by the Debtor.  The Debtor doesn't own any

9  of Neutra.  Who is making litigation decisions for Neutra?

10  All we know is that the Debtor is paying the freight for

11  whatever Neutra decides to do going forward.

12      The other issue, Your Honor, and this is probably the

13  broader issue, is this decision evidences a continuation of a

14  failed litigation strategy that precipitated this bankruptcy

15  in the first place.  Right?  So, we all heard that the reason

16  Highland Capital Management had to file bankruptcy is because

17  they couldn't pay the Crusader judgment.  Right?  They had a

18  $190 million judgment, or about to be judgment against them,

19  and they couldn't pay it.

20      So let's look at the Committee.  Right?  We have a

21  Committee with four members on it.  Three of them are

22  litigants.  Three of them are in active litigation against the

23  Debtor.

24      If you look at the Top 20 List in this case, of the Top

25  10, only one of them is not a litigation creditor, and that's

51

1   -- I'm trying to -- is an insider creditor.  The rest of the

2   Top 10 are either litigation adversaries or they're law firms

3   that were paid to fight the litigation adversaries.

4       So why is the Debtor continuing its strategy of fighting

5   every last issue, and using various instrumentalities to do

6   it, and then paying the freight for all of it?  That's exactly

7   how we got to where we are today in this case.

8       So, let me address also the benefit from the Neutra

9   appeal.  And, Your Honor, I think that's definitely an area

10  that we need to probe.  Because, like you, I don't get it.  I

11  think what they're outlining is sort of a fantasyland where

12  money is going to rain from the sky when they win this appeal,

13  or if they win this appeal.  And obviously, their reply goes

14  on for pages about the benefit to the Debtor.

15      So, just using basic odds of winning -- and I'm not going

16  to go to the substance of this appeal, which I think is

17  probably worse than the basic odds -- there's a 90 percent

18  chance that the Fifth Circuit just affirms the -- Judge

19  Fitzwater's ruling.  Right?  I mean, there's a 90 percent

20  chance that what the Debtor gets out of this is an affirmance

21  that says, "You lose."  Right?

22      But even if it's reversed, --

23          THE COURT:  What are you basing that on?  Because

24  Fitzwater affirmed 90 percent of the time?

25          MR. LAMBERSON:  Well, so, actually, Judge -- and Ms.

52

1   Chiarello can probably address this more specifically -- Judge

2   Fitzwater actually gets affirmed, I think, more than 90

3   percent of the time, --

4           THE COURT:  Probably, yes.

5           MR. LAMBERSON:  -- but the general reversal rate at

6   the Fifth Circuit is about ten percent.  So, and that

7   obviously includes things like 1983 appeals and things like

8   that.

9       But even if it is reversed, which I think we'd all agree

10  is fairly unlikely, again, money isn't just going to start

11  raining down on Highland Capital.  So what's most likely going

12  to happen if the Fifth Circuit decides to reverse -- and let

13  me, let me point out one issue, Your Honor.  The only issue on

14  appeal, I should say the only -- there are various issues on

15  appeal, and I'll just click through them.  So, one of them is

16  whether Neutra has standing to appeal.  Right?  Whether they

17  qualify under the person aggrieved standard that the Fifth

18  Circuit uses.  That's obviously a gating issue.  And, by the

19  way, that's the basis of Judge Fitzwater's ruling affirming

20  this Court's ruling, which was basically Neutra doesn't have

21  standing to appeal the order for relief.  They're not the

22  Debtor.

23      So the first issue is whether Neutra is a person

24  aggrieved.  Okay?

25      The second issue, and this is the substantive bankruptcy

53

1    issue, the only substantive bankruptcy issue, is whether the

2    order for relief should have been arbitrated.  Right?  So

3    that's the next issue.  That would be, frankly, the issue that

4    the Fifth Circuit would have to reverse on, is that well, yes,

5    this should have been arbitrated.  Right?  The order for

6    relief should have been arbitrated.

7        And then the final issue that we raised on appeal is

8    whether, even if Neutra has standing and even if there was

9    some right to arbitration, whether Neutra, via the putative

10   debtor, waived its right to arbitration by waiting until

11   literally, and you'll remember this, literally the day before

12   the order for relief file started, to raise its request for

13   arbitration.  Right?

14       So, assuming that they get some reversal, what's really

15   likely to happen is that the Court, the Fifth Circuit is going

16   to send it back to you on a remand and say, This is the

17   standard you should have applied, you need to make this

18   finding, or something like that, right?  It's very unlikely

19   the Fifth Circuit is going to say, We're going to reverse and

20   we're just going to render, right, and this thing just goes

21   away forever, particularly considering that the only live

22   substantive issue is whether the order for relief should have

23   been arbitrated, right?

24       But even if Neutra wins and its relief is wholly granted,

25   well, what does that mean?  That doesn't mean that the

54

1    involuntary goes away.  It doesn't mean the order for relief

2    permanently goes away.  It means that we go arbitrate it.

3    Right?  That's what they asked for, is that we go arbitrate

4    it.  So now we go arbitrate it.  Right?

5        So, basically, if you break it down, if, in the unlikely

6    event Neutra wins on appeal, it doesn't mean the bankruptcy

7    permanently goes away.  What it means is we have more

8    litigation.  Right?  And that's what normally happens when

9    there's a reversal on appeal, right?  You relitigate the

10   issues that were litigated in the first place.

11       So this concept -- you're exactly right, Your Honor.  This

12   sounds like fantasyland.  This concept that money is just

13   going to fall out of the sky and onto Highland because Neutra

14   got a reversal is just not going to happen.

15       There's some other problems here, obviously.  Counsel just

16   spent a lot of time talking about how all of Acis's funds are

17   going to get paid to Highland.  Well, that completely misses

18   the point that Josh Terry has an eight, probably somewhere in

19   the neighborhood of maybe $12 million judgment now against

20   Acis.  They're just going to ignore that?  They're just going

21   to ignore the fact that their largest creditor has a judgment

22   against them and is just hanging out there?  That's going to

23   have some impact on what happens to all that cash flow.

24       And then, finally -- and we'll talk about this in more

25   substance when we get to the testimony -- as you recall, this

55

1    was the entire basis of the Acis case:  Mr. Dondero and

2    Highland Capital were aggressively trying to liquidate Acis

3    when we showed up in your Court asking for relief.  So what

4    makes anybody think that that isn't going to continue

5    happening if there's not a bankruptcy anymore?  Right?

6        And Your Honor will recall that you had to twice enjoin

7    Dondero affiliates, HCLOF, from liquidating the PMAs and

8    Acis's assets during the bankruptcy.  Right?  So the concept

9    that if they win on appeal and there is no bankruptcy,

10   everything just goes away and we're not in this Court at all,

11   that Acis is going to have all of these valuable PMAs and cash

12   flow and it's all going to go to the benefit of Highland, is

13   completely contrary to what happened during the Acis case and

14   what precipitated the Acis case.

15       One other issue that we raised in the objection and in the

16   Debtor's omnibus reply is what we call the DAF litigation,

17   which is litigation filed in the Southern District  of New

18   York.  And Your Honor, I think you probably remember that from

19   the pleadings.  I do want to point out that -- so this, this

20   is a serious issue for Acis.  And the reason is because,

21   contrary to what was stated in the reply -- admittedly, this

22   happened after the reply -- but contrary to what happened --

23   was stated in the reply, that litigation has now been expanded

24   to include Acis and Mr. Terry and Brigade, and with basically

25   the same allegations of CLO mismanagement that were raised in

56

 1   this Court during the confirmation hearing.

 2       So this is a very significant matter to us.  We are very

 3   concerned that this Debtor is involved in that and is

 4   promoting it in some way.  And we want Your Honor to be aware

 5   of that litigation and the actions that are taken challenging

 6   your rulings in a court that's miles and miles away from here.

 7       Thank you, Your Honor.

 8           THE COURT:  All right.  Mr. Morris, are you ready to

 9   call your witness?

10           MR. MORRIS:  Yes, I am, Your Honor.  The Debtor calls

11   Russell Nelms.

12           THE COURT:  All right.

13           MR. MORRIS:  Your Honor, I have some exhibit binders.

14   May I hand up?

15           THE COURT:  You may.  All right.  Well, odd as it is,

16   I suppose I in this context need to swear you in.

17               RUSSELL NELMS, DEBTOR'S WITNESS, SWORN

18           THE COURT:  All right.  Please be seated.

19           MR. MORRIS:  John Morris for Pachulski Stang Ziehl &

20   Jones on behalf of the Debtor, Your Honor.

21       Before we get to the testimony, the Debtor has put on its

22   exhibit list nine specific documents that are in the binder

23   before you, and the Debtor moves for the introduction of those

24   documents into evidence.

25           THE COURT:  All right.  Any objection?

Nelms - Direct                              57

1          MR. LAMBERSON:  No objections, Your Honor.

2          THE COURT:  Exhibits 1 through 9 are admitted.

3      (Debtor's Exhibits 1 through 9 are received into

4  evidence.)

5          MR. MORRIS:  Thank you, Your Honor.

6                    DIRECT EXAMINATION

7  BY MR. MORRIS:

8  Q    Mr. Nelms, do you currently have a relationship to the

9  Debtor?

10 A    I do.

11 Q    And what is that relationship?

12 A    I am one of three independent directors of the Debtor.

13 Q    And when were you appointed?

14 A    January the 9th of this year.

15 Q    Did you just listen to the opening statement on behalf of

16 Acis?

17 A    I did.

18 Q    And did you hear the reference to the DAF litigation?

19 A    I did.

20 Q    And did you hear the allegation that the Debtor somehow

21 was involved in the prosecution of the DAF litigation?

22 A    I heard that, yes.

23 Q    Okay.  Did there come a time last week that the Board

24 learned of the possibility of a filing with respect to the DAF

25 litigation?

Nelms - Direct                          58

1    A    We learned about the filing of the DAF litigation sometime

2    within the last two weeks.

3    Q    And what did the Board do in response to learning that

4    information?

5    A    Well, first of all, I -- we met with Ms. Patel and her

6    client, Josh Terry.  They expressed their concerns about the

7    DAF litigation.  And so the Board used its influence to

8    encourage the trustee of the DAF, Grant Scott, to dismiss that

9    litigation, and we have gotten Mr. Scott's commitment to

10   dismiss the litigation.

11        There's a little bit of an issue there concerning about

12   whether some of the claims can -- they may need to be

13   dismissed without -- the preference is, of course, to dismiss

14   them without prejudice, but there are some issues about that.

15   But I'm told by Mr. Scott that he's going to dismiss the

16   litigation.

17   Q    Let's go back in time before this was filed.  Did the

18   Board express its view as to whether there should be a filing

19   at all?

20   A    It was really a very brief thing.  This was probably a

21   couple weeks or so ago, kind of late in the day at the end of

22   a long, long day, one of those long days we've been having.

23   Someone brought into a board meeting I guess a copy of this

24   new DAF complaint.  It had not been filed at that time.  They

25   showed it to Mr. Dubel.  He looked at it and just kind of

Nelms - Direct                                    59

1  asked what it was.  There was a brief explanation of what it

2  was.  And Mr. Dubel said, Tell them not to file this.  He

3  goes, This is only going to cause us problems.  And that's the

4  last we heard of it before it was filed.

5  Q    And what law firm filed that complaint?

6  A    That was filed by the Lynn Pinker firm.

7  Q    And after the Board learned that Lynn Pinker filed this,

8  in spite of the Board's instructions, did the Board take any

9  steps with respect to Lynn Pinker?

10 A    Well, of course, we -- one of the matters that previously

11 was before the Court was the Lynn Pinker application to be

12 retained in this case.  And I'll just say that it was -- it

13 was a factor that went into our deliberations concerning our

14 decision not to go forward with the Lynn Pinker litigation.

15 Q    So, I just want to make sure I have this right.  So the

16 Board, upon learning of a possible filing, gave instructions

17 not to do so; is that right?

18 A    It did.

19 Q    And upon learning that it was filed, it became one of the

20 factors that the Board relied upon in determining not to

21 pursue the Lynn Pinker retention; is that right?

22 A    That's correct.

23 Q    And you personally reached out to Mr. Terry and Ms. Patel

24 to discuss the issue; is that right?

25 A    Mr. Seery and I did, the two of us.

Nelms - Direct                              60

1   Q    And you used whatever influence you had to try to reach an

2   agreement for the withdrawal of that complaint without

3   prejudice; is that right?

4   A    That's correct.

5   Q    Okay.  Now, let's get back to the issues that are relevant

6   to the actual motion.  Are you aware that the Debtor has

7   sought the Court's approval to retain Foley Gardere as special

8   counsel?

9   A    I am.

10  Q    And have you reviewed the court filings with respect to

11  that motion?

12  A    Yes, I have.

13  Q    Okay.  Can you describe for the Court generally the

14  matters for which the Debtor seeks to retain Foley Gardere?

15  A    There are three matters, essentially.  One is an appeal in

16  the Fifth Circuit which concerns the entry of the order for

17  relief in the involuntary petition itself.  The second is an

18  appeal in the Fifth Circuit that concerns the confirmation of

19  the Acis plan.  And the third matter is the assertion of,

20  prosecution of a proof of claim that Highland Capital

21  Management would have in the Acis bankruptcy.

22  Q    Okay.  And are these the special purposes for which the

23  Debtor seeks to retain Foley?

24  A    Yes.

25  Q    Do you know whether there are matters that were part of

Nelms - Direct                                61

1    the original motion but which the Debtor no longer seeks to
2    pursue?
3    A    One of the matters that was pending when we took office
4    was an appeal, and I believe it was still in the District
5    Court, and that related to an alleged conflict of interest by
6    the Winstead firm.  And so there was an objection to their
7    fees and an appeal concerning payment of Winstead fees.  And
8    the Board has decided not to go forward with that appeal.
9    Q    Okay.  So the Board -- did you hear the opening from
10   Acis's counsel that charged that the Debtor was just doing
11   more scorched-earth litigation tactics?  Did you hear that
12   charge?
13   A    I heard that, yes.
14   Q    Okay.  But yet the Board has instructed Foley not to
15   pursue the Winstead matter; is that right?
16   A    That's correct.
17   Q    And just again, for the record, why did the Board make
18   that decision?
19   A    The Board made that decision because we just thought it
20   was in the best interest of the Debtor and this estate not to
21   do that.
22   Q    And did the Debtor see any benefit to pursuing that
23   particular litigation?
24   A    You know, there -- a benefit could be articulated, but we
25   decided not to pursue it.

Nelms - Direct                                          62

1    Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2    mean, I apologize, withdrawn.  That, plus the DAF matter, are

3    two examples where the Board exercised its judgment not to

4    pursue pending litigation; is that fair?

5    A    That's correct.

6    Q    Okay.  Is the Board supportive of the Debtor's application

7    to retain Foley for the three matters you have described?

8    A    It is.

9    Q    And without revealing privileged communications, can you

10   describe generally the diligence that the Board conducted to

11   reach that decision?

12   A    Well, we met with some of the people that work at

13   Highland.  We met with the Debtor's attorneys, the Pachulski

14   firm.  We did have a couple of meetings with Ms. Patel and Mr.

15   Terry.  Some of us have reviewed the pleadings, some more than

16   others.  And, well, we may have done other things, but those

17   are the ones that come to mind right now.

18   Q    I don't know if you mentioned it, but did you confer with

19   Ms. O'Neil?

20   A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21   Q    Okay.  And what was the purpose of the diligence that you

22   just described for the Court?

23   A    Well, ultimately, what we as a board were trying to do was

24   to conduct kind of a cost-benefit analysis to the estate:  How

25   much will this potentially cost us?  What's the potential

Nelms - Direct                                          63

1    upside of pursuing it?  And based upon that cost-benefit

2    analysis, we thought that this was the best thing to do.

3    Q    Okay.  Let's just focus on a couple of very narrow 327(e)

4    issues.  Is the Debtor seeking to retain Foley to act as

5    general bankruptcy counsel?

6    A    No.

7    Q    And which firm serves as general bankruptcy counsel?

8    A    That would be the Pachulski firm.

9    Q    Okay.  And do you know whether Foley Gardere represented

10   the Debtor's interest in each of the three matters that you've

11   described?

12   A    It has been representing the Debtor previously.

13   Q    Okay.  So let's talk about those three matters.  The first

14   one I believe you said was with respect to the representation

15   of the Debtor in connection with an $8 million claim that it

16   has against Acis; is that right?

17   A    That's correct.

18   Q    And is that the claim -- is that the subject of a formal

19   proof of claim?

20   A    Yes.

21   Q    Okay.

22   A    It is a claim filed in the Acis case.

23   Q    I've placed before you an exhibit binder, and I would ask

24   you to turn first to Exhibit 4.

25   A    Okay.

1  Q    And is that one of the proofs of claim that the Debtor has

2  filed against Acis?

3  A    It is.

4  Q    And you'll see that attached to the proof of claim a few

5  pages in there's a document called the Third Amended and

6  Restated Sub-Advisory Agreement.  Do you see that?

7  A    Yes.

8  Q    Do you know what that document is?  Generally?

9  A    Well, generally, I know what this document is.

10 Q    All right.  And what's your general understanding of the

11 document?

12 A    This is an advisory agreement that -- the only thing that

13 I know, I can tell you, really, about this agreement is it

14 gives rise to and generates fees that would inure to the

15 benefit of the Debtor.

16 Q    Okay.  And a few pages past that, you'll see something

17 called a Fourth Amended and Restated Shared Services

18 Agreement.  Do you see that?

19 A    Yes.

20 Q    Is it your understanding that that was another source of

21 revenue that the Debtor generated when it had this agreement

22 in place with Acis?

23 A    Yes.

24 Q    Okay.  Do you have an understanding as to, you know,

25 ballpark, what the annual fees were that the Debtor received

Nelms - Direct                                   65

1  pursuant to these agreements prior to the Acis bankruptcy?

2  A    Well, I think, prior to the bankruptcy, it was more, and

3  perhaps significantly more, than it is today.  It may have

4  been in the $12 million range per annum.  I think it's less

5  than that today.

6  Q    Okay.  And can you turn to Exhibit 5, please?  Is that

7  another proof of claim that was filed in the bankruptcy case,

8  the Acis bankruptcy case?

9  A    Yes.  This is a little bit different.  This is an

10  application for an administrative expense claim.  The prior

11  proof of claim that we looked at related to a pre-petition

12  claim that the Debtor had, then a gap period claim that the

13  Debtor had, and this is post-petition.  So this is an

14  administrative claim.  It's basically for the same services,

15  but just different time periods.

16  Q    Okay.  And who was responsible for preparing Exhibits 4,

17  5, and 6?

18  A    Ms. O'Neil and the Foley firm.

19  Q    Okay.  And has the Board reached a conclusion that it's in

20  the Debtor's best interest to retain Foley on a post-petition

21  basis to prosecute these claims?

22  A    It has.

23  Q    And why -- what's the justification for that?  Why did the

24  Board reach that decision?

25  A    Well, we believe it's in the best interest of the Debtor.

Nelms - Direct                              66

1    Obviously, a couple of things there.  I realize we may have a

2    very long road ahead of us with respect to these things.  But

3    the overall aspirational goal is to have an income stream

4    that's associated with these agreements.  The goal is to have

5    an amount of money out there that's available to pay our pre-

6    petition claims, the gap claims, the administrative claims,

7    while at the same time acknowledging that this company has the

8    obligation to satisfy and fulfill Mr. Terry's claim as well.

9    Q    All right.  Let's just focus for the moment on the three

10   proofs of claim.  The aggregate amount is approximately $8

11   million.  Do I have that right?

12   A    Yes, that's right.

13   Q    And from the Board's perspective, is the -- are those

14   claims an asset of the estate?

15   A    They are.

16   Q    And does the Board want to retain Foley for the purpose of

17   trying to recover that asset?

18   A    It does.

19   Q    And has the Board concluded that Foley is familiar with

20   these particular claims?

21   A    Foley is familiar with these claims, yes.

22   Q    And -- okay.  Let's move on, then, to the second task for

23   which the Debtor seeks approval to retain Foley, and that is

24   with respect to the confirmation order.  That's one of the

25   tasks, right?

Nelms - Direct                                67

1    A    It is.

2    Q    Okay.  And this is one of the Fifth Circuit arguments

3    that's scheduled for six weeks from now; is that right?

4    A    That's correct.

5    Q    Okay.  And has Foley represented the Debtor throughout the

6    proceedings that are leading up to this oral argument?

7    A    It has.

8    Q    And did Foley prepare all of the briefing in connection

9    with the arguments?

10   A    It did prepare the briefing.  It did that, in some

11   respects, along with Lynn Pinker.

12   Q    Okay.  Did you personally review the Debtor's briefs that

13   were filed in connection with the appeal?

14   A    I have reviewed those.

15   Q    Okay.  Have you reviewed every single piece of the record

16   on appeal?

17   A    I would doubt that I have.

18   Q    Okay.  Do you have a general understanding of the nature

19   of the appeal?  Of -- and this would --

20   A    Are we talking now about the confirmation appeal?

21   Q    Yes.  Just the confirmation.  Yeah.

22   Q    Well, the appeal has basically two broad elements, and the

23   first is an argument that the plan was not brought in good

24   faith.  Section 1129(a)(3).  And that goes back to the

25   arbitration issue.  Generally speaking, that because -- the

Nelms - Direct                                      68

1    allegation is that because Mr. Terry refused to arbitrate,

2    then the plan was tainted by that lack of good faith.  And the

3    second issue, broad issue that's involved in that appeal has

4    to do with, oh, the injunction, the breadth and scope of the

5    injunction, which the Debtor contends is -- was improper.

6    Q    And if the Fifth Circuit reverses the underlying decision,

7    has the Board made a determination of the possible benefits

8    that the Debtor may receive?

9    A    Well, there's two aspects of that appeal.  One would be a

10   narrower decision.  I suppose, if it's just related to the

11   injunction, it's -- it's hard to quantify exactly what that

12   would mean.

13   Q    Okay.

14   A    The bigger issue, of course, has to do with the

15   arbitration.  And if the -- theoretically, at least, the

16   arbitration, if the Fifth Circuit agreed on the issue of

17   arbitration, then the argument would be that we would -- that

18   in the arbitra... well, it is true to say that -- well, I

19   think I'm kind of getting ahead of myself here.

20   Q    You are, just a bit.  Let's just focus on the confirmation

21   appeal.  That's been consolidated for oral argument purposes

22   --

23   A    It has.

24   Q    -- with the appeal of the involuntary; is that right?

25   A    That's correct.

Nelms - Direct                              69

1   Q    Okay.  And just to sum up this piece of it, did Foley

2   represent the Debtor with respect to all of the underlying

3   proceedings?

4   A    It did.

5   Q    And why does the Board believe it's in the Debtor's best

6   interest to retain Foley to conduct the oral argument and to

7   finish up this proceeding?

8   A    Well, first of all, I think the Court would agree with me

9   that Foley is a very competent law firm.  It's competent to do

10  the work that they've been charged to do.

11       Second, pretty much all the work on the appeal is already

12  in the can.  The only thing that's left to be done at this

13  point in time is to make the oral argument.  Obviously, if we

14  didn't go forward with the Foley firm, we'd have to find

15  somebody who could make the argument.  So, we would -- but we

16  would lose the benefit of Foley's experience that they have in

17  the case so far.

18       I think there will be a cost element that would be

19  associated with bringing somebody new up to speed with respect

20  to this.

21       So, those, generally speaking, are the benefits that we

22  see.

23  Q    Okay.  Let's turn then, finally, to the Neutra appeal.  Do

24  you have a general understanding of that matter for which the

25  Debtor seeks to retain Foley?

Nelms - Direct                         70

1    A    Yeah.  The Neutra appeal, what happened in Neutra is that

2    Neutra, to my understanding, moved to intervene in the

3    involuntary proceeding.  I think that intervention was denied.

4    And so that appeal has to do with the fact that Neutra

5    contends that it should have been permitted to intervene, that

6    the matter of collections should have been arbitrated.

7        I think that one of the issues in there is this -- in that

8    appeal is who decides on the issue of arbitrability.  Is it

9    this Court, or is it the arbitrators themselves?

10       So, those are the issues that are present in the Neutra

11   appeal.

12   Q    Okay.  Is the Debtor named a party to the appeal?

13   A    The Debtor is not a named party in the Neutra appeal.

14   Q    But the Board nevertheless wants to retain Foley on a

15   post-petition basis to prosecute that appeal; is that right?

16   A    That's correct.

17   Q    And why is that?

18   A    Well, I think both -- we recognize and I think the Fifth

19   Circuit recognizes as well that these two things, that these

20   two appeals kind of go hand-in-glove.  The 1129(a)(3) argument

21   basically is dependent upon the arbitration issue, which is

22   fleshed out in the Neutra appeal.

23       And so, at the end of the day, the way that the Board sees

24   this is that the Debtor is the most immediate beneficiary of

25   the economic benefit of the Neutra appeal.  We see the

Nelms - Direct                          71

1   possibility of an income stream there.  We see the possibility

2   of the ability to pay our claims in the Acis case.  And I

3   think -- one of the things I think that is of particular focus

4   when it comes to all of this litigation is the fact that, as I

5   understand it, Mr. Terry started out with an $8 million claim,

6   and I think he bid $1 million of that claim for the interest

7   that he got in Acis, which reduced it, say, to $7 million.

8   And I think Mr. Terry's interest now over time I believe it's

9   been reduced to somewhere between $4 to $6 million.  So

10  that's, that's a claim.

11      But in this case, Mr. Terry has filed a proof of claim for

12  $70 million.  And my understanding from our visit with Mr.

13  Terry and his counsel is that that claim could get up to $300

14  million.  And so, as a board, we look at that and what we're

15  concerned about is the migration, the alleged migration of a

16  tremendous amount of value from Highland down to Acis.  So, at

17  the end of the day, it doesn't really matter who you regard as

18  the ultimate equity owner of Acis, whether it's Mr. Terry or

19  whether it's Mr. Dondero:  The migration of that value

20  downstream to Acis is of no real benefit to Highland Capital

21  at all.

22  Q   Is this one of the issues that the Board discussed with

23  the Committee last week in connection with this motion?

24  A   Yes.  It is.

25  Q   Okay.  And let's just go back to the income stream for a

1  second.  The income stream that the Board is hoping it will

2  get if the decision is reversed, is that income stream derived

3  from the two agreements that we just looked at?

4  A    It is.

5  Q    So those are the two very agreements that the Board would

6  look to have reinstated if it were to succeed on the appeal;

7  is that right?

8  A    Yes.

9  Q    Now, does the Board know exactly the form of relief the

10 Fifth Circuit is going to grant?

11 A    I have no earthly idea.

12 Q    Right?  But has the Board made a determination that the

13 outcome of Neutra obtaining control of Acis is one

14 possibility?

15 A    It's certainly a possibility.

16 Q    And is that the potential benefit that the Board focused

17 on in deciding to pursue this motion?

18 A    Yes.  I mean, I'm glad to adopt the percentages that Mr.

19 Terry's counsel has mentioned today.  I guess if the cost-

20 benefit analysis is that we're going to pay a couple hundred

21 thousand dollars here to get to the end of the road, and the

22 benefit is millions of dollars, well, even if our chances are

23 only ten percent, I think that's a shot worth taking.

24 Q    Thank you very much.  If the Fifth Circuit reversed,

25 because this is a point that was also made in the Acis

1    opening, what would happen to Mr. Terry's claim?  Or what's

2    your understanding or what's the Board's view as to whether or

3    not it would intend to satisfy Mr. Terry's claim?

4    A    I know, speaking on my behalf, that I'd -- the claim that

5    Mr. Terry got through arbitration I regard as a valid claim.

6    I think it's one that would have to be addressed no matter who

7    is in charge of paying the obligations of Neutra.

8    Q    Has the Board concluded that it's in the Debtor's best

9    interest to retain Foley for the purpose of prosecuting the

10   Neutra appeal, or at least in issuing the oral argument?

11   A    Yes.

12   Q    Okay.  And when is the argument scheduled for?

13   A    March the 30th.

14   Q    And is the fact that that's all that's left with respect

15   to this aspect of the engagement a factor that the Board took

16   into account in its decision?

17   A    Yes.

18   Q    Has the Board reached a decision as to who the real

19   economic party in interest is with respect to the Neutra

20   appeal?

21   A    Yes.  We believe ultimately that our Debtor would bear the

22   most economic interest in the outcome.  And, really, because

23   of the amount of the obligations that are owed, both to Mr.

24   Terry, to Highland Capital, by the time that you have this

25   kind of runoff of all the revenue streams, I'm not really sure

Nelms - Direct                          74

 1  that there would be anything left for either Mr. Dondero or

 2  Mr. Okada.

 3  Q   So, --

 4  A   That's -- that's a view from 50,000 feet, not even 30,000

 5  feet.

 6  Q   Okay.  Well, let's talk about the specific benefits,

 7  potential benefits, if it's reversed on appeal.  Does the

 8  Board believe it's possible that the two contracts get

 9  reinstated?

10  A   It is possible.

11  Q   And is that a motivating factor in supporting this motion?

12  A   It is.

13  Q   What would happen to the $8 million claim that the Debtor

14  has against Acis right now in the Acis bankruptcy?  Does the

15  Board have a view as to what would happen to that?

16  A   It would be our aspiration to collect that claim on behalf

17  of our client, which is Highland Capital Management.

18  Q   And would -- is it the Board's expectation that if it was

19  in that position it would get paid hundred-cent dollars,

20  rather than at least a portion of it as a general unsecured

21  claim?

22  A   Again, that would be our aspiration.

23  Q   Uh-huh.  What would happen to the adversary proceeding?

24  Do you have an understanding as to what would happen in the

25  adversary proceeding with respect to Mr. Terry if the Fifth

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 515-24   Filed 06/26/23   Page 473 of 1539   PageID 17711

Exhibit 24   Page 75 of 189

1    Circuit reverses and Neutra regains control of Acis?

2    A    Well, I'm assuming -- I'm assuming that that adversary

3    proceeding would go away.

4    Q    Okay.  And would that -- is that a potential benefit to

5    the estate?

6    A    That would be a benefit to the estate if it did.

7    Q    And do all of the factors that we just discussed go into

8    the cost-benefit analysis that the Board did in deciding to

9    pursue only these three very limited aspects of the

10   engagement?

11   A    Yes.

12   Q    Okay.  Has the Board considered the potential harm to the

13   Debtor if the motion is denied?

14   A    We have.

15   Q    And have -- can you share with the Court the issues that

16   the Board has identified as potentially being adverse if the

17   motion is denied?

18   A    It's really just the other -- the flip side of the coin of

19   benefit, which is added expense, loss of the experience that

20   the Foley firm has, perhaps delay of time in finding somebody

21   else, bringing them up to speed, not just with respect to the

22   two appeals but with respect to the proof of claim.  And there

23   may be others that I'm not thinking of right now.

24   Q    Did the Board consider the potential loss of the

25   institutional knowledge that Foley has and the potential

Nelms - Direct                              76

1   adverse impact it would have on the quality of the oral

2   argument?

3   A    It did.

4   Q    Okay.  So, two of the three matters that the Debtor seeks

5   to retain Foley for are appeals to the Fifth Circuit; is that

6   right?

7   A    Yes.

8   Q    And did those matters originate in this courtroom?

9   A    They did.

10  Q    And you were colleagues with Judge Jernigan at one time,

11  weren't you?

12  A    Yes.  We were bench colleagues for twelve years.

13  Q    And do you believe Judge Jernigan is a good judge?

14  A    I do.

15  Q    Do you believe she's a fair judge?

16  A    I do.

17  Q    Do you believe she tries to get it right every single

18  time?

19  A    I know she tries to get it right every time.

20  Q    So then why is the Board seeking to prosecute these

21  appeals of Judge Jernigan's decision?

22  A    Well, it's in the best interest of our client to do that.

23  And I have not -- I have to say there's always a little bit of

24  discomfort that comes with something like this, but I do know

25  this from my time on the bench, and that is that when you take

Nelms - Direct                            77

1   the job that Judge Jernigan has, you take it with full

2   understanding of how the system works.  And in the system,

3   half the people lose at any one given time.  And when you

4   lose, you tend to be disappointed in the result, and the

5   result of that is that you get the right to go to the next

6   court and have someone say that the judge got it wrong.

7        So those of us that take the bench understand that that's

8   the system, and I don't think -- for the most part, we're not

9   threatened by that.  And so I, you know, as uncomfortable as

10  this may -- this may put -- a position it may put me in from

11  time to time, I think that -- I think Judge Jernigan

12  understands the roles that we all play in this system.  And so

13  --

14  Q   Just, okay, just to summarize:  If the motion is granted,

15  what's the absolute worst-case scenario here for the Debtor?

16  A   I'm sorry.  Would you say that again?

17  Q   If the motion is granted and the Debtor is allowed to

18  retain Foley for the three tasks which you have described, do

19  you have an understanding as to what -- what's the worst that

20  could happen?  They'd have to pay Foley's fees, right?

21  A   We'd have to pay -- well, subject to Judge Jernigan's

22  approval, --

23  Q   Right.

24  A   -- those fees would be paid.

25  Q   And subject to everybody's opportunity to object, right?

Nelms - Direct                         78

1  A    Right.

2  Q    But if the fees were paid at a hundred percent, nobody

3  objected and Judge Jernigan approved of them, what's the

4  maximum exposure that the Debtor has from this?

5  A    I think Foley has about $311,000, I believe, right now in

6  time.  And I think they would probably have about maybe

7  another $100,000 more.  And I know -- I hate to scoff at the

8  notion that $400,000 is a lot of -- is not a lot of money.

9  But, you know, in the grand scheme of things in this case,

10 it's -- I won't say it's a rounding error, but it's not a lot

11 of money.

12 Q    And forget about, I mean, not forget about, but in

13 addition to its relative size to the overall case, how does

14 that compare to the relative economic benefit that the Debtor

15 believes it will recover if the appeal is successful?

16 A    Well, I think the cost is -- the cost is less than half a

17 million, and the potential benefits are in the millions.

18         MR. MORRIS:  Okay.  Just one moment, Your Honor, if I

19 may?

20         THE COURT:  Okay.

21     (Pause.)

22         MR. MORRIS:  All right.  Just a few more questions,

23 Your Honor.

24         THE COURT:  Okay.

25 BY MR. MORRIS:

Nelms - Direct                                  79

1  Q    Mr. Nelms, did Neutra pay a portion of the fees, Foley's

2  fees prior to the petition date in connection with an April

3  litigation?  Do you know?

4  A    If they did, I'm not aware of it.

5  Q    Okay.  Do you know what would happen to the appeal if

6  there was no funding for the appeal?

7  A    Well, I think I know what the result of the appellant not

8  showing up for an appellant argument would be.

9  Q    And what would that be?

10 A    Well, I think that would be a pretty quick resolution.

11 Q    Do you think the case would be dismissed, the appeal would

12 be dismissed?

13 A    I think so.

14 Q    And would that be the loss of a potential material benefit

15 and asset of the Debtor's estate?

16 A    It would be.

17 Q    Can you think of any way to ensure the appeal is

18 prosecuted today other than making sure the Debtor funds it?

19 A    I'll put it this way.  I think the most certainty can be

20 added to this case by having the Debtor fund this matter

21 through the end of March.

22 Q    And from --

23 A    I think that's -- that's -- for the time being, that's the

24 easiest, most simple path.

25 Q    And you say for the time being.  Has the Board reached an

Nelms - Direct                                              80

1    agreement to never request, from Neutra or anybody else,

2    contributions for the funding of this case?

3    A    No.  Ultimately, there is going to be at some point in

4    this case a settling of accounts between the Debtor and Mr.

5    Dondero, just as there are -- will be a settling of accounts

6    between the Debtor and other parties in interest.  We, as the

7    Board, have just chosen not to have that fight today.

8    Q    And why did the Board reach that decision?

9    A    Because we just thought it was in the best interest of the

10   Debtor to proceed that way.

11   Q    And is that because you need this appeal argued on March

12   30th?

13   A    It is.

14   Q    And that's because of all of the potential benefits that

15   you've identified; is that right?

16   A    Right.

17   Q    Okay.

18            MR. MORRIS:  I have no further questions, Your Honor.

19            THE COURT:  Okay.  Cross?

20            MR. LAMBERSON:  Yes, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. LAMBERSON:

23   Q    Good morning, Mr. Nelms.

24   A    Good morning.

25   Q    How's it to be on that side of the bench?

Nelms - Cross                           81

1   A    Not so fun.

2   Q    It's not great, right?

3            MR. LAMBERSON:  And Your Honor, we have an exhibit

4   notebook, which we're not -- we're not going to use all these

5   exhibits.  We actually -- you'll notice that there are some

6   empty tabs in here.  We downsized the exhibits from the

7   exhibit list, and I'm not going to use all these.  So I'll

8   just introduce them as I get to them.

9            THE COURT:  Okay.

10  BY MR. LAMBERSON:

11  Q    Let me pick up on your last point.

12           MS. CHIARELLO:  Your Honor, may we approach?  We have

13  binders.

14           THE COURT:  You may.

15  BY MR. LAMBERSON:

16  Q    So, let me pick up on your last point, Mr. Nelms.  So, who

17  -- who owns Neutra?

18  A    Well, if you follow the stream all the way up, it is owned

19  75 percent by Mr. Dondero and 25 percent by Mr. Okada.

20  Q    Okay.  And Mr. Dondero is one of the richest men in

21  Dallas.  Correct?

22  A    I don't know.

23  Q    Presumably?  Mr. Okada is also one of the richest men in

24  Dallas?

25  A    I don't know.  I haven't lived in Dallas in 17 years.

Nelms - Cross                                    82

1   Q    Okay.  Fair enough.  But they can't -- they can't pay the
2   litigation costs for their own entity?
3   A    Well, I don't know that they -- whether they can or
4   whether they can't.
5   Q    Right.  So, are you familiar with an entity called
6   Highland CLO Funding?
7   A    Vaguely, yeah.
8   Q    Okay.  And Highland CLO Funding is one of the appellants
9   in the appeal of the confirmation order, correct?
10  A    That's correct.
11  Q    Okay.  And one of the issues on appeal is actually the
12  plan injunction that's embedded in the confirmed plan,
13  correct?
14  A    That's correct.
15  Q    Right.  And is your understanding that that's really
16  Highland CLO Funding's main appeal issue?
17  A    I think it probably would be, yes.
18  Q    Okay.  And is there any reason that Highland CLO Funding
19  can't pay Neutra's legal fees to have -- have another
20  appellant in the Fifth Circuit?
21  A    I don't know the answer to that question.
22  Q    Okay.  So, let me -- let me -- I'm going to try to keep
23  this coordinated, but my notes are a little bit over the
24  place, so I apologize in advance if I move around a little
25  bit.

1       So, you had testified earlier that -- and I'm just trying

2   to synopsize your testimony -- that you -- that the Board

3   believes the primary benefit of paying Neutra's legal expenses

4   related to the order for relief appeal and the confirmation

5   appeal is the income stream that would be evidenced by the

6   sub-advisory agreement, right?

7   A    Yes.

8   Q    Okay.  And I'm -- when I say sub-advisory agreement, I'm

9   talking about this is the attachment to the Debtor's Exhibit

10  4, which is the proof of claim.

11  A    Right.

12  Q    Right?  And so it's your understanding that the way that

13  works is Acis Capital Management, my client, is the portfolio

14  manager for a bundle of CLOs, right?

15  A    That's my understanding.

16  Q    And that before the Acis bankruptcy, the sub-advisory

17  agreement allowed Highland Capital Management to sub-advise

18  those CLOs for a fee, correct?

19  A    That's correct.

20  Q    Okay.  So, I'm going to focus on the confirmation appeal.

21  So, you understand that the plan injunction prevents the

22  liquidation of the CLOs and the Acis portfolio management

23  agreement?

24  A    That is my understanding.

25  Q    Okay.  And the reason that, frankly, we had to get the

1   plan injunction is because HCLOF three times tried to

2   liquidate, redeem the CLOs, including twice in the bankruptcy

3   case?

4   A    I understand that was an issue.  But -- I have a general

5   understanding as to what you're saying, but not a specific

6   understanding.  But I'm not disagreeing with you.

7   Q    Yeah.  Okay.  And so if the plan goes away, the plan

8   injunction goes away, then is there any reason to think that

9   HCLOF isn't going to liquidate the CLOs?

10  A    I would not know.

11  Q    And in that case, there's not going to be any cash flow

12  under the portfolio management agreements or the sub-advisory

13  agreements, right?

14  A    If you're asking me if that's a possibility, I'd say it's

15  certainly within the realm of possibilities.

16  Q    Okay.  So, staying on the confirmation appeal, so let's --

17  let's assume that, for whatever reason, the Fifth Circuit

18  decides that the confirmation order needs to be reversed and

19  they send it back down to Judge Jernigan and say, "Try again."

20  Would you agree that that would effectively reactivate the

21  Acis case?

22  A    Well, I don't know, because, you know, one of the issues

23  in the appeal is who gets to make the decision with respect to

24  arbitrability.  Because I know that it's the Appellants'

25  position that the decision as to whether or not it should be

1   arbitrated, something such as collections, should they go to

2   be decided by the arbitrator, --

3   Q    Let me stop you, just to be clear.  I'm talking about the

4   confirmation appeal, the appeal of the confirmation order.

5   A    Uh-huh.

6   Q    Right?  Okay.  I'm not talking about the order for relief

7   appeal.

8   A    I may be conflating the two, so I'm sorry.

9   Q    Yeah, yeah, and I -- and it's -- yeah, it's -- but it is

10  confusing.  But I'm talking about the confirmation appeal.  So

11  the appeal of the Court's confirmation order confirming the --

12  I think was the third amended plan.  Okay?  So, I'm focusing

13  on that appeal only.  If the Fifth Circuit says, "Nope.  Try

14  again," then you would agree with me that that effectively

15  reactivates the Acis Chapter 11 case?

16  A    Well, I think it depends.  If you -- would you like me to

17  explain why I think it depends?

18  Q    Yeah.  Go ahead.  I don't -- because, I mean, honestly,

19  I'm not exactly sure what happened, so I would actually -- I

20  would like your opinion.

21  A    Well, given that the first issue in the confirmation

22  appeal is the issue of good faith, and the foundation of that

23  pretty much is the whole arbitration issue, if the Fifth

24  Circuit were to reverse on that basis, then I don't

25  necessarily know that it would go back to the Bankruptcy

Nelms - Cross                                    86

1   Court.

2       If it was reversed just on the narrower issue with respect

3   to the injunction, and maybe whether the injunction was too

4   broad or something like that, --

5   Q    Uh-huh.

6   A    -- and that was the only basis for reversal, I would agree

7   with you it would go back to Bankruptcy Court.

8   Q    Okay.  So there's some possibility that a result of the

9   confirmation appeal is that the Acis Chapter 11 case is

10  reactivated and we're back in front of Judge Jernigan on that

11  case, too?

12  A    That would be a possibility.

13  Q    Okay.  And then you'd get to talk with Mr. Phelan, right?

14  That would be fun.

15  A    Right.

16  Q    So, so how much money did Highland Capital spend in the

17  Acis bankruptcy case?

18  A    I don't know.

19  Q    Was it -- it was millions and millions, right?

20  A    I don't know, but I'm -- I'm assuming it exceeded a

21  million.

22  Q    Okay.  Well, aren't there -- aren't there claims of unpaid

23  fees just in the Top 20 list, which we'll point to here in a

24  minute, in the millions of dollars that relate to the

25  attorneys that represented Highland in the bankruptcy -- in

Nelms - Cross                          87

1   the Acis bankruptcy case?

2   A    I don't know.

3   Q    Okay.  So, why, you know, assuming that a result of the

4   confirmation appeal is that the Acis bankruptcy case is

5   reactivated, how is that in Highland's best interest?  And I'm

6   not talking about Neutra, and I'm not talking about HCLOF.

7   I'm talking about Highland.

8   A    Well, the -- what would be in our best interest would be

9   to once again control the sub-advisory agreement and to

10  generate revenues for the benefit of this estate.  Use those

11  -- that revenue stream both to address any claims that

12  Highland might have, as well as Mr. Terry.  That would be the

13  benefit as we see it.

14  Q    Right.  But by the time of the confirmation order, --

15  A    But if your question is, oh, but you're going to be

16  involved in a lot of other litigation and so how does that

17  benefit, then I guess my answer to that is it's a -- my answer

18  is a "Yes, but," and but may exceed the scope of your

19  question, so I won't --

20  Q    Okay.

21  A    -- I won't give you the but answer unless you want me to

22  do it.

23  Q    That's fine.  I just -- if we go back, if we go back to

24  where we were before confirmation, I mean, I'm not talking

25  about the order for relief, I'm talking about confirmation,

Nelms - Cross                                      88

1   the sub-advisory agreement had been terminated.  Highland had

2   been fired and Brigade was managing everything.

3   A    Right.

4   Q    So, there wouldn't be any cash flow going to Highland

5   based on the -- just the reversal of the confirmation order.

6   A    Well, what would have to happen, of course, is that Neutra

7   would have to -- would have to appoint us as -- would have to

8   allow us to come in under the sub-advisory agreement to

9   perform those services.

10  Q    Right.  Except that there's a trustee, right?  Robin

11  Phelan was in charge of everything.

12  A    Well, you're assuming there's still a bankruptcy.

13  Q    Right.  Yeah.  Well, I am.  I mean, again -- and maybe I'm

14  being simplistic about this, but if the confirmation order is

15  reversed, --

16        THE COURT:  Counsel is standing.  Do you have an

17  objection?

18        MR. MORRIS:  Yeah.  I do, Your Honor, to this whole

19  line of hypothetical questions.  We do understand, I think

20  everybody understands, that we don't know if the appeal will

21  be granted.  I think we do all understand that we don't know

22  what the form of relief, the exact form of relief will be.

23  But the testimony here is that the Board has decided that one

24  possible form of relief is that -- is that Neutra will regain

25  control of Acis and get these contracts reinstated, get the

Nelms - Cross                                89

 1    adversary proceeding dismissed, and get paid on its $8 million
 2    claim.
 3        If there's questions about that, I think it's relevant,
 4    but I don't know why we're spending a lot of time on
 5    hypotheticals with a fact witness.
 6             THE COURT:  But the --
 7             MR. MORRIS:  Not an expert witness.
 8             THE COURT:  The business judgment of the Board of the
 9    Debtor is at issue here, correct?
10             MR. MORRIS:  Correct.  Absolutely.
11             THE COURT:  Don't these hypotheticals go to, is
12    reasonable business judgment being exercised here?
13             MR. MORRIS:  I think he has to lay a foundation and
14    say, Is this -- is this a hypothetical you considered?  Is
15    this a hypothetical that you considered?  Because we're just
16    -- this is like expert testimony almost.  There is no evidence
17    that any of these factors were considered.  And at the end of
18    the day, there is no dispute that the scenario that the Board
19    is saying is worth the investment, basically, is also a
20    possibility.
21             THE COURT:  Okay.  I overrule the objection.
22             MR. LAMBERSON:  Okay.
23             THE COURT:  You can proceed.
24             MR. LAMBERSON:  And Your Honor, I'm just about done.
25             THE COURT:  Okay.

Nelms - Cross                                    90

1  BY MR. LAMBERSON:

2  Q    So, okay.  So, we -- but we can agree that -- okay.  Let

3  me -- let me hopefully do this.  Okay.  So, I mean, I think

4  that's fine for the confirmation appeal, so now I want to talk

5  about the order for relief appeal.  Right?  So this is the

6  appeal of the order for relief or the -- and I stated this

7  earlier to the Court, but the sole substantive issue in that

8  appeal is whether this Court should have compelled the order

9  for relief to arbitration.  Is that right?

10  A    The sole substantive issue?  I think, if you paint with a

11  broad brush, yeah.  I would agree with you, yes.

12  Q    Okay.  Well, and again, I'm not trying to --

13  A    I know.  So, --

14  Q    I'm not trying to trap anybody.  The three issues --

15  A    And I'm not trying to be evasive, either.

16  Q    Yeah.

17  A    Yeah.

18  Q    Are the standing issue, which, in my mind, isn't really a

19  substantive issue.  And then there's the issue about the

20  arbitration of the order for relief.  And then, finally, as I

21  mentioned, we've raised a waiver argument that basically, if

22  they had a right to arbitrate, which we think they don't, they

23  waited too long to raise it.  Right?  Those are the three

24  issues.  Correct?

25  A    That's correct.

Nelms - Cross                                    91

1  Q   Okay.  So, let me ask you.  And I'm not going to -- I'm

2  not going to hold this against you at the Fifth Circuit level,

3  but, I mean, do you -- do you think an order for relief is

4  subject to arbitration?

5           MR. MORRIS:  Objection, Your Honor.  Calls for a

6  legal conclusion.

7           THE COURT:  Overruled.

8           MR. LAMBERSON:  Sure it does.

9           THE COURT:  Overruled.

10          THE WITNESS:  I think the -- I think it's a -- I

11 think there's a colorable argument.

12 BY MR. LAMBERSON:

13 Q   Uh-huh.

14          MR. MORRIS:  Objection withdrawn.

15 BY MR. LAMBERSON:

16 Q   So you don't think *National Gypsum* and *Gandy* would apply

17 to an involuntary petition and order for relief?

18 A   Well, I'll put it this way.  I guess they'll apply if the

19 Fifth Circuit tells us they do.

20 Q   Right.

21 A   That's as much as I can tell you.

22 Q   Okay.  So, so if that ruling is reversed, right, as I

23 mentioned earlier -- and let me ask you, actually, another

24 thing.  So, how often, when you were a judge, how often were

25 -- I shouldn't say how often -- how many times were your

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-24   Filed 05/23/24   Page 490 of 1539   PageID 17728

Exhibit 24   Page 93 of 189

Nelms - Cross                                    92

1    rulings reversed?  Just roughly?

2    A    Was I reversed?

3    Q    Yeah.

4    A    I think six.

5    Q    Not very many claims, right?

6    A    No.

7    Q    So how many times was there a reverse and a render?

8    A    I'm sorry.  Say again?

9    Q    How many times was there a reverse and a render, where

10   nothing came back to you, that basically the higher court just

11   said, It's done?

12   A    Well, it was rendered every time except on one occasion,

13   and that --

14   Q    Uh-huh.

15   A    -- *Stern v. Marshall* had just been decided, and so --

16   gosh, I can't remember the district judge.

17   Q    Okay.

18   A    One of the judges reversed but sent it back to me to

19   reconsider it under the light of the ruling in *Stern v.*

20   *Marshall*, a jurisdictional issue.  So, in all those instances,

21   it was rendered.

22   Q    Okay.  So there was nothing -- there was no issue that

23   came back to you?  The case was just resolved?

24   A    No.  No issue came back to me.

25   Q    Okay.

Nelms - Cross                                  93

1   A    No, you know what, there was a second one.  I think the
2   second one was *In re Mirant*.  *Commerzbank versus -- MCAR v.*
3   *Commerzbank*.  That came back as well.
4   Q    Right.  Okay.  So, again, but focusing on the order for
5   relief appeal, one possibility is that the Fifth Circuit says,
6   okay, this may be subject to arbitration, and sends it back to
7   Judge Jernigan to make additional findings, apply a different
8   standard, right?  That's possible, right?
9   A    That's possible.
10  Q    Okay.  So, in that case, nothing necessarily came out of
11  the appeal, right?  Like you're just basically back in front
12  of her on the same issues?
13  A    Well, I -- that may very well be the case, but --
14  Q    Okay.  Well, let's assume that the Fifth Circuit does
15  reverse and render.  Wouldn't -- isn't what they would render
16  would be a -- compelling this case to arbitration?  Right?
17  Not that the bankruptcy goes away, disappears.  It would
18  basically be, "Should have been arbitrated.  Go arbitrate."
19  A    It's a good question, what the effect of reversing it
20  would be and sending it back, remanding it.  They -- I mean,
21  one of the things that they might decide is to say that the
22  whole issue of arbitration should be decided by an arbitrator.
23  Q    Uh-huh.
24  A    That's a possibility.
25  Q    Right.  But in that situation, the bankruptcy doesn't go

Nelms - Cross                                        94

1   away.  It just moves to a different forum, right?

2   A    No, I mean, you're probably right.  That, in and of

3   itself, would not eviscerate the bankruptcy filing.

4   Q    Uh-huh.

5   A    That's true.

6   Q    And so, in that situation, the result is -- and this is --

7   that's, frankly, the best situation, is --

8   A    But, of course, I mean -- can I go back to that?  Just,

9   I'm not sure about that.  Because, after all, this was an

10  involuntary petition.

11  Q    Uh-huh.

12  A    If it was a voluntary petition, then I would certainly

13  agree with you wholeheartedly.  Inasmuch as it was an

14  involuntary petition, I'm not sure about the answer to that

15  question.

16  Q    Uh-huh.  Okay.

17  A    That's a good question.

18  Q    But you would agree with me that a possible result of even

19  a reversal of the order for relief appeal would just be more

20  litigation?

21  A    Yes.  That's certainly a possibility.

22  Q    Right.  In this Court?  Maybe in front of an arbitrator?

23  Maybe both?

24  A    Yes.  That's possible.

25  Q    Okay.  All right.  So, still focusing on the order for

 1  relief appeal, but I want to go to this idea that, again,

 2  there's this cash flow stream that is going to be reinstated

 3  for the benefit of Highland Capital under the sub-advisory

 4  agreement.  Okay?

 5  A    Right.

 6  Q    All right.  So, before the Acis bankruptcy was filed,

 7  Dondero, and at that time, in control of Highland, were

 8  actually in the process of liquidating Acis, weren't they?

 9  A    Were they in the process of liquidating Acis?

10  Q    Uh-huh.

11  A    And I take it these are the transfers that were --

12  concerning your client that prompted the filing of the

13  involuntary petition itself?

14  Q    Correct.

15  A    Is that what you're referring to as the --

16  Q    Yes.

17  A    -- liquidation?

18  Q    Yes.

19  A    Well, I certainly know that -- I understand those

20  transfers were taking place.  Now, whether you'd call that a

21  liquidation or not, I don't know, but I know what you're

22  referring to --

23  Q    Okay.

24  A    -- and I think the answer to your --

25  Q    So, --

Nelms - Cross                                    96

1    A    Yeah.

2    Q    Yeah.  So there were a variety of transfers of assets away

3    from Acis before --

4    A    Right.

5    Q    -- the Acis bankruptcy filing, right?  And, actually, are

6    you aware that there was actually an agreement between

7    Highland CLO Management and Acis to transfer those PMAs to

8    HCLOF Management?

9    A    No, I'm not aware of that.

10   Q    Okay.  And as we talked about earlier, HCLOF repeatedly

11   attempted to redeem the CLOs, even during the Acis bankruptcy,

12   right?

13   A    I read about that in Judge Jernigan's opinion, so I'm

14   assuming that's the case.

15   Q    Right.  Okay.  And then -- and, in fact, if HCLOF was

16   successful, that would liquidate the CLOs and it would

17   effectively terminate the Acis portfolio management

18   agreements, right?

19   A    I don't know.

20   Q    Okay.  But if that was the case, if the portfolio

21   management agreements went away or no longer had assets to

22   manage, then the sub-advisory agreement would have no income,

23   right?

24   A    If you're asking me if that's something within the realm

25   of possibilities, I suppose so.

Nelms - Cross                          97

1   Q    Okay.  So, if, because of the appeal, the Acis bankruptcy

2   -- because of the order for relief appeal, if the bankruptcy

3   -- if the Acis bankruptcy just went entire away, just

4   disappeared, right, so Mr. Dondero would be in control of

5   Acis, not you, right?

6   A    He would be in control.  That's correct.

7   Q    Okay.  And so if he wanted to terminate the PMAs and enter

8   new PMAs with Dondero Capital Management, you couldn't keep

9   him from doing that, could you?

10  A    Well, I -- no, I could not keep him from doing that.

11  Q    Okay.  Or if he wanted to terminate the sub-advisory

12  agreement and enter into a different agreement, I mean, you

13  couldn't keep him from doing that, either, could you?

14  A    No, I couldn't.

15  Q    Right.  So what makes you think that Highland Capital

16  Management, a debtor that he lost control of, just like Acis,

17  would benefit from Acis's PMAs, when he was actively trying to

18  take Acis's PMAs away from Acis?

19  A    Well, I have -- I spoke to Mr. Dondero about this, and he

20  -- I asked him the question, and he said that he would

21  reinstate Highland under the sub-advisory agreement and the

22  shared services agreement.

23  Q    Okay.  So, on that point, you did mention earlier that, as

24  part of your -- as part of the Board's diligence, you talked

25  with Mrs. O'Neil and you talked to Pachulski.  Obviously,

 1  you've analyzed the issues.  I can tell you're familiar with

 2  all these, all of the pleadings.  But you also talked with

 3  different Highland Capital employees about the litigation and

 4  the appeals, correct?

 5  A    I did.

 6  Q    Okay.  Who did you talk with?

 7  A    Well, I have to say that the interaction with Highland

 8  employees was actually fairly abbreviated.

 9  Q    Uh-huh.

10  A    We spoke very, very briefly about this with Isaac Leventon

11  on the day that we were appointed.  I don't know if the Court

12  is aware of this or not, but we spoke about it very briefly,

13  and then he was injured later that night and he really hasn't

14  been back at the office since then.  So, --

15  Q    Oh.

16  A    -- I would say, for the most part, I have relied mainly on

17  Pachulski.

18  Q    Okay.  But you did indicate you talked to Mr. Dondero as

19  well?

20  A    I talked to him about this issue about reinstatement, yes.

21          MR. LAMBERSON:  So, Your Honor, I'd like to turn to

22  --

23          THE WITNESS:  Oh, you don't have to call me Your

24  Honor.

25          THE COURT:  There are two Your Honors.

Nelms - Cross                                    99

1          MR. LAMBERSON:  Your Honors.  How about that?

2          THE COURT:  Okay.

3          THE WITNESS:  Yeah, there's only one judge in the

4   court today.

5   BY MR. LAMBERSON:

6   Q    Could you turn to Exhibit 16, please?  This is Acis's

7   Exhibit 16.  I'm sorry.  Do you have that, Mr. Nelms?

8   A    I do.

9   Q    And could you identify Acis Exhibit 16?

10  A    Yes.  This is Official Form 204 in the current case, the

11  one we're here for today.

12  Q    Right.  So it's the Top 20 List of Creditors for Highland

13  Capital Management?

14  A    Yes, that's correct.

15  Q    Okay.  And have you seen Exhibit 16 before?

16  A    Pardon me?

17  Q    Have you seen Exhibit 16 before, the Top 20 List?

18  A    No, I have not seen it before.

19  Q    Okay.

20         MR. LAMBERSON:  Your Honor, we'd ask for the

21  admission of Exhibit 16.

22         THE COURT:  Any objection?

23         MR. MORRIS:  Just on relevance grounds.  Can we at

24  least establish a foundation as to which element of 327(e)

25  this goes to?

Nelms - Cross                              100

1          THE COURT:  Response?

2          MR. LAMBERSON:  Well, Your Honor, what I'm going to

3    point out is that the top ten creditors, other than an insider

4    creditor, are all litigation-based, and that the, as I pointed

5    out in my opening, the origin of this case was a bad

6    litigation strategy.

7          MR. MORRIS:  No objection to the introduction of this

8    exhibit for that limited purpose.

9          THE COURT:  All right.  It's admitted.

10       (Acis Capital Management GP, LLC's Exhibit 16 is received

11   into evidence.)

12   BY MR. LAMBERSON:

13   Q    All right.  So, Mr. Nelms, you said you hadn't seen this

14   before, but I think you'll probably be familiar with the

15   information on it generally.  So let's walk through this

16   quickly.  So, this is the Top 20 List of Creditors.  The first

17   creditor is Redeemer Committee, listed as litigation, do you

18   see that, for about $190 million?

19   A    Yes.

20   Q    And that's the arbitration award that precipitated this

21   filing, correct?

22   A    It is.

23   Q    Okay.  So the next claim is Pat Daugherty, litigation

24   claim.  It's $11.7 million.  Do you see that?

25   A    Yes.

Nelms - Cross                                101

1    Q    So, do you know what is Mr. Daugherty's history with

2    Highland Capital?  And try to keep it under five minutes.

3    A    Yeah.  Mr. Daugherty is a former employee.  And I know he

4    has some contractual disputes with the company based upon his

5    separation.

6    Q    Right.  And he's a long-time litigant with Highland

7    Capital, correct?

8    A    He is, yes.

9    Q    Yes.  So the next one is CLO HoldCo.  This is about $11.5

10   million.  CLO HoldCo is an insider of the Debtor, correct?  If

11   you know.

12   A    Is -- is it an insider?  I don't know.

13   Q    Okay.  Well, Grant Scott, the party here, is Mr. Dondero's

14   college roommate.  Do you know that?

15   A    That's my understanding, yes.

16   Q    Okay.  So, Creditor #4, McKool Smith, for two point --

17   roughly $2.1 million.  Do you see this?  This is for

18   attorneys' fees incurred by Highland Capital, correct?

19         MR. MORRIS:  Objection, Your Honor.  I still fail to

20   see how this is at all connected to any of the elements of

21   327(e) or the retention of Foley.

22         THE COURT:  Okay.  I overrule.

23   BY MR. LAMBERSON:

24   Q    So, this is -- this -- these are fees incurred by Highland

25   Capital, you know, a variety of venues, right, including this

1  one, state court fights against Mr. Terry, right?

2  A    I thought -- McKool Smith, I thought they were involved in

3  the Redeemer litigation, but they may be involved in other

4  litigation as well.

5  Q    Okay.  Fair enough.  And do you know, this claim is

6  disputed by the Debtor, correct?

7  A    Yes.

8  Q    Okay.  And do you know, obviously subject to the stay, but

9  do you know if this claim is being arbitrated or has been sent

10  to arbitration?

11  A    No, I don't know any -- no, I don't know.

12  Q    Okay.  That's fair enough.  So, then #5 -- I'll move it

13  along here.  Meta Discovery, Meta-e Discovery, they're a

14  litigation vendor, right?

15  A    I'm sorry, would you ask your question again?

16  Q    Meta-e Discovery, the next creditor.  They're a litigation

17  vendor and they provide litigation support services?

18  A    I don't know what they do.

19  Q    Okay.  Fair enough.  Foley Gardere.  Obviously, that's the

20  law firm you all are seeking to have engaged.  DLA Piper.

21  This relates to fees incurred in connection with the Terry

22  arbitration award, correct?

23  A    I think so.

24  Q    Okay.  Reid Collins.  These are fees related to the UBS

25  lawsuit, correct?

```
 1   A    I don't know.
 2   Q    Okay.  Josh and -- Joshua and Jennifer Terry.  This is a
 3   litigation claim, right?  This is -- this is an IRA claim,
 4   right?
 5   A    It is.
 6   Q    NWCC.  This is also a litigation claim?  In other words, a
 7   litigant fighting with Highland?
 8   A    I can only intuit that just because of the fact that it's
 9   a law firm.
10   Q    Okay.  Fair enough.  So, out of the Top 20 -- or, out of
11   the Top 10 Creditors, basically, they're all litigants or
12   attorneys paid to fight litigants, with the exception of
13   Dondero's college roommate.  Right?
14   A    With the exception of what?
15   Q    Mr. Dondero's college roommate that has a claim based on
16   some entity.
17   A    Yes.  They're -- they all have some nexus to litigation.
18   Q    Okay.  And let me just ask you:  If you were able to
19   completely set aside all of Highland Capital's litigation
20   issues, right, just like -- just like the concept of the order
21   for relief appeal makes the Acis bankruptcy go away forever,
22   if you could snap your fingers and make all of Highland's
23   litigation go away forever, would Highland have any financial
24   problems at all?
25   A    Well, I don't know that I know the answer to that, but I
```

1    -- but it's certainly to say that litigation up to this point

2    has been the driving force behind its bankruptcy filing.

3    Q    Okay.  Fair enough.  Okay.  So, Mr. Nelms, would you turn

4    -- could you turn to Acis Exhibit 27?

5    A    Okay.

6    Q    Do you have that?

7    A    I do.

8    Q    Okay.  And can you identify Exhibit 27?

9    A    Yes.  My understanding is that this was the lawsuit that

10   was filed by the DAF and CLO HoldCo in the Southern District

11   of New York.

12   Q    Okay.  And so I had mentioned this in my opening, and I

13   believe counsel had asked you about what we call the DAF

14   litigation.  Is this the complaint that's the basis of the DAF

15   litigation?

16   A    Yeah, that's my understanding.  It is.

17   Q    Okay.  And I think you had testified earlier that the

18   board was actually shown a copy of this complaint, was before

19   it was filed, and --

20   A    I wouldn't call it -- I'm sorry, go ahead, ask your

21   question.

22   Q    No, no, I -- that's fine.

23   A    I wouldn't call it a board presentation.  I just remember

24   it being handed to Mr. Dubel and Mr. Dubel looking at it,

25   asking what it was, and saying, Tell them not to do this.

Nelms - Cross                                        105

1   Q    Okay.  Thank you.  And -- but it's your understanding that

2   the complaint was filed anyway?

3   A    It is my understanding it was filed later.

4   Q    Okay.  And in fact, this has a file-stamp at the top,

5   which I'm sure you're very familiar with.  Correct?  Has a

6   PACER file-stamp at the top.

7   A    Right.

8   Q    Right.

9          MR. LAMBERSON:  So, Your Honor, we'd ask for the

10  admission of Exhibit 27.

11         THE COURT:  Any objection?

12         MR. MORRIS:  No objection.

13         THE COURT:  Admitted.

14    (Acis Capital Management GP, LLC's Exhibit 27 is received

15  into evidence.)

16         MR. LAMBERSON:  And I'll be relatively quick.

17  BY MR. LAMBERSON:

18  Q    I had mentioned in my opening that we -- I should say Acis

19  was concerned that Highland Capital Management had some

20  participation in this, and I probably should have been clearer

21  in saying that Highland Capital Management employees had some

22  participation in Exhibit 27.  Has the Board done any

23  investigation as to whether any Highland Capital employees

24  were involved in the preparation of Exhibit 27 or the filing

25  of Exhibit 27?

Nelms - Cross                              106

1   A    No, we have not.  At least, let me speak for myself.  I

2   haven't done that investigation.

3   Q    Uh-huh.  And your counsel had mentioned that -- I believe

4   this is correct -- your counsel had mentioned that you all had

5   reached out -- the Board, I should say -- reached out to Grant

6   Scott, who's the -- who's in control of the DAF as well as CLO

7   HoldCo, and, you know, had sort of convinced them that it

8   probably -- to dismiss this lawsuit.  Correct?

9   A    Yes.

10  Q    Okay.  And but do you -- as far as you know, it hasn't

11  been dismissed yet?

12  A    It hasn't been dismissed.  There's some kind of technical

13  things there, and I don't know if you want to go into them or

14  not, but it hasn't been dismissed, but I have a high degree of

15  certainty that this is going to get dismissed.

16  Q    Okay.  Fair enough.  And are you aware that there was

17  already a press release issued related to this lawsuit that

18  was picked up by various CLO publications?

19  A    When you say "already," are you talking about a specific

20  time?

21  Q    Well, that -- I guess what's I'm getting at is are you

22  aware that the filing of this lawsuit has already resulted in

23  various articles in CLO journals, periodicals?

24  A    I'm aware of it having appeared in one publication.

25  Q    Okay.  And so is it fair to say that the damage is already

Nelms - Cross                                  107

1   done and that, you know, dismissal of these claims probably

2   isn't really all that -- isn't really all that significant

3   when they've already, you know, put it in the press?

4   A    I don't know if the damage has already been done or not.

5   Q    Okay.

6          MR. LAMBERSON:  Give me just a second, Your Honor.

7          THE COURT:  Okay.

8       (Pause.)

9   BY MR. LAMBERSON:

10  Q    So, there is actually one other -- there is one point.

11  And I told you in advance that I was afraid I might be jumping

12  around a little bit, so I'm going to jump around a little bit.

13  Let me go back to the order for relief appeal.  So, this is

14  the appeal of the Court's order for relief that started the

15  Acis bankruptcy.

16      One of the things you testified about related -- on your

17  direct testimony is one of the benefits, one of the potential

18  benefits, understanding we don't know what's going to happen,

19  of the order for relief appeal is that if the -- if that

20  ruling was reversed and the Acis bankruptcy went away, then

21  the adversary would go away, the adversary between Acis

22  Capital Management and Highland Capital Management.  Correct?

23  A    Well, yes.  In my opinion, the adversary opinion -- excuse

24  me, the adversary proceeding would go away.  Would a lawsuit

25  under TUFTA be avoided altogether by Mr. Terry?

Nelms - Cross                                        108

1  Q    Right.

2  A    I don't know that it would take that away.

3  Q    Okay.  And that's -- you actually anticipated my question,

4  --

5  A    Uh-huh.

6  Q    -- which was:  It's fair to say that, even if the

7  adversary went away between Acis and Highland Capital

8  Management, that the -- certain of the claims in the adversary

9  -- for example, the fraudulent transfer claims or derivative

10 claims -- would not necessarily go away because they could be

11 asserted by Mr. Terry as a judgment creditor, correct?

12 A    They could, but the consequences of asserting that claim

13 outside of bankruptcy are vastly different than asserting them

14 inside of a bankruptcy case.

15 Q    Uh-huh.  Right.

16 A    At least potentially.

17 Q    And just to close the thought here, are you aware that one

18 of Acis's main arguments during the order for relief trial was

19 that we didn't need an involuntary, that Mr. Terry could just

20 go litigate all that stuff in state court?

21 A    Yeah, I think so.  I think I am aware of that.  Yes.

22 Q    Okay.  So you'd agree with me that, even on your possible

23 day on the order for relief appeal, that doesn't make the --

24 what I'll call the Terry litigation, right, the judgment

25 litigation, go away?

Nelms - Redirect                                    109

1    A    No.  No.  The reversal on appeal would not necessarily

2    make the Terry litigation go away.

3    Q    Okay.  Thank you.

4             MR. LAMBERSON:  That's all I have, Your Honor.

5             THE COURT:  All right.  Redirect?

6             MR. MORRIS:  I just have a few questions, Your Honor.

7             THE COURT:  Okay.

8                      REDIRECT EXAMINATION

9    BY MR. MORRIS:

10   Q    Can you turn to Exhibit 16 in your binder, sir?

11   A    Which one?

12   Q    I guess it's the Acis exhibits.

13   A    The Acis?  Okay.

14   Q    Yeah.  The List of Top 20 Creditors.

15   A    Okay.

16   Q    You were taken through each and every one of those to make

17   the point that they're largely litigation claims.  Is that

18   fair?

19   A    Say again, please?

20   Q    You were taken through many of those creditors to

21   establish that --

22   A    I was.

23   Q    -- that the Debtor was involved in a lot of litigation; is

24   that right?

25   A    It was.

Nelms - Redirect                              110

1  Q    Okay.  And the Board was appointed on January 9th; is that
2  right?
3  A    Yes.
4  Q    Did the Board have anything to do with any of the claims
5  that are set forth in Exhibit 16?
6  A    No.
7  Q    Did the Board authorize the filing of any suits that are
8  related to any of the claims that are set forth in Exhibit 16?
9  A    No.
10 Q    Did the Board direct the defense of any suits that were
11 commenced against Highland with respect to Exhibit 16?
12 A    No.
13 Q    Okay.  Has the Board been trying to diminish and eliminate
14 litigation where it thought it was in the Debtor's best
15 interests?
16 A    It has.
17 Q    And is that, for example, why the Board decided not to
18 pursue the Winstead matter?
19 A    It is.
20 Q    Is that why the Board has used its efforts to try to
21 thwart the DAF litigation?
22 A    Yes.
23 Q    Does the Debtor control DAF?
24 A    The Debtor does not control the DAF.
25 Q    Okay.  Did the Debtor authorize -- withdrawn.  Did the

Nelms - Redirect                                        111

1   Board authorize the filing of the DAF complaint?

2   A    It did not.

3   Q    Did the Board know the DAF complaint was going to be

4   filed?

5   A    Well, I mean, I know Mr. Dubel was presented with a copy

6   of the complaint.  We had noticed that that document existed.

7   But it came as somewhat of a surprise to us when it got filed.

8   Q    It came as a surprise to you?

9   A    It did.

10  Q    Because that's not what was expected after Mr. Dubel said,

11  Don't file it.  Right?

12  A    Right.

13  Q    Okay.  You were asked a bunch of questions on cross about

14  different possibilities and results and potential orders from

15  the Fifth Circuit on the assumption that the appeal was

16  granted.  Do you remember that?

17  A    Yes.

18  Q    And some of them were purported to be better or worse for

19  the Debtor.  Do you remember that?

20  A    Yes.

21  Q    If the appeal is not prosecuted, is there any chance that

22  the contracts that the Board has focused on will be

23  reinstated?

24  A    No.

25  Q    Is it fair to say that if the appeal is not prosecuted the

Nelms - Redirect                                          112

1    chances of the Debtor recovering the tens of millions of

2    dollars of revenue will be exactly zero?

3    A    Well, I don't know that it's exactly zero, but severely

4    diminished.

5    Q    Yeah.  How about getting paid a hundred-cent dollars on

6    the $8 million claim that's in the Acis litigation?  If the

7    appeal is not prosecuted, is there any chance that the Debtor

8    is likely to recover hundred-cent dollars?

9    A    Again, that possibility is severely diminished.

10   Q    Uh-huh.  How about with respect to terminating the

11   adversary proceeding in the Acis litigation?  If the appeal is

12   not prosecuted, is there any possibility of that adversary

13   proceeding just going away and being left with the arbitration

14   that you've described?

15   A    Again, a severely diminished possibility.

16   Q    You mentioned that the $8 million fraudulent transfer as

17   part of an arbitration would be very different outside of a

18   bankruptcy case.  Do you remember saying that?

19   A    I do.

20   Q    Can you explain to the Court why you believe it would be

21   different outside of a bankruptcy case?

22   A    Well, it actually goes to a case that started in my court.

23   This was the *MCAR v. Commerzbank* case in *In re Mirant*, and the

24   issue in that case, Mirant, when it filed its petition in

25   bankruptcy, was insolvent, but by the time that its bankruptcy

Nelms - Redirect                              113

 1   concluded, Mirant was a solvent entity.  And so all of its

 2   creditors were paid in full, but the trust that was

 3   established in the *Mirant* case brought some fraudulent

 4   transfer claims that were predicated on solvency, where these

 5   were constructively fraudulent as opposed to actual.

 6       And so the question was, if all the creditors had been

 7   paid in full, is there standing to bring fraudulent transfer

 8   claims that would basically not benefit creditors but would go

 9   to equity?

10       I originally -- I ruled that there was no such -- that you

11   couldn't bring such a cause of action, that the satisfaction

12   of claims in full extinguished those claims.  And I do recall

13   that one of the interesting things about that case is that a

14   lady named Elizabeth Warren wrote -- or proposed -- she

15   submitted -- they submitted an expert opinion on her behalf,

16   which I wouldn't let them file because I took the position

17   that I was an expert, the expert in the Court.

18       And in any event, it turns out I wasn't the expert.  I was

19   reversed by Judge Means on that, who said that it's not

20   limited.  It went up to the Fifth Circuit, and the Fifth

21   Circuit ruled the same thing.

22       So my takeaway from all of this is that, in a bankruptcy

23   setting, as opposed to just a state court setting, that the

24   potential recovery on account of fraudulent transfers is much

25   broader, much more unlimited than it would be in the context

 1  of a state court lawsuit.

 2      So, now, there may be things that would distinguish that,

 3  but that's something to be -- that's something to be troubled

 4  about if you're a director of this company.

 5  Q   And are these the types of things that, without, you know,

 6  just divulging privileged communications, are these the type

 7  of experiences and perspectives that you've shared with the

 8  other board members in the context of considering the various

 9  motions, the various matters for which Foley's retention is

10  sought?

11  A   Yes.

12  Q   Okay.

13          MR. MORRIS:  Just one second, Your Honor.

14          THE COURT:  Okay.

15      (Pause.)

16          MR. MORRIS:  Nothing further, Your Honor.

17          THE COURT:  All right.  Any recross on that redirect?

18          MR. LAMBERSON:  No, Your Honor.

19          THE COURT:  All right.  Thank you, Mr. Nelms.

20      (The witness steps down.)

21          THE COURT:  Any other evidence from Highland?

22          MR. MORRIS:  Your Honor, we have had admitted our

23  exhibits.  Among those exhibits are two declarations from Ms.

24  O'Neil, and so she's available in the courtroom today if

25  anybody wants to cross-examine on those issues.

O'Neil - Cross                          115

 1          THE COURT:  All right.  Well, I will accept those

 2   declarations as direct evidence.  Any desire to cross-examine

 3   Ms. O'Neil?

 4          MS. PATEL:  Yes, Your Honor.

 5          THE COURT:  All right.  Ms. O'Neil, we'll go ahead

 6   and swear you in on this today.

 7              HOLLAND O'NEIL, DEBTOR'S WITNESS, SWORN

 8          THE COURT:  All right.  Please be seated.

 9                      CROSS-EXAMINATION

10   BY MS. PATEL:

11   Q    Good afternoon, Ms. O'Neil.

12   A    Good afternoon.

13   Q    Ms. O'Neil, do you concurrently represent both Highland

14   Capital Management and Neutra, which is a Cayman entity,

15   correct?

16   A    Yes.

17   Q    Okay.  There are other entities that you either represent

18   or have represented that are kind of affiliated or within the

19   Highland umbrella; is that correct?

20   A    Yes.

21   Q    Okay.  And that includes, for example, CLO HoldCo was one

22   such representation.  Isn't that right?

23   A    Previous.  Previously.

24   Q    Okay.

25   A    Not currently.

O'Neil - Cross                        116

1  Q   Okay.  So, and I believe you say that in your declaration,

2  right, that you didn't -- that you no longer represent CLO

3  HoldCo?

4  A   Correct.

5  Q   Okay.  And when did that representation cease?

6  A   It was -- it was very brief.  I came into the case after

7  the involuntary -- after the orders for relief were entered.

8  And at that time, there had been the motion to intervene that

9  included that entity, and it was determined to proceed with an

10  appeal on that motion to intervene, or the denial of the

11  motion to intervene, as well as the orders for relief.

12  Actually, there was a compendium of orders that were appealed

13  all at the same time.

14      And so, because that entity had also filed a motion to

15  intervene, we had included that in the appeal.  And at that

16  time I was retained, but then by the time we kind of analyzed

17  the issues, determined it was not necessary to proceed with

18  that appeal, then I no longer represented that entity and

19  disengaged.

20  Q   Okay.  But CLO -- to be clear, CLO HoldCo was actually an

21  appellant for the order for relief appeal that we've been

22  talking about today, correct?

23  A   Initially, yes.

24  Q   Okay.  And it still remains an appellant; it just didn't

25  file a brief in the involuntary appeal.  Isn't that right?

O'Neil - Cross                              117

1    A    It has not filed any brief.  And I would have to look at

2    the record if it even filed a notice to the Fifth Circuit.  It

3    did -- was included in the notice to the District Court.  I

4    just honestly can't recall if it was included in the -- in any

5    notice to the Fifth Circuit.

6    Q    Okay.  And did you ever withdraw from your representation

7    of CLO HoldCo in the District Court appeal?

8    A    What do you mean, withdraw?

9    Q    Well, I mean, you entered an appearance.

10   A    You mean file a notice with the -- with the Court?

11   Q    Right.

12   A    I can't recall.

13   Q    Okay.  Ms. O'Neil, with respect to Neutra, you understand

14   and you've heard testimony, and I believe it's in the

15   declarations in support of the retention papers for Foley, and

16   if you need to look at that I can direct you to the exhibit

17   book, but it's -- is it your understanding that ultimately

18   Neutra is owned 75 percent by Mr. Dondero and 25 percent by

19   Mr. Okada?

20   A    Yes.

21   Q    Okay.  And Ms. O'Neil, in connection with your

22   representation of Neutra, who are the human beings that you

23   interact with?  Who directs your services?

24   A    At -- currently?  Are you --

25   Q    Just on behalf of Neutra.

O'Neil - Cross                                    118

1  A    Predominantly, I get direction from Highland's in-house

2  counsel.

3  Q    Okay.  And who would that be?  Who are the people?

4  A    The people are Mr. J.P. Sevilla, Mr. Isaac Leventon, Ms.

5  Stephanie Vitiello.  Those are the primary individuals that

6  direct vis-à-vis Neutra.

7  Q    Okay.  Have you ever spoke with Mr. Dondero regarding your

8  representation of Neutra?

9  A    Yes.

10  Q    Okay.  And when was that?  When was the last time?

11  A    It has -- it's been a while.  Certainly, it hasn't been

12  since this bankruptcy was commenced.  I think the last time I

13  recall discussing that specifically is when we were together

14  at the mediation during the course of the bankruptcy.  And I'd

15  have to look at my calendar.  I can't recall exactly when that

16  was.

17  Q    Okay.  And what about Mr. Okada?  Have you -- when was the

18  last time you spoke with Mr. Okada?

19  A    I have never spoken with Mr. Okada.

20  Q    During the course of your entire representation of Neutra,

21  you've never spoken with Mr. Okada?

22  A    That is correct.

23  Q    Okay.  And under -- do you have an understanding of under

24  what authority Mr. Sevilla or Mr. Leventon or Ms. Vitiello

25  would have to direct your legal services on behalf of Neutra?

1   A    Generally, yes, through the direction from the owners of

2   Neutra.

3   Q    Okay.  That would be Mr. Dondero and Mr. Okada?

4   A    Correct.

5   Q    Okay.  And it's your understanding, then, that Mr. Dondero

6   and Mr. Okada have directed Highland's legal department to

7   direct your services?

8   A    Yes.  Previously, yes.

9   Q    Okay.  Do you have -- is there a contract between Neutra

10  and Highland, or --

11  A    I don't know.

12  Q    Okay.  Did you ever ask if there was one?

13  A    No, I did not.

14  Q    Okay.  In connection with your representation of Neutra,

15  do you bill separately for the Neutra representation?

16  A    Since the bankruptcy was -- since the Highland bankruptcy

17  was commenced, we set up a separate task code to track the

18  fees being incurred on the Neutra appeal.  Prior to the

19  bankruptcy, we did not have a reason to do that.

20  Q    Okay.  So let's talk about prior to the bankruptcy.  I

21  believe in your declaration it was disclosed that there were

22  approximately $2.1 million in billings relating to your

23  representation of Highland, Neutra, and certain of the

24  Highland Cayman entities:  Highland CLO Management, Highland

25  CLO Holdings, and HCF Advisor, amongst others.  Right?

O'Neil - Cross                           120

1   A    That sounds about right.  I might want to look at the

2   declaration just to confirm on the number, but that sounds

3   about right.

4   Q    Okay.  Well, your declaration can be found under Tab 10.

5   A    Okay.  (Pause.)  And are you referring to Paragraph 16?

6   Q    Well, if you look at Page -- at the bottom, you'll see

7   that there's page numbers, and it says Page 15 of 48.  And

8   this would be your declaration.

9   A    Oh, thank you.  I was looking at the --

10  Q    Uh-huh.  Paragraph 3.

11  A    -- at the application, that's all.  Correct.  Yes.  Thank

12  you.

13  Q    Firm-earned fees of two point -- roughly $2.15 million,

14  almost, correct?

15  A    Yes.

16  Q    Okay.  And there's about $1.4 million of that that was

17  unpaid from the pre-petition period, correct?

18  A    Correct.

19  Q    Okay.  And is it your testimony that, of the $2.15 million

20  in fees, that there was no apportionment between Highland,

21  Neutra, and the Cayman defendants?

22  A    Correct.

23  Q    Okay.  So, --

24  A    Not -- not in my account -- not through my accounting

25  processes.  Obviously, the time entries, you could parse them

O'Neil - Cross                            121

 1  out, if need be.

 2  Q    Okay.  But you didn't keep your time necessarily that way,

 3  where they were already apportioned and parsed?

 4  A    Not under separate task codes, --

 5  Q    Okay.

 6  A    -- as we have done post-bankruptcy.

 7  Q    So, in connection with the billings that would have

 8  represented that $2.15 million, were those bills submitted to

 9  Highland, to Neutra, to the Cayman defendants?

10  A    They are submitted through an e-billing process that it

11  goes through a Highland portal and -- in the aggregate.  So

12  they're submitted through that portal.

13  Q    Okay.  But the portal goes to Highland, correct?

14  A    I do not know.  I honestly -- our e-billing department

15  handles it and I just know it goes through e-billing, an e-

16  billing portal, and I don't know exactly.  I'm assuming

17  obviously it goes to Highland.  They certainly get copies of

18  it.

19  Q    Okay.  Did you or Foley ever submit a bill to Neutra?

20  A    I mean, my understanding is that, going through the

21  portal, we would go to the various parties that are affiliated

22  with Highland.

23  Q    Okay.  But you've never directly sent a bill to Neutra for

24  your representation of Neutra?

25  A    As I said, it goes through e-billing, so that could be

O'Neil - Cross                                    122

1   interpreted to go directly to them if it goes through an e-
2   billing process.
3   Q    Okay.  But I'm asking, have you ever --
4   A    I'm -- maybe I'm being hyper-technical, but I'm just --
5   Q    Right.
6   A    It's being submitted through --
7   Q    I understand, but I just -- here's where I want to just
8   direct us, is:  Have you ever addressed a bill to Neutra, Ltd.
9   care of either Mr. Dondero, Mr. Okada, or its formal business
10  address?
11  A    As I indicated, post-petition, we have been segregating
12  them under a different task code and indicating it's Neutra.
13  Pre-petition, it was all under the same invoice.
14  Q    That was submitted to Highland only?
15  A    Submitted through the e-billing process.
16  Q    To Highland only, right?
17          MR. LAMBERSON:  Objection to the form of the
18  question.  This has been asked about four times.  The witness
19  is very clear.
20          THE COURT:  Overruled.  I think she's trying to get
21  an exact answer to her question, and she feels like she's not
22  getting it.  So, overruled.
23          THE WITNESS:  Okay.  Then I apologize, Your Honor.
24  I'm not -- I just don't know technically, once it goes through
25  the e-billing, how it's distributed on the other side.  I

O'Neil - Cross                                    123

1   just, I honestly --

2            THE COURT:  I think the question is, to whom was the

3   invoice directed?

4            THE WITNESS:  In terms of the -- not where it was

5   sent, but who it's directed to?

6   BY MS. PATEL:

7   Q    Yes.

8   A    It would have -- I believe it has the entities on it.  It

9   definitely has Highland on it for sure.

10  Q    Okay.  Does it have Neutra on it?

11  A    Neutra is subject to the engagement letter, so it would be

12  applicable to -- if our accounting department didn't

13  technically put Neutra on it, that is not necessarily at any

14  moment being -- as the engagement letter is -- was with all

15  those parties.  So I would have to look at the invoice, if it

16  has all of the clients listed on there.  I honestly -- I just

17  can't remember right now.

18  Q    Okay.  Well, --

19  A    We do have some post-petition invoices, and you'll see

20  where they're segregated with Neutra.

21  Q    You raise an interesting point.  If Highland and Neutra

22  and the other entities are all part of the engagement letter,

23  is Neutra also liable for all of Highland's legal fees?

24  A    I don't know the answer to that.

25  Q    Okay.  Is it your position that because Highland, Neutra,

O'Neil - Cross                              124

1   and the Cayman defendants are all part of the engagement

2   letter, that Highland is responsible for Neutra's legal fees?

3   A    From my firm's standpoint?

4   Q    Yes.

5   A    I think the, you know, our perspective is that they were

6   -- we were primarily working for Highland, so the beneficial

7   work, and as I think the Court knows, most of the work here

8   was on behalf of Highland Capital Management.  And it's in our

9   engagement letter to that effect, effectively.

10  Q    Sitting here today, Ms. O'Neil, post-petition, who's

11  calling the legal shots for purposes of Neutra?

12  A    The -- well, where we have been is the process with the

13  Fifth Circuit.  The Fifth Circuit schedule was already set

14  pre-petition, and we have just been complying with the pre-

15  petition -- or, rather, that schedule, which has rolled post-

16  petition.  And so our direction pre-petition has just

17  continued in terms of proceeding with the briefing.  And so,

18  again, going back to who it was pre-petition, it's the same

19  legal team giving instructions on behalf of Neutra.

20  Q    Okay.  And if the question were to be posed, for example,

21  whether the Neutra involuntary or the order for relief appeal

22  should be dismissed, for example, who would call the legal

23  shots on that?  Who would make the decision on that?

24  A    To dismiss the appeal?

25  Q    Yeah.

O'Neil - Cross                            125

1   A    Not proceed with it up to this point?  Despite where we

2   are at this point, to just -- to just drop it?

3   Q    Yes.

4   A    It would be the owners of Neutra.

5   Q    So that would be Mr. Dondero and Mr. Okada, right?

6   A    Yes.

7   Q    Okay.  You -- Ms. O'Neil, were you in the courtroom when

8   Mr. Demo or -- and Mr. Nelms -- when Mr. Demo made the opening

9   statement and then when Mr. Nelms was testifying?

10  A    Yes.

11  Q    Okay.  And you heard, again, the opening statement and

12  then the testimony regarding the benefit to Highland of

13  Highland paying for Neutra's legal fees in connection with the

14  appeals, correct?

15  A    I did hear that, yes.

16  Q    Okay.  All right.  And can you, in your words, then,

17  articulate, from your perspective as legal counsel to both

18  entities, what the benefit is to Highland in this bankruptcy

19  for Foley's representation of Neutra and Highland paying the

20  bill for it?

21  A    I just want to make sure I'm not, you know, getting onto

22  attorney-client privileged discussions in terms of the

23  benefit.  I think I would agree with what has been stated in

24  court today.

25  Q    Okay.  So, so, and just to kind of recap that, if I

O'Neil - Cross                    126

 1   understand it, it's that if Neutra is successful in its appeal
 2   of the involuntary orders for relief and also its appeal of
 3   the confirmation order, then everything goes back and Highland
 4   gets this revenue stream, correct, of about $12 million, plus
 5   it gets paid on an $8 million, approximately, purported claim.
 6   Right?
 7   A    That the -- the agreements would be reinstated, which
 8   would then yield approximately that type of revenue stream as
 9   -- pursuant to the sub-advisor and sub-management agreements
10   that were in place.
11   Q    Okay.  And one of the entities -- and I know that the
12   retention application doesn't actually go to, anymore, Foley's
13   representation of the Cayman entities, but -- that's kind of
14   been put to the side.  But you do -- and you do represent
15   Highland CLO Management, correct, which is a Cayman entity?
16   A    Correct.
17   Q    All right.  And it's one of the defendants in the Acis
18   adversary proceeding, right?
19   A    And that is the only engagement that we have for that
20   party, is in conjunction with that adversary proceeding, which
21   is stayed.  So nothing is going on with that right now.
22   Q    Well, I understand that, but you --
23   A    Okay.
24   Q    My question was, you represent Highland CLO Management,
25   correct?

O'Neil - Cross                    127

1   A    In that adversary proceeding.

2   Q    Okay.  So -- but you also represent it in connection with

3   -- in -- generally with the bankruptcy as well, Acis's

4   bankruptcy?

5   A    There was no involvement until the adversary proceeding,

6   until they were sued in the adversary proceeding.

7   Q    Okay.  And in the adversary proceeding, Highland CLO

8   Management was sued for a few things, correct?

9   A    In the adversary proceeding?

10  Q    Yes.

11  A    Yes.

12  Q    Okay.  Highland CLO Management, for example, received a

13  $9.5 million note that Acis was previously the holder of and

14  that was transferred after Mr. Terry's judgment, correct?

15  A    Are you asking if that was an allegation in the adversary

16  proceeding?

17  Q    Sure.

18  A    I --

19  Q    Right.

20  A    That sounds right.  That's been stayed, and I would have

21  to defer to the -- obviously, the second amended complaint and

22  the allegations therein.  So, --

23  Q    Okay.  And are you aware that your client, Highland CLO

24  Management, was also sued because it was to receive the

25  portfolio management agreements under which Acis represents --

O'Neil - Cross                                128

 1  or, I'm sorry, manages the Acis CLOs?

 2  A    That was -- that sounds like one of the allegations from

 3  that point in time.

 4  Q    Okay.  So I guess let me -- let me ask you a slightly

 5  different way.  Are you aware that there was a pre-petition

 6  agreement that was entered into and signed by Mr. Dondero that

 7  transferred the PMAs from Acis to Highland CLO Management?

 8  A    I cannot recall the -- all the evidence at the -- in

 9  conjunction with that at this time, but if that's one of your

10  representations.  I wasn't representing any of the parties at

11  that time, but I do recall that there may have been some

12  evidence presented in that regard.  But I would have to look.

13  It's been a long time.  And that record is hundreds of

14  thousands of pages.  I would need to check back on that.

15  Q    Okay.  But if there were such an agreement, for example,

16  that transferred the portfolio management agreements from Acis

17  to another entity, a Cayman entity, can you agree with me,

18  then, that Mr. Dondero's ownership interest in Neutra would

19  really be of no import anymore because there wouldn't be a $12

20  million revenue stream anymore, would there, if Acis wasn't

21  the portfolio manager of the Acis CLOs?

22  A    I don't agree with the premi... at the end, when you said,

23  if Acis isn't the CLO manager, then there would be no revenue

24  stream from the CLOs if it's not reinstated as the -- as the

25  manager.

O'Neil - Cross                                    129

1    Q    Okay.  So you agree that if Acis isn't the portfolio

2    manager of the Acis CLOs, there's no $12 million revenue

3    stream potential to Highland by virtue of Highland coming back

4    in as the sub-advisor and shared services provider, right?

5    A    Okay.  Now, the -- no, I don't know that that's

6    necessarily the case.

7    Q    Well, why not?

8    A    It could be appointed to be the sub-advisor, sub-manager

9    for -- through a different entity.

10   Q    Okay.  So it would basically be -- but, again, going back,

11   it would be through a different entity.  Again, Mr. Dondero's

12   ownership of Neutra would be of no import then, right?

13   A    Perhaps I'm not understanding your question.

14   Q    Well, --

15   A    I -- it's a hypothetical, and I --

16   Q    If Acis -- if Acis didn't have these portfolio management

17   agreements, it doesn't matter if Mr. Dondero wins the Neutra

18   appeal or not, right?  Because he wouldn't have control of the

19   Acis entity within which to redirect, through Acis, the sub-

20   advisory and the shared services agreements, correct?

21   A    He could direct it through another entity, as I think it's

22   been well-discussed that Highland had -- Highland had the

23   personnel to manage the CLOs.  In fact, Mr. Terry was a

24   Highland employee when he managed the CLOs.  So he could

25   certainly direct that management through another entity, even

O'Neil - Cross                          130

1   if it wasn't Acis.  But vis-à-vis Neutra, Neutra would be --

2   well, before the confirmation of the plan, Neutra owned Acis.

3   So, vis-à-vis through Neutra, I believe your statement would

4   be correct.

5   Q    Okay.  Ms. O'Neil, also as sort of a participant during

6   the Acis bankruptcy cases --

7           MS. PATEL:  And Your Honor, I know you're intimately

8   familiar with all of these.

9   BY MS. PATEL:

10  Q    But Ms. O'Neil, do you recall the multiple attempts during

11  the bankruptcy case to effectuate what was called an optional

12  redemption, which sought to liquidate the Acis CLOs?

13  A    By HCLOF, I believe there were two instances, yes.

14  Q    Okay.  HCLOF executed those optional redemptions, correct?

15  Mr. Bill Scott, one of the independent directors?  Is that

16  right?

17  A    I believe the evidence was presented before the Court --

18  Q    Okay.

19  A    -- in that regard.

20  Q    And during the course of the -- all of those proceedings

21  with the optional redemptions, Highland was the ultimate

22  advisor to HCLOF, was it not?

23  A    I'm not sure I understand what you mean by the ultimate

24  advisor.

25  Q    Well, the technical contractual advisor was an entity by

O'Neil - Cross                           131

1    the name of Highland HCF Advisor, right?  Is the portfolio

2    manager for Highland CLO Funding?

3    A    It has been a while since I looked at that org chart or

4    those issues, so I do not recall off the top of my head.

5    Q    Okay.  Well, you said that you interacted, for example,

6    with Neutra -- on your Neutra issues with JP Sevilla, Mr.

7    Leventon, and Stephanie Vitiello, correct?

8    A    Yes.

9    Q    Okay.  Wasn't it really, from a legal perspective, at

10   least, Mr. Sevilla, Mr. Leventon, who were all advising

11   Highland CLO Funding as well?

12   A    I don't know the answer.  You'd have to inquire of them.

13   Q    So, is it your testimony, then, that Highland had nothing

14   to do with the optional redemption notices that were issued

15   during the course of the Acis bankruptcy cases?

16   A    I'm not sure that I understand the relevance of that as to

17   whether Highland had any -- had nothing to do with it.  I

18   think they were certainly involved and were aware.  But they

19   weren't the -- independently making those determinations.

20   Q    Okay.

21   A    As you know, Ms. Patel, there were directors that were

22   involved.  They testified before this Court.  There -- HCLOF

23   was represented by counsel as well.  King & Spalding.  So

24   there were multiple parties involved.

25   Q    Okay.  So is it, again, your testimony that Highland had

O'Neil - Cross                         132

1    nothing to do with the optional redemption notices that were

2    issued during the Acis bankruptcy case?

3          MR. MORRIS:  Objection, Your Honor.  It may be me,

4    but I don't understand what this has to do with the Foley

5    retention application.

6          THE COURT:  Okay.  We do seem like we're getting a

7    little far afield.  What's your response to that?

8          MS. PATEL:  Your Honor, the contention has been made

9    that if these bankruptcy appeals are somehow granted or in the

10   District Court and this Court are reversed, --

11         THE COURT:  Uh-huh.

12         MS. PATEL:  -- that these cases are going to come

13   back and that suddenly, magically, there's going to be a $12

14   million revenue stream flowing out of Acis back into Highland,

15   and they're going to be able to collect on an $8 million

16   objected-to claim.

17      I'm just trying to get to how likely is that really to

18   happen.  I mean, given the course -- and again, I know Your

19   Honor was a viewer of all of this -- of the multiple attempts

20   to try to liquidate these assets, --

21         THE COURT:  Okay.  I'll allow the question, but it'll

22   be the end of the line of questioning.  Okay?

23         MS. PATEL:  Understood.  And Your Honor, just

24   additionally, it's -- that's part of the appeal that Foley is

25   handling on the confirmation appeal.  As Mr. Nelms said, it's

1   also based on the plan injunction.

2          THE COURT:  All right.  She can answer the question,

3   but then we move on to another area.

4          MS. PATEL:  Okay.

5   BY MS. PATEL:

6   Q    So is it your testimony, Ms. O'Neil, that Highland had

7   absolutely nothing to do with the optional redemptions --

8   A    I did not --

9   Q    -- during the bankruptcy case?

10  A    That is not what I said.

11  Q    Okay.  So, -- and I get it.  Highland CLO Funding is a

12  different entity, and the Bankruptcy Court made findings with

13  respect to the fact that it is controlled in every way by

14  Highland.  Do you recall that finding?

15  A    Preliminary findings in conjunction with determining

16  whether there was a likelihood of success on the merits.  I do

17  recall that --

18  Q    Okay.

19  A    -- those conclusions by the Court.

20  Q    As a part of the bench memorandum in support of the

21  confirmation order, correct?

22  A    Yes.

23  Q    Okay.

24  A    Actually, I will -- I will -- I'll correct that.  I'll let

25  that -- the Court's order speak for itself.  You may have said

O'Neil - Cross                          134

1  a few things that were more or less than what the Court's

2  order said, so I'd just defer to what the Court's order said.

3  Q    Okay.  Well, part of the representation for Foley here is

4  to represent Highland and Neutra in connection with the

5  confirmation appeal, correct?

6  A    Yes.

7  Q    And part of that confirmation appeal is also -- one of the

8  grounds there is that you're appealing the plan injunction,

9  which the plan injunction is what stops the CLOs from being

10 redeemed, correct?

11 A    Correct.

12 Q    Okay.  So, how is Highland damaged by the plan injunction?

13 A    I think it's fairly obvi... again, I want to not tread too

14 much on attorney-client privilege.  But, obviously, I have yet

15 to have a client over my 30-plus years of practicing law that

16 likes to be subject to any kind of injunction.  It limits --

17 that injunction is more than just on the -- it's a very broad

18 injunction.  So I'd like -- if I had the injunction in front

19 of me, there's -- there's lots of restrictions under that

20 injunction, and that is prejudicial to Highland to be able to

21 act freely.

22 Q    Able to act freely to liquidate CLOs?

23 A    Among other things, as it may do in the ordinary course of

24 business, in its opinion, that may be beneficial to his

25 clients.

O'Neil - Cross                                135

1   Q    Okay.  Now, Ms. O'Neil, --

2   A    If I may, may I add one more thing?

3        THE COURT:  You may.

4        THE WITNESS:  Okay.  Highland, at least in that role,

5   could not liquidate CLOs.  So I think that was an improper

6   statement.  Or suggestion.

7   BY MS. PATEL:

8   Q    Okay.  Well, then, what specific actions that Highland

9   would like to take is it being damaged by the injunction?

10  A    I would need to look at the -- the injunction is very,

11  very broad.  So, anything that it can't do freely that is

12  covered by the injunction is obviously a detriment to

13  Highland.

14  Q    Okay.  Now, Ms. O'Neil, if you would turn to Tab 31 in the

15  book, --

16  A    All right.

17  Q    -- please.  And I will ask you, this is the declaration of

18  Bradley Sharp that was in support of the order authorizing the

19  retention of Foley Gardere.  Have you had an opportunity to

20  review this?

21  A    Yes.

22  Q    Any dispute with any of the statements in here?

23  A    I don't recall having a -- I don't -- I think it was

24  accurate, but --

25  Q    Okay.  Well, when you read it, did you have any disputes

O'Neil - Cross                               136

1   with the statements that were in here?

2   A    I did not see it before it was filed, so -- but having

3   read it after it was filed, I don't recall having any disputes

4   with anything that was in it.

5   Q    Okay.  And I'll turn you specifically to Paragraph 13,

6   which is found on Page 4 of 5.

7   A    Okay.

8   Q    And I'll -- well, let's look at this together.  (reading)

9   Prior to the petition date, the majority of Foley's and Lynn

10  Pinker's fees and expenses were paid by a non-debtor entity,

11  Highland CLO Funding Limited.

12       Do you see that?

13  A    Yes.

14  Q    Okay.  And were Foley's bills sent to Highland CLO

15  Funding?

16  A    Yes.

17  Q    Okay.  And is -- were those bills separate and apart from

18  the $2.15 million that we talked about earlier that were

19  remitted through the Highland e-billing system?

20  A    Separate, yes.

21  Q    Okay.  About how much in fees has Highland CLO Funding

22  paid to Foley to date?

23  A    Nothing post-petition.  Prior -- I mean, during -- from

24  the inception of the representation of Highland, probably

25  approximately -- over a million dollars, for sure.

1   Q    Over $2 million?

2   A    I do not believe it is over $2 million.  It's somewhere

3   between $1 and $2 million.

4   Q    Okay.  And those separate matters that were billed to

5   Highland CLO Funding, how did those differ from what was

6   billed to Highland or to Neutra or to the Cayman defendants?

7   A    If it was a matter that was clearly of some benefit to

8   HCLOF, it was billed directly.  Otherwise, there was an

9   allocation billing for just the general work.  And that was

10  primarily through an indemnity agreement, as I understood it,

11  between Highland and HCLOF.

12  Q    Okay.  And who did the allocation between Highland and

13  Highland CLO Funding?

14  A    I was instructed as to what the allocation should be or

15  asked what I thought the allocation should be on any given

16  time, and I believe it was the -- it was discussed with the

17  board of HCLOF as to the allocation.

18  Q    Okay.  And who were you directed as to the categories of

19  allocation by that you just referenced?

20  A    You mean in terms of a person?

21  Q    Yes.

22  A    I most frequently discussed this with Mr. Sevilla, but

23  also had conversations with Mr. Maloney, with King & Spalding,

24  who was representing HCLOF, and occasionally would have direct

25  conversations with Mr. Maloney and Mr. Scott and Ms. Bestwick,

1   who were the two independent directors of HCLOF.

2   Q    Okay.  And what types of work generally either were

3   allocated or apportioned or billed in full to Highland CLO

4   Funding.  What was the benefit there?

5   A    The work was -- the work that was going on in the

6   bankruptcy case.

7   Q    Okay.  But I -- I understand that it was work in the

8   bankruptcy case because that's where Foley represented

9   Highland and various other entities, but I'm asking you

10  specifically:  What types of categories, and I don't -- you

11  don't have to go task by task -- but categories of work that

12  you performed for Highland or Neutra or for the Highland

13  Cayman defendants that benefited and were billed to Highland

14  CLO Funding?

15       MR. MORRIS:  Your Honor, I'm going to again assert a

16  relevance objection to any of this post-petition stuff.  This

17  is an application to retain Foley on a post-petition basis

18  for the benefits to this estate, not with respect to what

19  happened on a pre-petition basis.

20       THE COURT:  Your response?

21       MS. PATEL:  Your Honor, there's been much discussion

22  about what -- whether Neutra should have to pay this bill or

23  whether it should not have to pay its own way here.  This is

24  -- this is, in my mind, a bit of an extraordinary application

25  in that we're asking a debtor entity to pay for non-debtor

O'Neil - Cross                                       139

1  representation.

2      I want to inquire as to sort of this jumbled mix of work

3  that's been performed.  There's -- clearly, Ms. O'Neil said

4  she hasn't been paid by HCLOF post-petition, but I think we

5  need to separate out all of these representations, who's

6  controlling what, and how -- how these bills really should be

7  paid.

8              THE COURT:  How the allocation has worked --

9              MS. PATEL:  Yes.

10             THE COURT:  -- thus far?

11             MS. PATEL:  Yes, Your Honor.

12             THE COURT:  I overrule the relevance objection, but

13 let me tell you a pickle we're getting into timewise.  I have

14 a confirmation hearing starting at 1:30.  And we've gone three

15 hours on this without a bathroom break.  How much longer do

16 you think you're going to need?  Because we might have to stop

17 and come back at 2:30 if you're going to need much longer.

18             MS. PATEL:  Your Honor, I would say give me ten

19 minutes and I can wrap it up.

20             THE COURT:  Okay.  Ten minutes.

21             MS. PATEL:  Okay.

22             THE WITNESS:  I'm sorry.  What was the question?  I

23 apologize.

24 BY MS. PATEL:

25 Q   I'm trying to remember it myself, Ms. O'Neil.  The

1   question was, what specifically -- what -- and I don't -- you

2   don't have to go task by task.  But categorically, what was

3   the work that was performed that you would have billed

4   directly to HCLOF?

5   A    Prior to King & Spalding's involvement, you may recall

6   that we were representing HCLOF as well.  So there was direct

7   bill for the work during the bankruptcy by Foley Gardere for

8   specific work for HCLOF.

9        The -- the -- pursuant to the indemnification, as I

10  understood it, although I never read the indemnification

11  personally, that there would be an allocation between Highland

12  to HCLOF for that, for work that they performed that was of

13  benefit to HCLOF or its equity interest in the CLOs.

14       And so I was more directed as to what that allocation

15  should be vis-à-vis the work that was going on.  I think,

16  generally speaking, because the CLOs were being impacted, as

17  was well-discussed during the course of the Acis bankruptcy,

18  by the issues in the bankruptcy, by the temporary injunction

19  that were in place vis-à-vis their inability to seek an

20  optional redemption during the course of the bankruptcy, that

21  they were being significantly impacted by the actions in the

22  bankruptcy, even though they were not specifically a creditor

23  in the bankruptcy.

24  Q    So you performed services on behalf of your client,

25  Highland, that you then billed to Highland CLO Funding because

O'Neil - Cross                              141

```
 1  Highland CLO Funding couldn't effectuate an optional
 2  redemption?
 3  A    It was -- it was in conjunction with the overall
 4  activities that were going on in the bankruptcy.
 5  Q    Okay.
 6  A    Not that specifically, no.
 7  Q    All right, Ms. O'Neil.  I've only got a few minutes left.
 8  So let me ask you:  Towards the end of January, did there come
 9  a time where you sent me an email regarding Acis's quarterly
10  operating reports?
11  A    Yes.
12  Q    Okay.  And you copied Mr. Hurst on that email as well,
13  correct?
14  A    Correct.
15  Q    Okay.  And your email was to say, hey, can we set up a
16  time to talk because I've got -- Highland's got some questions
17  about the quarterly operating report.  Do you recall that?
18  A    Yes.
19  Q    Okay.  And again, just so we're clear, this is around end
20  of January 2020, right, after the appointment of the Board?
21  A    Yes.  You --
22  Q    Okay.
23  A    I think there's an exhibit.  One of your exhibits is that.
24  Q    There is.  If you turn to --
25  A    Or it's a portion of that email communication.
```

O'Neil - Cross                              142

1   Q    It is.  It's -- if you turn to Tab 28, this is sort of

2   your initial email to me, correct?

3   A    Yeah.  This is not the entire email dialogue, because --

4   Q    There were other emails afterward.

5   A    -- I did not get a response and sent a couple of emails

6   later, several days later, asking for a response.

7   Q    Right.  And I actually did respond to you after that,

8   correct?

9   A    Approximately a week later, yeah.

10  Q    Okay.  Because I was out sick, actually.

11  A    Yeah.  That's what you said.

12  Q    Right.  So, --

13  A    You didn't say sick, but you were out, so it's okay.

14  Q    Yeah.  I was out.  And so -- and I will tell you, I was

15  sick.  So I responded, albeit a little bit late, but I did

16  respond to you and say, Ms. O'Neil, could you tell me what

17  your questions are so that I can be prepared?

18       Does that sound about right?

19  A    Yeah.

20  Q    Okay.

21  A    Yes.

22  Q    And I never -- I never got a response to that.  You never

23  told me what your questions were with respect to the quarterly

24  operating report, right?

25  A    Yes.  And I --

O'Neil - Cross                          143

1   Q    Okay.

2   A    I can explain that.  Because Mr. -- I believe Mr.

3   Pomerantz said that there was a meeting that was -- and they

4   would discuss it then, so --

5   Q    Okay.

6   A    Or Mr. Demo.  I'm sorry.  Somebody from Pachulski told me

7   that that would be addressed.  Also, the status conference --

8   I mean, the questions we had were because there was a February

9   3rd status conference coming, and I wanted to see if we could

10  get some clarity so that when we appeared before the status

11  conference we could limit what we were going to be discussing

12  with the Court, if anything.

13  Q    Okay.  Well, what were -- what were the nature of your

14  questions?  Because there was a conversation between Mr. Terry

15  and myself and the Board and -- well, certain members of the

16  Board.  But what were your questions pertaining to?

17  A    Oh, okay.  Happy to discuss that.  It's kind of awkward to

18  have it in -- on this, in this --

19  Q    On Q and A.

20  A    -- forum, but --

21  Q    I hear you.

22  A    We sent -- as the Court will recall, the confirmation

23  injunction can be lifted if all the claims are paid.  So,

24  since the plan, the Acis plan was confirmed, we have been

25  tracking -- and the only way to track it is through the QORs

O'Neil - Cross                                    144

1    -- what the revenues were coming in and what has been paid.

2    And so -- in terms of expenses and then claims.  And so we

3    have been -- my paralegal has been tracking this.

4        As the Court may know from looking at the record, almost

5    all of -- any other claims that were in the case were either

6    disallowed or withdrawn.  And so, really, the only claim,

7    other than Highland's, was Mr. Terry's that was really left to

8    be paid, other than administrative claims.  And I believe the

9    administrative claimants had agreed to deferral on some of

10   their payments after the effective date.

11       So we had been tracking the payments, which you can track

12   through the QORs, and it appeared that all of -- including Oak

13   Tree's most recently allowed administrative claim -- that all

14   of the administrative claims had been paid, and it appeared at

15   least approximately a half of Mr. Terry's claim had been paid.

16       When you look at the QORs, it doesn't specifically say,

17   "Here's who got what payment," but it shows the claims being

18   paid down, in addition to just general expenses of the post-

19   confirmation Debtor.  And I'm -- this is taking a little bit,

20   but in the disclosure statement to the plan, there had also

21   been plan projections that set forth the revenues that were

22   anticipated post-confirmation to pay the claims.  And so

23   likewise -- as well as the expenses, including to Brigade or

24   just general operating expenses for Acis.

25       So, likewise, through the QORs, we had been comparing

O'Neil - Cross                        145

1  those against what was in the plan projection.  And there were

2  some things that weren't matching and we simply were having

3  questions about the expenses seemed to be much higher.

4  However, the claims were being paid down, so it looked like

5  Mr. Terry was the only claimant left and was probably owed, by

6  our calculation, around $4-1/2 million, and that was the only

7  thing left to be paid.  And, but the revenues per the QOR was

8  showing cash available of over five and -- $5.3 million.

9      So, one of the things we wanted to discuss was the

10  application of using the cash to go ahead and pay down what

11  was left of Mr. Terry's claim so that the injunction could be

12  lifted.  But wanted to discuss that with you.  That was the

13  purpose of that.

14  Q   Okay.  And I guess let me back up.  One, let me kind of

15  correct you on a technical point, which is Mr. Terry's claim

16  isn't the only claim that's left outstanding.  There were also

17  law firm claims that were lodged as against Acis, correct?

18  A   I believe there were two --

19         MR. MORRIS:  Objection, Your Honor.  Just relevance.

20  I don't get it.

21         THE COURT:  Okay.  Sustained.  You've gone seven

22  minutes.  So, three more minutes and we need to wrap it up.

23         MS. PATEL:  Okay.

24  BY MS. PATEL:

25  Q   Well, I guess, Ms. O'Neil, kind of in line with the email,

O'Neil - Cross                                    146

1   the email came in shortly before Acis was sued by your co-

2   counsel, Lynn Pinker, on behalf of the Charitable DAF and CLO

3   HoldCo.  Are you aware of this lawsuit?

4   A    After it was filed.  I was not aware of it before it was

5   filed.  The second one.  I had seen the first one after it was

6   filed.  I had not seen the second one until after it was

7   filed.  We have a conflict with one of the defendants in that,

8   so --

9   Q    Okay.  So, and when you say "the first one," are you

10  talking about when it was originally the Charitable DAF versus

11  U.S. Bank National Association and Moody's Investors Service?

12  A    Yes.

13  Q    Okay.  And that all involved claims by the DAF brought

14  against U.S. Bank and Moody's at the time relating to the Acis

15  bankruptcy, right?  It's claims that U.S. Bank didn't manage

16  --

17  A    Ms. --

18  Q    -- as a trustee correctly, correct?

19  A    Ms. --

20        MR. MORRIS:  Objection, Your Honor.  She's got no

21  foundation.  She said she has a conflict and wasn't involved

22  with this case.

23        THE COURT:  Sustained.

24        THE WITNESS:  That's correct.

25  BY MS. PATEL:

O'Neil - Cross                               147

1    Q    Okay.  I guess, Ms. O'Neil, let me just ask you:  Did you

2    have any involvement with -- if you look at Tab 27, that's a

3    copy of the lawsuit, so that we're all clear exactly which one

4    I'm asking you about.  This is the lawsuit between the

5    Charitable DAF and CLO HoldCo, your former client, versus U.S.

6    Bank National Association, Moody's Investors Service, Acis

7    Capital Management, Brigade, and Josh Terry.  Did Foley have

8    any involvement in the drafting or formulation of this

9    lawsuit?

10   A    None.

11   Q    Okay.

12        MS. PATEL:  No further questions, Your Honor.

13        THE COURT:  All right.  Any redirect?

14        MR. MORRIS:  Very briefly.

15        THE COURT:  Okay.

16                 REDIRECT EXAMINATION

17   BY MR. MORRIS:

18   Q    Ms. O'Neil, you've been representing a number of different

19   entities associated with Highland since 2018, right?

20   A    Correct.

21   Q    And are those entities identified in Plaintiff's Exhibit

22   #2 in the engagement letter?

23   A    Plaintiff's 2 or -- sorry.

24   Q    The Debtor's.

25   A    The Debtor's 2.  Okay.  Let me switch.  They are.

O'Neil - Redirect                          148

1    Q    Okay.  And since the Board has been appointed, have you

2    met with board members to discuss the status of the matters

3    that your firm has been handling?

4    A    Yes.

5    Q    And without disclosing attorney-client communications, did

6    that involve providing a history of the work that you'd done?

7    A    Yes.

8    Q    Did that involve providing a history of the work that you

9    expected to do in the future?

10   A    Yes.

11   Q    Did the Board have an opportunity to ask questions of you?

12   A    Yes.

13   Q    And did you, in fact, answer the Board's questions?

14   A    I endeavored to do so to the best of my ability, yes.

15   Q    Okay.

16   A    Or I followed up if -- with information via email if I

17   needed to get additional information.

18   Q    And is it your understanding that the Board supports your

19   retention for the purposes that were described earlier by Mr.

20   Nelms?

21   A    Yes.

22   Q    Okay.

23         MR. MORRIS:  I have nothing further, Your Honor.

24         THE COURT:  Any recross on that redirect?

25         MS. PATEL:  No, Your Honor.

O'Neil - Redirect                    149

1          THE COURT:  All right.  Ms. O'Neil, you're excused.

2          THE WITNESS:  Thank you.

3      (The witness steps down.)

4          THE COURT:  All right.  Highland, any more evidence?

5          MR. MORRIS:  No, Your Honor.  We rest.

6          THE COURT:  All right.  Is there any evidence from

7   Acis?

8          MR. LAMBERSON:  No, ma'am.

9          THE COURT:  All right.  Let's take a five-minute --

10  please, five-minute break -- and then we'll hear your closing

11  arguments.

12          THE CLERK:  All rise.

13      (A recess ensued from 12:47 p.m. until 12:56 p.m.)

14          THE CLERK:  All rise.

15          THE COURT:  All right.  Please be seated.  We're

16  going back on the record in Highland.  I'll hear closing

17  arguments.

18      I'm going to ask a question.  I need clarification --

19          MR. DEMO:  Of course.

20          THE COURT:  -- on this.  First off, in the Acis

21  adversary that's stayed in the Acis bankruptcy case, Foley,

22  it's proposed, would represent Highland.  But is Foley also

23  representing co-defendants in that adversary?  You know, I

24  think King & Spalding is representing all the co-defendants,

25  or someone else is, but am I wrong or right about that?

150

1          MR. DEMO:  Yes and no, Your Honor.  I think there's

2     been some miscommunication on that.  The adversary, as we

3     understand it, is stayed, and because of that we are not

4     seeking to represent -- or retain Foley in that adversary,

5     although we will if that comes up again.  So, in the

6     adversary, pre-petition, Foley did represent the Debtor and

7     then a handful of other creditors who were brought into that

8     adversary, as we understand it, as defendants.  On a go-

9     forward basis, though, we are proposing to retain Foley on

10    three things:  General matters in the bankruptcy proceeding;

11    the appellate --

12          THE COURT:  General matters in the Acis bankruptcy

13    proceeding?

14          MR. DEMO:  Correct, Your Honor.  The appeal involving

15    the confirmation order.  And the appeal involving the Neutra

16    litigation.  And --

17          THE COURT:  Okay.  On the appeal of the involuntary,

18    --

19          MR. DEMO:  Yes, ma'am.

20          THE COURT:  -- only Neutra --

21          MR. DEMO:  That is correct.

22          THE COURT:  -- is an appellant.  Okay.  So what

23    you're asking is for authority for Highland to pay the legal

24    fees of Neutra on that?

25          MR. DEMO:  Yes, Your Honor.

151

```
 1              THE COURT:  Okay.

 2              MR. DEMO:  We are.  And we, again, to the --

 3              THE COURT:  And let me -- let me -- and then the

 4    appeal of the confirmation order, are the appellants Highland

 5    and Neutra only, or is HCLOF an appellant?

 6              MR. DEMO:  In terms of Foley's representation, it's -

 7    -

 8              THE COURT:  No, no, no.  Just answer the question.

 9    Who are the appellants in the confirmation order?

10              MR. DEMO:  Highland, Neutra, and HCLOF.

11              THE COURT:  Okay.  Who is representing HCLOF?

12              MR. DEMO:  King & Spalding.

13              THE COURT:  Okay.  And Foley has thus far been

14    representing Neutra and Highland?

15              MR. DEMO:  Correct, Your Honor.

16              THE COURT:  Okay.  Well, okay.  You may proceed.

17              MR. DEMO:  And I will be brief.  And I think

18    ultimately this, this is a relatively simple thing, and I

19    think you've nailed it.

20          What are the benefits to the estate of -- because nobody

21    has objected, again, to Foley representing the Debtor.  What

22    are the benefits to the estate for Foley representing Neutra

23    and being paid for that by the Debtor?  And to answer that

24    question, I think you have to look to all the testimony that

25    we've heard today, and you also have to look at who's
```

152

 1   objecting, Your Honor.  The Committee is not objecting.  There

 2   is no other committee member objecting besides Acis.  The only

 3   party objecting to Neutra -- or, I'm sorry, to Highland paying

 4   Neutra's fees in the appeal, which, again, are a portion of

 5   the $500,000 that we think is going to be incurred post-

 6   petition on this, excluding today, because today has obviously

 7   gone a little bit long -- the only party objecting to paying a

 8   portion of that $500,000 to have Foley represent Neutra in an

 9   appeal that is happening less than six weeks from now is Acis.

10       Acis is the party opponent in that.  Acis is the party

11   that stands to benefit, not just because the involuntary

12   petition will not be overturned, but because there will be a

13   lack of leverage and a lack of ability to contest their $75

14   million, which is where it started, but it keeps growing.

15   It's at $300 million now.  The only party who's objected to

16   that is Acis.  None of the other creditors have objected.

17           THE COURT:  Well, until the past 24 hours, the

18   Committee was objecting.

19           MR. DEMO:  Correct, Your Honor.  And we had a --

20   finally had a chance, with the new Board in place, to discuss

21   it with the Committee.  And the new Board explained to the

22   Committee that, in their business judgment, spending this

23   money, this $500,000 -- which, again, is going to be allocated

24   across these three matters; not all of it's going to be

25   allocated to Neutra; a portion of it is going to be allocated

153

1    to Neutra -- $500,000 for the possibility of a recovery to the

2    estate, the possibility of the ability to challenge a $300

3    million proof of claim that impacts not just the estate but

4    the other creditors in the estate, substantially, because

5    there's only so much money here.  So, --

6          THE COURT:  Okay.  Let me ask you to recap what the

7    evidence was on benefit to Highland --

8          MR. DEMO:  On benefit --

9          THE COURT:  -- from the overturning of the order for

10   relief in Acis.

11         MR. DEMO:  In terms of the overturning of the order

12   for relief in Acis, there were -- there was testimony on the

13   possibility -- and again, it's a possibility, and we're not

14   disputing that.  Acis's attorneys said it was 10 percent.

15   That's fine.  Maybe it's 10 percent.  There was evidence

16   presented by Mr. Nelms on the possibility that if the Acis

17   involuntary is overturned, that the contracts at issue, the

18   advisory and the sub-management agreements, --

19         THE COURT:  Well, let's take it sequentially, because

20   you've got to, you know, look at benefit of the estate --

21         MR. DEMO:  Understood.

22         THE COURT:  -- versus time and cost, to some degree,

23   right?

24         MR. DEMO:  Right.

25         THE COURT:  So, Neutra wins.

154

1          MR. DEMO:  Okay.

2          THE COURT:  Okay?  That means, according to Mr.

3    Lamberson's argument, which I think is the correct argument,

4    that we send to arbitration whether it's appropriate for Acis

5    to be in a bankruptcy.

6          MR. DEMO:  Correct, Your Honor.

7          THE COURT:  Okay.

8          MR. DEMO:  Well, may be correct.

9          THE COURT:  So, --

10          MR. DEMO:  I think we did hear there's a different

11    possibility from Mr. Nelms.

12          THE COURT:  Well, what is the other possibility?

13          MR. DEMO:  Well, okay.  Understood, Your Honor.

14    Okay.

15          THE COURT:  Okay.

16          MR. DEMO:  So, say we -- assuming we send it to

17    arbitration, --

18          THE COURT:  So that means an arbitration panel is

19    convened, and at some point, many months from now, an

20    arbitration panel will either say yes or no, involuntary, you

21    know, should have gone forward.

22          MR. DEMO:  Okay.

23          THE COURT:  Okay?  Let's say the arbitration panel

24    says no, should not have gone forward.  Then what does the

25    world look like for Highland?

1          MR. DEMO:  I guess, taking it a step back, Your

2  Honor, assuming that this does go to arbitration, it also

3  means that the involuntary petition was not entered.  If the

4  involuntary petition was not entered, which means that the

5  Acis equity did not go to Mr. Terry, it stayed under Neutra,

6  at that point --

7          THE COURT:  Wait, wait, wait.

8          MR. DEMO:  -- you also go into arbitration.

9          THE COURT:  Wait, wait.  Wait, wait.  So you're

10 saying that everything is wiped out in the involuntary, the

11 Acis bankruptcy case?

12         MR. DEMO:  Your Honor, and I do want to be really,

13 honestly, very, very clear about this.  I am -- I am not

14 saying anything.  I'm not -- trying very hard not to draw a

15 legal conclusion.  What I'm saying is that the Board has

16 analyzed this, the Board has applied business --

17         THE COURT:  But I'm trying to understand --

18         MR. DEMO:  -- judgment to this, and that there is a -

19 - there is a possibility.  Now, --

20         THE COURT:  I'm trying --

21         MR. DEMO:  -- obviously, reasonable minds can --

22         THE COURT:  Okay.  Here's where I'm coming from.  And

23 you can tell me if I'm analyzing this incorrectly, in your

24 view.  Okay.  We used to have this terrible Fifth Circuit case

25 -- you know, God help me if this transcript gets sent -- but

156

1  called *Pro-Snax*.  Okay?

2         MR. DEMO:  Okay.

3         THE COURT:  I think the Fifth Circuit has decided

4  itself that it was terrible, so it's not going to come back to

5  haunt me, saying that.  So, *Pro-Snax* said basically the

6  Bankruptcy Court is a Monday-morning quarterback in looking at

7  the reasonableness of fees.  You know, did it provide a

8  benefit to the estate?

9         MR. DEMO:  Uh-huh.

10        THE COURT:  And then that got reversed a few years

11 ago.  I think it was the *Woerner* case -- *Baron & Newburger*

12 *(Woerner)* -- where the Court said, no, you don't do a

13 hindsight look.  You look at, at the time fees were expensed,

14 --

15        MR. DEMO:  Uh-huh.

16        THE COURT:  -- was there something like a reasonable

17 possibility they would benefit the estate?

18        MR. DEMO:  Yes.

19        THE COURT:  Okay?  So I'm looking through it in that

20 lens, so to speak, and I'm like, what benefit to the Highland

21 estate could there be if the confirmation -- well, if the

22 order for relief is unwound or the confirmation order is

23 unwound?  And I'm not there.  I'm not there understanding any

24 benefit for Highland.

25     I can understand a benefit, maybe, for Neutra, although I

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 18-24   Filed 05/22/23   Page 555 of 1539   PageID 17793
Exhibit 24   Page 258 of 189

157

 1  am even hard-pressed to see that, because it looks like years

 2  of more litigation.

 3           MR. DEMO:  And Your Honor, I mean, I do think that

 4  there was -- and again, I'm not going to challenge your legal

 5  conclusions -- I do think that there was evidence that in the

 6  Board's business judgment they did analyze this and they see

 7  it, I think, a little bit differently.

 8           THE COURT:  And I should defer heavily to a Board's

 9  reasonable exercise of business judgment.  I've got trouble.

10  So I'm just trying to --

11           MR. DEMO:  Understood.  And I think, when you look at

12  that business judgment, --

13           THE COURT:  Uh-huh.

14           MR. DEMO:  -- you know, obviously, I don't disagree.

15  I do think that when you have a three-person independent board

16  of this caliber who's come into a difficult situation, has

17  reviewed all of the evidence, talked to all the applicable

18  people, when things happened with the DAF litigation that they

19  didn't like, they took action to stop that.  When they looked

20  at the Winstead appeal and they said, you know, there's not a

21  benefit to the estate here, let's drop they, they dropped it.

22           THE COURT:  But again, work with --

23           MR. DEMO:  When they --

24           THE COURT:  Work with me.  Fifth Circuit reverses the

25  order for relief.  I don't think you have disagreed with

158

1   Lamberson's argument that best-case scenario in that reversal

2   scenario is that an arbitration panel now looks at, should

3   this Acis -- you know, should it have gone forward in a

4   bankruptcy?

5          MR. DEMO:  Well, I guess, Your Honor, then maybe I --

6          THE COURT:  So, in that many --

7          MR. DEMO:  -- I'm not being clear.

8          THE COURT:  -- months, let's say eight months that an

9   arbitration panel takes to decide, what happens during that

10  eight months?

11         MR. DEMO:  Well, then I guess, Your Honor, I need to

12  step back, because I have not -- absolutely not been clear.

13  If it goes to an arbitration panel, our view -- and I think

14  Ms. O'Neil's briefs to the Fifth Circuit are clear on this --

15  the arbitration panel is going to arbiter or arbitrate whether

16  or not there was a fraudulent conveyance.  It's going to

17  arbitrate how to resolve the claims.  It's not going to

18  arbitrate whether or not the involuntary petition should ever

19  have been entered.

20         THE COURT:  Wait, wait.  What does that mean?  Of

21  course.  That's the starting point of it all, right?  The

22  appeal is the Bankruptcy Court wrongly held a trial on the

23  involuntary petition and ordered for relief.  It should have

24  deferred to an arbitration panel to do that.  Isn't that

25  appeal number one that we're talking about?

159

```
 1              MR. DEMO:  Yes, but --

 2              THE COURT:  Neutra's appeal?

 3              MR. DEMO:  Yes, it is.

 4              THE COURT:  Okay.

 5              MR. DEMO:  But I do think there's a nuance.  And I do

 6    want to defer to the pleadings that were filed with the Fifth

 7    Circuit, because I don't want here to get myself out in front

 8    of that Fifth Circuit appeal, because obviously I do very much

 9    want that appeal to go forward.  And maybe we lose and maybe

10    we win, but if we win, I think the --

11              THE COURT:  If Neutra wins.

12              MR. DEMO:  If Neutra wins, one of the outcomes -- and

13    again, I understand that, you know, reasonable minds can

14    differ that there --

15              THE COURT:  Okay.

16              MR. DEMO:  -- of the outcomes.

17              THE COURT:  But one of the outcomes.

18              MR. DEMO:  One of the outcomes is that the

19    involuntary petition is unwound, withdrawn, and the parties go

20    to arbitration on the claims.  If that were to happen, --

21              THE COURT:  Wait.  It's unwound and they go to

22    arbitration on what claims?  The claims in the adversary

23    proceeding that's been filed in Acis?

24              MR. DEMO:  Again, Your Honor, I'm not the appellate

25    lawyer here.  I mean, this is why we are here.
```

160

```
 1          THE COURT:  But how do you skip over the arbitration

 2   of the order for relief?  Because if Joshua Terry, who

 3   commenced it, you know, he has the right now to argue to an

 4   arbitration panel that this should have been in bankruptcy,

 5   right?  He doesn't have to just agree that the adversary

 6   proceeding is now arbitrated.  Right?

 7          MR. DEMO:  Well, again, Your Honor, I don't want to

 8   substitute my judgment for the judgment of the Board.  I think

 9   the judgment of the Board is that there is a scenario and that

10   it's worth exploring and that it's worth the -- what we

11   honestly think is a limited amount of money to explore.

12   Because I think, if we explore that, we explore the

13   possibility, quite honestly, of taking it out of bankruptcy,

14   then, yes, in that scenario, and which we do it think is

15   possible, in that scenario, and call it whatever probability

16   you want, but if you're going to spend half a million dollars

17   to get to a scenario that could reap you -- and I don't want

18   to put a number on it -- but millions of dollars in future

19   revenue, millions of dollars in terms of --

20          THE COURT:  You're melding.  You're collapsing.  And

21   we all know as lawyers that's not how it works.  Things happen

22   sequentially, okay?

23          MR. DEMO:  Okay.  Then I guess, going --

24          THE COURT:  There's a setting aside -- well, there's

25   a reversal of the Bankruptcy Court's issuance of an order for
```

161

1  relief.

2          MR. DEMO:  Okay.

3          THE COURT:  And that means you should have deferred

4  to an arbitration panel, Judge Jernigan.  And so they remand

5  so that I can, consistent with that appellate ruling, say,

6  We're staying the bankruptcy and it's going to arbitration to

7  decide whether an order for relief.  Is there really any

8  realistic scenario where we skip that step?

9          MR. DEMO:  We think that there's a scenario that is

10 worth exploring.

11         THE COURT:  I feel like your colleagues are really

12 dying to chime in because they think they've got the answer to

13 my question, no offense to you.

14         MR. MORRIS:  I really -- I don't, Your Honor, but if

15 I may.

16         THE COURT:  Uh-huh.

17         MR. MORRIS:  I think Ms. O'Neil is the appellate

18 lawyer.  Maybe she should speak on this very precise point, --

19         THE COURT:  Okay.  Because --

20         MR. MORRIS:  -- if that's okay with the Court.

21         THE COURT:  Because I see many miles --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- to go before we sleep if there's a

24 reversal, and I'm trying to figure -- well, you know, we all

25 know that, right?

162

 1              MS. O'NEIL:  Your Honor, if I may.

 2              THE COURT:  Uh-huh.

 3              MS. O'NEIL:  And I did not want to interrupt Mr.

 4    Demo, and he's done a great job, but obviously we've been

 5    involved with the appeal.

 6              THE COURT:  Right.

 7              MS. O'NEIL:  We've prepared the briefs.

 8              THE COURT:  So how does it play out if there's a

 9    reversal in favor of Neutra --

10              MS. O'NEIL:  If I may, Your Honor.

11              THE COURT:  -- of the order for relief?

12              MS. O'NEIL:  The issue on the appeal is not to send

13    the concept to arbitration of the involuntary petitions.

14              THE COURT:  Okay.

15              MS. O'NEIL:  It is that Mr. Terry was not a qualified

16    petitioner because he was bound by an arbitration, a binding

17    arbitration agreement, and that the issue that he -- by

18    proceeding with these involuntary petitions, he commenced a

19    suit, a proceeding that was, at its core, about fraudulent

20    transfers, and that that should have gone to arbitration.  And

21    to proceed and try to engage this Court's jurisdiction on

22    something that he had contractually agreed to go to

23    arbitration on was improper.

24         So, if Neutra wins on that argument, and I would encourage

25    the Court, we -- I think the briefs are in one of the

163

 1 │ exhibits, but certainly I would provide them to the Court

 2 │ before the Court makes a determination if it would help.  If

 3 │ there -- if Neutra wins on that appeal, then our position

 4 │ would be that yes, the bankruptcy is effectively void *ab*

 5 │ *initio*, and that's what we believe the case law supports.

 6 │      Where that would put the parties, potentially -- and

 7 │ again, we're speculating what the Fifth Circuit may or may not

 8 │ due to instruct this Court to do -- could reverse and render,

 9 │ as it were, as Mr. Nelms testified happened to him previously,

10 │ but could instruct this Court to abstain, which I think was --

11 │ and that is one of the various motions and the orders that the

12 │ Court had denied.  All of these are wrapped up in the appeal,

13 │ Your Honor.  And in doing so, instruct the petitioner, Mr.

14 │ Terry, and Acis to go arbitrate the issue of the fraudulent

15 │ transfers.  That would reinstate Acis.  Acis could reinstate

16 │ Highland as the manager of the CLOs.

17 │      THE COURT:  So every single order in the Acis case

18 │ would be null and void?

19 │      MS. O'NEIL:  We believe that the case law is that it

20 │ would be void *ab initio*.  And now, Your Honor, practically

21 │ speaking, --

22 │      THE COURT:  Void *ab initio*?  Okay.  That could only

23 │ -- is that hinged to a subject matter jurisdiction, lack of

24 │ subject matter jurisdiction --

25 │      MS. O'NEIL:  Partially, that's part of the argument.

164

1            THE COURT:  -- theory?

2            MS. O'NEIL:  That's part of the argument.  Yes, Your

3    Honor.

4            THE COURT:  Okay.

5            MS. O'NEIL:  Practically speaking, it is our belief,

6    although it is not clear, is what I've tried to kind of convey

7    to the Court, and in conjunction with this conversation I was

8    trying to have with Mr. Terry's counsel/Acis's counsel, is

9    that we believe Mr. Terry has been paid down.  Practically

10   speaking, if that happens and he's only left with a claim or

11   currently has a claim of $4 million, $4-1/2 million, which is

12   what we think it is, or it's somewhere in that neighborhood,

13   that -- and there's sufficient cash in Acis to pay that claim

14   off -- it is a claim Judge -- Mr. Nelms testified to the fact

15   that it would need to be paid -- then there may not even need

16   to be a fraudulent transfer lawsuit because the claim would --

17   what's left of the claim would just be paid off.  And then

18   Acis -- Neutra would be back in ownership of Acis, Acis would

19   engage Highland to come back in and do what it was doing

20   before, Mr. Terry got his claim paid off, and there we are.

21           THE COURT:  Okay.

22           MR. DEMO:  That's honestly pretty much it, Your

23   Honor.  And we think that -- and the Board thinks that the

24   benefit of pursuing that is worth it, quite honestly.  And

25   they think, in their business judgment, that it's worth paying

165

1    those Neutra fees -- which again, are a portion of the

2    $500,000, only a portion -- because that benefit accrues to

3    the estate, or could accrue to the estate in a situation

4    where, in their business judgment, it's worth going forward on

5    this.

6            THE COURT:  Okay.  The appeal -- okay.  Let me make

7    sure I heard this correctly.  The appeal of the confirmation

8    order, whereas we have Neutra only on the appeal --

9            MR. DEMO:  Correct.

10           THE COURT:  -- of the order for relief, the appeal of

11   the confirmation order is Highland, Neutra, and HCLOF.

12           MR. DEMO:  Correct.

13           THE COURT:  And King & Spalding still represents

14   HCLOF in connection with that appeal.

15           MR. DEMO:  Correct.  And they're the only law firm

16   representing HCLOF in that appeal.

17           THE COURT:  So here's what I'm struggling with.  You

18   know, what initially seemed like kind of a compelling argument

19   -- all the briefing has been done, oral argument is set in

20   March -- it feels like to me the main beneficiaries of a

21   reversal of that confirmation order are HCLOF and Neutra.

22   Foley can represent Neutra.  Neutra can pay.  King & Spalding

23   can represent HCLOF.  HCLOF can pay.  And that seems like the

24   reasonable scenario to me.

25           MR. DEMO:  And I hear that.  But I think -- and I

166

1   think Mr. Nelms --

2           THE COURT:  Because let's --

3           MR. DEMO:  -- testified to it, but --

4           THE COURT:  Work with me.  Let's say they don't

5   reverse the order for relief --

6           MR. DEMO:  Okay.

7           THE COURT:  -- but they do reverse the confirmation

8   order.

9           MR. DEMO:  Okay.

10          THE COURT:  So, Chapter 11 Trustee is in place

11  representing Highland, and he can -- I'm sorry -- he is the

12  spokesperson for the Acis, the controller of the Acis estate.

13  He might go forward with plan number four, five, whatever it

14  would be.

15          MR. DEMO:  Okay.

16          THE COURT:  Or say, I think it's time to convert this

17  to 7.  I mean I'm just trying to figure out --

18          MR. DEMO:  And I guess I do want to go back to one

19  thing, --

20          THE COURT:  Uh-huh.

21          MR. DEMO:  -- because I do not think there is another

22  economic beneficiary that would pay Neutra's fees.  I think if

23  the Debtor is not allowed to pay Neutra's fees, nobody will

24  pay Neutra's fees, and that portion of the appellate argument

25  will fall by the wayside.  Because --

167

```
 1              THE COURT:  So Neutra loses, but I don't see how
 2   Highland loses.  You have not painted a scenario where it's
 3   clear to me there's any economic benefit to the estate.
 4              MR. DEMO:  I would, I would, with all --
 5              THE COURT:  And you're telling me, Defer to the
 6   Board's business judgment.  But I'm --
 7              MR. DEMO:  Well, I --
 8              THE COURT:  I'm concerned that the evidence hasn't
 9   shown me --
10              MR. DEMO:  I would also ask, Your Honor, --
11              THE COURT:  -- all of the --
12              MR. DEMO:  -- in all --
13              THE COURT:  -- scenarios that lead to their
14   reasonable business judgment on this.
15              MR. DEMO:  As Ms. O'Neil just said, I mean, this is
16   above the Fifth -- to the Fifth Circuit.  The Fifth Circuit is
17   set to hear this in six weeks.  And if the Fifth Circuit rules
18   the way that Ms. O'Neil just said, I do think, and I think the
19   Board thinks -- actually, I know the Board thinks -- that
20   there is a tangible benefit to the estate here.  And so I know
21   that I'm asking you to defer to their judgment, --
22              THE COURT:  All I heard was --
23              MR. DEMO:  -- but I'm also asking just for --
24              THE COURT:  -- that they'd reinstate the sub-advisory
25   and shared services agreements.
```

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-24   Filed 09/09/23   Page 566 of 1539   PageID 17804
Exhibit 24   Page 292 of 189

168

```
 1              MR. DEMO:  Which are --

 2              THE COURT:  Which, by the way, Highland moved to

 3    terminate, moved to compel rejection at one point during the

 4    case, and then, when that didn't work, HCLOF started calling

 5    for redemption.

 6              MR. DEMO:  And it's not the --

 7              THE COURT:  This is nuts for me --

 8              MR. DEMO:  It's not -- it's not the -- Your Honor,

 9    it's --

10              THE COURT:  Tell me why it's not nuts for me to think

11    --

12              MR. DEMO:  Because it's not the same Highland.

13              THE COURT:  -- that Highland would be thrilled to

14    have Acis back managing the CLOs and subcontracting with

15    Highland.  I mean, that --

16              MR. DEMO:  It's not, it's not the same Highland.  The

17    stuff that happened prior to the institution of the Board was

18    the stuff that happened prior to the institution of the Board.

19    There is new management of Highland.  That new management is

20    working very hard.  As you've seen, Your Honor, that new

21    management is willing to push back.  That new management, with

22    the DAF, which you've heard testimony of, that new management

23    is working to get that motion withdrawn.  That new management

24    is not going forward with Lynn Pinker because of actions that

25    it took that it thought subverted their control and their
```

169

1   management of the Debtor.  The new management decided to drop

2   an appeal that they did not think had any merit.

3        It's not the same Debtor, Your Honor.  It is a board

4   consisting of three highly-qualified people who are exercising

5   their own judgment.  So all of that stuff that happened prior

6   to January 9th, I don't want to say hey, it's a clear line in

7   the sand, but it is.  Mr. Dondero is not in control of

8   Highland Capital Management.

9             THE COURT:  But he is in control of Neutra.

10            MR. DEMO:  He is the economic beneficiary of Neutra.

11   That is correct.  But Mr. Dondero did tell Mr. Nelms, as Mr.

12   Nelms testified, that he would reinstate those contracts.  And

13   I understand that.  But again, as you've seen, Mr. Nelms and

14   the Board have been able to push back, have been able to exert

15   control, to exert influence, and to exert management over an

16   institution that is very difficult to manage.

17        And I do think that deference to that is something that

18   should very much be considered, because it's very easy to

19   think of this as Old Highland, but this is New Highland, who

20   has done an independent, objective review of these claims, who

21   has sat with Ms. O'Neil, who has sat with Pachulski, who has

22   sat with Mr. Terry and Ms. Patel and talked about this stuff,

23   and still thinks that there is a benefit here to the estate,

24   and that spending the $500,000 to pursue that benefit, which

25   is not just a benefit to Highland but it's a benefit to

170

 1   Highland other -- to Highland's other creditors, I guess, Your

 2   Honor, quite honestly, I would ask that you to defer to that

 3   new management, because it is not -- it is not Old Highland.

 4       All that stuff that people have talked about -- I mean,

 5   you've seen today in court, you've heard testimony about very

 6   qualified people working to stop that and working to put this

 7   estate into a position where it can reorganize, where it can

 8   come to agreements with its creditors, where it can work

 9   through this process, where it can come out the other side.

10       But if we take away that Board's ability to manage

11   litigation with one of their biggest creditors, whose

12   litigation claim keeps growing, all you're doing is

13   benefitting that one creditor, not to the detriment of Mr.

14   Dondero but to the detriment of the other creditors in this

15   case.

16       UBS has a claim.  Redeemer has a claim.  Meta-e has a

17   claim.  McKool's has a claim.  You can run through that whole

18   list.  And if you take away the Board's right to direct

19   litigation that is going directly to the Board's ability to

20   control runaway claims, to negotiate with creditors, and to

21   come up with an idea of how to split the pie, then, with all

22   respect, Your Honor, you are infringing on that Board's

23   business judgment and that Board's ability to reorganize this

24   case.

25       This case isn't just about --

171

1          THE COURT:  It wouldn't be taking away.  And here is

2    a nuance that -- I think it is perfectly reasonable, in case

3    you don't know where I'm heading on this, for Foley to

4    represent Highland in the Acis case, in that adversary

5    proceeding, if it goes forward, because heck yeah, Highland

6    has been sued for huge amounts of money.

7          MR. DEMO:  Understood.

8          THE COURT:  Their claim, that is many millions, has

9    been objected to.  So, heck yeah, this estate needs good

10   representation of Highland in that case, where there are many

11   unresolved issues still in the Acis case.

12      But on the appeal, I am just still lost as to how there is

13   any chance in the world Highland benefits in those appeals.

14   Neutra, heck yeah.  Maybe they get their Acis back and can

15   instruct it to, you know, stop suing Highland or whatever.

16   Dondero controlling Neutra can do that.  Okay?  And HCLOF, it

17   doesn't want Acis to have anything to do anymore with managing

18   its equity piece of those CLOs.  Sure.  But how -- I mean,

19   you're telling me that there could be a scenario -- here's

20   what I'm hearing.  That there is a benefit in having all those

21   fraudulent transfer claims arbitrated, I guess, not litigated

22   in the Bankruptcy or District Court, and there's a benefit in

23   having all of the management agreements, portfolio management

24   agreements reinstated.  And I just, I don't see how that

25   happens anytime soon based on how I perceive a reversal of

172

1   orders on appeal happening.

2        MR. DEMO:  And I guess I don't know what else to say

3   on that point.  We do think there's a $12 million tangible

4   benefit to reinstating those contracts.  We think there's a

5   tangible benefit to allowing Neutra to go forward with its

6   appeal.  And again, there is nobody else who I think would pay

7   that freight besides the Debtor, because that benefit, we

8   believe, goes to the Debtor.

9        THE COURT:  How many years of life are there left on

10   the CLOs that Acis manages?

11        MR. DEMO:  I would have to check, Your Honor.  I

12   don't know off the top of my head.  I can ask.  But --

13        THE COURT:  I mean, you're saying $12 million.  I

14   mean, I don't --

15        MR. DEMO:  I, you know, --

16        THE COURT:  There's not a -- I'm just not sure where

17   that number is coming from.  I never heard direct evidence of

18   that.

19        MR. DEMO:  Okay.  Well, I guess, Your Honor, I mean,

20   again, I would just ask that you defer to the business

21   judgment of the Board and allow them to position this

22   litigation in a way that best enables them to deal with every

23   creditor's claim, and not just the claims of one creditor.

24   And if they cannot fight the claims of the creditor, then they

25   can't negotiate how that pot is going to be split in a fashion

173

1    that benefits everybody.

2        So I guess, Your Honor, I mean, I don't know what else to

3    say about the benefits of the Neutra appeal except that the

4    testimony, I think, speaks for itself.  But, you know, I --

5    and in terms of --

6            THE COURT:  Again, fight the claim of a creditor.

7    Foley can represent Highland in the adversary proceeding,

8    wherever that goes forward.

9            MR. DEMO:  Yeah.

10           THE COURT:  Probably District Court, not this Court.

11   At least some of it, if not all of it.  But anyway, I'm

12   digressing.  They can object to Acis's proof of claim.  They

13   can object to Terry's proof of claim.  I mean, --

14           MR. DEMO:  And conversely, Your Honor, if -- if --

15           THE COURT:  -- this has nothing to do with -- I mean,

16   I don't get the appeal.  I mean, I --

17           MR. DEMO:  Right.

18           THE COURT:  Neutra can appeal, HCLOF can appeal, but

19   I'm not seeing the benefit to Highland.

20           MR. DEMO:  And I guess the only thing I would say,

21   Your Honor, is if there is an improper benefit, we are not

22   saying that the fee applications are sacrosanct.  People can

23   challenge the improper benefit there.

24       And again, the settlement gave broad discretion to the

25   Committee to pursue insider claims.  So if an insider is

174

1  receiving a benefit from this, the Committee has standing to

2  pursue that.

3      So it's not a null set, Your Honor, whereas cutting off

4  the appeal now does take away that possibility.

5          THE COURT:  How would I be cutting off the appeal?

6  I'm not cutting off the appeal.  King & Spalding can go in

7  there and fight hard.  Foley can go in there and fight hard

8  for Neutra.  So, --

9          MR. DEMO:  One second, Your Honor.

10     (Counsel confer.)

11         MR. DEMO:  And I guess, you know, Your Honor, and I

12 do want to reiterate that there is no other party with an

13 economic incentive to fight the Neutra appeal the way that the

14 Debtor has an economic incentive.

15         THE COURT:  That makes no sense to me.  HCLOF is the

16 one who hated this injunction.

17         MR. DEMO:  That's not the Neutra appeal, Your Honor.

18 That's the confirmation order.

19         THE COURT:  Well, okay.  Neutra gets its company back

20 if they win.

21         MR. DEMO:  And we would get our contracts back.

22         THE COURT:  And arguably, it can control Acis, maybe,

23 okay, and it can assign management contracts to whoever it

24 wants.  That just -- and it says it'll assign them to

25 Highland.  If you can trust Jim Dondero, then Highland's going

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-24   Filed 12/27/23   Page 573 of 1539   PageID 17811
Exhibit 24   Page 2762 of 189

175

 1   to benefit if Neutra wins that appeal.  Right?

 2              MR. DEMO:  Yes.  Yes, Your Honor.

 3              THE COURT:  Okay.  So that --

 4              MR. DEMO:  Highland would benefit greatly --

 5              THE COURT:  Okay.

 6              MR. DEMO:  -- if Neutra were to win that appeal.

 7              THE COURT:  Okay.  Okay.  Well, but first Neutra

 8   benefits, right?  And then --

 9              MR. DEMO:  No.

10              THE COURT:  -- Highland only secondarily benefits --

11              MR. DEMO:  I -- I --

12              THE COURT:  -- if Jim Dondero keeps his word and

13   gives the management contracts back to Highland.

14              MR. DEMO:  Jim Dondero would also have to repay the

15   $8 million in claim, even if he didn't reinstate those

16   contracts.  And that $8 million would be hundred-cent dollars.

17              THE COURT:  Okay.

18              MR. DEMO:  So, worst case, --

19              THE COURT:  It would have been nice to have him

20   testify as to all of this.

21              MR. DEMO:  Worst --

22              THE COURT:  It would be more compelling if I had him.

23              MR. DEMO:  Well, --

24              THE COURT:  Okay?  But I don't think --

25              MR. DEMO:  -- I can only do so much, Your Honor.

176

 1              THE COURT:  -- that's going to happen anytime soon.

 2              MR. DEMO:  But I guess worst-case scenario is that

 3      it's $8 million in hundred-cent dollars.

 4              THE COURT:  Okay.

 5              MR. DEMO:  And that's not nothing for $500,000.  And

 6      only a portion of that $500,000.

 7              THE COURT:  Okay.

 8              MR. DEMO:  Thank you, Your Honor.

 9              THE COURT:  Okay.  Mr. Lamberson?

10              MR. LAMBERSON:  Your Honor, do you want a closing

11      from me?  Or no?

12              THE COURT:  I don't really need it.  Thank you.

13              MR. LAMBERSON:  Okay.

14              THE COURT:  Okay.

15              MR. LAMBERSON:  Because I know your hearing starts in

16      about two minutes.

17              THE COURT:  All right.  So, I just hate it that we

18      spent so much time on this.  I hate it that we spent so much

19      time, but, I mean, I understand.  I understand.  You know, I

20      think the employment application was filed pretty early in the

21      case, right, and -- October 29th.  And it was continued,

22      continued, continued, because we were getting objections from

23      the Committee, or they wanted time to look at it, I guess.

24      And now you're kind of up against the wire, right, because

25      oral arguments are set at the Fifth Circuit next month.  So I,

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 18-24    Filed 12/28/23    Page 575 of 1539    PageID 17813
Exhibit 24    Page 278 of 189

177

1   you know, I hate it that we were here, but I understand it.

2       But I'm concerned.  I'm concerned -- well, here's the

3   deal.  We have a great board, and I totally get that

4   Bankruptcy Courts should defer heavily to the reasonable

5   exercise of business judgment by a board.  And we've got great

6   professionals.  And we've got this case, I think, on a good

7   track as a general matter now.  But I'm concerned that Dondero

8   or certain in-house counsel has -- you know, they're smart,

9   they're persuasive -- that -- what are the words I want to

10  look for -- they have exercised their powers of persuasion or

11  whatever to make the Board and the professionals think that

12  there is some valid prospect of benefit to Highland with these

13  appeals, when it's really all about Neutra, HCLOF, and Mr.

14  Dondero.  That's what I believe.

15      I mean, this is awkward, right, because you want to defer

16  to the debtor-in-possession, but I have this long history, and

17  I can think through the scenarios.  If this is reversed, here

18  is how it will play out.  If this is reversed, here is how it

19  might play out.  And I know, you know, there are multiple ways

20  it might play out, but I cannot believe there is a chance in

21  the world there is economic benefit to Highland if these

22  things get reversed.  Economic benefit to Neutra:  Yeah,

23  maybe.  Economic benefit to HCLOF:  Well, they'll get what

24  they want.  You know, whether it's an economic benefit, I

25  don't know.  But benefit to Highland?  I just don't think the

178

1  evidence has been there to convince me it's reasonable

2  business judgment for Highland to pay the legal fees

3  associated with the appeal.

4      And even more concerning to me is a valid point was made

5  that Highland is in bankruptcy because of litigation,

6  litigation, litigation.  The past officers and directors and

7  controls' propensity to fight about everything.  This isn't a

8  balance sheet restructuring, okay?  It's not a Chapter 11

9  caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13     Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18     So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

179

1    that's my ruling.

2        I will additionally rule, for the avoidance of doubt, that

3    if Foley wants to represent Neutra in the appeals and get paid

4    by Neutra, I don't have any problem with that.  In other

5    words, I'm not going to find something like there's a conflict

6    with the estate, you know, because of its simultaneous

7    representation of Neutra.  That's fine.  But I'm not going to

8    approve Highland paying anything in connection with either of

9    those appeals.  So that is the ruling of the Court.

10       Have I left any gaps here?

11           MR. DEMO:  Your Honor, just one clarification.

12           THE COURT:  Uh-huh.

13           MR. DEMO:  Foley is representing Highland Capital

14   Management in the appeal of the confirmation order to the

15   Fifth Circuit.  I just want to clarify that your ruling that

16   Highland can represent -- I'm sorry -- Foley can represent

17   Highland in all Acis matters extends to their representation

18   of Highland Capital Management in the appeal of the

19   confirmation order that's set for March 30th.

20           THE COURT:  Okay.  Let me think through that.

21           MR. DEMO:  And again, Your Honor, there's been no

22   objection to that.

23           THE COURT:  King & Spalding is in there representing

24   HCLOF.  Foley would be representing both Neutra and Highland

25   in connection with the confirmation order?

180

1            MR. DEMO:  Technically, but Neutra really has

2    nothing.  It's a coattail party in that case.  Highland

3    Capital Management, to the extent that they could bifurcate

4    Neutra, it would still be doing the exact same work.  So if

5    there is an issue there with the representation of Neutra,

6    we'd still ask that Foley be allowed to represent Highland

7    Capital Management in that appeal.

8            THE COURT:  Okay.  So you're telling me Neutra

9    doesn't really benefit from that appeal, so you want Highland

10   to pay all of the fees of Foley in connection with the

11   confirmation order appeal?

12           MR. DEMO:  All I'm asking, Your Honor, is that Foley

13   can represent Highland Capital Management in that appeal.  And

14   again, there's been no objection to that.  What happens with

15   Neutra, I, you know, I understand your position.  I am simply

16   asking for a clarification that Foley can continue

17   representing the Debtor in the Debtor's appeal of the

18   confirmation order.

19           THE COURT:  All right.  I will say yes to that, but

20   they need to be prepared to have their fees split.  I'm not

21   saying 50/50, I don't know what the percentage is, but they

22   are going to be allocated between Neutra and Highland, and

23   they should not expect to get a hundred percent of those

24   covered by Highland at the end of the day.  Okay?  There's

25   going to be a deep dive into looking at how that allocation

181

```
 1    should work, okay?

 2              MR. DEMO:  And they will be filing fee apps,

 3    obviously, on all of the matters that they are --

 4              THE COURT:  Okay.  Anything else?

 5              MR. POMERANTZ:  One moment, Your Honor.

 6              THE COURT:  Okay.

 7         (Pause.)

 8              MR. DEMO:  Yeah.  And Your Honor, I do just want to

 9    clarify that when we talk about the involuntary petition

10    appeal, that when we talk about its effect on the fraudulent

11    conveyance action, to the extent that -- and I would like to

12    clarify your position on this, Your Honor.  Is your position

13    that the appeal of the involuntary, if successful, would have

14    no impact on the fraudulent conveyance actions in the Acis

15    litigation?

16         Because I do think that it is clear that --

17              THE COURT:  I think we don't know.  We would have to

18    see --

19              MR. DEMO:  And I guess that's -- that's --

20              THE COURT:  -- what the Fifth Circuit states.

21              MR. DEMO:  And my --

22              THE COURT:  And it may be:  Bankruptcy Court, stay

23    the proceedings and defer, send it to arbitration.  "It" being

24    re-litigation of --

25              MR. DEMO:  Understood.
```

182

1         THE COURT:  -- the involuntary.

2         MR. DEMO:  And --

3         THE COURT:  That may be, to me, a likely scenario,

4  but maybe not.

5         MR. DEMO:  And -- and --

6         THE COURT:  Maybe they'll say something else.

7         MR. DEMO:  Understood.  And I think we're honestly on

8  the same page with that.

9         THE COURT:  Uh-huh.

10        MR. DEMO:  Because to the extent that it does put it

11  into arbitration, to the extent that there is that

12  possibility, that it changes the color of those fraudulent

13  conveyance claims, changes the color of Acis's $300 million

14  proof of claim, which goes to settlement strategy, which goes

15  to the benefits to other creditors, which goes to a whole

16  panoply of other things that tie into a benefit to the estate.

17  And I don't want to re-argue what we've already argued, but I

18  think, as Your Honor said, that chance that there is going to

19  be a change to the fraudulent conveyance, either because it

20  throws them into an arbitration or because it somehow

21  otherwise colors it, is, in and of itself, a substantial

22  benefit to the estate -- leaving aside the dollars from the

23  contracts, leaving aside the $8 million proof of claim --

24  because that benefit goes to, again, that $300 million proof

25  of claim that Acis has filed, which impacts the estate, which

183

 1   impacts other creditors, and which impacts the settlement

 2   mechanics in this case.

 3       So to the extent that there is a chance that the

 4   involuntary changes that and recolors it, there is a

 5   substantial benefit to the estate in that, because it allows

 6   the estate to work with creditors --

 7             THE COURT:  I mean, --

 8             MR. DEMO:  -- to figure out a way to settle claims in

 9   a way that are --

10             THE COURT:  I get what you're saying, but guess what?

11   You can object to that $300 million proof of claim.  And we

12   might have a very interesting conversation about --

13             MR. DEMO:  What --

14             THE COURT:  Well, it's the same judge either way, but

15   -- well, I guess I don't get what you're saying.  You have the

16   ability to object to the proof of claim whether there's

17   affirmance or --

18             MR. DEMO:  Yeah.  But --

19             THE COURT:  -- reversal, right?  I'm just --

20             MR. DEMO:  We don't have a -- you know, we may not

21   have to get -- I'm sorry, Your Honor, and I'll stop it -- but

22   we may not have to get there.  Objecting to the proof of claim

23   is quali... it is quantitatively and qualitatively different

24   than a Fifth Circuit order saying that there are changes to

25   the fraudulent conveyance, there are changes to the

184

 1   distribution of equity under the plan.  Maybe there is no plan
 2   -- or maybe there is no bankruptcy at all.
 3        Those things fundamentally change the dynamics of this
 4   case in a way that's good for the estate.  And those things
 5   can only happen if there's an order from the Fifth Circuit
 6   entering that.  We can object all down the pipe, and we are
 7   going to object, Your Honor, and I assume other people will
 8   object as well.  But our objecting does not have the same
 9   benefit to the estate as a Fifth Circuit opinion saying,
10   Fraudulent conveyance claims go to arbitration; saying, There
11   is no involuntary petition.
12        Now, I understand that there are questions as to the
13   probability of those things, but the fact that there is a
14   probability of those things happening and the cost to the
15   estate is a hundred thousand dollars, I understand what Your
16   Honor has said and I don't want to overstay my welcome, but I
17   do think we are -- at least maybe I am presenting it wrong --
18   but that Fifth Circuit order either way is going to calcify
19   and solidify this in ways that are beneficial to the estate
20   and beneficial to how this bankruptcy is going to progress.
21             THE COURT:  Okay.  I understand you feel passionately
22   about that, but just so you know, for future purposes or not,
23   I'm not there because, you know, among other things, we -- you
24   know, life has changed.  You know, if the Fifth Circuit says
25   reversal, not a darn thing should happen in a bankruptcy case

185

```
 1   of Acis, you know, it can all go to arbitration, well, that's

 2   the Acis litigation, right?  But Acis has filed a proof of

 3   claim now.  And are you going to tell me the Fifth Circuit is

 4   going to say the arbitration that should have happened in the

 5   earlier Acis case trumps, if you will, adjudication of a proof

 6   of claim now in a new case?

 7           MR. DEMO:  And the claims are --

 8           THE COURT:  I mean, I'm just -- someone mentioned

 9   Gandy and National Gypsum, and there's even a more recent

10   Fifth Circuit case dealing with arbitration which --

11           MR. DEMO:  The claims, Your Honor, are state law

12   claims if there's no bankruptcy, and I think --

13           THE COURT:  But there is a bankruptcy.  There's a

14   Highland bankruptcy now.  And there's a proof of claim --

15           MR. DEMO:  Not if the Fifth Circuit --

16           THE COURT:  -- in the Highland case.

17           MR. DEMO:  -- overturns the involuntary petition.

18           THE COURT:  Yeah.  I just -- okay.  We're just, we're

19   having academic conversations, and I'm probably guilty for

20   going down this trail.  So, anyway, is there anything further,

21   then?

22           MR. LAMBERSON:  No, Your Honor.

23           THE COURT:  I need a few orders.

24           MR. LAMBERSON:  If they want to prepare an order and

25   send it to us, we're happy to look --
```

186

```
 1          THE COURT:  Okay.  Thank you all.

 2       (Proceedings concluded at 1:44 p.m.)

 3                       --oOo--

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                    02/20/2020

24   _____    _____

25   Kathy Rehling, CETD-444                     Date
     Certified Electronic Court Transcriber
```

187

INDEX

PROCEEDINGS                                                              4

WITNESSES

Debtors' Witnesses

Russell F. Nelms
- Direct Examination by Mr. Morris                                      57
- Cross-Examination by Mr. Lamberson                                    80
- Redirect Examination by Mr. Morris                                  109

Holland O'Neil
- Direct Testimony via Declaration                                    115
- Cross-Examination by Ms. Patel                                      115
- Redirect Examination by Mr. Morris                                  147

EXHIBITS

Debtor's Exhibits                         Identified Received

1 through 9                                      57        57

Acis Capital Management GP's Exhibits     Identified Received

16    Top 20 List of Creditors                   99       100
27    DAF Lawsuit                                104       105

RULINGS

Motion to Compromise Controversy with Official Committee    8
of Unsecured Creditors filed by Debtor Highland Capital
Management, L.P. (carryover issues) (281) - *Revised
Operating Protocols to be Submitted*

Lynn Pinker Retention Application - *Withdrawn*            8

Foreign Representative Motion - *Order Signed*            10

Motion to Extend Exclusivity Period filed by Debtor       11
Highland Capital Management, L.P. (395)- *Order Signed*

Debtor's Motion for an Order (i) Establishing Bar Dates   13
for Filing Claims, Including 503(b)(9) Claims; and (ii)
Approving the Form and Manner of Notice Thereof (421) -
*Agreed Order to be Uploaded*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

188

1                                   INDEX
                                   Page 2
2
       RULINGS, cont'd.
3
       Motion for Relief from Stay by Creditor PensionDanmark      14
4      (218) - *Continued to March 11, 2020*

5      Status Conference Re: Motion of the Debtor for the Entry    28
       of an Order Concerning the "Sealing Motion" and for a
6      Conference Concerning the Substance, Scope, and Intent
       of Certain Recent Rulings (397)
7
       Motion to Employ/Retain Foley Gardere, Foley & Lardner     176
8      LLP as Special Texas Counsel filed by Highland Capital
       Management, L.P. (68)
9
       END OF PROCEEDINGS                                         186
10
       INDEX                                                  187-188
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 25

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

IN RE:                    .     Case No. 19-34054-11(SGJ)
                          .
HIGHLAND CAPITAL          .     Earle Cabell Federal Building
MANAGEMENT, L.P.,         .     1100 Commerce Street
                          .     Dallas, TX  75242-1496
          Debtor.         .     March 4, 2020
. . . . . . . . . . . . . ..    1:31 p.m.


 TRANSCRIPT OF HEARING ON MOTION OF THE DEBTOR FOR ENTRY OF AN
   ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE
          DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"
             BEFORE HONORABLE STACEY G. JERNIGAN
             UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Highland Capital       Pachulski Stang Ziehl & Jones, LLP
Management:                By:  JEFF POMERANTZ, ESQ.
                                GREG DEMO, ESQ.
                           10100 Santa Monica Blvd., 13th Floor
                           Los Angeles, CA 90067


                           Hayward & Associates PLLC
                           By:  MELISSA HAYWARD, ESQ.
                                ZACHARY ANNABLE, ESQ.
                           10501 N. Central Expry, Ste. 106
                           Dallas, TX 75231


Audio Operator:            Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
             produced by a transcript service.

_____

              J&J COURT TRANSCRIBERS, INC.
                   268 Evergreen Avenue
                Hamilton, New Jersey 08619
                E-mail:  jjcourt@jjcourt.com

          (609) 586-2311    Fax No. (609) 587-3599

APPEARANCES (Cont'd):

| | |
|---|---|
| For Acis Capital Capital Management: | Winstead, P.C. By: RAKHEE V. PATEL, ESQ. 2728 N. Harwood Street, Suite 500 Dallas, TX 75201 |
| | Rogge Dunn Group, PC By: BRIAN SHAW, ESQ. 500 N. Akard St., Suite 1900 Dallas, TX 75201 |
| For Official Committee of Unsecured Creditors: | Sidley Austin LLP By: MATT CLEMENTE, ESQ. DENNIS TWOMEY, ESQ. One South Dearborn Chicago, IL 60603 |
| | Sidley Austin LLP By: PENNY REID, ESQ. 2021 McKinney Avenue, Suite 2000 Dallas, TX 75201 |
| For CalPERS: | Singer & Levick, P.C. By: MICHELLE SHRIRO, ESQ. 16200 Addison Road, Suite 140 Addison, TX 75001 |
| For James Dondero: | Lynn, Pinker, Cox & Hurst, LLP By: MICHAEL LYNN, ESQ. JOHN BOND, ESQ. 2100 Ross Avenue, Suite 2700 Dallas, Texas 75201 |
| For Redeemer Committee: | Frost Brown Todd LLC By: MARK PLATT, ESQ. 100 Crescent Court, Suite 350 Dallas, TX 75201 |
| For Issuers Group: | Jones Walker LLP By: AMY ANDERSON, ESQ. 811 Main Street, Suite 2900 Houston, TX 77002 |

3

APPEARANCES (Cont'd):

TELEPHONIC APPEARANCES:

For CalPERS:              Nixon Peabody, P.C.
                         By:  LOUIS CISZ, ESQ.
                         One Embarcadero Center, 32nd Floor
                         San Francisco, CA 94111

                              - - -

4

**INDEX**

| WITNESSES | PAGE |
|---|---|
| **JAMES P. SEERY, JR.** | |
| Direct Examination by Ms. Hayward | 60 |
| Cross-examination by Ms. Reid | 84 |
| Cross-examination by Ms. Patel | 97 |
| Examination by the Court | 103 |
| | |
| Closing argument by Mr. Pomerantz | 110 |
| Closing argument by Mr. Clemente | 113 |

| EXHIBITS | | ID | EVID |
|---|---|---|---|
| **FOR THE DEBTOR:** | | | |
| 1 | Chart of Dynamic Income Fund structure | | 83 |
| 2 | Partnership agreement for Dynamic Income Fund | | 83 |
| 3 | Chart of Latin America Argentina Fund | | 83 |
| 4 | Partnership agreement for Argentina Fund | | 83 |
| 5 | Chart Fund | | 83 |
| 6 | Limited partnership agreement | | 83 |
| 7 | Order re ordinary course governance procedures | | 83 |
| 8 | Final term sheet | | 83 |
| 9 | Notice of amended operating protocols | | 83 |
| | CVs of Board members | | 83 |

5

1          THE COURT:  -- set a motion of the debtor for entry

2   of an order authorizing but not directing the debtor to cause

3   distributions to certain related entities.

4          Let's get lawyer appearances in the courtroom.

5          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

6   Pomerantz and Greg Demo, Pachulski Stang Ziehl & Jones, on

7   behalf of the debtors.

8          THE COURT:  Thank you.

9          MS. HAYWARD:  Good afternoon, Your Honor.  Melissa

10  Hayward and Zachary Annable of Hayward & Associates on behalf

11  of the debtor.

12         THE COURT:  Thank you.

13         MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

14  Clemente, Dennis Twomey, and Penny Reid from Sidley Austin on

15  behalf of the Official Committee of Unsecured Creditors.

16         THE COURT:  Thank you.

17         MS. SHRIRO:  Good afternoon, Your Honor.  Michelle

18  Shriro on behalf of CalPERS.  And I also have my co-counsel

19  Louis Cisz from Nixon Peabody, and he is -- he should be on the

20  line.

21         THE COURT:  Okay.  Thank you.

22         MR. LYNN:  Good afternoon, Your Honor.  Michel Lynn

23  and John Bonds for James Dundero.

24         THE COURT:  Okay.  Thank you.

25         MS. PATEL:  Good afternoon, Your Honor.  Rakhee

**WWW.JJCOURT.COM**

6

1  Patel, Winstead PC, on behalf of Acis Capital Management, LP,

2  and Acis Capital Management, GP, LLC.  Also, I have my co-

3  counsel Mr. Brian Shaw of the Rogge Dunn Firm on behalf of the

4  same clients.

5            THE COURT:  Thank you.

6            MR. PLATT:  Good afternoon, Your Honor.  Mark Platt

7  firm Frost Brown Todd on behalf of the Redeemer Committee of

8  the Highland Crusader Fund.  And I believe Terry Mascherin is

9  on the phone, as well --

10           THE COURT:  All right.

11           MR. PLATT:  -- from Jenner & Block.

12           THE COURT:  Thank you.

13           MS. ANDERSON:  Good afternoon, Your Honor.  Amy

14  Anderson with Jones Walker on behalf of the Issuers.  I believe

15  Mr. James Bentley with Schulte Roth is also on the phone on

16  behalf of the same parties.

17           THE COURT:  Okay.  Thank you.

18           All right.  We do have a large number of people on

19  the phone.  I'm just going to go through the live lines and

20  take roll.  Asif Attarwalla for UBS, are you there?

21           MR. ATTARWALLA:  Here.  Yes, Your Honor.

22           THE COURT:  All right.  James Bentley?

23           MR. BENTLEY:  Yes, Your Honor.  I'm here.

24           THE COURT:  Okay.  Also Jeff Bjork from Latham?

25  Yes/no?

7

```
 1                        (No response)
 2            THE COURT:  All right.  Earnestiena Cheng for FTI?
 3            MS. CHENG:  Yes, Your Honor.
 4            THE COURT:  Okay, thank you.  And Louis Cisz, I think
 5   we heard he was CalPERS co-counsel.  Are you there?
 6            MR. CISZ:  Yes, I am, Your Honor.
 7            THE COURT:  All right.  Thank you.  Kimberly Gianis
 8   for Contrarian?  Yes/no?
 9                        (No response)
10            THE COURT:  All right.  Terry Mascherin, I think we
11   heard he was there for the Redeemer Committee.
12            MR. MASCHERIN:  Yes, Your Honor.
13            THE COURT:  Okay.  I'll just ask anyone else on the
14   phone who wishes to appear, go ahead at this time.
15                        (No response)
16            THE COURT:  All right.  That may be it.
17            All right.  Mr. Pomerantz, I see a 20-minute time
18   estimate on our calendar.  I'm not sure where that came from,
19   but that --
20            MR. POMERANTZ:  I think that's quite aggressive.
21            THE COURT:  Okay.
22            MR. POMERANTZ:  Good afternoon again, Your Honor.
23   Jeff Pomerantz, Pachulski Stang Ziehl & Jones.  First, I want
24   to thank Your Honor for scheduling the hearing on shortened
25   time.  I would also like to introduce once again the three
```

8

1  members of the independent board who have been appointed

2  pursuant to the settlement, Your Honor, that Your Honor

3  approved on January 9th.  That's James Seery, John Dubel, and

4  Russell Nelms.

5          THE COURT:  Okay.  Hello.

6          MR. POMERANTZ:  I thought it might be helpful, Your

7  Honor, to provide Your Honor with a brief background of each

8  board member, how they have been approaching their duties as

9  independent directors, and what the focus has been the first

10 two months of the case.  And then I will go into the background

11 of this present motion.

12         THE COURT:  Okay.

13         MR. POMERANTZ:  James Seery will be the debtor's

14 witness at today's hearing, and he's a 30-year restructuring

15 lawyer with extensive experience with high-yield and distressed

16 investing both as a principal and manager which is precisely

17 the business in which the debtors operate.  He is an attorney

18 licensed to practice in New York who has passed and held the

19 Series 7, 63, 79, SIE and Series 24 FINRA principal

20 designations.

21         From April 2012 to 2017, he was the president and

22 senior investing manager of RiverBirch Capital.  And RiverBirch

23 is an SEC-registered investment advisor managing a $1.3 billion

24 global long short fund that focused on high yield loans, bonds,

25 CLOs, and distressed investments.  Prior to that, Mr. Seery

9

1    spent ten years as a senior high yield manager at Lehman

2    Brothers, and he was the global head of Lehman Brothers fixed-

3    income loan business.

4          Accordingly, Mr. Seery brings to his role as an

5    independent director a unique combination of a legal

6    background, restructuring experience, and a deep knowledge of

7    the highly regulated business in which the debtor operates.

8          Mr. Dubel brings 35 years' practice in the

9    restructuring area.  His experience includes turnaround

10   management, crisis management, operational restructurings, and

11   corporate acquisitions and divestitures.  He's worked at both

12   sides of the table, both on the company side and other side.

13   And he brings a unique perspective to each situation, and he

14   spent the last ten years being an independent director for a

15   wide range of distressed companies including Purdue Pharma

16   which obviously is the newest in current Chapter 11, WMC

17   Mortgage, Wartaco (phonetic), FXI, and ResCap.

18         And as an independent board member, he's plated a

19   principle role in overseeing management, negotiating with

20   creditors, supervising and investigating resolution, either

21   consensually or through litigation of insider and affiliate

22   claims, and also spearheading reorganization efforts.

23         I'm sure Your Honor is familiar with Russell Nelms

24   but briefly he was a distinguished bankruptcy litigator with

25   Carrington Coleman for 20 years which followed a stint of six

10

years as a United States Army judge advocate, and also he sat

with the bankruptcy court here in Fort Worth from 2004 to 2018.

Your Honor, these individuals bring a complementary

skill set to the independent board that have made them uniquely

qualified to manage the debtor's restructuring efforts in this

case, that bring a combination of sophisticated asset

management experience, financial restructuring, a legal

insolvency background, and judicial experience.  They've been

involved in many cases on all sides of the aisle, whether it's

been alleged wrongdoing or questionable conduct with people

they've ever had to supervise as a board member, advise as a

restructuring lawyer, work with as a financial advisor, or

administer their cases as a judge.

Mr. Seery and Dubel were selected by the Committee

not only because of their relevant expertise but because of

their commitment to independence and ability to stand up to

strong personalities that exist on all sides of this case.  Mr.

Nelms, while originally identified by the debtor, was scheduled

by the Committee, and was ultimately chosen to be the third

board member by Mr. Seery and Dubel from a group of highly-

qualified candidates.

Your Honor, I provide this background to stress that

the independent board consists of individuals whose background

and experience speak to their independence, experience, and

strength, and who take their job seriously to do what they

11

1 believe is right for this debtor, and they're not bring

2 influenced by any party in this case, be that the debtor, Jim

3 Dondero, members of the management committee, members of the

4 debtor's management, or the creditors' committee.  The

5 reputations of each of these gentlemen at are stake in a case

6 like this, and they take their attendance very seriously.

7          Upon taking over on January 9th, 2020, the board

8 quickly made a few observations about the current circumstances

9 that have guided their actions today.  First, the board

10 understood that the debtor was where it was in part due to many

11 years of intense litigation arising out of sometimes aggressive

12 management decisions or failure to settle certain employee

13 disputes and that the litigation led to cost and diversion of

14 time and energy for what the debtor did best which was manage

15 assets.

16          The board concluded that for case to succeed, the

17 board would have to chance the culture from one of litigation

18 to reconciliation and consensus building.  It doesn't mean that

19 the debtor will back down from defending itself from claims

20 that it doesn't believe are legitimate but rather the

21 litigation that the company under their watch would be involved

22 in would need to be carefully vetted by the independent board,

23 outside advisors, and the results of which would guide the

24 board's conduct.

25          The board's focus has and continues to be operating

WWW.JJCOURT.COM

12

1  the debtor's business in accordance with its obligations of

2  their debtor in possession in conformance with its statutory,

3  contractual, and fiduciary obligations as an investment

4  advisor.  By scrupulously meeting its obligations as an

5  investment advisor, the debtor will continue to enhance the

6  asset management business and avoid the litigation that

7  contributed to this case.

8         Second, the board understood the relationship between

9  the debtor's largest creditors and senior management had

10  materially deteriorated and that there was severe lack of trust

11  that creditors had with respect to management.  The board

12  initially determined, has determined to continue retaining the

13  services of senior management because it believes that their

14  historical background and deep knowledge of the debtor's assets

15  provide material value to the estate.  However, the board's

16  decisions thus far have and will continue to be based upon

17  their independent review of the facts and circumstances and

18  based upon consultation with outside advisors as appropriate.

19         Third, the board believe that a lengthy stay in

20  Chapter 11 only would serve to erode asset value while at the

21  same time leading to extensive restructuring costs.  The Court

22  and the board developed a timeline that will hopefully lead to

23  a confirmed plan at the end of the year.

24         Against this backdrop, the board is focused on the

25  following things the first two months of the case.  Initially,

13

1   the board met with all department heads and other members of

2   senior management including Mr. Dondero and let them know that

3   the board was now in charge and that all business decisions

4   needed to be run by the board subject to the board delegating

5   authority as it deemed appropriate.

6           The board has had several calls with the committee

7   and its professionals to discuss among other things the board's

8   initial determination as to staffing levels and employee

9   compensation, time-sensitive transactions that needed the

10  committee's input under the Court's approved operating

11  protocols, and the proposed timeline for achieving

12  restructuring.  There is an in-person meeting scheduled next

13  week in New York City between all the committee members and

14  their professionals and the debtor and their professionals.

15          Members of the board have also reached out to

16  individual committee members and have had or will have meetings

17  with them to understand their specific concerns with the debtor

18  and to importantly have a dialogue about the claims they have

19  against the debtor, as resolving the claims against the debtor

20  is a key part of achieving a consensual restructuring in this

21  case.

22          The debtor's asset basis is also extremely complex,

23  and the board has worked hard to get a grasp on how best to

24  maximize their value.  The board has analyzed the debtor's

25  liquidity needs and worked with the debtor's chief

14

1  restructuring officer to develop a 13-week cash flow and

2  otherwise address how to enhance liquidity.  The board has also

3  conducted a thorough review of the debtor's employee basis,

4  including performance reviews and address ongoing staffing and

5  compensation in a manner that the board believes will sustain

6  the debtor's business operations and maximize value.

7          Related to the motion before the Court, the board has

8  evaluated the status of certain funds which were in the process

9  of being wound down at the commencement of the case and has

10  supervised their wind-down in a manner consistent with the

11  debtors' fiduciary, statutory, contractual liabilities.  The

12  board has also commissioned outside counsel to provide an

13  independent analysis of the significant litigation claims that

14  are facing the debtor.  And as I mentioned, the board

15  anticipates engaging with these creditors to seek a resolution.

16          The board is acutely aware that resolving

17  consensually claims of creditors and claims the estate has

18  against third parties is the only way to restructure this

19  debtor efficiently and economically.  I'll now turn Your Honor

20  to the background with respect to the motion, explain the

21  relief requested, and address the two objections that are

22  before the Court.

23          Your Honor will hear testimony from Mr. Seery that

24  the debtor is the asset manager of two hedge funds, Dynamic and

25  ARF, that are in liquidation because of redemption requests

15

1  from large non-affiliated investors that render the funds

2  economically not viable.  The term of the third fund, which is

3  a private equity fund, Restoration Capital expired, and the

4  governing board comprised of large institutional pension funds

5  has refused to grant further extensions.

6          Mr. Seery will testify that while these wind-downs

7  were already in process and fully disclosed to the Court prior

8  to the installation of the independent board, the board

9  evaluated the decision to wind down the funds independently of

10  the debtor's decision and decided that the prudent exercise of

11  the debtor's business judgment was to continue with the wind-

12  down.  Neither the committee nor Acis challenge the board's

13  selection to continue with the wind-down.

14          You will hear testimony from Mr. Seery that a

15  priority of the independent board was to make sure that the

16  debtor operated in accordance with applicable law to ensure

17  that the debtor fills its obligations to investors and doesn't

18  act or fail to act in a manner which could expose the debtor to

19  liability.  After all, as I mentioned, Your Honor, a material

20  reason why the debtor is before the Court is because of

21  litigation claims that have plagued it over the last several

22  years.

23          Mr. Seery will testify that in evaluating the

24  debtor's duties and obligations as an asset manager of these

25  three funds, the board consulted with bankruptcy counsel with

**WWW.JJCOURT.COM**

16

1   respect to the applicability of the operated protocols and

2   domestic and Cayman counsel specializing in advising funds with

3   respect to their obligations under the transactional documents,

4   the Advisors Act, and general fiduciary duty obligations.

5          Tim Silva, a partner of WilmerHale, the debtor's

6   outside firm that provides fund advice, is present in the

7   courtroom and will be available to answer any questions the

8   Court or the parties have.  Dennis Olarou, a partner with Carey

9   Olsen, is on the phone.  He is the debtor's Cayman counsel and

10  also available.

11         Importantly, Mr. Seery will testify that the

12  independent board made the decisions that led to the filing of

13  this motion based upon their own expertise and the advise of

14  outside counsel and did not rely on the advice of the debtor's

15  employees or any of the related parties.

16         He will further testify that based upon the input of

17  outside counsel, the independent board concluded, one, that the

18  operating documents governing the funds did not permit the

19  debtor to unilaterally withhold distributions from some

20  investors and not others; that, two, the debtor risked

21  breaching its fiduciary duty to investors under principles of

22  common law if it withheld distributions on its own; and that,

23  three, the debtor risked liability under the Advisors Act if it

24  essentially attempted to use its position as an investment

25  manager to gain leverage against investors in connection with

17

1  an unrelated matter, to wit, potential claims that the estate

2  may have.

3           The motion describes in detail the nature and extent

4  of the debtor's obligations, and I think the substance of that

5  is not challenged by either the Committee or Acis.  I didn't

6  read their objections to challenge that the debtor has these

7  obligations and seeks to fulfill them.

8           Based upon the foregoing and to make sure that the

9  debtor didn't expose itself to liability, Mr. Seery will

10 testify that the board decided that it was obligated to

11 exercise its authority as asset manager to distribute the funds

12 to all investors.  After consultation with the bankruptcy

13 counsel, Mr. Seery will testify that the independent board

14 decided to provide the Committee with notice prior to making

15 such distributions as were required by the operating protocols

16 approved as part of the settlement.

17          The Committee objected to the distributions which led

18 to the filing of this motion.  The objections relate to

19 distributions to be made as follows.  Mr. Seery will testify

20 that Dynamic proposes to distribute $35 million of investor

21 funds that are held by Dynamic of which CLO Holdco stands to

22 receive $872,000 and Mr. Okada stands to receive $4,176,000.

23          With respect to ARF, Mr. Seery will testify that they

24 propose to distribute $22 million of investor funds held by

25 ARF.  HoldCo stands to receive $1.5 million.  And with respect

18

1 to Restoration Capital Partners, it proposes to distribute

2 $123,250,000 of which 2.1 million will be received by ACM

3 Services and, importantly, the debtor will receive 18 and a

4 half million dollars, the balance of approximately 121 million

5 would be distributed to non -- or 103 million would be

6 distributed to non-related parties, including CalPERS which

7 filed the statement with the Court.

8        The Committee and Acis argue that the Court should

9 prohibit the debtor from making distributions to related

10 parties, notwithstanding the debtor has contractual, fiduciary,

11 statutory obligations to do so as an asset manager.  It is

12 important for the Court to understand that the money to be paid

13 to these related parties is not the debtor's money, it's not

14 property of the estate.  It's actually funds that are the

15 investors' funds that were invested in these various funds.

16        Essentially, the Committee argues and Acis argues

17 that because the debtor may assert claims against some of all

18 of these related parties at some time in the future, the Court

19 should prohibit the debtor from authorizing the distribution of

20 non-debtor estate funds.  Essentially as we said in our papers,

21 the objectors are asking this Court to issue a pre-judgment

22 write of attachment adjoining these distributions without the

23 filing of any complaint which would assert causes of action,

24 without the need to satisfy applicable standards for a pre-

25 judgment writ either under Federal Rule of Civil Procedure 64

**WWW.JJCOURT.COM**

19

1  estate law, and without appropriate notice to the parties and

2  an opportunity to object.

3       The objectors want to use the debtor's position as an

4  asset manager to stop distribution of funds in which the debtor

5  has no interest to gain a potential litigation advantage

6  against these related parties.  The debtor just submits that is

7  not appropriate.  The Committee and Acis spent a lot of time in

8  their papers talking about the allegations and in some estate

9  case findings against the debtor's prior management relating to

10 the operation of the debtor's business, some of which have

11 matured into claims against the estate.

12      However, the fact that the debtor's actions taken by

13 prior management led to claims against the debtor is not

14 legally relevant as to whether the debtor should be permitted

15 to make these distributions of non-estate funds.  Allegations

16 of prior wrongdoing would not be sufficient in the context of a

17 pre-judgment attachment, and it should not form the basis for

18 essentially the injunctive relief the Committee and Acis urge

19 to the Court.

20      The Committee also argues that because the

21 Committee's currently investigating claims against the released

22 parties and other insiders that the distribution should be held

23 up essentially indefinitely until the Committee completes its

24 investigation.  Whether or not the estate has claims against

25 the related parties and insiders is unknown at this point

20

1  except for the notes which I will address in a moment.

2         Also, whether or not there are claims and how the
3  related parties acquired their investment in the funds is also
4  unknown at this time.  Since January 9th, the Committee has had
5  standing to investigate and prosecute these claims and the
6  debtor is cooperating with the Committee in its investigation.
7  If legitimate claims exist, they should most certainly be
8  prosecuted, and the independent board will cooperate with the
9  Committee in its efforts.

10        However, at this point other than with respect to the
11 notes, there is no admissible evidence that any claims exist,
12 and no claims have been clearly articulated other than some
13 vague allegations of fraudulent conveyance, breach of fiduciary
14 duty, the garden variety of claims you would expect to be
15 asserted in a case like this.  Again, no bankruptcy court, no
16 non-bankruptcy court would be authorized to enjoin payments on
17 the basis of these vague and unasserted claims, and the Court
18 shouldn't accept the invitation to do so wither.

19        The Committee also points to certain demand notes
20 executed by Jim Dondero, Mark Okada, and ACM Services in favor
21 of the debtor as a basis for withholding the distributions.
22 The debtor has made a demand on Mr. Okada to pay back the note,
23 and he has asserted that he may have potential offsets and the
24 nature of potential service obligations and expense
25 reimbursements allegedly owed to.  At some point in time, we

**WWW.JJCOURT.COM**

21

1  suspect those issues will be resolved either consensually or

2  there will be litigation to recover the demand.

3          ACM Services which is owned 75 percent by Mr. Dondero

4  and 25 percent by Mr. Okada, executed several notes in favor of

5  the debtor of which 850,000 are demand notes. The total amount

6  is approximately seven and a half million. The remaining notes

7  are current and have been paid down over the years.

8          The debtor has not made demand on ACM Services for

9  payment of the notes, nor have they made demand on Mr. Dondero

10  for payment of the notes he issued in favor of the debtor.  Mr.

11  Seery will testify that the reason for that is that, as I

12  indicated before, the board recognizes that in order for there

13  to be a consensual restructuring in this case, it's going to

14  involve not only resolution with the creditors and their claims

15  but also resolution with Mr. Dondero or potential claims the

16  estate has.

17          The independent board at this early stage in the case

18  does not believe that commencement of an adversary proceeding

19  against Mr. Dondero at this time is in their best interest.  If

20  this case turns into a litigation case, and as Your Honor

21  experienced previously, then such litigation will be commenced.

22  However, until the board has the opportunity to try to forge a

23  consensual resolution, aggressive action is premature.   The

24  last thing, Your Honor, CLO Holdco is not a party to any demand

25  notes.

**WWW.JJCOURT.COM**

22

 1                THE COURT:  Let me stop you.

 2                MR. POMERANTZ:  Sure.

 3                THE COURT:  You mentioned dollars on the notes.  The

 4   note receivable from Okada I think is 1.3 million.

 5                MR. POMERANTZ:  With credentials, yes.

 6                THE COURT:  And then you mentioned roughly seven and

 7   a half million of notes receivable from HCM Services.

 8                MR. POMERANTZ:  Of which 950 are demand notes.  The

 9   rest are currently before me in accordance with the terms.

10                THE COURT:  Okay.  You didn't mention a dollar amount

11   on the note receivable from Dondero.  My notes show 9.3

12   million.

13                MR. POMERANTZ:  Yeah, and so I think that's around

14   that --

15                THE COURT:  Is that a demand note or notes?

16                MR. POMERANTZ:  That is a demand note and then the

17   related party notes, yes --

18                THE COURT:  Okay.

19                MR. POMERANTZ:  -- Your Honor.  And, again, we're now

20   the board knows, fully aware.  The board could have commenced a

21   lawsuit.  Honestly, Your Honor, the Committee could have

22   commenced a lawsuit in the last two months.  I suspect the

23   Committee also would like to see a consensual restructuring.

24                And I think parties are taking the view of, again,

25   this can be a litigation case which would be like a lot of

23

1  money for all the professionals, not really do all that well

2  for the creditors.  Or the parties could cooperatively work

3  towards a restructuring to see based upon the leverage, based

4  upon the claims everyone has that it makes more sense.  And the

5  board's determination, again, made on its own coming into this

6  case in the last two months is that proceeding aggressively now

7  just does not make sense.

8        Even though it has not commenced any litigation

9  against the related parties nor presented any evidence of any

10 claims against the related parties, the Committee asks this

11 Court to use its equitable powers under Section 105 to enjoin

12 the distribution again of non-estate funds to the related

13 parties.  Your Honor, bankruptcy court -- bankruptcy

14 practitioners in certain cases love to use 105, assert 105.  My

15 experience has been when you assert 105 and that's all you

16 assert 105, it really means you don't have much authority and I

17 think that's the case here.

18       The courts have held that 105 is not -- grant the

19 court authority to be a roving commission to do equity because

20 it has to be tethered to something in the Bankruptcy Code.

21 Here the proper way for the Committee to obtain the relief they

22 sought was to file a complaint and seek pre-judgment remedy,

23 either an attachment under Rule 64 or an attachment under

24 applicable provisions of Texas law or other applicable law, or

25 an injunction under FRCP 65.

24

1        The debtor would not stand in the way if the

2   Committee decided to do that.  That's what the debtor bargained

3   for.  They gave the Committee the authority to do that.  The

4   Committee has not yet done that.  And the Court should just not

5   allow the debtor -- the Committee to use the debtor's position

6   as fiduciary to its investors as leverage.  That's what's

7   really happening.  The only reason we're here is because the

8   debtor is the asset manager of these other funds, and the

9   Committee and Acis want the debtor to use that leverage and

10  somehow to gain an advantage.

11       Your Honor, we would submit that the fiduciary duty

12  of the estate is to act in accordance with its obligations, and

13  that's the primary fiduciary duty and that the creditors are

14  best served if the company complies with its obligations and

15  doesn't expose the estate to any liability.

16       Lastly, Your Honor, I want to address the Committee

17  and Acis's allegations regarding the circumstances surrounding

18  the sale of the MGM shares, the proceeds of which the debtors

19  intend to use to distribute as part of the RCP fund.  Whether

20  or not Mr. Dondero's authorized to make that trade, it's really

21  irrelevant to the issues before the Court.  The independent

22  board first learned about the trade only a few weeks ago, and

23  the independent board -- and, again, this happened back in

24  November, two months before the independent board took over.

25  They promptly investigated the circumstances around the trade,

25

engaged counsel to advise whether it was binding and,

importantly, evaluated whether the trade was a sound exercise

in the debtor's business judgment at that time.

The board concluded that the trade was binding and

that it in fact was a good trade as of November 2019 and

disclosed that information to the Committee and engaged the

Committee in a dialogue to discuss the options that the debtor

had with respect to that trade.  The Committee, while I

understand was not unanimous, ultimately agreed with the

independent board that it was in the debtor's best interest to

consummate that trade.  While we understand that the Committee

and Acis may want to investigate the circumstances surrounding

that trade to determine whether the estate has any colorable

claims that could be asserted, that doesn't provide a basis for

enjoying the distribution of the funds.

Moreover, the allegation in Acis papers that Mr.

Dondero used his position on the board of MGM to facilitate the

trade so that ACM Services could receive $2.1 million of 123

and $250,000 sale, it just lacks and factual support.  And, in

fact, Mr. Dondero has steadfastly encouraged the investment

board not to sell the MGM shares because he believes they will

continue to appreciate and the estate and its creditors would

be benefitted thereby.

The reason that the RCP shares were sold is as I

mentioned before, the RCP, the term of that private equity fund

26

1  expired.  No more extensions were given, and the debtor as a

2  fiduciary and as an asset manager needed to liquidate the

3  assets in that estate which included the shares.  But, again,

4  if there are claims surrounding how that happened, we

5  understand there's concern that the creditors have about the

6  circumstances, they can investigate them and the independent

7  board will surely cooperate with such investigation.

8          In conclusion, Your Honor, this independent board was

9  installed because of its independence and sophistication in

10  managing a business as complex as the debtor's.  As you will

11  hear in the testimony, the independent board has been

12  thoughtful and thorough in its approach to the issues raised by

13  this motion and is trying to manage the debtor in a responsible

14  way to maximize value and prevent the estate from incurring any

15  liability.  The independent board understands and shares the

16  Committee's and Acis's decision to hold other parties

17  accountable for any liability they have against the debtor

18  arising out of conduct that occurred pre- or post-bankruptcy.

19  But trying to use the debtor's role as an independent asset

20  manager and fiduciary duty to investors is inappropriate and

21  create risks for the estate.

22          For these reasons, Your Honor, the debtor

23  respectfully requests that the Court approve the motion and

24  overrule the objections.

25          THE COURT:  All right, thank you.  Other opening

27

1  statements, Mr. Clemente?

2          MR. CLEMENTE:  Yes, Your Honor.  You actually touched

3  on a question that I had.  I assume I have more fulsome

4  comments that I had anticipated making after testimony, but so

5  I would reserve the opportunity to do that.  It was quite a

6  lengthy opening there, so I didn't know whether there was going

7  to be the opportunity for that after testimony, but --

8          THE COURT:  Certainly.

9          MR. CLEMENTE:  -- I certainly want to reserve that.

10 Thank you, Your Honor.

11          So I do have some opening remarks prepared, but I'm

12 going to react a little bit to what I just heard.  I and the

13 Committee do not dispute the credentials of the board.  We

14 obviously were involved in choosing them.  I heard a lot about

15 the duty to, quote/unquote, investors.  I don't think I heard a

16 word about the duty to the creditors and to the estate.  And I

17 think it's important when thinking about the investors that Mr.

18 Pomerantz keeps referring to, the Committee is not talking

19 about the legitimate third party investors, the CalPERS.  The

20 Committee is talking about the very people that were in charge

21 of this debtor while breaches of fiduciary duty were rampant

22 and their related entities that resulted in the filing of this

23 bankruptcy case.

24          And I find it a little bit rich, Your Honor, that

25 their debtor is using the duty to investors to include third

**WWW.JJCOURT.COM**

28

1 parties to try and come in here and passionately argue that

2 distribution should be made at this time to these insider

3 parties without a word at all about why it may actually be in

4 the creditors' best interest or this estate's best interest to

5 not make those distributions at this time.  So those were a

6 couple of comments that struck me as I was listening to what

7 Mr. Pomerantz said.

8        But let me be clear, Your Honor, as Your Honor is

9 aware the debtor is in bankruptcy because of the documented and

10 egregious breaches of fiduciary duties and contractual

11 obligations to its creditors and its propensity for fraudulent

12 and litigious conduct as documented.  Mr. Dondero and until

13 recently Mr. Okada dominated all aspects of the debtor and

14 controlled all of its decision-making, including the decision-

15 making that led various tribunals, including this Court, to

16 conclude that the debtor had breached its fiduciary duty,

17 engaged in fraudulent conduct, and employed persons who are not

18 credible and not truthful.

19        Against this backdrop, Your Honor, the debtor wants

20 to make distributions to investors, again, the investors we're

21 talking about here are Mr. Okada, and entities owned and/or

22 controlled by Mr. Dondero and Mr. Okada without regard

23 apparently because I didn't hear anything about that to the

24 interest of creditors under the rubric of a fiduciary duty that

25 is supposedly owed to those insider parties, the same insider

29

1  parties, Your Honor, who were found to have breached the duties

2  to the creditors of this estate or to the investors which then

3  resulted in them becoming creditors of this estate and led to

4  the bankruptcy.

5        Your Honor, I think the irony is fairly thick, and I

6  don't think the Court should allow the distributions at this

7  time.  These insider parties, and I'm glad Mr. Pomerantz

8  mentioned it to you because their papers did not mention the

9  notes that were owed, they owe the debtor millions of dollars.

10  The numbers that Your Honor read are just the direct notes

11  among those parties.  They do not include the notes that are

12  owed by, for example, affiliated entities of Mr. Dondero.  So

13  those numbers are even larger than what Mr. Pomerantz suggested

14  to Your Honor.

15        Second, as the debtors do finally disclose in their

16  papers, the insider parties receive certain of the insider

17  interests from the debtor pursuant to transactions that were

18  only recently disclosed to the Committee and not have been

19  examined by the Committee.  So in many of the circumstances,

20  the very interests that are giving rise to the basis for these

21  distributions once belonged to the debtor.

22        Third, obviously, the insider parties are the focus

23  of the Committee's ongoing investigation of the estate causes

24  of action, and that's entirely appropriate given the long

25  history and the findings made by this Court and others

**WWW.JJCOURT.COM**

30

1  regarding the behavior of this debtor prior to the bankruptcy.

2       Your Honor, instead of allowing the distributions to

3  be made, the Court should direct that the distributions that

4  the debtor seeks to make to the insider parties to be placed

5  into a segregated interest-bearing account pending the

6  resolution of potential claims against the insider parties

7  including the collection of notes owed by the insider parties

8  and the investigation into the validity of the insider

9  interests.

10      If the insider parties have an issue with this,

11 obviously, they can come before Your Honor, perhaps they'll

12 come before Your Honor today, and explain to you why what is

13 being proposed is unfair to them or why despite the

14 circumstances surrounding this case, the rampant breaches of

15 fiduciary duty, the questionable transactions, and the

16 existence of the notes they owe the debtor they should receive

17 those distributions now.  And we can do that after a fulsome

18 discovery of those parties, a fulsome record, full opportunity

19 to brief.

20      I believe, the Committee believes this is a very

21 sensible proposal, and it would seem to serve all interests.

22 The interests of the estate would be protected.  Let's talk

23 about those.  Obviously, we're more likely to recover on the

24 notes and any potential claims, including claims that the

25 insider interests were inappropriately obtained.

**WWW.JJCOURT.COM**

31

 1          Mr. Pomerantz referred to the word "leverage."
 2   Again, it's the estate, the estate should be thinking about how
 3   it can actually collect on its claims and notes.  So the word
 4   "leverage" I don't think is appropriate here.  It just seems
 5   sensible.  The interest of the insider parties would also be
 6   protected.  The money will be placed in a segregated account,
 7   and the status quo would be preserved.  And legitimate third
 8   party investors, we are all fully in support of the legitimate
 9   third party investors receiving their distributions.  We've
10   never had an issue with that, Your Honor.
11          Mr. Pomerantz referred to the authority, Section 105.
12   I do believe the Court has ample authority under Section 105 of
13   the Bankruptcy Code to order the relief requested by the
14   Committee.  Obviously, Section 105 is broad and, as we'll
15   discuss further later, it's been interpreted by this Court and
16   other courts to apply very broadly and in circumstances similar
17   to this.
18          Additionally, Your Honor, although I do not believe
19   105 needs to be tethered, I believe is the word that was used,
20   to other sections of the Code.  I do believe that other
21   sections of the Code are implicated as the relief the Committee
22   requests impacts property of the estate which includes the
23   notes and potential claims against the insider parties as well
24   as the rights and obligations of the debtor under the various
25   contracts that Mr. Pomerantz referred to.

32

1          So, we have 105.  If we need to tether it to

2   something, we can tether it to 541 and we can tether it to 363.

3   What we're asking the Court to do impacts property of the

4   estate, impacts the rights and obligations of the debtor.

5          Finally, Your Honor, there was a long discussion or

6   somewhat of a discussion about the fact that the Committee has

7   not sought a preliminary injunction or has not filed claims

8   against the insider parties.  First, again, I believe Section

9   105 gives the Court the authority that it needs to provide the

10  relief.  Second, the Court has the flexibility should it choose

11  to construe or find it necessary to construe our objection as a

12  request for a preliminary injunction and the request satisfies

13  that standard.

14         Third, Your Honor, this has been an expedited process

15  initiated by the debtor.  If this Court believes that other or

16  further proceedings or processes are necessary or appropriate,

17  the Court should allow the parties the time for that.  We

18  agreed to an expedited motion practice under the protocols.

19  That's a fact.  The protocols cover a variety of circumstances

20  designed with the exigencies of the debtor's business in mind,

21  not designed with trying to speed distributions to Dondero,

22  Okada, and the insider parties.  There simply is no exigencies

23  surrounding that, and the Committee should not be prejudiced if

24  this Court believes a further or other procedural vehicle is

25  necessary.

33

1          And a moment, Your Honor, on the investigation, as

2   Your Honor is aware the insider parties have dominated the

3   debtor for years.  Only recently January 9th the Committee has

4   gotten the ability to investigate.  And to date, we've been

5   doing that.  I do dispute what Mr. Pomerantz said about the

6   debtor's cooperation.  I believe that they've used words to

7   that effect but we've not gotten the documents that we need.

8   This is a complicated enterprise as Your Honor is aware.  It's

9   unrealistic to think that we would be in a position to bring

10  claims against insider parties at this particular time in the

11  case.  And we cannot be prejudiced by saying we should have

12  completed our investigation and had brought claims every time

13  the debtor thinks it should make a distribution to Mr. Dondero

14  or one of its related entities.

15          And so, Your Honor, to sum up, we think that the most

16  logical solution here and frankly the one that I assume the

17  debtor would have agreed with me on would be to come to this

18  Court, allow the distributions to be made to all the third

19  party investors, to withhold the distributions to the related

20  parties while the investigation occurs, while the notes are

21  settled, and while the Committee determines and the Court may

22  perhaps ultimately determine whether the interest that gave

23  rise to those distributions were in fact appropriately with

24  those parties.

25          Instead, we're here talking about duties owed to,

**WWW.JJCOURT.COM**

34

1    quote/unquote, the investors without considering what it is

2    that's owed to these creditors and to this estate.  And with

3    that, Your Honor, we would ask that the motion be denied or

4    however you'd look at it but that the relief we noticed in our

5    paper be ordered by Your Honor.

6            THE COURT:  Let me follow up and make sure I

7    understand a couple of things.  You've said a couple of times

8    that it's just the distributions that would go to related

9    investors, Mark Okada, CLO Holdco, HCM Services.  And I got the

10   impression from your pleadings as well as your oral statements

11   that the Committee is not challenging in any way the decision

12   to wind down these three funds, if you will.  You know, my

13   reading of the pleadings was November 2019, you know, less than

14   a month after the bankruptcy was filed or about a month after

15   the bankruptcy was filed, you know, there were significant

16   redemptions.  In the face of significant redemptions, the

17   debtor decided it was appropriate to wind these down.

18           Is that going to be the subject of evidence and

19   testimony today?  Is the Committee at all concerned about how

20   that all played out, whether it was legitimate unaffiliated

21   investors seeking redemption or if it was by chance insider

22   investors?

23           MR. CLEMENTE:  No, Your Honor.  The Committee is not

24   challenging the wind-down as I believe you're referring to.  We

25   are not doing that, Your Honor.

**WWW.JJCOURT.COM**

35

1          THE COURT:  Okay.  And this may be one instance where

2    it's kind of hard for me to separate what happened in the

3    related case of Acis versus this where we had all of a sudden

4    we don't want Acis to, you know, manage these in that case CLOs

5    anymore until redemptions were happening.

6          MR. CLEMENTE:  I understand, Your Honor.

7          THE COURT:  And the business judgment of that --

8    well, it's complicated, right.

9          MR. CLEMENTE:  I completely understand.

10         THE COURT:  It was, in the end of the day, depriving

11   Acis debtor of management fees.  Same thing is happening here,

12   right?  Highland is being deprived of management fees by the

13   wind-down of these three funds, but you're not challenging the

14   business judgment of the --

15         MR. CLEMENTE:  That is correct, Your Honor.

16         THE COURT:  -- whole process of the redemptions

17   period?

18         MR. CLEMENTE:  That is correct, Your Honor.

19         THE COURT:  Okay.

20         MR. CLEMENTE:  There is a pot of funds sitting in

21   those funds, and there is a pot of funds sitting in RCP --

22         THE COURT:  It was a legitimate non-affiliated

23   entity's --

24         MR. CLEMENTE:  We're not challenging it, Your Honor.

25         THE COURT:  Okay.

**WWW.JJCOURT.COM**

36

 1            MR. CLEMENTE:  What we are challenging obviously is

 2    now the distribution of those funds to the related entities.

 3    That's where we take issue with it at this particular moment in

 4    time.

 5            THE COURT:  Okay.

 6            All right.  Who else wishes to make an opening

 7    statement?  I know Acis had a joinder or a slightly different

 8    objection, I think.

 9            MS. PATEL:  Yes, Your Honor.  Good afternoon.

10    Again, Rakhee Patel on behalf of Acis.  And I'll address Your

11    Honor's question first.  Acis has concerns about the wind-down

12    of these funds.  I'll just clear with respect to it.  And Your

13    Honor referenced, you know, perhaps we need to separate what

14    happened in the Acis case and whether that's happening here or

15    not.

16            Your Honor, I'm not sure from Acis's perspective that

17    we don't object to the wind-down of these funds.  We just

18    frankly don't have enough information to kind of take a

19    position with respect to that whether these funds should be

20    wound down.  But the fact of the matter is is in the lead-in

21    into this motion -- and this is sort of the source and subject

22    of Acis's additional objection and not just plain vanilla

23    joinder and with the Committee -- is is that the transactions

24    happened.  The sale of the stock has happened.  So whether it's

25    in connection with the wind-down of the funds or whether it's

37

1  just a sale, it's happened now.

2        So I'm not sure that we can unring that bell, but

3  Acis's whole point and as we sort of set out in our joinder and

4  our separate comment or objection was, Your Honor, the light of

5  day needs to be cast on this transaction as a whole and we need

6  to be talking about it that the transaction needs to be

7  discussed here in open court.  And, frankly, the entire

8  creditor body needs to have and the Court needs to have

9  transparency with respect to that.

10        So to that point, Your Honor, the debtor filed the

11  motion to approve the distributions of the proceeds from the

12  sale in accordance with the procedures approved as part of the

13  broader settlement motion that Your Honor heard in January.

14  Now the debtor incredibly takes the position that this Court

15  and the creditors are effectively powerless to stop these

16  distributions.  And here's the problems with that position.

17        First, from a technical legal perspective, the debtor

18  ignores the language of Section 363.  Frankly, it's easy to

19  have a strong initial knee-jerk reaction that Section 363

20  doesn't apply here because there's no sale of property to the

21  estate.  The MGM stock was held down in a different entity.

22  Your Honor, frankly, I did it myself.  But when you analyze the

23  language of Section 363, it also prescribes the use of property

24  of the estate outside of the ordinary course of business.  And

25  here, the use of property of the estate is the debtor's

Case 19-34054-sgj11   Doc 3596-25   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-25   Filed 09/29/23   Page 625 of 1539   PageID 17863

38

1  valuable management rights of the various entities, so Dynamic,

2  AROF or AROF or NRCP.

3          And let's just assume for argument's sake that the

4  debtor's statement is correct and enforceable and there's no

5  problem with it that the funds are in liquidation.  No one can

6  rationally argue that that liquidation of a fund or a manager's

7  actions in liquidating said fund are ordinary course.  So there

8  is sort of the Section 363 hook for lack of a better term.

9          Second, from an equity perspective, it is wholly

10 inequitable for the debtor in an attempt to derail the Court

11 and the creditors from inserting a Chapter 11 trustee -- and

12 recall, Your Honor, that this case was filed on October 16th of

13 2019 where the debtor filed to seek protection from the

14 imminent within minutes if not hours of entry of $189 million

15 judgment against the debtor.  And it's really frankly, and as

16 Mr. Pomerantz acknowledged, the product of failed -- numerous

17 other failed litigation strategies.  Acis, UBS, Pat Daugherty,

18 quickly all -- and all of those the pieces of litigation

19 quickly coming home to roost.

20         Acis was clear right out of the gate, Your Honor, at

21 the first day hearings held on October the 18th, 2019 that it

22 would seek the appointment of a trustee.  And in an attempt to

23 sort of take itself out of a trustee potentially being

24 appointed or, you know, as to forestall that happening, the

25 debtor filed an ordinary course protocol motion.  And this is

APPX. 107356

39

1   in October of 2019.  And as a part of that ordinary course

2   protocol motion, the proposal was that Mr. Sharp, the CRO of

3   the debtor, be appointed the CRO of the debtor and that he

4   would be the gatekeeper, he would be in charge of all related

5   party transactions, and he would oversee all of those

6   transactions.

7           And, Your Honor, indeed Mr. Sharp testified that he

8   was the gatekeeper.  He was the guy in charge, and that was on

9   I want to say like November 20th of 2019.  And commensurately,

10  Mr. Waterhouse, the CFO for Highland Capital Management, also

11  testified and Mr. Waterhouse was the first day declarant for

12  Highland as well.  He testified that everyone understood that

13  Mr. Sharp was to be the gatekeeper.  And, indeed, Mr. Sharp

14  would -- they had training at Highland Capital Management to

15  the effect that all employees knew if you've got a related

16  party transaction, it's got to go through Brad Sharp.

17          So in an attempt to sort of derail Acis from getting

18  a trustee appointed, they affirmatively sought out these

19  protocols and ultimately agreed to protocols that look similar,

20  not exactly but similar to those proposed ordinary course

21  protocols.  And the protocols that ultimately were approved

22  required court approval.  And now we've got them coming back

23  and saying, ha ha, just kidding, no one can do anything about

24  it anyway and we have to make these distributions because we've

25  got a fiduciary duty to do it.

**WWW.JJCOURT.COM**

40

1          On that note, the debtor who should be fully
2   transparent during this process while it seeks the benefit of
3   bankruptcy including the automatic stay, argues in its reply
4   brief filed this morning at Footnote 9 that the underlying sale
5   transaction in excess of $123.25 million is sacrosanct and
6   irrelevant because the Committee blessed it.  Acis objected,
7   Your Honor.  When that transaction was presented to the
8   Committee, Acis objected.

9          First, it would have its cake and eat it, too.  It
10  can't take advantage of the protocols it likes while at the
11  same time stiff-arming those that are inconvenient to it.  It
12  can't say the transaction's good because the Committee blessed
13  it, but the Committee didn't bless the distributions to the
14  insiders and, oh well, you can't do anything about that anyway.

15         Second, the broader transaction is violative of at a
16  minimum traditional notions of transparency in bankruptcy and
17  likely 363 along what the debtor's fiduciary duties to its
18  creditors.  As Mr. Clemente pointed out, the debtor has dueling
19  fiduciary duties, and we didn't hear nearly a word with respect
20  to the debtor's fiduciary duties to its creditors.  And, Your
21  Honor, we're not looking to generally micromanage what this
22  debtor is doing, but this transaction is fundamentally flawed
23  and at a minimum has red flags all over it.

24         As we now know from the CalPERS objection, Mr.
25  Dondero entered into a transaction with Highland Capital

**WWW.JJCOURT.COM**

41

1  Management buying CalPERS' interest and likely others'

2  interests at June 30 prices or by giving over a set number of

3  MGM shares to CalPERS.  That's the agreement that's attached to

4  the CalPERS objection.  The agreement was always a win-win for

5  Highland Capital Management because it could either make money

6  on the arbitrage of the stock -- it bought it at a particular

7  price, and if it's ordered at a different price, you got to

8  keep the differential -- or give over the stock if the stock be

9  valued and priced.  Win-win.

10       He then immediately the very next day fraudulently

11  transferred that agreement from Highland Capital Management to

12  Highland Capital Management Services, an entity in which he is

13  the 75-percent owner and Mr. Okada is the 25-percent owner.

14  That is 15 days before filing this Chapter 11 bankruptcy case.

15  The only purported consideration for the transfer, and I think

16  this is Exhibit B, to the CalPERS objection, was an indemnity

17  by Highland Capital Management Services.  That's the only

18  consideration that was transferred as a part of that

19  transaction, Your Honor.

20       Then when the stock price rises in November, he seeks

21  committee approval for a transaction that still benefits

22  Highland Capital Management Services.  Despite not having a

23  Committee response, he enters into a rogue unauthorized trade

24  of MGM stock on whose board he serves on and is thus privy to

25  information, violative of the very protocols that the debtor

42

1  was pressing so strenuously to avoid the appointment of a

2  trustee.  Indeed, Brad Sharp testified the day before the rogue

3  trade that this exact type of transaction had to go through

4  him.  And Mr. Waterhouse's testimony came right after that to

5  indicate that everybody at the debtor knew that Mr. Sharp had

6  to approve it.

7          Ultimately, the Committee rejected that transaction

8  in November, but the trade was already done.  If Mr. Dondero

9  had his way, Highland Capital Management Services would have

10 benefitted from the transaction.  Frankly, every one of these

11 transactions needs the light of day shed upon them here in

12 court to determine what is in the best interest of creditors.

13 The debtor's attempt to cloak itself in the Committee's non-

14 objection, and I want to be clear on this, it was a non-

15 objection.  I think reference was made that the Committee

16 agreed to the sale of the MGM stock.  That's not what happened.

17 The Committee just did not object to the transaction which can

18 likely best be characterized frankly as everyone plugging their

19 nose while simultaneously telling this Court it can't do

20 anything about the proceeds is the exact reason why the Court

21 should be inquiring into the transaction in the first place.

22         And not so incidentally, that stock that Mr. Dondero

23 traded without authority in November is trading approximately

24 20 percent higher today, around the low 90s.

25         THE COURT:  All right.  Thank you.

43

1          Thank you.  All right.

2          Do we have any other opening statements?  I'm

3    probably going to have to take a break before we do evidence

4    and hear my 2:30 matter, which I don't think is going to take

5    very long, at all.

6          All right.  Judge Lynn.

7          MR. LYNN:  Your Honor, thank you.

8          We're not opposed to the motion, and we understand

9    the concerns expressed both by the debtor, the debtor's

10   independent board, which feels that it's compelled to make the

11   distribution to insiders.  And while we don't necessarily agree

12   with them, we understand the Creditors Committee's concerns as

13   well.

14         We'd like to suggest the following should the Court

15   determine that the motion should be denied.  And that is that

16   instead of the debtor retaining the funds, that the debtor

17   distribute the funds into the registry of the Court.  That way,

18   they lose control over the funds and they can say that they've

19   distributed them in accordance with their agreements and

20   applicable law.

21         The funds would remain there until either a recipient

22   or prospective recipient posts a bond or other suitable

23   collateral or the Creditors Committee agrees to the

24   distribution to the insider or there is a Court entered for

25   another reason after a showing made before Your Honor.  The

44

1  debtor and the Creditors Committee would, of course, retain all

2  rights to seek the funds they would have had, which rights they

3  would have had immediately before the distribution to the

4  registry, plus any rights that would be gained by reason of the

5  distribution itself.

6          The debtor thus distributes, the Creditors Committee

7  retains its rights, the Court retains control, and this can all

8  be done, we believe, by a Court order and we hope this may give

9  the Court a suitable alternative.

10         THE COURT:  Okay.  Let me make sure I understand.

11 You said, if the Court is inclined to deny the motion.  Are you

12 offering, I guess Mr. Dondero's proposal that -- I mean, these

13 aren't disbursements that would all go to him, they would --

14 some would go to Okada, and -- who's not objected or appeared.

15 But -- let me cut to the chase.

16         Are you trying to avoid a hearing and evidence

17 altogether by saying, you know, these related entities agree

18 their distributions will go into the registry of the Court

19 right now?

20         MR. LYNN:  Mr. Dondero supports this position.  We do

21 not speak for Mr. Okada.

22         THE COURT:  Right.

23         MR. LYNN:  I understand that more than one of the

24 entities -- and Your Honor must forgive me.  We're relatively

25 new to this case.

45

1          THE COURT:  Yeah.  One is Holdco, and that is
2     technically a DAF, a charitable entity that --
3          MR. LYNN:  Yes.  I believe that's so, and I
4     understand there may have been communications between the
5     independent board and the trustee of a DAF, but I was not a
6     party to those communications.  I'm just trying to give the
7     Court an alternative -- Mr. Dondero is doing so -- that might
8     be acceptable to the debtor and at the same time would
9     accomplish what the Creditors Committee wants, which is to
10    retain control of the funds.

11         I must say, Your Honor, that having been there
12    myself, I have a great deal more confidence in the registry of
13    the Court protecting funds than I do in just about anyone else.

14         THE COURT:  All right.  Well, that would certainly
15    seem to give the Committee everything it's asking for, and --

16         MR. POMERANTZ:  Your Honor, if I may interrupt.

17         I understand from members of the debtor's independent
18    board who have spoken to Grant Scott, who is the principal in
19    charge of CLO Holdco, that CLO Holdco would also support the
20    proposal that has just been made by Judge Lynn.  We do not have
21    the agreement of Mr. Okada to support that proposal.

22         THE COURT:  Okay.  Although, he has not weighed in
23    with any sort of -- well, I don't know.  How do we feel about
24    Mr. Okada's interest here?  I mean, he's obviously been given
25    notice of all of that, and --

46

1              MR. POMERANTZ:  Well, actually we asked him --

2              THE COURT:  Okay.

3              MR. POMERANTZ:  -- when we heard last night that this

4     might be a possibility.  He has rejected that.  And in light of

5     his rejection of that proposal, we as the debtor feel we need

6     to proceed with the motion.  I would think it substantially

7     narrows the issues that are going to be in evidence, all the

8     stuff we've heard about MGM Trade, which may at some point in

9     time be something that people don't testify from the podium and

10    that actually the subject of real evidence.  But with respect

11    to Mr. Okada, we will have to go forward with the motion.

12             MR. LYNN:  Yeah, so let me express that at this

13    point, Mr. Dondero is of course not supporting the Acis

14    suggestion that a trustee should be appointed.  We did not

15    understand that this hearing would address that issue.

16             THE COURT:  Yeah.  I'm not sure.  That's what they

17    were suggesting today.  I think they were just saying at one

18    point, they adamantly wanted a trustee, and these protocols

19    alleviated their concerns and caused them to back off.  And

20    now, they're upset that, you know, the debtor is resisting the

21    protocols in a way.  So -- all right.

22             Mr. Clemente, what say you?  I --

23             MR. CLEMENTE:  Your Honor, I --

24             MR. LYNN:  Thank you, Your Honor.

25             THE COURT:  Thank you.

47

1          MR. CLEMENTE:  -- I think you can tell from our

2    papers, this is effectively what we asked for.

3          THE COURT:  Right.

4          MR. CLEMENTE:  I don't even know why it took us to

5    get to this point for that.  It seemed so obvious to me.  But

6    when it was articulated by the former Judge here, it -- I think

7    it just held more -- maybe it made more sense.

8          As far as Mr. Okada's concerned, I think Your Honor

9    could clearly deposit the funds in the registry of the Court,

10   and he's free to come in.  I think that's what Counsel for

11   Mr. Dondero was actually suggesting.  So I'm not sure that

12   anything is required further with respect to Mr. Okada, unless

13   he has a representative here that would like to raise something

14   with Your Honor.  So, to me, on behalf of the Committee, I

15   think that accomplishes what the Committee was trying to do

16   with its objection.

17         THE COURT:  All right.

18         Anyone else wish to be heard?  Ms. Shriro, I know

19   that you filed something for CalPERS, but obviously, your

20   client is an unaffiliated investor in the private equity fund,

21   RCP.  You just want to get paid.

22         MS. SHRIRO:  That's correct.  We just want to get

23   paid, and I would defer to my co-counsel on the phone.  If he

24   has any comments, this would be the time to raise them.

25         THE COURT:  All right.

48

 1          Co-Counsel on the phone, I think it's Mr. Cisz.   Is

 2    that correct?

 3          MS. SHRIRO:   Yes.

 4          THE COURT:   Okay.   Anything you want to say about

 5    what's (indiscernible)?

 6          MR. CISZ:   That's correct, Your Honor.   This is Louis

 7    Cisz on behalf of CalPERS, and Ms. Shriro is correct.   So long

 8    as CalPERS receives its distribution relative to the sale of

 9    the MGM stock, CalPERS otherwise doesn't take a position with

10    respect to the motion.

11          THE COURT:   Okay.   Thank you.

12          All right.   Well, turning to the literal terms of the

13    motion, the relief the motion sought was simply an order

14    authorizing distribution of the cash from these wind-downs of

15    the three funds to insider investors.   And so we have the

16    Committee objection, we have the Acis objection, we have

17    Dondero's counsel here appearing.   I think I can, given this

18    request for relief and the opposition of the Committee, as well

19    as one of the Committee members, Acis, and due to these

20    representations of Dondero's counsel and the board, I can order

21    that the money that would otherwise go to insider investors --

22    I think it's roughly about 8.6 million -- will, instead of

23    going to the insider investors, will go into the registry of

24    the Court with reservation of everyone's rights later to file

25    motions requesting that it be disbursed to them.   So everyone

49

1  understands, this is just kind of a holding place for the funds

2  right now.

3          MR. POMERANTZ:  Your Honor, we do not have

4  Mr. Okada's representation and the debtor is not modifying its

5  motion.  The debtor would like to proceed with respect to

6  Mr. Okada.  We asked him, he did not want to agree to the same

7  things that would be in consideration by CLO Holdco, and for

8  the reasons we've identified in the motion and I've expressed

9  to Your Honor, we feel we have the obligation, we have the duty

10  to proceed, and we would request the opportunity to put on

11  evidence so you can hear from Mr. Seery and ultimately make a

12  determination whether the Committee and Acis have laid out a

13  legitimate basis for use of 105.  I'll reserve my comments and

14  their comments until the end.

15          But we would want to proceed in that limited matter

16  because we don't have all agreements of the parties and the

17  same reasons stand for why we filed the motion to proceed with

18  the distribution for Mr. Okada.

19          THE COURT:  Okay.  Well, I guess I misinterpreted

20  everything that I thought was going on out there.  Mr. Okada, I

21  guess, you said is owed 4.176 million from the Dynamic Hedge

22  Fund, and then -- I don't know if that was the total amount

23  from the three funds, but you feel like you have a fiduciary

24  duty to pursue that disbursement.

25          MR. POMERANTZ:  Absolutely, Your Honor.

50

1          THE COURT:  All right.

2          MR. POMERANTZ:  And again, you know, we could get

3    this into argument.  Mr. Okada is in a much different position

4    than some of the other insiders.  We understand the comments

5    about Mr. --

6          THE COURT:  Well, I remember some of the dynamics

7    here, but let me tell you what I'm going to feel the need to

8    get into if we hear evidence.  And what we'll do is we're going

9    to take a short break in a minute.  Let me ask the Barker

10   people who I think are in the back.

11      (Off record discussion 2:34:51 to 2:35:01)

12         THE COURT:  Okay.  So we'll take a 10-minute break in

13   a minute.

14         But again, one reason I was sort of delighted to get

15   the suggestion of Judge Lynn is I see this evidentiary hearing

16   as being a little more involved than looking at contractual

17   obligations and whatnot, and you know, the fact that these are

18   non-property of the estate funds that we're talking about.  I

19   have fundamental questions having read the pleadings about the

20   decision to wind-down these funds that was made in November

21   2019, days after Highland filed bankruptcy.

22         Who made the decision?  Was it insider investors

23   seeking redemption?  Or was it, you know, did we have large

24   unaffiliated investors exercising redemptions, and so

25   therefore, it was reasonable business judgment, you know, we

**WWW.JJCOURT.COM**

51

1   need to wind down?

2         I know the issues are a little bit different with the
3   two hedge funds versus the RCP fund that had the term.  And I
4   understand, I read the pleadings, how the term expired in April
5   2018, it was extended for one year, and then the advisory board
6   didn't consent to an additional extension.

7         Again, maybe the new board has thoroughly scrubbed
8   this and you're going to tell me that in evidence.  And maybe
9   the Committee has thoroughly scrubbed this, and you're going to
10  tell me that with evidence.  But I -- I'll want to hear that.
11  I'll want to hear that this was all legitimate, independent,
12  non-affiliated investors pressing for the wind-down of these
13  funds, and we didn't have what I refer to as the Acis situation
14  where -- well --

15        MR. POMERANTZ:  Your Honor, Mr. Seery is prepared to
16  testify to each of those.  And as I mentioned, the board did
17  thoroughly consider it and you will -- Your Honor will hear
18  evidence that led Mr. Seery and the board to conclude that each
19  of these were appropriate.  But we intended to get into that in
20  the evidence.

21        THE COURT:  Okay.

22     (Proceedings recessed from 2:37 p.m. to 3:01 p.m.)

23        THE COURT:  All right.  We're going back on the
24  record in Highland.  Mr. Pomerantz, are you ready to call your
25  witness?

52

1          MR. CLEMENTE:  Your Honor, if I might before.

2          THE COURT:  Mr. Clemente?

3          MR. CLEMENTE:  Matt Clemente on behalf of the

4    Committee, again.

5          I would just like to revisit the colloquy we had

6    before we broke.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  I'm still confused as to why Your

9    Honor just can't enter or so order that the debtor has

10   satisfied its duty upon depositing the money into the Court

11   registry.  And we don't need to have any of this this

12   afternoon.  I see it as similar to the Foley hearing where Your

13   Honor expressed some frustration.  It's kind of maybe not the

14   best use of time.  I'm not sure what exactly we're trying to

15   accomplish here.

16         If the debtor's concerned about its duty to a

17   constituent who is not present in Court today, I think Your

18   Honor can deal with that by entering an order that says, you

19   know, based on the pleadings and the record so far, the debtor

20   has satisfied its duty and placed the money in the Court

21   registry.

22         And if Mr. Okada has an issue with that, he can come

23   back before Your Honor.  I'm just not quite sure what the point

24   is here, Your Honor.

25         THE COURT:  All right.  Well, let's turn back to

**WWW.JJCOURT.COM**

53

 1  Mr. Pomerantz, and let's talk about what my, I guess, unrefuted
 2  evidence is.  I have -- Mr. Okada would be due for the Dynamic
 3  Hedge Fund, 4.176 million is what I read in the pleadings where
 4  you told me.
 5         And then, I don't know that I have written down what
 6  he would be owed from either the Argentina Fund or the RCP
 7  Fund.  Anything?
 8         MR. POMERANTZ:  Zero.
 9         THE COURT:  Zero.  So we're talking about the 4.176
10  from termination of the Dynamic Fund.
11         MR. POMERANTZ:  Right.
12         THE COURT:  Meanwhile, we know there is a $1.3
13  million demand note --
14         MR. POMERANTZ:  Correct.
15         THE COURT:  -- owing to Highland from Okada.  And I
16  feel like I heard that there was more, but that's the only --
17         MR. POMERANTZ:  That is the only note from Mr. Okada.
18         Your Honor, I think part of it is I stood up and gave
19  a lengthy presentation, and I told Your Honor what the
20  testimony would show.  Now there's been a lot of issues in this
21  case about what the board's doing, what it's not doing.  Part
22  of our reason for being here today and part of my presentation
23  was to get Your Honor comfortable with how the board is
24  handling its duties.  I didn't want you to hear that just from
25  me.  I wanted you to hear that from Mr. Seery.

**WWW.JJCOURT.COM**

54

1          There also have been allegations by Acis and concerns

2     Your Honor has raised as to what went into the wind-down of

3     these funds, given Your Honor's past experience with Acis.  And

4     I'm sure Ms. Patel's past experience with Acis.

5          I think it's important to hear from Mr. Seery because

6     he has good explanations of why each of these funds are in

7     wind-down.  And then, furthermore, look, Your Honor will decide

8     what Your Honor decides and whether the Committee and Acis have

9     met the showing under 105 to hold back the Okada funds.  If

10    Your Honor decides that, of course we will abide by that

11    decision.

12         But we didn't want any implication that we were sort

13    of laying down for that issue.  So I think it would be helpful

14    maybe to hear some testimony from Mr. Seery.  If Your Honor

15    then concludes that funds shouldn't be disbursed, Your Honor

16    will conclude that funds shouldn't be disbursed.  I don't think

17    this has to be very lengthy.  I think we've -- we've narrowed

18    the issues, given that we don't have an issue with respect to

19    RCP anymore.  We don't have the issue with HCM Services

20    receiving money on account of a trade that Acis is very

21    critical about.  Again, those issues at an appropriate time can

22    be raised in appropriate form, and Your Honor will have a full

23    evidentiary hearing, as opposed to a tail wagging the dog on

24    this motion when it's not even relevant anymore.

25         So what I would propose is that we allow Mr. Seery to

55

1 take the stand.  We allow him to address Your Honor's concerns.

2 We allow him to testify to the things that I said he would

3 testify to so it gives Your Honor some comfort, and hopefully

4 the other parties comfort, exactly how Mr. Seery and the other

5 board members are performing their duties.

6       THE COURT:  Okay.  Can we all agree to some

7 reasonable time limitations here?  I'm thinking we're done in

8 an hour.  Maximum 30 minute direct of debtor, or redirect, and

9 maximum 30 minute cross of all objectors.  Can we do that

10 today?

11       MR. POMERANTZ:  I think we can do that, Your Honor.

12       THE COURT:  Okay.  Then that's --

13       MR. CLEMENTE:  My only question, Your Honor -- Matt

14 Clemente on behalf of the Committee -- is what are we still

15 talking about here?  Are we just talking about the distribution

16 to Mr. Okada?  And the other distributions are off the table as

17 suggested by -- or as agreed to at least on behalf of

18 Mr. Dondero?  I don't even know what we're talking about.

19       MR. POMERANTZ:  That is correct, Your Honor.  It's

20 only the distributions to Mr. Okada.

21       THE COURT:  Although, I think he wanted the Court to

22 get some testimony from Mr. Seery about sort of the business

23 judgment of the three wind-downs, but I don't think that's

24 going to --

25       MR. POMERANTZ:  That shouldn't take a long time.

**WWW.JJCOURT.COM**

56

1          THE COURT:  -- be a probe today of MGM stock sales.

2          MR. POMERANTZ:  No, it won't be at all, Your Honor.

3   And again, look, we understand Your Honor has had experience

4   with Acis, and we understand the concerns, Your Honor, coming

5   in, seeing redemptions, and the questions you asked.

6          Again, it's important for the debtor to be able to

7   demonstrate to Your Honor that this board is doing its

8   appropriate things and hearing from Mr. Seery why he made these

9   decisions so Your Honor can get comfortable, not only in these

10  matters, but in other matters that brought before Your Honor in

11  the future that this board is doing exactly what they should be

12  doing acting as an independent fiduciary.

13         That's why I think some of our testimony, but we're

14  happy to live within the time frame that Your Honor has given

15  us.

16         THE COURT:  Okay.  All right.  Thank you.

17         MS. PATEL:  Your Honor, I just wanted to follow along

18  with one of the comments that I made during my opening

19  statement and hopefully, it will help further narrow the issues

20  and keep us within the time limits, is is that when -- in

21  responding to Your Honor's question about the wind-down of

22  these funds, and I said Acis had concerns, I want to say we've

23  got concerns with respect to the Argentina and the Dynamic

24  fund.  We frankly just don't understand or have that much

25  information with which to really evaluate the transaction, so

WWW.JJCOURT.COM

57

 1 we're a little hamstrung today for purposes of cross-

 2 examination because that's not something that necessarily Acis

 3 has inquired into.

 4        But separate and apart from that, just again so

 5 everyone's clear, with respect to the wind-down of RCP, Acis

 6 does not take issue with respect to the genesis of the wind-

 7 down.  So the decision to wind it down is a find from Acis's

 8 perspective that should probably have been wound down.  Now,

 9 the methodology of how it's being wound-down, that's fair game.

10        THE COURT:  I don't know what that meant --

11        MS. PATEL:  Okay.

12     (Laughter)

13        THE COURT:  -- the methodology of how it's being

14 wound-down.

15        MS. PATEL:  Okay.  Let me --

16        THE COURT:  Very quickly because, you know --

17        MS. PATEL:  Yes.  Your Honor, what I meant by that

18 was, in terms of the decision to wind-down RCP, that makes

19 sense to Acis because it is a fund that should have been wound-

20 down.  How it is going about being wound-down, that is open for

21 dispute, and one of those things being here this MGM stock

22 sale, etcetera.

23        THE COURT:  We'll hear from Mr. Seery.  I thought

24 there was a pile of cash at this point, but maybe I misread the

25 pleadings.

58

1          Okay.

2          MR. POMERANTZ:  Your Honor, let's remember what this

3    motion is.  This motion wasn't a referendum on wind-down, it

4    was the ability to make a distribution.

5          THE COURT:  Right.

6          MR. POMERANTZ:  Mr. Dondero's counsel, who is

7    speaking on behalf of ACM Services, said they're prepared to

8    hold those distributions in the registry of the Court.  The

9    issues regarding what Ms. Patel testified from the podium, at

10   some point, they may very well be the subject of a hearing in

11   the Court.  We're happy to continue responding to the Committee

12   and Ms. Patel's comments and questions about how, but it's just

13   not relevant here.

14         And, Your Honor, there is no way if Ms. Patel is

15   going to go down that road that we will ever be here only an

16   hour.  That is a much longer discussion.

17         THE COURT:  And let me just clarify where I was

18   coming from.

19         I thought if we were evaluating whether insiders

20   should get $8.6 million of distributions, the bona fides of the

21   decision to go into wind-down mode needed to be explored a

22   little bit and see if some of these insiders were improperly

23   exercising control in that.

24         So I agree with what you're saying.  Now, that we're

25   just talking about deferring to another day all but maybe

**WWW.JJCOURT.COM**

59

 1  Mr. Okada's disbursement, we don't need to hear great detail

 2  about the whole decision-making process for the wind-down of

 3  these three.  A little bit of background would be useful,

 4  but --

 5          MR. POMERANTZ:  Absolutely, Your Honor, and we

 6  will --

 7          THE COURT:  -- it doesn't need to be, you know --

 8          MR. POMERANTZ:  -- tailor our testimony to the issues

 9  that Your Honor was concerned about and the comments that I

10  made, and we will keep within the time limit that Your Honor

11  wants us to keep it to.

12          THE COURT:  All right.  Very good.

13          Mr. Seery?

14          MR. SEERY:  Yes, Your Honor.

15          THE COURT:  There you are.  If you could approach the

16  witness stand.  I know I've been introduced to you before.  I'm

17  not sure if you've taken the witness stand yet.

18          MR. SEERY:  I have not.

19          THE COURT:  I don't think you have.

20          Please raise your right hand.

21          JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22          THE COURT:  All right.  Please be seated.

23          MS. HAYWARD:  Your Honor, may I approach with an

24  exhibit binder?

25          THE COURT:  You may.


**WWW.JJCOURT.COM**

Seery - Direct/Hayward                          60

1         MS. HAYWARD:  Or two?

2         THE COURT:  Okay.  One for the Court.

3    Thank you.

4         MS. HAYWARD:  May I approach the witness?

5         THE COURT:  You may.

6                    DIRECT EXAMINATION

7    BY MR. HAYWARD:

8    Q    Well, good afternoon, Mr. Seery.  Since this is your first

9    time testifying, would you introduce yourself to the Court and

10   give her just a little bit of background?

11   A    I'll go pretty quickly because of the time constraints.

12   James P. Seery, Jr., for the record.  I am an independent

13   director for Highland Capital.  I've been in the asset

14   management restructuring business for about 32 years.

15        I started as a restructuring lawyer handling

16   everything from real estate to debtor's side to financial

17   transactions.  From there, I moved into asset management and

18   distressed investing.

19        From there, I moved into managing a large global loan

20   portfolio for a big investment bank.  That included teams of

21   people who both underwrote, distributed, held, managed,

22   restructured, and traded both loans, indicated loan assets,

23   primarily, but also high end bonds, distressed assets, as well

24   as CLO assets.

25        After that, I went into a hedge fund.  We had a

                        WWW.JJCOURT.COM

 1  billion, three long-short credit fund.  I was the senior

 2  investment partner and president of that firm.  We did similar

 3  types of investments, high yield, high yield loans, distressed

 4  loans, CLO assets, and some other structured products, long-

 5  shorts.  So we were domestic primarily, but we also had a

 6  global investment view and an office in London.

 7          Subsequent to that, I was a co-head of a credit

 8  business for an investment bank.  And then, in the last six

 9  months, I've decided to do this job.

10  Q    So of the three board members, you're kind of the stock

11  guy.  Would that be a fair --

12  A    I think -- stock isn't really my stock and trade, but I do

13  know my way a little bit around the stock market.  But it's

14  primarily been credit products, but I do -- I am familiar with

15  equities and equity trade.

16  Q    Okay.  So since coming onto the board, give the Court a

17  day in the life, if you don't mind, and maybe starting with the

18  day that the board took over on January 9th.

19  A    I think, as Your Honor will recall, when we left and we

20  talked about what the role would be and what the compensation

21  would be, I think your comment was, Your Honor, that it -- we

22  wouldn't be 50,000 feet.  Well, we -- we're actually fully on

23  the ground.  We're not even five feet above.  We don't keep

24  track of our hours like lawyers, but probably logged about 190

25  hours in January starting on the 9th, and then about 150 hours,

Seery - Direct/Hayward                          62

1   160 hours in February.  And I know my fellow board members are

2   similar time commitments.

3          We're involved day-to-day in each of the decisions

4   that the debtor makes from assets management decisions,

5   understanding how the funds are being managed and what the ways

6   that they could either be walled off if they're in liquidation,

7   or if what the proper way to treat them on a day-to-day basis

8   is, evaluating assets that the debtor owns directly or through

9   funds, be thinking about ways to monetize those assets;

10  employee issues, what they're doing, who they're reporting to,

11  how they're -- how they're performing, how they're being paid;

12  claims issues.

13         This case got started, as we all know, by three major

14  litigations, and they're not all easy to understand.  They've

15  got the redeemer arbitration, which I think is fairly

16  straightforward in terms of liability and amount.  There's a

17  number of offsets that are complicated.

18         We've got the UVS litigation that is a lot more

19  complicated because it's not against the debtor.  The judgment

20  is against two offshore funds that are, in essence, shells, and

21  there's a very complex history around the 10-year litigation

22  that that is.

23         Then we have the Acis litigation, which comes out of

24  the Acis bankruptcy, but is an unliquidated claim.  So

25  understanding those thinking about what the pros and cons of

1  those claims are, how we would manage them down the road, how

2  we would go forward.  Thinking about how to resolve them has

3  been a key part of what we're doing on a day-to-day basis.

4  Q    So has the board done an independent analysis of all these

5  various litigation claims?

6  A    Not yet.  So we've -- we've done a preliminary analysis,

7  and then we've gone further.  So with respect -- we haven't sat

8  down with -- frankly with Redeemer, yet, although one of the

9  board members has had a call with them separately.  But we have

10  sat down with the Acis creditors, and we've done some

11  significant analysis around that.  And we have sat down with

12  UBS claimants, and we've done significant analysis around that.

13        All three of those require a ton more work, and not

14  because it's not easy to figure out what the numbers are.  It's

15  really difficult to figure out what the liability is, how it

16  rolls up to the debtor, and then how to satisfy it, and so

17  we're trying to get our hands around that.  But that is a

18  critical component of resolving this case.

19  Q    When the board took over, did -- what types of things did

20  you do immediately upon taking over control of this debtor?

21  Did you meet with people at the facility?

22  A    Oh, sure.  So the first thing we did, actually, is have

23  lunch with the Committee and with Acis, and we wanted to get

24  their perspective because they were here and it was easier to

25  do that than to run back to the debtor and try to -- try to

Seery - Direct/Hayward                          64

1  then set up another meeting.

2          And so we wanted to get their perspective.  They'd

3  been living with the debtor from the litigations and through

4  the time in Delaware and the litigation in this case.  So we

5  got a feel for them of what their desires were, how they

6  thought the case would work out or potentially resolve, and

7  also, how they thought about our role.

8          One of the things we stressed at that time, and I

9  stressed when I was interviewed for the role, is that -- I know

10 my fellow directors feel the same way, but I'm a pretty

11 independent person, and I wasn't going to be certainly the

12 management of Highlands guy, nor would I be the guy of the

13 Committee.  So we're going to -- I'm going to work

14 independently make decisions with the fellow board members in

15 what I think is the best way.

16          I'm going to try to exercise my duty in both care and

17 loyalty to the estate, but then if the estate has duties, I'm

18 going to make sure we exercise those.  And I feel very strongly

19 about that because this is just one -- a decent sized matter,

20 but one small piece of a career, and I'm not going to

21 compromise myself to satisfy either people on the management

22 side or people on the Committee side.

23 Q   Yeah.  Well, and I want to talk a little bit about the

24 duties since you mentioned them, because we heard I think the

25 Committee say that we -- the debtor has not mentioned the

Seery - Direct/Hayward                            65

1  fiduciary duties to the estate in the opening statement.  Do

2  you think that by presenting this motion the debtor -- does

3  this motion contemplate protecting the fiduciary duties that

4  the debtor owes to the estate?

5  A    To me, it absolutely does.  But to be fair, I think that

6  the rhetorical flair and opening remarks and missing the duties

7  to the estate, we're very conscious as a board of our duties to

8  the estate.  We're also very conscious of our duties as an

9  asset manager.  And what is in the pleadings is absolutely the

10 case, it's been -- it's my experience, my understanding of the

11 law, and it's being confirmed by both Cayman counsel, and by

12 fund counsel in the U.S. separate from bankruptcy counsel.

13         We owe a duty under the Advisor's Act to the funds

14 and to the investors in those funds.  That duty actually

15 supercedes the benefit to the estate, but it doesn't undercut

16 it because by vindicating the duty to the funds, you actually

17 vindicate the duty to the estate.  If you create liability at

18 the funds, it will roll to the estate.  So by exercising your

19 duty correctly, you do in fact, vindicate the duty of the

20 estate.

21         And what's important in the Advisor's Act, and it's

22 an interesting part of U.S. law.  At least my understanding,

23 it's been confirmed by outside counsel, is if the manager,

24 which would be Highland, has an interest, it's actually

25 required to subordinate that interest to the interest of the

WWW.JJCOURT.COM

Seery - Direct/Hayward                              66

1 investors in the funds it managed.  And it makes sense.

2         If you have funds invested in a fund with an outside

3 investor, you want to make sure that that investor is not --

4 that manager is not using your funds to aggrandize itself as

5 opposed to looking out for your best interest.  And so, I think

6 by vindicating our obligations with respect to the funds, we

7 actually enhance our obligations with respect to the estate.

8 Q   Let's talk a little bit about the funds now.  So

9 originally, the motion pertained to three different funds.

10 Could you just briefly explain to the Court the status of those

11 funds and how they got there?

12 A   Yeah.  I'll try to go quickly, and if I skip something or

13 I go too quickly, Your Honor, please let me know.

14        The Highland Dynamic Fund, which is the primary one

15 we're talking about now, I think you'll see at the end of Tab 1

16 how it's set up right before Tab 2.  And I haven't looked at

17 these exhibits in a long time, so I apologize.  I didn't know I

18 was getting this.  But it's really straightforward.

19        These funds are set up, and this is a pretty typical

20 structure.  It's a limited partnership structure.  It's got a

21 master feeder structure.  And what does that mean?  The master

22 is the main fund.  That's the King Exemptive Limited

23 Partnership at the bottom.

24        It's fed by two feeders, a domestic feeder and an

25 offshore feeder.  Why is it done that way?  Purely tax.

1  Offshore investors, non-taxables in the U.S. who are worried

2  about ECI or UVTI, or unrelated business income, we want to

3  make sure that there's no withholding or any tax ramifications

4  with respect to the distributions they get off the fund.  Since

5  it's a pass-through entity, both of those investors, either

6  domestic or foreign, are non-taxables in the U.S., will have

7  their own tax treatment when it gets up to them.  So they don't

8  want anything withheld.

9          When you look at the left side of the page, Dynamic

10  domestic feeder, the other investors is where you'd include

11  Mark Okada.  This fund was founded originally under a different

12  name.  I believe it was called the Highland Loan Fund.  It

13  might have been CLO Loan Fund, I apologize.  And then that was

14  in 2013.

15          Mark Okada put $2 million cash into the fund at that

16  time.  Why did he put it in?  This fund was designed to own CLO

17  assets and loan assets.  Okada was the founder of that part of

18  the business and the driver of that business.  It was pretty

19  essential that he put some money in.

20          However, in '13, they did get third-party investors,

21  but this fund never got real scale.  I think it was only a bit

22  over $100 million.  Not insignificant, but not a big fund.  And

23  they went out looking for loan funds, loan opportunities, and

24  CLO paper.  So the CLO papers, the debt of the CLOs, generally

25  (indiscernible) type paper that was higher yielding unless

WWW.JJCOURT.COM

Seery - Direct/Hayward                          68

1  there was some interesting opportunity in the -- in the higher

2  rated tranches.

3        In 2018, the fund got restructured, and they -- I'm

4  pretty sure that's when the name change occurred.  Okada put

5  another two and a half million dollars of cash in.  So he

6  didn't get this as free-carry or anything.  This was actually

7  cash that he deposited in the fund.

8        In 2019, Okada in the spring of 2019, determined that

9  he was leaving Highland.  And his separation was finally

10 completed in September of 2019.  So he is no longer an employee

11 of the debtor.  He has no influence, say, discussion, he's not

12 involved in anything.  He hasn't been since we've been there.

13       The investor, I think it was late summer, either

14 understood that or the fund hadn't performed that well.

15 Frankly, it was undersized anyway.  Realdania, a third-party, I

16 believe they're European, issued a redemption notice.  This was

17 a hedge fund style fund.  So we've got three different funds

18 here, two of them are hedge fund, and we explained a little bit

19 in the papers, but the real dynamic, no pun intended,

20 difference between the two is that Dynamic and Argentina are

21 hedge funds which provide liquidity to the investor.

22       What does that mean?  Monthly, quarterly, semi-

23 annually, they can look for redemptions.  The fund manager

24 sales assets because the assets are supposed to be a little bit

25 more liquid, makes distributions per the redemptions.


**WWW.JJCOURT.COM**

Seery - Direct/Hayward                                69

1        If the redemptions are too big and the sales will

2   somehow disadvantage the remaining investors, either gates come

3   down or you put the fund into liquidation.  Realdania had made

4   a, I believe it's a $65 million -- it was initially a smaller

5   one, then there was a $65 million redemption, and it -- this is

6   prepetition.  The debtor determined we've got to wind this fund

7   up because we can't basically more than halve it and then

8   continue to try to function.  It would have been far too

9   undersized.

10       So the debtor then went about selling the assets,

11  creating a pool of cash, and then this motion is to liquidate

12  it and pay the investors, including Okada.  When it's done,

13  assuming they made the full distributions, about 80-something

14  percent of the assets will have been distributed.  There's a

15  few small assets that are left.  They're not particularly

16  liquid, but they're small and I'm relatively certain we can

17  unload those at decent prices, create cash for the investors,

18  make the final distribution, so it would be a hold cash to

19  wind-down and then dissolve the various little limited

20  partnerships.

21       Argentina is similar.  The basically different

22  premise of why that fund existed, the original theory was post

23  the Argentina crisis with the election of Macri in '15.  Late

24  '15, Argentina started going through a number of changes in its

25  economy and the thought was that Argentina would start to grow

APPX. 107336

Seery - Direct/Hayward                    70

1 and really be able to realize the potential of its people and
2 its resources.  That didn't work out that well, and then at the
3 end of, I think it was '18, Macri was voted out and the former
4 Kirchner, effectively, government is going to back.  Argentina
5 economy has slid into basically -- certainly recession over
6 multiple quarters, but even some would say depression.

7         Very difficult time.  This was not a unique fund for
8 Highland.  There were a lot of these Argentina-type opportunity
9 funds, and that -- that performance has not been particularly
10 good.  The decision there was made to wind-down a third-party
11 investor who made a 15 percent withdrawal, and that a number of
12 other funds that I forget the percentage, but they're managed
13 by UBS, third parties made a -- indicated that they were going
14 to have full redemptions, as well, so that fund was put into
15 liquidation.

16         Importantly, I think something that was mentioned
17 before, there's no benefit to keeping these funds around.  They
18 don't make any fees.
19 Q    Why is that?
20 A    And once they've gone into liquidation, they're not paying
21 any fees.  Similarly, RCP -- now, RCP is a different style of
22 fund, and I think Your Honor, you mentioned it in the papers,
23 you saw that it was a 10-year old fund.  That term was
24 extended.  It was originally a 2008 fund.  It was done as a
25 distressed for control.  Very different opportunity,

WWW.JJCOURT.COM

                            Seery - Direct/Hayward                71

1  (indiscernible), at the time, they probably didn't see the

2  global financial crisis, but saw it as distressed and the

3  opportunity to do distressed for control positions had to be

4  long term.  So that fund had no liquidity provisions for

5  investors.  Typical PE-style fund.

6           The -- when it got to the end of its life, the 10-

7  year life, Highland didn't have the ability to extend the term.

8  A steering committee of third-party institutional investors

9  with no Highland influence whatsoever, Ontario Teachers,

10 CalPERS, some of the biggest, most sophisticated investors in

11 the world in both debt, equity, and distress were driving that.

12 There was also a couple of other funds that are third parties

13 on that steering group.  And they still exist.  They gave a

14 one-year extension.  Highland had no ability to do anything

15 about that.

16          In exchange for the extension, Highland waived fees.

17 So there are no fees being paid on the RCP Fund.  There was a

18 series of one-month extensions that went -- was finished in

19 November of 2019.  And with this distribution, there's still a

20 lot of assets in RCP that have to be managed, about 175

21 million.  And so we're going to -- after we make the

22 distribution -- we've had a few calls and I've been on them,

23 with the steering group.

24          We've told them we're coming to Court to make the

25 distribution.  We were confident that we would be able to -- to

                            WWW.JJCOURT.COM

Seery - Direct/Hayward                                72

1  be able to make a distribution to them subject to the Court's
2  order, that we make that distribution and somewhere in the next
3  two weeks we're going to have a steering group meeting to talk
4  about the other assets and how we monetize them.

5       They are different types of assets.  Some have more
6  liquidity than others, so we're going to need to come up with a
7  plan.  It's 85 percent, roughly, third parties.  Highland
8  Capital Management, the debtor, actually has a roughly 15
9  percent interest in HCM Services, has as a couple percentage,
10 because I think there would have been about 2 percent of the
11 distribution.

12      So it's vast -- the vast majority of the owners of
13 the fund are outsiders, and we're going to need to come up with
14 a structured plan to get them their cash because they've been
15 invested for 12 years in this fund.
16 Q   Do you agree, having had the chance to come in and look
17 over all these things, that these funds should be wound-down?
18 A   Oh, absolutely.  So I think it's easiest to say,
19 Dynamic -- Okada was the driver.  It never got to where it
20 wanted.  The biggest investor wanted out.  It's not big enough
21 to support itself.  Even if one were to look today, and say, it
22 should have, frankly, owning CLO paper when this fund was
23 started until today, there should have been good appreciation
24 in it, and it just didn't -- I don't know the reasons it
25 didn't, but it didn't perform the way it should have, and it

Seery - Direct/Hayward                              73

1  didn't attract the investors it should have.  Perhaps that had

2  something to do with it, you know, the way the other cases or

3  litigations were going on and the public nature of them.

4          And frankly, coming out of the global financial

5  crises, Highland had had a tough time of it, so it wasn't as if

6  it was the easiest thing to raise funds.  Argentina, there's

7  absolutely no question that the purpose and structure of that

8  fund and what it set out to do doesn't work, just doesn't work.

9  So it makes no sense to keep that going, and that's why the

10 investors -- third-party investors sought redemptions.

11         The insider interests, while not immaterial, are

12 pretty small.  Okada's interest is about 12 percent in the

13 fund, and he's not driving it.  Like I said, he's not even at

14 the debtor.  These two -- but to be fair -- both the decisions

15 to wind-down Dynamic and Argentina were made before the board

16 was involved and before the petition was filed, and they really

17 related to the withdrawals from third parties.

18 Q    So why are we here today?  Do you -- do these funds wind-

19 down in the ordinary course of their business?

20 A    Well, it -- they all have life.  So I'd say in the case of

21 RCP, it's pretty clearly in the ordinary course because it

22 reached the end of its life.  And the investors were very clear

23 that they wanted to be cashed out.  So the difficult part is

24 that it -- because of its structure and in the way it was

25 originally set up as a PE-style fund, it has illiquid, a number

Seery - Direct/Hayward                                          74

1  of illiquid assets.

2        And the challenge in any of the PE funds is to time

3  your exit, and the timing on this hasn't been opportune because

4  the opportunity to sale has not been as good as one might hope

5  and the investors are just at the point where they want to get

6  cashed out as we've heard today from CalPERS.  But we've seen

7  it in the documents and our discussions -- and my discussions

8  directly with them.

9        The other funds, once they've reached this -- it's an

10 ordinary course thing for funds.  When funds either they're --

11 they've reached their life or investors redeem and they get to

12 this state where they really can't support themselves, it's a

13 very ordinary thing for managers to wind-down funds.

14 Q    And as part of the winding down of the funds, is it also

15 ordinary then to make distributions once the funds have become

16 liquid?

17 A    Well, I mean one of the questions you started to ask, or

18 maybe did ask, and I didn't answer, was why are we here?

19        Our view as an independent board, my view as an

20 independent board member, is we have an obligation to all

21 investors.  It would be really easy if the documents or the law

22 said all investors, other than ones who might have been related

23 somehow to the asset manager.  It just doesn't say that.  And

24 as we talked about, this is -- these are not funds from

25 Highland.  If they were funds from Highland, again, it would be

WWW.JJCOURT.COM

Seery - Direct/Hayward                          75

1  really easy.

2          As I described for Highland Dynamic, I don't need to

3  hold and carry water for Mark Okada.  But I do need to carry my

4  own fiduciary duties and make sure that I exercise them well.

5  The gentleman put $2 million in -- this is April 2013, put 2

6  million -- 2.5 million in cash in 2018, and the fund is being

7  wound down.  It's not the debtor's money.  If it was the

8  debtor's money, it would be really easy to say, you know,

9  Mr. Okada, I'm not going to give you the money because we may

10 have claims against you, and a different discussion would

11 ensue.

12 Q    Well, I want to walk through that just a little bit.  You

13 say it's not the debtor's money.  Where is the money?

14 A    This money sits in funds or in bank accounts.  Its assets

15 are denominated and they're held in trust.  And the cash that's

16 in accounts, they're denominated in the name of the fund.  The

17 asset manager, Highland, has the ability to access the accounts

18 and use the funds in accordance with the fund documents.  It

19 does not have the ability to access the accounts and use the

20 funds however it see fit.

21 Q    So it's like an authorized signer?

22 A    It's certainly an authorized signer in terms of what its

23 ability to do in terms of accessing the funds.  Typically,

24 that's done through the trustee.  But it can manage the funds.

25 It couldn't take the funds and make an unrelated investment.


**WWW.JJCOURT.COM**

Seery - Direct/Hayward                                76

1  It couldn't take the funds and use it for its own purposes and

2  pay them back later.  It's just simply not permitted.

3  Q     Well, taking that to the next level.  If the Court did not

4  allow these distributions to be made, would the distributions

5  then go to the debtor?

6  A     No.

7  Q     Where would they go?

8  A     There's really no provision for it.  There are certain

9  provisions in the underlying documents that would enable the

10 manager to withhold funds.  If there was a change in law that

11 didn't permit a distribution.  If there was some other reason

12 that it became unfeasible to make the distribution.  If you

13 couldn't find the investor, and sometimes that happens.  There

14 are provisions of how you deal with those funds.  But they

15 never would go to the manager.

16 Q     So what is the -- why is the primary reason then that

17 we're here today asking this Court for permission to distribute

18 these funds?

19 A     It's pretty straightforward.  We have a fiduciary duty and

20 we've confirmed that with outside counsel, both Cayman and

21 domestic fund counsel, to make distributions and treat all

22 investors in the funds pro rata.  And we're here to make sure

23 we vindicate our duties, not exercising our fiduciary duties,

24 doing things that were not permitted.  One, we don't think

25 that's right or appropriate.  Two, that's not going to help

WWW.JJCOURT.COM

Seery - Direct/Hayward                          77

 1  resolve this case that probably contributes to some of the

 2  things that led to this case.  So we're not real interested as

 3  an independent board in doing things that are close to the

 4  edge, along the margin, try to use our positions to leverage

 5  investors.

 6  Q    Are you familiar with the protocols?

 7  A    I am.

 8  Q    Okay.  But for the protocols, do you believe that the

 9  debtor would need to obtain the Court's permission in order to

10  makes these distributions on behalf of these funds?

11  A    I don't think so, no.

12  Q    So then, why are we asking the Court's permission?

13  A    Well, the protocols require it, and I think the Committee,

14  you know, with due respect and I mean that truly, would like us

15  to withhold the funds, and that provides certain leverage

16  potentially over insiders.  I think when I look at the

17  protocols, I think the main function of the protocols is to

18  assure that there isn't undue influence by insiders over the

19  actions of the company, and that insiders are not somehow

20  benefitting themselves by virtue of their control over the

21  company.

22        The independent board has control over the company.

23  We're not naive and think we have control over every single

24  persons every single second of every day, but we do have

25  control over what happens with the accounts, how payments are

Seery - Direct/Hayward                                78

 1  made, when we wind something down, when an asset is sold, how

 2  the proceeds will be used.  That's the board.  That's not

 3  anybody in management.  The decision around these distributions

 4  was made by the board independently.  We did consult with the

 5  CCO, and that was important to make sure we got all the facts

 6  with respect to these funds.

 7          We then sought outside counsel to inform our

 8  decision, both Cayman and domestic.  We didn't have any

 9  influence whatsoever and we didn't speak to Mr. Dondero nor

10  Mr. Okada other than to tell Mr. Okada that we were coming to

11  court and then to ask him if he would defer his distribution.

12  And we know his response.

13  Q    I want to ask you just a couple -- I know I'm almost at my

14  30 minutes here, so I just want to ask you a few quick

15  questions because one of the issues that came up were these

16  demand notes.  I understand that Mr. Okada does have a demand

17  note.

18  A    He does.  We've --

19  Q    And has the board --

20  A    And we've sent a demand.

21  Q    Okay.  And what was -- what is the status of that demand

22  note?

23  A    He acknowledges that he signed it and he said that he's

24  owed certain things from the company.  He's asked how we work

25  those through because he was severed -- or severed himself in

Seery - Direct/Hayward                          79

1  September, and he has -- they reached a severance agreement

2  according to Mr. Okada.  I haven't personally investigated it

3  yet, but we will get to it quickly.  And he has some expenses

4  that are owed, but I don't think those are material.

5          I'm quite confident.  He said his severance was

6  agreement not money, but terms, was very standard.  We'll take

7  a look at that and make sure there's agreement on that.

8          I think it would be covered by the protocol, but it's

9  probably a transaction, so we'd have to talk to the Committee

10  about it, but we'll work -- I'm confident that we can work our

11  way through a standard severance agreement very quickly and

12  resolve that issue and collect on the note.

13  Q    Now, to be clear, the demand note is payable to whom?

14  A    The demand note is payable to the debtor.

15  Q    Okay.

16  A    It was actually a note that was -- he didn't receive cash

17  for the note.  It's basically a tax -- rather than gross-up

18  salary sometime in the past, for whatever reason they decided

19  not to gross it up to cover taxes.

20          Because of the structure of the limited partnership,

21  they could have had taxable income without matching cash, and

22  so they issued notes back to Highland to cover certain of those

23  obligations rather than actually making a distribution.

24  Q    To you knowledge, does Mr. Okada owe any money to the

25  fund?

WWW.JJCOURT.COM

Seery - Direct/Hayward                                80

1  A    No.  Not a -- my knowledge is that he does not.  So I am

2  knowledgeable of it, and he does not owe any money to the fund.

3  Q    Okay.  Quickly, I just want to talk a little bit about

4  Mr. Dondero.  One of I think the points that was made at the

5  very beginning of opening statements was that Mr. Dondero is

6  still around.  Why is that?

7  A    He's around because he has incredible knowledge about the

8  investments.  He is a portfolio manager for the fund.  He does

9  work with respect to non-Highland unrelated funds, some of

10  which Highland employees do work under shared services

11  arrangement and we get paid for them.  But Mr. Dondero is

12  around for those reasons and his knowledge about a number of

13  the investments in which we're involved.

14  Q    Does the Debtor -- or does the board have the power to

15  terminate Mr. Dondero if it decides to?

16  A    Yeah, he's -- we could, he's unpaid so there's no cost to

17  his involvement.  His expertise around certain investments,

18  particularly the equity funds as well as some of the larger

19  investments, including the PE investments, is really important.

20  Q    And with respect to the Dondero notes, what are the status

21  of those demand notes?

22  A    We've done an investigation of the notes and I wouldn't

23  say it's as exhaustive as -- it's in similar stages as our

24  examination of other assets.  We've looked at Dondero's notes,

25  we made a decision to send a demand letter to Okada because

WWW.JJCOURT.COM

Seery - Direct/Hayward                               81

1  he's no longer a part of the company and there's no real

2  benefit that we saw strategically to not making that demand.

3  It's a small amount of money relative to the size of the case,

4  it's real money, but it's a small amount of money relative to

5  the size of the case.  We should clean that up and move on from

6  Mr. Okada.

7           With respect to the Dondero notes on Dondero entity

8  notes, we want to think about those strategically.  They're a

9  sizable amount of money, not just the ones that are demand, but

10  also there's a number of the notes that ate notes with

11  maturities and they're actually current, they're all current,

12  but how can we use those cash, can we collect those, and I

13  think that's more strategic in terms of how we resolve this

14  case.

15           I agree with Mr. Pomerantz's statement that I think

16  it evolves into a pure litigation case and we really hope it

17  doesn't.  That then -- those can just be sued on and the demand

18  notes are pretty clear as to how they work and even include

19  cost of collection.  So they're pretty straightforward notes.

20  Q    But so for now the board --

21  A    Well, we thought about it, we don't think it makes sense

22  to make that demand at this time.  There's -- our initial --

23  we're not -- we haven't come up with what the plan is for this

24  case, but we have ideas.  We do think they involve Mr. Dondero

25  and they involved contributions from Mr. Dondero whether in the

Seery - Direct/Hayward                                      82

1  form of notes, whether in the form of cash, whether in the form

2  of other assets.  We haven't discussed those with him, but we

3  do think that's ultimately, at least preliminarily, where we're

4  going to end up somewhere.  So strategically we think that

5  that'll make sense to include in that sort of a resolution.

6  Q    Okay.  And --

7           THE COURT:  You have one minute.

8           MS. HAYWARD:  Yes, thank you, Your Honor.

9  BY MS. HAYWARD:

10  Q    Last question I'm going to ask you, are you aware of any

11  legal basis to withhold these funds now from Mr. -- from these

12  investors and these related parties?

13  A    I'm not aware of any, but as the Court has contemplating,

14  as the Committee has said, perhaps now that Section 105, you

15  know, grants that sort of authority, but that'll be up to the

16  Judge.

17           MS. HAYWARD:  Your Honor, a housekeeping matter.  I

18  move for the admission of Exhibits 1 through 12.  I don't think

19  any of them are controversial.  But I will let --

20           THE COURT:  You want me to look through

21           MS. HAYWARD:  Your Honor, they are --

22           THE COURT:   -- all of these.

23       (Laughter.)

24           MS. HAYWARD:  Your Honor, just for the record, they

25  are Number -- Exhibit 1 is the chart showing the structure of

Seery - Direct/Hayward                          83

1  the Dynamic Income Fund.

2          THE COURT:  Right.  We looked at that.

3          MS. HAYWARD:  Exhibit 2 is the partnership agreement,

4  so I know they're large documents, but they're not numerous

5  documents.  Exhibit 3 is just the chart of the Latin America

6  Argentina Fund.  Four, the partnership agreement for that fund.

7  Five, the chart (indiscernible) Third Fund.  Six would be the

8  agreement, the limited partnership agreement for that fund.

9  Seven, Your Honor, is Your Honor's order on the ordinary course

10 governance procedures.

11         THE COURT:  Okay.

12         MS. HAYWARD:  Eight is the final term sheet.  Nine is

13 the notice of amended operating protocols that was filed last

14 week.

15         THE COURT:  All right.  And then CVs of our board

16 members.

17         MS. HAYWARD:  And then the CVs for the board members.

18         THE COURT:  Any objections to these?

19         MS. REID:  No objection, Your Honor.

20         THE COURT:  Okay.  They're admitted.

21         MS. HAYWARD:  Okay.

22         THE COURT:  All right.  Any cross-examination?

23         MS. REID:  Yes, Your Honor.

24         THE COURT:  Okay.

25         MS. REID:  Good afternoon, Your Honor.  Penny Reid on

Seery - Cross/Reid                                                84

1  behalf of the Creditors Committee.

2                        CROSS-EXAMINATION

3  BY MS. REID:

4  Q    Good afternoon, Mr. Seery.

5  A    Good afternoon.

6  Q    You are aware, Mr. Seery, aren't you, of the Acis

7  bankruptcy?

8  A    I'm aware of it, yes.

9  Q    Okay.  And you're aware that prior to that bankruptcy Mr.

10 Terry obtained an arbitration award in October of 2017.

11 Correct?

12 A    I'm aware of that, yes.

13 Q    And, Mr. Seery, are you aware that four days after that

14 arbitration award assets started being transferred away from

15 Acis, stripping it of its value at that time?

16 A    I've read the judge's decision in the Acis case but I'm

17 not aware of any of the underlying facts, other than from

18 reading that case.

19 Q    So you aren't aware of all the assets that went out of

20 Acis the day after an arbitration award was entered.

21 A    No, I haven't looked at any of those.

22 Q    Okay.  And you're not aware that the day after a final

23 judgment was entered more assets were stripped from Acis.  Is

24 that correct?

25 A    Other than reading the Judge's decision I'm not aware of

WWW.JJCOURT.COM

Seery - Cross/Reid                                        85

1  any of the specific assets, no.

2  Q    Are you aware that two days after that, or entry of the

3  final judgment was ordered, Acis' entire risk retention

4  structure was transferred away from it and into the ownership

5  of Highland CLO Holdings?

6  A    I'm aware of some of the facts relating to the Acis case

7  from the decision and I'm aware of some of the facts from the

8  Acis case because of my discussions with Ms. Patel and Mr.

9  Terry.  I'm not aware of the specific transfers to which you're

10 referring without having -- looking at them.

11 Q    Okay.  So you're not aware that some of the assets that

12 were stripped from Acis went to one of the entities you're

13 wanting to send money to today.  Is that right?

14         MS. HAYWARD:  Objection.  Your Honor, I'm not sure

15 how this is relevant to the Debtor's distribution motion --

16         MS. REID:  Well, it's relevant to the distributions

17 that you're trying to give to the same entity.

18         MS. HAYWARD:  Your Honor, I think right now Mr.

19 Okada --

20         THE WITNESS:  What I --

21         THE COURT:  Just a minute.

22         THE WITNESS:  Sorry.

23         THE COURT:  We have an objection.  Let me hear the

24 objection.

25         MS. HAYWARD:  Your Honor, I think at this point Mr.

Seery - Cross/Reid                                    86

1  Okada is the only one getting a distribution at issue in this

2  case as of now in light of the representation that was made by

3  Judge Lynn.

4           THE COURT:  All right.  Well, what is your response

5  to the relevance objection?  She's saying that this line of

6  inquiry has kind of been taken off the table since -- I'm not

7  sure which entity, I think you're talking about the Holdco, CLO

8  Holdco.  Right?

9           MS. HAYWARD:  Yes, Your Honor.

10          THE COURT:  Since now the disbursement that would

11 have gone to it is being put off the table and would go into

12 the registry of the Court.  So what is your response?

13          MS. REID:  Well, Your Honor, and I can take it off,

14 but currently it's my understanding that Mr. Okada is a 25

15 percent owner in Holdco.  But I can move on to the next

16 question.

17 BY MS. REID:

18 Q    Which is, are you aware that Mr. Okada right after the

19 final judgment was entered transferred their entire interest to

20 Nutra Limited?

21 A    Who transferred to whom?

22 Q    Right after the final judgment --

23 A    Right.

24 Q    -- that Mr. Terry obtained, Mr. Okada transferred their

25 entire limited partner interest in Acis, LP to Nutra.

Seery - Cross/Reid                              87

1  A    So I apologize.  A couple of things.  One is it goes to

2  what you said, I don't believe Mr. Okada has any interest in

3  sale of Holdco, but you're saying Mr. Okada and their in your

4  question, and so it doesn't make sense.  He's an individual.

5  So I just don't know what you're asking me.  You said Mr. Okada

6  transferred their interest.   Who's their?

7  Q    Are you aware that Acis -- that you're aware that after

8  the entry of the Acis judgment that Mr. Okada's limited

9  partners interest in Acis was transferred to Nutra?

10         MS. HAYWARD:  Again, Your Honor, I lodge the same

11  objection to relevance.

12         THE COURT:  All right.  Again, what is your response

13  to the relevance objection?

14         MS. REID:  I think it's very relevant because I mean

15  he has been saying that they have a fiduciary duty to

16  investors.  Mr. Okada is not your normal independent investor.

17  It's a related party that has engaged in prior improper acts in

18  this court which you're aware, aren't you -- well.

19         THE COURT:  Yeah, I'll overrule the objection and

20  allow a little latitude.

21         THE WITNESS:  So I think what you're referring to is

22  the position in Nutra and I'm aware of some of those issues.

23  Mr. Okada apparently owns 25 percent of Nutra, Mr. Dondero owns

24  75 percent of it.  The control in Nutra is actually vested in

25  Highland Capital Management through a control agreement.  So

WWW.JJCOURT.COM

Seery - Cross/Reid                                    88

1 I'm not -- I'm aware that they made a transfer and that Nutra

2 owns that interest now, and I'm aware that that split is 75-25,

3 I assume because of that split just like ATM Services, Mr.

4 Okada doesn't have any say in how it's run.  And the control in

5 that entity anyway is vested in Highland, the Debtor.

6 BY MS. REID:

7 Q    So you're aware there were improper transfers made at --

8 during -- before the Acis bankruptcy.  Is that correct?

9 A    I'm aware --

10 Q    You're not aware?

11 A    I'm aware of the decision and I'm aware of the transfers.

12 The designation of it then as improper, I'm not sure that I can

13 say one way or the other because I've looked at the transfers

14 and I can't tell you whether that transfer was improper.  So if

15 you're asking me if I'm aware that that transfer occurred, I

16 think I said I was.  I don't think it's fair for you to color

17 that the transfer was improper.  If somebody --

18 Q    Are you aware of the Court's decision --

19 A    I am --

20 Q    -- that they were improper?

21 A    -- I don't recall the Court's decision with respect to

22 that transfer.  There were a lot of transfers, a number of

23 which the Judge ruled were improper.

24 Q    Okay.  So you are aware that there were improper transfers

25 made from Acis that the Judge found were improper.  Correct?

WWW.JJCOURT.COM

1  A    Yes, I am.

2  Q    Okay.  And you're aware that Mr. Okada was the Chief

3  Investment Officer at the time those transfers were made.

4  Correct?

5  A    Of which entity?

6  Q    Of Highland, of the Debtor.

7  A    I believe he was -- I believe he was a co-CIO of the

8  Debtor at that time, but I'm not positive.

9  Q    So you don't know.

10  A    I'm not sure, no.

11  Q    Okay.  Do you know he was -- he was the Debtor's -- so you

12  do not know one way or the other.

13  A    I am aware that at some time he was the CIO and then the

14  co-CIO.  I don't know the specific time that he was the sole

15  CIO.  I just don't know.

16  Q    Do you know if he was involved with the Debtor at the time

17  these improper transfers were made?

18  A    He definitely worked for the Debtor at that time.

19  Q    Okay.  You -- the reply that was filed today by the --

20  this morning by the Debtor states that the making of these

21  distribution to Mr. Dondero and Mr. Okada is essential to

22  rebuilding the Debtor's reputation in the marketplace.  Is that

23  correct?

24  A    I believe that's what it says, yes.  I assume you're

25  reading it?

Seery - Cross/Reid                                    90

1  Q    I am.

2  A    Okay.

3  Q    Aren't you -- is the marketplace not well aware of

4  Highland's history including the Acis and the Redeemer

5  Committee litigation?

6  A    I believe the market is aware of the Acis and Redeemer

7  litigations.

8  Q    Okay.  And is the marketplace well aware of the extensive

9  wrongdoing that Mr. Okada and Mr. Dondero engaged in as found

10 by this Court and the other tribunals?

11 A    I don't know how the marketplace -- I know that they're

12 aware of the decisions, I can't tell you whether the

13 marketplace as a large general matter knows the specifics.  I

14 don't know.

15 Q    Have any non-insider investors expressed concern to you

16 over the possibility of Mr. Okada not receiving the

17 distribution?

18 A    No, I don't believe so.  I think -- just to make sure I

19 answered your question, have the non-insiders raised issues

20 about Mr. Okada --

21 Q    Not getting distribution.

22 A    No, there won't --

23 Q    No one is really concerned about that except Mr. Okada.

24 Correct?

25 A    I think each investor is concerned about their own

WWW.JJCOURT.COM

Seery - Cross/Reid                                      91

1 distributions, so like with respect to RCP I don't CalPERS

2 referred at all to the distributions to Ontario, they probably

3 don't care, they care about their own distributions.

4 Q    And the only one we're talking about right now is the one

5 to Mr. Okada.  Correct?

6 A    That's correct.  I hope so.  Right?  Meaning I'm under the

7 impression that the Committee doesn't object to the investment,

8 to the release of funds and the distribution to third-party

9 investors.

10 Q    Mr. Seery, you testified that one of the reasons you're

11 seeking to distribute these funds is because the Debtor has

12 fiduciary duties to investors.  Correct?

13 A    Yes.

14 Q    Okay.  But these funds aren't being distributed to just

15 regular investors.  Correct?  They're being distributed to

16 insiders.

17 A    Again, unfortunately these are things one has to be

18 precise with.  The question is insider under some securities

19 law, or insider under the Bankruptcy Code?  So --

20 A    Insider under the protocols.

21 Q    I believe the term there, again, we should be precise, is

22 related party.  So he's a related party under the protocols.

23 As far as I know there's no separation under the Investment

24 Advisors Act, under the Cayman law, under Delaware law, or

25 under the contracts with respect to persons who might have

Seery - Cross/Reid                                    92

1  worked for the investment manager who made an investment in the

2  fund.

3  Q    Are you aware that the Debtor also has duties to the

4  Creditors Committee?

5  A    I don't believe the Debtor has any duties to the Creditors

6  Committee.

7  Q    To the estate?

8  A    I believe the Debtor has significant and overriding

9  duties, but that's what we're here for, to the estate.

10 Q    To the estate.  And were very conscious of those duties.

11 Correct?

12 A    I am indeed.

13 Q    That's what you testified.  Right?

14 A    Yes.

15 Q    Okay.  So can you explain to me what -- how you consider

16 the estate's considerations in deciding to distribute these,

17 what was your consideration of the estates, how does this

18 benefit the estate?

19 A    This benefits the estate because we have an obligation to

20 the funds and to the investors in the funds to perform

21 according to the terms of the funds.  Unfortunately there is no

22 provision in the fund documents or in the law that allows us to

23 treat the investors in the funds in a disparate way.  And we

24 believe, after consulting with outside counsel, domestic and

25 Cayman, considering federal law under the Advisors Act, as well

WWW.JJCOURT.COM

Seery - Cross/Reid                                          93

1  as Delaware law, that the only way to make distributions, other

2  than if there was a law change, was pro rata to all of the

3  investors.

4          So in order to vindicate our obligations to the

5  outside investors, we also have to pay the inside investors.

6  In addition, if we don't pay the inside investors, there's no

7  basis not to do that.  Now there may ultimately be no liability

8  because it will be hard to bring a case.  But it seems to me

9  that incurring potentially liability is not in the best

10 interest of the estate.  Holding up a distribution from non-

11 estate property doesn't seem to do anything to help the estate.

12 In fact, it puts it at risk.

13         And so we did the work and that's how we determined,

14 exercising what I think is our duty of care, which is really

15 researching this, and we spent a lot of time and a lot of money

16 making sure we got this right.  And our duty of loyalty.  Is

17 there some good reason that the fund could hold up the

18 distribution.  Until we have a claim is there a valid to attack

19 these distributions.

20         By the way, there were $8 million out of 180 million.

21 Now if there had been 180 -- if there had been 172 out of 180,

22 maybe we would come in here and say, We should something a

23 little bit different because we're really letting the small

24 outside investors dictate us and force us to make distributions

25 to related parties that the Committee has some concern about.

Seery - Cross/Reid                                94

1        But while $8 million is real money, and I don't deny

2   that, again, it's not huge in this case.  And it seemed to us,

3   after doing the work, that we were putting the estate at risk

4   by no exercising our fiduciary duties.  Moreover, we each have

5   reputations, and they're important to us, and they don't

6   override our fiduciary duties.  We're not going to do things to

7   aggrandize ourselves, to help our reputation versus the estate.

8   But running this Debtor correctly seems to us, looking at the

9   history, was the right thing to do.

10  Q    Has anyone, Mr. Seery, threatened to bring a fiduciary

11  duty claim against you if you don't pay these funds?

12  A    No.

13  Q    Has any -- has Mr. Okada said he's going to bring a claim

14  against you if you don't distribute these funds?

15  A    No, and nor did I consult him about it.  We just told him

16  what we were doing.  We're not -- I'm not inviting someone to

17  sue us.  That I think would be, you know, grossly wrong for us.

18  Q    Now we've touched a little bit on this, Mr. Okada owes the

19  Debtor 1.3 million.  Correct?  In the demand note?

20  A    Approximately, yes.

21  Q    All right.  And you have made a demand on Mr. Okada.

22  Correct?

23  A    That's correct.

24  Q    And he hasn't paid it.  Right?

25  A    No, he has not.

Seery - Cross/Reid                                    95

1  Q    And that's money into the estate.  Correct?

2  A    That will be, yes.

3  Q    Now do you still think it's okay to just hand him off, you

4  know, $4 million and even though he's not paying the estate

5  that you have a duty to?

6  A    There's no such thing in my life as just handing off $4

7  million.  This is fund money --

8  Q    Distributable.

9  A     -- that will be distributed to the owners of the fund pro

10 rata.  We're not handing off anything to Mr. Okada or anybody

11 else.

12 Q    But Mr. Okada has not agreed to pay back his note.

13 Correct?

14 A    He's not agreed to pay it back, no.  Technically I would

15 say no.

16 Q    Okay.  And that's because of some severance agreement that

17 you're not aware of what the terms are.  Is that right?

18 A    I have not -- we have not -- I have not looked at the

19 terms, I don't believe many of my fellow directors yet have.

20 It's something that is on the burner for us to get to as soon

21 as this is over.

22 Q    And are --

23 A    He's pushing for it.

24 Q     -- are you aware that the Committee has asked for that

25 severance agreement?

Seery - Cross/Reid                                      96

1  A    I was not aware of that, no.

2  Q    You're not aware of that.

3  A    I haven't seen it.

4  Q    And you don't know that it hasn't been produced to us.   Is

5  that correct?

6  A    I don't -- I have not seen it myself, I don't -- didn't

7  know that you'd asked for it, nor do I know that it hadn't been

8  produced.

9  Q    Okay.  And you haven't looked at it.

10  A    I haven't seen it.

11  Q    So you don't know if his failure to pay that money back is

12  valid or not.   Is that correct?

13  A    That's -- I don't -- he still owes the money whether he

14  has appropriate setoffs and whether a settlement agreement

15  would actually work as one.   I don't -- haven't really analyzed

16  that and I don't know that our counsel has either.   It may be

17  that he owes the money and we're holding a severance agreement,

18  but those aren't mutual obligations that are subject to setoff.

19  Q    You don't know one way or the other whether he has a right

20  of setoff.   Correct?

21  A    I don't believe he -- other than perhaps expenses I

22  don't -- haven't heard any articulated monetary setoff against

23  the obligations he owes.

24  Q    If the Court orders that his distribution be put into the

25  Court registry, do you still think you've breached your duty to

Seery - Cross/Patel                                    97

1  the estate somehow by that?

2  A    I think if the Court orders it, I don't think we would be

3  subject to a breach of liability.  I think that we're here

4  vindicating our responsibilities and our duties to investors.

5  If there's an interceding court order, we will follow it.

6  Q    Thank you.

7            MS. HAYWARD:  I have no further questions.

8            THE COURT:  All right.  I think that was about 17

9  minutes.  Any other examination?  Okay.  You'll have 13

10 minutes.

11           MS. PATEL:  Just a few questions, Your Honor.

12                       CROSS-EXAMINATION

13 BY MS. PATEL:

14 Q    Good afternoon, Mr. Seery.

15 A    Good afternoon.

16 Q    Mr. Seery, I think your testimony was that the fund, let's

17 use RCP -- or I'm sorry, that's the wrong one --

18 A    Dynamic?

19 Q    I think it was the Dynamic --

20 A    Dynamic.

21 Q     -- Income Fund is the one that Mr. Okada has an

22 investment in.  Correct?

23 A    That's correct.

24 Q    Okay.  And the fund has duties to Mr. Okada including

25 fiduciary duties as an investor.  Right?

WWW.JJCOURT.COM

Seery - Cross/Patel                                    98

 1  A    That's correct.

 2  Q    Okay.  Does Mr. Okada have duties to the fund?

 3  A    I don't believe he does, no.

 4  Q    Okay.  Did he ever?

 5  A    I believe he did.

 6  Q    Okay.  That was during his tenure at Highland Capital

 7  Management.  Right?

 8  A    I think as an officer of Highland Capital Management, the

 9  investment manager, he would have had duties to the fund, yes.

10  Q    Okay.  And have you investigated whether he's breached any

11  of his duties to the fund?

12  A    We have looked, we have not seen anything.  We know that

13  the redemptions came in without any objection.  We have not

14  spoken to the individual investors.

15  Q    Okay.  So would it be fair to say then that you haven't

16  concluded your investigation of whether Mr. Okada has breached

17  any of his duties to the fund itself?

18  A    I don't think that would be fair.  I think what would be

19  fair to say is we've taken a look, we see no evidence

20  whatsoever that there were any breaches by Mr. Okada of his

21  duty to that fund, so there would be no reason to undertake an

22  investigation that we had yet to complete.

23  Q    Okay.  And who undertook that investigation, was it just

24  the board or did you have others involved?

25  A    It was the board.

WWW.JJCOURT.COM

Seery - Cross/Patel                          99

1   Q    Okay.  No one else?

2   A    The investigation with respect to the -- we got data from

3   other people but I'm the one who looked at whether there were

4   any claims related to the redemptions, any objections to any of

5   the other distributions, any objections to the fees, and we

6   found none.

7   Q    Okay.  So no outside counsel advised you with respect to

8   whether Mr. Okada had potentially breached any duties to the

9   fund?

10  A    No, again, it's not something that we would have looked at

11  with no evidence whatsoever that there was any sort of

12  complaint or breach.

13  Q    Okay.  All right.  Mr. Seery, with respect to the, I'll

14  call it the agreement because I'm assuming that it is an

15  agreement, that Mr. Dondero's counsel announced on the record

16  regarding putting the funds that would otherwise be payable to

17  Mr. Dondero into the registry of the Court.  Do you have an

18  understanding whether that agreement also extends to Highland

19  Capital Management Services?

20  A    Yeah, just to be clear because, again, we should be

21  precise, Mr. Dondero was not going to receive any money.  The

22  CLO Holdco, which is owned by the charitable DAF has

23  investments in the Argentina Fund and the Dynamic Fund.  It was

24  going to receive money.  Highland Capital Services has around a

25  2 percent interest in RCP, it was going to receive money.

WWW.JJCOURT.COM

Seery - Cross/Patel                    100

1         I understand that Mr. Dondero, through his counsel,

2    directed that the distribution to Highland Capital Services

3    would not be made.  Mr. Okada owns 25 percent of that, he was

4    not consulted.  I know that because I spoke to Mr. Okada.  The

5    distribution with respect to the CLO Holdco has been similarly

6    treated, but that was done by Grant Scott talking to Mr. Nelms

7    (phonetic) for the charitable DAF that controls the CLO Holdco.

8    Q     Okay.  So, again, to be clear, Mr. Okada has not consented

9    to the agreement that was announced on the record with respect

10   to any distributions to Highland Capital Management Services.

11   Correct?

12   A     He has not, but since he doesn't control it and Mr.

13   Dondero does, the agreement is binding.

14   Q     Okay.  And how do you know that Mr. Dondero controls

15   Highland Capital Management Services?

16   A     Mr. Okada told me.

17   Q     Okay.  All right.  Mr. Seery, with respect to Mr. Okada, I

18   believe your testimony was he separated from Highland Capital

19   Management in September of 2019.  Correct?

20   A     I believe I testified that he originally began his

21   separation in the spring, I don't know exactly when it was, and

22   I believe his official resignation was some time around

23   September.

24   Q     Okay.  Would September 30 of 2019 sound about right?

25   A     It -- approximately, I don't know the date.

Seery - Cross/Patel                                    101

1  Q    Okay.  So it was towards the end of September though.

2  Correct?

3  A    I don't -- I don't know whether it was September 1,

4  September 15 or September 30, I just don't know the answer.

5  Q    Okay.  And at the time Mr. Okada separated from Highland

6  or any time before then, did Mr. Okada have a non-compete

7  agreement?

8  A    I have not looked at Mr. Okada's contract.

9  Q    Okay.

10  A    So I don't know.

11  Q    All right.  Does -- did Mr. Okada have something called a

12  non-solicit --

13  A    I don't know.

14  Q    -- where he wouldn't solicit clients for example of

15  Highland Capital Management?

16  A    I don't know.

17  Q    Okay.  Did Mr. Okada have what's called a non-recruit

18  where he wouldn't come in and try and recruit employees of

19  Highland Capital Management?

20  A    Again, because I haven't looked at his contract, if he had

21  one, I don't know that he did, and because I haven't looked at

22  it, and I testified that I haven't seen this severance

23  agreement he's talking about, I don't have any understanding of

24  the terms of Mr. Okada's employment with Highland Capital

25  Management.

Seery - Cross/Patel                           102

1  Q    Okay.  So you just haven't looked at any of those things.

2  A    That's correct.

3  Q    All right.  Are you aware -- well, did you have an

4  opportunity to look at -- I believe there was a press release

5  that was somewhere around September 2019 where Mr. Okada said

6  he was actually retiring from Highland Capital Management?

7  A    I would have no reason to have looked at such a thing in

8  September.

9  Q    Okay.  All right.  So you haven't seen that.  Let me ask

10  you another question, are you aware that Mr. Okada has a new

11  business by the name of Sycamore Tree Capital?

12  A    I'm aware that he intends to start a new fund, I have no

13  idea what the name is and I'd have no idea what development --

14  stage of development it's in.

15  Q    Okay.  Are you aware if any Highland employees have been

16  engaged by Sycamore Tree Capital

17  A    I'm aware that at least one maybe, I'd have no idea

18  whether that employee, ex-employee now, is involved or not.

19  Q    And isn't that employee Troy Parker?

20  A    That's correct, yes.

21  Q    Okay.  What did Troy Parker do for Highland Capital

22  Management?

23  A    Most recently he ran the PE book.

24  Q    Okay.

25        MS. PATEL:  No further questions, Your Honor.


WWW.JJCOURT.COM

Seery - By the Court                    103

1          THE COURT:  All right.  We have seven minutes.  Do

2    you have questions, Judge Lynn?  We have a little bit of time?

3          JUDGE LYNN:  No, but I just want to make clear Mr.

4    Dondero's suggestion for resolving the motion was not a

5    dickered agreement, it was a suggestion that we would hope

6    would make life easier for the parties and the Court.

7          THE COURT:  Okay.  Thank you.  Thank you.

8          I had one or two questions.  Is there going to be

9    redirect?  Well, no, you used all your time, you don't get

10   redirect.

11       (Laughter.)

12

13         MS. HAYWARD:  And, Your Honor, I don't have redirect.

14         THE COURT:  Oh, very good.

15                          EXAMINATION

16   BY THE COURT:

17   Q    Let me ask you, sir, I want to revisit Dynamic, that's the

18   one I hear most about obviously since that's the one that Mr.

19   Okada --

20   A    Yes.

21   Q    -- has the distribution rights from.  You know, I was

22   fixated before I came out here a little on the time line.

23   Right?  So the pleadings said Dynamic, the termination date was

24   November 15, 2019.

25   A    Correct, Your Honor.

Seery - By the Court                        104

1 Q    About 30 days after the Highland bankruptcy was filed.

2 What I heard your testimony to be was that pre-petition the

3 largest third-party investor -- I wrote it down phonetically --

4 A    Realdania.

5 Q     -- Realdania --

6 A    I'm not sure if there's someone in the courtroom who know

7 them.

8 Q    Sounds like a Spanish company maybe.

9 A    I believe they're a European company, it's an investor I'm

10 not familiar with, Your Honor, but I have seen the redemption

11 notices.

12 Q    Okay.  They issued a $65 million --

13 A    I believe it was in the neighborhood of 65 million, yes.

14 Q    And it was pre-petition?  You wouldn't know?

15 A    It was pre-petition, I think it was around 40 percent of

16 the fund.

17 Q    Okay.  I mean do you remember when?  Was I t --

18 A    I believe it was in the spring and it followed a -- spring

19 or early summer and it followed a separate redemption from a

20 different investor.

21 Q    Okay.  So there was another third-party investor, even

22 before Realdania that --

23 A    That's my recollection, yes, Your Honor.

24 Q     -- that was unaffiliated with Highland.

25 A    That's correct.

WWW.JJCOURT.COM

Seery - By the Court                    105

1  Q    Okay.  So it's your business judgment that once these two

2  biggies issued their redemptions, it just wasn't worthwhile to

3  keep this fund going anymore.

4  A    That's correct, Your Honor.  And as I said, Mr. Okada was

5  a driver to that fund and he had left.  He did not actually

6  redeem, but he was being compulsory redeemed as the fund went

7  into liquidation.  So all of the investors, redeemed and non,

8  will be treated the same.

9  Q    All right.  So I guess one thing I'm getting at is timing

10 of Mr. Okada leaving versus timing of these third-party

11 redemptions happening.

12 A    Right.  I could --

13 Q    Is there any --

14 A    I see no connection whatsoever.  And, again, his piece of

15 the fund was about -- I believe it was round 12 percent of the

16 fund.

17 Q    Yeah, his --

18 A    And it's a material amount of money I suppose to most

19 folks, including myself, but it's not -- it wasn't a driver

20 whatsoever that we could see, and he did not redeem.  So the

21 third-party redeemed, Okada was leaving having been the driver

22 of the fund, it was an undersized fund anyway, there was no

23 real valid reason to keep a small fund trying to do this around

24 after Mr. Okada left.

25 Q    Okay.  I'm just wondering whether I should or not, you

Seery - By the Court                    106

1  know, the timing of this.  So this is -- starts spring of 2019,

2  but then a month post-petition let's terminate this thing.  I

3  mean who actually makes that decision?

4  A    Well, the decision to continue forward is made by the

5  board.  Before that it would have been made by the managers of

6  the funds or the compliance group.  So I have not looked into

7  specifically who said, Let's terminate it.  To be perfectly

8  frank, I don't know --

9  Q    But it would --

10  A     -- the specifics.

11  Q     -- the manager, Highland?

12  A    It's Highland who determines to terminate it.  Ultimately,

13  if all the investors issued redemption notices, then the fund

14  would have to liquidate --

15  Q    Right.

16  A     -- on its own.  So Highland --

17  Q    Right.

18  A     -- wouldn't have any say about it.  But to put it into

19  liquidation, I believe it was Highland that did it.  Some of

20  the funds, it could be foreign directors, but that's not what

21  happened.

22  Q    Uh-huh.  Okay.  So there are third-party non-affiliated

23  investors still in it, there's 35 million that would go out the

24  door and --

25  A    It's about -- there's a couple of assets that still have

Seery - By the Court                    107

1  to be liquidated.  Approximately 85 percent of the distribution

2  is to third-party un-affiliated investors.  And then we --

3  we'll have -- we'll retain some cash to make sure that we can

4  manage the liquidation of the fund and the dissolution of the

5  entities.  But we still have to get rid of a small amount of

6  assets that are pretty liquid.

7  Q    Okay.  Now I heard you also say that Highland isn't owning

8  any fees anymore on these refunds.  Did I not hear you say

9  that?

10 A    Yeah, certainly -- so I think on ours I think.  On Dynamic

11 and on AROF, the Argentina Recovery Opportunity Fund, once they

12 were put into liquidation they don't earn any fees anymore.

13 The --

14 Q    Okay.  Let me -- okay, so when did that stop, when were

15 they "put into liquidation" so the management fees stop?

16 A    I believe that Dynamic would have been in the fall, I

17 don't know the exact date, and Argentina --

18 Q    Well --

19 A    -- was before that.

20 Q    -- the Court termination date used in the pleadings was

21 November 20, 2019.

22 A    Yeah, but I don't recall the exact date, Your Honor.  We

23 can certainly figure that out, I just don't recall off the top

24 of my head.  When the fee cutoff date -- the fee cutoff date

25 for RCP was I believe in April of 2018 when the one-year

Seery - By the Court                          108

1  extension was given.  That was the trade for the extension.

2  Q    Okay.  But you don't know for sure when the management fee

3  cutoff was --

4  A    No.

5  Q    -- on either Argentina or Dynamic.

6  A    No, that's correct, Your Honor.

7  Q    I mean would it have been in November 2019 you think?

8  A    I think it was before that, but I don't -- I believe so

9  but I don't know for sure.

10 Q    Okay.

11 A    If I'm wrong, I'll figure that out and correct it to you.

12 Q    Okay.  All right.  Thank you.  You're --

13 A    Thank you.

14 Q    -- excused.

15 A    Thank you.

16        THE COURT:  Does anyone in the room know the answer

17 to that?

18        MS. HAYWARD:  Your Honor, we can figure it out very

19 quickly I think.

20        THE COURT:  Really?  Okay.

21     (Pause in the proceedings.)

22        THE COURT:  Actually I had one more question for Mr.

23 Seery.

24        THE WITNESS:  Yes.

25 BY THE COURT:

Seery - By the Court                    109

1  Q    Do we have any other Highland managed funds out there that
2  are imminently going to be going into wind-down mode?  Is that
3  easy to answer?
4  A    We have a number of CLO funds that are what we call 1.0
5  CLOs.  They're old and they're effectively winding down.  And a
6  number of those we don't get fees off of, but they had --
7  because they own very illiquid assets, we have to realize on
8  those assets.  May of those have cross-ownership to funds that
9  we do get fees on.  We need --
10 Q    Let me back you up.  Why didn't Highland get fees on
11 those?
12 A    Because sometimes in the CLO structure it depends on what
13 kind of asset gets treated under the net asset value, so for
14 example if it's equity, it may not count, even if it has a
15 value, you don't get paid a fee on it.  So if you had a loan
16 that converted to equity, some of those CLOs you  may not get a
17 fee on because you don't own any loans anymore.  So, but most
18 of those assets, if a CLO owned equity for example in a PE
19 company, we would have other funds that owned additional equity
20 in that same PE company.
21       We do have other assets where they aren't necessarily
22 wind-down, but there will be distributions to entities that may
23 or may not be related parties under the protocols, and we are
24 in the process, and the Committee's aware of it, selling
25 certain assets, and hopefully those sales will go the way we

Seery - By the Court                              110

1  want them to.  They're valuable assets so we feel we have a

2  good opportunity to realize good value for the estate.  There

3  would be requirements on certain of them to pay off debt from

4  certain entities before we can distribute money back up to

5  Highland Capital.

6  Q    All right.  Thank you.

7  A    Thank you.

8           THE COURT:  You're excused.

9           All right.  Anything else today?

10          MR. POMERANTZ:  Do you want to hear closings, or have

11 you heard enough, Your Honor?

12          THE COURT:  I mean if you  have a quick one or two

13 minute closing, I'll hear that, to recap anything.  Did you

14 have that quick answer that Ms. Hayward --

15          MR. POMERANTZ:  We are --

16          THE COURT:   -- was confident about?

17          MR. POMERANTZ:  We are trying to find it.

18          THE COURT:  Okay.

19          MR. POMERANTZ:  We have a couple of emails out,

20 hopefully by, we get a couple of answers.

21          THE COURT:  Okay.  Okay.

22           CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23          MR. POMERANTZ:  Your Honor, I just wanted the

24 highlight the fiduciary duty as you -- I know it was a subject

25 of discussion with Mr. Seery, cross-examination.  Again, as you

111

1  heard, and as the only evidence before Your Honor is, Mr.

2  Seery, who as Your Honor knows is a restructuring lawyer,

3  practice in it.  He's fully aware of what the fiduciary duty

4  requires.

5           And first and foremost, I think it may even be 28 USC

6  959, the Debtor has to operate in accordance with applicable

7  law.  Every debtor before Your Honor has to act in accordance

8  with applicable law, and if the debtor is not acting in

9  accordance with applicable law, then they are creating

10  liability.  As Mr. Seery testified, that is exactly what that

11  the Debtor is doing. And this concept of dueling fiduciary

12  duties or the board taking certain actions that just happened

13  to benefit insiders as indicating that they are not looking out

14  for the estate is just not accurate.  That's not how the law

15  works and I think Mr. Seery said it correctly, that the Debtor

16  fulfills its fiduciary duty to the estate by operating in

17  accordance with applicable law.

18           With respect to 105, Your Honor, the cases cited by

19  the Committee don't support granting injunctive relief forward

20  of attachment without going through the necessary process.

21  They do cite the DeLorean case which at first blush sounds like

22  a court authorized the holding of money, but if you read that

23  case carefully, it was done because there was a complaint and

24  because the Court ultimately determined that the evidence

25  before the Court established grounds for preliminary

**WWW.JJCOURT.COM**

112

1  injunction.

2          Mr. Clemente has asked Your Honor to hold that the
3  objection filed satisfies the standard.  But the objection
4  isn't a legal document.  The Committee has not put on any
5  evidence to support any claims that exist.  The testimony from
6  Mr. Seery is that there's a claim under a note and that there
7  are defenses to the note.  So Your Honor does not have the
8  sufficient evidentiary basis in order to meet the standards of
9  the injunction of which irreparable harm -- there's a whole
10 host of reasons.

11         So while we understand what the Committee wanted to
12 do.  If they wanted to file an action, they could have.  We
13 don't expect them to have completed their investigation on all
14 the types of claims they're looking at.  But they've been aware
15 of this Okada note for a couple of months.  It would not have
16 been difficult for them to file, as they have standing, a
17 lawsuit to recover any.  They asked us to issue a demand note,
18 we did, and we got the answer.

19         So, Your Honor, I don't think there's a basis under
20 105, the way it's being used here and the lack of evidentiary
21 record to support it.  And for those reasons, Your Honor, we
22 would ask that Your Honor support the motion and other than the
23 distributions that are being held in the registry, allow the
24 distribution to be made to Mr. Okada.

25         THE COURT:  Okay.

**WWW.JJCOURT.COM**

113

 1                    MR. POMERANTZ:  Thank you, Your Honor.

 2                    THE COURT:  All right.  Other quick closings?

 3                    MR. CLEMENTE:  Your Honor, I'll be very quick.

 4              CLOSING ARGUMENT ON BEHALF OF THE COMMITTEE

 5                    MR. CLEMENTE:  There's obviously a lot more that I

 6        could say, but I'll be respectful and be very quick.

 7                    First of all, Your Honor is the judge and you're the

 8        one that determines what the law is and what the duties

 9        ultimately are for this Debtor.  Mr. Seery I think indicated in

10        his testimony that, for what it's worth, he does not believe

11        that there would be a viable claim for breach of fiduciary duty

12        if Your Honor ordered the distribution to Mr. Okada be put in

13        the Court registry.

14                    I think the testimony was clear from Mr. Seery that

15        Mr. Okada, at all times relevant, when all the things that

16        happened that involved the Redeemer Committee, that involved

17        Acis, that involved UBS, Mr. Okada was at least co-Chief

18        Investment Officer and we all know he was co-founder of

19        Highland.  I think Your Honor's questions, and perhaps

20        frustration with sort of trying to figure out some of the

21        answers, show how interrelated all of these things are and the

22        various capacities and roles that Mr. Okada had back at the

23        time when all these different transactions occurred.

24                    I think the testimony we heard is that Mr. Seery did

25        a lot of work around why we should pay Mr. Okada, but almost no

114

 1  work around why we shouldn't pay Mr. Okada.  And so I go back

 2  to what I said earlier, Your Honor, I think Mr. Okada is

 3  perfectly capable of coming into this court and arguing that

 4  once the monies that were put into this Court's registry should

 5  be distributed to him, he can come in and do that.

 6         But I think for purposes of today, Your Honor has

 7  heard more than enough to come to the conclusion that the

 8  appropriate remedy here is to place the money within the

 9  registry of this Court.  It satisfies the fiduciary duty of the

10  Debtor and it protects the interest of Mr. Okada, who is free

11  to come into this court and make whatever argument he so

12  chooses as to his entitlement to those funds.

13         Unless Your Honor has any questions of me, I'll sit

14  down.

15         THE COURT:  Thank you.

16         MR. CLEMENTE:  Thank you.

17         THE COURT:  Anything else?

18         MR. POMERANTZ:  Your Honor, in answer to you

19  question, November 11 was the date that the fees were no longer

20  payable to the Debtor in the Dynamic Fund.

21         THE COURT:  November 11 post-petition.

22         MR. POMERANTZ:  Correct.

23         THE COURT:  I like being transparent and I -- and so

24  I sometimes share my thoughts hoping that it will help.  But

25  I'm -- you all get why I'm fixated on this point?  Maybe I'm

115

1  sharing my thoughts when I don't have to.  But the time line

2  looks suspect, whether it should be or not, it looks maybe

3  problematic.  Do you see what I'm saying?

4        We had this fund that I understand never got to real

5  scale and in spring 2019 we have a couple of big unrelated

6  third-parties -- third-party investors issue redemptions and

7  that makes it really not a very worthwhile fund, so maybe it

8  should go into wind-down mode.  Nevertheless, Highland has been

9  continuing to get its management fee.  I don't know how much

10 management fee, but it's been getting a management fee until it

11 files bankruptcy, and then, Oh, let's wind this sucker down.

12       Do you see what -- you know, I don't know.  I mean

13 again, a hearing for another day.  But this is the kind of

14 thing I get concerned about, and maybe kind of want to look

15 into the bona fides of the decision making process to wind

16 down, let's terminate this thing and make disbursements.  And,

17 you know, did we have any fingerprints of this on insiders that

18 should make me troubled.  I don't know.  I mean if I'm going

19 out on a lark here, just stop me.

20       MR. POMERANTZ:  Well, look, Your Honor, I certainly

21 understand why you're concerned.  As you said at the first

22 hearing, you have stuff in your head that you can't forget, and

23 I understand.  I wasn't around but I understand the history and

24 especially the history with certainly similar things that may

25 have happened in the Acis case.

**WWW.JJCOURT.COM**

116

1          The facts are that Realdania made its redemption

2   request on August 15, the fees that the -- August 15, but that

3   the liquidation was the time where the management fees stopped,

4   which incidentally were $12,000 a month based upon the level of

5   this spot.

6          THE COURT:  Okay.

7          MR. POMERANTZ:  So, Your Honor, I understand your

8   concerns, however, what I would say is, you have Mr. Seery here

9   answering your questions.  You have Mr. Seery who said he's

10  conducted an thorough investigation.  At some point, and I'm --

11  you know, obviously you brought up a couple of questions, at

12  some point the creditors -- Your Honor has to accept that if

13  the board has done a thorough analysis, and we're coming into

14  this hearing today, and before we filed the motion, as Mr.

15  Seery said, we crossed all our Ts and dotted all our Is.

16         We spent a lot of money collectively, the different

17  firms that are involved, because we wanted to make sure it's

18  the right thing.  We understood that coming to Your Honor

19  asking to pay investors who are related parties, given the

20  context of this case and given the Committee's opposition, was

21  going to be a big challenge.  We thought it was the right thing

22  to do, but we wanted to make sure Your Honor knows that the

23  board actually did a thorough investigation, again, spearheaded

24  by Mr. Seery, who is not just someone off the street, but as he

25  testified, this is what he's done over the last 10-15 years.

117

1          So I certainly understand Your Honor's concerns.  Mr.

2   Seery I think has testified about the thorough investigation,

3   and that the 12,000 a month, that I think if he got back on the

4   stand, he would testify that would be a breach of duty to the

5   investors to continue on getting fees.  There's an obligation

6   at some point, when the redemptions happened, to either pay the

7   redemptions, put the fund in liquidation, and that's what

8   happened.

9          And just because it wasn't done by the board, it was

10  done before, it was important, as I mentioned in my opening,

11  and as Mr. Seery testified, he looked at that carefully and

12  thoroughly.  He didn't want to be embarrassed, we didn't want

13  to be embarrassed coming in and not having those answers.  So,

14  Your Honor, this is a long way of saying I think at some point

15  the board is entitled to the deference of business judgment if

16  they can demonstrate that they've gone through the process

17  necessary to earn the deference to business judgment, which I

18  think Mr. Seery has done.

19          THE COURT:  Okay.  And while we're on the subject, I

20  mean 12,000 a month was the management fee to Highland from

21  Dynamic.  What was the management fee from Argentina, do you

22  have that off the top of your head?

23          MR. SEERY:  It would have been in the same -- these

24  are approximately --

25          THE COURT:  The same range?

WWW.JJCOURT.COM

APPX. 017335

118

1          MR. SEERY:   -- the same neighborhood.

2          THE COURT:   Okay.

3          MR. SEERY:   That the meetings would be based upon

4    fees.

5          THE COURT:   Okay.

6          MR. SEERY:   Or the redemptions (indiscernible)

7    variable asset now (indiscernible).

8          THE COURT:   Okay.

9          MR. SEERY:   (indiscernible).

10         THE COURT:   Okay.   All right.   Just a minute while I

11   do some math.

12        (Pause in the proceedings.)

13         THE COURT:   All right.   I'm doing this math in my

14   head.   There's a $7.4 million note receivable from HCM Services

15   of which Okada is the 25 percent owner of.

16         MR. POMERANTZ:   Your Honor, 7.4 is not the demand

17   notes.   Again, 985,000 is the demand notes.   The rest of those

18   notes are performing and not in the fall.

19         THE COURT:   Okay.   All right.   With regard to the

20   motion and the objection and the Committee there's been a lot

21   of argument about 105 and what it permits the Court to do and

22   what it doesn't as far as fashioning an equitable remedy here.

23   Here I mean it's clear that this Debtor has receivables owed by

24   these related parties, although they don't necessarily match up

25   perfectly with the amount of disbursements that are owed by

119

1  these funds and of course the funds are separate legal entities

2  than the Debtor.  So I'm not glossing over that fact or

3  ignoring that fact.

4         But I do think the Court has broad equitable powers

5  to remedy -- to fashion remedies that preserve the status quo

6  and I think it is appropriate here to order that most of this

7  money, that most of the 8.6 million that would go to related

8  investors in these three funds, be put into the registry of the

9  court pending further motions, orders, adversary proceedings

10 anyone wants to file to make a claim to that money.  I said

11 most of it.

12        I am going to order that with regard to the amount

13 that would be payable to Mr. Okada, the 4.176 million, we will

14 subtract from that the 1.3 million that represents the demand

15 note receivable that the Debtor has so that I'm essentially

16 doing an equitable offset at that point.  So he can only be

17 paid -- he should only be paid from the Dynamic Fund whatever

18 4.176 million minus 1.3 million is, and the rest shall be put

19 into the registry of the court.  And everybody's rights are

20 reserved on anything and everything with regarding to do tos

21 and do froms.

22        I reserve the right to supplement in more detail in a

23 written form of order to justify the Court's 105 action here.

24 But, Mr. Pomerantz, I'd ask you to upload a form of order on

25 this, please.

**WWW.JJCOURT.COM**

120

 1          MR. POMERANTZ:  We'll be happy to, Your Honor.  We'll

 2    circulate it to the Committee and Ms. Patel as well.

 3          THE COURT:  All right.  Well, thank you all, and --

 4          MR. CLEMENTE:  Your Honor, but just to be clear

 5    though, the other amounts, correct, to HCM Services and CLO

 6    Holdco, would that be part of the order or what did Your Honor

 7    have in mind with respect to that?

 8          THE COURT:  Well --

 9          MR. CLEMENTE:  Because I believe those are to be

10    deposited with the Court as well, yes.

11          THE COURT:   -- all of -- everything gets deposited

12    in the registry of the court, except Mr. Okada will get

13    whatever the differential is of 4.176 minus 1.3.  Okay?

14          MR. CLEMENTE:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          COURT SECURITY OFFICER:  All rise.

17                        *****

18

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**

121

# C E R T I F I C A T I O N

1

2         We, DIPTI PATEL, KAREN WATSON and TERRI STARKEY,

3    court approved transcriber, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of my ability.

7

8    /s/ Dipti Patel

9    DIPTI PATEL

10

11   /s/ Karen Watson

12   KAREN WATSON

13

14   /s/ Terri Starkey

15   TERRI STARKEY

16   J&J COURT TRANSCRIBERS, INC.        DATE:  March 6, 2020

17

18

19

20

21

22

23

24

25

WWW.JJCOURT.COM

# EXHIBIT 26

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3                                    )    Case No. 19-34054-sgj-11
         In Re:                       )    Chapter 11
                                      )
 4       HIGHLAND CAPITAL             )    Dallas, Texas
         MANAGEMENT, L.P.,            )    Wednesday, December 16, 2020
 5                                    )    1:30 p.m. Docket
                                      )
 6              Debtor.               )
                                      )    - MOTION FOR ORDER IMPOSING
 7                                    )    TEMPORARY RESTRICTIONS [1528]
                                      )    - DEBTOR'S EMERGENCY MOTION TO
                                      )    QUASH SUBPOENA AND FOR ENTRY
 8                                    )    OF PROTECTIVE ORDER [1564,
                                      )    1565]
 9                                    )    - JAMES DONDERO'S MOTION FOR
                                      )    ENTRY OF ORDER REQUIRING
10                                    )    NOTICE AND HEARING [1439]
         _____)
11                         TRANSCRIPT OF PROCEEDINGS
12             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                      UNITED STATES BANKRUPTCY JUDGE.
13
         WEBEX APPEARANCES:
14
         For the Debtor:            Jeffrey N. Pomerantz
15                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    10100 Santa Monica Blvd.,
16                                   13th Floor
                                    Los Angeles, CA  90067-4003
17                                  (310) 277-6910

18       For the Debtor:            John A. Morris
                                    Gregory V. Demo
19                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    780 Third Avenue, 34th Floor
20                                  New York, NY  10017-2024
                                    (212) 561-7700
21
         For the Official Committee Matthew A. Clemente
22       of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                                    One South Dearborn Street
23                                  Chicago, IL  60603
                                    (312) 853-7539
24

25
```

2

```
1   APPEARANCES, cont'd.:

2   For James Dondero:          D. Michael Lynn
                                 Bryan C. Assink
3                                BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
4                                420 Throckmorton Street,
                                   Suite 1000
5                                Fort Worth, TX  76102
                                 (817) 405-6900
6
    For the Issuer Group:       James E. Bain
7                                JONES WALKER, LLP
                                 811 Main Street, Suite 2900
8                                Houston, TX  77002
                                 (713) 437-1820
9
    For the NexPoint Parties:   James A. Wright, III
10                               K&L GATES
                                 State Street Financial Center
11                               One Lincoln Street
                                 Boston, MA  02111
12                               (617) 261-3193

13  For Highland CLO Funding,   Rebecca Matsumura
    Ltd.:                       KING & SPALDING, LLP
14                               500 West 2nd Street, Suite 1800
                                 Austin, TX  78701
15                               (512) 457-2024

16  Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
17                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
18                               (214) 753-2062

19  Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
20                               Shady Shores, TX  76208
                                 (972) 786-3063
21

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

3

1            DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.

2            THE COURT:  All right.  This is Judge Jernigan.  We

3    have settings in Highland.  We have -- I guess the very first

4    thing that we had set today was a motion of Dondero, Mr.

5    Dondero wanting some sort of revised procedures for "future

6    estate transactions occurring outside the ordinary course of

7    business."  Then, related to that, we received the other day

8    -- I'm not showing it on the calendar, I'm not sure if that

9    means it's moot now or not, but we had a motion for protective

10   order and a motion to quash with regard to certain depositions

11   that Mr. Dondero wanted in connection with his motion.  The

12   Debtor filed that motion to quash.  It was to quash a

13   deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14   Caruso.  And then we have the CLO Motion, what I'm calling the

15   CLO Motion, of --

16        (Interruption.)

17            THE COURT:  Okay.  Let's --

18            MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19   The first two motions have been resolved.  And after Your

20   Honor takes appearances, I'm happy to inform the Court of the

21   proposed resolution, and there's an agreed order that we would

22   upload after the hearing.

23            THE COURT:  Okay.  Well, that is certainly music to

24   my ears.  All right.  So I was just trying to lay out the

25   program for what I thought was set, potentially three motions,

4

1  one of which was a deposition dispute.

2     All right.  So let's go ahead and get appearances.  Mr.

3  Pomerantz, you're obviously appearing for the Debtor team.

4        MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5  good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6  Ziehl & Jones.  Also on the video with me today are John

7  Morris and Greg Demo.  They will be handling the CLO Motion,

8  and I will be reporting to the Court on the resolution of Mr.

9  Dondero's motion and our corollary discovery motions.

10        THE COURT:  Okay.  All right.  Well, why don't I take

11  an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12  there.

13        MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14  Assink, who will replace me after the preliminaries when our

15  business is done.  Other than concurring with Mr. Pomerantz, I

16  wanted to advise Your Honor that in the last 30 minutes we

17  filed an additional motion where we're seeking a clarification

18  with respect to the temporary restraining order that the Court

19  entered last week.

20        THE COURT:  All right.  Well, I did see an email from

21  my courtroom deputy right before walking in about that motion,

22  and so that's why I was a little surprised and said "Music to

23  my ears" that there was an agreed order on the Dondero

24  motions.  But I'll get the details --

25        MR. LYNN:  Well, we're --

5

 1          THE COURT:  I'll get the details about that in a

 2    minute.  Let me go ahead and get the other appearances.

 3        For the Movants on what I've called the CLO Motion, who do

 4    we have appearing?

 5          MR. WRIGHT:  Good afternoon, Your Honor.  It's James

 6    Wright of K&L Gates for the -- I guess I'll call them the

 7    Movant for this motion.

 8          THE COURT:  Yes.  Sometimes you're referred to as the

 9    Advisors and the Funds and -- but Movants on Docket Entry

10    1528.

11        All right.  For the Committee, I know you have weighed in

12    on a couple of these motions.  Who do we have?

13          MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14    Clemente with Sidley Austin on behalf of the Committee.

15          THE COURT:  All right.  Well, we have a lot of folks

16    on the phone.  I think I've covered everybody who filed a

17    pleading for today.  Is there anyone else who would like to

18    appear?  I'd really like to restrict it only to those who have

19    filed pleadings today.

20          MS. MATSUMURA:  This is Rebecca Matsumura from King &

21    Spalding representing Highland CLO Funding, Ltd.  I don't

22    expect I'll be weighing in today, but there are a couple

23    issues that I may say a sentence on, so I want to go ahead and

24    make my appearance now.

25          THE COURT:  All right.  Thank you.  Anyone else?

6

1          MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2     Walker; on behalf of the CLO Issuers.

3          THE COURT:  All right.

4          MR. BAIN:  And Your Honor, if we may make certain

5     comments at the requisite time, we'd appreciate it.

6          THE COURT:  All right.  Thank you.  Anyone else?

7        All right.  Well, Mr. Pomerantz, let's hear about the

8     agreements you have on the Dondero-related motions.

9          MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10    Lynn is correct, we saw also an emergency motion that came

11    through that I'll have a couple of comments at the end of my

12    presentation.

13       So, as I mentioned before, Your Honor, I'm pleased to

14    report that with respect to the two motions that Your Honor

15    scheduled for today's hearing, we have an agreement with Mr.

16    Dondero.  One was the motion of Mr. Dondero requiring

17    transactions out of the ordinary course to be brought before

18    this Court.  The second was the Debtor's motion to quash a

19    series of subpoenas that had been issued in the last two days,

20    requiring board members and others to testify.

21       As part of the agreement, we have agreed with Mr. Dondero

22    that his motion, which is presently set for today, shall be

23    continued to January 4th, which is the same date set as the

24    continued hearing on the preliminary injunction relating to

25    the TRO that Your Honor had entered last week.

7

```
 1      As part of that agreement, the Debtor has agreed that it

 2  will provide Mr. Dondero with three business days' notice

 3  before selling any non-security assets from any managed funds

 4  accounts through and including January 13th, which is the date

 5  set for confirmation.

 6      While, as the Court is aware, the Debtor doesn't believe

 7  that any notice, opportunity for hearing, or an order from the

 8  Court is required in connection with such transactions, as the

 9  Debtor does not have any current plans to sell non-security

10  assets from managed funds before confirmation, it was willing

11  to agree to the notice requirement as essentially a way of

12  resolving the motion before Your Honor today and continuing

13  until the 4th.

14      As part of the agreement as well, Your Honor, the parties

15  have agreed that there will be no further discovery in

16  connection with the motion that is set.  That'll be no

17  additional discovery by Mr. Dondero, so he is withdrawing the

18  subpoenas as it relates to this motion, and there will be no

19  further discovery as -- by the Debtor.  As Your Honor, I

20  think, is aware, there were depositions conducted of both Mr.

21  Seery and Mr. Dondero on Monday in connection with this

22  motion, but the discovery will not happen over the next couple

23  of weeks.

24      Mr. Dondero wanted to make sure, and the Debtor didn't

25  have any opposition, that that agreement with respect to no
```

8

```
 1   discovery only relates to the pending motion before the Court.

 2   And in connection with any other matters relating to this

 3   bankruptcy case, Mr. Dondero would reserve the right to pursue

 4   discovery, and of course the Debtors would reserve the right

 5   to challenge discovery if we believed it was inappropriate or

 6   unduly burdensome.

 7        With respect to the motion that was just filed, Your

 8   Honor, we had a chance to briefly review it.  We haven't had a

 9   chance to discuss it with the board.  In any event, we don't

10   think there's an emergency.  Mr. Dondero wants the opportunity

11   to approach and communicate with the board.  I've told Mr.

12   Lynn that communications regarding the plan are to go through

13   Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14   He's the chief restructuring officer.  And at this point, the

15   board doesn't see a reason or have a desire to meet with Mr.

16   Dondero to talk about his plan, but, again, would be happy to

17   receive any written communications that Mr. Dondero has.

18        Mr. Dondero has sought to modify the TRO to allow him to

19   speak to the board.  Again, if the board agreed to speak with

20   Mr. Dondero, that wouldn't violate the TRO, provided that

21   counsel would be present.  But at this point, the board has

22   decided that it would be inappropriate and not a good use of

23   anyone's time to have that communication and that Mr. Dondero

24   should continue to communicate through Mr. Seery, the Debtor's

25   chief executive officer.
```

9

1        If Your Honor, after reading the motion and hearing my

2   comments, and I'm sure Judge Lynn's comments that he will make

3   to Your Honor, Your Honor wants to set it for hearing, we

4   would submit, Your Honor, there's no emergency and that a

5   hearing could be set next week, but we would think Your Honor

6   might be able to dispose of the motion just on the papers and

7   the limited argument that would go on today.

8             THE COURT:  All right.

9             MR. POMERANTZ:  Thank you, Your Honor.

10            THE COURT:  All right.  Mr. Lynn, first, could you

11   confirm the terms of the agreed order that Mr. Pomerantz just

12   announced are consistent with what you and your client

13   believed was negotiated?

14            THE CLERK:  He's on mute.

15            THE COURT:  You're on mute, sir.

16            MR. LYNN:  Mr. Pomerantz has correctly stated the

17   agreement of the parties.  I am pleased to advise Your Honor

18   that I expect that we will withdraw the motion that is

19   presently pending to be heard on January 4th, since all we

20   were asking for was notice until confirmation date.  If those

21   sales are going to take place before then, we don't have a

22   problem any longer with the pre-confirmation activity of Mr.

23   Seery.

24        With regard to the motion that we filed requesting that

25   the temporary restraining order be modified, we would point

10

1   out, respectfully, that the independent board is the board of

2   directors of Strand Advisors.  Strand Advisors belongs to Mr.

3   Dondero.  It is not unreasonable for the sole stockholder of

4   Strand Advisors to ask the board questions or present thoughts

5   to the board or ask its advice.  Mr. Seery, on the other hand,

6   while being a member of the board of Strand, is the chief

7   executive officer and the chief restructuring officer of

8   Highland, which is not the same as Strand.

9        Furthermore, Your Honor, Mr. Dondero has been attempting

10  for several months to negotiate an arrangement by which the

11  Debtor can continue as a going concern.  It is his desire to

12  discuss further with the board as a whole what he can do in

13  that regard.  I think the Court, by directing him originally

14  to participate in the mediation that took place in September,

15  expected him to do so.  He has attempted to do so.  And while

16  he has not gotten a response from the Creditors' Committee

17  that is definitive, he has at least caught the interest of Mr.

18  Seery, though that interest may have died for a variety of

19  reasons in recent weeks.

20       And by the way, next week is fine with us.  We're not in a

21  hurry beyond that if the Court feels further discussion would

22  be useful.

23         MR. POMERANTZ:  Your Honor, just a couple of points

24  in response.

25       Mr. Dondero has the right to request an audience with the

11

1   board.  He has requested the audience with the board.  The

2   board has considered it and decided not to communicate in that

3   fashion with Mr. Dondero at this time.  There is nothing that

4   Your Honor can do in the TRO that would change that, other

5   than ordering the board to speak with Mr. Dondero, which I

6   highly doubt Your Honor would do.

7       Having said that, this board in general and Mr. Seery in

8   particular have been very supportive of an overall resolution

9   to this case, not only with the creditors, but with Mr.

10  Dondero.  Mr. Seery has spent tens if not hundreds of hours

11  over the last several months working with Mr. Dondero to try

12  to get him in a position to present something that would have

13  traction with the Unsecured Creditors.  Unfortunately, that

14  hasn't occurred.  We understand there have been communications

15  between Mr. Lynn and Mr. Clemente.  And if there is any hope

16  of a plan and any traction with the creditors, this Debtor in

17  general and Mr. Seery in particular stands ready, willing, and

18  able to do anything within the Debtor's power to help that

19  out.

20      So, it's not really the Debtor standing in the way.  It's

21  an economic agreement ultimately that needs to be reached with

22  Mr. Clemente and his constituents and Mr. Lynn.  And if that

23  can be reached, we will be the first to jump on that bandwagon

24  and do everything humanly possible to have that occur.

25      Thank you, Your Honor.

12

1          THE COURT:  All right.  Well, again, I've not read

2    the motion.  I've just seen an email that I have this motion.

3    I'm a little bit confused.  I don't want to spend too long on

4    this because we have another motion to get to.  But I'm a

5    little bit confused on how Dondero wants the TRO to be

6    modified.  If he has the right already to request an audience

7    of the board, what is it that is problematic about the TRO

8    that he wants modified?

9          THE CLERK:  He's on mute.

10          THE COURT:  You're on mute.

11          MR. LYNN:  Sorry, Your Honor.  As I told you before,

12    you must forgive me, my command of technology is not great.

13      In response, I would say that I question whether it is

14    appropriate, in advance of a meeting with the board of his

15    company, that what he wants to talk about should be screened.

16    And that is what has occurred in our effort to meet by

17    telephone with the board.

18      Any such meeting would, of course, be subject to the

19    restraints that are included in the temporary restraining

20    order, in that both Mr. Pomerantz or his designee and I would

21    participate in any such discussion.  I respectfully submit

22    Strand is his.  Nobody may like that, but it is his, and he

23    ought to be able to talk to his own board.

24          THE COURT:  Is this about having a conversation

25    without the Committee's involvement?  I just don't -- hmm.  I

13

 1   just need to see the motion.

 2       Mr. Clemente, anything you want to add at this juncture?

 3   Have you even reviewed the motion yet?

 4           MR. CLEMENTE:  Your Honor, I apologize.  I haven't

 5   actually even seen the motion.  And so I have no comment on

 6   it, Your Honor.  I apologize for not having been able to look

 7   at it.

 8           THE COURT:  Okay.  Well, what about the agreed order

 9   that's been announced?  Any comment on that?

10           MR. CLEMENTE:  Your Honor, we support the resolution

11   that Mr. Pomerantz announced on the record.

12           THE COURT:  Okay.  All right.  Well, I assume there's

13   nothing further, then, on the Dondero motions that were

14   scheduled today?

15       All right.  So I will happily accept the agreed order that

16   has been announced.  For now, we will continue the Dondero

17   motion that was Docket Entry No. 1439 to January 4th, when the

18   preliminary injunction hearing is set.  And we -- I understand

19   there are going to be no more discovery requests in connection

20   with these matters that were set today.

21       And I will review the motion that Mr. Dondero has filed

22   shortly before today's hearing in chambers later, and I will

23   have my courtroom deputy communicate to the lawyers whether I

24   see fit to set it for an emergency hearing next week or rule

25   on the pleadings or set it for January 4th.  Those are, I

14

 1   guess, the three possibilities I can think of that I might

 2   decide upon.

 3       So, again, I'm not making any ruling at all on a motion I

 4   haven't read yet.  So I'll -- the courtroom deputy will let

 5   you all know, if not later today, tomorrow.  Probably

 6   tomorrow, because I have a confirmation hearing set later

 7   today in another case.

 8       All right.  So, thank you all for working these issues

 9   out.  And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10   Lynn, anything further on the Dondero disputes?

11           MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

12           MR. LYNN:  Your Honor, nothing from Mr. Dondero.  May

13   I be excused?

14           THE COURT:  Is anyone anticipating needing Mr.

15   Dondero's counsel for the other matter?  All right.  If not,

16   then I certainly have no problem with you dropping off the

17   line, Mr. Lynn.  Thank you.

18           MR. LYNN:  Thank you, Your Honor.

19           THE COURT:  Okay.  All right.  So let's turn next to

20   the CLO Motion.  I take it there are no agreements on this

21   one?

22           MR. POMERANTZ:  There are not, Your Honor.

23           MR. WRIGHT:  There are not, Your Honor.  I can

24   confirm that.

25           THE COURT:  All right.  Mr. Wright, do you have

15

```
 1   anything you want to say as far as an opening statement before
 2   we go to the evidence?
 3          MR. WRIGHT:  I don't, Your Honor.  My intention, if
 4   it's okay with you, you asked me to bring a witness, so I do
 5   have Mr. Norris from my client, and I was going to just remind
 6   the Court who I am and state the name of all of my Movants,
 7   and then I was going to move directly to put him on the stand
 8   and go through a brief direct.
 9          THE COURT:  All right.  I think I heard Mr. Morris is
10   going to handle this phase of the hearing.
11          MR. DEMO:  And Your Honor, this is Greg Demo from
12   Pachulski on behalf of the Debtor.
13          THE COURT:  Oh, okay.
14          MR. DEMO:  We would like to make a brief opening
15   statement before we have witnesses, if that's all right with
16   Your Honor.
17          THE COURT:  All right.  I'm fine with that.  So, --
18          MR. DEMO:  All right.
19          THE COURT:  -- go ahead.
20          MR. DEMO:  All right.  Well, thank you, Your Honor.
21   Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.
22       We are here today on what really amounts to the third of
23   three motions that deal with Mr. Dondero's attempts, either
24   directly or through a proxy, to transfer control away from the
25   Debtor and back to Mr. Dondero.
```

16

1      The current motion is filed by NexPoint Capital and

2  Highland Capital Management Fund Advisors and three of their

3  managed funds:  Highland Income Fund, NexPoint Capital, and

4  NexPoint Strategic Opportunities Funds.

5      Mr. Dondero owns and controls NexPoint Capital and

6  Highland Capital Management Fund Advisors.  While both

7  NexPoint Capital and Highland Capital Management Fund Advisors

8  are governed by boards, the boards have no investment

9  authority with respect to the funds they manage, nor was the

10  boards' approval necessary to file the motion, or obtained.

11      Mr. Dondero is the sole portfolio manager for NexPoint

12  Strategic Opportunities Fund and Highland Income Fund.  Mr.

13  Dondero is one of three portfolio managers for NexPoint

14  Capital.  Mr. Dondero's decisions are not subject to

15  oversight.

16      The Movants disclosed these facts in their recent SEC

17  filings, and there can be no dispute that Mr. Dondero is the

18  controlling figure behind the Movants in the relief being

19  sought in the motion which seeks to impede the Debtor's

20  efforts to exercise its rights as a CLO manager.

21      The fact that this motion was even filed is quite

22  surprising, since on December 7th the Debtor filed a complaint

23  and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24  the Debtor's efforts to sell assets from the very CLOs that

25  are the subject of this motion.

17

1      The Court granted the TRO on December 10th.  Mr. Dondero

2   also filed a motion seeking similar relief in November, which

3   has now been adjourned to January 4th.

4      The Movants are essentially now seeking an order from this

5   Court enjoining the Debtor from exercising its rights as a CLO

6   manager and requiring the Debtor to seek the Movants' and Mr.

7   Dondero's permission to fulfill its obligations as a manager

8   for the CLOs.

9      The Movants, however, do not come right out and say this,

10   and instead couch the motion as seeking to simply pause the

11   CLOs' asset sales while the Movants and the Debtor engage in

12   discussions regarding the future of the CLOs' management.

13      In the motion, the Movants also argue the Debtor has made

14   decisions detrimental to the interests of the preference

15   shareholders because the Debtor is trying to monetize its

16   assets in a manner inconsistent with the preference shares'

17   objectives.

18      The Movants simply mischaracterize the facts, the parties'

19   respective rights under contracts, and the law.

20      First, to the extent the Movants hold interests, they hold

21   only preference shares in the CLOs and are minority investors

22   in the preference shares of 12 of the 15 CLOs at issue.  In

23   one third of the CLOs, the Movants' interests sit behind

24   senior debt which must be paid first.

25      Notably, Your Honor, no other investors in the CLOs are

18

1   here or have expressed support for the Movants' position.

2        Second, the Movants simply have no right under the

3   contracts governing the CLOs to the relief they are

4   requesting.  The CLOs are governed by a series of agreements

5   which were agreed to long ago and dictate the rights of all

6   investors of the CLOs.  The enforceability of those agreements

7   is relied on by all investors, not just the Movants.

8        Under these agreements, investment discretion is given to

9   the CLOs' manager -- in this case, the Debtor -- and no

10  investor has the right to direct the CLO manager.  The manager

11  was chosen to manage the CLOs' assets.  No individual investor

12  was chosen to manage the CLOs' assets.

13       Simply said, there will be no evidence that the Movants

14  have the right to do what they're trying to do, and there will

15  be no evidence that the Movants' preferences with respect to

16  the CLOs' assets is in line with that of the other investors

17  in the CLOs.

18       Under the relevant agreements, if an investor is not happy

19  with a manager's performance, the investor's rights are

20  generally limited to replacing the manager.  The investors

21  here -- excuse me, the Movants here -- have not done that and

22  cannot do that.  Under the agreements, replacement requires at

23  least the majority of the preference shares that are not

24  affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25  hold a substantial minority interest position.  They are not

19

1    the majority.  In the three CLOs in which they are the

2    majority, the Movants still cannot replace the Debtor as the

3    investment manager because they are the Debtor's affiliates.

4         It is indisputable that, prior to January 9th, when Mr.

5    Dondero was removed from control of the Debtor, that the

6    Debtor, NexPoint Advisors, Highland Capital Management Fund

7    Advisors, and the three funds were the Debtor's affiliates

8    because of Mr. Dondero's common control.

9         After January 9th, where the Court removed Mr. Dondero

10   from control of the Debtor, the Debtor is arguably, under the

11   documents, not an affiliate.  However, Your Honor, the Movants

12   have disclosed in their recent proxy statements filed in 2020

13   that they still consider themselves the Debtor's affiliate,

14   and they should be bound by that statement.  The Movants, by

15   virtue of Mr. Dondero's being removed from control of the

16   Debtor, should not be able to use that removal to reassert

17   control over the CLOs that were taken away from Mr. Dondero

18   when he was removed in January 2020.

19        The Debtor believes that additional briefing may be needed

20   on this issue, and that a ruling specifically on this issue

21   and the parties' relative rights under the CLO management

22   agreements may be needed.  The Debtor reserves its right to

23   brief this issue and to bring it before this Court, either as

24   a declaratory judgment or any other procedurally-appropriate

25   motion.

20

1          Because the Debtor -- excuse me.  The Movants have no

2     right to the relief requested.  They argue that the relief is

3     justified because of the mismatch between the investors'

4     timelines and the Movants'.  This is not true.  The Movants

5     cite to three transactions to justify their statement in the

6     motion:  SSP, OmniMax, and certain recent transactions.

7          The recent transactions were the attempted sales of two

8     public equities immediately before Thanksgiving that Mr.

9     Dondero interfered with.  You'll hear testimony from Mr. Seery

10    about each of these transactions and how each was in the best

11    interest of the CLOs.

12         First, SSP.  SSP is a steel business that was suffering

13    for a number of reasons.  The Debtor's investment team

14    believed SSP should be sold since 2019.  The Debtor received

15    multiple offers for SSP, the Debtor evaluated these offers,

16    and the Debtor choose the one that was the best.  The SSP sale

17    closed in early November.

18         Notably, Your Honor, none of the CLOs held an equity

19    interest in SSP, its parent, or in Trussway.  Instead, they

20    held debt, and they got exactly what they bargained for,

21    repayment of their debt obligations in full.

22         OmniMax, Your Honor, is the second one.  It is a

23    fabricator of building materials.  The CLOs and the Movants

24    held an interest in OmniMax debt which they have been trying

25    to refinance or equitize since 2019.  That deal was intended

21

1    to include the Movants, but instead of working with the

2    Debtor, Mr. Dondero held out and used the threat of litigation

3    against OmniMax to secure a higher price for the Movants, to

4    the detriment of the CLOs.

5        As Mr. Seery will testify, these two transactions were all

6    about maximizing value and have nothing to do with investment

7    timelines.

8        Finally, Your Honor, the Movants reference the

9    Thanksgiving transactions.  These transactions were discussed

10   in the context of Mr. Dondero's TRO.  Mr. Seery directed

11   Debtor personnel, on the advice of his investment team, to

12   sell these securities.  Mr. Dondero blocked those trades.  Now

13   the Movants argue that the reason those trades were blocked

14   was because of a mismatch between the Movants' and the

15   Debtor's investment timelines.  That is not the case.  Mr.

16   Seery will testify as to these trades.  The Debtor is an

17   investment manager and appreciates that its decisions with

18   respect to how it manages its assets are -- is a judgment

19   call.  The evidence, however, will show that the Debtor at all

20   times exercised that judgment in good faith based on all

21   available information.

22       The Movants may disagree with the Debtor's judgment, Your

23   Honor, but that is irrelevant.  The Movants have no right to

24   interfere with the Debtor's management of the CLOs.  There is

25   simply no statutory or contractual basis for this, not under

Case 19-34054-sgj11   Doc 3596-26   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 88-1   Filed 09/29/23   Page 731 of 1539   PageID 17969

22

```
 1  Section 363 and not under the CLO agreements.
 2       Finally, Your Honor, -- I guess not finally.  There's one
 3  more point I want to make.  But Your Honor, this -- what we're
 4  here on today is notably similar to the Acis bankruptcy that
 5  Your Honor noted last time we were here last week.  In that
 6  bankruptcy, HCLOF tried to direct the collateral manager to
 7  take certain actions that HCLOF thought were in the best
 8  interest of the CLOs.  In this case, the Movants, through Mr.
 9  Dondero, are trying to file an action that functionally seeks
10  to direct the Debtor to take interests that the Movants
11  believe are in their best interest.  There is substantial
12  overlap between the litigation in Acis and the litigation
13  here.
14       Finally, Your Honor, the Debtor has been in discussions
15  with the CLOs' counsel on this issue.  And the Debtor has been
16  informed that the CLOs' position is that the Debtor's ability
17  to operate under the management agreements should not be
18  interfered with, not by the Movants or not by any other party.
19       Thank you, Your Honor.  With that, I will turn it over to
20  Mr. Norris.  Or, I'm sorry, Mr. Wright.
21          THE COURT:  All right.  Mr. Wright, you may call your
22  witness.
23          MR. WRIGHT:  All right, Your Honor.  Dustin Norris
24  should be -- should be dialed in and should be available on
25  screens.
```

Norris - Direct                    23

1            THE COURT:  Okay.  I'm going to --

2            MR. WRIGHT:  I'll pause and have him confirm that.

3            THE COURT:  I'm going to ask you, Mr. Wright, to

4    speak up or closer to your device.  I didn't hear the name of

5    your witness.

6            MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

7    last time, you were having trouble hearing me, and so I'm

8    trying a different device this time.  I actually followed the

9    instructions that I found very helpful, so I'm trying my phone

10   in hopes that it will work better.

11           THE COURT:  All right.

12           MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13   I-N, N-O-R-R -- N-O-R-R-I-S.

14           THE COURT:  All right.  Mr. Norris, can you say

15   "Testing one two" so we pick up your video?

16           MR. NORRIS:  Testing one two.

17           THE COURT:  All right.

18           MR. NORRIS:  Testing one two.

19           THE COURT:  All right.  Please raise your right hand.

20             DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21           THE COURT:  All right.  Mr. Wright, you may proceed.

22           MR. WRIGHT:  Thank you, Your Honor.

23                     DIRECT EXAMINATION

24   BY MR. WRIGHT:

25   Q   Mr. Norris, you're employed by NexPoint Advisors?

Norris - Direct                          24

1  A    I am.  That's correct.

2  Q    And what is your title and role there?

3  A    Yeah.  I am the executive vice president of NexPoint

4  Advisors.  In that role, I oversee business development,

5  marketing, sales, investor relations.  And as far as the funds

6  advised by the advisor, I'm the liaison with the independent

7  board on the business side.

8  Q    Thank you.  Do you also have a role for Highland Capital

9  Management Fund Advisors?

10 A    I do.  I'm also the same executive vice president and

11 fulfill that same role as it pertains to business development,

12 sales, investor relations.  And in both, I'm also working on

13 product development.  So, launching, developing new products

14 and investment funds.

15 Q    Do you also have a role for Highland Income Fund, NexPoint

16 Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17 A    I do.  I'm also executive vice president for each of those

18 funds.

19 Q    Thank you.  Have you ever served on the boards of these

20 three funds?

21 A    I have.  I've served as the interested trustee, sole

22 interested trustee for each of these funds.  I'm no longer the

23 board member or interested trustee, but still serve as an

24 officer, executive vice president, for each fund.

25 Q    At times, I'm going to refer to NexPoint Advisors, LP and

Norris - Direct                          25

1   Highland Capital Management Fund Advisors, LP simply as the

2   Advisors, to avoid having to keep saying their long names.

3   And similarly with the three funds that are part of the

4   motion, I may just call them the Funds.

5       Can you explain the relationship between the Advisors and

6   the Funds, briefly?

7   A   Yeah.  So, each of these are investment companies that are

8   registered under the Investment Company Act of 1940.  So, with

9   that comes a unique relationship between an investment advisor

10  and the funds themselves.  The Funds don't have employees.

11  They rely on the investment advisor and investment advisor

12  employees.  And between the Funds and the Advisors is an

13  investment advisory agreement.  And the Funds themselves are

14  also overseen by an independent board, and that's by statute

15  by the 1940 Act.

16  Q   Okay.  And just to be clear, when you said that these are

17  -- entities are investment companies, you meant that the three

18  Funds are investment companies?

19  A   Correct.  Correct.  The three Funds are investment

20  companies.  The investment advisors are not investment

21  companies.

22  Q   Thank you.  Can you explain the role of the board for the

23  Funds?

24  A   Yeah.  So, as prescribed by the Investment Company Act of

25  1940, there are certain obligations related to an investment

Norris - Direct                    26

1   company, and one of those is they must be overseen by an

2   independent board.  And the independent board has a

3   responsibility to oversee the -- certain material agreements,

4   including the advisory agreement.  And we meet regularly with

5   the boards.  They overseas certain processes and, again, all

6   material contracts.  And the board is, by Section 15(c) of the

7   1940 Act, required by law to annually review the capabilities

8   of the Advisor and to either approve or reject the advisory

9   contracts.  So, each year, those contracts are renewed by the

10  independent board.

11      There are certain obligations of the Fund and operations

12  that are delegated responsibility to the investment advisors.

13  That includes portfolio management and investment decisions.

14  But all those are overseen by the board.

15  Q   Okay.  And are the boards involved in the day-to-day

16  operations of the Funds?

17  A   They're not.

18  Q   Okay.  And do you know who the members of the boards of

19  these three Funds are?

20  A   I do.

21  Q   Could you share that with us?

22  A   Yeah.  So, the -- there is one interested trustee of each

23  board, and that's John Honis.  And then for the Highland

24  Income Fund and the NexPoint Strategic Opportunities Fund --

25  sorry, for NexPoint -- for Highland Income Fund and NexPoint

Norris - Direct                              27

1    Capital, we have the same three disinterested or independent

2    trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

3    Powell.  And for NexPoint Strategic Opportunities Fund, we

4    have the same four trustees, one interested, three

5    independent, but there's another fourth independent trustee,

6    Ed Constantino.

7    Q    And when you refer to independent trustees, do you mean

8    independent for purposes of the Investment Company Act of

9    1940, as amended?

10   A    That's correct.  They, by statute, they are independent

11   trustees.  They also have an independent legal counsel.  Stacy

12   Louizos represents them from Blank Rome.  And also two of

13   these Funds are listed on the New York Stock Exchange, and the

14   New York Stock Exchange has various independence requirements

15   that each independent director has met.

16   Q    Thank you.  And which are the two Funds that are listed on

17   NYSE?

18   A    The Highland Income Fund and the NexPoint Strategic

19   Opportunities Fund are both NYSE-listed.

20   Q    And I know you probably haven't memorized everybody who

21   invests in the Funds, but can you give us a general idea of

22   who invests in these Funds?

23   A    Certainly.  I definitely have not memorized them.  There

24   are thousands of individual investors in each of these Funds.

25   Part of my role overseeing investor relations and sales, I do

Norris - Direct                          28

1   talk to a lot of those investors.  But the majority of the

2   investors in each of these Funds are individual investors.

3      As '40 Act Funds, almost anybody with a brokerage account

4   can buy them.  They have tickers, particularly the Funds that

5   are listed.  Closed-end funds.  And so, with that, it is mom-

6   and-pop investors.  It's retail investors, including myself.

7   I've allocated my 401(k) to these funds, the majority of my

8   401(k) to these funds.  But there are also institutional

9   investors.  There's hedge funds.  There's ETFs.  There are

10  large high-net-worth individuals.  But the majority of it is

11  individual investors that have invested through their

12  brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13  These are -- these are -- these are the individual investors.

14  Q    Thank you.  Does Mr. Dondero have investments in the

15  Funds?  Do you know?

16  A    He does.  He's invested in each of the Funds.

17  Q    Does he have a majority investment in any of the Funds?

18  A    He does not have a majority investment in any of the

19  Funds.

20  Q    Thank you.  Does Mr. Dondero have a control relationship

21  with the two Advisors?

22  A    Yes.  He does.  With the Advisors.

23  Q    And does he have a control relationship with the Funds?

24  A    As it pertains to portfolio management, he is a portfolio

25  manager of each Fund.  But as discussed, as I mentioned, the

Norris - Direct                      29

 1  independent board on an annual basis has the ability to
 2  terminate or renew our advisory contracts, and that -- that
 3  dynamic removes the control, overall control, of the Funds in
 4  that regard.
 5  Q   Are you familiar with the motion that the Court I think
 6  has accurately referred to as the CLO Motion that was filed by
 7  the two Advisors and the three Funds?
 8  A   Yes.  I am familiar with it.
 9  Q   And I'm going to ask you a question now that I think is of
10  interest to the Court, based on the last time I was in front
11  of Judge Jernigan.  Were any employees of the Debtor involved
12  in deciding to bring this motion or in preparing the motion?
13  A   No.  None of the HCMLP employees, to my knowledge, were
14  involved in preparing or deciding to bring the motion.
15  Q   Okay.  And you investigated who was involved in preparing
16  the motion, so your knowledge is pretty good on this point?
17  A   Correct.  I have.  And none were involved, based on that
18  investigation.
19  Q   (garbled) involved in deciding to bring a motion,
20  preparing it, other than outside counsel and my firm?
21  A   Yeah.  So, the initial cause for concern was raised by Mr.
22  Dondero himself to our legal -- internal legal team and
23  compliance team.  And working together with them, myself, and
24  outside counsel, and senior management of Highland Capital
25  Management Fund Advisors, including Joe Sowin, we prepared the

Norris - Direct                          30

1  order.  Or, sorry, not the order, the motion.

2  Q   All right.  Thank you.  Were the boards of the three Funds

3  involved at all with bringing the motion?

4  A   They were not involved in the preparation of the motion

5  itself.  They were aware and supportive, but they did not

6  prepare the motion.

7  Q   You provided a (audio gap), correct?

8  A   Sorry.  You did cut out there.  I didn't hear the

9  question.

10 Q   I'll try again.  You provided a declaration (garbled)

11 motion, correct?

12 A   I did, yes.

13 Q   And there are two exhibits to your declaration.  There's

14 an Exhibit A and an Exhibit B.

15 A   Correct.

16 Q   Exhibit A, does this reflect the current repayment status

17 of the various CLOs as we -- as you understand it to be as of

18 December 1st?

19 A   Yes, it does.

20 Q   And does Exhibit (garbled) of the three Funds --

21        THE COURT:  Okay.  Mr. --

22 BY MR. WRIGHT:

23 Q   -- and the various CLOs, --

24        THE COURT:  Mr. Wright?

25 BY MR. WRIGHT:

Norris - Direct                          31

1    Q    -- as you understand it?

2              THE COURT:  Mr. Wright, time out.  Two things.

3    First, I don't know what you can do to improve --

4              MR. WRIGHT:  Sure.

5              THE COURT:  -- your connection, but you're

6    occasionally breaking up a little.

7        But second, can we be clear for myself, the record,

8    everyone else, what you're referring to right now?  We have an

9    Advis... your witness and exhibit list is at Docket 1573.  Is

10   that what I should be looking at first?

11             MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12   Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13   It may be the only exhibit on our exhibit list, frankly.

14             THE COURT:  Okay.  So you're talking about his

15   declaration now, not the witness and exhibit list with the

16   attachments to it?  Actually, it is attached here.  Exhibit A.

17   Okay.  I'm there.  I went to Exhibit A in your attachments to

18   your exhibit list at 1573.

19       All right.  Let's try again with your question you just

20   asked.

21             MR. WRIGHT:  Sure.

22   BY MR. WRIGHT:

23   Q    So, Mr. Norris, Exhibit A, this reflects the current

24   repayment status of the CLOs that are the subject of the

25   motion as of December 1.  Correct?

Norris - Direct                          32

1  A    Correct.

2  Q    And then --

3          MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4  which is just a couple pages forward.

5          MR. MORRIS:  Your Honor, I would ask that this be put

6  up on the screen, if possible.

7          THE COURT:  Yes.  Can you do that, please?

8          MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9          THE COURT:  He asked if you could --

10          MR. MORRIS:  I would --

11          THE COURT:  -- share your screen.  Can you share your

12  screen as to what you're looking at?

13          MR. WRIGHT:  Can I share my screen?  Last time I was

14  using a computer and you were having trouble hearing me, so

15  this time I'm doing it on my phone.  So my phone, no, I don't

16  have this on my phone to share my screen that way.  It's

17  Docket 1522-1, and it's the only exhibit that was on our

18  exhibit list.

19          MR. MORRIS:  No objection, Your Honor.

20          MR. WRIGHT:  All it shows is the holdings in Funds in

21  the CLOs.  That's all it is.

22          MR. MORRIS:  No objection, Your Honor.

23          THE COURT:  Okay.

24          MR. NORRIS:  I'm sorry, John.  I didn't hear.

25          THE COURT:  Give me a minute, because I was at 1573,

Norris - Direct                          33

1   your witness and exhibit list.

2        (Pause.)

3             THE COURT:  Okay.  That's not the correct docket

4   number.

5             MR. MORRIS:  Your Honor?

6             THE COURT:  Yes?

7             MR. MORRIS:  If I may, it's John -- it's John Morris.

8   It's Docket No. 1528.  And the declaration can be found at

9   Page 12 of 26.

10             MR. WRIGHT:  Thank you.

11             THE COURT:  1528?

12             MR. WRIGHT:  That's bizarre, because I have a

13   printout of it and it says Docket 1522-1.

14             THE COURT:  Okay.  1528 is the -- the actual motion

15   we've set for hearing.

16             MR. MORRIS:  And it's attached to that, yes.  If you

17   -- if you go to PDF Page 12, it's the first page of the

18   declaration.

19             THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20   that declaration.  And then you were having the witness look

21   first at Exhibit A to that declaration.  And then where are

22   you having him look next?  Exhibit B, which is entitled

23   "Holdings of Preferred Shares in CLOs"?

24             MR. WRIGHT:  Exhibit B, Your Honor.

25             THE COURT:  Okay.  Continue.

Norris - Direct                    34

1        MR. WRIGHT:  (garbled) I think some of the exhibits

2   that I have had the wrong docket number printed on the top,

3   and I --

4   BY MR. WRIGHT:

5   Q   Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6   shows the holdings of the preference shares of the Funds in

7   the various CLOs that are the subject of the motion, correct?

8   A   That's correct.  One clarification.  It shows the

9   percentage ownership of each of those preference share

10  tranches that each Fund owns.

11  Q   Thank you.  Mr. Norris, do the three Funds have a date by

12  which they have to liquidate their investments?

13  A   Sorry, you did skip out there.  If you could you repeat

14  the question.  I apologize.

15  Q   It's frustrating.  Do the three Funds have a date by which

16  they must liquidate their investments?

17  A   No.  They do not.

18  Q   Okay.  Can you briefly explain why the Advisors and the

19  Funds brought this motion?

20  A   Yeah.  The Advisors and the Funds were concerned with

21  certain transactions, as described in the motion.  As

22  preference share owners, we own the majority or a substantial

23  portion of the economics of most of these CLOs, and in three

24  instances the majority of the economic benefit.  And there was

25  concern with the way that the sales were executed.  And so,

Norris - Cross                    35

1   with that, we're simply asking for a temporary relief in order

2   to benefit and to maximize the recovery for our preference

3   shares that we own.

4   Q    Thank you.

5         MR. WRIGHT:  All right, Your Honor.  I have no

6   further questions for Mr. Norris, although I guess I reserve

7   the right to redirect.

8         THE COURT:  All right.  Cross-examination?

9         MR. MORRIS:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q    Good afternoon, Mr. Norris.  Can you hear me?

13  A    I can.  Thank you, Mr. Morris.

14  Q    All right.  I'm going to go into a little bit more detail

15  about some of the topics that you discussed.  To be clear

16  here, there are five moving parties; is that right?

17  A    That's correct.  The two Advisors and the three Funds.

18  Q    And one of the advisory firms is Highland Capital

19  Management Fund Advisors, LP; is that right?

20  A    That's correct.

21  Q    And I'll refer to that as Fund Advisors; is that okay?

22  A    That's great.

23  Q    James Dondero and Mark Okada are the beneficial owners of

24  Fund Advisors, correct?

25  A    That is my understanding, yes.

Norris - Cross                                    36

1   Q    And your understanding is that Mr. Dondero controls Fund

2   Advisors, correct?

3   A    That's correct.

4   Q    And the other advisory firm that brought the motion is

5   NexPoint Advisors, LP; is that right?

6   A    That is correct.

7   Q    And Mr. Dondero is the beneficial owner of NexPoint; is

8   that right?

9   A    A family trust where Jim is the sole beneficiary, I

10  believe, controls or owns NexPoint Advisors.

11  Q    Okay.  And Mr. Dondero --

12  A    Or 99.9 percent of NexPoint Advisors.

13  Q    Thank you for the clarification.  Mr. Dondero controls

14  NexPoint; is that right?

15  A    Correct.

16  Q    All right.  And I'm going to refer to Fund Advisors and

17  NexPoint as the Advisors going forward; is that fair?

18  A    That's fair.

19  Q    Each of the Advisors manages certain funds; is that right?

20  A    That is correct.

21  Q    And three of those funds that are managed by the Advisors

22  are the Movants on this motion, correct?

23  A    Correct.

24  Q    All right.  The Advisors caused these three Funds to

25  invest in CLOs that are managed by the Debtor; is that right?

Norris - Cross                                37

1   A    The portfolio managers working for the Advisors did.

2   That's correct.

3   Q    And Mr. Dondero is the portfolio manager of the Highland

4   Income Fund; is that right?

5   A    He is one of the portfolio managers for that Fund.

6   Q    And he's also --

7   A    I believe there are two.

8   Q    And he's also a portfolio manager of NexPoint Capital,

9   Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

Norris - Cross                          38

1   A    To my knowledge, that is correct.

2   Q    And in fact, the boards were not required to approve the

3   filing of this motion, correct?

4   A    I'm not -- I believe that's a legal question, but to my

5   knowledge, there was not a requirement of the board to -- or,

6   to adopt a resolution for that.

7   Q    Okay.  Let's talk a little bit about your background.  I

8   think you testified that you're the executive vice president

9   at NexPoint Advisors, one of the Movants.  Is that right?

10  A    That's right.

11  Q    Who's the president of NexPoint Advisors, LP?

12  A    Mr. Dondero.

13  Q    And you report directly to him; is that right?

14  A    I do.

15  Q    You're also the executive vice president of Fund Advisors,

16  another Movant; is that right?

17  A    Correct.

18  Q    And Mr. Dondero is the president of Fund Advisors; is that

19  right?

20  A    He is not.  There is no president of Fund Advisors.  But

21  he -- yeah.

22  Q    You're the president of another entity called NexPoint

23  Securities; is that right?

24  A    That's correct.

25  Q    And you're also the executive vice president of the 11 or

Norris - Cross                               39

1    12 funds that are managed by the Advisors here, right?

2    A    Yes.  That is correct.

3    Q    Okay.  You've been working for Highland Capital Management

4    or other Highland-related entities for a little more than a

5    decade; is that right?

6    A    That's correct.  Since June 2010.

7    Q    Okay.  Now, you don't personally make any investment

8    decisions for -- for the Funds.  Is that right?

9    A    That's correct.

10   Q    And you don't hold yourself out as an investment manager,

11   do you?

12   A    I do not.

13   Q    And you've never worked for a CLO, have you?

14   A    Never worked for a -- for a C -- employed by a CLO.

15   Worked on accounting, various other aspects, but never worked

16   for a CLO.

17   Q    Okay.  You referred earlier to the declaration that you've

18   submitted in support of the motion.  Do you remember that?

19   A    I do.

20   Q    I've got an assistant on the line here.

21         MR. MORRIS:  Ms. Cantey, can we put up onto the

22   screen Debtor's Exhibit C, which I believe was Mr. Norris's

23   declaration?  And if we could go to Page 12 of 26.  Oh, all

24   right.

25   BY MR. MORRIS:

Norris - Cross                            40

1   Q    And, again, Mr. Norris, as we did in the deposition

2   yesterday, I'll remind you of the difficulty of doing a

3   virtual examination.  And if at any time I ask you a question

4   about your declaration that prompts you to think you need to

5   see another portion of the declaration, will you let me know

6   that?

7   A    Yes, I will.

8   Q    Okay.  Because I'm not here to test your memory.  I'm just

9   here to ask you certain questions.  So please let me know if

10  you need to see something that's not on the screen itself.

11       You didn't write any portion of this declaration; is that

12  right?

13  A    I did not.

14  Q    And you didn't provide any substantive comments to the

15  declaration as drafted because you agreed with -- with the

16  declaration as written by others; is that fair?

17  A    Correct.

18  Q    And all of the key information in your declaration was

19  supplied by NexPoint's management; isn't that right?

20  A    Correct.

21  Q    The individuals who provided the information that's in

22  your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23  and outside counsel at K&L Gates; is that right?

24  A    Correct.

25  Q    And Mr. Sauter is in-house counsel at the Advisors; is

Norris - Cross                              41

1  that right?

2  A    That is right.

3  Q    And Mr. Post is the chief compliance officer at NexPoint;

4  is that right?

5  A    That's correct.

6  Q    The whole idea for this motion initiated with Mr. Dondero;

7  isn't that right?

8  A    The concern, yes, the concern originated, and his concern

9  was voiced to our legal and compliance team.

10 Q    Okay.

11          MR. MORRIS:  Can we take the declaration down for --

12 oh, actually, no, I'm sorry, leave it there, and let's talk

13 about Exhibit B.  Now we can all see it.  If you can scroll

14 down to Exhibit B, please.  Okay.

15 BY MR. MORRIS:

16 Q    This page is attached to your declaration, right?

17 A    That's correct.

18 Q    And this page is intended to show the percentage of

19 preferred shares owned by each of the Movant Funds and the 15

20 different CLOs, right?

21 A    That's right.

22 Q    And the Debtor is the portfolio manager for each of these

23 CLOs; is that right?

24 A    Yes.

25 Q    And it's your understanding that the Debtor's management

Norris - Cross                                        42

1    of the CLOs on this page is governed by written agreements

2    between the Debtor and each of the CLOs, right?

3    A    Yes.

4    Q    None of the Movants are parties to the agreements between

5    the Debtor and each of the CLOs pursuant to which the Debtor

6    serves as portfolio manager; is that correct?

7    A    I believe that is correct.  One, I think, important --

8    even though they're not subject to the agreement, they are the

9    -- they have the economic ownership of each of these CLOs.

10   Q    But they're not party to the agreement; is that right?

11   A    Not that I'm aware of.

12   Q    Okay.  And in preparing for this motion and preparing for

13   your testimony, you didn't personally review any of the

14   agreements between the Debtor and any of the CLOs listed on

15   this page, right?

16   A    No.  I relied on legal counsel for that review.

17   Q    Okay.  And, but even though you didn't review the

18   agreements, it's your understanding that among the

19   responsibilities that the Debtor has as the portfolio manager

20   is buying and selling assets on behalf of the CLOs; is that

21   right?

22   A    Yes.  And I believe I specifically stated in my statement,

23   if you want to turn to it, what I (audio gap) to regarding the

24   CLOs' duties under the agreements.

25   Q    Okay.  It's your understanding, in fact, that nobody other

Norris - Cross                              43

1    than the Debtor has the right or the authority to buy and sell

2    assets on behalf of the CLOs listed on Exhibit B, correct?

3    A    That's my understanding.

4    Q    Okay.  And it's also your understanding, your specific

5    understanding, that holders of preferred shares do not make

6    investment decisions on behalf of the CLO; is that right?

7    A    Correct.

8    Q    And that's something that the Advisors knew when they

9    decided to invest in the CLOs on behalf of the Movant Funds;

10   is that fair?

11   A    That's right.  And at that time, the knowledge in the

12   purchase was with Highland Capital Management, LP and the

13   portfolio management team at that time.

14   Q    And it's still with Highland Capital Management, LP; isn't

15   that right?

16   A    That's correct.  I'm not sure that the portfolio

17   management team looks the same, but it was HCMLP.

18   Q    Okay.  Let's just look at this document for a second.  The

19   first column has the list of the CLOs in which the Movant

20   Funds have invested; is that right?

21   A    Correct.

22   Q    And the second column, HIF, that stands for Highland

23   Income Fund; is that right?

24   A    Yes, sir.

25   Q    And Highland Income Fund is one of the Funds who are the

Norris - Cross                              44

1    Movants here, right?

2    A    That is correct.

3    Q    And the percentages below that show the percentage of the

4    preference shares of each of the CLOs that that particular

5    fund holds; is that right?

6    A    That's right.

7    Q    And then the third column relates to NexPoint Strategic

8    Opportunities Fund, one of the Movants here; is that right?

9    A    That's correct.

10   Q    And the next column, the fourth column, relates to

11   NexPoint Capital, Inc.'s holding of preference shares in the

12   15 CLOs, right?

13   A    That's right.

14   Q    So, NexPoint Capital doesn't hold any preference shares in

15   any of the CLOs except for a less-than-one-percent interest in

16   Grayson; am I reading that correctly?

17   A    Yes, that's correct.

18   Q    Okay.  And then the last column is intended to show the

19   aggregate portion or percentage of preference shares that the

20   three moving Funds have in each of the 15 CLOs; is that right?

21   A    Yes, that's right.

22   Q    Okay.  Am I reading this correctly that, for 12 of the 15

23   Funds, the moving Funds own less than a majority of the

24   outstanding preferred shares?

25   A    Yes, that's correct.

Norris - Cross                               45

1   Q    And is it also -- am I also reading this correctly to

2   conclude that the moving Funds owned less than 70 percent of

3   every one of these CLOs; is that right?

4   A    That's correct.

5   Q    You don't know who owns the preferred shares in the CLOs

6   that are not owned by the Movant Funds, do you?

7   A    I don't know any -- any specific owners.

8   Q    And some of these CLOs still have notes that are

9   outstanding; is that right?

10  A    Yes.  Very small amounts as a percentage of the overall

11  CLO original capital structure, but yes, some still have small

12  --

13  Q    So, --

14  A    -- notes.  Small amounts of notes.

15  Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16  if we took the time to look at Exhibit A, Exhibit A would

17  show, for each of the 15 CLOs, which of those CLOs still had

18  notes outstanding and the amount of out -- the dollar value of

19  those notes.  Is that right?

20  A    That's correct.

21  Q    Okay.  And your understanding is that -- your

22  understanding -- withdrawn.  The payment -- the distributions

23  from the CLOs are made pursuant to a waterfall; is that right?

24  A    Yes, that's correct.

25  Q    And your understanding of the waterfall process is that

Norris - Cross                                46

1    the notes that are still outstanding at any CLO must be paid

2    -- must be paid in full before the preferred shares receive

3    any recovery; is that right?

4    A    So, I would say that my understanding is slightly

5    different.  It's going to be dependent on each indenture.

6    But, in general, interest payments are made to the debt

7    holders, and anything extra is then allocated to the equity.

8    But ultimate recovery, to your point, would be once those --

9    once the debt is paid off.  And that's the critical thing

10   here, where the preference shares here now with most of these

11   CLOs almost all the way wound down, with the exception of a

12   small piece of debt.  The equity owns the lion's share of the

13   economic interest of every one of these CLOs.  And I think

14   that's important.

15   Q    Okay.  Some of the CLOs still have outstanding notes.  Is

16   that right?

17   A    Yes.  As we discussed on -- Exhibit A will have the notes

18   that are -- that are remaining on those.

19   Q    And you don't know who holds the notes in the other CLOs,

20   right?

21   A    I don't.

22   Q    The only holders of preferred shares that are pursuing

23   this motion are the three Funds managed by the Advisors,

24   right?

25   A    In this motion, yes.

Norris - Cross                              47

1    Q    You're not aware of any holder of preferred shares

2    pursuing this motion other than the three Funds managed by the

3    Advisors, correct?

4    A    No, I'm not aware of any others.

5    Q    You didn't personally inform any holder of preferred

6    shares, other than the Funds that are the Movants, that this

7    motion would be filed, did you?

8    A    No, I did not.

9    Q    You're not aware of any steps taken by either of the

10   Advisors to provide notice to holders of preferred shares that

11   this motion was going to be filed, are you?

12   A    I'm not, no.

13   Q    And you're not aware of any attempt that was made to

14   obtain the consent of all of the holders of the preferred

15   shares to seek the relief sought in this motion, correct?

16   A    That's correct.

17   Q    You don't have any personal knowledge, personal knowledge,

18   as to whether any holder of preferred shares other than the

19   Funds managed by the Advisors wants the relief sought in the

20   motion, correct?

21   A    Correct.

22   Q    You don't have any personal knowledge as to whether any of

23   the CLOs that are subject to the contracts that you described

24   want the relief that's being requested in this motion, right?

25   A    That's correct.  I have not spoken or been involved at all

Norris - Cross                                48

1  directly with the CLOs.  I'm representing the Funds.

2  Q    Okay.  Now, two of the Funds, two of the three Movant

3  Funds, I believe you testified are publicly traded; is that

4  right?

5  A    That's correct.

6  Q    And that's the Highland Income Fund and the NexPoint

7  Strategic Opportunities Fund; is that right?

8  A    That's right.  That's right.

9  Q    And because they are publicly-traded, the shareholders in

10 those two funds can sell their shares any time the market is

11 open; is that right?

12 A    If they're willing to take the price that the market is

13 willing to give, yes.

14 Q    Yes.

15 A    Between market hours.

16 Q    And if they -- if they don't like the way the assets that

17 are -- that the Funds have been invested, one of the things

18 they could do is simply sell their shares, right?

19 A    Yes.

20 Q    And the third fund, the shareholders in the third fund

21 have the right to sell out not on a public market but on a

22 quarterly basis; is that right?

23 A    Correct.

24 Q    That third Movant Fund is NexPoint Capital; do I have that

25 right?

Norris - Cross                    49

1  A    Correct.

2  Q    So they also have the ability to exit if they don't like

3  management on a quarterly basis; is that right?

4  A    Correct.

5  Q    All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6  of your declaration?  Okay.  Paragraph 8 describes a

7  transaction that's been referred to as OmniMax; is that right?

8  A    Yes.

9  Q    And Paragraph 9 refers to a transaction involving SSP

10  Holdings, LLC; do I have that right?

11  A    That's correct.

12  Q    Do you know what SSP stands for?

13  A    See if we say it in there.  SSP Holdings, LLC.

14  Q    Right.  Do you know what SSP stands for?

15  A    I don't.  Something Steel Products.  I --

16  Q    Okay.  You don't need to guess.  These are the only two

17  transactions that the Movants question; is that right?

18  A    These transactions, as well as certain transactions around

19  Thanksgiving time.

20  Q    Okay.  We'll talk about those.  But those transactions

21  about -- around Thanksgiving time aren't in your declaration,

22  are they?

23  A    Not specifically mentioned by name.

24  Q    Okay.  Let's talk about the two that are mentioned by

25  name, Trussway and SSP.  The Movants do not contend that

Norris - Cross                                50

1   either transaction was the product of fraudulent conduct, do

2   they?

3   A    No.

4   Q    The Movants do not contend that the Debtor breached any

5   agreement by effectuating these transactions, do they?

6   A    I don't believe so.

7   Q    In fact, the Movants do not contend that the Debtor

8   violated any agreement at any time in the management of the

9   CLOs listed on Exhibit B; is that right?

10  A    That's right.

11  Q    The Movants don't even question the Debtor's business

12  judgment, only the results of the trans -- of these two

13  transactions.  Is that right?

14  A    That's right.  And results is the key here and the

15  approach.

16  Q    I see.  And the reason the Movants do not question the

17  Debtor's business judgment is because you don't know what

18  factor or factors the Debtor considered in executing these

19  transactions, right?

20  A    That's right.  I can't look into the mind or know the

21  business judgment and the inputs that went into this.  We do

22  know the outcomes.  And to us, that's troubling, right, as the

23  owners of the lion's share or the majority or even significant

24  amounts of the economic ownership of the CLOs.  And having

25  insight into those transactions, as mentioned in my statement,

Norris - Cross                                51

1    really just trying to maximize recoveries for our Funds.

2            MR. MORRIS:  Your Honor, I move to strike the portion

3    of his answer following that which was responsive to the

4    question.

5            THE COURT:  All right.  I grant that motion.

6            MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Sir, you never asked the Debtor what factors it considered

9    in making these trades, right?

10   A    I did not.

11   Q    And you have no reason to believe that anyone on behalf of

12   the Movants ever asked the Debtor why it executed these

13   trades, right?

14   A    I don't have any knowledge.  There could have been

15   somebody from -- from the Movants.  But I did not.

16   Q    Okay.  On OmniMax, the Movants disagree with the price at

17   which the Debtor effectuated the trade, right?

18   A    Correct.

19   Q    And I believe there was a meeting of the boards of the

20   Funds back in August at which Mr. Seery appeared.  Do I have

21   that right?

22   A    I believe it was August, but he did appear.

23   Q    And the purpose of the appearance was so that Mr. Seery

24   could give an update on the bankruptcy; is that right?

25   A    That's correct, and on the services provided by Highland

Norris - Cross                                    52

 1   Capital Management, LP to our Advisor.  Advisors.  They

 2   provide various shared services.

 3   Q   And it was during that meeting that Mr. Seery forthrightly

 4   told the boards the price at which he was planning to execute

 5   the OmniMax transaction, correct?

 6   A   Correct.

 7   Q   The transaction hadn't yet occurred, right?

 8   A   I'm not sure if it had been finalized.  He had a price,

 9   and these -- these things are negotiated.  This was, I

10   believe, a company in restructuring.  So I don't know whether

11   it had been transacted or not.

12   Q   Okay.  The board didn't ask Mr. Seery not to execute the

13   transaction, did it?

14   A   Not to my knowledge.  The board wouldn't -- I don't think

15   the board would have that authority, either.

16   Q   Okay.  But it's here asking the Court to cause the Debtor

17   to pause in the execution of any trades in the CLOs; is that

18   right?

19   A   I think the order speaks in that regard.

20   Q   Yeah.  Okay.  Let's talk about the SSP transaction for a

21   moment.  It's your understanding that Trussway Holdings, LLC

22   owned a majority interest in SSP Holdings, LLC, right?  That's

23   in Paragraph 9.

24   A   Yes.  The statement in Paragraph 9 is what I believe is

25   correct.

Norris - Cross                           53

1   Q    Okay.  And it's also your understanding that Trussway is a

2   wholly-owned subsi... I'm sorry, that SSP Holdings is a

3   wholly-owned subsidiary -- withdrawn.  It's also your

4   understanding that Trussway is a wholly-owned subsidiary of

5   the Debtor, right?

6   A    Yes.

7   Q    But Trussway is not a debtor in bankruptcy, right?

8   A    I'm not sure.

9   Q    Okay.  You have no reason to believe that; is that fair?

10  A    That it's not a debtor in bankruptcy?  That Trussway is

11  not in bankruptcy itself?

12  Q    Correct.

13  A    Yeah.  I have no knowledge of Trussway's situation.

14  Q    Okay.  But you -- but according to your declaration that

15  was prepared by the Advisors' management team, Trussway and

16  not the Debtor owned SSP Holdings, LLC.  Is that right?

17  A    I'm looking here at the statement just to make sure.

18  Q    Sure.

19       (Pause.)

20  A    I -- again, I -- the statement is correct, and I believe

21  speaks for itself regarding entity ownership.

22  Q    The only things you know about the SSP transaction are,

23  one, that you believe it was made without a formal bidding

24  process; and two, that it resulted in a $10 million loss.  Is

25  that right?

Norris - Cross                         54

1   A    Correct.

2   Q    Okay.  But, again, neither you, or to the best of your

3   knowledge, anybody at Advisors, ever spoke with anybody at the

4   Debtor about the circumstances concerning either of the

5   transactions, right?

6   A    I don't know the conversations that were had at anyone

7   else from our Advisors, but this is the knowledge that -- that

8   I have.

9   Q    Okay.  And it's the only knowledge you have, right?  You

10  don't know anything about the SSP transaction other than those

11  two facts, right?

12  A    Correct.

13  Q    In fact, I think you testified yesterday that you've been

14  very remote from the SSP transaction, right?

15  A    That's correct.

16  Q    And that it's not a transaction that you have much

17  knowledge on.  Fair?

18  A    Fair.

19  Q    Let's just talk briefly about the transactions that

20  occurred (garbled) Thanksgiving.  They're not specifically

21  referred to in your declaration; is that right?

22  A    That's correct.

23  Q    And you have no knowledge about any transaction that Mr.

24  Seery wanted to execute around Thanksgiving; is that right?

25  A    I know there were transactions and there were concerns

Norris - Cross                                    55

 1   from our management team, but I'm not aware of what the

 2   transactions were.

 3   Q   In fact, you can't even identify the assets that Mr. Seery

 4   wanted to sell around Thanksgiving, or at least you couldn't

 5   at the time of your deposition yesterday.  Is that right?

 6   A   That's correct.

 7   Q   And you have no knowledge as to why Mr. Seery wanted to

 8   make those particular trades at around Thanksgiving?

 9   A   No, I don't.

10   Q   And in fact, you don't even know if the transactions that

11   Mr. Seery wanted to close around Thanksgiving ever in fact

12   closed.  Is that fair?

13   A   Correct.

14   Q   Okay.  Let's just -- let's just finish up with a few

15   questions about the boards.

16          MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17   Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18   BY MR. MORRIS:

19   Q   This particular page identifies the directors for each of

20   the three Movant Funds; is that right?

21   A   Let me take a look and confirm.  (Pause.)  Yes.  That

22   looks correct.

23   Q   Okay.  And this was prepared by the Movants; is that

24   right?

25   A   I'm not sure who prepared it.

1  Q   Okay.  To the best of your knowledge, does this document

2  accurately reflect the composition of the boards of each of

3  the three Movant Funds?

4  A   Yes, it does.

5  Q   Okay.  John Honis, I think you mentioned him earlier.

6  He's on all three boards.  Is that right?

7  A   That's correct.  And the reason being we have a unitary

8  board structure, so -- which is very common in '40 Act Fund

9  land, where the board sits, for efficiency purposes, on

10 multiple fund boards, and there's a lot of economies of scale

11 from an operating standpoint.  So, yes, they sit on multiple

12 boards.

13 Q   Okay.  And for purposes of the '40 Act, Mr. Honis has been

14 deemed to be an interested trustee.  Is that right?

15 A   That's correct.

16 Q   Okay.  But you don't specifically know what facts caused

17 that designation; you only know that the designation exists.

18 Right?

19 A   That's right.  And I know they are disclosed in the proxy

20 -- or, in the -- the relative filings related to those Funds.

21 Q   Okay.  Three other people are common to all three of the

22 Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,

23 --

24 A   Froehlich.

25 Q   Froehlich.  Ethan Powell and Bryan Ward.  Right?

Norris - Cross                              57

1    A    That is correct.

2    Q    Okay.  All three of those individuals actually serve on

3    the 11 or 12 boards that you mentioned earlier that are

4    managed by the Advisors, right?

5    A    Yes, that is correct.

6    Q    And they're the same Funds for which you serve as an

7    executive vice president, right?

8    A    Yes.  That's correct.

9    Q    So, for all of the Funds that are managed by the Advisors,

10   you serve as executive vice president and all four of these

11   directors -- trustees serve as trustees on the boards, right?

12   A    Yes, that's correct.

13   Q    Okay.  In exchange for serving on all of these boards, the

14   three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15   -- each receive $150,000 a year for services across the

16   Highland complex; is that right?

17   A    That's correct.

18   Q    Dr. Froehlich has been serving as a board member across

19   the Highland complex for seven or eight years now; is that

20   right?

21   A    That's correct.

22   Q    Mr. --

23   A    I believe it's about seven or eight years.

24   Q    And Mr. Powell, he actually was employed by Highland or

25   related entities from about 2007 or 2008 until 2015, right?

Norris - Cross                                    58

 1   A    That's correct.

 2   Q    And Mr. Ward, the third of the independent trustees, he's

 3   been serving as a board member on various Highland-related

 4   funds on a continuous basis since about 2004.  Do I have that

 5   right?

 6   A    Yeah, I believe that's correct.

 7   Q    Okay.  Just a couple of final questions.  You would agree,

 8   would you not, sir, that portfolio managers have an obligation

 9   to effectuate transactions concerning the assets that they

10   manage based on their business judgment?

11   A    Yes.  And in accordance with whatever governing documents

12   govern the fund structure.

13   Q    And you would personally expect a portfolio manager to

14   execute a transaction that he or she reasonably believes in

15   good faith and in their business judgment would maximize value

16   for the CLO, even if the CLO did not need cash at that

17   particular time.  Is that right?

18   A    I think it would come down to the governing documents.

19   And I think what you're getting at here is, in this instance,

20   these sales and the intent of the portfolio manager.  And our

21   view, again, is -- and the request for the motion is simply

22   there is a lot at play here.  Several negotiations.  And in

23   order to maximize returns, simply asking for a pause on

24   transactions.

25   Q    All right.  Let me -- let me ask the question again, and I

Norris - Cross                          59

 1   would ask that you please listen carefully to the question.

 2   You would expect a portfolio manager would execute a

 3   transaction that he or she believes maximizes value, even if

 4   the CLO didn't need cash at that particular moment in time.

 5   Correct?

 6   A    Yeah.  As long as that is maximizing value for the

 7   stakeholders, and in the instance of a CLO, the economic

 8   interest is owned by the equity holders.  So, to their

 9   benefit, yes, that -- that would be the idea.

10           MR. MORRIS:  Your Honor, I have no further questions.

11           THE COURT:  Any redirect, Mr. Wright?

12           MR. WRIGHT:  Only briefly, Your Honor.

13                       REDIRECT EXAMINATION

14   BY MR. WRIGHT:

15   Q    Mr. Norris, I think you were asked at one point about how

16   long you'd been working for Highland Capital Management, which

17   there's -- there's Highland Capital Management Fund Advisors

18   and then there's Highland Capital Management, LP, Debtor.  And

19   I wanted to give you an opportunity to just explain when and

20   what years you worked for HCMLP and then when and what years

21   you worked for NexPoint Advisors or Highland Capital

22   Management Fund Advisors.

23   A    Yes.  From June 2010, I was employed by Highland Capital

24   Management, LP, until July or August of 2012, at which time I

25   was then hired by Highland Capital Management Fund Advisors,

Norris - Redirect                    60

 1   not HCML -- no longer employed by HCMLP, and have worked since

 2   that time for HCMFA and NexPoint Advisors and not for the

 3   Debtor, HCMLP.

 4   Q   Okay.  So -- and I'm sorry if I missed a year, but it's

 5   been about ten years since you had worked for HCMLP or been an

 6   employee of HCMLP, correct?

 7   A   Yeah.  It's been over eight years since I have left

 8   employment by HCMLP.  Ten and a half years ago, I started

 9   working for HCMLP, and then two years after that transitioned

10   away and started working for the Advisors that are part of

11   this motion.

12   Q   Thank you for clarifying.

13           MR. WRIGHT:  Your Honor, I hope -- you directed us to

14   have a witness here today, and so we do.  And I know that you

15   had asked me at the last hearing some questions about the

16   involvement of people at HCMLP, which I tried to address with

17   Mr. Norris in my direct.  But I, you know, I do want to make

18   sure that we've answered any questions that you have.

19           THE COURT:  All right.  Yes, that's fine.  Are you

20   -- does that conclude your redirect?

21           MR. WRIGHT:  It does, Your Honor.

22           THE COURT:  Any recross, Mr. Morris, on that

23   redirect?

24           MR. MORRIS:  No, thank you, Your Honor.

25           THE COURT:  All right, then.  That concludes the

61

1 testimony of Mr. Norris.

2     Any other evidence, Mr. Wright?

3         MR. WRIGHT:  I do not, Your Honor, although I guess I

4 would offer the Exhibit A and Exhibit B to Mr. Norris's

5 declaration --

6         THE COURT:  Any objection to that?

7         MR. WRIGHT:  -- into evidence.

8         MR. MORRIS:  No, Your Honor.

9         THE COURT:  All right.  Those are admitted.

10     (Movants' Exhibits A and B are received into evidence.)

11         THE COURT:  All right.  Well, Mr. Morris, did you

12 want to put on any evidence?

13         MR. MORRIS:  Does the -- do the Movants rest, Your

14 Honor?

15         THE COURT:  I understood that they rest.  Correct,

16 Mr. Wright?

17         MR. WRIGHT:  That's correct, Your Honor.

18         MR. MORRIS:  Your Honor, I would move, effectively,

19 for a directed verdict here.  The Movants have the burden of

20 establishing a *prima facie* case to entitlement to the relief

21 that's been requested, and they have failed to meet that

22 burden.  The Debtor has -- we -- the undisputed facts are the

23 Debtor has the contractual right, and indeed, the obligation,

24 to serve as the portfolio manager of the CLOs pursuant to

25 written agreements.

62

1          The Movants are not parties to those agreements.  The

2    testimony is undisputed that there are many holders of

3    preferred shares and notes that have had no notice of this

4    proceeding that will undoubtedly be impacted by the tying of

5    the hands of the portfolio manager.  The chart that was

6    attached as Exhibit B expressly shows just what a large

7    portion of interested parties and people who would be affected

8    by this motion are not -- they didn't get notice.  There was

9    no attempt to get notice.  There was no attempt to get their

10   consent.  All of that testimony is now in the record, and I

11   think due process alone would prevent the entry or even the

12   consideration of an order of this type.

13         There is nothing improper that's been alleged.  There is

14   no -- there is no allegation of fraud.  There is no allegation

15   of breach of contract of any kind.  There's not even a

16   question of business judgment.  The Movants didn't even do

17   their diligence to ask the Debtor why they made these

18   transactions.  There is nothing in the record that shows that

19   the Debtor, as the portfolio manager of the CLOs, did anything

20   improper.

21         The only thing that the Movants care about is that they

22   don't like the results in two particular trades.  I don't

23   think that that meets their burden of persuasion that the

24   Court should enter an order of this type, and I would like to

25   relieve Mr. Seery of the burden, frankly, and the Court, of

63

1    having to put on testimony to justify transactions that really

2    aren't even being questioned, Your Honor.

3        So the Debtor would respectfully move for the denial of

4    the motion and the relief sought therein.

5        THE COURT:  All right.  Your request for a directed

6    verdict, something equivalent to a directed verdict here, is

7    granted.  I agree that the Movant has wholly failed to meet

8    its burden of proof here today to show the Court, persuade the

9    Court that, as Mr. Morris said, I should essentially tie the

10   hands of the Debtor as a portfolio manager here, as stated.

11   Nothing improper has been alleged.  There has been no showing

12   of a statutory right here, or a contractual right here, on the

13   part of the Movants.

14       I am -- I'm utterly dumbfounded, really.  I agree with the

15   -- I was going to say innuendo; not really innuendo -- I agree

16   with part of the theme, I think, asserted by the Debtor here

17   today that this is Mr. Dondero, through different entities,

18   through a different motion.  I feel like he sidestepped the

19   requirement that I stated last week that if we had a contested

20   hearing on his motion, Dondero's motion, that I was going to

21   require Mr. Dondero to testify.  He apparently worked out an

22   eleventh hour agreement with the Debtor on his motion to avoid

23   that.  But, again, these so-called CLO Motions very clearly,

24   very clearly, in this Court's view, were pursued at his sole

25   direction here.

64

1      This is almost Rule 11 frivolous to me.  You know, we're

2  -- we didn't have a Rule 11 motion filed, and, you know, I

3  guess, frankly, I'm glad that a week before the holidays begin

4  we don't have that, but that's how bad I think it was, Mr.

5  Wright and Mr. Norris.  This is a very, very frivolous motion.

6  Again, no statutory basis for it.  No contractual basis.  You

7  know, you didn't even walk me through the provisions of the

8  contracts.  I guess that would have been fruitless.  But you

9  haven't even shown something equitable, some lack of

10  reasonable business judgment.

11      Bluntly, don't waste my time with this kind of thing

12  again.  You wasted my time.  We have 70 people on the video.

13  Utter waste of time.

14      All right.  So, motion is denied.  Mr. Morris, please

15  upload an order.

16          MR. MORRIS:  Thank you, Your Honor.

17          THE COURT:  All right.  Do we have any other business

18  to accomplish today?

19          MR. POMERANTZ:  I don't think so, Your Honor.  I know

20  we will see you tomorrow in connection with Mr. Daugherty's

21  relief from stay motion.

22          THE COURT:  Well, yeah, we do have that.  Okay.  We

23  will see you tomorrow.  We stand adjourned.

24          MR. CLEMENTE:  Thank you, Your Honor.

25          MR. MORRIS:  Thank you, Your Honor.

65

1          THE CLERK:  All rise.

2          (Proceedings concluded at 3:05 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE

20     I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22   **/s/ Kathy Rehling**                    **12/17/2020**

23   _____    _____

     Kathy Rehling, CETD-444                    Date
24   Certified Electronic Court Transcriber

25

66

                                    INDEX

PROCEEDINGS                                                          3

WITNESSES

Movants' Witnesses

Dustin Norris
- Direct Examination by Mr. Wright                                 23
- Cross-Examination by Mr. Morris                                  35
- Redirect Examination by Mr. Wright                               59

EXHIBITS

Movants' Exhibits A and B                               Received 61

RULINGS

Debtor's Emergency Motion to Quash Subpoena and for                13
Entry of a Protective Order or, in the Alternative,
for an Adjournment (1564, 1565) - *Agreed Order*

James Dondero's Motion for Entry of an Order Requiring             13
Notice and Hearing for Future Estate Transactions
Occurring Outside the Ordinary Course of Business (1439)
- *Continued to 01/04/2021*

Motion for Directed Verdict - *Granted*                            63

Motion for Order Imposing Temporary Restrictions on               63
Debtor's Ability, as Portfolio Manager, to Initiate Sales
by Non-Debtor CLO Vehicles Highland Capital Management Fund
Advisors, L.P., Highland Fixed Income Fund, NexPoint
Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
Opportunities Fund (1528) - *Denied*

END OF PROCEEDINGS                                                 65

INDEX                                                              66

# EXHIBIT 27



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

December 22, 2020
Page 2

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders.  Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing.  While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request.  Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act").  As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021.  The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

# EXHIBIT 28



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds").  CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs.  In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor.  If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308545876.3

December 23, 2020
Page 2

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities.  We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation;  (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 23, 2020
Page 3

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.   To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

# EXHIBIT 29

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                               )       Case No. 19-34054-sgj-11
 3   In Re:                    )       Chapter 11
                               )
 4   HIGHLAND CAPITAL          )       Dallas, Texas
     MANAGEMENT, L.P.,         )       Tuesday, January 26, 2021
 5                             )       9:30 a.m. Docket
                               )
 6            Debtor.          )
                               )       MOTION FOR ENTRY OF ORDER
 7                             )       AUTHORIZING DEBTOR TO
                               )       IMPLEMENT KEY EMPLOYEE
 8   _____)       PLAN [1777]
                               )
 9   HIGHLAND CAPITAL          )       Adversary Proceeding 21-3000-sjg
     MANAGEMENT, L.P.,         )
10                             )
                               )
11            Plaintiff,       )
                               )
12   v.                        )       PLAINTIFF'S MOTION FOR A
                               )       PRELIMINARY INJUNCTION AGAINST
13   HIGHLAND CAPITAL          )       CERTAIN ENTITIES OWNED AND/OR
     MANAGEMENT FUND ADVISORS, )       CONTROLLED BY MR. JAMES
14   L.P., et al.             )       DONDERO [5]
                               )
15            Defendants.      )
     _____)
16
                      TRANSCRIPT OF PROCEEDINGS
17          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
18
     WEBEX APPEARANCES:
19
     For the Debtor:          Jeffrey Nathan Pomerantz
20                            PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
21                              13th Floor
                              Los Angeles, CA  90067-4003
22                            (310) 277-6910

23   For the Debtor:          John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
24                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
25                            (212) 561-7700
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3                                One South Dearborn Street
                                  Chicago, IL  60603
 4                                (312) 853-7539

 5   For CLO Holdco, Ltd.:        John J. Kane
                                  KANE RUSSELL COLEMAN LOGAN, P.C.
 6                                901 Main Street, Suite 5200
                                  Dallas, TX  75202
 7                                (214) 777-4261

 8   For Certain Defendants:      Davor Rukavina
                                  Julian Vasek
 9                                MUNSCH, HARDT, KOPF & HARR
                                  500 N. Akard Street, Suite 3800
10                                Dallas, TX  75201-6659
                                  (214) 855-7587
11
     For Certain Defendants:      A. Lee Hogewood, III
12                                Emily Mather
                                  K&L GATES, LLP
13                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
14                                Raleigh, NC  27609
                                  (919) 743-7306
15
     For James D. Dondero:        John T. Wilson
16                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
17                                420 Throckmorton Street,
                                    Suite 1000
18                                Fort Worth, TX  76102
                                  (817) 405-6900
19
     For the U.S. Trustee:        Lisa L. Lambert
20                                OFFICE OF THE UNITED STATES
                                    TRUSTEE
21                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
22                                (214) 767-8967

23   Recorded by:                 Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
24                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
25                                (214) 753-2062
```

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX   76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

4

 1              <u>DALLAS, TEXAS - JANUARY 26, 2021 - 9:40 A.M.</u>

 2              THE COURT:  All right.  We have Highland settings

 3    this morning:  a Motion for Approval of a KERP, which I didn't

 4    see objections to, and then a Preliminary Injunction hearing.

 5    Let me get appearances from the parties who have filed

 6    pleadings.

 7         For the Debtor team, I see Mr. Morris.  Who do we have

 8    appearing?

 9              MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

10    Pomerantz and John Morris appearing on behalf of the Debtor.

11    I will handle the KERP motion, which we'll propose goes first

12    and quickly, and then Mr. Morris will handle the adversary

13    proceeding.

14              THE COURT:  All right.  Very good.

15         All right.  Let me get appearances from the Defendants in

16    the preliminary injunction matter.  Do we have Mr. Kane or

17    someone for CLO Holdco?

18              MR. KANE:  Yes, Your Honor.  John Kane for CLO

19    Holdco, Ltd.

20              THE COURT:  All right.  What about for the Funds and

21    Advisors?  I guess we have a couple of law firms involved.

22    Who do we have appearing for the K&L Gates firm?

23              MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

24    Hogewood with K&L Gates, and also with our firm appearing

25    today is Emily Mather.

5

 1          THE COURT:  Okay.  I didn't get Emily's last name.

 2   Could you repeat that?

 3          MR. HOGEWOOD:  I'm sorry, Your Honor.  Emily Mather,

 4   M-A-T-H-E-R.

 5          THE COURT:  Thank you.

 6      All right.  For the Munsch Hardt team, do we have Mr.

 7   Rukavina or someone else appearing?

 8          MR. RUKAVINA:  Your Honor, good morning.  This is

 9   Davor Rukavina.  I represent all of the Defendants in the

10   adversary except CLO Holdco.

11      Pursuant to the Court's instructions, Mr. Dondero is also

12   present here in my conference room, so he is here.  He is not

13   on the camera, but he is here.

14          THE COURT:  Okay.  All right.  And does Mr. Dondero

15   have counsel, his individual counsel appearing today?

16          MR. WILSON:  Your Honor, John Wilson for Jim Dondero.

17          THE COURT:  Okay.  Thank you.  Do we have Creditors'

18   Committee lawyers on the phone today?

19          MR. CLEMENTE:  Yes, Your Honor.  Good morning.

20   Matthew Clemente; Sidley Austin; on behalf of the Official

21   Committee of Unsecured Creditors.

22          THE COURT:  All right.  Thank you.

23      All right.  Well, obviously, if any other lawyer is dying

24   to chime in at some point today, I will consider letting that

25   happen.  But, again, I think we've got the parties who have

6

1    filed pleadings having appeared at this point.  So, let's turn

2    to the KERP motion.  Mr. Pomerantz?

3         MR. POMERANTZ:  Yes, Your Honor.  Good morning again.

4    On January 19th, the Debtor filed its motion for approval of a

5    Key Employee Retention Program which would substitute out its

6    annual bonus plan.

7        We have not received any opposition to the motion,

8    although the United States Trustee did ask some questions

9    which we are prepared to address in connection with the

10   proposed proffer of Mr. Seery's testimony.  I'm happy to make

11   a full presentation of the motion to Your Honor, if you would

12   like, or I could just present Mr. Seery's proffer, which I

13   should -- which I believe will establish the factual predicate

14   and the evidence to support the motion.

15        THE COURT:  All right.  Let's just go straight to the

16   proffer, please.

17          MR. POMERANTZ:  Okay.  Thank you, Your Honor.

18           PROFFER OF TESTIMONY OF JAMES P. SEERY

19        MR. POMERANTZ:  Mr. Seery is on the video today, and

20   if he was called to testify he would testify that his name is

21   James P. Seery, Jr. and that he is the chief executive officer

22   and chief restructuring officer of Highland Capital

23   Management.

24       He would also testify that he was one of the independent

25   directors appointed to the Court on January 9th, 2020.

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-85   Filed 09/08/23   Page 791 of 1539   PageID 18029

7

1   Because of his role with the Debtor, he is familiar with the

2   company's day-to-day operations, including its -- the

3   company's employee and wage benefit and bonus plans relating

4   to the employees.

5       He would testify that he has been involved in the

6   negotiation and drafting of the company's plan of

7   reorganization, and is familiar with the expected operation of

8   the Claimant Trust and Reorganized Debtor post-confirmation in

9   connection with the plan.

10      He would testify that the plan generally provides for the

11  monetization of the company's assets for the benefit of

12  creditors and stakeholders, and he would testify that, as part

13  of the plan process, he worked closely with DSI, the company's

14  financial advisor, to assess both the costs of the Debtor's

15  current employee base and the projected cost of operations in

16  connection with the Reorganized Debtor and Claimant Trust

17  following the effective date.

18      He would testify that, to ensure the continued smooth

19  operation of the company in connection with the continuation

20  and consummation of the plan for the benefit of all

21  stakeholders, that he worked with DSI to determine the

22  appropriate staffing needs necessary for the company's

23  remaining operations.

24      He would testify that he analyzed the current employees to

25  determine which, if any, would need to be continued to be

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 09/03/25   Page 792 of 1539   PageID 18030
Exhibit 29   Page 29 of 258

8

1   retained by the Debtor and operate during the Reorganized

2   Debtor and Claimant Trust period following the effective date

3   of the plan.

4        He would testify as part of that analysis he reviewed the

5   roles and functions of the non-insider employees with respect

6   to the services that they needed, and he reviewed the wages,

7   benefits, and bonuses for those remaining non-insider

8   employees necessary for those functions.

9        He would testify, that based upon his review, the company

10  determined that it was in the best interests of the estate to

11  terminate the existing annual bonus plan, as it was no longer

12  necessary to effectively incentivize the remaining non-insider

13  employees who would be terminated prior to being entitled to

14  any further payments under the annual bonus plan.

15       He would testify that, instead, the company developed a

16  new retention plan that was designed to incentivize the non-

17  insider employees to remain with the company for as long as

18  they are needed to assist in the effectuation of the plan.

19       He would testify that Mr. Waterhouse and Surgent, arguably

20  two insiders of the Debtor, are not eligible for the retention

21  plan, and that's not because there is any concern regarding

22  their loyalty, but the Debtor is looking at ways to

23  appropriately incentivize and compensate those people as

24  appropriate in the future.

25       He would testify that there are a few persons on the list

9

1  of people who are part of the retention plan with a title that

2  includes director or manager; however, he would testify that

3  none of those individuals are corporate officers or directors

4  of the Debtors -- the Debtor, and that the titles are for

5  convenience only.  He would testify that the individuals who

6  are employed in these roles do not have any authority

7  whatsoever to make any decisions on behalf of the Debtor.

8      He would testify that in connection with the new retention

9  plan, the non-insider employees may be offered the opportunity

10  to enter into a termination agreement with the company that

11  will provide specified benefits and payments in return for the

12  non-insider employee remaining as an employee in good standing

13  with the company through the separation date.

14      He would testify that a key component of the retention

15  plan is that non-insider employees will be entitled to the

16  specific bonus payments provided that they do not voluntarily

17  terminate their employment with the Debtor prior to the

18  separation date and are not terminated for cause.

19      He would testify that that is in contrast to the existing

20  or the prior annual bonus plan, which provided that non-

21  insider employees would not receive their bonus payments if

22  they were not employed by the Debtor on the vesting date for

23  any reason except on account of disability, including

24  termination without cause.

25      Mr. Seery would further testify that the retention plan is

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-29   Filed 12/29/23   Page 794 of 1539   PageID 18032

Exhibit 29   Page 29 of 258

10

1    being offered to approximately 53 employees, and the projected

2    aggregate amount of payments under the retention plan is

3    approximately $1,481,000, which is $32,000 approximately less

4    than the amount that would have been paid to such employees

5    under the annual bonus plan.

6        He would testify that the retention plan includes 20

7    employees who are not entitled to benefits under the annual

8    bonus plan.  Fourteen employees are entitled to receive more

9    under the retention plan than they would have received under

10   the annual bonus plan.

11       With respect to the 20 employees I've previously mentioned

12   who are not otherwise entitled to receive anything under the

13   annual bonus plan, the vast majority of those -- 18 -- will be

14   entitled to payments of $2,500 each, and the other two

15   entitled to payments of $10,000 and $7,500, respectively.

16       Mr. Seery would testify that he believes that these

17   additional payments are reasonable in light of the current

18   status of the company and the value to be added to the estate

19   through the retention of these employees, and that this plan

20   is more accurately and narrowly-tailored to achieve the

21   company's reorganization goals.

22       On this basis, Your Honor, Mr. Seery would testify that he

23   presented the proposed retention plan to the independent

24   directors and they agreed with Mr. Seery's assessment that

25   entry into the retention plan was in the best interests of the

11

1   estate and its creditors.

2       He would also testify that he had negotiations with the

3   Creditors' Committee and its advisors regarding the retention

4   plan and that the Committee is supportive of the retention

5   plan.

6       And that would conclude my proffer of testimony from Mr.

7   Seery, Your Honor.

8           THE COURT:  All right.  Mr. Seery, if you could say

9   "Testing, one, two" so we can catch your audio and video,

10  please?

11          MR. SEERY:  Testing, one, two, Your Honor.

12          THE COURT:  All right.  There you are.  Please raise

13  your right hand.

14          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

15          THE COURT:  All right.  Thank you.  Is there anyone

16  who has questions at this time for Mr. Seery?

17      (No response.0

18          THE COURT:  All right.  Well, I'll just double-check

19  with the Committee.  It's been represented that you all are in

20  support of this.  Mr. Clemente, if you could confirm that on

21  the record?

22          MR. CLEMENTE:  That's correct, Your Honor.  The

23  Committee has no objection to the motion, so Mr. Pomerantz's

24  statements are accurate.

25          THE COURT:  All right.  Anyone else?

12

1          MS. LAMBERT:  This is Lisa Lambert for the United

2    States Trustee.  The U.S. Trustee has reviewed the actual data

3    about the comparatives, and the U.S. Trustee, based on the

4    stipulations, has no objection.

5          THE COURT:  All right.  Thank you.  Anyone else?

6      All right.  Well, the Court will approve this motion.

7    First, while the notice was expedited, the Court finds that it

8    was sufficient under the circumstances.  We are many months

9    into the case, it's been vetted by the Committee, and the

10   Court is satisfied with the level of notice here.

11     The Court finds that this is a KERP that is justified by

12   all the facts and circumstance of this case, to use the

13   wording of Section 503(c)(3) of the Bankruptcy Code.  There

14   also appears to be a very sound business purpose justifying

15   the proposed KERP.  It appears to be reasonable in all ways,

16   and fair under the circumstances, so I do approve it.

17     All right.  So if you all will get the order uploaded

18   electronically, I will promise to sign it promptly.

19          MR. POMERANTZ:  We will do so, Your Honor.  Thank

20   you.

21          THE COURT:  All right.  So, the preliminary

22   injunction.  Mr. Morris, I heard you were going to be taking

23   the lead on that, so go ahead.

24          MR. MORRIS:  Indeed.  Good morning, Your Honor.  John

25   Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

13

 1           THE COURT:  Good morning.

 2           MR. MORRIS:  A few items before I give what I hope

 3  will be an informative opening statement.  I trust that Your

 4  Honor has not had the opportunity, because it was just filed a

 5  moment ago, to see that the Debtor filed on the docket notice

 6  of a settlement with CLO Holdco, Ltd., one of the Defendants

 7  here today.

 8           THE COURT:  I have not seen that.  Okay.

 9           MR. MORRIS:  Right.  So you'll find that at Docket

10  1838.

11           THE COURT:  Okay.

12           MR. MORRIS:  It really is a very simple settlement,

13  Your Honor.  In exchange for the withdrawal of CLO Holdco's

14  objection to the Debtor's plan of reorganization, the Debtor

15  is dismissing CLO Holdco from this adversary proceeding with

16  prejudice.  There are, you know, some other bells and whistles

17  there, the most important of which to the Debtor is simply

18  that, under the CLO management agreements, most of them but

19  not all of them require that a level of cause be established

20  before the contracts can be terminated, and CLO Holdco has

21  agreed that, before it seeks to terminate a contract for

22  cause, there will be a gating provision or a gatekeeping

23  provision that requires them to come to this Court to simply

24  establish whether or not there is a colorable claim -- not for

25  a determination on the merits, but simply to protect the

14

1   Debtor from frivolous lawsuits.

2      So that's really the sum and substance of it.  Mr. Kane is

3   on the line now, and if I've either inaccurately or

4   incompletely characterized the settlement, I'm sure he'll take

5   the opportunity to supplement the record.  But we don't see

6   any need, really, to go through a full 9019 motion here.

7   There's no releases.  There's no exchange of money.  It's the

8   withdrawal of a plan objection in consideration for the

9   dismissal of an injunctive proceeding.

10      So we did want to alert you to that.  And as a result,

11   there was one witness that we intended to call today, Grant

12   Scott.  Mr. Scott is the director of CLO Holdco.  And with the

13   resolution of the issues between the Debtor and CLO Holdco, we

14   have no intention of calling Mr. Scott today.  But I'd like to

15   give Mr. Kane an opportunity to be heard just in case he's got

16   anything to add.

17          THE COURT:  All right.  Mr. Kane, can you confirm?

18   Do you have anything to change about what you heard?

19          MR. KANE:  Your Honor, I do not.  The settlement

20   agreement speaks for itself.  We did reach an agreement with

21   Debtor's counsel and the Debtor yesterday evening, fairly late

22   in the evening.  Mr. Morris's synopsis of the proposed

23   settlement is accurate.  The Debtor has agreed to dismiss CLO

24   Holdco from the preliminary injunction adversary proceeding

25   with prejudice.

15

 1          THE COURT:  All right.  Well, thank you.  I've pulled

 2   it up on my screen.  It's very short and to the point.  And I

 3   agree with the comment of Mr. Morris that I don't think a

 4   formal 9019 motion is required here, given no consideration is

 5   going back and forth, or releases.  It's just exactly as you

 6   described orally.  So, I appreciate that.  It simplifies a

 7   little bit what we have set today.  And we will accept this

 8   settlement as being in place as we roll forward.  All right?

 9   Thank you.

10          MR. MORRIS:  Thank you, Your Honor.

11       So, before I get to the substance of the argument, I would

12   like to take care of some housekeeping items relative to

13   today's proceedings.

14          THE COURT:  Okay.

15          MR. MORRIS:  You know, this has been a bit of a

16   challenge for me personally, and it's going to be a little bit

17   of a challenge today for Ms. Canty, my assistant, in part

18   because it's almost like Groundhog's Day.  This is, I think,

19   the third time that we're covering some of the same issues.

20   We had covered them the first time on December 16th in

21   connection with what I'll now just simply refer to as the

22   Defendants, the Defendants' motion to try to limit the Debtor

23   from trading the CLO assets.  We heard a lot of what we're

24   going to hear today again on January 8th in connection with

25   the preliminary injunction motion against Mr. Dondero.  And so

16

1   there's already a ton of evidence in the record.  We do

2   believe that we need to present our evidence today, but one of

3   the challenges that we'll face, and I think we'll be able to

4   do it efficiently, Your Honor, is there may just be some back

5   and forth between various documents.  But everything's gone

6   pretty smoothly, and I'm optimistic we'll get through that

7   part of it today.

8       So I want to deal with the exhibits themselves, Your

9   Honor.  As you may have seen, there have been a number of

10  different filings relating to the Debtor's exhibits for this

11  particular motion, and I just want to go through the exhibits

12  and make sure that we're all on the same page here.  I want to

13  tell the Court exactly what happened and why and where we are

14  today.

15      The Debtor timely filed its original witness and exhibit

16  list on January 22nd.  They filed that witness and exhibit

17  list at Docket 39 in this Adversary Proceeding 21-3000.  The

18  exhibit list referenced Exhibits A through I'll just say

19  AAAAA.  It was a lot of exhibits, and somebody had the wise

20  idea to convert them to numbers, but it wasn't me, so I can't

21  take credit.  But we're left with letters, and they go from A

22  through AAAAA.

23      After filing that initial exhibit list, we realized that

24  --

25      (Interruption.)

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-29   Filed 10/30/23   Page 801 of 1539   PageID 18039

17

 1          THE COURT:  All right.  Does someone have their
 2  device unmuted?  Okay.  It went away.  Go ahead, Mr. Morris.
 3          MR. MORRIS:  Thank you.  So, shortly after filing
 4  that initial exhibit list, we realized that we forgot to file
 5  among the exhibits AAAAA.  So at Docket #40 in the adversary
 6  proceeding, the Court can find Debtor's Exhibit AAAAA.
 7      And then we're going to -- I'm going to refer in a few
 8  minutes -- I'm going to use in a few minutes some
 9  demonstrative exhibits, and I'm going to use them again with
10  Mr. Seery.  And these exhibits concern trading in AVYA and SKY
11  securities that you've heard about previously.
12      But I'm pointing that out now because I'm kind of old
13  school, Your Honor, and I won't use a demonstrative exhibit if
14  it doesn't have the evidence in the record.  And what we
15  realized, Your Honor, is we made two additional mistakes on
16  Friday with all the papers that we filed.  The backup for
17  these demonstratives was mistakenly included on the exhibit
18  list for the confirmation hearing as opposed to the
19  preliminary injunction hearing.  That was error number one.
20  And error number two, we hadn't redacted the information to
21  show only the SKY and AVYA.
22      And that's why, Your Honor, at Docket #48, you will find
23  our amended exhibit list that includes what we have identified
24  as Exhibits BBBBB as in boy through SSSSS as in Sam.  And
25  those exhibits, Your Honor, are the backup to the

18

 1   demonstrative exhibits.  I don't expect to use them at all,

 2   but I do believe strongly that one should not use a

 3   demonstrative exhibit unless the evidence is in the record to

 4   support it, and now it is.

 5       So that's why, Your Honor, I do appreciate your court

 6   staff.  I do appreciate Your Honor.  I think you either had

 7   before you and you may have signed an order on redacting.

 8   This is what it was all about.  It was just to make sure we

 9   had the proper evidence in the record, so I appreciate that.

10       At this time, Your Honor, I think, just because I'll be

11   referring to it in the opening, the Debtor would move for the

12   admission into evidence of Exhibits A through SSSSS.

13            THE COURT:  All right.  Is there any objection?

14            MR. RUKAVINA:  Your Honor, there is.  Your Honor, I

15   object to UUUU.  I'll object to VVVV as in Victor.  I object

16   to AAAAA.  That's it, Your Honor.

17       I will note that there are several exhibits in here of

18   relevance to CLO Holdco that may not be relevant to my

19   clients, but those are my limited objections for now.

20            THE COURT:  All right.  Before we ask the nature of

21   your objection, let me ask Mr. Morris:  Shall we just --

22            MR. MORRIS:  Yeah.

23            THE COURT:  -- carve these out for now, and then if

24   you want to offer them the old-fashioned way, we'll hear the

25   objection then?

1        MR. MORRIS:  Yes, although I can make it very clear

2   that UUUU should not be in there precisely because it's

3   demonstrative.  We had talked that yesterday and I agreed; I

4   just forgot that.  UUUU should not be part of the record.

5        THE COURT:  Okay.  And so you'll just decide later do

6   you want to offer VVVV and AAAAA the old-fashioned way?

7        MR. MORRIS:  Correct.

8        THE COURT:  All right.  So, for the record, I am

9   admitting by stipulation -- with three exceptions I'll note --

10  all of the exhibits of the Debtor that appear at Exhibits 39

11  and, well, and 48.  And we're carving out of that admission

12  UUUU, VVVV, and AAAAA, which actually appears at Exhibit --

13  Docket Entry 40.  Those are not admitted at this time.

14     (Debtor's Exhibits A through SSSSS, exclusive of Exhibits

15  UUUU, VVVV, and AAAAA, are received into evidence.)

16       THE COURT:  All right.  Go ahead, Mr. Morris.

17       MR. MORRIS:  Yes.

18       MR. RUKAVINA:  Well, Your Honor, while we're talking

19  about housekeeping -- Mr. Morris, I apologize.  Is there more

20  housekeeping?

21       MR. MORRIS:  I'd like to continue.  I was going to

22  describe the witnesses.

23        OPENING STATEMENT ON BEHALF OF THE DEBTOR

24       MR. MORRIS:  So, Your Honor, the Debtor is going to

25  call three witnesses today.  The first witness will be Mr.

20

 1   Dondero, the second will be Jason Post, and then the third

 2   will be Mr. Seery.

 3       Obviously, Mr. Dondero and Mr. Seery are very familiar to

 4   the Court and they will cover much but not all of the same

 5   ground that you've heard previously.

 6       Mr. Post, I believe, is a new witness appearing in this

 7   court for the first time.  I understand that he is the chief

 8   compliance officer of each of the Debtors [sic].  He had

 9   worked at Highland Capital Management, the Debtor, for more

10   than a decade, I believe, but moved over to NexPoint to work

11   with Mr. Dondero shortly after Mr. Dondero resigned from

12   Highland Capital on or about October 10th last year.

13       So those are the three witnesses that we plan to present

14   today, and I'd like to describe briefly kind of what we think

15   the evidence will show.

16       The theme from our perspective here, Your Honor, is that

17   this is a case that is about power and not rights.  The Debtor

18   brings this motion for preliminary injunction in order to

19   protect itself from the interference of Mr. Dondero and the

20   Defendants, entities that there will be no dispute he owns and

21   controls.

22       You may have read in the papers, and I suspect you will

23   hear today from the Defendants, the clarion call for

24   contractual rights and the need for this Court to protect

25   their contractual rights.  This is a red herring, Your Honor.

21

1   There are no contractual rights at issue here.  What Mr.

2   Dondero and the Defendants really want is to maintain control,

3   or at least to deny Mr. Seery from exercising the Debtor's

4   valuable contractual rights.  If there are any contractual

5   rights at issue here, it is the Debtor's.  The Debtor is the

6   party to the CLO management agreements, and it's those very

7   rights that are being infringed upon.

8       This was supposed to have been resolved 53 or 54 weeks ago

9   now, Your Honor, when Mr. Dondero agreed and this Court

10  ordered that Mr. Dondero could not use related entities to

11  terminate any of the Debtor's agreements.  There is no dispute

12  that each of the Defendants is a related entity for purposes

13  of the January 9th order, since Mr. Dondero and Mr. Norris

14  have already testified that the Defendants are owned and/or

15  controlled by Mr. Dondero.

16      Notwithstanding the plain language of the January 9th

17  order, which Mr. Dondero not only agreed to, but it may be one

18  of the very few orders in this case that he hasn't appealed,

19  notwithstanding the plain language, Your Honor, he persists,

20  and that is why we are here.

21      How do we know that this is about power and not rights?

22  How do we know that everything that's going to be described

23  for you, what the evidence is going to show that this is about

24  power and not rights, is very simple.  Mr. Dondero and Mr.

25  Post will testify -- I'm just going to give four, five, six

22

1   examples here -- are going to testify that Mr. Seery's AVYA

2   trades were not in the Funds' best interests.  It's an

3   irrelevant point, Your Honor.  There is no contractual right

4   that gives them the ability to terminate because they don't

5   like trades that are being made.  They can sell.  If they

6   don't like it, they can sell.  That's what's really funny

7   about this.

8        But what's -- what makes it even more clear that this is

9   about power and not rights is the evidence is going to show

10  that Mr. Dondero sold AVYA shares throughout 2020.  He sold

11  those shares right up until the day he resigned.  And yet six

12  days after resigning, NexPoint sends a letter saying, Don't

13  sell any assets.

14       Ms. Canty, can we put up Exhibit number -- Demonstrative

15  Exhibit 1, please?

16       Okay, Your Honor.  We have redacted this to shield from

17  public disclosure the name of each fund that's trading, but

18  the backup, as I alluded to earlier, in Exhibits BBBBB through

19  SSSSS, some portion of those documents, that's where these

20  demonstrative figures come from.

21       And as you can see, beginning on January 29, 2000,

22  continuing through the bottom of the page, October 9th, 2020,

23  when Mr. Dondero left Highland Capital, he traded millions and

24  millions and millions of dollars in AVYA stock.

25       Can we go to Demonstrative Exhibit #2, please?

23

1    This chart is really -- no, I apologize if I -- the other

2    one.  The AVYA trading activity chart.  Yeah.

3    This one is really interesting, Your Honor, because it

4    shows the trading throughout the year of AVYA stock, and you

5    can see the brown bars there represent Mr. Dondero's trades.

6    And you can see just how many trades there are.  There are

7    over a million shares, I think, if you added it up.  They're

8    represented by the brown bars.  You can see him selling AVYA

9    stock throughout the period, sometimes at a price really near

10   its bottom.

11   And then Mr. Seery tries and actually does sell some stock

12   toward the end of the year.  That's the green bars on the

13   right.  A very, very tiny amount compared to Mr. Dondero.  And

14   he sells it at a substantially greater price than Mr. Dondero

15   sold the AVYA stock.  And yet they're here telling you, Your

16   Honor, that somehow Mr. Seery is mismanaging the CLOs and they

17   disagree with what he's doing and he's not acting in the best

18   interests of the investors.  That's what they want -- but this

19   is what the evidence shows, Your Honor.

20   With respect to SKY, if we could go to the next slide,

21   please.

22   So this is SKY.  Now, Mr. Dondero did not trade any SKY

23   securities, but Mr. Seery did.  And this was another security

24   -- and we'll get to the evidence in a moment -- that Mr.

25   Dondero interfered with and tried to stop.  So Mr. Seery

24

1    succeeded sometimes and he was stopped sometimes, but the

2    point is, Your Honor, look at the price that Mr. Seery sold.

3         And remember, you heard this before and you're going to

4    hear it again.  Nobody from the Defendants ever asked Mr.

5    Seery, Why do you want to trade this?  Not that they even had

6    to.  Not that Mr. Seery needs to defend himself, frankly.

7    He's got the authority under the management contracts to act

8    in the way that he thinks is in the best interest.  But look

9    at this chart.  He made these sales, Your Honor, at more than

10   twice the price of the bottom.

11        How can they have any credibility?  How can Mr. Dondero

12   and Mr. Post come into this courtroom and assert that Mr.

13   Seery is doing anything other than a fabulous job?  He is

14   selling at the top of the market.  Because they think that

15   some high -- in the future, it's going to go higher?  It's

16   prudent, Your Honor.

17        Mr. Seery is going to tell you the work that he did.  He

18   is going to give you the rationale for his decisions.  And the

19   only conclusion that I hope and believe the Court will be able

20   to reach is that these were not only rational decisions but

21   they were prudent, taking some money off the table when the

22   stock was near its high.

23        That's how we know, this is more evidence how we know this

24   is about power.  It's not about rights.  It's not about

25   justice.  It's not about anything having to do with anything

25

1     other than Mr. Dondero wanting to maintain control.

2         How else do we know?  What other evidence is there that

3     this is about power and not rights?  Again, the timing.  The

4     calendar here is going to be very, very important.  The first

5     demand from NexPoint from the Defendants that Mr. Seery stop

6     trading came on October 16th.  It was less than a week after

7     Mr. Dondero -- like, where does this come from?  There's no

8     right to demand stopping of trading.  You don't get to do it.

9     And they're going to minimize it.  They're going to spend the

10    whole day, Your Honor, either -- either focusing on the law or

11    trying to minimize.  And they'll say, well, it was just a

12    request, Your Honor.  And if it was a third-party request, I

13    bet Mr. Seery -- Mr. Seery is going to tell you, if it was a

14    third party, he wouldn't care.  But when you put all of this

15    together, it is oppressive.  It is an exertion -- it's an

16    attempt at exertion of control.  That's how it's perceived and

17    that's actually what happened.

18        Do you need more evidence?  Again, they'll talk about

19    termination for cause and how they have the right and the

20    Court -- you, Your Honor, don't have the power to infringe

21    upon their contractual rights.  But there will be no evidence.

22    Absolutely none.  Mr. Post is going to tell you, in fact, that

23    he has no evidence of any breach, of any default, of any

24    reason whatsoever that cause might exist for the termination

25    of these contracts.  That's how you know this is about power

26

1   and not rights.

2       Last point on the issue of power versus rights:  Who were

3   the counterparties to the CLO agreements?  Did the CLO Issuers

4   -- where are they?  They're not here.  They're not here to

5   tell the Court that Mr. Seery is breaching his duty.  They're

6   not here to tell the Court that the Debtor is in default.  In

7   fact, what Mr. Seery is going to tell you, and it won't be

8   rebutted, is that the CLO Issuers are close to finalizing a

9   deal that will permit the Debtor to assume the CLO management

10  contracts.

11      Mr. Post or Mr. Dondero might get up on the stand today

12  and say, oh, because people have left the firm, that somehow

13  they don't have the ability to service the contracts anymore.

14  You know who doesn't believe that?  The contractual

15  counterparty, the Issuers.  It's about power, Your Honor.

16  It's not about rights.

17      There is substantial evidence that warrants the imposition

18  of a preliminary injunction, substantial evidence, much of

19  which you've heard already.

20      The October and November letters demanding or requesting

21  that the Debtor halt trades.  There's no right to that.

22      Mr. Dondero's interference with the support of Joe Sowin,

23  the Advisors' trader, around Thanksgiving, when they actively

24  moved in.  And it's in the emails.  It's in the record.  We'll

25  put in the record again.

27

1        And then he made the threat to Thomas Surgent -- Mr.

2   Dondero made the threat to Thomas Surgent about potential

3   personal liability.

4        The ridiculous -- remember the ridiculous motion that was

5   heard on December 16th, a motion so devoid of factual or legal

6   basis that the Court granted the Debtor a directed verdict and

7   dismissed the motion as frivolous?  Notably, neither Mr.

8   Dondero nor Mr. Post testified at that hearing.  Yet, within a

9   week, Your Honor -- the hearing was on a Wednesday.  The

10  hearing was on Wednesday, December 16th.  The Court entered

11  the order on Friday, December 18th.  On Monday, December 21st,

12  the next business day, Mr. Dondero and Mr. Post and the

13  lawyers for the Defendants held conference calls to figure out

14  what to do next.

15       And the very next day, the evidence is going to show --

16  it's already in the record -- Mr. Dondero again actively

17  stopped Mr. Seery's trades from being effectuated.  They sent

18  their first letter.  This is less than a week after that

19  hearing, Your Honor.  They sent another letter asking the

20  Debtor -- again, they requested -- minimize -- this is what

21  you're going to hear:  Well, we just sent a letter requesting

22  no more trading.

23       What happened the next day, December 23rd?  They send

24  another letter and they say, We're thinking about terminating

25  the contracts.  Now we think we're going to terminate the

28

1  contracts.  And we just want to let you know we're thinking

2  about terminating the contracts.

3       And we call them -- and Mr. Seery is going to testify to

4  this -- we say, What are you doing?  Every time we just said,

5  Please withdraw your letter.  There's no basis for doing this.

6  Leave us alone and let us do our job.  They wouldn't -- they

7  refused to withdraw the letter.

8       And finally -- again, Mr. Seery will testify to this -- we

9  told them, If you think you really have a basis for

10  terminating the contract, make your motion to lift the stay.

11  And if you don't, the Debtor will file the motion that brings

12  us here today.

13       And that's how we got here, because they continued to

14  interfere with the trading.  They continued to send these

15  specious letters that are implicit threats.  Mr. Seery is

16  going to tell you that every one of these, he -- is an

17  implicit threat.  We asked them, Just withdraw the letters and

18  stop it.  We asked them to make their own motion if you think

19  so strongly of it.  They wouldn't do that, either.  They just

20  want it hanging out there.  They just want it all hanging out

21  there over Mr. Seery's head so that he knows somebody's --

22  somebody's watching and somebody's planning, you know, to take

23  action.

24       It's not right, Your Honor.  They have no right to any of

25  this.  There's nothing in the contract that allows them to

29

1    make even a good-faith -- to make any claim that they have

2    cause to terminate the contract.  They have no right under any

3    circumstances to stop Mr. Seery from trading.

4        What they are going to tell you is there's no agreement

5    between the Advisors and the Debtor that requires the Advisors

6    to execute the trades.  And they're right about that.  They're

7    actually right about that.  But here's the thing, Your Honor.

8    What Mr. Seery is going to tell you is that Advisors has the

9    trading desk.  For more than a decade, they executed the

10   trades.  Through the entirety of this bankruptcy case, until

11   Mr. Dondero left Highland, they executed the trades.  Even

12   after Mr. Dondero left Highland in October, they continued to

13   execute the trades.  And on December 22nd, they fold their

14   hands and they say, Nope, I don't care about the course of

15   dealing, I don't care what impact it has, you can't make me do

16   it.  So Mr. Seery has tried end-arounds, and that'll be in the

17   record, too, and that's when the threats to Surgent come.

18   That's when the threat to Surgent come, when we try to do the

19   workaround.  Cannot do it.

20       This is just not right, Your Honor.  It's just not right.

21   There's order -- there's the January 9th order.  There was the

22   TRO that was in effect that we're going to hear about again,

23   because that TRO not only applied to Mr. Dondero, it prevented

24   him from conspiring with or even encouraging a related entity

25   from engaging in prohibited conduct.  And that prohibited

30

1    conduct, as Your Honor knows, because it's your order, is

2    plain and as unambiguous as can possibly be:  Don't interfere

3    with the Debtor's business.  It's all we're asking for.  It's

4    the only reason we're here today.

5        Interestingly, Your Honor, probably the best piece of

6    evidence that I'll put in front of you today are going to be

7    the words out of Mr. Post's mouth, because basically what he's

8    going to tell you is that, as chief compliance officer, he has

9    never once in the history of his employment told Mr. Dondero

10   to stop.  In fact, what he's going to tell you is that he

11   defers to the investment professionals, and that but for the

12   TRO that is consensually in place today, it would depend on

13   the facts and circumstances as to whether or not he actually

14   does anything as chief compliance officer to stop this

15   conduct.  Depends on the -- maybe he can explain to Your Honor

16   what facts and circumstances he thinks, as chief compliance

17   officer, would allow the Advisors to interfere with the

18   Debtor's business.  It'll be interesting to hear him answer

19   that question.

20       That's all I have, Your Honor.  I look forward to

21   presenting the evidence today.  I'd like this done once and

22   for all.  It's time to move on.  And the Debtor -- the Debtor

23   is in bankruptcy.  Your Honor, I think, has every power, every

24   right, and frankly, you know -- I feel very strongly about

25   this, obviously, Your Honor -- the Debtor needs the breathing

31

 1   space and to be left alone so it can do its job.  And we'll

 2   respectfully request at the end of this that the Court enter

 3   an order allowing it to do so.

 4        Thank you, Your Honor.

 5           THE COURT:  All right.  We were hearing some

 6   distortion there, I'm not sure where it was coming from, but

 7   we'll try to keep it reined in.

 8        Mr. Rukavina, your opening statement.

 9           MR. RUKAVINA:  Your Honor, thank you.  Can the Court

10   hear me?

11           THE COURT:  Yes.

12        OPENING STATEMENT ON BEHALF OF CERTAIN DEFENDANTS

13           MR. RUKAVINA:  Your Honor, I think it's important

14   first to note a few obvious things.  One, what we're talking

15   about today is enjoining future rights, future rights under a

16   contract.  Hearing Mr. Morris's opening, it sounds like we're

17   trying a breach of contract case.  There is no declaratory

18   relief sought for whether there is grounds for a breach of

19   contract case.  And prior to assumption and prior to

20   confirmation, the automatic stay applies.

21        So let me be clear that what they're asking the Court to

22   do today is to excise from these contracts our rights in the

23   future, effectively for all time, as I'll explain.

24        The second thing that merits real consideration is that it

25   is the Funds, Your Honor, not the Advisors, it is the Funds

32

1    that have the right to remove the Debtor as manager.

2         Those Funds, as you will hear, have independent boards.

3    Mr. Dondero doesn't own those Funds.  He's not on those

4    boards.  He doesn't control them.

5         When Mr. Morris talks about Mr. Norris's prior testimony,

6    that testimony was limited to the Advisors.  And yes, Mr.

7    Dondero does own the Advisors, and Mr. Dondero, while I won't

8    say controls the Advisors, certainly has a lot of input.  That

9    is not the case for the Funds, which are the ones with the

10   contractual powers here to remove the Debtor.

11        You will hear that those -- that that board or those

12   boards meet frequently, they have independent counsel, and

13   they take separate actions, including very recently where they

14   did not do something that was advised and acted independently.

15        And the third thing that makes this case different and

16   that all of us should bear in mind is that we're talking today

17   about other people's money.  There's more than one billion

18   dollars of investment funds, retirement funds, pension funds,

19   firefighter funds, school funds, wealthy individuals, having

20   nothing in the world to do with Mr. Dondero or anyone in this

21   case.

22        So what we're talking about here today, Your Honor, is

23   that if my retirement manager files bankruptcy, that I for all

24   time would be effectively enjoined from removing him, no

25   matter what he may do in the future, just because he needs

33

1   that revenue.

2       That is an absolutely inappropriate use of a preliminary

3   injunction.  It is the modification of a contract that the

4   Debtor seeks to assume, and there is going to be no evidence

5   on the underlying elements that the Court must consider.

6       I say that, Your Honor, because I'm new to -- I'm late to

7   this case but I have studied in detail what Your Honor did in

8   the *Acis* case.  And I think that we have to qualitatively

9   differentiate today from *Acis*.  In *Acis*, there were

10  allegations of fraudulent transfer.  When Your Honor enjoined

11  future actions, I believe in part it was because the

12  legitimate owner of those rights might not have been having

13  those rights.

14      So that was a very important difference.  Here, there's no

15  question that we have more than billion dollars of other

16  people's funds at issue.

17      Also in *Acis*, as confirmed by the District Court, there

18  was the exercise of an optional redemption right, which could

19  have very well been used as a weapon to strip the manager of

20  its rights.  That's not the case here today.  We are talking

21  about removing the Debtor in the future -- not today, not

22  prior to assumption, in the future -- for such things as if

23  the Debtor commits fraud, if Mr. Seery is indicted for

24  felonies, if the Debtor absconds with our funds.  We are

25  talking about potential hypothetical actions in the future

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 115-29   Filed 02/25/21   Page 818 of 1539   PageID 18056

34

1  that are not even ripe based on the Debtor's potential

2  wrongful actions, not based anything on our motivations or our

3  intentions.

4       So this is a different case than Your Honor has heard so

5  far in these cases.  And what it boils down to, Your Honor, is

6  will the Court give judicial immunity to the post-assumption,

7  post-confirmation Debtor over the next two or three years as

8  it manages and liquidates more than a billion dollars of other

9  people's funds?  It is their money at issue.

10       So, in order to do this, the Debtor first has to tell Your

11  Honor that it has a likelihood of merits on the success [sic]

12  of some claim.  The Debtor cannot just come to you -- because

13  the Debtor knows Your Honor's opinion on 105(a) and the

14  Supreme Court law -- and the Debtor cannot just say, Judge,

15  please give us an injunction because it's convenient or

16  because we don't want to comply with our obligations.  So they

17  concoct a tortious interference claim.  They argue that there

18  is an automatic stay violation, which, as Your Honor knows,

19  all of us bankruptcy lawyers take most seriously.  And they

20  argue that, well, whatever Mr. Dondero has been enjoined from

21  doing, somehow we *a priori* are also enjoined.  Basically, an

22  alter ego with no facts, law, trial, or due process.

23       On the tortious interference, Your Honor will hear

24  absolute evidence that cannot be refuted that all that we did,

25  all that we did was we refused, our employees refused to make

35

 1   a ministerial entry into a computer program of two trades that

 2   Mr. Seery authorized.  Those trades closed exactly as Mr.

 3   Seery wanted.  Those trades closed, were executed, before Mr.

 4   Seery asked our employees to do his bidding.  And the reason

 5   why our employees were instructed not to do what Mr. Seery

 6   wanted was because our chief compliance officer looked at it,

 7   those employees looked at it, and they all said, What is this?

 8   Our internal protocols were not followed.  We don't know

 9   anything about these trades.  We have fiduciary duties, we

10   have SEC obligations, and Mr. Seery has his own employees whom

11   he can instruct to enter these two trades into the computer

12   and our employees aren't going to do it.  It's as simple as

13   that.

14        Mr. Dondero did not command that decision.  Mr. Dondero

15   did not instruct that decision.

16        Our employees not doing what Mr. Seery requested of them

17   is not tortious interference.  It is not interference as a

18   matter of law.  There was no breach of contract as a result.

19        So the two elements -- two of the elements required for

20   tortious interference, there will be zero evidence on.  But in

21   the bigger picture, what they're talking about again is

22   restraining our rights in the future.  And whether -- whether

23   we are party to these contracts or a third-party beneficiary,

24   it doesn't matter, because we are not a stranger to these

25   contracts.  These contracts expressly give us rights.  And a

36

 1  party exercising their right under a contract, it could be

 2  breaching that contract, but it cannot be tortious

 3  interference as a matter of law.

 4      And if Your Honor is concerned about us tortiously

 5  interfering in the future, then the Court should enjoin us

 6  from tortious interference in the future, not excise from the

 7  contract the remedies that the Debtor must accept if it wants

 8  to assume these contracts.

 9      Moving to the automatic stay issue, the sole and exclusive

10  argument for why we violated the stay is because our counsel,

11  a seasoned, gentlemanly bankruptcy lawyer of many years'

12  experience, sent two letters to seasoned veteran bankruptcy

13  lawyers for the Debtor.  Communications.  Communications

14  amongst counsel.

15      The first, the December 22nd letter, is a request:  Okay,

16  we lost in front of Judge Jernigan, Judge Jernigan called our

17  motion frivolous, we get that, but we ask you to please stop

18  trading until the plan is confirmed.  A request which the

19  Debtor ignored.  Or that's not true, didn't ignore:  refused

20  to comply with.

21      The second letter, a day later, after various

22  communications, was:  Okay, we are going to initiate the

23  process of terminating you as the servicer.

24      Mr. Dondero had nothing in the world to do with these

25  letters.  Mr. Dondero did not direct these letters.  This was

37

1   professional advice from outside counsel and the independent

2   boards of the Advisors believing that their fiduciary duty

3   compelled that.

4       And guess what, that letter even said:  subject to the

5   automatic stay.  You heard from Mr. Morris that they basically

6   said, File your stay motion.

7       Our follow-up letter clarified anything that we might do

8   is subject to the automatic stay.  We never said we're going

9   to act in a way that the stay doesn't permit.  We said we're

10  going to come to this Court first.

11      But even all that, all those communications, while it may

12  be interesting, are irrelevant, because we never took any

13  action.  You will hear that we never communicated with the

14  CLOs, the Trustees, or the Issuers, anything like we went over

15  with the Debtor, anything like, Please start the process of

16  removing the Debtor.  We have done nothing of the sort, we

17  will do nothing of the sort, precisely because of the

18  automatic stay.

19      So I equate this, Your Honor, to your average home lender

20  whose lawyer sends a letter to the borrower saying, You don't

21  have insurance; we're going to start the process of

22  foreclosure.  You're past due on your post-petition adequate

23  protection payments; we're going to start the foreclosure

24  process; we're going to go seek a list of stay.  That is not

25  actionable.  It is not a stay violation.  Those are

38

1   communications, not actions.  And that is precisely what

2   seasoned professional counsel should be doing.

3       And now, Your Honor, we move to the Mr. Dondero issue.

4   The argument is, well, on January the 9th, Mr. Dondero,

5   apparently for all time, in perpetuity, agreed that he will

6   not cause the related entities to terminate these agreements.

7   And then the argument is, well, the Court entered a TRO

8   against Mr. Dondero and the Court entered a preliminary

9   injunction against Mr. Dondero.  Okay?

10       I don't see where the problem is.  Mr. Dondero is

11  prohibited from causing us to terminate these agreements.

12  There are many ways, with independent boards, that Mr. Dondero

13  has nothing to do with that.  And he will have nothing to do

14  with that in the future.  So if the concern is enjoining us

15  because of an injunction against Mr. Dondero, enjoin Mr.

16  Dondero.  Just like if the concern is that we're going to

17  tortiously interfere, you enjoin us from tortious

18  interference.  Or if we're going to violate the stay, enjoin

19  us from violating the stay.  But do not for all time assume

20  that any right that we may exercise in the future will

21  necessarily be tainted and the corrupt product of Mr.

22  Dondero's instructions.  You will see today on the evidence

23  that that has not happened and it will not happen.

24       And whatever Mr. Dondero may have agreed to, we are

25  separate entities.  Again, the Funds have -- are not

39

1  controlled or owned, and Mr. Dondero is not on the board.  So

2  whatever he may have agreed to is between the Court and the

3  Debtor and him, but he never agreed to that on behalf of the

4  Funds.  He never agreed to that on behalf of the Advisors, who

5  have their own independent fiduciary duties and duties under

6  the law.

7       So, Your Honor, there will be no substantial likelihood of

8  success on the merits.  There will be no likelihood of success

9  on the merits.  And I'm talking about the post-assumption,

10  post-confirmation time frame.  The issue is fundamentally

11  different pre-assumption and pre-confirmation.  But post-

12  assumption and post-confirmation, the Debtor will not show a

13  likelihood of success on the merits.  The Debtor will not show

14  any irreparable injury.  None.

15      Mr. Seery will testify that managing these agreements for

16  the coming couple or three years will have some value to the

17  Debtor.  He doesn't know what the profitability of that is to

18  the Debtor.  You will hear that, in fact, managing these

19  contracts for the next two years does not bring any

20  profitability to the Debtor.  The Debtor will lose money

21  managing of them.  But whatever damages there are are monetary

22  damages, and monetary damages are not an irreparable injury as

23  a matter of law.

24      Now, the Debtor says, well, the Court can enter an

25  injunction in the aid of restructuring, but this injunction

40

1  will happen after restructuring.

2      On the balance of harm and public interest, Your Honor, I

3  think we're dealing with more than a billion dollars of clean,

4  innocent third-party funds.  The balance of harm here weighs

5  against granting this injunction.  If we try to do anything in

6  the post-confirmation world, the Debtor has all of its rights

7  and remedies to contest what we do.  If we do it wrong, we're

8  liable in contract or in tort, there's monetary damages, and

9  the Debtor has already successfully organized.

10      But if the Debtor does something wrong in the future and

11  we cannot take action to stop a gross mismanagement or a

12  denution [sic] of the Debtor or an abscondence with funds,

13  then think about the harm to the innocent investors here.

14  Because if we even go to court, your Court, any court, we will

15  be in violation of a federal court injunction.

16      Your Honor, this is not the appropriate purpose of an

17  injunction for the preservation of the status quo.  The status

18  quo, by definition, cannot extend post-assumption or post-

19  confirmation.  This is not a proper exercise of equity.  We

20  have done nothing wrong, we have threatened to do nothing

21  wrong, and we will do nothing wrong to justify forever being

22  prejudiced and enjoined from exercising our contractual and

23  statutory rights.

24      Your Honor, this TRO extends through February the 15th.

25  We asked the Debtor to continue this hearing.  We asked the

1   Debtor to go to our independent boards and seek approval of

2   the same settlement that the Debtor has with CLO Holdco, which

3   we learned about last night.  We simply haven't had the time

4   to get those boards aligned up and present a settlement to

5   them.  We're trying to put together a competing plan.

6       Your Honor, there is no reason to go forward today except,

7   like Mr. Morris said, power.  Power.  Mr. Seery's power, Your

8   Honor.  Not ours.  Mr. Seery's power in perpetuity or for

9   judicial immunity, get out of jail free card.  Thank you.

10          THE COURT:  All right.  Mr. Morris, you may call your

11  witness.

12          MR. MORRIS:  Yeah.  I just want to make a motion to

13  strike the notion of a get out of jail free card.  I

14  appreciated everything counsel had to say, but I think that's

15  a little -- a little over the top.

16      We call Mr. James Dondero, please.

17          THE COURT:  Mr. Dondero, --

18          MR. RUKAVINA:  Your Honor, bear with me.

19          THE COURT:  Okay.

20          MR. RUKAVINA:  Your Honor, bear with me.  I'm going

21  to get out of this chair.  Mr. Dondero will get in this chair.

22  And so that there's no reverberation, I will be sitting next

23  to Mr. Dondero in case I have to make any objections.

24          THE COURT:  Okay.  All right.  Good morning, Mr.

25  Dondero.

 1              MR. DONDERO:  Good morning.

 2              THE COURT:  Please raise your right hand.

 3                 JAMES DONDERO, DEBTOR'S WITNESS, SWORN

 4              THE COURT:  Thank you.  Mr. Morris, go ahead.

 5              MR. MORRIS:  May I proceed, Your Honor?

 6              THE COURT:  Yes.

 7                         DIRECT EXAMINATION

 8  BY MR. MORRIS:

 9  Q   Good morning, Mr. Dondero.  Okay.  John Morris; Pachulski,

10  Stang, Ziehl & Jones; for the Debtor.  Can you hear me okay,

11  sir?

12  A   Yes.

13  Q   There are no board members here on behalf of any of the

14  Funds to testify or offer any evidence; isn't that right?

15  A   Not that I'm aware of.

16  Q   Okay.  And you knew the hearing was going to be today on

17  the preliminary injunction, right?

18  A   Yes.

19  Q   And you had an opportunity to confer with the boards of

20  the Funds in advance of this hearing, right?

21  A   No.

22  Q   There's no -- there's no -- no board member is expected to

23  testify, fair?

24  A   Correct.

25  Q   So the Court isn't going to hear any evidence as to the

Dondero - Direct                                   43

1    board's perception of what's happening here, right?

2    A    Not that I'm aware of.

3    Q    Okay.  Until January 9th, 2020, you controlled the debtor

4    Highland Capital Management, LP; isn't that right?

5    A    I don't remember exactly when these -- when the

6    independent board was put in place, but up until around that

7    time, I believe.

8    Q    Okay.  So, January 2020?

9    A    Yes.

10   Q    And during that month, you completed an agreement with the

11   Creditors' Committee where you ceded control of the Debtor

12   pursuant to a court order, right?

13   A    Pursuant to a court ...?  I thought it was pursuant to a

14   negotiation where they would have fiduciary responsibility to

15   the estate in my absence.  That's -- that's what I think the

16   (garbled).

17   Q    Okay.  You're aware -- so you entered into an agreement

18   with the Creditors' Committee pursuant to which you ceded

19   control of the Debtor, right?

20        MR. RUKAVINA:  Your Honor, I'll object.  That

21   agreement speaks for itself.  And if Mr. Morris wants to

22   present it to Mr. Dondero, he can.

23        THE COURT:  Um, --

24        MR. MORRIS:  Sure.  Ms. Canty, can we please put up

25   --

Dondero - Direct                        44

1            THE COURT:  All right.  Well, I --

2            MR. MORRIS:  I'm happy to put it up, Your Honor.

3            THE COURT:  I overrule that objection.  You can ask.

4    And then if he's not sure, you can present the agreement.  All

5    right?  Go ahead.

6            MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Mr. Dondero, is there any doubt in your mind that in

9    January of 2020 you gave up control of Highland in favor of an

10   independent board at the Strand Advisors level?

11   A    No.  I -- yes, I agree with that.

12   Q    Okay.  And do you recall that, in connection with that

13   agreement, the Court entered an order?

14   A    Several orders.  Which one?

15   Q    Okay.

16           MR. MORRIS:  Can we please put up Docket No. 339?

17           MS. CANTY:  Sure, just one second.

18           MR. RUKAVINA:  And you have it here.

19      John, I have the order if just want Mr. Dondero to review

20   it.

21           MR. MORRIS:  I think -- I think everybody should have

22   the benefit of seeing it.  But thank you very much.

23      Your Honor, while we take this moment, can you just remind

24   me of when the Court needs to take a break today, so that I'm

25   mindful of that and respectful of your time?

Dondero - Direct                    45

1              THE COURT:  11:30.

2              MR. MORRIS:  Okay.  And what time will we reconvene?

3              THE COURT:  Well, I have said 1:00.  I hope it can be

4    a little sooner, but let's just plan on 1:00, okay, so there's

5    no confusion.

6              MR. MORRIS:  Okay.  All right.  All right.  So, on

7    the screen here, we have Exhibit OOOO, which is in the record.

8    BY MR. MORRIS:

9    Q    This is an order that was entered by the Court on January

10   9th, 2020.  Do you see that, sir?

11   A    Yes.

12             MR. MORRIS:  Can we scroll down to Paragraph 9,

13   please?  (Pause.)  Are you having problems, Ms. Canty?

14             MS. CANTY:  It's on the screen.  You can't see it?

15             MR. MORRIS:  Yeah.  Can you scroll down to Paragraph

16   9?

17             MS. CANTY:  It's on Paragraph --

18             MR. MORRIS:  That's on Page 2, I believe.

19             MS. CANTY:  Yeah, I have it up.  I'm not sure what

20   the disconnect is, because I can see it on my screen.  I'm

21   going to stop it and reshare it.

22             MR. MORRIS:  Thank you very much.

23        (Pause.)

24             MS. CANTY:  Do you see it now?

25             MR. MORRIS:  Okay.  Beautiful.

Dondero - Direct                          46

 1  BY MR. MORRIS:

 2  Q   Mr. Dondero, if you'd just read Paragraph 9 out loud.

 3  A   (reading)  Mr. Dondero shall not cause any related entity

 4  to terminate any agreements with the Debtor.

 5  Q   Okay.  So you understood, as part of the corporate

 6  governance settlement pursuant to which you avoided the

 7  imposition of a trustee, that you agreed that you wouldn't

 8  cause any related entity to terminate any agreements with the

 9  Debtor, right?

10  A   Uh, --

11  Q   Is that correct?  You understood that paragraph?

12  A   Yes.

13  Q   Okay.  And you didn't appeal this particular order, did

14  you, sir?

15  A   I -- I believe I've refuted -- I've adhered to that order

16  entirely.

17  Q   Okay.  NexPoint Advisors LP, is one of the defendants in

18  this matter, right?

19  A   Yes.

20      (Pause.)

21  Q   Can you hear me, sir?

22  A   Yes.  Yes, I said, "Yes."

23        MR. NICHOLSON:  Well, John, did you -- did you ask a

24  question?  Because you went offline for a few seconds there.

25        MR. MORRIS:  I asked whether NexPoint Advisors, LP

Dondero - Direct                         47

1    was an advisory firm.

2              THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q    And you have a direct or indirect ownership interest in

5    NexPoint Advisors, LP, correct?

6    A    Yes.

7    Q    And you understand that, based on that direct or indirect

8    ownership interest, NexPoint Advisors, LP is a related entity

9    under Paragraph 9 of this order, right?

10   A    Yes.

11   Q    Okay.  Highland Capital Management Fund Advisors, LP is

12   one of the other defendants in this case, right?

13   A    Yes.

14   Q    And we'll refer to that entity as Fund Advisors; is that

15   fair?

16   A    Yes.

17   Q    And we'll refer to Fund Advisors together with NexPoint

18   Advisors, LP as the Advisors; is that fair?

19   A    Yes.

20   Q    Okay.  Fund Advisors is also an advisory firm; is that

21   (audio gap)?

22   A    I missed that last question.

23             MR. RUKAVINA:  John, you're freezing up on us.  Is it

24   on our end, Your Honor, or is it on Mr. Morris's end?

25             MR. MORRIS:  Just let me know -- just let me know

 1    when it happens.

 2           THE COURT:  Yes.  I'm hearing him.  But go ahead, Mr.

 3    Morris.  Let's try again.

 4           MR. MORRIS:  Okay.

 5    BY MR. MORRIS:

 6    Q    You have a direct or indirect ownership interest in Fund

 7    Advisors, correct, sir?

 8    A    Yes.

 9    Q    (audio garbled)  And based on that direct or indirect

10    interest, you would agree that Fund Advisors is a related

11    entity for purposes of this order, correct?

12    A    Yes.

13    Q    In addition to your ownership interest, you're also the

14    president of Fund Advisors; is that (audio gap)?

15           THE COURT:  All right.  Now --

16           THE WITNESS:  I believe so.

17           THE COURT:  Yes.  Now I'm starting to have some

18    trouble, Mr. Morris.  Every once in a while, you're freezing

19    towards the end of a sentence.  So I don't know what can be

20    done, but it's --

21           MR. MORRIS:  All right.  Let me know if that

22    continues.

23           THE COURT:  Okay.

24    BY MR. MORRIS:

25    Q    To use your words -- to use your words, Mr. Dondero, it's

Dondero - Direct                              49

1   fair to say that you generally control Fund Advisors, right?

2   A    Yes.

3   Q    And based on that, you acknowledge that Fund Advisors is a

4   related entity under the Court's order, correct?

5   A    Yes.

6   Q    And together, the Advisors that you own and control manage

7   certain investment funds, correct?

8   A    Yes.

9   Q    And three of those funds are defendants in this case,

10  correct?

11  A    Yes.

12  Q    And you are the portfolio manager of each of those funds;

13  is that right?

14  A    I believe so.

15  Q    Okay.  Let's talk about the events that led to this

16  matter.  CLO stands for Collateralized Loan Obligations,

17  correct?

18  A    I'm sorry.  Repeat that, please?

19  Q    Sure.  CLO stands for Collateralized Loan Obligations,

20  correct?

21  A    Yes.

22  Q    Years ago, the Advisors that you own and control caused

23  the investment funds that they manage to buy the interests in

24  CLOs that are managed by the Debtor, correct?

25  A    Yes.  Yes.

Dondero - Direct                          50

1   Q    Okay.  And those Funds still hold an equity interest

2   today, correct?

3   A    Yes.

4   Q    And K&L Gates is one of the law firms that represents the

5   Advisors and the Funds that are managed by the Advisors,

6   correct?

7   A    Yes.

8   Q    You would agree that the Debtor is party to certain

9   contracts that give it the right and the responsibility to

10  manage certain CLO assets, right?

11  A    Yes.

12  Q    And you recall that --

13       MR. RUKAVINA:  Your Honor, Mr. Morris is frozen on

14  our end.

15       THE COURT:  Yes.  Mr. Morris, you just froze.

16       MR. RUKAVINA:  We heard nothing, Mr. Morris.

17       THE COURT:  Yes.

18       MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Sir, do you recall that you resigned from the Debtor on or

21  around October 10th, 2020?

22  A    Yes.

23  Q    Okay.  And shortly thereafter, K&L Gates sent a couple of

24  letters to the Debtor on behalf of the Advisors and the Funds,

25  correct?

Dondero - Direct                    51

1    A    Yes.

2    Q    Okay.

3            MR. MORRIS:  Can we take a look at these?  These are

4    documents that were admitted into evidence in a different

5    matter, but they're actually referred to in his prior

6    testimony, which is in evidence in this case.  So I would just

7    ask Ms. Canty to go to Trial Exhibit B, which was filed in the

8    Adversary Proceeding 20-3190 at Docket 46.  And for the

9    record, it's PDF Page #184 out of 270.  I just want to take a

10   look at these two letters.

11   BY MR. MORRIS:

12   Q    Okay.  Do you see this letter, sir?

13   A    Yes.

14   Q    And NexPoint is one of the defendants here; is that right?

15   A    Yes.

16   Q    And that's one of the Advisors that you own and generally

17   control, correct?

18   A    Yes.

19   Q    And so this letter is sent less than a week after you've

20   left Highland Capital Management, right?

21   A    Yes.

22   Q    Do you recall this particular letter?

23   A    No.

24   Q    Can -- you're familiar with the substance of this letter

25   and the other one that was sent in November, correct?

Dondero - Direct                        52

1  A    Could you pull it a little higher and let me read it?

2  Q    Yes.  Sure.

3         MR. RUKAVINA:  If this is an exhibit, I can show it

4  to him as an exhibit, Mr. Morris.

5         MR. MORRIS:  I don't know that this is one of the

6  marked exhibits.  It's one of the exhibits that's used within

7  his prior testimony.  So, but I want to give Mr. Dondero a

8  chance to review it.  And please let us know if you need to

9  scroll further down.

10      (Pause.)

11         MR. RUKAVINA:  You're going to have to scroll down.

12         THE WITNESS:  Scroll down a little further, please.

13      (Pause.)

14         MR. RUKAVINA:  Mr. Morris, can you please scroll

15  down?  Neither Mr. Dondero nor I can read the balance.

16  BY MR. MORRIS:

17  Q    There you go.  (Pause.)  So, you see at the top of the

18  page there there is a reference to the sale of assets and a,

19  quote, "a rush to sell these assets at fire sale prices."  Is

20  that what you think -- did you think that Mr. Seery was

21  selling (audio garbled) CLO assets at fire sale prices in

22  October 2020, --

23         MR. RUKAVINA:  Your Honor, --

24         MR. MORRIS:  -- less than a week after --

25         MR. RUKAVINA:  Your Honor, I'll object.  We did not

Dondero - Direct                              53

 1  hear Mr. Morris's question.

 2          THE COURT:  All right.  Could you repeat the

 3  question?

 4          MR. MORRIS:  Okay.  Yes, Your Honor.

 5  BY MR. MORRIS:

 6  Q   Mr. Dondero, on or about October 16th, did you personally

 7  believe that Mr. Seery was in a rush to sell CLO assets at

 8  fire sale prices?

 9  A   I believe he had no business purpose to sell any of the

10  assets, which I believe he stated that to Joe Sowin, our

11  trader.  I -- I -- there was no business purpose stated or

12  ever given or obvious from the sales.  And --

13  Q   Okay.

14  A   -- I (indecipherable) draft this letter.

15  Q   Okay.

16          MR. MORRIS:  I move to strike, Your Honor.  It's a

17  very simple question --

18          THE COURT:  Sustained.

19          MR. MORRIS:  -- and it has to do solely with Mr.

20  Dondero's state of mind.

21  BY MR. MORRIS:

22  Q   Mr. Dondero, on or about October 16th, did you personally

23  believe that Mr. Seery was in a rush to sell CLO assets at

24  fire sale prices?

25  A   He was in a rush to sell them for some reason with no

 1  business purpose.  I don't know the reason.

 2          THE COURT:  All right.  Can you --

 3  BY MR. MORRIS:

 4  Q    Okay.  And you never asked him, right?

 5          THE COURT:  Yes.  Yes or no answer, Mr. Dondero.

 6          THE WITNESS:  Never asked him.

 7          MR. MORRIS:  Okay.  Can we turn to the next exhibit,

 8  which is Exhibit C on that same docket?

 9      (Pause.)

10  BY MR. MORRIS:

11  Q    While we're waiting, can you just read the last sentence

12  of the paragraph that ends at the top of the page, Mr.

13  Dondero, beginning, "Accordingly"?

14  A    (reading)  Accordingly, we hereby request that no CLO

15  assets be sold without prior notice and prior consent from the

16  Advisors.

17  Q    Are you aware of any contractual provision pursuant to

18  which the Funds or the Advisors can -- can expect that the

19  Debtor will refrain from any -- selling any assets without

20  giving prior notice and obtaining prior consent from those

21  entities?

22  A    I think the documents have an overall good-faith/fair-

23  dealing clause which would cover something like this, I

24  believe.

25  Q    Your -- is it your testimony, sir, that the duty of good

Dondero - Direct                          55

1   faith and fair dealing requires the Debtor to give notice to

2   the Advisors and to obtain the Advisors' prior consent before

3   they can sell any CLO assets?

4   A    Well, I think -- yes, I do.  I think --

5   Q    All right.

6   A    Yes.  Yeah.

7   Q    Okay.  And then the next month, another letter was sent by

8   NexPoint to Mr. Seery.  Do you recall that?

9   A    Not specifically.  If you bring it up, we can talk about

10  it.

11        MR. MORRIS:  Can we scroll down a little bit?

12      (Pause.)

13        MS. CANTY:  John, are you talking to me?  I was

14  frozen out.  I just got back on.  I apologize.

15        MR. MORRIS:  That's okay.  Can we just scroll down so

16  Mr. Dondero can see more of this particular letter?

17        MS. CANTY:  Okay.

18        MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Can you just read out loud, Mr. Dondero, out loud the last

21  two sentences, please, beginning with, "We understand"?

22  A    (reading)  We understand that Charitable DAF Holdco, Ltd.

23  has made a similar request.  Accordingly, we hereby re-urge

24  our request that no CLO assets be sold without prior notice to

25  and prior consent from the Advisors.

Dondero - Direct                          56

1    Q    What's the Charitable DAF Holdco, Ltd.?

2    A    I think that's who you settled with yesterday.

3    Q    Do you have an interest in that entity?

4    A    No.  It's a bona fide charity.  It was one of the largest

5    in Dallas before it got cut in half by Acis.

6    Q    Does -- are you familiar with the Get Good and the Dugaboy

7    Investment Trusts?

8            MR. RUKAVINA:  Your Honor, at this time I would

9    object to relevance.  I don't see what this has to do with

10   tortious interference and stay violation on December 22nd and

11   December 23rd, 2020.

12           THE COURT:  Response?

13           MR. MORRIS:  Your Honor, I'm trying to establish that

14   Charitable DAF Holdco, Ltd. is another entity in which Mr.

15   Dondero holds a beneficial interest.

16           THE COURT:  Okay.  Overrule the objection.

17           MR. RUKAVINA:  John, you're not only frozen, now

18   you're off.

19           MR. MORRIS:  Yeah, I can see myself.  You can't hear

20   me?

21           MR. RUKAVINA:  We can now, but Your Honor, we lost

22   Mr. Morris for a bit there.

23           THE COURT:  All right.  I think we were --

24           MR. MORRIS:  Okay.

25           THE COURT:  -- waiting on an answer from Mr. Dondero,

Dondero - Direct                         57

1  actually.

2         THE WITNESS:  We didn't hear the question at --

3  BY MR. MORRIS:

4  Q   Sure.  Are you familiar with the Get Good and Dugaboy

5  Investment Trusts?

6  A   Yes.

7  Q   Are you the beneficiary of those trusts?

8         MR. RUKAVINA:  Your Honor, again, objection to

9  relevance.  These are non-parties, and what his personal

10 interests are has no relevance to this.

11        THE COURT:  Overruled.

12        THE WITNESS:  The Get Good Trust, Get -- I believe

13 those are defective grantor trusts.  I don't believe I have

14 any interest whatsoever in those.  Dugaboy is a perpetual

15 Delaware trust.  I don't know how that's set up, but I believe

16 I do have an interest there until I pass.

17 BY MR. MORRIS:

18 Q   In fact, you're -- you're the sole beneficiary of the

19 Dugaboy Investment Trust, right?

20 A   Until I pass.  It's a -- it's a estate planning trust.

21 Q   I appreciate that.  And the Dugaboy and the Get Good

22 Trusts are the owners of the Charitable DAF Holdco Ltd.,

23 correct?

24 A   No.  Not as far as I know.

25 Q   Okay.

Dondero - Direct                        58

1    A    (garbled) time at all.

2    Q    All right.  So we just looked at these two letters, sir.

3    And you were familiar with the substance of the letters before

4    they were sent, right?

5    A    Uh, just --

6              MR. MORRIS:  You can take it down, Ms. Canty.

7              THE WITNESS:  Just generally.  Again, I wasn't

8    involved directly with the letters.

9    BY MR. MORRIS:

10   Q    You were aware of the letters before they were sent,

11   right?

12   A    Yes.

13   Q    And you discussed the substance of the letters with

14   NexPoint, correct?

15   A    Not the substance of the letters, just the substance of

16   the issue.

17   Q    You actually discussed the substance of the letters with

18   NexPoint, correct?

19   A    I -- Again, I remember it being the substance of the

20   issue.  Generally, at most, the substance of the letters.

21   Q    And you discussed the substance of the letters with the

22   Advisors' internal counsel, too, right?

23   A    The sub -- generally, the substance, yes, but more the

24   issue than the letter.

25   Q    Okay.  If I pull up your transcript from the TRO hearing,

Dondero - Direct                            59

1   would that refresh your recollection that you discussed the

2   substance of these letters with NexPoint and with the

3   Advisors' internal counsel?

4   A    I'd like to clarify with the testimony I just gave.

5   Q    Okay.  Would you -- do you have any reason to believe that

6   you did not previously testify that you discussed the

7   substance of the letters with NexPoint and with NexPoint

8   Advisors' internal counsel?

9   A    I repeat the same testimony.  Generally.  Like, those

10  letters that you put on the screen, I have no recollection of

11  those specifically.

12          MR. MORRIS:  Ms. Canty, can we please call up on the

13  screen Exhibit NNNN, which was the transcript from the January

14  8th, 2021 preliminary injunction hearing?

15          MR. RUKAVINA:  Mr. Morris, just one sec.  I'm trying

16  to find it on paper.

17          MR. MORRIS:  Yeah.  It's four Ns.

18          MR. RUKAVINA:  One, two, three, four.  (inaudible)

19  put that on the screen.

20          MS. CANTY:  John, I'm not sure what's going on, but

21  it won't come up on the screen.  I've tried three times.  I'm

22  going to keep trying.

23          MR. MORRIS:  All right.  I have it in front of me.

24  Do you have it, too?

25          MR. RUKAVINA:  Yes, the witness has it --

Dondero - Direct                               60

1                MR. MORRIS:  Okay.

2                MR. RUKAVINA:  -- in front of him.  This is NNNN,

3      just to confirm?

4                MR. MORRIS:  Yes.  And it is the January 8th

5      transcript.

6      BY MR. MORRIS:

7      Q    Mr. Dondero, were you asked these questions and did you

8      give these answers?  Question:  Are you familiar with --

9                MR. RUKAVINA:  Where are you, John?  Where are you?

10     Where are you?  We -- we -- we --

11               MR. MORRIS:  I apologize.  Page 40.  I'm going to

12     read Page 40, Lines 1 through 14.

13               MR. RUKAVINA:  Okay.  He has it in front of him, if

14     you just want him to read it.

15     BY MR. MORRIS:

16     Q    Did you give these answers at Page 40, beginning Line 1:

17          "Q   And were you -- and you were familiar, you were

18          aware of these letters before they were sent; is that

19          correct?

20          "A   Yes.

21          "Q   And you generally discussed the substance of these

22          letters with NexPoint; is that right?

23          "A   Generally, yes.

24          "Q   You discussed the letters with the internal

25          counsel; is that right?

Dondero - Direct                              61

1       "A    Yes.

2       "Q    That's D.C. Sauter?

3       "A    Yes.

4       "Q    And you have been on some calls with K&L Gates

5       about these letters, right?

6       "A    I believe so.

7       "Q    And you knew these letters were being sent,

8       correct?

9       "A    Yeah.  They're -- they're reported.

10  Q    Did you give those answers to those questions at the prior

11  hearing?

12  A    I -- I believe it's what I -- it's almost exactly what I

13  just said, but yes.

14  Q    And you supported the sending of the letters; isn't that

15  right?

16  A    Absolutely.

17  Q    And you encouraged the sending of the letters, right?

18  A    Absolutely.

19  Q    Around Thanksgiving, you learned that Mr. Seery had given

20  a direction to sell certain securities owned by CLOs managed

21  by the Debtor, correct?

22  A    Yes.

23  Q    And when you learned that, you personally intervened to

24  stop the trades, correct?

25  A    Yes.

Dondero - Direct                          62

1  Q   Let's -- I want to look at that email string that we

2  looked at once before.  It can be found at Trial Exhibit D

3  found on Docket No. 46 in the adversary proceeding. It's PDF

4  Number -- it's PDF Page 189 of two (garbled).

5          MR. RUKAVINA:  Did you catch that?

6          THE COURT:  Which -- which exhibit number -- letter

7  is it?

8          MR. MORRIS:  It's on the docket in the Adversary

9  Proceeding 20-3190.  And in that adversary proceeding, at

10 Docket No. 46, you've got the Debtor's exhibit list.  And

11 Exhibit D, which can be found at PDF Page 189 of 270, is the

12 email string I'm looking for.

13     I apologize, Your Honor.  It wasn't until I was reading

14 the transcript yesterday that I realized I needed these

15 documents.  But they are in the record.  Obviously, they're

16 referred to in the transcript that is in the record.

17          THE COURT:  Okay.

18          MR. RUKAVINA:  Your Honor, I would like to interject

19 for the record here that this is the first time my clients

20 have been sued.  They have a right to be confronted with the

21 witnesses and testimony and evidence against them.  So if Mr.

22 Morris wants to introduce this as an exhibit here today,

23 that's one thing, but I object to any notion that there's a

24 prior record that is going to tie my clients' hands.  It might

25 tie Mr. Dondero's hands, but not my clients' hands.

Dondero - Direct                    63

1          MR. MORRIS:  I'd move for the introduction into

2    evidence of this document that has emails not only from Mr.

3    Dondero, but from Joe Sowin, the head trader of the

4    Defendants.

5          MR. RUKAVINA:  And Your Honor, I have no problem with

6    that admission.  I just want to make it clear that we're not

7    conceding that whatever happened in this case previous to this

8    is a part of today's record.  That's all.  So I do not have a

9    problem with the admission of this.  I would, however, ask

10   you, Mr. Morris, to have someone email it to us so that I can

11   use it today if I need to.

12         THE COURT:  All right.

13         MR. MORRIS:  Okay.  Will do.

14         THE COURT:  So, I'll --

15         MR. MORRIS:  We'll do that at the --

16         THE COURT:  I'll admit it into evidence.  You'll need

17   to not only email it Mr. Rukavina, but you'll need to file a

18   supplement to your exhibit and witness list after the hearing

19   showing the admission of --

20         MR. RUKAVINA:  And Mr. Morris, if you could email it

21   to Mr. -- if you could email it to Mr. Vasek as well, because

22   obviously I can't get to it now.  Thank you.

23         MR. MORRIS:  Sure.

24         THE COURT:  All right.  So this --

25         MR. MORRIS:  Okay.  So, --

Dondero - Direct                     64

1          THE COURT:  For the record, let's just be clear what

2     the record is -- this is going to be called on the record.  I

3     think you are up to SSSSS, so this would be TTTTT when you

4     file it on the record.  All right?  Go ahead.

5          MR. MORRIS:  Thank you very much, Your Honor.

6       (Debtor's Exhibit TTTTT is received into evidence.)

7     BY MR. MORRIS:

8     Q   Mr. Dondero, you recall looking at this email string at

9     the last hearing, right?

10    A   Yes.

11    Q   Let's start at the bottom, please, with Mr. Covitz's

12    email.

13        (Pause.)

14          MR. RUKAVINA:  Hey, John, real quick, now we've lost

15    you.  We've lost you and we're not seeing anything from your

16    assistant.  Do you have the email, Mr. Vasek?

17          MR. MORRIS:  I'm here.  Can you hear me?

18          MS. CANTY:  I'm here.  (garbled) on the screen.

19          MR. MORRIS:  Yeah.  Can we scroll down to the bottom?

20          MS. CANTY: I did.  I don't know why it's not showing

21    on you guys' screen.

22          MR. MORRIS:  Hopefully this gets fixed.  Yeah.  We've

23    never had this problem before, Your Honor.  I'm not sure what

24    the issue is, but I do apologize.

25          THE COURT:  All right.  Well, I can hear you, but we

Dondero - Direct                      65

1    don't see movement of the exhibit.

2            MR. MORRIS:  Yeah.  When I began earlier today by

3    suggesting that this was going to be challenging, this was not

4    one of the challenges I anticipated.

5            THE COURT:  Okay.  All right.

6            MR. RUKAVINA:  Do you have the email yet?

7            MS. CANTY: I'm sorry.  I don't know what's happening

8    on this end.  I have three streams of Internet going, and I

9    don't think it's the Internet.  I don't know what's going on.

10           MR. MORRIS:  Hmm.

11           MR. RUKAVINA:  Yeah, John, what I'm suggesting is

12   that you have an associate email it to Mr. Vasek immediately

13   and then we can present it to Mr. Dondero.

14           MR. MORRIS:  I'll tell you what.  While that -- one

15   more try.

16           MR. CANTY:  Can you see it now?

17           MR. MORRIS:  Okay.  Yes.

18   BY MR. MORRIS:

19   Q   All right.  Mr. Dondero, Hunter Covitz is an employee of

20   the Debtor, right?

21           MR. RUKAVINA:  Hold on a sec.  Hold on a sec.

22       Your Honor, I believe that I have the right to see the

23   full email here.  I believe that Mr. Dondero does.  And we've

24   just seen the first little bit and now some middle piece.

25           THE COURT:  All right.  So are you saying --

Dondero - Direct                          66

1           MR. MORRIS:  And in the order that --

2           THE COURT:  -- you want to see the whole string?

3           MR. RUKAVINA:  Well, I think -- Mr. Dondero, do you

4    need to see the whole string?  I don't know what this is, but

5    maybe you do.

6           MR. DONDERO:  It depends on what the question is.  I

7    can answer some questions off of this email.

8           THE COURT:  Okay, let's go.

9           MR. MORRIS:  Yeah.

10   BY MR. MORRIS:

11   Q   All right.  So, for the moment, Mr. Covitz is an employee

12   of the Debtor, correct?

13   A   Yes.

14   Q   And he's the author of this email in front of us, correct?

15   A   Yes.

16   Q   And Mr. Covitz helps to manage the CLO assets on behalf of

17   the Debtor, correct?

18   A   Yes.

19   Q   Mr. Covitz is giving directions to Matt Pearson and Joe

20   Sowin to sell certain securities held by the CLOs, correct?

21   A   Yes.

22   Q   And if we can scroll up, I think we can see that you

23   received a copy of this email?

24       (Pause, 11:15 a.m.)

25           MR. MORRIS:  What I would like to do instead, we'll

Dondero - Direct                          67

1   take a break in about 15 or 20 (audio gap).  When we

2   disconnect, we'll get a better connection after the break.

3   And in the interim, I've got testimony that I would like

4   that's already been admitted into the record but there's

5   portions of which I would like to read into the record from

6   Dustin Norris, who is the executive vice president for each of

7   the Defendants.  And maybe it would be easiest for me to do

8   that.

9            THE COURT:  Okay.

10           MR. MORRIS:  All right.  On Docket No. 39.

11           MR. RUKAVINA:  Your Honor, I apologize.  Your Honor,

12   I apologize.  We did not hear --

13           MR. MORRIS:  I'm going to read into the record a

14   portion of Mr. Norris' testimony from the December 16th

15   hearing.

16           MR. RUKAVINA:  Your Honor, I do not see that

17   transcript in the exhibits.  If Mr. Morris could give me an

18   exhibit.

19           MR. MORRIS:  Exhibit B as in boy.

20           MR. RUKAVINA:  Thank you.

21           MR. MORRIS:  All right.  Instead of putting it on the

22   screen, if we could take the exhibit down, Ms. Canty.  He can

23   just follow along.  Beginning at Page 38, Line 7 through  -- 7

24   through 17.

25       Are you there, Mr. Rukavina?

Dondero - Direct                               68

1          MR. RUKAVINA:  I am.  Thank you.  I have it in front

2     of Mr. Dondero.

3          MR. MORRIS:  Okay.  Page 38, Lines 7 through 17:

4        "Q   I think you testified that you're one of the

5        executive vice presidents at NexPoint Advisors, one of

6        the Movants.  Is that right?

7        "A   That's right.

8        "Q   Who is the president of NexPoint Advisors, LP?

9        "A   Mr. Dondero.

10       "Q   And you report directly to him; is that right?

11       "A   I do.

12       "Q   You're also the executive vice president of Fund

13       Advisors, another Movant; is that right?

14       "A   Correct."

15          MR. MORRIS:  Beginning on Page 38, Line 25:

16       "Q   You're also the executive vice president (audio

17       gap) that are managed by the Advisors here, right?

18       "A   Yes.  That is correct."

19          MR. MORRIS:  Then going back to Page 35, beginning at

20    Line 15:

21       "Q   To be clear here, there are five moving parties;

22       is that right?

23       "A   That's correct.  The two Advisors and the three

24       Funds.

25       "Q   And one of the advisory firms is Highland Capital

Dondero - Direct                          69

1    Management Fund Advisors, LP; is that right?

2    "A    That's correct.

3    "Q    And I'll refer to that as Fund Advisors; is that

4    okay?

5    "A    That's great.

6    "Q    James Dondero and Mark Okada are the beneficial

7    owners of Fund Advisors, correct?

8    "A    That is my understanding.

9    "Q    And your understanding is that Mr. Dondero

10   controls Fund Advisors, correct?

11   "A    That's correct.

12   "Q    And the other advisory firm that brought the

13   motion is NexPoint Advisors, LP; is that right?

14   "A    That is correct.

15   "Q    And Mr. Dondero is the beneficial owner of

16   NexPoint; is that right?

17   "A    A family trust where Jim is the sole beneficiary,

18   I believe, controls or owns NexPoint Advisors.

19   "Q    Okay.  And Mr. Dondero --

20   "A    Or 99 percent of NexPoint Advisors.

21   "Q    Mr. Dondero controls NexPoint; is that right?

22   "A    Correct."

23        MR. MORRIS:  Continuing at Line 16 on Page 36:

24   "Q    All right.  And I'm going to refer to Fund

25   Advisors and NexPoint as the Advisors going forward; is

Dondero - Direct                          70

1        that fair?

2        "A    That's fair.

3        "Q    Each of the Advisors manages certain funds; is

4        that right?

5        "A    That is correct.

6        "Q    And three of those funds that are managed by the

7        Advisors are Movants on this motion, correct?

8        "A    Correct.

9        "Q    All right.  The Advisors caused these three Funds

10       to invest in CLOs that are managed by the Debtor; is

11       that right?"

12       "A    --"

13            MR. RUKAVINA:  Your Honor, I object.  Is there a

14   question at the end of this?  I mean, Mr. Dondero can't

15   possibly remember all this and then be asked a question.

16            MR. MORRIS:  He doesn't have to answer any questions.

17   I'm just reading the evidence into the record.

18            THE COURT:  Okay.

19            MR. RUKAVINA:  Your Honor?

20            MR. MORRIS:  Since we're having difficulty --

21            MR. RUKAVINA:  Your Honor, that's a matter for

22   summation.  That's -- this is a question and answer, I submit.

23            THE COURT:  Well, I overrule.

24            MR. MORRIS:  Your Honor, here's -- here's --

25            THE COURT:  This has been admitted into --

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-29   Filed 07/28/23   Page 855 of 1539   PageID 18093
Exhibit 29   Page 72 of 258

Dondero - Direct                                71

1        MR. MORRIS:  Yeah.

2        THE COURT:  -- evidence.  And if he wants to

3    highlight to the Court portions of the evidence, he can.

4        Go ahead.

5        MR. MORRIS:  Thank you, Your Honor.

6    "A   The portfolio managers working for the Advisors

7        did.  That's correct.

8    "Q   And Mr. Dondero is the portfolio manager of the

9        Highland Income Fund; is that right?

10   "A   He is one of the portfolio managers for that Fund.

11   "Q   And he's also --

12   "A   I believe there are two.

13   "Q   And he's also a portfolio manager of NexPoint

14       Capital, Inc., one of the Movants here, right?

15   "A   That is correct.

16   "Q   And he's also the portfolio manager of NexPoint

17       Strategic Opportunities Fund, another Movant; is that

18       right?

19   "A   Yes.  That is correct."

20       MR. MORRIS:  Going to Line -- Page 41, Lines 6

21   through 9:

22   "Q   The whole idea for this motion initiated with Mr.

23       Dondero; isn't that right?

24   "A   The concern, yes, the concern originated, and his

25       concern was voiced to our legal and compliance team."

1          MR. MORRIS:  Page 42, Lines 4 through 11:

2      "Q   None of the Movants are parties to the agreements

3      between the Debtor and each of the Debtors pursuant --

4      each of the CLOs pursuant to which the Debtor serves as

5      portfolio manager; is that correct?

6      "A   I  believe  that  is  correct.   One,  I  think,

7      important -- even though they're not (audio gap), they

8      are the -- they have the economic ownership of each of

9      these CLOs.

10     "Q   But they're not party to the agreement; is that

11     right?

12     "A   Not that I am aware of."

13         MR. MORRIS:  Page 42, Line 25:

14     "Q   Okay.   It's your understanding, in fact, that

15     nobody other than the Debtor has the right or the

16     authority to buy and sell assets on behalf of the CLOs

17     listed on Exhibit B, correct?

18     "A   That is my understanding.

19     "Q   Okay.   And it's also your understanding, your

20     specific  understanding,  that  holders  of  preferred

21     shares do not make investment decisions on behalf of

22     the CLO; is that right?

23     "A   (audio gap)

24     "Q   And that's something the Advisors knew when they

25     decided to invest in the CLOs on behalf of the Movant

Dondero - Direct                    73

1    Funds; is that fair?

2    "A   That's right.  And at that time, the knowledge in

3    the purchase was with Highland Capital Management, LP

4    and the portfolio management team at the time.

5    "Q   And it's still with Highland Capital Management,

6    LP; isn't that right?

7    "A   That's correct.  I'm not sure that the portfolio

8    management team looks the same, but it was HCMLP."

9        MR. MORRIS:  Moving on to Page 46, Line 22:

10   "Q   The only holders of preferred shares that are

11   pursuing this motion are the three Funds managed by the

12   Advisors, right?

13   "A   In this motion, yes.

14   "Q   You're not aware of any holder of preferred shares

15   pursuing this motion other than the three Funds managed

16   by the Advisors, correct?

17   "A   No, I'm not aware of any others.

18   "Q   You didn't personally inform any holder of

19   preferred shares, other than the Funds that are the

20   Movants, that this motion would be filed, did you?

21   "A   No, I did not.

22   "Q   You're not aware of any steps taken by either of

23   the Advisors to provide notice to holders of preferred

24   shares that this motion was going to be filed, are you?

25   "A   I'm not, no.

Dondero - Direct                    74

1      "Q   And you're not aware of any attempt that was made

2      to obtain the consent of all of the noteholder -- of

3      all the holders of the preferred shares to seek the

4      relief that is sought in this motion, correct?

5      "A   That's correct.

6      "Q   You don't have any personal knowledge, personal

7      knowledge, as to whether any holder of preferred shares

8      other than the Funds managed by the Advisors wants the

9      relief sought in this motion, correct?

10     "A   Correct.

11     "Q   You don't have any personal knowledge as to

12     whether any of the CLOs that are subject to the

13     contracts that you described want the relief that's

14     being requested in this motion, right?

15     "A   That's correct.   I have not spoken or been

16     involved at all directly with the CLOs.   I'm

17     representing the Funds."

18         MR. MORRIS:  Moving to Page 49.  I just have a bit

19     more, Your Honor.  Page 49, Line 9.  And this is the reference

20     to his declaration.

21     "Q   And Paragraph 9 refers to a transaction involving

22     SSP Holdings, LLC; do I have that right?

23     "A   That's correct.

24     "Q   Do you know what SSP stands for?

25     "A   See if we say it in there.  SSP Holdings, LLC.

Dondero - Direct                           75

1      "Q    Right.  Do you know what SSP stands for?

2      "A    I don't.  Something Steel Products.  I --

3      "Q    Okay.  You don't need to guess.  These are the

4      only two transactions that the Movants question; is

5      that right?

6      "A    These    transactions,    as    well    as    certain

7      transactions around Thanksgiving time.

8      "Q    Okay.   We'll talk about those.   But those

9      transactions about -- around Thanksgiving time aren't

10     in your (audio gap)?

11     "A    Not specifically mentioned by name.

12     "Q    Okay.  Let's talk about the two that are mentioned

13     by name, Trussway and SSP.  The Movants do not contend

14     that either transaction was the product of fraudulent

15     conduct, do they?

16     "A    No.

17     "Q    The   Movants   do   not   contend   that   the   Debtor

18     breached   any   agreement   by   effectuating   these

19     transactions, do they?

20     "A    I don't believe so.

21     "Q    In fact, the Movants do not contend that the

22     Debtor violated any agreement at any time in the

23     management of the CLOs listed on Exhibit B; is that

24     right?

25     "A    That's right.

Dondero - Direct                         76

1      "Q   The  Movants  don't  even  question  the  Debtor's

2      business judgment, only the results of the trans -- of

3      these two transactions.  Is that right?

4      "A   That's right.  And the results is the key here,

5      and the approach."

6           MR. MORRIS:  Moving on to Page 51, Line 8:

7      "Q   Sir, you never asked the Debtor what factors it

8      considered in making these trades, right?

9      "A   I did not.

10     "Q   And you have no reason to believe that anyone on

11     behalf  of  the  Movants  ever  asked  the  Debtor  why  it

12     executed these (audio gap), right?

13     "A   I don't have any knowledge.  There could have been

14     somebody from (audio gap) Movants.  But I do not."

15          MR. MORRIS:  Page 54, Line 19:

16     "Q   Let's  just  talk  briefly  about  the  transactions

17     that  occurred  (garbled)  Thanksgiving.   They're  not

18     specifically referred to in your declaration; is that

19     right?

20     "A   That's correct.

21     "Q   And you have no knowledge about any transaction

22     that Mr. Seery wanted to execute around Thanksgiving;

23     is that right?

24     "A   I know there were transactions and there were

25     concerns from our management team, but I'm not aware of

1    what those transactions were.

2       "Q   In fact, you can't even identify the assets that

3    Mr. Seery wanted to sell around Thanksgiving, or at

4    least you couldn't at the time of your deposition

5    yesterday. Is that right?

6       "A   That's correct.

7       "Q   And you have no knowledge as to why Mr. Seery

8    wanted to make particular trades around Thanksgiving?

9       "A   No, I don't.

10      "Q   And in fact, you don't even know if the

11   transactions that Mr. Seery wanted to close around

12   Thanksgiving ever in fact closed. Is that fair?

13      "A   Correct."

14      MR. MORRIS: Last one. Page 56, Line 1:

15      "Q   Okay. To the best of your knowledge, does this

16   document accurately reflect the composition of the

17   boards of each of the three Movant Funds?

18      "A   Yes, it does.

19      "Q   Okay. John Honis, I think you mentioned him

20   earlier. He's on all three boards. Is that right?

21      "A   Yeah, that's correct. And the reason we're --

22   we're being -- we have a unitary board structure, so --

23   which is very common in '40 Act Fund land, where the

24   board sits, for efficiency purposes, on multiple fund

25   boards, and there's a lot of economies of scale from an

1    operating standpoint.  So, yes, they sit on multiple

2    boards.

3    "Q   Okay.  And for purposes of the '40 Act, Mr. Honis

4    has been deemed to be an interested trustee.  Is that

5    right?

6    "A   That's correct.

7    "Q   Okay.  But you don't specifically know what (audio

8    gap) caused that designation; you only know that the

9    designation exists.  Right?

10    "A   That's right.  And I know they are disclosed in

11    the proxy -- or, in the -- the relative filings related

12    to those Funds.

13    "Q   Okay.  Three other people are common to all three

14    Movant Funds.  I think you've got Dr. Froehlich, Ethan

15    Powell, --

16         MR. MORRIS:  I think he -- pronunciation.

17    "A   Froehlich.

18    "Q   Ethan Powell and Bryan Ward.  Right?

19    "A   That is correct.

20    "Q   Okay.  All three of those individuals actually

21    serve on the 11 or 12 boards that you mentioned earlier

22    that are managed by the Advisors, right?

23    "A   That is correct.

24    "Q   And they're the same Funds for which you serve as

25    the executive vice president, right?

Dondero - Direct                          79

1    "A    This is correct -- yes.  That's correct.

2    "Q    So, for all of the Funds that are managed by the

3    Advisors, you serve as executive vice president and all

4    four of these directors -- trustees serve as trustees

5    on the boards, right?

6    "A    Yes, that's correct.

7    "Q    Okay.  In exchange for serving on all of these

8    boards, the three individuals -- Dr. Froehlich, Mr.

9    Ward, and Mr. Powell  -- each receive $150,000 a year

10   for services across the Highland complex; is that

11   right?

12   "A    That's correct.

13   "Q    Dr. Froehlich has been serving as a board member

14   across the Highland complex for seven or eight years

15   now; is that right?

16   "A    That's correct.

17   "Q    Mr. --

18   "A    I believe it's about seven or eight years.

19   "Q    Mr. Powell, he actually was employed by Highland

20   related -- Highland or related entities from about 2007

21   or 2008 until 2015, right?

22   "A    That's correct.

23   "Q    And Mr. Ward, the third of the independent

24   trustees, he's been serving on a board or various of --

25   on various Highland-related funds on a continuous basis

Dondero - Direct                    80

1      since about 2004.  Do I have that right?

2      "A   Yeah, I believe that's correct."

3           MR. MORRIS:  Your Honor, that concludes the reading

4  of the portions of Mr. Norris's testimony that I wanted to

5  present to the Court.

6      I know it's 11:30 now, and I would respectfully request

7  that we simply adjourn and let Your Honor tend to your

8  business.

9           THE COURT:  Okay.

10          MR. MORRIS:  And hopefully when we come back at 1:00

11  o'clock, we'll have a better connection.

12          THE COURT:  All right.  So, we are going to go into

13  recess until 1:00 o'clock Central.  Mike, can people just stay

14  connected, or should they --

15          THE CLERK:  Yes.  They can stay.  Yes.

16          THE COURT:  You can stay or reconnect, whichever you

17  want.  But we'll see you at 1:00.

18          MR. MORRIS:  Thank you, Your Honor.

19          THE CLERK:  All rise.

20      (A luncheon recess ensued from 11:33 a.m. until 1:37 p.m.)

21          THE CLERK:  All rise.  The United States Bankruptcy

22  Court for the Northern District of Texas, Dallas Division, is

23  now in session, the Honorable Stacey Jernigan presiding.

24          THE COURT:  Good afternoon.  Please be seated.

25  Apologies.  I was a little ambitious in my time estimate.  So,

Dondero - Direct                    81

1   anyway, I didn't have any control over getting in and out of

2   Parkland Hospital, so I'm just grateful to be here.

3       All right.  We were in the middle of direct examination of

4   Mr. Dondero.  Mr. Morris, are you ready to proceed?

5           MR. MORRIS:  I am, Your Honor, and I'm hopeful that

6   the computer issues have resolved themselves.  It remains to

7   be seen once we try.  If problems arise again, I plan on just

8   putting this on mute and dialing in through the telephone,

9   kind of the other alternative.

10          THE COURT:  All right.

11          MR. MORRIS:  So (garbled) and I apologize to Mr.

12  Dondero, too.  I know I'm testing his patience.  But it's not

13  for any reason other than technological.

14          THE COURT:  All right.

15          MR. MORRIS:  And Your Honor, you don't have to

16  apologize for keeping us waiting.  That's okay.

17          THE COURT:  Okay.

18          MR. MORRIS:  But thank you.

19          THE COURT:  All right.  Mr. Dondero, --

20          MR. MORRIS:  All right.  So, --

21          THE WITNESS:  Yeah.

22          THE COURT:  I was just going to remind you, I have to

23  remind you you're still under oath.

24      Are you ready, Mr. Morris?

25          MR. MORRIS:  I am, Your Honor.

Dondero - Direct                                82

 1          THE COURT:  All right.  You may proceed.

 2          MR. MORRIS:  And we're going to begin with the

 3   document that we had difficulty scrolling through earlier,

 4   which we have now sent to counsel, and that would be what was

 5   marked as Exhibit D on Docket No. 46.

 6          THE COURT:  All right.

 7          MR. MORRIS:  That's the email string that we had seen

 8   earlier that I think Your Honor admitted into evidence.  Do I

 9   have that right?

10          THE COURT:  Yes.

11          MR. MORRIS:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q    So, let's just start at the bottom and see if we can do

15   this more easily, Mr. Dondero.  And again, I apologize for

16   keeping you waiting before.  Starting at the bottom, that's an

17   email from Hunter Covitz.  Do you see that?

18   A    Yeah, I see it.

19   Q    And he's an employee of the Debtor, right?

20   A    Yes.

21   Q    And your understanding is that Mr. Covitz actually helps

22   the Debtor manage the CLO assets, right?

23   A    Yes.

24   Q    And in this email, Mr. Covitz is giving directions to Matt

25   Pearson and Joe Sowin regarding certain securities held by the

Dondero - Direct                          83

 1  CLOs, right?

 2  A    Yes.

 3  Q    And if we could scroll up, hopefully, we can see that you

 4  received a copy of this email.

 5         MR. MORRIS:  Yeah.  Right there.

 6  BY MR. MORRIS:

 7  Q    Do you see that?

 8  A    Yes.

 9  Q    And then -- and then you instructed the recipients of Mr.

10  Covitz's email not to sell the SKY securities as had been

11  instructed by Mr. Seery, correct?

12  A    Yes.

13  Q    And you understood when you gave that instruction that the

14  people on the email were trying to execute trades that Mr.

15  Seery had authorized, correct?

16  A    Incorrect.

17  Q    You didn't know that, sir?

18  A    What I knew was that Seery had not authorized the trade,

19  he had orchestrated the trade.  Hunter is not an analyst with

20  any particular knowledge.  I called Hunter, why would he sell

21  those?  And he said Seery told him to sell those.  So it

22  wasn't that Seery authorized Hunter trading it.  It was Seery

23  told Hunter to trade it, which is -- which is a material

24  difference in my mind.

25  Q    Okay.  So I'll ask you again.  At the time you gave the

Dondero - Direct                              84

1    instruction, "No, do not," you knew that you were stopping

2    trades that had been authorized and directed by Mr. Seery,

3    correct?

4    A    Yes.

5    Q    You didn't speak with Mr. Seery before sending this email,

6    did you?

7    A    No.

8    Q    And you took no steps to seek the Debtor's consent before

9    instructing the recipients of this email to stop executing the

10   SKY transactions.  Is that right?

11   A    I'm sorry.  I missed the first part of that question.

12   Q    Okay.  You took no steps to seek the Debtor's consent

13   before instructing the recipients of this email to stop

14   executing the SKY transactions that were authorized by Mr.

15   Seery, correct?

16   A    I don't -- I'm not sure I was permitted to talk to Seery

17   at this point, but I don't recall specifically, no.

18   Q    You didn't seek consent, did you, before stopping these

19   trades?

20   A    No.

21   Q    Okay.  In response to your instruction --

22          MR. MORRIS:  If we could scroll up to the next

23   response.

24   BY MR. MORRIS:

25   Q    You see the response from Mr. Pearson?

Dondero - Direct                           85

1   A    Yes.

2   Q    And in response to your instructions, Mr. Pearson canceled

3   all of the SKY and AVYA sales that the Debtor had directed but

4   which had not yet been executed, right?

5   A    Yes.

6   Q    Okay.

7           MR. MORRIS:  Can we scroll up to the next email,

8   please?

9   BY MR. MORRIS:

10  Q    And you responded again, right?  That's your response?

11  A    Yes.

12  Q    Can you read your response out loud, please?

13  A    (reading) HFAM and DAF have instructed Highland in writing

14  not to sell any CLO underlying assets.  There is potential

15  liability.  Don't do it again, please.

16  Q    And the writings that you refer to there are the two

17  letters that we looked at earlier, the October 16 and the

18  November 24 letter, right?

19  A    I believe so.  If not, if there's a third or fourth

20  letter, all the letters in aggregate.

21  Q    All right.  And you, you interpreted those letters not as

22  requests but, as you tell the recipients of your email here,

23  that they were actually instructions, right?

24  A    That was -- that was my choice of words.  I don't know if

25  I thought about it that clearly.

Dondero - Direct                               86

1    Q    Okay.  But the reci... you have no reason to believe that

2    the recipient of this email wouldn't understand that you

3    believed that Highland had been instructed not to do these

4    trades, right?

5    A    I'm sorry.  Can you ask that again?  I had no reason to

6    believe what?

7    Q    That's okay.  I'll move on.  At this juncture, the

8    reference to potential liability was intended for Mr. Pearson,

9    right?

10   A    Frankly, when you violate the Advisers Act, the CFO has

11   liability.  I mean, I'm sorry, the chief compliance officer

12   has liability, and anybody who has an awareness that it

13   violates the Advisers Act has potential liability also.

14   Q    And is it -- is it your testimony and your position that

15   Mr. Pearson had potential liability under the Advisers Act for

16   carrying out Mr. Seery's trade requests?

17   A    Yes, once he was informed that the underlying investors

18   didn't want assets sold and Seery had stated he had no

19   business purpose in selling those assets.

20        MR. MORRIS:  I move to strike the latter part of the

21   answer, Your Honor.  Mr. Dondero has testified repeatedly

22   multiple times that he has never communicated with Mr. Seery

23   about why he wanted to make these transactions.

24        THE COURT:  I grant that.

25   BY MR. MORRIS:

Dondero - Direct                        87

1   Q    Mr. Sowin responded and indicated that he would follow

2   your instructions, right, if we scroll to the next email?

3   A    I'm sorry.  What part are you saying, or what part are you

4   referring to?

5   Q    Mr. Sowin.  Who is Mr. Sowin?

6   A    He's Matt Pearson's boss.  He's the head trader.

7   Q    And he works for the Advisors, right?

8   A    Yes.

9   Q    He's one of your employees, right?

10  A    Yes.

11  Q    Mr. Sowin followed your instructions as set forth in this

12  email, right?

13  A    He did a bunch of things, but, yes, I believe -- yes,

14  that's a fair way to characterize.

15  Q    And the only information that you know of that he's

16  relying upon to state that Compliance should never have

17  approved this order was your email that preceded it, right?

18  A    No.

19  Q    No?  There's nothing else on this email other than your

20  email that preceded it, correct?

21  A    Correct.

22  Q    Okay.  A few days later, you learned that Mr. Seery was

23  trying a workaround to effectuate the trades anyway, right?

24  A    I believe so.

25       MR. MORRIS:  Can we scroll up to the next email?

Dondero - Direct                          88

1  BY MR. MORRIS:

2  Q    This is your response to Mr. Surgent, right?

3  A    Yes.

4  Q    Now, Mr. Surgent hasn't written anything.  He is not part

5  of this conversation, is he?

6  A    No.

7  Q    But you bring him into the conversation, right?

8  A    Because he's the chief compliance officer at Highland,

9  yes.

10 Q    He's not -- he's not the chief compliance officer for the

11 Advisors.  He's the chief compliance officer for a company

12 that you no longer work for, right?

13 A    Correct, but he has personal liability for violations of

14 the Advisers Act.

15 Q    Okay.  And you thought it was your responsibility to

16 remind him of that, right?

17 A    It was my view of the situation, and at least he could

18 evaluate it himself if I reminded him of it, yes.

19 Q    Uh-huh.  What does it mean to do a workaround?  What did

20 you mean by that?

21 A    There's a concept in compliance called you can't do

22 something indirectly that you can't do directly, and that's

23 what I was referring to there.

24 Q    Does that mean that he was trying to effectuate the trade

25 without the assistance of the Advisors?

Dondero - Direct                                89

1   A    I believed he was trying to do it without compliance and

2   without proper regard for investors, so that's why I described

3   it as a workaround.

4              MR. MORRIS:  I move to strike.

5              THE COURT:  Sustained.

6   BY MR. MORRIS:

7   Q    I'm asking you a very specific question.

8              MR. MORRIS:  Can I have a ruling, Your Honor?  Thank

9   you.

10             THE COURT:  Yes.

11  BY MR. MORRIS:

12  Q    Did you, when you used the phrase workaround, did you mean

13  that he was trying to effectuate the trade without relying on

14  the Advisors' employees?

15  A    No.

16  Q    Okay.  But you found out about the trade and you thought

17  it was a good idea to send Mr. Surgent this email, right?

18  A    Yes.

19  Q    Can you read the last line of your email?

20  A    (reading)  You might want to remind him and yourself that

21  the chief compliance officer has personal liability.

22  Q    Personal liability for effectuating a trade that Mr. Seery

23  had authorized, correct?

24  A    For violating the Advisers Act, is what I meant.

25  Q    Uh-huh.  Did you report anybody to the SEC?

Dondero - Direct                          90

1   A   I would be happy to if it's permitted by the Court.

2   Q   But you didn't -- you never asked the Court to do that,

3   right?

4   A   No.

5   Q   It didn't seem important enough for you to take that step,

6   right?  But you wanted -- you had to make sure that you told

7   Mr. Surgent that he might be personally liable, right?  That

8   was what you needed to do?

9   A   Could you repeat that question, please?

10  Q   You needed to make sure that Mr. Surgent knew that you

11  were threatening him with personal liability if he followed

12  Mr. Seery's instructions, right?

13  A   No.

14  Q   As a factual matter, you never asked Mr. Seery why he

15  wanted to make these trades, right?

16  A   I asked Joe Sowin to ask him.

17  Q   As a factual matter, you never asked Mr. Seery why he

18  wanted to make these trades, correct?

19  A   I believe I wasn't permitted to talk to him.

20  Q   In November 2020?  What would have prevented that?

21  A   I believe Scott Ellington was the go-between at that

22  point in time.

23  Q   Is it your testimony that you never spoke with Jim Seery

24  in November 2020?

25  A   I believe in an unauthorized fashion, the day after

Dondero - Direct                          91

1    Thanksgiving I talked to him, but that's the only day I can

2    remember.

3    Q    Should we call up the email where you threatened him not

4    to do it again?

5    A    That was an email.

6    Q    Ah.  So you could communicate by email?  Did you ever send

7    Mr. Seery an email and say, Why do you want to do these

8    trades?

9    A    No.

10   Q    But somehow you thought you couldn't even speak to him?

11   You couldn't speak to him but you can send him emails?  That's

12   the world that you live in, right?  That's what you think?

13   A    I have no comment on that.

14   Q    All right.  So, after this exchange, --

15        MR. MORRIS:  And this is what I read out-of-order

16   before, Your Honor.  We moved to the December 16th hearing.

17   BY MR. MORRIS:

18   Q    And you remember, Mr. Dondero, that the Defendants made

19   that motion that asked the Court to stop the Debtor from

20   trading in the CLO assets?  Do you remember that?

21   A    I'm sorry.  You're asking me do I remember letters were

22   sent?  Yes.

23   Q    No.  Do you remember that there was a hearing in mid-

24   December?

25   A    Yes.

Dondero - Direct                            92

1    Q    Okay.

2          MR. MORRIS:  And Your Honor, for the record, Exhibit

3    A is the Debtor -- is the Defendants' motion.  Exhibit B is

4    the transcript that we had looked at earlier or that I had

5    read portions of earlier.

6          THE COURT:  Okay.

7          MR. MORRIS:  And Exhibit C is the order that the

8    Court entered denying the Defendants' motion.

9        Can we call up Exhibit C, please?

10   BY MR. MORRIS:

11   Q    All right.  Do you see --

12         MR. MORRIS:  If we could scroll to the very top,

13   please.  All right.

14   BY MR. MORRIS:

15   Q    Do you see this document is dated December 18th, sir?

16   A    Yes.

17   Q    And if we scroll down, this is the order denying the

18   motion of the Advisors and the Funds for an order trying to

19   temporarily restrict the Debtor's ability as portfolio manager

20   from initiating sales.  Do you see that?

21   A    Yes.

22   Q    Okay.  So, this is December 18th.  And if you'll recall,

23   the TRO was issued against you on December 10th.  Do you

24   remember that?

25   A    I don't believe it was the 10th.

Dondero - Direct                          93

1    Q    Okay.  It was in December, and it was just before this.
2    Is that fair?
3    A    I believe there was an intent, and then the actual filing
4    I think was much later.  I don't have -- I don't have the
5    knowledge.  I don't have the knowledge of when the TRO was put
6    in place.
7    Q    Okay.  (Pause.)  Okay.  We talked earlier about how you
8    interfered with Mr. Seery's trading activities around
9    Thanksgiving.  Do you remember that?
10   A    Yes, I do.  I do remember the trading then, also.
11   Q    Okay.  And do you remember that just before Christmas you
12   interfered with Mr. Seery's tradings again?
13   A    Yes.
14   Q    Okay.
15          MR. MORRIS:  If we can call up Exhibit K from Docket
16   No. 46, which I have shared with counsel?
17          THE WITNESS:  You know what?
18   BY MR. MORRIS:
19   Q    Yeah.
20   A    Let's handle these each incident one at a time.  And I
21   don't want to use the word "interfering" or accept the word
22   "interfering" as an answer because I think my participation in
23   each situation was very different.
24          MR. MORRIS:  All right.  Can we scroll down?
25   BY MR. MORRIS:

Dondero - Direct                            94

1   Q    This is a letter that my firm wrote to Mr. Lynn.  Mr. Lynn

2   is your lawyer.  Is that right?

3   A    Yes.

4          MR. MORRIS:  And if we could start down at the first

5   page.  We've seen these letter before.  A little further.

6   BY MR. MORRIS:

7   Q    Do you see there is a reference there to the Debtor's

8   management of CLOs?

9   A    Yes.

10  Q    And there is a recitation of the history that we talked

11  about a bit earlier.  If we -- if we look further in that

12  paragraph to around Thanksgiving, when you intervened to block

13  the trades.

14  A    Yes, I see that sentence.

15  Q    Okay.

16         MR. MORRIS:  And then if we can go to the next page,

17  the next paragraph.  Yeah, that's where.

18  BY MR. MORRIS:

19  Q    Then we referred to the December 16th hearing, right?  And

20  then the next paragraph says, "On December 22, 2020" --

21         MR. MORRIS:  Can you scroll down just a little bit?

22  Nope, the other way.  Yeah, right there.

23  BY MR. MORRIS:

24  Q    "On December 22, 2020, employees of NPA and HCMFA" --

25  those are the Advisors, right?

Dondero - Direct                           95

1   A     Yes.

2   Q     -- "notified the Debtor that they would not settle the

3   CLO's sale of the AVYA and SKY security."  Have I read that

4   correctly?

5   A     Yes.

6   Q     All right.  On or about December 22nd, you personally

7   instructed employees of the Advisors not to trade the SKY and

8   AVYA securities that Mr. Seery had authorized.  Is that right?

9   A     No.

10  Q     You personally instructed, on or about December 22, 2020,

11  employees of those Advisors to stop doing the trades that Mr.

12  Seery had authorized with respect to SKY and AVYA, right?

13  A     No.  You know, we need to look at source documents.  My

14  recollection is I encouraged Compliance to look at those

15  trades.  But I'm willing to be -- I'm willing to be -- get

16  source documents again, if you'd like.

17  Q     All right.  My source document is your prior testimony.

18          MR. MORRIS:  Can we please call up Exhibit NNNN at

19  Page 73?  Beginning at Line 2?  Okay.

20  BY MR. MORRIS:

21  Q     Page 73, beginning at Line 2, did you give the following

22  answer to my question?

23          "Q    And  you  personally  instructed,  on  or  about

24          December  22nd,  2020,  employees  of  those  Advisors  to

25          stop  doing  the  trades  that  Mr.  Seery  had  authorized

Dondero - Direct                                    96

 1      with respect to SKY and AVYA, right?

 2      "A    Yeah.   Maybe we're splitting hairs here, but I

 3      instructed them not to trade them.   I never gave

 4      instructions not to settle the trades that occurred,

 5      but that's a different ball of wax."

 6   Q   Did you give that answer, sir?

 7   A   I believe I confused dates or misspoke there, but I did

 8   give that answer.

 9   Q   Okay.  Thank you.  Stated a different way, you personally

10   instructed the Advisors' employees not to execute the trades

11   that Mr. Seery had authorized but which had not yet been made,

12   right?

13   A   No.  Not -- not on December 22nd.  That was in November.

14   November 22nd, I did not do that.

15   Q   Okay.

16         MR. MORRIS:  Can we go to Page 76, please?  Line 15.

17   BY MR. MORRIS:

18   Q   Did you give this answer to my question?

19      "Q   And you would agree with me, would you not, that

20      you instructed the employees of the Advisors not to

21      execute the very trades that Mr. Seery identifies in

22      this email, correct?

23      "A    Yes."

24   Q   Did you give that answer, sir?

25   A   Well, like I said, I -- I confused the Thanksgiving

                        Dondero - Direct                    97

 1   trades, the week of Thanksgiving, with my more nuanced

 2   responses to later trades.

 3          MR. MORRIS:  I move to strike, Your Honor.  It's a

 4   very simple question.

 5          THE COURT:  Granted.

 6   BY MR. MORRIS:

 7   Q    Did you give that answer to my question, sir?

 8   A    I -- yes, I did.

 9   Q    Thank you.  Now, all of this is just a week after that

10   December 16th hearing, right?

11   A    Yes.

12   Q    And right after that hearing, the K&L Gates firm sent, on

13   behalf of the Defendants, more letters to the Debtors, right?

14   A    Yes.

15          MR. MORRIS:  Can we please pull up the first letter?

16   It's Exhibit DDDD.  And if we can go not to our response but

17   to the original letter that was sent that's attached to this.

18   I think it is Exhibit A.  Right there.

19   BY MR. MORRIS:

20   Q    That's the first of the letters, December 22, 2020.  Do

21   you see that?

22   A    Yes.

23          MR. MORRIS:  And can we scroll down to the end of the

24   letter to see what the request is here?  Right there.

25   BY MR. MORRIS:

Dondero - Direct                              98

1  Q   Can you read the end of that letter right there, sir?

2  A   (reading)  Sincerely, A. Lee Hogewood, III.

3  Q   Nice.  I meant the actual substance.

4  A   (reading)  For the foregoing and other reasons, we request

5  that no further CLO transactions occur, at least until the

6  issues raised by and addressed in the Debtor's plan are

7  resolved at the confirmation hearing.

8  Q   Okay.  And that's similar in substance to the letter that

9  was sent on behalf of the Defendants on October 16th that you

10 saw and approved, right?

11 A   I did not see and approve.

12 Q   All right.  The record will speak for itself.  And it's

13 similar in substance to the letter that was sent on November

14 24th by the K&L Gates clients on behalf of the Defendants,

15 right?

16 A   I don't know.

17 Q   We looked at it before.  Should we get it again?

18 A   It's a -- all the letters, as far as I understand, were

19 similar in requesting that the -- the beneficial owners of the

20 CLOs were requesting that no wholesale liquidation of their

21 assets occur.  That's how I understand it.

22 Q   And that's --

23 A   You asked my understanding.  That's my understanding.

24 Q   Okay.  And notwithstanding the request in this letter,

25 when you were -- when you were talking to the traders at your

1   shop, you actually told them that the Debtor was instructed

2   not to do these trades, right?

3   A    Are you parsing "instructed" versus "requested"?  I don't

4   understand the question.

5   Q    I am, in fact.  You used a very different phrase when

6   speaking to your employees than you did -- then your lawyers

7   did when they wrote to the Debtor, right?

8   A    It seems to be a difference, yes.

9   Q    Okay.  So, this is on December 22nd.  Now, the night

10  before, you participated in a meeting with Grant Scott and

11  with the lawyers for the Defendants, right, to talk about what

12  you guys were going to do with respect to the Debtor's

13  management of the CLOs.  Isn't that right?

14  A    I don't remember specifically.

15  Q    Okay.  But is it fair to say it's true, is it not, that

16  during the week leading up to Christmas you participated in

17  several phone calls with the K&L Gates firm and with other

18  members of the Defendants' -- the Advisors, Mr. Sowin or Mr.

19  Post or Mr. Sauter, and the lawyers, right?  You were all

20  together talking about these issues during the week before

21  Christmas, right?

22          MR. RUKAVINA:  Your Honor, I'm going to object.  If

23  counsel is asking what was discussed with counsel present for

24  the purpose of legal advice, that is an inappropriate

25  question.

Dondero - Direct                              100

 1            THE COURT:  Okay.

 2            MR. MORRIS:  I'm certainly not.  I'm asking if the

 3    conversations took place.

 4            MR. RUKAVINA:  And the conversations -- the question

 5    was, did they discuss what to do with respect to the CLOs?

 6    That would be privileged, Your Honor.  If they discussed

 7    football, that's not privileged, but what to do with the CLO

 8    management agreements is privileged.

 9            THE COURT:  Okay.  I sustain.

10            MR. MORRIS:  Can we please call up Exhibit TT?  I'm

11    sorry, TTT.  Nope, TTTT.  TTTT.  Can you scroll down a bit?

12    Right there.

13    BY MR. MORRIS:

14    Q   Do you see -- this is an email from Grant Scott to Scott

15    Ellington; do you see that?

16    A   Yes.

17    Q   And at this point, Mr. Ellington is still working for the

18    Debtor, right?

19    A   Yes.  I believe he was settlement counsel.

20    Q   Uh-huh.  And do you see that this is an email that refers

21    to your availability for a 9:00 a.m. call?

22    A   Yes.

23    Q   And do you see that there's a question as to whether the

24    K&L people can make it?

25    A   Yes.

Dondero - Direct                               101

1    Q    And you understand that refers to K&L Gates, right?

2    A    I -- I guess so.

3    Q    And so does this refresh your recollection that at or

4    around Christmas, or in the days leading up to Christmas, you

5    participated in calls with Mr. Scott, with Scott Ellington,

6    and with the K&L Gates folks?

7    A    I -- I don't know.  I don't know if -- if I actually did

8    or not.  But I was highly concerned with inappropriate

9    behavior.

10   Q    And you were available -- and did you tell somebody that

11   you were available for this call on the morning of the 23rd?

12   A    I don't know.

13   Q    This is the day after you stopped the trades, right?

14   A    Again, I didn't stop the trades on the 23rd.

15   Q    You stopped them on the 22nd, right?

16   A    No, I stopped them on the week of Thanksgiving.

17            MR. MORRIS:  Can we go back to Exhibit NNNN, the

18   transcript?  Page 73?

19   BY MR. MORRIS:

20   Q    Let me see if I can refresh your recollection.  Tab 2.

21   Did you give this answer to this question:

22        "Q   And  you  personally  instructed,  on  or  about

23        December 22, 2020, employees of those Advisors to stop

24        doing  the  trades  that  Mr.  Seery  had  authorized  with

25        respect to SKY and AVYA, right?

Dondero - Direct                              102

1         "A   Yeah.   Maybe we're splitting hairs here, but I

2         instructed them not to trade them."

3    Q    Did you give that answer to the question?

4    A    Yes.

5    Q    Okay.

6    A    But we -- we corrected.

7    Q    All right.  You didn't correct it at the preliminary

8    injunction hearing, did you?

9    A    No, I did not.

10   Q    Okay.  So as far as the Court knows as of this moment,

11   that's the only testimony that you've ever given on the topic,

12   right?

13   A    I'm trying to give some now.

14   Q    Okay.  And on December 22nd, that's the date that the

15   first letter was also sent, right, we just looked at?

16   A    All right.  Okay.

17   Q    You agree with that, right?

18   A    I don't remember the date on the letter.  If you want to

19   pull it up, I'll say it is the 22nd or the 23rd, whatever it

20   says.  I don't know.

21   Q    Sure.

22          MR. MORRIS:  Let's go back to DDDD, please.  And if

23   we can just go to the top of the letter.  Thank you.

24   BY MR. MORRIS:

25   Q    K&L Gates.  December 22nd.  That's the letter, right?

Dondero - Direct                        103

1   A    Yes.

2   Q    And according to the testimony that you gave at the

3   preliminary injunction hearing on January 8th, that's the day

4   that you also stopped AVYA and SKY trades, right?

5   A    I'm not agreeing to that testimony.  I am changing the

6   testimony.

7   Q    Okay.  And then we just saw that other exhibit where they

8   were trying to arrange a phone call with you, the K&L Gates

9   lawyers, and Mr. Ellington and Grant Scott for the 23rd.  Do

10  you remember that one we just looked at?

11  A    Yes.

12  Q    And then later on the day on the 23rd, K&L Gates sends

13  another letter, right?

14          MR. MORRIS:  Can we call up EEEE?  And can we scroll

15  to the Exhibit A, to our response?  Right there.

16  BY MR. MORRIS:

17  Q    That's the 23rd.  Do you see that letter?

18  A    Yes.

19  Q    Again, this is one week after the hearing, right?

20  A    Yes.

21  Q    Okay.  And this is a letter where K&L Gates states on

22  behalf of the Defendants that they are contemplating taking

23  steps to terminate the CLO management agreements, right?

24  A    I don't know.  Can you scroll down, if you want to ask me

25  --

Dondero - Direct                    104

1  Q    Sure.

2         MR. MORRIS:  Can we flip to the next page, please?

3  Keep going.  Right there.

4  BY MR. MORRIS:

5  Q    Can you read the first sentence of the paragraph

6  beginning, "Consequently"?

7  A    (reading)  Consequently, in addition to our request of

8  yesterday, where appropriate and consistent with the

9  underlying contractual provisions, one or more of the entities

10  above intend to notify the relevant Trustees and/or Issuers

11  that the process of removing the Debtor as fund manager should

12  be initiated, subject to and with due deference to the

13  applicable provisions of the United States Bankruptcy Code,

14  including the automatic stay of Section 362.

15  Q    Okay.  So, on December 23rd, the Defendants told the

16  Debtor that they intended to notify the relevant Trustees

17  and/or the Issuers that the process of removing the Debtor as

18  the fund manager should be initiated, right?

19  A    That's what it says.

20  Q    And then the K&L Gates firm sent yet another letter to the

21  Debtor, right?  Do you remember that?

22  A    No.

23         MR. MORRIS:  Can we get up FFFF, please?

24  BY MR. MORRIS:

25  Q    This is dated December 31st.  Do you see that?

Dondero - Direct                               105

1  A    Yes.

2        MR. MORRIS:  Can we scroll down a bit?

3  BY MR. MORRIS:

4  Q    Do you recall this is the letter where they claim that

5  they've been damaged by the Debtor's eviction of you from the

6  Highland offices?

7  A    I don't remember specifically, but that's true.

8  Q    Okay.  So we just saw these three letters, in addition to

9  your -- the -- at least the testimony you gave regarding your

10  conduct on the 22nd of December.  You were aware that all of

11  these letters were being sent by K&L Gates, correct?

12  A    Yes, generally.

13  Q    And you were supportive of the sending of these letters,

14  right?

15  A    Absolutely.  They were appropriate.

16  Q    And you pushed and encouraged the chief compliance officer

17  and the general counsel to send these letters, right?

18  A    I'd like to think that they believed and they acted

19  largely on their own judgment, but I strongly believed it was

20  a violation of the Advisers Act, and stated that numerous

21  times.

22  Q    Sir, you pushed and encouraged the chief compliance

23  officer and the general counsel to send these letters,

24  correct?

25  A    No, I wouldn't use those words.

Dondero - Direct                                        106

1   Q    Do you understand that the Debtor demanded that the K&L

2   Gates clients or the Defendants withdraw these letters?

3   A    I believe they requested it.  I didn't -- I didn't know

4   the former, what you mean by demand, but --

5   Q    Well, it's fair to say you never instructed the K&L Gates

6   clients or the Defendants to withdraw these letters, right?

7   A    No.  I still believe they are appropriate and accurate.  I

8   wouldn't withdraw them today.

9   Q    Okay.  Sir, throughout 2020, when you were still the

10  portfolio manager at Highland Capital Management, it's true

11  that you sold AVYA shares on numerous occasions on behalf of

12  both the CLOs and on behalf of the Funds outside of the

13  holdings of the CLOs?

14  A    Always with a business purpose, yes.  That is still a

15  small percentage of our total AVYA holdings, and we still

16  liked AVYA.

17  Q    Sir, I'm going to ask you just one more time.  In 2020,

18  you sold AVYA stock many times on behalf of the CLOs and on

19  behalf of the Funds?

20  A    Yes.

21  Q    Thank you.

22          MR. MORRIS:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Rukavina?

24          MR. RUKAVINA:  Your Honor, I will reserve my

25  questions to my case in chief, and I would request a very

1  short restroom break.

2            THE COURT:  All right.  Mr. Dondero, we're --

3            MR. RUKAVINA:  And I do mean short.  I will --

4            THE COURT:  I'm sorry.  What?

5            MR. RUKAVINA:  And I do mean short, Your Honor.  I

6  just need to run and be back -- I can be back in three

7  minutes.

8            MR. MORRIS:  No problem, Your Honor.

9            THE COURT:  Okay.  You're finished for now, Mr.

10  Dondero, but you're going to be recalled, so hang tight.

11      Your next witness, Mr. Morris?

12            MR. MORRIS:  The Debtor calls Jason Post.

13            MR. RUKAVINA:  Your Honor, may I be excused to run to

14  the restroom and Mr. Vasek take over for a few minutes?

15            THE COURT:  Oh.  Okay.  I'm sorry.  If you made that

16  request, I didn't hear you.  So that's fine.

17      All right.  Mr. Post, --

18            MR. MORRIS:  Your Honor, can we just -- I apologize

19  for interrupting.  Can we just direct Mr. Dondero not to speak

20  with anybody about anything at any time?  Not by phone, not by

21  text, not by email, not by meeting, not by anything?  Because

22  he's still on the stand.

23            MR. RUKAVINA:  Well, Your Honor, anything at any

24  time.  I think I know that Mr. Morris is being facetious, but

25  if he's trying to get the rule invoked, that's different.

Post - Direct                                    108

 1          MR. MORRIS:  Okay.  I'm trying to get the rule

 2   invoked.

 3          THE COURT:  Okay.  All right.  I'm not going to make

 4   that instruction.  All right.  So, --

 5          MR. RUKAVINA:  I've got to run to the restroom.  I'll

 6   be -- listen for the instructions.

 7          THE COURT:  Jason Post, you've been called to the

 8   witness stand.  Could you say, "Testing, one, two"?

 9          MR. POST:  (Indiscernible.)

10          THE COURT:  All right.  Please raise --

11          MR. POST:  Testing, one, two.

12          THE COURT:  Thank you.  Please raise your right hand.

13              JASON POST, DEBTOR'S WITNESS, SWORN

14          THE COURT:  All right.  Mr. Morris, go ahead.

15                    DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q    Good afternoon, Mr. Post.  We met the other day.  Do you

18   remember that?

19   A    I do.

20   Q    Okay.  So, again, just to remind you, my name is John

21   Morris.  I'm an attorney at Pachulski, Stang, Ziehl & Jones.

22   We represent the Debtor here.  You're the chief compliance

23   officer for each of the Defendants; is that right?

24   A    I am.

25   Q    And in your role as the chief compliance officer, your job

Post - Direct                                          109

1    is to act as a liaison between regulatory bodies and internal

2    working groups with respect to the rules and regulations for

3    the funds advised by the Advisors; is that correct?

4    A    Correct, that's -- that's the (inaudible).  Correct.

5    Q    All right.  And internally, you report to Mr. Dondero.

6    Isn't that right?

7    A    Correct.

8    Q    And you've been working with Mr. Dondero since 2008 when

9    you joined Highland Capital Management, correct?

10   A    I worked at Mr. Dondero's firm since 2008, but I reported

11   to other direct reports during that time outside of Mr.

12   Dondero.  I started to report to him directly in October of

13   2020.

14   Q    Okay.

15   A    (overspoken)

16   Q    But you've -- you've worked at Highland -- you worked at

17   Highland since 2008, fair?

18   A    Yes.

19   Q    Okay.  And you were employed by Highland up until October

20   2020, correct?

21   A    Yes.

22   Q    Okay.  And at that time, Mr. Dondero left and he went to

23   NexPoint and you went to NexPoint.  Is that right?

24   A    Shortly after Mr. Dondero left Highland, I transitioned

25   over to NexPoint.

Post - Direct                                    110

1   Q    And that's where Mr. Dondero is, right?

2   A    Correct.

3   Q    Okay.  You joined Highland in 2008, and in around 2011 you

4   joined Highland's internal legal and compliance team, correct?

5   A    That's correct.

6   Q    And in 2015, while still employed by Highland, Mr. Dondero

7   appointed you as the chief compliance officer of the Advisors

8   and the Funds, right?

9   A    Technically, the retail board appointed me the CCO of the

10  Funds, and then I was appointed internally.  I believe Mr.

11  Dondero was part of that decision for the Advisors.

12  Q    Had you ever worked with the retail boards before that?

13  A    There was about -- I worked with them for about a year

14  prior to that.

15  Q    Okay.  And you've served as the CCO, the chief compliance

16  officer, of each of the Advisors and each of the Funds since

17  September 2015 on a continuous basis, right?

18  A    That is correct.

19  Q    You know Thomas Surgent; is that right?

20  A    I do.

21  Q    Mr. Surgent has been the Debtor's chief compliance officer

22  since around 2013 or 2014; is that right?

23  A    I believe -- uh -- I -- I think that's correct.  It may be

24  a year or two off.  He took the role after the former CO

25  resigned, which I don't know if that was 2011 or 2012.  I

1  can't recall specifically.

2  Q   Okay.  But he's been -- he's been in that position for a

3  long time, right?  Fair enough?

4  A   Yes, that's fair.

5  Q   And during the whole time that you were employed by

6  Highland and serving as the chief compliance officer for the

7  Funds and the Advisors, you reported to Mr. Surgent?

8  A   Internally.  Yes, that's correct.

9  Q   Yeah.  And you respect Mr. Surgent; isn't that right?

10  A   During the time I reported to him, yes.

11  Q   Yeah.  And you believed that he did his job well, right?

12  A   As far as I could see, yes.

13  Q   You viewed it as -- you viewed him as a mentor, did you

14  not?

15  A   Yes.  I mean, when I joined the legal compliance team, you

16  know, he was there.  He was a senior member on the team.  And

17  he, you know, helped educate me, along with other, you know,

18  external sources, et cetera, on the compliance function.

19  Q   Uh-huh.  He trained you for the work you're doing now,

20  right?

21  A   With respect to the on-the-job training, yes.

22  Q   Uh-huh.  Despite all of that, throughout all the

23  proceedings, the court hearings, all of the issues that we're

24  talking about in this case, you never, ever stopped to discuss

25  any of these issues with your former mentor, Mr. Surgent; is

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 58-29   Filed 09/29/23   Page 896 of 1539   PageID 18134
Exhibit 29   Page 2 of 258

Post - Direct                                    112

 1  that right?

 2  A    The -- with respect to, for example, the trade (garbled)

 3  that you were talking about earlier?

 4  Q    Let's do it this way.  From the time that you left

 5  Highland until today, you've never discussed with Mr. Surgent

 6  Mr. Seery's trades; is that right?

 7  A    I believe there was a discussion after -- I can't recall

 8  exactly the context.  There was a discussion after the trades

 9  in the November time frame.  And then I believe there was a --

10  I responded to an email exchange in the December time frame

11  regarding booking of the trades.

12  Q    Sir, you -- you've never spoken with Mr. Surgent about any

13  issue concerning the Debtor's management of the CLOs, correct?

14  A    I don't recall directly, no.

15  Q    In fact, you're not aware of anyone acting on behalf of

16  the Advisors or the Funds who has reached out to Mr. Surgent

17  to get his views on any of the issues related to this motion.

18  Isn't that right?

19  A    I believe previously there's correspondence that Mr.

20  Dondero had with Surgent.  But aside from that, I'm not aware

21  of any.

22  Q    Is that the email where he reminded him of his personal

23  liability?  Is that the one you're thinking of?

24  A    Correct.

25  Q    Yeah.  Do you know of any other communication -- do you

Post - Direct                                    113

1  know of any other communication that any of the Defendants had

2  with Mr. Surgent concerning the Debtor's management of the

3  CLOs?

4  A    With Mr. Surgent directly, I don't -- I don't -- I don't

5  believe so.

6  Q    Yeah.  You graduated from Baylor; is that right?

7  A    Correct.

8  Q    But you don't have any certifications or licenses

9  applicable to your work, correct?

10  A    Correct.

11  Q    You don't have any specialized training or education

12  that's relevant to your work as a chief compliance officer,

13  correct?

14  A    Correct.

15  Q    Your job -- your training is limited to on-the-job

16  training; isn't that right?

17  A    That is correct.

18  Q    You've never spoken at any conferences on compliance

19  matters, have you?

20  A    Spoken, no.  Attended, yes.

21  Q    You don't recall presenting any papers at any compliance-

22  related conferences, do you?

23  A    That is correct.

24  Q    You've never published anything in connection with your

25  work as a compliance officer; isn't that right?

1  A    Not that I can recall.

2  Q    Let's talk about the CLO management agreements briefly.

3  You're aware that the Debtor is party to certain management

4  agreements pursuant to which it serves as the portfolio

5  manager for certain CLOs, correct?

6  A    Correct.

7  Q    And until your lawyers recently asked you to review them,

8  you last had reason to review a CLO management agreement about

9  five or six years ago; isn't that right?

10 A    I believe that's correct.

11 Q    And the request from your lawyers to look at the CLO

12 management agreements, that request came in late November/

13 early December; isn't that right?

14 A    I believe that's around the right time frame.

15 Q    And the portions of the management agreements that you

16 read were the portions that your counsel asked you to read;

17 isn't that right?

18 A    Correct.

19 Q    And other than the general recollection of having read

20 something about the rights of preference shareholders, you

21 don't recall much about the agreements at all; isn't that

22 right?

23 A    I mean, the agreements are very lengthy in nature.  You

24 know, I think it was probably rights that the preference

25 shareholders had, and, you know, possibly indemnification

Post - Direct                                    115

 1   provisions.  But aside from that, I don't recall anything else
 2   specifically right now.
 3   Q   As the chief compliance officer of the Advisors and the
 4   Funds, you don't know whether any of them are party to the CLO
 5   management agreements between the Debtors and -- between the
 6   Debtor and the Issuers, correct?
 7           MR. RUKAVINA:  And Your Honor, I would just object to
 8   the extent that that calls for a legal conclusion.  This
 9   witness is not a lawyer.
10           THE COURT:  Overruled.
11           THE WITNESS:  I'm sorry.  Can you repeat the
12   question, please?
13   BY MR. MORRIS:
14   Q   Sure.  As the chief compliance officer for each of the
15   Defendants, you don't know whether any of them are party to
16   the CLO management agreements between the Debtor and the
17   Issuers, correct?
18   A   They're not the named collateral manager, but they're a
19   security holder of the CLOs, so they should be entitled to,
20   you know, the rights that those security holders are afforded
21   under those agreements.
22           MR. MORRIS:  I move to strike, Your Honor.
23           THE COURT:  Granted.
24   BY MR. MORRIS:
25   Q   All right.  So, now, Mr. Post, I know this is difficult,

Post - Direct                              116

 1   and I do appreciate that it's difficult just to focus on the

 2   question.  Your counsel will have the opportunity to ask you

 3   whatever he wants.  But I would respectfully request that you

 4   listen to my question and only answer my question.  It really

 5   is very likely to require just a yes or no answer.

 6       So, let me try again.  As the chief compliance officer of

 7   the Advisors and the Funds, you don't know whether any of them

 8   are a party to the CLO management agreements between the

 9   Debtor and the Issuers, correct?

10   A    I don't believe they are, correct.

11   Q    Okay.  Let's talk about that prior hearing.  Now, by the

12   way, Mr. Post, did you listen in to Mr. Dondero's testimony

13   earlier?

14            MR. RUKAVINA:  Mr. Post was here with me --

15            MR. MORRIS:  Yeah.

16            MR. RUKAVINA:  -- as my representative..

17            MR. MORRIS:  Okay.  I -- there's no problem.  I just

18   -- I just -- that way there's some background and he has some

19   context.  That's the only reason I asked.

20   BY MR. MORRIS:

21   Q    You're aware that the Funds and the Advisors previously

22   filed a motion in the Bankruptcy Court asking the Court to

23   institute a pause in the Debtor's ability to sell CLO assets,

24   correct?

25   A    Correct.

Post - Direct                                    117

1   Q    And you recall that that happened in mid-December, around

2   December 16th; is that right?

3   A    That sounds correct.

4   Q    And in connection with that motion, you provided

5   information to counsel that they requested from you, right?

6   A    Yes.  I was part of the working -- internal working group,

7   with internal and external counsel.

8   Q    Other than providing that information, you generally

9   agreed with the position being taken that it wasn't in the

10  best interest of the Funds involved for Highland to make any

11  trades; isn't that right?

12  A    Yes.  And that was based off of discussions with the

13  investment professionals.

14  Q    And the investment professionals are Mr. Sowin and Mr.

15  Dondero, correct?

16  A    Correct.

17  Q    Okay.  So you're the chief compliance officer, and they

18  made a motion that was based on the idea that the fund

19  manager, Highland Capital Management, shouldn't trade any

20  assets in the CLOs.  Do I have that right?

21  A    I believe that's what the motion contained.

22  Q    But you don't even remember who authorized the filing of

23  the motion; isn't that right?

24  A    I believe it was pursuant to discussions internally and

25  with external counsel, and I believe Mr. Norris signed the

Post - Direct                                    118

 1  filing, if I -- if I recall correctly.

 2  Q   Sir, you don't remember who authorized the filing of the

 3  motion, correct?

 4  A   It -- it was pursuant to a discussion with the investment

 5  professionals and counsel, and it was in the best interest of

 6  the Funds to make the filing.  So I think it was a

 7  collaborative determination.

 8         MR. MORRIS:  I move to strike, Your Honor.

 9         THE COURT:  Granted.

10         MR. MORRIS:  Ms. Canty, can we please pull up Mr.

11  Post's deposition transcript?  And let's go to Page 35.  Line

12  21.  Okay.

13  BY MR. MORRIS:

14  Q   Do you remember giving the following answer to the

15  following question:

16         "Q   Who authorized the filing of this motion?

17         "A   I can't recall specifically who authorized it."

18  Q   Did you give that answer to my question just the other

19  day?

20  A   That's -- that's what it says there, yes.

21  Q   And it says that because that's, in fact, what you

22  testified to under oath the other day, right?

23  A   Correct.

24  Q   Okay.  And the one thing that you know for certain is that

25  you didn't authorize the filing of the motion; isn't that

1  right?

2  A    I didn't sign anything in connection with the filing.

3  Q    All right.  Listen carefully to my question.  The one

4  thing that you're certain of is that you did not authorize the

5  filing of the motion as the chief compliance officer of the

6  Debtors, correct?

7  A    Correct.

8  Q    Okay.  But you did participate in conversations with Mr.

9  Dondero and counsel concerning the motion; is that fair?

10  A    There were conversations with Mr. Dondero initially, and

11  then the conversations were then more so with internal and

12  external counsel in terms of the filing.

13  Q    Okay.  So they started just with Mr. Dondero, and then

14  they moved on to counsel.  Is that what you're saying?

15  A    I can't recall specifically.  It may have been part of a

16  discussion internally with internal counsel and Mr. Dondero.

17  I just -- I can't recall the specifics.

18  Q    Okay.  But Mr. Dondero certainly supported the filing of

19  the motion, right?

20  A    Yes.  From an investment perspective, it was in the best

21  interest of the Funds in terms of the sales that were

22  occurring.

23  Q    Okay.

24          MR. MORRIS:  I move to strike.

25          THE COURT:  Granted.

Post - Direct                                          120

 1  BY MR. MORRIS:

 2  Q    It's a very simple question.  Mr. Dondero supported the

 3  filing of the motion; is that correct?

 4  A    Yes.

 5  Q    You did not file a declaration in support of the motion;

 6  is that correct?

 7  A    Me personally, no.

 8  Q    Okay.  So you're the chief compliance officer of the

 9  Defendants; is that right?

10  A    Correct.

11  Q    But instead of you filing a declaration, Mr. Norris filed

12  the declaration.  Do I have that right?

13  A    Correct.  My understanding is one person needs to sign the

14  declaration.

15  Q    And remind me, what is Mr. Norris's position?  He's the

16  executive vice president, right?

17  A    Correct.

18  Q    What responsibilities does he have?  Does he have trading

19  responsibility?

20  A    He does not.

21  Q    Does he have compliance responsibility?

22  A    Not directly, no.

23  Q    Does he have investment responsibility?

24  A    He's familiar with the composition of the portfolios in

25  his role as a product strategy team member.

Post - Direct                                    121

1  Q   Does he have investment responsibility, sir?

2  A   He is not making direct investments for the -- for the

3  Funds.

4  Q   Okay.  So he doesn't -- and he's not a compliance person,

5  right?

6  A   Correct.

7  Q   And he's not a lawyer, right?

8  A   Correct.

9  Q   But nevertheless, as the chief compliance officer, you

10  believed that Mr. Norris's declaration contained all of the

11  information that was relevant to support the motion, right?

12  A   It was a determin... or a collaborative determination in

13  conjunction with counsel.  But I, you know, I don't -- yeah,

14  it was -- it was a collaborative determination.  There were

15  multiple elements that went into that -- the letter.

16  Q   Okay.  You believed that the motion and Mr. Norris's

17  declaration contained all the relevant facts that supported

18  the Advisors and the Funds' requests to the Court, correct?

19  A   Yes.

20  Q   In fact, you believed that Mr. Norris was the most

21  knowledgeable person to testify on behalf of the Movants;

22  isn't that right?

23  A   I think it was -- he was identified pursuant to

24  discussions with counsel to be the most knowledgeable.

25  Q   I'm going to ask you just about you and not counsel.  You

Post - Direct                              122

 1  believed at the time that Mr. Norris was the most

 2  knowledgeable witness to testify on behalf of the Movants;

 3  isn't that right?

 4  A    Yes.

 5  Q    And you didn't testify -- not only didn't you submit a

 6  declaration, but you didn't testify at the hearing, did you?

 7  A    Correct on both.

 8  Q    Okay.  And you listened to parts of the hearing, but not

 9  all of it, because you were busy doing other stuff, right?

10  A    Correct.

11  Q    You didn't listen to Mr. Norris's testimony at all, right?

12  A    I don't believe I did.

13  Q    You didn't listen to the Court when the Court rendered its

14  decision, did you?

15  A    I don't -- I don't believe I did.

16  Q    And you didn't read the transcript from the hearing, did

17  you?

18  A    I don't -- correct.  I did not.

19  Q    Okay.  So in your capacity as the chief compliance

20  officer, you didn't believe that you should take the time to

21  review the transcript, did you?

22  A    Correct.  I mean, just it was filed based off of the

23  belief that the -- that the trades weren't in the best

24  interest, and I -- and no, I didn't read it personally.

25  Q    And you didn't believe, in -- that in your capacity as the

Post - Direct                              123

 1   CCO, the chief compliance officer, that it was in the scope of

 2   your responsibility to listen to the hearing, correct?

 3   A   I was -- I wasn't asked to listen, and quite frankly, I

 4   don't -- I don't recall if I remember the timing, but I did

 5   not listen.

 6   Q   Okay.  And in your capacity as the chief compliance

 7   officer, you didn't believe that it was in the scope of your

 8   responsibilities to listen to the hearing; isn't that right?

 9   A   Correct.

10   Q   And because you didn't listen to the hearing or review the

11   transcript, you were unaware of what the Court said or how

12   Judge Jernigan described the motion or the people involved in

13   presenting the case on behalf of the Defendants, right?

14   A   Correct, but I -- I believe I probably would have received

15   some guidance from counsel who attended or listened to the

16   hearing.

17   Q   Well, after the hearing was over, you did speak to Mr.

18   Norris, right?

19   A   Very briefly.

20   Q   In fact, --

21   A   Very --

22   Q   In fact, the only thing you can remember about your

23   conversation with Mr. Norris following the hearing was

24   discussing with him how long the hearing took.  Isn't that

25   right?

Post - Direct                                    124

1    A    Correct, because I -- I believe I heard it was a short
2    hearing.
3    Q    And that's -- that's all -- that's all you asked Mr.
4    Norris about, about the hearing, right?  That's all you
5    remember talking to him about?
6    A    I believe so, correct.
7    Q    You don't recall discussing with Mr. Norris any other
8    aspect of the hearing other than the length of time it took to
9    conduct, correct?
10   A    I don't recall specifically.
11   Q    And you have no recollection of ever discussing with Mr.
12   Dondero what happened at the hearing, right?
13   A    I don't think I talked with Jim, Jim Dondero about that.
14   Q    Nor did you talk to Mr. Dondero about the Court's ruling;
15   isn't that right?
16   A    Correct.
17   Q    Okay.  Let's talk about the events that occurred after the
18   hearing, in the two weeks following the hearing.  The
19   Defendants for which you serve as the chief compliance officer
20   sent three separate letters to the Defendant [sic], correct?
21   A    If you could bring them up, I can confirm.
22   Q    Sure.
23        MR. MORRIS:  Let's start with DDDD, please.  Okay.
24   Okay.  Can we scroll to the attachment, please?
25   BY MR. MORRIS:

Post - Direct                           125

1    Q   All right.  So this is the first letter, Mr. Post.  Do you

2    recall, on or about December 22nd, the K&L Gates firm sent, on

3    behalf of the Advisors and Funds for which you serve as the

4    chief compliance officer, a letter to the Debtors?

5    A   Yes.

6    Q   Okay.

7          MR. MORRIS:  And can we call the next exhibit?  I

8    guess it's EEEE.

9          And I don't mean to be quick about these.  If there's any

10   reason that you want to read them, I wasn't planning on asking

11   any questions about the substance of the letters of this

12   witness.

13   BY MR. MORRIS:

14   Q   But Mr. Post, I don't mean to be quick here.  So if you

15   think there's a benefit to you to reading the letters, please

16   let me know.

17          Do you see, December 23rd, the next day, another letter

18   was sent by K&L Gates?

19   A   Yes.

20   Q   Okay.  And do you recall generally that the Advisors and

21   Funds for which you serve as chief compliance officer told the

22   -- told the Debtor that they were going to begin the process

23   of seeking to terminate the CLO management agreements?

24   A   I believe -- I believe that was contained in the letter,

25   so long as it was done in compliance with the Court.

Post - Direct                                           126

1    Q    Uh-huh.  And do you remember there was a third letter that
2    was sent?
3    A    If you wouldn't mind pulling it up.
4    Q    Yeah, not at all.
5          MR. MORRIS:  Can we get the December 31st letter?  I
6    think it might be -- yeah.
7    BY MR. MORRIS:
8    Q    Now, here's the December 31st letter.  Do you remember the
9    December 31st letter was the one where K&L Gates suggested
10   that the Advisors and the Funds had suffered damages because
11   the Debtor evicted Mr. Dondero from the Highland suite of
12   offices?
13   A    I -- I had heard of that letter being drafted, but I don't
14   recall -- I obviously don't recall a specific date.  But if it
15   says December 31st, --
16   Q    Okay.  Mr. Dondero was one of the main voices in the
17   decision to send these letters, correct?
18   A    He was part of the preliminary conversation and expressed
19   his opinion, and then myself and others internally, and with
20   external counsel, then worked to draft the letters.
21         THE COURT:  All right.  Mr. Post, I am going to
22   interject.  I have heard Mr. Morris give you this instruction
23   many times.  Maybe it's time for me to.  Maybe it's past time
24   for me to.
25       Most of his questions simply require a yes or no answer.

Post - Direct                               127

1   If you feel like there are other things that you want to

2   supplement your testimony with, Mr. Rukavina is going to have

3   a chance to question you, and that would be the situation

4   where maybe you could give more fulsome answers.  But please

5   listen to the question.  If it's a yes or no answer, that's

6   all we want you to give right now.  Okay?  Got it?

7              THE WITNESS:  Understood.

8              THE COURT:  Okay.

9              MR. MORRIS:  Thank you, Your Honor.

10  BY MR. MORRIS:

11  Q   Mr. Post, Mr. Dondero was one of the main voices in the

12  decision to send the letters; isn't that correct?

13  A   He was a voice.

14             THE COURT:  That was not a yes --

15  BY MR. MORRIS:

16  A   And he was -- he --

17             THE COURT:  Okay.

18             THE WITNESS:  I'm --

19             THE COURT:  Please, just a yes or no answer, okay?

20             THE WITNESS:  No.

21             MR. MORRIS:  Okay.  Can we go to Mr. Post's

22  transcript, please, Page 47?  Line 22?

23       And Your Honor, when we pull it up on the screen, there is

24  an objection, and I would respectfully request that the Court

25  rule on the objection before I read the question and the

Post - Direct                                    128

1   answer.

2           THE COURT:  All right.

3           MR. MORRIS:  So if we could just call up Page 47

4   beginning at Line 22.

5           MR. RUKAVINA:  Page 47, Line 22.

6           THE COURT:  Okay.

7           MR. MORRIS:  One moment.  Give her a moment.  She's

8   not there.

9           MR. RUKAVINA:  Do you remember what exhibit this is?

10          MR. MORRIS:  Yeah.  There it is.  Beginning at Line

11  22, "Do you know?"  And there is Mr. Rukavina's objection.

12          MR. RUKAVINA:  Your Honor, it's very simple.  He

13  can't go into Mr. Dondero's head.  But he -- but if Mr.

14  Dondero told him something, that's different.  So I think

15  counsel can rephrase the question and it's perfectly fine, but

16  he can't go into Mr. Dondero's state of mind.

17          MR. MORRIS:  Your Honor, I'm not asking for Mr.

18  Dondero's state of mind.  I'm asking for Mr. Post's knowledge.

19  "Do you know?"

20          THE COURT:  Okay.  I'll overrule the objection.  He

21  can answer.

22  BY MR. MORRIS:

23  Q   All right.  So, Mr. Post, do you remember giving this

24  answer to the following question:

25      "Q   Do  you  know  whether  Mr.  Dondero  supported  the

Post - Direct                                    129

1      sending of each of these three letters?

2          "A    I don't -- I don't recall specifically.   I think

3      he had his views on certain of the transactions that

4      were occurring, and he wasn't in agreement with those

5      transactions, as one of the main voices."

6   Q    Do you see that?

7   A    I do.

8   Q    Does that refresh your recollection that Mr. -- that you

9   testified that Mr. Dondero was one of the main voices?

10  A    Yes.

11  Q    Okay.  Mr. Dondero --

12         MR. MORRIS:  You can take that down now for the

13  moment, please.

14  BY MR. MORRIS:

15  Q    Mr. Dondero had his views on certain of the transactions

16  that were occurring, and he wasn't in agreement with those

17  transactions.  Isn't that right?

18  A    Yes.

19  Q    All right.  Going back to the letters that we just looked

20  at quickly, you recall the Debtor responded to each of those

21  letters, but as the chief compliance officer, you couldn't

22  really recall what the Debtor said in response.  Is that fair?

23  A    I'm -- I believe they -- I'm sorry.  I can't recall

24  specifically without seeing the letters.

25  Q    Okay.  So you don't recall that, in response, the Debtor

1    requested that the Advisors and the Funds withdraw the

2    letters, right?

3    A    I believe that was requested in the letters.

4    Q    Okay.  But the Funds and the Advisors didn't comply with

5    that request, right?

6    A    To my knowledge, they have not withdrawn the letters.

7    Q    You do recall that the Debtor specifically asked the

8    Defendants to file their lift stay motion so that they could

9    finally resolve the issue of whether or not the Advisors and

10   the Funds could actually terminate the agreement, right?

11   A    I -- I'm sorry.  Can you repeat that question, please?

12   Q    Do you recall that the Funds and the Advisors informed the

13   Debtor that they were going to initiate steps to terminate the

14   CLO management agreements, including moving to lift the stay?

15   A    I think they indicated that they were going to take steps,

16   but it would be pursuant to what was permitted in the court.

17   Q    And do you remember that the Debtor specifically asked the

18   Defendants to do exactly that, to bring this matter to a

19   conclusion, to file the motion so that the Court could resolve

20   the issue of whether or not they had a right to terminate the

21   agreement?  You remember that, right?

22              MR. RUKAVINA:  Objection, compound, Your Honor.

23              THE WITNESS:  I can't --

24              THE COURT:  I'm sorry.

25              MR. MORRIS:  I can't recall.

1           THE COURT:  Was there an objection?

2           MR. RUKAVINA:  Yes, Your Honor.  That's four

3    questions in one.  That's compound.

4           MR. MORRIS:  I'll rephrase, Your Honor.

5           THE COURT:  Okay.  And let me interject a minute.

6    Mr. Post, you have this habit of not looking squarely at the

7    camera but looking over to your right.  And in a normal

8    courtroom setting, that might be fine, but I have no way of

9    knowing if some lawyer or some other person is -- you're

10   looking at them and they're somehow instructing you.  I would

11   certainly hope that's not what's going on, but it just kind of

12   leaves room for me to wonder when you're not looking squarely

13   at the camera.  So can you start looking squarely at the

14   camera, please?

15          MR. RUKAVINA:  Your Honor, I can explain that, and

16   certainly there's no funny business going on.  There are two

17   cameras on Mr. Post.  One is on a laptop.  We're looking at

18   the Court on the big camera.  I'm sitting behind Mr. Post.  So

19   if the Court would prefer that Mr. Post look directly into the

20   laptop, then that's what he'll do, or if the Court would

21   prefer that he look into the big camera.

22          THE COURT:  Okay.  Well, I prefer he look into the

23   big camera just because it --

24          MR. RUKAVINA:  So keep looking there?  Yeah.

25          THE COURT:  No, no, no, no.  Okay.  I don't know what

Post - Direct                                           132

1    -- I thought -- okay.  Do you see what I'm seeing?  I don't

2    know if you can see what I'm seeing.

3              MR. MORRIS:  Yes.

4              THE COURT:  I'm seeing the left side of his face.

5              THE WITNESS:  I'm sorry.  I'll just look at the

6    laptop.  Sorry.  I was -- I was looking at who was speaking to

7    me.

8              THE COURT:  Okay.  Well, I don't --

9              MR. MORRIS:  Okay.

10             THE COURT:  I don't know the setup, so it was

11   confusing to me.

12        All right.  This is better.  Thank you.

13             THE WITNESS:  Yeah.  I apologize.

14             MR. RUKAVINA:  We'll focus on the laptop, Judge.

15   BY MR. MORRIS:

16   Q   All right.  So the question, Mr. Post, is:  You do recall

17   that the Debtor specifically asked the Defendants to file

18   their motion to lift the stay so that the issue could finally

19   be resolved; isn't that right?

20   A   I can't recall that specifically.

21   Q   You believe that may be one of the options that the Debtor

22   specifically proposed, right?

23   A   It -- yes.

24   Q   Okay.  But the Defendants never filed their lift stay

25   motion to terminate the agreements; isn't that right?

1   A    I don't believe so.

2   Q    Right.  So the Debtor filed its complaint and its request

3   for the injunction, right?

4   A    Correct.

5   Q    As the CO -- as the CCO, you may have reviewed the

6   Debtor's complaint and motion, but you can't recall, given all

7   the documentation that's involved, right?

8   A    Correct.

9   Q    You can't recall any facts that the Debtor asserted in

10  support of its motion; isn't that right?

11  A    I can't recall specifically.  Correct.

12  Q    But the one thing you do know is that the Debtor's motion

13  is based on its entitlement to transact business pursuant to

14  their arrangement with the CLOs as collateral manager,

15  correct?

16  A    Yes.

17  Q    Now, you heard that there was supposed to be an initial

18  hearing on the Debtor's motion for a temporary restraining

19  order against the Defendants, right?

20  A    Correct.

21  Q    But you don't believe the motion for the TRO got heard,

22  and you presume it got resolved, right?

23  A    I don't believe it was heard.

24  Q    Okay.  And you understand that there is a TRO in place

25  now, pursuant to which the Advisors and the Funds are

1   prevented from interfering with the Debtor's execution of its

2   rights under the CLO management agreements, right?

3   A    Correct.

4   Q    Before the TRO was resolved, you weren't personally

5   involved in the process of deciding what witnesses would be

6   called and what exhibits would be offered into evidence; is

7   that right?

8   A    No.

9        MR. MORRIS:  During the deposition, Your Honor,

10  subject to correction from Mr. Rukavina, I believe that the

11  Defendants and the Debtor reached the following two

12  stipulations.

13     First, the Defendants and the Debtor stipulate that Mr.

14  Post was not going to be called as a witness at the TRO

15  hearing.

16        MR. RUKAVINA:  That is correct.

17        MR. MORRIS:  And second, the Defendants and the

18  Debtor stipulate that the Defendants were not going to offer

19  into evidence any exhibits other than those specifically

20  listed on their witness and exhibit list.

21        MR. RUKAVINA:  That being the witness and exhibit

22  list filed before the TRO.  That is correct.

23        MR. MORRIS:  Okay.

24  BY MR. MORRIS:

25  Q    Let's talk about Mr. Seery for a minute.  You know who Mr.

Post - Direct                              135

 1  Seery is, correct?

 2  A    Correct.

 3  Q    You understand he's an independent director and the CEO of

 4  the Debtor, right?

 5  A    Correct.

 6  Q    And you also understand that his -- in his capacity as the

 7  Debtor's CEO, Mr. Seery is authorized to sell certain

 8  securities and assets that are owned by the CLOs, correct?

 9  A    Correct.

10  Q    In your opinion as the CCO, the chief compliance officer

11  of the Advisors and the Funds, Mr. Seery has the knowledge and

12  experience to trade securities on behalf of the CLOs, correct?

13  A    Correct.

14  Q    But you don't believe that it's in the Funds' best

15  interest for Mr. Seery to sell SKY and AVYA securities, right?

16  A    Correct.

17  Q    But even though you reached that decision about Mr. Seery,

18  you have no knowledge as to whether Mr. Dondero ever traded

19  either of those securities before he resigned from Highland;

20  isn't that right?

21  A    I saw some trades that were shown on the screen earlier.

22  I don't think I recalled at the time I was asked on Friday.

23  Q    As of the time -- as of Friday, you had no knowledge as to

24  whether Mr. Dondero had traded in AVYA securities prior to his

25  departure from Highland, correct?

Post - Direct                           136

1  A    Correct.

2  Q    And before, before forming your view as the chief

3  compliance officer that Mr. Seery's trading of AVYA was not in

4  the best interest of the Funds, you made no effort to see if

5  Mr. Dondero had sold the exact same securities Mr. Seery was

6  selling, correct?

7  A    Correct.

8  Q    And the sole source of information that you relied upon to

9  reach your opinion that the trades weren't in the best

10 interest of the Funds is Jim Dondero and Joe Sowin, correct?

11 A    I'm sorry.  Can you repeat that?  You kind of cut out at

12 the beginning.

13 Q    Sure.  And please, any time that happens, let me know.  We

14 had some problems this morning.

15     The sole source of information that you relied upon to

16 reach your opinion that the trades weren't in the best

17 interest of the funds is Jim Dondero and Joe Sowin; isn't that

18 correct?

19 A    Correct.  They're the investment professionals, yes.

20 Q    And you have no understanding as to why Mr. Seery wanted

21 to sell the AVYA and SKY securities, do you?

22 A    I was told that -- I don't know why he wanted to sell them

23 personally, correct.

24 Q    Okay.  In fact, before reaching your conclusion as the CCO

25 that Mr. Seery's trades were not in the best interest of the

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 58-29 Filed 12/23/23   Page 921 of 1539   PageID 18159
Exhibit 29 Page 2382 of 258

Post - Direct                              137

1   Fund, you did not undertake any investigation of any kind to

2   try to determine why Mr. Seery wanted to sell AVYA or SKY

3   stock, correct?

4   A    Correct.  I didn't reach out to Mr. Seery.

5   Q    All right.  You believe that Mr. Dondero and Mr. Sowin's

6   opinion that Mr. Seery's trades aren't in the Funds' best

7   interest should be heard pursuant to the Advisers Act, right?

8   A    Correct.

9   Q    Specifically, Section 2000 -- 206 of the Advisers Act,

10  right?

11  A    Correct.

12  Q    Have you ever read Section 206 of the Advisers Act?

13  A    Yes.

14  Q    Okay.

15        MR. MORRIS:  Ms. Canty, can you please put up the

16  demonstrative for Section 206 of the Advisers Act?

17        MR. RUKAVINA:  Your Honor, the witness just asked me

18  for water.  Nothing more.

19        THE COURT:  Okay.

20        MR. MORRIS:  Yeah.  No problem.

21  BY MR. MORRIS:

22  Q    I've put on the screen Section 206 of the Advisers Act,

23  Mr. Post.  Can you please tell the Court what provision of 206

24  you believe Mr. Seery allegedly breached when he sought to

25  sell AVYA and SKY securities?

Post - Direct                                    138

 1   A    It would be Number 4.

 2   Q    Do you believe that Mr. Seery engaged in fraudulent,

 3   deceptive, or manipulative practices by trying to trade AVYA

 4   and SKY securities?

 5   A    The -- as collateral manager for the CLOs, they're

 6   supposed to maximize returns for the preference shares, which

 7   we didn't believe the sales reflected that, and so they

 8   weren't acting, --

 9           THE COURT:  Okay.

10           THE WITNESS:  -- you know, pursuant to their duties

11   --

12           THE COURT:  Here I -- here I go --

13           THE WITNESS:  -- under the collateral management --

14           THE COURT:  Here I go again.  Here you go again.

15           THE WITNESS:  I'm sorry.

16           THE COURT:  It really was a yes or no question.  All

17   right?

18   BY MR. MORRIS:

19   Q    You're the -- you're the chief compliance officer, right?

20   A    Yes.

21   Q    And this is the provision in Section 4 that you cite to as

22   the provision that Mr. Seery violated when he attempted to

23   sell SKY and AVYA securities, correct?

24   A    Yes.

25   Q    Did Mr. Seery engage in an act, practice, or course of

Post - Direct                                        139

 1   business which was fraudulent when he looked to sell those

 2   securities?

 3   A    No.

 4   Q    Do you believe that Mr. Seery engaged in an act, a

 5   practice, or a course of business which was deceptive when he

 6   went to sell the SKY and the AVYA securities?

 7   A    Yes.

 8   Q    Who did he deceive?

 9   A    The investors of the CLOs, --

10   Q    How?

11   A    -- the preference shareholders.

12   Q    How?

13   A    By selling securities that the preference shareholder

14   investors believed had further upside to them.

15   Q    Did he lie to them?

16   A    I don't believe he talked to the investors.

17   Q    But you're putting your reputation on the line here and

18   you're swearing under oath that Mr. Seery deceptively tried to

19   sell SKY and AVYA securities?

20   A    I believe that based off of a review and discussion with

21   counsel.

22   Q    Do you think he was manipulative?

23   A    No.

24   Q    Did you -- did you check in with the SEC to tell them that

25   you had a bad actor here?

1    A    No.

2    Q    You first formed your view that the Debtor violated

3    Section 206 of the Advisers Act after the sales started to

4    occur in the CLOs, correct?

5    A    Correct.

6    Q    But you don't know when the sales actually started, right?

7    A    I believe there were sales --

8    Q    And I assume, since you were the chief compliance officer

9    since 2015, you don't believe that Mr. Dondero's sale of AVYA

10   stock was deceptive, right?

11   A    You would have to ask Mr. Dondero that, but I believe he

12   was selling for cash, cash needs for other funds.

13           MR. MORRIS:  Okay.  I move to strike.  I'm asking him

14   not --

15           THE COURT:  Sustained.

16   BY MR. MORRIS:

17   Q    I'm asking about you.  I'm asking about you.  You're the

18   chief compliance officer, right?

19   A    Yes.

20   Q    And you don't believe that when Mr. Dondero sold AVYA

21   stock that he was engaged in deceptive practices, do you?

22   A    No.

23   Q    And that's because you don't even know whether he sold

24   AVYA stock; isn't that right?

25   A    On Friday, I -- that is correct.

Post - Direct                              141

1   Q    In fact, the only reason you learned that Mr. Seery wanted

2   to sell AVYA and SKY stock is because Mr. Dondero told you;

3   isn't that right?

4   A    I believe I was forwarded the email after -- after there

5   was communications on the sales.

6   Q    And that's the email where Mr. Dondero told Mr. Surgent

7   that he had personal liability, correct?

8   A    I -- I believe it was an email prior to that about were

9   trades being requested and Mr. Dondero responding.

10  Q    You're familiar with the email where Mr. Dondero

11  interfered with Mr. Seery's trades?

12  A    Yes.

13  Q    Okay.  And you're aware that Mr. Dondero told Mr. Surgent

14  that he faced potential liability if he continued to follow

15  Mr. Seery's instructions, correct?

16  A    Correct.  Based off of Mr. Dondero's view.

17  Q    Notwithstanding all of that, in your capacity as the chief

18  compliance officer, you don't believe it's ever appropriate

19  for an investor to step in and impede transactions that have

20  been authorized by the portfolio manager unless the contract

21  permits the investor to step in; isn't that right?

22  A    I believe -- I'm sorry, can you repeat that, please?

23  There was a lot of question.

24  Q    Sure.  Sure.  In your capacity as the chief compliance

25  officer, you don't believe it's ever appropriate for an

Post - Direct                                    142

1    investor to step in and impede transactions that were

2    authorized by the portfolio manager unless the contract

3    permits the investor to do so; isn't that correct?  Isn't that

4    correct?

5    A    Yes.

6    Q    Okay.  I know you're not a lawyer, but you are the chief

7    compliance officer of the Funds; isn't that right?

8    A    Correct.

9    Q    And you can't point to anything in any contract that gives

10   Mr. Dondero the right to step in and impede transactions that

11   have been authorized by Mr. Seery; isn't that correct?

12   A    He's entitled rights as preference shareholders for the --

13   for the Funds that hold those preference shareholders.  So,

14   indirectly, he should be afforded those rights as portfolio

15   manager for those Funds.

16   Q    Sir, you can't point to anything in any contract that

17   gives Mr. Dondero the right to step in and impede transactions

18   that have been authorized by Mr. Seery; isn't that correct?

19   A    Correct.

20   Q    Okay.  But yet you have never told Mr. Dondero that he

21   should not interfere with Mr. Seery's trades; isn't that a

22   fact?

23   A    Correct.

24   Q    In fact, you never personally took any steps at any time

25   to make sure that there would be no further interference with

Post - Direct                                143

1  the Debtor's trading activities; isn't that correct?

2  A    Correct.

3  Q    And that's because you believe, as the chief compliance

4  officer of the Funds, that Mr. Dondero should have the leeway

5  to make the determination as to whether or not the

6  transactions are appropriate; isn't that correct?

7  A    He should be able to be heard in the transactions that are

8  being made, correct.

9  Q    Sir, not to be heard, but to make the determination.  Let

10 me ask the question again.  You believe, as the CO -- CCO of

11 the Funds, that Mr. Dondero should have the leeway to make the

12 determination as to whether or not the transactions are

13 appropriate; isn't that correct?

14 A    Yes.

15 Q    Okay.  And you completely deferred to Mr. Dondero; isn't

16 that right?

17 A    For the investment determination, yes.

18 Q    And based on that deference, you never took any steps at

19 any time to make sure no one on behalf of the Advisors or the

20 Funds impeded or stopped transactions authorized by Mr. Seery,

21 correct?

22 A    Correct.

23 Q    You understand there's a TRO in place today that prevents

24 Mr. Dondero and the Advisors and the Funds from interfering

25 with Mr. Seery's trading activities; isn't that right?

1          MR. RUKAVINA:  I'm going to object to that, Your

2     Honor, to the extent that calls for a legal conclusion.  And I

3     do think it mischaracterizes the testimony.  I'm sorry.  The

4     TRO.

5          THE COURT:  Overruled.

6     BY MR. MORRIS:

7     Q    You can answer, sir.  Would you like me to repeat the

8     question?

9     A    Yes, please.

10    Q    You understand that there is a TRO in place -- TRO in

11    place today that prevents Mr. Dondero, the Advisors, and the

12    Funds from interfering with Mr. Seery's trading activities on

13    behalf of the CLOs, correct?

14    A    Correct.

15    Q    But in the absence of the TRO, in your view, whether you

16    tell Mr. Dondero not to interfere with Mr. Seery's trades

17    depends on the facts and circumstances that exist at the time,

18    right?

19    A    Correct.  From a -- yes.

20    Q    Okay.  And up until this point, there have been no facts

21    and circumstances that have caused you to tell Mr. Dondero not

22    to interfere with Mr. Seery's trades on behalf of the CLOs,

23    correct?

24    A    He can't because of the TRO.

25    Q    Correct.  But if the TRO wasn't in place, it's possible

Post - Direct                                    145

1    that you wouldn't take any steps to stop Mr. Dondero from

2    impeding Mr. Seery's trades; isn't that right?

3    A    I mean, if Mr. Dondero or other investment professionals

4    have a view, that they should be -- they should have a right

5    to be heard as preference shareholders of the CLOs.

6    Q    Okay.  But if the TRO wasn't in place, you wouldn't act to

7    stop Mr. Dondero from interfering or impeding the Debtor's

8    trades on behalf of the CLO; isn't that right?

9    A    He would -- if he would be permitted to talk to Mr. Seery.

10   Q    Okay.  Prior to the imposition of the TRO, you took no

11   steps to stop Mr. Dondero from interfering with Mr. Seery's

12   trades, correct?

13   A    Correct.

14   Q    And if the TRO wasn't in place, it's possible you wouldn't

15   take any steps to stop Mr. Dondero from impeding -- impeding

16   Mr. Seery's trades again; isn't that right?

17   A    If there's an investment rationale as to why they feel the

18   trades shouldn't be done, I -- again, I feel like Mr. Dondero

19   or the other investment professionals should be able to raise

20   those points with Mr. Seery.

21   Q    Do you think they should be able to stop the trades?

22   A    I -- I -- I think they should be able to question the

23   trades.  But flat-out stop them, I'd probably say no.

24   Q    Then why didn't you do anything before the TRO was

25   entered?

Post - Direct                                      146

 1  A    Um, I'm sorry, can you repeat the -- do anything in -- in
 2  what manner?
 3  Q    Why didn't you take any steps before the TRO was entered
 4  to stop Mr. Dondero from interfering and stopping and impeding
 5  the Debtor's trades?
 6  A    I think, as I recall, there was only one -- one set of
 7  trades in question that he stepped in on.
 8  Q    So, one is okay?  How about two?
 9  A    Or, sorry.  There were two trades on one day that -- that,
10  you know, he questioned.  Or stepped in on.  I don't -- I
11  don't recall him stopping any other trades thereafter.
12  Q    That's all you know about, right?
13  A    Correct.
14  Q    And with that knowledge, it never occurred to you to tell
15  Mr. Dondero to knock it off, did it?
16  A    He believed the trades weren't in the best interest for
17  the investors, so I did not.
18  Q    And that's what you mean by deferring to him; isn't that
19  right?
20  A    From the investment perspective, yes.
21  Q    Thank you for your -- thank you for your honesty.  As the
22  CCO, you have never communicated with the Issuers about the
23  Debtor's performance under the CLO management agreements;
24  isn't that right?
25  A    Correct.

Post - Direct                                    147

1   Q    And that's because you didn't believe it was in your

2   responsibility as the CCO to check with the Issuers to see if

3   the Issuers believed that the Debtor was in compliance with

4   the CLO management agreements, correct?

5   A    That communication would have involved counsel and that

6   communication didn't occur.  I wouldn't have reached out to

7   them directly.

8   Q    Yeah.  You didn't believe it was within your

9   responsibility as the chief compliance officer to communicate

10  with the Issuers to see if they had any views as to Mr.

11  Seery's performance as portfolio manager, correct?

12  A    Correct, because it would have involved me working with

13  counsel and there was never direction to do that.

14  Q    As the chief compliance officer of the Defendants, you

15  have no idea if anyone on behalf of the Advisors or the Funds

16  ever asked the Issuers whether they believed the Debtor was in

17  default under the CLO management agreements, correct?

18  A    Correct.

19  Q    As the CCO, you have no idea if anyone on behalf of the

20  Advisors or the Funds ever asked the Issuers whether they

21  believed was in breach under the CLO management agreements,

22  correct?

23  A    Correct.  I believe there was a call that I wasn't a part

24  of, that it was just involving lawyers, that I don't know what

25  was discussed on the call.  So, correct.

1  Q    As the CCO, you have no idea if anyone on behalf of the

2  Advisors or Funds ever asked the Issuers whether they believed

3  it was appropriate to try to take steps to terminate the CLO

4  management agreements; isn't that right?

5  A    Correct.

6  Q    None of the Issuers joined any of the letters that were

7  sent on behalf of the Funds and the Advisors, right?

8  A    I didn't -- I don't recall seeing their names listed.

9  Q    As the CCO, you don't have any understanding as to what

10  the standard is for terminating the CLO management agreements

11  unless you get legal advice; isn't that right?

12  A    Yes.  It was -- it would be a discussion with counsel,

13  given the complexity of the agreements.

14  Q    But as a factual matter, you're not aware of any facts

15  that would support the termination of the CLO management

16  agreements except that there were trades that Mr. Dondero

17  didn't think were in the best interests of the Funds; isn't

18  that right?

19  A    Yes.  And because the belief was those trades weren't

20  maximizing value for the preference shareholders.

21        MR. MORRIS:  I move to strike everything after the

22  word yes, Your Honor.

23        THE COURT:  Granted.

24        MR. MORRIS:  I have no further questions.

25        THE COURT:  All right.  Mr. Rukavina?

Post - Direct                                    149

1           MR. RUKAVINA:  Your Honor, I'll reserve my questions

2    for my case in chief.

3           THE COURT:  All right.  Mr. Post, that concludes your

4    testimony for now.  Stick around.

5       Mr. Morris?

6           MR. MORRIS:  Your Honor, last witness, and I hope

7    it's rather brief, actually.  The Debtor calls James Seery.

8           MR. RUKAVINA:  Your Honor, may we have a brief

9    restroom break, all of us in this room, before we start the

10   next witness?

11          THE COURT:  All right.  We'll take a five-minute

12   restroom break.  I know part of the long day is because of my

13   commitment at the lunch hour, but you all did estimate three

14   or four hours for this hearing, right?  That's what I recall.

15          MR. MORRIS:  We did.

16          MR. RUKAVINA:  Your Honor, I was never consulted on a

17   time estimate.  I had no idea that someone said three to four

18   hours.

19          THE COURT:  All right.

20          MR. MORRIS:  And part -- part of that is my fault and

21   the technological problems we had this morning, so I take

22   responsibility for that, Your Honor, and I sincerely

23   apologize.

24          THE COURT:  Okay.  Well, just so you know, we cannot

25   come back tomorrow.  I've got two -- too booked today tomorrow

150

 1 | to come back, so --

 2 |         MR. MORRIS:  I don't expect Mr. Seery to be more than

 3 | about 15 minutes.

 4 |         THE COURT:  Okay.  We'll take a five-minute break.

 5 |         THE CLERK:  All rise.

 6 |     (A recess ensued from 3:22 p.m. until 3:32 p.m.)

 7 |         THE CLERK:  All rise.

 8 |         THE COURT:  All right.  Please be seated.  I wanted

 9 | to clarify one thing I said, just so no one is confused.  I

10 | know that originally you had today, Wednesday, and Thursday,

11 | 26th, 27th, and 28th, for confirmation.  So if anyone thought,

12 | oh, we're coming back tomorrow on this if we don't finish,

13 | because originally you had all three of those days, you know,

14 | as soon as we continued the confirmation hearing, we started

15 | filling in Wednesday.  So we have three different Chapter 11

16 | case matters set tomorrow.  And so it was, you know, you give

17 | up time and we have people usually wanting to get that time,

18 | so that's what happened.

19 |     But anyway, people, we'll talk fast and we'll get it done

20 | today, right?

21 |         MR. RUKAVINA:  Your Honor, my -- Your Honor?  Oh,

22 | wait.  I need to --

23 |         THE COURT:  Ooh, it sounds like you're in a cave.

24 | Let's get those headphones on.

25 |         MR. MORRIS:  I promise to be as quick as I can, Your

151

1    Honor.

2              THE COURT:  Okay.  Mr. Rukavina, were you trying to

3    say something?

4              MR. RUKAVINA:  I was, Your Honor.  Can you hear me?

5              THE COURT:  Yes.

6              MR. RUKAVINA:  This darn video.  Too many -- Your

7    Honor, we have an agreed TRO that goes through February the

8    15th.  And I'm certainly not suggesting taking any more of the

9    Court's time than is necessary, but I cannot commit to

10   finishing today, especially because Mr. Morris has taken so

11   much time.  So I think we will do our best, but I just want

12   the Court to know that there's no urgency to this, and if we

13   have to come back at some point after Tuesday or Wednesday,

14   there's no possible harm to the Debtor.

15             MR. MORRIS:  Your Honor, it's my hope that we can get

16   this done, and I think the sooner we begin the better.

17             THE COURT:  Okay.  Well, we're going to try to get it

18   done.  All right, Mr. Seery.  You've called Mr. Seery to the

19   stand now?

20             MR. MORRIS:  Yes, Your Honor.  The Debtor calls James

21   Seery.

22             THE COURT:  All right.  Mr. Seery, please raise your

23   right hand.

24               JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

25             THE COURT:  All right.  Thank you.

Seery - Direct                                    152

 1          MR. MORRIS:  May I proceed?

 2          THE COURT:  You may.

 3          MR. MORRIS:  Thank you, Your Honor.

 4                    DIRECT EXAMINATION

 5   BY MR. MORRIS:

 6   Q    Good afternoon, Mr. Seery.  Can you hear me okay?

 7   A    I can, yes.

 8   Q    Okay.  Let's just cut to the chase here.  You're the CEO

 9   of the Debtor; is that right?

10   A    That's correct.

11   Q    And in that capacity, do you understand that the Debtor is

12   party to contracts pursuant to which it manages certain CLO

13   assets?

14   A    Yes.

15   Q    And are you personally involved in the management of those

16   assets?

17   A    Yes.

18   Q    Do you have any prior experience managing other people's

19   money or other people's assets?

20   A    Yes.

21   Q    Can you please explain to the Court your experience and

22   your knowledge as to investing other people's money?

23   A    Yes.  I was a finance lawyer -- I'll go quickly, if it's

24   okay.  I can fill in later, if you like.  I was a finance and

25   bankruptcy lawyer for ten years before I went to Lehman on the

Seery - Direct                                153

1   business side in 1999.

2       In that role, I started immediately in distressed

3   investing.  I worked as part of a team of analysts and traders

4   to build distressed positions in prop (phonetic) business,

5   trading Lehman Brothers balance sheet at the time.  This was

6   in 1999 and 2000.  We were one of the most significant

7   investors on the Street, and I was part of that team, and a

8   leading part of the team, putting on significant investments

9   of our balance sheet, which was Lehman's money, into different

10  kinds of stressed, distressed, high yield investments.  That

11  included bonds, that included loans, unsecured, subordinated.

12  Sometimes equity.  Typically, we stayed in credit, but a lot

13  of this was very distressed credit, which often ended up as

14  reorg equity.

15      After that, I began running different teams for making

16  distressed loans to companies that no one else would lend

17  money to.  These investments were significant, anywhere from

18  fifty to a billion dollars.  Some of the largest transactions

19  in the world at the time were transactions I ran, like a

20  rescue loan to PG&E for a billion dollars.  That was in 2000.

21      After that, I continued to grow my career there, running

22  distressed investments.  In 2005, I took over the loan

23  business at Lehman.  That included all high-grade loans, high-

24  yield loans, trading and sales of those loans; managing that

25  portfolio, which was in excess of $10 or $20 billion,

Seery - Direct                          154

 1   depending on the time; exposure both in committed transactions

 2   as well as funded loans; the hedging of that portfolio;

 3   traders and salespeople working for me.  In addition, I had

 4   significant responsibility for the distressed book, as well as

 5   all restructuring business at Lehman.

 6       After Lehman, I -- and I was one of the people who sold

 7   Lehman -- I became a senior investing partner at RiverBirch

 8   Capital.  We were about a billion and a half dollar long/short

 9   investor, mostly stressed and distressed, but a lot of high-

10   grade trades as well, particularly in preferred stocks.  That

11   was a global business, but primarily U.S., Europe, some Asian

12   investments as well.

13       Since then, I've gotten to Highland.  I've been

14   responsible for Highland's investments.  After the first

15   quarter, when the performance managed by Mr. Dondero was

16   absolutely disastrous -- we lost about $80 million in equity

17   securities, positions that he managed, about $50 million in

18   the Select Equity Fund, and about $30 million in the -- in the

19   Highland internal account.  After Jefferies seized the Select

20   account, I took over the --

21           A VOICE:  I think Mr. Seery has sort of gone beyond

22   the question of his background.

23           THE WITNESS:  He's asked me if I was experienced in

24   investing other people's money.  I was giving that background.

25   But we -- I can stop or I can keep going, if you like.

Seery - Direct                              155

1            THE COURT:  Okay.  If that was an objection, --

2            MR. MORRIS:  Let's --

3            THE COURT:  -- I overrule it.  Go ahead.

4            THE WITNESS:  I've been managing that portfolio.  In

5    addition, after Mr. Dondero left, but I actually started

6    looking at it before that, started taking over the CLO

7    portfolio, or taking a look at it, frankly.  We have a -- we

8    have an experienced professional sitting on top of it, Hunter

9    Covitz, who manages the day-to-day exposure.  But those

10   portfolios -- we call them CLOs, Your Honor, but I think

11   you've heard testimony before, they're not really.  Acis 7 is

12   a CLO.  The 1.0 CLOs are very old investment vehicles that are

13   primarily structured as, right now, closed-end investment

14   funds.  They don't have the typical diverse portfolio of loans

15   that a CLO has.  They have mostly reorg equity or positions in

16   real estate and in MGM.  So the -- the securities we've been

17   talking about in these trades are publicly-traded liquid

18   securities that Highland took as post-reorganization equity.

19   Q    Thank you, Mr. Seery.  Let's cut to the chase on the AVYA

20   and the SKY.  Nobody seems to have asked you this question,

21   but did you -- have you looked to sell AVYA and SKY securities

22   since the time that Mr. Dondero left in October?

23   A    I have, yes.

24   Q    Can you please explain to the Court your investment

25   rationale, the reason why you wanted to sell -- let's just

Seery - Direct                          156

1  take them one at a time.  Let's start with AVYA.  In the last

2  couple of months, why have you wanted to sell AVYA?

3  A    Well, the original impetus to sell AVYA came from Mr.

4  Covitz when it started moving up as a post-reorg security in

5  the communications space that had -- had really performed

6  extremely poorly post its Chapter 11.  Mr. Covitz over the

7  summer felt we should start lightening up on that position.  I

8  agreed.  He did that.  And Mr. Dondero eventually cut him off.

9      As it got to the fall, what I did was I got Mr. Covitz, as

10 well as then the analyst -- the analyst on that is Kunal

11 Sachdev.  That's the Highland analyst on the position -- as

12 well as Joe Sowin and Matthew Gray, who's another senior

13 analyst.  And I looked at all of the equity positions in the

14 CLOs and wondered why we had them.  What was the view?  Were

15 they worth keeping?

16     Primarily, the ones we looked at were four of the post-

17 reorg equities that were liquid.  A company called Vistra, a

18 company called Arch Coal.  Vistra is the old TXU, a well-known

19 bankruptcy.  Arch Coal, another well-known bankruptcy.  Avaya,

20 a bankruptcy; and Sky Champion, a less -- less-known

21 bankruptcy but came out of there.

22     Mr. Gray is the analyst on Vistra and Arch.  We

23 determined, based upon his recommendations, not to sell those.

24 Mr. Sachdev was the analyst on Avaya, and he believed that it

25 had reached its peak, and even though it could continue to go

Seery - Direct                                157

1    up or down -- stocks often do that -- he did not think that

2    the value was there.  His recommendation was to sell.

3        Mr. Sowin was in those meetings.  Prior testimony to the

4    contrary or any statements that were said before are

5    completely false, they're completely made up, so I know it's

6    frustrating and I apologize for -- for being frustrated.

7        So we decided that we would sell the Sky Champion.  A

8    pretty simple answer.  Highland didn't have an analyst.

9    Literally didn't have an analyst.  Nobody had a view as to

10   what the stock was.  It just sat in there, in two CLOs,

11   without anybody paying any attention to it.

12       I had Matthew Gray take a look.  He felt that it was at

13   fair value.  I did my own work on it, felt it was at fair

14   value, notwithstanding some good tailwinds in -- secular

15   tailwinds in the home building space, and determined that that

16   CLO should sell those securities.

17   Q    Thank you, sir.  Prior to his departure at Highland, did

18   Mr. Dondero have responsibility over the management of any of

19   the CLO assets?

20   A    He did, yes.

21   Q    And do you understand, do you know whether Mr. Dondero

22   sold AVYA securities on behalf of the CLOs and on behalf of

23   the Funds during the time that he was employed as the

24   portfolio manager from January until October 2020?

25   A    I do.  And he did sell those securities.  The chart you

Seery - Direct                                  158

1   put up, based upon our business record, is accurate, and he

2   engaged in significant sales of those securities throughout

3   the year.

4   Q    Okay.

5         MR. MORRIS:  Can we please put upon Demonstrative #1?

6   BY MR. MORRIS:

7   Q    Okay.  And can you just explain to the Court what this

8   document is?

9   A    It's a trade report, one of Highland's -- this shows the

10  whole platform, so it's the aggregate sales.  The name of the

11  email -- I apologize, I forgot the system; it just left my

12  mind.  But the email you saw before is anybody on the platform

13  used for various trades if they're part of a trading group.

14  And that's to make sure that, across the portfolio, in its

15  corporate platform, you aren't running into either compliance

16  problems or allocation problems that could lead to a

17  compliance problem.

18  Q    So this shows sales of Avaya on these particular dates.

19  The trade is -- the trade symbol is AVYA.  This is a liquid

20  security.  Trades in, you know, liquid equity markets.  I

21  believe its average trading volume is somewhere about a

22  million and a half a day, approximately.  So you have a trade

23  date.  You have the type of transaction.  It could be a buy or

24  a sell.  These are all sales.  The quantity.  And then the

25  price.  And then it would have the Fund, and then the

Seery - Direct                                   159

1   aggregate dollars, which is simply multiplying the price times

2   the quantity.

3   Q   And if we just scroll down to the end of the document,

4   October 9th, is that around the time that Mr. Dondero left

5   Highland?

6   A   Right around that time.  This was coming into a number of

7   hearings that we thought it was most important to have Mr.

8   Dondero depart, particularly in light of some of the positions

9   that he and his companies were taking vis-à-vis the Debtor.

10          MR. MORRIS:  Can we put up Demonstrative Exhibit #2,

11   please?

12   BY MR. MORRIS:

13   Q   Can you explain to the Court what this is?

14   A   Uh, --

15          MR. MORRIS:  And again, just for -- just for the

16   record -- sorry to interrupt, Mr. Seery -- the backup for this

17   information can be found at Debtor's Exhibits BBBBB to SSSSS

18   BY MR. MORRIS:

19   Q   Go ahead, sir.  Could you explain to the Court what this

20   is?

21   A   Yeah.  This is just a pretty straightforward chart showing

22   the bars being sales and the lines being the -- the closing

23   sale price of a buy on that day.  And so you can see, you

24   know, with the market fallout in the early part of the year,

25   AVYA hit a low, but like most of the securities in the market,

1   it has come back very strongly.  And you see Mr. Dondero's

2   trades earlier in the year, the rest of it during the middle

3   part of the year, sales in the third quarter, and then, when

4   he's gone, I began selling in November and December.

5   Q    Now, so is it fair to say that Mr. Dondero and the

6   Defendants didn't completely impede and stop the Debtor from

7   selling AVYA shares?

8   A    That's fair.  What -- there's a little bit of confusion.

9   The way the trading desk worked previously is that you have

10  these separate companies but they're not really separate

11  companies.  HCFMA is populated by about seven employees.  Many

12  of them have functions across a number of different companies.

13  HCFMA exists solely because Highland funds it.  They haven't

14  paid fees of about three million bucks this year.  They owe

15  $10 million related to a disastrous bailout of what was an

16  open-end fund called Global Al a couple years ago where the

17  SEC, you know, came in and took significant action, almost

18  shut significant parts of Highland down.  And these traders do

19  the trading of all the equities across the platform.

20       So I typically would call them, and this is how we worked

21  in the spring when I took over the internal account after the

22  seizure by Jefferies of Mr. Dondero's management of the Select

23  Equity account.  I would work with Joe Sowin as the trader,

24  make decisions on what we wanted to do for the day, he would

25  execute those trades by going out in the market with a broker,

Seery - Direct                           161

1    selling them to -- to the dealer on the other side, run it

2    through our automated system, and then the trades get closed

3    with the back office.

4        So there's the trade, which is your agreement to buy or

5    sell at a particular dollar price.  That gets inputted into

6    the OMS system, and then from there it's the back office takes

7    over, and then ultimately securities are delivered versus

8    payment to the counterparty.

9    Q    Okay.  And can you just describe, you know, in one or two

10   sentences, your interpretation of this chart and how your

11   sales and the green bars compare to Mr. Dondero's sales and

12   the brown bars?

13   A    Well, the two simple obvious answers are, one, they're

14   smaller, and two, they're at higher prices.

15   Q    Okay.  You also traded, since Mr. Dondero's departure,

16   securities known as SKY; is that right?

17   A    That's correct.  It's Sky Champion Corp.  The ticker is

18   SKY.

19   Q    And did Mr. -- to the best of your knowledge, Dr. Mr.

20   Dondero trade in SKY securities prior to his departure?

21   A    I don't believe so.  As I said earlier, we didn't appear

22   to have an analyst on that for some time.  I don't even know

23   how far back it goes.  It was a bit of an orphan security

24   sitting in the portfolio.  It's only -- it was only in two of

25   the CLOs.

Seery - Direct                                    162

1    Q    Okay.

2              MR. MORRIS:  Can we please put up Demonstrative #3,

3    please?  Okay.

4    BY MR. MORRIS:

5    Q    And can you just explain to the judge what's depicted on

6    this page?

7    A    Again, similar to the last chart, you have the dollar

8    price of the security at the close each day, throughout the

9    year, and then the green bar showing where we began to sell

10   securities for those CLOs.

11   Q    And so, again, is it fair to say that Mr. Dondero and the

12   Defendants haven't completely stopped the Debtor from engaging

13   in SKY transactions?

14   A    That's correct.  What we did was the so-called workaround

15   previously mentioned, was that we decided that I would have to

16   do the trading directly.  So I'd literally look at the stock

17   each day, talk to the broker at Jefferies, determine what

18   level to sell at, communicate with him throughout the day,

19   work through transactions.  Then he reports in whether he's

20   been able to sell and execute on our behalf.  When he's done

21   that, then we have the back office manually enter the trades,

22   as opposed to doing it from the automated trading desk, and

23   then have those trades close.  So, so far, knock on wood, we

24   haven't failed on any trades.

25   Q    Okay.

Seery - Direct                                           163

 1            MR. MORRIS:  We can the demonstrative down, please.
 2    BY MR. MORRIS:
 3    Q    Just two more topics here, sir.  Can we talk briefly about
 4    what efforts, if any, the Debtors have made to avoid this
 5    litigation?  I'll just ask them one at a time.  Has the Debtor
 6    made any attempt to transfer the CLO management agreements to
 7    the Defendants or to others?
 8    A    Well, our original construct of our plan was to do that.
 9    We've since determined, when we tried to do that, we got
10    virtually no response from the Dondero interests.  The
11    structure of the original thought of the plan was if we didn't
12    get a grand bargain we would effectively transition a
13    significant part of the business to Dondero entities, they
14    would assume employee responsibilities and the operations, and
15    then assure that the third-party funds were not impacted.
16        As I think I testified on the -- I can't recall if it was
17    the deposition or my prior testimony in court -- Mr. Dondero,
18    true to his word, told me that would be very difficult, he
19    would not agree, and he has made that very difficult.
20        So we examined it.  We've determined that we're going to
21    maintain the CLOs and assume them.  But we originally tried to
22    contemplate a way to assign those management agreements.
23    We've had --
24    Q    All right.
25    A    -- significant discussions with the CLO Issuers, and

Seery - Direct                          164

1   they're supportive of us retaining them.

2   Q    Okay.  You were on the -- you've been participating or

3   listening in to the hearing throughout the day; is that right?

4   A    I have, yes.  I apologize.  I didn't leave the screen on

5   because I didn't want to suck up bandwidth.

6   Q    Are you familiar with all of the K&L Gates letters that

7   that were reviewed today?

8   A    I am, yes.

9   Q    Did the Debtor request that the Defendants withdraw those

10  letters?

11  A    Yes, we did.

12  Q    Had the Defendants withdrawn those letters, might that

13  have avoided this whole litigation?

14  A    I think it would have.  What we wanted to have here is a

15  withdrawal of the letters and an agreement by the clients for

16  the -- the K&L Gates clients that they wouldn't interfere with

17  the operations of the Debtor and our drive towards a plan.

18  They could take their legal positions and object to the plan,

19  if they like, but interfering on a day-to-day basis was

20  unacceptable to us in terms of trying to operate this business

21  in the most efficient manner.

22       We specifically requested that they do that.  This is, I

23  don't think, lost on anybody, certainly not on me in my

24  experience here for years:  These entities are all dominated

25  and controlled by Mr. Dondero, and each of these attacks is

Seery - Direct                                          165

1    specifically coordinated for the purpose of diverting the

2    Debtor, causing confusion, and forcing us to spend estate

3    resources.

4    Q    Do you know if the Debtor also asked the Defendants to

5    avoid this whole injunction proceeding by simply filing their

6    motion to lift the stay and see if they could actually win a

7    motion to terminate the contract?

8    A    Well, what we did was we contemplated the best, most

9    efficient way out, and it was either withdrawing the

10   agreement; if they didn't agree, then we'd said you should

11   file your stay motion immediately and let's have this

12   determined.  We told them, short of that, if they weren't

13   willing to do that, then we would have to put this in front of

14   the Court to try to make sure that we could operate the

15   business.

16   Q    All right.  So, just to summarize, you attempted to sell

17   the CLO management agreements, but were unable to do so; is

18   that right?

19   A    I would say assign.  We would have looked for a payment,

20   there is a cure payment that we have to make, but we didn't

21   we didn't conduct an auction for the CLO assets.

22   Q    And to the best of your knowledge, the Defendants never

23   withdrew the letters; is that right?

24   A    They did not.

25   Q    And to the best of your knowledge, the Debtors -- the

Seery - Direct                                    166

1    Defendants never brought their contemplated lift stay motion,

2    right?

3    A    They have not, no.

4    Q    And so why did the Debtor bring this action?

5    A    Well, quite clearly, to try to prevent the managers and

6    Mr. Dondero and the Funds from interfering with the way that

7    we operate the business.  We intend to continue to manage the

8    CLOs, we intend to assume those contracts, we intend to manage

9    them post-confirmation, after exit from bankruptcy.  And

10   causing confusion among the employees, preventing the Debtor

11   from consummating trades in the ordinary course, deferring

12   those transactions, we thought put the estate at significant

13   risk, in addition to the cost.

14   Q    Did you hear Mr. Rukavina in the opening suggest that

15   these might, in fact, be money-losing contracts?

16   A    I did, yes.

17   Q    Why would the Debtor want to assume money-losing

18   contracts?

19   A    They're not money losing contracts.

20   Q    And why, why do you say that?

21   A    They generate fee income.  So the fees on each of these

22   CLOs get paid to the Debtor.  Now, not all of these CLOs, as I

23   mentioned earlier, are -- none of them are ordinary CLOs,

24   other than Acis 7.  But not all -- because they don't all have

25   liquid assets that are able to pay their fees each quarter,

Seery - Direct                                    167

1    some are deferred.  There are some CLOs that will probably

2    never pay any deferred fee because they are underwater.  Those

3    are not CLOs that Mr. Dondero or the Funds own any of.  That's

4    not really a surprise.  But we will continue to manage those

5    and look for ways to exit for those investors who are

6    noteholders who are underwater in those CLOs.

7    Q    Okay.  Can you describe for the Court the Debtor's

8    contentions as to how the conduct that has been adduced

9    through today's evidence, how is the Debtor harmed by Mr.

10   Dondero's interference in the trades and the sending of these

11   letters?

12   A    I think it's clear in terms of operational risk.  Being

13   forced to construct a workaround to consummate trades that we

14   think are in the best interest of the Funds.

15        It's telling not only that neither Mr. Dondero nor Mr.

16   Sowin nor -- Mr. Sowin was on the calls and agreed to the

17   analyst view, by the way -- nor anybody from MHF ever asked me

18   a question, their lawyers in the deposition never asked me why

19   we were selling these securities.  They simply want to get in

20   the way, cause additional risk to the estate, and cause

21   additional exposure with respect to legal fees, divert our

22   attention from trying to consummate the case.  I think that's,

23   in my opinion, that's pretty clear.

24   Q    Is there any concern on the part of the Debtor that

25   that Mr. Dondero's emails and conduct is creating uncertainty

Seery - Direct                                    168

1   among the staff as to who's in charge?

2   A    I think they did initially, and if they continued, they

3   would.  Right now, the workaround is working pretty well.  We

4   still do keep Mr. Sowin on the emails to make sure that, you

5   know, from a compliance perspective, that our sales, he knows

6   about; that we're not stepping on each other's markets, if you

7   will; that we're not getting in the way that -- in the way if

8   he wants to sell assets from a different MHF other managed

9   asset holding, but we do have a workaround that works right

10  now.

11      I think the biggest risk is, because it's much more

12  manual, you have risk of so-called fat-finger trades, where

13  you think you're selling a thousand and you sell 10,000, you

14  think you're executing a sale and you're executing a buy, you

15  think you're executing from an account that has the securities

16  and end up selling short from an account that doesn't.  So

17  we've got to be very careful of that, but the team is doing

18  that now.  There certainly was confusion at the start.

19  Q    And can you just explain to the Court your view as to how

20  the Debtor is able to -- how the Debtor will be able to

21  service the contract on a go-forward basis?

22  A    The CLO contracts?

23  Q    Yes.

24  A    We'll have a team of folks able to manage these assets

25  with professionals that are experienced credit analysts,

Seery - Direct                                         169

1   equity analysts.  I think we'll be able to manage this --

2   these assets in a pretty straightforward manner.  It's not

3   going to be very difficult.

4   Q    Has the Debtor been harmed through the diversion of your

5   personal attention as CEO in responding to all of this?

6   A    I like to think that I can juggle a lot of different

7   things.  I would prefer not to have to be looking at the

8   securities levels each day and feeding out securities that we

9   determine to sell through the broker at Jefferies, who,

10  notwithstanding, is doing a great job.  It's the job of the

11  trader to actually do that and day-to-day -- throughout the

12  day monitor the markets and look for the best place to sell.

13       So do I think I'm getting the best execution?  I think the

14  trader at Jefferies is excellent.  Do I think if a trader on

15  the Highland side was involved every step of the way, I think

16  it would be better.

17  Q    Have the Debtor's professionals' attention and resources

18  been diverted to deal with all of this stuff?

19  A    That -- I think that's -- that's quite clear as well.

20  It's a significant expense.

21  Q    Okay.

22            MR. MORRIS:  Your Honor, I have no further questions

23  of this witness.

24            THE COURT:  All right.  Mr. Rukavina?

25            MR. HOGEWOOD:  Your Honor, if you please, Lee

Seery - Cross                                    170

 1  Hogewood from North Carolina.  You've admitted me *pro hac*
 2  *vice*.  If I may do cross-examination, I would appreciate it.
 3          THE COURT:  All right.  Go ahead.
 4          MR. HOGEWOOD:  Thank you, Your Honor.
 5                     CROSS-EXAMINATION
 6  BY MR. HOGEWOOD:
 7  Q   Mr. Seery, let me ask you about the letters that came from
 8  our firm, and especially from me, beginning on December 22nd.
 9  I think you spoke about those generally.  If you need them to
10  be called up, I think my questions will be crisp as to the
11  letters generally, but we could certainly look at them
12  specifically, if need be.
13      There was initially a letter dated December 22nd, 2020,
14  that's Debtor's Exhibit DDDD, at Docket 39.  I take it you've
15  read that letter?
16  A   I have, yes.
17  Q   And it's fair to say that was a request you had seen
18  before?
19  A   I don't think that's fair to say, no.
20  Q   You had not seen a request to discontinue trades until the
21  confirmation hearing?
22  A   I don't believe so, no.
23  Q   Okay.  So that, that was the first time a request had been
24  made not to trade in the CLO securities prior to confirmation?
25          MR. MORRIS:  Objection to the form of the question.

Seery - Cross                                  171

1              THE COURT:  Overruled.

2              THE WITNESS:  I --

3              THE COURT:  Go ahead.  You can answer.

4              THE WITNESS:  I don't recall you sending me a letter

5      before that, but I -- if you have, then I apologize.  I

6      thought I was pretty familiar with them, but I don't recall

7      you sending me that request previously.

8      BY MR. HOGEWOOD:

9      Q    Okay.  I'm sorry.  That was the first request you had

10     received from me, is that -- that's correct?

11     A    Yes.

12     Q    But there had been prior requests of a similar nature?

13     A    Not to my recollection.  Is there a letter?

14     Q    All right.  Well, let me -- let me move on.  You

15     weren't intimidated by my letter, were you?

16     A    Was I intimidated by your letter?  No, I was not

17     intimidated.

18     Q    And it didn't cause -- the letter itself did not cause you

19     or the Debtor to alter your investment strategy?

20     A    It did not, no.

21     Q    And it did not cause you or the Debtor to refrain from

22     operating the company in the manner that you perceived to be

23     in its best interest?

24     A    It did not.

25     Q    It did not cause you to change any of your trading

Seery - Cross                                    172

1   decisions?

2   A    No.

3   Q    You and your counsel responded -- or, your counsel

4   responded to the letter a couple of days later; isn't that

5   correct?

6   A    Yes.

7   Q    And the response rejected the request that had been made

8   and demanded that the letter be withdrawn; is that right?

9   A    Yes.

10  Q    So the range of communication is a set of lawyers

11  representing adverse parties asserting their respective

12  positions?  Is that a fair characterization of that set of

13  communications?

14  A    No.

15  Q    Okay.  Would you characterize it differently?

16  A    Yes.

17  Q    All right.  How so?

18  A    I believe you sent a letter with no good-faith basis,

19  knowing what the contracts say as an experienced lawyer,

20  knowing there was not cause, yet still making the same

21  threats, basically couching them as a request.  But I don't

22  think there was any good-faith exchange of ideas.  No one even

23  asked me why I was making the trades.  I think you were aware

24  of that.

25  Q    You -- but you testified that, nonetheless, the letter did

Seery - Cross                          173

1   not cause you to conduct yourself in any other manner than you

2   would have conducted had you not received the letter; isn't

3   that right?

4   A    That's correct.

5   Q    So I think there's some confusion, then, and I just want

6   to clear this up.  There was earlier testimony, both at your

7   deposition, that -- that my clients actually interfered with

8   and caused trades not to occur on or around December 22nd and

9   23rd of 2020.  And that's not correct.

10          MR. MORRIS:  Objection.  Your Honor, the evidence is

11  in the record.

12          MR. HOGEWOOD:  Okay.  Well, let me --

13          THE COURT:  All right.  You're going to have to

14  rephrase.

15  BY MR. HOGEWOOD:

16  Q    Yeah.  Let me -- let me say it differently.  Focusing

17  solely on December of 2020, every trade that you initiated

18  closed; isn't that correct?

19  A    Every trade.  Yes.  We did not fail one trade.

20  Q    Okay.  And so the issue that you have raised in your

21  pleading is that there were -- there was an expectation that

22  employees of my clients would book trades, which is

23  essentially a backroom operation, after the trade has closed.

24  Isn't that right?

25  A    That's incorrect.

Seery - Cross                               174

1    Q    Okay.  So, once again, let me just get -- there were no

2    trades that you initiated that failed to close; is that right?

3    A    That's correct.

4    Q    And nothing that was done by the Defendants resulted in a

5    trade that you wished to make in December of 2020 to fail to

6    occur or fail to close; isn't that right?

7    A    That incorrect.

8    Q    So you initiated a trade that did not close?

9    A    Yes.

10   Q    In December of 2020?  And when was that?

11   A    I believe that's the case, yes.

12   Q    And specifically what trade did not close that you

13   initiated?

14   A    I'd have to check the notes, but the specific trades were

15   my attempt to initiate the trade with the desk.  Then the

16   trading desk goes into the market and makes the sale.  Once

17   it's inputted into the order management system, referred to as

18   an OMS, then it gets processed for closing.  In November and

19   in December, Mr. Dondero instructed those employees not to

20   initiate those trades.  So there was never an agreement.  When

21   I initiated a trade, which was the workaround you saw referred

22   to, I quite simply called Jefferies directly and I had the

23   back-office folks manually input it instead of the trading

24   desk.

25        Sorry.  I just wanted to make sure we cleared that up.

Seery - Cross                                    175

1   Q    No, just -- that -- that's helpful to understand.  But I

2   think, focusing again solely on December, every trade you

3   initiated closed?

4   A    Every trade that I actually went and made in the market

5   closed.

6   Q    And indeed, if --

7             MR. HOGEWOOD:  I observed your demonstrative

8   exhibits, and if I could ask that the one related to the Avaya

9   trades be called up, Mr. Morris.  is that possible?

10            MR. MORRIS:  Yeah, sure.  Is that the first one with

11  Mr. Dondero's trades, or do you want the chart?

12            MR. HOGEWOOD:  The -- the -- I think it was your

13  Demonstrative #2 that showed the timeline of the trades.

14            MR. MORRIS:  Yeah.  You bet.

15       (Pause.)

16            MR. HOGEWOOD:  Thank you.  Thank you very much.

17  BY MR. HOGEWOOD:

18  Q    So, just so I understand this document, the bottom axis is

19  the passage of time, and when we get into the period between

20  November of 2020 and the end of 2020, 12/31/2020, there are --

21  there's a green bar that has the numbers 50,000 at the top of

22  it.  That reflects what, Mr. Seery?  The number of shares or

23  the dollar amount of the trades?

24  A    Number of shares.

25  Q    And while this is not date-specific, do you know when

Seery - Cross                            176

1   those sets of $50,000 trades happened?  Or --

2   A    I don't --

3   Q    -- 50,000 shares trades happened?

4   A    I don't know the specific dates off the top of my head,

5   no.

6   Q    But looking at it just in comparison to the calendar, that

7   -- that's awfully close to December 22nd and 23rd, is it not?

8   A    It appears to be, yes.

9          MR. HOGEWOOD:  And Mr. Morris, if the I guess it's

10  the SKY document could be pulled up as well?  I just want to

11  be clear --

12         MR. MORRIS:  Demonstrative #3, please.

13         MR. HOGEWOOD:  Yes.  Thank you.

14  BY MR. HOGEWOOD:

15  Q    The  timeline on this demonstrative is similar, is it not?

16  A    Yes, it is.

17  Q    It's showing trades by day throughout the course of the

18  year?

19  A    That's correct.

20  Q    And again, there are a significant number of trades in SKY

21  on what looks awfully close to the few days before Christmas

22  of 2020; is that right?

23  A    That's correct.

24  Q    Okay.  And this is the period of time that we're talking

25  about there being interference by the Defendants' employees;

Seery - Cross                          177

1   is that right?

2   A    Yes.

3   Q    Okay.  I'll move on.  So, the next letter in question was

4   one that came the day after, on December 23rd.  Again, that

5   was a letter from me to your counsel.  Do you recall that

6   letter?

7   A    Yes.

8   Q    And the letter of the 23rd, if we need to look at it, is

9   the EEEE, Docket 39.  You read that letter as well?

10  A    Yes.

11  Q    And you disagreed with the position taken in the letter?

12  A    I'm trying to remember the specific position in that one.

13  Was that the one threatening to try to terminate the CLOs

14  without having checked whether there's cause?  I just don't

15  recall.

16  Q    Why don't we call it up, if we can?

17       MR. HOGEWOOD:  Mr. Morris, if you could help us,

18  because it's one of your exhibits, that would be great.  But

19  Ms. Mather has got it up, so that's great.

20  BY MR. HOGEWOOD:

21  Q    Mr. Seery, can you see the December 23rd letter?

22  A    I can, yes.

23  Q    And I think you referred to it as a threat to terminate

24  the portfolio management contracts?

25  A    I wasn't sure.  That's why I was just asking if this was

Seery - Cross                                    178

1   that one.  I don't -- I don't recall.

2   Q    Right.  And if you review the first page and the second

3   page, does that confirm your recollection that that is the one

4   related to portfolio management contracts?

5   A    I can't see the second page.  I believe it is.  I'm not

6   trying to --

7   Q    Yeah, no, --

8   A    If you represent, I'll accept it.

9   Q    Take your time.

10  A    (Pause.)  Yes.

11  Q    Okay.  And I think you already said this:  You strenuously

12  disagreed with the positions stated in the letter?

13  A    Yes.

14  Q    But again, you were not intimidated by the letter?

15  A    Intimidated?  No.

16  Q    The letter didn't cause you to change your investment

17  strategy?

18  A    No.

19  Q    It didn't cause you to trade or not trade in a particular

20  manner?

21  A    No.

22  Q    You continued to function the Debtor's operations as you

23  deemed appropriate?

24  A    Yes.

25  Q    To your knowledge, no CLO or Issuer has taken any steps to

Seery - Cross                                   179

 1  remove the Debtor as the portfolio manager?

 2  A    The CLO or the Issuers?

 3  Q    Yeah.  No one's -- no one's taken a position that you

 4  should -- that the Debtor should be removed as a portfolio

 5  manager?

 6  A    Not -- not from the Issuers, no.

 7  Q    And -- or, I'm sorry.  And so when you -- when you brought

 8  a distinction between the Issuer and the CLO, are you -- are

 9  you referring to CLO Holdco?

10  A    No.

11  Q    Okay.  Has a CLO taken steps to remove the Debtor as a

12  portfolio manager?

13  A    The CLO is the Issuer.

14  Q    Okay.

15  A    So the answer is no.

16  Q    Okay.  So no one has -- no one has acted to take any -- to

17  do anything as it relates to the removal of the Debtor as the

18  portfolio manager?

19        MR. MORRIS:  Objection to the form of the question.

20        THE COURT:  Overruled.

21        THE WITNESS:  I'm quite sure the CLO Issuers haven't,

22  as they agreed and we've been working with them on an

23  assumption.  With respect to what your clients have done, I

24  don't know.

25  BY MR. HOGEWOOD:

Seery - Cross                                  180

1   Q    But you don't have any evidence that my clients have taken

2   any action in violation of the automatic stay to -- to move or

3   encourage the removal of the Debtor as the portfolio manager,

4   do you?

5   A    Other than the letter?  No.

6   Q    Other than the letter between me and your counsel?

7   A    Correct.

8   Q    All right.  So, and that letter expressly states that any

9   of those actions that would be taken are subject to the

10  automatic stay and the Bankruptcy Code; is that right?

11  A    That's correct.

12  Q    And as we sit here today, the Debtor is not in breach of

13  any contract with any of the Issuers; is that right?

14  A    That's correct.

15  Q    And the letter didn't cause the Debtor to breach any

16  contract with any Issuer, did it?

17  A    Did not.

18  Q    And I think you've already testified today and you also

19  testified in deposition that you anticipate that the -- all of

20  the CLOs will consent to the assumption of the portfolio

21  management agreements in the context of confirmation; is that

22  right?

23  A    Yes.

24  Q    And the plan supplement that you recently filed, you

25  provide a mechanism by which the issue of for-cause

Seery - Cross                                181

1   termination is to be resolved, do you not?

2   A    I don't recall if there's a specific provision in the plan

3   supplement.  We certainly have, either in the plan or in the

4   plan supplement, a provision related to the gatekeeper

5   function.

6   Q    And that's similar to the settlement that you entered into

7   with CLO Holdco in terms of resolving both their objection to

8   confirmation and the lawsuit against them today; is that

9   right?

10  A    I believe it's similar.

11  Q    Okay.  And the gatekeeper is the Bankruptcy Court to

12  determine, short of a full-blown trial, that if cause exists,

13  isn't that correct, under the plan?

14  A    Among other functions, yes.

15  Q    So if the Court confirms the plan, then the concerns that

16  you have are resolved by the gatekeeper function that is the

17  subject of this motion; is that right?

18  A    I think it depends on the contents of the confirmation

19  order.

20  Q    And if the Court denies confirmation, then the stay

21  remains in effect and the letter related to the removal of the

22  portfolio manager was expressly subject to the stay; isn't

23  that right?

24  A    If the letter says it's subject to the stay?  It does say

25  that, but it says other false things as well, so I'm not sure

Seery - Cross                                    182

1   -- I don't know exactly what you're asking me there.

2   Q    All right.  It wasn't a very good question, frankly.

3        Your counsel responded to the December 23rd letter as well

4   and demanded a retraction; isn't that right?

5   A    Yes.

6   Q    And that was sort of a separate (audio gap) with counsel?

7   A    I'm sorry.  You broke up for a second there, sir.  I'm

8   sorry.

9   Q    I'm sorry.  That -- that' -- let's just skip that.  You

10  had testified that neither letter was withdrawn?

11  A    I believe that's correct, yes.

12  Q    Are you familiar -- and -- are you familiar with the fact

13  that, in the response letters, your counsel insisted that

14  there be a response and withdrawal by not later than, I

15  believe, 5:00 on December 28th?  Do you recall that?

16  A    I don't recall that specifically, but I accept your

17  representation.

18  Q    And do you know whether or not there was a response dated

19  December 28th?

20  A    I don't believe there was a written response.  I don't --

21  I don't recall.

22  Q    All right.

23       MR. HOGEWOOD:  Ms. Mather, can you call up

24  Defendant's Exhibit 84, which is at Docket 45, please?  Thank

25  you.

Seery - Cross                                    183

BY MR. HOGEWOOD:

Q    So, Mr. Seery, have you ever seen this letter dated
December 28?

A    I believe I have, yes.

Q    And this letter was not attached to the complaint nor your
declaration nor the request for a TRO or preliminary
injunction, was it?

A    If you say it wasn't.  I don't recall specifically.

Q    Okay.  So, you, by seeing this, you realize now there was
a response by the 28th.  Is that right?

A    Yes.

Q    And in the -- let me just direct your attention to the
final sentence of the first paragraph.  It says -- it makes
once again clear that the -- any efforts to remove the Debtor
as manager would be subject to applicable orders of the
pending bankruptcy case, provisions of the Bankruptcy Code,
and specifically, the automatic stay.  Do you see that?

A    I apologize.  I don't see it.  Which paragraph?

Q    I'm at the very last sentence of the first paragraph.
There's a sentence that --

A    (reading)  Subject to applicable orders in the pending
bankruptcy case, provisions of the Bankruptcy Code,
specifically, the automatic stay.

    I read that, yes.

Q    Yes.  Okay.  There was some testimony about the letter

Seery - Cross                                184

1   related to Mr. Dondero's eviction.  I don't intend to belabor
2   that.  But once again, that was a letter between counsel, was
3   it not?
4   A    I believe it -- I believe it was.  I don't recall
5   specifically now.  I assume -- I assume all of these were
6   directed to counsel.
7   Q    Right.  And again, the fact that counsel wrote a letter
8   requesting that the eviction not occur did not change your
9   process and you proceeded with the eviction, did you not?
10   A    I think the letter came after Mr. Dondero was no longer
11   permitted.  Eviction is an odd word.  He was no longer an
12   employee, so employee not being able to come into the office
13   and hang around and disrupt business isn't exactly an
14   eviction.  So I disagree with your characterization there.
15   Q    Okay.  Well, so I'll just leave that.  I mean, the --
16   since this exchange of letters, are you aware -- I mean, there
17   was some testimony about the Debtors presenting the Defendants
18   with the choice of either filing a motion for relief from stay
19   or this injunction proceeding would be brought.  Isn't that
20   right?
21   A    Yes.
22   Q    And no motion for relief from stay was filed, and
23   therefore this injection proceeding was brought.  Is that
24   correct?
25   A    Yes.

Seery - Cross                              185

1   Q    So the other thing that you know was filed by the

2   Defendants was an objection to confirmation, which was due on

3   January 5th of 2020, correct?

4   A    I'm sorry, Mr. Hogewood.  You broke up.  Did you say the

5   other paper or pleading that was filed?

6   Q    The pleading that was filed by the -- these who are

7   Defendants as well as other parties to this case was an

8   objection to confirmation, the deadline for which was January

9   5, 2020.  Are you familiar that an objection to confirmation

10  was filed?

11  A    I'm familiar that one was filed, yes.

12  Q    And so the objection to confirmation raised many of these

13  same issues regarding the circumstances under which the

14  various CLO agreements could be assumed; isn't that right?

15  A    I'm not aware of the specifics of the objection.

16  Q    Okay.  But nonetheless, my client was under no obligation

17  to initiate yet another motion or lawsuit or pleading against

18  the Debtor beyond objecting to confirmation, was it?

19  A    An obligation?  No.

20  Q    And since the objection to confirmation has been filed,

21  there have been a number of pleadings filed in the case.  We

22  obviously were required to respond to the motion for

23  preliminary injunction, and it says there's been an objection

24  filed to that.  Are you aware of that?

25  A    That -- that you objected to the preliminary injunction?

Seery - Cross                                    186

1    Q    Yes.

2    A    Yes, yes, I'm aware of that.

3    Q    And --

4    A    I'm very aware.

5    Q    And you're aware that there was a proposed settlement with

6    HarbourVest; is that correct?

7    A    We have an approved settlement with HarbourVest.

8    Q    Right.  And there were objections filed to that particular

9    -- or, to that particular settlement agreement, were there

10   not?

11   A    Yes.

12   Q    But none of my clients participated in that objection, did

13   they?

14   A    I don't recall the specifics of your clients versus the

15   other Dondero entities, but I'm certain Mr. Dondero

16   participated.

17   Q    But the De... the parties that we represent did not object

18   to the settlement?

19   A    I don't recall specifically.

20   Q    Okay.  And another motion that was filed was for an

21   examiner.  Isn't that correct?

22   A    I believe that's the case, yes.

23   Q    Yeah.  And my clients didn't join that motion, either?

24   A    No.  It's a bit of whack-a-mole, but they did not -- they

25   did not -- I don't -- I don't know.  To be honest, I don't

1   know if they did or not.

2   Q   All right.  Toward the end of your testimony, you were

3   giving some information about the value of these management

4   contracts in terms of income over the course of the coming

5   year or two.  What is the projected revenue with respect to

6   these management contracts?

7   A   Do you mean the CLO 1.0 management contracts?

8   Q   Yes.

9   A   They generate about four-and-a-half to five million

10  dollars a year, depending on the asset base in total, but

11  that's accrual, as I mentioned earlier.  It doesn't all come

12  in in cash.  It depends on the waterfall.  Expect about two-

13  and-a-half to 2.7 million to come in per year during the

14  course of the projected time period.

15      (Echoing.)

16  Q   Have you done any sort of profitability analysis on the

17  management contracts?

18  A   Not specifically on those contracts, no.  We look at the

19  --

20  Q   Okay.

21  A   -- aggregate of the Debtor's receipts versus its costs.

22  Q   Can you -- so, --

23          MR. HOGEWOOD:  Ms. Mather, can you call up the

24  disclosure statement?  This is Docket 1473.  And in

25  particular, Page 176.

Seery - Cross                              188

1  BY MR. HOGEWOOD:

2  Q   So, I'm, Mr. Seery, I'm trying to square the 779 for the

3  month ended -- month period ended in March '21 and no further

4  revenue coming in on management fees with what you just said.

5  A   I'm not -- I'm not sure why.  This should -- certainly

6  should have the management fees according to the CLOs if this

7  was included in the assumption of those.  We have revenue,

8  they do generate revenue, they currently generate and they

9  will continue to generate.

10 Q   But this is the disclosure statement approved by the

11 Court, right?

12 A   Yes.  I'll have to come back and check why that for the

13 year doesn't have it, unless we were assuming that we wouldn't

14 receive any into the -- into this vehicle.  I just, I don't

15 know the answer.

16       MR. HOGEWOOD:  Your Honor, that's all the questions I

17 have.  Thank you very much.

18       THE COURT:  All right.  Redirect?

19       MR. MORRIS:  Can we just leave this up on the screen

20 for a second, very quickly, for Mr. Seery?  Can we put the

21 document back?

22                    REDIRECT EXAMINATION

23 BY MR. MORRIS:

24 Q   Mr. Seery, do you recall that the disclosure statement was

25 approved back in November?

Seery - Redirect                          189

1   A    Yes.

2           THE COURT:  Could you repeat the question?  I

3   couldn't hear it.

4           MR. MORRIS:  Yeah.  That is -- I don't know if

5   somebody's phone is not on mute.

6           THE COURT:  Yes.  Please put your device on mute if

7   you're not the one talking.  Okay.  Someone did.  Go ahead.

8           MR. MORRIS:  Thank you.

9   BY MR. MORRIS:

10  Q    Mr. Seery, do you recall that this disclosure statement

11  was approved back in November?

12  A    Yeah.  What I'd said earlier was that I'm not sure if the

13  -- this plan projection conforms with our decision to maintain

14  the CLO management contracts, and so there certainly should be

15  revenue, while it comes in quarterly on the management fee,

16  the base management fee.  And it's not always -- each CLO is

17  not always able to pay it in cash.  It will depend on our

18  ability to monetize assets, because they don't -- a lot of the

19  assets are not cash-generative.  Some are.  For example, the

20  Trussway loan is cash generative.  The CCS loan is not.

21       But I'm just not sure why this doesn't show the management

22  fees at all.  At least for the whole year, we certainly will

23  have them, unless this is prior to the determination to assume

24  those agreements.

25  Q    Okay.  So if the assumption in November was that the

Seery - Redirect                                    190

1   agreements would be assigned, there would be no revenue shown.

2   Is that fair?

3   A    That would have been the assumption prior to us

4   determining that we wanted to assume them, yes.

5   Q    Okay.  And do you recall whether the Debtor became more

6   convinced that it would assume the contracts rather than

7   assign them before or after the disclosure statement was

8   approved?

9   A    I don't recall the specific timing, but a number of things

10  happened around this time.  First, the Dondero entities were

11  unwilling to even engage on assignment because they were on a

12  much more aggressive, quote, blow up the place strategy.

13  That's Mr. Dondero's quote.

14      Number two, we settled with HarbourVest, and that

15  significantly increased the value of maintaining the CLO

16  management.  The HarbourVest --  or the HCLOF entities own

17  significant preferred shares in the 1.0 CLO structures, and

18  having management of those and being able to monetize those in

19  accordance with the agreement, maximizing value for the

20  benefit of HCLOF, would be far, far better for the estate than

21  letting these assets just sit.  We're not trying to drive the

22  price down, because we wouldn't be in the business of trying

23  to buy back those securities on the cheap.  We're in the

24  business of trying to maximize value.

25  Q    All right.

Seery - Examination by the Court                191

1           MR. MORRIS:  I have nothing further, Your Honor.

2           THE COURT:  Any recross on that redirect?

3           MR. HOGEWOOD:  No, thank you, Your Honor.  Appreciate

4     the opportunity to appear before you.

5           THE COURT:  All right.  Thank you.

6        Mr. Seery, before we let you go, I have a couple of

7     follow-up questions.

8                   EXAMINATION BY THE COURT

9           THE COURT:  These CLOs, I mean, you've said a couple

10    of times they're not really traditional CLOs, except for the

11    Acis 7 one.  But I have this question.  I've learned back in

12    the Acis case most of what I know about CLOs, I suppose.  And

13    what the witnesses told me there were they typically had a 12-

14    year life, and then, yeah, there was some period, you know,

15    the first five years, seven years, something like that, where

16    it was in a reinvestment/refinancing phase, but then after

17    that, you know, we couldn't do that anymore and it was kind of

18    heading towards wind-down.

19       Anyway, my long-winded question is:  Do these CLOs work

20    generally like that or not?  Because you said they're

21    atypical.

22          THE WITNESS:  They -- they --

23          THE COURT:  Go ahead.

24          THE WITNESS:  They used to.

25          THE COURT:  Okay.

Seery - Examination by the Court                192

1         THE WITNESS:  So these are extremely old.  These go

2    back to 2006, '07, '08.  These are very old CLOs.  So they're

3    far beyond their investment periods.  Some of them are coming

4    up on their maturities on their debt.  Many of them don't have

5    any debt at all.

6         So you'll recall, Your Honor, that a CLO is a vehicle

7    where you take x-hundred million -- we'll use 400 for fun --

8    million dollars.  You ramp up $400 million of assets.  You

9    sell off, for our purposes, $350 million of securities.  You

10   have the AAA securities, the AAs, all the way down.  And then

11   you have these preference shares.

12        During a period of time, as cash is generated in the CLO,

13   the CLO is entitled to reinvest it.  And that keeps it going.

14   And then it gets beyond its reinvestment period and it's in

15   what folks usually refer to as its harvest period.  That's

16   when oftentimes, depending on where rates are, depending on

17   asset value, the rates for the debt obligations or the rate

18   you can receive on your assets, you may see refinancings or

19   resets.  Otherwise, the CLOs begin to wind down.  They have --

20   they don't have a life, like a partnership with a final date,

21   but there's maturities on the debt and then there's an

22   expectation that they would wind down.

23        These CLOs -- which typically CLOs only invest in

24   performing loans, and oftentimes, particularly Highland -- and

25   I could regale you with stories how Highland would take

Seery - Examination by the Court          193

1   virtually non-interest-bearing, seventh lien debt -- that's a

2   bit of an exaggeration -- but just to keep the fees going, and

3   not actually convert to equity.  A lot of these, that wasn't

4   an option, so they've converted to equity.  So I just have one

5   that I happen to have on my screen, Your Honor, Gleneagles.

6   The assets in Gleneagles (echoing) are 16 -- MGMs.

7          THE COURT:  Okay.  Someone needs to put their phone

8   on mute.  All right.  I'm sorry.

9          THE WITNESS:  So it has -- it has -- the specifics

10   aren't particularly important, but its assets are -- just this

11   one I just pulled up; they're all a little different, and --

12   but mostly the same -- MGM stock.  This is MGM Studios, which

13   you read about with James Bond, a very valuable asset.  Across

14   the Highland platform, there's roughly $500 million worth of

15   stock.  It doesn't pay off any income.  So if it had debt --

16   and I'm not sure if Gleneagles still has any; I'd have to

17   switch screens; I don't believe it does; if it does, it's

18   small -- it wouldn't get any income-generating -- that's not

19   income generating asset.

20      Vistra, which is the TXU stock I talked about before, is

21   the next biggest asset.  Skyline Corporation, which was the

22   one we were selling.  That's no longer in there.  TCI

23   portfolio, which is a Dondero real estate asset it has, it's

24   an old Las Vegas and Phoenix, Arizona real estate

25   developments.  Not income-generating.  Not that they don't

Seery - Examination by the Court                194

1  have value, but this is much more like what would be referred

2  to as a closed-end fund.  It's not going to go out and buy

3  anything.  It can't.  It can only generate cash by selling

4  assets, give that cash to the trustee, and then the trustee

5  pays it through the waterfall.  And that's the way all of

6  these CLOs work.

7      Now, some of them do have debt.  And some of them have a

8  lot of debt, and the preferred shares will never be worth any

9  money, so we refer to those as being underwater.  No surprise,

10 the Dondero-related entities don't own any of those junior

11 securities.

12     The -- some do have debt.  A lot of that debt is going to

13 get paid off in the first half of the year because there'll be

14 refinancings at Trussway and a refinancing at Cornerstone.

15 They own debt, and that'll generate cash.  It'll go to the

16 CLOs, go to the trustee.  First it goes to pay the obligations

17 for the outstanding debt of the CLO, and then the asset

18 dollars, they get put through the waterfall to pay the more

19 junior securities.

20          THE COURT:  Okay.  And --

21          THE WITNESS:  And I --

22          THE COURT:  The --

23          THE WITNESS:  I was going to give you -- I contrast

24 that to a more typical CLO, which is whether it's beyond its

25 investment period or not, will have something like 150 to 250,

Seery - Examination by the Court                195

1   sometimes more, loans in it.  150 would be on the loan side.

2   It'll own -- own those in smaller amounts.  It has

3   requirements as to what its concentrations are in different

4   buckets of types of assets.  It has to return -- it has to

5   have an income-generating ability to satisfy certain covenants

6   in its debt obligations and in the indenture.  And then it

7   will, once it gets past its investment period, it will start

8   to harvest those assets.

9       There are different ways for the CLO manager to swap

10  assets, to stay in compliance, to extend out the tenure, but

11  usually markets start to move and there's some reason for the

12  CLO manager to do something like a reset or a refinancing or

13  to call the CLO.

14      So you'll see a number -- there was one this week, and

15  there'll be a number because of the conditions in the market

16  -- of CLOs called by the, effectively, the equity, saying,

17  Great time to sell, I don't need the short income, call the

18  CLO, do a BWIC or some other way to get dollars for all of the

19  assets, pay off all of my debt, and give me the balance of the

20  proceeds.

21          THE COURT:  Okay.  All right.  And the plan

22  contemplates that these will all be wound down over a two-year

23  period, correct?

24          THE WITNESS:  It's not a hard -- it's not a hard

25  period.

1          THE COURT:  Okay.

2          THE WITNESS:  So it's not a two-year period.  We're

3     going to -- we're going to manage these assets, as any asset

4     manager would, and we've had direct discussions with some of

5     the underlying holders, including one of the biggest investors

6     in the world who's an investor in the CLO but also has a

7     couple separate accounts which they want us to manage, and

8     we'll look for opportunities, depending on the market.  We're

9     not going to -- we're not going to just sell.  It's not a

10    liquidation.  We're going to find opportunities where, if we

11    believe it's the right value, we'll sell.  That doesn't mean

12    we'll sell it all in a big chunk.  We may manage pieces.  We

13    may hold on to some.

14       Some of them may perform -- some of the assets may

15    actually do things differently than others.  For example,

16    Cornerstone, for unknown reasons, has $60 million of MGM

17    stock, not an asset that you'd think you'd stuff into a

18    healthcare business, but this is Highland.  That may be sold

19    before, for example, Gleneagles sells its MGM.  It'll just

20    depend on, you know, market and the need of the specific

21    investor.

22          THE COURT:  All right.  Thank you.  That's all the

23    questions I have.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  All right.  So, Mr. Seery, I think we're

Seery - Examination by the Court                197

 1  done with you, but we hope you'll stick around for however

 2  longer this goes.

 3          THE WITNESS:  I will indeed.

 4          THE COURT:  Okay.

 5          THE WITNESS:  Thank you.

 6          THE COURT:  Does the Debtor rest, Mr. Morris?

 7          MR. MORRIS:  Yes, Your Honor.  There were those

 8  couple of documents that we had used from the different docket

 9  that we'll certainly put on the docket with the supplement

10  witness and exhibit list.  I just wanted to point that out.

11  And I, you know, I don't recall, frankly, if I moved into

12  evidence each of those extras, and I'm happy to go through it,

13  but it's very important to me that those documents be part of

14  the record.  So --

15          THE COURT:  Okay.  I think what you added was TTTTT,

16  and I think I admitted it.  You moved to admit it, and I said

17  yes, but you're going to have to file it on the docket --

18          MR. MORRIS:  Yeah.

19          THE COURT:  -- as a supplemental exhibit.

20          MR. MORRIS:  Right.  And then there were the couple

21  from the other -- let me see if I can get them.

22          THE COURT:  I admitted everything else that you filed

23  on the docket except UUUU, VVVV, and AAAAA.

24          MR. HOGEWOOD:  Yeah.  And that's fine.

25      Can we, Ms. Canty, going from Docket No. 46, can we just

198

 1   call up Exhibit K to make sure that that's in evidence?

 2   Docket 46 from the Dondero adversary proceeding.

 3       Okay.  So this was the letter, Your Honor, that I used

 4   earlier today with Mr. Dondero.  If you scroll down, where I

 5   examined him on the trading.  This is what led into the

 6   December 22nd trading, if you go to the next page.  So if it's

 7   not in evidence, I would respectfully request that this

 8   document be admitted into evidence, Your Honor.

 9           MR. RUKAVINA:  Your Honor, I object.  This document

10   is hearsay of Mr. Pomerantz.

11           THE COURT:  Okay.

12           MR. MORRIS:  Mr. Dondero has already -- I'm sorry,

13   Your Honor.

14           THE COURT:  Okay.  So this is -- I wholesale-admitted

15   all of your exhibits with those three carved out that I

16   mentioned.  So you're saying I've not admitted this one yet?

17           MR. MORRIS:  I just don't recall, because this wasn't

18   on the exhibit list. I will point out that we had no objection

19   to the entry into the evidence of all of K&L Gates letters,

20   and I'm really a little surprised, having heard the testimony

21   from Mr. Dondero on this particular letter, that there would

22   be an objection.  But I would respectfully request that it be

23   admitted as an exception to the hearsay rule.

24           THE COURT:  All right.  Well, I'm going to overrule

25   the objection.  I'll admit it.

199

1        So, again, it has to be supplemented on the docket.

2        (Debtor's Exhibit K is received into evidence)

3             MR. MORRIS:  Yes.  And there's just one other

4    document, Your Honor, from that same docket.  It's Exhibit D,

5    Ms. Canty.  I just want to make sure that's in the record as

6    well.  And I do apologize again, Your Honor.

7             THE COURT:  Okay.

8             MR. MORRIS:  I didn't realize until I was reading --

9             THE COURT:  We're getting terrible distortion.   I

10   don't know where it's coming from, but --

11            MR. MORRIS:  Okay.  And this is, this is the email

12   that I -- it's Mr. Dondero's own statement, so it's not even

13   hearsay, but I just want to make sure this is part of the

14   evidentiary record, Your Honor.  So I move for the admission

15   of this document as well to our exhibit list.

16            MR. RUKAVINA:  I believe this document has been

17   admitted.  I believe -- I believe --

18        (Echoing.)

19            MR. RUKAVINA:  Is that us?  Testing.

20            THE COURT:  All right.  Mike, where is that coming

21   from?

22        (Clerk advises.)

23            THE COURT:  Okay.  Mike thinks it's Mr. Morris, but

24   -- so put yourself on mute.

25        Mr. Rukavina, go ahead.

200

1          MR. RUKAVINA:  Your Honor, I think this exhibit is in

2     already.  If it's not, no objection.

3          THE COURT:  All right.  So it will be admitted, and

4     again, you need to file it as a supplement, Mr. Morris.

5       (Debtor's Exhibit D is received into evidence)

6          MR. MORRIS:  Yeah.  Thank you, Your Honor.  The

7     Debtor rests.

8          THE COURT:  All right.  Mr. Rukavina, I want to go a

9     while longer, so let's at least -- do you have Mr. Dondero as

10    well as Mr. Post?

11         MR. RUKAVINA:  I do, Your Honor.  I have both.

12         THE COURT:  Okay.  Well, let's go.  You may call your

13    witness.

14         MR. RUKAVINA:  Your Honor, we'll call Jason Post.

15         THE COURT:  All right.  Mr. Post, I swore you in

16    earlier and I consider you still under oath.  Do you

17    understand that?

18         MR. POST:  I do.

19         THE COURT:  All right.  Go ahead.

20      JASON POST, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

21         MR. RUKAVINA:  Oh, turn on the video.  Can you see

22    how to do that?  Is Jason on the video?  Okay.  All right.

23    Mr. Post?  Hold on a second.  I'm hearing myself.

24         THE WITNESS:  I'm hearing the same.

25         MR. RUKAVINA:  Let me turn down my volume.  Testing.

Post - Direct                              201

 1   Okay.  Mr. Post, can you hear me?

 2            THE WITNESS:  Yes.

 3            MR. RUKAVINA:  Okay.

 4                      DIRECT EXAMINATION

 5   BY MR. RUKAVINA:

 6   Q    You were asked about some of your background and

 7   qualifications.  Just so that the record is clear, you are the

 8   chief compliance officer for both two Advisors and each of the

 9   Funds, correct?

10   A    Correct.

11   Q    And I think we refer to these three defendant funds as

12   retail funds; is that correct?

13   A    Correct.

14   Q    Describe what we mean or what you mean by a retail fund.

15   A    I look at it two ways.  There's private funds, which are

16   institutional in nature, and retail funds, which are comprised

17   of open-end funds, closed-end funds, BDCs, ETFs, and that

18   constitutes the suite of funds that are advised by Highland

19   Capital Management Fund Advisors and NexPoint Advisors.  And

20   they generally have a broad swath of investors, including

21   institutional investors, but also, you know, just regular mom-

22   and-pop investors.

23   Q    Okay.  So, for the Highland -- I'm sorry, for the three

24   retail funds, how much in ballpark investments do they have in

25   the CLOs that are at issue today?  Ballpark.

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 58-29    Filed 10/26/23    Page 986 of 1539    PageID 18224
Exhibit 29    Page 202 of 258

Post - Direct                                    202

1  A    Maybe call it a hundred million, ballpark.  Or a hundred

2  million, give or take.

3  Q    Okay.  And for all of the CLOs that Highland manages that

4  the Advisors and other Funds have an interest in, do you have

5  an estimate of how much it manages of CLO assets?

6  A    I believe it's approximately a billion, a little over a

7  billion that HCMLP manages for its CLO assets.

8  Q    Do you have an estimate of how many individual investors

9  there are in the three retail funds?

10 A    I -- thousands.  I don't have an exact number.

11 Q    Okay.  And I think you mentioned some of the types.  Do

12 you have any names of the types of investors that Her Honor

13 might know or have heard of before?

14 A    Off the top of my head, I do not, just -- but they're

15 generally constituted or characterized of the investor types

16 that I mentioned earlier.

17 Q    Okay.  Now, these three retail funds, do they own voting

18 preference shares in any of the CLOs that the Debtor manages?

19 A    Yes.

20 Q    Okay.  Do they own a majority in any of those CLOs' voting

21 preference shares?

22 A    In aggregate, across the three, they would.

23 Q    Okay.

24 A    With other CLOs.

25 Q    What are those three CLOs, sir?

Post - Direct                                        203

1   A    I believe it's Greenbrier, Graceland, and Stratford, if I

2   recall correctly.

3          MR. RUKAVINA:  Your Honor, have you received a

4   couriered binder of our exhibits?

5          THE COURT:  I have.  I've got them right here.

6          MR. RUKAVINA:  Now I can't hear the judge.  What's

7   she saying?

8          THE COURT:  Yes.  I've got them.

9          MR. RUKAVINA:  I think you're on mute, Judge.

10          MR. VASEK:  No, you turned your volume down.

11          MR. RUKAVINA:  Oh.  I apologize, Your Honor.

12      So, Mr. Vasek, if you'll please put Exhibit 2 up.

13   BY MR. RUKAVINA:

14   Q    Mr. Post, are you the custodian of records for the Funds

15   and Advisors?

16   A    Yes.  We're required to keep records of ownership and

17   trades for the Funds involved.

18   Q    And you are an actual officer of these Funds and Advisors,

19   correct?

20   A    Correct.

21   Q    Okay.  Are you familiar with this Exhibit 2?

22   A    I am.

23   Q    Did you participate in pulling together the underlying

24   information with others to prepare Exhibit 2?

25   A    I did.

Post - Direct                                    204

1   Q    Does Exhibit 2 accurately reflect the current ownership of

2   the various CLOs by the three retail funds that are --

3   A    At the time it was put together, I believe it did.

4   Q    And approximately when was that?

5   A    I believe it was in the November time frame, middle of

6   November, end of November.

7   Q    Do you have reason to believe that the numbers we're

8   referring to would be materially different today?

9   A    I don't believe they would be materially different.

10           MR. RUKAVINA:  Your Honor, I move for the admission

11   of Exhibit 2 as a summary of underlying data.

12           THE COURT:  All right.  Any objection?

13           MR. MORRIS:  Yes, Your Honor.  It's hearsay.  I

14   understand that the witness has testified to it, but just as I

15   put in the backup for my demonstrative, where's the backup?

16   We're just supposed to take his word for it?  There's no

17   ability to check this.  This is not evidence.  It's a

18   demonstrative.

19           THE COURT:  All right.  Mr. Rukavina, do you have

20   backup?

21           MR. RUKAVINA:  Let me ask the witness a couple more

22   questions.

23   BY MR. RUKAVINA:

24   Q    What would be the backup for this Exhibit 2?

25   A    We'd have to pull the holdings from the intranet and that

Post - Direct                                      205

 1   would identify the quantity that's held by each of the

 2   respective funds and then an aggregate that, over the

 3   preference shares outstanding, would give you the percentages

 4   that are outlined in this exhibit.

 5   Q   Okay.  And is that a database that you have personal

 6   access and authority over?

 7   A   I have personal access to it.  Yes.

 8   Q   Okay.

 9         MR. MORRIS:  Your Honor, *voir dire*?

10   BY MR. RUKAVINA:

11   Q   Can you easily take that data from a computer and show it

12   to the Court here today?

13   A   Yes.  It would just require the CUSIPs for each of the

14   preference shares and then plug it into the intranet and then

15   that would provide a screenshot of the ownership of the CLOs.

16   Q   And is this what that is, basically?

17   A   This is an aggregation -- or, this is a percentage of the

18   shares outstanding, the preference shares.  So what would be

19   shown on the intranet would be the quantity and then you'd

20   have to tie that back to the shares outstanding and that would

21   give you the percentages that are shown on this exhibit.

22         MR. MORRIS:  *Voir dire*, Your Honor?

23         THE COURT:  I'm sorry?

24         MR. MORRIS:  May I inquire before this --

25         THE COURT:  Mr. Morris, is that you?  Okay.  You want

Post - Voir Dire                          206

 1   to take him on *voir dire*?

 2           MR. MORRIS:  Yes.

 3           THE COURT:  Go ahead.  Uh-huh.

 4                       VOIR DIRE EXAMINATION

 5   BY MR. MORRIS:

 6   Q    Yes.  Mr. Post, did you prepare this document?

 7   A    I provided information and the document was ultimately

 8   prepared by counsel.

 9   Q    So you didn't personally prepare this, right?

10   A    I didn't personally put this chart together.

11   Q    And you didn't personally make the calculations on this

12   chart, right?

13   A    I would have supplied or assisted in supplying the

14   holdings with reference to the shares outstanding and then

15   they would have done the math to place the percentages.

16   Q    I'm asking a very specific question.  You didn't do the

17   calculations necessary to come up with the percentages on this

18   chart, right?

19   A    Me personally, no, I did not.

20   Q    And you can't verify that this chart is accurate, can you?

21   A    I provided, provided the information.  Then it's a

22   mathematical calculation.

23   Q    Okay.  You didn't take any steps to determine the accuracy

24   of this chart, right?   You relied on others?

25   A    There's a -- I would have cross -- you know, maybe cross-

Post - Voir Dire                           207

1   referenced some of the percentages against another spreadsheet
2   that was -- that we had internally.
3   Q   Sir, I didn't want to know what you would have done.  You
4   didn't do anything to confirm the accuracy of all of the
5   numbers on this page, correct?
6   A   I believe I may have spot-checked a couple of them.  I
7   can't recall specifically.
8           MR. MORRIS:  Your Honor, not only don't we have the
9   backup, but this witness isn't even competent to testify to
10  the accuracy of the chart.  I renew my objection.
11          THE COURT:  All right.  I sustain the objection.
12          MR. RUKAVINA:  Your Honor, I'll --
13          THE COURT:  It's not allowed.
14          MR. RUKAVINA:  Going back to the -- take that down.
15          THE COURT:  All right.  Mr. Rukavina, we're -- our
16  connection to your office is suddenly not very good.  Both you
17  and Mr. Post are very hard to hear.  So let's see what we can
18  to improve.
19          MR. RUKAVINA:  Is it a question of loudness or
20  quality?
21          THE COURT:  Quality.  And I heard you fine just then,
22  but -- so let's try again.
23                  DIRECT EXAMINATION, RESUMED
24  BY MR. RUKAVINA:
25  Q   Mr. Post, let's go back to those retail funds.  How are

Post - Direct                                    208

 1  those funds managed at the top level?

 2  A    They're overseen by a board of trustees.

 3  Q    Okay.  Do you interact with that board of trustees

 4  periodically?

 5  A    I do.

 6  Q    Okay.  Approximately how often?

 7  A    At least quarterly, and generally intervening periods.

 8  I'd probably say anywhere from every five to six weeks, if not

 9  more frequent.

10  Q    Have you been communicating with them more frequently

11  recently?

12  A    Yes.

13  Q    As the CCO of the funds, who do you ultimately report to?

14  A    The board.

15  Q    Is Mr. Dondero on any of those boards?

16  A    He is not.

17  Q    Okay.  Are those boards capable, to your experience, of

18  making independent decisions?

19          MR. MORRIS:  Objection to the form of the question.

20          THE COURT:  Overruled.

21          THE WITNESS:  I think the question, is are they

22  capable of making independent determinations?  Yes.

23  BY MR. RUKAVINA:

24  Q    Okay.  Explain the interaction between the Fund Advisors

25  and the retail funds.  What -- what does the one do for the

Post - Direct                                        209

 1  other, if you will?

 2  A    I'm sorry.  Can you repeat that?  I didn't -- I didn't

 3  hear the question.

 4  Q    So, we have the three retail funds.

 5  A    Yes.

 6  Q    What relationship, if any, is there between the two

 7  Advisor defendants and any retail fund defendants?

 8  A    So, there's an investment advisory agreement that the

 9  Funds have entered into with the investment advisor, and the

10  investment advisor performs investment functions on behalf of

11  those Funds, along with other noninvestment functions.

12  Q    Okay.  So is it fair to conclude that, for investment

13  purposes, the Advisors make pretty much all, if not all,

14  decisions for the three Funds?

15  A    Yes.

16  Q    Okay.  What about other matters that the board might

17  consider?  Do the Funds make -- I'm sorry.  Do the Advisors

18  make other decisions for the Funds, or is it an advisory role?

19  A    The Advisors may make other decisions or recommendations,

20  which they then set forth to the board for their approval, if

21  needed.

22  Q    Okay.  Does the board have independent counsel?

23  A    They do.

24  Q    Okay.  Have you interacted before?

25  A    I have.

Post - Direct                                210

1  Q   And is it fair to conclude that the board not only is

2  capable of making independent decisions but has made

3  independent decisions recently?

4          MR. MORRIS:  Objection.  Leading.

5          THE COURT:  Sustained.

6          THE WITNESS:  They have.

7          MR. RUKAVINA:  Okay.

8          THE COURT:  That was --

9          MR. RUKAVINA:  And we'll get --

10         THE COURT:  You don't answer.

11         MR. RUKAVINA:  Go into that in another bit.

12         THE WITNESS:  Oh.  Sorry.

13         MR. RUKAVINA:  Okay.

14 BY MR. RUKAVINA:

15 Q   Explain to the Court what your role as the chief

16 compliance officer for the Advisors and the Funds is.

17 A   I think, as you mentioned earlier, it's interaction with

18 the board.  Also with regulatory bodies to the extent

19 examinations occur.  It could be to ensure oversight and

20 compliance with a fund's prospectus and SAI limitations, and

21 then it's establishing policies and procedures and ensuring

22 that those policies and procedures are adequate to detect any

23 sort of violations that could occur by the Funds.

24 Q   And are you an attorney?

25 A   I am not.

Post - Direct                                         211

1    Q    Do you frequently work with attorneys?

2    A    I do.

3    Q    Both in-house and external?

4    A    Yes.

5    Q    Good.  And do you frequently rely on the advice of

6    counsel?

7    A    I do.  At times will present, you know, if there is a

8    question or an issue, present the background to either

9    internal or external counsel and then request their advice on

10   certain matters.

11   Q    So when counsel was asking about why you wouldn't appear

12   at a hearing or listen to a hearing or read a transcript of a

13   hearing, are those the kinds of things that you would rely on

14   counsel?

15   A    Yes.  If counsel were to tell me to, you know, attend the

16   hearing, I would have attended the hearing.

17   Q    Okay.  Does -- do the Funds and Advisors also have in-

18   house counsel?

19   A    Yes.

20   Q    I think we established that's D.C. Sauter?

21   A    He's been the primary point of in-house counsel more

22   recently, I'd say, within the past three to four months.

23   Q    Okay.  And would you expect that perhaps he would be

24   attending hearings and reading transcripts instead of you for

25   some of these litigated matters?

Post - Direct                               212

 1          MR. MORRIS:  Objection to the form of the question.

 2          THE COURT:  Overruled.

 3          MR. MORRIS:  Leading.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  I believe he would be.

 6   BY MR. RUKAVINA:

 7   Q    Okay.  Well, the implication was made, Mr. Post, that

 8   somehow you were negligent as CCO by not following the

 9   December 16th hearing.  I'd like to know, --

10          THE COURT:  Okay.  Could you -- could you repeat --

11   BY MR. RUKAVINA:

12   Q    -- Did you have counsel at the hearing and did you hear

13   from --

14          THE COURT:  Mr. Rukavina, start over with your

15   question.  It was a little hard to hear.

16          MR. RUKAVINA:  Okay.

17   BY MR. RUKAVINA:

18   Q    Mr. Post, the implication had been made that, because you

19   weren't at the December 16th hearing and because you had not

20   read the transcript, that you were somehow deficient as a CCO.

21   I'd like to know, Did you have the benefit of outside

22   counsel's views both before and after that hearing as to that

23   hearing and what happened?

24   A    Yes.

25   Q    It's not that you put your head in the sand and ignored

Post - Direct                                        213

1   what's happening, is it?

2   A    That is correct.

3   Q    Okay.  And is it fair to say that when you deal with

4   compliance, you deal with complicated statutes and

5   regulations?

6   A    That is correct.

7   Q    Okay.

8          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

9   (garbled).

10       (Pause.)

11  BY MR. RUKAVINA:

12  Q    Okay.  Taking you back to Mr. Morris's questions, do you

13  recall Mr. Morris asking you whether you believe that any of

14  the trades that were being discussed were deceptive?

15         MR. MORRIS:  Hold on one second, Your Honor.  What

16  exhibit is this?

17         THE COURT:  I don't know.  What is it?

18         MR. RUKAVINA:  Can you hear me, Mr. Post?

19         THE WITNESS:  They're asking a question as to what

20  exhibit this is.

21         MR. RUKAVINA:  Your Honor, this is not an exhibit.

22  This is a Commission Interpreting Regarding Standard of

23  Conduct for Investment Advisors, an SEC regulation in

24  conjunction with 17 CFR 276.

25         THE COURT:  Okay.  How are we --

1          MR. RUKAVINA:  So, Your Honor, these are the actual

2    regulations.

3          THE COURT:  I mean, it's -- okay.  The answer to the

4    question is it's not an exhibit.  You have pulled up 17 CFR

5    part 276.  Is that what the answer is?

6          MR. RUKAVINA:  Yes, Your Honor.  And I haven't

7    offered this as an exhibit.

8          THE COURT:  All right.

9          MR. MORRIS:  You have -- Your Honor, I don't know why

10   this is being put up on the screen now.  It's not an exhibit.

11   It's not in the record like a couple of those that I had.  I

12   used the statute that he relied on to cross-examine him with

13   the 206.  I don't know what this is.  I don't know if it's

14   accurate.  I don't know anything about it.

15         MR. RUKAVINA:  Your Honor, this is a rule and

16   regulation.  This is not an exhibit.  If it is an exhibit, I

17   haven't moved to admit it yet.  I'm going to use this to

18   refresh his memory and explain why he believed that the

19   actions were deceptive, a door opened solely by Mr. Morris.

20         MR. MORRIS:  His recollection hasn't -- there's no

21   need to refresh it yet.  He hasn't even answered a question

22   where he says, "I don't remember."

23         THE COURT:  Okay.  I sustain the objection here.  I

24   mean, you can ask him a question, but, again, it's kind of

25   hard for us to tell what this is, actually.  I mean,

Post - Direct                                    215

1  Commission Interpretation Regarding Standard of Conduct for

2  Investment Advisors.  I mean, is this actually a -- I mean,

3  it's not a statute.  I'm not even sure it's a reg.  It's --

4          MR. MORRIS:  Okay.

5          THE COURT:  I don't know what it is.  So, --

6          MR. RUKAVINA:  Your Honor, we'll lay a predicate

7  later.  First, let me ask some other questions.

8  BY MR. RUKAVINA:

9  Q   Again, you recall that you were asked whether, pursuant to

10  Section 206 of the Advisers Act, you believed the trades that

11  have been discussed were deceptive.  Do you recall?

12  A   Yes.

13  Q   Okay.  And you answered that you believed that they were

14  deceptive?

15  A   Correct.  I did.

16  Q   As the CCO, do you have an understanding of what role, if

17  any, conflicts of interest play in an advisor's duties under

18  the Advisers Act?

19  A   Yes.

20  Q   Okay.  What is your understanding?

21  A   All -- all known material conflicts of interests need to

22  be disclosed -- need to be disclosed by the advisor to the

23  underlying investors.

24  Q   Okay.  And why, why do those conflicts of interests have

25  to be disclosed?

Post - Direct                                216

1  A    Because an advisor could have a view that may deviate from

2  the underlying investors' view of how the portfolio could be

3  managed and in contradiction to it.

4  Q    And do you have an understanding as to whether, pursuant

5  to your experience as the CEO [sic], the Advisers Act and the

6  SEC regulations (garbled) it require an advisor to adopt the

7  principal's goals as opposed to his or her own goals?

8         MR. MORRIS:  Objection to the form of the question.

9  Your Honor, he has not been offered as an expert.  He

10  shouldn't be permitted to provide -- this is -- this would be,

11  at best, expert testimony.  I asked him 30 different questions

12  about his background.  He's got no training.  He's got no

13  licenses.  He's taken no special courses.  He doesn't have

14  anything except on-the-job training.  This is not right.

15         MR. RUKAVINA:  Your Honor, Mr. Morris got to ask yes-

16  and-no questions all day, leading questions, and the witness

17  was told that he could explain his answers.  The Court told

18  him that.  And I am trying to explain his answer as to why he

19  believed that these transactions were deceptive, especially

20  because the allegation is that we willfully and intentionally

21  violated the stay by sending letters that this witness

22  authorized.  So understanding his understanding is very

23  important to Your Honor's determination of the actual --

24         THE COURT:  Well, I sustain the objection.

25         MR. RUKAVINA:  And Mr. Morris opened this door.

Post - Direct                                                217

1          THE COURT:  You can ask him why he thought the

2    actions were deceptive, but he's starting to go into what may

3    or may not be CFRs and conflicts of interest.  No.  This is

4    going well beyond asking him, Why do you think it was

5    deceptive?  And I agree:  It's straying into expert testimony.

6    BY MR. RUKAVINA:

7    Q    Mr. Post, you are familiar with the December 22nd AVYA

8    and SKY sales and transactions which you were asked about by

9    Mr. Morris and that you previously have testified about,

10   correct?

11   A    Correct.

12   Q    Okay.  How are you familiar with those sales and

13   transactions as they were occurring?  How did you learn about

14   them?

15   A    There was some internal email correspondence.  If I recall

16   from memory, at the bottom it provided fill information that

17   Jefferies provided to, I believe, Mr. Seery and others on the

18   email.  And then it kind of worked its way up to get the

19   trades that had been executed administratively booked into the

20   OMS.

21   Q    Why did you get involved with those transactions?

22   A    They were requesting that employees of HCMFA book those --

23   I'm sorry, Highland Capital Management Fund Advisors -- book

24   those into the system.  And those employees were not a party

25   to the trade.  I don't believe --

Post - Direct                                              218

1   Q    Well, let me pause you.  Let me pause you.  Those two

2   employees, who were they?

3   A    Joe Sowin and Matt Pearson.

4   Q    Were they at that time employees of the Debtor?

5   A    They were not.

6   Q    Okay.  So, how did you come to learn about this ask that

7   those two employees book -- book it?

8   A    I believe there was an email that was sent to me, or I was

9   on it.  I can't recall specifically.

10  Q    Okay.  And did you undertake any review as to whether

11  those two employees should or should not do what was being

12  asked of them?

13  A    Once it was brought to my attention, I discussed with -- I

14  looked at it.  It looked like, pursuant to prior

15  correspondence with -- that Joe Sowin made, he wasn't aware of

16  the trades.

17       You know, I also had a discussion with K&L based off of --

18  our legal counsel based off of a prior letter that was sent,

19  and just it didn't -- it didn't look right that they would be

20  booking trades on behalf of the two Advisors that are named in

21  the letters when they had nothing to do with it and weren't --

22  weren't a part of any of the pre-trade compliance checks, et

23  cetera.

24  Q    What is a pre-trade compliance check?

25  A    Well, there's an electronic system, a -- or a management

Post - Direct                                    219

1   system we have, the OMS, which is called Verda (phonetic).

2   And generally, trades are entered into the system by the

3   portfolio manager, and they then go through pre-trade

4   compliance checks.  And once those compliance checks are

5   passed, they're then routed to the trading desk for direction

6   or execution, where the executing brokers and the trading desk

7   will then monitor that execution over the course of the day.

8   And at the conclusion of the trading day, those trades, if

9   they weren't already allocated, would be allocated, and then a

10  trade would be sent to custodian prime brokers to identify the

11  trades that occurred in the respective Funds for those -- or,

12  on that day, and then they would then be dropped into the

13  database and our -- the settlement team would kind of work to

14  settle those trades or ensure that those trades were settled

15  based off of the stipulated time frame for settlement on the

16  trades.

17  Q   So, in all that course of a transaction, what exactly was

18  it that those two employees of the Advisors were being asked

19  to do on behalf of the Debtor?  What exactly were they being

20  asked to do?

21  A   To just book them in the system because they are trades

22  that already have been executed.

23  Q   Did you stop that?

24  A   I believe I responded and said, you know, it -- they're

25  employees of, if I recall, employees of one of the named

1    Advisors, and believe those trades are in the best interest of

2    those Advisors, and separately, you know, the Debtor has

3    designated operators/traders that should be able to enter

4    those trades as well, aside from Mr. Sowin and Matt Pearson.

5    Q    So can you think of any reason why Mr. Seery would ask

6    your employees, as with his own employees, to book these

7    trades?

8    A    I believe based off of past practice.

9    Q    Okay.  But nevertheless, those two trades did not comply

10   with internal compliance?

11   A    They weren't run through the OMS.  We try and route trades

12   through the order management system because there's pre-trade

13   compliance checks that can be performed, and it reduces any

14   sort of back-end reallocation or trade errors that may occur

15   as a result of, you know, trades being entered after the fact,

16   because quantities could be, you know, referenced incorrectly

17   or funds could be identified incorrectly.

18   Q    Based on prior practices, have these internal policies

19   been followed when perhaps employees of the Debtor asked

20   employees of the Advisors to take a particular action in the

21   course of a transaction?

22   A    Yes.

23   Q    When internal practices are not followed, what is your

24   job?  What are you supposed to do?

25   A    When internal practices are followed, --

Post - Direct                                221

1   Q    Are not followed.

2   A    Oh.  Not followed?  To the extent that they're not

3   followed, we would question, you know, number one, why weren't

4   they followed?  You know, we -- we try and have all trades

5   booked in the OMS so that the necessary checks could be

6   performed, and as I mentioned earlier, to avoid any

7   reallocation or trade errors.  So I would then question, you

8   know, why was this done outside of the system?

9   Q    And if you did not get an appropriate response back to

10  your question, what are you supposed to do?

11  A    If I didn't get an appropriate response, would, you know,

12  research it further and elevate it to senior management and/or

13  any of the board if it was ultimately an issue.

14  Q    Are you supposed to stop trades or stop the process if you

15  see something that you believe is not compliant with your

16  obligations and the fiduciary obligations of the Advisors?

17  A    Yes.

18  Q    Have you done that in the past?

19  A    Yes.

20  Q    Have you done that frequently, or infrequently?

21  A    I would say it's -- it's infrequent, but they do occur.

22  For example, if a fund is trading in a security that it's not

23  permitted to invest in based off of a prospectus limitation,

24  it would get flagged in the OMS and we would then not permit

25  the trade to go forward because it could cause the breach to

Post - Direct                                        222

1  go further offsides or it could cause it to go offsides.

2  Q    Okay.  And these December 22nd trades, were they the type

3  of, in your past experience, problematic trades like you have

4  interfered or stopped or intervened to stop in other

5  situations in the past?  Do you understand my question?  That

6  was an inartful question.  Do you understand it?

7  A    If the question is because they were done outside of the

8  system?

9  Q    Yes.

10  A    And repeatedly?

11  Q    Yes.

12  A    I would have raised the question with the trading desk or

13  the portfolio manager as to why that's being done, because it

14  was not in -- not consistent with how we instruct trades be

15  booked.

16  Q    Did Mr. Dondero, for these December 22nd transactions,

17  tell these two employees not to book the trades?

18          THE COURT:  Okay.  Please repeat the question.  It

19  was garbled.

20          MR. RUKAVINA:  Thank you, Your Honor.

21  BY MR. RUKAVINA:

22  Q    For these December 22nd trades, did Mr. Dondero tell those

23  two employees not to book the trades?

24          MR. MORRIS:  I object, Your Honor.  No foundation.

25  This witness has no personal knowledge to testify to this --

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 61-529   Filed 02/22/24   Page 1007 of 1539   PageID 18245
Exhibit 29   Page 2243 of 258

Post - Direct                                      223

 1  to answer this question.

 2         THE COURT:  Overruled.  If he knows.

 3         THE WITNESS:  I do not know.

 4  BY MR. RUKAVINA:

 5  Q    Okay.  Do you have a reason to believe that he did?

 6  A    I don't know.  I just saw the email traffic and Mr. Sowin,

 7  I believe, was questioning the trades, you know, more in the

 8  sense that he wasn't aware of them.  So, I don't -- I don't

 9  know what kind of conversations, what happened in the

10  background, just that he -- he didn't recognized that rates.

11  Q    Let me try it this way.  You determined that these trade

12  would have violated the Advisors' policies and procedures,

13  correct?

14  A    Yes, because they were done outside of the OMS.

15  Q    Did Mr. Dondero tell you to come to that conclusion?

16  A    He did not.

17  Q    Did Mr. Dondero pressure you to come to that conclusion?

18  A    He did not.  He had indicated that there -- there are

19  these trades, and you should take a look at it from a legal

20  compliance perspective, which I did.

21  Q    And you talked to K&L Gates?

22  A    Correct.

23  Q    And when Mr. Dondero told you to look at these trades, did

24  he suggest to you in any way, shape, or form what you should

25  conclude or decide to do, if anything, with respect to these

Post - Direct                                    224

1   trades?

2   A    I don't believe so.

3   Q    Okay.  Let's go back to that question about your view that

4   some of what Mr. Seery was doing was deceptive under the 1940

5   Investors Act.  When did you form that view?

6   A    I believe it was after it was identified that there was

7   not (inaudible) on certain of the trades that were entered

8   into at the end of the November time frame, the SKY and AVYA

9   trades.

10  Q    And why did you form the opinion that those trades that

11  Mr. Seery was attempting to do or had done were deceptive

12  under the statute that Mr. Morris asked you about?

13  A    It was pursuant to reviewing them and supplemental

14  discussion.  A review with the portfolio managers and then

15  supplemental discussion with K&L be it from a (inaudible)

16  perspective, through, you know, perform in the best interest

17  of your clients, it was expressed that, at least with respect

18  to preference shareholders, they were supposed to maximize

19  value, and those sales, they're not really maximizing value.

20      And it was also identified that the Debtor was planning to

21  liquidate the CLOs based off of a filing within the Court

22  within a few-year period.  And the investors -- or, the Funds

23  that invested and the preference shareholders, or preference

24  shares, had a longer-time view in those assets.

25      So the sales, coupled with the short duration, or the

Post - Direct                              225

1   anticipated, you know, two-year duration, didn't line up with

2   the investment objective that they were seeking to maximize

3   returns.

4   Q   To your understanding and your experience, does the

5   servicer of the CLOs owe fiduciary duties to anyone?

6           THE COURT:  Okay.  I cannot -- someone is flipping

7   paper.  Please stop flipping paper.  Okay.  Repeat your

8   question, Mr. Rukavina.

9           MR. RUKAVINA:  Thank you, Your Honor.

10  BY MR. RUKAVINA:

11  Q   In your experience and in your knowledge, does the

12  servicer of the CLOs owe fiduciary duties to anyone?

13  A   They should, yeah, the underlying investors in the CLO,

14  whether it be the Debtor or the equity holders.

15  Q   Do the Advisors owe fiduciary duties to anyone?

16          MR. MORRIS:  Your Honor, I'm sorry, I apologize.  I

17  really do move to strike.  He's not a lawyer.  There is no

18  foundation.  He's not here as an expert.  There's no basis for

19  this witness to be talking about who owes who fiduciary

20  duties.  I don't even think that's the law, what's just been

21  stated.

22          THE COURT:  Okay.  I sustain.

23          MR. RUKAVINA:  Okay.

24  BY MR. RUKAVINA:

25  Q   Well, let me make it very easy, then.  Do you have an

Post - Direct                                    226

1    understanding as to whether Advisors subject to the 1940 Act

2    owe a fiduciary duty?

3    A    Yes.

4    Q    Do you have an understanding of how a conflict of interest

5    plays into a fiduciary duty?

6    A    Yes.

7    Q    What is your understanding?

8    A    If there's a material conflict of interest, it should be

9    disclosed.

10   Q    And what did you conclude with respect to Mr. Seery and

11   the Debtor once the Debtor stated that it will liquidate

12   within two years?

13   A    That's not the investment horizon that the underlying

14   preference shareholders have, especially with respect to the

15   underlying assets held in those CLOs.  More or less, you're --

16   they're now put on a clock, and those preference shareholders

17   may have a longer-term view on the underlying assets of those

18   CLOs.

19   Q    Let's move on to those December 22nd and December twenty

20   -- well, let me strike that.  You heard Mr. Seery testify that

21   those December 22nd trades closed, correct?

22   A    I did.

23   Q    And did you independently look at whether that's true?

24   A    I did.

25   Q    And what did you conclude?

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 1-29  Filed 22/23 of 258  Page 1011 of 1539   PageID 18249

Post - Direct                                      227

 1  A    They showed a sale in the -- on the intranet.

 2  Q    Okay.  Let's move on to the December 22nd and December

 3  23rd letters.  Are you familiar with those letters from K&L

 4  Gates to counsel for the Debtor?

 5  A    I am.

 6  Q    And did you participate in preparing those letters?

 7  A    I did.

 8  Q    Okay.  And I think Mr. Morris asked you and I think you

 9  testified you supported or agreed with the sending of those

10  letters.  Is that generally accurate?

11  A    Yes.

12  Q    Why?  Why did you support sending those letters?

13  A    It wasn't in the best interest of the Funds pursuant to

14  discussions with the portfolio managers and the investment

15  objectives that they were looking to seek any of those

16  investment in the preference -- preference securities and

17  CLOs.

18  Q    Was that a purpose that you were trying to achieve by

19  sending those?

20          THE COURT:  Repeat the question.

21          THE WITNESS:  Ah, --

22          THE COURT:  Repeat the question.

23  BY MR. RUKAVINA:

24  Q    Was that a purpose that you were trying to achieve by

25  sending those letters?

Post - Direct                                    228

 1  A    Yes.  I believe there was something towards the end of one

 2  or both letters that said, to the extent, you know,

 3  transactions occur, if, for lack of better words, a courtesy

 4  heads up could be given to the Funds and the Advisor.

 5  Q    Did you intend in any way to intimidate the Debtor by

 6  authorizing or supporting the sending of those letters?

 7  A    No.

 8  Q    Did you intend in any way to violate the automatic stay by

 9  sending those letters?

10  A    No.

11  Q    Were you trying to engage the Debtor in a dialogue at that

12  time as to what to do with these CLO management agreements?

13  A    Yes.  I believe that was stated at one -- at the end of

14  one or both of the letters.

15  Q    And I think Mr. Morris discussed with you that the Debtor

16  sent back letters asking you to withdraw these two letters.

17  Do you recall that discussion?

18  A    Yes.

19  Q    And do you recall saying that we never withdrew these

20  letters, right?

21  A    Correct.

22  Q    Why did we not withdraw these letters?

23  A    Because we don't believe that the trades that are being

24  entered into are in the best interest of the shareholders --

25  *i.e.*, the Funds.

Post - Direct                                229

1    Q    To your knowledge, did we ever, or did you ever,

2    communicate to the Trustees or Issuers anything in the nature

3    of instructing them to terminate the CLO management agreements

4    with the Debtor?

5    A    I did not.

6    Q    To your knowledge, did anyone, for the Funds or Advisors?

7    A    I don't believe so.

8    Q    Did you or anyone to your knowledge communicate to the

9    Issuers or Trustees that the process of removing the Debtor as

10   manager should commence?

11   A    I don't believe so.

12   Q    Okay.  To your knowledge, have any of the Issuers or

13   Trustees undertaken any steps to remove the Debtor or

14   terminate these contracts?

15        MR. MORRIS:  Objection to the extent it calls for the

16   conduct or knowledge of the Issuers.

17        THE COURT:  Overruled.  He can answer if he knows.

18        THE WITNESS:  I don't believe so.

19   BY MR. RUKAVINA:

20   Q    Had they, is that something that you would have expected

21   them to inform the Funds of?

22   A    Yes.  The Funds would have received some type of

23   notification if there was a new Advisor on the CLOs.

24   Q    So, other than these two letters -- let me stop there.

25   Did any discussion of trying to terminate these contracts

1   basically cease with the sending of these two letters and the

2   Debtor's responsive letters?

3   A    That's my understanding, yes.

4   Q    Okay.  And we never did file a motion for lift stay.  Can

5   you explain to the judge why we didn't file a motion for

6   relief from the stay?

7   A    It's my understanding that the intent was that the

8   management of the CLOs was going to be heard in conjunction

9   with the confirmation hearing.

10  Q    And do you recall when that confirmation hearing was

11  originally set for?

12  A    I believe it was supposed to start today.  Or tomorrow.

13  Q    Well, wasn't it earlier in January?  Around January 11th?

14  A    Uh, I -- I don't recall specifically.

15        MR. RUKAVINA:  Mr. Vasek, if we could pull up the

16  Form CLO agreement.  What exhibit is that?

17      (Pause.  Counsel confer.)

18        MR. RUKAVINA:  No, that's not.

19        THE COURT:  Can I ask what we're about to start

20  doing?

21        MR. RUKAVINA:  Eight.

22        THE COURT:  Can I ask what we are about to start

23  doing?

24        MR. RUKAVINA:  Your Honor, I apologize.  I'm trying

25  to find one of the CLO portfolio management agreements.  I'm

Post - Direct                                    231

1   trying to pull it up for you.

2            THE COURT:  Okay.

3            MR. RUKAVINA:  It should be in your binder.

4            THE COURT:  All right.  Well, --

5            MR. RUKAVINA:  Where is it, Julian?

6            MR. VASEK:  It should be 8.

7            MR. RUKAVINA:  I'm sorry?

8            MR. VASEK:  8.

9            MR. RUKAVINA:  Your Honor, it's Exhibit 8 in your

10  binder.

11           THE COURT:  Exhibit --

12  BY MR. RUKAVINA:

13  Q    And Mr. Post, you have that in front of you, right?

14           MR. RUKAVINA:  Mr. Vasek, if you'll go to Page 14,

15  please.  Section 14.  Termination by the Issuer for Cause.

16           MR. VASEK:  Okay.

17           MR. RUKAVINA:  Your Honor, the contract speaks for

18  itself, and I'm not about to read the contract to the Court.

19  The Court can read.  I want to ask him certain questions about

20  this.  And you'll note that the contract gives the requisite

21  holders of voting preference shares certain rights.

22           MR. MORRIS:  Your Honor, respectfully, the witness

23  has testified that he hadn't seen any of these contracts for

24  five or six years, until the lawyers asked him to look at it,

25  and they told him which specific provisions to look at.

Post - Direct                                   232

1        The document does speak for itself.  Counsel should just

2   make it part of his closing argument.  There's no evidence

3   that there's a quote/unquote Form CLO Management Agreement.

4   And I would just respectfully suggest that this is better

5   saved for closing argument.

6             THE COURT:  Yes.  What are we going to do here?  He

7   did not seem like he was an expert on these CLOs in his

8   earlier testimony.  He hadn't read much of them until

9   recently.  So where are we going with this?

10             MR. RUKAVINA:  Well, Your Honor, the question, again,

11   is -- can you hear me?  The question again is, Are we going to

12   be enjoined from exercising any rights in the future, so I

13   would like to take the witness through the importance from a

14   regulatory perspective and a fiduciary perspective of some of

15   these rights.  If Your Honor thinks that that's for closing

16   argument, that's fine.  But I will note that that Your Honor

17   allowed Mr. Morris for some forty minutes to read prior

18   testimony into the record.

19             MR. MORRIS:  I'm happy to respond if Your Honor needs

20   me to.

21             THE COURT:  Go ahead.

22             MR. MORRIS:  There is a complete difference, Your

23   Honor.  To read statements against interest, to read defense's

24   own sworn statements that they made at a prior proceeding, as

25   opposed to trying to get a witness who has admitted that he's

Post - Direct                              233

1    not familiar with these documents, to try to convince the

2    Court that they said something that the witness doesn't have

3    any personal knowledge or expertise about.  It's completely

4    different.

5              THE COURT:  All right.  I sustain the objection.  You

6    can make whatever argument you want in the closing arguments

7    about whatever provisions of whichever CLO agreements justify

8    actions.  I guess that's where we're going.

9              MR. RUKAVINA:  Then, if you could pull up Exhibit 78,

10   and if Your Honor could turn to Exhibit 78.

11             THE COURT:  All right.

12             MR. RUKAVINA:  Is this a confidential -- Julian, what

13   does it mean, it's confidential?  78.  Is this confidential?

14             MR. VASEK:  It says confidential on the --

15             MR. RUKAVINA:  Your Honor, apparently this is a

16   confidential document, so how does the Court want to proceed

17   on this WebEx?

18             THE COURT:  All right.  We're stopping.  We're

19   stopping.  We have protocols in place in this case, and people

20   usually file motions to present things under seal or

21   redactions.  My patience is shot, so we're going to stop.

22   Let's talk about where we go from here.

23             MR. MORRIS:  If I may, Your Honor?

24             THE COURT:  Yes.

25             MR. MORRIS:  John Morris from Pachulski Stang --

234

1              THE COURT:  Uh-huh.

2              MR. MORRIS:  -- for the Debtor.

3              MR. RUKAVINA:  We filed this under seal, right?

4              MR. MORRIS:  We were --

5              MR. RUKAVINA:  Oh, I thought we had.

6              MR. MORRIS:  -- hoping that we would get this

7     finished today, Your Honor, and the Debtor was really hoping

8     to get a ruling before confirmation.  But given all that's in

9     front of us, including the contempt hearing next Friday, just

10    a couple of days after the confirmation hearing, I think the

11    Debtor at this point is prepared to agree, if it's okay with

12    the Defendants' counsel, to push this to the following week,

13    since the -- you know, with the understanding that everybody

14    stipulate on the record that the TRO stays in place.  And if

15    we could have this particular motion heard, I guess, somewhere

16    -- it's the week of February 8th, the Debtor would consent to

17    that.

18             THE COURT:  All right.  Do we already have a --

19             MR. RUKAVINA:  Your Honor, can the Court --

20             THE COURT:  -- setting that week?  Because I know we

21    have confirmation, what, are we set for the 2nd, 3rd, and 4th?

22    Three days next week.

23             MR. MORRIS:  I believe -- yeah.  I think it's just

24    two, Your Honor.  I think --

25             THE COURT:  Okay.

235

 1          MR. MORRIS:  -- confirmation is the 2nd and the 3rd,

 2   and then I think the 5th is the contempt hearing.  I'm not

 3   aware, but I don't -- I don't profess to know the entirety of

 4   the calendar.  I'm not aware of anything that's on for the

 5   following week.

 6          THE COURT:  Does it make sense to continue this to

 7   the 5th?  Because the issues are so overlapping here.  I feel

 8   like it's been a contempt hearing half of today, actually.

 9          MR. MORRIS:  Yeah.

10          THE COURT:  So, shall we just set it for -- is it

11   Friday, the 5th?

12          MR. MORRIS:  It is.

13          THE COURT:  At 9:30?

14          MR. MORRIS:  And I think that's a great idea, yeah.

15   Yeah.

16          THE COURT:  What do you want to say about that, Mr.

17   Rukavina?

18          MR. RUKAVINA:  Thank you, Your Honor.  We're fine

19   with that.

20      Let me just point out, so that if the Court is impatient

21   or frustrated, we did move Exhibit 78 to be filed under seal.

22   The Court did enter an order allowing it to be filed under

23   seal.  So that the Court doesn't think that somehow we were

24   negligent in that.

25      But February the 5th works for us.

236

1          THE COURT:  Okay.  All right.  So I have an

2    unredacted clean copy up here, which, if and when I admit it,

3    we will put it under seal in our exhibit room, or I guess our

4    electronic exhibit room.

5       So, we'll come back on the 5th at 9:30.  But I am not -- I

6    am not done.  Yes, I am frustrated.  Yes, I'm impatient.  I

7    have asked myself "Why are we here?" so many times today.  Why

8    are we here?  I mean, I've had this conversation before.  I

9    mean, we had a, as you know, a very lengthy hearing on the

10   motion for a TRO or preliminary injunction against Mr. Dondero

11   personally.  And I think it was Mr. Morris who said, it's a

12   little bit like Groundhog Day.  You know, that was actually a

13   more flattering way of describing it than I might have.  I

14   might have said this is reminding me of Albert Einstein's

15   definition of insanity.  You all know what I'm talking about?

16   When you're doing the same thing over and over again and

17   expecting a different result.

18       And, you know, no offense, Mr. Dondero, if you're still

19   there listening, but that's what it feels like to me.  I mean,

20   it is -- it's the same thing over and over again.  And we've

21   spent very, very, very little time talking about the January

22   9th, 2020 corporate governance settlement agreement.  Of

23   course, it was mentioned extensively in the pleadings, at

24   least by the Debtor.  But, you know, I've heard all of this

25   evidence today, and I'm going to hear more evidence,

237

1   apparently, on the 5th.  But Paragraph -- was it 9? --

2   Paragraph 9 of the January 9th, 2020 settlement agreement.

3   The order directed Mr. Dondero not to "cause any related

4   entity to terminate any agreements with the Debtor."

5       And, you know, I thought to myself as I was reading,

6   preparing for this hearing, that, you know, I seem to remember

7   those words meant so, so much to me.  And then this reply

8   brief was filed by the Debtor at 6:00 or 7:00 o'clock last

9   night, and it gave an excerpt of the transcript, the hearing

10  where I approved this corporate governance settlement

11  agreement, and I said, that language is so important to me

12  because of my history in the *Acis* case, I want it in the

13  order.  I don't even -- I don't want it merely in the term

14  sheet, and then, of course, the order cross-references,

15  approves the term sheet.  I want that in the order.  Because,

16  you know, I knew, even with this highly-qualified independent

17  board of directors, and even with this very sophisticated

18  Creditors' Committee with very sophisticated professionals

19  monitoring everything that happened, and having not just the

20  monitoring rights but the standing to pursue things, I knew,

21  even with this great system that had been negotiated in the

22  January term sheet, there was the possibility of things

23  happening through Dondero-controlled entities indirectly.  And

24  so that's why we had that Paragraph 9.  So, --

25      (Interruption.)

238

```
 1           THE COURT:  I don't know what that was I just heard,
 2    but someone needs to put me on mute.
 3       So, I mean, we've heard a lot.  We've heard a lot, but --
 4           MR. DONDERO:  Hello?  Your Honor?  Your Honor?
 5           THE COURT:  Okay.  I --
 6           MR. DONDERO:  Hi.  Jim Dondero.
 7           THE COURT:  Oh, okay.  I'm still talking.  I'm still
 8    talking.  But I --
 9           MR. DONDERO:  Okay.
10           THE COURT:  But I said --
11           MR. DONDERO:  I'm sorry.
12           THE COURT:  I said at the hearing on the preliminary
13    injunction as to Mr. Dondero personally, do you remember what
14    I said, I said life changed when you put your company in
15    Chapter 11.  And, you know, even if you had stayed on as
16    president of the Debtor, life changed.  Okay?  Because you're
17    a debtor-in-possession.  You have to say, "Mother, may I?" to
18    the Court.  Creditors get to object to things.  So things
19    changed.
20       But things really, really, really changed, you know, they
21    changed in October 2019, and then they changed dramatically in
22    January 2020, when independent board members were put in place
23    and you were taken out of management.
24       So, the reason I'm coming back to that concept is this:
25    I've heard a lot about the preferred shareholders didn't like
```

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-29   Filed 07/24/23   Page 1023 of 1539   PageID 18261
Exhibit 29   Page 240 of 258

239

1   the trades Mr. Seery was implementing, the sale of AVYA, the

2   sale of SKY.  They didn't like it.  Well, I mean, I hate to

3   say something flippant like tough luck, but really:  Tough

4   luck.  Okay?  We all know that with a company like this, with

5   a company like Acis, it's complicated, right?  Because you've

6   got a fiduciary duty to your creditors to maximize value of

7   the estate so creditors get paid in Chapter 11, right?  But

8   meanwhile, you know, you've got to have fiduciary duties, I

9   don't know if it's directly to preferred shareholders or just

10  to the CLOs.  But whatever it is, you know, there may be

11  differing views that individual preferred shareholders have.

12  But Mr. Seery is in charge.  The Debtor is in charge.  You

13  don't like it, I'm sorry, but he's in charge.

14       So, you know, I thought, am I going to come in here today

15  and see all kinds of specific contractual references, where, I

16  don't know, somehow you have an argument that you can control

17  buys and sells?  Of course, in this case, it would just be

18  sells at this point.  You know, no.  I knew I wasn't going to

19  see that.  And I haven't.

20       So I don't know what I'm going to hear more on the 5th

21  that is going to tilt me a different way, but right now, if I

22  had to rule right now, this would be a total no-brainer to

23  issue this preliminary injunction.  Okay?  I feel like it's

24  been teed up almost like find Dondero in contempt, find these

25  entities in contempt.  What I'm here on today is whether I

240

1    should issue a preliminary injunction, and the December

2    letters, the emails, the communications, they lead me to

3    believe that this preliminary injunction is needed because

4    someone doesn't understand that Mr. Seery is in charge and the

5    preferred shareholders, the Funds, the Advisors, they don't

6    have the ability to interfere with what he's doing in running

7    the company.

8        And the threats of we're going to, you know, direct -- we

9    may direct the CLO Issuer to terminate the Debtor:  I mean,

10   it's just -- there's no sound business justification for that.

11   Okay?  I don't know what we're doing, where we're going.

12       Mr. Dondero, I said to you in December, you know, I really

13   wanted to encourage good-faith negotiations on your possible

14   pot plan because I thought you wanted to save your baby.  But

15   the more I hear, the more I feel you're just trying to burn

16   the house down.  Okay?  Maybe it's an either/or proposition

17   with you:  I'll either get my company back or I'll burn the

18   house down.  That's what it feels like.  And I have no choice

19   but to enter preliminary injunctions with this kind of

20   behavior.

21       So, I'm very frustrated.  I'm very frustrated.  I don't

22   know if anyone wants to say anything or we just end it on this

23   frustrating note.

24       Mr. Rukavina, did you want to let your client speak, or

25   no?

241

1              MR. RUKAVINA:  Your Honor?

2              THE COURT:  Not your client.

3              MR. RUKAVINA:  No, but --

4              THE COURT:  The client representative.

5              MR. RUKAVINA:  Your Honor, I take issue with what the

6    Court has said, but we did file a motion yesterday to file a

7    plan under seal.  It is -- Mr. Dondero, can you mute your

8    phone?  The Court should have seen that by now.  It is a pot

9    plan with much more cash consideration.  We have discussed it

10   with the Debtor and the Committee.  We are in earnest

11   negotiations.  I have no reason to believe or disbelieve that

12   we're close to a settlement.

13       But recall what I said at the beginning.  We asked the

14   Debtor to continue this hearing.  We said, You have a TRO that

15   ends February the 15th.  Why are you doing this?  Well, the

16   Debtor did it to smear Mr. Dondero on a very carefully crafted

17   record, without telling you the other half of it.  And when I

18   tried to have Mr. Post explain it, opposing counsel won't let

19   me even tell you our views.  So there is a competing plan.  We

20   want to try --

21             THE COURT:  You tried to get him to testify about

22   comments to CFRs when he has shown no expertise whatsoever --

23             MR. RUKAVINA:  That's fine.

24             THE COURT:  -- to permit that.

25             MR. RUKAVINA:  And I understand, Your Honor.  I don't

242

1   want -- Your Honor has made her evidentiary rulings.  I'm not

2   here to second-guess them.

3       I'm telling you that Mr. Dondero -- and more importantly,

4   the other companies, *i.e.*, NexPoint -- we heard you loud and

5   clear.  We did not just send forward some cocktail-napkin term

6   sheet.  I spent the weekend and Friday preparing a

7   comprehensive plan and disclosure statement.  I hope that the

8   Court will allow it to be filed under seal.  Exclusivity has

9   expired.  I am asking to file it under seal only.

10          THE COURT:  Tell me what utility that has.  What

11  utility does that have if you don't have one plan supporter?

12  I mean, where are we going with this?  I have invited, I have

13  encouraged, I have directed good-faith negotiations with the

14  Committee.  If you don't have the Committee on board, what

15  utility is there in allowing you to file a plan under seal?

16          MR. RUKAVINA:  Well, if it's filed under seal, Your

17  Honor, then, really, no one is going to be prejudiced or hurt.

18  But we have not been told --

19          THE COURT:  Then why --

20          MR. RUKAVINA:  -- from the Committee --

21          THE COURT:  Then why are we doing it?  Help me to

22  understand the strategy.  Maybe I'm just naïve.

23          MR. RUKAVINA:  Your Honor, there is no strategy and

24  the Court is not naïve.  Pursuant to an agreement of the

25  Committee and the Debtor, I sent that draft plan to them over

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 15-29 Filed 04/23/24   Page 1027 of 1539   PageID 18265

Exhibit 29   Page 244 of 258

243

1    the weekend, and they agree it's not solicitation.  It has not

2    gone to the creditors.  No one has seen it.

3        The reason why we sent it to the Committee and the Debtor

4    was to foster ongoing negotiations.  We had negotiations last

5    night.  The Committee and the Debtor had negotiations last

6    night.  We've been promised a response in the next couple of

7    days, and we have a follow-up meeting scheduled for Thursday.

8        The reason why I wanted the plan filed under seal is so

9    that there is a record of what is being discussed so the U.S.

10   Trustee can see it, if she wants to, and so that other key

11   constituents, if they want to or have a reason to, can see it.

12       But I agree with you:  That plan ain't going nowhere if we

13   don't have some material creditor support.  We won't know that

14   for a couple more days.

15       So my only point in saying this to Your Honor is that we

16   are working earnestly, we are increasing our consideration, we

17   have heard you loud and clear, and all the parties are

18   negotiating.

19       Again, we did not want this hearing to happen today

20   because it's a step backwards from negotiations, not a step

21   forward.  Thank you.

22            MR. POMERANTZ:  Your Honor, may I be heard?

23            THE COURT:  Go ahead, Mr. Pomerantz.  Go ahead.

24            MR. POMERANTZ:  Mr. Rukavina sent us over the plan,

25   and we had no problem with it being sent to the Committee.  He

244

 1   then sent us over the motion.  Now, aside from the fact that

 2   the motion contains some statements which the Debtor strongly

 3   disagrees with, with respect to the ability of administrative

 4   claims or other claims to be assumed, but putting that aside,

 5   we were concerned that the filing of a plan on the docket,

 6   unsealed, would be a distraction.

 7        Having said that, we also saw utility in the plan being

 8   put in the hands of the largest creditors so that they can

 9   evaluate what was being proposed.

10        We told Mr. Rukavina we have no problem if the plan was

11   filed under seal, stayed under seal until after confirmation,

12   and then, in exchange, we would agree to something that we

13   don't think we had to agree:  That he could send the plan to

14   UBS, to Acis, to Redeemer, to Meta-e, to HarbourVest, and

15   Daugherty.  Essentially, all the players in the case.  Mr.

16   Rukavina said he would consider that, and then just filed his

17   motion.

18        We don't have any problem with him doing that still,

19   sending it to the six creditors so they can look at it.  We

20   don't think it should be unsealed on the docket.

21        And the discussion of status of negotiations, Your Honor,

22   as we've told you many times before, we would love there to be

23   a plan.  We would love there to be support of a plan.  Mr.

24   Dondero asked to approach the board and speak to the board

25   yesterday.  We heard him out.  The plan essentially is the

245

 1  same document and the same term sheet, I think, that has been

 2  floating around for several weeks.

 3      Having said that, we said, We are not going to stand in

 4  the way of Mr. Dondero and the Creditors' Committee.  And if

 5  the Creditors' Committee and Mr. Dondero have a meeting of the

 6  minds, if there's any desire of them to have more time, we

 7  would be supportive of it.  I'll let Mr. Clemente respond as

 8  to whether there's any negotiation -- (echoing.)  But when Mr.

 9  Rukavina said that last night there were negotiations between

10  the Debtor and Mr. Dondero, that's just not accurate.  We, we

11  look at ourselves as the honest broker.  But at the end of the

12  day, as Your Honor has remarked many times throughout this

13  case and just remarked a few moments ago, unless the

14  Creditors' Committee supports this plan, it is DOA.  And we

15  have communicated that several times to Mr. Dondero and his

16  team.

17      So, I just wanted to speak to correct the record.  We're,

18  again, supportive of a plan if there can be one.  But at this

19  point, we haven't seen anything, the parties coming any closer

20  or any more negotiations, and we just have to get confirmed

21  sooner rather than later (echoing), prepared to go forward.

22          MR. CLEMENTE:  Your Honor, it's Matt Clemente at

23  Sidley.  I'm happy to make some comments to Your Honor, --

24          THE COURT:  Okay.

25          MR. CLEMENTE:  -- if you -- if you wish.

246

1           THE COURT:  Please do.

2           MR. CLEMENTE:  I think it's fair to say that the

3   Committee believes the plan needs to go forward next week,

4   Your Honor.  We have, of course, taken your direction very

5   seriously, and we very seriously consider all of the

6   communications we get from Mr. Dondero.  There exists still a

7   material value gap in what is being offered under Mr.

8   Dondero's plan, as well as a quality of the value.

9       So, Your Honor, while we continue to consider the plan and

10  what we receive from Mr. Dondero, I do not want to leave Your

11  Honor with the impression that the Committee feels like we are

12  close to an agreement, and we anticipate going forward with

13  the plan next week.

14      That being said, we of course will respond to Mr. Dondero

15  as we review the plan, but as I sit here today, I don't

16  believe that we are close.  But, again, the Committee will

17  continue to review it, and we should anticipate going forward

18  with confirmation next week.

19          THE COURT:  All right.  So, you don't have any

20  problem with the plan being filed under seal?

21          MR. CLEMENTE:  Your Honor, we -- the Committee does

22  have the plan, and I guess I'm not sure I'd see the point of

23  having it filed it under seal.  I think it serves to confuse

24  issues.  But, you know, hearing what Your Honor said earlier,

25  I don't think we need to continue to bring different fights in

247

 1   front of Your Honor, so I'm not sure that I see necessarily

 2   the harm in a plan being filed under seal, again, with the

 3   idea that, you know, why bring -- continue to bring fights to

 4   Your Honor if we don't need to?

 5            THE COURT:  All right.

 6            MR. CLEMENTE:  But what I do think is clear, Your

 7   Honor, that I do want to express to you is that the

 8   representations in that motion the Committee do not believe

 9   are accurate.  We do not believe that there's been a

10   significant value increase.  We do not believe that we are

11   close.  That would be the point that I would make in

12   connection with a response to that motion.  So, but in terms

13   of filing it under seal, I'm not sure the Committee has a

14   strong feeling that that should not happen.

15            THE COURT:  Yes.

16            MR. RUKAVINA:  And Your Honor, very quickly, --

17            THE COURT:  The words --

18            MR. RUKAVINA:  -- I never represented that we're

19   close.

20            THE COURT:  The words I remember in the motion were

21   significant value increase, something to that effect.  But

22   also more recovery than the plan that's on file.

23       (Echoing.)

24            THE COURT:  So I was kind of darn curious to see it

25   just for that.

1          MR. RUKAVINA:  And Your Honor, obviously, because

2    there's many people on this call, I don't want to run afoul of

3    any kind of procedures.  I'd be happy to walk Your Honor

4    through, but I can't, not with 90 people on the call.

5          THE COURT:  Right.

6          MR. RUKAVINA:  I did not represent that we're close

7    to a settlement in that motion, and I did not send the plan to

8    those people that Mr. Pomerantz mentioned.

9       So, right now, the Committee, the Debtor, and the

10   employees, because they requested it after Mr. Pomerantz

11   approved it, have what I would like to file under seal.  I'm

12   not suggesting here today that it go any farther than being

13   filed under seal, but at least it be there for some record.

14         THE COURT:  Well, didn't you -- did I dream this? --

15   didn't you say that there would be something like 48 hours for

16   people to object or then it would be filed not under seal?

17   Did I dream that?

18         MR. RUKAVINA:  Your Honor, that was my proposal, and

19   Your Honor can certainly reject that.  Mr. Pomerantz asked

20   that the plan should never be unsealed pending confirmation of

21   the Debtor's plan.  I have a different proposal.  Your Honor

22   will rule and we'll comply with Your Honor's ruling.

23         MR. DONDERO:  Jim Dondero here.  Can I have two --

24   two quick minutes and just say two quick things?

25         THE COURT:  Well, only if your counsel permits it.  I

249

1  don't want to get in --

2          MR. RUKAVINA:  I just don't -- yeah.  Mr. Dondero, if

3  you would please just not describe the substance, the economic

4  substance of our proposed plan, not with so many people on the

5  line.

6          MR. DONDERO:  Sure.  I just want to make two quick

7  points.  I couldn't apologize more for taking the Court's time

8  today.  It wasn't our 'druthers.  You heard, I think, at least

9  five or six hours from the Debtor.  You never once heard them

10 say that their activities didn't violate the Advisers Act.

11 And they never once said that violating the Advisers Act

12 wasn't a big deal.  You know, they never said that.

13     What they tried to say, oh, we have these other contracts.

14 Let's try and turn this into an injunction against Dondero

15 interfering.  But they never -- they never denied that Dondero

16 and the NexPoint team was trying to do what was in the best

17 interest of investors and that they had violated the Advisers

18 Act.

19     I think, in normal course, each side would have had an

20 expert and you could have opined on whether it was a violation

21 of the Advisers Act, but they know they did something wrong so

22 they're trying to make it an injunction against me.  Okay.

23 That's all I have to say about that point.

24     As far as the alternative plan, Your Honor, we heard you

25 loud and clear.  And the economics that we put forward, I

1    can't talk them about specifically, but they're at least 20

2    percent better than what the Debtor has put forward as far as

3    a plan.  And what we put forward is elegant, it's simpler, it

4    treats the employees fairly, it gives the business continuity,

5    it gives investors continuity, and it's not just a harsh,

6    punitive liquidation that's going to end up in a myriad of

7    litigation.

8         We're paying a premium, it's a capitulation price, to try

9    and get to some kind of settlement.  And I encourage you to

10   look at it.  It's elegant.  It's straightforward.  It's

11   simple.  And now that you've encouraged and gotten us up to a

12   number that's well in excess of the Debtor, maybe a little

13   pressure on other people to treat employees fairly, maybe not

14   liquidate a business that's important in Dallas, that has been

15   a big business for a number of years, doing enormous good

16   things for a lot of people.

17        You know, we went into bankruptcy with $450 million of

18   assets and almost no debt.  And we've been driven into the

19   ground by the process.  And then the plan is to just harshly

20   liquidate going forward.  I -- I -- it's crazy.  I don't know

21   what else to do to stop the train other than what we've

22   offered.

23            THE COURT:  All right.  Well, I hear what you're

24   saying, and I do, just because -- I don't know if you left the

25   room or not, but we did have discussion of Section 206 of the

Case 19-34054-sgj11 Doc 3596-29 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 35-29 Filed 12/22/23 Page 1035 of 1539 PageID 18273

251

 1   Investment Advisers Act today.  It was put on the screen.  Mr.

 2   Post was asked what was unlawful as far as what had happened

 3   here, what was going on here, what was fraudulent, deceptive,

 4   or manipulative, in parsing through the words of the statute.

 5   And he said Mr. Seery engaged in deceptive acts because he

 6   wasn't trying to maximize value.  Okay?  I'm not an expert on

 7   the Investment Advisers Act, but I know that that was not a

 8   deceptive act.

 9        And so I'll allow the plan to be filed under seal, but

10   it's not going to be unsealed absent an order of the Court.

11   Okay?  So we'll just leave it at that for now.  And while I

12   still encourage good-faith negotiations here, I've said it

13   umpteen times, where you're tired of the cliché, probably:

14   The train is leaving the station.  And if you want the Court

15   to have patience in the process and if you want the parties to

16   cooperate in good faith, it might help if we didn't have

17   things like Dugaboy and Get Good Trust filing a motion for an

18   examiner 15 months into the case.

19        I mean, it feels to me, Mr. Dondero, whether I'm right or

20   wrong, that it's like you've got a twofold approach here:  I

21   either get the company back or I burn the house down.  And I'm

22   telling you right now, if we don't have agreements, --

23            MR. DONDERO:  That's not true.

24            THE COURT:  -- if we don't have agreements and we

25   come back on the 5th for a continuation of this hearing and a

252

 1  motion to hold you in contempt, you know, I'm leaning right

 2  now, based on what I've heard so far, and I know I haven't

 3  heard everything, but I'm leaning right now towards finding

 4  contempt and shifting a whole bundle of attorneys' fees.

 5  That, to me, seems like the likely place we're heading.

 6      I mean, I commented at the December hearing on the

 7  preliminary injunction against you personally that it had been

 8  like a $250,000 hearing, I figured, okay, just guesstimating

 9  everybody's billable rate times the hours we spent.  Well,

10  here we were again, and I know we've got all this time outside

11  the courtroom preparing, taking depositions.  I mean, what

12  else is a judge to think except, by God, let's drive up

13  administrative expenses as much as we can; if we can't win,

14  we're going to go down fighting?  That's what this looks like.

15  Okay?  So if it's not really what's going on, then you've got

16  to work hard to change my perceptions at this point.

17          MR. RUKAVINA:  Your Honor, I hear everything what

18  you're saying, and I'm going to discuss it very bluntly with

19  my clients.  But we're being asked not to exercise contract

20  rights in the future.  This is not a contempt hearing.  And

21  Your Honor, we did ask and offered the estate a million

22  dollars, found money, plus to waive almost all our plan

23  objections, if they would just put this case on pause for 30

24  days.

25      So we are trying.  We are trying creative solutions here.

1   We know that the train is leaving.  We've put our money where

2   our mouth is.  We will continue trying.  But Your Honor, this

3   is not a contempt proceeding, and my clients are not Mr.

4   Dondero.  You've heard they're independent boards.

5         MR. POMERANTZ:  I can't leave that last comment

6   without a response.  Yes, there was an offer of a million

7   dollars, by an entity that owes the estate multiples of that.

8   So they are offering to pay us something that they already owe

9   us.  So Mr. Rukavina continues try to do this.  We will not

10  stand for it.

11        MR. RUKAVINA:  That is not a fair statement, sir.  I

12  misrepresented nothing.  We were offering you a million

13  dollars, with no conditions, earned upon receipt, with no

14  credit, no deduction for any of our liability.  So you're free

15  to say no, sir, but you're not going to tell the judge that I

16  misrepresented something.

17        THE COURT:  All right.

18        MR. POMERANTZ:  Should tell the Court --

19        THE COURT:  You know what?

20        MR. POMERANTZ:  -- that that entity owed the Debtor.

21        THE COURT:  You know what?  You know what?  I am more

22  focused on, Mr. Rukavina, your comment that this Court can't

23  enjoin your clients from exercising contractual rights when,

24  again, in January of 2020, the representation was made and it

25  was ordered, "Mr. Dondero shall not cause any related entity

254

1    to terminate any agreements with the Debtor."  Okay?  That was

2    -- go back and look at the transcript.  That was so meaningful

3    to me.

4        We were facing a possible trustee.  And that's what I did

5    in the *Acis* case.  Okay?  I had a Chapter 11 trustee.  And it

6    was not a perfect fit, to be sure.  But it is where we were

7    heading in this case, had the lawyers and parties not

8    negotiated what they did.  That was a very important

9    provision, convincing me that, you know what, I think the

10   structure they've got will be better than a trustee.  And it

11   has, for the most part.  But the fees have gone out the roof,

12   and I lay that at the feet of Mr. Dondero, for the most part.

13   Okay?  We have a bomb thrown every five minutes by either him

14   personally or the Dugaboy or the Get Good Trust or the Funds

15   or the Advisors or I don't know who else.  Okay?

16       So the train is leaving the station, unless you all come

17   to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18   -- grand solution here.  Okay?  If you get there in the next

19   few days, wonderful.  Okay?  But I don't know what else to say

20   except I'm tired of the carpet-bombing, and if I had to rule

21   this minute, there would be a huge amount of fee-shifting for

22   what we went through today, for what we went through in

23   December, for the restriction motion that, after I called it

24   frivolous, the lawyers were sending letters pretty much

25   regurgitating the same arguments.  All right.  So, not a happy

255

1    camper.

2        But upload your order on the motion to seal the plan.

3    And, again, it's not going to be unsealed absent a further

4    order of the Court.  And if you all come to me next week and

5    say, hey, we've got something in the works here, okay, I'll

6    consider unsealing it and letting you go down a different

7    path.  But I'm not naïve.  I feel like this is just more

8    burning the house down, maybe.  I don't know.  I hope I'm

9    wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10   see you next week.

11              MR. POMERANTZ:  Thank you, Your Honor.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  We're adjourned.

14              MR. RUKAVINA:  Thank you, Your Honor.

15              THE CLERK:  All rise.

16        (Proceedings concluded at 6:08 p.m.)

17                        --oOo--

18

19

20                    CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23     /s/ Kathy Rehling                    01/28/2021

24   _____    _____

     Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

256

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

- By Mr. Morris                                              19
- By Mr. Rukavina                                           31

WITNESSES

Debtor's Witnesses

James P. Seery
- Proffer of Direct Testimony by Mr. Pomerantz               6

James D. Dondero
- Direct Examination by Mr. Morris                          42

Jason Post
- Direct Examination by Mr. Morris                         108

James P. Seery, Recalled
- Direct Examination by Mr. Morris                         152
- Cross-Examination by Mr. Hogewood                        170
- Redirect Examination by Mr. Morris                       188
- Examination by the Court                                 191

Defendants' Witnesses

Jason Post
- Direct Examination by Mr. Rukavina                       201
   *Voir Dire* Examination by Mr. Morris                   206
   Direct Examination, Resumed, by Mr. Rukavina            207

EXHIBITS

Debtor's Exhibits A through SSSSS *(exclusive of*   Received  19
   *Exhibits UUUU, VVVV, and AAAAA)*
Debtor's Exhibit D (Email)                        Received 200
Debtor's Exhibit K (Letter)                       Received 198
Debtor's Exhibit TTTTT                            Received  64

257

INDEX
Page 2

RULINGS

19-34054-sgj11 - Highland Capital Management, L.P.

    Motion of the Debtor for Entry of an Order                    12
    Authorizing the Debtor to Implement a Key Employee
    Retention Plan with Non-Insider Employees and
    Granting Related Relief filed by Debtor Highland
    Capital Management, L.P. (1777) - *Granted*


21-03000-sgj - Highland Capital Management, L.P. v.
Highland Capital Management Fund Advisors, L.P. et al.

    Agreed Settlement with CLO Holdco, Ltd.                        15

    Plaintiff's Motion for a Preliminary Injunction              233
    against Certain Entities Owned and/or Controlled
    by Mr. James Dondero (5) - *Continued*

END OF PROCEEDINGS                                                  255

INDEX                                                          256-257

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 30

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3    In Re:                         )    Chapter 11
                                     )
 4    HIGHLAND CAPITAL               )    Dallas, Texas
      MANAGEMENT, L.P.,              )    Monday, February 8, 2021
 5                                   )    9:00 a.m. Docket
                                     )
 6            Debtor.                )
                                     )    BENCH RULING ON CONFIRMATION
 7                                   )    HEARING [1808] AND AGREED
                                     )    MOTION TO ASSUME [1624]
 8    _____)

 9                         TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                    UNITED STATES BANKRUPTCY JUDGE.

11    WEBEX APPEARANCES:

12    For the Debtor:              Jeffrey Nathan Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
13                                 10100 Santa Monica Blvd.,
                                     13th Floor
14                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
15
      For the Official Committee   Matthew A. Clemente
16    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
17                                 Chicago, IL  60603
                                   (312) 853-7539
18
      For James Dondero:           D. Michael Lynn
19                                 John Y. Bonds, III
                                   Bryan C. Assink
20                                 BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
21                                 420 Throckmorton Street,
                                     Suite 1000
22                                 Fort Worth, TX  76102
                                   (817) 405-6900
23
      For Get Good Trust and       Douglas S. Draper
24    Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
                                   650 Poydras Street, Suite 2500
25                                 New Orleans, LA  70130
                                   (504) 299-3300
```

2

APPEARANCES, cont'd.:

For Certain Funds and          Davor Rukavina
Advisors:                      MUNSCH, HARDT, KOPF & HARR
                               500 N. Akard Street, Suite 3800
                               Dallas, TX  75201-6659
                               (214) 855-7587

For Certain Funds and          A. Lee Hogewood, III
Advisors:                      K&L GATES, LLP
                               4350 Lassiter at North Hills
                                 Avenue, Suite 300
                               Raleigh, NC  27609
                               (919) 743-7306

Recorded by:                   Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
                               (214) 753-2062

Transcribed by:                Kathy Rehling
                               311 Paradise Cove
                               Shady Shores, TX  76208
                               (972) 786-3063

              Proceedings recorded by electronic sound recording;
                  transcript produced by transcription service.

3

| | |
|---|---|
| 1 | <u>DALLAS, TEXAS - FEBRUARY 8, 2021 - 9:08 A.M.</u> |
| 2 | THE COURT:  Please be seated. |
| 3 | (Beeping.) |
| 4 | THE COURT:  Someone needs to turn off their whatever. |
| 5 | All right.  Good morning.  This is Judge Jernigan, and we |
| 6 | have scheduled today a bench ruling regarding the Debtor's |
| 7 | plan that we had a confirmation trial on last week.  This is |
| 8 | Highland Capital Management, LP, Case No. 19-34054. |
| 9 | Let me first make sure we've got Debtor's counsel on the |
| 10 | line.  Do we have -- |
| 11 | MR. POMERANTZ:  Yes. |
| 12 | THE COURT:  -- Mr. Pomerantz? |
| 13 | MR. POMERANTZ:  Yes, Your Honor.  Good morning, Your |
| 14 | Honor.  Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on |
| 15 | behalf of the Debtor. |
| 16 | THE COURT:  Okay.  Good morning.  Do we have the |
| 17 | Creditors' Committee on the phone? |
| 18 | MR. CLEMENTE:  Good morning, Your Honor.  Matthew |
| 19 | Clemente of Sidley Austin on behalf of the Creditors' |
| 20 | Committee. |
| 21 | THE COURT:  Good morning.  All right.  We had various |
| 22 | Objectors.  Do we have Mr. Dondero's counsel on the phone? |
| 23 | MR. LYNN:  Yes, Your Honor.  Michael Lynn, together |
| 24 | with John Bonds and Bryan Assink, for Jim Dondero. |
| 25 | THE COURT:  Good morning.  For the Trusts, the |

4

 1  Dugaboy and Get Good Trusts, do we have Mr. Draper?

 2          MR. DRAPER:  Yes.  Douglas Draper is on the line,

 3  Your Honor.

 4          THE COURT:  Good morning.  Now, for what I'll call

 5  the Funds and Advisor Objectors, do we have Mr. Rukavina and

 6  your crew on the line?

 7          MR. RUKAVINA:  Davor Rukavina.  And Lee Hogewood is

 8  also on the line.

 9          THE COURT:  All right.  Good morning to you.  All

10  right.  And we had objections pending from the U.S. Trustee as

11  well.  Do we have the U.S. Trustee on the line?

12      (No response.)

13          THE COURT:  All right.  If you're appearing, you're

14  on mute.  We're not hearing you.

15      All right.  Well, we have lots of other folks.  I don't

16  mean to be neglectful of them, but we're going to get on with

17  the ruling this morning.  This is going to take a while.  This

18  is a complex matter, so it should take a while.

19      All right.  Before the Court, of course, for consideration

20  is the Debtor's Fifth Amended Plan, first filed on November

21  24, 2020, as later modified on or around January 22, 2021,

22  with more amendments filed on or around February 1, 2021.  The

23  Court will hereinafter refer to this as the "Plan."

24      The parties refer to the Plan as a monetization plan

25  because it involves the gradual wind-down of the Debtor's

5

1   assets and certain of its funds over time, with the

2   Reorganized Debtor continuing to manage certain other funds

3   for a while, under strict governance and monitoring, and a

4   Claimants Trust will receive the proceeds of that process,

5   with the creditors receiving an interest in that trust.  There

6   is also anticipated to be Litigation Sub-Trust established for

7   the purpose of pursuing certain avoidance or other causes of

8   action for the benefit of creditors.

9       The recovery for general unsecured creditors is estimated

10  now at 71 percent.

11      The Plan was accepted by 99.8 percent of the dollar amount

12  of voting creditors in Class 8, the general unsecured class,

13  but as to numerosity, a majority of the class of general

14  unsecured creditors did not vote in favor of the plan.

15  Specifically, 27 claimants voted no and 17 claimants voted

16  yes.  All but one of the rejecting ballots were cast by

17  employees who, according to the Debtor, are unlikely to have

18  allowed claims because they are asserted for bonuses or other

19  compensation that will not become due.

20      Meanwhile, in a convenience class, Class 7, of general

21  unsecured claims under one million dollars, one hundred

22  percent of the 16 claimants who chose to vote in that class

23  chose to accept the Plan.

24      Because of the rejecting votes in Class 8, and because of

25  certain objections to the Plan, the Court heard two full days

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35-11   Filed 12/29/23   Page 1048 of 1539   PageID 18286
Exhibit 30   Page 972 of 52

6

1    of evidence, considering testimony from five witnesses and

2    thousands of pages of documentary evidence, in considering

3    whether to confirm the Plan pursuant to Sections 1129(a) and

4    (b) of the Bankruptcy Code.

5         The Court finds and concludes that the Plan meets all of

6    the relevant requirements of Sections 1123, 1124, and 1129 of

7    the Code, and other applicable provisions of the Bankruptcy

8    Code, but is issuing this detailed ruling to address certain

9    pending objections to the Plan, including but not limited to

10   objections regarding certain Exculpations, Releases, Plan

11   Injunctions, and Gatekeeping Provisions of the Plan.

12        The Court reserves the right to amend or supplement this

13   oral ruling in more detailed findings of fact, conclusions of

14   law, and an Order.

15        First, by way of introduction, this case is not your

16   garden-variety Chapter 11 case.  Highland Capital Management,

17   LP is a multibillion dollar global investment advisor,

18   registered with the SEC pursuant to the Investment Advisers

19   Act of 1940.  It was founded in 1993 by James Dondero and Mark

20   Okada.  Mr. Okada resigned from his role with Highland prior

21   to the bankruptcy case being filed.  Mr. Dondero was in

22   control of the Debtor as of the day it filed bankruptcy, but

23   agreed to relinquish control of it on or about January 9,

24   2020, pursuant to an agreement reached with the Official

25   Unsecured Creditors' Committee, which will be described later.

7

1       Although Mr. Dondero remained on as an unpaid employee and

2   portfolio manager with the Debtor after January 9, 2020, his

3   employment with the Debtor terminated on October 9, 2020.  Mr.

4   Dondero continues to work for and essentially control numerous

5   nondebtor companies in the Highland complex of companies.

6       The Debtor is headquartered in Dallas, Texas.  As of the

7   October 2019 petition date, the Debtor employed approximately

8   76 employees.

9       Pursuant to various contractual arrangements, the Debtor

10  provides money management and advisory services for billions

11  of dollars of assets, including CLOs and other investments.

12  Some of these assets are managed pursuant to shared services

13  agreements with a variety of affiliated entities, including

14  other affiliated registered investment advisors.  In fact,

15  there are approximately 2,000 entities in the Byzantine

16  complex of companies under the Highland umbrella.

17      None of these affiliates of Highland filed for Chapter 11

18  protection.  Most, but not all, of these entities are not

19  subsidiaries, direct or indirect, of Highland.  And certain

20  parties in the case preferred not to use the term "affiliates"

21  when referring to them.  Thus, the Court will frequently refer

22  loosely to the so-called, in air quotes, "Highland complex of

23  companies" when referring to the Highland enterprise.  That's

24  a term many of the lawyers in the case use.

25      Many of the companies are offshore entities, organized in

8

1   such faraway jurisdictions as the Cayman Islands and Guernsey.

2       The Debtor is privately owned 99.5 percent by an entity

3   called Hunter Mountain Investment Trust; 0.1866 percent by the

4   Dugaboy Investment Trust, a trust created to manage the assets

5   of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6   personally and through family trusts; and 0.25 percent by

7   Strand Advisors, Inc., the general partner.

8       The Debtor's primary means of generating revenue has

9   historically been from fees collected for the management and

10  advisory services provided to funds that it manages, plus fees

11  generated for services provided to its affiliates.

12      For additional liquidity, the Debtor, prior to the

13  petition date, would sell liquid securities in the ordinary

14  course, primarily through a brokerage account at Jefferies,

15  LLC.  The Debtor would also, from time to time, sell assets at

16  nondebtor subsidiaries and distribute those proceeds to the

17  Debtor in the ordinary course of business.

18      The Debtor's current CEO, James Seery, credibly testified

19  that the Debtor was "run at a deficient for a long time and

20  then would sell assets or defer employee compensation to cover

21  its deficits."  This Court cannot help but wonder if that was

22  necessitated because of enormous litigation fees and expenses

23  that Highland was constantly incurring due to its culture of

24  litigation, as further addressed hereafter.

25      Highland and this case are not garden-variety for so many

9

 1    reasons.  One is the creditor constituency.  Highland did not

 2    file bankruptcy because of some of the typical reasons a large

 3    company files Chapter 11.  For example, it did not have a

 4    large asset-based secured lender with whom it was in default.

 5    It only had relatively insignificant secured indebtedness

 6    owing to Jefferies, with whom it had a brokerage account, and

 7    one other entity called Frontier State Bank.

 8        Highland did not have problems with trade vendors or

 9    landlords.  It did not suffer any type of catastrophic

10    business calamity.  In fact, it filed Chapter 11 six months

11    before the COVID-19 pandemic was declared.  The Debtor filed

12    Chapter 11 due to a myriad of massive unrelated business

13    litigation claims that it was facing, many of which had

14    finally become liquidated or were about to become liquidated

15    after a decade or more of contentious litigation in multiple

16    fora all over the world.

17        The Unsecured Creditors' Committee in this case has

18    referred to the Debtor under its former chief executive, Mr.

19    Dondero, as a serial litigator.  This Court agrees with that

20    description.  By way of example, the members of the Creditors'

21    Committee and their history of litigation with the Debtor and

22    others in the Highland complex are as follows:

23        First, the Redeemer Committee of the Highland Crusader

24    Fund, which I'll call the Redeemer Committee.  This Creditors'

25    Committee member obtained an arbitration award against the

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 10/29/23   Page 1052 of 1539   PageID 18290
Exhibit 30   Page 29 of 52

10

1  Debtor of more than $190 million, inclusive of interest,

2  approximately five months before the petition date from a

3  panel of the American Arbitration Association.  It was on the

4  verge of having that award confirmed by the Delaware Chancery

5  Court immediately prior to the petition date, after years of

6  disputes that started in late 2008 and included legal

7  proceedings in Bermuda.  This creditor's claim was settled

8  during the bankruptcy case in the amount of approximately

9  $137.7 million.  The Court is omitting various details and

10 aspects of that settlement.

11     The second Creditors' Committee member, Acis Capital

12 Management, LP, which was formerly in the Highland complex of

13 companies but was not affiliated with Highland as of the

14 petition date.  This UCC member and its now-owner, Josh Terry,

15 were involved in litigation with Highland dating back to 2016.

16 Acis was forced into an involuntary bankruptcy in the

17 Bankruptcy Court for the Northern District of Texas, Dallas

18 Division, by Josh Terry, who was a former Highland portfolio

19 manager, in 2018 after Josh Terry obtained an approximately $8

20 million arbitration award and judgment against Acis that was

21 issued by a state court in Dallas County, Texas.  Josh Terry

22 was ultimately awarded the equity ownership of Acis by the

23 Dallas Bankruptcy Court in the Acis bankruptcy case.

24     Acis subsequently asserted a multimillion dollar claim

25 against Highland in the Dallas Bankruptcy Court for Highland's

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 10/09/23    Page 1053 of 1539    PageID 18291
Exhibit 30 Page 29 of 52

11

1    alleged denuding of Acis in fraud of its creditors, primarily

2    Josh Terry.

3        The litigation involving Acis and Mr. Terry dates back to

4    mid-2016, and has continued on, with numerous appeals of

5    bankruptcy court orders, including one appeal still pending at

6    the United States Court of Appeals for the Fifth Circuit.

7        There was also litigation involving Josh Terry and Acis in

8    the Royal Court of the Island of Guernsey and in a court in

9    New York.

10       The Acis claim was settled during this bankruptcy case in

11   court-ordered mediation for approximately $23 million.  Other

12   aspects and details of this settlement are being omitted.

13       Now, the third Creditors' Committee member, UBS

14   Securities.  It's a creditor who filed a proof of claim in the

15   amount of $1,039,000,000 in the Highland case.  Yes, over one

16   billion dollars.  The UBS claim was based on the amount of a

17   judgment that UBS received from a New York state court in 2020

18   after a multi-week bench trial which had occurred many months

19   earlier on a breach of contract claim against other entities

20   in the Highland complex.  UBS alleged that the Debtor should

21   be liable for the judgment.  The UBS litigation related to

22   activities that occurred in 2008.  The litigation involving

23   UBS and Highland and its affiliates was pending for more than

24   a decade, there having been numerous interlocutory appeals

25   during its history.

12

1        The Debtor and UBS recently announced a settlement of the

2   UBS claim, which came a few months after court-ordered

3   mediation.  The settlement is in the amount of $50 million as

4   a general unsecured claim, $25 million as a subordinated

5   claim, and $18 million of cash coming from a nondebtor entity

6   in the Highland complex known as Multistrat.  Other aspects of

7   this settlement are being omitted.

8        The fourth and last Creditors' Committee member is Meta-e

9   Discovery.  It is a vendor who happened to supply litigation

10  and discovery-related services to the Debtor over the years.

11  It had unpaid invoices on the petition date of more than

12  $779,000.

13       It is fair to say that the members of the Creditors'

14  Committee in this case all have wills of steel.  They fought

15  hard before and during the bankruptcy case.  The members of

16  the Creditors' Committee are highly sophisticated and have had

17  highly sophisticated professionals representing them.  They

18  have represented their constituency in this case as

19  fiduciaries extremely well.

20       In addition to these Creditors Committee members, who were

21  all embroiled in years of litigation with Highland and its

22  affiliates in various ways, the Debtor has been in litigation

23  with Patrick Daugherty, a former limited partner and employee

24  of Highland, for many years in both Delaware and Texas state

25  courts.  Patrick Daugherty filed a proof of claim for "at

13

1  least $37.4 million" relating to alleged breached employment-

2  related agreements and for the tort of defamation arising from

3  a 2017 press release posted by the Debtor.

4       The Debtor and Patrick Daugherty recently announced a

5  settlement of the Patrick Daugherty claim in the amount of

6  $750,000 cash on the effective date, an $8.25 million general

7  unsecured claim, and a $2.75 million subordinated claim.

8  Other aspects and details of this settlement are being

9  omitted.

10      Additionally, an entity known as HarbourVest, who invested

11 more than $70 million with an entity in the Highland complex,

12 asserted a $300 million proof of claim against Highland,

13 alleging, among other things, fraud and RICO violations.  The

14 HarbourVest claim was settled during the bankruptcy case for a

15 $45 million general unsecured claim and a $35 million junior

16 claim.

17      Other than these claims just described, most of the other

18 claims in this case are claims asserted against the Debtor by

19 other entities in the Highland complex, most of which entities

20 the Court finds to be controlled by Mr. Dondero; claims of

21 employees who believe that they are entitled to large bonuses

22 or other types of deferred compensation; and claims of

23 numerous law firms that did work for Highland and were unpaid

24 for amounts due to them on the petition date.

25      Yet another reason this is not your garden-variety Chapter

14

1   11 case is its postpetition corporate governance structure.

2   Highland filed bankruptcy October 16, 2019.  Contentiousness

3   with the Creditors' Committee began immediately, with first

4   the Committee's request for a change of venue from Delaware to

5   Dallas, and then a desire by the Committee and the U.S.

6   Trustee for a Chapter 11 or 7 trustee to be appointed due to

7   concerns over and distrust of Mr. Dondero and his numerous

8   conflicts of interest and alleged mismanagement or worse.

9        After many weeks of the threat of a trustee lingering, the

10   Debtor and the Creditors' Committee negotiated and the Court

11   approved a corporate governance settlement on January 9, 2020

12   that resulted in Mr. Dondero no longer being an officer or

13   director of the Debtor or of its general partner, Strand.

14        As part of the court-approved settlement, three eminently-

15   qualified Independent Directors were chosen by the Creditors'

16   Committee and engaged to lead Highland through its Chapter 11

17   case.  They were James Seery, John Dubel, and Retired

18   Bankruptcy Judge Russell Nelms.  They were technically the

19   Independent Directors of Strand, the general partner of the

20   Debtor.  Mr. Dondero had previously been the sole director of

21   Strand, and thus the sole person in ultimate control of the

22   Debtor.

23        The three independent board members' resumes are in

24   evidence.  James Seery eventually was named CEO of the Debtor.

25   Suffice it to say that this changed the entire trajectory of

15

1   the case.  This saved the Debtor from a trustee.  The Court

2   trusted the new directors.  The Creditors' Committee trusted

3   them.  They were the right solution at the right time.

4       Because of the unique character of the Debtor's business,

5   the Court believed this solution was far better than a

6   conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7   particular, knew and had vast experience at prominent firms

8   with high-yield and distressed investing similar to the

9   Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15      By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

 1   could not get Highland and its affiliates to agree to any

 2   actions taken in the case, and he finally obtained

 3   confirmation of a plan over Highland and its affiliates'

 4   objections in his fourth attempted plan, which confirmation

 5   then was promptly appealed by Highland and its affiliates.

 6        Suffice it to say it was not easy to get such highly-

 7   qualified persons to serve as independent board members and

 8   CEO of this Debtor.  They were stepping into a morass of

 9   problems.  Naturally, they were worried about getting sued, no

10   matter how defensible their efforts might be, given the

11   litigation culture that enveloped Highland historically.  It

12   seemed as though everything always ended in litigation at

13   Highland.

14        The Court heard credible testimony that none of them would

15   have taken on the role of Independent Director without a good

16   D&O insurance policy protecting them, without indemnification

17   from Strand, guaranteed by the Debtor; without exculpation for

18   mere negligence claims; and without a gatekeeper provision,

19   such that the Independent Directors could not be sued without

20   the bankruptcy court, as a gatekeeper, giving a potential

21   plaintiff permission to sue.

22        With regard to the gatekeeper provision, this was

23   precisely analogous to what bankruptcy trustees have pursuant

24   to the so-called "Barton Doctrine," which was first

25   articulated in an old U.S. Supreme Court case.

17

1        The Bankruptcy Court approved all of these protections in

2   a January 9, 2020 order.  No one appealed that order.  And Mr.

3   Dondero signed the settlement agreement that was approved by

4   that order.

5        An interesting fact about the D&O policy came out in

6   credible testimony at the confirmation hearing.  Mr. Dubel and

7   an insurance broker from Aon, named Marc Tauber, both credibly

8   testified that the gatekeeper provision was needed because of

9   the so-called, and I quote, "Dondero Exclusion" in the

10  insurance marketplace.

11       Specifically, the D&O insurers in the marketplace did not

12  want to cover litigation claims that might be brought against

13  the Independent Directors by Mr. Dondero because the

14  marketplace of D&O insurers are aware of Mr. Dondero's

15  litigiousness.  The insurers would not have issued a D&O

16  policy to the Independent Directors without either the

17  gatekeeping provision or a "Dondero Exclusion" being in the

18  policy.

19       Thus, the gatekeeper provision was part of the January 9,

20  2020 settlement.  There was a sound business justification for

21  it.  It was reasonable and necessary.  It was consistent with

22  the Barton Doctrine in an extremely analogous situation --

23  *i.e.*, the independent board members were analogous to a three-

24  headed trustee in this case, if you will.  Mr. Dondero signed

25  off on it.  And, again, no one ever appealed the order

18

1    approving it.

2        The Court finds that, like the Creditors' Committee, the

3    independent board members here have been resilient and

4    unwavering in their efforts to get the enormous problems in

5    this case solved.  They seem to have at all times negotiated

6    hard and with good faith.  As noted previously, they changed

7    the entire trajectory of this case.

8        Still another reason why this was not your garden-variety

9    case was the mediation effort.  In summer of 2020, roughly

10   nine months into the Chapter 11 case, this Court ordered

11   mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12   and Mr. Dondero.  The Court selected co-mediators, since this

13   seemed like such a Herculean task, especially during COVID-19,

14   where people could not all be in the same room.  Those co-

15   mediators were Retired Bankruptcy Judge Allan Gropper from the

16   Southern District of New York, who had a distinguished career

17   presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18   who likewise has had a distinguished career, first as a

19   partner in a preeminent law firm working on complex Chapter 11

20   cases, and subsequently as a mediator and arbitrator in

21   Houston, Texas.

22       As noted earlier, the Acis claim was settled during the

23   mediation, which seemed nothing short of a miracle to this

24   Court, and the UBS claim was settled many months later, and

25   this Court believes the groundwork for that ultimate

19

1  settlement was laid, or at least helped, through the

2  mediation.  And as earlier noted, other enormous claims have

3  been settled during this case, including that of the Redeemer

4  Committee, who, again, had asserted approximately or close to

5  a $200 million claim; HarbourVest, who asserted a $300 million

6  claim; and Patrick Daugherty, who asserted close to a $40

7  million claim.

8      This Court cannot stress strongly enough that the

9  resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

1    that the Debtor filed shortly before the confirmation hearing

2    that, among other things, show the estimated distribution to

3    creditors and compare plan treatment to a likely disbursement

4    in a Chapter 7.

5         These do not constitute a materially adverse change to the

6    treatment of any creditors or interest holders.  They merely

7    update likely distributions based on claims that have now been

8    settled, and they've otherwise incorporated more recent

9    financial data.  This happens often before confirmation

10   hearings.  The Court finds that it did not mislead or

11   prejudice any creditors or interest holders, and certainly

12   there was no need to resolicit the Plan.

13        The only Objectors to the Plan left at this time were Mr.

14   Dondero and entities that the Court finds are controlled by

15   him.  The standing of these entities to object to the Plan

16   exists, but the remoteness of their economic interest is

17   noteworthy, and the Court questions the good faith of the

18   Objectors.  In fact, the Court has good reason to believe that

19   these parties are not objecting to protect economic interests

20   they have in the Debtor, but to be disruptors.

21        Mr. Dondero wants his company back.  This is

22   understandable.  But it's not a good faith basis to lob

23   objections to the Plan.  The Court has slowed down

24   confirmation multiple times on the current Plan and urged the

25   parties to talk to Mr. Dondero.  The parties represent that

21

1    they have, and the Court believes that they have.

2         Now, to be specific about the remoteness of the objectors'

3    interests, the Court will address them each separately.

4    First, Mr. Dondero has a pending objection.  Mr. Dondero's

5    only economic interest with regard to the Debtor at this point

6    is an unliquidated indemnification claim.  And based on

7    everything this Court has heard, his indemnification claim

8    will be highly questionable at this juncture.

9         Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor.  The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18        Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds.  The Court understands they

21   assert disputed administrative expense claims against the

22   estate.  While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

1    entities have ever testified before the Court.  Moreover, they

2    have all been engaged with the Highland complex for many

3    years.

4        The witness who testified on these Objectors' behalves at

5    confirmation, Mr. Jason Post, their chief compliance officer,

6    resigned from Highland after more than twelve years in October

7    2020, at the same time that Mr. Dondero resigned or was

8    terminated by Highland.  And a prior witness recently for

9    these entities whose testimony was made part of the record at

10   the confirmation hearing essentially testified that Mr.

11   Dondero controlled these entities.

12       Finally, various NexBank entities objected to the Plan.

13   The Court does not believe they have liquidated claims.  Mr.

14   Dondero appears to be in control of these entities as well.

15       To be clear, the Court has allowed all of these objectors

16   to fully present arguments and evidence in opposition to

17   confirmation, even though their economic interests in the

18   Debtor appear to be extremely remote and the Court questions

19   their good faith.  Specifically on that latter point, the

20   Court considers them all to be marching pursuant to the orders

21   of Mr. Dondero.

22       In the recent past, Mr. Dondero has been subject to a TRO

23   and preliminary injunction by the Bankruptcy Court for

24   interfering with the current CEO's management of the Debtor in

25   specific ways that were supported by evidence.  Around the

1   time that this all came to light and the Court began setting

2   hearings on the alleged interference, Mr. Dondero's company

3   phone supplied to him by Highland, which he had been asked to

4   turn in, mysteriously went missing.  The Court merely mentions

5   this in this context as one of many reasons that the Court has

6   to question the good faith of Mr. Dondero and his affiliated

7   objectors.

8       The only other pending objection besides these objections

9   of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12      In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17      With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

24

1   objected to them.

2        First, a word about plan releases generally, since the

3   Objectors at times seem to gloss over, in this Court's view,

4   relevant distinctions, and seem to refer to the plan releases

5   in this Plan and the exculpations and the plan injunctions all

6   as impermissible third-party releases, when, in fact, they are

7   not, *per se*.

8        It has, without a doubt, become quite commonplace in

9   complex Chapter 11 bankruptcy cases to have three categories

10  of releases in plans.  These three types are as follows.

11       First, Debtor Releases.  A debtor release involves a

12  release by the debtor and its bankruptcy estate of claims

13  against nondebtor third-parties.  For example, a release may

14  be granted in favor of creditors, directors, officers,

15  employees, professionals who participated in the bankruptcy

16  process.  This is the least-controversial type of release

17  because the debtor is extinguishing its own claims, which are

18  property of the estate, that a debtor has authority to utilize

19  or not, pursuant to Sections 541 and 363 of the Bankruptcy

20  Code.

21       Authority for a debtor release pursuant to a plan arises

22  out of Section 1123(b)(3)(A), which indicates that a plan may

23  provide for "the settlement or adjustment of any claim or

24  interest belonging to the debtor or to the estate."

25       In this context, it would appear that the only analysis

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-1    Filed 10/26/23    Page 263 of 52    Page 1067 of 1539    PageID 18305
Exhibit 30    Page 263 of 52

25

1    required is to determine whether the release or settlement of

2    the claim is an exercise of reasonable business judgment on

3    that part of the debtor, is it fair and equitable, is it in

4    the best interest of the estate, given all the relevant facts

5    and circumstances?  Also relevant is whether there's

6    consideration given of some sort by the releasees.

7        Now, the second type of very commonplace Chapter 11 plan

8    release is an exculpation.  Chapter 11 plans also very often

9    have these exculpation provisions, and they're something much

10   narrower in scope and time than a full-fledged release.  An

11   exculpation provision is more like a shield for a certain

12   subset of key actors in the case for their acts during and in

13   connection with the case, which acts may have been merely

14   negligent.

15       Specifically, a plan may absolve certain actors -- usually

16   estate fiduciaries -- such as an Official Unsecured Creditors'

17   Committee and its members, Committee professionals, sometimes

18   Debtor professionals, senior management, officers and

19   directors of the Debtor, from any liability for postpetition

20   negligent conduct -- *i.e.*, conduct which occurred during the

21   administration of the Chapter 11 case and in the negotiation,

22   drafting, and implementation of a plan.  An exculpation

23   provision typically excludes gross negligence and willful

24   misconduct.  It is usually worded in a passive voice, so it

25   may seem a little unclear as to whether it is actually a

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-31    Filed 10/29/23    Page 273 of 52 Page 1068 of 1539    PageID 18306

26

 1  release and by whom.

 2       In any event, the rationale is that parties who actively

 3  participate in a court-approved process -- often, court-

 4  approved transactions by court order -- should receive

 5  protection for their work.  Otherwise, who would want to work

 6  in such a messy, contentious situation, only to be sued for

 7  alleged negligence for less-than-perfect end results?

 8       Chapter 11 end results are not always pretty.  One could

 9  argue that these exculpation provisions, though, are much ado

10  about nothing.  Why?  For one thing, again, the shield is only

11  as to negligent conduct.  There is no shield for other

12  problematic conduct, such as gross negligence or willful

13  misconduct.

14       Second, in many situations, any claims or causes of action

15  that might arise will belong to the Debtor or its estate.

16  Thus, they would already be released pursuant to a debtor

17  release.

18       Additionally, there is case law stating that, where a

19  claim is brought against an estate professional whose fees

20  have already been approved in a final fee application, any

21  claims are barred by *res judicata*.  Thus, exculpated

22  professionals would only have potential exposure for a very

23  short window of time, until final fee applications.

24       Additionally, certain case law in Texas makes clear that

25  an attorney generally does not owe any duties to persons other

1  than his own client.

2      All of this suggests that the shield of a typical

3  exculpation provision may rarely become useful or needed.

4      Moving now to the third type of release, a true third-

5  party release, Chapter 11 plans also sometimes contain third-

6  party releases.  A true third-party release involves the

7  release of claims held by nondebtor third parties against

8  other nondebtor third parties, and there is often no

9  limitation on the scope and time of the claims released.

10      This is the most heavily scrutinized of the three types of

11  plan releases.  Much of the case authority focuses on whether

12  a third-party release is consensual or not in analyzing their

13  propriety and/or enforceability.

14      In Highland, there are no third-party releases.  Rather,

15  there are debtor releases and exculpations.  There also happen

16  to be plan injunctions and gatekeeper provisions that have

17  been challenged.  The Objectors argue that these provisions

18  violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19  otherwise beyond the jurisdiction or authority of the

20  bankruptcy court.  These arguments are now addressed.

21      First, the debtor release is found at Article IX.D of the

22  Plan.  The language, in pertinent part, reads as follows.  "On

23  and after the effective date, each Released Party is deemed to

24  be hereby conclusively, absolutely, unconditionally,

25  irrevocably, and forever released and discharged by the Debtor

1   and the Estate, in each case on behalf of themselves and their

2   respective successors, assigns, and representatives, including

3   but not limited to the Claimant Trust and the Litigation Sub-

4   Trust, from any and all causes of action, including any

5   derivative claims, asserted on behalf of the Debtor, whether

6   known or unknown, foreseen or unforeseen, matured or

7   unmatured, existing or hereafter arising, in law, equity,

8   contract, tort, or otherwise, that the Debtor or the Estate

9   would have been legally entitled to assert in their own right,

10  whether individually or collectively, or on behalf of the

11  holder of any claim against, or interest in, a debtor or other

12  person."

13      There are certain exceptions discussed, and then Released

14  Parties are defined at Definition 113 of the Plan collectively

15  as:  the Independent Directors; Strand, solely from the date

16  of the appointment of the Independent Directors through the

17  effective date; the CEO/CRO; the Committee, the members of the

18  Committee, in their official capacities; the professionals

19  retained by the Debtor and the Committee in the Chapter 11

20  case; and the employees.  This is a defined term in the Plan

21  Supplement and does not include certain employees.

22      To be clear, these are not third-party releases such as

23  addressed in the *Pacific Lumber* case.  These are the Debtor's

24  and/or the bankruptcy estate's causes of action that are

25  proposed to be released.  Releases by a debtor are

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-30 Filed 12/29/23   Page 303 of 52 Page 1071 of 1539   PageID 18309

29

1  discretionary and can be provided by a debtor to persons who

2  have provided consideration to the debtor and the estate.

3  Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4       The evidence here supported the notion that these releases

5  are a *quid pro quo* for the Released Parties' significant

6  contributions to a highly complex and contentious

7  restructuring.  The Debtor is releasing its own claims.  Some

8  of the Released Parties would have indemnification rights

9  against the Debtor.  And the Debtor's CEO, James Seery,

10  credibly testified that he does not believe any claims exist

11  as to the Released Parties.  The Court approves the Debtor

12  releases and overrules the objections to them.

13       Next, the exculpations appear at Article IX.C of the Plan

14  and provide as follows:  Subject in all respects to Article

15  XII.D of the Plan, to the maximum extent permitted by

16  applicable law, no Exculpated Party will have or incur, and

17  each Exculpated Party is hereby exculpated from, any claim,

18  obligation, suit, judgment, damage, demand, debt, right, cause

19  of action, remedy, loss, and liability for conduct occurring

20  on or after the petition date in connection with or arising

21  out of the filing and administration of the Chapter 11 case,

22  the negotiation and pursuit of a disclosure statement, the

23  Plan, or the solicitation of votes for or confirmation of the

24  Plan, the funding or consummation of the Plan, or any related

25  agreements, instruments, et cetera, et cetera, whether or not

30

1   such Plan distributions occur following the effective date,

2   the implementation of the Plan, and any negotiation,

3   transactions, and documentation in connection with the

4   foregoing clauses, provided, however, the foregoing will not

5   apply to any acts or omissions of any Exculpated Party arising

6   out of or related to acts or omissions that constitute bad

7   faith, fraud, gross negligence, criminal misconduct, or

8   willful misconduct; or Strand or any employee other than with

9   respect to actions taken by such entities from the date of

10  appointment of the Independent Directors through the effective

11  date.

12      Exculpated Parties are later defined at Section -- or,

13  earlier defined at Section 62 of the Plan, Definition No. 62

14  of the Plan, as later limited by the Debtor, as announced in

15  the confirmation hearing.  And so these are the Exculpated

16  Parties:  the Debtor and its successors and assigns; the

17  employees, certain employees, as defined; Strand; the

18  Independent Directors; the Committee, the members of the

19  Committee, in their official capacities; the professionals

20  retained by the Debtor and the Committee in the Chapter 11

21  case; the CEO and CRO; and the related persons as to each of

22  these parties listed in Part (iv) through (viii) above;

23  provided, for the avoidance of doubt, and it goes on to say

24  Dondero, Mark Okada, and various others aren't Exculpated

25  Parties.

1    Now, as earlier mentioned, the Objectors argue that

2   *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3   categorically rejects the permissibility of nonconsensual

4   exculpations as well as third-party releases in a Chapter 11

5   plan.  So the Court is going to take a deep dive into that

6   assertion.

7    In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8   numerous challenges to a confirmed plan of affiliated debtors

9   known as Palco and Scopac and four subsidiaries.  The debtor

10  Palco owned and operated the sawmill, a power plant, and even

11  a town called Scotia, California.  The debtor Scopac owned

12  timberlands.  A creditor, a secured creditor called Marathon

13  had a claim against Palco's assets.  Marathon estimated

14  Palco's assets were worth $110 million.  Its claim was $160

15  million.  Meanwhile, other parties had large secured claims

16  against the other debtor, Scopac.

17    The plan that the bankruptcy court confirmed, which was on

18  appeal to the Fifth Circuit, was filed by both the secured

19  creditor Marathon and a joint plan proponent called MRC.  MRC

20  was a competitor of the debtor Palco.  The Marathon/MRC plan

21  proposed to dissolve all the debtors, cancel intercompany

22  debts, and create two new entities, Townco and Newco.  Almost

23  all of the debtor Palco's assets, including the town of

24  Scotia, California, would be transferred to Townco.  The

25  timberlands and other assets, including the sawmill, would be

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-85    Filed 10/29/23    Page 323 of 52   Page 1074 of 1539    PageID 18312

32

1    placed in Newco.

2        Marathon and MRC proposed to contribute $580 million to

3    Newco to pay claims against Scopac.  And Marathon would

4    convert its secured claim against Palco's assets into equity,

5    giving it full ownership of Townco, a 15 percent stake in

6    Newco, and a new note for the sawmill's working capital.  MRC

7    would own the other 80 percent of Newco and would manage and

8    run the company.

9        An indenture trustee for the secured indebtedness against

10   Scopac -- which, by the way, had also been a plan proponent of

11   a competing plan -- appealed the confirmation order, raising

12   eight distinct issues on appeal.  One of the eight issues

13   pertained to what the Fifth Circuit referred to as a

14   "nondebtor exculpation and release clause."  This issue is

15   discussed on the last two pages of a very lengthy opinion.

16       While the complained-of provision is not quoted verbatim

17   in the *Pacific Lumber* opinion, it appears to have been a

18   typical exculpation clause.  Not a third-party release; a

19   typical exculpation clause.  The Fifth Circuit stated, "The

20   plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21   Creditors' Committee, and their personnel, from liability,

22   other than for willful and gross negligence related to

23   proposing, implementing, and administering the plan" at Page

24   251.

25       The Fifth Circuit held that "the nondebtor releases must

33

1    be struck except with respect to the Creditors' Committee and

2    its members."

3       Footnote 26 of the opinion also states that the appellants

4    had "not briefed why Newco and Townco or their officers and

5    directors should not be released," and so "we do not analyze

6    their position."  Rather, the Fifth Circuit merely analyzed

7    why the exculpation provision was not permissible as to the

8    two plan proponents, MRC and Marathon.

9       Thus, the Court views *Pacific Lumber* as being a holding

10   that squarely addressed the propriety of two plan proponents,

11   a secured lender and a third-party competitor purchaser of the

12   Debtors, obtaining nonconsensual exculpation in the plan.

13   However, its reasoning certainly cannot be ignored, strongly

14   suggesting it would not be inclined to approve an exculpation

15   for any party other than a Creditors' Committee or its

16   members.

17      As far as the Fifth Circuit's reasoning, it relied on

18   Bankruptcy Code Section 524(e) for striking down the

19   exculpations, stating, "The law states, however, that

20   discharge of a debt of the debtor does not affect the

21   liability of any other entity on such debt."  Page 251.  The

22   opinion suggests that MRC and Marathon may have tried to argue

23   that 524(e) did not apply to their exculpations because MRC

24   and Marathon were not liable as co-obligors in any way on any

25   of the debtor's debt.

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-85 Filed 10/26/23 Page 353 of 52 Page 1076 of 1539   PageID 18314

34

1    The Fifth Circuit seemed dismissive of this argument,

2    stating as follows, "MRC/Marathon insist the release clause is

3    part of their bargain because, without the clause, neither

4    company would have been willing to provide the plan's

5    financing.  Nothing in the records suggests that MRC/Marathon,

6    the Committee, or the Debtor's officers and directors were co-

7    liable for the Debtor's prepetition debts.  Instead, the

8    bargain the proponents claim to have purchased is exculpation

9    from any negligence that occurred during the course of the

10   case.  Any costs the released parties might incur defending

11   against suits alleging such negligence are unlikely to swamp

12   either of these parties or the consummated reorganization.  We

13   see little equitable about protecting the released nondebtors

14   from negligence suits arising out of the reorganization."

15       The Court goes on to note that, in a variety of cases,

16   that releases have been approved, but these cases "seem

17   broadly to foreclose nonconsensual nondebtor releases and

18   permanent injunctions."

19       The Court then adds at Footnote 27 that the Fifth Circuit

20   in the past did not set aside challenged plan releases that

21   were in final nonappealable orders and were the subject of

22   collateral attack much later, citing its famous *Republic*

23   *Supply v. Shoaf* case, where the Fifth Circuit ruled that *res*

24   *judicata* barred a debtor from bringing a claim that was

25   specifically and expressly released by a confirmed

35

1  reorganization plan because the debtor -- the objector failed

2  to object to the release at confirmation.

3      The Fifth Circuit in *Pacific Lumber* also noted that the

4  Bankruptcy Code permits bankruptcy courts to enjoin third-

5  party asbestos claims under certain circumstances, 524(g),

6  which the Court said suggests nondebtor releases are most

7  appropriate as a method to channel mass tort claims towards a

8  specific pool of assets, citing numerous cases, including

9  *Johns-Manville*.

10     In reach its holding, the Fifth Circuit saw no reason to

11 uphold exculpation to the plan proponents MRC and Marathon,

12 seeming to find it inconsistent with 524(e) under the facts at

13 bar, but the Court did uphold exculpation for the Creditors'

14 Committee and its members, stating, "We agree, however, with

15 courts that have held that 1103(c) under the Code, which lists

16 the Creditors' Committee's powers, implies Committee members

17 have qualified immunity for actions within the scope of their

18 duties."  Numerous cites.  "The Creditors' Committee and its

19 members are the only disinterested volunteers among the

20 parties sought to be released here.  The scope of protection,

21 which does not insulate them from willful and gross

22 negligence, is adequate."

23     Thus, the Court held that the exculpation provisions in

24 *Pacific Lumber* must be struck except with regard to the

25 Creditors' Committee and its members.

36

1        Now, after all of that, this Court believes the following

2   can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3   hinted that consensual exculpations and/or consensual

4   nondebtor third-party releases are permissible.  The Court

5   was, of course, dealing with nonconsensual exculpations in

6   *Pacific Lumber*.  In this regard, I note Page 252, where the

7   Court cited various prior Fifth Circuit authority and then

8   stated, "These cases seem broadly to foreclose nonconsensual

9   nondebtor releases and permanent injunctions."

10       The second thing that can be gleaned from *Pacific Lumber*:

11  The Fifth Circuit hinted that nondebtor releases may be

12  permissible in cases involving global settlements of mass

13  claims against the debtors and co-liable parties.  The Court,

14  of course, referred to 524(g), but various other cases which

15  approved nondebtor releases where mass claims were channeled

16  to a specific pool of assets.

17       Third, the Fifth Circuit outright held that exculpations

18  from negligence for a Creditors' Committee and its members are

19  permissible because the concept is both consistent with

20  1103(c), "which implies Committee members have qualified

21  immunity for actions within the scope of their duties," and a

22  good policy result, since "if members of the Committee can be

23  sued by persons unhappy with the outcome of the case, it will

24  be extremely difficult to find members to serve on an official

25  committee."

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 81-85    Filed 10/29/23    Page 373 of 52 Page 1079 of 1539   PageID 18317

37

1        Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2   that *res judicata* may bar complaints regarding an

3   impermissible plan release, citing to its earlier *Republic*

4   *Supply v. Shoaf* opinion.

5        Now, being ever-mindful of the Fifth Circuit's words in

6   *Pacific Lumber*, this Court cannot help but wonder about at

7   least three things.

8        First, did the Fifth Circuit leave open the door that

9   facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21       Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

38

1   Chapter 11 case, did this rationale leave open the door to

2   sometimes permitting exculpations to other parties in a

3   particular Chapter 11 case besides Creditors' Committees and

4   their members?  For example, in a situation such as the

5   Highland case, in which Independent Directors, brought in to

6   avoid a trustee, are more like a Creditors' Committee than an

7   incumbent board of directors.

8       Third, the Fifth Circuit's sole statutory basis was

9   Section 524(e).  This Court would humbly submit that this is a

10  statute dealing with prepetition liability in which some

11  nondebtor is liable with the Debtor.  Exculpation is a concept

12  dealing with postpetition liability.

13      The Ninth Circuit recently, in a case called *Blixseth v.*

14  *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15  validity of an exculpation clause incorporated into a

16  confirmed Chapter 11 plan that purported to absolve certain

17  nondebtor parties that were "closely involved" in drafting the

18  plan.  They were the largest secured creditor, a purchaser,

19  and an individual who was an indirect owner of certain of the

20  debtor companies.  The exculpation was from any negligence,

21  liability, for "any act or omission in connection with,

22  related to, or arising out of the Chapter 11 cases."

23      By the time the appeal was before the Ninth Circuit, the

24  only issue was the propriety of the exculpation clause as to

25  the large secured creditor, which was also a plan proponent,

39

 1    since all the other exculpated parties had settled with the

 2    appellant.

 3        The Court, in determining that the exculpation clause was

 4    permissible as to the secured lender, concluded that Section

 5    524(e) "does not bar a narrow exculpation clause of the kind

 6    here at issue -- that is, one focused on actions of various

 7    participants in the plan approval process and relating only to

 8    that process," Page 1082.  Why?  Because "Section 524(e)

 9    establishes that discharge of a debt of the debtor does not

10    affect the liability of any other entity on such debt."  In

11    other words, the discharge in no way affects the liability of

12    any other entity for the discharged debt.  By its terms,

13    524(e) prevents a bankruptcy court from extinguishing claims

14    of creditors against nondebtors over the very discharged debt

15    through the bankruptcy proceedings.

16        The Court went on to explicitly disagree with *Pacific

17    Lumber* in its analysis of 524(e), reiterating that an

18    exculpation clause covers only liabilities arising from the

19    bankruptcy proceedings and not of any of the debtor's

20    discharged debt.  Footnote 7, Page 1085.

21        Ultimately, the Court held that under Section 105(a),

22    which empowers a bankruptcy court to issue any order, process,

23    or judgment that is necessary or appropriate to carry out the

24    provisions of Chapter 11 and Section 1123, which establishes

25    the appropriate content of the bankruptcy plan, under these

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 10/24/23    Page 94/23 of 52    Page 1082 of 1539    PageID 18320

40

1    sections, the bankruptcy court had authority to approve an

2    exculpation clause intended to trim subsequent litigation over

3    acts taken during the bankruptcy proceedings and so render the

4    plan viable.

5        This Court concludes that, just as the Fifth Circuit left

6    open the door for consensual exculpations and releases in

7    *Pacific Lumber*, just as it left open the door for consensual

8    exculpations and releases in *Pacific Lumber*, its dicta

9    suggests that an exculpation might be permissible if there is

10    a showing that "costs that the released parties might incur

11    defending against suits alleging such negligence are likely to

12    swamp either the Exculpated Parties or the reorganization."

13    Again, that was a quote from the Fifth Circuit.

14        If ever there were a risk of that happening in a Chapter

15    11 reorganization, it is this one.  The Debtor's current CEO

16    credibly testified that Mr. Dondero has said outside the

17    courtroom that if Mr. Dondero's own pot plan does not get

18    approved, that he will "burn the place down."  Here, this

19    Court can easily expect the proposed exculpated parties might

20    expect to incur costs that could swamp them and the

21    reorganization process based on the past litigious conduct of

22    Mr. Dondero and his controlled entities.

23        Additionally, this Court concludes that the Fifth

24    Circuit's rationale in *Pacific Lumber* for permitted

25    exculpations to Creditors' Committees and their members, which

1    was clearly policy-based based on their implied qualified

2    immunity flowing from Section 1103 and their importance in a

3    Chapter 11 case, leaves the door open to sometimes permitting

4    exculpations to other parties in a particular Chapter 11 case

5    besides a UCC and its members.

6        Again, if there was ever such a case, the Court believes

7    it is this one, in which Independent Directors were brought in

8    to avoid a trustee and are much more like a Creditors'

9    Committee than an incumbent board of directors.  While,

10   admittedly, there are a few exculpated parties here proposed

11   beyond the independent board, such as certain employees, it

12   would appear that no one is invulnerable to a lawsuit here if

13   past is prologue in this Highland saga.

14       The Creditors' Committee was initially not keen on

15   exculpations for certain employees.  However, Mr. Seery

16   credibly testified that there was a contentious arm's-length

17   negotiation over this and that he needs these employees to

18   preserve value implementing the Plan.  Mr. Dondero has shown

19   no hesitancy to litigate with former employees in the past, to

20   the *nth* degree, and there is every reason to believe he would

21   again in the future, if able.

22       Finally, in this situation, in the case at bar, we would

23   appear to have a *Shoaf* reason to approve the exculpations.

24   The January 9, 2020 order of this Court, Docket Entry 339,

25   which approved the independent board and an ongoing corporate

42

 1   governance structure for this case, and which is incorporated

 2   into the Plan at Article IX.H, provided as follows:  "No

 3   entity may commence or pursue a claim or cause of action of

 4   any kind against any Independent Director, any Independent

 5   Director's agents, or any Independent Director's advisors

 6   relating in any way to the Independent Director's role as an

 7   Independent Director of Strand without the Court (1) first

 8   determining, after notice, that such claim or cause of action

 9   represents a colorable claim of willful misconduct or gross

10   negligence against Independent Director, any Independent

11   Director's agents, or any Independent Director's advisors; and

12   (2) specifically authorizing such entity to bring such a

13   claim.  The Court will have sole jurisdiction to adjudicate

14   any claim for which approval of the Court to commence or

15   pursue has been granted."

16       This was both an exculpation from negligence as to the

17   Independent Directors and their agents and advisors, as well

18   as a gatekeeping provision.  This Court believes that this

19   provision basically approved an exculpation for the

20   Independent Directors way back on January 9, 2020 for their

21   postpetition conduct that might be negligent.  And this is the

22   law of the case and has *res judicata* preclusive effect now.

23       Thus, as to the three Independent Directors, as well as

24   the other named parties in the January 9, 2020 order, their

25   agents, their advisors, we have a situation that fits within

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-5    Filed 10/24/23   Page 94 of 52   Page 1085 of 1539   PageID 18323

43

1    *Republic Supply v. Shoaf*, and we fit within the exception

2    articulated in *Pacific Lumber*.

3        The Court reserves the right to supplement these findings

4    and conclusions as to the exculpations, but based on the

5    foregoing, they are approved and the objections are overruled.

6        Now, turning to the Plan objection, it appears at Article

7    IX.F of the Plan and provides, in pertinent part, as follows:

8    Upon entry of the confirmation order, all enjoined parties are

9    and shall be permanently enjoined on and after the effective

10   date from taking any action to interfere with the

11   implementation or consummation of the Plan.  Except as

12   expressly provided in the Plan, the confirmation order, or a

13   separate order of the Bankruptcy Court, all Enjoined Parties

14   are and shall be permanently enjoined on and after the

15   effective date, with respect to any claims and interests, from

16   directly or indirectly -- and then commencing, conducting,

17   continuing any suit, action, proceeding of any kind, and

18   numerous other acts of that vein.

19       The injunction set forth herein shall extend to and apply

20   to any act of the type set forth in any of the causes above

21   against any successors to the Debtor, including but not

22   limited to the Reorganized Debtor, the Litigation Sub-Trust,

23   and the Claimant Trust, and their respective property and

24   interests in property.

25       Plan injunctions like this are commonplace and

44

1    appropriate.  They are entirely consistent with and

2    permissible under Bankruptcy Code Sections 1123(a)(5),

3    1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4    Rule 3016(c), which articulates the form that a plan

5    injunction must be set forth in a plan.

6        The Court finds the objections to the Plan Injunctions to

7    be unfounded, and they are thus overruled without much

8    discussion here.

9        Now, lastly, the Gatekeeper Provision.  It appears at

10   Paragraph 4 of Article IX.F of the Plan and provides, in

11   pertinent part, "Subject in all respects to Article XII.D, no

12   Enjoined Party may commence or pursue a claim or cause of

13   action of any kind against any Protected Party that arose or

14   arises from or is related to the Chapter 11 case, the

15   negotiation of the Plan, the administration of the Plan, or

16   property to be distributed under the Plan, the wind-down of

17   the business of the Debtor or Reorganized Debtor, the

18   administration of the Claimant Trust or the Litigation Sub-

19   Trust, or the transactions in furtherance of the foregoing,

20   without the Bankruptcy Court (1) first determining, after

21   notice and a hearing, that such claim or cause of action

22   represents a colorable claim of any kind, including but not

23   limited to negligence, bad faith, criminal misconduct and

24   willful misconduct, fraud, or gross negligence against a

25   Protected Party; and (2) specifically authorizing such

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 88-85    Filed 10/31/22    Page 963 of 52    Page 1087 of 1539    PageID 18325

45

1  Enjoined Party to bring such claim or cause of action against

2  such Protected Party, provided, however, that the foregoing

3  will not apply to a claim or cause of action against Strand or

4  against any employee other than with respect to actions taken,

5  respectively, by Strand or any such employee from the date of

6  appointment of the Independent Directors through the effective

7  date.  The Bankruptcy Court will have sole and exclusive

8  jurisdiction to determine whether a claim or cause of action

9  is colorable and, only to the extent legally permissible and

10 as provided for in Article XI, shall have jurisdiction to

11 adjudicate the underlying colorable claim or cause of action."

12      This gatekeeper provision appears necessary and reasonable

13 in light of the litigiousness of Mr. Dondero and his

14 controlled entities that has been described at length herein.

15 Provisions similar to this have been approved in this district

16 in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17 provision is within the spirit of the Supreme Court's Barton

18 Doctrine.  And it appears consistent with the notion of a pre-

19 filing injunction to deter vexatious litigants that has been

20 approved by the Fifth Circuit in such cases as *Baum v. Blue*

21 *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22 850 F.3d 811, which arose out of a bankruptcy pre-filing

23 injunction.

24      The Fifth Circuit, in fact, noted in the *Carroll* case that

25 federal courts have authority to enjoin vexatious litigants

46

 1   under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

 2   under the Bankruptcy Code, a bankruptcy court can issue any

 3   order, including a civil contempt order, necessary or

 4   appropriate to carry out the provisions of the Code, citing,

 5   of course, 105 of the Bankruptcy Code.

 6       The Fifth Circuit stated that, when considering whether to

 7   enjoin future filings against a vexatious litigant, a

 8   bankruptcy court must consider the circumstances of the case,

 9   including four factors:  (1)  the party's history of

10   litigation; in particular, whether he has filed vexatious,

11   harassing, or duplicative lawsuits; (2) whether the party had

12   a good faith basis for pursuing the litigation, or perhaps

13   intended to harass; (3) the extent of the burden on the courts

14   and other parties resulting from the party's filings; and (4)

15   the adequacy of alternatives.

16       In the *Baum* case, the Fifth Circuit stated that the

17   traditional standards for injunctive relief -- *i.e.*,

18   irreparable harm and inadequate remedy at law -- do not apply

19   to the issuance of an injunction against a vexatious litigant.

20       Here, although I have not been asked to declare Mr.

21   Dondero and his affiliated entities as vexatious litigants *per*

22   *se*, it is certainly not beyond the pale to find that his long

23   history with regard to the major creditors in this case has

24   strayed into that possible realm, and thus this Court is

25   justified in approving this provision.

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-1 Filed 10/29/23 Page 948 of 52 Page 1089 of 1539   PageID 18327

47

1        One of the Objectors' lawyers stated very eloquently in

2   closing argument, in opposing the plan injunction and

3   gatekeeping provisions, that "Even a serial killer has

4   constitutional rights," suggesting that these provisions would

5   deprive Mr. Dondero and his controlled entities of fundamental

6   rights or due process somehow.  But to paraphrase the district

7   court in the *Carroll* case, no one, rich or poor, is entitled

8   to abuse the judicial process.  There exists no constitutional

9   right of access to the courts to prosecute actions that are

10  frivolous or malicious.  The Plan injunction and gatekeeper

11  provisions in Highland's plan simply set forth a way for this

12  Court to use its tools, its inherent powers, to avoid abuse of

13  the court system, protect the implementation of the Plan, and

14  preempt the use of judicial time that properly could be used

15  to consider the meritorious claims of other litigants.

16       Accordingly, the Objectors' objections to this provision

17  are overruled.

18       As earlier stated, this Court reserves the right to alter

19  or supplement this ruling in a written order.  In this regard,

20  the Court directs Debtor's counsel -- I hope you are still

21  awake; it's been a long time -- the Court directs Debtor's

22  counsel to submit a form of order.  And specifically, I assume

23  that you've already prepared or have been in the process of

24  preparing a set of findings of fact, conclusions of law, and

25  confirmation order that tracks the confirmation evidence and

48

1   recites conclusions of law that the Plan complies with all the

2   various provisions of Section 1123, 1129, and other applicable

3   Code provisions.

4       What I want you to do is take this bench ruling and add it

5   to what you've prepared.  And what I mean is, as you can tell,

6   I've been reading:  I will have my courtroom deputy email to

7   you all a copy of what I just read.  I'll have her obviously

8   copy the Debtor's counsel, Creditors' Committee, Dondero and

9   the other Objectors, copy them on this written document she's

10  going to send out.  And, again, I want you to kind of meld it

11  into what you've already been preparing.

12      Obviously, I did not address in this oral ruling every

13  provision of 1129(a) and (b).  I did not address every 1123

14  objection.  I did not even address every single objection of

15  the Objectors.  But, again, any objection I've not

16  specifically addressed today is overruled.

17      The briefing, I should say, that the Debtor submitted,

18  there was a Memorandum of Law in Support of Confirmation filed

19  on January 22nd.  There was also a reply brief, a hundred

20  pages or so, separately filed, replying to all the objections.

21  I don't disagree with anything that was in that.  So, again,

22  to the extent you want to send me conclusions of law that are

23  along the lines of that briefing, I would consider that.

24      And so what I thought is you'll send me the melded

25  document and I will edit it if I see fit.  I recognize this

49

1   may take a few days, so I don't give you a strict timetable,

2   just hopefully it won't take too many days.

3        All right.  Is there anyone out there -- Mr. Pomerantz,

4   you had to go to jury duty, except I can't believe --

5               MR. POMERANTZ:  No, I --

6               THE COURT:  I can't believe you were called, but are

7   you there?

8               MR. POMERANTZ:  Your Honor, I am here.  I was luckily

9   excused, because I probably wouldn't have made it.

10       Your Honor, one just comment I'd make.  You referred to

11  the January 9th order.  You didn't refer to the CEO order,

12  which is your order July 16th, which had the same gatekeeper

13  provision.  I assume that was the same analysis?

14              THE COURT:  That was an oversight.  Same analysis.

15  And that's exactly why I said I reserve the right to

16  supplement or amend, because I know there had to be places

17  like that where I omitted to mention something important.

18              MR. POMERANTZ:  But thank you, Your Honor, for your

19  thoughtful ruling, and we will certainly incorporate your

20  materials into the order that we're working on and get it to

21  you when we can.  But we appreciate it on behalf of the

22  Debtor.  We know this took a lot of time and a lot of effort.

23  Hopefully, you got a chance to still watch the Super Bowl

24  yesterday.

25              THE COURT:  Well, when I saw that Tom Brady was going

50

1  to win, I turned it off.

2      I'm sorry.  That's terrible.  You know, my law clerk, my

3  law clerk that you can't see, Nate, he is from Ann Arbor,

4  Michigan, University of Michigan, and he almost cried when I

5  said I didn't like Tom Brady the other day.  So, I apologize.

6          MR. POMERANTZ:  Your Honor, one other comment.  We

7  had our motion to assume our nonresidential real property

8  lease that was also on.  It got missed in all the fanfare, but

9  it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12          THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14          MR. POMERANTZ:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **02/09/2021**

24  _____      _____
   Kathy Rehling, CETD-444                       Date
25  Certified Electronic Court Transcriber

51

INDEX

PROCEEDINGS                                                      3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Confirmation Hearing [1808]                                      3

Agreed Motion to (1) Assume Non-Residential Real Property       50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS                                              50

INDEX                                                           51

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 31

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                           DALLAS DIVISION

 3                                 )    Case No. 19-34054-sgj-11
     In Re:                        )    Chapter 11
 4                                 )
     HIGHLAND CAPITAL              )    Dallas, Texas
 5   MANAGEMENT, L.P.,             )    Friday, January 8, 2021
                                   )    9:30 a.m. Docket
 6            Debtor.              )
     _____)
 7                                 )
     HIGHLAND CAPITAL              )    Adversary Proceeding 20-3190-sgj
 8   MANAGEMENT, L.P.,             )
                                   )
 9            Plaintiff,           )    PRELIMINARY INJUNCTION
                                   )    HEARING [#2]
10   v.                            )
                                   )
11   JAMES D. DONDERO,             )
                                   )
12            Defendant.           )
     _____)

13                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                 UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX/TELEPHONIC APPEARANCES:

16   For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
17                                10100 Santa Monica Blvd.,
                                   13th Floor
18                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
19
     For the Debtor/Plaintiff:    John A. Morris
20                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
21                                New York, NY  10017-2024
                                  (212) 561-7700
22

23

24

25
```

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero,          D. Michael Lynn
     Defendant:                  John Y. Bonds, III
 3                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
 4                                 JONES, LLP
                                 420 Throckmorton Street,
 5                                 Suite 1000
                                 Fort Worth, TX  76102
 6                               (817) 405-6900

 7   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 8                               One South Dearborn Street
                                 Chicago, IL  60603
 9                               (312) 853-7539

10   For the Funds and           Davor Rukavina
     Advisors:                   MUNSCH HARDT KOPF & HARR, P.C.
11                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
12                               (214) 855-7554

13   For Certain Employees:      Frances A. Smith
                                 ROSS & SMITH, P.C.
14                               Plaza of the Americas
                                 700 N. Pearl Street, Suite 1610
15                               Dallas, TX  75201
                                 (214) 593-4976
16
     Recorded by:                Michael F. Edmond, Sr.
17                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
18                               Dallas, TX  75242
                                 (214) 753-2062
19
     Transcribed by:             Kathy Rehling
20                               311 Paradise Cove
                                 Shady Shores, TX  76208
21                               (972) 786-3063

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

3

 1              <u>DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.</u>

 2              THE COURT:  All right.  We are here for Highland

 3      Capital Management, L.P. versus James Dondero, a preliminary

 4      injunction hearing.  This is Adversary 20-3190.

 5          All right.  Let's start out by getting appearances from

 6      counsel.  First, for the Plaintiff/Debtor, who do we have

 7      appearing?

 8              MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

 9      Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10      others.

11              THE COURT:  All right.  Good morning.  All right.

12      For Mr. Dondero, who do we have appearing?

13              MR. LYNN:  Michael Lynn, together with John Bonds,

14      for Mr. Dondero.

15              THE COURT:  Good morning.

16          All right.  I know we have a lot of parties in interest

17      represented on the video or phone today.  I'm not going to go

18      through a roll call, other than I'll see if we have the

19      Committee, the Unsecured Creditors' Committee counsel on the

20      line.  Do we have anyone appearing for them?

21              MR. CLEMENTE:  Yes, good morning, Your Honor.

22      Matthew Clemente from Sidley Austin on behalf of the

23      Committee.

24              THE COURT:  Okay.  Thank you.  All right.

25              MR. CLEMENTE:  Thank you, Your Honor.

4

```
 1            THE COURT:  Well, as I said, I'm not going to do a
 2   roll call.  I don't think we had any specific parties in
 3   interest, you know, file a pleading, or any other parties
 4   other than the Debtor and Mr. Dondero in this adversary.  So
 5   I'll just let the others kind of listen in without appearing.
 6       All right.  Mr. Morris, are you going to start us off this
 7   morning with, I don't know, an opening statement or any
 8   housekeeping matters?
 9            MR. MORRIS:  I have both an opening statement and
10   housekeeping matters.  I just wanted to see if Mr. Pomerantz
11   has anything he wants to convey to the Court before I begin.
12            MR. POMERANTZ:  (garbled)
13            THE COURT:  Mr. Pomerantz, if you could take your
14   device off mute, please.
15            THE CLERK:  He's off mute.  I don't know what --
16            THE COURT:  Okay.  Well, we're showing you're not on
17   mute, but we can't hear you.  What now?
18            THE CLERK:  He's not on mute now.  He's --
19            THE COURT:  Okay.  Go ahead, Mr. Pomerantz.
20       (Pause.)
21            THE CLERK:  He's not coming through.
22            THE COURT:  We're -- you're not coming through, and
23   we're not sure what the problem is.  We're not showing you on
24   mute.
25       (Pause.)
```

5

1          THE COURT:  All right.  Should we have him call back

2   in on his phone?  All right.  If you could, if you have a

3   phone, maybe you can try calling in on your phone and speak

4   through your phone, not your computer.

5          MR. MORRIS:  You know what, Your Honor?  I'm going to

6   proceed, and Mr. Pomerantz will address the Court at the

7   conclusion of the hearing on the motion.

8          THE COURT:  Okay.  Very good.  We usually hear him

9   loud and clear, so I don't know what's going on this morning.

10  Go ahead, Mr. Morris.

11          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12          MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13  John Morris; Pachulski Stang; for the Debtor.

14      We are here this morning, Your Honor, on the Debtor's

15  motion for preliminary injunction against Mr. Dondero.  We

16  filed last night also an emergency motion for an order to show

17  cause as to why this Court should not hold Mr. Dondero in

18  contempt of court --

19          THE COURT:  All right.

20          MR. MORRIS:  -- for violating a previously-issued

21  TRO.

22          THE COURT:  Yes.  Let me just interject, in case

23  there's any confusion by anyone.  I am not going to hear the

24  motion for show cause order this morning.  While I understand

25  you think there might be some efficiency and overlap in

6

```
 1    evidence, it's not enough notice.  So we'll talk about
 2    scheduling that at the end of the presentations this morning.
 3    All right?
 4              MR. MORRIS:  Thank you for addressing that, Your
 5    Honor.
 6              THE COURT:  Okay.
 7              MR. MORRIS:  Your Honor, then let's just proceed
 8    right to the preliminary injunction motion.  There is ample
 9    evidence to support the Debtor's motion for a preliminary
10    injunction.  There would have been substantial evidence to
11    support it based on the conduct that occurred prior to the
12    issuance of the TRO, but the conduct that did occur following
13    the TRO only emphasizes the urgent need for an injunction in
14    this case.
15        I want to begin by just telling Your Honor what evidence
16    we intend to introduce here today.  We filed at Docket 46 in
17    the adversary proceeding our witness and exhibit list.  The
18    exhibit list contains Exhibits A through Y.  And at the
19    appropriate time, I will move for the admission into evidence
20    of those exhibits.
21        The exhibit list and the witness list also identifies
22    three witnesses for today.  Mr. Dondero.  Mr. Dondero is here
23    today.  Notwithstanding Your Honor's comments on December 10th
24    and on December 16th, when I deposed him on Tuesday he was
25    unsure whether he was going to come here today to testify.
```

7

1   And he will inform Your Honor of that on cross-examination.

2   And so the Debtor was forced to prepare and serve a subpoena

3   to make sure that he was here today.  But Mr. Dondero is here

4   today.

5        Following the conclusion of Mr. Dondero's deposition on

6   Tuesday, and based in part on the evidence adduced during that

7   deposition, the Debtor terminated for cause Scott Ellington

8   and Isaac Leventon.  We had asked counsel for those former

9   employees to accept service of a trial subpoena so that they

10  would appear today.  We were told that they would do so if we

11  gave them a copy of the transcript of Mr. Dondero's

12  deposition.

13       We thought that was inappropriate and we declined to do

14  so, and they declined to accept service of the subpoenas.  We

15  have spent two days with a professional process server

16  attempting to effectuate service of the trial subpoenas for

17  Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18  doing that.  So we'll only have one witness today, unless we

19  have cause to call anybody on rebuttal, and that witness will

20  be Mr. Dondero.

21       I want to talk for a few moments as to what Mr. Dondero

22  will testify to and what the evidence will show.  Mr. Dondero

23  will testify that he never read the TRO, Your Honor.  He will

24  testify that he didn't participate in the motion on the

25  hearing for the TRO, that he never read Mr. Seery's

8

1  declaration in support of the Debtor's motion for the TRO,

2  that he never bothered to read the transcript of the

3  proceedings on December 10th so that he could understand the

4  evidence that was being used against him.  He had no knowledge

5  of the terms of the TRO when he was deposed on Tuesday.

6      And that's the backdrop of what we're doing here today,

7  because he didn't know what he was enjoined from doing, other

8  than speaking to employees.  He actually did testify and he

9  will testify that he knew he wasn't supposed to speak with the

10 Debtor's employees, but he spoke with the Debtor's employees

11 in all kinds of ways, as the evidence will show.

12     The evidence will also show that Mr. Dondero violated the

13 TRO by throwing away the cell phone that the company bought

14 and paid for after the TRO was entered into.  He's going to be

15 unable to tell you who threw it away.  He's going to be unable

16 to tell you who gave the order to throw it away.  He's going

17 to be unable to tell you when after the TRO was entered the

18 phone was thrown away.

19     But we do have as one fact and as I believe one violation

20 of the TRO --

21          MR. POMERANTZ:  So, I'm on a WebEx.

22          MR. MORRIS:  Jeff, --

23          THE COURT:  Mr. Pomerantz, we heard you.  We heard

24 you say something.  So, apparently, you got your audio

25 working.

9

1      All right.  Mr. Morris, continue.

2          MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3   you, Your Honor, is that it's really Mr. Seery's fault that

4   the phone got thrown away, because Mr. Seery announced that

5   all of the employees were going to be terminated at the end of

6   January, and because Mr. Seery did that, he and I believe Mr.

7   Ellington thought it was appropriate to just throw their

8   phones away, without getting the Debtor's consent, without

9   informing the Debtor, and switching the phone numbers that

10  were in the Debtor's account to their own personal names.  So

11  that's Item No. 1.

12      Item No. 2 -- and this is in no particular order, Your

13  Honor.  I don't want you to think that I'm bringing these

14  things up in terms of priority.  But they're just the order in

15  which they came up in the deposition, and so I'm just

16  following it as well.

17      Item No. 2 is trespass.  On December 22nd, you will hear

18  evidence that Mr. Dondero personally intervened to yet again

19  stop trades that Mr. Seery was trying to effectuate in his

20  capacity as portfolio managers of the CLOs.  He did that just

21  six days after Your Honor dismissed as frivolous a motion

22  brought by the very Advisors and Funds that he owns and

23  controls.

24      Therefore, the very next day, the Debtor sent him a

25  letter, sent through counsel a letter, evicting him from the

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38    Filed 12/29/23    Page 1104 of 1539    PageID 18342

10

 1    premises, demanding the return of the phone, and telling him

 2    that he had to be out by December 30th.

 3        I was stunned, Your Honor, stunned, when I took his

 4    deposition on Tuesday and he was sitting in Highland's

 5    offices.  He hadn't asked for permission to be there.  He

 6    hadn't obtained consent to be there.  But he just doesn't care

 7    what the Debtor has to say here.  He just doesn't.

 8        I don't know when he got there or when he left.  I don't

 9    know if he spoke to anybody while he was there.  But he just

10    took it upon himself to show up in the Debtor's office,

11    notwithstanding the very explicit eviction notice that he got

12    on December 23rd.

13        Mr. Dondero, as I mentioned, clearly violated the TRO by

14    knowingly and intentionally and purposely interfering with the

15    Debtor's trading as the portfolio manager of the CLOs.  This

16    has just gone on too long.  There have been multiple hearings

17    on this matter, but he doesn't care.  So he gave the order to

18    stop trades that Mr. Seery had effectuated.  That's a clear

19    violation of the TRO, and it certainly supports the imposition

20    of a preliminary injunction.

21        Mr. Seery -- Mr. Dondero is going to testify that multiple

22    letters -- that I'm going to refer to them, Your Honor, as the

23    K&L Gates Parties, and those are the two Advisors and the

24    three investment funds and CLO Holdco that are all owned and/

25    or controlled by Mr. Dondero -- after that hearing on the

11

16th, K&L Gates, the K&L Gates Parties sent not one, not two,
but three separate letters.  They said they may take steps to
terminate the CLO management agreements.  After we evicted Mr.
Dondero, sent a letter suggesting that we would be held liable
for damages because we were interfering with their business.

     And Mr. Dondero is going to tell you, Your Honor, that he
encouraged the sending of those letters, that he approved of
those letters, that he thought those letters were the right
things to send to the Debtor, even after -- even with the
knowledge of what happened on December 16th.

     He's going to tell you he knew about that hearing and he
still, he still approves of those letters, and never bothered
to exercise his control to have those letters withdrawn upon
the Debtor's request.  We asked them to withdraw it, and when
they wouldn't do it, Your Honor, that's what prompted the
filing of yet another adversary proceeding.  And we're going
to have another TRO hearing next Wednesday because they won't
stop.

     Next, a preliminary injunction should issue because Mr.
Dondero violated the TRO by communicating with the Debtor's
employees to coordinate their legal strategy against the
Debtor.  The evidence will show, in documents and in
testimony, that on December 12th, while he was prohibited from
speaking to any employee except in the context of shared
services, you're going to see the documents and you're going

12

1    to hear the evidence that on December 12th Scott Ellington was

2    actively involved in identifying a witness to support Mr.

3    Dondero's interests at the December 16th hearing.

4        You will receive evidence that on December 15th Mr.

5    Ellington and Mr. Leventon collaborated with Mr. Dondero's

6    lawyers to prepare a common interest agreement.

7        You will hear evidence that on the next day, December

8    16th, the day of that hearing, that Mr. Dondero solicited Mr.

9    Ellington's help to coordinate all of the lawyers representing

10   Mr. Dondero's interests, telling Mr. Ellington that he needed

11   to show leadership, and Mr. Ellington readily agreed to do

12   just that.

13       You will hear evidence that on December 23rd Mr. Ellington

14   and Grant Scott communicated in connection with calls that

15   were being scheduled with Mr. Dondero and with K&L Gates, the

16   very K&L Gates Clients who filed the frivolous motion that was

17   heard on December 16th and that persisted in sending multiple

18   letters threatening the Debtor thereafter.

19       You will hear evidence that late in December Mr. Dondero

20   sought contact information for Mr. Ellington and Mr.

21   Leventon's lawyer, and he will tell you that he did it for the

22   explicit purpose of advancing their mutual shared interest

23   agreement, while they were employed by the Debtor.  While they

24   were employed by the Debtor.

25       Finally, you will hear evidence, and it will not be

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 38-3    Filed 12/14/26    Page 1107 of 1539    PageID 18345

Exhibit 31    Page 242 of 270

13

1  disputed, you will see the evidence, it's on the documents,

2  that Mr. Dondero personally intervened to stop the Debtor from

3  producing the financial statements of Get Good and Dugaboy,

4  two entities that he controls, that the U.C.C. had been asking

5  for for some time, that the Debtor had been asking of its

6  employees for some time to produce.  And it was only when we

7  got, frankly, the discovery from Mr. Dondero when there's a

8  text message that says, Not without a subpoena.

9       The documents are on the Debtor's system.  We just don't

10  know where they are because they're hidden someplace.  But Mr.

11  Dondero knows where they are.  He can certainly force -- he

12  can certainly get them produced.  And one of the things we'll

13  be asking for when we seek the contempt motion is the

14  production of those very documents.

15       So, Your Honor, that's what the evidence is going to show.

16  I don't think there's going to be any question that a

17  preliminary injunction ought to issue.  But I do want to spend

18  just a few minutes rebutting some of the assertions made in

19  the filing by Mr. Dondero last night.

20       Of course, they offer no evidence.  There is no

21  declaration.  There is no document.  There is merely argument.

22  It's been that way throughout this case.  For a year, Mr.

23  Dondero has never stood before Your Honor to tell you why

24  something was wrong being done to him, why -- he hasn't

25  offered to be here at all, and he's here today, again, only

14

1  because he got a subpoena.  That's the only reason we know

2  he's here today.

3       So let's just spend a few minutes talking about the

4  assertions made in the document last night.  Mr. Dondero

5  complains about the scope of the injunction, and I say to

6  myself, in all seriousness, Are you kidding me?  You didn't

7  even read the TRO and you're going to be concerned about what

8  the scope of the injunction is?  You didn't even have enough

9  respect for the Court to read the TRO and we're going to worry

10 about the scope of some future injunction?  Doesn't make any

11 sense to me.

12      But let's talk about the specific arguments that they

13 make.

14      Third parties.  They're concerned that somehow third

15 parties don't have notice of the injunction.  Your Honor,

16 third parties are not impacted by the injunction.  The only

17 third parties that are impacted by the injunction are those

18 that are owned and/or controlled by Mr. Dondero.  If he

19 doesn't tell them, that's his breach of duty.  He created the

20 Byzantine empire of over 2,000 entities, and he wants the

21 Debtor to have the burden of notifying all of them so that

22 they can all come in here and make 2,000 arguments as to why

23 they shouldn't be enjoined?

24      He owns and controls them.  They are the only third

25 parties who are impacted by this proposed preliminary

15

1   injunction, and he has the responsibility, he has the duty to

2   inform them, because he owns and controls them.

3        We know of the K&L Gates Parties.  We know Get Good and

4   Dugaboy are in this courtroom.  We know CLO Holdco.  So many

5   of these parties have been so -- they're on the phone now.

6   They don't have notice?  It is insulting, frankly, to suggest

7   that the Debtor somehow has some obligation to figure out who

8   Mr. Dondero owns and controls.  He should know that.  That's

9   number one.

10       Number two, there is a statement in there about employees

11  and how he should be able to speak with them about personal

12  and routine matters.  As to that, Your Honor, he has forfeited

13  that opportunity.  He cannot be trusted.  There cannot be any

14  communication because nobody can police it.  And so we think a

15  complete bar to any discussion with any employee, except as it

16  relates to shared services -- because we do have a contractual

17  obligation; that's what was in it -- ought to be barred.

18  That's number one.

19       Number two, there's a reference in the objection to Mr.

20  Dondero's personal assistant.  I'd like to know who that is,

21  Your Honor.  I wasn't aware that he still was using a personal

22  assistant at the Debtor.  I want to know specifically who that

23  is.  I don't know that they -- you know, I just -- we need to

24  cut that off.  And he should not be communicating with any

25  employee.  The Debtor should not be paying for his personal

16

 1  assistant.

 2      It's offensive to think that he's still doing that,

 3  particularly after he was terminated or his resignation was

 4  requested back in October precisely because his interests were

 5  adverse to the Debtor.

 6      Number three, he's concerned that the Debtor is somehow

 7  preventing him from speaking to former employees.  We now

 8  know, Your Honor, that that's a, I'm sure, a very specific

 9  reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10  a green light to be able to do that.  And you know, I'll leave

11  it to Your Honor as to whether that's appropriate.  I'll leave

12  it to their counsel as to whether, going forward, colluding

13  together against the Debtor at this point in time is in

14  anybody's best interest.  But I will -- what I will demand in

15  the preliminary injunction is a very explicit statement that

16  Mr. Ellington and Mr. Leventon are not to share any

17  confidential or privileged information that they received in

18  their capacity as general counsel and assistant general

19  counsel of the Debtor.

20      The pot plan.  He's afraid somehow the order is going to

21  prevent him from pursuing the pot plan.  He's had over a year

22  to pursue this pot plan, Your Honor.  Frankly, I don't, you

23  know, I don't know what to say.  He has never made a proposal

24  that has gotten any traction with the only people who matter.

25  And it's not the Debtor.  It's the creditors.  It's the

17

```
 1 │ Creditors' Committee.
 2 │    If you want to put in an exception that he can call Matt
 3 │ Clemente, I don't mean to put this on Mr. Clemente, he can
 4 │ decide whether or not that's appropriate, but the creditors
 5 │ are the only ones who matter here.  Your Honor, it's not the
 6 │ Debtor.
 7 │    And I'll let Mr. Dondero's counsel explain to Your Honor
 8 │ why he thinks he still needs to pursue a pot plan, and Your
 9 │ Honor can decide.  I trust Your Honor to decide what
10 │ boundaries and what guardrails might be appropriate for him to
11 │ continue to pursue his pot plan.
12 │    That's all I have, Your Honor.  Not much.
13 │         THE COURT:  All right.
14 │         MR. MORRIS:  But I think there's going to be --
15 │ there's going to be an awful lot of evidence.  This is going
16 │ to be a lengthy examination.  I ask the Court for your
17 │ patience.
18 │         THE COURT:  I've got --
19 │         MR. MORRIS:  But that's all I have.
20 │         THE COURT:  I've got all day, if we need it.
21 │         MR. MORRIS:  Okay.
22 │         THE COURT:  I hope we don't, but I've got all day if
23 │ we need it.  All right.
24 │         MR. MORRIS:  That's what I have, Your Honor.
25 │         THE COURT:  All right.  Mr. Dondero's counsel, your
```

18

1   opening statement?

2          MR. BONDS:  Your Honor, I would reserve my opening

3   statement to the end of the hearing.

4      I would also point out that anything that Mr. Morris just

5   said was not evidence, and we think that the evidence will

6   show completely differently than argued or articulated by Mr.

7   Morris.

8          THE COURT:  All right.

9          MR. BONDS:  That's all.

10         THE COURT:  Thank you, Mr. Bonds.

11     Mr. Morris, you may call your witness.

12         MR. MORRIS:  The Debtor calls James Dondero.

13         THE COURT:  All right.  Mr. Dondero, this is Judge

14  Jernigan.  I would ask you to say, "Testing, one, two," so we

15  pick up your video so I can swear you in.

16     All right.  Mr. Dondero, if you're speaking up, we're not

17  hearing you, so please make sure you're unmuted and have your

18  video --

19     (Echoing.)

20         MR. DONDERO:  Hello.  One, two.

21         THE COURT:  Okay.  We got you.

22         MR. DONDERO:  One, two three.

23         THE COURT:  We got you now.

24         JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25         THE COURT:  All right.  Thank you.

                        Dondero - Direct                      19

1        Mr. Morris, go ahead.

2             MR. MORRIS:  Thank you, Your Honor.

3        (Echoing.)

4             THE COURT:  I'm going to ask everyone except Mr.

5    Dondero and Mr. Morris to put your device on mute.  We're

6    getting a little distortion.

7        All right.  Go ahead.

8                       DIRECT EXAMINATION

9    BY MR. MORRIS:

10   Q   Good morning, Mr. Dondero.  Can you hear me?

11   A   Yes.

12       (Echoing.)

13            THE COURT:  Ooh.  Okay.  We're having a little echo

14   when you speak, Mr. Dondero.  Do you have -- well, first, you

15   have headphones.  That always helps.

16       (Echoing.)

17            THE COURT:  Okay.  That may help as well.

18       (Pause.)

19            THE COURT:  Okay.  Let's try again.  If you could

20   say, "Testing, one, two."

21            THE WITNESS:  Is that better?

22            THE COURT:  That is better, yes.

23       All right.  Go ahead.

24            THE WITNESS:  Okay.  Great.

25            MR. MORRIS:  Thank you.

Dondero - Direct                        20

1   BY MR. MORRIS:

2   Q    Can you hear me, Mr. Dondero?

3   A    You're a bit faint.  Give me one second.  Okay.  Got you.

4   Q    Okay.  Thank you.  Who is in the room with you right now?

5   A    Bonds, Lynn, and a tech.

6           A VOICE:  Bryan Assink.

7           THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

8   sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

9   BY MR. MORRIS:

10  Q    Okay.  You're testifying today pursuant to a subpoena,

11  correct?

12  A    Yes.

13  Q    Okay.

14          MR. MORRIS:  And Your Honor, that subpoena can be

15  found at Docket No. 44 in the adversary proceeding.

16          THE COURT:  All right.

17  BY MR. MORRIS:

18  Q    In the absence of a subpoena, in the absence of a

19  subpoena, you didn't know if you would show up to testify at

20  this hearing; is that right?

21  A    I -- I do what my counsel directs me to do, and I didn't

22  know at that time whether they would direct me to come or not.

23  Q    Okay.  And when I -- when I deposed you earlier this week,

24  you agreed that you may or may not testify; is that right?

25  A    It depends on what counsel instructs me to do, correct.  I

Dondero - Direct                  21

 1  didn't know at the time.

 2  Q    Okay.  And you didn't mention anything about counsel when

 3  I asked you the questions earlier this week, correct?

 4  A    That was the undertone in almost all my answers, that I

 5  relied on counsel.

 6        MR. MORRIS:  Your Honor, I move to strike.  I'm

 7  asking very specific questions.  And if I need to go to the

 8  deposition transcript, I'm happy to do that.

 9        THE COURT:  All --

10        MR. MORRIS:  Just going forward, Your Honor, this is

11  cross-examination.  It's really yes or no at this point.

12  That's what I would request, anyway.

13        THE COURT:  All right.  Mr. Dondero, do you

14  understand --

15      (Echoing.)

16        THE COURT:  Do you understand what Mr. Morris was

17  raising there?  We really need you to give specific answers --

18  and usually they're going to be yes or no answers -- to Mr.

19  Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20  go ahead.

21        THE WITNESS:  Yeah.

22  BY MR. MORRIS:

23  Q    Mr. Dondero, you're aware that Judge Jernigan granted the

24  Debtor's request for a TRO against you on December 10th,

25  correct?

Dondero - Direct                          22

1   A    Yes.

2   Q    But you never reviewed the declaration that Mr. Seery

3   filed in support of the Debtor's motion for a TRO, correct?

4   A    I relied on counsel.

5   Q    Sir, you never reviewed the declaration that Mr. Seery

6   filed in support of the Debtor's motion for a TRO, correct?

7   A    Correct.

8   Q    You didn't even know the substance of what Mr. Seery

9   alleged in his declaration at the time that I deposed you on

10  Tuesday, correct?

11  A    Correct.

12  Q    And that's because you didn't even think about the fact

13  that the Debtor was seeking a TRO against you; isn't that

14  right?

15  A    No.

16  Q    That's not right?

17  A    No.

18  Q    All right.

19        MR. MORRIS:  Your Honor, could I ask my assistant,

20  Ms. Canty, to put up on the screen what had been designated as

21  the Debtor's Exhibit Z in connection with the motion for

22  contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23        THE COURT:  All right.

24        MR. MORRIS:  And I would like to -- I'd like to

25  cross-examine Mr. Dondero on his testimony on Tuesday.

Dondero - Direct                           23

 1              THE COURT:  All right.  You may.

 2              MR. MORRIS:  Can we put up Page 15, please?  And go

 3    to Lines 15 through 17.

 4    BY MR. MORRIS:

 5    Q    Sir, you recall being deposed on Tuesday by my -- by me,

 6    correct?

 7    A    Yes.

 8    Q    Okay.  Did you hear this question and did you hear this

 9    answer?

10        "Q   Did  you  care  that  the  Debtor  was  seeking  a  TRO

11        against you?

12        "A   I didn't think about it."

13    Q    Is that -- is that your testimony from the other day?

14    A    Yes.

15    Q    You didn't dial in to the hearing when the Court

16    considered the Debtor's motion for a TRO against you, did you?

17    A    I -- I don't recall.  I don't think so.

18    Q    You never read the transcript in order to understand what

19    took place in this courtroom when Judge Jernigan decided to

20    enter a TRO against you; isn't that right?

21    A    I relied on counsel, which has been my testimony all

22    along.

23              MR. MORRIS:  Can we go to Page 13 of the transcript,

24    please?  Beginning at Line 24.

25    BY MR. MORRIS:

Dondero - Direct                    24

```
 1   Q    (reading)
 2        "Q   Did you read a transcript of the hearing?
 3        "A   No."
 4   Q    Did you testify on Tuesday that you did not read a
 5   transcript of the hearing?
 6   A    Yes.
 7   Q    In fact, as of at least last Tuesday, you hadn't even
 8   bothered to read the TRO that this Court entered against you.
 9   Isn't that right?
10        MR. BONDS:  Your Honor, I'm going to object.
11        (Echoing.)
12        THE COURT:  Okay.  We're getting that echo from you
13   now, Mr. Bonds.  So maybe you need to turn your volume down a
14   little.  But what is the basis for your objection?
15        (Echoing.)
16        MR. BONDS:  Leading and rhetorical.
17        MR. MORRIS:  I think it's because they're in the same
18   room.
19        THE COURT:  Okay.  Do you have -- I don't know what
20   you're doing.  I guess you're moving to a different room?
21        MR. BONDS:  I am, Your Honor.
22        THE COURT:  Okay.
23        (Echoing.)
24        THE COURT:  Okay.  I'm waiting for the objection
25   basis.
```

Dondero - Direct                          25

```
1          MR. BONDS:  The basis of the objection, Your Honor,

2    is that --

3        (Echoing.)

4          THE COURT:  Okay.  We're going to have to do

5    something different here.  We can't have this issue for the

6    entire hearing.  Do you need to get a tech person in there, or

7    maybe call in on your phone?  I don't know.

8          MR. BONDS:  Your Honor, I'm going into the conference

9    room.

10       (Pause.)

11         THE COURT:  Okay.  Are we going to try again here?

12         MR. BONDS:  Yes.  Is this working?

13         THE COURT:  Yes.

14         MR. BONDS:  Perfect.  Your Honor, my objection is

15   that Mr. Dondero has already testified that he relied on his

16   lawyers.  I don't know where Mr. Morris is going with this,

17   but it's pretty clear that Mr. Dondero simply relies on his

18   lawyers to tell him what happened.  I don't know that that's

19   that different than any other layperson.

20         MR. MORRIS:  Your Honor, if this is --

21         THE COURT:  Well, --

22         MR. MORRIS:  If I may?

23         THE COURT:  Yes.

24         MR. MORRIS:  I believe it's terribly relevant to know

25   how seriously Mr. Dondero takes this Court and this Court's
```

Dondero - Direct                       26

 1   proceedings and this Court's orders.  If the Court decides

 2   that it doesn't matter whether or not he read the transcript,

 3   you're the fact-finder and you'll make that decision.  But I

 4   believe it's at least relevant.

 5          THE COURT:  Okay.  I agree and I overrule the

 6   objection.

 7       Go ahead.

 8   BY MR. MORRIS:

 9   Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10   read the TRO that was entered against you, correct?

11   A   I'm sorry.  We're dealing with some tech stuff here for a

12   second.  Can you repeat the question?

13   Q   Yes.

14       (Echoing.)

15   Q   As of Tuesday, you had not bothered to read the TRO that

16   was entered against you?

17       (Echoing.)

18          MR. MORRIS:  Your Honor, can we take a break?  I

19   can't do this.  I just --

20          THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21   do we need to do to fix these technical problems?  Do I need

22   to get my IT guy in here and help you?  This is terrible.

23   This connection is terrible.  And I understand people have

24   technical problems sometimes, but we've been doing these video

25   hearings since March, so --

Dondero - Direct                          27

 1            MR. BONDS:  Your Honor, I have simply gone to another

 2    conference room.  The Debtor (garbled) I think that Mr.

 3    Dondero should be fine.

 4            THE COURT:  Okay.  I don't know what you said except

 5    that you think Mr. Dondero should be fine.  I --

 6            MR. MORRIS:  Is there anybody in that room with a

 7    cell phone on, Mr. Dondero?

 8            THE WITNESS:  No.

 9            MR. BONDS:  And I'm completely over in --

10            THE COURT:  Okay.

11            MR. MORRIS:  Can I try and proceed?

12            THE COURT:  Try to proceed.

13            MR. MORRIS:  Okay.

14       (Echoing.)

15    BY MR. MORRIS:

16    Q   Mr. Dondero, as of Tuesday you only had a general view of

17    what this Court restrained you from doing; is that correct?

18       (Echoing.)

19            MR. MORRIS:  I'd still -- I -- there's too much

20    noise, Your Honor.  I can't do it.

21            THE COURT:  Okay.  We're going to take a five-minute

22    break.  Mr. Bonds, can you get a technical person there to

23    work through these problems?

24       And Mike, let's get Bruce up here to --

25            THE CLERK:  It's because they're in the same room.

Dondero - Direct                          28

1   That's the problem.

2            THE COURT:  They're -- they're --

3            THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4   on his way up there.

5            THE COURT:  Thank you.

6       Mike, explain it to me, because I don't understand.

7   You're saying if they have two devices on in the same room?

8            THE CLERK:  The same -- that's the problem.  They're

9   so close.  And they're trying to use the same device, give it

10  back to you.

11           A VOICE:  He has a phone on in the room.

12           MR. MORRIS:  I asked that question.

13           THE COURT:  Okay.

14           MR. MORRIS:  Please instruct the witness to exclude

15  everybody from the room, to turn off all electronic devices

16  except the device that's being used for this (garbled).  At

17  least have --

18           THE COURT:  All right.  So, the consensus of more

19  technical people than me is you've got two devices on in the

20  same room and that's what's causing the distortion and echo.

21  So I don't know if it's somebody's phone that needs to be

22  turned off or if you have two iPads or laptops.

23       (Court confers with Clerk.)

24       (Pause.)

25           MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                          29

```
 1          THE WITNESS:  Yes.
 2       (Pause.)
 3          THE COURT:  Okay.  Bruce, can you walk their office
 4    through?  They have, I think, two devices in the same room.
 5    It's a horrible echo.  So, Mr. Bonds or some --
 6          MR. BONDS:  Yes, Your Honor.
 7          THE COURT:  We have a lawyer and the lawyer's client
 8    who is testifying right now in the same room.
 9          I.T. STAFF:  Uh-huh.
10          THE COURT:  And --
11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-
12    in user on a telephone?
13          THE COURT:  I don't know.  I don't --
14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is
15    feeding back in.  They need to separate if they're both on.
16    Or just use one and the attorney can slide over and the client
17    can --
18          THE COURT:  Okay.
19          I.T. STAFF:  -- go in his place.  Just use one --
20          THE COURT:  Our IT person is confirming what everyone
21    else has been saying, that you really can only have one device
22    in the same room.  It's just unavoidable, the echoing.
23          I.T. STAFF:  Unless everybody has --
24          THE COURT:  Unless everyone has headphones on.
25          I.T. STAFF:  Right.
```

Dondero - Direct                    30

```
 1        THE COURT:  So we either need everyone to have
 2   headphones on, or one device in the room.  And you all,
 3   awkward as it is, just have to share.  Or I guess you could
 4   have two laptops, but one person has to --
 5        I.T. STAFF:  Has to have a headset.
 6        THE COURT:  Has to --
 7        I.T. STAFF:  Because the other one, the audio is
 8   going to be feeing into the microphone of the other one.
 9        THE COURT:  Okay.  So, Mr. Bonds, I don't know if
10   you've heard any of that, but --
11        THE CLERK:  He needs to unmute himself.
12        THE COURT:  You're on mute, Mr. Bonds.
13        MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit
14   next to Mr. Dondero and answer any questions that may come up.
15        THE COURT:  Okay.
16        MR. BONDS:  If any objections --
17        THE COURT:  Okay.  So we're going to have one device?
18        MR. BONDS:  Yes.
19        THE COURT:  Okay.  Let's try again.
20     Okay.  Go ahead, Mr. Morris.
21   BY MR. MORRIS:
22   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?
23        THE COURT:  I didn't hear you, Mr. Morris.  What?
24   BY MR. MORRIS:
25   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?
```

Dondero - Direct                                31

1    A    I have no idea.

2    Q    Is Mr. Leventon listening to this hearing?

3    A    I have no idea.  I haven't spoken with him.

4    Q    Okay.  So let's try again.  At least as of today, you

5    never bothered to read the TRO that was entered against you,

6    correct?

7    A    Correct.

8    Q    As of Tuesday, you only had a general understanding of

9    what the Court restrained you from doing, correct?

10        (Echoing.)

11   A    I had an adequate understanding.

12   Q    You had a what?

13   A    Adequate understanding.

14   Q    Your understanding --

15             A VOICE:  Your Honor?

16   BY MR. MORRIS:

17   Q    -- was that you were prohibited from speaking to the

18   Debtor's board without counsel and from speaking to the

19   Debtor's employees; is that right?

20   A    No.

21   Q    Okay.

22             MR. MORRIS:  Can we go to Page 13, Line 8, please?

23   BY MR. MORRIS:

24   Q    Were you asked this question and did you give this answer?

25        "Q    Tell me your understanding of what the temporary

Dondero - Direct                         32

1       restraining order restrains you from doing.

2       "A   To talk to Independent Board directly or talking

3       directly with employees.

4       "Q   Is there any other aspect of the temporary

5       restraining order that you're aware of that would

6       otherwise constrain or restrain your conduct?

7       "A   Those are the points I (garbled)."

8   Q   Did you give those answers to the questions that I asked?

9   A   Yes.

10  Q   And even with that general understanding, you went ahead

11  and communicated directly (garbled) employees many, many, many

12  times after the TRO was entered?

13  A   Only with regard to shared services, pot plan, and

14  Ellington, the settlement counsel.

15  Q   Does the restraining order permit you to speak with

16  Debtor's employees about the pot plan?

17      (Echoing.)

18          THE COURT:  Mr. Morris, let me stop.

19          MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20          THE COURT:  Even --

21          MR. MORRIS:  It's not working.

22          THE COURT:  Even your sound is not coming through

23  clearly.  And I think it's the echo coming out of their

24  speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25  conclude that, would you turn off your video and ask your

Dondero - Direct                               33

1   question again and see if it's any better, just to confirm

2   it's not a bandwidth issue on your end?  I doubt it is, but --

3   okay.  So, try asking your question again, and I'm going to

4   see if it's still distorted.

5   BY MR. MORRIS:

6   Q    There's nothing in the TRO that permitted you to speak

7   with Debtor employees about the pot plan, correct?

8            THE COURT:  Okay.  Mr. Morris, it's not at your end.

9   It's -- it's their end.  Okay.  So you can turn your video

10  back on.

11      Mr. Bonds?

12           MR. BONDS:  Yes, ma'am.

13           THE COURT:  You all are going to have to use earbuds,

14  apparently.  We're getting -- we're getting a feedback loop,

15  okay?  Whenever Mr. Morris talks or I talk, we're hearing

16  ourselves echo through your speakers.

17           MR. BONDS:  Can you check right now to see if it's

18  true, if we're experiencing the same problem?

19           THE WITNESS:  In other words, is this better?  We

20  unplugged the cord here.

21           THE COURT:  Well, when you all speak, it's -- it's

22  better now.  But when --

23           MR. MORRIS:  It is better.

24           THE COURT:  But when Mr. Morris asks a question, it's

25  echoing through your speakers.  But I don't hear myself

Dondero - Direct                    34

1   echoing through your speakers.

2           I.T. STAFF:  Can Mr. Morris say something, please?

3           THE COURT:  Mr. Morris, say something.

4           MR. MORRIS:  They may have solved the problem.  They

5   may have solved the problem.  How's that?

6           THE COURT:  Okay.  I think the problem is solved,

7   whatever you did, so let's try once again.

8       Go ahead, Mr. Morris.  Repeat your last question.  I

9   didn't hear it.

10  BY MR. MORRIS:

11  Q   Mr. Dondero, the temporary restraining order doesn't

12  permit you to speak with the Debtor's employees about a pot

13  plan; isn't that right?

14  A   There was a presentation on the pot plan given to the

15  Independent Board after the restraining order was put in

16  place.  What are you implying, that that wasn't proper?

17          MR. MORRIS:  Your Honor, I move to strike.  It's a

18  very simple question.

19          THE COURT:  Okay.  Sustained.  If you could just

20  answer the specific question, Mr. Dondero.

21          THE WITNESS:  I don't know.

22  BY MR. MORRIS:

23  Q   Fair enough.  Sir, let's talk about some of the events

24  that led up to the imposition of the TRO.  I appreciate the

25  fact that you hadn't read Mr. Seery's declaration or any of

Dondero - Direct                           35

1  the evidence that was submitted in connection with the TRO, so

2  let's spend some time talking about that now.  CLO stands for

3  Collateralized Loan Obligation, correct?

4  A    Yes.

5  Q    And the Debtor is party to certain contracts that give it

6  the exclusive right and responsibility to manage certain CLOs,

7  correct?

8  A    Yes.

9  Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10 right?

11 A    Yes.

12 Q    And we can refer to that, that firm, as NexPoint; is that

13 fair?

14 A    Yes.

15 Q    You have a direct or indirect ownership interest in

16 NexPoint, correct?

17 A    Yes.

18 Q    You're the president of NexPoint; isn't that right?

19 A    Yes.

20 Q    And as the president of NexPoint, it's fair to say that

21 you control that entity, correct?

22 A    To a certain extent.

23 Q    Sir, as the president of NexPoint, it's fair to say that

24 you control that entity, correct?

25 A    To a certain extent.

Dondero - Direct                      36

1        MR. MORRIS:  Can we go to Page 18 of the transcript,

2   please?  Lines 19 and 21.

3   BY MR. MORRIS:

4   Q   Were you asked this question and did you give this answer?

5       "Q   As the president of NexPoint, it's fair to say

6       that you control that entity?

7       "A   Generally."

8   Q   Is that the right answer that you gave the other day?

9   A   I think it's similar to what I just said, yeah, yeah.

10  Q   Sir, you're familiar with Highland Capital Management Fund

11  Advisors, LP; is that right?

12  A   Yes.

13  Q   And we'll call that Fund Advisors; is that fair?

14  A   Yes.

15  Q   And we'll refer to Fund Advisors and NexPoint together as

16  the Advisors; is that okay?

17  A   Yes.

18  Q   Fund Advisors is also an advisory firm, correct?

19  A   Yes.

20  Q   You have a direct or indirect ownership interest in Fund

21  Advisors, correct?

22  A   Yes.

23  Q   You're the president of Fund Advisors, correct?

24  A   Yes.

25  Q   And you also have an ownership interest in the general

Dondero - Direct                          37

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10  A    I don't think that's a name that we manage.

11  Q    Let's put it this way.  There are three funds that are

12  represented by K&L Gates that are managed by the Advisors,

13  correct?

14  A    I don't know.

15  Q    Okay.  You're the portfolio manager of the investment

16  funds advised by NexPoint and Fund Advisors, correct?

17  A    Largely.

18  Q    And NexPoint and Fund Advisors caused the investment funds

19  that they manage to invest in CLOs that are managed by the

20  Debtors, correct?

21  A    Years ago, they bought the equity interests, if that -- if

22  that's what you're asking me, in various CLOs.

23  Q    The two Advisors that you own and control caused the

24  investment funds to purchase interests in CLOs that are

25  managed by the Debtor, correct?

Dondero - Direct                          38

```
 1    A    Not recently.  Not recently.  Years ago.  Yes.

 2    Q    And they still hold those interests today, correct?

 3    A    Yes.

 4    Q    And K&L Gates represents all of those entities, correct?

 5    A    Yes.

 6    Q    And we'll call those the K&L Gates Clients; is that fair?

 7    A    Yes.

 8    Q    Before the TRO was entered, the K&L Gates Clients sent two

 9   letters to the Debtor concerning the Debtor's management of

10   certain CLOs, right?

11   A    Yes.

12   Q    Okay.

13         MR. MORRIS:  Your Honor, I just want to take a moment

14   now, because we're going to start to look at some documents.

15   The Debtor would respectfully move into evidence Exhibits A

16   through Y that are on their exhibit list.

17         THE COURT:  All right.

18         MR. BONDS:  Your Honor, we have no objection.

19         THE COURT:  A through Y are admitted.  And for the

20   record, these appear at Docket No. 46 in this adversary.

21      (Plaintiff's Exhibits A through Y are received into

22   evidence.)

23         MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24   in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25   us know.
```

Dondero - Direct                              39

1           MS. CANTY:  Yeah.  I'm pulling it up right now.

2           MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3    down just a bit?

4    BY MR. MORRIS:

5    Q    All right.  Can you see this letter was sent on October

6    16th?

7    A    Yes.

8    Q    And we see the entities that are reflected on this letter.

9    We've got Highland Capital Management, LP.  That's the

10   question that they're asking.  And the questions and the

11   statements are being asserted on behalf of NexPoint Advisors,

12   LP.  Do you see that?

13   A    Yes.

14   Q    And Highland Capital Management Fund Advisors, LP.  Those

15   are the two Advisors that you own and control, correct?

16   A    Control to a large extent.

17   Q    Okay.

18           MR. MORRIS:  And can we put up Exhibit C, please?

19   BY MR. MORRIS:

20   Q    This is a second letter sent by NexPoint on November 24th.

21   Do you see that?

22   A    Yes.

23   Q    Okay.  And you're familiar with the substance of these

24   letters, correct?

25   A    Yes.

Dondero - Direct                          40

1   Q    And you were familiar -- you were aware of these letters

2   before they were sent.  Is that correct?

3   A    Yes.

4   Q    And you generally discussed the substance of these letters

5   with NexPoint; is that right?

6   A    Generally, yes.

7   Q    And you discussed the substance of the letters with the

8   Advisors' internal counsel; is that right?

9   A    Yes.

10  Q    That's D.C. Sauter?

11  A    Yes.

12  Q    And you have been on some calls with K&L Gates about these

13  letters, right?

14  A    I believe so.

15  Q    And you knew these letters were being sent, correct?

16  A    Yeah, they're -- they're reported.

17  Q    You knew these letters for being sent; isn't that right,

18  sir?

19  A    Yes.

20  Q    And you didn't object to the sending of these letters,

21  correct?

22  A    No.

23  Q    In fact, you supported the sending of these letters.  Is

24  that right?

25  A    Yes.

Dondero - Direct                    41

1    Q    And you have never directed NexPoint to withdraw these

2    letters, correct?

3    A    No.

4    Q    Around Thanksgiving, you learned that Mr. Seery had given

5    a direction to sell certain securities owned by the CLOs

6    managed by the Debtors, correct?

7    A    Yes.

8    Q    And when you learned that, you personally intervened to

9    stop the trades, correct?

10   A    Yes.  I believe they were inappropriate.

11           MR. MORRIS:  I move to strike the latter part of the

12   answer, Your Honor.

13           THE COURT:  It's stricken.

14           MR. MORRIS:  Can we put up Exhibit D, please?

15   BY MR. MORRIS:

16   Q    We looked at this email string the other day.  Do you

17   recall that?

18   A    Yes.

19           MR. MORRIS:  Can we start at the bottom, please?

20   BY MR. MORRIS:

21   Q    There's an email from Hunter Covitz.  Do you see that?

22   A    Yes.

23   Q    Now, this is November 24th.  It's before the TRO.  Is that

24   fair?

25   A    Yes.

Dondero - Direct                          42

1   Q    Mr. Covitz is an employee of the Debtor, right?

2   A    I believe so.

3   Q    And Mr. Covitz helps manage the CLOs on behalf of the

4   Debtor.  Is that your understanding?

5   A    Yes.

6   Q    And Mr. Covitz in this email is giving directions to Matt

7   Pearson and Joe Sowin to sell certain securities held by the

8   CLOs.  Is that correct?

9   A    No.  He's giving Jim Seery's direction.

10          MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13          THE COURT:  Overruled.

14          MR. MORRIS:  May I respond, Your Honor?

15          THE COURT:  I --

16          MR. MORRIS:  Okay.  Thank you.

17          THE COURT:  I think it's relevant.  Go ahead.

18          MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q    Mr. Seery is the CEO of the Debtor; is that right?

21  A    Yes.

22  Q    And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A    I don't believe so.  The Debtor is in default of the

                          Dondero - Direct                    43

 1   agreements.

 2           MR. MORRIS:  I move to strike, Your Honor.

 3           THE COURT:  Sustained.

 4   BY MR. MORRIS:

 5   Q   Sir, the Debtor has the exclusive contractual right and

 6   obligation to manage the CLOs, correct?

 7   A   I don't agree with that.

 8   Q   Okay.

 9           MR. MORRIS:  Can we scroll up to the -- just --

10   BY MR. MORRIS:

11   Q   Do you see that Mr. Pearson acknowledges receipt of Mr.

12   Covitz's email?

13   A   Yes.

14   Q   And you received a copy of Mr. Covitz's email, did you --

15   did you not?

16   A   Yes.

17           MR. MORRIS:  Can you scroll up a little bit, please?

18   BY MR. MORRIS:

19   Q   And can you just read for Judge Jernigan your response

20   that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21   November 24th?

22   A   (reading)  No, do not.

23   Q   You instructed the recipients of Mr. Covitz's email not to

24   sell the SKY securities as had been specifically instructed by

25   Mr. Seery, correct?

                          Dondero - Direct                    44

1    A    Yes.

2    Q    And you understood when you gave that instruction that the

3    people on the email were trying to execute trades that Mr.

4    Seery had authorized, correct?

5    A    No.  I -- no, that isn't how I would describe it.

6            MR. MORRIS:  A second, Your Honor?

7            THE COURT:  Okay.

8        (Pause.)

9    BY MR. MORRIS:

10   Q    Sir, when you gave the instruction reflected in this

11   email, you knew that you were stopping trades that were

12   authorized and directed by Mr. Seery, correct?

13   A    I don't think -- I -- I wasn't -- I wasn't sure at the

14   moment I did that.  I didn't find out until later that it was

15   Seery who directed it.

16           MR. MORRIS:  Can we please go back to the deposition

17   transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18   BY MR. MORRIS:

19   Q    Were you asked this question and did you give this answer?

20       "Q  At the time that you gave the instruction, "No, do

21       not," you knew that you were stopping trades that had

22       been authorized and directed by Mr. Seery, correct?

23       "A   Yes."

24   Q    Did you give that answer to my question on Tuesday?

25   A    I'd like to clarify it, but yes, I did give that answer.

Dondero - Direct                           45

1    Q    Okay.  You didn't speak with Mr. Seery before sending your

2    instructions interfering with his trade, the trades that he

3    had authorized, correct?

4    A    No, I did not.

5    Q    And you took no steps to seek the Debtor's consent before

6    instructing the recipients of your email to stop executing the

7    SKY transactions that had been authorized by Mr. Seery,

8    correct?

9    A    I'm sorry.  Can you repeat the question?

10   Q    You took no steps to seek the Debtor's consent before

11   stepping in to stop the trades that Mr. Seery had authorized,

12   correct?

13   A    I took other actions instead.

14   Q    Okay.  But you didn't seek the Debtor's consent?  That's

15   not one of the actions you took, right?

16   A    No, I educated the traders as to why it was inappropriate.

17          MR. MORRIS:  I move to strike, Your Honor.

18          THE COURT:  Sustained.

19   BY MR. MORRIS:

20   Q    Sir, did you seek the Debtor's consent before stepping in

21   to stop the trades that Mr. Seery had authorized?

22   A    No, I did not seek consent.

23   Q    In response to your instruction, Mr. Pearson canceled all

24   of the trades that Mr. Seery had authorized, correct?

25   A    Yes.

Dondero - Direct                              46

1          MR. MORRIS:  Can we go back to the exhibit, please?

2   And if we could just scroll -- stop right there.

3   BY MR. MORRIS:

4   Q    That's -- that's Mr. Pearson's response to your email,

5   confirming that he had canceled both the SKY and the AVAYA

6   trades that had not yet been executed, correct?

7   A    Yes.

8          MR. MORRIS:  Can we scroll to the response to that?

9   BY MR. MORRIS:

10  Q    Is this your response?

11  A    Yes.

12  Q    Can you read that aloud, please?

13  A    (reading)  HFAM and DAF have instructed Highland in

14  writing not to sell any CLO underlying assets.  There is

15  potential liability.  Don't do it again, please.

16  Q    The writings that you're referring to are the two letters

17  from NexPoint, Exhibits B and C that we just looked at,

18  correct?

19  A    Yeah.  There might have been a third letter.  I don't

20  know.  But, yes, generally, those letters.

21  Q    Okay.  And at this juncture, the reference to potential

22  liability was a statement intended for Mr. Pearson.  Is that

23  correct?

24  A    Um, I -- no.  Pearson wouldn't have had any personal

25  liability.  It was -- it was meant for the -- there was

Dondero - Direct                          47

1   potential liability to the Debtor or to the compliance

2   officers at the Debtor.

3          MR. MORRIS:  Can we go to Page 45 of the deposition

4   transcript, please?  Line -- beginning at Line 11, through 18.

5   BY MR. MORRIS:

6   Q    Did I ask these questions and did you give these answers?

7        "Q   Do  you  see  the  reference  there  in  the  latter

8        portion  of  your  email,  'There  is  potential  liability.

9        Don't do it again'?

10       "A   Yes.

11       "Q   Who  was  the  intended  recipient  of  that  message?

12       "A   At this juncture, it's Matt Pearson, I believe."

13  Q    Did you give those answers to my questions on Tuesday?

14  A    Yeah.  That's not inconsistent.

15         MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q    Mr. Sowin responded to your email; is that right?

18         MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q    Okay.  Who's Mr. Sowin?

21  A    He's the head trader.

22  Q    Who's he employed by?

23  A    I believe he's employed by HFAM but not the Debtor.

24  Q    Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

Dondero - Direct                     48

1   A    I believe so.

2   Q    And Mr. Sowin responded to your email and he indicated

3   that he would follow your instructions.  Is that right?

4   A    Yeah.  He understands that it's inappropriate.  That's

5   what he's reflecting.  Yes.

6            MR. MORRIS:  I move to strike, Your Honor.

7            THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q    Sir, Mr. Sowin responded and indicated that he would

10  follow your instructions, correct?

11  A    (no audible response)

12  Q    Did you answer?  I'm sorry.

13  A    No, I didn't answer.  It's -- I don't know if you could

14  expressly say that from that email.  Maybe we should read the

15  email.

16           MR. MORRIS:  Let's just move on, Your Honor.

17           THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q    A few days later, you learned -- you learned that Mr.

20  Seery was trying a workaround to effectuate the trades anyway,

21  correct?

22  A    I believe so.

23  Q    Uh-huh.  And when you learned that, you wrote to Thomas

24  Surgent; is that right?

25  A    I -- I believe so.

Dondero - Direct                           49

1   Q    I don't -- I don't mean to -- this is not a test here.

2        MR. MORRIS:  Can we just scroll up to the next email,

3   please?  Okay.  Stop right there.

4   BY MR. MORRIS:

5   Q    When you -- when you learned that Mr. Seery was trying a

6   workaround, you wrote to Mr. Surgent when you learned that,

7   right?

8   A    Yes.

9   Q    And Mr. Surgent is an employee of the Debtor; is that

10  correct?

11  A    I believe he's still the chief compliance officer of the

12  Debtor.

13  Q    Okay.  Now, as a factual matter, you never asked Mr. Seery

14  why he wanted to make these trades; isn't that right?

15  A    I -- I did not.

16  Q    Okay.  And before the TRO was entered, there was nothing

17  that prevented you from picking up the phone and asking Mr.

18  Seery why he wanted to make these trades, correct?

19  A    That's not true.

20       MR. MORRIS:  One second, please, Your Honor.

21       THE COURT:  Okay.

22       (Pause.)

23       MR. MORRIS:  Can we go to Page 60 of the transcript?

24  Mr. Bonds says -- beginning at Line 14.  There is an objection

25  there, Your Honor, and I would ask that the Court rule on the

Dondero - Direct                                    50

1    objection before I read from the transcript.

2              THE COURT:  Okay.

3              MR. MORRIS:  There you go.

4              THE COURT:  (sotto voce)  (reading)  Is there

5    anything that you're aware of that prevented you from picking

6    up the phone and asking Mr. Seery for his business

7    justification for these trades prior to December 10.

8    Objection, form.

9        I overrule the objection to the form of that question.

10             MR. MORRIS:  Okay.

11   BY MR. MORRIS:

12   Q   Mr. Dondero, were you asked this question and did you give

13   this answer?

14       "Q   Is there anything that you're aware of that

15       prevented you from picking up the phone and asking Mr.

16       Seery for his business justification for these trades

17       prior to December 10, 2010?

18       "A   No.  I expressed my disapproval via email."

19   Q   Is that right?

20   A   I'd like to adjust that answer to the answer I just gave.

21   Q   Okay.

22             MR. MORRIS:  And I move to strike.

23   BY MR. MORRIS:

24   Q   I'm just asking you if that's the answer you gave on

25   Tuesday.

Dondero - Direct                          51

1           THE COURT:  Sustained.

2           THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q    Thank you.  Now, you wrote to Mr. Surgent because you

5    wanted to remind him of his personal liability for regulatory

6    breaches and for doing things that aren't in the best interest

7    of investors, correct?

8    A    Yes.

9    Q    And you actually thought about this and you -- because you

10   didn't believe that Mr. Surgent had extra insurance and

11   indemnities like Mr. Seery, right?

12   A    No.

13   Q    Didn't you testify to that the other day?

14   A    I don't remember, but that isn't the only reason.

15   Q    I didn't ask you if it was the only reason.  Listen

16   carefully to my question.  Did you send this email because you

17   -- because you wanted to remind him of his personal liability

18   for regulatory breaches and for doing things that aren't in

19   the -- I apologize.  Withdrawn.

20       You did not believe at the time that you sent this email

21   that he, Mr. Surgent, had insurance and indemnities like Mr.

22   Seery, correct?

23   A    Yes.

24   Q    Okay.

25           MR. MORRIS:  Can we go back to the email, please?

Dondero - Direct                        52

1  BY MR. MORRIS:

2  Q    Can you just read the entirety of your email to Mr.

3  Surgent out loud?

4  A    (reading)  I understand Seery is working on a workaround

5  to trade these securities anyway, trades that contradict

6  investor desires and have no business purpose or investment

7  rationale.  You might want to remind him and yourself that the

8  chief compliance officer has personal liability.

9  Q    Okay.  That's -- that's the message you wanted to convey

10 to Mr. Surgent, right?

11 A    Yes.

12 Q    And, again, you never bothered to ask Mr. Seery what his

13 businessperson -- purpose or investment rationale was,

14 correct?

15 A    I -- I didn't believe I could talk to him directly.

16 Q    This is before the --

17 A    That's why I never picked up the phone.

18 Q    Okay.  You intended to convey the message to Mr. Surgent

19 that, by following Mr. Seery's orders to execute the trades,

20 that Mr. Surgent faced personal liability, correct?

21 A    Yes, he does.

22 Q    And that's the message you wanted to send to him, right?

23 A    It's a true and accurate message, yes.

24 Q    Okay.  Just a few days earlier, you also threatened Mr.

25 Seery, right?

Dondero - Direct                              53

1  A    I wouldn't use the word "threatened."

2  Q    Okay.  Let's let -- let's let it speak for itself.

3           MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4  scrolling down just a bit.

5  BY MR. MORRIS:

6  Q    This is an email that you sent to Mr. Seery on November

7  24th.  And as always, Mr. Dondero -- this is the third time

8  we're meeting -- if there's something in the document that you

9  need to see, please just let me know, because I don't -- I

10 don't mean to test your memory if the document can help

11 refresh your recollection.

12           MR. MORRIS:  Can we just scroll up a little bit

13 further to the top to see the date?

14 BY MR. MORRIS:

15 Q    Okay.  So, Jim, there, JD, who is that?

16 A    That's me.

17 Q    Okay.  And can you tell by the substance of the email, of

18 the text messages, this is communications between you and Mr.

19 Seery, right?

20 A    Yes.

21 Q    Okay.  And you see that it's dated November 24th there?

22 A    Yes.  Right after we were discussing the pipeline.  Or

23 right when we were working on the pipeline.

24 Q    Okay.

25           MR. MORRIS:  Can you scroll down a little bit,

Dondero - Direct                              54

 1   please?

 2   BY MR. MORRIS:

 3   Q    At 5:26 p.m., you sent Mr. Seery a text, correct?

 4   A    Yes.

 5   Q    Can you read that, please?

 6   A    (reading)  Be careful what you do.  Last warning.

 7   Q    Okay.  This was a warning telling Mr. Seery to stop

 8   selling assets out of the CLOs or the beneficial owners would

 9   take more significant action against him, correct?

10   A    It was a general statement that what he was doing was

11   regulatorily inappropriate and ethically inappropriate and he

12   was in breach of the contracts he was operating.

13   Q    Neither you nor any entity owned or controlled by you are

14   parties to the contracts you just referred to; isn't that

15   correct?

16   A    I believe they're indirectly parties to those contracts,

17   especially when they're in default.

18   Q    Neither you nor any entity owned or controlled by you is a

19   signatory to any CLO management contract pursuant to which the

20   Debtor is a party, correct?

21   A    I -- I don't know and I don't want to make legal

22   conclusions on that.

23   Q    Okay.  At the deposition the other day, some of the things

24   that you suggested the beneficial owners of the CLO interests

25   might do against Mr. Seery and the Debtor are class action

Dondero - Direct                              55

1   lawsuits.  Is that right?

2   A    I -- I did not suggest the entities I control would do

3   that.  If anybody on this call were to call a class action

4   lawsuit -- a class action law firm and tell them what's been

5   going on with the CLOs, I think a class action law firm would

6   file it on their own regard, not on the behalf of my entities.

7            MR. MORRIS:  I move to strike, Your Honor.

8            THE COURT:  Sustained.

9   BY MR. MORRIS:

10  Q    Let's talk about that cell phone.  Okay?  Until at least

11  December 10th, the day the TRO was entered, you had a cell

12  phone that was bought and paid by the Debtor, right?

13  A    Yes.

14  Q    But sometime after December 10th, your phone was disposed

15  of or thrown in the garbage; is that right?

16  A    Yes.

17  Q    And you don't know when after December 10th the cell phone

18  that was the Debtor's property was disposed of, right?

19  A    I don't believe at that point it was the Debtor's

20  property.  I think I paid it off in full and the Debtor had

21  announced that they were canceling everybody's cell phones so

22  it was appropriate for me to get another one.

23            MR. MORRIS:  I move to strike, Your Honor.

24            THE COURT:  Sustained.

25            MR. BONDS:  Your Honor, at some point, I mean, Mr.

1    Morris just ought to go on and testify.

2            MR. MORRIS:  No, this is Mr. Dondero's testimony,

3    Your Honor.  He gave it the other day.  I'm just asking him to

4    confirm it, basically.

5            THE COURT:  Okay.  I overrule the objection, if any

6    there was, on the part of Mr. Bonds.

7    BY MR. MORRIS:

8    Q    Sometime after December 10th, the cell phone that prior to

9    that time had been owned and paid for by the Debtor was thrown

10   in the garbage or otherwise disposed of, correct?

11   A    Yes.

12   Q    And you don't know when after December 10th that was --

13   the phone was disposed of, correct?

14   A    It was on or about that date, I'm sure.

15   Q    Well, we know it was after December 10th, right?

16   A    Okay.  Or about that date.

17   Q    You testified the other day that you just don't know who

18   made the decision to throw your phone away, right?

19   A    I could find out, but I don't know.  I would have to talk

20   to employees.

21   Q    Did you make any request of the Debtor since your

22   deposition to try to find out the answer as to who made the

23   decision to throw your phone away?

24   A    No.

25   Q    How did you learn that your phone was thrown away?

Dondero - Direct                              57

1    A    As I testified, it's standard operating procedures every

2    time a senior executive gets a new phone.

3    Q    Hmm.  You don't know exactly who threw the phone away; is

4    that right?

5    A    No, but I can find out.

6    Q    Okay.  I'm just asking -- I'm not asking you to find out.

7    I'm just asking you if you know.  Do you know who threw your

8    phone away?

9    A    No.

10   Q    Do you know who made the decision to throw your phone

11   away?

12   A    It -- there wasn't a decision.  It was standard operating

13   procedure.

14           MR. MORRIS:  I move to strike.

15           THE COURT:  Sustained.

16   BY MR. MORRIS:

17   Q    You and Mr. Ellington disposed of your phones at the same

18   time, correct?

19   A    I don't have specific awareness regarding what Mr.

20   Ellington did with his phone.

21   Q    It never occurred to you to get the Debtor's consent

22   before throwing the phone that they had purchased away, right?

23   A    I'm not permitted to talk to the Debtor.

24   Q    Sir, it never occurred to you to get the Debtor's consent

25   before throwing the phone away, correct?

Dondero - Direct                         58

```
 1   A    I'm going to stick with the answer I just gave.

 2              MR. MORRIS:  Can we go to Page 75 of the transcript?

 3   Lines 12 through 15.  There is an objection there, Your Honor.

 4   I would respectfully request that the Court rule on the

 5   objection before I read the testimony.

 6              THE COURT:  Okay.  Starting at Line 12?

 7              MR. MORRIS:  12.

 8              THE COURT:  (sotto voce)  (reading)  Did it ever

 9   occur to you to get the Debtor's consent before doing this?

10   Objection, form.

11        That objection is overruled.

12   BY MR. MORRIS:

13   Q    All right.  Mr. Dondero, did you give this answer to my

14   question on Tuesday?

15        "Q   Did it ever occur to you to get the Debtor's

16        consent before doing this?

17        "A   No."

18   A    Yes, I gave that testimony.

19   Q    Okay.  And you also had the phone number changed from the

20   Debtor's account to your own personal account; is that right?

21   A    The phone number changed?  The phone number stayed the

22   same.

23   Q    But you had the number changed from the Debtor's account

24   to your own personal account, correct?

25   A    The Debtor said they wouldn't pay for it anymore.  Who
```

Dondero - Direct                                  59

1   else could I change it to?

2          MR. MORRIS:  Your Honor, I move to strike.  It's a

3   very simple question.

4          THE COURT:  Sustained.

5   BY MR. MORRIS:

6   Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7   number changed from the Debtor's account to your personal

8   account, correct?

9   A   I didn't change the number.  I had the billing changed to

10  my personal account versus the company account.

11  Q   And you never asked the Debtor for permission to do that,

12  correct?

13  A   No.

14  Q   And you never told Debtor you were doing that, correct?

15  A   No.

16  Q   And nobody ever told Mr. Seery or anybody at my firm that

17  the phone was being thrown in the garbage, correct?

18  A   Well, --

19         MR. BONDS:  To the extent he knows.

20         THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21  BY MR. MORRIS:

22  Q   You didn't believe it was necessary to give the Debtor

23  notice that you were taking the phone number for your own

24  personal account and throwing the phone in the garbage,

25  correct?

                      Dondero - Direct                    60

1    A    Correct.

2    Q    The phone --

3          MR. BONDS:  Your Honor, I'm going to object.  He --

4    Mr. Dondero did not testify he personally threw the phone in

5    the garbage.

6          MR. MORRIS:  Withdrawn.

7          THE COURT:  Okay.

8    BY MR. MORRIS:

9    Q    Mr. Dondero, the phone was in Highland's offices on

10   December 10th, the date the TRO was in effect, correct?

11   A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12   know.  It's -- I remember going over to -- well, anyway, I --

13   I don't know.  We'll leave it at that.

14         MR. MORRIS:  Can we go to Exhibit G, please?

15   BY MR. MORRIS:

16   Q    Who's Jason Rothstein, while we wait?

17   A    Jason, Jason is our -- is the Highland head of technology.

18   Q    Okay.  And did you text with him from time to time?  On or

19   about December 10th?

20   A    Yes.

21   Q    Okay.

22         MR. MORRIS:  Can we just scroll up a little bit?

23   BY MR. MORRIS:

24   Q    Is that Mr. Rothstein there?

25   A    Yes.  Yeah.

Dondero - Direct                        61

1   Q    Okay.  And do you see that there's a text message that you

2   sent to him on December 10th, right at the top?  Can you read

3   -- can you read the text message Mr. Rothstein --

4   A    He sent that to me.  At the top.

5   Q    I apologize.  Thank you for the correction.  Can you read

6   what Mr. Rothstein told you on December 10th?

7   A    That my old phone is in the top drawer of Tara's desk.

8   Q    And who's Tara?

9   A    My assistant.

10  Q    Is she still your assistant today?

11  A    Yes.

12  Q    And has she been serving as your assistant since the TRO

13  was entered into on December 10th?

14  A    Yes.

15  Q    Okay.  Is it fair to say that you were informed on

16  December 10th that the phone was not thrown in the garbage,

17  had not been disposed of, but was instead sitting in Tara's

18  desk?

19  A    As of that moment, yes.

20  Q    Okay.  And it's also fair to say that, as of December

21  10th, Mr. Rothstein didn't take it upon himself to throw your

22  old phone in the garbage, right?

23  A    Not as of that moment.  But like I said, I can find out

24  how it was disposed of.

25  Q    If you were curious to do that, would you have done that

Dondero - Direct                          62

1   before today?

2   A    I haven't been curious.

3   Q    Thank you very much.  Someone you can't identify made the

4   decision after December 10th to throw the phone in the garbage

5   without asking the Debtor for permission or seeking the

6   Debtor's consent, correct?

7            MR. BONDS:  I'm going to object, Your Honor.  To the

8   extent that the witness knows, he can answer.

9            THE COURT:  I -- I didn't hear --

10           THE WITNESS:  I don't know.

11           THE COURT:  I didn't hear what your objection was,

12  Mr. Bonds.  Repeat.

13           MR. BONDS:  Your Honor, my objection was along the

14  lines of to the extent that the witness knows, he could

15  testify, but if he doesn't know, he doesn't need to speculate.

16           THE COURT:  All right.  Well, I don't hear an

17  objection there, but go ahead, Mr. Dondero, if you have

18  knowledge and can answer the question.

19           THE WITNESS:  I don't know.

20  BY MR. MORRIS:

21  Q    Do you recall that the Debtor subsequently gave notice to

22  you to vacate its offices and to return its cell phone?

23  A    I don't know.

24  Q    Did you ever --

25  A    I know I -- I know I was told to vacate the offices.  I

Dondero - Direct                            63

1   didn't see the specific --

2   Q    Uh-huh.  Your lawyer -- your lawyers never told that

3   Debtor that the cell phone had been disposed of or thrown in

4   the garbage, consistent with company practice, right?

5   A    I don't know.

6         MR. MORRIS:  Can we put up Exhibit K, please?

7   BY MR. MORRIS:

8   Q    This is the letter that my firm sent to your lawyer on

9   December 23rd.  Do you see that?

10  A    Yeah, I see it.

11  Q    Okay.

12        MR. MORRIS:  Can we scroll down a little bit?  Keep

13  going.  Okay.  Stop right there.

14  BY MR. MORRIS:

15  Q    Do you see that it says that, as a result of the conduct

16  described above, that the Debtor "has concluded that Mr.

17  Dondero's presence at the HCMLP office suite and his access to

18  all telephonic and information services provided by HCMLP are

19  too disruptive"?

20  A    Yeah, I see it.

21  Q    And this is the letter that gave you notice that you had

22  to vacate the premises by December 30th, correct?

23  A    I believe so.

24        MR. MORRIS:  Can we scroll down a little bit?

25  BY MR. MORRIS:

Dondero - Direct                         64

1   Q    You see at the bottom there's a reference to a defined
2   term of "cell phones"?
3   A    Yes.
4   Q    And it says that the Debtor "will also terminate Mr.
5   Dondero's cell phone plan and those cell phone plans
6   associated with parties providing personal services to Mr.
7   Dondero."  Do you see that?
8   A    Yes.  Yeah.
9   Q    Have I read that accurately?
10  A    Yes.
11  Q    And then my colleagues went on to write, "HCMLP demands
12  that Mr. Dondero immediately turn over the cell phones to
13  HCMLP by delivering them to you, Mr. Lynn."  Do you see that?
14  A    Yes.
15  Q    Have I read that accurately?
16  A    Yes.
17  Q    The last sentence on the page begins, "The cell phones
18  and."
19        MR. MORRIS:  And let's scroll down further.
20  BY MR. MORRIS:
21  Q    "The cell phones and the accounts are property of HCMLP.
22  HCMLP further demands that Mr. Dondero refrain from deleting
23  or wiping any information or messages on the cell phone.
24  HCMLP, as the owner of the account and cell phones, intends to
25  recover all information related to the cell phones and

Dondero - Direct                        65

1   accounts, and reserves the right to use the business-related

2   information."  Have I read that accurately?

3   A    Yes.

4   Q    Okay.  We were a couple of weeks too late, huh?

5   A    It sounds like it.

6   Q    Yeah.  Because the phones were already in the garbage,

7   right?

8   A    Yes.

9   Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10  your behalf, right?

11  A    I don't know.

12  Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13  said.

14          MR. MORRIS:  Can we go to Exhibit U, please?

15  BY MR. MORRIS:

16  Q    It took Mr. Lynn six days to write a one-paragraph letter

17  in response, right?  December 29th, he responded?

18          MR. MORRIS:  Can we scroll down a bit?

19  BY MR. MORRIS:

20  Q    Let me read beginning with the second sentence of the

21  first substantive paragraph.  "We are at present not sure of

22  the location of the cell phone issued to Mr. Dondero by the

23  Debtor, but we are not prepared to turn it over without

24  ensuring the privacy of the attorney-client communications."

25  And then he goes on.

1      Have I read that correctly?

2   A   Yes.

3   Q   Okay.  So Mr. Lynn didn't say anything about the phone

4   being thrown in the garbage, right?

5   A   No.

6   Q   He didn't say that it was disposed of, did he?

7   A   No.

8   Q   He didn't refer to any company practice or policy, right?

9   A   No.

10  Q   Mr. Lynn's not a liar, is he?

11  A   No, he's not.

12  Q   He's a decent and honest professional.  Wouldn't you agree

13  with that?

14  A   Yes.

15  Q   And is it fair to say that he conveyed only the

16  information that he had at the time?

17  A   I don't know.

18  Q   Do you have any reason to believe that Mr. Lynn would

19  withhold from the Debtor the information that the cell phone

20  had been thrown in the garbage, consistent with company

21  practice?

22  A   No, I don't believe he would withhold whatever he knew.

23  Q   All right.  Let's talk about -- let's talk about other

24  matters.  You do know, sir, do you not, that the Debtor is

25  subject to the Bankruptcy Court's jurisdiction?

Dondero - Direct                              67

1    A    Yes.

2    Q    Okay.  And we just saw in the December 23rd letter that

3    the Debtor demanded that you vacate their offices a week

4    later, right?

5    A    Yes.

6    Q    And you knew that at or around the time the letter was

7    sent on December 23rd, correct?

8    A    I -- I don't remember when I knew.

9    Q    Well, in fact, in fact, you or through counsel asked for

10   an accommodation and asked for an extension of time to

11   December 31st; isn't that right?

12   A    I had to pack up 30 years of stuff in three days.  I -- I

13   know we asked for some forbearance.  I don't think we got any.

14   I don't remember the details.  I don't understand why it's

15   important.

16   Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17   gave you seven days' notice, right?  They sent the letter on

18   December 23rd and asked you to vacate on December 30th,

19   correct?

20   A    I don't -- I don't remember.  But, again, I think the

21   initial response was it was inconsistent with shared services

22   agreement.  No Highland employees are coming into the office

23   anyway.  So kicking me out of my office was -- seemed

24   vindictive and overreaching.  And we tried to get some, you

25   know, forbearance.

Dondero - Direct                          68

1  Q    Okay.

2           MR. MORRIS:  I move to strike, Your Honor.

3           THE COURT:  Sustained.

4  BY MR. MORRIS:

5  Q    Mr. Dondero, you were given seven days' notice before --

6  before you were going to be barred from the Debtor's office,

7  correct?

8  A    I don't know.

9  Q    Okay.

10          MR. MORRIS:  Can we go back to Exhibit K, please?

11  Oh, actually, it's okay.

12  BY MR. MORRIS:

13  Q    We just read, actually, the piece from the Debtor's letter

14  of December 23rd barring you from the Debtor's office.  Do you

15  remember that?  And we can go back and look at it if you want.

16  A    Yes.

17  Q    Was there anything ambiguous that you recall about the

18  Debtor's demand that you not enter their offices after

19  December 30th?

20  A    Ambiguous?  I can tell you what my understanding was or I

21  can tell you what the letter says.  What would you like to

22  know?

23  Q    I'd just like to know if, as you sit here right now, you

24  believe there was anything ambiguous about the Debtor's demand

25  that you vacate the offices as of December 30th?

Dondero - Direct                              69

1  A    I mean, I did vacate the offices as of December 30th.

2  Q    Correct.  And you knew that -- and you were complying with

3  the Debtor's demand you do that, right?

4  A    Well, with the Court's demand, I guess.

5  Q    Okay.  And it's your understanding that you would not be

6  permitted in the Debtor's offices after that time, correct?

7  A    Um, (pause), uh, I don't know how to answer that question.

8  I knew I wouldn't be residing in the offices anymore.  But for

9  legitimate business purposes, to visit the people at NexPoint

10 who were in the office, since there are no Highland people in

11 the office, or to handle a deposition, you know, there was

12 nothing I thought inappropriate about that.

13 Q    Did the Debtor tell you that they would allow you to enter

14 the offices any time you just believed that it would be

15 appropriate to do that?

16 A    I used my business judgment.

17         MR. MORRIS:  I move to strike.

18 BY MR. MORRIS:

19 Q    I'm asking you a very --

20         THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q    -- specific question, sir.  Did the Debtor ever tell you

23 that they -- that you would be permitted to enter their

24 offices after December 30th if you, in your own personal

25 discretion, believed it to be appropriate?

Dondero - Direct                          70

1   A    No.

2   Q    Did the Debtor provide you any exception to their demand

3   that you vacate the offices, without access, by and after

4   December 30th?

5   A    I always do what I think is appropriate and in the best

6   interests.  I don't know.  I didn't know the specifics of the

7   Debtor's -- okay, yeah, what the specifics of the Debtor was.

8   Q    Despite the unambiguous nature of the Debtor's demands

9   letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17        MR. MORRIS:  Move to strike.

18        THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

Dondero - Direct                          71

1   permission, correct?

2   A    I'm prohibited from contacting them, so no, I did not.

3   Q    Okay.  Let's talk about other events that occurred after

4   the entry of the TRO.  We talked earlier about how you

5   interfered with Mr. Seery's trading activities on behalf of

6   the CLOs around Thanksgiving.  Do you remember that?

7   A    Yes.

8   Q    But after the TRO was entered, the K&L Gates Clients also

9   interfered with the Debtor's trading activities, correct?

10  A    No.

11          MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q    Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A    Yes.

17  Q    And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A    Yes.

21  Q    And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A    Yes.

25  Q    And you were aware of that motion at the time it was made,

Dondero - Direct                        72

1  right?

2  A    Yes.

3  Q    And you were supportive of the making of that motion,

4  right?

5  A    Supportive?  Yes.

6        MR. MORRIS:  And scroll down to the next paragraph,

7  please.

8  BY MR. MORRIS:

9  Q    Okay.  So, my colleague wrote that, "On December 22nd,

10  2020, employees of NPA and HCMFA notified the Debtor that they

11  would not settle the CLO sale of the AVAYA and SKY

12  securities."  Have I read that right?

13  A    Yes.

14  Q    And that took place six days after the motion that the

15  Court characterized as frivolous was denied on December 16th?

16  A    Yes.  I wasn't aware of that, for what that's worth.

17  Q    Okay.  You personally instructed the employees --

18  withdrawn.  NPA -- that refers to NexPoint, correct?

19  A    Yes.

20  Q    That's an entity you own and control, right?

21  A    I -- largely.

22  Q    And that's one of the Advisors we defined earlier, right?

23  A    Yes.

24  Q    And HCMFA, that's Fund Advisors, another advisory firm

25  that you own and control, correct?

Dondero - Direct                          73

1    A    Yes.

2    Q    And you personally instructed, on or about December 22nd,

3    2020, employees of those Advisors to stop doing the trades

4    that Mr. Seery had authorized with respect SKY and AVAYA,

5    right?

6    A    Yeah.  Maybe we're splitting hairs here, but I instructed

7    them not to trade them.  I never gave instructions not to

8    settle trades that occurred.  But that's a different ball of

9    wax.

10   Q    Okay.  But you did instruct them not to execute trades

11   that had not been made yet, right?

12   A    Yeah.  Trades that I thought were inappropriate, for no

13   business purpose, I -- I told them not to execute.

14   Q    Okay.  You actually learned that Mr. Seery wanted to

15   effectuate these trades the Friday before, right?

16   A    I don't know, but what did I do?  When did I know it?

17   What did I do?  When I knew things are inappropriate, I

18   reacted immediately.  I don't -- I don't -- whenever --

19   whenever I found out about inappropriate things, I reacted to

20   the best of my ability.

21   Q    Okay.

22            MR. MORRIS:  I move to strike, Your Honor.

23            THE COURT:  Sustained.

24       Mr. Dondero, I'm going to -- I'm going to interject some

25   instructions once again here.  Remember we talked about early

Dondero - Direct                        74

1    on, and I know you've testified before, but I'll repeat it:

2    You need to just give direct yes or no answers.

3        And let me just say that we see witnesses all the time do

4    what you're doing here, and that is they feel they need to say

5    more than yes or no.  They feel the need to clarify or

6    supplement the yes or no answer they give.  And just to remind

7    you how this works, your lawyer, Mr. Bonds, is going to be

8    given the opportunity when Mr. Morris is through to ask you

9    all the questions he wants, and that will be your chance to

10   clarify yes and no answers to the extent he asks you to

11   revisit certain of these questions and answers.  Okay?

12       So I'm going to remind you once again:  yes or no or

13   direct -- you know, other appropriate direct answers.  Mr.

14   Bonds can let you clarify later.  All right?

15       Mr. Morris, continue.

16           MR. MORRIS:  Okay.  Thank you, Your Honor.

17       Can we please put up on the screen Exhibit L?  And at the,

18   I guess, the bottom of Page 1.

19   BY MR. MORRIS:

20   Q   This is an email string.  And --

21           MR. MORRIS:  Go to the email below that, please.

22   Yeah.  Okay.  Right there.

23   BY MR. MORRIS:

24   Q   This is an email from Mr. Seery dated December 18th at

25   (garbled) :30 p.m.  Do you see that?

Dondero - Direct                          75

1   A    Yes.

2   Q    And in the substantive portion of his email, continuing on

3   to the next page, he's giving instructions to sell certain SKY

4   and AVAYA securities that are held by CLOs, correct?

5   A    Yes.

6   Q    And Mr. Sowin forwarded this email to you, right?

7   A    Yes.

8            MR. MORRIS:  If we can scroll up.

9   BY MR. MORRIS:

10  Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11  Let's just give Ms. Canty a chance.

12           MR. MORRIS:  Keep scrolling up.

13  BY MR. MORRIS:

14  Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15  that?

16  A    Yes.

17  Q    And if we scroll up, you turn around and give it to Mr.

18  Ellington a few minutes later, right?

19  A    Yes.

20  Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21  that Mr. Seery wants to sell AVAYA and SKY securities on

22  behalf of the CLOs, right?

23  A    Yes.

24  Q    Why did you decide to forward this email to Mr. Ellington?

25  A    Ellington's role has been of settlement counsel that

Dondero - Direct                              76

1    supposedly everybody is able to talk to to try and bridge some

2    kind of settlement.  Ellington, I thought, should be aware of

3    things that would make settlement more difficult or create

4    liabilities for the Debtor.  And so I thought it was

5    appropriate for him to know.

6    Q    Okay.  This is the email that caused you to put a stop to

7    the trades that Mr. Seery wanted to effectuate, correct?

8    A    This is the -- I'm sorry.  Ask the question again.  This

9    is the email that what?

10   Q    This is -- this is how you learned that Mr. Seery wanted

11   to effectuate rates in AVAYA and SKY securities, right?

12   A    I -- I learned about it pretty early on of him trading it.

13   I don't know if it was this email or -- or one of the others.

14   But yes, it was from -- it was from Joe Sowin.

15   Q    And you would agree with me, would you not, that you

16   personally instructed the employees of the Advisors not to

17   execute the very trades that Mr. Seery identifies in this

18   email, correct?

19   A    Yes.

20   Q    At no time after December 10th, when the TRO was entered

21   into, did you instruct the employees of the Funds that you own

22   and control not to interfere or impede the Debtor's management

23   of the CLOs, correct?

24        MR. BONDS:  Can you repeat the question?  I'm sorry.

25   BY MR. MORRIS:

Dondero - Direct                    77

1  Q   At no time after December 10th, when the TRO was entered,
2  did Mr. Dondero instruct any employee of either of the
3  Advisors that he owns and controls not to interfere or impede
4  with the Debtor's business and management of the CLOs,
5  correct?
6  A   I did not.
7  Q   Okay.  Neither you nor anybody that you know of ever
8  provided a copy of the TRO to the employees of the Advisors
9  that you own and control, correct?
10 A   I don't know.
11 Q   Okay.  After the TRO was entered, the K -- after the TRO
12 was entered, and after the hearing on December 16th, the K&L
13 Gates Clients sent three more letters to the Debtor, right?
14 A   Yes.
15 Q   Okay.
16       MR. MORRIS:  Your Honor, those are Exhibits M as in
17 Mary, N as in Nancy, and X as in x-ray.
18       THE COURT:  Okay.
19       MR. MORRIS:  Unless the witness thinks there is a
20 need to look at them specifically -- oh, let me just ask a
21 couple of questions.
22 BY MR. MORRIS:
23 Q   Mr. Dondero, in those letters, it's your understanding
24 that the K&L Gates Clients again requested that the Debtor not
25 trade any securities on behalf of the CLOs, right?

Dondero - Direct                          78

1    A    Yes.

2    Q    And it's your understanding that in those letters the K&L

3    Gates Clients suggested that they might seek to terminate the

4    CLO management agreements to which the Debtor was a party,

5    correct?

6    A    I don't know specifically, but that wouldn't surprise me.

7    Q    Okay.

8    A    So, --

9    Q    Is it your understanding that the K&L Gates Clients also

10   sent the letter a Debtor -- the Debtor a letter in which they

11   asserted that your eviction from the offices might cause them

12   damages and harm?

13   A    I know there was objections to me -- I assume so.  I don't

14   know specifically.

15   Q    And you were aware of these letters at the time that they

16   were being sent, right?

17   A    I'm sorry, what?

18   Q    You were aware of these letters at the time they were

19   being sent by the K&L Gates Clients, right?

20   A    Generally, yes.

21   Q    And you were generally supportive of the sending of those

22   letters, right?

23   A    I'm always supportive of doing what we believe is the

24   right thing, yes.

25   Q    And in this case, you were supportive of the sending of

Dondero - Direct                          79

1  these three letters, correct?

2  A   I -- yes.

3  Q   In fact, you pushed and encouraged the chief compliance

4  officer and the general counsel to send these letters, right?

5  A   I push them to do the right thing.  I didn't push them

6  specifically.

7  Q   Okay.  At the time the letters were sent, you were aware

8  that the K&L Gates Clients had filed that motion that was

9  heard on the 16th of December, correct?

10  A   Yes.

11  Q   And you were aware that they advanced the very same --

12  withdrawn.  You're aware that in the letters they advance some

13  of the very same arguments that Judge Jernigan had dismissed

14  as frivolous just six days earlier, right?

15  A   I wasn't at the hearing.  I don't know if it was the same

16  arguments or similar arguments.  I -- I can't -- I can't

17  corroborate the similarity or contrast the differences between

18  the two.

19  Q   All right.  So it's fair to say, then, that you were

20  supportive of the sending of these letters, you were aware of

21  the December 16 argument, but you didn't take the time to see

22  whether or not any of the arguments being advanced in the

23  letters were consistent or any different from the arguments

24  that were made at the December 16th hearing, correct?

25  A   Correct.  I wasn't directly involved, but still believed

1   that fundamentally Seery's behavior was wrong.

2   Q   You never instructed the K&L Gates Clients to withdraw the

3   three letters that were sent after December 10th, correct?

4   A   No.

5   Q   And you're aware that the Debtor had demanded that those

6   letters be withdrawn or it would seek a temporary restraining

7   order against the K&L Gates Clients, correct?

8   A   I'm not aware of the back and forth.

9   Q   Okay.  Let's talk about your communications with Mr.

10  Ellington and Mr. Leventon.  You communicated with them on

11  numerous occasions after December 16th, correct?

12  A   No.

13  Q   No, you didn't communicate with them many times after

14  December 10th?

15  A   You're lumping in Ellington and Isaac, and numerous times

16  is a bad clarifier, so the answer is no.

17  Q   I appreciate that.  You communicated many times with Mr.

18  Ellington after December 10th, right?

19  A   Not -- not outside shared services, pot plan, and him

20  being the go-between between me and Seery.  I would say

21  virtually none.

22  Q   Okay.  On Saturday, December 12th, two days after the

23  temporary restraining order was entered against you, Mr.

24  Ellington was involved in discussions with your personal

25  counsel about who would serve as a witness at the upcoming

Dondero - Direct                               81

1    December 16th hearing, correct?

2    A    I don't -- I don't remember.

3    Q    Let's see if we can refresh your recollection.

4              MR. MORRIS:  Can we please put up Exhibit P?  Can we

5    scroll down?  Okay.

6    BY MR. MORRIS:

7    Q    Do you see where Mr. Lynn writes you an email on Saturday,

8    December 12th, and he says, among other things, it looks like

9    trial?

10   A    Yes.

11   Q    And then if we scroll up a little bit, he wrote further,

12   "That said, we must have a witness now."  Have I read that

13   accurately?

14   A    Yes.

15   Q    Okay.

16             MR. MORRIS:  Can we scroll back up?

17   BY MR. MORRIS:

18   Q    And this is Mr. Ellington's response, right?

19   A    Yes.

20   Q    Can you read Mr. Ellington's response for Judge Jernigan?

21   A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22   needs to contact you first thing in the morning.

23   Q    Is it your testimony that this email relates to --

24   withdrawn.  Mr. Ellington is not your personal lawyer, right?

25   A    No.  Mr. Ellington has been functioning as settlement

Dondero - Direct                          82

 1  counsel, trying to bridge settlement, --

 2  Q    Okay.

 3  A    -- which is what this email looks like to me.

 4  Q    Okay.  I'll let -- I'll let the judge --

 5          MR. MORRIS:  I move to strike, Your Honor.

 6          THE COURT:  Sustained.

 7  BY MR. MORRIS:

 8  Q    So, after the TRO was entered, you and Mr. Ellington not

 9  only communicated but Mr. Ellington was actively involved in

10  identifying witnesses to testify on behalf of your interests

11  at the December 16th hearing, correct?

12  A    I -- I don't know what the witness was for, but I believe

13  Ellington was doing his job as settlement counsel, trying to

14  facilitate settlement.  I don't -- I have no reason to think

15  this was anything more nefarious.

16  Q    Okay.  You looked to Mr. Ellington for leadership in

17  coordinating with all of the lawyers who were working for you

18  and your personal interests, right?

19  A    I'm not agreeing with that.

20  Q    No?  All right.

21          MR. MORRIS:  Let's look at the next exhibit.  I think

22  it's Exhibit Q.  And if we could stop right there.

23  BY MR. MORRIS:

24  Q    There's an email from Douglas Draper, do you see that, on

25  December 16th?

Dondero - Direct                        83

1   A    Yes.

2   Q    So this is after the TRO was entered into, right?

3   A    I believe so.

4   Q    And Mr. Draper represents Get Good and Dugaboy; is that

5   right?

6   A    I believe so.

7   Q    And he was new to the case at that moment in time, right?

8   A    On or about, I believe so.

9   Q    And he was looking to -- he was looking for a joint

10  meeting among all of the lawyers representing your personal

11  interests, right?

12  A    No.  I think he was trying to coordinate -- coordinate or

13  understand whatever.  But not everybody -- he doesn't just

14  talk to lawyers around my interests.  I mean, and he hasn't

15  sought agreements with just lawyers reflecting my interests.

16  Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17  A    Yes.

18  Q    But you can't remember why you did that, right, or at

19  least -- withdrawn.  You couldn't remember as of Tuesday's

20  deposition why you forwarded this email to Mr. Ellington,

21  right?

22  A    Not specifically.  But, again, Ellington is settlement

23  counsel.

24       MR. MORRIS:  I move to strike, Your Honor, after the

25  initial phrase "Not specifically."

Dondero - Direct                          84

 1             THE COURT:  Sustained.

 2             MR. MORRIS:  Can we scroll up a little bit, please?

 3  BY MR. MORRIS:

 4  Q   Mr. Lynn responded initially with a reference to the

 5  assumption that a particular lawyer was with K&L Gates, right?

 6  A   Yes.

 7             MR. MORRIS:  And if we could scroll up a little bit.

 8  BY MR. MORRIS:

 9  Q   That's where you forward this email to Mr. Ellington,

10  right?

11  A   Yes.

12  Q   And can you read to Judge Jernigan what you wrote at 1:33

13  p.m.?

14  A   (reading)  I'm going to need you to provide leadership

15  here.

16  Q   But at least as of Tuesday's deposition, you couldn't

17  remember why you needed Mr. Ellington to provide leadership,

18  right?

19  A   Correct.  Nor if he did.

20             MR. MORRIS:  I move to strike the latter portion of

21  the answer, Your Honor.

22             THE COURT:  Sustained.

23  BY MR. MORRIS:

24  Q   So you have no --

25      (Echoing.)

Dondero - Direct                        85

 1              MR. MORRIS:  We're getting --

 2              THE WITNESS:  Can I -- can I hold -- can I hold on

 3    for one second here?  Can I just put you guys on mute, please?

 4              MR. MORRIS:  Sure.

 5          (Pause.)

 6              THE COURT:  All right.

 7              THE CLERK:  John, there's some feedback again.  I'm

 8    sorry.

 9              MR. MORRIS:  That's okay.

10              THE COURT:  Mr. Bonds, --

11              MR. MORRIS:  We lost Mr. --

12              THE COURT:  Mr. Bonds, what's going on?

13              MR. MORRIS:  We've lost -- the screen --

14              THE COURT:  You know you can't counsel your client in

15    the middle of court testimony.  I thought maybe Mr. Dondero

16    had some non-legal thing going on in the background.  Mr.

17    Bonds?

18              MR. BONDS:  Your Honor, I -- I did not in any way

19    counsel Mr. Dondero.

20              THE COURT:  Okay.  Well, I'll take your

21    representation on that.  Are we ready to go forward?

22              MR. MORRIS:  I'll readily accept Mr. Bonds'

23    representation as well, Your Honor.

24              THE COURT:  Okay.

25              MR. MORRIS:  But I'd ask that it not happen again.

Dondero - Direct                            86

1          THE COURT:  Well, fair enough.  I think Mr. Bonds

2    understands.

3    BY MR. MORRIS:

4    Q    Mr. Dondero, you have no recollection of why you forwarded

5    this email to Mr. Ellington and why you told him you needed

6    him to provide leadership, correct?

7    A    Correct.

8          MR. MORRIS:  And if we can scroll up, can we just see

9    how Mr. Ellington responded?

10   BY MR. MORRIS:

11   Q    All right.  And can you just read for Judge Jernigan what

12   Mr. Ellington said on December 16th in response to your

13   statement that you're going to need him to provide leadership

14   here?

15   A    (reading)  On it.

16   Q    Thank you.  In your deposition, you testified without

17   qualification that Scott Ellington and Isaac Leventon did not

18   participate in the drafting of a joint interest or mutual

19   defense agreement.  Do you recall that testimony?

20   A    Yes, as far as I knew.

21   Q    And you also testified that you never discussed with

22   either of them the topic of a joint defense or mutual defense

23   agreement; is that right?

24   A    Correct.  That was Draper.

25   Q    Okay.

Dondero - Direct                              87

 1            MR. MORRIS:  Can we put up Exhibit 11, please?  I

 2    apologize.  It's Exhibit W.  Okay.  Can we stop right there?

 3    BY MR. MORRIS:

 4    Q    This is an email between some of your counsel and Mr.

 5    Ellington.  Do you see that?

 6    A    Yes.

 7    Q    And a common interest agreement is attached to the

 8    communication.  Is that a fair reading of the portion of the

 9    exhibit that's on the screen?

10    A    Yes.

11            MR. MORRIS:  And can we scroll to the top of the

12    exhibit, please?

13    BY MR. MORRIS:

14    Q    And do you see that there is an email exchange between Mr.

15    Ellington and Mr. Leventon concerning the common interest

16    agreement?

17    A    Yes.

18    Q    Okay.  So it's your testimony that this email may exist

19    but you had no idea that Mr. Ellington and Mr. Leventon were

20    working with your lawyers to draft a common interest

21    agreement?  Is that your testimony?

22    A    I wasn't part of this.  It looks to me like they were just

23    included in a -- a final draft.  And, again, Ellington is

24    settlement counsel.  I -- but I don't want to speculate why or

25    what they were doing.

Dondero - Direct                    88

1   Q    Do you remember that I asked you a few questions the other
2   day about Multi-Strat financial statements and whether or not
3   you'd ever given -- you'd ever received any of those documents
4   from Mr. Ellington and Mr. Leventon?
5   A    Yes.
6   Q    Okay.  And you testified under oath that you never got any
7   financial information, including balance sheets, concerning
8   Multi-Strat from either of those lawyers, correct?
9   A    I -- hmm.  I -- I don't remember.  Yeah, I don't remember.
10  I may have to clarify that, but I don't remember.
11  Q    You testified under oath the other day that you wouldn't
12  even think to ask them for financial information relating to
13  Multi-Strat because it's not natural for them to have it,
14  right?
15  A    I -- I'm sorry.
16       THE WITNESS:  Your Honor, do I just have to answer
17  these questions yes or no, or is that the -- can I clarify at
18  all, or can I --
19       THE COURT:  Well, I mean, if the question simply
20  directs a yes or no answer, that's correct, you just answer
21  yes or no.  And I think this one did.
22       Again, your lawyer is going to have the chance to do
23  follow-up examination later.
24  BY MR. MORRIS:
25  Q    So let me try again.  During your deposition, you

Dondero - Direct                            89

 1   testified under oath without qualification that you never got

 2   any financial information, including balance sheets,

 3   concerning Multi-Strat from Scott Ellington or Isaac Leventon,

 4   correct?

 5   A    I believe I might have misspoken there.

 6   Q    Okay.  But that was your testimony the other day, right?

 7   A    Yes.

 8   Q    And today, you believe you might have gotten that

 9   information from them, right?

10   A    Only because Ellington was supposed to be the go-between

11   and I couldn't go directly to somebody.  But he wouldn't

12   normally have that information, which is what I was saying.

13             MR. MORRIS:  Your Honor, I have an exhibit that's not

14   on the Debtor's exhibit list, and I was going to use it for

15   impeachment purposes to establish the fact that Mr. Ellington

16   and Mr. Leventon in fact gave to Mr. Dondero, after December

17   10th, financial information concerning Multi-Strat, which Mr.

18   Dondero had previously denied receiving.  May I -- may I use

19   that document to impeach Mr. Dondero?

20             THE COURT:  You may.

21             MR. BONDS:  Your Honor, I'm going to object.  This is

22   pretty clearly something that should have been disclosed and

23   it wasn't.

24             THE COURT:  Well, he says it's purely to impeach the

25   testimony that Mr. Dondero just now gave.  So we'll -- we'll

Dondero - Direct                    90

1   see the document and, you know, I'll either agree with that

2   being impeachment or not.  So, he may proceed.

3          MR. BONDS:  Your Honor, I think that the testimony

4   -- Your Honor, I'm sorry.  I think that the testimony that was

5   (inaudible) given was that he thought that he may have talked

6   to Scott or Isaac, not that he did not.

7          MR. MORRIS:  Your Honor, if I may, the testimony the

8   other day was unequivocal and unambiguous that not only didn't

9   he get this information from the two lawyers, but that he had

10  no reason to believe he would ever get the information from

11  those two lawyers.

12     I appreciate the fact that Mr. Dondero today is suggesting

13  that he may have, but I -- I would still like to use this

14  document to refresh his recollection and to impeach even the

15  possibility that he's giving this qualified testimony that he

16  may have.

17         THE COURT:  All right.

18         MR. MORRIS:  There's no doubt that he did.

19         THE COURT:  I overrule the objection.  You can go

20  forward.

21         MR. MORRIS:  Can we please put up on the screen -- I

22  believe it's Debtor's Exhibit AA.  And if we can scroll down,

23  please.  And just stop, yeah, towards the top.  All right.

24  Stop right there.

25  BY MR. MORRIS:

Dondero - Direct                                91

1    Q    Do you see in the first email Mr. Klos -- he's an employee

2    of the Debtor, right?

3    A    Yes.

4    Q    And he provides Multi-Strat balance sheet and financial

5    information to Mr. Leventon, Mr. Ellington, and Mr.

6    Waterhouse.  Do you see that?

7    A    Yes.  He's the person I would normally go to.

8    Q    Okay.  And they're all Debtor employees, right?

9    A    Yes.

10   Q    Okay.  And then Mr. Leventon sends it to you and Mr.

11   Ellington on February 4th, 2020; is that correct?

12   A    Yes.

13   Q    And this is confidential information; is that fair?

14   A    No.

15   Q    Okay.  Let's -- let's talk about the next --

16   A    No, it's not -- wait, wait, hold on a second.  Judge, I

17   need to clarify this.  I -- it's not confidential information.

18   It's available to every investor, of which I was one of them.

19   Okay?  So, let's -- let's not mischaracterize this as some

20   corporate secret.

21   Q    Okay.  You interfered with the Debtor's production of

22   documents; isn't that right?

23   A    No.

24   Q    Several times in the last year, various entities have

25   requested that Dugaboy produce its financial statements,

Dondero - Direct                              92

1   correct?

2   A    Dugaboy is my personal trust.  It's not an entity of the

3   Debtor in any form or fashion.

4   Q    Sir, you're aware that several times in the last year

5   various entities requested that the Debtor produce Dugaboy

6   financial information, correct?

7   A    The Debtor is not in a position to do it.  I -- I don't

8   know if it's been several times or whatever, but it's not

9   appropriate.

10          MR. MORRIS:  I move to strike, Your Honor.

11          THE COURT:  Sustained.

12   BY MR. MORRIS:

13   Q    I'll try one more time.  If we need to go to the

14   transcript, we can.  It's a very simple question.  You knew

15   and you know that several times in the last year various

16   entities have requested that the Debtor produce Dugaboy

17   financial statements, correct?

18   A    Yes.

19   Q    Do you recall at the deposition the other day I asked you

20   whether you had ever discussed with Mr. Ellington and Mr.

21   Leventon whether or not the Dugaboy financial statements

22   needed to be produced, and you were directed not to answer the

23   question by counsel and you followed those directions?

24   A    Yes.

25   Q    But you communicated with at least one employee concerning

Dondero - Direct                                93

 1   the production of the Dugaboy financial statements, correct?

 2   A    Yes.

 3   Q    And that's Melissa Schroth; is that right?

 4   A    Yes.

 5   Q    She's an executive accountant employed by the Debtor,

 6   right?

 7   A    Yes.

 8   Q    And on December 16th, after the TRO was entered into, you

 9   instructed Ms. Schroth not to produce the Dugaboy financials

10   without a subpoena, correct?

11   A    That was the advice I had gotten from counsel, yes.

12   Q    Okay.  The Dugaboy and Get Good financial statements are

13   on the Debtor's platform, correct?

14   A    I do not know.

15   Q    There is no shared services agreement between Dugaboy or

16   Get Good and the Debtor, correct?

17   A    I don't know.

18   Q    You're not aware of any; is that fair?

19   A    Yes.

20   Q    Okay.

21        MR. MORRIS:  Can we put on the screen Exhibit R?  And

22   can you scroll down a bit?

23   BY MR. MORRIS:

24   Q    Okay.  That's Melissa Schroth at the top there; is that

25   right?

Dondero - Direct                          94

1   A    Yes.

2   Q    And these are texts that you exchanged with her after the

3   TRO was entered into, correct?

4   A    Yes.

5              MR. MORRIS:  Can we scroll down a little bit?

6   BY MR. MORRIS:

7   Q    And do you see on December 16th you sent Ms. Schroth an

8   email -- I apologize -- a text that says, "No Dugaboy details

9   without subpoena"?

10  A    Yeah.

11  Q    But you can't remember why you sent this text, correct?

12  At least you couldn't as of Tuesday?

13  A    I believe it was on advice of counsel.

14  Q    But that's not what you said on Tuesday, correct?

15  A    I don't remember.

16  Q    You sent this text even though you knew that various

17  entities had requested the Dugaboy financials, but you have no

18  recollection of ever talking to anyone at any time about the

19  production of those documents, right?

20  A    Can you repeat the question?

21  Q    I'll move on.  Let me just -- last topic, and then I'm

22  going to respectfully request that we just take a short break.

23  You're familiar with the law firm of Baker & McKenzie; is that

24  right?

25       (Echoing.)

Dondero - Direct                          95

```
 1  A    I'm sorry.  You broke up on us there.

 2  Q    No problem.  You're familiar with the law firm Baker &

 3  McKenzie, correct?

 4  A    Yes.

 5  Q    That firm has never -- never represented you or any entity

 6  in which you have an ownership interest, correct?

 7  A    Correct.

 8  Q    But in December, the Employee Group, of which Mr. Leventon

 9  and Mr. Ellington was a part, was considering changing counsel

10  from Winston & Strawn to Baker & McKenzie, right?

11  A    I believe so.

12  Q    And you asked -- and because of that, you specifically

13  asked Mr. Leventon for the contact information for the lawyers

14  at Baker & McKenzie, right?

15  A    I believe so.

16  Q    Okay.

17          MR. MORRIS:  Can we put up Exhibit S, please?

18  BY MR. MORRIS:

19  Q    And who is that email sent from?  I apologize.  Withdrawn.

20  Who is that text message exchange with?

21  A    Isaac Leventon.

22  Q    Okay.  And Mr. Leventon was an employee of the Debtor

23  after December 10th, correct?

24  A    Yes.

25          MR. MORRIS:  Can we scroll down a little bit?
```

Dondero - Direct                          96

BY MR. MORRIS:

 1  BY MR. MORRIS:

 2  Q    And on December 22nd, you asked Mr. Leventon for the

 3  contact information at Baker & McKenzie, correct?

 4  A    Yes.

 5  Q    And the reason you asked Mr. Leventon for the contact

 6  information, that was in connection with the shared defense or

 7  mutual defense agreement, right?

 8  A    I -- I don't remember why.  It might have just been for my

 9  records.  I don't know.

10  Q    The only reason that you could think of for asking for

11  this information was for the shared defense or mutual defense

12  agreement, correct?

13  A    I -- no, it -- I don't know and I don't want to speculate.

14  I don't want to -- I don't want to speculate.  I -- did -- I

15  don't think I ever got -- I don't know what your point is.

16          MR. MORRIS:  May we please go back to the transcript

17  at Page 136?  At the bottom, Line 23.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20          "Q    Do  you  recall  asking  Isaac  Leventon  for  the

21          contact  information  for  the  --  for  the  lawyers  at

22          Bakers & McKenzie?

23          "A    I -- I don't -- I don't -- it might have been for

24          part  of  the  shared  defense,  mutual  defense  whatever

25          agreement, but that's -- that's the only reason I would

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38   Filed 2/28/24   Page 1191 of 1539   PageID 18429
Exhibit 31   Page 982 of 1076

Dondero - Direct                          97

1       have asked for it."

2    Q    Did you give that answer to my question?

3    A    Yeah.  I shouldn't have speculated.

4    Q    Okay.  But that's the answer you gave the other day; is

5    that right?

6    A    I shouldn't have speculated.  That's my answer today.

7    Q    And today -- withdrawn.  In fact, you wanted the Baker

8    contact information in order to help Mr. Draper coordinate the

9    mutual defense agreement, correct?

10   A    I don't want to speculate.

11          MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12   to 5.

13   BY MR. MORRIS:

14   Q    Did you -- did you hear this question and did you give

15   this answer on Tuesday?

16        "Q   Why did you want the Baker & McKenzie contact

17        information?

18        "A   I was trying to help Draper coordinate the mutual

19        shared defense agreement, period."

20   Q    Did you give that answer to my question on Tuesday?

21   A    Yes.

22          MR. MORRIS:  Your Honor, I'd respectfully request a

23   short break to see if I've got anything more.

24          THE COURT:  All right.  Well, I was going to ask you

25   how much more do you think you have.  We've been going almost

Dondero - Direct                          98

1    two hours.

2        So we'll take a break.  Let's make it a ten-minute break.

3    And then, depending on how much more you have and how much Mr.

4    Bonds is going to have, we'll figure out are we going to need

5    a lunch break in just a bit.

6        All right.  So it's 12:00 noon Central.  We'll come back

7    at 12:10.  Ten minutes.

8            MR. MORRIS:  Your Honor, may I have an instruction of

9    the witness not to check his phone for any purposes, not to

10   make -- not to communicate with anybody until -- until his

11   testimony is completed?

12           THE COURT:  All right.  Any -- any --

13           MR. BONDS:  Your Honor, he's going to speak with me.

14           THE COURT:  Pardon?

15           MR. BONDS:  I assumed he will speak to me about just

16   general events.  I mean, I don't want to be in breach of some

17   order.

18           MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19   for -- you know, it's not -- he's on the stand.  He's still on

20   the stand.

21           THE COURT:  Yeah.  He --

22           MR. MORRIS:  He shouldn't be conferring with counsel,

23   either.  No disrespect to Mr. Bonds at all.

24           THE COURT:  Exactly.  I mean, you all can talk about,

25   you know, the national champion football game or whatever, but

Dondero - Direct                    99

 1  it would be counseling your client in the middle of testimony

 2  if you -- if you talk about this case at the moment.  So, you

 3  know, --

 4          MR. BONDS:  I understand, Your Honor.

 5          THE COURT:  All right.

 6          MR. BONDS:  I just didn't want to be --

 7          THE COURT:  All right.  So now we'll come back at

 8  12:11.

 9          THE CLERK:  All rise.

10          MR. MORRIS:  Thank you, Your Honor.

11      (A recess ensued from 12:01 p.m. until 12:12 p.m.

12          THE CLERK:  All rise.

13          THE COURT:  Please be seated.  This is Judge

14  Jernigan.  We're going back on the record in Highland Capital

15  versus Dondero.  We have taken an 11-minute break.  It looks

16  like we have Mr. Dondero and counsel back.  And Mr. Morris,

17  are you out there, ready to proceed?

18          MR. MORRIS:  I am, Your Honor.  And I do have just a

19  few more questions.

20          THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21  there in the room with Mr. Dondero.  Now, did you want to --

22          MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23  the restroom.

24          THE COURT:  Okay.  All right.  Everyone ready to

25  proceed?

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 16-31    Filed 10/23/23    Page 1194 of 1539    PageID 18432
Exhibit 31    Page 101 of 206

Dondero - Direct                                100

1           MR. MORRIS:  Yes, Your Honor.

2           THE COURT:  Okay.  Mr. Morris, go ahead.

3           MR. MORRIS:  Thank you, Your Honor.

4                     DIRECT EXAMINATION, RESUMED

5    BY MR. MORRIS:

6    Q    Can you hear me, Mr. Dondero?

7    A    Yes.

8    Q    Did you ever discuss the request of any party to produce

9    the financial statements of Get Good and Dugaboy with Scott

10   Ellington?

11   A    Not that I recall.

12   Q    Did you ever communicate with Mr. Leventon on the subject

13   matter of whether or not the financial statements for Get Good

14   and Dugaboy needed to be produced by the Debtor?

15   A    No.

16   Q    Those are the two questions that you were directed not to

17   answer the other day, right?

18   A    I don't remember.

19   Q    Okay.  You mentioned that Mr. Ellington serves in some

20   capacity as settlement counsel.  Do I have that right?

21   A    Yes.

22   Q    Do you know if there's any exception in the TRO that

23   permits you to communicate directly with Mr. Ellington in his

24   so-called capacity as settlement counsel?

25   A    There was no change in his status in the TRO.  It's -- and

1  I think he was still used by both the Debtor and by me in that

2  function.

3  Q   You said that -- you testified earlier that you understood

4  that you were prohibited from speaking with the Debtor's

5  employees, correct?

6  A   Except for -- except for with regard to the pot plan,

7  shared services, and Ellington as settlement counsel.  But I

8  continued to talk to employees about the pot plan as recently

9  as the end of the year, and I continued to talk to employees

10 about shared services based on the shared services proposal

11 that was sent to Ellington and forwarded to me as recently as

12 two days ago.

13 Q   You never -- you never read the TRO, right?

14 A   No.

15         MR. MORRIS:  Can we have it put up on the screen?  I

16 don't know the exhibit number, Ms. Canty, but hopefully it's

17 clear on the exhibit list.

18         MS. CANTY:  I'm sorry, John.  Can you repeat what

19 you're looking for?

20         MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21 to Paragraph 2, please?  Okay.

22 BY MR. MORRIS:

23 Q   I appreciate the fact that you've never seen this before,

24 Mr. Dondero, but let me know if I'm reading Section 2(c)

25 correctly.  "James Dondero is temporarily enjoined and

Dondero - Direct                                    102

1  refrained from" -- subparagraph (c) -- "communicating with any

2  of the Debtor's employees, except for specifically -- except

3  as it specifically relates to shared services currently

4  provided to affiliates owned or controlled by Mr. Dondero."

5      Have I read that correctly?

6  A    Yes.

7  Q    Does that provide for any exceptions concerning the pot

8  plan?

9  A    The Independent Board requested a meeting on the pot plan.

10 Q    Okay.  But does it -- I appreciate that, and we'll talk

11 about that in a moment, but my question is very specifically

12 looking at the order.  And I, again, appreciate that you've

13 never seen it before.  But looking at the order now, is there

14 any exception for you to communicate with the Debtor's

15 employees concerning the pot plan?

16 A    I would think the pot plan would fall under that, since

17 some of the pot plan value is coming from affiliated entities

18 that are subject to the shared services agreement.  I would

19 think that would be reasonable, again, plus the -- well, it

20 was the subject of a meeting with the Independent Board at the

21 end of the month.

22 Q    Okay.

23 A    I still think it's the best alternative for this estate.

24 Q    Okay.  Did you -- did you ever -- did you ever ask

25 anybody, on your behalf, have asked the Debtors whether they

Dondero - Direct                            103

1    agreed with what you believed was a reasonable interpretation

2    of the restraining order?

3    A    I did not.

4    Q    Okay.  And let's just deal with the notion of settlement

5    counsel.  Do you see anywhere in this TRO -- and if you want

6    to read anything more, please let me know -- do you see

7    anything in this TRO that would permit you to speak with Mr.

8    Ellington in his so-called role as settlement counsel?

9    A    Well, I would say, more importantly, I don't see anything

10   that takes away his role as settlement counsel, which was

11   formally done six months ago.

12   Q    Okay.  I did read Section 2(c) correctly, right?

13   A    Yes.

14   Q    And the only exception that's in Judge Jernigan's

15   restraining order that she entered against you relates to

16   shared services.  Have I read that correctly?

17   A    Yes.

18   Q    Okay.  Let's talk about the pot plan for a moment.  After

19   the TRO was entered, you were interested in continuing to

20   pursue the pot plan; is that right?

21   A    I still believe it's the best possible result for this

22   estate.

23   Q    And you sought a forum with the Debtor's board, correct?

24   A    Yes.

25   Q    And you knew that you couldn't speak directly with any

Dondero - Direct                              104

 1   member of the Debtor's board unless your counsel and the

 2   Debtor's counsel was -- was present at the same time.

 3   Correct?

 4   A    Yeah.  As a matter of fact, I didn't go.  I just had

 5   counsel go.

 6   Q    And the Debtor's board gave Mr. Lynn a forum for him to

 7   present your pot plan after the TRO was entered.  Isn't that

 8   right?

 9   A    I believe so.

10   Q    And are you aware that the Debtor's board spent more than

11   an hour and a half with Mr. Lynn talking about your pot plan

12   after the TRO was entered?

13   A    Yes.

14   Q    And is it fair to say that, notwithstanding Mr. Lynn's

15   goodwill and Mr. Lynn's efforts to try to get to a successful

16   resolution here, the terms on which the pot plan were offered

17   were unacceptable to the Debtor?

18   A    I wasn't there.  I -- I don't know.

19   Q    The Debtor never made a counteroffer, did it?

20   A    Not that I heard.

21   Q    You'll admit, will you not, that over the last year you or

22   others acting on behalf -- on your behalf have made various

23   pot plan proposals to the Official Committee of Unsecured

24   Creditors?

25   A    Quite generous pot plans that I think will exceed any

Dondero - Direct                              105

1    other recoveries.

2    Q    Okay.  So you're aware that your pot plan was delivered

3    either by you or on your behalf to the U.C.C., correct?

4    A    I -- some were.  Some, I don't know.

5    Q    Okay.  Has the U.C.C. ever made a counterproposal to you?

6    A    Nope.

7              MR. MORRIS:  I have no further questions, Your Honor.

8              THE COURT:  All right.  Pass the witness.

9         Mr. Bonds, do you have any time estimate for me,

10   guesstimate?

11             MR. BONDS:  My guess is, Your Honor, it'll be about

12   an hour.  I would hope that we could take some type of a

13   break, just because I'm a diabetic and need to have some --

14             THE COURT:  All right.  Well, --

15             MR. MORRIS:  I have no objection, Your Honor.

16   Whatever suits the Court.  I'm willing to accommodate Mr.

17   Bonds always.

18             THE COURT:  Okay.  Let's take a 45-minute break.

19   Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20   minutes after 1:00 Central time.

21        All right.  We're in recess.

22             THE CLERK:  All rise.

23        (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Please be seated.  This is Judge

Dondero - Cross                    106

1    Jernigan.  We are going back on the record in Highland Capital

2    Management versus Dondero.  We took a lunch break.  And when

3    we broke, Mr. Bonds was going to have the chance to examine

4    Mr. Dondero.

5        Let me just make sure we have, first, Mr. Dondero and Mr.

6    Bonds.  Are you there?

7            MR. BONDS:  Yes, we are.

8            THE COURT:  All right.  Very good.  I don't see your

9    video yet, but -- there you are.  All right.  Mr. Morris, are

10   you there?

11           MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12           THE COURT:  I can.  All right.

13           MR. MORRIS:  Thank you.

14           THE COURT:  Well, we've got lots of other people, but

15   that's all I'll make sure we have at this moment.  All right.

16   Mr. Bonds, you may proceed.

17       And, Mr. Dondero, I know you know this, but I'm required

18   to remind you you're still under oath.

19       Okay, go ahead.

20                        CROSS-EXAMINATION

21   BY MR. BONDS:

22   Q   Before you resigned as portfolio manager, how long had you

23   had with Highland Capital Management?

24   A   Since inception in 1994.

25   Q   Okay.  And how long have your offices been at the

 1  Crescent?

 2  A    Eight years.

 3  Q    Okay.  Before you resigned as portfolio manager, did you

 4  spend a lot of time in the office?

 5  A    Yes.  I spent every business day this -- or 2020,

 6  including COVID, in the office.

 7  Q    Okay.  And this is the first time that you are not in the

 8  office, is that right, in decades?

 9  A    Yes.

10  Q    Can you tell us about the shared services agreement that

11  exists between the Debtor and the other entities in which you

12  have an interest?

13  A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14  what other entities paid.  Shared services, which is typical

15  in finance, for centralized tax, accounting, RICO function, so

16  that we don't have to have redundant, multiple high-paid

17  people in different entities.  We'd have them centralized and

18  with collective experience and collective functionality.  And

19  so, historically and recently, they pay Highland for those --

20  fees for those services.  And I, as a non-paid employee, or a

21  non-employee of Highland but a paid employee of NexBank -- of

22  NexPoint, was -- and my occupancy and support were part of

23  those shared services agreement.

24  Q    What do those agreements allow those entities to do?

25  A    Would it allow those entities to do?  Well, to access the

Dondero - Cross                                    108

1   Highland functionality as appropriate, because most of those

2   entities, as is typical in finance, did not have their own

3   functionality, legal, tax, and -- legal, tax, and accounting,

4   but although they've been -- they've been building it lately

5   in anticipation of the pot plan not going through at Highland.

6   Q   Okay.  Do those agreements allow you to share office space

7   with --

8            MR. MORRIS:  Objection --

9            THE WITNESS:  Yes.

10           MR. MORRIS:  -- to the form of the question, Your

11   Honor.  I think the exhibits and the agreements themselves

12   would be the best evidence.  They're not in evidence.  They

13   haven't been offered in evidence.  I have no way to challenge

14   the witness on anything he's saying.  And on that basis, I'd

15   -- it's not fair to the Plaintiff.

16           THE COURT:  All right.  Mr. Bonds, can I ask you to

17   repeat your question?  It was muffled and I was about to ask

18   you to repeat it before I got the objection.  So, repeat the

19   question so I can --

20           MR. BONDS:  Okay.  I'm going to repeat it and amend

21   it.

22           THE COURT:  Okay.

23   BY MR. BONDS:

24   Q   Is it your understanding that those agreements allow you

25   to share office space with the Debtor?

Dondero - Cross                                        109

1    A    Yes.  Virtually all of NexPoint's employees share the

2    Highland office space as part of a shared services agreement.

3    Q    Do those agreements allow you to share -- I'm sorry,

4    excuse me.  Strike that.  What else do they allow?

5    A    Typically is used in coordination of systems, servers,

6    software, cloud software, Internet software, office software,

7    tax, accounting, and legal functionality are all part of the

8    shared services agreement, although, you know, much of -- much

9    of that was stripped, you know, four or five months ago,

10   especially legal functionality and the accounting

11   functionality, without the concurrent adjustment in the

12   building.

13   Q    Okay.  And you previously testified that you generally

14   control NexPoint; is that correct?

15   A    Generally.  And the distinction I was trying to make is,

16   you know, following the financial crisis in '08, compliance

17   and the chief compliance officer has personal liability. along

18   with the rest of the C Suite, and operates independently, with

19   primary loyalty to the regulatory bodies.  And they're --

20   they're not controlled, bamboozled, or segued away from their

21   responsibility.  And at all times, they're supposed to be

22   doing what they believe is right, regulatorily-compliant, and

23   in the best interest of investors.

24        So that was the distinction I was drawing between, A, what

25   I was trying to remind Thomas of, that he should be

Dondero - Cross                          110

 1   independent of Seery, in terms of following what he believes

 2   is correct and regulatory-compliant.  And I don't have to push

 3   the NexPoint compliance people and general counsel to do

 4   anything specific, nor could I.  They are supposed to do what

 5   is right from a regulatory investor standpoint, and I believe

 6   that's what they've done.

 7   Q    All right.  And what do you mean by the term or the usage

 8   of the word "generally"?

 9   A    Well, that's the distinction I was just drawing.  I mean,

10   generally, on regular business strategy, you know, major

11   investments, you know, other business items, I'm in control of

12   those entities.  But in terms of the content and allegations,

13   regulatory opinions that come from compliance and the general

14   counsel, that is their best views on their own, knowing they

15   have compliance obligations and personal liability.

16   Q    Do you believe that NexPoint and its other owners and

17   interest holders have rights independent from your own in this

18   case?

19   A    Right, yes, and obligations, and responsibilities to

20   investors.  I believe the attempt by the Debtor or Seery to

21   hide behind contracts that the Debtor has with the CLOs are --

22   are a spurious, incomplete argument.  You know, they're not in

23   compliance with those contracts.  Bankruptcy alone is an event

24   of default.  Not having the key man -- the key men, the

25   required requisite professionals that they're obligated to

Dondero - Cross                    111

 1   contractually have working at the Debtor is a clear breach, in
 2   violation of those CLO contracts.  Not having adequate staff
 3   or investment professionals to analyze, evaluate, or follow
 4   the investments in the portfolio is a clear violation.  And
 5   specifically telling investors in the marketplace that you
 6   plan to terminate all employees, a date certain January 24th,
 7   is a proclamation that you're not going to be in any form able
 8   to be a qualified registered investment advisor or qualified
 9   in any which way to manage the portfolio or be in compliance
10   with the CLO contracts.
11       I would -- I would further add that the selling of the
12   securities, and the SKY securities, represent incomplete
13   intentional incurring of loss against the investors.  You have
14   securities that are less liquid with, you know, restructured
15   securities that have been owned for ten years, and they were
16   sold during the most illiquid weeks of the year, the couple
17   days before and after Thanksgiving, couple days before and
18   after Christmas, where the investors could have gotten 10 or
19   15 percent more on their monies if they were just sold in a
20   normal week.  It's -- it's preposterous to me.  It's
21   consistent with Seery not being an investment (garbled).
22       But it's preposterous to me that -- that this treatment of
23   investors is allowed or being camouflaged as some kind of
24   contractual obligation, when the investors have said these
25   funds are clearly in transition and the manager clearly is

Dondero - Cross                          112

1  incapable of managing them.  You know, please don't transact

2  until the transition is complete.  But Jim Seery has traded

3  every day, including -- I don't know about today, but every

4  day this week, selling securities for no investment rationale

5  and no business purpose.

6  Q    Are you also portfolio manager for NexPoint?

7  A    Yeah, I'm a portfolio manager for the closed-end retail

8  funds, which do have a higher fiduciary obligation than

9  anything on the institutional side.  I'm a portfolio manager

10 for those '40 Act funds that are the primary owners of the

11 CLOs that Seery is selling securities in for some unknown

12 reason.

13 Q    And what shared service agreements exist between NexPoint

14 and the Debtor?

15 A    Those are the shared service agreements I spoke of.  I

16 don't want to repeat myself.

17 Q    And I'm going to call Highland Capital Management Fund

18 Advisors, LP just Fund Advisors.  Is that okay with you?

19 A    Yes.

20 Q    Okay.  And you testified generally -- that you generally

21 control Fund Advisors; is that correct?

22 A    Yes.

23 Q    Do you believe that Fund Advisors and its owners and

24 interest holders have rights independent from your own in this

25 case?

Dondero - Cross                          113

1   A    Yes.

2   Q    Are you the portfolio manager for Fund Advisors?

3   A    Yes.

4   Q    What shared services agreements exist between Fund

5   Advisors and the Debtor?

6        MR. MORRIS:  Objection, Your Honor.  The agreements

7   themselves are the best evidence of the existence in terms of

8   any agreement between the Debtor and these entities.

9        MR. BONDS:  Your Honor, I can fix that.

10       THE COURT:  Okay.

11  BY MR. BONDS:

12  Q    I'm just asking:  What is your understanding, Mr. Dondero,

13  of the shared service agreements between the Debtor and Fund

14  Advisors?

15  A    It's similar to the agreement I mentioned earlier.  It

16  covers a broad range of centralized services historically

17  provided by Highland, but now those, while still paying

18  smaller than historic fees, those entities now have been

19  required to incur the expenses of duplicating those functions.

20  Q    Okay.  Do you recall the email string dated November 24th

21  regarding SKY equity that the Debtor talked about?

22  A    Yes.

23  Q    What did you mean when you sent that email about the

24  trade?  What did you mean, I'm sorry?

25  A    I was trying to inform the traders, and once they knew --

Dondero - Cross                    114

1    they weren't willing to do the trades anymore once they knew

2    that the underlying investors had requested that their

3    accounts not being traded until the transition be -- until the

4    transition of the CLOs was effectuated.

5        It's -- it's standard by, you know, statute or

6    understanding, in the money and management business, when

7    you're moving accounts from one asset manager to another, and

8    someone requests that you don't do anything to their account,

9    you don't trade it whimsically.  And so I was -- I was making

10   sure the traders knew that the underlying investors had

11   requested that no trades occur in their accounts.

12       And then I believed it was a clear violation of the

13   Registered Investment Adviser's Act.  I believe that people

14   involved at a senior level or at a compliance level could have

15   material liability, and could create material liability for

16   the Debtor.  And I think if, as I said before, I think if

17   anybody on this call were to call the SEC, they would start on

18   audit on this.

19          MR. MORRIS:  Your Honor, I move to strike the first

20   portion of the answer prior to when he started to describe

21   what he believes and what he thinks.  The first portion of the

22   answer was devoted to testifying about what is in the

23   knowledge of the people who he was communicating with.

24   There's no evidence.  Mr. Dondero, of course, was free to call

25   any witness he wanted.  He could have called the chief

Dondero - Cross                    115

1    compliance officer.  He could have called the general counsel.

2    He could have called all the people he's now testifying on

3    behalf of, and he did not.

4        So I move to strike anything in the record that purports

5    to reflect or suggest the knowledge on behalf of any party

6    other than Mr. Dondero.

7            THE COURT:  Okay.  I'm --

8            MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9    to rephrase the question.

10           THE COURT:  Okay.  Very well.

11           MR. BONDS:  I'm sorry.

12           THE COURT:  So the motion to strike is granted.  If

13   you're going to rephrase, go ahead.

14           MR. BONDS:  Okay.

15   BY MR. BONDS:

16   Q   Mr. Dondero, what did you mean when you said -- that the

17   emails about the trade?

18   A   Okay.  I'll give my intention by sending emails to stop

19   the trade and my basis for those emails.  My intentions were

20   to inform the traders and to inform the compliance people that

21   I believe there was a trade that wasn't in the best interest

22   of the employees that had no business purpose for its

23   occurring.  And the people involved weren't aware that the

24   investors had sent over requests not to trade their accounts

25   while they were in transition.

Dondero - Cross                              116

1     So I made the traders aware of that.  I made compliance

2    aware of that also.  And it's my belief, based on 30 years'

3    experience in the industry, that it is entirely inappropriate

4    to trade the accounts of investors that are in transition, and

5    especially when you're not -- you're not contractually -- you

6    are contractually in default with that client, to trade their

7    account whimsically, for no business purpose.  And I thought

8    it was a clear breach of both regulatory, ethical, and

9    fairness with regard to the investors.

10     So I -- what did you know, when did you know it, what did

11    you do?  I did what I felt was the right thing, which I try

12    and do every day, and made all the relevant parties aware of

13    what was going on.

14   Q   Mr. Dondero, do you recall the text message you sent to

15   Mr. Seery in which you said, "Be careful what you do"?

16   A   Yes.

17   Q   What did you mean by that message?

18   A   It's -- I even said, Last warning.  I mean, I -- he's

19   doing things against the interests of investors.  He's

20   purposely incurring losses by trading in days and weeks and

21   time of the year, the day before and after Thanksgiving, where

22   any novice knows the markets are illiquid and anybody who can

23   read a computer screen can see you get ten percent less --

24   five or ten percent less than you would the week before or the

25   week after.  And with as much professional umbrage as

Dondero - Cross                              117

1   possible, I was recommending that he stop.

2   Q    Did you intend to personally threaten Mr. Seery in any

3   way?

4   A    No.  It was bad -- bad intentional professional acts

5   against the interests of investors that flow through to '40

6   Act retail mom-and-pop investors.  I was trying to prevent

7   those losses and those bad acts from occurring.  And I believe

8   everybody who's -- everybody around that issue should be

9   ashamed of themselves, in my opinion.

10  Q    Do you now regret sending the text?

11  A    No.  No, I mean, I could have worded it differently.  I

12  was angry on behalf of the investors.

13  Q    And Mr. Dondero, you have management ownership interest in

14  that entity; is that right?

15  A    Yes.

16  Q    Do you believe the interests or other entities in which

17  you are involved are independent from your personal rights in

18  this case?

19  A    Yes.

20  Q    And do you believe you caused anyone to violate the TRO?

21  A    No.  I've been -- I've been very conscious to just try and

22  champion the thing that -- things that I think are important

23  and the things that I've been tasked to do, like an attractive

24  pot plan to help resolve this case.  I spend time on that.

25  But every once in a while, do I have to access, let's say,

Dondero - Cross                          118

1   David Klos, who is the person who put the model together, who

2   has been working on it for six or nine months, and no one else

3   S has a copy of?  Yes.  Yeah, I have to -- I have to access

4   him.  I don't believe that's the -- inappropriate or in any

5   way violating the spirit of the TRO.

6       I believe settlement in this case is only going to happen

7   with somebody fostering communication.  And Ellington's role,

8   which I thought was a good one and I thought he was performing

9   well as settlement counsel, was an important role.  And I used

10  him for things like -- and Seery also used him for things.  As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint.  I think his role there was -- it was

15  valued.  To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly.  Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q   (faintly)  And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

Dondero - Cross                          119

1           MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2    hearing that question.

3           THE COURT:  Please repeat.

4           MR. BONDS:  Sure.

5    BY MR. BONDS:

6    Q   Do you recall the questions Debtor's counsel had regarding

7    the letters sent by K&L Gates to the clients of the Debtor --

8    to the Debtor?

9    A   Yes.

10   Q   You testified on direct that the letters were sent to do

11   the right thing; is that correct?

12   A   Yes.

13   Q   What did you mean by that?

14   A   I don't want to repeat too much of what I just said, but

15   the Debtor has a contract to manage the CLOs, which in no way

16   is it not in default of.  It doesn't have the staff.  It

17   doesn't have the expertise.  Seery has no historic knowledge

18   on the investments.  The investment staff of Highland has been

19   gutted, with me being gone, with Mark Okada being gone, with

20   Trey Parker being gone, with John Poglitsch being gone.

21         And there's -- there's a couple analysts that are a year

22   or two out of school.  The overall portfolio is in no way

23   being understood, managed, or monitored.  And for it to be

24   amateur hour, incurring losses for no business purpose, when

25   the investors have requested numerous times for their account

Dondero - Cross                    120

1    not to be traded, is crazy to me.  Where the investors say, We

2    just want our account left alone.  We just want to keep the

3    exposure.  And Jim Seery decides no, there's -- I'm going to

4    turn it into cash for no reason.  I'm just going to sell your

5    assets and turn them to cash and incur losses by doing it the

6    week of Thanksgiving and the week of Christmas.  I think it's

7    -- it's shameful.  I'm glad the compliance people and the

8    general counsel at HFAM and NexPoint saw it the same way.  I

9    didn't edit their letters, proof their letters, tell them how

10   to craft their letters.  They did that themselves, with

11   regulatory counsel and personal liability.  They put forward

12   those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14   Mr. Dondero just gave about these people saw it.  They're not

15   here to testify how they saw it.  We know that Mr. Dondero

16   personally saw and approved the letters before they went out.

17   He can testify what he thinks, what he believes.  I have no

18   problem with that.  But there should be no evidence in the

19   record of what the compliance people thought, believed,

20   understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24   lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25   response?

Dondero - Cross                                121

1              MR. BONDS:  Your Honor, my response would be that

2      there are several exhibits the Debtor introduced today that

3      stand for the proposition that the compliance officers were

4      concerned.  So I think there is ample evidence of that in the

5      record.

6              THE COURT:  I didn't --

7              MR. MORRIS:  Your Honor, the letter --

8              THE COURT:  I did not understand what you said is in

9      the record.  Say again.

10             MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11     -- there are references that are replete in the record that

12     have to do with the compliance officers' understanding of the

13     transactions.

14             THE COURT:  I don't know what you're referring to.

15             THE WITNESS:  Your Honor?

16             THE COURT:  I've got a lot of exhibits.  You're going

17     to have to point out what you think --

18             THE WITNESS:  Can I -- can I -- can I -- can I answer

19     for -- that for a second?  The letters that were signed by the

20     compliance people or by the businesspeople at NexPoint and

21     HFAM objecting to the transactions, those letters were their

22     beliefs, their researched beliefs.  They weren't --

23             THE COURT:  Okay.

24             THE WITNESS:  -- micromanaged by me.  You know, they

25     weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                         122

1    that they've stated.  Those were their own beliefs and their

2    own research, --

3              THE COURT:  All right.

4              THE WITNESS:  -- and the record should reflect --

5              THE COURT:  This is clearly hearsay.  I mean, it's

6    one thing to have a letter, but to go behind the letter and

7    say, you know, what the beliefs inherent in the words were is

8    inadmissible.  All right?  So I strike that.

9              THE WITNESS:  Maybe ask your question again.

10   BY MR. BONDS:

11   Q    Yeah.  What is your understanding of the rights that these

12   parties had and what do you believe that was intended to be

13   conveyed by the compliance officers?

14             MR. MORRIS:  Objection.  Calls -- calls for Mr.

15   Dondero to divine the intent of third parties.  Hearsay.

16             THE COURT:  I sustain.

17             MR. BONDS:  Your Honor, --

18             MR. MORRIS:  No foundation.

19             MR. BONDS:  -- I don't agree.  I think that this is

20   asking Mr. Dondero what he thinks.

21             MR. MORRIS:  The letters speak for themselves, Your

22   Honor.

23             THE COURT:  Okay.  I sustain --

24             MR. MORRIS:  And Mr. --

25             THE COURT:  I sustain the objection.

Dondero - Cross                            123

1          MR. MORRIS:  All right.  Thank you.

2          THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14        The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Dondero - Cross                              124

1   standing.  Okay?  Number one.

2       Number two, when the investors know that it's in

3   transition, you're not in compliance as a manager, you're not

4   going to be an RIA in three weeks, the accounts are going to

5   have to transition to somebody else in three weeks, and the

6   investors ask you, Please don't trade my accounts between now

7   and then, that is -- that is a -- if it's not a *per se*, it's

8   an ethical and a spirit violation of any relationship between

9   an investor and an asset manager.

10      To then sell assets -- not replace assets, just sell

11  assets for cash -- and purposely do it on the least liquid

12  days of the year -- the day before Thanksgiving, the day after

13  Thanksgiving, the week of Christmas, this past week, whatever

14  -- to purposely incur losses so that the investors suffer ten

15  or fifteen percent losses that other -- on each of those sales

16  that they wouldn't otherwise have to incur, and for no stated

17  business purpose, for no investment rationale, with no staff

18  to even say whether the investment is potentially going up or

19  down, is -- is -- is -- I've never seen anything else like it.

20      And I will stand up and say it every day:  I'm glad the

21  letters went out from HFAM and from NexPoint.  I would never

22  recommend they get retracted.  And I believe everybody who

23  signed those letters meant everything in those letters.  And I

24  believe the letters are correct.  And I believe the whole

25  selling of CLO assets is a travesty.

Dondero - Cross                          125

1      My personal opinion, we need an examiner or somebody here

2   to look at this junk and look at some of the junk that

3   occurred earlier this year.  This -- this stuff is

4   unbelievable to me.

5   Q    Generally, who holds interests in the CLOs?

6   A    A vast majority of the CLOs that we're speaking of that

7   Seery has been selling the assets of are owned by the two

8   mutual funds, the two '40 Act -- the two '40 Act mutual funds

9   and the DAF.  Between them, I think out of -- eleven out of

10  the sixteen CLOs, they own a vast majority, and then I think,

11  whatever, two or three they own a hundred percent, and I think

12  two or three they own a significant minority.

13      And just because they don't own a hundred percent doesn't

14  somehow allow a registered investment advisor to take

15  advantage of an investor.  And I -- I've never understood that

16  defense.  I wouldn't be able -- in my role of 30 years, I

17  wouldn't be able to tell that to an investor, that, hey, you

18  had a contract with us, we did something that wasn't in your

19  best interest, but we got away with it because you didn't own

20  a hundred percent, you only owned eighty percent.

21          MR. MORRIS:  Your Honor, I move to strike.  There's

22  no contract between the Debtor and Mr. Dondero's -- and the

23  entities that he owns and controls for purposes of the CLO.

24  The only contract is between the Debtor and the CLOs

25  themselves.

Dondero - Cross                          126

 1          THE COURT:  All right.  Well, I overrule whatever
 2   objection that is.  Again, if you want to bring something out
 3   on cross-examination or through Mr. Seery, you know, you're
 4   entitled to do that.
 5       All right.  Please continue.
 6   BY MR. BONDS:
 7   Q    Do you believe these letters were sent by the Funds to the
 8   Advisors because they are trying to protect the independent
 9   entities?
10   A    They're trying to protect their investors.  They were
11   trying to protect their regulatory liability for activities
12   they see that are not in the best interests of investors.
13          MR. MORRIS:  Objection, Your Honor.  I move to
14   strike.  He's again testifying as to the intent of the people
15   who sent the letters who are not here to testify today.
16          THE COURT:  Sustained.
17   BY MR. BONDS:
18   Q    Mr. Dondero, what is your belief as to the letters that
19   were sent by the Funds and Advisor?  Is -- are they trying to
20   protect their independent interests?
21          MR. MORRIS:  Objection, Your Honor.  Asked and
22   answered.
23          THE COURT:  Sustained.
24          THE WITNESS:  Ask me --
25   BY MR. BONDS:

Dondero - Cross                                    127

1   Q    What is your understanding of why the letters were sent?

2           MR. MORRIS:  Objection, Your Honor.  Asked and

3   answered.

4           THE COURT:  Sustained.

5   BY MR. BONDS:

6   Q    Mr. Dondero, would you have sent the letters?

7   A    I would have sent the letters exactly or very similar or

8   probably even more strongly than the letters were stated, for

9   the purposes of protecting investors, to protecting mom-and-

10  pop mutual fund investors from incurring unnecessary losses by

11  an entity that was no longer in compliance with their -- with

12  their asset management contract and because the investors had

13  requested that their account just be frozen until it was

14  transitioned.

15      That's why I would have sent the letter.  That's why I

16  believe the letter should be sent.  That's why I'm happy they

17  were sent.  That's why we've never retracted.

18  Q    Mr. Dondero, who is Jason Rothstein?

19          THE COURT:  I did not hear the question.

20          THE WITNESS:  Jason -- Jason --

21          MR. BONDS:  Who --

22          THE COURT:  Please repeat.

23          MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24  Rothstein was.

25          THE WITNESS:  Jason Rothstein heads up our systems

Dondero - Cross                          128

 1   department at Highland Capital.

 2   BY MR. BONDS:

 3   Q    Can you explain what your text message to Mr. Rothstein

 4   was about?

 5   A    Which text message?  The one where it was in the drawer?

 6   Q    Yeah.

 7   A    Uh, --

 8   Q    And that was actually from him, not you.

 9   A    Yeah.  That was from him.  I think he transferred icons or

10   set up personal stuff to the new phone, and he was just saying

11   that the old phone was in Tara's drawer.

12   Q    And you don't know whether -- what's happened to the

13   phones, do you?

14   A    No.  Like I said, I believe they've been destroyed, but I

15   -- I can find out.  I mean, I can query and find out who

16   destroyed it, if that's important.

17   Q    And you understood that you were not supposed to talk to

18   the Debtor's employees; is that correct?

19   A    Like I said, except for my roles regarding shared

20   services, the pot plan, and trying to reach some type of

21   settlement, I've had painfully few conversations with the

22   Debtor's employees.

23   Q    When you talked to certain employees, did you think it was

24   an -- under an exception to the TRO, like shared services,

25   related to the pot plan, or settlement communications?

Dondero - Cross                              129

1   A    Yes.

2              MR. MORRIS:  Your Honor, I move to strike.  Mr.

3   Dondero never read the TRO.  He's got no basis to say what the

4   TRO required and didn't require.

5              MR. BONDS:  That wasn't the -- that wasn't the

6   question.

7              THE COURT:  Okay.

8              MR. BONDS:  I'm sorry.

9              THE COURT:  Okay.  Rephrase the question, please.

10             MR. BONDS:  Okay.  I'm sorry.

11  BY MR. BONDS:

12  Q    When you talked to these -- to certain employees, did you

13  think it was under an exception to the TRO, like shared

14  services, relating to the pot plan, or settlement

15  communications?

16  A    Yes.  Absolutely.

17             MR. MORRIS:  I object.  No foundation.

18             THE COURT:  Sustained.

19  BY MR. BONDS:

20  Q    Mr. Dondero, do you understand -- did your lawyers explain

21  to you the TRO?

22  A    Yes.

23  Q    And who was the lawyer that explained the TRO to you?

24             MR. MORRIS:  Your Honor, I don't know if we're

25  getting into a waiver of privilege, but I just want to tell

Dondero - Cross                           130

1   you that my antenna are up very high.

2          THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3   you about to waive the privilege?

4          MR. BONDS:  No, Your Honor, I am not.

5          THE COURT:  Okay.  Well, it sounded like perhaps we

6   were about to have the witness testify about conversations he

7   had with lawyers.

8          MR. BONDS:  I'm sorry, Your Honor.  That was not my

9   intention.  Again, I'm asking Mr. Dondero to explain for us

10  his contact with -- or, his impression of the TRO.

11  BY MR. BONDS:

12  Q    What did the TRO mean to you?

13  A    The TRO meant to me that I was precluded from talking to

14  Highland employees -- which, again, very few, if any, were

15  coming into the office.  I was not talking to Highland

16  employees with any regularity anyway.  But there was an

17  exception with regard to Scott Ellington regard -- Scott

18  Ellington in terms of him functioning as settlement attorney

19  to try and bridge the U.C.C., the Independent Board, Jim

20  Seery, other people, and things that impacted me or other

21  entities.

22         I also viewed that there was an exception for the pot

23  plan, which had been presented and gone over as recently as

24  December 18th and 20th.  And -- or December 18th, I think, was

25  the date.

Dondero - Cross                         131

1       And you know what, I want to clarify a characterization of

2   the pot plan.  I still believe it's the best and most likely

3   alternative for this estate in the long run.  I think what

4   we've proposed numerous times is more generous than what

5   anyone will receive in a liquidation and in a more timely

6   fashion.

7       And the last time we presented it to the Independent

8   Board, the Independent Board thought it was attractive and

9   thought we should go forward with it to the U.C.C. and other

10  parties.

11          MR. MORRIS:  Your Honor, I move to strike the last

12  portion of the answer that purports to describe what the

13  Independent Board thought.

14          THE COURT:  Well, --

15          MR. MORRIS:  No foundation.  Hearsay.

16          THE COURT:  What is your response to the hearsay

17  objection, Mr. Bonds?

18          MR. BONDS:  Your Honor, I don't have one.

19          THE COURT:  Okay.  I sustain.

20  BY MR. BONDS:

21  Q   What exceptions did you believe there were for

22  communications with employees?

23  A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24  Ellington and settlement counsel.  I covered the pot plan.

25  Q   Okay.

Dondero - Cross                            132

1    A    My -- my view of the pot plan as -- my view of the pot

2    plan was that it was very attractive, and I had received

3    encouragement to go forward with it as something that should

4    be workable.  That's my testimony on that.

5        And then -- and we talk about negotiating shared services.

6    So, there's shared services in terms of overlap in

7    functionality, but there's also, in terms of negotiating the

8    shared services agreement, which, as I said, was something

9    that Ellington was put in charge of three or four days ago by

10   Jim Seery to negotiate with us.  And he reached out to me to

11   negotiate it.  And I think the Pachulski deadline on it was

12   three days later.  That whole process was something that I

13   viewed as separate from the TRO, especially since it was

14   initiated by Jim Seery, DSI, et cetera, and consistent with

15   what Scott Ellington's role had been for the last six, nine

16   months.

17   Q    As to the Debtor's request that you vacate the office

18   space, did you comply with this request?

19   A    Yes.

20   Q    What did you think that vacating meant?

21   A    I moved out all my -- my personal items to a new office at

22   NexBank.

23   Q    (faintly)  And, in fact, did you work on the last day over

24   to 3:00 a.m.?

25   A    Yes.  4:00.

Dondero - Cross                          133

1           THE COURT:  Mr. Bonds, I didn't hear your question.

2   I didn't hear your question.

3           MR. BONDS:  Okay.  I'm sorry.

4   BY MR. BONDS:

5   Q   Did -- isn't it true that you worked through the night, to

6   3:00 or 4:00 a.m., to vacate the premises?

7   A   Yes.  Until 4:00 a.m. on the last day, to organize and

8   pack up all my stuff, yes.

9   Q   Did you think your presence in the office, with no other

10  employees there, violated the spirit of the TRO?

11  A   No.  I thought it was over the top and meant to tweak me,

12  but, yeah, there's no -- there's not Debtor employees coming

13  in since COVID.

14  Q   (faintly)  Okay.  And you thought you could talk to Mr.

15  Ellington and -- as settlement counsel; is that correct?

16          MR. MORRIS:  I'm having trouble hearing it, Your

17  Honor.

18          THE WITNESS:  Yes.

19          THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20  sure you speak into the device.

21          MR. BONDS:  I'm sorry.  I'll try to get closer.

22  Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23  Dondero if he thought he could talk to Ellington as a go-

24  between or settlement counsel.  And I asked him if that was

25  correct.

Dondero - Cross                          134

1          THE WITNESS:  Yes.  For settlement, shared services,

2    the pot plan.  Nothing that interrupts or affects the Debtor,

3    but for those purposes, as has consistently occurred for the

4    last six months.

5    BY MR. BONDS:

6    Q    Okay.  And you saw the texts and emails presented by the

7    Debtor between you and Mr. Leventon; is that correct?

8    A    The one regarding Multi-Strat?

9    Q    Yes.

10   A    Yes.

11   Q    In your understanding, did you believe those

12   communications were allowed under the TRO?

13   A    Well, yes.  And, again, to clarify my -- my contrasting

14   testimony, I would never typically have gone to them for that

15   kind of information, but to be compliant with the TRO, for

16   Multi-Strat information, which I needed in order to put

17   together the pot plan that the Independent Board audienced on

18   December 18, I needed the information on Multi-Strat, and I

19   requested it as appropriate through settlement counsel

20   Ellington.  And I think Ellington requested it from Isaac, who

21   requested it from David Klos.

22        The whole purpose, I believe -- my belief is the whole

23   purpose of this TRO is to make it impossible for us to get

24   information to come up with alternatives other than a -- the

25   plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                          135

1  Ellington in the go-between, which he's now no longer an

2  employee, I assume the only way we get any information,

3  balance sheet or anything from Highland Capital, is with a

4  subpoena.

5     And as much as I've tried to engage or make an attractive

6  pot plan for everybody, each one of them has been a complete

7  shot in the dark, without even knowing the assets and

8  liabilities of Highland, but just estimating where they were

9  or were likely to be.

10 Q    Do you believe your text message with Leventon caused any

11 harm to the Debtor's business?

12 A    No.  It potentially fostered a pot plan, because, you have

13 to know, the pot plan needed -- one of the aspects of the pot

14 plan was the --

15 Q    Do you still want to advocate for your pot plan?

16 A    I think that's eventually where we ultimately end up.  Or

17 -- or should end up.  Otherwise, I fear it's going to be an

18 extended, drawn-out process.

19 Q    And how much did you initially propose to pay creditors in

20 this case?

21 A    The most recent -- the most recent pot plan?

22 Q    No.  The -- initially.

23 A    The initial pot plan, I believe, was $160 million.

24 Q    And what about the notes?

25 A    There was $90 [million] of cash and I believe $70

1   [million] of notes.

2   Q    And what is Multi-Strat?

3   A    Multi-Strat is a fund that's managed by Highland.  They

4   used to have $40 or $50 million in value.  It used to contain

5   a lot of life settlement policies.  And I believe now has $5

6   or $6 million of value, after assets have been sold.

7   Q    Do you recall the email Debtor's counsel presented

8   regarding the balance sheet today?

9   A    The balance sheet of Multi-Strat?

10  Q    Correct.

11  A    Yes.

12  Q    Do you believe you were entitled to see that document?

13  A    Yes.  It's just -- again, for the pot plan, I needed it.

14  But also I'm an investor in that fund and I'm entitled to it.

15  It's -- there was nothing in there that was improper or

16  untoward or in any way damaged the Debtor.

17  Q    And you recall the request for documents sent by the

18  Debtor; is that correct?

19  A    On my -- my personal estate plan?

20  Q    No, on Multi-Strat.

21  A    The Debtor's request on -- I'm sorry.  What was that?

22  Q    The Debtor sent you a request for Multi-Strat.  For Duga

23  -- I'm sorry.

24  A    For Dugaboy?  Okay.

25  Q    Dugaboy.

Dondero - Cross                               137

1   A    Yeah.  There's -- there's personal estate planning trusts.

2   Some are active.  Some are inactive.  Some have been around

3   for 15 years.  But they're -- they're not assets or anything

4   that's related to the estate.  And that was -- that was my

5   text to Melissa that said, you know, Not without a subpoena.

6   Q    Mr. Dondero, if you remember back on Exhibit K, there was

7   some request that you terminate your offices at the Crescent,

8   and I think you were given seven days' notice to do that.  Do

9   you know if Christmas occurred during that time?

10  A    I believe it did.

11  Q    So, if Christmas and Christmas Eve are both holidays, how

12  many days, business days, did they give you to terminate or to

13  get out of the space?

14  A    There would have been three business days.  It was Monday

15  through Wednesday that I moved out.

16          MR. BONDS:  Your Honor, I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  Take a break.  I hope.

19          MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20  minute break?  I think that I'm going to be through, but I

21  don't know.

22          THE COURT:  All right.  I'll give you a ten-minute

23  break.

24          MR. BONDS:  All right.  Thank you, Your Honor.

25          THE COURT:  We're coming back at 2:15.

                          Dondero - Cross                    138

1              THE CLERK:  All rise.

2         (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3              THE CLERK:  All rise.

4              THE COURT:  All right.  Please be seated.  We're back

5    on the record in Highland versus Dondero.  Mr. Bonds, do you

6    have more examination?

7              MR. BONDS:  Your Honor, I have one question.

8              THE COURT:  Okay.

9              MR. BONDS:  And that's --

10             MR. LYNN:  And one more witness.

11             MR. BONDS:  And one more witness.

12                  CROSS-EXAMINATION, RESUMED

13   BY MR. BONDS:

14   Q    Do you think that Scott Ellington and Isaac Leventon were

15   treated appropriately by the Debtor?

16   A    No, I do not.  I don't think they've been treated fairly,

17   nor do I think other senior employees have been treated

18   fairly.  I've never seen a bankruptcy like this where, during

19   complex unwinding of 20 years of various different entities

20   and structures, relying on the staff, working them hard,

21   working overtime, a lot of investment professionals like

22   lawyers and DSI just putting their name on the work of stuff

23   that was done by internal employees, getting to the end of the

24   year, trying to pay people zero bonuses and retract prior

25   years' bonuses, and try and come up with legal charges against

Dondero - Cross                     139

1  those people is unusual to this case and my experience, in the

2  bankruptcies we've been involved in, where typically

3  management teams get paid multiples of current salary to stay

4  on and be the experts.

5      I also think they were put in difficult spots from the

6  very beginning.  It was Jim Seery that made Scott Ellington

7  the settlement counsel six, seven months ago.  It was a

8  broadly-defined role that was never retracted, never adjusted,

9  never modified, yet somehow he and Isaac violated it.  I don't

10  know.  I haven't spoken to them since they've been terminated.

11  They aren't allowed to speak to me, from what I hear.  But I

12  wish them luck in their claims.

13         THE COURT:  Okay.  You pass the witness?

14         MR. BONDS:  Yes, Your Honor.

15         THE COURT:  All right.  Mr. Morris, do you have

16  further examination?

17         MR. MORRIS:  Just a few questions.

18                REDIRECT EXAMINATION

19  BY MR. BONDS:

20  Q   Mr. Dondero, you knew about this hearing for some time,

21  right?

22  A   No.

23  Q   When did you first learn this hearing was going to take

24  place?

25  A   Two days ago.

Dondero - Redirect                          140

1   Q    Two days ago?

2   A    When was the depo, three days ago?  Whatever.

3   Q    And you didn't know prior to the deposition that we would

4   be having a hearing today on the Debtor's motion for a

5   preliminary injunction?

6   A    No.  I thought it was going to be postponed or canceled.

7   I was waiting for the text last night.

8   Q    You had an opportunity to call any witness in the world

9   you wanted to today, right?

10  A    I guess.

11  Q    You could have called -- you could have called the chief

12  compliance officer at the Advisors if you thought the Court

13  should hear from him as to the compliance issues that you've

14  testified to, right?

15  A    I think their letters stand on their own.

16  Q    Okay.  So you didn't think that it was important for the

17  Court to hear from Mr. Sowin directly, correct?

18  A    Sowin is a trader.

19  Q    I'm sorry.  Who's the chief compliance officer of the

20  Advisors?

21  A    Jason Post, as far as NexPoint is concerned.  He's the one

22  that would have been behind the K&L -- K&L letters.

23  Q    And he is not here today to testify, right?

24  A    I think his letters stand on their own and I think

25  everybody should read them, make sure they read them.

Dondero - Redirect                    141

1  Q   Okay.  But Mr. Post is not here to answer any questions;
2  is that right?
3  A   I don't know if there are any questions beyond what's
4  obviously stated in the letters.  You should read the letters
5  carefully.  They're -- they're -- they talk about clear
6  violations.
7         MR. MORRIS:  Your Honor, I move to strike.  It's a
8  very simple question.
9         THE COURT:  Sustained.  That was another yes or no
10 answer, Mr. Dondero.   Go ahead.
11        THE WITNESS:  I'm sorry.
12 BY MR. MORRIS:
13 Q   Mr. Dondero, Mr. Post is not here to testify in order to
14 explain to the Court what he thinks the regulatory issues are,
15 correct?
16 A   He's not here today.
17 Q   And you could have called him as a witness, correct?
18 A   Yes.
19 Q   And you thought Mr. Ellington and Mr. Leventon were
20 treated unfairly, right?
21 A   Yes.
22 Q   And there's no reason why they couldn't have come today to
23 testify, correct?
24 A   I guess they could have.
25 Q   And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                    142

1    Gates clients couldn't have been here to testify, correct?

2    A    I didn't deem it necessary, I guess.

3    Q    Okay.  You could have offered into evidence, at least

4    offered into evidence, any document you wanted, right?

5    A    Yes.

6    Q    And you could have offered the judge, for example, the

7    shared services agreement, the shared services agreements for

8    which you gave the Court your understanding, right?

9    A    Which shared services, the one that Seery gave Ellington

10   three days ago or the original one from years ago?

11   Q    Any of the ones -- any of the ones that you have referred

12   to today.  You could have given any of them to the judge,

13   right?

14   A    Correct.

15   Q    And you didn't, right?

16   A    I did not.

17   Q    In fact, there's not a single piece of evidence in the

18   record that corroborates anything you say; isn't that right?

19   A    I -- I believe all those documents are in the record.

20   They're just not in the record of this TRO.  But they're all

21   --

22   Q    Oh.

23   A    They're all in the record.

24   Q    Do you remember that there was a hearing on December 16th?

25   I think you -- you testified that you're fully aware of that

Dondero - Redirect                    143

 1   hearing that was brought by the K&L Gates Clients.  Do you
 2   remember that?
 3   A    Yes.
 4   Q    Who testified at that hearing on behalf of the K&L Gates
 5   Clients?  Dustin Norris?
 6   A    I believe -- I believe Dustin Norris testified.
 7   Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?
 8   A    He's one of the senior managers.
 9   Q    Is he a compliance officer?
10   A    No.
11   Q    Is he a trader?
12   A    No.  But he's one of the senior managers.
13   Q    Okay.  They could have called anybody they wanted, to the
14   best of your understanding, right?
15   A    I don't think they got a chance to.  Wasn't it an
16   abbreviated hearing?
17   Q    They offered Mr. Norris as a witness.  Do you understand
18   that?
19   A    I -- all I -- I wasn't there.  I didn't attend virtually.
20   I -- but I did know that Norris testified.  But I don't know
21   who else was called, wasn't called, was going to be called,
22   was on the witness list.  I have no awareness.
23   Q    Okay.  You were pretty critical of the trades that Mr.
24   Seery wanted to make that you interfered to stop, right?
25   A    I think he's subsequently done most of those trades.

Dondero - Redirect                    144

1   Q    And you called them preposterous because he wanted to do

2   it around Thanksgiving or around Christmas, at least based on

3   your testimony, correct?

4   A    That's when it did occur.

5   Q    And is it your testimony -- is it your testimony that

6   every single person in the world who trades securities near a

7   holiday is making a preposterous trade?

8   A    I think it's amateur and not what an investment

9   professional would do.

10  Q    So you never trade on holidays; is that your testimony?

11  You've never done it once in your life?

12  A    Very rarely, unless there's another overriding reason.

13  And there was no overriding reasons, period.

14  Q    How would you know that when you didn't even ask Mr. Seery

15  why he wanted to make the trades?

16  A    I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17  said that Jim Seery just said for risk reduction.

18          MR. MORRIS:  I move to strike on the grounds that

19  it's hearsay, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    You never asked Mr. Seery why he wanted to make the

23  trades, correct?

24  A    I'm not allowed to talk to Mr. Seery.

25  Q    You certainly were around Thanksgiving; isn't that right?

Dondero - Redirect                    145

1   A    I don't know.

2   Q    There was no TRO in place at that time, correct?

3   A    That's true.

4   Q    You're pretty critical of Mr. Seery and his capabilities;

5   is that right?

6   A    He's a lawyer.  He's not an investment professional.

7   Q    Did you object to his appointment as the CEO of the

8   Debtor?

9   A    No.

10  Q    Have you made any motion to the Court to have him removed

11  as unqualified?

12  A    Not yet.

13  Q    Okay.  But with all the knowledge of all the preposterous

14  things that he's been doing for months now, you haven't done

15  it, right?

16  A    No.

17  Q    When you -- when -- before you threw the phone in the

18  garbage, did you back it up?

19  A    No.

20  Q    Did it occur to you that maybe you should save the data?

21  A    No.

22  Q    You said that the only way you think you might be able to

23  get information going forward is through a subpoena.  Do I

24  have that right?

25  A    I mean, that's how it seems.  I mean, it seems at every

1    turn -- and now with Scott Ellington being gone and Isaac

2    being gone -- I have no idea how the Debtor is ever going to

3    defend against UBS.

4              THE COURT:  I did not --

5              THE WITNESS:  I have no idea how --

6              THE COURT:  I didn't hear the answer after with

7    Ellington and Leventon being gone.  I didn't hear the rest of

8    the answer.  Could you repeat?

9              THE WITNESS:  I said I have no idea how the Debtor is

10   ever going to defend itself against UBS.  But I also have no

11   idea how we're ever going to get any information or ever push

12   forward any kind of settlement without having any access to

13   information or anybody to talk to.

14   BY MR. MORRIS:

15   Q    Do you trust Judge Lynn?

16        (Echoing.)

17   A    Yes.

18   Q    Is he a good advocate?

19   A    Yes.  If anybody returns his phone calls.

20   Q    Do you recall that on October 24th Judge Lynn specifically

21   asked my law firm to provide information on your behalf in

22   connection with the Debtor's financial information, their

23   assets and their liabilities?

24   A    Yes.

25   Q    Do you recall that the Debtor simply asked that you

Dondero - Redirect                            147

1    acknowledge in an email between and among counsel that you
2    would abide by the confidentiality agreement that was entered
3    by the Court?
4    A    I wasn't involved in those details.
5    Q    Didn't you send an email in which you agreed to receive
6    the financial information subject to the protective order that
7    this Court entered?
8    A    I'm sure I would.  I just don't remember.
9    Q    That was a condition that the Debtors made.  That doesn't
10   refresh your recollection?
11   A    I'm not denying it.  I just don't remember, and --
12   Q    Okay.  And --
13   A    (overspoken)
14   Q    I'm sorry, I don't mean to cut you off.  And in fact, on
15   December 30th, the day you were supposed to vacate the office,
16   the Debtor voluntarily provided to Judge Lynn all of the
17   information that had been requested on your behalf without the
18   need for a subpoena, right?
19   A    Yeah.  It took a week.  It's 40,000 pages of mixed
20   gobbledygook that we're -- we're going through.  But it should
21   provide enough information for us to negotiate a pot plan if
22   anybody so chose.
23   Q    So you didn't need to (echoing) the 40,000 pages of
24   financial information from the Debtor; all you needed was an
25   agreement that you would abide by the protective order.

Dondero - Redirect                    148

1   Correct?

2   A    I think that was the first thing that was ever produced on

3   request that I can remember.  But yes.

4   Q    And it was just a week ago, right?

5   A    Yes.

6           MR. MORRIS:  I have no further questions, Your Honor.

7           THE COURT:  All right.  Mr. Bonds, do you have

8   anything else?

9           MR. BONDS:  I do not, Your Honor, as to this witness.

10  I have one other witness.

11          THE COURT:  All right.

12          MR. MORRIS:  Your Honor, I don't know who they plan

13  on calling, but he's not on the witness list.

14          THE COURT:  All right.  Well, --

15          MR. BONDS:  Your Honor, this other witness --

16          THE COURT:  Just a moment.  This concludes, for the

17  record, Mr. Dondero's testimony.  But, obviously, stick

18  around, because we're going to have a lot to talk about when

19  this is finished as far as the evidence.

20      All right.  Now, who are you wanting to call that you did

21  not identify?

22          MR. BONDS:  I'd like to call Mike Lynn for the

23  purpose -- or, to -- as a rebuttal witness.

24          THE COURT:  Lawyer as witness?

25          MR. MORRIS:  Your Honor?

149

 1          THE COURT:  Well, you know, first off, rebuttal of

 2   what?  Rebuttal --

 3          MR. MORRIS:  Exactly.  He's going to rebut his own

 4   client, Your Honor?  He's going to rebut his own client?

 5   There's only been one witness to testify here.  He was on

 6   their exhibit list.  How do they call a witness to rebut their

 7   own client?

 8          THE COURT:  Yes.  What -- I don't --

 9          MR. BONDS:  Your Honor?

10          THE COURT:  Go ahead.

11          MR. BONDS:  Mr. Morris testified or attempted to

12   testify that the pot plan didn't gain any traction.  We will

13   submit Mike Lynn on that issue.

14          THE COURT:  No.

15          MR. MORRIS:  Your Honor?

16          THE COURT:  I'm not going to allow a lawyer to

17   testify to rebut lawyer argument.  That's very inappropriate,

18   in my view.  So, not going to happen.

19          MR. LYNN:  (garbled)

20          MR. BONDS:  Your Honor, he would be a fact witness to

21   discussions with the other side.

22          MR. MORRIS:  Your Honor, I strenuously object.

23   They're -- he's only rebutting -- my questions are not

24   evidence.  The only evidence in the record is Mr. Dondero's

25   testimony.  Mr. Dondero is their client.  Mr. Dondero was on

150

```
 1    their witness list.  They should not be permitted to call any

 2    witness, with all due respect to Mr. Lynn, to rebut their own

 3    witness.

 4              THE COURT:  All right.

 5              MR. BONDS:  Your Honor, we're not rebutting our

 6    witness.  We are rebutting the testimony that Mr. Morris gave.

 7              THE COURT:  Mr. Morris is a lawyer.  He makes

 8    argument.  He asks questions.  He was not a witness today.

 9    Okay?

10       So if you want to say whatever you want to say as lawyers

11    in closing arguments, then obviously you can do that.  But I'm

12    not going to allow a lawyer to be a witness to rebut something

13    another lawyer said in argument or in a question.  I -- it's

14    -- so, I disallow that.

15       Anything else, then?

16              MR. BONDS:  No.

17              THE COURT:  Okay.  And while we're talking about

18    procedure, actually, Mr. Morris, it's the Debtor's motion, and

19    I'm not even sure that's all of your evidence.  So, do you

20    have any more evidence as Movant?

21              MR. MORRIS:  No, Your Honor.  The Plaintiff and the

22    Debtor rest.

23              THE COURT:  All right.  So, at the risk of repeating,

24    now that the Movant has rested, it would be Mr. Dondero's

25    chance to put on supplemental evidence.  But what I'm hearing
```

151

1    from Mr. Morris is there were no witnesses identified on your

2    witness list?

3          MR. BONDS:  Other than Mr. Dondero, Your Honor.

4          THE COURT:  Okay.  All right.  Well, was there any

5    stipulated documentary evidence that -- that you had --

6          MR. BONDS:  No, Your Honor.

7          THE COURT:  All right.  Well, I guess we're done with

8    evidence.

9      Mr. Morris, your closing argument?

10         MR. MORRIS:  All right.  Before I get to that, Your

11    Honor, I just want to make a very brief statement.  When the

12    Debtor objected to Mr. Dondero's emergency motion for a

13    protective order, the Debtor stated that it sought discovery

14    from Mr. Dondero to determine whether Mr. Dondero may have

15    violated the TRO by interfering and impeding the Debtor's

16    business, including by potentially colluding with UBS.  After

17    that motion was decided, both Mr. Dondero and UBS produced

18    documents to the Debtor.

19      Based on the review of that information, the Debtor found

20    no evidence that Mr. Dondero and UBS colluded to purchase

21    redeemed limited partnership interests of Multi-Strat, nor any

22    inappropriate conduct by UBS or its counsel.

23      The Debtor appreciates the opportunity to clear that part

24    of the record.

25          THE COURT:  All right.

1              CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2          MR. MORRIS:   Now, with respect to the motion at hand

3     today, Your Honor, I want to take you back just about a month

4     ago to December 10th, 2020.  At that time, we had a hearing on

5     the Debtor's motion for a TRO.  The motion had been filed in

6     advance.  Mr. Dondero had filed an objection.  He had concerns

7     about the scope and the language of the terms of the proposed

8     TRO.

9          And at that hearing, Your Honor, if you'll recall, you

10    listened carefully to the arguments that were made on behalf

11    of Mr. Dondero.  You heard carefully -- you listened carefully

12    to the proposed changes that he sought to make.  And you went

13    through that proposed TRO word by word, Paragraph 2 and 3, and

14    you read them out loud, and you made decisions at that time as

15    to whether the Court believed any portion of that was

16    ambiguous or whether it was clear.  You made determinations at

17    that time whether or not the provisions were reasonable.

18         Mr. Dondero wasn't there.  He didn't read the transcript.

19    He has no idea what you said.  But his lawyers were there, and

20    they had an opportunity to object and they had an opportunity

21    to make comments, and the order is what the order is.  And for

22    whatever reason, Mr. Dondero chose not to read it, or,

23    frankly, even understand it, based on his testimony.

24         The fact is, Your Honor, the one thing that the evidence

25    shows very clearly here is that Mr. Dondero thinks that he is

 1  the judge.  He believes that he is the decider.  He believes

 2  that he decides what the TRO means, even though he never read

 3  it.  He believes that he decides what exceptions exist in the

 4  TRO, even though he never read it.

 5      He believes that he decides that it's okay to ditch the

 6  Debtor's cell phone without even seeking, let alone obtaining,

 7  the Debtor's consent.  I guess he decides that he can ditch

 8  the phone and trash it without seeking to back it up or

 9  informing the Debtor.

10      Mr. Dondero believes that he gets to decide that it's okay

11  to take a deposition from the Debtor's office, even when the

12  Debtor specifically says you're evicted and you're not allowed

13  to have access.

14      Mr. Dondero believes that he gets to decide that Mr. Seery

15  has no justification for making trades, even though he

16  couldn't take the time to pick up the phone or otherwise

17  inquire as to why Mr. Seery wanted to do that.

18      Mr. Seery -- Mr. Dondero believes that he is the arbiter

19  and the decision-maker and gets to decide to stop trades,

20  notwithstanding the TRO, notwithstanding the CLO agreements

21  that he is not a party to, that his entities are not a party

22  to.

23      Mr. Dondero thinks that he gets to decide that the Debtor

24  has breached the agreements with the CLOs.  He gets to decide

25  that the Debtor is in default under those agreements.  He gets

154

 1    to decide that it's perfectly fine for Ellington and Leventon

 2    to support his interests while they have obvious duties of

 3    loyalty to the Debtor.

 4         It is not right, Your Honor.  It is not right.  I stood

 5    here, I sat here, about four hours ago, five hours ago, and

 6    told the Court what the evidence was going to show, and it

 7    showed every single thing that I expected it to show and

 8    everything I just described for the Court about Mr. Dondero's

 9    belief that he's the decider.

10         He's not the decider, Your Honor.  You are.  And you made

11    a decision on June -- on December 10th that he ignored.

12         There is ample evidence in the record to support the

13    imposition of a preliminary injunction.  And Your Honor, I'm

14    putting everybody on notice now that we're amending our

15    complaint momentarily to add all of the post-petition parties,

16    because this has to stop.  The threats have to stop.  The

17    interference has to stop.  Mr. Dondero can always make a

18    proposal if he thinks that there's something that will capture

19    the imagination and the approval -- more importantly, the

20    approval -- of the Debtor's creditors.  We have no interest in

21    stopping him from doing that.  He's got very able and

22    honorable counsel, and he can go to them and through them any

23    time he wants.

24         But the record is crystal clear here that, notwithstanding

25    Your Honor's order, one entered after serious deliberation, is

155

1  of no meaning to him.  And we'll be back at the Court's

2  convenience on the Debtor's motion to hold him in contempt.

3  It'll just be a repeat of what we've heard today, because,

4  frankly, the evidence is exactly the same.

5      With that, Your Honor, unless you have any questions, the

6  Debtor rests.

7          THE COURT:  All right.  I do not.

8      Mr. Bonds?

9          MR. BONDS:  Your Honor, we would like to divide our

10 time between Mike Lynn and myself.  Is that a problem?

11         THE COURT:  That's fine.  Go ahead.

12         MR. LYNN:  Are we on mute?

13         MR. BONDS:  No.

14         CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15         MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16 Phelan's book.  I happened to read the confirmation hearing in

17 the *Acis* case regarding what was referred to as Clients A, B,

18 and C.  And Mr. Phelan, who testified, really gave an oral

19 argument to the Court which was very persuasive and very

20 thorough.  So I'm going to sort of do the reverse, because I

21 hope that the Court would find useful some information

22 regarding the pot plan about which you've heard many words

23 spoken but very little to do with what that plan was or how it

24 came about.

25     The pot plan was proposed by Mr. Dondero for the first

156

1   time in September of 2020, shortly after the conclusion of the

2   first round of mediations.  Though there had been versions of

3   it before, and lesser versions, the pot plan was finally in

4   the form that would more or less survive it in September.

5   Under the pot plan, Mr. Dondero proposed to come up with $90

6   million of cash and $70 million in promissory notes, and that

7   was to form a pot which creditors would share in.

8       The proposal was provided to the Debtor and then shared

9   with the Committee.  Mr. Seery responded with a degree, a

10  degree only, of enthusiasm to the pot plan, and indeed

11  provided a counter-term sheet to the pot plan.  He also, so he

12  said, and I believe him, approached the Committee and said

13  this is a proposal to be taken seriously.

14      He proposed some improvements in his view to the pot plan.

15  No response was received from the Creditors' Committee at that

16  time.

17      After going back and forth with the Debtor -- and Mr.

18  Seery, not unreasonably, was unwilling to propose the pot plan

19  without some support on the Creditors' Committee -- I

20  contacted Matt Clemente.  We had a nice conversation.  And at

21  that time, Mr. Clemente raised two particular concerns.  The

22  $160 million, which creditors did not think was enough, was

23  not enough, in part, because that included no consideration

24  for the acquisition of promissory notes executed some by Mr.

25  Dondero and some by entities controlled by Mr. Dondero, which

157

1   notes total approximately $90 million.

2        The second concern was that Mr. Dondero would get a

3   release under the plan.  During that call, I said the issue of

4   the notes is subject to negotiation and might well result in a

5   transfer of those notes, possibly with some amendments, to the

6   pot, and that Mr. Dondero was prepared, in all likelihood, to

7   forego a release.

8        Mr. Clemente agreed to get back to me.  He did.  And he

9   said to me, I have talked to the Committee about this and they

10  would like you to go to or they want you to go first to Mr.

11  Seery, work off of his revised timesheet -- or term sheet,

12  sorry -- and after you have reached an agreement with him,

13  come to us, come to the Committee, and we'll negotiate with

14  you.

15       Now, I might have agreed that that was a reasonable

16  approach if there were a possibility that Mr. Seery would

17  propose a plan without the agreement of creditors.  But the

18  way I took it was that the Committee was saying go make a deal

19  with Seery and then we'll start negotiating, and we know,

20  correctly, that Mr. Seery will not propose a plan that does

21  not have our support.

22       So, effectively, we get to go through two rounds of

23  negotiations, even though effectively everything that is in

24  the estate, everything -- causes of action against Mr.

25  Dondero, promissory notes from Mr. Dondero -- everything that

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 16-31   Filed 09/15/23   Page 1252 of 1539   PageID 18490
Exhibit 31   Page 252 of 706

158

1   they would get under a plan or under a liquidation, they would

2   get under the pot plan.

3       Now, I wanted you to know that, Your Honor, not because

4   I'm now trying to get you or anyone else to sell the pot plan.

5   But I think it's important that Your Honor know that Mr.

6   Dondero's approach in this case has not been a hostile

7   approach.

8       I know the Court had what it found to be an unsatisfactory

9   experience with Mr. Dondero in the *Acis* case.  But from the

10  time I became involved in this case and Mr. Bonds became

11  involved, we have been quiet, we have said nothing, and we've

12  done virtually nothing in the case, up until the time after

13  the mediation, when negotiations regarding a pot plan broke

14  down.

15      Since that time, regrettably, there has been a good deal

16  of hostility, and it's spreading.  I would like to see it stop

17  spreading.  I will do what I can to make it stop spreading.

18  But I need others to help me on that.  And it's my hope that I

19  can count on the Pachulski law firm, the Sidley law firm, and

20  the firms representing the major creditors to help make that

21  happen.

22      I do not think, and I would submit that it is not to the

23  benefit of the estate, it is not to the likely workout of this

24  case, that it would be best served by entering a preliminary

25  injunction, which it appears to me prevents Mr. Dondero from

159

1    saying good morning to one of the employees of the Debtor that

2    he knows.

3        It seems to me, Your Honor, that the injunction, by its

4    terms, as Mr. Morris would have it, is an injunction that

5    would prevent Mr. Dondero from discussing politics with Mr.

6    Ellington.  And it seems to me that an injunction that broad,

7    that extensive, and one which lasts, as far as I can tell,

8    until infinity, that such an injunction is not the right thing

9    to do, given, if nothing else, the First Amendment to the

10   United States Constitution.

11       That will conclude my presentation, and I will turn it

12   over to the wiser and better-spoken colleague, John Bonds.

13   Thank you, Your Honor.

14           THE COURT:  Thank you.  Mr. Bonds, what else do you

15   have to say?

16           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17           MR. BONDS:  Your Honor, has the Debtor met the

18   requirements for the issuance of a preliminary injunction?  We

19   submit that they have not.  And the Fifth Circuit's rules are

20   fairly clear as to the awarding of a preliminary injunction.

21       First, let's look at the type of preliminary injunction

22   that the Debtor would like you to enter today.  It provides

23   that Mr. Dondero cannot talk to any employee, regardless of

24   what is being communicated.  Mr. Dondero can pass an employee

25   on the street, but he can't acknowledge the employee, with

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 31 Filed 12/16/23 of 206  Page 1254 of 1539    PageID 18492

160

1    whom he may have worked for years.  Nor can he talk to his

2    personal assistants, again, which he has worked with for

3    years.  Does that violate the First Amendment of the

4    Constitution?

5        What about the shared services agreement?  What about the

6    pot plan which he is advocating as a means of reorganizing the

7    Debtor?  Not the liquidation proposed by the Debtor.  Can Mr.

8    Dondero communicate with creditors about the pot plan and the

9    other proposals without violating the TRO or the preliminary

10   injunction which deals with interfering with the Debtor's

11   business?

12       Your Honor, I think it's important to note that a

13   preliminary injunction is an extraordinary remedy that may

14   only be awarded upon a clear showing that the Plaintiff is

15   entitled to such relief.  Plaintiffs are entitled to a

16   preliminary injunction if they show, one, a substantial

17   likelihood that they will prevail on the merits of their

18   claims; two, a substantial threat that they will suffer an

19   irreparable injury if the injunction is not granted; three,

20   their threatened injury outweighs the harm to the estate or

21   the other party; and four, the public interest will not be

22   disserved, misserved, if the preliminary injunction is

23   granted.

24       The party seeking the preliminary injunction bears the

25   burden of persuasion on all four requirements.  We believe

1    that the Debtor today has failed to carry its burden of

2    persuasion of proof with regard to the second element, which

3    I'm going to refer to as the irreparable injury requirement.

4    In order to show irreparable harm to the Court, the Plaintiff

5    must prove that if the District Court denied the grant of a

6    preliminary injunction, irreparable harm would be the result.

7    Injuries are irreparable only when they cannot be undone

8    through monetary remedies.  There is no evidence before the

9    Court today that Mr. Dondero cannot respond to any judgment

10   that is rendered against him by this Court.

11       Your Honor, this preliminary injunction does not involve

12   real property.  Unlike the *Saldana* case, this request for the

13   issuance of a preliminary injunction involves personal

14   property only.  The request that Mr. Dondero cease and desist

15   all contact with employees is just wrong and may violate the

16   First Amendment of the Constitution, as I previously stated.

17       We have other concerns regarding the issuance of a

18   preliminary injunction.  We feel that the preliminary

19   injunction is too broad.  It lacks a beginning and an end.

20   When does the preliminary injunction terminate?  What about

21   the former employees?  Once they are terminated, can Mr.

22   Dondero speak to them?  What about the pot plan?  Is it gone

23   forever?  Can Mr. Dondero talk with the mediators about the

24   pot plan?  Can Mr. Dondero speak with the members of the

25   U.C.C.?

162

1      It is easy to criticize Mr. Dondero.  Did he violate the

2   TRO?  We submit that he didn't and the Debtor says that he

3   did.  What matters going forward is the lack of evidence of

4   irreparable harm.

5      Mr. Seery sure wants to keep Mr. Dondero from talking to

6   anyone in this case.  Why is that?  Does Mr. Seery believe

7   that the only way to get his liquidation plan confirmed is to

8   keep Mr. Dondero from talking to anyone?  How will the

9   preliminary injunction help the Debtor's creditors?  Does

10  keeping Mr. Dondero from talking with anyone mean that there

11  will be a greater return to the creditor body?  Does

12  precluding Mr. Dondero from talking about his pot plan mean

13  that the creditors will take home more money on their claims,

14  or does it eliminate the possibility that they may take home

15  more money on their claims?

16     Your Honor, what we are seeing here today is an attempt by

17  a group to destroy what Mr. Dondero has built over the last

18  few years.  That isn't the way Chapter 11 should work.

19     Just one last thing to keep in mind, Your Honor.  Mr.

20  Seery's plan is a liquidation of the Debtor.  Mr. Dondero's

21  pot plan is a reorganization of the Debtor.

22     Thank you, Your Honor.

23          THE COURT:  All right.  Mr. Morris, you get the last

24  word.  Anything in rebuttal?

25          MR. MORRIS:  I would just point out, Your Honor, that

163

1   nobody here has objected to the Debtor's motion for the entry

2   of a preliminary injunction except Mr. Dondero.  While I

3   appreciate that this is an adversary proceeding, anybody who

4   felt strongly about the matter certainly could have moved to

5   intervene.  The Creditors' Committee could have moved to

6   intervene.  Mr. Clemente could have stood at the podium and

7   begged Your Honor not to impose the injunction because he

8   thought it was in the best interest of creditors to allow Mr.

9   Dondero to interfere with the Debtor's business and to speak

10  with their employees.  Nobody has done that, Your Honor.

11  Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12  here to testify on his behalf.  Nobody's -- there's no

13  evidence in the record that supports or corroborates anything

14  that he said at all, Your Honor.

15      Unless Your Honor has any specific questions, the Debtor

16  is prepared to rest.

17          THE COURT:  All right.  I do not have any follow-up

18  questions.

19      All right.  I have a lot to say.  I'm sorry, I apologize

20  in advance, but I've got a heck of a lot to say right now.

21  I'm going to give you a ruling on the motion before me, but

22  I've got a lot to add onto that, so I hope all the key parties

23  in interest are listening carefully.  Mr. Bonds, in the video,

24  I can only see you.  I hope Mr. Dondero is just right there

25  out of the video camera view.  Okay, there you are.  I wanted

164

 1    to make sure you didn't wander off to take a bathroom break or

 2    anything.  So, again, I have a whole lot to say here today.

 3        First, I'm going to rule on the motion.  The Court does

 4    find there is sufficient compelling evidence to grant a

 5    preliminary injunction that is completely consistent with the

 6    prior TRO.  Okay?  So, specifically, the Court today is going

 7    to continue to prevent Mr. Dondero from (a) communicating in

 8    any way, directly or indirectly, with any of the Debtor's

 9    board members -- I think that's really Strand board members --

10    unless Mr. Dondero's counsel and counsel for the Debtor are

11    included.  Okay.  I'm saying those words slowly and carefully.

12    There is no bar on Mr. Dondero talking to the board about a

13    pot plan or anything else in the universe Mr. Dondero wants to

14    talk to them about.  There's just a preclusion from him doing

15    it without his counsel and the Debtor's counsel present.

16    Okay?

17        I did that before and I'm doing it now because I've seen

18    concerning evidence that some communications to Mr. Seery and

19    others had an intimidating tone, a threatening tone one or two

20    times, an interfering tone.  So, guess what, we're just going

21    to have lawyers involved if any more conversations happen.

22    Okay.

23        So (b) the preliminary injunction, just as the TRO did, is

24    going to prevent Mr. Dondero from making any threats of any

25    nature against the Debtor or any of its directors, officers,

165

1    employees, professionals, or agents.  Okay.  It's almost

2    embarrassing having to say that or order that with regard to

3    such an accomplished and sophisticated person, but, you know,

4    I saw the evidence.  I've got to do what I've got to do.  You

5    know, words in a text like, Don't do it, this is your last

6    warning, and some of the other things, that has a threatening

7    tone, so I'm going to order this.

8        Third, the preliminary injunction will prevent Mr. Dondero

9    from communicating with any of the Debtor's employees except

10   as it specifically relates to shared services provided to

11   affiliates owned or controlled by Mr. Dondero.

12       Now, I'm going to elaborate in a couple of ways here.  I

13   think in closing argument there was a suggestion that he can't

14   even talk to his friend, Mr. Ellington, about anything.  Well,

15   I heard today that Mr. Ellington and Mr. Leventon are no

16   longer employees of the Debtor, so actually that's not an

17   issue.  But while this is very restrictive, while this

18   prevents Mr. Dondero from engaging in small talk with Debtor

19   employees about the weather or the football game or whatever,

20   it's regrettable, but I feel like I'm forced to order this

21   now, because, again, the communications that were put in the

22   record.  Okay?  We just can't take any chances, as far as I'm

23   concerned, with regard to there being potential interference

24   with the Debtor's operations that might be harmful or contrary

25   to creditors' interests.

166

 1        Fourth, the preliminary injunction, just like the TRO,

 2    will prevent Mr. Dondero from interfering with or otherwise

 3    impeding the Debtor's business, including but not limited to

 4    the Debtor's decisions concerning its operations, management,

 5    treatment of claims, disposition of assets owned or controlled

 6    by the Debtor, and pursuit of any plan or alternative to the

 7    plan.

 8        Now, I understand the argument that this is pretty broad

 9    and might be, I don't know, subject to some disputes regarding

10    was it interference, did it impede the Debtor's business or

11    not?  You know what, if you follow the other prongs of the

12    preliminary injunction, that you don't talk to the board

13    without your counsel, Mr. Dondero, and the Debtor's counsel,

14    and you don't talk to Debtor's employees except with regard to

15    matters pertaining to the shared services agreement, and,

16    bottom line, if you just run everything by your attorneys,

17    you'll be okay.  We won't have this ambiguous, vague,

18    problematic territory.

19        Fifth, I will go ahead and, for good measure, belts and

20    suspenders, whatever you want to call it, prevent Mr. Dondero

21    from otherwise violating Section 362(a) of the Bankruptcy

22    Code.

23        Now, I read the response filed at 9:30 last night by Mr.

24    Dondero's counsel.  It's a good response.  It makes legal

25    arguments about that being, you know, it just being too vague.

167

 1    Well, to the contrary, it just restates what's already in the

 2    Bankruptcy Code, right?  Persons are prohibited from violating

 3    Section 362(a) of the Bankruptcy Code.  If anything, it's the

 4    sky is blue, right, just stating what is true.  But I

 5    understand Debtor wanting some clarity in an order, because we

 6    want you to take this seriously, Mr. Dondero, and not just do

 7    something and then say, well, you didn't know what was in the

 8    Code.  You know, you need to consult with your lawyer.  That's

 9    going to be in there.

10         Bottom line, I want that language in there because, Mr.

11    Dondero, I want you to see an order that this Court expects

12    you to comply with the Bankruptcy Code.  And again, if you

13    don't understand, if you're unsure whether you can take action

14    x or y, consult with your very capable lawyers.

15         I note that if you listened carefully to these words,

16    there was nothing in here that stopped Mr. Dondero from

17    talking to the Creditors' Committee about a pot plan.  Nothing

18    in this injunction, nothing in the previous TRO, ever

19    prohibited that.

20         Last, with regard to the ruling -- and again, I've got a

21    lot more to say when I'm done -- I am going to further enjoin

22    Mr. Dondero from what we said in the TRO:  causing,

23    encouraging, or conspiring with any entity controlled by him

24    and/or any person or entity acting on his behalf from directly

25    or indirectly engaging in any of the aforementioned items.

168

 1  This is not an injunction as to nonparties to the adversary

 2  proceeding.  It is an injunction as to Mr. Dondero from doing

 3  the various enjoined acts that I previously listed under the

 4  guise of another entity or a person that he controls.

 5     Again, if you're dealing with and through your attorneys,

 6  Mr. Dondero, I don't think this will be hard to maneuver.

 7     I guess I'm actually not through with my ruling yet.  I do

 8  want to add that the Court rules that the injunction shall

 9  last through the time of confirmation of a plan in this case

10  unless otherwise ordered by this Court.

11     And as to the legal standards, I want to be clear for the

12  record that the Court believes this injunction is necessary to

13  avoid immediate and irreparable harm to the Debtor's estate

14  and to its reorganization prospects.  I believe that there's a

15  strong likelihood the Debtor will succeed in a trial on the

16  merits of this adversary proceeding.  I believe the public

17  interest strongly favors this injunction.  And I believe the

18  balance of harms weighs in favor of the Debtor on all of these

19  various issues.

20     Again, I want to reiterate, the intimidation and

21  interference that came through in some of these email and text

22  communications was concerning to the Court and is a motivation

23  for this preliminary injunction.

24     Now, I'm going to add on a couple of things today.  The

25  first thing I'm going to add on -- and I want this, Mr.

169

1    Morris, in the order you submit.  You didn't ask me for this,

2    but I'm going to do it.  I'm going to order you, Mr. Dondero,

3    to attend all future hearings in this bankruptcy case unless

4    and until this Court orders otherwise.  And I'm doing this --

5    it's not really that unusual a thing for me to do.  I

6    sometimes order this in cases when I'm concerned about, you

7    know, is the businessperson paying attention to what's going

8    on in the case and is he engaged, is he invested, is he

9    available when we need him?

10       In this case in particular, the evidence was that you

11   didn't read the TRO.  You were not aware of its basic terms

12   and you didn't read it.  Okay?  So that was what sent me over

13   the edge as far as requiring this new element that you're

14   going to attend every hearing.  Obviously, we're doing video

15   court, so that's not that much of a burden or imposition.  You

16   can pretty much be anywhere in the world and patch in by

17   video, since we're in the pandemic and not doing live court.

18   But I think it's necessary so I know you hear what I rule and

19   what goes on in this case.

20       I will tell you that I was having a real hard time during

21   your testimony deciding if I believe you didn't read the TRO

22   or know about the different things that were prohibited.  You

23   know, I was thinking maybe you're not being candid to help

24   yourself in a future contempt hearing, or actually maybe

25   you're being a hundred percent honest and candid but you're

170

1  kind of hiding behind your lawyers so that you can argue the

2  old plausible deniability when it suits you.

3      But no more.  No more.  I'm not going to risk this

4  situation again of you not knowing what's in an order that

5  affects you.  So you must be in court by video until I order

6  otherwise.

7      Second, and I regret having to do this, but I want it

8  explicit in the preliminary injunction that Mr. Dondero shall

9  not enter Highland Capital Management's offices, regardless of

10 whether there are subleases or agreements of Highland

11 affiliates or Dondero-controlled entities to occupy the

12 office, unless Mr. Dondero has explicit written permission

13 that comes from Highland's bankruptcy counsel to Dondero's

14 bankruptcy counsel.  Okay?  If he does, it will be regarded as

15 trespassing.

16     And, I don't know, are there security guards on the

17 premises?  I mean, gosh, I hate to be getting into this

18 minutia, but -- well, I just want it explicit in the order

19 that Mr. Dondero, I'm sorry, but you can't go to these offices

20 without written permission.  And again, that can only be given

21 from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22 it's going to be trespassing.  You know, someone can call the

23 Dallas Police Department and have you escorted out.  Again, I

24 hate having to do that.  It's just, it's embarrassing for me.

25 I think it's embarrassing for everyone.  But I'm backed up in

1  that corner.

2      Next, I am going to ask that it be clear that Mr. Dondero

3  can deal with the Unsecured Creditors' Committee and its

4  professionals with regard to talking about a pot plan.

5      And next, I'm going to add -- and I think, Mr. Morris, you

6  requested this at some point today in oral argument -- Mr.

7  Ellington and Mr. Leventon shall not share any confidential

8  information that they received as general counsel, assistant

9  general counsel for the Debtor, without Debtor's counsel's

10  explicit written permission.  Okay?  So we've got that in

11  writing.

12      And, you know, that's a little awkward because they're not

13  here, they weren't parties to the injunction, but they were

14  Debtor employees until recently.  If they want to risk

15  violating that and come back to the Court and argue about

16  whether they got notice and whatnot of that, they can argue

17  that, but I want it in the order regardless.

18      So that is the ruling.  And now I want to kind of talk

19  about a few other things.  And before we're done here, Mr.

20  Morris, I'll ask do you have questions, does Mr. Bonds have

21  questions, does anyone have questions about the ruling.  But I

22  want to talk about a couple of things.  And again, I hope that

23  I'm coming through loud and clear, Mr. Bonds, in your office

24  for Mr. Dondero to hear this.  It's really, really important

25  that he heard what I'm about to say.  I'm going to say some

172

1    kind of unpleasant things and then I'm going to say some

2    hopeful things, okay?

3       Mr. Dondero?  Okay.  Mr. Dondero, I'm going to -- Mr.

4    Morris, you've got your hands on your head.  Did I miss

5    something?

6            MR. MORRIS:  No.  I was just surprised to see Mr.

7    Dondero on his phone.  I apologize, Your Honor.

8            THE COURT:  Oh, my goodness.  Were you on your phone,

9    Mr. Dondero?

10           MR. DONDERO:  No, I was not.

11           THE COURT:  Okay.  I want you to listen to this

12   really closely, and then I promise I'm going to have something

13   hopeful to say after this very unpleasant stuff.  You know, I

14   keep a whiteboard up at my bench.  I don't know if you can

15   read it.  But sometimes I hear something in a hearing and I

16   think, okay, this is one of my major takeaways from what I

17   heard today.  And I've got two, I've got two big takeaways

18   here.  Number one on my whiteboard is Dondero's spoliated

19   evidence.  Game-changer for all future litigation.  Okay.

20           MR. DONDERO:  I'm sorry.  I didn't hear that.  I

21   didn't hear that.  Could you repeat that, please?

22           THE COURT:  Mr. Dondero, spoliated evidence, game-

23   changer in future litigation.

24      Okay.  Let me tell you, the throwing away of the phone,

25   that was the worst thing I heard all day.  That was far and

1    away the worst thing I heard all today.  I don't know what I'm

2    going to hear down the road to fix this, but if it's really

3    gone, let me tell you how bad this is.  We have all sorts of

4    Federal Rules of Civil Procedure that talk about this being a

5    bad thing, but I wrote an opinion a couple years ago dealing

6    with spoliation of electronic evidence, and I think it might

7    be helpful for everyone to read.  It was called *In re Correra*,

8    C-O-R-R-E-R-A.  I have no idea what the cite on it is.  But in

9    this case, *Correra*, we had a debtor who had a laptop, and he

10   gave the laptop to his personal assistant, who took it away to

11   another state.  And at some point during the case, parties

12   discovered, oh, there's a laptop that may have a treasure

13   trove of information.  Who knows?  Maybe it does; maybe it

14   doesn't.  But there's a laptop that we just now learned about

15   that the personal assistant has.

16       And so I issued an order that she turn it over, and there

17   were subpoenas and depositions, blah, blah, blah.  Long story

18   short, the evidence ended up being that she deleted everything

19   on the laptop, and then -- this would almost be funny if it

20   wasn't so serious -- she downloaded thousands of pictures of

21   cats onto the laptop.  I kid you not, cats.  Meow, meow, cats.

22   And she downloaded a hundred-something full-length movies.

23   And we had two days of forensic experts come in and take the

24   witness stand and tell me about how, okay, this is like an

25   amateurish -- you've talked about amateur hour today -- this

174

1   is kind of an amateurish way of deleting data, right.  You

2   first delete all the files on the laptop and then you cover

3   over all the space to make sure the information is not

4   retrievable.  You know, this genius ended up retrieving some

5   of the information.

6       But the long story short is I sanctioned the debtor and

7   his assistant jointly and severally.  You'll have to go back

8   and look at the opinion.  I'm pretty sure it was over a

9   million dollars.  And I can't remember if that was attorneys'

10  fee-shifting only, or monetary, like penalty on top of the

11  attorneys' fees-shifting.  I just can't remember.  But maybe

12  poor Tara needs to be advised of that opinion, too.  I mean,

13  --

14      But the other reason I put game-changer in future

15  litigation is, in my *Correra* case, it wasn't just the monetary

16  million-dollar sanction or whatever it was; it was a game-

17  changer in future litigation because the adverse party to the

18  debtor ended up arguing -- and it was the state of New Mexico,

19  by the way -- they ended up saying, in all future litigation,

20  we want you -- some adversaries, we want you to make an

21  adverse inference.  In other words, for all of these elements

22  that we're trying to prove in our fraudulent transfer

23  litigation and whatever else was going on, we want you to make

24  an adverse inference that there would have been evidence there

25  on that laptop that would have supported some of our causes of

175

1  action and it was destroyed to keep us from having that

2  evidence.

3      And they brought forth all kinds of case law.  It's a hard

4  area.  It's a really, really hard area.  But I ended up --

5  again, it's not in the main opinion.  It was in subsequent

6  orders.  I ended up saying, yeah, I think you've met the

7  standard here to draw adverse inferences.

8      So, again, this is a very unpleasant message for me to

9  deliver today.  But the destruction of the phone is my biggest

10  takeaway of concern today, how that might have ramifications.

11  You know, there are other bad things, too, about that.  I'm

12  not even going to go there right now.  But the, you know,

13  Title 18, you can ask your lawyer what that means, but okay.

14      My second big takeaway before we get to the hopeful stuff

15  is -- and this is kind of harsh, what I'm about to say -- but

16  Ellington and Leventon maybe care more about you, Mr. Dondero,

17  than their law license.  You know, I guess it's great to have

18  people in your life who are very, very loyal to you.  I mean,

19  loyalty is a wonderful thing.  But I am just so worried about

20  things I've heard.  Again, the phone and in-house lawyers.

21  The biggest concerns in my brains right now.  I have worried

22  about them for a while.

23      You all will -- well, Mr. Dondero, you might not know

24  this.  But we had a hearing a few months ago, maybe September,

25  October, where the Creditors' Committee was trying to get

176

```
 1    discovery of documents.  And we had some sort of hearing,
 2    maybe a motion to compel production.  And we had many, many
 3    entities that you control file objections:  NexPoint, NexBank.
 4    I can't even remember.  We just had a whole slew.  CLO Holdco.
 5    Many, many of these entities objected.  And I was trying to
 6    figure out that day who was instructing them.  And oh my
 7    goodness, I hope the in-house layers are not involved in this
 8    document discovery dispute, because, you know, they have
 9    fiduciary duties.  And are -- you know, is it -- it feels like
10    it's breaching a duty to the bankruptcy estate when it's in
11    the bankruptcy estate's best interest to get these documents
12    if you're meanwhile hiring lawyers for these other entities,
13    Holdco, et cetera, and saying, Fight this.
14        I never really pressed it very hard back then, but I
15    raised the issue and I said, I'm really, really concerned
16    about this.  And I continue to be concerned about it.  I had
17    experiences with Mr. Ellington in the Acis case where he
18    testified on the witness stand, and later it looked a heck of
19    a lot like he might have committed perjury.  I hate to use
20    such blunt terms.  But I let it go.  I'm just like, you know,
21    I'm not going to -- you know, I'm going to just hope for the
22    best that he misspoke.
23        But I'm getting a really bad taste in my mouth about
24    Ellington and Leventon, and I hope that they will be careful
25    and you will be careful, Mr. Dondero, in future actions.
```

177

 1      Is Mr. -- I can't see Mr. Dondero.  I want to make sure
 2   he's not on the phone.  Okay.  Okay.  Thank you.
 3      So where was I going to head next?  I guess I want to say
 4   a couple of things now that I would describe as a little bit
 5   more hopeful, and that is pertaining to this whole pot plan
 6   thing.
 7      You know, I tend to think, without knowing what's being
 8   said outside the courtroom, that a pot plan would be the best
 9   of all worlds, okay, because the plan that we have set for
10   confirmation next week, I understand we have a lot of
11   objections, and if I approve it, if I confirm the plan, we're
12   going to have a lot of appeals and motions for stay pending
13   appeal, and no matter how that turns out, we're going to have
14   a lot of litigation.  Okay?  You know, we're going to have
15   adversaries.  And we have a not-very-workable situation here
16   where we have these Dondero-controlled affiliates questioning
17   Mr. Seery's every move.
18      I would love to have a pot plan that would involve, Mr.
19   Dondero, you getting to keep your baby, okay?  I acknowledge,
20   everyone here acknowledges, you are the founder of this
21   company.  This is your baby.  You created a multi-billion-
22   dollar empire, okay?  I would be shocked if you didn't want to
23   keep your baby.  Okay?  If there was a reasonable pot plan, I
24   would love it.
25      But I'm telling you, the numbers I heard didn't impress me

178

1    a heck of a lot.  I'm not an economic stakeholder.  It's not

2    my claim that would be getting paid.  But I can see where

3    these Creditor Committee members, they're not going to think

4    $160 million -- $90 million in cash, $70 million in notes, or

5    vive-versa -- is nearly enough.  Okay?

6        So I am going -- what just happened?  What just happened?

7    I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

8    almost.

9        Okay.  I am going to order that between now and the end of

10   the day Tuesday there be good-faith, and I'll say face-to-face

11   -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12   and his counsel and at least the Committee and its

13   professionals regarding this pot plan.

14       Now, the train is leaving the station next Wednesday,

15   okay?  If we don't have Creditors' Committee and Debtor and

16   Dondero rushing in here saying, Please continue the

17   confirmation hearing next Wednesday, if we don't have like

18   unanimous sentiment to do that, you know, this is a 15-month-

19   old case, I'm going to go forward with the plan that's on

20   file.

21       And it's been a long, expensive case.  I had great

22   mediators try to give it their best shot to get a grand

23   compromise.  I just, I'm not going to drag this out unless you

24   all tell me Wednesday morning, We want you to continue this a

25   week or two.

179

1        And let me tell you -- this may be the stars lining up, or

2   it may not be -- I was supposed to have a seven-day trial

3   starting the week after next, and then I was supposed to have

4   a four- or five-day day trial starting immediately after that.

5   And all of those lawyers came in and asked for a continuance

6   because of COVID.  They wanted a face-to-face trial, and so

7   I've put them off until April.

8        So if you wanted to postpone the confirmation hearing to

9   the following week or even the following week, I have the gift

10  of time to give you.  But I'm not going to do it lightly.

11  I'm, again, I'm just going to order face-to-face meetings.

12  And I said Dondero and his counsel and the Committee and its

13  professionals.  You know, if -- I'm not slighting the Debtor

14  here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15  Morris, I think I heard you say, that at this point it's the

16  Committee, it's the Committee's money, and I think that's the

17  starting place.  And if they want to join the Debtor in at the

18  beginning or midway through, you know, wonderful, but I think

19  it needs --

20            MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21  Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22  judge, but I did have something to say in my comments about a

23  continuance that we've talked about with the Committee and

24  some other developments in the case.

25            THE COURT:  Oh.

1          MR. POMERANTZ:  I'm happy to wait.  But it has -- it

2   has nothing to do with the comments you said, although, as I

3   think you've heard from me before, the Debtor has been a

4   supporter, a supporter of a pot plan.  Mr. Seery has done a

5   tremendous amount of work working with Mr. Dondero, working

6   with Mr. Lynn, to try to make that happen.  And if the

7   Committee is willing to engage in a pot plan, we would

8   definitely support that.  Because we do agree with Your Honor

9   that, absent a pot plan, we are looking at a lot of

10  litigation.

11       Some of the issues you're going to have to deal with at

12  the confirmation hearing if we do not have a peace-in-the-

13  valley settlement is exculpations, releases, moratoriums on

14  litigation, extensions of your January 9th order --

15          THE COURT:  Uh-huh.

16          MR. POMERANTZ:  -- with respect to pursuing certain

17  people.

18       So, we get it, and we've gotten it from the beginning.

19  And Mr. Seery, sometimes even at a fault, has been

20  singlehandedly focused on trying to get that done.  It's just

21  unfortunate where we are here.

22       But having said that, I wanted to first apprise the Court

23  of a recent major development in the case.  I'm pleased to

24  report that the Debtor and UBS have reached a settlement in

25  principle which will resolve all of UBS's claims against the

181

 1   estate, all of UBS's claims against Multi-Strat.  The parties

 2   are working on documentation.  The settlement is subject to

 3   internal approvals from UBS, but we've been led to believe

 4   those approvals will occur, and we would hope to file a Rule

 5   9019 motion in the near future.

 6       I'm sure Your Honor is quite pleased to hear that.  The

 7   UBS matters have taken a substantial amount of time.  And with

 8   the settlement of UBS's claims, the only material unresolved

 9   claim, unrelated to Mr. Dondero or the employees, are Mr.

10   Daugherty.  And Mr. Seery will continue to work with Mr.

11   Daugherty to try to settle that.

12           THE COURT:  Okay.

13           MR. POMERANTZ:  With respect to the scheduling, with

14   respect to the scheduling, Your Honor, there are three

15   significant matters on for hearing on the 13th.  The first is

16   the Debtor's motion to approve a settlement with HarbourVest,

17   which Mr. Dondero is contesting.  Depositions are being

18   conducted on Monday, and we anticipate an evidentiary hearing

19   in connection therewith.

20       The Debtors, as Mr. Morris indicated earlier on in the

21   hearing, have also filed a complaint and a motion for a

22   temporary restraining order against certain of the Advisors

23   and Funds owned and controlled by Mr. Dondero which relate to

24   the CLO management agreements for which Your Honor has heard a

25   lot of testimony today.  We also expect that TRO to be

182

1   contested and for the Court to have an evidentiary hearing.

2        And as Your Honor mentioned, the confirmation of the plan

3   was scheduled for Wednesday, and there were 15 objections.  I

4   would point out, Your Honor, all but four of which were Mr.

5   Dondero, his related entities that he owns or controls, and

6   employees or former employees.

7        The Court previously gave us time on the 13th and the

8   14th, I think anticipating that we would have a lot and it may

9   be necessary to go into two days.  However, Your Honor, those

10  two days are not going to be enough to deal with all the

11  issues that we have before Your Honor.

12        So what we suggest, and we've spoken to the Committee and

13  the Committee is supportive, that we continue confirmation to

14  a day around January 27th.  This will enable the Debtor to not

15  only -- and the Committee -- not only to take Your Honor up on

16  what you'd like to see accomplished in the next few days.  I'm

17  sure the Debtor is supportive and will be supportive, and we

18  hope the Committee will engage in good-faith negotiations, and

19  if there's a way to do a pot plan, we are all for it.  It'll

20  give time for that to happen.

21        But at the same time, and I think what you'll hear from

22  Mr. Clemente, that we're willing to give a continuance, we all

23  know that if there is not a settlement to be had, if there is

24  not a pot plan to be had, this case has to confirm, it has to

25  exit bankruptcy, and at least from the Debtor's perspective, a

183

1    lot of protections will have to be in place that basically

2    this has not just been a pit stop in Bankruptcy Court and we

3    return to the litigation ways that Highland is involved in.

4         So, Your Honor, we believe that the two evidentiary

5    hearings on for next week probably will fill up both days.  We

6    would suggest that the first day be the complaint and the TRO

7    against the Advisors and the Funds for the 13th, and the 14th

8    be the HarbourVest.

9         We also recognized as we were preparing for today, Your

10   Honor, looking ahead, that we thought it was not fair for us,

11   although we know Your Honor works tirelessly and as hard as

12   anyone on this hearing and that Your Honor would be prepared

13   for confirmation and would be prepared for each of those

14   trials, given the gravity of these issues, the extensive

15   pleadings, pleadings that you would get in confirmation on

16   Monday from the Debtor, that it made sense to continue the

17   hearing.

18        So, again, fully supportive of Your Honor's mandate to try

19   to see if we could work things out, fully supportive of a

20   continuance until the 27th, if that date works for Your Honor,

21   but we believe we do need to go ahead with the two matters

22   that are on for calendar next week.

23             MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24   May I be heard briefly?

25             THE COURT:  Oh my goodness.  Who do you represent,

184

1   Mr. Rukavina?

2       MR. RUKAVINA:  And I apologize -- Your Honor, I am

3   the new counsel who will be representing the Funds and

4   Advisors.  I will probably be taking the laboring oar at

5   confirmation.

6       I apologize I'm not wearing a suit and tie.  I did not

7   anticipate speaking right now.

8       I support -- to the extent that that's an oral motion for

9   continuance by Mr. Pomerantz, I certainly support that.  I

10  would suggest that the Court give us an understanding of that

11  today, because we do have depositions and discovery lined up

12  which we can then push if the hearing on confirmation is

13  pushed to the 27th.  And we have no problem going forward on

14  the other matters on the 13th.

15      So, I am co-counsel to K&L Gates, Your Honor, so whoever

16  the K&L Clients are, they're now my clients as well.  I just

17  wanted to be heard briefly that we support the recommendation

18  by Mr. Pomerantz and just urge that the Court give us finality

19  on that issue today so that we're not burning the midnight

20  oil, many sets of lawyers preparing for confirmation on the

21  13th.

22      Thank you for hearing me, Your Honor.

23      THE COURT:  All right.  So, just to be clear, the

24  proposal is that we go forward next Wednesday on the newest

25  request for a TRO with regard to -- is -- the CLO Funds and

185

 1   the Advisors.  I'm forgetting the exact names.  And then that

 2   would take likely the whole day, but whether it does or does

 3   not, we would roll over to Wednesday of next week -- that'd be

 4   the 14th -- to do the HarbourVest.  It's a compromise motion,

 5   right?  Is there anything else?

 6          MR. POMERANTZ:  No, correct, it's the compromise

 7   motion, Your Honor.  There are two pending objections on this

 8   and discovery scheduled for Monday.

 9          THE COURT:  All right.  Well, as far as --

10          MR. CLEMENTE:  Your Honor?

11          THE COURT:  Yes, who is that?

12          MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at

13   Sidley on behalf of the Committee.  I'm here, and I thought

14   maybe I'd offer just a couple of comments at this point, but

15   I'm happy to hold them.

16          THE COURT:  Well, --

17          MS. SMITH:  And Your Honor, this is Frances Smith.  I

18   would also like to be heard before you wrap up.

19          THE COURT:  Okay.  Well, I guess generally I want to

20   know, does anyone have any objection -- I can't imagine they

21   would -- but any objection to pushing confirmation out to

22   around the 27th?  I'm going to say that because I have an

23   issue middle of the day the 28th.  If we do it the 27th, I

24   could only go a day and a half, okay?  I have to go out of

25   town the evening of the 28th, and I would be out the 29th as

186

1   well.  That's Thursday and Friday.  So we'll talk about that.

2   But anyone, Mr. Clemente or anyone else, want to say anything

3   about continuing the confirmation?

4           MR. CLEMENTE:  Your Honor, it's Matt Clemente at

5   Sidley.  No, Your Honor, we're supportive of that schedule.

6       And Your Honor, just briefly, I heard my name discussed

7   quite a bit at this hearing as well as the Committee.  I'm not

8   going to get into it unless Your Honor would like me to, but

9   let me be very clear:  The committee has taken very seriously

10  the pot plan proposals that Mr. Dondero has presented, and

11  there's much more to the discussion other than what Mr. Lynn

12  suggested in his remarks.

13      So I'm not going to get into all that unless Your Honor

14  thinks it's necessary.  I think it's of no moment here.  But I

15  did want Your Honor to know that we have carefully considered

16  the pot plan proposals and have communicated a variety of

17  issues about that to Mr. Lynn and will continue to take the

18  direction of Your Honor and engage on a pot plan, Your Honor.

19  But I did not want there to be any suggestion that we did not

20  take it seriously and that there was much, much more

21  consideration and discussion about it than what was suggested.

22          THE COURT:  Uh-huh.

23          MR. CLEMENTE:  Thank you, Your Honor.

24          THE COURT:  All right.

25          MS. SMITH:  Your Honor, this is Frances Smith.

187

1          THE COURT:  Who do you represent, Ms. Smith?

2          MS. SMITH:  Your Honor, we were recently retained by

3     the four senior employees:  Tom Surgent, Frank Waterhouse,

4     Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

5     and I believe we have the Baker & McKenzie lawyers Deb

6     Dandeneau and Michelle Hartmann on the line.

7          Your Honor, we have listened to the whole hearing.  And I

8     was not going to make an appearance.  I was following your

9     instructions and listening carefully.  But Your Honor, I --

10    first of all, we hate to be before you for the first time in a

11    discovery dispute.  We did file a very limited objection to

12    the plan because of the disparate treatment of our clients,

13    which we are not arguing today, of course.  We received -- it

14    is our usual practice, Your Honor -- you've known me for a

15    long time -- to cooperate on having witnesses appear.  We got

16    -- we were notified very late Tuesday that the Debtor's

17    counsel would like two of our clients to appear.  We made what

18    we thought was a reasonable request for a copy of the

19    transcript from the deposition.  We were invited to the

20    deposition and then told we could not attend, or our clients

21    could not attend.  When we offered to make it lawyers-only,

22    they said no.  So we did not produce our clients without a

23    subpoena.

24         Our clients have not been evading service.  As far as we

25    know, they were each attempted service one time, late

188

1  Wednesday, when they were -- around dinnertime.  Mr. Leventon

2  was home all day today.  Didn't go any -- or yesterday.

3  Didn't go anywhere.  Was not served.  Wasn't served this

4  morning.  The same, as far as we know, with Mr. Ellenton.

5      Your Honor, on the order that you just entered, I am a

6  little unclear of where your findings of fact stopped.  First

7  of all, I do not think that you can enjoin Mr. Ellenton and

8  Mr. Leventon.  They are not parties to the adversary

9  proceeding.

10     You know, we did some very quick research.  There's a

11 Seventh Circuit case, a district court may not enjoin

12 nonparties who are not either acting in concert with an

13 enjoined party nor in the capacity of agents, employees,

14 officers of the enjoined party.  Mr. Ellington and Mr.

15 Leventon are not agents, employees, officers of Mr. Dondero.

16 So I think that, Your Honor, you cannot make that ruling.

17     Of course, you can rule that Mr. Dondero cannot talk to

18 Mr. Leventon and Mr. Ellington.  That might be a way to fix

19 that one part.  But as nonparties, I don't believe that you

20 can enjoin them.

21     Also, Your Honor, there was just no evidence against them

22 to support that.  Out of more than two dozen exhibits, there

23 was one mention of Mr. Leventon, where all he did was give Mr.

24 Dondero Matt Clemente's phone number.  And you yourself ruled,

25 Your Honor, that Mr. Dondero could speak with the Committee,

189

1   so that wouldn't even have been a violation of your orders.

2   There's three related to Mr. Ellington, but no evidence of

3   confidential information.

4        And, Your Honor, I'm very concerned about the comments

5   that you made about Mr. Ellington and perjury.  I just want to

6   make sure that it's clear on the record that those were not

7   findings of fact.  That did not -- there was no evidence about

8   that today.  And I understand Your Honor's frustration.  I was

9   -- but I just want to be very clear on the record that those

10  were not findings of fact that you were making during that

11  part of your comments.  I was a little unclear about where the

12  ruling exactly stopped when you said you wanted to add onto

13  the order and then you were going to make a few more comments.

14       So that's all I have, Your Honor.

15            THE COURT:  Okay.

16            MS. SMITH:  Thank you for listening and --

17            THE COURT:  Thank you.  Fair comments, one and all.

18  I'm first going to tweak.  I was concerned.  You heard me

19  express concern about, you know, Ellington and Leventon aren't

20  parties to this adversary.  Not here.  So here's -- Mr.

21  Morris, I assume you're the scrivener.  Let's change what I

22  said earlier and have the injunction read that Mr. Dondero

23  shall not request that Mr. Ellington or Mr. Leventon share any

24  confidential information they received as general counsel or

25  assistant general counsel for the Debtor without Debtor's

190

 1   counsel's explicit written permission, nor accept any

 2   confidential information that the two of them may have

 3   received as general counsel or assistant general counsel for

 4   the Debtor.  Okay?  So the injunction is --

 5          MR. MORRIS:  Your Honor, if I may, --

 6          THE COURT:  Who?

 7          MR. MORRIS:  Your Honor, if I may, that is not

 8   sufficient for us, because that means that they can actually

 9   share it with him as long as he doesn't request it.  I'm a

10   little surprised --

11          THE COURT:  No.  You didn't hear the accept -- the

12   last part.

13          MR. MORRIS:  Okay.

14          THE COURT:  I added on at the end, nor shall Mr.

15   Dondero accept any confidential information.  They -- he shall

16   not request that they share it, nor shall he accept it.  Okay?

17   I --

18          MR. MORRIS:  So, but that -- my concern is that that

19   makes Mr. Dondero the arbiter of what's confidential and

20   what's privileged.  And I think that's improper.  I think it's

21   really reasonable, and I'm surprised -- you know, we're all

22   advocates here, so I take no issue with counsel, but the order

23   was going to be pretty simple:  Don't disclose privileged or

24   confidential information.  If they don't like that, that's

25   fine.  Just bar Mr. Dondero from speaking to either one of

191

 1  them, period, full stop.  Because we should not be in a
 2  position where he doesn't request it but somehow they send it
 3  to him.  It is confidential.

 4     I mean, who's deciding what's confidential here?  Mr.
 5  Ellington?  Mr. Leventon?  Mr. Dondero?  Just stop their
 6  communication.  Mr. Dondero is subject to the Court's order.
 7  He's the one who's subject to this motion.  Bar him from
 8  speaking to either one of them.  It's a very -- very simple
 9  solution.

10        MR. BONDS:  Your Honor, I agree that it's a simple
11  solution.  It's, I mean, not correct to assume that Mr.
12  Dondero is in any way going to breach his obligations to the
13  Court or to Mr. Ellington and Mr. Leventon.  I don't see where
14  -- what we're talking about.

15        MS. SMITH:  Also, Your Honor, I have to object to him
16  disparaging my clients that way.  There's been no evidence
17  that they improperly shared any information.  They are
18  licensed lawyers and they know the Rules of Professional --
19  they know the rules of professionalism, so --

20        THE COURT:  Okay.  I, you know, I didn't make a
21  finding earlier when I held out my two giant takeaways, to get
22  to your later question, no findings.  But I really hope you
23  share with them everything I said, the concerns I expressed.
24  Maybe get the transcript.

25        MS. SMITH:  Absolutely, Your Honor.

192

```
 1          THE COURT:  Because I have huge concerns about
 2   conflicts of interest here.  Okay?  Huge, huge concerns.  I
 3   had them back when we had the discovery fight, Committee
 4   wanting documents, and, you know, and I still have them.  You
 5   know, did Ellington know about the TRO?
 6          MS. SMITH:  Understood, Your Honor.
 7          THE COURT:  Okay.  So let me backtrack.  We already
 8   had a TRO that prevented Mr. Dondero from talking to any
 9   employees of the Debtor unless it was about shared services
10   agreement.
11      So, Mr. Bonds, I'm going to flip it back to you on this
12   one.  Why shouldn't I at this point just say, okay, guess
13   what, no talking to Mr. Leventon or Ellington for the time
14   being?  Why --
15          MR. BONDS:  First of all, --
16          MS. SMITH:  Your Honor, that's acceptable to us.
17          THE COURT:  Okay.  What's wrong with that, Mr. Bonds?
18          MR. BONDS:  Your Honor, we don't believe that Mr.
19   Dondero has violated the TRO.
20      And secondly and more importantly, we don't believe that
21   there's any way that you can enter an order that singles out
22   two former employees.  I mean, that's bizarre.
23          THE COURT:  If I'm concerned that it's thwarting the
24   reorganization efforts and there are conflicts of interest
25   here, why can't I?
```

193

1       You know, this is -- I hate to say it, but I feel like

2    I've been in the role of a divorce judge today.  We have very

3    much a corporate divorce that has been in the works, unless we

4    get this pot plan on track, okay, and I'm a judge having to

5    enter interim orders keeping one spouse away from the other,

6    keeping one spouse out of the house, keeping one spouse away

7    from the kids.  It's not pleasant at all.  But I don't -- the

8    more I think about it, the more I have authority to do it just

9    to protect, to protect the nest egg here.

10          MS. SMITH:  Your Honor, we are perfectly fine with

11   you enjoining Mr. Dondero from speaking to our clients, and we

12   will convey that to our clients.

13          THE COURT:  Okay.  Mr. Bonds, I can't hear you.

14          MR. BONDS:  I'm sorry, Your Honor.  What evidence is

15   there of irreparable harm as to Mr. Dondero talking with

16   either Mr. Leventon or Mr. Ellington?

17          THE COURT:  Okay.  Do I need to parse through the

18   communications I saw?  Do I need to parse-

19          MR. BONDS:  Yeah, I think so.  I mean, I don't

20   understand.

21          THE COURT:  Okay.  I never authorized Mr. Ellington

22   to be the settlement lawyer or whatever, okay?  I never would

23   have, okay?  And maybe Mr. Seery, you know, said something to

24   -- early on in the case to make him think he had that

25   authority, but no, we're done.  Okay?  And I feel like it's

194

1    causing more harm than good right now.  Okay?

2        I don't know who instructed all of these Dondero-

3    controlled entities to hire lawyers.  I don't know if

4    Ellington and Leventon have been giving instructions to these

5    entities.  But we've got conflicts everywhere now.  Okay?

6    We've got -- and by the way, I'm just going to list them now.

7    We have, of course, Bonds Ellis representing Dondero.  We have

8    Doug Draper, Heller Draper, now representing these trusts, Get

9    Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10   now Munsch Hardt also representing the Advisors, NexPoint and

11   the various CLO or other Funds.  We have CLO Holdco

12   represented by Kane Russell Coleman Logan.  We have NexPoint

13   Real Estate represented by Wick Phillips.  Who have I left --

14   and, of course, the employees, Baker & McKenzie and Ms. Smith.

15   We have Spencer Fane in there for other current or former

16   employees.  We have Loewinsohn Flegle in there for certain

17   former or current employees.

18       I mean, the proliferation of lawyers.  And again, I don't

19   know if Mr. Ellington and Mr. Leventon have had a role in

20   hiring counsel, wearing their hat for these other entities or

21   not.  Can anyone tell me?  Maybe I'm worried about something I

22   shouldn't be worried about.

23           MR. DONDERO:  You're worried about something you

24   shouldn't worry about, Your Honor.

25           THE COURT:  Okay.  So Ellington --

195

```
 1          MR. MORRIS:  Your Honor, I would just point to the

 2    evidence that's in the record, Your Honor.  You have Mr.

 3    Dondero asking Mr. Ellington to show leadership in

 4    coordinating all of the lawyers you just mentioned.  It's in

 5    the record.

 6          THE COURT:  Yes.  I'm just going to, until otherwise

 7    ordered, no conversations between Dondero and Ellington and

 8    Leventon, and that's just going to be my ruling until further

 9    order.  That's what I feel best about.

10       Now, let me ask you, knowing that I could only give you a

11    half a day on the 28th of January, if we start the

12    confirmation hearing on whatever the plan looks like on

13    January 27th, I mean, do people want to go with that, --

14          MR. POMERANTZ:  Your --

15          THE COURT:  -- even knowing we might not finish that

16    day, or no?

17          MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18    Maybe if we could start on the 26th, have the 26th, 27th, and

19    then maybe half of the 28th.  I would think two and a half

20    days should be enough, notwithstanding the volume of

21    objections, because I think you'll find that, while there may

22    be some evidence, I think the majority of the objections are

23    really legal in nature.

24          THE COURT:  All right.  Traci, are you out there in

25    video-land?
```

196

1             THE CLERK:  Yes, I'm here.

2             THE COURT:  Okay.  Have I overcommitted the 26th?  If

3   we start the 26th at 9:30 in the morning, can we do that?  Or

4   --

5             MR. BONDS:  Your Honor?

6             THE CLERK:  That'd be fine.

7             THE COURT:  Okay.

8             THE CLERK:  Just remember that you have an

9   appointment at lunchtime that day at noon on the 26th.

10            THE COURT:  Okay.  I --

11            THE CLERK:  You don't have any court hearings.

12            THE COURT:  Okay.

13            MR. BONDS:  Your Honor, I'm sorry.

14            THE COURT:  Go ahead.

15            MR. BONDS:  Your Honor, I'm sorry.  This is John

16  Bonds.  I have a hearing on the 26th that I can't miss.

17            THE COURT:  Well, can someone else --

18            MR. POMERANTZ:  Your Honor, we would request, right,

19  that Mr. Lynn lead the confirmation hearing.  There's a lot of

20  lawyers.  If we try to look at everyone's calendar, we're

21  never going to be able --

22            THE COURT:  Yes.

23            MR. POMERANTZ:  -- to get something that's good for

24  everyone.

25            THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink

197

1  can handle it, Mr. Bonds.

2      So we're going to start the 26th at 9:30.  We'll go all

3  day, except I have something at lunchtime, apparently.  And

4  then we'll go all day on the 27th, and then I can give you

5  half a day on the 28th.

6      So you'll upload immediately a notice to that effect, Mr.

7  Pomerantz.

8          MR. POMERANTZ:  Yes, we would.

9      Your Honor, in terms of our documents in support of

10  confirmation, we want to make it convenient with the Court.

11  We know your Court would at least need one business day, so we

12  would prefer to file, say, by 2:00 Central on the 24th, on a

13  Sunday.  Everyone will have it, and have one business day.  I

14  mean, the old order only had one business day in advance as

15  well.  So that's what we would propose for our confirmation

16  documents to be filed.

17          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

18  An important issue here is how the creditors have voted, and I

19  have no idea how they have voted.  The voting deadline has

20  expired.  So I have no problem with what Mr. Pomerantz

21  suggests, but I do think that the Debtor should file its

22  tabulation of votes sooner rather than later so we all know

23  one of the central elements for the hearing that we'll have.

24          THE COURT:  Okay.

25          MR. POMERANTZ:  That's fair, Your Honor.  We're

198

```
 1    prepared to file the summary of voting and tabulation by the
 2    15th of January.
 3             THE COURT:  Okay.  Very good.
 4        So, backing up, Mr. Pomerantz, you asked that I approve
 5    you filing any plan modifications by noon on Sunday, the 24th?
 6    Is that what you said?
 7             MR. POMERANTZ:  Yeah.  So, there's a couple of
 8    things.  There's our confirmation brief.
 9             THE COURT:  Uh-huh.
10             MR. POMERANTZ:  There is our -- any evidence we would
11    submit, although I suspect we are likely to provide live
12    testimony, as opposed to a declaration.  There was our summary
13    of ballots, which we will now do on the 15th.  And to the
14    extent we have any modifications, we would provide them on
15    Sunday by 12:00 noon Central time as well.  Yes.
16             THE COURT:  All right.
17             MR. RUKAVINA:  Well, Your Honor, this is Davor
18    Rukavina.  Does that mean the witness and exhibit lists also
19    will not be due until Sunday at noon?  Because I would request
20    that we have the normal period of time to exchange exhibits
21    and witnesses.
22             MR. BONDS:  Your Honor, I think that the normal time
23    period is also important in this case.
24             THE COURT:  Okay.  I'm going to --
25             MR. POMERANTZ:  Your Honor, we could -- if everyone
```

199

 1  agrees on witness lists, we could do those by 5:00 p.m.

 2  Central on the 22nd.

 3           THE COURT:  Okay.  Let's do that.  Okay.

 4           MR. POMERANTZ:  But that -- but that needs to be for

 5  everybody.

 6           THE COURT:  Oh, it will be for everyone.

 7           MR. RUKAVINA:  Your Honor, no problem.

 8           THE COURT:  Okay.  Let's --

 9           MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10           THE COURT:  No more discussions.  That'll be the

11  ruling, okay?  Everything is going to be due by 5:00 p.m.

12  Central time on Friday, the 22nd.  All right.

13           MR. POMERANTZ:  Your Honor, is that our brief as

14  well, or --

15           THE COURT:  Yes.

16           MR. POMERANTZ:  -- was that just the witness list?

17           THE COURT:  Everything.  Brief, witness list, and --

18           MR. POMERANTZ:  Okay.

19           THE COURT:  -- plan mods.

20     Let me look through my notes and see if there's anything

21  else I want to say.  You know, let me do some quick math here.

22  I know there was one other thing I wanted to say that involves

23  math.  Okay.  I think my math is right here.  Okay.  You know,

24  I mentioned the proliferation of lawyers.  And let me just say

25  this.  We had -- we've had about 90 people on the -- showing

200

1    up on the video screen today -- 89, 90, 91, 92.  A few, a
2    little over 90.  Okay?  So let's say 90.  It's been up to 95
3    earlier.  But let's pretend that 60 of those are lawyers
4    billing by the hour.  That's very conservative.  Probably many
5    more than 60.  And let's assume conservatively that the
6    average billing rate is $700 an hour.  That's probably very
7    low, right?  We probably don't have many baby lawyers on the
8    phone.  So that's a very low average.  So, 60 lawyers times
9    $700 an hour, $42,000 an hour this hearing has cost.  And then
10   we've been going over seven hours.  So let's say seven,
11   conservatively, times $42,000.  This hearing has cost $294,000
12   today.  A preliminary injunction hearing.  I mean, no one
13   thinks that's chump change.  I don't know, maybe some people
14   do.  This just seems like a ridiculous way to spend resources.
15   No offense to all the wonderful lawyers, but this is just --
16   it's crazy-town, right?  It is crazy-town.  So I implore you,
17   okay, how about I use that word, I implore you to have these
18   good-faith discussions on a pot plan.
19       Please, Mr. Dondero, I mean, don't waste people's time.
20   $160 million, I know that's not going to cut it.  Okay?  So
21   it's going to have to be more meaningful.  I just know that in
22   my gut.
23       But having said that, I mean, I honestly mean I think a
24   pot plan -- I think you getting your baby back is the best
25   thing for everyone.  Okay?  I think it's the best thing for

201

1    everyone.  So I want you all to --

2              MR. DONDERO:  Judge, I -- Judge, I just need to

3    interject for a second, because no one follows the big

4    picture.  We filed for bankruptcy with $450 million of assets.

5    $360 million of third-party net assets, $90 million of

6    affiliated notes.  The third-party assets are down to $130

7    million and falling fast.

8              MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9    Dondero, but that is not the purpose of this hearing.

10             THE COURT:  Well, --

11             MR. POMERANTZ:  Mr. Dondero's statement of the assets

12   and value is just not something that the Debtors would agree

13   and support.  I'm sure it's not something the creditors -- I

14   think we understand what Your Honor is saying.  I think the

15   Committee understands.  And Your Honor knows that the Debtor

16   and the Committee are close to the asset values.  And Mr.

17   Dondero should be making his argument to the Debtor and the

18   Committee, not Your Honor, in this open forum.

19             THE COURT:  Okay.

20             MR. POMERANTZ:  It's just not appropriate.

21             THE COURT:  And I understand where you're both coming

22   from.  And he's saying that because I made the comment I made

23   about $160 million not being enough.

24        I've seen the evidence.  I've heard the evidence at prior

25   hearings, Mr. Dondero.  We've had a lot of hearings.  And I

202

1   remember writing that down.  Wow, why did that happen?  Seeing

2   the dissipation of value.  I couldn't remember the exact

3   numbers, but I thought it was like $500 million something and

4   then $300 million or whatever.  And I remember Multi-Strat,

5   that being sold, and blah, blah, blah, blah.

6       But having said that, there are a lot of causes of action

7   that have been hinted at by the Creditors' Committee and

8   others.  So, causes of action is one of the things they are

9   looking at when they start thinking about what's appropriate

10  value.

11      So I just, I get where everyone is coming from.  I get

12  where everyone is coming from.  But, again, let's take one

13  more stab at this, please.  Okay?

14          MR. POMERANTZ:  Yeah.  And Your Honor, my last

15  comment.  We're commercial people.  The creditors are

16  commercial people.  I think we've done a tremendous job in

17  being able to resolve most every one of the significant

18  claims.  I think the Court should trust the process.  Mr.

19  Dondero should trust the process.

20      And again, if there's a commercial deal to be worked out,

21  I don't think there's anyone more than of course the Debtor

22  and the people on the Committee, who have been litigating in

23  many cases with Mr. Dondero and Highland for ten years, I

24  don't think it's anyone's desire.  So if there's a reasonable,

25  rational proposal that the creditors can get behind and want

203

 1  to engage, then there'll be a discussion.  If they don't

 2  believe it's a reasonable, rational proposal, they won't.

 3          THE COURT:  Yes.  All right.  Well, I do feel very

 4  good about what I've heard about the UBS issues being worked

 5  out.  I mean, we have come a long way in 15 months, even

 6  though it's frustrating to me and others.  But, again, I know

 7  you all are going to do what you need to do.  And I'll look

 8  for the form of order.  I'm going to see you all, Mr. Dondero,

 9  including you, next Wednesday.  And if there's nothing else,

10  we stand adjourned.

11          MS. SMITH:  Your Honor, I'd like to review the form

12  of order as it regards my clients before it's submitted.

13          THE COURT:  Okay.

14          MS. SMITH:  If I could have a courtesy copy, please.

15          THE COURT:  Yes.  Well, yes.  I'm not going to

16  require 90 lawyers to get the order, but I will ask Mr.

17  Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18  obviously Mr. Dondero's counsel gets it.  And I probably won't

19  get it until Monday, it sounds like, but --

20          MR. POMERANTZ:  That's likely.

21          THE COURT:  But I'll be on the lookout for it.  Okay.

22  Thank you.  We stand adjourned.

23          MS. SMITH:  Thank you, Your Honor.

24          THE CLERK:  All rise.

25          MR. MORRIS:  Thank you, Your Honor.

204

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 4:09 p.m.)

3                     --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                  CERTIFICATE

19     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
20 above-entitled matter.

21   **/s/ Kathy Rehling**                    **01/11/2021**

22 _____        _____
   Kathy Rehling, CETD-444                    Date
23 Certified Electronic Court Transcriber

24

25

205

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                               5

WITNESSES

Plaintiff's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                          19
- Cross-Examination by Mr. Bonds                           106
- Redirect Examination by Mr. Morris                       139

EXHIBITS

Plaintiff's Exhibits A through Y              Received 38

CLOSING ARGUMENTS

- By Mr. Morris                                           152
- By Mr. Lynn                                             155
- By Mr. Bonds                                            159

RULINGS                                               163/189

END OF PROCEEDINGS                                        204

INDEX                                                     205

# EXHIBIT 32

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/29/26 of 87   Page 1301 of 1539   PageID 18539
Exhibit 32 Page 2 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 1 of 86

Docket #0050  Date Filed: 5/25/2021

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |
| ─────────────────────────────── | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) |
| | ) PLAINTIFF'S MOTION for |
| Plaintiff, | ) CONTINUANCE |
| | ) |
| v. | ) |
| | ) |
| CLO HOLDCO, LTD., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| ─────────────────────────────── | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
| Plaintiff, | ) |
| | ) DEFENDANT DONDERO'S MOTION |
| v. | ) to COMPEL DISCOVERY, the |
| | ) TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) SEERY, JR. |
| | ) |
| Defendant. | ) May 20, 2021 |
| | ) Dallas, Texas (Via WebEx) |
| ─────────────────────────────── | ) |

Appearances in 21-03003:

| | |
|---|---|
| For Plaintiff Highland Capital Management, | John A. Morris Pachulski Stang Ziehl & Jones LLP 10100 Santa Monica Boulevard, 13th Floor Los Angeles, California  90067 |
| For Defendant-Movant James Dondero: | Michael P. Aigen Stinson, L.L.P. 3102 Oak Lawn Avenue, Suite 777 Dallas, Texas  75219 |
| | Bryan C. Assink Bonds Ellis Eppich Schafer Jones LLP 420 Throckmorton Street, Suite 1000 Forth Worth, Texas  76102 |

Appearances continued on next page.

1934054210525000000000006

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35-1 Filed 12/29/23   Page 1302 of 1539   PageID 18540
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 2 of 86

2

<u>Appearances in 20-3195</u>:

| | |
|---|---|
| For the Official<br>Committee of<br>Unsecured Creditors: | Paige Holden Montgomery<br>Sidley Austin LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas  75201 |
| | Matthew A. Clemente<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois  60603 |
| For Defendants<br>Highland Dallas<br>Foundation and<br>CLO Holdco Ltd.: | Louis M. Phillips<br>Kelly Hart & Pitre<br>301 Main Street, Suite 1600<br>Baton Rouge, Louisiana  70801 |
| | Amelia L. Hurt<br>Kelly Hart & Pitre<br>400 Poydras Street, Suite 1812<br>New Orleans, Louisiana  70130 |
| For Defendants The<br>Dugaboy Investment<br>Trust and The Get<br>Good Nonexempt Trust: | Douglas S. Draper<br>Heller, Draper, Patrick & Horn, L.L.C.<br>650 Poydras Street, Suite 2500<br>New Orleans, Louisiana  70130-6103 |
| For Grant James:<br>Scott, III: | John J. Kane<br>Kane Russell Coleman Logan<br>Bank of America Plaza<br>901 Main Street, Suite 5200<br>Dallas, Texas  75202 |
| For UBS Securities<br>LLC: | Andrew Clubok<br>Latham & Watkins, LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, D.C.  20004-1304 |
| For Scott Ellington,<br>Jean Paul Sevilla,<br>Isaac Leventon, and<br>others: | Frances Smith<br>Ross & Smith, PC<br>Plaza of the Americas<br>700 North Pearl Street, Suite 1610<br>Dallas, Texas  75201 |
| Digital Court<br>Reporter: | United States Bankruptcy Court<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic<br>Transcriber: | Susan Palmer<br>Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 82   Filed 12/29/26 of 87   Page 1303 of 1539   PageID 18541
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 3 of 86

3

I N D E X

Adversary Proceeding 21-3003,
 Defendant Dondero's Motion to Compel:      page   5
      The Ruling of the Court:              page  33


Adversary Proceeding 20-3195:
      Committee's Motion for Continuance:   page  35
      The Ruling of the Court:              page  78


      Witnesses:
                        Direct    Cross   Redirect   Recross

      Marc Kirschner
       Declaration:        61
       By Mr. Phillips:              62
       By Ms. Montgomery:                      65



      Exhibits Received in Evidence:

          Defendants' 1 - 6:                 page  70

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 32    Exhibit 32 Filed Page 952 of 87 Page 1304 of 1539    PageID 18542
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 4 of 86

*Adversary 21-3003, Motion to Compel Discovery*                4

1    Thursday, May 20, 2021                    9:40 o'clock a.m.

2              P R O C E E D I N G S

3         THE COURT:  — settings in Highland Capital adversary

4    proceedings.

5         Before I start with that, I want to let anyone who is

6    on the line for a different case, RE Palm Springs II, LLC, that

7    the hearing we had on that matter was continued.  Certain of the

8    parties filed an agreed motion to continue, and so I continued

9    that to June 9th at 9:30.  So to the extent you are on the line

10   only for the Palm Springs matter, that matter is not going

11   forward today.

12        All right.  So turning to Highland, I will start with

13   the first-filed emergency motion.  It was in Highland versus

14   Dondero, Adversary 21-3003.  Counsel for Dondero filed a motion

15   to compel testimony of James Seery.  So who do we have appearing

16   for Mr. Dondero this morning?

17        All right.  So —

18        MR. [SPEAKER]:  I think he's on mute, Your Honor.

19        THE COURT:  Sir, you are on mute.  Try again.

20        MR. AIGEN:  Ah, I apologize, Your Honor.  Is this

21   better?

22        THE COURT:  Yes.

23        MR. AIGEN:  Okay.  Good morning, Your Honor.  Michael

24   Aigen from Stinson, representing Mr. Dondero.  I apologize for

25   that.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 32   Filed 12/29/23   Page 1305 of 1539   PageID 18543
Exhibit 32   Page 6 of 87
Case 21-03003-sgj   Doc 50   Filed 05/25/21   Entered 05/25/21 12:59:11   Page 5 of 86

*Adversary 21-3003, Motion to Compel Discovery*                      5

1          THE COURT:  All right.  So you are now co-counsel with

2     Bond Ellis, perceive?

3          MR. AIGEN:  That is correct.  The lead counsel from

4     our firm is Ms. Deborah Deitsch-Perez.  She unfortunately has

5     medical emergencies going on with her family and is

6     unfortunately unable to be here for this hearing.

7          THE COURT:  All right.  Thank you.

8          For Highland, who do we have appearing on this matter?

9          MR. MORRIS:  Good morning, Your Honor.  It's John

10    Morris From Pachulski Stang Ziehl and Jones for the debtor.

11         THE COURT:  All right.  Thank you.  I presume those

12    are the only appearances on this discovery dispute.

13         MR. AIGEN:  That's correct.

14         THE COURT:  All right.  Well, Ms. — Mr. Aigen, you're,

15    I guess, new on the scene in the Highland matters.  And let me

16    just tell you I've read all the pleadings.  So I am aware that

17    of our numerous adversary proceedings, this is the one only

18    involving Dondero as a defendant and only involving three notes.

19    So, to help you find your argument, I'm going to say this.  I

20    remember when I was in law school — here comes a story — one of

21    our law professors said a suit on a note is the simplest kind of

22    lawsuit there is.  And probably when you are a young lawyer and

23    if you go to a civil business practice type law firm, this is

24    probably where you're going to get your feet wet.

25              And so, with that in my brain and having read the

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 35 Filed 12/29/22   Page 1306 of 1539   PageID 18544
Exhibit 32  Page 7 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 6 of 86

*Adversary 21-3003, Motion to Compel Discovery*                                            6

1   pleadings, I'm asking:  Why is this going to be complicated

2   where we need extensive discovery from the CRO/CEO who came on

3   the scene post bankruptcy two plus years after the notes?

4          So that's what's in my brain having read the

5   pleadings.  And so convince me why I'm totally misreading the

6   situation.

7          MR. AIGEN:  Thank you, Your Honor.  I appreciate that.

8   One thing I want to make sure we understand is this is we're

9   seeking to compel deposition testimony for Mr. Seery in his

10  corporate rep capacity.  We're not specifically asking for Mr.

11  Seery.  We sent corporate rep depo topics over.  They told us

12  Mr. Seery would be the corporate rep but they objected to

13  certain topics, as is their right.  The specific topics, as you

14  know, we're seeking discovery on, there's Numbers 9, 14 through

15  17 go together, Number 20.  In that sense what we're seeking

16  discovery on is a defense that we have asserted in this

17  proceeding that's currently pending.

18         As I'm sure you know from reading the pleadings, one

19  of Mr. Dondero's defenses is that there was a subsequent oral

20  agreement that the home would be discharged based upon certain

21  conditions being met.  Highland, as is their right, believes

22  that this oral agreement never happened.  And, as a result, it

23  contends that the defense has no merit.  In their motion, I

24  think it was, or in their response, paragraph 4, they

25  specifically say that this defense has no basis in fact.  That's

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35-1 Filed 12/29/23 Page 1307 of 1539   PageID 18545
Exhibit 32 Page 8 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 7 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    7

1  their right.  The problem, however, is just taking this

2  position, based on this position they're also saying, well, we

3  don't get discovery on this event.

4        And although we're talking about six different

5  requests, it really comes down to three different areas, and

6  I'll jump into those and explain each one.  The first one, which

7  I think is the most straightforward, is topic nine, which asks

8  for testimony regarding Mr. Dondero's defenses.  Initially we

9  got a response saying that the objection wasn't relevant and

10 then they filed a response.  And I think they realized that

11 might not have made a lot of sense saying it wasn't relevant, so

12 they said it was vague or invalid.

13        Counsel's well aware, as you are, what are defenses in

14 this case.  They served discovery on these defenses.  We

15 responded.  They never complained that they're inadequate.  They

16 know that our defense, at least one of them, is there had been

17 oral agreement on the loan, that it would be forgiven if certain

18 conditions occur, and that's what we want to take discovery on.

19        I'm confident counsel has interviewed Highland

20 employees to see who knows anything about this agreement.  I'm

21 sure it's very possible that no one knows anything about this

22 agreement, and that's fine.  But we certainly have a right to

23 ask the corporate rep about this and find out if anyone's going

24 to talk about this oral agreement at trial.  This isn't

25 burdensome discovery —

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35-32   Filed 12/09/24   Page 1308 of 1539   PageID 18546
Exhibit 32   Page 9 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 8 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    8

1      THE COURT:  Can I — can I — let me ask a question

2   right there.  The defense is based on an oral agreement.  I mean

3   your client is the payee on the notes — excuse me — excuse me —

4   the maker.  It's easy to get confused here.  He's the maker on

5   the notes, but he was the CEO of the payee on the notes.  So

6   this is not Bank of America makes a loan to Joe, the plumber,

7   or, you know, I mean this is — he's on both sides of the

8   transaction.  So he knows who the oral agreement was made with,

9   right?

10      MR. AIGEN:  Correct, Your Honor.

11      THE COURT:  So, again, I'm trying to understand —

12      MR. AIGEN:  May I follow up —

13      THE COURT:  — the depth of the discovery needed.

14   Presumably, I think I read in here, that you're deposing — or I

15   don't know if it's agreed or not — you're deposing various other

16   Highland former employees.  But — but I don't understand why the

17   current CEO that was not around before the bankruptcy would have

18   any personal knowledge about oral agreements.  I mean this would

19   all be in Mr. Dondero's head, right?

20      MR. AIGEN:  Your Honor, I absolutely agree.  And there

21   are, I guess, two parts to that answer.  One is we aren't taking

22   other Highland employees' depositions.  We've asked for them,

23   and they have refused to give them to us and said they're

24   irrelevant.  We're trying to work that issue out.  And we may

25   get one of their depositions.  If they go give us one for a

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/08/23   Page 1309 of 1539   PageID 18547
Exhibit 32 Page 9 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 9 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    9

1    couple hours and drop off, but this is — right now this is the

2    only discovery we're getting.  Their doc requests, they're not

3    going to give us any documents related to these topics.  So this

4    is our chance to get discovery on it.

5           As to his personal knowledge, he's their corporate

6    rep.  As a corporate rep, he can go figure out what other people

7    know.  But they're going to put someone on the stand — and I

8    think it's important, Your Honor, obviously they're going to

9    make a defense in this case — or, sorry — which stops our

10   defense with legal arguments saying even if this oral agreement

11   occurred and took place, it's not legally enforceable.  I

12   understand.

13          THE COURT:  Yeah, and what about —

14          MR. AIGEN:  I mean this is —

15          THE COURT:  — what about that?  What about that?  I

16   mean it's hard not to separate the need for discovery from that,

17   so what about that?

18          MR. AIGEN:  Well, your — yeah.  No, that's — if they

19   file a summary judgment on a legal issue, then we will address

20   that in our summary judgment legal issue, but right now we have

21   a pending defense.  And, Your Honor, one of their responses to

22   our defense, as they put in their response in paragraph 4, they

23   specifically state that this oral agreement never occurred.  So

24   I need to know how they know that, who are they going to put on

25   the stand.  I don't know which people are saying that.  So we

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 32   Exhibit 32   Filed 09/13/23   Page 9 of 87   Page 1310 of 1539   PageID 18548
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 10 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    10

1    ask for — to put it down into corporate rep topic.  They could

2    have given us anyone.  They decided to give us Mr. Seery.  But,

3    yes, he may not have personal knowledge, but that's who they

4    chose for their corporate rep to testify on this topic.

5           He's the only one I'm able to get this information

6    from.  And he may come up and say no one knows anything about

7    that.  That's fine.  But they have already said:  We're taking

8    the position that this oral agreement never occurred.  I don't

9    know how they know that, I don't know who they're going to put

10   on the stand, but they are taking a factual position on that.

11   So we should have a right to take discovery on it.  Whether they

12   don't think this is a legally-valid defense, well, that's fine,

13   they could have moved for summary judgment on day one.  They

14   didn't.  As of now, this defense is still pending.

15          We have less than two months until trial.  I don't

16   know when the summary judgment's going to come, so there's not

17   going to be a chance to wait until the legal aspects of these

18   defenses are heard and then take discovery.  This is our one

19   opportunity to do it.

20          THE COURT:  Okay.  So this is topic number nine.  And

21   you say why not, let us ask a few questions, it may be five

22   minutes of questioning if he doesn't really know anything.  Is

23   that a summary of your position?

24          MR. AIGEN:  Well, yeah, he may not know anything and

25   they may not know anything, or they may, yes.  I don't know how

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-1   Filed 09/23   Page 1311 of 1539    PageID 18549
Exhibit 32 Page 29 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 11 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    11

1    much time it's going to take.  The fact that they put in writing

2    that this agreement never occurred makes me think that someone

3    must know something, but I don't know.  It could be on that.

4    that —

5            THE COURT:  All right.

6            MR. AIGEN:  — it's certainly possible, Your Honor.

7            THE COURT:  All right.

8            MR. AIGEN:  That — and then the second topic or

9    second, I guess, group is 14 through 17 where we ask about

10   information about loans made by Highland or the debtor that were

11   particular to other people.  And the reason these requests are

12   relevant is, once again, — well, not once again — but it's our

13   position that Highland commonly entered into these types of

14   agreements.  They're saying:  Hey, this never happened, this

15   agreement didn't take place.

16           So the fact that Highland entered into other similar

17   type loan agreements with similar type business group

18   provisions, although maybe not dispositive, it certainly leads

19   to evidence that this agreement did in fact take place in the

20   situation where they're telling you and putting a pleading and

21   writing in the pleading, hey, this never — this agreement never

22   took place.  So this is relevant —

23           THE COURT:  So — so — so —

24           MR. AIGEN:  — and, like I said, —

25           THE COURT:  — on topics 14 through 17 you're saying

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/23 of 87   Page 1312 of 1539   PageID 18550
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 12 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    12

1    it's relevant if loans were made to other employees or officers

2    besides Mr. Dondero and it's relevant if those loans were

3    forgiven or not as to these three notes?

4         MR. AIGEN:  Correct, Your Honor.  Because they are

5    challenging that this agreement took place, for the —

6         THE COURT:  Well, —

7         MR. AIGEN:  — fact that other similar —

8         THE COURT:  — what if they did do this with another

9    employee, why is that relevant these three notes?

10        MR. AIGEN:  Well, because they're challenging that our

11   oral agreement took place.  The fact that oral agreements like

12   this were routine at Highland would make it more believable and

13   factual that our agreement took place, in light of their

14   challenge to the fact that the agreement took place.

15        Like I said, if they were just making legal challenges

16   to whether the agreement is enforceable, that would be one

17   thing.  So instead they're also taking the position, hey, we

18   don't think this actually took place.  So all — if Highland

19   routinely entered into agreements like this for other employees,

20   like I said, I understand that wouldn't be dispositive, but that

21   would tend to show that this pattern and practice of Highland

22   did include oral agreements like this.

23        THE COURT:  Okay.  I don't mean to get off on a

24   tangent here, but, you know, are there going to be a lot of

25   fraudulent-transfer lawsuits if in fact there was debt forgiven

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 32   Page 9 of 87   Page 1313 of 1539   PageID 18551
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 13 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    13

1   in the couple of years or four years leading up to bankruptcy?

2   And are we going to have — well, I just don't understand, you

3   know, the obvious big tax exposure to your client and other

4   human beings if your — if your argument prevails, but I guess I

5   shouldn't — I shouldn't second guess legal strategy, but my

6   brain can't help to go there.

7          All right.  But, again to the relevance, your defense

8   is:  There was an agreement to forgive these notes.  It was oral

9   and we're entitled to discovery regarding other loans to other

10  employees for which there might have been oral forgiveness

11  because that will help establish our defense; that's the sum and

12  substance of categories 14 through 17?

13          MR. AIGEN:  That's correct, Your Honor.

14          THE COURT:  Okay.

15          MR. AIGEN:  And obviously I don't think there's any

16  need to try the ultimate legal issues here, but we're well aware

17  of these tax issues and we've worked into it, and so there are

18  different tax consequences depending on how conditions are

19  structured and it's my understanding that in situations like

20  this there wouldn't be sort of tax consequences, but that's an

21  issue for another day.  But because you raised it, Your Honor, I

22  want to make sure that you know we are aware of that issue and

23  that is something we're prepared to address when it — when it

24  comes before this.

25          So should I move on to the last — last topic, Your

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 32   Filed 09/25/23   Page 1314 of 1539   PageID 18552
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 14 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    14

1   Honor?

2            THE COURT:  Okay.

3            MR. AIGEN:  The last topic is Request Number 20 which

4   asks for testimony regarding compensation paid by Highland to

5   Mr. Dondero.  And I know this might be a little unusual because

6   someone should know what they were paid, but obviously in a

7   situation like this where we don't have control of all the

8   records and the pay structure is complicated, we don't have all

9   of that, so it's a little different than your usual situation.

10  And the reason this is relevant, obviously this goes to the

11  forgiveness aspect of it, and basically information regarding

12  Mr. Dondero's compensation will be helpful or relevant because

13  it shows part of the story here is that if you look at his

14  compensation as a whole, he was underpaid and the notes were

15  forgiven as part of this compensation which goes along with the

16  underpaid.  In other words, it puts this oral agreement into

17  context and explains why it is thus.  Again, they're saying this

18  never happened, so as part of our presentation of our case,

19  we're going to explain why this was done and why it makes sense.

20  And to put that into context, we want information related to Mr.

21  Dondero's compensation.  We're not asking for other people's

22  compensation on this, we said information related to Mr.

23  Dondero's own compensation.

24            And, again, I understand that counsel thinks that

25  these defenses have no merit.  That's their right.  That makes

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/06/23   Page 1315 of 1539   PageID 18553
Exhibit 32   Page 15 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 15 of 86

*Adversary 21-3003, Motion to Compel Discovery*          15

1   sense.  And I assume they will file a summary judgment on these,
2   but they haven't done it.  These defenses are currently pending.
3   We're going to trial in less than two months.  We may not be
4   getting anyone else's depositions.  They're not giving us
5   documents on this topic.  And I understand it may be a little
6   unique to have Mr. Seery testify on this, but that's because we
7   just presented them with topics.  That's the witness they are
8   putting forward, which is their right.  I have no problem with
9   that.  But this is our one opportunity to get discovery on this
10  and that's why we're before the Court today.  Thank you for your
11  time.
12          THE COURT:  Okay.  Just to clarify, I think I heard
13  you saying Mr. Dondero doesn't have access to the records.  Mr.
14  Dondero doesn't have records regarding the compensation paid by
15  Highland to him and any agreements related to that?
16          MR. AIGEN:  He — he had some but not all.
17          THE COURT:  Okay.  Well, I don't understand that.  Why
18  would that be?  He's the founder, he was the CEO of this company
19  until three months after the bankruptcy was filed.  He — I mean
20  it sounds inconceivable to me that he wouldn't have everything
21  he needs as far as what he was paid in the agreements regarding
22  what he was paid by his company Highland.
23          MR. AIGEN:  Well, Your Honor, fortunately or
24  unfortunately I have not been involved what I understand is sort
25  of disagreements between the parties here on Mr. Dondero's

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85 Filed 09/29/23 Page 1316 of 1539   PageID 18554
Exhibit 32 Page 29 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 16 of 86

*Adversary 21-3003, Motion to Compel Discovery* 16

1    access to certain documents of Highland, but my understanding is

2    he — Highland now has possession of all its documents.  And he —

3    I know there were requests between counsels on Dondero to get

4    particular documents in other matters and other situations going

5    on.  But he — Highland is the one that has possession of those

6    documents now, not — not Mr. Dondero.

7              THE COURT:  Okay.  He'd at least have his tax returns,

8    right, and files regarding his tax returns?

9              MR. AIGEN:  Correct, correct.  Correct.  Yes.  Yes,

10   Your Honor.

11             THE COURT:  All right.  Well, Mr. Morris, now for your

12   responses in — I'm playing devil's advocate with you.  If y'all

13   have named Mr. Seery as a 30(b) corporate rep and out of these

14   20 topics you agree to — two, three, four, five, six — I guess

15   13 of the subject matters, what's the big deal about a few extra

16   questions?

17             MR. MORRIS:  A few — a few issues.

18             First, Your Honor, is Mr. Dondero on the line?

19             THE COURT:  Well, that's a good question.  I forgot to

20   check that because I have ordered him in the past to be at every

21   hearing.

22             Mr. Dondero, are you with us this morning?

23             Mike, did you see him —

24             MR. ASSINK:  No, Your Honor.  This is —

25             THE REPORTER:  I haven't seen Mr. Dondero.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/08/23   Page 1317 of 1539   PageID 18555
Exhibit 32 Page 18 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 17 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    17

1        THE COURT:  Okay.  Well, Mr. Aigen, what do you know

2    about that?  Or I see Mr. Bryan Assink is out there as well.

3    What do y'all know about that?

4        THE REPORTER:  He's on mute, Your Honor.

5        THE COURT:  You're on mute, sir.

6        MR. ASSINK:  Your Honor, I apologize.  This is Bryan

7    Assink of Bonds Ellis.  I'm just trying to — I'm just trying

8    to —

9        THE COURT:  Okay.  It sounds like someone's speaking,

10   but I can't hear it.

11       THE REPORTER:  Bryan Assink, his voice is low.  He's —

12       THE COURT:  Okay.  Mr. Assink, please turn your volume

13   up.  We can barely, barely, barely hear you.

14       Mr. Assink.

15       MR. ASSINK:  Your Honor, is that — is that better?

16   I'm sorry.  I tested this before —

17       THE COURT:  Okay, it's better now.  Go ahead.

18       MR. ASSINK:  — I joined and —

19       THE COURT:  Go ahead.

20       MR. ASSINK:  Your Honor, this was set on an emergency

21   basis, and we just didn't coordinate with Mr. Dondero.  We

22   didn't think he needed to attend these kind of nonevidentiary

23   hearings and —

24       THE COURT:  Mr. Assink, you asked for the emergency

25   hearing.  And you filed your motion Friday afternoon.  We were

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/23/23   Page 1318 of 1539   PageID 18556
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 18 of 86

*Adversary 21-3003, Motion to Compel Discovery*                              18

1   in court Tuesday.  And I was happy that you resolved our

2   disputes Tuesday.  And I remember saying:  Preview of coming

3   attractions, I guess I'll see y'all Friday, right.  Right,

4   nobody said anything about, uh, we have an emergency setting,

5   we're hoping to have.

6           But, anyway, be that as it may, an hour or two after I

7   got out of court Tuesday, my Courtroom Deputy was telling me

8   that you were wanting the hearing this week.  And I first said

9   it'll have to be Monday.  I mean we're — we've got a backlog of

10  stuff in our queue that we're really trying to get out.  And —

11  and I understood that you really pressed for having this hearing

12  today.  I didn't see the — all the emails, but my Courtroom

13  Deputy said you all really wanted this hearing today, not

14  Monday.

15          So, with that, why would you press for today if Mr.

16  Dondero wasn't available, number one?  And, number two, why

17  would you think he wasn't needed?  I mean it was a couple of

18  hearings ago that I said someone pull out my order and see what

19  I said, because I couldn't remember the exact wording —

20          MR. ASSINK:  No, Your Honor, I apologize.  I'm sorry,

21  Your Honor.  I apologize.  There's been a lot going.  I think it

22  — the coordination might have just slipped.  I'm not sure, Your

23  Honor, I wasn't sure what order required him to be here today

24  with the preliminary injunction dissolves but, you know, it

25  wasn't our intention that he would not — he would not appear.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31   Filed 12/22/23   Page 20 of 87   Page 1319 of 1539   PageID 18557
Exhibit 32   Page 20 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 19 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    19

1    We — it was more just a coordination thing.  We intend that he

2    will be at all hearings before, Your Honor, you know, Friday's

3    hearing and substantive hearings.  I just — I think this is more

4    of a coordination issue, Your Honor, and I apologize.

5              THE COURT:  Okay.

6              MR. ASSINK:  There has been a lot going on.

7              THE COURT:  Oh, don't I know.  There's two of us, me

8    and my Law Clerk working on this, and there are a bunch of

9    y'all.  So, yes, I feel — I feel absolutely what you feel and

10   more as far as a lot going on.

11             So let me clarify.  My language that ordered Mr.

12   Dondero to be at every hearing was in the preliminary injunction

13   that's now superseded by the agreed order y'all announced

14   Tuesday.  So are you telling me you thought now that mandate

15   didn't apply?  Is that one of the things —

16             MR. ASSINK:  Not — not specifically, Your Honor, —

17             THE COURT:  — I'm hearing?

18             MR. ASSINK:  Not specifically, Your Honor.  We thought

19   perhaps the formal mandate in the order was no longer applying,

20   but our understanding was you would want Mr. Dondero at

21   substantive hearings going forward, and that has been our

22   understanding.  And we would expect him to be before Your Honor

23   at all such hearings.  Part of the basis, the reasoning he's not

24   here today was perhaps as an oversight on my part due to the

25   scheduling, and I had a lot of deadlines yesterday and I think

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-85   Filed 10/22/23   Page 13 of 87   Page 1320 of 1539   PageID 18558
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 20 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    20

1    it just maybe fell through the cracks, and I apologize, Your

2    Honor.

3              THE COURT:  All right.

4              MR. ASSINK:  You know, we — Your Honor, —

5              THE COURT:  Well, I'm going to say a couple of things.

6    You know this could have been raised Tuesday, when we were here

7    on the adversary proceeding, in which the preliminary injunction

8    was issued, okay, it would have been — it would have been wise,

9    it would have been very wise to raise the issue.

10             Second, it screams irony, if nothing else, that at a

11   time when I have under advisement a motion to hold Mr. Dondero

12   in contempt of Court that there would be a trip-up, the

13   second-recent trip-up, by the way, where he didn't appear at a

14   hearing.  There was a time a few weeks ago, two or three weeks

15   ago, can't remember what hearing it was then, but he wasn't

16   here.

17             Okay.  The —

18             MR. ASSINK:  Well, Your Honor, I just want to say —

19             THE COURT:  — the third thing I'm going to say — the

20   third thing I'm going to say is I guess I'll issue an order in

21   the main case now, you know, a one- or two-sentence order in the

22   main case saying repeating the sentence that was in the

23   preliminary injunction, that he's going to show up at every

24   hearing.  I never said only at substantive hearings.  The only

25   thing I hesitated on at all, because I've done this in other

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/22/23   Page 1321 of 1539   PageID 18559
Exhibit 32 Page 22 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 21 of 86

*Adversary 21-3003, Motion to Compel Discovery*                21

1    cases, is sometimes I'll say any hearing at which, you know, the

2    person is taking a position, okay, an opposition, an objection,

3    you know, even if you file a pleading taking a neutral stand, if

4    he's going to file a pleading that requires the Court and all

5    the lawyers' attention to some extent, he's going to need to be

6    in court.  So that's something I thought about doing, but then I

7    was reminded, that I said, no, he's just going to be at all

8    hearings in the future.

9           And procedural, substantive, I never made that

10   distinction and I never would because — because it's taking up

11   time, it's taking up time of the Court, lawyers, parties.  And

12   if he is going to use the offices of this Court or, you know,

13   take up the time of any lawyers, then he needs to be a part of

14   it, okay?

15          MR. ASSINK:  Your Honor, yes, I —

16          THE COURT:  So I thought I made that very clear the

17   last time he didn't show up, but I think —

18          MR. ASSINK:  Your Honor, I apologize.  You know that's

19   certainly not our intention here.  We've been rushing around.  I

20   think this is more — this is more on — on me and just the fast

21   pace with everything.  We would intend that he would be here at

22   all hearings.  We're not trying to make any exception.  We're

23   not trying to say that the preliminary injunction got rid of his

24   obligation to be before, Your Honor.  You know, we weren't clear

25   exactly what the directive was for these kinds of hearings, or

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-85   Filed 02/23/23   Page 223 of 87   Page 1322 of 1539   PageID 18560
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 22 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    22

1    at least perhaps I wasn't fully, and — but, nevertheless, Your

2    Honor, we would — we would have had him be here.  I think the

3    fast pace with the hearing settings and just everything going

4    on, it might have slipped through the cracks.  It's not — there

5    was no ill will with him not being here, Your Honor.  I

6    apologize.  It's just an oversight on our part.  We would

7    anticipate that he will be here for all future hearings.  You

8    know it's no disrespect to the Court.  It was not an intentional

9    thing.  We apologize, Your Honor.  So I understand the Court's

10   comments.  It's — but I just want to make clear it's we're not

11   trying to be cute, we're not trying to say that, oh, the

12   preliminary injunction is gone, he doesn't have to be here.

13   That's not our intention, Your Honor.  It was I think just an

14   oversight and a scheduling issue this time, but Mr. Dondero will

15   of course appear before Your Honor in all matters going forward,

16   so I apologize.

17          THE COURT:  All right.  Well, again, you're

18   scheduling.  You sought the scheduling, you sought the emergency

19   hearing, and this is the second time we've had this discussion

20   in less than a month.

21          All right.  So, Mr. Morris, back to you.  I think —

22          MR. MORRIS:  Yeah.

23          THE COURT:  — you were about to answer the question of

24   if Mr. Seery is going to be produced and talk about 13 different

25   topics, why is it a big deal to talk about these other seven

APP.10952
APP.13953

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 32 Filed 09/24/23 of 87 Page 1323 of 1539   PageID 18561
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 23 of 86

*Adversary 21-3003, Motion to Compel Discovery*                     23

1    topics.

2              MR. MORRIS:  Because there is no way to prepare a

3    witness for the vague statements that are being offered by

4    counsel.  I'll point out that Mr. Aigen is yet another former —

5    a lawyer who formerly represented Highland and is now suing us,

6    but we'll dispense with the disqualification motion right now.

7              Your Honor, here is the deal.  There have to be some

8    limits, there have to be some reasonable limits.  As you

9    started, Your Honor, in law school you're taught that a

10   collection case under demand notes is the simplest thing there

11   is.  In fact, in New York there's a special provision in state

12   law that permits a plaintiff to file a motion for summary

13   judgment in lieu of a complaint when they have an instrument

14   such as a note, which is exactly what we have here.

15             Mr. Dondero has already admitted in his answer, in his

16   interrogatories, and in his answers to several requests to admit

17   that the notes are valid, that he received the money

18   contemporaneously with the notes.  When he signed the note, he

19   received the money.  The debtor has made demand and he hasn't

20   paid, so we will be moving for summary judgment on that basis.

21             So let's look at what the defenses are and why we just

22   feel like it's a burden on the debtor to even entertain these

23   concepts.  His first answer, Your Honor, said that the notes

24   were forgiven based on an agreement.  So we asked him in the

25   interrogatory or request to admit, I forget which, show us your

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-1    Filed 02/23/24    Page 1324 of 1539    PageID 18562
Exhibit 32    Page 253 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 24 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    24

1    tax returns that you paid the taxes.  Of course he didn't pay

2    taxes because of course the note wasn't forgiven.  So instead he

3    amends his answers, he amends the affirmative defense to add the

4    words:  Pursuant to a condition subsequent.  Okay, he didn't say

5    that the first time.

6            The first time it was — it was forgiven and now it's

7    not forgiven but it's basically deferred until a condition

8    subsequent.  So he is not even contending.  If you look at his

9    amended answer, he's not even contending that it was forgiven,

10   he's simply saying that the obligation to repay has been

11   deferred pursuant to an oral agreement under which he does have

12   to pay until the debtor completes the liquidation of his assets,

13   basically, if you read it.  That's what it says.  And that's how

14   we got here.

15           I don't know if you picked up on it, Your Honor, but

16   in response to an interrogatory, when we said who made the

17   agreement on behalf of the debtor, Mr. Dondero said that he did.

18   Okay, this isn't an oral agreement unless he was talking to

19   himself.  This is something that happened, according to him, in

20   his head; that somehow he, as the maker of the note, had a

21   discussion with himself in his capacity as the chief executive

22   officer of the debtor, and the two of them, in his head, agreed

23   that he wouldn't have to pay.  Initially wouldn't have to pay at

24   all and now apparently doesn't have to pay until the debtor

25   completes its sale of assets.  That is what the defense is here,

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 31-85   Filed 02/26/23   Page 1325 of 1539   PageID 18563
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 25 of 86

*Adversary 21-3003, Motion to Compel Discovery* 25

1    so let's be very, very clear about it.

2           It's not an oral agreement, it's something that he's

3    making up in his head that he didn't make up the first time,

4    that he changed the second time, and that he — that he can't

5    describe at all.  One of the interrogatories said:  When did

6    this take place.  He didn't answer that part of the

7    interrogatory.  He hasn't told us.

8           And here is the interesting thing, Your Honor.  He's

9    partially performed.  He has admitted in response to — I forget

10   if it was an interrogatory or a request to admit, it's in our

11   papers — he has admitted that in December 2019, after the

12   petition date, and while he was still in control of the debtor,

13   that he made a payment to the debtor, a portion of which was

14   used to pay principal and interest on one or more of the notes,

15   so.  So either he made that payment after he made his agreement

16   in his head that it would be deferred, which makes no sense, or

17   he entered the agreement in his head after the time that he made

18   the payment, which would be in violation of the automatic stay,

19   because how did he just get to forgive or to defer payment of an

20   obligation to the debtor without seeking permission from the

21   Bankruptcy Court.  Those are the only two possibilities here,

22   okay.

23          So I don't want to have to prepare my client for such

24   nonsense.  I don't think we should be required to prepare my

25   client for such nonsense.  And if you take a look at the other

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 09/22/23    Page 1326 of 1539    PageID 18564
Exhibit 32    Page 27 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 26 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    26

1    so-called affirmative defenses, he's got waiver, but he doesn't

2    know — he doesn't identify how we waived, when we waived, who

3    waived.  And, in fact, it's completely contradicted from the

4    evidence that's already in the record.  Every single monthly

5    operating report, all of the debtor's contemporaneous books and

6    records, they're in the record.  I actually submitted them in

7    opposition to his first request for an adjournment of this

8    proceeding because I wanted — I put my cards on the table, Your

9    Honor.  I really don't — I don't like to play games.  I put my

10   cards on the table.  They see all of that.  All of that is

11   there.  The debtor has — can see them.  So how could we have

12   waived everything.

13          Consideration, I'm supposed to prepare my client to

14   answer questions on his defense of lack of consideration, when

15   Mr. Dondero has already admitted that he received the face

16   amount of each note at the time the note was executed?  What —

17   we should not be entertaining this.

18          And let's talk about topics 14 to 17, the so-called

19   other loans that were forgiven.  Mr. Dondero was the president

20   and chief executive officer of this company for decades.  Has he

21   identified one single person who received a forgiven loan?

22   Nope.  Has he identified one loan that was ever forgiven?  Nope.

23   Has he ever contended that he had a forgivable loan?  Nope.

24   He's got this vague and ambiguous defense that somehow — it's

25   not even a defense, frankly.  His defense is that he had an oral

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 12/22/23    Page 1327 of 1539    PageID 18565
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 27 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    27

 1   agreement with himself, either he did or he didn't, right.

 2   We've got document requests outstanding.  They were due weeks

 3   ago.  Mr. Aigen has promised me in writing tomorrow, tomorrow,

 4   Friday.  May 21st, he's going to complete his document

 5   production.

 6           We've gotten two documents so far, two bank statements

 7   that show his receipt of the loan proceeds, right.  We don't

 8   have — there is no evidence for this.  We don't have the

 9   identification of a loan that was ever forgiven.  We don't have

10   the identification of a person whose loan was forgiven.  We have

11   nothing.  How can we possibly prepare?

12           Rule 30(b)(6) actually requires them to describe with

13   reasonable particularity the matters for examination.  How do I

14   prepare my client on — on these things?  What he's trying to do,

15   I think what they're trying to do is be cute, of course, and

16   they're trying to — they want to ask Mr. Seery and Mr. Seery

17   will say, 'I don't have any knowledge of this.'  And then

18   they're going to show up to trial and they're going to put on a

19   case and say, 'Mr. Seery didn't have any knowledge of it, so he

20   can't rebut,' or something — something silly like — I mean I

21   don't really know what they're doing.  This is just such bad

22   faith.

23           Your Honor, you heard counsel say that the loan was

24   forgiven or deferred, but it's not even forgiven.  So — so it

25   doesn't even make sense, but you heard him say that he was

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 32ed Page 29 of 87age 1328 of 1539    PageID 18566
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 28 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    28

1   underpaid, that Mr. Dondero was underpaid and that there's some

2   connection not with forgiveness because he's admitted that he's

3   now changed his story, it hasn't been forgiven.  It was

4   originally forgiven, now it's just deferred, and that that

5   happened because he was underpaid.  Does that make any sense at

6   all?

7          The guy who was in control of this enterprise from day

8   one, and I'm supposed to prepare my client to provide a history

9   of Mr. Dondero's compensation.  He doesn't know what he was —

10  did he not pay his taxes?  Should we go down that path and

11  should I now start subpoenaing his tax returns?  Because I think

12  that's appropriate.  If you want to ask what I have, I want to

13  know what you have.  So maybe Mr. Aigen can agree on the record

14  that I can have Mr. Dondero's tax returns.  If he'll do that

15  maybe I'll reconsider, because this is nonsense, Your Honor.

16  And that's really the point.  And I want to nip this in the bud

17  now because this is the first of five note cases for entities

18  owned and controlled by Mr. Dondero, and the same thing is

19  happening in some of these other cases, Your Honor.  It is.

20         And — and if we go down this path, you know you're the

21  Judge, you make the call, but we're going to be having a lot of

22  these because I'm not volunteering putting my client through

23  this process.  It's not right.  It's just not right.

24         He made an oral agreement with himself?  Please.  You

25  either violated the automatic stay or you partially performed,

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 03/03/23   Page 303 of 87   Page 1329 of 1539   PageID 18567
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 29 of 86

 1  thereby proving it never happened.  Mr. Aigen says, oh, we

 2  contest it.  We don't sit here and contest it.  The proof is in

 3  the record.  The proof is his client's own words.  The proof of

 4  the documents that we've already put before the Court.  (Briefly

 5  garbled audio) — never happened.

 6           And I just — I just want to nip this in the bud.

 7  That's really our point, Your Honor.  To put forth a client in —

 8  in a notes action, the simplest form of action there could

 9  possibly be, to answer questions on 13 different topics, but

10  there's a limit to what we'll do, and this is our limit.  And

11  that's why we won't — we won't do it in the absence of a court

12  order.

13           THE COURT:  Okay.

14           MR. MORRIS:  Thank you, Your Honor.

15           THE COURT:  All right.  So I will give the last word

16  to you, Mr. Aigen.  What would you like to say in rebuttal?

17           All right.  You must be on mute.

18           MR. [SPEAKER]:  He's on mute.

19           MR. AIGEN:  Sorry.

20           THE COURT:  Okay.

21           MR. AIGEN:  A few quick points, Your Honor.  Number

22  one, counsel has referred to New York procedure on how he could

23  file a quick summary judgment.  Well, he can file summary

24  judgment here too.  They didn't do it.  These defenses are

25  pending, we have a right to take discovery on it.  I think

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 10/23/23    Page 1330 of 1539    PageID 18568
Exhibit 32    Page 31 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 30 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    30

1    that's pretty straightforward.

2           Number two, counsel has repeatedly stated, as he

3    states in his pleading, that we changed our position and that

4    first answer it said that the notes were forgiven.  It doesn't

5    say that.  I'm reading from their pleading at paragraph 16 where

6    they quote our answer, the original one where it says,

7    "Defendant asserts that plaintiff's claim should be barred

8    because it was previously agreed by plaintiff that plaintiff

9    would not collect on the note."  There's no change in the

10   position.  It wasn't asserted before these notes were actually

11   forgiven, so that's just not true, and his own pleadings reflect

12   that.

13          We also heard a lot of conversation about what we have

14   given them.  We have answered their interrogatories.  They

15   didn't ask about other people who may have loans forgiven.  They

16   had never asked about that.  That's why we haven't told them.

17   They could get that information.  They could serve discovery.

18   They're the one that wanted this case on a fast track.  So keep

19   talking about discovery or answers he doesn't have because those

20   are answers to questions he never asked.  There is no discovery

21   out there where they said to us identify the individual who you

22   believe received loans that are forgiven.  They never asked

23   that.  That's why they don't —

24          THE COURT:  Let me —

25          MR. AIGEN:  — that answer, so I don't think that's

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-1Exhibit 32Filed 09/23/23 of 87Page 1331 of 1539   PageID 18569
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 31 of 86

*Adversary 21-3003, Motion to Compel Discovery*                          31

1   right.

2          THE COURT:  Let me ask you this.  If Bank of America

3   loaned money to Mr. Dondero and he defaulted and they sued him

4   on the note, do you think Mr. Dondero could get discovery

5   regarding all other borrowers or any other borrower that Bank of

6   America may have lent money to and did they forgive some of

7   their indebtedness, did they have special arrangements?  Do you

8   think in a million years a state court judge would allow

9   discovery on this?

10          MR. AIGEN:  Not under that hypothetical, but I would —

11  what I would say, Your Honor, if there was an oral condition as

12  part of that loan and it turns out that everyone knew that Bank

13  of America provided those same oral conditions to a subset other

14  group of lenders — or borrowers, for whatever reason, and the

15  parties disputed that, then I think it would be discoverable.

16  So I think the situation here is —

17          THE COURT:  Oral agreements —

18          MR. AIGEN:  — different from your situation.  I agree

19  with the hypothetical.

20          THE COURT:  I mean again I — you know, oral

21  agreements.  I mean give me examples of case law where oral

22  agreements somehow prevailed at the end of the day.  I mean I

23  just...

24          MR. AIGEN:  And, Your Honor, at summary judgment, when

25  we have to present our case, we'll present our case.  Like I

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 03/23/23    Page 1332 of 1539    PageID 18570
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 32 of 86

*Adversary 21-3003, Motion to Compel Discovery*                           32

 1  said, they could have filed the summary judgment on day one,

 2  just like they could do in New York, and said, you know, on the

 3  defenses, but we're doing this and we're doing it on a fast

 4  track obviously with trial in less than two months.  So this is

 5  our one opportunity to get discovery.  And when they filed their

 6  summary judgment, we'll respond with the law.  But until they

 7  do, for whatever reason they have waived it.  They have told you

 8  that it would be burdensome to allow him to answer a few other

 9  questions.  I don't — for one thing, burden was not an objection

10  they made, so he's talking about how it's burdensome and he

11  doesn't want to do it.  But this is our one opportunity to get

12  this information.  And if they file summary judgment, and, you

13  know, these defenses go away, obviously it won't be an issue

14  later, but this is our one opportunity to get this discovery.

15          THE COURT:  Okay.

16          MR. MORRIS:  Your Honor, if I may?  Just one last

17  point.  There is zero chance, zero chance that if any loan was

18  ever forgiven by the debtor that it was on the same terms on

19  which Mr. Dondero now claims his loan would be forgiven or

20  deferred.  And how do I know that?  Because if you look at his

21  response to the interrogatory, the condition subsequent, by

22  them.  And Mr. Aigen is just wrong, he did change his answer.

23  His original answer was that he wouldn't have to pay.  And then

24  his new answer, his amended answer is that he wouldn't have to

25  pay until a condition subsequent.  And when we asked him what

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35 Filed 09/24/3 Page 3 of 87 Page 1333 of 1539   PageID 18571
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 33 of 86

*The Court's Ruling on the Motion to Compel*                                33

1   that condition subsequent was, it was the liquidation of certain

2   assets.  Since the liquidation of those assets has not been

3   completed, by definition, no other maker could have had a note

4   or an oral agreement or an agreement of any kind of the type

5   that Mr. Dondero has.  So yet another reason why it fails to

6   meet the burden, they fail to meet the burden under Rule 26.

7   Nobody could have ever had the same note forgiven or agreement,

8   because the condition subsequent hasn't been met yet.

9           THE COURT'S RULING ON THE MOTION TO COMPEL

10          THE COURT:  All right.  Well, I'm going to deny the

11  motion to compel.  I don't think that the burden has been met to

12  establish the relevance of these, I guess it's — one, two,

13  three, four, five — six topics that are now at issue, topics 9,

14  14 through 17, or 20, and, you know, I don't think the

15  proportionality standard is met here.

16          I do think it would be not proportionate to the needs

17  of the case for the CEO, who came in place in 2020,

18  postpetition, two years after these notes were executed, to have

19  to go do research about any loans made by Highland to any

20  officers and employees over the years and, you know, I don't

21  know who he's going to question, what policy he is going to look

22  into that might be some substance or evidence as to oral

23  agreements or forgiveness.  I don't think he should have any

24  obligation to search files and interview people to figure out

25  what the affirmative defenses and Mr. Dondero are all about or

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 32 Filed 09/23/23 Page 1334 of 1539   PageID 18572
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 34 of 86

*The Court's Ruling on the Motion to Compel*                               34

 1   based in.  And, again, no one would have better information

 2   about his own compensation than Mr. Dondero himself.

 3          I mean I want to stress that this comes against a

 4   backdrop of — well, it seems like some antagonism, to say the

 5   least, on the part of Mr. Dondero where Mr. Seery's concerned.

 6   It seems like it's always a fight with Mr. Seery.  And you say,

 7   well, we didn't handpick him as the 30(b)(6) witness, but, you

 8   know, the motion to compel names him by name.  It just — it

 9   feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11   so different topics.  I think it is appropriate to draw the line

12   on these six or so topics that again just don't seem relevant or

13   proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15   just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18   to do it.  I'm sorry.  I need to be thinking about attorney's

19   fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21   an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25   particular adversary, let me just double check.  Any

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-1 Filed 06/03/63 87 Page 1335 of 1539   PageID 18573
Exhibit 32 Page 36 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 35 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    35

1   housekeeping matters before I move onto the other adversary?

2        MR. AIGEN:  Not from the debtor, Your Honor.

3        MR. CLUBOK:  Your Honor, —

4        THE COURT:  All right.

5        MR. CLUBOK:  I don't know if you're about to move on.

6   Your Honor, can you hear me?

7        THE COURT:  I'm sorry, Mr. Clubok?

8        MR. CLUBOK:  Your Honor, —

9        THE COURT:  Were you weighing in on —

10       MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11  that proceeding, but are you about to move on beyond — beyond

12  the Highland matters?

13       THE COURT:  No, no, no.

14       MR. CLUBOK:  There was another Highland matter —

15       THE COURT:  I was next — I was next going to go to the

16  other adversary, the dispute between the committee and seven or

17  so defendants.  And, yes, I know we have UBS I guess all day

18  tomorrow unless anything has changed.  So we'll — we'll hear

19  before we're done any previews about tomorrow.

20       All right, so moving on —

21       MR. CLUBOK:  Thank you.

22       THE COURT:  — the Committee versus CLO Holdco,

23  20-3195.  We have a committee motion to basically stay the

24  adversary proceeding for 90 days.  So I will get lawyer

25  appearances on that.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85   Filed 02/23/24   Page 1336 of 1539   PageID 18574
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 36 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    36

1          Who do we have appearing for the committee, the

2   movant?

3          MS. MONTGOMERY:  Yes, Your Honor.  Paige Montgomery

4   for the committee.

5          THE COURT:  All right.  And for the defendants, who do

6   we have appearing?

7          MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

8   Phillips on behalf of Highland Dallas Foundation and CLO Holdco

9   Ltd., along with my associate Amelia Hurt.

10          THE COURT:  All right.  I saw your —

11          MR. DRAPER:  Good morning, Your —

12          THE COURT:  — pleading filed at 9:00 something last

13   night.

14          Any other defendant appearances?

15          MR. KANE:  Yes, Your Honor, —

16          MR. DRAPER:  Yes, Your Honor.  Douglas Draper on

17   behalf of the Dugaboy Investment Trust —

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  — and Get Good.

20          THE COURT:  Oh, okay.  Thank you.

21          Other appearances?

22          MR. KANE:  Yes, Your Honor.  John Kane on behalf of

23   Grant James Scott, III.

24          THE COURT:  Okay.  Mr. Kane, your volume was very low.

25   You're — you're Mr. Scott's counsel as trustee for these trusts?

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/23/23   Page 1337 of 1539   PageID 18575
Exhibit 32 Page 37 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 37 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    37

1          MR. KANE:  In — in a sense, Your Honor, and in his

2     individual capacity.  I no longer represent CLO Holdco.

3          THE COURT:  Okay.  I don't know if you got that at

4     all, Michael.  It was so faint.

5          THE REPORTER:  Yeah, I got a little of it, but it —

6          THE COURT:  Okay. you're no longer representing CLO

7     Holdco, Ltd., but you're representing Grant Scott in his trustee

8     capacity for these two trusts?

9          MR. KANE:  Your Honor, Grant Scott is no longer the

10     acting director or trustee of CLO Holdco, but he was a named

11     defendant in this action based on his time as trustee or

12     director of CLO Holdco, and I represent him in that capacity.

13          THE COURT:  Okay.  Any other defendant appearances?

14          MR. ASSINK:  Good morning, Your Honor.  This is Bryan

15     Assink for Mr. Dondero.

16          THE COURT:  Okay.  Any other appearances?

17          All right.  Well, Ms. Montgomery, you may make your

18     argument.

19          MS. MONTGOMERY:  Thank you, Your Honor.  And thank you

20     for taking the time to consider our motion so quickly.

21          I'd like to just briefly address how we plan to

22     proceed today.  To make more time, we'd like to give a brief

23     opening statement.  I'm not sure who among the defendants

24     intends to be heard specifically today in opening, but at the

25     conclusion of that we would like to proceed to testimony.  We

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 09/22/23    Page 1338 of 1539    PageID 18576
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 38 of 86

 1   have Mr. Kirschner, who you can see on the screen, Your Honor,

 2   and he's here today.  We plan, for efficiency sake, to put him

 3   on by proffer to the extent that that is acceptable to the

 4   Court.  And then he will be available to answer any questions

 5   that the Court or the defendants may have.

 6           THE COURT:  All right.

 7           MS. MONTGOMERY:  As you can see in our motion, we're

 8   requesting a 90-day stay of the adversary proceeding.  And the

 9   purpose for that stay is to allow Mr. Kirschner and his firm,

10   Teneo, the time they need to get up to speed on this case.

11           Stepping back for a moment, it was always the

12   committee's intention have these claims prosecuted by the

13   ultimate litigation trustee.  However, due to a disagreement

14   about certain funds that are held in the Court's registry, the

15   clock started ticking on the committee's time to bring this

16   adversary proceeding.  So but for the order that the committee

17   commenced an adversary proceeding by a date certain, this action

18   would have been brought at a later time by a litigation trustee

19   post effective date as part of a comprehensive litigation

20   strategy related to all estate claims.

21           For a variety of reasons the effective date of the

22   plan has been repeatedly delayed, which has necessarily delayed

23   the formation of the litigation subtrust.  We're coming up on

24   two years since the filing of the bankruptcy proceeding and

25   there's limited time available for the trust to be formed and

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 35  Exhibit 32  Page 40 of 87  Page 1339 of 1539   PageID 18577
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 39 of 86

*Adversary 20-3195, Committee's Motion to Stay*                     39

1    the trustee to develop a comprehensive litigation strategy.

2           As the Court may have noted, as we are wrapping things

3    up, two of our four committee members have also recently

4    retired/withdrawn from the committee.  So as a result last

5    Friday, the committee filed an application —

6           THE COURT:  Just inquiring minds want to know.  I mean

7    did they — did they by chance sell their claims or they just

8    were tired of the committee role?

9           MR. CLEMENTE:  Your Honor, if I may?  It's Matt

10   Clemente.  I'll just jump in on that, Your Honor, —

11          THE COURT:  Um-hum.

12          MR. CLEMENTE:  — very quickly.  I don't know how

13   anybody could be tired of being on the committee, but the answer

14   is, Your Honor, that they both sold their claims and

15   claim-transfer notices have been placed on the docket.  The

16   United States Trustee is aware and the trustee's position at

17   this point is to keep the committee at the two members, which

18   are Meta E and UBS, as we continue forward here through the case

19   and hopefully to an effective date in the near future.

20          THE COURT:  All right.  Thank you.

21          All right.  Ms. Montgomery, continue.

22          MS. MONTGOMERY:  Thank you, Your Honor.

23          So as a result, last Friday the committee filed an

24   application to retain Mr. Kirschner and his firm as litigation

25   advisor to the committee until the plan goes effective and the

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33-85    Filed 09/23/87    Page 1340 of 1539    PageID 18578
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 40 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    40

 1  litigation subtrust is formed.  At that point Mr. Kirschner will
 2  become the litigation trustee under the plan and he'll be
 3  responsible for all claims brought seeking recovery on behalf of
 4  the estate.  So obviously under the terms of the plan, our
 5  client, the committee, will cease to exist at that point and
 6  responsibility for the adversary proceeding that we're currently
 7  being heard in will pass to the litigation trustee.  And there
 8  will be a new oversight committee, which has not been formed yet
 9  either as of the effective date.
10          So because this adversary proceeding will transfer to
11  the litigation subtrust upon the effective date of the plan,
12  it's imperative that Mr. Kirschner be involved in the
13  prosecution of the adversary proceeding immediately and the
14  development of legal strategy for all of the estate claims as a
15  whole.  For a number of reasons, the 90-day stay of the
16  adversary proceeding will provide Mr. Kirschner with the
17  necessary time he needs to get up to speed.
18          Mr. Kirschner needs to familiarize himself with the
19  Byzantine structure of the debtor and the relationships among
20  the debtor and its thousands of related entities and insiders.
21  The corporate structure, as you have noted on several occasions,
22  is highly complicated.  And the ownership and beneficial
23  ownership of entities is confusing enough even before you
24  consider the variety of transfers of estate assets between and
25  among those entities — entities.  We've heard these

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-35    Filed 09/22 of 87    Page 1341 of 1539    PageID 18579
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 41 of 86

*Adversary 20-3195, Committee's Motion to Stay*                                    41

1    relationships described as tentacles.  I tend to think of them

2    as a web, and the allegations of this adversary proceeding

3    represent only a small section of strands.

4         Mr. Kirschner also needs time to familiarize himself

5    with the pending motions to withdraw the reference and the

6    motions to dismiss, and to develop the strategy which could

7    significantly change the trajectory of the adversary proceeding

8    and future adversary proceedings.  Mr. Kirschner's decisions

9    regarding how to respond to these motions may change the course

10   of the litigation in ways that are material to the pending

11   motions.  For example, he could determine to amend the complaint

12   or he could bring additional claims that the committee does not

13   have standing to bring on its own.  For example, breach of

14   fiduciary duty.  Importantly, there could be arguments

15   surrounding the motion to withdraw the reference and have

16   impacts on the other actions that may be brought by Mr.

17   Kirschner in his role as litigation trustee.

18        The strategy surrounding plaintiff's response to the

19   motion to withdraw the reference may also depend on facts that

20   have not yet been developed.  Mr. Kirschner should be given at

21   least some time to develop that strategy.

22        It's also worth noting that the notice period on Mr.

23   Kirschner's retention application does not end until June 7th,

24   which is after the current hearing date for the motions to

25   withdraw the reference, which are set for June 3rd.  Given his

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 09/23/24    Page 1342 of 1539    PageID 18580
Exhibit 32 Page 43 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 42 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    42

1    proposed role as litigation advisor and his future role as

2    litigation trustee, he will be responsible for this adversary

3    proceeding, he should be involved in the strategy to oppose the

4    motions to withdraw the reference.

5            As you know, Your Honor, the Highland entities have an

6    extremely complex structure involving obscure relationships and

7    ownership structures.  Mr. Kirschner not only has to get up to

8    speed with those facts, but he also needs to wrap his hands

9    around the transfer of information obtained from both the debtor

10   and the committee over the course of these proceedings.  So this

11   adversary proceeding is just one part of the complexity that is

12   the estate claims, but it's an important part and he should have

13   time to ensure that he's proceeding in the most efficient way

14   and in the way that's best for the debtor's estate.

15           In addition to needing to get up to speed on the facts

16   giving rise to this case, Mr. Kirschner is also — will be

17   working on a comprehensive strategy for all estate claims.  As

18   pointed out in the response that was filed last night, since he

19   is familiar with the adversary proceeding, obviously, we filed

20   it, and we did so after tedious review of thousands of

21   documents, and it took us months to put together a picture of

22   the transactions that are underlying the complaint, and those

23   months were after we had been actively involved in these

24   proceedings for over a year, so it's a very complicated —

25   there's some pretty complicated stuff going on there.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/24/23   Page 1343 of 1539   PageID 18581
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 43 of 86

1          We also believe that we provide competent

2    representation, which is at least tangentially challenged in

3    that response, but we're the lawyers that represent the

4    committee.  We're not the party that's responsible for the

5    decisions of the underlying management of the litigation.

6    Obviously lawyers take direction from their clients and ours as

7    of the effective date will no longer exist, and Mr. Kirschner

8    will be the person who's responsible for making those decisions.

9          So to put it slightly differently, we may be driving

10   the car but we're not deciding, you know, where the car is

11   going.  That's the client's decision.

12         I am at least somewhat offended by opposing counsel's

13   implication that the motion to stay was brought in bad faith

14   because it smelled that there might be some litigation

15   advantage.  All I can do in response to that, Your Honor, is

16   assure the Court that the stay is not being sought for such a

17   purpose.  To the extent that there's any gamesmanship occurring

18   in these proceedings, it's not us that's engaging in it.

19         Mr. Kirschner is entitled to gain his own

20   understanding of the issues underlying this adversary and of the

21   litigation landscape as a whole, and to have an orderly

22   transition of responsibilities from the committee, the debtor,

23   and counsel for both before he's asked to make important

24   strategic decisions that could have long-lasting implications on

25   his work.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/22/23   Page 1344 of 1539   PageID 18582
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 44 of 86

 1         In short, Your Honor, there is no rush to have the

 2    pending motions heard and no prejudice to defendants by a stay

 3    of proceedings.  As they point out in their response, the Court

 4    has delayed the hearing on the motion to dismiss until after

 5    consideration on the motion to withdraw the reference.

 6    Additionally, as they make clear in their response, discovery is

 7    not underway at this point.  We still haven't effectuated

 8    service as to all defendants.  We have some defendants that are

 9    foreign entities and we're still working through the service of

10    process.  We're not entirely sure how much longer that's going

11    to take, but it has proven to be a lengthy process to date, and

12    we don't really have an estimated time for when that will be

13    done.  So, if anything, there is an ideal time for a pause on

14    proceedings that won't prejudice any party.

15         The only purported harm our opponents have identified

16    is the delay itself, and I have to admit, Your Honor, that this

17    is the first time I've ever heard a defendant argue that they're

18    prejudiced by litigation against them not proceeding.  In fact,

19    we reviewed the cases that are cited in the response that

20    purport to support a right of good — to a determination of

21    rights and liabilities without undue delay.  Unsurprisingly,

22    both involve instances of a defendant seeking to delay

23    prosecution of a plaintiff's case rather than the reverse, as we

24    see here.  And in those cases, the stays that were sought were

25    either indefinite or extremely long.  They were not a brief

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/26/23   Page 963 of 87  Page 1345 of 1539   PageID 18583
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 45 of 86

*Adversary 20-3195, Committee's Motion to Stay*                 45

1   90-day extension of the sort recognize requested here.  There's

2   simply no prejudice to the defendant in the adversary by staying

3   the proceeding for 90 days.

4          On the other hand, the 90-day stay of the adversary

5   proceeding will provide Mr. Kirschner with the time that he

6   needs to develop an understanding of this adversary proceeding

7   and the litigation strategy as a whole.  And moving forward

8   without the stay may very well prejudice the future litigation

9   subtrust and harm the debtor's estate.

10         That's all I have for now, Your Honor.

11         THE COURT:  All right.  A couple of questions.  You

12  said there's been no service on certain defendants, and I know

13  that certain of these defendants are said to be Cayman Island

14  entities, these various Charitable — Charitable Daf (phonetic),

15  maybe CLO Holdco Ltd, Charitable Daf Fund, those three in

16  particular, right, right foreign entities?  Okay, so they have

17  gone —

18         MS. MONTGOMERY:  Yes, Your Honor.

19         THE COURT:  — they have not — those are the three, I

20  presume, that have not been served?

21         MS. MONTGOMERY:  CLO Holdco has been served, the

22  others have not.

23         THE COURT:  Okay, okay.  Thank you.  I'm sorry, I'm

24  getting a little mixed up.  So there's been money in the

25  registry of the Court and I remember that was why early on I

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Exhibit 32 Page 9 of 87   Page 1346 of 1539   PageID 18584
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 46 of 86

*Adversary 20-3195, Committee's Motion to Stay*                46

1   sort of created a quick time table for you all getting this

2   filed.  How much money is still in the registry of the Court?  I

3   remember there were agreed orders that some of it could be paid

4   over, I think, to Mr. Rocatta (phonetic).  I can't remember who

5   — who all.  But is there still a substantial fund in the

6   registry of the Court without me going online and looking that

7   up?

8              MS. MONTGOMERY:  I'm going to have to look and get the

9   exact numbers as well, Your Honor, but it's the portion of the

10  moneys that were purportedly payable to CLO Holdco are still in

11  the Court's registry.

12             THE COURT:  Okay.  So it's just that defendant's

13  funds.  And am I also correct that now the debtor ultimately has

14  a majority interest in CLO Holdco, the debtor itself, because of

15  that Harbor Vest (phonetic) settlement?

16             MR. PHILLIPS:  No, Your Honor.

17             THE COURT:  Oh, that's not right?

18             MR. PHILLIPS:  I don't think so, no.

19             MR. KANE:  Your Honor, this is John Kane.  I can

20  actually provide some clarity on that.  The Harbor Vest

21  acquisition by the debtor's affiliate relates to HCLOF, Highland

22  CLO Funding, not CLO Holdco.  CLO Holdco is the 49-percent

23  interest owner in HCLOF.

24             THE COURT:  Okay.

25             MR. DEMO:  And this is Greg Demo, Your Honor, from the

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-5   Filed 04/23/24   Page 1347 of 1539   PageID 18585
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 47 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    47

1   debtor.  I can confirm what Mr. Kane just said.

2          THE COURT:  Okay, okay.  So CLO Holdco is just

3   strictly in that line of the Charitable Daf and as far as who

4   owns — who owns it —

5          MS. MONTGOMERY:  That is — that's my understanding,

6   Your Honor.

7          THE COURT:  Okay, okay, so I — once again I have

8   flipped the organizational structure.

9          All right.  And then my last question for you, Ms.

10  Montgomery, is the effective date of the plan has not occurred.

11  There's obviously an appeal now at the Fifth Circuit, a direct

12  appeal of the confirmation order.  Is there still a stay pending

13  appeal — a motion for a stay pending appeal pending out there

14  either at the District Court or Fifth Circuit, or have those

15  been ruled on one way or the other?

16         MS. MONTGOMERY:  Mr. Demo, could you — were you

17  popping on to answer that question?

18         MR. DEMO:  Yes, Ms. Montgomery.

19         This is Greg Demo, Your Honor, from Highland Capital

20  Management.  We still intend to try to go effective after the

21  hearing on the exit financing, which has been postponed until

22  June 25th.  That's counsel to NexPoint Advisors, and counsel to

23  Highland Capital Management Fund Advisors filed a motion last

24  night with the Fifth Circuit seeking a further stay of the — of

25  the effective date, pending the resolution of their appeal.  So

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85   Exhibit 32   Page 49 of 87   Page 1348 of 1539   PageID 18586
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 48 of 86

*Adversary 20-3195, Committee's Motion to Stay*                48

1    we don't know how that's going to shake out, but the debtor does

2    anticipate trying to go effective following June 25th.

3            THE COURT:  All right.  So has there been a stay of

4    the confirmation order?

5            MR. DEMO:  We've agreed to a short administrative

6    stay —

7            THE COURT:  Okay.

8            MR. DEMO:  — as all this stuff has been going on.  I

9    believe the administrative stay — actually I can't remember when

10   it expires, but we have agreed to a short administrative stay.

11           THE COURT:  Okay.  And so it's —

12           MR. DRAPER:  Your Honor, this is Douglas Draper.

13           THE COURT:  Okay, go ahead.

14           MR. DRAPER:  Just to give the Court some background, —

15           THE COURT:  Go ahead.

16           MR. DRAPER:  — there were two — you denied the stay

17   pending appeal.  There were two appeals taken from your ruling.

18   One by myself on behalf of Dugaboy and one by Devor (phonetic)

19   on behalf of other entities.  They both went up to Judge Godbey.

20   He has never ruled on the stays pending appeal.  So what was

21   done is inasmuch as the motion — the appeal of the confirmation

22   order is up in the Fifth Circuit, last night Devor filed a

23   motion for a stay pending appeal in the Fifth Circuit, and

24   that's pending.  So that's the procedural background of what's

25   gone on.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85 it 32led 02/25/23 of 87age 1349 of 1539   PageID 18587
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 49 of 86

*Adversary 20-3195, Committee's Motion to Stay*                 49

1          THE COURT:  All right.  Thank you, Mr. Draper.

2          All right.  Well, I'll hear opening statements from

3    our defendants.  And I ask you please not to be duplicative of

4    each other.  So who wants to go first for the defendants?

5          MR. PHILLIPS:  Your Honor, Louis M. Phillips on behalf

6    of Highland Dallas Foundation and CLO Holdco Ltd.  We filed a

7    response in opposition to the motion to stay.  And we are the

8    ones who, my firm and I, and I'm the one that filed, that sent

9    messages across to counsel for the committee in response to the

10   request for consent or notice of opposition.  So I guess since

11   we filed the response we ought to go forward.

12         We have reviewed the — we laid out a time line in our

13   response.  We've laid out communications between counsel and our

14   response.  We laid out what we think the burden is.  And we've

15   laid out the case law that we think establishes the burden for a

16   stay.

17         What we are concerned about is the — first of all, the

18   90-day stay, it might even come around as far as further

19   activity in the lawsuit because we don't know what the Court

20   would do on June 3rd.  We know that the Local Rules require that

21   — or set forth that the Court will issue a report after the

22   conference on June 3rd about — to the District Court concerning

23   the motion to withdraw reference.  We filed a motion to withdraw

24   reference.  We filed a first response to the litigation, A, a

25   motion to withdraw reference; and, B, a motion to dismiss under

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85   Filed 10/25/23   Page 1350 of 1539   PageID 18588
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 50 of 86

*Adversary 20-3195, Committee's Motion to Stay*                          50

1   Rule 12(b)(6) and a motion for a more definite statement as

2   well.  Both our filings were followed by other defendants who

3   sought withdrawal of the reference and also dismissal.

4           This Court has pushed aside the motion to dismiss

5   pending resolution of the — of the motion to withdraw reference,

6   which we think is entirely appropriate and we're fine with, so

7   where we are, Your Honor, —

8           THE COURT:  And let me — let me just interject there.

9   That is always 100 percent of the time my practice, and I think

10  the other bankruptcy judges here.  It's out of deference to the

11  District Court.  If the District Court ends up withdrawing the

12  reference, they may want to say, 'I want to withdraw the whole

13  darn thing.  We don't even want you doing pretrial matters,' so

14  we don't want to get ahead of them by considering a pretrial

15  matter.  So I did what I do in every case and will take the next

16  steps —

17          MR. PHILLIPS:  And we agree a hundred percent with

18  that approach, Your Honor.  We didn't really know how we were

19  going to proceed on the motions to dismiss.  But we had

20  deadlines to filing and we got very brief extensions for one of

21  our clients to file a response to the complaint after service.

22  On the other client, we didn't get any extension to file a

23  response.  So we filed timely responses and we didn't know how

24  the Court was going to handle the motion to dismiss.  And the

25  way the Court just handled them is entirely what we — we agreed

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31-35    Filed 10/25/23    Page 1351 of 1539    PageID 18589
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 51 of 86

1  that that was the way to do it, because the District Court has
2  several alternatives if it determines to withdraw the reference.
3  And we know the courts, we've looked at the Court's Local Rule.
4  We just don't know how long, and we have no control and we're
5  fine with having no control over how long the Court would —
6  would have to take, given its docket, to issue its report to the
7  District Court.  And we have no control over what the District
8  Court would do.

9          Our problem with the motion for a stay is that we know
10  that the only things really pending now are motions to withdraw
11  reference.  Those are subject to being brought before Your Honor
12  at either kind of a hearing/conference where the parties will
13  put forth their legal arguments and any evidence, but the
14  evidence will basically be the nature of a litigation and the
15  situation of the docket.  So there's no real factual issues in
16  dispute.  We have a lawsuit, we have a motion to withdraw
17  reference that's been briefed.  We grant an extension of the
18  response deadline to May 21st in connection with the request by
19  counsel.  And we purposely asked the Court for the June 3rd
20  date, all with agreement of all counsel.  And then two days we
21  get the emergency motion — or last night, yesterday we get the
22  emergency motion to stay when the litigation assistant was, in
23  fact, retained on the day or two after we filed our responses.
24  And there was no mention in any way, shape, or form of a need to
25  stay at that time.

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31    Exhibit 32 Page 53 of 87    Page 1352 of 1539    PageID 18590
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 52 of 86

---

*Adversary 20-3195, Committee's Motion to Stay*                    52

1          So we have one thing pending:  Motions to withdraw the

2    reference.  We have reviewed and set forth in our response the

3    scope of services for which Teneo was being retained.  It does

4    look to us like it is — it looks like litigation support and

5    litigation analysis.

6          And I hear what counsel for the plaintiff is saying,

7    but there have been — she's — we agree that there has been

8    months and months and months of analysis, there have been

9    millions and millions and millions of dollars spent on U.S. —

10   UCC counsel fees.  They have gone through thousands and

11   thousands of documents.  They came up with this piece of

12   litigation.  This is the one I know about.  This is the one

13   pending before the Court.  And there might be — there is a

14   suggestion that there is an overarching litigation strategy

15   being employed, but this is what we have right here.  And that's

16   speculation that we have no idea about and we assume the Court

17   has no idea about.

18         So we have one thing that we want decided and it's

19   easy for a plaintiff to say — and, look, we're chastised for

20   being defendants who want to move the lawsuit.  One of our

21   clients didn't even ask for an extension of the deadline to

22   respond.  We have — we asked for one extension for one of

23   clients.  And that extension dovetailed into the response date

24   for the other client so that we could file a single response for

25   both clients.  That was granted.  We appreciate that.  And when

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 31-85  Filed 12/05/23  Page 1353 of 1539    PageID 18591
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 53 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    53

1    the committee asked for an additional time, we granted it with

2    the proviso that we get the June 3rd date so that if we need to

3    file a reply, we'd have three or four days to file the reply.

4           We have been — we have not been the ones asking for

5    any delay and we're not going to ask for any delay.  And so I

6    don't care what other cases say, I don't care what the

7    plaintiff's lawyer says about defendants always want to delay.

8    We're not asking for any kind of delay.  We want to move

9    forward.  And we think we have the right to figure out and find

10   out what court is going to be handling our litigation.  That's

11   what we're asking for.

12          We've already said in the communications that we've

13   listed on our witness and exhibit list that we'll be more than

14   happy to talk about some type of stay about motions — you know,

15   discovery, whatever, whatever, if there — if the litigation

16   advisor needs to get up to speed on what documents are out

17   there, what documents it would have to review, that's fine.

18   We're probably going to do some discovery.  But we're only going

19   to discovery if our motion to dismiss under 12(b) are not

20   granted, because if they are there doesn't need to be any

21   litigation advice or any analysis about alternatives or

22   objectives or overarching strategy to deal with the motion to

23   dismiss under Rule 12(b).  That's a legal issue.  And the

24   counsel is very adept — we say counsel's adept.  We know they're

25   adept.  That's why we know that they are ready to proceed in

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 32    Filed 10/25/23    Page 1354 of 1539    PageID 18592
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 54 of 86

1    response to our motion to withdraw reference.

2          And then if the District Court takes it after Your

3    Honor gives her report, then we'll bring the motions, we'll get

4    with the lawyers for the plaintiff and we'll make — bring our

5    motion to dismiss before the District Court on some kind of

6    agreed schedule, but those are legal issues.  There is no advice

7    needed for a motion to withdraw reference.  There's no advice

8    needed for a motion to dismiss under 12(b).  Those are legal

9    questions and — and the idea that Sidley and Austin needs

10   assistance from an advisor as to how to approach a legal issue,

11   we don't think is meritorious.

12         So, Your Honor, we have put — we have a witness and

13   exhibit list of six documents.  One is — Document 1 is the

14   application to employ the Teneo firm.  2 is the — 2, 3, 4, 5,

15   and 6 are email communications we have provided them.  They are

16   between counsel that are before the Court here today, just to

17   show that we granted extension for them to respond, then they

18   ask, and we responded, and so that they were on notice that we

19   opposed the requested stay.  And we would like for the motion to

20   withdraw reference to go forward.

21         The parties will have plenty of time to work out

22   discovery, Rule 26 issues, motion for relief — motion to dismiss

23   under 12(b) in front of whichever court is going to handle it.

24   Certainly this Court is — if the motion to withdraw reference is

25   denied, this Court will be in full control of when we have

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 32-1 Page 563 of 87 Page 1355 of 1539   PageID 18593
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 55 of 86

1   hearings on the motion to dismiss.  And we understand that.  So

2   will the District Court if the District Court grants the motion

3   to withdraw the reference.  The District Court will determine

4   hearings on the motion to dismiss under Rule 12(b).  And then we

5   have those two things to get past.  And those are legal

6   questions, legal questions that are already before the Court or

7   already there.  So we don't see how additional time is necessary

8   with respect to that.

9          We think by the time the stay — quote stay expires

10  we'll have a determination at least on the withdrawal motions.

11  And we can probably have a setting on the dismissal motions.

12  And if there — if the plaintiffs survive dismissal, then we'll

13  have discovery that all litigants will be involved in and

14  agreeing to and with scheduling orders, et cetera, from whatever

15  court is going to try this case.

16         And I'd like to say also that once we have — CLO

17  Holdco has been involved in the bankruptcy case.  We recognize

18  that.  I was not the lawyer for CLO Holdco, but I'm representing

19  CLO Holdco now.  The Highland Dallas Foundation has not been.

20  And the Highland Dallas Foundation is a charitable organization

21  that has institutional people on the board, has one donor seat

22  on the board, but it's — it's being sued for twenty something

23  million dollars.  And the idea that it has no interest in

24  getting this resolved is not correct.  It wants to get it

25  resolved and that's why we're opposing this stay.  Thank you,

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/25/23   Page 1356 of 1539   PageID 18594
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 56 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    56

1   Your Honor.

2          THE COURT:  All right.  A couple of follow-up

3   questions.  I'm struggling a bit with the fact that we have a

4   couple of defendants, two or three defendants that have not even

5   been served yet.  So is it appropriate for this Court to be

6   going forward on a motion to withdraw the reference when I don't

7   know what's going to happen with those two defendants.  Are they

8   going to be served?  If so, what sort of position are they going

9   to have with regard to the reference being withdrawn?

10          And, in any event, ultimately I'm going to have to

11   slice and dice this in a report to the District Court saying,

12   you know, these entities filed proofs of claim and that may

13   affect the authority of the Court, you know, maybe it does.  I

14   mean a part of me thinks what's going on here and should we just

15   wait till they have been served so we have the ability to report

16   to the District Court:  Here is every defendants' position on

17   this.

18          MR. PHILLIPS:  Your Honor, I can't answer the

19   question.  I don't — I mean it seems to me like we have — we

20   have — CLO Holdco was served.  And it is a foreign entity.  We

21   don't know why the other two have not been served.  I'm not — we

22   just don't know.  So I mean does that mean if we — I mean we had

23   to go forward, we had to answer, we had to respond.  We had a

24   deadline to do it.  It didn't matter that two hadn't been

25   served.  And so we — you know, if we hadn't responded, given our

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85 Exhibit 32 Filed 10/26/23   Page 58 of 87   Page 1357 of 1539   PageID 18595
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 57 of 86

1   service, we would have had a default entered against us and a

2   request for a default judgment.  So I don't know the answer to

3   the question because I can't imagine that a plaintiff can file a

4   lawsuit and then the lawsuit was filed months ago and not serve

5   two people and keep the defendants hung up.

6           I don't know if there is a problem of service.  There

7   was one entity that got served that is a foreign entity.  I

8   don't know why the other ones haven't been served.  The Highland

9   Dallas Foundation was served.  The other parties who have

10  appeared were served.  So we have no control over that because

11  we're not serving anybody.  And I would think that the part — I

12  did some looking in the — in the record and it seems to me like

13  we don't have — you know, I can't tell you whether we have —

14  what the arguments would be for the parties who have not been

15  served.

16          I would assume given that everybody has — my two

17  clients have filed what they filed.  CLO Holdco filed a proof of

18  claim, but it was in effect disallowed and converted to a claim

19  for zero.  My other client, Highland Dallas Foundation, has not

20  made any appearance in this case.  So all I can say is we think

21  two — I think the two clients that I'm currently representing,

22  we know they have been served.  We had a deadline to respond.

23  We have responded.  And we think we're entitled to a jury trial

24  and withdrawal of the reference.

25          MS. MONTGOMERY:  Your Honor, if I can answer the

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35 Filed 12/29/23    Page 1358 of 1539    PageID 18596
Exhibit 32    Page 59 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 58 of 86

*Adversary 20-3195, Committee's Motion to Stay*                                   58

1    question.  CLO Holdco was served through its counsel, whereas

2    the other two foreign entities require domestication of the

3    subpoena in the Caymans.  And it's our understanding that may

4    take as long as — just having heard — as another two months for

5    that process to be complete.

6            THE COURT:  All right.  My other question I guess is

7    maybe more rhetorical than something you could really answer.  I

8    — you know — on the one hand, you know, what Ms. Montgomery is

9    arguing:  Our true plaintiff contemplated for this lawsuit isn't

10   in place yet because the plan hadn't gone effective and, you

11   know, some — some of the defendants here or affiliates of

12   defendants are wanting to delay, delay, delay further when the

13   plan can go effective.  You know last night a motion for stay

14   pending appeal with the Fifth Circuit was filed.  So it's like,

15   no, don't let the plan go forward, let's not get Mr. Kirschner

16   in place.  But, oh, don't issue a stay on this lawsuit.  It just

17   feels a little bit inconsistent, the two positions.  What — do

18   you have anything to say to that?

19           MR. PHILLIPS:  I have — all I have to say, all I can

20   say, Your Honor, and that is CLO Holdco, as I understand it, is

21   not an appealing party.  My other client that's been served,

22   Highland Dallas Foundation, is not an appealing party.  We're a

23   defendant in — in this lawsuit.  And so we don't see — we're not

24   in a position to be inconsistent about anything.  We're not an

25   appellant.  We're not seeking any kind of relief on appeal.  And

Case 19-34054-sgj11 Doc 3596-32 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34 Filed 08/03/23 Page 1359 of 1539 PageID 18597
Case 21-03003-sgj Doc 50 Filed 05/25/21 Entered 05/25/21 12:59:11 Page 59 of 86

*Adversary 20-3195, Committee's Motion to Stay*     59

1   we — but we are defendants who have been served and who have

2   filed motions to withdraw reference.  So you will have to ask

3   other people about that.  I'm completely consistent in my

4   position.

5        MR. DRAPER:  Your Honor, this is Douglas Draper on

6   behalf of Dugaboy, who has both —

7        THE COURT:  All right.

8        MR. DRAPER:  — appealed your decision —

9        THE COURT:  Okay.

10        MR. DRAPER:  — and has asked for a stay pending

11   appeal.

12        THE COURT:  Okay.

13        MR. DRAPER:  It's not an inconsistent position because

14   two reasons.  Number one, you gave the committee authority to

15   file this suit.  The committee took that authority and filed the

16   suit within the time period.  So whether the case is going

17   forward or — the stay — the case is stayed and the confirmation

18   order is stayed or not, this action and this entity and this

19   proceeding is going to go forward.

20        And so all we're talking about here, just so we — it's

21   all clear, we're just talking about who is going to try this

22   suit.  We're not talking about a master litigation strategy.

23   We're talking about a location.  And, quite frankly, it would

24   surprise the hell out of me if — if the new person, or whoever,

25   says, look, I want to go to the District Court.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-1   Filed 06/23 of 87   Page 1360 of 1539   PageID 18598
Exhibit 32   Page 61 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 60 of 86

1          This is just a location issue, nothing more.  You can

2     sift through each one of these defendants who have been served

3     as to whether we have a right to a jury trial or not.  And each

4     one, as the Court recognized, is on a — on a defendant-by-

5     defendant basis.  I did file a proof of claim.  Whether I have a

6     right to a jury trial, you're going to have to look at to see if

7     in fact my proof of claim relates to this claim.

8          Mr. — Mr. Phillips is a defendant set of facts.  And

9     these other defendants may be a different set of facts.  So all

10    we're talking about is location.  It is purely procedural.  And

11    I don't think the stay at the district — of the confirmation

12    order or not is — is in any way impacts this whatsoever.  This

13    is a location question.

14          THE COURT:  All right.  Any other opening statements

15    from defendants?

16          All right.  Ms. Montgomery, you may put on your

17    witness.  And I'm fine with the proffer, but we'll then swear

18    him in and see if there cross-examination from the others.  All

19    right, you may proceed.

20          MS. MONTGOMERY:  Yes, Your Honor.  At this point we'd

21    like to proffer Mr. Kirschner's declaration that was submitted

22    in support of our motion for the stay as the content of his

23    proposed testimony.  Mr. Kirschner is obviously here to answer

24    any questions you have or on cross-examination after he's been

25    sworn in.  And, Your Honor, we would just reserve our right to a

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 02/23/24   Page 1361 of 1539   PageID 18599
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 61 of 86

1   brief redirect should that prove necessary.

2          THE COURT:  All right.  So I have in front of me the

3   Declaration of Marc S. Kirschner.  It was actually attached to

4   the committee's motion for stay.  It's about four pages long.

5          Let me ask:  Are there lawyers who are going to want

6   to cross-examine Mr. Kirschner?

7          Going once, going twice, no one wishes to

8   cross-examine him?

9          THE REPORTER:  He's on mute.

10          THE COURT:  Oh, Mr. Phillips, —

11          MR. PHILLIPS:  Your Honor, I'm sorry.  I was on mute.

12   I'm on mute, as I probably already muted, but I was on mute and

13   I apologize.

14          Your Honor, this — this is — this declaration, there's

15   no way to cross-examine a declaration that speaks in conclusory

16   language.  The declaration, it was mimicked and mirrors —

17   mirrors exactly as the party looking into the mirror, not as the

18   reverse of the party looking into the mirror, argument by —

19   opening statement by counsel.  I would ask a couple of questions

20   of Mr. Kirschner, please.

21          THE COURT:  All right.  Mr. Kirschner, I need to swear

22   you in.  Would you speak up, say, "testing one, two."

23          MR. KIRSCHNER:  Yes.  Testing one, two.

24          THE COURT:  All right.

25          MR. KIRSCHNER:  Coming through?

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-1 Filed 10/23/23 Page 62 of 87    Page 1362 of 1539    PageID 18600
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 62 of 86

*Kirschner - Cross/Phillips*                                            62

1          THE COURT:  I — I hear you, I don't see —

2          MR. KIRSCHNER:  Okay.

3          THE COURT:  There you are.  Please raise your right

4    hand.

5          MR. KIRSCHNER:  I can.

6     <u>MARC S. KIRSCHNER, COMMITTEE'S WITNESS, SWORN/AFFIRMED</u>

7          THE WITNESS:  I do.

8          THE COURT:  All right.  Thank you.

9          Mr. Phillips, go ahead.

10          MR. PHILLIPS:  Yes, Your Honor.  Thank you.  Just a

11    couple of questions.

12                     <u>CROSS-EXAMINATION</u>

13    BY MR. PHILLIPS:

14    Q.  Mr. Kirschner, in paragraph 7 of your declaration, if you

15    could find it.  Just let me know when you're there.

16    A.  I'm there.  Thank you.

17    Q.  Okay.  Thanks.  You say that it's important for your firm to

18    gain an understanding of the complex transactions described in

19    the adversary proceeding, particularly in connection with the

20    motion to dismiss and motions to withdraw reference and complex

21    issues before the Court.  What does that mean?

22    A.  That means that, as Ms. Paige indicated in her opening

23    statement and as the Court and all the defendants understand, I

24    was — when I was designated as litigation trustee in January,

25    there has been delay after delay after delay in the effective

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 06/23/23   Page 1363 of 1539   PageID 18601
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 63 of 86

1  date of the plan, and now we're even at the Fifth Circuit, so

2  the trust and my role as subtrustee has not yet gone into

3  effect.  Prior to April 15th, I had no access to the debtor, to

4  the committee, or any of the attorneys, no access through any

5  protected information.  I had no input on the complaint.

6        I became worried as the passage of time went on about

7  the possible running of statute of limitations later on this

8  year in October.  And it was I who suggested to Mr. Clemente to

9  come up with what is an extremely unusual procedure, to permit

10 the committee retain me on an interim basis until the

11 effectiveness of the trust, and then to flip my work effectively

12 into the trust.

13       This is very unusual.  It's not even yet approved by

14 the Court.  Nevertheless, I and my firm have worked very

15 diligently since April 15th to get up to speed on this entire

16 complex factual and legal situation.  I cannot just look at the

17 Holdco adversary in a vacuum.

18       There has been as the Court and all the parties here

19 know much better than I, there has been ongoing litigation on

20 many fronts for quite a long time.  There has been supplied a

21 Byzantine web of some 1400 entities —

22       MR. PHILLIPS:  Your Honor, Your Honor, —

23       THE WITNESS:  — to accomplish —

24       MR. PHILLIPS:  Your Honor, could I interrupt?  He

25 needs to answer the question.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 38-85   Filed 10/25/23   Page 653 of 87   Page 1364 of 1539   PageID 18602
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 64 of 86

1   BY MR. PHILLIPS:

2   Q.  What does — what does — what does the understanding about

3   the motion to withdraw reference mean?  What do you need to get

4   up to date on the motion to withdraw reference?

5   A.  I'm responding to your question.

6            THE WITNESS:  If I may, Your Honor, I'm responding to

7   the question.  I'm almost done —

8            MR. PHILLIPS:  Your Honor, a narrative, a preexisting

9   narrative —

10           THE COURT:  Ah, —

11           MR. PHILLIPS:  We just — I just want to know.  We have

12  legal issues.

13           THE COURT:  Okay, I sustain the objection —

14           MR. PHILLIPS:  I want to know what he —

15           THE COURT:  If you could reask the question and we'll

16  see if we can get an answer —

17           MR. PHILLIPS:  All right.  I'll reask the question,

18  Your Honor.  I'm sorry.  I apologize.

19           Your Honor, I'm going to withdraw any questions.  I'm

20  — this is — this is going to turn into just an argument.  His

21  declaration and conclusory and it's just going to be more

22  conclusion.  So I'm — I'm willing to argue from his declaration

23  in closing.

24           THE COURT:  All right.  Any other questions?

25           No other —

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-5 Filed 09/23/23 Page 1365 of 1539   PageID 18603
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 65 of 86

*Kirschner - Redirect/Montgomery*                                    65

1          MR. DRAPER:  None, Your Honor, from Dugaboy.

2          THE COURT:  Okay.  Anyone else?

3          Ms. Montgomery, do you have any redirect on that brief

4    cross?

5                    REDIRECT EXAMINATION

6          MS. MONTGOMERY:  Yes.  I think, Your Honor, I would

7    just ask if there is anything else that Mr. Kirschner feels the

8    Court should be aware of before reaching a decision on today's —

9    on today's motion?

10          MR. PHILLIPS:  Your Honor, we object to that question.

11   That's not even a question.

12          THE COURT:  I overrule.  He can answer.

13          THE WITNESS:  Okay.  Thank you very much, Your Honor.

14          As I was saying, there is a Byzantine web here of over

15   1400 entities, many moving intertwined parts.  I have literally

16   and my firm has literally had to triage the monumental amount of

17   work that is necessary to get my hands on this overall

18   situation.  There's allegations that money's been flying all

19   over the world —

20          MR. PHILLIPS:  Your Honor, this is not — this is not

21   appropriate testimony.  This is — that's hearsay.  There's

22   allegations all — money flowing all over the world.  This is —

23   this is a narrative that has nothing to do with the pending

24   motion to withdraw reference and is, in essence, an

25   assassination piece.  This is — what we —

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document Exhibit 32 Filed Page 673 of 87Page 1366 of 1539   PageID 18604
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 66 of 86

*Kirschner - Redirect/Montgomery*                                66

1          THE COURT:  I overrule.  He's trying to explain why he

2     needs 90 days at bottom here, so I think it's relevant.

3          MR. PHILLIPS:  Well, the long —

4          THE COURT:  And I understand everything's an

5     allegation subject to evidence.

6          MR. PHILLIPS:  Well, we're talking about

7     allegations, —

8          MR. [SPEAKER]:  Right.

9          MR. PHILLIPS:  — we're talking about — we just heard

10    they're allegations about money flying all over the world.

11    That's not an acceptable testimony.  You know that and everybody

12    on this call knows that.  That's absolute abject hearsay and the

13    idea that you could — you could buttress a motion for stay after

14    you've had 30 days to review a legal analysis about a motion to

15    withdraw reference, because there are allegations of money

16    flowing all over the world is ridiculous.  Your Honor, we — we

17    firmly and in this way object —

18         THE COURT:  Overruled.  I understand you don't like

19    the emotional, if you want to call it, emotional language.  You

20    think it's hyperbole, you think it's hearsay, but he didn't — he

21    didn't offer an out-of-court statement.  He's just saying the

22    allegations — you know, they're in pleadings, they're

23    allegations in many different adversaries, and so I overrule the

24    objection.

25         You can complete your answer, Mr. Kirschner.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Exhibit 32   Page 823 of 87   Page 1367 of 1539   PageID 18605
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 67 of 86

1          THE WITNESS:  Thank you very much, Your Honor.

2          All of these complexities in my view potentially

3    impact on the motions to withdraw.  I recently realized that I

4    cannot properly perform my fiduciary duty to all creditors by

5    the deadline for a response to the motion to withdraw and the

6    motions to dismiss.  I am in fact considering potential

7    amendments to the existing Holdco adversary to possibly other

8    issues that may impact the withdrawal motion.

9          Your Honor said this morning that it's important to

10   take into consideration both procedural and substantive matters.

11   I am worried about potential impacts of whatever I do.  And bear

12   in mind, as Ms. Paige indicated, I am — (brief garbled audio) —

13   no process plan.  All of this was supposed to have been put in

14   the litigation trust under my auspices.  I am now litigation

15   advisor, not yet approved by the Court.  It is the client, I,

16   who direct, after consultation, all strategy by lawyers.

17         I have a long history, as Your Honor has seen from my

18   C.V., of directing complex billions of dollars of litigations.

19   I rely on lawyers, but I am very involved in every aspect of the

20   case.  This is very confusing, not just the CLO Holdco itself

21   but the entire complexity of all of the potential matters here

22   that I need to study in a very short period of time.  I'm

23   concerned that dealing just with this in this couple of days is

24   going to be harmful to creditors ultimately and respectfully

25   request the Court to grant the 90-days adjournment.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 10/02/23   Page 1368 of 1539   PageID 18606
Exhibit 32   Page 69 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 68 of 86

1          Maybe I'm being overly cautious and I apologize for

2   that, but I feel strongly about my fiduciary duty and want to do

3   the best I can to understand everything that's going on before

4   we have to respond both to the withdrawal motion and the motion

5   to dismiss.  So thank you, Your Honor.

6          THE COURT:  Thank you.

7          Anything else, Ms. Montgomery, as far as examination?

8          MS. MONTGOMERY:  No, Your Honor.  I have no further

9   questions.

10          THE COURT:  All right.  Mr. Phillips, or anyone else,

11  any recross on that redirect?

12          No?  All right.  Thank you.

13          All right.  This —

14          MR. PHILLIPS:  No, Your Honor.  I muted myself again.

15  No, Your Honor.

16          THE COURT:  Okay.  Is that all of the evidence you're

17  going to present, Ms. Montgomery?

18          MS. MONTGOMERY:  It is, Your Honor.

19          THE COURT:  All right.  Well, I'll turn to our

20  objectors —

21          MR. PHILLIPS:  We —

22          THE COURT:  I'm sorry?

23          MR. PHILLIPS:  We'd like the enter and offer — we'd

24  like to offer and introduce our exhibits that we put on our

25  witness and exhibit list, Your Honor.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 02/01/23   Page 1369 of 1539   PageID 18607
Exhibit 32 Page 70 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 69 of 86

*Committee's Motion for Continuance*                                           69

```
 1              THE COURT:  Okay.

 2              MR. PHILLIPS:  And we've submitted them to the Court,

 3   Exhibit 1 through 6, as itemized in our witness and exhibit

 4   list.

 5              THE COURT:  All right.  This is Docket Number 52 in

 6   the adversary, correct?

 7              MR. PHILLIPS:  Yes.  Yes, ma'am.

 8              THE COURT:  All right.  So let me pull it up here.

 9   Okay, we've got the application to employ Teneo and different

10   emails.

11              Any objection, Ms. Montgomery, to this?

12              MS. MONTGOMERY:  I have no objection to Exhibit 1,

13   Your Honor, the application, and obviously it's a pleading that

14   we filed.  I have questions about the relevance of the other

15   exhibits, but I have no objection to their admission.  They're

16   emails that went back and forth between the parties.

17              THE COURT:  All right.  Well, do you want to address

18   that relevance?  I'm not sure if it was an objection or — was it

19   an objection ultimately?  Was it —

20              MR. PHILLIPS:  I didn't hear an objection, Your Honor.

21              THE COURT:  Ms. Montgomery.

22              MS. MONTGOMERY:  Your Honor, for purposes of today's

23   hearing, I have — I have no concerns about their admission for

24   your consideration.

25              THE COURT:  Oh, okay, so —
```

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 09/13/23    Page 1370 of 1539    PageID 18608
Exhibit 32    Page 70 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 70 of 86

| *Committee's Motion for Continuance* | 70 |
|---|---|

1       MS. MONTGOMERY:  We're not contesting the history of

2  the back-and-forth between the parties.

3       THE COURT:  Okay.  I will admit 1 through 6.

4     (Defendants' Exhibits 1 through 6 received in evidence.)

5       THE COURT:  All right.  Any — any other evidence from

6  our defendants?

7       MR. PHILLIPS:  No, Your Honor.

8       THE COURT:  All right.  Well, anything in the way of

9  closing argument?  Ms. Montgomery, you are the movant.  You go

10  first.

11       MS. MONTGOMERY:  Yes, Your Honor, just very briefly to

12  address a couple of points.  First of all, I think that there's

13  been some sort of misconstruing of Mr. Kirschner's role as the

14  litigation advisor and ultimately the litigation trustee.  He —

15  functionally, the litigation advisor — we're in a very unique

16  situation here.

17       The parties never expected that the effective date

18  would be delayed in the way that it has been.  We're coming up

19  on the two-year anniversary of the filing of the proceedings.

20  There are a number of claims that need to be investigated and

21  decisions make about how they will be pursued in the next couple

22  of months.  And so this litigation advisor role, as Mr.

23  Kirschner testified, is somewhere unique in that we're trying to

24  work around the constraints that have been created by the way

25  that these proceedings have moved forward.

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-1    Filed 09/12/23    Page 1371 of 1539    PageID 18609
Exhibit 32 Page 72 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 71 of 86

*Committee's Motion for Continuance*                                      71

1          The litigation advisor is really functionally a proxy

2    for the role that Mr. Kirschner will have upon the effective

3    date of the plan as litigation trustee.  He's not acting in the

4    capacity of a law firm or like and FTI or a DSI, or any of the

5    other professionals that have been specifically retained in the

6    bankruptcy to date because the role isn't the same traditional

7    role.  Right, he is functioning in a way that will allow him

8    access that he needs to the data to get up to speed to make the

9    decisions that have to be made so that he can, you know, proceed

10   in the way that is best for meeting his fiduciary duties to the

11   ultimate litigation subtrust.

12         So to the extent that there is any sort of argument

13   that, you know, he — that his role is duplicative or any of the

14   other things that we've heard today or that we've seen in the

15   response, I think that those are just a misunderstanding of what

16   he will actually be doing.  He is going to be the client, Your

17   Honor.  He is not going to be the lawyer.

18         The other thing I think that we talked about a bit is,

19   you know, this argument that Mr. Kirschner has been involved in

20   the case since April 15th and therefore he's had plenty of time

21   to understand everything that he needs to know to be able to

22   move forward.  Technically, Your Honor, I think it goes without

23   saying he's not officially retained until after the return date

24   on the motion to withdraw.  And even so, just based on the years

25   now that we've spent in this case, I can — I can argue to you

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 10/27/23   Page 1372 of 1539   PageID 18610
Exhibit 32 - Page 73 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 72 of 86

*Committee's Motion for Continuance*                                    72

 1   and I think Your Honor will feel the same way, there's too much

 2   learn in that short a time period to be able to say that you are

 3   proceeding in the way that is going to be best for the estate in

 4   that short timeframe.

 5          We're working to get Mr. Kirschner up to speed, the

 6   debtor is working to get Mr. Kirschner up to speed, but there is

 7   a lot that has happened here and that continues to change on a

 8   daily basis, including the stay that was filed just last night.

 9          And then, finally, Your Honor, I would argue that

10   there has been no harm established by virtue of the stay.  And,

11   in fact, all of the things we've heard today established the

12   fact that there may be harm if the stay is denied.  So, for

13   example, Your Honor you know very correctly pointed out that we

14   have two international defendants who haven't even appeared at

15   this proceeding yet, right.  We may not effectuate service for

16   another two months.  It may be another 60 of these 90 days that

17   we're requesting for a stay may be required just to get them

18   properly served and into this proceeding.

19          And, you know, I agree, Your Honor, that there may be

20   issues that surround those two defendants that, you know, we

21   won't be able to take into consideration until they're properly

22   here in the Court and able to file their own motion to withdraw,

23   if that's what they want, or state their position with regard to

24   it.

25          You know, Your Honor, moreover, there is a lot going

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 09/14/23    Page 1373 of 1539    PageID 18611
Exhibit 32    Page 74 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 73 of 86

*Committee's Motion for Continuance*                                73

1   on here and Mr. Kirschner does realistically need time to be

2   able to develop his approach and make decisions about whether or

3   not there will be amendments to the complaint that could impact

4   the motion to withdraw.  He needs to make decisions about other

5   claims that may be brought.  There are a lot of moving parts.

6   It's a unique situation.  And we would urge the Court to allow

7   him the time that he needs to be able to effectuate his duties

8   in the way that he sees fit.

9           THE COURT:  And I know I have it right in front of me,

10  but the employment application for Mr. Kirschner and his firm to

11  potentially be litigation advisor until the plan goes effective,

12  when is that set for hearing?

13          MS. MONTGOMERY:  It's set for June 7th, Your Honor,

14  and the motion to withdraw is currently set for June 3rd.  And

15  that — that motion to retain Mr. Kirschner was only filed on

16  Friday of last week, and our motions that you're hearing today

17  were filed on Tuesday.

18          THE COURT:  Okay.

19          MS. MONTGOMERY:  So it's a very short delay of time

20  between the two.

21          THE COURT:  All right.  I'll hear other closing

22  arguments.

23          MR. PHILLIPS:  Your Honor, thank you.  As far as harm,

24  we have one — we have one client, Highland Dallas Foundation,

25  who has made no appearance in this case, as has very — and

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/29/23   Page 1374 of 1539   PageID 18612
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 74 of 86

*Committee's Motion for Continuance* 74

1   assume they're being sued for $24 million, and that's not a

2   problem.

3          Under the argument structure we're hearing today, we

4   could never really get until a plaintiff has said, 'I have no

5   further ability to amend the complaint,' a hearing on a motion

6   to withdraw reference.  Look, we didn't file the complaint.  The

7   complaint was filed four or five months ago.  And very able

8   counsel looked, and as counsel has argued, has looked at

9   thousands and thousands of documents, have been paid millions

10  and millions of dollars for its work, and it came up with this

11  lawsuit that was filed — I've forgotten the filing date, but it

12  was filed at least four and a half months ago, January of this

13  year I believe.  Ms. Montgomery — counsel for plaintiff can say

14  the exact date.

15         But we've got two defendants who haven't been served,

16  but I've got one — I've got two that have been served.  And we

17  have established a basis upon which we can get — we have a right

18  to a jury trial and a right to withdrawal of the reference.  And

19  that motion has been filed.  And the idea that I'm going to

20  bring — I'm going to change clients — and it's really

21  complicated.  After we've done millions and millions and

22  millions of dollars worth of work, looked at thousands and

23  thousands and thousands of documents, that we may come in and do

24  a different lawsuit that pleads around a motion to withdraw

25  reference is no basis for a stay.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 09/27/63   Page 1375 of 1539   PageID 18613
Exhibit 32 Page 76 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 75 of 86

*Committee's Motion for Continuance*                     75

1        That — that — the narrative about, you know, the

2    hearsay, the narrative about the aspersions, the this and the

3    that, this is really complicated, this is really hard, well, we

4    have a lawsuit in front of you, Your Honor, and it's been

5    pending for months.  And it was filed by the committee that had

6    authority to file it and it was filed by the law firm for the

7    committee that had authority to represent the client who filed

8    it.  And that's what they came up with after months and months

9    and months of years of looking at stuff and looking at documents

10   and deciding what to bring as far as claims of this nature

11   against these defendants.  I'm worried about two of them.

12        I'm worried about — particularly worried with respect

13   to the stay, I'm worried about both of them for — with respect

14   to the stay, but one of my clients, Highland Dallas Foundation,

15   has had no involvement in this bankruptcy case.  And now let's

16   just wait around.  It's got a $24 million cloud hanging over its

17   head and it's expected to continue to try to raise money and try

18   to act as a charity while — while Mr. Kirschner gets familiar —

19   refamiliarized and gets familiar with the situation where

20   counsel and the committee have been working for, what, a year

21   and a half, two years, to get ready, and here's what the lawsuit

22   — here's the lawsuit they came up with.

23        So no harm has been alleged.  In fact, harm will be —

24   all you heard about the potential harm to the estate is that

25   notwithstanding millions and tens of millions of dollars of fees

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 09/28/23   Page 1376 of 1539   PageID 18614
Exhibit 32   Page 923 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 76 of 86

*Committee's Motion for Continuance*                                        76

1   paid to professionals to determine litigation claims and we have

2   barely, what, two months left to bring them?  That's 22 months

3   worth of looking into things, millions and millions of fees.

4   The estate might be irretrievably harmed if a motion to withdraw

5   reference moves forward, when the committee and counsel were

6   responsible and filed this complaint, and they were responsible

7   to file the complaint under the transaction and occurrences,

8   standards such that whatever they haven't pled, whatever they

9   haven't pled by the time to plead is gone.  And the idea that we

10  need another 22 months for Mr. Kirschner to get up to speed or

11  some other to come up with additional litigation and additional

12  amendments to postpone a withdrawal of reference means that you

13  can never get a hearing on a withdrawal of reference.

14          We think the pleadings are there.  They have been —

15  they have been investigated, we assume.  They're subject to

16  motions to dismiss, which are legal questions.  They're subject

17  to motions to withdraw reference, which are legal questions.

18  And we're ready for a decision on what court's going to handle

19  this.  And by the time that's done, Mr. Kirschner will have

20  whatever rights he has, as if he has any.  The plan will either

21  be confirmed and effective or it won't be, but that's not our

22  problem.  Thank you.

23          THE COURT:  Any other closing arguments?

24          Going once, going twice.

25          MR. ASSINK:  Your Honor, I apologize.  Just for the

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 32 Exhibit 32 Filed 09/23/23   Page 1377 of 1539   PageID 18615
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 77 of 86

*Committee's Motion for Continuance*                                              77

1    record, this is Bryan Assink for Mr. Dondero.  And Mr. Dondero

2    joins in the objections made by defendants in this proceeding

3    and adopts the arguments made by Mr. Phillips.  That is all,

4    Your Honor.  Thank you.

5              MR. DRAPER:  Your Honor, can the Court hear me?

6              THE COURT:  Yes.

7              MR. DRAPER:  This is Douglas — okay.  What I'd like to

8    make, a short comment.  The argument that there are unserved

9    parties is a red herring and it's a red herring for the

10   following reason.  The Court has to go through each defendant to

11   determine if they have a right to — a right to withdraw a

12   reference.  The facts with respect to Mr. Phillips' clients are

13   different than the facts with respect to my clients.  So the two

14   unserved parties may have a right to do it, they may not, but it

15   doesn't affect your ruling with respect to Mr. Phillips' clients

16   or mine because we have either waived or didn't waive our right

17   to a jury trial.  And so this argument that there's two other

18   parties out there, again, is a red herring.  They have their own

19   right and it will not affect Mr. Phillips' right or mine.  So I

20   think that needs to be taken into account.

21              And, again, all we're talking about is location.  The

22   — if they want to amend their suit at a later point, that's

23   fine, but we are just talking about who's going to hear the

24   case.  And, quite frankly, Mr. Phillips is right, I don't think

25   the Court can in a very short period of time unpack these

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 09/22/23    Page 1378 of 1539    PageID 18616
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 78 of 86

*The Ruling of the Court on the Motion to Continue* 78

1    withdrawal issues.  And so you may be looking at a

2    recommendation that you make that takes 30 or 60 days.  We don't

3    know what the District Court's going to do with it.  And, quite

4    frankly, you know we may be 90 or 120 days down the road before

5    the location is even determined.

6            That's all I have to say, Your Honor.

7            THE COURT:  All right.  Anyone else?

8                    THE RULING OF THE COURT

9            THE COURT:  All right.  I'll just be honest, I've

10    tried hard to understand where everyone is coming from here, but

11    this has been yet another hearing where I just frankly don't

12    understand why the big fight, why all the papers, and why all

13    the Court time used.

14            I mean I think I hear everyone agreeing that the

15    plaintiff is essentially going to get its/his 90-day stay here.

16    I mean if I were to go forward on the motions, plural, motions

17    to withdraw the reference, let's be real, it's going to take:

18    This Court two or three or four weeks to get a report and

19    recommendation to the District Court, given the complexity here

20    of the parties and, you know, we try to do a very clear roadmap

21    for the District Court, what's this lawsuit about, who are the

22    parties; and then it's going to take a few weeks for the

23    District Court to rule on that.  So I mean optimistically, the

24    most optimistic thing I can imagine is 60 days from now you have

25    an order from the District Court saying where the lawsuit's

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-5 Filed 02/28/23   Page 1379 of 1539   PageID 18617
Exhibit 32 Page 303 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 79 of 86

1   going to go forward.

2            I mean so we're fighting, to me, over a big nothing

3   burger.  I think the stay is, in effect, going to happen.  So

4   all we're talking about here is pushing a plaintiff to go

5   forward, who at this point is working for free because the plan

6   hadn't gone effective and he hadn't been appointed.  I mean it

7   seems like from my perspective the defendants — again I'm trying

8   to understand the practicalities here, but I'm going to be

9   honest, it almost feels like defendants tweaking with the future

10  litigation trustee, 'We're going to make you go forward and work

11  for free when at the end of the day you're probably going to get

12  a stay anyway,' because there's no way a district judge is going

13  to rule on this in much sooner than 90 days.  It's like you're

14  just forcing him to work for free and move fast on the motion to

15  withdraw the reference.

16           And it is a red herring?  I don't know, maybe.  I

17  think likely this is ultimately going to be tried in the

18  District Court since certain parties haven't filed proofs of

19  claim.  But if the District Court does what it always does, in

20  my experience, I've never had, I can't remember ever having a

21  district court say, 'I'm withdrawing the whole darn thing.'

22  They almost always use the — they almost always use the

23  bankruptcy judges as their magistrates in a case when they

24  withdraw the reference.

25           Bankruptcy judge, handle all the pretrial stuff, the

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 32    Filed 08/23 of 87 Page 1380 of 1539    PageID 18618
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 80 of 86

*The Ruling of the Court on the Motion to Continue*                    80

 1    discovery disputes, the motions to dismiss, motions for summary

 2    judgment.  If you were on a motion to dismiss or a motion for

 3    summary judgment in a way that would finally dispose of any

 4    claims, well, you have to do that in a report and recommendation

 5    to me.  So I feel like we all know that's likely where this is

 6    heading, so I don't know why we had to have an hour fight.

 7            I don't know why it's any big shakes to just stay the

 8    whole darn thing for 90 days, especially when we have the whole

 9    reason the plaintiff, liquidating trustee is not in place yet,

10    because of a stay, that some of these defendants or their

11    affiliates have wanted.  It just seems silly to me.

12            And I do want to address one other thing.  There has

13    been an argument that Sidley and Austin and the committee have

14    had months to get up to speed on the issues in the lawsuit, they

15    had months to bring it.  It's been pending months.  But I'll say

16    something for the benefit of those who have not been around for

17    this whole case, in July of last year, July 2020, which by that

18    point was about 10 months into the case, it was front and center

19    to this Court the difficulty the committee was having getting

20    discovery.  They had served four requests for production, going

21    back to before this case was even pending before me.  When the

22    case was in Delaware, they were already filing, serving requests

23    for production of documents, wanting to get a protocol in place

24    for ESI, and then finally it all kind of came to a head in July.

25            And I remember saying, 'I'm sure there's a transcript

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33  Filed 09/22/2 of 87Page 1381 of 1539   PageID 18619
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 81 of 86

*The Ruling of the Court on the Motion to Continue*                                    81

 1   out there you can access.'  Gee, I may not have pressed the

 2   issue so much on this lawsuit being filed involving CLO Holdco.

 3   I may not have pressed the committee's feet to the fire so much

 4   on getting that filed if I had been fully aware at all of these

 5   efforts going on outside of the Court to get documents, to get

 6   documents, four requests for production, and then finally the

 7   protocol order, if you will, that the committee filed, asking

 8   this Court to put in place some protocol to get ESI from like

 9   nine different custodians of debtor records.  So my point is

10   those who have not lived with this case for the whole time, they

11   don't know that I kind of live to regret pressing the committee

12   to get this lawsuit on file.  You know I was worried because of

13   Holdco.  I had like ordered money to be put in the registry of

14   the Court before I had, you know, litigation pending.  So that's

15   why I put pressure.  But then I learned and had a multi-hour

16   hearing on what the committee had gone through trying to get

17   documentation.  So that's very much in the back of my mind here

18   in my ruling.

19           And my ruling is going to be that I grant the 90-day

20   continuance.  Again, I hope that in 90 days, we — I don't know

21   if we'll know something from the Fifth Circuit on the plan or

22   not, but at least we'll be closer to that point.  And, again,

23   we're looming, you know October 16th, 2021 as a deadline for

24   bringing claims, and I think that's relevant here.  There's a

25   lot to be focused on that may or may not impact the way this

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 08/23/24   Page 1382 of 1539   PageID 18620
Exhibit 32 Page 83 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 82 of 86

*The Ruling of the Court on the Motion to Continue*                    82

1   lawsuit ultimately is mapped out.  I think the fact that we have

2   two unserved defendants, I think it does matter.

3        I think a district court may be a little hesitant,

4   really want to see the complete picture on each defendants'

5   position before it rules.  So the 90-day stay is granted.

6        All right.  So please upload the order, Ms.

7   Montgomery.

8        Thank you, all, for your arguments.

9        Before we wrap it up, Mr. Clubok, if you're still with

10  us, I think you were hoping to raise something that might

11  pertain to tomorrow's hearing on the UBS debtor compromise.  If

12  you're still there, you may speak to whatever it was you wanted

13  to present.

14        MR. CLUBOK:  Good morning, Your Honor.  Still — still

15  the morning.  Hopefully you can hear me.

16        THE COURT:  I can.

17        MR. CLUBOK:  Your Honor, I'm really just previewing an

18  issue.  In light of the comment that you made earlier today

19  about having this motion, discovery, and then folks not

20  previewing it, I just wanted to alert you to the fact that in

21  our adversary proceeding we have sought discovery against five

22  third parties, Scott Ellington, Isaac Ellington, three other

23  folks, all of whom are represented by Ms. Smith, who is here,

24  you can see.  And we first sought —

25        MS. SMITH:  This is Frances Smith.  Your Honor,

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 10/24/23   Page 843 of 87   Page 1383 of 1539   PageID 18621
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 83 of 86

*The Ruling of the Court on the Motion to Continue*                    83

1   Frances Smith on behalf of Mr. Ellington, J.P. Sevilla, Mr.

2   Isaac Leventon, Matt VRO, and Mary Catherine Lucas (phonetics).

3        I just received an email earlier this morning from Mr.

4   Clubok that he was going to do this preview for you.  To the

5   extent he gets into the substance of any motions that are not

6   filed, that's inappropriate.  And so —

7        THE COURT:  Okay.

8        MS. SMITH:  — if he wants to take Your Honor offer of

9   a preview to say what he is going to file, I'm fine with that.

10  But if he's going to start going into the substance, that is not

11  appropriate.

12       THE COURT:  Okay.  We'll let Mr. Clubok get a little

13  further into what he was going to say, and then we'll decide do

14  we need to cut it off.

15       Mr. Clubok, go ahead.

16       MR. CLUBOK:  Thank you, Your Honor.  I was about to

17  say that there were five — there's the five individuals that Ms.

18  Smith represents, we sought discovery from in April 2nd, and,

19  namely, depositions.  After a long period of time culminating in

20  a meet-and-confer last week, Ms. Smith filed a motion to quash

21  on behalf of these five individuals on Monday and set a hearing

22  date for July 29th.

23       All I'm — all I'm previewing, Your Honor, is to alert

24  you that in response to that motion to quash, a hearing date set

25  for July 29th, so effectively will end up being, you know,

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33   Exhibit 32   Filed 02/23/23   Page 85 of 87   Page 1384 of 1539    PageID 18622
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 84 of 86

*The Ruling of the Court on the Motion to Continue*                    84

1    months and months of delay to these individuals who are needed

2    to move this conjunctive-relief proceeding forward, we are

3    filing our response today to Ms. Smith's motion and a

4    countermotion to compel.  And I'm merely flagging this issue for

5    Your Honor because we are going to ask either Your Honor or Ms.

6    Ellison, we're going to style our motion as an expedited

7    request, we would just simply love to have a hearing as early as

8    reasonably practicable on these issues.  And I have no intention

9    of getting into the merits now, but happy to do so.  I think it

10   will all be familiar to you from their discussions in the

11   Dondero deposition dispute, but we just — or simply I'm just

12   flagging for you, because you raised it this morning, you know,

13   why didn't people tell me, so we just are going to ask the

14   hearing, the soonest-possible hearing, and I don't think it has

15   to be a very long hearing, on whether or not we get third-party

16   discovery, depositions of Mr. Ellington, Mr. Leventon, and the

17   other three individuals that Ms. Smith represents; subject to

18   one of them is on maternity leave, and we're going to be

19   pursuing discovery of that while she's in that state, but —

20            THE COURT:  All right.

21            MR. CLUBOK:  — but other than that we just ask that a

22   hearing to be scheduled.  And I'm just alerting you that we're

23   going to be making that request.

24            THE COURT:  Okay.  Well, I have been forewarned.  I

25   have been forewarned.  And I'll wait to see the motion for

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33-85   Filed 10/23/23   Page 1385 of 1539   PageID 18623
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 85 of 86

*The Ruling of the Court on the Motion to Continue*                           85

1   expedited hearing and decide if I think it's appropriate to give

2   an expedited hearing, okay?  I'll look at the pleadings and

3   likely just rule on the pleadings on the timing, okay?

4            Thank you.

5            MR. CLUBOK:  Your Honor, —

6            MS. SMITH:  Your Honor, since we're previewing, we

7   will be filing a response to that as well.

8            THE COURT:  All right.

9            MS. SMITH:  Thank you, Your Honor.

10           COURT SECURITY OFFICER:  All rise.

11       (The hearing was adjourned at 11:45 o'clock a.m.)

12                           —o0o—

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/29/23   Page 1386 of 1539   PageID 18624
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 86 of 86

State of California          )
                            )      SS.
County of San Joaquin        )


        I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording provided to me by the United

States Bankruptcy Court, Northern District of Texas, Office of

the Clerk, of the proceedings taken on the date and time

previously stated in the above matter.

        I further certify that I am not a party to nor in any

way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber

by the American Association of Electronic Reporters and

Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer

Reporting Services is approved by the Administrative Office of

the United States Courts to officially prepare transcripts for

the U.S. District and Bankruptcy Courts.


                                Susan Palmer
                                Palmer Reporting Services

                                Dated May 22, 2021

# EXHIBIT 33

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-11 Filed 12/02/22  Page 1388 of 1539    PageID 18626
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 1 of 21    PageID 3611

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Debtor, | § | |
| -------------------------------------------------- | § | |
| THE CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| | § | |
| Plaintiffs/Appellants, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-3129-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Defendant/Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Appellants The Charitable DAF Fund, L.P. (Charitable DAF) and CLO

Holdco, Ltd. (CLO Holdco)'s appeals from the bankruptcy court's Motion to Dismiss Order and

Motion to Stay Order. For the reasons that follow, the Motion to Dismiss Order is **REVERSED** and

**REMANDED**. The Motion to Stay Order is **AFFIRMED**.

- 1 -

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35 Filed 1 Page 2 of 22 Page 1389 of 1539    PageID 18627
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 2 of 21    PageID 3612

# I.

## BACKGROUND[1]

These are consolidated appeals from an adversary proceeding in a bankruptcy case. The Debtor, Highland Capital Management, L.P. (HCM), filed for Chapter 11 bankruptcy on October 16, 2019, in the United States Bankruptcy Court for the District of Delaware and that court transferred venue to the United States Bankruptcy Court for the North District of Texas. *In re Highland Cap. Mgmt. L.P.*, 2022 WL 780991, at *1 (Bankr. N.D. Tex. Mar. 11, 2022).

In 2017, Charitable DAF—through the holding entity CLO Holdco—purchased 49.02% of the available shares of Highland CLO Funding, Ltd. (HCLOF) based upon investment advice from HCM.[2] Doc. 9, Appellant's Br., 5. Another entity, HarbourVest, acquired 49.98% of the HCLOF shares and HCM and its employees acquired the remaining 1%. *Id.*; Doc. 21, Appellee's Br., 7. A company agreement (the HCLOF Member Agreement) governing the rights and obligations of HCLOF shareholders purportedly prohibited a member from "sell[ing] shares to another member without first providing all other members the right to purchase a pro rata portion thereof at the same price" (the Right of First Refusal). Doc. 9, Appellant's Br., 6. The value of the HCLOF shares fluctuated throughout the bankruptcy proceedings; the actual value is one of the issues giving rise to some of Charitable DAF's causes of action. *Id.* at 6–7; R. at 551–65.

---

[1] Because these are two consolidated appeals with separate appellate records, the Court indicates when it switches between the separate appellate records by footnotes. The Appellant's Brief and record cites in this Background section are in Doc. 6 in case No. 3:22-CV-0695-B. Appellee's Brief, which was filed after consolidation, is in case No. 21-CV-3129-B.

[2] Except where otherwise stated, the Court refers to Charitable DAF and CLO Holdco collectively as Charitable DAF because Charitable DAF controls and owns CLO Holdco and both entities have the same director. Doc. 21, Appellee's Br., 7 & n.6. Appellant Charitable DAF does not dispute this relationship and imputes the actions of CLO Holdco to itself throughout Appellant's brief. *See* Doc. 9, Appellant's Br., 13–14 (imputing the Objection to both Appellants).

APPX. 18479

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 08/28/23    Page 1390 of 1539    PageID 18628
Exhibit 33    Page 426 of 22
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 3 of 21    PageID 3613

During the bankruptcy, "HarbourVest filed proof of claims against [HCM] totaling over $300 million, notionally." Doc. 9, Appellant's Br., 6. As part of the settlement for these claims, "HarbourVest agreed to sell its interest in HCLOF to [HCM]." *Id.* at 8. HCM would then have majority ownership of HCLOF. *See id.* at 5; Doc. 21, Appellee's Br., 7. "CLO Holdco filed an objection to the settlement, contending that the HCLOF Member Agreement entitled [CLO] Holdco to a Right of first Refusal" (the Objection). Doc. 9, Appellant's Br., 8. At the beginning of the settlement hearing (the Rule 9019 Settlement Hearing), CLO Holdco withdrew its Objection. Doc. 21, Appellee's Br., 10–11; R. at 6269–70. After overruling the remaining objections from the other parties, the bankruptcy court approved the HarbourVest Settlement. Doc. 9, Appellant's Br., 9.

This Adversary Proceeding stems from the complaint filed by Appellants on April 12, 2021, in this Court in *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P., et al.*, Case No. 3:21-CV-0842-B. *Id.*; Complaint, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D Tex. Apr. 12, 2021), Doc. 1. On September 20, 2021, this Court referred that case to the bankruptcy court for "docket[ing] as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P." Order of Reference, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D. Tex. Sept. 20, 2021), Doc. 64. During the Adversary Proceeding, Appellants moved for a stay of the case (the Motion to Stay) and Appellees moved to dismiss the case (the Motion to Dismiss). R. at 1634–67, 3248–52. On November 23, 2021, the bankruptcy court held a hearing on the Motion to Stay and Motion to Dismiss. *Id.* at 5951. The bankruptcy court denied the Motion to Stay at the hearing and later entered an order granting the Motion to Dismiss, dismissing all causes of action with prejudice. *Id.* at 5977; *In re Highland*, 2022 WL 780991, at *12. Appellants promptly appealed both orders; this

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 08/30/23    Page 1391 of 1539    PageID 18629
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 4 of 21    PageID 3614

Court consolidated the appeals. *In re Highland Cap. Mgmt.*, 2022 WL 2193000, at *1, *4 (N.D. Tex. June 17, 2022). While the appeals were pending, the Fifth Circuit affirmed the HCM reorganization plan (the Plan), but vacated the exculpatory provision "as to all parties *except* [HCM], the Committee and its members, and the Independent Directors for conduct within the scope of their duties." *Highland Cap. Mgmt., L.P. v. NexPoint Advisors, L.P.*, 2022 WL 3571094, at *14 (5th Cir. Aug. 19, 2022).

The appeals are fully briefed and ripe for review. The Court considers them below.

## II.

## LEGAL STANDARDS

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a). Because the district court functions as an appellate court in this scenario, it applies the same standards of review that federal appellate courts use when reviewing district court decisions. *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992) (citations omitted).

A.      *Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiffs complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

- 4 -

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 12/06/22   Page 1392 of 1539   PageID 18630
Exhibit 33   Page 962 of 22
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 5 of 21   PageID 3615

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotation marks and alterations omitted).

B.      *Motion to Stay*

Incidental to a court's inherent power to control its docket is the power to stay proceedings before it. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A court considers four factors when determining whether to stay a case pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quoting *Nken*, 556 U.S. at 434).

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35    Filed 03/29/23    Page 1393 of 1539    PageID 18631
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 6 of 21    PageID 3616

## III.

## ANALYSIS

The Court begins with the appeal of the Motion to Dismiss Order because it can only review the appeal of the Motion to Stay Order if it reverses the bankruptcy court's decision to dismiss the causes of action in the adversary proceeding. *In re Highland*, 2022 WL 2193000, at *2. Finding reversal of the Motion to Dismiss Order warranted, the Court then reviews the appeal of the Motion to Stay Order.

A.    *Appeal of the Motion to Dismiss Order*[3]

Charitable DAF raises three issues in its appeal of the Motion to Dismiss Order: (1) whether the bankruptcy court "commit[ted] reversible error by sua sponte dismissing this action on the basis of collateral estoppel without giving notice and an opportunity to respond"; (2) whether collateral estoppel barred Charitable DAF's claims when the claims were adjudicated in a Rule 9019 Settlement Hearing; and (3) whether the bankruptcy court's application of judicial estoppel erroneously relied on a transcription error, an ostensibly inconsistent position of Charitable DAF, or a failure to conclude that "subsequently discovered evidence . . . render[ed] the ostensible inconsistency 'inadvertent.'" Doc. 9, Appellant's Br., 2.

An appellate court reviews a dismissal under Rule 12(b)(6) de novo. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 868 (5th Cir. 2000). "[T]he application of collateral estoppel is" also reviewed de novo. *Id.* (quoting *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997)). However, "a [bankruptcy] court's decision to invoke the equitable doctrine of judicial estoppel [is reviewed] for abuse of discretion." *Cox v. Richards*, 761 F. App'x 244, 246 (5th Cir. 2019) (citing

---

[3] For this appeal, the record and document citations are in case No. 3:22-CV-0695-B. However, Appellee's Brief is in case No. 21-CV-3129-B.

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35 Filed 11/29/22 Page 826 of 22 Page 1394 of 1539    PageID 18632
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 7 of 21    PageID 3617

*United States ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 271 (5th Cir. 2015)). Therefore, this Court reviews the bankruptcy court's sua sponte invocation of collateral estoppel de novo, the application of collateral estoppel de novo, and the invocation of judicial estoppel for abuse of discretion. The Court addresses each in turn below.

### 1.    Sua Sponte Dismissal

The bankruptcy court dismissed Charitable DAF's claims with prejudice based on collateral estoppel—even though neither party raised the issue "per se"—finding their res judicata arguments relevant to the issue. *In re Highland*, 2022 WL 780991, at *7. The Court first considers whether the sua sponte application was proper.

Charitable DAF challenges the bankruptcy court's sua sponte invocation of collateral estoppel to dismiss its claims. Doc. 9, Appellant's Br., 11–12. Specifically, Charitable DAF argues that the bankruptcy court could "only do so if the 'procedure employed is fair'—that is, if prior notice is given with adequate time for the plaintiff to prepare a response." *Id.* at 12 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177–78 (5th Cir. 2006)). The failure to provide "notice and an opportunity to dispute the claimed bases for dismissal is reversible error," according to Charitable DAF. *Id.*

The Court disagrees. The Fifth Circuit has recognized two instances when a court may dismiss a case sua sponte on the basis of collateral estoppel: when (1) "both actions were brought in courts of the same district" or (2) "all of the relevant facts are contained in the record and . . . uncontroverted." *OneBeacon Am. Ins. Co. v. Barnett*, 761 F. App'x 396, 399 (5th Cir. 2019) (first quoting *Trammell Crow Residential Co. v. Am. Prot. Ins. Co.*, 574 F. App'x 513, 522 (5th Cir. 2014); and then quoting *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 281 (5th Cir. 2001)). This case easily

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35 Filed 11/02/22 Page 1395 of 1539    PageID 18633
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 8 of 21    PageID 3618

fits into the first category because all of the proceedings at issue took place in the bankruptcy court

before the same judge. *See In re Highland*, 2022 WL 780991, at *7 (relying on the former category

to dismiss the case). Thus, the bankruptcy court did not err by raising the collateral estoppel issue

sua sponte.

This case is unlike the *Carroll* case cited by Charitable DAF, which did not involve collateral

estoppel. 470 F.3d 1171. In *Carroll*, the Fifth Circuit held that a court may dismiss a case sua sponte

under Federal Rule of Civil Procedure 12(b)(6) if the "procedure employed is fair[,]" which requires

"both notice of the court's intention and an opportunity to respond." *Id.* at 1177 (quoting *Bazrowx

v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)). The district court erred by not providing "notice or

opportunity to be heard" and "did not even . . . mention [some of the dismissed] claims in its order

of dismissal." *Id.*

This case is more akin to *McIntyre v. Ben E. Keith Co.* where the Fifth Circuit upheld the

district court's sua sponte raising of the issue of res judicata to dismiss the case under Rule 12(b)(6).

754 F. App'x 262, 265 (5th Cir. 2018). In *McIntyre*, the plaintiff's "Civil Rights Act and FLSA

actions were brought before the same federal district court." *Id.* Because the latter action closely

resembled the former action, the Fifth Circuit found no reversible error with the district court's

raising the issue of res judicata sua sponte. *Id.*

First, dismissal for failure to state a claim like in *Carroll* and dismissal for collateral estoppel

as in the instant case are conceptually and procedurally different. In the former, the plaintiff is in the

process of attempting to "allege[] [their] best case," *Bazrowx*, 136 F.3d at 1054, while collateral

estoppel occurs after a plaintiff "alleged [their] best case" and fully litigated the issue. *See Allen v.

McCurry*, 449 U.S. 90, 94 (1980). Put more succinctly, collateral estoppel eliminates "unnecessary

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 33    Filed 09/02/23 of 22    Page 1396 of 1539    PageID 18634
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 9 of 21    PageID 3619

judicial waste" from repeated attempts at alleging the best case. *Arizona v. California*, 530 U.S. 392, 412 (2000) (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)). Second, the parties addressed res judicata during oral argument and in their pleadings before the bankruptcy court. While res judicata is not collateral estoppel, it is closely related. *Hous. Prof'l Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016) ("[R]es judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion."). Thus, the bankruptcy court employed a fair procedure by allowing the parties to litigate the issues, including res judicata, before dismissing the case sua sponte. *See generally Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) ("District courts may, for appropriate reasons, dismiss cases *sua sponte*.").

The Court next considers whether the bankruptcy court's substantive application of collateral estoppel was proper.

### 2.    Collateral Estoppel

"Collateral estoppel prevents litigation of an issue when: '(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision.'"[4] *Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548 (5th Cir. 2013) (quoting *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005)). "Relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." *In re Southmark Corp.*, 163 F.3d at 932.

Charitable DAF attacks each element of collateral estoppel, so the Court addresses each

---

[4] Appellant lists a fourth element occasionally referenced by the Fifth Circuit—"there is no special circumstance that would make it unfair to apply the doctrine"—but the Court finds no reason to address this possible fourth element in this case. *See In re Southmark Corp.*, 163 F.3d 925, 932 n.9 (5th Cir. 1999) (declining to apply the fourth element because appellant "failed to support it factually").

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 09/23/23    Page 1397 of 1539    PageID 18635
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 10 of 21    PageID 3620

element individually.

      *i.    Identical issue*

The bankruptcy court found "(a) consideration of the value that the estate was both receiving and paying, as well as (b) the potential existence of a 'Right of First Refusal' . . . [were] the gravamen of [Charitable DAF's] Complaint." *In re Highland*, 2022 WL 780991, at *9 (emphasis omitted). During the settlement hearing, the bankruptcy court had to determine whether the HarbourVest Settlement "was 'fair and equitable' and in the 'best interests of creditors,' and whether it was the 'product of arms-length bargaining, and not of fraud or collusion[.]'" *Id.* at *8. This determination entailed "arguments and evidence regarding the methodology for the valuation of the HCLOF interest and the existence or non-existence of a 'Right of First Refusal.'" *Id.*

Charitable DAF argues that the issues are not identical because the Objection "only addressed whether HarbourVest . . . had performed all conditions precedent to being able to transfer the interest to Highland *as another co-investor*" and did not present an identical claim "for breach of the HCLOF [Member] Agreement" and associated damages. Doc. 9, Appellant's Br., 13–14. Further, "even if this one contract issue was fully . . . litigated," only the second cause of action in Charitable DAF's complaint arguably parallels that issue, according to Charitable DAF—the others are distinct. *Id.* at 14–15. Charitable DAF contends that these non-contract causes of action rely on evidence that was not known at the Rule 9019 Settlement Hearing, "stem from events that either occurred post-hearing, or were not discovered until after the hearing." *Id.* at 15.

The Court finds the issues are identical. CLO Holdco's Objection specifically argued:

Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Exhibit 33    Filed 09/23/2 Page 1398 of 1539    PageID 18636
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 11 of 21    PageID 3621

inaccurate interpretation of the Member Agreement's contractual provisions that would render specific passages redundant and meaningless.

R. at 4730. The bankruptcy court also heard argument and testimony from Seery, HCM's chief executive and chief restructuring officer, and Pugatch, a managing director of HarbourVest, about the valuation of HCLOF's assets at the settlement hearing. *Id.* at 6273, 6292, 6303–05 ("The twenty-two and a half [million] is the current—actually, the November value of HCLOF—the HarbourVest interests in HCLOF."), 6358, 6374 ("The current value is right around $22-1/2 million.").

In the Original Complaint, Charitable DAF brought five causes of action: breach of fiduciary duties, breach of the HCLOF Member Agreement, negligence, RICO, and tortious interference. *Id.* at 551–65. The breach of fiduciary duties and negligence causes of action center around the alleged concealment of the rising value of HCLOF's assets and failing to offer the purchase of the assets to CLO Holdco or Charitable DAF before offering to HCM. *Id.* at 553–55, 559–60. The breach of the HCLOF Member Agreement cause of action encompasses the Right of First Refusal in the agreement. *Id.* at 558–59. The RICO cause of action alleges that HCM used mail and wire fraud "to obtain or arrive at valuations of the HCLOF interests," and "conceal[ ] the true value of the HCLOF interests." *Id.* at 560–64. Lastly, the tortious interference cause of action stems from HCM's alleged interference with CLO Holdco's Right of First Refusal in the Member Agreement and "misrepresenting the fair market value" of HCLOF's assets. *Id.* at 564–65. In sum, all of these causes of action involve either the valuation of HCLOF or the Right of First Refusal, so the issues are the same as those before the bankruptcy court at the Rule 2019 Settlement Hearing.

 *ii.* *Actually Litigated*

The bankruptcy court found the same arguments were also actually litigated, reasoning:

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 33    Filed 09/23/23    Page 1399 of 1539    PageID 18637
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 12 of 21    PageID 3622

The Bankruptcy Court would never have approved the HarbourVest Settlement if it thought the value being exchanged was not fair, or if it thought the HCLOF Interests could not be transferred and that someone might later sue the Debtor, claiming the Transfer was improper. All parties had the chance to argue and present evidence about this. The Bankruptcy Court made a ruling based on the evidence and argument.

*In re Highland*, 2022 WL 780991, at *9.

Charitable DAF argues that because the Objection was withdrawn and no one objected to the withdrawal, the issue asserted therein was not litigated. Doc. 9, Appellant's Br., 16. Additionally, it claims the Rule 9019 Settlement Hearing is not a mini-trial and, therefore, cannot serve as an opportunity for a party to litigate their claims. *Id.* at 17–18 (citing *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015)).

An issue is not actually litigated and, thus, precluded unless the legal standard in the prior action mirrors the legal standard of the latter action. *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995) (citations omitted). The bankruptcy court approved the HarbourVest Settlement after applying the *Jackson Brewing* test, which considers:

(1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

R. at 5568; *see also In re Highland*, 2022 WL 780991, at *8 (quoting *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015)). Stated more succinctly, when faced with a settlement, the bankruptcy court ensures the "compromise is truly 'fair and equitable' and 'in the best interest of the estate.'" *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 33 Filed Page 09/23 of 22 Page 1400 of 1539    PageID 18638
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 13 of 21    PageID 3623

Cir. 1980) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer)*, 390 U.S. 414, 424 (1968)).

However, in the context of litigating actual claims—such as those asserted by Charitable DAF—a court applies a preponderance of the evidence standard, not the probability of success standard from *Jackson Brewing. Copeland*, 47 F.3d at 1423; *In re Zale Corp.*, 62 F.3d 746, 766 n.60 (5th Cir. 1995) ("We also note for future reference that the legal standard in a settlement hearing differs from that applicable in an adversary proceeding or state court trial . . . . Consequently, we doubt that the findings of the bankruptcy court in a settlement hearing would have preclusive effect in adversary proceedings or state court trials."). *See generally Weaver v. Aquila Energy Mktg.*, 196 B.R. 945, 957 (S.D. Tex. 1996) ("[S]ettlement hearings and preference actions involve the application of different legal standards."). "Examining whether a particular settlement is fair or equitable and in the best interest of the estate and creditors is a different inquiry, driven by different policies, than litigation of the actual claim." *Copeland*, 47 F.3d at 1423. While the issues of the Right of First Refusal and the valuation of HCLOF were raised in the Rule 9019 Settlement Hearing, the parties did not fully litigate the issues as one would at trial, and the bankruptcy court did not resolve the issues according to a preponderance of the evidence standard. Because the bankruptcy court applied a legal standard in the Rule 9019 Settlement Hearing that is inapplicable to the adjudication of Charitable DAF's causes of action, the issues were not actually litigated in the Rule 9019 Settlement Hearing and collateral estoppel does not apply.[5] The Court **REVERSES** the bankruptcy court on this issue.

---

[5] Having found the second element of collateral estoppel unmet, the Court need not address the third element—necessity of the previous determination to the prior decision.

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 09/02/22    Page 1401 of 1539    PageID 18639
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 14 of 21    PageID 3624

3.    Judicial Estoppel

The bankruptcy court found the elements of judicial estoppel met and barred the second and fifth causes of action, which rely on the Right of First Refusal. *In re Highland*, 2022 WL 780991, at *12. The Court now addresses whether judicial estoppel applies to Charitable DAF's second and fifth causes of action.

Judicial estoppel is an equitable common law doctrine aimed at preventing a party from asserting an inconsistent legal position from a previous proceeding. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999). "The purpose of the doctrine is 'to protect the integrity of the judicial process', by 'prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest.'" *Id.* (alteration in original) (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). A court examines three criteria when determining the applicability of judicial estoppel: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc).

Charitable DAF raises arguments for each of the judicial estoppel elements, so the Court addresses each element below.

i.    *Inconsistent legal position*

Charitable DAF argues that the bankruptcy court's determination relies on a transcription error that amounted to an admission of HCM's compliance with the Right of First Refusal. Doc. 9, Appellant's Br., 22–23. The corrected transcript makes clear that no admission was made on behalf of CLO Holdco, according to Charitable DAF. *Id.* at 23–24.

The relevant portion of the original transcript reads:

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 33    Filed 09/23/22    Page 1402 of 1539    PageID 18640
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 15 of 21    PageID 3625

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client, **but** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.

R. at 6280. The corrected transcript reads:

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client **that** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.

Doc. 9-1, Appellant's Br. Ex. A, 4.

Accepting this verison of the record, CLO Holdco refused to "enter into a short stipulation on the record reflecting that the Debtor's acquisition of HarbourVest's interests in HCLOF is compliant with all of the applicable agreements between the parties." *Id.*; R. at 6280. However, moments before this, CLO Holdco withdrew its Objection premised on the Right of First Refusal stating:

> CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. Based on our analysis of Guernsey law and some of the arguments of counsel in those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as Trustee for CLO Holdco, to withdraw the CLO Holdco objection based on the interpretation of the member agreement.

R. at 6269–70. The bankruptcy court's decision rests primarily on this earlier withdrawal of the Objection and only later buttresses its argument with the then-unknown transcription error. *In re Highland*, 2022 WL 780991, at *11 (following discussion of the withdrawal of the Objection with "[i]f that weren't enough" before mentioning the then-unknown transcription error). Thus, if the earlier withdrawal—without the transcription error—satisfies the first element of judicial estoppel then the bankruptcy court did not commit any error even if it referenced an incorrect transcription of the latter exchange.

- 15 -

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Filed 09/23/22    Page 1403 of 1539    PageID 18641
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 16 of 21    PageID 3626

The Court finds the bankruptcy court did not err in finding the first element of judicial estoppel. CLO Holdco made clear in the withdrawal of its objection that it no longer disputed the other parties' interpretation of the Right of First Refusal, which now forms the basis of Charitable DAF's second and fifth causes of action. *See* R. at 6269–70. Thus, the withdrawal of the objection put CLO Holdco on the opposite side of the legal argument that Charitable DAF now makes in its second and fifth causes of action. The first element of judicial estoppel is established because Charitable DAF has taken inconsistent positions in separate proceedings.

  ii.  *The bankruptcy court accepted the prior position*

The bankruptcy court solely relied on the withdrawal of the Objection to find the second element of judicial estoppel established. *In re Highland*, 2022 WL 780991, at *12. In the words of the bankruptcy court, it "perceived [this objection] as one of the major arguments that was relevant to the HarbourVest Settlement." *Id.* "The [b]ankruptcy [c]ourt relied upon that withdrawal of CLO Holdco's objection in making the determination to approve of the HarbourVest Settlement and, specifically, that Highland would not be running afoul of any obligation in entering into the HarbourVest Settlement." *Id.*

Charitable DAF argues that there is no acceptance by the bankruptcy court of a prior position because without the transcription error, there is no admission and no inconsistent position. Doc. 9, Appellant's Br., 25–26. Further, it contends that the withdrawal of the Objection is not the equivalent of stating the Right of First Refusal causes of action are meritless. *Id.* at 26–27.

The bankruptcy court did not err in finding the second element of judicial estoppel met because it necessarily relied on the change in CLO Holdco's assessment of its Objection. The Right of First Refusal created a major obstacle to approval of the HarbourVest Settlement. When CLO

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 33    Filed 09/28/23 of 22    Page 1404 of 1539    PageID 18642
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 17 of 21    PageID 3627

Holdco withdrew its Objection based on the Right of First Refusal, the Court had to accept CLO Holdco's position that the Right of First Refusal no longer posed an obstacle to the HarbourVest Settlement. Thus, the Court finds no error by the bankruptcy court for the second element of judicial estoppel.

### iii.    Inadvertence of Charitable DAF

The bankruptcy court did not examine the inadvertence of Charitable DAF in asserting inconsistent legal positions. *See In re Highland*, 2022 WL 780991, at *12.

Charitable DAF argues that it did not know the facts for several of its claims until after the settlement hearings, so it could not have asserted these claims at the hearing. Doc. 9, Appellant's Br., 27. Charitable DAF relies on the allegations surrounding the valuations of the HCLOF assets and the alleged acts violating the RICO statutes. *Id.* at 27–29. Additionally, the bankruptcy court did not address the inadvertence element for judicial estoppel and a failure to apply the correct legal standard is reversible error, Charitable DAF contends. Doc. 9, Appellant's Br., 27; Doc. 27, Appellant's Reply, 3–4.

The Court agrees with Appellant's last argument. A court abuses its discretion by applying the wrong legal standard. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Def. Distrib. v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022). And the misapplication of a legal standard is reviewed de novo. *In re Woerner*, 783 F.3d 266, 270–71 (5th Cir. 2015). By not addressing the third element of judicial estoppel, the bankruptcy court applied the wrong legal standard. The Fifth Circuit implicitly recognized this third element—inadvertence—in *In re Coastal Plains, Inc.*, 179 F.3d at 206, 210, which the bankruptcy court cited for its legal standard. *In re Highland*, 2022 WL 780991, at *11. The Fifth Circuit has since clarified that "[t]his circuit . . . recognizes *three* particular requirements"

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 33   Filed 09/23/22   Page 1405 of 1539   PageID 18643
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 18 of 21   PageID 3628

for judicial estoppel. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008) (emphasis added). Because the bankruptcy court did not address the inadvertence element in its order dismissing Charitable DAF's second and fifth causes of action, the bankruptcy court abused its discretion. While the district court finds no issue in the bankruptcy court's analysis of the first two elements of judicial estoppel, the bankruptcy court did not address this third element, warranting remand for determination by the bankruptcy court whether Charitable DAF acted inadvertently to change its legal position.

### 3.    Leave to Amend

Charitable DAF requested leave to amend its complaint in its response to the motion to dismiss, R. at 2272–73, which the bankruptcy court denied by dismissing all claims with prejudice. *In re Highland*, 2022 WL 780991, at *12. The Court need not address this argument because, upon remand, the bankruptcy court will have the opportunity to reassess Charitable DAF's claims and determine whether amendment should be allowed under Federal Rule of Civil Procedure 15(a). *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (listing factors a court considers when determining whether to allow amendment of the complaint).

C.    *Appeal of the Motion to Stay Order*[6]

Appellant Charitable DAF raises one issue on appeal of the Motion to Stay Order: "Did the bankruptcy court err by proceeding with the case rather than staying it" when Charitable DAF was enjoined "from litigating any action against Appellee [HCM]"? Doc. 11, Appellant's Br., 2. The bankruptcy court denied Charitable DAF's Motion to Stay All Proceedings and the subsequent Amended Motion to Stay All Proceedings, reasoning:

---

[6] For this appeal, the record and document citations are in case No. 3:21-CV-3129-B.

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document Exhibit 33    Filed 12/23/Page 20 of 22    Page 1406 of 1539    PageID 18644
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 19 of 21    PageID 3629

> I just don't think that you have shown that, you know, either the exculpation clause
> or the injunction provisions of the plan somehow tie your hands in arguing the
> 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that
> your arguments reflect, frankly, a misunderstanding of how the injunction language
> and exculpation language applies here.

R. at 2087; *see also id.* at 4–5.

On appeal, Charitable DAF argues that the bankruptcy court erred in its denial of the motion for a stay because the Plan Confirmation Order's injunction prohibited Charitable DAF from participating in the case, "terminat[ing] any case or controversy and stripp[ing] the bankruptcy court of jurisdiction." Doc. 11, Appellant's Br., 7. Accordingly, "[t]he bankruptcy court could only stay the case pending the [appeal of the Plan Confirmation Order's injunction], or dismiss the case as barred by the injunction[,]" Charitable DAF contends." *Id.* at 9.

As noted above, the Fifth Circuit affirmed the Plan in all respects except one and specifically affirmed the injunction. *Highland*, 2022 WL 3571094, at *13–14. The injunction in the Plan provides that "all Enjoined Parties are and shall be permanently enjoined . . . from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind . . . against or affecting the Debtor or the property of the Debtor." R. at 2401. And the term Enjoined Parties includes "(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor [and] . . . (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case." *Id.* at 2358.

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Exhibit 33    Page 223 of 22    Page 1407 of 1539    PageID 18645
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 20 of 21    PageID 3630

Relatedly, the Plan exculpates HCM[7] "from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of [execution of the Plan]." *Id.* at 2398. However, this exculpation provision[8] does "not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) [other specific entities actions]." *Id.* at 2398–99.

The bankruptcy court did not abuse its discretion[9] in denying the motion for a stay of the case. The bankruptcy court found that the Plan's injunction and exculpation provisions—*which it approved*—did not prevent Charitable DAF from pursuing its causes of action. *Id.* at 2087. In effect, the bankruptcy court held that Charitable DAF could continue to litigate its causes of action and the Court agrees. *See id.* Just like the bankruptcy court, this Court does not see how the injunction and exculpation provisions prohibit Charitable DAF from participating in the below action. The exculpation provision permits Charitable DAF to bring claims against HCM for "bad faith, fraud,

---

[7] The Plan makes clear that the term Exculpated Party does not include Charitable DAF. R. at 2359 ("Exculpated Parties" means, collectively, (i) the Debtor . . . provided, however, that, for the avoidance of doubt, none of . . . the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities) . . . is included in the term 'Exculpated Party.'").

[8] Subsequently to this appeal, the Fifth Circuit vacated a portion of the exculpation provision. *Highland*, 2022 WL 3571094, at *12. The Fifth Circuit held that "the exculpation of certain non-debtors . . . was unlawful" so the court "str[uck] all exculpated parties from the Plan except for [HCM], the Committee and its members, and the Independent Debtors." *Id.* Charitable DAF brings its causes of action against HCM, so what remains of the exculpation provision still applies to this case. *See id.*

[9] The parties disagree on whether this Court reviews the denial of the stay for abuse of discretion or de novo. Doc. 11, Appellant's Br., 6 ("Questions of law are reviewed de novo."); Doc. 16, Appellee's Br., 2 ("The Court reviews the bankruptcy court's order for abuse of discretion."). Charitable DAF does not pursue this argument in its Reply, so this argument is considered waived, *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006), as well as incorrect. *See Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 392 (5th Cir. 2013) (citing *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992)) ("We review a district court's denial of a stay pending appeal for abuse of discretion.").

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 33    Exhibit 33    Page 22 of 22    Page 1408 of 1539    PageID 18646
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 21 of 21    PageID 3631

gross negligence, criminal misconduct, or willful misconduct" and Charitable DAF's causes of action—breach of fiduciary duty, breach of contract, negligence, and RICO—appear to fit within these categories of claims. *Id.* at 490–504, 2398–99. Further, Charitable DAF continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss. *See* Section III(A) *supra.* Lastly and importantly, Charitable DAF did not even attempt to address the traditional stay elements. R. at 2087 ("I guess one might say the traditional four-factor test for a stay of a proceeding has really not been the subject of the argument here for a stay."). Without argument on the factors for a stay, this Court lacks any basis to overturn the bankruptcy court.

The bankruptcy court's Motion to Stay Order is **AFFIRMED**.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **REVERSES** and **REMANDS** the bankruptcy court's Motion to Dismiss Order and **AFFIRMS** the bankruptcy court's Motion to Stay Order.

**SO ORDERED**.

SIGNED: September 2, 2022.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

# EXHIBIT 34

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35 Filed 34 Page 2926 of 64 Page 1410 of 1539   PageID 18648
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 1 of 8

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT
### TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following amended

witness and exhibit list with respect to the *Order Requiring the Violators to Show Cause Why*

*They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2255]

---

1 The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 34 Filed 12/29/23 Page 1411 of 1539 PageID 18649
Exhibit 34 Page 2 of 64
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21 Entered 06/07/21 20:02:45 Page 2 of 8

(the "<u>Show Cause Order</u>"), which the Court has set for hearing at 9:30 a.m. (Central Time) on

June 8, 2021 (the "<u>Hearing</u>") in the above-styled bankruptcy case (the "<u>Bankruptcy Case</u>").

     A.    <u>Witnesses</u>:

       1.    James Dondero;

       2.    Mark Patrick;

       3.    Grant Scott (by deposition designation);

       4.    Gregory V. Demo;[2]

       5.    Any witness identified by or called by any other party; and

       6.    Any witness necessary for rebuttal.

     B.    <u>Exhibits</u>:

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-1] | | |
| 2. | Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-2] | | |
| 3. | Exhibit A, the [Proposed] Order on the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-3] | | |
| 4. | James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest [Docket No. 2237-4] | | |
| 5. | Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-5] | | |

---

[2] If needed, Mr. Demo will be called as a witness for the sole purpose of authenticating Exhibits 54 and 55, time records from Pachulski Stang Ziehl & Jones, LLP relating to the Show Cause Order.

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/12/26 of 64   Page 1412 of 1539   PageID 18650
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 3 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 6. | CLO Holdco's Objection to HarbourVest Settlement. [Docket No. 2237-6] | | |
| 7. | Notice of Deposition to James Dondero [Docket No. 2237-7] | | |
| 8. | Transcript of January 11, 2021 Deposition of Michael Pugatch [Docket No. 2237-8] | | |
| 9. | Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-9] | | |
| 10. | Transcript of January 14, 2021 Hearing [Docket No. 2237-10] | | |
| 11. | Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-11] | | |
| 12. | Original Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) (GScott000389) [Dondero June 1, 2021 Deposition Exhibit 7] [Docket No. 2237-12] | | |
| 13. | Email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-13] | | |
| 14. | Second email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-14] | | |
| 15. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 2237-15] | | |
| 16. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 2237-16] | | |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35-1   Filed 12/29/23   Page 1413 of 1539   PageID 18651
Exhibit 34 Page 5 of 64
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 4 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 17. | Plaintiff's Motion for Leave to File First Amended Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) [Docket No. 2237-17] | | |
| 18. | CM/ECF Notice dated April 20, 2020 and lodged as Docket No. 8 in the DAF Action [Docket No. 2237-18] | | |
| 19. | Transcript of March 22, 2021 Hearing [Docket 2351-1] | | |
| 20. | Email from DAF counsel to Debtor's counsel dated April 20, 2021 [Docket 2351-2] | | |
| 21. | All communications between Debtor's counsel and the Bankruptcy Court courtroom deputy [Docket 2355-3] | | |
| 22. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] | | |
| 23. | Transcript Designations from the January 21, 2021 Deposition of Grant Scott | | |
| 24. | Transcript Designations from the June 1, 2021 Deposition of Grant Scott | | |
| 25. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] | | |
| 26. | Amended and Restated Limited Liability Company Agreement of Charitable DAF GP, LLC, effective as of January 1, 2012 (PATRICK_000031) [Dondero June 1, 2021 Deposition Exhibit 2] | | |
| 27. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (GScott000325) [Dondero June 1, 2021 Deposition Exhibit 3] | | |
| 28. | January 31, 2021 Meeting Appointment (GScott000011) [Dondero June 1, 2021 Deposition Exhibit 4] | | |
| 29. | Email chain re Grant Scott's notice of intent to resign (GScott000018) [Dondero June 1, 2021 Deposition Exhibit 5] | | |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-5 Filed 12/29/23   Page 1414 of 1539   PageID 18652
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 5 of 8

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| 30. | Email chain re Highland Adherence Agreement in connection with HarbourVest shares (GScott000085) [Dondero June 1, 2021 Deposition Exhibit 6] | | |
| 31. | Email and attached A&R Service and Advisory Agreements and GP Resolutions (GScott000312) [Scott June 1, 2021 Deposition Exhibit 8] | | |
| 32. | Notice of CLO Holdco Settlement Agreement [Scott June 1, 2021 Deposition Exhibit 9] | | |
| 33. | Email between Grant Scott and Mark Patrick re Complaint (GScott000080) [Scott June 1, 2021 Deposition Exhibit 10] | | |
| 34. | Email chain re TerreStar Corporation Equity Investment and Residual Assets held by HOCF (GScott000138) [Scott June 1, 2021 Deposition Exhibit 11] | | |
| 35. | Email chain re request for information from Elysium Fund Management, Ltd. (GScott000361) [Scott June 1, 2021 Deposition Exhibit 12] | | |
| 36. | Assignment and Assumption of Membership Interest Agreement between Grant J. Scott and Mark E. Patrick dated March 24, 2021 (PATRICK_000006) [Scott June 1, 2021 Deposition Exhibit 13] | | |
| 37. | Written Resolutions of the Sole Director of the Company Dated March 25, 2021 (PATRICK_000003) [Scott June 1, 2021 Deposition Exhibit 14] | | |
| 38. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 24, 2021 (PATRICK_000012) [Scott June 1, 2021 Deposition Exhibit 15] | | |
| 39. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 31, 2021 (PATRICK_000001) [Scott June 1, 2021 Deposition Exhibit 16] | | |
| 40. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on April 2, 2021 (PATRICK_000002) [Scott June 1, 2021 Deposition Exhibit 17] | | |
| 41. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 35   Filed 04/29/24   Page 1415 of 1539   PageID 18653
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 6 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 43. | Email from Mark Patrick to Grant Scott dated April 6, 2021 re Urgent Questions (PATRICK_001129) | | |
| 44. | Original Complaint (Docket No. 1, PCMG Trading Partners XXIII, LP v. Highland Capital Management, L.P., Case No. 21-cv-01169, U.S. District Court Northern District of TX) | | |
| 45. | Defendant's Motion For Leave to Amend Answer (Docket No. 32, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., Adv. Pro. No. 21-03004) | | |
| 46. | Email chain re NDA for D&O Insurance Quote (GScott000172) | | |
| 47. | Check Request dated April 7, 2021 (D1 Landscape & Irrigation) (GScott000354) | | |
| 48. | Check Request dated April 7, 2021 (Sanders Lawn & Maintenance) (GScott000355) | | |
| 49. | Check Request dated April 7, 2021 (BB Services) (GScott000358) | | |
| 50. | Highland Capital Management, L.P.'S Notice of Amended Subpoena to Grant Scott [Docket No. 2366] | | |
| 51. | Certificate of Service for Notice of Deposition of Grant Scott (Docket No. 41, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al., Adv. Pro. No. 21-03000) | | |
| 52. | Email re Zoom Instructions for June 1, 2021 Deposition of Grant Scott | | |
| 53. | Email re Zoom Instructions for January 21, 2021 Deposition of Grant Scott | | |
| 54. | Pachulski Stang Billing Detail (April 18 – April 30, 2021) | | |
| 55. | Pachulski Stang Billing Detail (May 1 – June 7, 2021) | | |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 12/23/22    Page 1416 of 1539    PageID 18654
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 7 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 56. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 57. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 58. | All exhibits identified by or offered by any other party at the Hearing | | |

[*Remainder of Page Intentionally Blank*]

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 35-1   Filed 12/29/of 64   Page 1417 of 1539   PageID 18655
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 8 of 8

Dated:  June 7, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 54

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

|  |  |
|---|---|
| April 30, 2021 | |
| Invoice | 127680 |
| Client | 36027 |
| Matter | 00002 |
| | **JNP** |

RE:  Postpetition

STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH  04/30/2021

|  |  |
|---|---|
| FEES | $1,286,897.00 |
| EXPENSES | $8,173.58 |
| **TOTAL CURRENT CHARGES** | **$1,295,070.58** |
| **BALANCE FORWARD** | **$5,472,625.24** |
| **LAST PAYMENT** | **$3,187,420.34** |
| **TOTAL BALANCE DUE** | **$3,580,275.48** |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 09/23 of 67age 1420 of 1539    PageID 18658
Case 19-34054-sgj11 Doc 2483 Filed 05/07/21 Entered 05/07/21 22:53:02 Page 93 of 129

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/18/2021 | GVD | BL | Draft summary of DAF litigation to I. Pachulski | 0.90 | 950.00 | $855.00 |
| 04/19/2021 | IDK | BL | Numerous E-mails with J Pomerantz, others re DAF lawyers correspondence to add CEO to DAF lawsuit, and how to respond (.3); Telephone conferences with J Pomerantz re same (.3); Review of correspondence with J Pomerantz and DAF lawyers re our response to their request and potential contempt, and their feedback re same on no violation of prior court orders (.2). | 0.80 | 1325.00 | $1,060.00 |
| 04/19/2021 | IDK | BL | E-mails with J Pomerantz re DAF District Court action and related issues (.4); E-mails with R Saunders re same and timing, including list of issues to research and relevant documents for same (.5). | 0.90 | 1325.00 | $1,192.50 |
| 04/19/2021 | JNP | BL | Conference with J. Dubel regarding District Court DAF litigation and related issues (several). | 0.40 | 1295.00 | $518.00 |
| 04/19/2021 | JNP | BL | Review and respond to various emails from counsel for DAF regarding District Court litigation. | 0.30 | 1295.00 | $388.50 |
| 04/19/2021 | JNP | BL | Conference with Ira D. Kharasch and then John A. Morris regarding  DAF District Court litigation. | 0.30 | 1295.00 | $388.50 |
| 04/19/2021 | JNP | BL | Emails to Board regarding DAF District Court litigation. | 0.30 | 1295.00 | $388.50 |
| 04/19/2021 | JNP | BL | Conference with John A. Morris and J. Seery regarding DAF District Court litigation. | 0.40 | 1295.00 | $518.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 10/29/23   Page 33 of 64   Page 1421 of 1539   PageID 18659
Case 19-34054-sgj11 Doc 2423 Filed 05/07/21 Entered 05/07/21 22:50:45 Page 604 of 129

Pachulski Stang Ziehl & Jones LLP                         Page:    33
Highland Capital Management LP                            Invoice 127680
36027   - 00002                                          April 30, 2021

| 04/19/2021 | JAM | BL | Tephone conference with J. Pomerantz re: DAF lawsuit (0.1); review e-mails between J. Pomerantz and counsel to the DAF re: DAF intention to name Seery as a defendant (0.2); telephone conference with J. Seery, J. Pomerantz re: DAF intention to name Seery as a defendant (0.4). | 0.70 | 1245.00 | $871.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 29/23 Page 423 of 64 Page 1422 of 1539    PageID 18660
Case 19-34054-sgj11 Doc 2423-1 Filed 05/07/21 Entered 05/07/21 22:50:45 Page 15 of 29

Pachulski Stang Ziehl & Jones LLP                                    Page:    34
Highland Capital Management LP                                       Invoice 127680
36027    - 00002                                                    April 30, 2021

|  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|



| 04/20/2021 | IDK | BL | E-mails with R Saunders re DAF action and prioritizing various issues re same (.2); Review of DAF motion for leave to amend and add CEO and D Court denial of same (.3); Review of correspondence with Board, J Pomerantz re same (.1). | 0.60 | 1325.00 | $795.00 |



| 04/20/2021 | JNP | BL | Conference with J. Dubel regarding DAF litigation and related. | 0.30 | 1295.00 | $388.50 |
| 04/20/2021 | JNP | BL | Review DAF motion to amend to add Seery as defendant. | 0.20 | 1295.00 | $259.00 |
| 04/20/2021 | JNP | BL | Conference with John A. Morris regarding DAF motion to amend and response. | 0.10 | 1295.00 | $129.50 |
| 04/20/2021 | JNP | BL | Conference with John A. Morris regarding DAF District Court lawsuit and employee claims litigation issues. | 0.50 | 1295.00 | $647.50 |
| 04/20/2021 | JNP | BL | Conference with J. Dubel regarding DAF District Court lawsuit. | 0.30 | 1295.00 | $388.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Exhibit 34   Filed 10/29/23   Page 953 of 67   Page 1423 of 1539   PageID 18661
Case 19-34054-sgj11 Doc 2433 Filed 05/07/21 Entered 05/07/21 12:58:02 Page 26 of 49

Pachulski Stang Ziehl & Jones LLP                                        Page:      35
Highland Capital Management LP                                           Invoice 127680
36027    - 00002                                                        April 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 04/20/2021 | JAM | BL | Telephone conference with J. Pomerantz re: DAF complaint and strategy concerning the same (0.5); outline of issues for contempt motion concerning DAF complaint/Seery (0.8). | 1.30 | 1245.00 | $1,618.50 |
| 04/20/2021 | JAM | BL | Review DAF complaint (0.4); telephone conference with J. Seery re: DAF complaint and related matters (0.2); research re: factual issues concerning DAF complaint (0.3); e-mail to J. Seery, J. Pomerantz re: factual issues concerning DAF complaint (0.2). | 1.10 | 1245.00 | $1,369.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-34   Filed 12/29/23   Page 1424 of 1539   PageID 18662
Case 19-34054-sgj11   Doc 2383-1   Filed 05/07/21   Entered 05/07/21 22:58:02   Page 37 of 49

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    36

Invoice 127680

April 30, 2021

| Date | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/20/2021 | GVD | BL | Review DAF/CLOH lawsuit | 0.50 | 950.00 | $475.00 |
| 04/21/2021 | IDK | BL | Telephone conference with J Pomerantz re DAF action issues (.1). | 0.10 | 1325.00 | $132.50 |
| 04/21/2021 | JNP | BL | Conference with John A. Morris regarding potential contempt motion. | 0.20 | 1295.00 | $259.00 |
| 04/21/2021 | JHD | BL | Correspondence from Ira D. Kharasch re DAF litigation; correspondence from Isaac M. Pachulski re same; correspondence from Gregory V. Demo re same | 0.30 | 1645.00 | $493.50 |
| 04/21/2021 | JHD | BL | Research re DAF litigation issues; prepare | 0.80 | 1645.00 | $1,316.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 12/29/23   Page 9 of 64   Page 1425 of 1539   PageID 18663
Case 19-34054-sgj11   Doc 2431   Filed 05/07/21   Entered 05/07/21 22:08:45   Page 43 of 129

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:   37

Invoice 127680

April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | correspondence to Ira D. Kharasch re same; correspondence from Ira D. Kharasch re same | | | |
| 04/22/2021 | JNP | BL | Review motion for contempt. | 0.30 | 1295.00 | $388.50 |
| 04/22/2021 | JNP | BL | Conference with John A. Morris regarding motion for contempt. | 0.20 | 1295.00 | $259.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85 Filed Exhibit 34 Page 2/83 of 64 Page 1426 of 1539    PageID 18664
Case 19-34054-sgj11 Doc 2423-1 Filed 05/07/21 Entered 05/07/21 22:50:45 Page 59 of 149

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    38
Invoice 127680
April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 04/22/2021 | JAM | BL | Work on DAF contempt motion (9.7); e-mails with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft DAF contempt motion (0.2); telephone conference with J. Pomerantz re: draft DAF | 10.00 | 1245.00 | $12,450.00 |

| 04/22/2021 | HRW | BL | Draft motion for order to show cause and ancillary documents for DAF contempt motion (2.5); Draft witness and exhibit list for trial on Dondero adversary proceeding for injunctive relief (0.6); Call with J. Morris re: DAF contempt motion (0.1); Call with J. Morris, T. Surgent, and G. Demo re: discovery responses (0.2). | 3.40 | 695.00 | $2,363.00 |

Case 19-34054-sgj11  Doc 3596-34  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:23-cv-00726-S  Document 85-34  Filed 10/29/23  Page 1427 of 1539  PageID 18665
Case 19-34054-sgj11  Doc 2431-1 Filed 05/07/21  Entered 05/07/21 20:02:45  Page 40 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:     39
Invoice 127680
April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| 04/23/2021 | JNP | BL | Conference with John A. Morris regarding DAF litigation and motion for contempt. | 0.20 | 1295.00 | $259.00 |
| 04/23/2021 | JNP | BL | Review final version of contempt motion. | 0.20 | 1295.00 | $259.00 |
| | | | | | | |
| 04/23/2021 | JMF | BL | Review contempt pleadings. | 0.40 | 1050.00 | $420.00 |
| | | | | | | |
| 04/23/2021 | GVD | BL | Review motion for contempt | 0.50 | 950.00 | $475.00 |
| 04/23/2021 | GVD | BL | Correspondence with counsel to HCLOF re contempt motion | 0.20 | 950.00 | $190.00 |
| 04/23/2021 | GVD | BL | Conference with J. Morris re next steps on contempt motion | 0.20 | 950.00 | $190.00 |
| | | | | | | |
| 04/23/2021 | GVD | BL | Conference with J. Morris re status of contempt motion | 0.20 | 950.00 | $190.00 |
| 04/23/2021 | HRW | BL | Review DAF/CLO Holdco Contempt Motion. | 0.60 | 695.00 | $417.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 12/29/23   Page 203 of 674 Page 1428 of 1539   PageID 18666
Case 19-34054-sgj11   Doc 2421   Filed 05/26/21   Entered 05/26/21 20:02:45   Page 41 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/24/2021 | HRW | BL | Review DAF/CLO Holdco motion to amend complaint. | 0.40 | 695.00 | $278.00 |
| 04/26/2021 | IDK | BL | Review of correspondence with Wilmer Hale on DAF action and related federal law issues for their review and coordination of call re same (.2); Review of further R Saunders memo/research on DAF and enforcing the reference re same (.3). | 0.50 | 1325.00 | $662.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34   Filed 09/22/23   Page 213 of 674   Page 1429 of 1539   PageID 18667
Case 19-34054-sgj11   Doc 2431   Filed 05/26/21   Entered 05/26/21 22:20:03   Page 62 of 149
21

Pachulski Stang Ziehl & Jones LLP                                    Page:      41
Highland Capital Management LP                                       Invoice 127680
36027    - 00002                                                    April 30, 2021

|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/26/2021 | JNP | BL | Conference with J. Dubel regarding contempt motion and related issues. | 0.20 | 1295.00 | $259.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34 Filed Exhibit 34 Page 2 of 64 age 1430 of 1539   PageID 18668
Case 19-34054-sgj11   Doc 2421 Filed 05/26/21 Entered 05/26/21 20:02:45 Page 13 of 49
21

Pachulski Stang Ziehl & Jones LLP                                          Page:    42
Highland Capital Management LP                                            Invoice 127680
36027    - 00002                                                         April 30, 2021

|            |       |      |                                                                 | Hours | Rate    | Amount     |
|------------|-------|------|-----------------------------------------------------------------|-------|---------|------------|
| 04/26/2021 | JAM   | BL   | E-mail to T. Ellison, J. Pomerantz, G. Demo, M. Heyward re: hearing date for contempt motion (0.2); telephone conference with J. Pomerantz re: e-mail to Ms. Ellsion concerning contempt hearing (0.2); telephone conference with J. Seery re: possible motion for Rule 11 sanctions (0.1); telephone conference with J. Pomerantz, R. Feinstein, T. Silva re: possible defenses to DAF complaint (0.4). | 0.90  | 1245.00 | $1,120.50  |
| 04/26/2021 | JAM   | BL   | Telephone conference with J. Pomerantz, G. Demo, King & Spalding re: DAF litigation matters (0.4); telephone conference with J. Seery, J. Pomerantz re: litigation matters (0.5) | 0.90  | 1245.00 | $1,120.50  |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 85-14   Filed 12/22/23   Page 223 of 64   Page 1431 of 1539   PageID 18669
Case 19-34054-sgj11 Doc 2331 Filed 05/07/21 Entered 05/07/21 20:03:45 Page 70 of 149
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/27/2021 | IDK | BL | E-mails with J Morris, others on court's email setting contempt hearing as live hearing. | 0.20 | 1325.00 | $265.00 |
| 04/27/2021 | IDK | BL | E-mails with R Saunders, J Pomerantz re DAF | 0.30 | 1325.00 | $397.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 09/22/23    Page 1432 of 1539    PageID 18670
Case 19-34054-sgj11 Doc 2431 Filed 05/07/21 Entered 05/07/21 22:20:03 Page 71 of 149
21

Pachulski Stang Ziehl & Jones LLP                                      Page:     44
Highland Capital Management LP                                         Invoice 127680
36027    - 00002                                                      April 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | action and Barton doctrine re same. |  |  |  |
| 04/27/2021 | JNP | BL | Conference with John A. Morris regarding email to court regarding contempt motion. | 0.10 | 1295.00 | $129.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85   Filed 04/23/24   Page 25 of 67   Page 1433 of 1539   PageID 18671
Case 19-34054-sgj11   Doc 2421   Filed 05/07/21   Entered 05/07/21 20:02:45   Page 72 of 149
21

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    45
Invoice 127680
April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/27/2021 | JAM | BL | Communications with T. Ellison, J. Pomerantz, Z. Annable re: notice of motion for contempt hearing (DAF) (0.2) draft notice of hearing for contempt motion (0.3); e-mails with Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: notice of hearing for contempt motion (0.2); e-mails with M. Sbaiti, C. Taylor re: notice of motion for contempt hearing and related matters (0.4). | 1.10 | 1245.00 | $1,369.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 07/26/23   Page 263 of 64   Page 1434 of 1539   PageID 18672
Case 19-34054-sgj11   Doc 2421   Filed 05/07/21   Entered 05/07/21 20:02:45   Page 48 of 49
21

Pachulski Stang Ziehl & Jones LLP                                    Page:      46
Highland Capital Management LP                                       Invoice 127680
36027    - 00002                                                    April 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/28/2021 | JNP | BL | Conference with J. Dubel regarding contempt motion and related issues (2x). | 0.20 | 1295.00 | $259.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 12/27/23    Page 273 of 674    Page 1435 of 1539    PageID 18673
Case 19-34054-sgj11    Doc 2381    Filed 05/06/21    Entered 05/06/21 20:03:45    Page 74 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/28/2021 | JAM | BL | Communications with Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: Order to Show Cause (0.3); review/revise Order to Show Cause (0.2). | 0.50 | 1245.00 | $622.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85 Filed Page 223 of 67age 1436 of 1539    PageID 18674
Case 19-34054-sgj11 Doc 2321-1 Filed 05/07/21 Entered 05/07/21 20:02:45 Page 75 of 149
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:     48

Invoice 127680

April 30, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85-34   Filed 12/22/23   Page 223 of 674   Page 1437 of 1539   PageID 18675
Case 19-34054-sgj11   Doc 2421-1   Filed 05/07/21   Entered 05/07/21 22:20:02   Page 76 of 149   Page 20 of
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 03/03/23   Page 303 of 674   Page 1438 of 1539   PageID 18676
Case 19-34054-sgj11   Doc 2381   Filed 05/07/21   Entered 05/07/21 20:02:45   Page 77 of 149
21

# EXHIBIT 55

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 35-1    Filed 12/29/23    Page 323 of 674    Page 1440 of 1539    PageID 18678

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 2 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

Page:    99
Prebill#283067
June 07, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 10/23/23    Page 333 of 64    Page 1441 of 1539    PageID 18679

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 3 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-14    Filed 12/09/24    Page 4 of 64    Page 1442 of 1539    PageID 18680

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 4 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:   101
Highland Capital Management LP                                       Prebill#283067
36027    - 00002                                                    June 07, 2021



| 05/05/2021 | JNP | DAF | Conference with King and Spalding and PSZJ regarding DAF lawsuit status. | 0.40 | 1295.00 | $518.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85   Filed 02/23/24   Page 353 of 64   Page 1443 of 1539   PageID 18681

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 5 of 34

Pachulski Stang Ziehl & Jones LLP                                          Page:   102
Highland Capital Management LP                                             Prebill#283067
36027    - 00002                                                          June 07, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| RJF Bill | 05/05/2021 | | DAF | 0.40 | 0.40 | 1,395.00 | | 558.00 |
| 05/05/2021 | RJF | DAF | Telephone conference with Jeffrey N. Pomerantz, Gregory V. Demo and John A. Morris regarding complaint. | | 0.40 | 1395.00 | $558.00 |
| RJF Bill | 05/05/2021 | | DAF | 0.40 | 0.40 | 1,395.00 | | 558.00 |
| 05/05/2021 | RJF | DAF | Call with CLO Holdco's attorney regarding case status. | | 0.40 | 1395.00 | $558.00 |
| RJF Bill | 05/05/2021 | | DAF | 0.40 | 0.40 | 1,395.00 | | 558.00 |
| 05/05/2021 | RJF | DAF | Research response date, related emails, civil action coversheet. | | 0.40 | 1395.00 | $558.00 |
| JAM Bill | 05/05/2021 | | DAF | 1.00 | 1.00 | 1,245.00 | | 1,245.00 |
| 05/05/2021 | JAM | DAF | Telephone conference with J. Pomerantz, R. Feinstein, G. Demo re: strategic issues concerning DAF litigation (0.4); telephone conference with J. Pomerantz, G. Demo, M. Maloney re: DAF litigation issues including service of process and timing (0.4); research re: Rule 11 motion (0.2). | | 1.00 | 1245.00 | $1,245.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 12/23/23    Page 363 of 674    Page 1444 of 1539    PageID 18682
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 6 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:    103
Highland Capital Management LP                                      Prebill#283067
36027    - 00002                                                   June 07, 2021

| | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 12/29/23   Page 1445 of 1539   PageID 18683
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 7 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:   104

Prebill#283067

June 07, 2021

| | | | | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| HRW Bill | 05/06/2021 | | DAF | 1.20 | 1.20 | 695.00 | 834.00 |
| 05/06/2021 | HRW | DAF | Research re: meaning of "related to" on civil cover sheet for DAF/CLO Holdco litigation (1.2). | 1.20 | 695.00 | | $834.00 |
| 05/07/2021 | JAM | DAF | Telephone conference with J. Pomerantz, R. Feinstein, G. Demo re: strategic issues concerning DAF Action, including responding to complaint and timing of related motions (0.8). | 0.80 | 1245.00 | | $996.00 |
| GVD Bill | 05/07/2021 | | DAF | 0.80 | 0.80 | 950.00 | 760.00 |
| 05/07/2021 | GVD | DAF | Conference with PSZJ team re planning for DAF action response | 0.80 | 950.00 | | $760.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 12/23/23    Page 323 of 64    Page 1446 of 1539    PageID 18684

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 8 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:   105
Highland Capital Management LP                                       Prebill#283067
36027   -00002                                                      June 07, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/23/23    Page 392 of 64    Page 1447 of 1539    PageID 18685
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 9 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 12/29/23    Page 10 of 64    Page 1448 of 1539    PageID 18686
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 10 of
34

Pachulski Stang Ziehl & Jones LLP                                    Page:   107
Highland Capital Management LP                                      Prebill#283067
36027    - 00002                                                   June 07, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 04/23/ 67 Page 1449 of 1539    PageID 18687
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 11 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    108
Prebill#283067
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JE Bill | 05/11/2021 | DAF | 8.70 | 8.70 | 1,195.00 | 10,396.50 |

| 05/11/2021 | JE | DAF | Review draft revisions to objection from Mr. Pomerantz and review and revise same accordingly (7.7); call with Mr. Demo regarding reference and contempt pleadings (.2); review contempt pleadings and applicable documents attached to contempt pleadings for fact section (.8). | 8.70 | 1195.00 | $10,396.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

Page:    109
Prebill#283067
June 07, 2021



Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/29/21    Page 1451 of 1539    PageID 18689
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 13 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-34    Filed 10/24/23   Page 1452 of 1539   PageID 18690

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 14 of
34

Pachulski Stang Ziehl & Jones LLP                                        Page:   111
Highland Capital Management LP                                           Prebill#283067
36027    - 00002                                                        June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JNP Bill | 05/14/2021 | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/14/2021 | JNP | DAF | Conference with John A. Morris regarding discovery regarding contempt motion and related. | 0.10 | 1295.00 | $129.50 |
| JNP Bill | 05/14/2021 | DAF | 0.20 | 0.20 | 1,295.00 | 259.00 |
| 05/14/2021 | JNP | DAF | Review discovery regarding contempt motion and provide comments. | 0.20 | 1295.00 | $259.00 |
| JNP Bill | 05/14/2021 | DAF | 0.30 | 0.30 | 1,295.00 | 388.50 |
| 05/14/2021 | JNP | DAF | Review responses to contempt motion filed by various parties. | 0.30 | 1295.00 | $388.50 |
| 05/14/2021 | JAM | DAF | Preliminary review of objection to contempt motion (0.4); telephone conference with J. Pomerantz re: objections to contempt motion (0.2). | 0.60 | 1245.00 | $747.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-34    Filed 02/09/23    Page 1453 of 1539    PageID 18691

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 15 of
34

Pachulski Stang Ziehl & Jones LLP  
Highland Capital Management LP  
36027    -00002

Page:    112  
Prebill#283067  
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JAM Bill | 05/15/2021 | | DAF | 6.30 | 6.30 | 1,245.00 | | 7,843.50 |

| 05/15/2021 | JAM | DAF | Draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (3.6); e-mails to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (0.2); telephone conference with J. Dubel re: objections to contempt motion and related matters (0.7); revisions to draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (0.6); e-mails to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (0.2); draft subpoena for Grant Scott (0.4); telephone conference with J. Seery re: discovery in connection with contempt motion (0.2); telephone conference with G. Demo re: discovery in connection with contempt motion (0.1); e-mails to counsel for Violators re: discovery in connection with contempt motion (0.3). | 6.30 | 1245.00 | $7,843.50 |

| GVD Bill | 05/15/2021 | | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |

| 05/15/2021 | GVD | DAF | Review draft discovery requests re contempt hearing | 0.20 | 950.00 | $190.00 |

| GVD Bill | 05/15/2021 | | DAF | 0.30 | 0.30 | 950.00 | | 285.00 |

| 05/15/2021 | GVD | DAF | Review responses to order to show cause | 0.30 | 950.00 | $285.00 |

| JE Bill | 05/16/2021 | | DAF | 1.60 | 1.60 | 1,195.00 | | 1,912.00 |

| 05/16/2021 | JE | DAF | Review responses of DAF and others to Order to show cause, look at certain cited case law and | 1.60 | 1195.00 | $1,912.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-34 Filed 10/24/23 Page 16 of 64   Page 1454 of 1539   PageID 18692

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 16 of 34

Pachulski Stang Ziehl & Jones LLP                           Page:   113
Highland Capital Management LP                              Prebill#283067
36027    -00002                                            June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  | correspondence with team regarding same. |  |  |  |  |
| IDK Bill | 05/17/2021 | DAF | 0.80 | 0.80 | 1,325.00 | 1,060.00 |
| 05/17/2021 | IDK | DAF | Attend conference call with J Pomerantz, others re DAF opposition to OSC re contempt, contempt powers, damages and reply issues (.6); E-mails with J Morris, others re same DAF opposition and related errant E-mail issue (.2). | 0.80 | 1325.00 | $1,060.00 |
| IDK Bill | 05/17/2021 | DAF | 1.00 | 1.00 | 1,325.00 | 1,325.00 |
| 05/17/2021 | IDK | DAF | Attend conference call with J Pomerantz, others on DAF and OSC as well as other litigation matters (1.0). | 1.00 | 1325.00 | $1,325.00 |
| JNP Bill | 05/17/2021 | DAF | 0.60 | 0.60 | 1,295.00 | 777.00 |
| 05/17/2021 | JNP | DAF | Conference with PSZJ team regarding contempt reply. | 0.60 | 1295.00 | $777.00 |
| JNP Bill | 05/17/2021 | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/17/2021 | JNP | DAF | Conference with R. Nelms regarding contempt issues. | 0.10 | 1295.00 | $129.50 |
| JNP Bill | 05/17/2021 | DAF | 1.40 | 1.40 | 1,295.00 | 1,813.00 |
| 05/17/2021 | JNP | DAF | Detailed review of DAF response to contempt motion and draft comments thereto. | 1.40 | 1295.00 | $1,813.00 |
| JNP Bill | 05/17/2021 | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/17/2021 | JNP | DAF | Conference with John A. Morris regarding DAF contempt issues. | 0.10 | 1295.00 | $129.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-34    Filed 10/24/23    Page 1455 of 1539    PageID 18693

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 17 of 34

Pachulski Stang Ziehl & Jones LLP

Page:    114

Highland Capital Management LP

Prebill#283067

36027    - 00002

June 07, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|

| JNP Bill | 05/17/2021 | | DAF | 0.50 | 0.50 | 1,295.00 | | 647.50 |
|---|---|---|---|---|---|---|---|---|
| 05/17/2021 | JNP | DAF | Conference with PSZJ team regarding DAF response. | | 0.50 | 1295.00 | $647.50 |
| JNP Bill | 05/17/2021 | | DAF | 0.40 | 0.40 | 1,295.00 | | 518.00 |
| 05/17/2021 | JNP | DAF | Conference with R. Nelms and John A. Morris regarding contempt issues. | | 0.40 | 1295.00 | $518.00 |
| JNP Bill | 05/17/2021 | | DAF | 0.20 | 0.20 | 1,295.00 | | 259.00 |
| 05/17/2021 | JNP | DAF | Conference with John A. Morris regarding contempt reply. | | 0.20 | 1295.00 | $259.00 |
| JNP Bill | 05/17/2021 | | DAF | 0.10 | 0.10 | 1,295.00 | | 129.50 |
| 05/17/2021 | JNP | DAF | Emails regarding jurisdiction regarding DAF proceeding. | | 0.10 | 1295.00 | $129.50 |
| JNP Bill | 05/17/2021 | | DAF | 0.20 | 0.20 | 1,295.00 | | 259.00 |
| 05/17/2021 | JNP | DAF | Consider issues regarding pending contempt motion. | | 0.20 | 1295.00 | $259.00 |
| RJF Bill | 05/17/2021 | | DAF | 0.80 | 0.80 | 1,395.00 | | 1,116.00 |
| 05/17/2021 | RJF | DAF | Review opposition to contempt motion, related emails. | | 0.80 | 1395.00 | $1,116.00 |
| RJF Bill | 05/17/2021 | | DAF | 0.50 | 0.50 | 1,395.00 | | 697.50 |
| 05/17/2021 | RJF | DAF | Internal call regarding contempt motion. | | 0.50 | 1395.00 | $697.50 |
| JAM Bill | 05/17/2021 | | DAF | 2.00 | 2.00 | 1,245.00 | | 2,490.00 |
| 05/17/2021 | JAM | DAF | E-mails with L. Phillips, M. Sbaiti, others re: | | 2.00 | 1245.00 | $2,490.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-1    Filed 12/29/23    Page 1456 of 1539    PageID 18694
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 18 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:   115
Prebill#283067
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | discovery (0.3); telephone conference with J. Pomerantz, J. Elkin, G. Demo, I. Kharasch re: legal and factual issues concerning Contempt Motion (0.6); telephone conference with J. Pomerantz, J. Elkin, G. Demo, I. Kharasch, R. Feinstein re: legal and factual issues concerning Contempt Motion (0.7); telephone conference with J. Pomerantz, R. Nelms re: DAF contempt issues (0.4). | | | |
| GVD Bill | 05/17/2021 | | DAF | 0.70 | 0.70 | 950.00 | 665.00 |
| 05/17/2021 | GVD | DAF | Conference with PSZJ re reply to responses to order to show cause | 0.70 | 950.00 | $665.00 |
| GVD Bill | 05/17/2021 | | DAF | 0.60 | 0.60 | 950.00 | 570.00 |
| 05/17/2021 | GVD | DAF | Conference (internal) re contempt motion and next steps | 0.60 | 950.00 | $570.00 |
| GVD Bill | 05/17/2021 | | DAF | 0.30 | 0.30 | 950.00 | 285.00 |
| 05/17/2021 | GVD | DAF | Review contempt motions re research issues | 0.30 | 950.00 | $285.00 |
| JE Bill | 05/17/2021 | | DAF | 5.00 | 5.00 | 1,195.00 | 5,975.00 |
| 05/17/2021 | JE | DAF | Call with PSZJ team to discuss show cause reply (.6); second call with PSZJ team to discuss show cause reply (.8); review comments of Mr. Pomerantz and Mr. Feinstein regarding reply (.4); research issues for reply on civil contempt and jurisdiction (3.2). | 5.00 | 1195.00 | $5,975.00 |
| IDK Bill | 05/18/2021 | | DAF | 0.30 | 0.30 | 1,325.00 | 397.50 |
| 05/18/2021 | IDK | DAF | Attend part of conference call with J Pomerantz, | 0.30 | 1325.00 | $397.50 |

Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:23-cv-00726-S Document 85 Filed 12/29/23 Page 1457 of 1539 PageID 18695
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21 Entered 06/07/21 20:02:45 Page 19 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   116
Prebill#283067
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | others on contempt motion and opposition thereto and potential response | | | |
| JNP Bill | 05/18/2021 | | DAF | 0.70 | 0.70 | 1,295.00 | 906.50 |
| 05/18/2021 | JNP | DAF | Conference with PSZJ team regarding DAF contempt reply. | 0.70 | 1295.00 | $906.50 |
| RJF Bill | 05/18/2021 | | DAF | 0.70 | 0.70 | 1,395.00 | 976.50 |
| 05/18/2021 | RJF | DAF | Call with Jeffrey N. Pomerantz, Gregory V. Demo, Judith Elkin, John A. Morris regarding DAF contempt reply. | 0.70 | 1395.00 | $976.50 |
| 05/18/2021 | RJF | DAF | Review Villegas case. | 0.20 | 1395.00 | $279.00 |
| RJF Bill | 05/18/2021 | | DAF | 0.30 | 0.30 | 1,395.00 | 418.50 |
| 05/18/2021 | RJF | DAF | Review Elkin contempt research, related emails. | 0.30 | 1395.00 | $418.50 |
| JAM Bill | 05/18/2021 | | DAF | 1.10 | 1.10 | 1,245.00 | 1,369.50 |
| 05/18/2021 | JAM | DAF | Telephone conference with J. Elkin re: issues concerning reply brief for Contempt motion (0.4); telephone conference with J. Pomerantz, I. Kharasch, R. Feinstein, J. Elkin, G. Demo re: reply brief on contempt motion (0.7). | 1.10 | 1245.00 | $1,369.50 |
| GVD Bill | 05/18/2021 | | DAF | 0.70 | 0.70 | 950.00 | 665.00 |
| 05/18/2021 | GVD | DAF | Conference with PSZJ working group re contempt proceedings | 0.70 | 950.00 | $665.00 |
| JE Bill | 05/18/2021 | | DAF | 6.90 | 6.90 | 1,195.00 | 8,245.50 |
| 05/18/2021 | JE | DAF | Call with team regarding show cause reply (.7); research various issues raised in show cause | 6.90 | 1195.00 | $8,245.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34    Filed 10/25/23    Page 1458 of 1539    PageID 18696
Exhibit 34    Page 20 of 64

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 20 of
34

Pachulski Stang Ziehl & Jones LLP                    Page:   117
Highland Capital Management LP                       Prebill#283067
36027   -00002                                      June 07, 2021

|  | | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| response (5.8); call with Mr. Morris regarding fact | | | | | |



| JNP Bill | 05/19/2021 | DAF | 1.00 | 1.00 | 1,295.00 | 1,295.00 |
|---|---|---|---|---|---|---|

| 05/19/2021 | JNP | DAF | Review and revise sections of contempt reply brief. | 1.00 | 1295.00 | $1,295.00 |
|---|---|---|---|---|---|---|



| 05/19/2021 | RJF | DAF | Comment on deposition notices to DAF and CLC. | 0.20 | 1395.00 | $279.00 |
|---|---|---|---|---|---|---|



| RJF Bill | 05/19/2021 | DAF | 0.40 | 0.40 | 1,395.00 | 558.00 |
|---|---|---|---|---|---|---|

| 05/19/2021 | RJF | DAF | Research regarding contempt, related emails. | 0.40 | 1395.00 | $558.00 |
|---|---|---|---|---|---|---|
| JAM Bill | 05/19/2021 | DAF | 8.10 | 8.10 | 1,245.00 | 10,084.50 |

| 05/19/2021 | JAM | DAF | Prepare notice of deposition for Mark Patrick (0.3); | 8.10 | 1245.00 | $10,084.50 |
|---|---|---|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 12/05/23    Page 1459 of 1539    PageID 18697
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 21 of 34

Pachulski Stang Ziehl & Jones LLP                                                    Page:    118
Highland Capital Management LP                                                        Prebill#283067
36027    -00002                                                                      June 07, 2021

|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | e-mails with Z. Annable, H. Winograd re: Patrick notice of deposition (0.1); prepare Rule 30(b)(6) deposition notice for DAF/CLO Holdco (0.6); e-mails with J. Pomerantz, R. Feinstein, G. Demo, Z. Annable re: Rule 30(b)(6) deposition notice for DAF/CLO Holdco (0.1); work on reply brief for contempt motion (6.8); e-mails with L. Phillips, others re: depositions (0.1); e-mail to J. Pomerantz, R. Feinstein, J. Elkin re: reply brief for contempt motion (0.1). |  |  |  |
| GVD Bill | 05/19/2021 | DAF | 0.10 | 0.10 | 950.00 | 95.00 |
| 05/19/2021 | GVD | DAF | Correspondence with J. Elkin re contempt motion | 0.10 | 950.00 | $95.00 |
| JE Bill | 05/19/2021 | DAF | 13.30 | 13.30 | 1,195.00 | 15,893.50 |
| 05/19/2021 | JE | DAF | Review and comment on discovery notice (.3); review cases cited by DAF in brief (2.3); work on reply brief and miscellaneous correspondence with Mr. Morris and Mr. Pomerantz regarding same (10.7). | 13.30 | 1195.00 | $15,893.50 |
| JNP Bill | 05/20/2021 | DAF | 1.00 | 1.00 | 1,295.00 | 1,295.00 |
| 05/20/2021 | JNP | DAF | Review and revise reply regarding contempt motion. | 1.00 | 1295.00 | $1,295.00 |
| JAM Bill | 05/20/2021 | DAF | 5.10 | 5.10 | 1,245.00 | 6,349.50 |
| 05/20/2021 | JAM | DAF | Continued work on reply brief on contempt motion (4.5); telephone conference with J. Elkin re: reply brief on contempt motion (0.2); e-mails to counsel for the alleged Violators re: discovery (0.2); review document requests (0.1); telephone conference with J. Pomerantz re: document requests (0.1). | 5.10 | 1245.00 | $6,349.50 |
| GVD | 05/20/2021 | DAF | 0.30 | 0.30 | 950.00 | 285.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 10/25/23   Page 523 of 64 Page 1460 of 1539   PageID 18698

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 22 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:   119
Highland Capital Management LP                                       Prebill#283067
36027    -00002                                                     June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 05/20/2021 | GVD | DAF | Review reply to contempt motion | 0.30 | 950.00 | $285.00 |
| JE Bill | 05/20/2021 | | DAF | 13.10 | 13.10 1,195.00 | 15,654.50 |
| 05/20/2021 | JE | DAF | Work on reply brief (11.0); review motion to amend complaint (.4); call with Mr. Morris regarding briefing (.3); research judgment issues (1.4). | 13.10 | 1195.00 | $15,654.50 |
| JNP Bill | 05/21/2021 | | DAF | 1.00 | 1.00 1,295.00 | 1,295.00 |
| 05/21/2021 | JNP | DAF | Emails and review and revised reply regarding contempt motion. | 1.00 | 1295.00 | $1,295.00 |
| RJF Bill | 05/21/2021 | | DAF | 0.50 | 0.50 1,395.00 | 697.50 |
| 05/21/2021 | RJF | DAF | Review and comment on contempt motion reply. | 0.50 | 1395.00 | $697.50 |
| JAM Bill | 05/21/2021 | | DAF | 4.50 | 4.50 1,245.00 | 5,602.50 |
| 05/21/2021 | JAM | DAF | E-mails to counsel for the Violators re: discovery (0.2); review/revise draft reply on Contempt Motion (3.3); e-mail to J. Seery, PSZJ team re: draft Reply on Contempt Motion (0.1); telephone conference with G. Demo re: facts concerning contempt motion (0.1); review/revise draft Reply on Contempt Motion (0.4); communications with J. Elkin, H. Winograd, Z. Annable re: Reply and supporting declaration on Contempt Motion (0.2); revise subpoena for Grant Scott (0.1); e-mails with J. Kane, J. Pomerantz, G. Demo, H. Winograd re: Scott subpoena (0.1). | 4.50 | 1245.00 | $5,602.50 |
| GVD Bill | 05/21/2021 | | DAF | 1.50 | 1.50 950.00 | 1,425.00 |
| 05/21/2021 | GVD | DAF | Review draft reply to contempt motion | 1.50 | 950.00 | $1,425.00 |
| GVD Bill | 05/21/2021 | | DAF | 0.10 | 0.10 950.00 | 95.00 |
| 05/21/2021 | GVD | DAF | Conference with J. Morris re contempt reply | 0.10 | 950.00 | $95.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85-1    Filed 10/25/23    Page 1461 of 1539    PageID 18699
Exhibit 34 Page 23 of 64

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 23 of
34

Pachulski Stang Ziehl & Jones LLP                                    Page:    120
Highland Capital Management LP                                      Prebill#283067
36027    - 00002                                                    June 07, 2021

| HRW Bill | 05/21/2021 | DAF | 1.20 | 1.20 | 695.00 | 834.00 |
|---|---|---|---|---|---|---|

| 05/21/2021 | HRW | DAF | Prepare declaration and gather exhibits for reply in support of DAF contempt motion (1.2). | 1.20 | 695.00 | $834.00 |
|---|---|---|---|---|---|---|

| JE Bill | 05/22/2021 | DAF | 0.60 | 0.60 | 1,195.00 | 717.00 |
|---|---|---|---|---|---|---|

| 05/22/2021 | JE | DAF | Miscellaneous correspondence regarding preparation for hearings on Motion to Modify and Contempt Motion. | 0.60 | 1195.00 | $717.00 |
|---|---|---|---|---|---|---|

| JNP Bill | 05/23/2021 | DAF | 0.60 | 0.60 | 1,295.00 | 777.00 |
|---|---|---|---|---|---|---|

| 05/23/2021 | JNP | DAF | Conference with John A. Morris and M. Sbaiti regarding discovery. | 0.60 | 1295.00 | $777.00 |
|---|---|---|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 05/23/67    Page 1462 of 1539    PageID 18700

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 24 of
34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    121
Prebill#283067
June 07, 2021

| | | | | Hours | | | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| JNP Bill | 05/23/2021 | | DAF | 0.10 | 0.10 | 1,295.00 | | 129.50 |
| 05/23/2021 | JNP | DAF | Review email from M. Sbaiti; Conference with John A. Morris regarding same. | | 0.10 | 1295.00 | | $129.50 |
| JAM Bill | 05/23/2021 | | DAF | 1.40 | 1.40 | 1,245.00 | | 1,743.00 |
| 05/23/2021 | JAM | DAF | Prepare Notice of Service of Subpoena (Grant Scott) (0.2); e-mails to J. Seery, T. Surgent, J. Pomerantz, Z. Annable re: subpoena for Scott (0.2); e-mail to C. Taylor, J. Bonds, J. Pomerantz, G. Demo, H. Winograd re: discovery in connection with contempt motion (0.3); meet and confer call with J. Pomerantz, M. Sbaiti re: Violators' document requests and related matters (0.5); telephone conference with J. Pomerantz re: discovery requests (0.2). | | 1.40 | 1245.00 | | $1,743.00 |
| IDK Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,325.00 | | 397.50 |
| 05/24/2021 | IDK | DAF | Attend conference call with internal team re DAF (.3). | | 0.30 | 1325.00 | | $397.50 |
| JNP Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,295.00 | | 388.50 |
| 05/24/2021 | JNP | DAF | Conference with PSZJ team regarding strategy issues concerning DAF lawsuit. | | 0.30 | 1295.00 | | $388.50 |
| JNP Bill | 05/24/2021 | | DAF | 0.40 | 0.40 | 1,295.00 | | 518.00 |
| 05/24/2021 | JNP | DAF | Conference with J. Elkin, John A. Morris, Gregory V. Demo, and Ira D. Kharasch regarding issues relating to DAF. | | 0.40 | 1295.00 | | $518.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/25/23    Page 1463 of 1539    PageID 18701

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 25 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    122
Prebill#283067
June 07, 2021

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| RJF Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,395.00 | 418.50 |
| 05/24/2021 | RJF | DAF | Internal call regarding DAF. | | 0.30 | 1395.00 | $418.50 |
| JMF Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,050.00 | 315.00 |
| 05/24/2021 | JMF | DAF | Status call re contempt motion and litigation issues. | | 0.30 | 1050.00 | $315.00 |
| GVD Bill | 05/24/2021 | | DAF | 0.40 | 0.40 | 950.00 | 380.00 |
| 05/24/2021 | GVD | DAF | Conference with PSZJ team re response to contempt action (partial attendance) | | 0.40 | 950.00 | $380.00 |
| GVD Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 950.00 | 285.00 |
| 05/24/2021 | GVD | DAF | Attend PSZJ status conference on DAF litigation | | 0.30 | 950.00 | $285.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/25/23    Page 563 of 64    Page 1464 of 1539    PageID 18702
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 26 of
34

Pachulski Stang Ziehl & Jones LLP                                    Page:    123
Highland Capital Management LP                                       Prebill#283067
36027    - 00002                                                    June 07, 2021

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 85    Filed 10/25/23    Page 573 of 64 Page 1465 of 1539   PageID 18703

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 27 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:    124
Highland Capital Management LP                                       Prebill#283067
36027    - 00002                                                    June 07, 2021

| GVD Bill | 05/26/2021 | DAF | | 0.50 | 0.50 | 950.00 | | 475.00 |

| 05/26/2021 | GVD | DAF | Review and update Morris declaration in support of order to show cause | 0.50 | 950.00 | $475.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/25/23    Page 528 of 67 Page 1466 of 1539    PageID 18704
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 28 of
34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

|  | Hours | Rate | Amount |
|--|-------|------|--------|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 34   Filed 12/09/23   Page 592 of 67 Page 1467 of 1539   PageID 18705
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 29 of
34

Pachulski Stang Ziehl & Jones LLP                                        Page:    126
Highland Capital Management LP                                          Prebill#283067
36027    -00002                                                        June 07, 2021

|   | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/23/23    Page 1468 of 1539    PageID 18706

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 30 of 34

Pachulski Stang Ziehl & Jones LLP                                      Page:   127
Highland Capital Management LP                                         Prebill#283067
36027    -00002                                                       June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|



| JNP Bill | 05/30/2021 | DAF | 0.20 | 0.20 | 1,295.00 | 259.00 |
|---|---|---|---|---|---|---|
| 05/30/2021 JNP DAF | Conference with John A. Morris regarding contempt hearing and discovery. | | | 0.20 | 1295.00 | $259.00 |
| GVD Bill | 05/30/2021 | DAF | 1.10 | 1.10 | 950.00 | 1,045.00 |
| 05/30/2021 GVD DAF | Conference with J. Morris re document discovery | | | 1.10 | 950.00 | $1,045.00 |
| GVD Bill | 05/30/2021 | DAF | 1.30 | 1.30 | 950.00 | 1,235.00 |
| 05/30/2021 GVD DAF | Review document production re DAF issues | | | 1.30 | 950.00 | $1,235.00 |



| GVD Bill | 05/30/2021 | DAF | 0.60 | 0.60 | 950.00 | 570.00 |
|---|---|---|---|---|---|---|
| 05/30/2021 GVD DAF | Conference with J. Morris re deposition preparation | | | 0.60 | 950.00 | $570.00 |
| JE | 05/30/2021 | DAF | 4.80 | 4.80 | 1,195.00 | 5,736.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34  Filed 12/26/23  Page 623 of 64  Page 1469 of 1539   PageID 18707

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 31 of
34

Pachulski Stang Ziehl & Jones LLP                                    Page:   128
Highland Capital Management LP                                       Prebill#283067
36027    -00002                                                     June 07, 2021

|  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|

| GVD Bill | 06/01/2021 | DAF | 2.30 | 2.30 | 950.00 | 2,185.00 |

| 06/01/2021 | GVD | DAF | Attend Dondero deposition (partial attendance) | 2.30 | 950.00 | $2,185.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S    Document 34-85    Filed 10/26/23    Page 32 of 64    Page 1470 of 1539    PageID 18708
Case 19-34054-sgj11   Doc 2421-2   Filed 06/07/21    Entered 06/07/21 20:02:45    Page 32 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:   129
Highland Capital Management LP                                       Prebill#283067
36027    - 00002                                                    June 07, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| GVD Bill | 06/01/2021 | DAF | 2.20 | 2.20 | 950.00 | | 2,090.00 |
| 06/01/2021 | GVD | DAF | Attend G. Scott deposition (partial) | | 2.20 | 950.00 | $2,090.00 |
| GVD Bill | 06/02/2021 | DAF | 1.00 | 1.00 | 950.00 | | 950.00 |
| 06/02/2021 | GVD | DAF | Conference with J. Morris and HCMLP re M. Patrick deposition prep | | 1.00 | 950.00 | $950.00 |
| GVD Bill | 06/02/2021 | DAF | 0.10 | 0.10 | 950.00 | | 95.00 |
| 06/02/2021 | GVD | DAF | Conference with J. Morris re follow up to M. Patrick deposition prep | | 0.10 | 950.00 | $95.00 |
| GVD Bill | 06/02/2021 | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |
| 06/02/2021 | GVD | DAF | Conference with J. Donohue re M. Patrick deposition issues | | 0.20 | 950.00 | $190.00 |
| GVD Bill | 06/03/2021 | DAF | 3.50 | 3.50 | 950.00 | | 3,325.00 |
| 06/03/2021 | GVD | DAF | Review M. Patrick document production and correspondence with J. Morris re same | | 3.50 | 950.00 | $3,325.00 |
| GVD | 06/04/2021 | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:23-cv-00726-S   Document 34-85   Filed 14/09/23   Page 633 of 64 age 1471 of 1539   PageID 18709
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 33 of
34

Pachulski Stang Ziehl & Jones LLP                                           Page:   130
Highland Capital Management LP                                              Prebill#283067
36027    - 00002                                                           June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill |  |  |  |  |  |  |
| 06/04/2021 | GVD | DAF | Conference with J. Morris re preparation for M. Patrick deposition | 0.20 | 950.00 | $190.00 |
| GVD | 06/04/2021 |  | DAF | 2.20 | 2.20 | 950.00 | | 2,090.00 |
| Bill |  |  |  |  |  |  |
| 06/04/2021 | GVD | DAF | Attend deposition of M. Patrick (partial) | 2.20 | 950.00 | $2,090.00 |

Pachulski Stang Ziehl & Jones LLP                                     Page:    249
Highland Capital Management LP                                        Prebill#283067
36027    -00002                                                      June 07, 2021

---

### REMITTANCE ADVICE

**Please include this Remittance with your payment**

**For current services rendered through:**    **06/07/2021**

**Total Fees**                                                       **$1,450,912.50**

**Total Expenses**                                                   **14,097.56**

**Total Due on Current Invoice**                                     **$1,465,010.06**

**Outstanding Balance from prior invoices as of**    **06/07/2021**    **(May not include recent payments)**

| A/R Bill Number | Invoice Date | Fees Billed | Expenses Billed | Balance Due |
|---|---|---|---|---|
| 127680 | 04/30/2021 | $1,286,897.00 | $8,173.58 | $1,295,070.58 |

**Total Amount Due on Current and Prior Invoices:**    **$4,009,430.04**

# EXHIBIT 35

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                      .   Case No. 19-34054-11(SGJ)
                            .
HIGHLAND CAPITAL            .   Earle Cabell Federal Building
MANAGEMENT, L.P.,          .   1100 Commerce Street
                            .   Dallas, TX  75242-1496
                            .
          Debtor.           .   Monday, September 12, 2022
. . . . . . . . . . . . . . .   9:40 a.m.


TRANSCRIPT OF HEARING ON MOTION TO WITHDRAW PROOF OF CLAIM #146
         BY HCRE PARTNERS, LLC (3443) AND
 REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
            PROTECTION [DOCKET NO. 3464] AND
(B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
            TO COMPEL A DEPOSITION (3484)

            BEFORE HONORABLE STACEY G. JERNIGAN
         UNITED STATES BANKRUPTCY COURT CHIEF JUDGE




TELEPHONIC APPEARANCES:

For Highland Capital       Pachulski Stang Ziehl & Jones LLP
Management, L.P.:          BY:  JOHN MORRIS, ESQ.
                           780 3rd Avenue, 34th Floor
                           New York, New York 10017


For NexPoint Real          Hoge & Gameros, L.L.P.
Estate Partners LLC        BY:  CHARLES W. GAMEROS, JR., ESQ.
f/k/a HCRE Partners        6116 North Central Expressway
LLC:                       Suite 1400
                           Dallas, Texas 75206


Audio Operator:            Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
            produced by a transcript service.

LIBERTY TRANSCRIPTS
7306 Danwood Drive
Austin, Texas 78759
E-mail:  DBPATEL1180@GMAIL.COM
(847) 848-4907

2

**INDEX**

Page

MOTION TO WITHDRAW PROOF OF CLAIM #146 BY HCRE
PARTNERS, LLC (3443)

**Court's Ruling - Denied**                                    **55**

REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO
QUASH AND FOR PROTECTION [DOCKET NO. 3464] AND
(B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE
SUBPOENAS AND TO COMPEL A DEPOSITION (3484)

**Court's Ruling - Granted**                                   **55**


**WITNESSES**

MOTION TO WITHDRAW PROOF OF CLAIM #146 BY HCRE PARTNERS, LLC
(3443)

**FOR THE DEBTOR:**

James Dondero
  Direct Examination by Mr. Gameros                          40/43


**FOR HCRE:**

(None)

REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
PROTECTION [DOCKET NO. 3464] AND
(B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
TO COMPEL A DEPOSITION   (3484)


**FOR THE DEBTOR:**

(None)

**FOR HCRE:**

(None)

3

**INDEX**

**EXHIBITS**

MOTION TO WITHDRAW PROOF OF CLAIM #146 BY HCRE PARTNERS, LLC
(3443)

|  | | ID | EVD |
|---|---|---|---|

**FOR THE DEBTOR:**

| 1 through 16 | Docket Number 3488 With Declaration of John Morris | 9 | 9 |

**FOR HCRE:**

(None)


REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
PROTECTION [DOCKET NO. 3464] AND (B) CROSS-MOTION TO ENFORCE
SUBPOENAS TO ENFORCE SUBPOENAS AND TO COMPEL A DEPOSITION
(3484)


**FOR THE DEBTOR:**

| 1 through 6 | Docket Numbers 3485 and 3486 With Declaration of John Morris | 7 | 8 |

**FOR HCRE:**

(None)

**WWW.LIBERTYTRANSCRIPTS.COM**

4

1      (Proceedings commenced at 9:40 a.m.)

2          THE COURT:  All right.  We have a setting this

3  morning in Highland Capital, Case Number 19-34054.  We have

4  both a motion to withdraw proof of claim of HCRE Partners, LLC,

5  as well as the reorganized debtor's objection to a motion to

6  quash and cross-motion to enforce subpoenas.

7          All right.  So let's start by getting lawyer

8  appearances, please.  For HCRE, who do we have appearing?

9          Let me get appearances first from the main parties.

10  For the debtor this morning, who is appearing?

11          MR. GAMEROS:  Good morning, Your Honor.  Bill Gameros

12  for NexPoint Real Estate Partners f/k/a HCRE.

13          THE COURT:  All right.  Thank you.

14          For Highland, who do we have appearing this morning?

15          MR. MORRIS:  Good morning, Your Honor.  John Morris,

16  Pachulski Stang Ziehl & Jones for Highland Capital Management,

17  L.P.

18          THE COURT:  Good morning.

19          All right.  I'm guessing these are our only

20  appearances.  These are the only parties involved who filed

21  pleadings.  If there is anyone who felt the need to appear, go

22  ahead.

23      (No audible response)

24          THE COURT:  All right.  Well, I don't know if you all

25  have talked about the sequence we are going to take things this

5

1  morning.  Obviously, the first filed motion is HCRE's motion to

2  withdraw proof of claim.  But we have a discovery dispute and I

3  think -- well, we've got Highland objecting to the motion to

4  withdraw the proof of claim, but I think the backup argument is

5  at the very least let us take discovery before you rule on the

6  motion to withdraw proof of claim.

7        So have you all talked about who's going to go first

8  on this one?

9        MR. GAMEROS:  Your Honor, we haven't spoken about it,

10  but it makes sense to me that if we withdraw the proof of

11  claim, it moots everything else.  And I think that's really

12  what we ought to do, take it all at one time.

13        THE COURT:  All right.  Mr. Morris, do you agree on

14  that sequence?

15        MR. MORRIS:  I'm happy to cede the podium and let Mr.

16  Gameros go first since he filed the first motion, but I do

17  think that Your Honor had your finger on the pulse that before

18  -- either the motion should be denied for the reasons set forth

19  in our papers or we should be permitted discovery.

20        THE COURT:  All right.

21        With that, Mr. Gameros, I'll hear your opening

22  statement and hear what your evidence is going to be.

23        MR. GAMEROS:  We didn't file any evidence today.  We

24  just simply want to withdraw the proof of claim.  I think that

25  we've satisfied the Manchester factors.

6

1      Quite frankly, there's only been the filing of the

2  proof of claim and a scheduling order entered.  Since I've been

3  involved in it, we've only had the scheduling order entered.

4  Anything else that's happened in this case was a motion to

5  disqualify that precipitated our appearance.  We filed the

6  motion to withdraw.  There's no summary judgments pending, no

7  dispositive motions pending.

8      Quite frankly, we've looked at it as the company

9  continued to operate.  The things we were worried about

10 happening didn't happen.  And as a result, we decided we don't

11 need the proof of claim, we don't want to continue it because I

12 think we satisfy Manchester.  If the Court has any concerns at

13 all, A, the debtor's reorganized so proceeding with our proof

14 of claim or withdrawing it doesn't affect it and, B, you can

15 conditionally withdraw with a forecreduous [*sic*] order

16 withdrawing the proof of claim.

17     But, quite frankly, I don't think we could amend it

18 and we passed the claims bar date.  So the Court should simply

19 allow NexPoint Real Estate Partners to discontinue pursuing a

20 proof of claim that they don't want to continue anymore.

21 Everything else falls after that.  That's it.

22     THE COURT:  All right.  Well, assuming the Manchester

23 factors apply here, you're not going to have any evidence on

24 any of these factors?

25     MR. GAMEROS:  I don't believe that we need to have

7

1  evidence on those.  The only one that could possibly be at

2  issue is one that the debtor might be able to bring but they

3  haven't, and that's actual legal prejudice.

4        The withdrawal of the proof of claim here essentially

5  says they win.  And they've objected to our proof of claim, and

6  now we're withdrawing it.  So the proof of claim is resolved in

7  their favor except we're withdrawing it instead of going

8  through all of the exercise to get to a hearing where we don't

9  want to pursue the proof of claim anymore.

10        THE COURT:  All right.  But is it a withdrawal that

11  you seek with prejudice with any bells and whistles about

12  future preclusion of litigation?

13        MR. GAMEROS:  Your Honor, the proof of claim -- I

14  know the Court knows this, it's its own type of proceeding.

15  This isn't a adversary proceeding or a different kind of

16  lawsuit.  It's simply a proof of claim, and we know we're not

17  going to be able to amend it, we're not going to be able to re-

18  assert it because it's after the bar date.  That's why the

19  Court should allow the withdrawal and, to the extent the Court

20  wishes to condition it, condition it with prejudice.  That's

21  it.

22        THE COURT:  Mr. Morris, I'll hear from you.

23        MR. MORRIS:  Thank you, Your Honor.

24        Before I begin, I'd like to move into evidence

25  Exhibits 1 through 6 that appear at Docket 3485 and 3486.

8

1  They're mirror images of each other.  They're duplicates of

2  each other, Your Honor.

3          But because our motion -- our objection to the motion

4  for a protective order and the cross-motion to compel were

5  filed as one document, the Court had us file it basically twice

6  so that one is serving as the objection to the motion for the

7  protective order and the other is serving as the cross-motion

8  to compel.  And so you'll see at Dockets 3485 and 3486

9  duplicate declarations from me with Exhibits 1 through 6.

10         THE COURT:  All right.  Any objections?

11         MR. GAMEROS:  Your Honor?

12         THE COURT:  Any objection?

13         MR. MORRIS:  And then -- and then, Your Honor?

14         THE COURT:  I'm sorry, I did not hear what Mr.

15  Gameros said.

16         MR. GAMEROS:  Your Honor, we don't object.

17         THE COURT:  All right.

18         MR. GAMEROS:  We don't necessarily believe it's

19  relevant, but we don't object to its admission.

20         THE COURT:  All right.  They'll --

21         MR. MORRIS:  And then, Your Honor, we've got --

22         THE COURT:  Docket -- Exhibits 1 through 6 are

23  admitted.

24         Go ahead.

25     (Debtor's Exhibits 1 through 6 admitted into evidence)


**WWW.LIBERTYTRANSCRIPTS.COM**

9

 1         MR. MORRIS:  And then at Docket 3488 we have another

 2  declaration under my signature with Exhibits 1 through 16,

 3  which are offered in opposition to HCRE's motion to withdraw

 4  their proof of claim.

 5         THE COURT:  Any objection?

 6         MR. GAMEROS:  No, Your Honor.

 7         THE COURT:  Okay.  Those exhibits and that

 8  declaration are admitted, as well.

 9     (Debtor's Exhibits 1 through 16 admitted into evidence)

10         MR. MORRIS:  So, Your Honor, if I may, please, you

11  know, the lack of evidence and the dismissiveness with which

12  HCRE is approaching this proceeding is alarming.

13         We have litigated for two years.  We were forced to

14  move and litigate vigorously a motion to disqualify our prior

15  counsel even though we put into evidence a document that said

16  Wick Phillips represents Highland Capital Management.  We were

17  still forced to do that.  We were forced to engage in expert.

18  We were forced to have a hearing on this.

19         We have gone through discovery not once but twice.

20  We have fulfilled every single obligation that were were

21  required to fulfill under the scheduling orders.  We have

22  engaged in two rounds of written discovery.  We have offered up

23  every witness that has been noticed.  We have produced

24  thousands of pages of documents.

25         We took discovery from third parties, and this is

10

1  really important for a number of reasons, Your Honor.   We

2  served subpoenas on BH Equities.   BH Equities is not subject to

3  the jurisdiction in Dallas, so we served the subpoena.   We took

4  the deposition.

5         They can't be compelled to testify at a hearing.

6  HCRE chose not to ask any questions.   The accounting firm, they

7  chose not to ask any questions.   Discovery is over, okay.   I

8  hear Counsel talk about the proof of claim.   We need -- and

9  this is where the prejudice comes in.   We need an order on the

10 merits.   We need to know that HCRE is never going to challenge

11 again Highland's 46.06 percent interest in SE Multifamily.

12 That's what we need, because that's what we were about to get

13 and they know that.   And that's why they're folding their tent.

14        We informed them that we were moving for summary

15 judgment.   In fact, just seven days before they filed their

16 motion, we negotiated a stipulation in order to extend the

17 expert discovery deadline so that they could file an expert

18 report while preserving Highland's ability to move for summary

19 judgment.   HCRE knew this when it filed its motion.

20        Discovery is now closed.   There's only three things

21 left to do.   There's four things left to do: take the

22 deposition of Mr. Dondero, Mr. McGraner (phonetic) and HCRE and

23 have a hearing on the merits.

24        I want to say right now, Your Honor, Highland is

25 willing to forego its right to move for summary judgment.   We

11

1  don't need to take that step.  Let's just proceed.  This motion

2  should be denied.  They offer no evidence whatsoever.  Let's

3  just proceed with the three depositions because discovery is

4  otherwise closed and let's have a one-day trial live in your

5  courtroom, Your Honor.  We could have this done in six weeks.

6          The legal prejudice is enormous.  We've set it out in

7  our papers.  Our evidence supports it.  But I want to just

8  highlight a few things.  Again, I hear vagueness here.  I hear

9  you can dismiss the proof of claim with prejudice, but somehow

10  I get the feeling from their papers from the cases that they

11  cited to, from the quotations that say just because we get a

12  tactical advantage doesn't mean that the motion should be

13  denied, just because we may choose to file this in a different

14  forum.

15          And that's the question that I really hope the Court

16  will ask Mr. Gameros.  Is HCRE waiving its right to ever

17  challenge this again because if you can't get an unambiguous

18  answer to that question, the motion must be denied because

19  that's the prejudice.

20          But there's more prejudice, too.  They've taken our

21  deposition and based on what Mr. Gameros just told you, based

22  on what's in their papers, they perceive something that

23  happened in that deposition as being advantageous to them.  If

24  this Court were to consider dismissing this case with

25  prejudice, it should do so on the condition that that

12

1  transcript cannot be used for any purpose at any time anywhere
2  because otherwise it's not fair, otherwise we've been
3  prejudiced by them being permitted to take our deposition but
4  foreclosing us from taking their deposition.  Either the
5  playing field needs to be level or that deposition transcript
6  should never see the light of day.

7          That's condition number two, not just the dismissal
8  with prejudice here, we need an ironclad commitment that HCRE
9  is irrevocably waiving its right to challenge Highland's
10  interest in SE Multifamily because that would be the result if
11  this went to trial.  And that transcript of Mr. Seery as
12  Highland's 30(b)(6) witness should never see the light of day
13  because they're playing games.  They want to use that for some
14  other purpose.  And if they want to do that, that's fine, but I
15  get to take their depositions.  The playing field has to be
16  level, Your Honor.

17          We have spent hundreds of thousands of dollars on
18  this case.  The excuse that they're giving, the reason that
19  they're giving for dismissing the case at this time makes no
20  sense whatsoever.  There's nothing in the proof of claim,
21  nothing in the pleadings.  There will never be any evidence.

22          There's no affidavit suggesting that Highland was
23  interfering with SE Multifamily, that Highland threatened to
24  interfere with SE Multifamily, that until this motion was filed
25  that HCRE had any concerns whatsoever that Highland would be

13

1  engaging in wrongful conduct.  There will never be any evidence

2  whatsoever that HCRE ever took any steps to protect itself from

3  this so-called interference that they're now so fearful of.

4        And I do want to -- I have to ask this question, Your

5  Honor.  If HCRE believed that they were at risk on Wednesday,

6  August 10th, so that they had to take Mr. Seery's deposition,

7  what happened after that that caused them 48 hours later to

8  file this motion with no notice whatsoever?

9        It's not right, Your Honor.  So let me get to the

10 substance.  This is not a motion under Rule 41.  Under Rule 41,

11 plaintiffs sometimes have the right, the unilateral right to

12 withdraw a pleading.  HCRE has no right to that today.  Rule

13 3006 is very clear.  When there is a proof of claim that is

14 contested, the proof of claim can only be withdrawn with court

15 approval after a hearing and subject to whatever conditions the

16 Court decides are appropriate.

17        And that's to protect the integrity of the process.

18 And that's what we're asking the Court to do, to protect the

19 integrity of the claims resolution process.

20        It is a fact-intensive inquiry.  In this district, as

21 HCRE has pointed out, there is precedent, the Manchester case,

22 that sets forth a long list of factors that a court could

23 consider in the face of such a motion.  As we explain in our

24 opposition, we believe that every single one of those factors

25 weighs in favor of denying the motion.

14

 1          I'm going to go through just a bit of it, Your Honor,

 2   because I think it's very important that everybody see exactly

 3   what's happening.   In contrast to the lack of evidence by HCRE,

 4   we have all of the exhibits that have just been admitted into

 5   evidence here.   The claims stated, the proof of claims, start

 6   with the proof of claim, stated that some or all of Highland's

 7   interest in SE Multifamily might be the property of HCRE.

 8      It's a proof of claim that was signed by Jim Dondero.   It

 9   was signed under the penalty of perjury.   There is no good-

10   faith basis for that proof of claim to have been filed, none

11   whatsoever.   If you take a look at their response to Highland's

12   initial objection which can be found at Exhibit 7 on the

13   initial docket, we'll put it up on the screen jut -- here's

14   Exhibit 7 from Docket Number 3488.

15          And this is HCRE's response.   And if we can go to

16   Paragraph 5.   This is the -- this is really their response

17   here.   And it says:

18          "After reviewing what documentation is available to

19           HCRE with the debtor, HCRE believes the

20           organizational documents relating to SC Multifamily

21           improperly allocates the ownership percentages of the

22           members thereto due to mutual mistake, lack of

23           consideration, and/or the failure of consideration.

24           As such, HCRE has a claim to reform, rescind, or

25           modify the agreement."

**WWW.LIBERTYTRANSCRIPTS.COM**

15

1    This is their proof of claim, that there was some

2  mistake that happened in the drafting of the SE Multifamily

3  documents.  There is no good-faith basis for this proof of

4  claim.  There is no good-faith basis for this response that's

5  up on the screen.  And let me show you why.

6    If Your Honor had an opportunity to review BH

7  Equities' deposition transcript, at least the portions that we

8  specifically cited to, BH Equities is a truth third party.

9  They're the only third party that is a member of SE

10  Multifamily.  I took their deposition.  They retained Dentons.

11  They produced documents.  They acted professionally.

12    And their witness testified up, down, and sideways

13  that from their perspective, it was a bilateral negotiation

14  with them on one side and the grand Highland on the other side

15  and that Highland drafted the ultimate agreement, the amended

16  and restated LLC agreement.

17    It's an issue that is not in dispute.  Highland

18  drafted the document.  People working on the Highland platform

19  in the spring of 2019 when Mr. Dondero was in control, solely

20  in control of Highland and HCRE.

21    So they say in that response and in the proof of

22  claim that the allocation, the allocation is the allocation of

23  the membership interest in SE Multifamily, they say, oh my

24  goodness, that allocation was wrong because Highland only put

25  in $49,000.  And Mr. Dondero signed the agreement.

16

1          Let's take a look just quickly at Exhibit 5, and

2    let's see how it's possible that Mr. Dondero could swear under

3    oath that he made a mistake.  If we can go to Schedule A.

4          Take a look at this, Your Honor.  This is Schedule A.

5    It's about a page or two after Mr. Dondero's signature.  It has

6    the percentage interest that he says was a mistake as if he

7    didn't know the capital contribution that Highland put in.  And

8    if we got to a trial, Your Honor, we would show that Highland

9    actually reached into its pocket for the $49,000.  HCRE, in

10   contrast, borrowed all the money, even though Highland was on

11   the hook for the obligations to Key Bank.

12         But, nevertheless, here it is.  It's in plain, plain,

13   plain terms.  The numbers are next to each other.  It's not

14   just the percentage interest.  It shows the capital

15   contribution.  I'd be really interested in asking Mr. Dondero

16   did he review this.  I suspect he'll say no because that's what

17   he usually says.  But doesn't that scream fraud?  How do you

18   say you made a mistake when the numbers are on that page?  I

19   don't understand it.

20         Yet, we've spent two years and hundreds of thousands

21   of dollars litigating this case.  But here's the thing, Your

22   Honor, it's not just in Schedule A.  If we could go to Section

23   1.7 earlier in the agreement.

24         And remember, this is a document that BH Equities

25   says was drafted by Highland.  Look at 7; 7 is company

17

1  ownership.  That's the name of the section.  Again, HCMLP has

2  46.06 percent.  Is that a mistake?  How did this -- somebody

3  should explain how this mistake happened.

4         Let's go to Section 6.1.  Section 6.1 is critical,

5  and we'll see this in a moment.  This is what's known as the

6  waterfall.  It shows how the distributions of cash from SE

7  Multifamily are going to be made to its members.  And you'll

8  see in Section 6.1A that after certain things occur, cash is

9  going to be distributed 46.06 percent to Highland.  Another

10 mistake, I guess, without explanation.

11        Section 9.3.  Section 9 deals with liquidation and

12 termination, and 9.3 is effectively the waterfall that's

13 supposed to be in place upon a liquidation.  And at the bottom

14 of the waterfall in 9.3(e), not surprisingly, you see the exact

15 same allocation.

16        So the allocation that Mr. Dondero swore under oath

17 was the result of a mutual mistake was an allocation that

18 appears in four separate places in a document that was drafted

19 by people under his authority.  Think about that.  It's

20 extraordinary.  We spent two years litigating this case, and

21 now they just want to go home.

22        But wait, there's so much more, Your Honor.  I'm not

23 going to go through all of it, but I want to just show you two

24 other documents because these numbers are not in this document

25 by accident.  They're there on purpose.

18

1          If we could go to Exhibit Number 11.

2          So if you've seen from our papers and at all, Your

3   Honor, Highland presented an initial draft of the amended and

4   restated agreement to BH Equities on March 14th.  It had to be

5   completed by March 15th in order t make it retroactive to the

6   prior August because that's for tax reasons.  And you'll see up

7   on the screen there's an email exchange from Mr. Broaddus at

8   Highland to a fellow named Dusty Thomas at BH Management.

9          And it's two emails.  The first one is sent on the

10  afternoon of March 15th.  And the important point is a little

11  bit down where he says: "The contributions schedule in the

12  attached needs to be updated with the actual contribution

13  numbers."

14          So this is Highland telling BH Equities that the

15  contribution schedule, which is Schedule A, needs to be updated

16  so that the actual contribution numbers are in it.  This is the

17  mistake.  This is the mistake, right.  And notice that Mr.

18  McGraner, I'm told is one of the Apex employees, he's got

19  notice of this.  He know exactly what's happening, right.

20          And Mr. Broaddus follows up.  He follows up the next

21  day and says the contribution schedule is attached.  Well,

22  let's take a look at what the contribution schedule is, if we

23  can go to the next page.  Look at that.

24          It's the same contribution schedule that appears in

25  the final agreement.  And this is just critical, Your Honor,

19

1 because this shows that Highland, people working at the

2 direction of Highland are preparing this document and it's a

3 stand-alone document.  So it's not as if somebody can say, gee,

4 you know, it got lost in the sauce, it was deep in the details,

5 deep in the weeds and I just missed it.

6        The very purpose of the sending of this document was

7 to show the other counterparty, BH Equities, exactly what the

8 capital contribution and percentage interest were going to be,

9 not just the percentage interest but the capital contributions.

10        Later on that day, if we can go the next document,

11 Exhibit 13.  BH Equities was very concerned about the

12 waterfall.  They wanted to make sure that they were going to

13 get back their capital before other distributions were made.

14 And you can see here this is an email from Mr. Thomas back to

15 Mr. Broaddus where he raises this issue, and I'll just kind of

16 cut to the chase.  Attached to Mr. Thomas' email was a proposal

17 that BH Equities had made the prior fall with respect to the

18 waterfall.

19        There's no dispute that Mr. Broaddus on behalf of

20 Highland, the big Highland, rejected BH Equities' proposal.

21 And if we can go the prior page and see exactly what they did

22 in response.  Instead, you can see Mr. Chang, Freddie Chang,

23 another member of the Highland complex, with a very private

24 email to Mr. Broaddus, right, BH Equities isn't even copied on

25 it.  And he comes up, it's labeled 6.1, but this is what

20

1  becomes -- it's labeled 1.1, but this is what becomes 6.1 in

2  the actual agreement.  This is the waterfall.  This is Mr.

3  Chang and Mr. Broaddus exchanging an email with a new version

4  of the waterfall that they wanted.  And the new version that

5  they wanted shows in Section 1.1(a) here that Highland was

6  going to get 46.06 percent of the distributable cash as set

7  forth therein.

8          A mistake?  A mutual mistake when people working

9  under Mr. Dondero's direction drafted these documents in

10 specific -- as part of a negotiation?  This is about the only

11 thing that was the subject of a negotiation.

12         And, of course, there's more because if you take a

13 look at the deposition transcript that we cited from BH

14 Equities from BH Equities' perspective, Section 1.7, 6.1, and

15 9.3 and Schedule A all reflects the parties' intent.  And that

16 deposition is closed, right.  I mean they chose not to ask any

17 questions.  They didn't challenge that.  There is no good-faith

18 basis for this proof of claim to have ever been filed.  And

19 that, Your Honor, is the definition of vexatiousness, and that

20 is one of the Manchester factors.

21         Another one of the factors is the extent to which the

22 suit has progressed.  Other than the depositions that they

23 unilaterally shut down, the only thing left was either a

24 summary judgment motion or a trial.  Again, discovery is over.

25 Highland has fulfilled its obligations.  There is nothing left

21

 1  to do here except to take three depositions and have a trial on

 2  the merits.   So the suit has progressed far.

 3          Duplicate of expense of re-litigation, are we really

 4  going to do this again?   Are they really going to get the

 5  benefit of new discovery in a new lawsuit somewhere else that's

 6  not a proof of claim but that somehow tries to recraft it

 7  because we've seen stuff like this before from Mr. Dondero.

 8  He's going to say, oh, that was just a proof of claim, that's a

 9  different standard that somehow, you know, I can bring a

10  different claim in a different court at a different time.

11  We're going to do this again?   I hope not.

12          How about the adequacy of the explanation?   They

13  concluded that Highland wasn't interfering.   Where was the

14  evidence that Highland ever interfered?   Where was the evidence

15  that Highland ever threatened to interfere?   Where was the

16  evidence that HCRE ever expressed a concern that Highland would

17  interfere?  Where's their application to the Court for some

18  kind of protective order or some type of protection, some type

19  of injunction relief to prevent us from interfering?   There's

20  nothing.

21          HCRE filed this -- and I'll have to speculate here

22  because they're not -- I don't thing they're being candid with

23  the Court.   They filed it because they hoped to do this trial

24  in a different forum at a different time elsewhere.

25          They're shutting it down because they know that their

22

 1  witnesses are going to be asked questions that are going to

 2  further buttress Highland's claims to breach of contract, going

 3  to get into some serious tax questions where even BH Equities

 4  wouldn't even rely on the K-1s that HCRE caused to be prepared.

 5  Really tough questions.

 6          I know they want to get out now, but they never

 7  should have filed the proof of claim.  And forcing Highland to

 8  go down this path to incur this expense, to take our deposition

 9  and then try to shut the door, can't think of a better fact

10  scenario for the denial of a 3006 motion than we have here.

11          Look at just what happened in the seven days before

12  they filed their motion because it is extraordinary, and I

13  didn't even put everything in the papers because one of the

14  things I forgot to put in is Mr. Gameros sent to me seven days

15  before the motion the 30(b)(6) notice for Highland.  So that's

16  sent on August 5th.

17          On August 5th, we finish negotiating and sign a

18  stipulation that extends the expert discovery deadline to allow

19  them to call an expert which we think had no merit which is why

20  we reserve the right on the motion to strike because we don't

21  think -- as described to us at the time, but nevertheless, we

22  reserved our right to either make a motion to strike or to

23  proceed right to summary judgment.  It's all in the stipulation

24  that we negotiated, that we signed on behalf of the clients,

25  and that Your Honor's approved just two days before this is

**WWW.LIBERTYTRANSCRIPTS.COM**

23

1  filed.

2          I think Mr. Seery's deposition was the 10th.  At 4:00

3  on the 9th, HCRE produced over 4,000 pages of documents like

4  six weeks after the deadline, right.  And Counsel and I spent

5  the next 24 hours -- you know, I was pretty upset, I'll admit

6  it, but you've got -- you know, it's in the record, you know,

7  what my written responses were.  And I tried very hard to avoid

8  motion practice, and I tried very hard as I always do to try to

9  come to a reasonable resolution.  And we actually got to that

10 point just moments before Mr. Seery's deposition.  And then

11 they take Mr. Seery's deposition.

12         So think about it.  They serve a 30(b)(6) notice,

13 they take a deposition, they produce 4,000 pages of documents,

14 they negotiate and sign a stipulation to extend the discovery

15 deadline, the Court takes the time to review the stipulation,

16 orders it.  All of this happens within seven days of their

17 motion, two days after they take Mr. Seery's deposition and

18 just two days before I'm scheduled to take their client's

19 depositions.

20         Based on the complete lack of evidence on HCRE's part

21 and the evidence that I've just shown the Court, we believe the

22 Court should simply deny the -- deny all three motions, you

23 know what I mean?  Let's just cut to the chase, let's take

24 three substantive depositions, and let's set a trial date.

25 That, I believe, is the most appropriate result here.

24

1          If the Court is not inclined to rule on the motion to

2   withdraw, the Court should then deny the motion for a

3   protective order and grant our cross-motion to compel the

4   depositions on this motion.  I assure the Court that if the

5   Court decides to follow that path, my questioning will be

6   limited to the Manchester factors.  And I won't get into the

7   substance because that wouldn't be ripe.

8          The first question is whether or not they have a

9   right to -- whether the Court should grant their motion to

10  withdraw, and I will limit my questioning if we go down, you

11  know, option B to those questions, to the Manchester questions,

12  right.  There's no question that we have the right to

13  discovery.  They filed a motion.  We filed an objection.  We

14  now have a contested matter under the bankruptcy rules.  We're

15  entitled to discovery.

16         I want to address, I guess, on this topic some of the

17  issues that were raised in the motion for the protective order.

18  They say, oh, we didn't serve the witnesses.  That's easily --

19  well, first, I would point out that if you looked at Exhibit 1,

20  you know, Counsel previously accepted service of subpoenas on

21  Mr. Dondero and Mr. McGraner's behalf.  Maybe he's got an

22  explanation why he did it before but he won't do that now.  But

23  if that's the way HCRE wants to do it, we'll hire professional

24  process servers that can -- that give us a couple of weeks and

25  we'll find them.  We'll find them.  And if not, we'll get the

25

1 adverse inference.

2          They said we didn't give enough time, that we didn't
3 take into account their scheduling.  Just look at Exhibit 4,
4 Your Honor.  I specifically wrote to Counsel, it's there in
5 writing.  You know, it's there in writing.  If you need an
6 accommodation, let me know.  Let me know if the dates and times
7 work.  I have flexibility.  I told him that in writing.  And
8 yet, the reason the Court should enter a protective order is
9 because we didn't give them sufficient time or we wouldn't take
10 into account their schedules.

11          We've got all the time now, Your Honor.  I'm actually
12 not available next week, but after that, I can take these
13 depositions any time the last week of September, the first week
14 of October, whatever is convenient for them.  That is no reason
15 to grant a protective order.

16          And then, finally, this notion that, you know, Mr.
17 McGraner and Mr. Dondero are some Apex employees, Your Honor,
18 HCRE has no employees.  None.  Mr. Dondero signed the original
19 LLC agreement.  He signed the amended LLC agreement.  He signed
20 the proof of claim.  Who else should I be deposing?  Mr.
21 McGraner owns a substantial interest of HCRE.  He's on the
22 emails that show he had contemporaneous knowledge that people
23 working in the Highland complex were drafting Schedule A in a
24 manner that was ultimately accepted not just by Highland and
25 HCRE but by a third party, BH Equities.

26

1          There's nobody to depose other than Mr. McGraner and

2   Mr. Dondero.  I mean I guess Mr. Ellington, I haven't thought

3   about that.  He is a five percent owner.  But for a company

4   with no employees, who else am I supposed to depose?

5          Finally, Your Honor, I've taken probably enough time

6   here.  But option C, right, I think this just be denied

7   outright.  If not, we should at least be permitted to get some

8   discovery before the Court rules on the motion.  Option C, if

9   the Court really wants to dismiss this -- grant the motion in

10  any respect, there ought to be severe conditions on it.

11         It has to be a dismissal on the merits.  It has to be

12  a dismissal that pays Highland its reasonable legal fees

13  incurred for this waste of time.  And it has to be conditioned

14  on the fact that Mr. Seery's deposition transcript will be

15  barred from use in any proceeding going forward or they have

16  got to show up for the depositions to level the playing field.

17         So that's where we are, Your Honor.  Three choices.

18  You know, they're in the order that we think are most

19  appropriate.  But I've got nothing further at this point, Your

20  Honor.

21         THE COURT:  All right.  A couple of questions for

22  you.

23         You've represented as an officer of the Court that

24  your client, the estate, has incurred hundreds of thousands of

25  dollars of attorneys' fees and costs relating to this proof of

27

1   claim.  Is that correct?

2        MR. MORRIS:  Yes, Your Honor.

3        THE COURT:  Okay.  And I'm just curious, did this

4   claimant, HCRE, file other pleadings during the Highland case,

5   like objections to the plan or -- I remember discovery disputes

6   when Wick Phillips was involved in the main case.  But I'm just

7   curious, did you look at other times they may have participated

8   as a party, a creditor?

9        MR. MORRIS:  In all candor, Your Honor, I haven't --

10       THE COURT:  Okay.

11       MR. MORRIS:  -- looked at that.  My memory, which

12   could be wrong, my memory is that they did file other things,

13   although it's possible I'm just confusing it with Wick Phillips

14   representing different entities of Mr. Dondero.  But I believe

15   that Wick Phillips was involved in other matters.  I think HCRE

16   filed other things, but I don't know off the top of my head.

17       THE COURT:  Okay.  So the representation that

18   hundreds of thousands of dollars were spent on this proof of

19   claim dispute, I mean you're zeroing in on this proof of claim

20   dispute.  Is that correct?

21       MR. MORRIS:  One hundred percent limited to this

22   proof of claim.

23       I mean think about what we did here, Your Honor.  We

24   had a whole litigation over Wick Phillips.  Both sides retained

25   experts.  We took fact discovery.  We participated in written

28

1  discovery, something that never ever should have happened.  But

2  we were forced to do that, and I do include that as part of

3  this.

4         What else have we done?  Because I think it's -- I

5  think Your Honor's asking a fair question, like how do you get

6  to that number.  Before the Wick Phillips' disqualification

7  motion and the reason that we got to that point is we had

8  engaged in written discovery.  And this is back in the spring

9  of 2021.  We served, you know, document requests, we served

10 requests to admit, we served interrogatories.  All of that was

11 answered.

12        We produced thousands of pages of documents at that

13 time.  And it was in preparing for the depositions that were

14 then scheduled that we saw in the documents the conflict that

15 Wick Phillips had.  So we went though that whole process

16 throughout the rest of 2021, completely unnecessary.  Just

17 completely unnecessary, but nevertheless, we did.  We

18 prevailed.

19        New counsel came in in January and did nothing,

20 right.  It took us six months to get to a scheduling order.  It

21 took me almost three months to get them to respond at all.  But

22 we did the whole thing again, and we went through more written

23 discovery and more interrogatories and more requests to admit

24 and more document requests.  And we produced more documents.

25        We served subpoenas on Mark Patrick, on BH Equities,

Case 19-34054-sgj11   Doc 3596-35   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:23-cv-00726-S   Document 85   Filed 10/23/23   Page 303 of 62age 1502 of 1539   PageID 18740

29

1   on Baker Vigotto, the accounting firm that prepares the tax

2   returns at the direction of HCRE on behalf of SE Multifamily.

3   There's lots of negotiations in there.  There's -- I mean Your

4   Honor can see just how many times depositions were scheduled

5   and rescheduled and rescheduled again to accommodate

6   everybody's summer and business, right.

7           So we took the deposition of Mr. Patrick.  We took

8   the deposition of Barker Vigotto.  We took the deposition of BH

9   Equities.  We defended Mr. Seery and his deposition.  We took

10  the time to prepare for that.  We were reviewing the 4,000

11  documents that they produced belatedly, right.  We're

12  marshaling our evidence, getting ready for our summary judgment

13  motion.  We're negotiating amendments to scheduling orders at

14  HCRE's request.

15          Yeah, we spent several hundred thousand dollars, Your

16  Honor, for sure.

17          THE COURT:  Okay.

18          All right, Mr. Gameros, do you have cross-examination

19  of Mr. Morris?

20          MR. GAMEROS:  I don't have cross-examination of Mr.

21  Morris.  I'd just like to respond to a few points if I could.

22          Is that permitted, Your Honor?

23          THE COURT:  Oh, yes.  I mean this was your chance to

24  cross-examine Mr. Morris since he submitted a declaration with

25  exhibits.  But if you decline to do that, I think Mr. Morris --

30

1          MR. GAMEROS:  Cross-examine Mr. Morris, Your Honor?

2          THE COURT:  Just -- Mr. Morris, the reorganized

3   debtor rests, right?  I got the impression you were resting?

4          MR. MORRIS:  Yes, Your Honor.

5          THE COURT:  All right.

6          MR. MORRIS:  Yes.

7          THE COURT:  Mr. Gameros, now your chance for

8   rebuttal.

9          MR. GAMEROS:  All right.

10          First, in terms of hundreds of thousands of dollars

11   of fees and the activity level since my firm appeared in

12   January of 2022, I think we need to look back at the

13   disqualification proceeding and remember that the estate was

14   denied its request for attorneys' fees on the disqualification

15   and that's in this Court's order.

16          If we proceed to trial, they won't be entitled to

17   attorneys' fees for winning, if they do.  There's no claim here

18   that entitles the estate to shift its attorneys' fees to

19   NexPoint.  None.

20          And I think that's important.  The relief that he's

21   asking for, Your Honor, if you listen to what the estate's

22   requesting, it wants to limit the use of Mr. Seery's

23   deposition.  It wants to have a trial.  Now apparently they may

24   not move for summary judgment.  Okay.  Things that they would

25   like, but all they get is a ruling on a proof of claim.  And

31

 1  we've already said the Court should allow us to withdraw the

 2  proof of claim and condition it with prejudice.

 3          There is no other lawsuit out there.  There is no

 4  other position being taken anywhere.  Frankly, Your Honor, the

 5  reason why I said admit the exhibits and I question their

 6  relevance is because none of them go to actual legal prejudice.

 7  Can't show it, hasn't shown it, hasn't demonstrated it.  It

 8  says they did a lot of work, gave you the greatest hits of some

 9  email, but quite frankly, Your Honor, that goes to merit, not

10  legal prejudice.  That goes to, I believe, part of their story

11  as to what happened.

12          The story that matters to me is we think things were

13  going to happen during the estate, he's right.  We didn't move

14  for them.  We looked back at it and said we don't need the

15  proof of claim anymore, we should withdraw it.  That's the only

16  thing that's happened, and that's why we're here.  We don't

17  think he's entitled to discovery as to why we withdrew the

18  proof of claim.

19          It's his burden to show legal prejudice.  He can show

20  it or he can't.  He hasn't.

21          THE COURT:  Okay.

22          MR. GAMEROS:  The estate hasn't.

23          THE COURT:  Mr. Gameros?

24          MR. GAMEROS:  (Indiscernible) Mr. Dondero.

25          THE COURT:  I have a question.  I mean I'm looking at

32

1  your pleading, your motion to withdraw the proof of claim, and

2  I'm looking at this wonderful chart you have on Page 7 saying

3  here are the standards under Bankruptcy Rule 3006, you, Court,

4  should consider.  They were articulated in the Manchester case.

5        And it's not merely about is there any prejudice to

6  the estate.  I mean you set forth five factors.  One is "reason

7  for dismissal."  One is diligence in bringing the motion to

8  withdraw.  One is undue vexatiousness.  One is the matter's

9  progression including trial preparation.  One is duplication of

10  expense of relitigation.

11        This is your own authority, which I believe actually

12  is correctly articulating the standards.  It's not just about

13  prejudice.  Yes, I agree that some of the case law has zeroed

14  in on that one in particular.  But I mean you say yourself

15  reason for dismissal is a factor the Court must consider.

16        MR. GAMEROS:  That's correct, Your Honor.  Those are

17  the factors, and I think our analysis on them is correct.

18        If we go all the way to trial and the result is that

19  our proof of claim is denied, we're in the same position we are

20  right now.  So why should the parties, the estate, and the

21  Court go through that exercise?

22        THE COURT:  Okay.  Well, that's another issue, I

23  think, other than the reason for dismissal.  But a follow-up

24  question to what you just said is this.

25        Would you agree to a condition on the withdrawal of

33

1  your proof of claim that your client agrees that Highland has a

2  46-point whatever it was percent interest in SE Multifamily

3  Holdings and your client waives any right in the future to

4  challenge that interest?

5          MR. GAMEROS:  Your Honor, if that's what the Court

6  wants to put in an order and I have a chance to confer with my

7  client on it, I'm pretty sure that would be agreeable.

8          THE COURT:  Today's the day.  I'm not going to

9  continue.  I've got, you know, the whole day booked if I needed

10  it because I wasn't sure what you all were going to want to put

11  on.

12          MR. GAMEROS:  Your Honor, we'd agree with that.

13          MR. MORRIS:  Your Honor, I'm sorry to interrupt, but

14  a waiver of any appeal, too.  I just hard that if that's what

15  you want to put in the order, that's okay.  But this case has

16  to end, and that's what we're looking for.

17          We're a post-confirmation estate that will not go

18  forward with the possibility hanging over its head that it may

19  be divested of this asset.  That is what this proof of claim

20  and this dispute is about.

21          And what the debtor needs in order to avoid legal

22  prejudice is the complete elimination of any uncertainty that

23  it owns 46.06 percent of SE Multifamily.  And if HCRE is not

24  willing to give that comfort today, we again renew our request

25  for a direction that the three HCRE witnesses appear for

34

 1  substantive depositions and we get this on the trial calendar.

 2          MR. GAMEROS:  Your Honor, we'll agree to it.

 3          THE COURT:  Well, you know what, this is such a big

 4  deal I really need a client representative to say that.  It

 5  would be that --

 6          MR. GAMEROS:  I don't have one here today, but I can

 7  get you one.

 8          THE COURT:  How soon --

 9          MR. GAMEROS:  Do you want me to file a stipulation or

10  an affidavit?

11          THE COURT:  Pardon?

12          MR. GAMEROS:  Do you want me to file an affidavit?

13          THE COURT:  Well, let's be a hundred percent clear.

14  Your client would state that with the granting of the motion to

15  withdraw proof of claim number 146, HCRE is irrevocably waiving

16  the right to ever challenge Highland Capital Management's 46

17  percent interest -- and I know it's 46-point something -- 46

18  percent interest in SE Multifamily Holdings, LLC and is,

19  likewise, waiving the right to appeal or challenge the order to

20  this effect.

21          MR. MORRIS:  Your Honor, if I may, perhaps we can

22  take a ten-minute recess and allow him to consult with his

23  client and perhaps get a client representative on the phone who

24  can make that representation?

25          THE COURT:  All right.  Mr. Gameros, you think you

**WWW.LIBERTYTRANSCRIPTS.COM**

35

1  can get a client rep on the WebEx?

2         MR. GAMEROS:  I'm pretty sure I can, Your Honor.

3         THE COURT:  All right.  Well, how about we take a 15-

4  minute recess.  Does that sound a reasonable amount of time?

5  We've got, you know, two dozen people --

6         MR. GAMEROS:  It does, Your Honor.

7         THE COURT:  Two dozen people on the WebEx.  I don't

8  know if maybe one is a client representative, but we'll take a

9  15-minute break and I'll come back.  Okay.

10         THE CLERK:  All rise.

11     (Recess at 10:33 a.m./Reconvened at 10:50 a.m.)

12         THE CLERK:  All rise.

13         THE COURT:  Please be seated.

14         We're back on the record in Highland.

15         Mr. Gameros, how did you want to proceed now?

16         MR. GAMEROS:  Your Honor wanted me to get a

17  representative of NexPoint Real Estate Partners to state that

18  they agree that the estate has its 46 percent interest in the

19  company agreement subject to the company agreement.  And I've

20  got Mr. Sauter here who has authority to speak on behalf of

21  NexPoint Real Estate Partners.

22         THE COURT:  All right.  Well, so what is his position

23  with HCRE?

24         MR. SAUTER:  Your Honor, I don't have -- this is DC

25  Sauter.  I don't have an official position with HCRE, but I

36

 1  have spoken with Mr. Dondero and he has authorized me to appear

 2  here today and agree to the conditions that Mr. Gameros just

 3  outlined.

 4          THE COURT:  All right.  Well, it sounds like hearsay

 5  to me.  I don't know -- Counsel, let me have you both respond.

 6  You know, I worry about this will fall apart the minute Mr.

 7  Dondero is instructing a lawyer, I never agreed to that.  I

 8  mean I just don't know.  This is highly unusual.

 9          First --

10          MR. GAMEROS:  Your Honor, if I might?

11          THE COURT:  Please.

12          MR. GAMEROS:  Mr. Sauter is an officer of the Court.

13  He works, you know, with Mr. Dondero at his business at

14  NexPoint; certainly an authorized agent on behalf of NexPoint

15  Real Estate Partners to make this agreement on behalf of

16  NexPoint Real Estate Partners.

17          To the extent that the condition that you originally

18  described as a conclusory matter, in other words, how to end

19  the withdrawal, we already agreed to that, that we also can

20  agree on the record to waive any appeal.  Mr. Sauter is

21  authorized to agree to that, as well.

22          So I think as an agent and a lawyer on behalf of

23  NexPoint Real Estate Partners, he's fully able to do that.

24          THE COURT:  How do I know he's able to do that?

25          And, by the way, if Mr. Dondero is in I guess the

37

1 last 15 minutes given him authority to testify before the

2 Court, why couldn't Dondero just get on the WebEx himself?

3          MR. SAUTER:  Your Honor, I think he felt more

4 comfortable with me being a lawyer agreeing to those terms so

5 that he wouldn't misstate something.  He has been listening.  I

6 believe he's still on, although I'm not certain.

7          THE COURT:  Mr. Morris, do you want to respond?  I

8 mean I'm not sure, frankly, I care what you say, no offense.  I

9 don't think I have a person with clear authority here.

10          MR. MORRIS:  I'll just be quick and say I agree.

11          THE COURT:  Okay.  Mr. Gameros --

12          MR. GAMEROS:  As an attorney for NexPoint Real Estate

13 Partners, I have the authority to make that agreement on the

14 record and it be binding.  Mr. Sauter is confirming that

15 authority having spoken with Mr. Dondero about it.

16          I think that the Court is fully --

17          THE COURT:  Mr. Gameros --

18          MR. GAMEROS:  -- capable of doing that --

19          THE COURT:  Mr. Gameros, come on.  You know this is

20 the client's decision to make.  Okay.  I don't have a client

21 representative.  I don't have an officer or controlling

22 equityholder as evidence here of --

23          MR. MORRIS:  Mr. Dondero --

24          THE COURT:  -- the willingness to make the agreement.

25          Pardon?

**WWW.LIBERTYTRANSCRIPTS.COM**

38

1          MR. MORRIS:  Can Mr. Dondero make the representation
2   on the record to the Court that he is authorizing Mr. Sauter to
3   waive any claim that HCRE has to Highland's 46.06 percent
4   interest in SE Multifamily along with any appeal?  This is just
5   step one.  But if Mr. Dondero was on the phone, let him speak
6   up and make it crystal clear that he is delegating the full
7   authority to Mr. Sauter to negotiate and enter into this
8   consensual order on behalf of HCRE.

9          THE COURT:  All right.  Mr. Gameros, do you want to
10  give your client authority to speak up?  Your client
11  representative, someone who's actually an officer or a
12  controller or equity owner?

13         MR. GAMEROS:  Your Honor, if Mr. Dondero can do that,
14  that would be great.  I don't know if he's in a place where he
15  can do that.

16         THE COURT:  All right.  Mr. Dondero, if you can hear
17  us, are you willing to give some quick testimony in that
18  regard?

19      (No audible response)

20         MR. DONDERO:  I can't see the box --

21         UNIDENTIFIED SPEAKER:  Surprising that -- surprising
22  he was on the phone before, but now he's not after delegating.
23  Just I'm not --

24         MR. SAUTER:  Your Honor, he's on the phone.  I'm just
25  -- if you will give me a minute, I got to run around the corner

39

1  and try to make sure he knows how to unmute himself.

2          THE COURT:  Star 6.  If he's on a phone, star 6 is

3  the way to unmute himself.  But I want to see video, too.

4          THE OPERATOR:  There we go.  Try again.

5          MR. DONDERO:  Hello?

6          THE COURT:  All right.

7          MR. DONDERO:  Hello?

8          THE COURT:  Mr. Dondero, is that you?

9          MR. DONDERO:  It's me.  I've been on the entire time.

10         THE COURT:  All right.  Can you turn your video on,

11 please?

12         MR. DONDERO:  I am on my cell phone.

13         THE COURT:  Okay.  Well, so I guess you just called

14 in on your cell phone, you don't have a WebEx connection on

15 your cell phone?

16         MR. DONDERO:  I don't have a WebEx.

17         THE COURT:  Okay.  Well -- yeah, it sounded like you

18 were in the same office as Mr. Sauter.  Is that -- did I

19 misunderstand?

20         MR. DONDERO:  We work in the same office.  I'm in my

21 car.  I just stepped out of my car.

22         THE COURT:  All right.  Well, this is not ideal, you

23 know, without us seeing you.  But I'll go ahead and swear you

24 in.  All right.  Can you hear me okay?  I need to swear you in.

25         MR. DONDERO:  Yes.

Dondero - Direct                          40

1          THE COURT:  All right.

2              JAMES DONDERO, HCRE'S WITNESS, SWORN

3          THE COURT:  All right.

4          Mr. Gameros, do you want to ask him the questions we

5    need to hear answers on, please?

6          MR. GAMEROS:  Thank you, Your Honor.

7                      DIRECT EXAMINATION

8    BY MR. GAMEROS:

9    Q    Mr. Dondero, on behalf of HCRE, do you agree as a

10   condition for withdrawing the proof of claim that HCRE will not

11   challenge the estate's ownership or equity interest in SE

12   Multifamily subject to the company agreement?

13   A    Yes.

14   Q    Do you agree that you will not appeal and that, therefore,

15   HCRE is waiving any appeal right to that determination as a

16   condition of withdrawing the proof of claim?

17   A    Yes.

18          MR. GAMEROS:  Those are the questions for Mr.

19   Dondero.

20          MR. MORRIS:  Your Honor, if I may?

21          THE COURT:  Mr. Morris, you may.

22          MR. MORRIS:  I'm very uncomfortable.  I'm very

23   uncomfortable with the inclusion of the language subject to the

24   company agreement.  It sounds like a very conditional waiver.

25   We need an irrevocable unconditional admission by HCRE that

41

1  Highland owns 46.06 percent of SE Multifamily, period, full

2  stop.  If they want to keep conditions in there and make it

3  conditional and make it subject to other things, let's please

4  deny the motion and proceed to trial.

5          THE COURT:  All right.  Well, Mr. --

6          MR. GAMEROS:  The equity that they own is part of the

7  company agreement.  It's not modifying the company agreement by

8  saying.

9          THE COURT:  Well --

10         MR. MORRIS:  Our ownership is not subject to the

11 agreement.  We either have an ownership interest or we don't.

12 Our rights and obligations as a member of SE Multifamily are

13 subject to the agreement, but our ownership interest is not.

14 And that's the ambiguity that we need to remove.

15         THE COURT:  Okay.  Well, Mr. Gameros, do you want to

16 rephrase the question or are you not willing to make the

17 agreement as specific as Mr. Morris says he needs it?

18         MR. GAMEROS:  That's what I'm -- I guess I don't

19 understand what his complaint is.  If the estate owns 46

20 percent of the equity of SE Multifamily, it owns that subject

21 to the company agreement.  It's not a separate ownership

22 interest.  So I don't know what the problem is.

23         THE COURT:  Okay.  Let me try to phrase it as I

24 understand it.

25         What I understand has been asserted in the proof of

42

1  claim is that what was set forth in the agreement was a

2  mistake, okay.  A mistake.  And it sounds like you're using

3  language that says we'll agree the agreement, you know, they

4  have a 46 percent interest pursuant to the agreement.  But that

5  doesn't change -- that does not really zero in on the argument

6  made in the proof of claim that there was a mistake in the

7  agreement, right?

8            So you'd have to go broader to completely resolve the

9  issues raised in your proof of claim and say we agree, Highland

10 has a 46.06 interest in SE Multifamily and we agree that is

11 correct and we waive any right to challenge it in the future

12 and we waive any right to appeal this order.

13           MR. GAMEROS:  And, Your Honor, if that's the

14 condition, I guess my concern is that the 46 percent is still

15 part of the company agreement.  We agree not to challenge it on

16 the basis of anything asserted in the proof of claim, that

17 being mistake, lack of consideration, or failure of

18 consideration.  Their 46 percent is their ownership interest in

19 SE Multifamily and HCRE won't challenge that.

20           Is that sufficient?

21           THE COURT:  Well, I need to hear from your client.  I

22 mean he needs to be asked every which way from Sunday whether

23 he is waiving the right to challenge Highland's 46.06 interest

24 from now until eternity, okay.  That's basically, you know, we

25 either have that agreement or we'll just have a trial.

Dondero - Direct                          43
CONTINUED DIRECT EXAMINATION

1  BY MR. GAMEROS:

2  Q    Mr. Dondero, do you agree that NexPoint Real Estate

3  Partners will not challenge in any way the estate's interest in

4  SE Multifamily, its 46-point whatever percent interest that is?

5  A    I think the nuance is that agreement is okay in current as

6  of today.  But it's part of an operating agreement, and that

7  percentage ownership can change due to capital calls and other

8  things.  And it could change over time.  It's never in a

9  partnership agreement fixed into perpetuity.  And so no

10 businessman can agree to that.

11     If the Court wants it fixed into perpetuity, that would be

12 very odd.

13          MR. MORRIS:  Can we go to trial, Your Honor?  Can we

14 just deny the motion and go to trial?  Let me have my

15 depositions and go to trial.  This is -- if Mr. Dondero wants

16 to take that position, he's welcome to do that.  But I'm

17 entitled to finality, and I'd like to get there.

18          THE COURT:  All right.  Well, Mr. Gameros, anything

19 else you want to ask your client that you think might be

20 helpful?

21 BY MR. GAMEROS:

22 Q    Mr. Dondero, you desire to withdraw the proof of claim.

23 Correct?

24 A    Yes.

**WWW.LIBERTYTRANSCRIPTS.COM**

44

1   Q     And you agree to an order denying the proof of claim with

2   prejudice.   Correct?

3   A     Yes.

4   Q     And can you agree that HCRE will not challenge the equity

5   ownership of its member in SE Multifamily of the estate?

6   A     Yes.

7           MR. GAMEROS:   Your Honor, I think there it is.

8           THE COURT:   Mr. Morris, do you have any --

9           MR. GAMEROS:   He agrees.

10          THE COURT:   -- do you have any follow-up questions --

11          MR. MORRIS:   The waiver of the right to --

12          THE COURT:   -- Mr. Dondero?

13          MR. MORRIS:   The waiver of the right to any appeal

14  whatsoever.   And I do have -- you know, there are the other

15  conditions that we mentioned earlier, right?   Either they have

16  to also agree that Mr. Seery's deposition transcript shall

17  never be used for any purpose at any time or they need to level

18  the playing field and submit their witnesses to examination.

19          The playing field needs to be level here.   Either if

20  they want to use that deposition transcript for some purpose, I

21  have no problem with that.   Just let me take my depositions.

22  If they don't want to submit their witnesses to depositions,

23  then they also have to agree that that transcript will never be

24  used for any other purpose.   It's as if this proof of claim has

25  never been filed, right, for that purpose, right.   Because

45

1  that's just not fair.  That's the legal prejudice.

2       How do you take my client's deposition on Wednesday

3  and file this motion on Friday knowing your client's supposed

4  to be deposed on Tuesday?  Level the playing field.  That's

5  conditional number two.

6       And condition number three, frankly, Your Honor, this

7  proof of claim was fraudulent.  I mean my client has been

8  damaged.  My client has spent an enormous amount of money on

9  this, and I'd like them to agree to if not make us whole, you

10 know, do something because it's wrong.  It's just wrong that

11 Mr. Dondero files proofs of claim under penalty of perjury that

12 have absolutely no basis in fact.

13      It's distressing.  I'd like those two last issues

14 addressed, as well.

15      MR. GAMEROS:  Your Honor, in terms of the Court's

16 questions in terms of finality with respect to the membership

17 interest in SE Multifamily, Mr. Dondero agrees with the Court.

18 He's already said that he won't waive -- that he waives, rather

19 -- I'm sorry, let me start again.

20      He has said very clearly that he has waived appeal of

21 this order allowing the withdrawal of the proof of claim with

22 the conditions that you asked for.  I think you should grant

23 the motion to withdraw and we can put an end to all of this.

24      THE COURT:  Okay.

25      MR. MORRIS:  Here's the thing, Your Honor.  We know

46

 1  there's going to be more litigation with HCRE.  We know they've

 2  breached the contract.  We know because the evidence is in the

 3  record.  We know that Highland demanded access to books and

 4  records as is its contractual right back in June.  We know that

 5  that notice was sent to all of Mr. Dondero's lawyers and HCRE's

 6  lawyers.  And we know that that request has been absolutely

 7  categorically ignored.  Okay?

 8          We are going to --

 9          MR. GAMEROS:  This has nothing to do with the proof

10  of claim.

11          MR. MORRIS:  We are going to get -- well, no.

12          To be clear, Your Honor, that is what's driving this

13  concern is because we know that there's going to be additional

14  litigation.  We know the tax forms are not accurate.  We know

15  there's already an existing breach of contract.

16          And what we're trying to make sure is that HCRE is

17  not able to resurrect this concept that we don't have an

18  ownership interest, that it's not 46.06 percent, that Mr. Seery

19  made some admission that they're going to use in some future

20  litigation.  That's the prejudice, okay.

21          So I think step one is (indiscernible), but then we

22  need either an agreement that the transcript isn't going to be

23  used elsewhere or that I get the deposition of the HCRE

24  witnesses because it's unfair prejudice to use this process to

25  take that deposition on Wednesday, August 10th and to file this

47

1   motion on Friday, August 12th.  That is unfair prejudice for

2   them to have taken my client's sworn testimony and then shut it

3   down before I could take theirs.

4        So either eliminate it all or let it all in, right?

5   It can't be.  They can't possibly benefit from this.

6        THE COURT:  Let me understand something, Mr. Morris,

7   you just said.  We know we're going to have future litigation.

8   I mean I'm not asking for revelation of attorney-client

9   privilege, but -- communications, but you kind of dangled it

10  out there.

11       You're saying that the reorganized debtor intends to

12  file litigation against HCRE because of what you think are

13  breaches by it as manager of SE Multifamily of the existing

14  agreement.

15       MR. MORRIS:  The evidence is already in the record,

16  Your Honor.  We have -- Highland as a member of SE Multifamily

17  has the contractual right to obtain access to inspect and copy

18  -- those are the words, inspect and copy SEC *[sic]*

19  Multifamily's books and records.

20       We made that request at the end of June.  It's one of

21  the exhibits that's attached that's in the record now.  I made

22  probably three different follow-up emails, and it's been

23  completely ignored, okay.

24       HCRE is the manager of SE Multifamily, right.

25  They're in control.  They're the ones who dictate how the

**WWW.LIBERTYTRANSCRIPTS.COM**

48

1  accounting is done.  They're the ones who dictate how

2  distributions are made.  They're the ones who dictate how tax

3  forms are prepared.  They have an obligation under the amended

4  and restated agreement to cause SE Multifamily to prepare the

5  tax returns.  They're the ones who are in direct contact with

6  Barker Vigotto.

7          There's a whole host of issues we're going to

8  examine, but the one thing that I do know for certain, Your

9  Honor, is that they are in breach of the agreement today

10 because they have refused for three months now to give us what

11 we're entitled to.  And that is access to inspect and copy SE

12 Multifamily's books and records.

13         So unless they agree to do that, and I mean pretty

14 soon, we're not going to have any alternative.  If you recall,

15 Your Honor, Mr. Dondero's trust, the Dugaboy Trust, filed this

16 valuation motion which we'll address in due course.  I don't

17 know where they got the number, but according to Mr. Dondero's

18 trust, Highland's interest in SE Multifamily is worth $20

19 million.  This is not a small asset.  This is not harassment.

20         But they're not complying with their contractual

21 obligation to give us access to inspect and copy SE

22 Multifamily's books and records.  For a $20-million asset where

23 it's -- I mean they're conceding now that we're the owner of

24 those membership interest.  How can they deny us access?

25         And if they don't give us that access so that we can

49

1  verify the value of this asset, so that we can verify whether

2  or not we've gotten the distributions that we're entitled to,

3  so that we can verify that the profits and losses that have

4  been allocated to Highland were actually proper and consistent

5  with the agreement, I'm afraid that there will be further

6  litigation, and that's why we need to -- we need to nail this

7  down right now because I don't want to get a counterclaim that

8  says we left the deal open to challenging Highland's interest

9  in SE Multifamily.  That door needs to close today.

10          THE COURT:  Okay.  All right.  Well, I'm going to

11  start out by saying we're in a very unusual procedural posture.

12          Before I forget, Mr. Gameros, I meant to mention this

13  at the very beginning.  The motion to withdraw the proof of

14  claim of your client, you had an odd way of signing it.  I

15  wonder if this was a mistake or you always sign this way.  You

16  signed the pleading signature Charles W. Gameros, Jr., PC.

17          Is that -- was that inadvertent or do you always sign

18  that way?  I mean a lawyer's supposed to personally sign under

19  Rule 11 a pleading.  Was that just inadvertent or do you think

20  that's fine?

21          MR. GAMEROS:  I've used that signature block for over

22  20 years, and I've never -- no one has ever asked.  I thought

23  it was fine.

24          THE COURT:  Okay.  Well, no one's ever asked and you

25  think it's fine.  I think you need to go back and do some

**WWW.LIBERTYTRANSCRIPTS.COM**

50

1  research on that, okay.  I'm not sure it's fine.  I'm not sure

2  it's fine.

3          I mean you would agree that you're personally bound

4  under Rule 11 when you file a pleading, right?

5          MR. GAMEROS:  Yes, Your Honor.

6          THE COURT:  I mean I know it feels a little different

7  if you're -- well, I don't know.  You're not a -- you have a

8  firm, Hoge & Gameros, L.L.P.   I mean it wouldn't be

9  appropriate for Mr. Morris to sign a pleading Pachulski Stang,

10 right?  He has to sign his name personally on a pleading,

11 right?

12         MR. GAMEROS:  Your Honor, I'll make that change.

13         THE COURT:  Okay.

14         Well, so we're in an unusual procedural context.  We

15 I think all agree that Bankruptcy Rule 3006 is the applicable

16 authority, and it provides that, you know, a creditor can't

17 just withdraw a claim when there's been an objection filed to

18 it.  There has to be notice and an order from the Court.

19         And so we don't run into this situation very often,

20 but I have seen it before.  And as someone or both correctly

21 noted, it is a rule that sort of goes to the integrity of the

22 system.  Filing a proof of claim is obviously a very

23 significant act in the context of a bankruptcy case.

24         You file a proof of claim under penalty of perjury so

25 it's a big deal from, you know, a criminal exposure standpoint

51

1 but it's also a big deal because we want to make sure only

2 parties with legitimate claims are given a seat at the table,

3 so to speak, in bankruptcy as far as, you know, their right to

4 a distribution, their right to be heard in a case.

5 　　　　　So, you know, that's the reason for the rule.  We

6 don't see it come into play very often, but it's there because

7 we want to make sure that we protect the integrity of the

8 bankruptcy process.  And if someone files a proof of claim and

9 it's pending and, you know, activity happens in the bankruptcy

10 case as a result of it, that we don't just let a party say

11 never mind.

12 　　　　　So the Manchester case, which you both cited in your

13 pleadings, has set forth fact-intensive factors -- fact-

14 intensive inquiry.  And, again, I'm just looking at HCRE's

15 motion, Page 7.  There was a chart and it sets forth the

16 Manchester factors.  Factor number one, diligence in bringing

17 the motion to withdraw the proof of claim.

18 　　　　　In Mr. Gameros' chart, his response to that factor is

19 that HCRE brought its motion to withdraw immediately after

20 conferring with debtor's counsel.  I don't even know what that

21 means, okay.  But what I do know is in looking at diligence of

22 bringing the motion, the proof of claim was filed April 8th,

23 2020.  It was objected to, the proof of claim, July 30th, 2020.

24 And then on August 12th, 2022, this motion to withdraw the

25 proof of claim was filed.

**WWW.LIBERTYTRANSCRIPTS.COM**

52

1    So two years and one month after the objection was

2    filed to the proof of claim HCRE withdraws it.  So that doesn't

3    seem very diligent.  It's not diligent at all, to be honest.

4    Your second factor, you cited, Mr. Gameros, undue

5    vexatiousness, and you say HCRE has not been vexatious in

6    pursuing its proof of claim.  And outside the motion to

7    disqualify previous counsel, which is not substantive,

8    everything in the matter has proceeded by agreement and there

9    have been no hearings set or held.

10    Okay.  Well, debtor has represented in its pleadings

11    and today through counsel on the record that it has spent

12    hundreds of thousands of dollars litigating this.  It has

13    mentioned that four depositions have been taken.  It was Mr.

14    Mark Patrick.  It was the tax accounting firm.  We had the B --

15    the entity -- BH Equities, LLC, their representative.  And then

16    Mr. Seery.  So four depositions, and I'm told a lot of written

17    discovery.

18    And on the day before the -- well, the day after, day

19    or two after the Seery deposition, the motion to withdraw the

20    proof of claim was filed after 5:00 in the evening on a Friday,

21    August 12th, and I guess a couple of business days before the

22    depositions were to occur of Mr. Dondero and the fellow, Mr.

23    McGraner, and I feel like there was one other deposition.  I'm

24    losing track of those.

25    But --

53

 1              THE CLERK:  The 30(b)(6).

 2              THE COURT:  Oh, the 30(b)(6).  The 30(b)(6)

 3    representative.

 4              So on top of all of that, you know, Highland argues

 5    there was just simply no good-faith basis for the proof of

 6    claim.  Proof of claim asserted the membership interest,

 7    Highland's 46.06 interest, set forth in the Multifamily LLC

 8    agreement were the result of mistake.

 9              Mr. Dondero signed the agreement for both parties,

10    HCRE and Highland.  And then now the motion to withdraw says

11    something to the effect of the anticipated issues have not

12    materialized.  So anyway, the undue vexatiousness factor I

13    think weighs -- because of these factors I've mentioned, weighs

14    in favor of there has been undue vexatiousness.

15              Factor number three, according to HCRE's motion to

16    withdraw the proof of claim, is matter's progression including

17    trial preparation.  Again, four depositions, thousands of pages

18    of written discovery.  We were days away from the last

19    depositions occurring, those of HCRE's potential witnesses and

20    we have trials set.  We have a trial set in November.  So that

21    factor, again, seems to weigh heavily in favor of Highland's

22    objection here.

23              Duplication of expense of relitigation, here's why we

24    got Mr. Dondero on the phone or wanted to have a witness with

25    authority.  Highland is saying we are concerned about

**WWW.LIBERTYTRANSCRIPTS.COM**

54

1   relitigation of this ownership interest issue.  And as part of

2   its argument, Highland has said we've got claims, we've got our

3   own claims for breach of agreement and different things that

4   are going to cause us to have to drill down on terms of the LLC

5   agreement.

6          And we can't -- we don't want to face exposure on

7   this issue of, well, you don't have the ownership interest or

8   the rights you say you do, Highland.  So, you know, if we could

9   get ironclad language here of, you know, we waive the right, we

10  agree that Highland has the 46.06 interest and we waive the

11  right to challenge that, then I don't think we'd have to worry

12  about relitigation of the issues in the proof of claim.  But it

13  feels like we had a little bit of reluctance to say it as

14  forcefully as we would need to have it said to avoid

15  relitigation.

16         Reason for dismissal, I don't know.  I don't know

17  what the reason for dismissal.  Again, to quote HCRE's pleading

18  on Page 7, the reason for dismissal is, "The operation of the

19  company" -- I think that means SE Multifamily -- "during the

20  case and the anticipated issues therewith have not materialized

21  and NREP no longer desires to proceed in the matters raised in

22  the proof of claim."

23         I mean that's just not in sync with the theory

24  espoused in the proof of claim that we think there was a

25  mistake made in the LLC agreement.  So, again, looking at these

55

1  legal factors, I do not think that the correct result is to

2  grant the motion to withdraw the proof of claim under Rule 3006

3  under the Manchester factors.  I will throw in that I think

4  there is potential for prejudice here of the debtor.

5          I mean not even considering that hundreds of

6  thousands of dollars have been spent over two-plus years on

7  this issue, you know, I remember very well the disqualifying

8  motion.  And I said Wick Phillips should be disqualified.  I

9  didn't shift fees because I just wasn't sure at the time that,

10  frankly, HCRE should be imposed with the fees attributable to

11  its lawyers, not recognizing the conflict of interest when they

12  saw one.  It was just a little fuzzy in my mind.

13          But I'm just letting you know that now that we are

14  here many years later, many months later and we have all the

15  sudden, okay, never mind, this is just a situation where I have

16  some regrets I didn't shift fees, to be honest.  But -- so the

17  motion is denied.  The depositions shall go forward.  I'm not

18  sure, you know, if the dates that have been proposed are still

19  workable, but if someone wants to speak up now about those

20  deposition dates to avoid an emergency hearing, I'm willing to

21  hear that.

22          I think what I heard was, well, I don't know what --

23  have you talked about dates at all?  Probably not, Mr. Morris,

24  in light of this hearing today.

25          MR. MORRIS:  We have not, Your Honor.  But I do think

**WWW.LIBERTYTRANSCRIPTS.COM**

56

 1  that Counsel and I can work that out.  I'm not available until

 2  the week of the 26th.  So it won't be early that week but

 3  sometime between let's say the 28th of September and the 7th of

 4  October, I'll be prepared to take these depositions.  And I

 5  would respectfully request, and we can work with Ms. Ellison to

 6  try to find a trial date sometime the last week of October,

 7  first week of November so we can get this finished.

 8           THE COURT:  Okay.  Did I dream up that there was a

 9  trial set already in November?

10           MR. MORRIS:  You know what?

11           You know what, let's just keep that date, Your Honor.

12  Let's just keep that date.

13           THE COURT:  All right.  Traci, are you still on the

14  line?  Can you confirm my memory?  I thought we had a two-day

15  trial set aside for this in November.

16           MS. ELLISON:  Is this on the merits of HCRE's claims,

17  Judge Jernigan?  I have a note holding November 1 and 2.

18           THE COURT:  Okay.

19           MR. MORRIS:  Yeah.

20           THE COURT:  So we'll go ahead and mark that down.

21           Now the last -- so you'll work on an a mutually

22  agreeable date for these three remaining depositions sometime,

23  you know, late September, early October.  And I trust you will

24  --

25           MR. MORRIS:  Yeah.  I would respectfully request that

**WWW.LIBERTYTRANSCRIPTS.COM**

57

1   Counsel just propose dates for the depositions.  I'll wait to

2   hear from him.  But I think -- I'm representing to the Court

3   that any time between September 28th and let's just give it two

4   full weeks, October 12th.  That's plenty of time in advance of

5   the trial.

6          THE COURT:  All right.  Mr. Gameros, anything you

7   want to add on that?

8          MR. GAMEROS:  No, Your Honor.  I'm sure we can work

9   with Mr. Morris to get those scheduled.

10          THE COURT:  All right.  And here's actually the last

11   thing I wanted to say.

12          You know, I had thought about, you know, waiting 24

13   hours to give you a ruling on this motion to withdraw the proof

14   of claim and directing you all to kind of talk and see if maybe

15   you could work out language, you know, without the pressure of

16   the Court hovering over you that could make both of your

17   clients satisfied.

18          I still encourage you to do that, but I'm going to

19   pick on our U.S. Trustee.  I see she's observing today, and I'm

20   not going to ask you to say anything, Ms. Lambert.  But if you

21   all do agree, if you all in the next, you know, 24 hours come

22   to some sort of agreement, I don't mean to be alarming, but I

23   want it run by the U.S. Trustee because, you know, I've heard

24   some things that have troubled me about the, you know, lack of

25   good faith with regard to the proof of claim and, you know,

58

1  alleged gamesmanship.

2          And, you know, I talked earlier about this goes to

3  the integrity of the system, you know, filing a proof of claim

4  under penalty of perjury.  Anyway, I'm feeling a little bit

5  uncomfortable about signing off on an agreed order where there

6  may be quid pro quos that went back and forth in connection

7  with withdrawing a proof of claim.  I mean at some point --

8  well, that's why we have scrutiny of these things under Rule

9  3006, right?

10          Again, there are integrity issues.  And so I just --

11  you know, if you were to work out language, I want you to run

12  it by Ms. Lambert and I want to hear that either she was okay

13  with it or she wasn't okay with it or maybe she declines to

14  comment.  You know, I'm not going to tell her how to do her

15  job, but I feel like that needs to happen, okay?

16          It's just something uncomfortable going on in my

17  brain about, you know, again a proof of claim being on file

18  two, almost two and a half years and then, you know, okay,

19  never mind, okay, I agree to never mind as long as you agree to

20  XYZ.

21          And I have no idea what's in the Seery transcript.  I

22  don't have it before me.  But, you know, I don't even know what

23  that's all about.  I don't even know if I care what that's all

24  about.  I just know if there are quid pro quos I feel like, you

25  know, maybe I need to have the U.S. Trustee, you know, not per

59

1  se signing off on any agreed order but at least kind of looking

2  at it and telling me either U.S. Trustee's fine with it, U.S.

3  Trustee is not fine with it, or U.S. Trustee declines to

4  comment.  Just I know that I've gone through the drill, okay?

5       So just letting you know I am still, you know, all

6  open to an agreed resolution of this, okay.  But we're going

7  forward as if you can't get there, okay?

8       All right.  I'll look for -- what am I going to look

9  for?  I'm going to look for an order denying the motion to

10  withdraw proof of claim.  I'm going to look for an order

11  granting the -- well, an order resolving the objection to

12  motion to quash and cross-motion for subpoenas saying that

13  these three witnesses are going to appear at a mutually

14  agreeable time either late September or early October.

15       All right.  We're adjourned.

16       THE CLERK:  All rise.

17       MR. MORRIS:  Thank you, Your Honor.

18    (Proceedings concluded at 11:35 a.m.)

19                    * * * * *

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

60

1          **C E R T I F I C A T I O N**

2                I, DIPTI PATEL, court-approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7    /s/ Dipti Patel

8    DIPTI PATEL, CET-997

9

10   LIBERTY TRANSCRIPTS              DATE: September 13, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

# EXHIBIT 36

# MATTERS AWAITING FINAL JUDGMENT*

**Pending Adversary Proceedings:**

- *Marc S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust v. James D. Dondero, et al. (In re Highland Capital Management, L.P.),* **Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.).**

  James Dondero and his controlled entities filed motions to dismiss the Kirschner Adversary on July 11 and July 12, 2022, and the Litigation Trustee filed his response to the motions to dismiss on September 19, 2022.  Mr. Dondero and his controlled entities responses are due November 14, 2022.

- *Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd. (In re Highland Capital Management, L.P.),* **Adv. Proc. No. 21-03067-sgj (Bankr. N.D. Tex.)**

  On April 12, 2021, plaintiffs filed a complaint in the District Court alleging, among other things, that Highland had breached its fiduciary duty to plaintiffs in connection with the HarbourVest settlement.  On September 29, 2021, the District Court referred the matter to this Court, and this Court dismissed the action on March 11, 2022.  Plaintiffs appealed to the District Court, which remanded to this Court.  Highland filed its renewed motion to dismiss on October 14, 2022.

**Pending Bankruptcy Court Matters, Case No. 19-34054-sgj:**

- *Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust* **[Docket No. 3382], as amended and supplemented by** *Supplemental and Amended Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust* **[Docket No. 3533]**

  On June 20, 2022, Dugaboy filed a motion seeking a valuation of Highland's and supplemented that motion on September 21, 2022.  Hunter Mountain Investment Trust filed a response effectively joining Dugaboy's motion on August 24, 2022 [Docket No. 3467].  Highland objected on August 24, 2022 [Docket No. 3465].  Responses to Highland's objections are due November 1, 2022, and Highland may respond on or before November 8, 2022.  A status conference is scheduled for November 15, 2022.

- *Motion to Conform Plan* **[Docket No. 3503]**

  On September 9, 2022, Highland filed a motion seeking to conform the Plan to the Fifth Circuit's opinion affirming, in material part, the Confirmation Order.  The Funds and the Advisors objected on September 27, 2022, and September 30, 2022, respectfully.  A hearing was held on October 26, 2022 at which this Court orally approved Highland's motion, denied the Funds and Advisors' objections, and stated that it would issue a memorandum opinion.

---

\* Chart includes pending matters as of October 31, 2022, exclusive of the Renewed Motion.  All capitalized terms used but not defined in this chart have the meanings given to them in *Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support.*

- ***Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [Docket No. 906] (hearing scheduled for November 1, 2022)**

  On April 8, 2020, HCRE filed its proof of claim (Claim No. 146), and Highland objected. On August 12, 2022, HCRE filed a motion to withdraw its proof of claim, which was denied. A hearing is scheduled on HCRE's proof of claim for November 1 and 2, 2022.

**Pending Appeals Before the District Court:**

- ***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (In re Highland Capital Management, L.P.)*, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.), consolidated with Docket No. 1826.**

  On September 14, 2022, this Court found that the Advisors breached their payment obligations to Highland under certain shared service and payroll reimbursement agreements [Adv. Docket No. 126]. The Advisors appealed to the District Court. A briefing schedule has not yet been set.

- ***Consolidated Notes Litigation*, Adv. Proc. Nos. 21-03003-sgj, 21-03004-sgj, 21-03005-sgj, 21-03006-sgj, 21-03007-sgj (Bankr. N.D. Tex.).**

  James Dondero and certain of his controlled entities issued promissory notes in favor of Highland prior to the bankruptcy case and subsequently defaulted on their payment obligations. Highland filed multiple adversary proceedings to collect on the notes and moved for summary judgment. On April 20, 2022, this Court held a trial, and on July 19, 2022, issued its report and recommendation to the District Court recommending summary judgment be granted. Mr. Dondero and his controlled entities have objected to the reports and recommendation, and the matter is currently pending before the District Court.

- ***The Charitable DAF Fund, LP v. Highland Capital Management, L.P. (In re Highland Capital Management, L.P.)*, Adv. Proc. No. 22-03052-sgj (Bankr. N.D. Tex.)**

  Plaintiff filed its original complaint on July 22, 2021, in the District Court alleging that Highland breached its fiduciary duties to the DAF as an investor in Highland Multi-Strategy Credit Fund, L.P. On May 19, 2022, the District Court referred the matter to this Court for adjudication, and Highland filed its amended motion to dismiss on May 27, 2022, alleging that the DAF's claims should be dismissed for failure to comply with the administrative expense claim bar date. On September 30, 2022, this Court granted Highland's motion to dismiss, and the DAF appealed to the District Court. A briefing schedule has not been set.

- ***Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* [Docket No. 2242]**

  DAF and CLOH filed a motion seeking modification of this Court's order appointing Mr. Seery as Highland's chief executive officer and chief restructuring officer, which was denied on June 25, 2021 [Docket No. 2506]. DAF and CLOH appealed to the District Court and moved to stay the appeal pending resolution of the appeal of the Confirmation Order. The District Court granted the motion to stay. On

September 26, 2022, after the Fifth Circuit affirmed the Confirmation Order in material part, Highland filed a motion in the District Court for summary affirmance of this Court's order.  The matter has been fully briefed and is under advisement.

**Pending Appeals to the Fifth Circuit:**

- ***Debtor's Motion for Entry of an Order (i) Authorizing the (a) Creation of an Indemnity Subtrust and (b) entry into an Indemnity Trust Agreement and (ii) Granting Related Relief* [Docket No. 2491]**

  Highland filed a motion seeking authority to create an indemnity subtrust, which this Court granted over Mr. Dondero, the Advisors, and Dugaboy's objections [Docket No. 2599].  Mr. Dondero, the Advisors, and Dugaboy appealed to the District Court, which affirmed this Court's order.  On February 24, 2022, the Dondero entities appealed to the Fifth Circuit.  Briefing is complete and oral argument is tentatively scheduled for the week of December 4, 2022.

- ***Fifth and Final Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones, LLP* [Docket No. 2906]**

  NexPoint objected to the fees incurred by Highland's various professionals during the bankruptcy case [Docket No. 2977].  This Court denied NexPoint's objection on November 22, 2021 [Docket No. 3047].  NexPoint appealed to the District Court which denied its appeal as moot on May 9, 2022.  NexPoint appealed to the Fifth Circuit on June 7, 2022.  Highland's responsive brief is due on November 18, 2022.

- ***Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P.)*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)**

  On June 7, 2021, this Court found Mr. Dondero in contempt for violating this Court's temporary restraining order [Adv. Docket No. 190].  Mr. Dondero appealed to the District Court which upheld this Court's order on August 17, 2022.  Mr. Dondero has appealed to the Fifth Circuit.  His opening brief is due December 19, 2022.

- ***Motion to Compel Compliance with Bankruptcy Rule 2015.3* [Docket No. 2256] (appeal denied by District Court, appealed to Fifth Circuit)**

  Dugaboy and Get Good filed a motion seeking to compel Highland to file certain reports under Rule 2015.3 [Docket No. 2256].  After a hearing, this Court denied the motion on September 7, 2021 [Docket No. 2812].  Dugaboy and Get Good appealed to the District Court, which dismissed their appeal as moot on August 8, 2021.  Dugaboy and Get Good appealed to the Fifth Circuit on August 24, 2022.  The Fifth Circuit has not yet set a briefing schedule.

- ***Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625]**

  HarbourVest filed claims against Highland in excess of $300 million. HarbourVest and Highland executed a settlement agreement which was approved by this Court over the objection of Mr. Dondero, Dugaboy, and Get Good [Docket No. 1788]. CLOH also objected but subsequently withdrew its objection. Dugaboy and Get Good appealed to the District Court. The District Court affirmed this Court's ruling on September 26, 2022. Dugaboy and Get Good appealed to the Fifth Circuit on October 4, 2022. The Fifth Circuit has not yet set a briefing schedule.

- ***Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199]**

  Highland and UBS entered into a settlement agreement which was approved by this Court over the objection of Mr. Dondero and Dugaboy [Docket No. 2389]. Dugaboy and Mr. Dondero appealed to the District Court, which affirmed this Court's order on September 22, 2022. Dugaboy and Mr. Dondero appealed to the Fifth Circuit on October 4, 2022. The Fifth Circuit has not yet set a briefing schedule.

- ***Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247]**

  On August 4, 2021, this Court found Mr. Dondero, CLOH, the DAF, and others in contempt for violating this Court's order appointing Mr. Seery as Chief Executive Officer and Chief Restructuring Officer. The contemptors appealed to the District Court, which affirmed this Court's order on September 28, 2022. On October 28, 2022, the contemptors appealed to the Fifth Circuit. The Fifth Circuit has not yet set a briefing schedule.

**Potential Appeals to the U.S. Supreme Court:**

- ***Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943]**

  On September 7, 2022, the Fifth Circuit entered its order affirming this Court's Confirmation Order in material part. Certain of the Dondero parties requested an extension of time to file a petition for a writ of certiorari in the U.S. Supreme Court, which was granted and the deadline extended to January 5, 2023.